WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | |
| **COMPANY, INC.,** *et al.*, | : | **Case No. 15-23007 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Joint Administration Pending)** |
| | : | |

-----------------------------------------------------------------x

## DECLARATION OF CHRISTOPHER W. MCGARRY
## PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY
## RULES FOR THE SOUTHERN DISTRICT OF NEW YORK

I, Christopher W. McGarry, make this declaration under 28 U.S.C. § 1746:

1.     I am the Chief Restructuring Officer ("**CRO**") of The Great Atlantic &

Pacific Tea Company, Inc. ("**Great Atlantic**") and its affiliated debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or "**A&P**").  I

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

was appointed as the CRO on July 19, 2015.  As CRO, I report and provide strategic business

advice to A&P's Board of Directors and Chief Executive Officer in connection with the Debtors'

chapter 11 cases, and am responsible for carrying out the Debtors' chapter 11 strategy and

objectives described herein.

2.      On the date hereof (the "**Commencement Date**"), the Debtors each

commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with the

Debtors' day-to-day operations, business and financial affairs, books and records, and the

circumstances leading to the commencement of these chapter 11 cases (the "**Chapter 11**

**Cases**").  I have been an A&P executive since 2006.  I was a member of A&P's management

team during its prior chapter 11 case filed on December 12, 2010 (the "**2010 Cases**").

3.      Except as otherwise indicated herein, the facts set forth in this Declaration

are based upon my personal knowledge, my review of relevant documents, information provided

to me by employees working under my supervision, or my opinion based upon my experience,

knowledge, and information concerning the Debtors' operations and the supermarket industry.  If

called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      This Declaration is submitted pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") for the purpose of

apprising the Court and parties in interest of the circumstances that compelled the

commencement of these Chapter 11 Cases and in support of the motions and applications that the

Debtors have filed with the Court, including the "first-day motions" (the "**First-Day**

**Pleadings**").  I am authorized to submit this Declaration on behalf of the Debtors.

5.     Section I provides an overview of the Debtors and these Chapter 11 Cases. Section II describes the Sale Strategy (defined below).  Section III describes the circumstances that compelled the commencement of the Chapter 11 Cases.  Section IV describes the Debtors' businesses.  Section V describes the Debtors' capital structure.  Section VI provides a summary of the First Day Pleadings and factual bases for the relief requested therein.  Section VII identifies the attached schedules of information required by Local Rule 1007-2.

# I.
## Overview[2]

6.     The Debtors are one of the nation's oldest leading supermarket and food retailers, operating approximately 300 supermarkets, beer, wine, and liquor stores, combination food and drug stores, and limited assortment food stores across six Northeastern states.  The Debtors' primary retail operations consist of supermarkets operated under a variety of well-known trade names, or "banners," including A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, The Food Emporium, Best Cellars, and A&P Liquors.  The Debtors currently employ approximately 28,500 employees, over 90% of whom are members of one of twelve local unions whose members are employed by the Debtors under the authority of 35 separate collective bargaining agreements (collectively, the "**CBAs**").  As of February 28, 2015, the Debtors reported total assets of approximately $1.6 billion and total liabilities of approximately $2.3 billion.

7.     The Debtors have commenced these Chapter 11 Cases to implement a comprehensive asset sales strategy (the "**Sale Strategy**").  The Sale Strategy is the foundation of these Chapter 11 Cases and is critical to maximizing recoveries for all creditors and preserving thousands of jobs.  Following an unsuccessful merger and acquisition process in 2014, the

---

[2] Capitalized terms used but not defined in this overview section shall have the meanings assigned to them below.

Debtors have refinanced their credit facilities and undertaken a strategic review process to find the best path forward to save jobs and maximize value.  Since March 2015, the Debtors' board and management, with the assistance of the Debtors' advisors, have been actively engaged in an extensive strategic review process to identify various alternatives for the Debtors' businesses, including exploring the sale of assets.  In that regard, Evercore Group LLC, the Debtors' investment bankers, actively marketed the Debtors' stores for going concern sales in an organized prepetition bidding process, contacting over 30 potential buyers, including strategic and financial buyers (the "**Tier I Sale Process**").

8.      The Debtors received 8 bids as part of the Tier I Sale Process and, after extensive negotiations with the bidders and deliberations with their advisors, have entered into three stalking horse asset purchase agreements (collectively, the "**APAs**").  The stalking horse bids provide for the going concern sale of 120 stores, which employ 12,500 employees, for an aggregate purchase price of almost $600 million (the "**Stalking Horse Bids**").  The Stalking Horse Bids are each subject to higher or better offers in accordance with the global bidding procedures described below.  The Debtors are continuing to engage with other interested parties as part of the sale process and expect to enter into many transactions for the sale of additional stores on a going concern basis during these Chapter 11 Cases.

9.      Although the Tier I Sale Process has so far been successful, the Debtors' strategic review process and the sale process have also confirmed to the Debtors' that their businesses are not sustainable over the long term under the current cost structure.  No bidder has been willing to assume the Debtors' liabilities—in particular, the Debtors' substantial labor and pension obligations—in connection with a purchase of the Debtors' stores.  To the contrary, the stalking horse bidders and all other bidders in the Tier I Sale Process conditioned their purchase

of the Debtors' assets free and clear of all liabilities, such as liabilities arising under or related to the Debtors' collective bargaining agreements, including the multi-employer contribution and withdrawal liabilities relating thereto. That being said, the Stalking Horse Bids all contemplate negotiating with the Debtors' unions to reach agreements for employment with affected employees. The Debtors are hopeful that consensual agreements may be reached with affected unions.

10.     Given these and other considerations, the Debtors have concluded in the exercise of their business judgment and as fiduciaries for all of the Debtors' stakeholders that the best and only viable path to maximize the value of their business and preserve thousands of jobs is a strategic chapter 11 filing to facilitate sales free and clear of liabilities. It is the Debtors' judgment that if the Debtors cannot achieve free and clear sales within the required time periods prescribed by the APAs and the debtor-in-possession financing agreement described below, all of the value that has been created and preserved through the Debtors' prepetition strategic review and marketing process will be destroyed, and the Debtors will be left with no choice but to liquidate their business in a fire sale and piecemeal fashion.

11.     The Sale Strategy has been developed with great care, thought and planning. Unlike other retail businesses whose demise is predetermined even before a  chapter 11 filing, the Debtors have developed the Sale Strategy to drive value and offer the best opportunity to preserve as many jobs and accomplish as many going concern sales of their stores as possible. To that end, the Debtors have secured a fully-committed Junior Lien DIP Facility (the "**Junior Lien DIP Facility**") in the amount of $100 million from Fortress Credit Group ("**Fortress**").

12.     The Junior Lien DIP Facility is the result of the Debtors' robust prepetition marketing efforts and negotiations with various potential lenders, and contains competitive terms that are favorable to the company and its creditors.  Accordingly, subject to Court approval, the Debtors expect to soon have approximately $50 million in bank cash available on their balance sheet and approximately $50 million in additional borrowing capacity upon entry of an interim order approving the Junior Lien DIP Facility, and an additional $50 million upon entry of a final order approving the Junior Lien DIP Facility (such interim and final orders, the "**DIP Orders**").  The Junior Lien DIP Facility, together with the consensual use of cash collateral, should provide the Debtors with sufficient liquidity to implement the Sale Strategy in an orderly and value-maximizing manner.

13.     While the Junior Lien DIP Facility provides the liquidity needed to carry out the Sale Strategy, it cannot be emphasized enough that time is of the essence.  Given the significant costs associated with continued operations that are described more fully below, the Junior Lien DIP Facility imposes strict milestones (the "**DIP Milestones**") on the Debtors to accomplish various objectives in a prompt and timely manner.  In particular:

- within 10 days of the Commencement Date, the Debtors must file a motion to reject the 25 stores that are cash flow negative and have no real estate value (the "**Initial Closing Stores**");

- within 20 days of the Commencement Date, the Debtors must file a motion (the "**Sale Motion**") seeking entry of an order (the "**Bidding Procedures Order**") approving bidding and auction procedures in connection with the sale of the Debtors stores (with a minimum value of $275 million (excluding inventory and scripts) (the "**363 Sales**");

- within 45 days of the Commencement Date, the Court must have entered the Bidding Procedures Order;

- within 60 days of the Commencement Date, the Debtors must vacate premises of each of the Initial Closing Stores;

- On or before October 15, 2015, the Court shall have entered orders approving the 363 Sales (with a minimum value of $275 million (excluding inventory and scripts) (the "**Sale Orders**"); and

- On or before October 30, 2015, the Debtors shall have consummated the 363 Sales, pursuant to a purchase agreement entered into among the Debtors and the winning bidder(s) at the auctions.

14.    In addition to the DIP Milestones set forth above, the DIP financing is conditioned on the modification of the Debtors' CBAs.  Specifically, the Junior Lien DIP Facility requires that, within 30 days of the Commencement Date, the Debtors must reach agreements with their collective bargaining units, including the collective bargaining units applicable to the Initial Closing Stores, to implement store closing programs and other accommodations needed to facilitate the Sale Strategy.  To the extent the Debtors and the unions do not reach agreement on these modifications within the requisite time frame, the Junior Lien DIP Facility requires the Debtors to file a motion for temporary relief from the Court pursuant to section 1113(e) of the Bankruptcy Code and to obtain entry of an order authorizing such relief within 45 days of the Commencement Date.

15.    Additionally, on or prior to the date of the entry of any Sale Order, the Debtors shall either (i) have reached agreements in good faith with representatives of their collective bargaining units for relief from CBAs applicable to personnel of the stores subject to such sale, or (ii) shall have obtained entry of an order by the Court authorizing relief pursuant to section 1113(c) of the Bankruptcy Code.

16.    The Debtors are acutely aware that their businesses have been built not only on the quality of the products they provide to consumers, but also on the service and shopping experience delivered to their customer base, none of which would be possible without the dedication of their employees.  The Debtors have proudly employed thousands of individuals in communities across the Northeast and the United States for more than 150 years and do not

take lightly the fact that these employees and their families will bear a significant burden of these Chapter 11 Cases. Indeed, since the 2010 Cases, the Debtors have sought, and they will continue to seek, solutions where possible to mitigate the burden on the employees and preserve as many jobs as possible. The Debtors are committed to engaging in direct and comprehensive negotiations with their unions and hope to achieve a consensual outcome with respect to the CBAs.

17.     It is imperative that the parties cooperate with one another and that negotiations be conducted as expeditiously as possible. While the Debtors are committed to pursuing consensual resolutions with their unions where possible, if consensual resolutions cannot be quickly achieved within the required deadlines imposed by the DIP Milestones and the APAs, the Debtors will be required to commence proceedings under sections 1113 and 1114 of the Bankruptcy Code to seek authority to implement both temporary and permanent modifications to the CBAs on a unilateral basis. The Debtors believe that all constituents, including the employees, will benefit from this chapter 11 proceeding over a fire sale liquidation and, as a result, must maintain the timeline presented to achieve the necessary relief and maximize value for all stakeholders.

## II.
## The Sale Strategy

18.     Generally, the Sale Strategy consists of: (i) the sale of core stores on a going concern basis through an auction and sale process pursuant to section 363 of the Bankruptcy Code led by the Stalking Horse Bids (subject to higher or better offers), (ii) the going concern sale or rationalization of other stores and non-core assets on an ad hoc basis, and (iii) the orderly wind-down of certain stores that a potential strategic buyer has not expressed

interest in acquiring, including the immediate closure of approximately 25 stores that have negative profitability and negative lease value.

19.     The Sale Strategy and the procedures developed by the Debtors, in consultation with their advisors and primary stakeholders, are intended to provide the Debtors flexibility to allow for the potential sale of additional stores on a going concern basis for the highest and best value available.  As noted, the Sale Strategy must be implemented quickly and efficiently to maximize value.

20.     To implement the Sale Strategy in an optimal manner, the Debtors will file three motions designed to permit a flexible and expeditious sale process:

- Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363 and 365 and Fed. R. Bankr. P. 2002, 6004 and 6006 for Approval of: (I)(A) Global Bidding Procedures, (B) Bid Protections, (C) Form and Manner of Notice of Sale Transactions and Sale Hearing, and (D) Assumption and Assignment Procedures; and (II)(A) Purchase Agreements, (B) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, and (C) Assumption and Assignment of Certain Executory Contracts and Leases (the "**Tier I Global Sales Motion**");

- Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363 and 365 and Fed. R. Bankr. P. 2002, 6004 and 6006 for Approval of Global Sale and Lease Rationalization Procedures (the "**Tier II Procedures Motion**");

- Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365 and 554 for Approval of (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer,  or Abandonment of De Minimis Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry into a Liquidation Consulting Agreement  (the "**Store Closings Motion**").

21.     Collectively, the motions are designed to achieve maximum interest for the Debtors' stores and other assets and to drive value for the Debtors' stakeholders.  Without the speed and flexibility afforded by the relief requested in the foregoing motions, it will be extremely difficult, if not impossible, for the Debtors to successfully complete as many going

concern sales as possible that will maximize and preserve value for the benefit of all stakeholders. Each one of these motions is described below. A summary of the timeline contemplated by the motions is attached as <u>Exhibit A</u> hereto.

### A.    Tier I Global Sales Motion

22.    Pursuant to the Tier I Global Sales Motion, the Debtors seek approval of uniform bidding and auction procedures (the "**Tier I Global Bidding Procedures**") for *all* of their stores and related assets, including, but not limited to, the stores that are the subject of each of the Stalking Horse Bids (the "**Tier I Process**"). Under the Tier I Global Bidding Procedures, interested parties will have the opportunity to bid for any of the Debtors' stores, either individually or on a package basis, whether or not a particular store or package of stores is included in a Stalking Horse Bid. In order to top a Stalking Horse Bid, however, the Debtors must have received bids that individually or in combination with other bids that include all of the stores included in the Stalking Horse Bid are higher or better than such Stalking Horse Bid.

23.    In addition, during their negotiations with the Stalking Horse Purchasers, the Debtors insisted that certain of the Debtors' stores have significant standalone value and accordingly did not agree to stalking horse protections in the event of a higher or better bid or bids for such stores. For example, the A&P store located in Mount Kisco, New York, is the Debtors' best performing store with annual four-wall EBITDA of $9.2 million in fiscal year 2014. Based on their negotiations and discussions with interested bidders, the Debtors are confident that there is significant interest in the Mount Kisco store and that it should generate significantly greater value if auctioned on a standalone basis. Accordingly, although the Mount Kisco store is part of a Stalking Horse Bid, parties in interest may submit a bid, and the Debtors may conduct a separate auction, for just the Mount Kisco store without triggering a break-up fee or expense reimbursement.

24.    Interested parties are requested to submit non-binding indications of interest for any stores they may have an interest in purchasing by August 24, 2015, with final bids to be submitted by September 11, 2015, all in accordance with the Tier I Global Bidding Procedures. This will provide the Debtors the best available and most complete information on the scope of interest for all of their stores in a timely and orderly fashion so the Debtors, in consultation with their advisors and key stakeholders, can make informed decisions on the sale of their stores. Under the Tier I Global Bidding Procedures, the Debtors will have the ability and time to evaluate each of the bids, identify any overlap and conduct auctions as necessary to maximize value for each of their stores and related assets.

25.    Given the current circumstances and the need for the Debtors to move as quickly as possible, the Tier I Global Bidding Procedures set forth an expeditious bidding and sale process with the following key proposed dates:

- **August 10, 2015**:  Hearing on motion to Approve Global Sale Procedures;

- **August 24, 2015**:    Global indication of interest date by which all interested parties should contact the Debtors to indicate their interest in any of the Debtors' stores.

- **September 11, 2015**:  Global Bid Deadline for any store or packages of stores, whether or not such stores are included in a Stalking Horse Bid;

- **September 18, 2015:** Selection and publication of baseline bids

- **September 24 – 25, 2015**: Auction(s);

- **October 1, 2015**:  Sale Hearing.[3]

---

[3] The foregoing is only a summary of certain provisions and dates in the Global Bidding Procedures.  Bidders potentially interested in any Tier I Stores should refer to the Global Bidding Procedures for a complete understanding of the Tier I Process and deadlines applicable thereto.

### B.   Tier II Procedures Motion

26.    The Debtors have an extremely valuable real estate portfolio. The Debtors have engaged Hilco to provide real estate consulting services and to actively monetize their valuable real estate portfolio. Specifically, Hilco has been retained to solicit interest in the approximately 150 stores that are not currently the subject of a Stalking Horse Bid, plus any stores included in the Tier 1 Process that are not sold during such process (collectively, the "**Tier II Stores**").

27.    To effectively market the Tier II Stores, negotiate and secure bids and conduct auctions, if necessary, to elicit the highest and best offers within the compressed timeline imposed by the DIP Milestones and Budget, all in order to maximize the value of the Debtors' remaining real estate portfolio, the Debtors require flexibility to move as expeditiously as possible. Accordingly, the Tier II Procedures Motion seeks authority for advance approval of omnibus procedures that will permit the Debtors to solicit proposals, negotiate transactions, provide break-up fee protections (if necessary and appropriate), hold auctions on an as-needed basis and consummate the highest and best offer, all while protecting the due process rights of all parties in interest and giving them and the Court a full and fair opportunity to review and consider the proposed transaction.[4]

28.    In light of the sheer volume of Tier II Stores and the compressed timeline under which the Debtors must act to maximize value, the Debtors believe that the Tier II Store procedures are appropriate and provide the much-needed flexibility to maximize the value of the Debtors' real estate portfolio. Interested parties will be given adequate notice of the proposed

---

[4] The foregoing is only a summary of certain provisions and dates in the Tier II Procedures. Bidders potentially interested in any Tier II Stores should refer to the Tier II Procedures in its entirety for a complete understanding of the Tier II Process and deadlines applicable thereto.

transactions without incurring the administrative costs and delay associated with separately seeking Court approval for every single such transaction.

### C.    Store Closings Motion

29.    By the Store Closings Motion, the Debtors seek to implement global procedures to effectuate the closing of underperforming stores that are not or will not be sold during the Tier I Process or the Tier II Process (the "**Tier III Stores**").  The Tier III Stores are generally characterized as having negative "four-wall" EBITDA and leasehold value locations. The Debtors' designed the Store Closing Procedures to provide them with an efficient mechanism to effectively address the three main requirements for closing any of their stores. The proposed Store Closing Procedures will provide the Debtors with the ability to liquidate inventory and the furniture, fixtures and equipment, and to sell or transfer prescription drug products and customer prescriptions (the "**Store Closing Assets**") that are associated with the Tier III Stores.  The Store Closing Procedures will also provide the Debtors the ability to reject burdensome leases and sell, transfer or abandon certain surplus, obsolete, non-core, or burdensome assets without the need for a Court motion and hearing for each such action. Essentially, pursuant to the Store Closing Motion, the Debtors will be able to do everything needed to liquidate their assets and vacate a store, and surrender the lease.

30.    The relief requested in the Store Closing Motion is integral to maximizing the value of the Debtors' estates and will permit the orderly closing of the Tier III Stores.  Any delay in implementing a store closing would be costly to the Debtors as they may be obligated to pay expenses, including rent, as an administrative expense.

31.    Prior to the Commencement Date, the Debtors identified 25 Tier III Stores (referred to as the Initial Closing Stores) (i) that have a negative 4-wall EBITDA; (ii) for which no bids to acquire the store have been received after marketing; and (iii) that do not have a

positive market value.  The Initial Closing Stores contribute no value to the Debtors' balance sheet and will cost the Debtors approximately $20 million dollars in expense (inclusive of rent and labor costs) for the remainder of Fiscal Year 2015 alone.  They need to be closed and vacated immediately to minimize further losses and costs associated therewith.  In addition to the significant savings obtained in rejecting the leases underlying the Initial Closing Stores, however, the Debtors estimate that they will be able to recover approximately $48 million in gross sale proceeds from liquidating the Store Closing Assets located at the Initial Closing Stores.

### D.    Modifying and Rejecting the CBAs

32.    As noted above, the successful implementation of the Sale Strategy requires relief from CBA provisions that would preclude an orderly sale of the Debtors' operations.  Indeed, provisions such as bumping clauses and work guarantees cut at the very heart of the Debtors' Sale Strategy by threatening the sale process and also by impeding their ability to close stores when necessary.  If the CBAs are not modified, either consensually or by Court order in a timely fashion, the consequences could be catastrophic.

33.    The Debtors, or, where applicable, the Stalking Horse Bidders or other purchasers for particular stores, will present proposals to the union representatives for each CBA. If the parties cannot reach agreement on the necessary temporary relief on an expeditious basis that aligns with DIP Milestones, the Debtors are required to file a motion pursuant to section 1113(e) of the Bankruptcy Code seeking immediate temporary relief from certain of their CBA obligations.  The Debtors will make every effort to reach an agreement with respect to a consensual rejection of each of their CBAs.

**III.**
**The Need for Chapter 11 Relief and the Events**
**Compelling the Commencement of These Chapter 11 Cases**

34.     This is the Debtors' second bankruptcy in just five years.  A&P previously

filed the 2010 Cases seeking to achieve an operational and financial restructuring.  The 2010

Cases were difficult and challenging.  Unfortunately, despite best efforts and the infusion of

more than $500 million in new capital in the 2010 Cases, A&P did not achieve nearly as much as

was needed to turn around its business and sustain profitability.  For example, during the 2010

Cases, A&P decided against closing approximately 50-60 underperforming stores in their

supermarket portfolio in favor of preserving the jobs in those stores.  Instead, A&P pursued a

financial restructuring and negotiated a reduction in labor and vendor costs to attempt to return

these stores to profitability.  Those efforts have failed.  Similarly, A&P did not seek to address its

multi-employer pension and certain other significant legacy obligations.   These obligations have

been a drain on the Company for the entire post-emergence period.  From February 2014 through

February 2015, A&P lost more than $300 million.

35.     In addition to their weak performance, the Debtors' businesses remain

plagued by other limitations that have prevented them from operating in an efficient and

profitable manner.   Among other things, most of the Debtors' CBAs contain "bumping"

provisions that require A&P to conduct layoffs by seniority, *i.e.*, by terminating junior union

members before more senior members.  Bumping provisions also have an inter-store component:

upon the closing of a store, terminated union employees are permitted to take the job of a more

junior employee at another store (resulting in the most junior employee at that store losing his or

her job).  As a result, the closing of one store results in increased salaries—the same high salaries

that may have in part precipitated the store closing—being transferred to another (possibly

profitable) store.  In fact, the Debtors have continued to operate certain stores that regularly

operate at a loss because continuing to operate such stores at a loss is less costly to A&P than the bumping costs (combined with other "legacy" costs) that would be triggered by closing such stores.

36.     The Debtors' deteriorating financial condition has also been compounded by the fact that, since emerging from the 2010 Cases, their unsustainable cost structure has prevented them from investing sufficiently in their businesses at a pivotal time in the competitive grocery industry, when their peers were investing heavily in new stores and existing store remodels, robust pricing initiatives, and were introducing technological advances and other initiatives to customize and improve the consumer experience.  For example, under its plan of reorganization in the 2010 Cases, A&P was projected to invest over $500 million in capital improvements during the ensuing 5-year period.  Since emergence, due to insufficient capital and declining operations, among other things, the Debtors have been able to deploy capex at scarcely more than half that rate.  As a result, many of the Debtors' stores have remained outdated and/or underinvested, making it difficult to attract and retain new customers during a crucial time of rebranding and rebuilding.

37.     In addition to the historical pressures on their liquidity, as news of the Debtors' continued financial challenges recently began to permeate throughout the market, a number of the Debtors' suppliers and vendors began contacting management and demanding changes in payment and credit terms.  Certain of the Debtors' vendors have negotiated reduction in trade terms while others have demanded that the Debtors pay cash in advance as a condition for further deliveries.  Although the Debtors have been working diligently with their advisors to resolve open vendor issues and avoid supply chain interruption, the actions taken by these vendors have further diminished the Debtors' cash position by approximately $24 million in the

weeks prior to the Commencement Date.  Furthermore, on July 14, 2015, C&S Wholesale

Grocers, Inc. ("**C&S**") – the Debtors' primary supplier of approximately 65% of all goods –

issued a notice of default for non-payment of the $17 million deferred payment amount under

that certain Supply, Distribution and Related Services Agreement, dated as of May 29, 2011

between the Debtors and C&S (as amended and modified, the "**C&S Agreement**").

38.     In addition, on July 15, 2015, the ABL Agent (defined below) declared an

event of default under the ABL Credit Agreement (defined below) and issued a notice to the

Debtors accelerating the entire unpaid principal amount of the loans under the ABL Credit

Agreement, all interest accrued and unpaid thereon, and all other "Obligations," including,

without limitation, the "Applicable Prepayment Fee," as each such term is defined in the ABL

Credit Agreement.  Taken together, these challenges are the catalyst for the commencement of

these Chapter 11 Cases.

39.     The Sale Strategy is a proactive approach intended to maximize value for

all stakeholders and to preserve as many jobs as possible.  With cash burn rates averaging $14.5

million during the first four periods of Fiscal Year 2015, the Debtors believed it was not only

prudent but necessary to commence these Chapter 11 Cases as the only viable alternative to

avoid a fire sale liquidation of the company.  The Debtors have explored all possible alternatives

and pursued numerous strategies to "right the ship."  The last three years have demonstrated,

however, that the Sale Strategy is the only viable path forward.

### A.     Post-Emergence Stabilization Efforts

40.     Upon emergence from the 2010 Cases, the Debtors had $93.3 million of

cash on their balance sheet and were prepared to invest in the growth of their business.  In an

effort to distance their businesses from the specter of bankruptcy, the Debtors designed and

implemented an integrated marketing campaign intended to show customers that they had

successfully emerged from bankruptcy and were prepared to move forward by offering high-quality, localized products and enhanced services.   The campaign entailed temporary price reductions and promotional advertising of the same through print, television, and radio.   The Debtors' investments did not, however, achieve the desired returns.   Although the Debtors' strategy drew more customers to their stores, such efforts were at the expense of margin income and the Debtors were not building productive, long-lasting relationships with their customers.

*Implementing a New Business Strategy*

41.   The Debtors' thwarted attempts to attract and retain a new customer base compounded with their lingering legacy obligations drove down sales throughout many of their stores and negatively impacted their bottom line.   During the first six months of fiscal year 2012, the Debtors were losing approximately $28 million per month.   In an effort to turnaround their businesses, the Debtors' management team launched a business strategy intended to restore stability and offset increasing post-restructuring liquidity pressures by scaling back the temporary price reductions they had implemented in certain of their stores because such reductions were showing diminishing marginal returns, setting up better controls over cash management, and monetizing a number of their real estate assets.   Over a period of six to ten months, the Debtors generated over $200 million in asset sales, including sale leasebacks, while only relinquishing a handful of stores.   The proceeds from these sales were used largely to pay down debt, while also giving the businesses with a slim liquidity buffer.

42.   The Debtors' business strategy showed signs of success and, by the end of fiscal year 2013, the Debtors had $192 million in cash, EBITDA was in the range of $121 million, and four-wall EBITDA was approximately $228 million.   Still, due to the increasing competitive nature of the industry, during the same year, sales were down by 7.6% when compared to the prior year.

*Exploring Strategic Alternatives*

43.     After stabilizing their businesses during fiscal year 2013, the Debtors' private equity owners began to evaluate potential strategic alternatives and, in Spring 2013, the Debtors retained Credit Suisse AG ("**Credit Suisse**") to review such alternatives, including a possible going concern sale of the company.  Credit Suisse initiated contact with a number of potential buyers and financial sponsors and marketed an equity-based sale of the company. Although the Credit Suisse marketing process garnered meaningful interest in the Debtors' assets, the Debtors did not receive a viable offer for the stock of the company.  The Debtors and their advisors ultimately determined that selling assets in smaller or one-off sales was not the best way to maximize recoveries and protect the interest of stakeholders, including their thousands of employees.  Accordingly, plans to sell the Debtors' businesses were placed in a state of suspension.

*Refinancing Debt*

44.     During the second half of 2014, it started to become evident that the Debtors' unsustainable cost structure would continue drive down their overall financial health and, accordingly, the Debtors explored ways to improve their liquidity position.  To that end, the Debtors arranged for the $300 million senior secured ABL Facility and the $270 million senior secured Term Loan through an amendment and restatement of its existing senior secured term loan.  This refinancing enabled the Debtors to reduce their borrowing costs by 250 basis points and provided them with much-needed operational and financial flexibility.

B.     **Declining Financial Performance**

45.     The Debtors continued to suffer declining revenues.  The Debtors showed a net loss of $305 million in Fiscal Year 2014, compared with a net loss of $68 million in Fiscal Year 2013.  The Debtors generated a negative EBIT of -1.9% of sales or $105 million in Fiscal

Year 2014, compared to a positive EBIT of 1.1% of sales, or $62 million, in Fiscal Year 2013. In 2014, the Debtors experienced a sales decline of approximately 6% when compared with 2013, and the trend continued into 2015.

46.     The Debtors determined that they may continue to lose up to $10 to 12 million in cash per period during 2015.  Additionally, the recent tightening of vendor terms has adversely affected working capital by approximately $24 million.  Those situations would make them unable to maintain sufficient liquidity to meet the minimum cash requirements during 2015.  Based on preliminary projections, the Debtors expected EBITDA of approximately $40 to $50 million in the 52 weeks ending February 29, 2016 ("**Fiscal Year 2015**").  With maintenance capital expenditures (approximately $35 million), higher cash contributions for workers' compensation payments than expense (approximately $17 million), pension contributions greater than the actuarially-calculated book expenses (approximately $17 million), the tightening of accounts payables terms (approximately $24 million) and an eroding sales base, the company projected it would be unable to satisfy the $38 million in interest and principal due during Fiscal Year 2015.

47.     *Crippling Legacy Costs*.  Historically, the Debtors' legacy costs have not been aligned with the operating reality of their businesses.  The Debtor' labor-related costs make up 17.75% of sales while the total merchandising income before any warehousing/transportation and operating expenses is 35.48% of sales.  In addition, the Debtors remain party to a number of leases that they have been unable to assign or terminate since emerging from the 2010 Cases, the cost of which leases outweigh the profits generated by the applicable stores, including leases for the Initial Closing Stores.

48.    _Inflexible Collective Bargaining Agreements_.  In addition to mandating
direct labor costs, the CBAs contain a variety of different work rules that have functioned to
hamstring the Debtors' operations.  For example, as stated above, most of the CBAs contain
"bumping" provisions that require the Debtors to hire employees from a closed store location at a
different nearby store and replace less senior employees at such store.  Because any healthy store
in close proximity to a store that is closing must take on the increased costs of retaining more
senior level employees, "bumping" costs make it difficult and, in some cases, financially
impractical, to close unprofitable stores notwithstanding that such stores continue to strain the
Debtors' balance sheet.  For instance, one of the Debtors' stores in Hackensack, New Jersey
loses approximately $4 million per year but, under the applicable CBA, closing that store would
require the Debtors to "bump" certain senior employees to a number of nearby stores—
increasing labor costs by around $1.5 million per year.  Preliminary analysis conducted by the
Debtors' advisors indicates that closing Initial Closing Stores alone could generate bumping
costs as high as almost $14.8 million—making it more efficient to keep these stores open, absent
relief from such provisions pursuant to the MA& Strategy.

49.    _Competitive Industry_.  The Debtors also continue to face competitive
pressure within the supermarket industry.  For the reasons set forth herein, upon emerging from
the 2010 Cases, the Debtors had a diminished capacity to invest in long-term capital projects.
Thus, as the Debtors' competitors realized new technology platforms, remodeled and enhanced
their stores, and implemented localization strategies geared toward tailoring each store to
specific neighborhood needs, the Debtors have not been able to invest in creating an operational
distinction between their various "banners" and tailor stores to customer needs.

## IV.
## The Debtors' Businesses

### A.    History and Formation

50.    A&P was founded in 1859.  By 1878, The Great Atlantic & Pacific Tea Company (A&P)—originally referred to as The Great American Tea Company—had grown to 70 stores.  A&P introduced the nation's first "supermarket"—a 28,125 square foot store in Braddock, Pennsylvania—in 1936 and, by the 1940s, operated at nearly 16,000 locations.  The Tengelmann Group of West Germany's purchase A&P in 1979 precipitated an expansion effort that led to the acquisition of, among others, a number of Stop & Shops in New Jersey, the Kohl's chain in Wisconsin, and Shopwell.  Due to a series of operational and financial obstacles, including high labor costs and fast-changing trends within the grocery industry, by 2006 A&P had reduced its footprint to just over 400.

51.    In 2008, A&P acquired its largest competitor, Pathmark Stores, Inc., in an effort to continue expanding its brand portfolio and, in doing so, became the largest supermarket chain in the New York City area.  A&P continued to experience significant liquidity pressures on account of burdensome supplier contracts, overwhelming labor costs, and other significant legacy obligations.  Moreover, A&P had become highly leveraged and was unable to operate as a profitable company.  Accordingly, on December 12, 2010, A&P and certain of its subsidiaries and affiliates (the "**2010 Debtors**") commenced the 2010 Cases.

### B.    The 2010 Cases

52.    The 2010 Debtors confirmed a plan of reorganization in March 2012 to implement an organizational and financial restructuring.[5]  A key component of the reorganization plan was the new money investment of debt and equity totaling $493.3 million by

---

[5] An order closing the only remaining 2010 Case was entered on March 31, 2015.

certain holders of A&P's prepetition notes and certain affiliates of The Yucaipa Companies LLC ("**Yucaipa**" and, together with the prepetition noteholders, the "**Investors**").

53.     The 2010 Cases facilitated, among other things, (i) rationalizing the Debtors' store footprint by closing and/or selling a number of unprofitable and non-core store locations; (ii) replacing costly and outdated supply and logistics arrangements with new agreements better-tailored to their revised store footprint; and (iii) negotiating a modest reduction of their unsustainably high labor expenditures.  These initiatives were expected to revitalize A&P's businesses and generate material savings that would then permit the company to thrive within the competitive grocery industry.

**C.     The Debtors' Current Business Operations**

54.     A&P emerged from bankruptcy in March 2012 as a smaller, privately-held company, operating approximately 300 supermarkets, combination food and drug stores, beer, wine and liquor stores, and limited assortment food stores in Connecticut, Delaware, Maryland, New Jersey, New York, and Pennsylvania.  As of the Commencement Date, the Debtors operate under a variety of well-known trade names, or "banners," across the Northeastern United States—including, A&P (87 stores), Food Basics (10 stores), Pathmark (101 stores), Superfresh (22 stores), The Food Emporium (11 stores), and Waldbaums (48 stores).  Nineteen of the Debtors conduct active operations or otherwise hold material assets; the remaining Debtor entities are inactive.

55.     The Debtors maintain their headquarters in Montvale, New Jersey.  As of the Commencement Date, the Debtors employ approximately 28,500 employees, including approximately 20,000 part-time employees.  Approximately 93% of the Debtors' workforce is unionized and the Debtors are party to 35 CBAs with 12 different local union affiliates.  Each CBA was separately negotiated and governs key aspects of the Debtors' relationships with its

unionized employees, including, among other things, work rules, bumping rights, notice requirements, severance pay, work guarantees, seniority, wages and benefits, right to strike, and successorship.

56. The Debtors' operating cash flow depends on their ability to provide customers with high volumes of fresh, high quality, food, beverage, pharmaceutical, and other products without interruption. The Debtors' stores offer a broad variety of branded and private label packaged or "shelf stable" foods, as well as fresh and frozen produce, meat, seafood, dairy, and general merchandise. Many of the Debtors' supermarkets include in-store bakeries, delis, floral departments, and fresh meat and seafood counters, and in-store pharmacies. The Debtors experience a high turnover of inventory due to the perishability of certain merchandise that must be replaced quickly to satisfy customer demand and ensure that the Debtors' shelves do not suddenly go barren.

57. In the 53 weeks ending February 28, 2015 ("**Fiscal Year 2014**"), the Debtors reported approximately $5.5 billion in sales and gross profit of $2.0 billion. The Debtors reported aggregate adjusted EBITDA of $46 million over this same period, but due to their disproportionately high cost structure, the Debtors lost approximately $305 million during Fiscal Year 2014 as a result of depreciation, amortization, interest expense and other operating costs associated with supporting 297 stores with a declining sales base.

**D.      The Debtors' Cost Structure**

58. The Debtors' cost structure includes certain high fixed and variable costs that have historically driven down their profit margins, including employee and labor related costs, workers' compensation liabilities, trade costs, and real estate leases and related costs. The cost of doing business for the Debtors also includes, without limitation, costs pertaining to

freight delivery, purchasing and receiving, warehouse inspection, advertising, software purchase and use, and other related items.

*Employee/Labor Related Costs*

59.   *Labor & Pension*:   The Debtors' CBAs mandate increases in employee benefits that are unsustainable given the Debtors' current financial situation.   Pursuant to the CBAs, the Debtors are required to contribute to (i) a Company-sponsored single employer pension plan, entitled The Great Atlantic & Pacific Tea Company, Inc. Pension Plan (the "**A&P Plan**"), (ii) a single employer pension plan sponsored by a joint board of trustees and administered by a local United Food and Commercial Workers union, entitled the New York-New Jersey Amalgamated Pension Plan for A&P Employees ("**Amalgamated Plan**"), (iii) a Company-sponsored multiple employer pension plan that covers collectively-bargained employees of an unaffiliated entity, entitled the Pathmark Stores, Inc. Pension Plan (the "**Pathmark Plan**"), and (iv) 12 multiemployer pension plans.   The Debtors also participate in 13 different multiemployer health and welfare funds that provide medical, pharmacy, dental, vision, and/or other ancillary benefits to active employees and retirees, as determined by each plan.[6]

60.   Typically, the Debtors contribute to the multiemployer plans according to negotiated algorithms based on amounts per employee per week, amounts for each hour worked, or percentages of compensation.   The expenses for the 12 multiemployer pension plans totaled approximately $31.4 million in Fiscal Year 2014, and are projected to be $33.6 million in Fiscal Year 2015.   The expenses for the 13 multiemployer health and welfare funds totaled approximately $96.3 million in Fiscal Year 2014, and are projected to be $104.3 million in Fiscal Year 2015.   The Debtors contributed an aggregate amount of $14.6 million to their single-

---

[6] The multiemployer plans are defined benefit plans.   A&P also contributes to certain defined contribution multiemployer plans, such as annuity plans, that are not referenced herein.

employer plans in Fiscal Year 2014, and projected annual contributions for Fiscal Year 2015 to the A&P Plan, the Pathmark Plan, and the Amalgamated Plan are estimated at $9.9 million, $0, and $2 million, respectively.

61.     The CBAs also mandate wage increases each year irrespective of sales. The company's average hourly wage increased from $16.41 in Fiscal Year 2013 to $16.65 in Fiscal Year 2014 and to an expected $16.85 in Fiscal Year 2015, an increase of 2.7%. The labor rate (as a percent of sales) increased from 13.46% in Fiscal Year 2013 to 14.07% in Fiscal Year 2014 to an expected 14.78% in Fiscal Year 2015, an increase of 9.8%.

62.     *Workers' Compensation Liabilities*:  Due to the nature of the Debtors' businesses, at any given time, the Debtors have substantial liabilities on account of workers' compensation claims. The Debtors maintain third-party workers' compensation insurance for 28 of their stores (the "**Third-Party Insured Programs**"). The Debtors self-insure for workers' compensation claims for the remainder of their stores (the "**Self-Insured Programs**" and, together with the Third-Party Insured Programs, the "**Workers' Compensation Programs**"). On a per claim basis, the Debtors' maximum exposure is $750,000 under all of their Workers' Compensation Programs, whether they are insured by a third party or self-insured. The Debtors estimate that the pay approximately $840,000 per week on account of workers' compensation claims. To secure payment of the Debtors' obligations under the Workers' Compensation Programs, the Debtors are required to post collateral in the form of letters of credit, surety bonds, or other security in various amounts based upon the size of the Debtors' operations in a particular state and the Debtors' loss experience in that state. As of the Commencement Date, the aggregate amount of outstanding collateral posted by the Debtors in support of their Workers' Compensation Programs is approximately $187 million.

### Other Operating Costs

63.     _Trade_:  The Debtors rely on a broad network of hundreds of vendors to supply their merchandise, including suppliers of fresh dairy, meat and seafood products, and branded and private label food processors.  A majority of vendors conduct business with the Debtors on an invoice-by-invoice basis and are paid on prearranged terms.  As of the Commencement Date, the Debtors estimate that approximately $140 million of trade debt is due and outstanding, the majority of which related to goods and services provided to the Debtors in the 20 days prior to the Commencement Date.  The foregoing amount does not include amounts owed to C&S.

64.     C&S supplies approximately 65% the majority of merchandise sold in the Debtors' stores and is the Debtors' largest unsecured creditor.  As part of their restructuring in the 2010 Cases, the Debtors rejected their then-existing agreement with C&S and replaced it with the C&S Agreement.  The C&S Agreement includes a more favorable and flexible cost structure than the prior agreement and was projected to result in approximately $50 million in annual savings.  Because the Debtors have been unable to meet their projections, the actual cost savings on account of the C&S Agreement have been significantly less than anticipated.  As of the Commencement Date, the Debtors owe C&S approximately $22 million in connection with merchandise delivered prior to the Commencement Date, and approximately $17 million as a Daily Deferred Payment Amount (as defined in the C&S Agreement).

65.     _Real Estate Lease Obligations_:  The Debtors operate primarily in leased facilities and, in the ordinary course of business, the Debtors maintain over 300 real property leases.  The Debtors' lease obligations consist of capital leases, operating leases, and long-term real estate liabilities.  As of the Commencement Date, the Debtors estimate that over 100 of their

property leases have remaining terms of over 20 years.  The Debtors estimate that they incurred approximately $270 million on lease-related expenses in Fiscal Year 2014 and that their aggregate outstanding lease obligations total approximately $1.9 billion.

### E.    The Grocery Industry

66.    The Debtors operate in a highly competitive industry with significant pricing pressures and competitors that have more advanced technology and certain cost advantages.  The grocery retailing industry is characterized by local, regional, and national competitors operating on slim profit margins.  Since emerging from the 2010 Cases, the Debtors have continued to face competitive challenges from mass merchandisers, warehouse clubs, drug stores, dollar stores, and convenience stores.  The Debtors' in-store pharmacy operations also continue to face competition from mail order and internet-based prescription processors, as well as traditional brick-and-mortar pharmacies.  Additionally, in recent years, there has been an explosive growth in demand for natural, organic, and gluten-free goods.  This changing operating environment has been compounded by falling producer and retail food prices, and competitors' increased willingness to engage in price-based competition.  The Debtors' deteriorating financial condition has also cut into the financial flexibility required to invest in their business and, as a result, they have fallen behind with respect to technology and other related areas—placing the Debtors at a competitive disadvantage when compared to their traditional and non-traditional peers.

### V.
### Corporate and Capital Structure

### A.    Corporate Structure

67.    As the Debtors are privately-held companies, none of the Debtors' equity securities have been publicly-traded since emerging from the 2010 Cases.  Montvale is the direct

corporate parent of Great Atlantic and A&P Live Better, LLC.  Great Atlantic is the direct or indirect corporate parent of each of the remaining Debtors.  Montvale's principal stockholder is Mount Kellett Capital Partners LP ("**Mt. Kellett**") directly and/or through its subsidiaries or affiliates.  As of the Commencement Date, Mt. Kellett, directly and/or through its subsidiaries, owned 77.27% of the Montvale's common stock and Yucaipa, directly and/or through its subsidiaries, owned 22.73% of the Debtors' common stock.  An organizational chart illustrating the corporate structure of the Debtors is annexed hereto as **Exhibit "B."**

68.   As stated above, I am the CRO for each of Debtors.  I am also the Chief Administrative Officer and Executive Vice President of Montvale and Great Atlantic and the Vice President and Secretary for the other Debtor entities.  The remainder of the Debtors' senior management team consists of the following individuals:

- Paul Hertz, Chief Executive Officer
- Tim Carnahan, Chief Financial Officer and Treasurer
- Brian Fitzpatrick, Chief Operating Officer[7]
- Nirup Krishamurthy, Chief Strategy Officer
- Eric Kanterman, Chief Merchandizing Officer
- Richard Angelillo, Chief Information Officer
- Matthew Bennett, General Counsel and Secretary

69.   Additional information regarding the Debtors' senior management team is set forth in **Schedule 10** annexed hereto.

**B.    Capital Structure**

70.   As set forth in the table below, as of the Commencement Date, the Debtors have outstanding funded debt obligations consisting of (i) approximately $198 million in senior lien secured borrowings under the Debtors' ABL Facility, (ii) approximately $262.5 million in principal amount of senior secured borrowings under the Debtors' Term Loan Facility;

---

[7] On the Commencement Date, Mr. Fitzpatrick was the Chief Operating Officer.  His last day with A&P is July 20, 2015.  Eric Kanterman will assume the role of Chief Operating Officer.

(ii) a face amount of $215 million of secured PIK Toggle Notes, and (iii) a face amount of $250 million of secured Convertible Notes.

| Secured Debt | Principal Balance |
|---|---:|
| ABL Facility | $198 million (letters of credit) |
| Term Loan Facility | $262.5 million |
| PIK Toggle Notes | $215 million |
| Convertible Notes | $250 million |

71.     The Debtors are party to an intercreditor agreement setting forth priorities and certain consent rights, dated as of March 13, 2012 (as amended, the "**Intercreditor Agreement**"), with Wells Fargo Bank, National Association ("**Wells Fargo**")[8] as agent for the ABL Facility and the Term Loan, and U.S. Bank National Association, as trustee for the PIK Toggle Notes and the Convertible Notes.

72.     Because the Debtors are privately-held, they are not subject to the information disclosure requirements of the Securities Exchange Act of 1934, as amended. Accordingly, the Debtors do not file annual, quarterly, or current reports or any other financial information with the Securities and Exchange Commission.

**C.     Senior Debt – The ABL Facility and Term Loan Facility**

73.     The Term Loan Facility and the ABL Facility (each as defined below) are herein referred to as the "**Senior Debt**." The Senior Debt was incurred as part of a refinancing the Debtors completed on September 17, 2014 in an effort to reduce borrowing costs and improve their liquidity position. The Debtors' obligations under the Senior Debt are collateralized by first-priority "criss-cross" liens on all of the Debtors' assets (with certain specified exceptions) including, but not limited to, all accounts, goods, documents, instruments,

---

[8] As successor in interest to JPMorgan Chase Bank, N.A.

equipment, inventory, fixtures, letters of credit, investment property, intellectual property, commercial tort claims, general intangibles, deposit accounts, and any other personal property of the Debtors (the "**Common Collateral**").  The "Term Priority Collateral" includes all leased properties of the Debtors, equipment, all equity interests in A&P Real Property, LLC and certain other related assets.  The "ABL Priority Collateral" includes all Common Collateral that is not "Term Priority Collateral."

*The ABL Facility*

74.    On March 12, 2012, upon emerging from the 2010 Cases, the Debtors borrowed $15.2 million from their then-existing asset-based revolver and later repaid that amount in 2012.  On September 17, 2014, the Debtors entered into that certain Amended and Restated Senior Secured Revolving Credit Agreement (the "**ABL Credit Agreement**") with Wells Fargo, as agent, letter of credit issuer, and swing line lender, and lenders from time to time party thereto providing the Debtors with an asset-based revolving credit facility in an amount up to $300 million, subject to a borrowing base formula (the "**ABL Facility**").

75.    Up to $225 million of the ABL Facility is available for issuances of letters of credit and any such issuance of letters of credit reduce the amount available under the ABL Facility on a dollar for dollar basis.  Up to $20 million of the ABL Facility is available for swing line loans.  Availability under the ABL Credit Agreement is capped by a borrowing base, which is calculated based on certain percentages of the value of the Debtors' inventory and receivables and subject to certain reserves and sub-limits.  The ABL Credit Agreement matures on September 17, 2019.  As of the Commencement Date, letters of credit in the amount of approximately $198 million had been issued and outstanding under the ABL Facility.

*The Term Loan Facility*

76.     On September 17, 2014, Great Atlantic, together with its subsidiaries and Montvale, as guarantor, also refinanced their then-existing term loan facility that was issued upon emergence from the 2010 Cases, and entered into that certain Amended and Restated Senior Secured Term Credit Agreement (as thereafter amended or modified from time to time, the "**Term Loan Credit Agreement**") with Wells Fargo, as administrative and collateral agent, and GB Credit Partners, LLC, as syndication agent, Wells Fargo and Credit Suisse Securities, as joint lead arranges and joint book runners and lenders from time to time party thereto.  The Term Loan Credit Agreement provides the Debtors with $270 million in total availability (the "**Term Loan Facility**") through (i) a $75 million "Tranche A" term loan and (ii) a $195 million "Tranche B" term loan.  The Term Loans bears interest on the outstanding principal amount at a rate per annum equal to the Adjusted LIBO Rate plus 3.45% in the case of the "Tranche A" term loan and the Adjusted LIBO Rate plus 8.85% in the case of the "Tranche B" term loan and accrue from the date such loans were advanced or obligations incurred.  Interest on the Term Loans is payable monthly.

77.     The Term Loan Facility matures on September 17, 2019 (the "**Term Loan Termination Date**").  In accordance with the Term Loan Credit Agreement, the Debtors pay the aggregate principal amount of all outstanding loans under the Credit Agreement in consecutive equal quarterly installments of $2.5 million on the last day of each February, May, August, and November.  The final principal repayment installment of the loans is due and payable on the Term Loan Termination Date.

78.     As of the Commencement Date, approximately $262.5 million in principal amount is due under the Term Loan Facility.  The Debtors are current on all of their obligations owed under the Term Loan Facility.

### D.    PIK Notes

79.    In connection with A&P's emergence from the 2010 Cases, on March 13, 2012, Montvale entered into an Indenture (the "**PIK Toggle Indenture**") with U.S. Bank National Association, as trustee and collateral agent, pursuant to which Montvale issued a face amount of $215 million of Senior Secured PIK Toggle Notes due 2017 (the "**PIK Notes**") in a private offering exempt from, or not subject to, the registration requirements under the Securities Act of 1933, as amended (the "**Securities Act**").  The PIK Notes are secured by liens on the Common Collateral other than certain "Excluded Assets," as defined in the PIK Toggle Indenture, subject to the priority of liens discussed in Section V.F herein.  Pursuant to the Intercreditor Agreement, the PIK Notes are expressly subordinated to liens on the Common Collateral granted in support of the ABL Facility and the Term Loan Facility.

80.    The PIK Notes mature on September 13, 2017.  Montvale may elect to pay interest due on the PIK Notes on each interest payment date (i) entirely in cash at the rate of 10% per annum, (ii) entirely in payment-in-kind ("**PIK**") interest at the rate of 12.50% per annum, or (iii) 50% in cash and 50% PIK.  PIK interest on the PIK Notes is payable by (i) increasing the principal amount of the outstanding global note representing the PIK Toggle Notes by an amount equal to the amount of PIK interest, or (ii) if required by the depository, issuing additional PIK Notes in certificated form in an aggregate principal amount equal to the amount of PIK interest. Following an increase in the principal amount of PIK Notes as a result of each payment of PIK interest, the PIK Notes bear interest on such increased principal amount.  Montvale must pay interest on overdue principal, premium, if any, and interest from time to time on demand at a rate of 1% per annum in excess of the rate then in effect.

### E.       Convertible Notes

81.       Also as part of the 2010 Cases, Montvale entered into an indenture (the "**Convertible Notes Indenture**") with U.S. Bank National Association, as trustee and collateral agent, pursuant to which Montvale issued a face amount of $250 million of Senior Secured Convertible Notes (the "**Convertible Notes**"), which amount includes a commitment fee of $40 million.  The Convertible Notes were issued in a private offering exempt from, or not subject to, the registration requirements under the Securities Act.  The Convertible Notes are secured by liens on the Common Collateral, other than certain "Excluded Assets," as defined in the Convertible Notes Indenture, subject to the priority of liens discussed in Section V.F herein. Pursuant to the Intercreditor Agreement, the Convertible Notes are expressly subordinated to liens on the Common Collateral granted in support of the ABL Facility, the Term Loan, and the PIK Toggle Notes.

82.       The Convertible Notes mature on March 13, 2018 and accrue PIK interest at a rate of 14% per annum.  PIK interest is payable annually on March 13 of each year until maturity.  PIK interest on the Convertible Notes is payable by (i) increasing the principal amount of the outstanding global note representing the Convertible Notes by an amount equal to the amount of PIK interest or (ii) if required by the depository, issuing additional Convertible Notes in certificated form in an aggregate principal amount equal to the amount of PIK interest. Montvale must pay interest on overdue principal and premium, if any, from time to time on demand at a rate of 16% per annum in cash.  During the continuance of an Event of Default, Montvale must pay interest from time to time on demand at a rate of 16% per annum, in cash.

### F.       Intercreditor Agreement

83.       The relative priorities of the liens held by (i) Wells Fargo as agent on behalf of the lenders under the Term Loan Credit Agreement (collectively, the "**Term Loan**

Secured Parties") and the ABL Credit Agreement (collectively, the "**ABL Secured Parties**" and, together with the Term Loan Secured Parties, the "**Senior Secured Parties**"), (ii) the holders of the PIK Notes and (iii) the holders of the Convertible Notes and restrictions on the ability to exercise remedies against collateral are subject to the Intercreditor Agreement.

84.     In accordance with the Intercreditor Agreement, the Senior Secured Parties, the holders of the PIK Notes and the holders of the Convertible Notes agreed to the following priorities with respect to the ABL Priority Collateral and the Term Loan Priority Collateral:

|  | **ABL Priority Collateral** | **Term Loan Priority Collateral** |
|---|---|---|
| First Priority | ABL Secured Parties | Term Loan Secured Parties |
| Second Priority | Term Loan Secured Parties | ABL Secured Parties |
| Third Priority | Holders of PIK Notes | Holders of PIK Toggle Notes |
| Fourth Priority | Holders of Convertible Notes | Holders of Convertible Notes |

## VI.
## First-Day Pleadings

85.     As stated, the Debtors operate in a highly competitive industry.  It is imperative that they make a seamless transition into chapter 11 to preserve the reputation of their businesses and the loyalty and goodwill of their customers, suppliers and employees.  Sales and operations must continue in the ordinary course of business to preserve the value of the Stalking Horse Bids and implement the Sale Strategy.  While difficult to implement in any chapter 11 process, maintaining operations without interruption will be particularly challenging here as many of the Debtors' vendors and customers were active participants in the 2010 Cases.  Accordingly, the Debtors have filed a number of First Day Pleadings designed to facilitate their transition into these chapter 11 cases.  The Debtors anticipate that the Court will conduct a

hearing soon after the Commencement Date at which the Court will hear and consider many of the First Day Pleadings.[9]

86.     I have reviewed each of the First Day Pleadings with the Debtors' counsel, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and will be necessary and critical to the Debtors' ability to execute the Sale Strategy and is in the best interests of the Debtors' estates and creditors.  I adopt and affirm the factual representations contained in each of the First Day Pleadings.  A description of the relief requested and the facts supporting each of the pleadings is set forth below.

A.     **Administrative Motions**

(i)     Motion of Debtors for Entry of an Order Directing the Joint Administration of their Related Chapter 11 Cases (the "**Joint Administration Motion**")

87.     The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, The Great Atlantic & Pacific Tea Company, Inc.

88.     Joint administration of the chapter 11 cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest.  Many of the motions, hearings and orders that will be filed in the chapter 11 cases almost certainly will affect each of the Debtors.  The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.  The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their

---

[9] Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleading.

creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 with the least disruption.

> (ii)  Motion of Debtors for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "**Schedules and Statements Motion**")

89.     The Debtors request entry of an order granting additional time to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs.  As a consequence of the size and complexity of the Debtors' business operations, the number of creditors likely to be involved in these chapter 11 cases, the geographical spread of the Debtors' operations, the numerous critical operational matters that the Debtors' management and employees must address, and the time and attention that must be given to the 363 Sales, a 30 day extension (without prejudice to further extensions) is necessary and appropriate.  I believe this will ultimately maximize the value of the Debtors' estates for the benefit of their creditors and all other parties in interest.

> (iii)  Motion of Debtors for Entry of an Order Implementing Certain Notice and Case Management Procedures (the "**Case Management Motion**")

90.     The Debtors seek entry of an order approving and implementing the notice, case management, and administrative procedures therein (collectively, the "**Case Management Procedures**").

91.     Given the size and scope of these cases,  the Case Management Procedures will facilitate service of notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents, and other papers filed in these chapter 11 cases that will be less burdensome and costly than serving such documents on every potentially

interested party.  This, in turn, will maximize the efficiency and orderly administration of these

chapter 11 cases, while at the same time ensuring that appropriate notice is provided.

> (iv)   Motion of Debtors for Entry of an Order (I) Waiving the
> Requirement to File a List of Creditors and (II) Granting Debtors
> Authority to Establish Procedures for Notifying Creditors of the
> Commencement of their Chapter 11 Cases  (the "**Creditor Matrix
> Motion**")

92.   The Debtors request a waiver of the requirement to file a list of creditors

with their voluntary petitions and authority to establish and implement procedures for notifying

creditors of the commencement of their chapter 11 cases and other important information. The

Debtors propose to retain a claims and noticing agent to assist the Debtors in preparing creditor

lists and mailing initial notices.  With such assistance, the Debtors will be prepared to file a

computer-readable consolidated list of creditors upon request and will be capable of undertaking

all necessary mailings in a timely and efficient manner.

**B.   Operational Motions Requesting Immediate Relief**

93.   The Debtors intend to ask for immediate relief with respect to the

following First Day Pleadings and, therefore, will present these motions at the First Day Hearing.

> (i)   Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363 and
> 507(a) for Interim and Final Authority, but not Direction, to (A)
> Pay Certain Prepetition Wages and Reimbursable Employee
> Expenses, (B) Pay and Honor Employee Medical and Other
> Benefits, (C) Continue Employee Benefits Program, and for
> Related Relief (the "**Wages and Benefits Motion**")

94.   The Debtors request the entry of interim and final orders authorizing, but

not directing, the Debtors to (a) pay prepetition wages, salaries and other compensation, taxes,

withholdings and related costs and reimbursable employee expenses, (b) pay and honor

obligations relating to employee medical, insurance and other benefits programs, and

(c) continue their employee medical, insurance and other benefits programs on a postpetition basis.

95.     The relief requested includes compensation for the Debtors' full-time and part-time employees, temporary employees retained through an outside agency, and numerous independent contractors that provide services related to various aspects of the Debtors' operations and are vital to the Debtors' businesses.  As of the date hereof, certain prepetition obligations to such employees and supplemental workers may be due and owing.

96.     The majority of the Debtors' workforce relies on the Debtors' compensation, benefits and reimbursement of expenses to satisfy daily living expenses.  The workforce will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, morale and loyalty will be jeopardized at a time when support is critical.  In the absence of such payments, the workforce may seek alternative employment opportunities, including with the Debtors' competitors, hindering the Debtors' ability to meet their customer obligations and likely diminishing customer confidence.  Loss of valuable employees would distract the Debtors' from focusing on their operations and administering the Chapter 11 Cases.

(ii)     Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Honor all Insurance Obligations ("**Insurance Motion**")

97.     The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (a) continue to maintain their various insurance policies and workers' compensation programs in the ordinary course of business and (b) pay any prepetition obligations related thereto, including, without limitation, premiums, broker or advisor fees, assessments, taxes, and workers' compensation liabilities.

98.     The Debtors maintain various liability, property and other insurance policies to help manage and limit the various risks associated with operating their businesses. The Debtors also maintain workers' compensation insurance as required by statute in each of the states in which they operate.  Certain of the Debtors' workers' compensation programs are self-insured, whereas others are insured by third-party insurers.  The Debtors estimate they pay approximately $840,000 per week on account of workers' compensation claims.  To secure payment of these and other amounts, the Debtors have posted various forms of collateral, which, as of the Commencement Date, total approximately $187 million.

99.     The Debtors employ Marsh USA Inc. and Gallagher Basset Services Inc. as their insurance advisors (collectively, the "**Insurance Service Providers**").  Respectively, these advisors (i) procure, negotiate and evaluate the Debtors' insurance policies and (ii) administer claims arising under both the insurance policies and the workers' compensation programs.

100.    Postpetition, the Debtors' insurance policies and workers' compensation programs are essential to the preservation of the value of the Debtors' businesses, properties and assets, and, in certain instances, are required by law.  If any of the Debtors' insurance policies are terminated or lapse, the Debtors would be exposed to substantial liability to the detriment of all parties in interest and could be in violation of law.  State law may prohibit the Debtors from operating without certain insurance.  The Insurance Service Providers are intimately familiar with the Debtors' policies and programs, and the loss of either Insurance Service Provider (or even a temporary disruption in their services) would be detrimental to the Debtors' chapter 11 estates because the Debtors' would need to shift some of their focus from administering their estates and businesses to managing the Debtors' multitude of insurance policies and the claims

arising thereunder.  Accordingly, having authority to pay all insurance-related obligations is crucial to the continued operation of the Debtors' businesses.

> (iii)    Motion of Debtors Requesting Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Postpetition Intercompany Claims Administrative Expense Priority, and (V) Granting Related Relief (the "**Cash Management Motion**")

101.    The Debtors request authorization to (a) continue their existing cash management system, including, without limitation, the continued maintenance of their existing bank accounts and business forms, (b) implement changes to their cash management system in the ordinary course of business, including, without limitation, opening new or closing existing bank accounts, (c) continue to, in their business judgment and at their sole discretion, perform under and honor intercompany transactions in the ordinary course of business and (d) provide postpetition intercompany claims administrative expense priority.  The Debtors also request that the Court grant any necessary relief related to the foregoing.

102.    In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations (the "**Cash Management System**").  The Cash Management System is comprised of approximately 38 bank accounts at various financial institutions (the "**Banks**") to accommodate different business divisions and to collect, organize and track various forms of customer receipts (collectively, the "**Bank Accounts**").  The Cash Management System is tailored to meet the Debtors' operating needs as an operator of six supermarket chains and other retail beverage businesses.  The Cash Management System enables the Debtors to efficiently collect and disburse cash generated by their business, pay their financial obligations, centrally control and

monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data.  It is critical that the Cash Management System remain intact to ensure seamless continuation of transactions and uninterrupted collection of revenues.

103.    In the ordinary course of business, the Debtors incur intercompany receivables and payables (the "**Intercompany Claims**").  All of the outstanding Intercompany Claims represent intercompany transactions (the "**Intercompany Transactions**") that have occurred from and after the 2010 Cases.

104.    Intercompany Claims are not settled by actual transfers of cash among the Debtors.  The Debtors track all Intercompany Transactions electronically in their accounting system, which concurrently are recorded on the applicable Debtor's balance sheets.  The accounting system requires that all general-ledger entries be balanced at the legal-entity level, and, therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet.

105.    To ensure each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims arising after the Commencement Date be accorded administrative expense priority.  In this manner, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

106.    To minimize expenses, the Debtors seek authorization to continue using all business forms and checks substantially in the forms used immediately prior to the

Commencement Date, without reference to the Debtors' status as debtors in possession; provided that in the event that the Debtors generate new business forms and/or checks during the pendency of these cases other than from their existing stock, such business forms and checks will include a legend referring to the Debtors as "Debtors-In-Possession."  To the extent practicable, the Debtors also will laser print such legend on any business forms and checks electronically generated during these cases.

107.     Finally, the Debtors seek entry of an order authorizing and directing their Banks to continue to treat, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the usual and ordinary course, and to receive, process, and honor and pay all checks, drafts, wires, or Automated Clearing House Payments drawn on the Bank Accounts after the Commencement Date; provided that any payments issued or made prior to the Commencement Date will not be honored absent direction of the Debtors and an order of the Court.

(iv)     Motion of Debtors for Interim and Final Authority to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices and (II) Pay and Honor Related Prepetition Obligations (the "**Customer Programs Motion**")

108.     The Debtors request authority to, in the ordinary course of business and consistent with past practice, (i) maintain and administer prepetition customer programs, promotions and practices, as necessary and appropriate in the Debtors' business judgment, and (ii) to pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Commencement Date.

109.     The Debtors' businesses depend upon the loyalty of their customers.  To maximize customer loyalty, the Debtors have maintained and followed, in the ordinary course of business, various practices and programs (collectively, the "**Customer Programs**") to reward

and provide incentives to existing customers and to attract new customers to the Debtors' stores. Such programs are standard in the retail food business. Without the ability to continue their Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing market share and value of their businesses. The Debtors' Customer Programs are described more fully in the Motion.

110.     In order to maintain the Debtors' reputation for reliability and to maintain the loyalty, goodwill and support of their Customers, the Debtors must maintain their Customer Programs and honor their obligations thereunder.

> (v)     Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Taxes and Fees ("**Taxes and Fees Motion**")

111.     The Debtors request authorization, but not direction, the Debtors to remit and pay sales, use, franchise, state and local income, real and personal property, and other taxes, assessments, fees and charges (collectively, the "**Taxes and Fees**").

112.     The Debtors collect, withhold or incur an assortment of Taxes and Fees that they remit to various federal, state and local taxing, licensing, regulatory and other governmental authorities (collectively, the "**Authorities**"). Many of the Taxes and Fees collected are held in trust for and must be turned over to the Authorities. The Debtors also seek to pay certain prepetition Taxes and Fees in order to, among other things, forestall Authorities from taking actions that might interfere with the administration of these Chapter 11 Cases, which may include bringing personal liability actions against directors, officers and other key employees (whose full-time attention to the Debtors' Chapter 11 Cases is required to avoid business disruptions and maximize recoveries to the Debtors' creditors), asserting liens on the Debtors' property or assessing penalties and/or significant interest on past-due taxes. In addition, the non-payment of such Taxes and Fees may give rise to priority claims pursuant to

section 507(a)(8) of the Bankruptcy Code.  Accordingly, I believe that the relief requested in the

Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors and all other

parties in interest, and will enable the Debtors to continue to operate their businesses.

      (vi)     Motion of Debtors Pursuant to 11 U.S.C. § 363 and 503 for Interim and Final Authority to (A) Pay Prepetition Claims Of Warehousemen and Miscellaneous Lien Claimants, (B) Confirm Administrative Expense Priority of Undisputed Commencement Date Orders and Satisfy Such Obligations in the Ordinary Course of Business and (C) Pay PACA/PASA Claims (the "**Lienholders' Motion**")

113.    The Debtors seek authority to (i) pay prepetition claims of Warehousemen

and Miscellaneous Lien Claimants, (ii) confirm administrative expense priority of all undisputed

obligations for merchandise ordered prepetition and delivered on the Commencement Date or

postpetition, and (iii) pay PACA/PASA Claims.

114.    The Debtors contract with various third-party transporters (collectively,

the "**Shippers**") and third-party storage facility providers (collectively, together with the

Shippers, the "**Warehousemen**") to deliver certain suppliers' merchandise and store such

merchandise in storage facilities (collectively, the "**Warehouses**") prior to ultimate delivery to

the Debtors' supermarkets.  In the event that the Debtors fail to reimburse the Warehousemen for

charges incurred in connection with the transport and storage of the merchandise, various state

laws permit the Warehousemen to assert a statutory lien against the merchandise in their

possession that is the subject of any delinquent charges, securing such charges and potentially

blocking the Debtors' access to the stored merchandise.  To maintain access to the stored

merchandise that is essential to the continued viability of the Debtors' retail operations and

preserve the value of the merchandise, the Debtors seek authority to honor outstanding invoices

related to the shipping and warehousing services provided to the Debtors prior to the

Commencement Date.

115.    The Debtors contract with a number of third parties (collectively, the "**Miscellaneous Lien Claimants**") to perform repairs and make improvements related to refrigeration equipment, electrical systems, plumbing, elevator and escalator systems and various types of food service equipment.   The Miscellaneous Lien Claimants could potentially assert liens, including mechanic's liens, artisan's liens and materialman's liens (the "**Miscellaneous Lien Claims**") against the Debtors' property for amounts the Debtors owe to those third parties. If the Debtors are unable to pay the Miscellaneous Lien Claims, they risk losing access to facilities and equipment that are critical to the continued operation of the supermarkets.

116.    In addition, prior to the Commencement Date, and in the ordinary course of business, the Debtors ordered goods and supplies necessary to operate their businesses, the delivery of which will occur on or after the Commencement Date (the "**Commencement Date Orders**").   To avoid becoming general unsecured creditors of the Debtors' estates with respect to related merchandise, certain suppliers of merchandise subject to one or more Commencement Date Orders may refuse to ship or transport such merchandise (or may recall such shipments) unless the Debtors issue substitute purchase orders postpetition.   To prevent any disruption to the Debtors' retail operations, the Debtors seek an order (a) confirming administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of merchandise subject to the Commencement Date Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

117.    In addition, prior to the Commencement Date, the Debtors purchased certain produce that they believe may qualify as "perishable agricultural commodities" under the under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq.* ("**PACA**").   Similarly, certain of the Debtors' suppliers (the "**PASA Claimants**" and,

together with the PACA Claimants, the "**PACA/PASA Claimants**") may be eligible to assert claims under the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 *et seq.* ("**PASA**"), which prescribes the conditions of operations for businesses dealing in livestock and poultry.  It is my understand that under both PACA and PASA, eligible suppliers and their agents (the "**PACA/PASA Claimants**") are the beneficiaries of a statutory trust in certain of the buyer's applicable inventory and proceeds relating thereto, and assets of the respective statutory trusts are not property of the Debtors' estates.   The PACA/PASA Claimants may be eligible to assert potential claims under the respective statutes for outstanding payments on account of applicable merchandise, which claims are granted priority ahead of secured and unsecured creditors.

> (vii)    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 541 to Release Certain Funds Held in Trust and to Continue to Perform and Honor Obligations Under the Coin Deposit and Consignment Arrangements (the "**Trust Funds Account Motion**")

118.    The Debtors request authority to release certain funds held in trust for the benefit and on behalf of non-Debtor third parties, to continue to perform and honor obligations under their prepetition coin deposit arrangement and to continue to perform and honor obligations under their prepetition consignment sales arrangements, in the ordinary course of business and in a manner consistent with past practice.  The Debtors engage in various marketing and sales practices in the ordinary course of their business as a means of offering a convenience to their customers, attracting new customers, promoting loyalty among the existing customer base, and producing alternative streams of income.   To preserve reputational integrity and continue to attract existing and new customers of their stores, it is essential that the Debtors honor their obligations in connection with selling lottery tickets and third-party retail gift cards, and also providing onsite money transfer services and depositories for coins and bottles.

119.    Not only do the Debtors earn commission or bonuses directly from their participation in the Trust Programs, but the Debtors are also compensated indirectly because the Trust Programs attract customers to the Debtors' stores and may incrementally increase revenue at the point of sale.  The payment of the Trust Funds is important to the Debtors' continued business operations, and the value of the Debtors' businesses could be significantly harmed if the Debtors are unable to continue to offer these programs and products, and may drive customers to the Debtors' competitors for access these programs and products.

(viii)    Motion of the Debtors for the Entry of an Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests and Claims in the Debtors (the "**NOLs Motion**")

120.    The Debtors seek to establish procedures to protect the potential value of the Debtors' tax net operating loss carryforwards ("**NOLs**") and certain other tax attributes ("**Tax Attributes**").  The proposed procedures would impose certain restrictions and notification requirements with respect to (i) the common stock of Montvale (such common stock, the "**Common Stock**"), (ii) the Convertible Notes (together with the Common Stock, the "**Montvale Securities**") and (iii) any options or similar interests to acquire such securities.

121.    The Debtors estimate that, as of February 28, 2015, the Debtors had approximately $512 million of consolidated NOLs for U.S. federal income tax purposes (of which approximately $200 million remain effectively subject to limitation as a result of Montvale having undergone an "ownership change" for U.S. federal income tax purposes in connection with its emergence from the 2010 Cases on March 13, 2012), in addition to certain other Tax Attributes.  These Tax Attributes are valuable assets of the respective Debtors' estates because the Tax Code generally permits corporations to carry over their Tax Attributes to reduce future taxable income.  Accordingly, absent any intervening limitations, the Tax Attributes could

substantially reduce the Debtors' U.S. federal income tax liability during the pendency of these Chapter 11 Cases (such as in connection with the disposition of assets) or, potentially, in the event of a future transaction, to offset future income tax liabilities.   The Tax Attributes could thus translate into future tax savings over time and any such savings could enhance the Debtors' cash position for the benefit of all parties in interest.

122.   An ownership change, pursuant to section 382 of the United States Internal Revenue Code (which is described further in the NOL Motion), prior to the effective date of a chapter 11 plan could effectively eliminate the Debtors' ability to use their Tax Attributes, thereby resulting in a significant loss of potential value to the Debtors' estates. Accordingly, the trading procedures seek authority to monitor and approve certain changes in the ownership of Montvale Securities (including by claiming a worthlessness deduction) to protect against the occurrence of an ownership change during the pendency of these bankruptcy cases.

(ix)   Motion of Debtors Requesting Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service (the "**Utilities Motion**")

123.   The Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to utility providers, (ii) establishing procedures for determining adequate assurance of payment for future utility services, and (iii) prohibiting utility providers from altering or discontinuing service on account of outstanding prepetition invoices.

124.   Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and the Sale Process.   Indeed, any interruption in utility services— even for a brief period of time—would seriously disrupt the Debtors' ability to continue operations and service their customers.   This disruption would adversely impact customer

relationships and would result in a decline in the Debtors' revenues.  It also would affect the value of inventory—particularly items like perishable goods and frozen food.  Such a result could seriously jeopardize the Debtors' restructuring efforts and, ultimately, creditor recoveries. Therefore, it is critical that utility services continue uninterrupted during these chapter 11 cases.

125.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner.  The Debtors expect that cash flows from operations and their DIP Financing will be sufficient to pay postpetition obligations related to their utility services in the ordinary course of business.

126.    Furthermore, the Debtors propose to deposit into a newly-created, segregated, interest-bearing bank account a sum equal to the cost of two weeks' worth of the average utility cost for each Utility Provider (less any amounts already on deposit with any such Utility Provider that have not been applied to outstanding prepetition amounts)[10], based on the Debtors' average usage for the fiscal year ending 2014 (collectively, the "**Adequate Assurance Deposit**").

127.    I believe that the Adequate Assurance Deposit, in conjunction with the DIP Financing, cash flow from operations, and cash on hand demonstrate the Debtors' ability to pay for future utility services in the ordinary course of business and constitute sufficient adequate assurance to the Utility Providers.

(x)    Application of Debtors for an Order Appointing Prime Clerk LLC as Claims and Noticing Agent (the "**Claims and Noticing Agent Retention Application**")

128.    The Debtors request authority to appoint Prime Clerk LLC ("**Prime Clerk**") as claims and noticing agent ("**Claims and Noticing Agent**") in accordance with the

---

[10]  To the extent any deposits with any Utility Provider is in excess of two weeks' worth of the average utility cost, the Debtors reserve their right to demand such excess amounts.

terms and conditions of that certain Engagement Agreement dated July 15, 2015, by and between

A&P and Prime Clerk (the "**Engagement Agreement**"), effective *nunc pro tunc* to the

Commencement Date.   Prime Clerk's duties will include assuming full responsibility for the

distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in

these Chapter 11 Cases.   I believe the Debtors' selection of Prime Clerk to serve as their Claims

and Noticing Agent has satisfied the Court's Protocol for the Employment of Claims and

Noticing Agents Under 28 U.S.C. § 156(c).   Specifically, the Debtors have solicited and

reviewed engagement proposals from at least two other Court-approved claims and noticing

agents to ensure selection through a competitive process.

129.    I believe that Prime Clerk's rates are competitive and reasonable given

Prime Clerk's quality of services and expertise.   The terms of Prime Clerk's retention are set

forth in the Engagement Agreement attached to, and filed contemporaneously therewith, the

Claims and Noticing Agent Retention Application.   Appointing Prime Clerk as their Claims and

Noticing Agent will maximize the efficiency of the distribution of notices and the processing of

claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative

burden of processing an overwhelming number of claims.

## VII.
## Information Required by Local Rule 1007-2

130.    In accordance with Local Rule 1007-2, the schedules attached hereto

provide certain information related to the Debtors.

131.    Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names

and addresses of the members of, and attorneys for, any committee organized prior to the

Commencement Date and a brief description of the circumstances surrounding the formation of

the committee and the date of its formation.

132.     Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' forty (40) largest unsecured claims on a consolidated basis, excluding claims of insiders.

133.     Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the four (4) largest secured claims against the Debtors on a consolidated basis.

134.     Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors and their non-Debtor affiliates.

135.     Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

136.     Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

137.     Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

138.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature,

location, and value of any assets held by the Debtors outside the territorial limits of the United States.

139.    Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

140.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

141.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases as the Debtors intend to continue to operate their businesses.

142.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

### Conclusion

143.    This declaration illustrates the factors that have precipitated the commencement of the Chapter 11 Cases and the critical need for the Debtors to implement their Sale Strategy.

144.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 19th day of July, 2015

/s/ Christopher W. McGarry
Christopher W. McGarry
Chief Restructuring Officer,
The Great Atlantic & Pacific
Company, Inc.

**Exhibit A**

# Illustrative Case Timeline



**Note:** The flexibility of the Tier II Sale process will allow for both Tier I and Tier II to run simultaneously on parallel tracks

**Exhibit B**

# A&P: Corporate Structure



**Schedules to the Declaration**

## Schedule 1

**Committees**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no committee has been organized prior to the Commencement Date.

## Schedule 2

## Consolidated List of 40 Largest Unsecured Claims (Excluding Insiders)[1]

       Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of the July 11, 2015 the forty (40) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 1 | C & S Wholesale Grocers, Inc. | C & S Wholesale Grocers, Inc.<br>Attn.: President or General Counsel<br>7 Corporate Drive<br>Keene, NH 03431<br>Tel: 603-354-7000<br>Fax: 603-354-4690<br>Email: | Trade Debt | $39,358,006.53 |
| 2 | McKesson Drug Co. | McKesson Drug Co.<br>Attn.: President or General Counsel<br>One Post Street<br>San Francisco, CA 94104<br>Tel: 415-983-8300<br>Fax: 415-983-9369<br>Email: | Trade Debt | $8,353,950.47 |
| 3 | Facility Source, LLC | Facility Source, LLC<br>Attn.: President or General Counsel<br>200 E. Campus View Blvd., Ste. 301<br>Columbus, OH 43235<br>Tel: 800-896-9000<br>Fax: 614-318-1701<br>Email: | Trade Debt | $6,712,618.35 |
| 4 | Coca-Cola Enterprises | Coca-Cola Enterprises<br>Attn.: President or General Counsel<br>2500 Windy Ridge Parkway<br>Atlanta, GA 30339<br>Tel: 678-260-3000<br>Fax: 404-676-4903<br>Email: | Trade Debt | $4,757,348.88 |

---

[1]The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 5 | Mondelez Global LLC | Mondelez Global LLC<br>Attn.: President or General Counsel<br>100 Deforest Avenue<br>East Hanover , NJ 07936<br>Tel: 855-535-5648<br>Fax:<br>Email: carol.ward@mdlz.com | Trade Debt | $3,162,367.71 |
| 6 | Garelick Farms Inc. | Garelick Farms Inc.<br>Attn.: President or General Counsel<br>1199 W Central St. Ste. 1<br>Franklin, MA 02038<br>Tel: 508-528-9000<br>Fax: 508-520-0307<br>Email: | Trade Debt | $2,372,773.97 |
| 7 | Mindy Klarman | Mindy Klarman<br>58 Erie Avenue<br>Rockaway, NJ 07866<br>Tel:<br>Fax:<br>Email: | Litigation | $1,821,116.35 |
| 8 | Manhattan Beer | Manhattan Beer<br>Attn.: President or General Counsel<br>955 East 149th Street<br>Bronx, NY 10455<br>Tel: 718-292-9300<br>Fax: 718-292-0125<br>Email: | Trade Debt | $1,202,040.02 |
| 9 | Entenmann's Bakery | Entenmann's Bakery<br>Attn.: President or General Counsel c/o<br>Bimbo Bakeries USA<br>2810 Golden Mile Hwy<br>Pittsburgh, PA 15239<br>Tel: 724-327-1854<br>Fax: 610-320-9286<br>Email: | Trade Debt | $1,070,182.86 |
| 10 | Quad Graphics, Inc. | Quad Graphics, Inc.<br>Attn.: President or General Counsel<br>N61 W23044 Harry's Way<br>Sussex, WI 53089-3995<br>Tel: 414-566-6000<br>Fax: 414-566-9558<br>Email: sxwdeliveryappt@qg.com | Trade Debt | $917,327.11 |

2

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 11 | CBA Industries | CBA Industries<br>Attn.: President or General Counsel 669 River Drive<br>Elmwood Park, NJ 07407-1717<br>Tel: 201-587-1717<br>Fax: 201-587-8308<br>Email: | Trade Debt | $859,592.42 |
| 12 | Arnold Bakers Inc. | Arnold Bakers Inc.<br>Attn.: President or General Counsel c/o Bimbo Bakeries USA<br>2810 Golden Mile Hwy<br>Pittsburgh, PA 15239<br>Tel: 724-327-1854<br>Fax: 610-320-9286<br>Email: | Trade Debt | $828,507.19 |
| 13 | Coremark/Klein Wholesale Dist. | Coremark/Klein Wholesale Dist.<br>Attn.: President or General Counsel<br>395 Oyster Point Blvd<br>South San Francisco, CA 94080<br>Tel: 650-589-9445<br>Fax: 650-952-4284<br>Email: | Trade Debt | $810,200.22 |
| 14 | S B Thomas Inc. | S B Thomas Inc.<br>Attn.: President or General Counsel<br>191 Talmadge Road #5<br>Edison, NJ 08817<br>Tel: 732-287-0040<br>Fax: 732-287-0292<br>Email: | Trade Debt | $761,268.89 |
| 15 | UTZ Quality Foods Inc. | Utz Quality Foods Inc.<br>Attn.: President or General Counsel<br>900 High Street<br>Hanover, PA 17331<br>Tel: 717-637-6644<br>Fax: 717-634-5890<br>Email: customerservice@utzsnacks.com | Trade Debt | $758,346.60 |
| 16 | Wise Foods | Wise Foods<br>Attn.: President or General Counsel<br>228 Raseley Street<br>Berwick, PA 18603<br>Tel: 888-759-4401<br>Fax: 570-759-4001<br>Email: | Trade Debt | $725,233.09 |

3

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 17 | Tolt Solutions, Inc. | Tolt Solutions, Inc.<br>Attn.: President or General Counsel<br>3550 Rutherford Rd.<br>Taylors, SC 29687<br>Tel: 704-206-7868<br>Fax: 704-509-2538<br>Email: marketing@toltsolutions.com | Trade Debt | $680,919.41 |
| 18 | Capital Wine & Spirits | Capital Wine & Spirits<br>Attn.: PJ Horgan – President<br>129 Hartman Road<br>North Wales, PA 19454<br>Tel: 267-960-0900<br>Fax: 267-960-0901<br>Email | Trade Debt | $664,951.13 |
| 19 | Kellermeyer Bergensons Services, LLC | Kellermeyer Bergensons Services LLC<br>Attn.: President or General Counsel<br>1575 Henthorne Drive<br>Maumee, OH 43537<br>Tel: 419-867-4300<br>Fax: 800-288-1375<br>Email: hr@kbs-services.com | Trade Debt | $650,921.58 |
| 20 | Nebraskaland | Nebraskaland<br>Attn.: President or General Counsel<br>355 Food Center Drive Building-G<br>Bronx, NY 10474<br>Tel: 718-842-0700<br>Fax: 718-842-2046<br>Email: customerservice@nebraskaland.com | Trade Debt | $649,020.18 |
| 21 | Keebler Biscuit Co. | Keebler Biscuit Co.<br>Attn.: President or General Counsel<br>677 Larch Ave<br>Elmhurst, IL 60126<br>Tel: 630-833-2900<br>Fax: 630-833-6961<br>Email: | Trade Debt | $624,030.41 |
| 22 | Pepperidge Farm Inc. Bread | Pepperidge Farm Inc. Bread<br>Attn.: President or General Counsel<br>595 Westport Ave<br>Norwalk, CT 06851<br>Tel: 203-846-7000<br>Fax: 203-846-7369<br>Email: | Trade Debt | $613,315.76 |

WEIL:\95393231\2\50482.0004

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 23 | Lehigh Valley Dairies Inc. | Lehigh Valley Dairies Inc.<br>Attn.: President or General Counsel<br>880 Allentown Road<br>Lansdale, PA 19446<br>Tel: 570-385-1884<br>Fax: 570-385-1686<br>Email: | Trade Debt | $572,201.95 |
| 24 | Universal Environmental | Universal Environmental<br>Attn.: President or General Counsel<br>900 Merchants Concourse, Suite 214<br>Westbury, NY 11590<br>Tel: 800-552-0309<br>Fax: 516-489-3736<br>Email: jciardulli@uecny.com | Trade Debt | $538,378.94 |
| 25 | Western Union Financial | Western Union Financial<br>Attn.: President or General Counsel<br>12510 Belford Avenue<br>Englewood, CO 80112<br>Tel: 720-332-1000<br>Fax: 720-332-4753<br>Email: | Trade Debt | $500,000.00 |
| 26 | Mc Kee Baking Co. | Mc Kee Baking Co.<br>Attn.: President or General Counsel<br>10260 McKee Road<br>Collegedale, TN 37315<br>Tel: 615-238-7111<br>Fax: 615-238-7127<br>Email: | Trade Debt | $491,712.21 |
| 27 | Nestle DSD Company Ice Cream | Nestle DSD Company Ice Cream<br>Attn.: President or General Counsel<br>3863 Collections Center Drive<br>Chicago, IL 60693<br>Tel: 510-652-8187<br>Fax:<br>Email: karla.johnson@us.nestle.com | Trade Debt | $482,348.27 |
| 28 | Consolidated Edison Co-NY | Consolidated Edison Co-NY<br>Attn.: President or General Counsel<br>4 Irving Place<br>New York, NY 10003<br>Tel: 212-460-4600<br>Fax: 212-673-1729<br>Email: | Trade Debt | $465,536.82 |

WEIL:\95393231\2\50482.0004

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 29 | Flowers Baking Co of Lynchburg, LLC | Flowers Baking Co of Lynchburg, LLC<br>Attn.: President or General Counsel<br>1905 Hollins Mill Road<br>Lynchburg, VA 24503<br>Tel: 434-528-0441<br>Fax: 434-528-3413<br>Email: | Trade Debt | $446,551.84 |
| 30 | R & R Marketing | R & R Marketing<br>Attn.: Credit Dept.<br>10 Patton Drive<br>West Caldwell, NJ 07006<br>Tel: 973-228-5100<br>Fax: 973-403-8670<br>Email: | Trade Debt | $435,551.49 |
| 31 | Two Paragon Drive LLC | Two Paragon Drive LLC<br>c/o Paragon Affiliates<br>Attn.: President or General Counsel<br>One Paragon Dr., Ste. 145<br>Montvale, NJ 07645<br>Tel: 201-391-5070<br>Fax:<br>Email: | Rent | $435,080.84 |
| 32 | Masters Pharmaceutical d/b/a River City Pharma | Masters Pharmaceutical<br>d/b/a River City Pharma<br>Attn.: President or General Counsel<br>11930 Kemper Springs Drive<br>Cincinnati, OH 45240<br>Tel: 513-354-2690<br>Fax: 513-354-2691<br>Email: info@mastersrx.com | Trade Debt | $433,975.40 |
| 33 | Brescome Barton Inc. | Brescome Barton Inc.<br>Attn.: President or General Counsel<br>69 Defco Park Rd.<br>North Haven, CT 06473<br>Tel: 203-239-4901<br>Fax: 203-985-8205<br>Email: Sales@BrescomeBarton.com | Trade Debt | $432,771.82 |
| 34 | Stroehmann Bakeries Inc. | Stroehmann Bakeries Inc.<br>Attn.: President or General Counsel<br>255 Business Center Drive<br>Horsham, PA 19044<br>Tel: 215-672-8010<br>Fax: 215-672-6988<br>Email: | Trade Debt | $431,470.42 |

WEIL:\95393231\2\50482.0004

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 35 | Clare Rose Nassau | Clare Rose Nassau<br>Attn.:   Sean Rose, CEO<br>100 Rose Executive Blvd.<br>East Yaphank, NY 11967<br>Tel: 631-475-1840<br>Fax: 631-475-1837<br>Email: seanrose@clarerose.com | Trade Debt | $419,542.54 |
| 36 | Parmed Pharmaceuticals Inc. | Parmed Pharmaceuticals Inc.<br>Attn.:   Daniel H. Movens - Senior VP<br>4220 Hyde Park Blvd.<br>Niagara Falls, NY 14305-1798<br>Tel: 716-284-5666<br>Fax: 800-727-6330<br>Email dmovens@parmedpharm.com | Trade Debt | $409,752.09 |
| 37 | Snyder's of Hanover | Snyder's of Hanover<br>Attn.: President or General Counsel<br>1250 York Street<br>P O Box 6917<br>Hanover, PA 17331<br>Tel: 717-632-4477<br>Fax: 717-632-7207<br>Email | Trade Debt | $401,018.63 |
| 38 | Valassis | Valassis<br>Attn.: President or General Counsel<br>19975 Victor Parkway/<br>Livonia, MI 48152<br>Tel: 734-591-3000<br>Fax: 860-285-6412<br>Email: | Trade Debt | $396,409.99 |
| 39 | Snapple Distributors Inc. | Snapple Distributors Inc.<br>Attn.: President or General Counsel<br>12891 Collections Center Dr.<br>Chicago, Il 60693<br>Tel: 972-673-7000<br>Fax: 972-365-8150<br>Email: | Trade Debt | $391,795.48 |
| 40 | Goya Foods | Goya Foods<br>Attn.: President or General Counsel<br>350 County Road<br>Jersey City, NJ 07307<br>Tel: 201-348-4900<br>Fax: 201-348-6609<br>Email: | Trade Debt | $382,773.18 |

WEIL:\95393231\2\50482.0004

**Schedule 3**

**Consolidated List of Holders of Four Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the Commencement Date, the four (4) largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Amount of Claim | Type of Collateral |
|-----|----------|-------------------------------------------------------------|-----------------|--------------------|
| 1. | Wells Fargo Bank, National Association, in its capacity as Agent for the Lenders, pursuant to that certain Amended and Restated Senior Secured Revolving Credit Agreement dated September 17, 2014 | Wells Fargo Bank, National Association<br>One Boston Place, 18th Floor<br>Boston, Massachusetts 02108<br>Attn:  Emily Abrahamson<br>Telephone:  (617) 854-7243<br>Facsimile:  (855)-842-6360<br>emily.j.abrahamson@wellsfargo.com | $300,000,000.00 | All personal property of the Debtors |
| 2. | Wells Fargo Bank, National Association, in its capacity as Agent for the Lenders, pursuant to that certain Amended and Restated Senior Secured Term Credit Agreement dated September 17, 2014 | Wells Fargo Bank, National Association<br>One Boston Place, 18th Floor<br>Boston, Massachusetts 02108<br>Attn:  Christian West<br>Telephone:  (617) 854-7263<br>Facsimile:  (877) 474-3331<br>christian.c.west@wellsfargo.com | $261,500,000.00 | All personal property of the Debtors |

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Amount of Claim | Type of Collateral |
|-----|----------|--------------------------------------------------------------|-----------------|--------------------|
| 3. | U.S. Bank National Association, in its capacity as Trustee and Collateral Agent for holders of Senior Secured PIK Toggle Notes due 2017, pursuant to that certain Indenture dated March 31, 2012, by and between Montvale-Para Holdings, Inc. and U.S. Bank National Association | U.S. Bank National Association<br>100 Wall Street<br>New York, NY 10005<br>Attn:  Corporate Trust Department<br>Facsimile:  (212) 361-6153 | $286,300,000.00 | All personal property of the Debtors |
| 4. | U.S. Bank National Association, in its capacity as Trustee and Collateral Agent for holders of Senior Secured Convertible Notes due 2018, pursuant to that certain Indenture dated March 13, 2012, by and between Montvale-Para Holdings, Inc. and U.S. Bank National Association | U.S. Bank National Association<br>100 Wall Street<br>New York, NY 10005<br>Attn:  Corporate Trust Department<br>Facsimile:  (212) 361-6153 | $390,800,000.00 | All personal property of the Debtors |

WEIL:\95271127\1\35076.0003

## <u>Schedule 4</u>

**Condensed Consolidated Balance Sheet (Unaudited)**
**as of May 23, 2015**

**MONTVALE-PARA HOLDINGS , INC.**
**CONSOLIDATED BALANCE SHEETS**
**( DOLLARS IN THOUSANDS )**
**(UNAUDITED)**

| | ACTUAL AS OF May 23, 2015 | | ACTUAL AS OF May 17, 2014 | |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 115,082 | $ | 210,634 |
| Restricted cash | | 1,039 | | 1,063 |
| Accounts receivable, net | | 92,241 | | 92,778 |
| Inventories, net | | 301,045 | | 318,325 |
| Prepaid expenses and other current assets | | 27,161 | | 44,130 |
| Total current assets | | 536,568 | | 666,930 |
| Non-current assets: | | | | |
| Property owned, net | | 865,730 | | 939,582 |
| Property under capital leases, net | | 29,574 | | 36,193 |
| Property, net | | 895,304 | | 975,775 |
| Intangible assets, net | | 79,205 | | 96,717 |
| Other assets | | 72,183 | | 114,893 |
| Total assets | $ | 1,583,260 | $ | 1,854,315 |
| **Liabilities and Stockholders' Deficit** | | | | |
| Current liabilities: | | | | |
| Current portion of long-term debt | $ | 10,080 | $ | 2,778 |
| Current portion of obligations under capital leases | | 7,762 | | 7,230 |
| Accounts payable | | 146,743 | | 153,580 |
| Book overdrafts | | 16,602 | | 16,498 |
| Accrued salaries, wages and benefits | | 63,742 | | 67,943 |
| Accrued taxes | | 15,941 | | 18,350 |
| Other accruals | | 121,078 | | 139,742 |
| Total current liabilities | | 381,948 | | 406,121 |
| Non-current liabilities: | | | | |
| $270 million Term Loan, due 3/14/2017 | | - | | 227,579 |
| $375/$300 million ABL, due 3/13/2017 | | - | | 15,200 |
| $270 million Term Loan, due 9/17/2019 | | 261,465 | | - |
| 12.5% PIK Toggle Note (2nd Lien) due 9/13/2017 | | 286,313 | | 245,180 |
| 14.0% New Convertible (3rd Lien) due 3/13/2018 | | 380,732 | | 346,643 |
| Other | | 423 | | 468 |
| Long-term debt | | 928,933 | | 835,070 |
| Long-term obligations under capital leases | | 56,276 | | 64,152 |
| Long-term real estate liabilities | | 328,534 | | 308,090 |
| Other financial liabilities | | 63,471 | | 64,419 |
| Other non-current liabilities | | 551,580 | | 517,288 |
| Total liabilities | | 2,310,742 | | 2,195,140 |
| Stockholders' deficit: | | | | |
| Common stock | | 8 | | 8 |
| Additional paid-in capital | | 83,614 | | 93,230 |
| Accumulated other comprehensive income (loss) | | (50,802) | | 16,903 |
| Accumulated deficit | | (760,302) | | (450,966) |
| Total stockholders' deficit | | (727,482) | | (340,825) |
| Total liabilities and stockholders' deficit | $ | 1,583,260 | $ | 1,854,315 |

## Schedule 5

**The Debtors' Securities**

       Pursuant to Local Rule 1007-2(a)(7), the Debtors submit that they have not issued securities that are registered with the Securities and Exchange Commission. The securities listed in the chart below were issued by Montvale-Para Holdings, Inc. pursuant to an exemption from registration under the Securities Exchange Act of 1934, as amended.

| Type of Security | Principal Amount | Approximate Number of Record Holders | As of |
|---|---|---|---|
| 12.5% Senior Secured PIK Toggle Notes due 2017 | $215,000,000.00 | 8 | July 19, 2015 |
| 14% Senior Secured Convertible Notes due 2018 | $250,000,000.00 | 8 | July 19, 2015 |

## Schedule 6

**Debtors' Property Not in the Debtors' Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, vendors, shippers, common carriers, materialmen, distributors, warehousemen, fulfillment houses, service providers, custodians, public officers or agents, where the Debtors' ownership interest is not affected.  Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## Schedule 7

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

### Leased Property[1]

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| A&P Live Better, LLC | 1 Padanaram St | Danbury | CT | 06812 | USA |
| A&P Live Better, LLC | 1511 Route 22 | Brewster | NY | 10509 | USA |
| A&P Live Better, LLC | 2200 Maple Ave | Fair Lawn | NJ | 07410 | USA |
| A&P Live Better, LLC | 3399 Aramingo Ave | Philadelphia | PA | 19134 | USA |
| A&P Live Better, LLC | 4365 Robert Kirkwood Highway | Wilmington | DE | 19808 | USA |
| APW Supermarkets, Inc. | 84 Jericho Turnpike | Commack | NY | 11725 | USA |
| APW Supermarkets, Inc. | 1510 Old Country Rd | Riverhead | NY | 11901 | USA |
| APW Supermarkets, Inc. | 3620 Long Beach Rd. | Oceanside | NY | 11572 | USA |
| APW Supermarkets, Inc. | 1236 Veteran's Highway | Hauppauge | NY | 11788 | USA |
| APW Supermarkets, Inc. | 777 Pulaski Road | Greenlawn | NY | 11740 | USA |
| APW Supermarkets, Inc. | 2475 Jericho Tpk. | Garden City | NY | 11040 | USA |
| APW Supermarkets, Inc. | 812 Montauk Hwy | Ctr Moriches | NY | 11934 | USA |
| APW Supermarkets, Inc. | 70 Sunset Ave | West Hampton | NY | 11978 | USA |
| APW Supermarkets, Inc. | 3100 Ocean Ave. | Brooklyn | NY | 11235 | USA |
| APW Supermarkets, Inc. | 60 Wall St | Huntington | NY | 11743 | USA |
| APW Supermarkets, Inc. | 2149 Ralph Ave. | Brooklyn | NY | 11234 | USA |
| APW Supermarkets, Inc. | 440 W Sunrise Hwy | North Patchogue | NY | 11772 | USA |

---

[1] The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

| APW Supermarkets, Inc. | 60 E Hoffman Av | Lindenhurst | NY | 11757 | USA |
| APW Supermarkets, Inc. | 5508 Sunrise Highway | Massapequa | NY | 11758 | USA |
| APW Supermarkets, Inc. | 67 Newtown Lane | Easthampton | NY | 11937 | USA |
| APW Supermarkets, Inc. | 167 Jagger Ln | Southampton | NY | 11968 | USA |
| APW Supermarkets, Inc. | 10095 Main Rd. | Mattituck | NY | 11952 | USA |
| APW Supermarkets, Inc. | 153-01 10th Ave | Whitestone | NY | 11357 | USA |
| APW Supermarkets, Inc. | 133-11 20th Ave | College Point | NY | 11356 | USA |
| APW Supermarkets, Inc. | 4054 Nesconset Highway | East Setauket | NY | 11733 | USA |
| APW Supermarkets, Inc. | 1686 Merrick Rd | Merrick | NY | 11566 | USA |
| APW Supermarkets, Inc. | 4560 Sunrise Hwy | Oakdale | NY | 11769 | USA |
| APW Supermarkets, Inc. | 336 N. Broadway | Jericho | NY | 11753 | USA |
| APW Supermarkets, Inc. | 2424 Flatbush Ave. | Brooklyn | NY | 11234 | USA |
| APW Supermarkets, Inc. | 196-35 Horace Harding Expy | Flushing | NY | 11365 | USA |
| APW Supermarkets, Inc. | 8121 New Utrecht Ave. | Brooklyn | NY | 11214 | USA |
| APW Supermarkets, Inc. | 890 Walt Whitman Rd. | Melville | NY | 11747 | USA |
| APW Supermarkets, Inc. | 2 Westbury Ave | Carle Place | NY | 11514 | USA |
| APW Supermarkets, Inc. | 1530 Front St | East Meadow | NY | 11554 | USA |
| APW Supermarkets, Inc. | 83-25 153rd Ave | Howard Beach | NY | 11414 | USA |
| APW Supermarkets, Inc. | 905 Atlantic Ave. | Baldwin | NY | 11510 | USA |
| APW Supermarkets, Inc. | 702 Hicksville Rd. | Massapequa | NY | 11758 | USA |
| APW Supermarkets, Inc. | 2162 Nesconset Hwy | Stony Brook | NY | 11790 | USA |
| APW Supermarkets, Inc. | 245 Route 25A | Rocky Point | NY | 11778 | USA |
| APW Supermarkets, Inc. | 259-01 Union Turnpike | Glen Oaks | NY | 11004 | USA |
| APW Supermarkets, Inc. | 112-15 Beach Channel Dr. | Bell Harbor | NY | 11694 | USA |

WEIL:\95391973\1\50482.0004

| APW Supermarkets, Inc. | 40 Great Neck Rd. | Great Neck | NY | 11021 | USA |
|---|---|---|---|---|---|
| APW Supermarkets, Inc. | 213-15 26th Ave | Bay Terrace | NY | 11360 | USA |
| APW Supermarkets, Inc. | 75-55 31st Ave | Jackson Hgts | NY | 11372 | USA |
| APW Supermarkets, Inc. | 156-01 Cross Bay Blvd. | Howard Beach | NY | 11414 | USA |
| APW Supermarkets, Inc. | 1-1 Park Plaza | Glen Head | NY | 11545 | USA |
| APW Supermarkets, Inc. | 35-10 Francis Lewis Blvd. | Bayside | NY | 11361 | USA |
| APW Supermarkets, Inc. | 85 E Park Ave | Long Beach | NY | 11561 | USA |
| APW Supermarkets, Inc. | 211 Middle Country Rd. | Selden | NY | 11784 | USA |
| APW Supermarkets, Inc. | 1050 Willis Ave | Albertson | NY | 11507 | USA |
| APW Supermarkets, Inc. | 1960 Deer Park Ave | Deer Park | NY | 11729 | USA |
| APW Supermarkets, Inc. | 6400 Amboy Rd | Staten Island | NY | 10309 | USA |
| APW Supermarkets, Inc. | 375 Tompkins Ave. | Rosebank | NY | 10305 | USA |
| Food Basics, Inc. | 498 East 30th Street | Paterson | NJ | 07504 | USA |
| Food Basics, Inc. | 514 Van Houten Ave | Passaic | NJ | 07055 | USA |
| Food Basics, Inc. | 465 Getty Ave. | Paterson | NJ | 07503 | USA |
| Food Basics, Inc. | 2185 Coyle St | Brooklyn | NY | 11229 | USA |
| Food Basics, Inc. | 937 Lincoln Ave | Glen Rock | NJ | 07452 | USA |
| Food Basics, Inc. | 414 Main Street | Belleville | NJ | 07109 | USA |
| Food Basics, Inc. | 8920 Frankford Ave. | Philadelphia | PA | 19135 | USA |
| Food Basics, Inc. | 1425 Kennedy Blvd | North Bergen | NJ | 07047 | USA |
| Food Basics, Inc. | 289 Bergen Blvd. | Fairview | NJ | 07022 | USA |
| Food Basics, Inc. | 15501 Bustleton Ave. #5 | Philadelphia | PA | 19116 | USA |
| Pathmark Stores, Inc. | 321 Stadium Plaza | Jersey City | NJ | 07305 | USA |
| Pathmark Stores, Inc. | 420 Grand St. | Jersey City | NJ | 07302 | USA |

3

| Pathmark Stores, Inc. | 115 Belmont Ave | Belleville | NJ | 07109 | USA |
| Pathmark Stores, Inc. | 405 NJ-17 | Hackensack | NJ | 07601 | USA |
| Pathmark Stores, Inc. | 2660 Hylan Blvd. | Staten Island | NY | 10306 | USA |
| Pathmark Stores, Inc. | 85 Ackerman Ave | Clifton | NJ | 07011 | USA |
| Pathmark Stores, Inc. | 4100 Park Ave | Weehawken | NJ | 07087 | USA |
| Pathmark Stores, Inc. | 58 Broadway | Elmwood Park | NJ | 07407 | USA |
| Pathmark Stores, Inc. | 895 Paulison Ave | Clifton | NJ | 07011 | USA |
| Pathmark Stores, Inc. | 281-295 Ferry Street | Newark | NJ | 07105 | USA |
| Pathmark Stores, Inc. | 481 River Road | Edgewater | NJ | 07020 | USA |
| Pathmark Stores, Inc. | 80 New Bridge Road | Bergenfield | NJ | 07621 | USA |
| Pathmark Stores, Inc. | 167 Bergen Street | Newark | NJ | 07103 | USA |
| Pathmark Stores, Inc. | 471-79 Lyons Ave | Irvington | NJ | 07111 | USA |
| Pathmark Stores, Inc. | 175 Lakeside Blvd. | Landing | NJ | 07850 | USA |
| Pathmark Stores, Inc. | 407 Valley Street | South Orange | NJ | 07079 | USA |
| Pathmark Stores, Inc. | 35 Lackawanna Plaza | Montclair | NJ | 07042 | USA |
| Pathmark Stores, Inc. | 1157 US-46 | Parsippany | NJ | 07054 | USA |
| Pathmark Stores, Inc. | 25 Kinnelon Road | Kinnelon | NJ | 07405 | USA |
| Pathmark Stores, Inc. | 757 Route 15 | Lake Hopatcong | NJ | 07849 | USA |
| Pathmark Stores, Inc. | 211 Elmora Ave | Elizabeth | NJ | 07202 | USA |
| Pathmark Stores, Inc. | 195 Rockland Center E. Route 59 | Nanuet | NY | 10954 | USA |
| Pathmark Stores, Inc. | 1757 Central Park Ave | Yonkers | NY | 10710 | USA |
| Pathmark Stores, Inc. | 130 Midland Ave | Port Chester | NY | 10573 | USA |
| Pathmark Stores, Inc. | 2540 Central Park Ave | Yonkers | NY | 10710 | USA |
| Pathmark Stores, Inc. | 10 Triangle Plaza | Ramsey | NJ | 07446 | USA |

4

| Pathmark Stores, Inc. | 242 Lincoln Blvd. | Middlesex | NJ | 08846 | USA |
| Pathmark Stores, Inc. | 10 South Ave | Garwood | NJ | 07027 | USA |
| Pathmark Stores, Inc. | 651 North Stiles Street | Linden | NJ | 07036 | USA |
| Pathmark Stores, Inc. | 95 New Brunswick Ave | Hopelawn | NJ | 08861 | USA |
| Pathmark Stores, Inc. | 1000 Easton Rd | Wyncote | PA | 19095 | USA |
| Pathmark Stores, Inc. | 500 Lincoln Highway | Fairless Hills | PA | 19030 | USA |
| Pathmark Stores, Inc. | 3021 Grays Ferry Ave | Philadelphia | PA | 19146 | USA |
| Pathmark Stores, Inc. | 561 Route 1 | Edison | NJ | 08817 | USA |
| Pathmark Stores, Inc. | 50 RaceTrack Road | East Brunswick | NJ | 08816 | USA |
| Pathmark Stores, Inc. | 176-82 W. Chelten Ave | Philadelphia | PA | 19144 | USA |
| Pathmark Stores, Inc. | 330 Oregon Ave | Philadelphia | PA | 19148 | USA |
| Pathmark Stores, Inc. | 8700 Frankford Ave | Philadelphia | PA | 19136 | USA |
| Pathmark Stores, Inc. | 4160 Monument Ave | Philadelphia | PA | 19131 | USA |
| Pathmark Stores, Inc. | 2900 North Broad St | Philadelphia | PA | 19132 | USA |
| Pathmark Stores, Inc. | 5005 Edgemont Ave | Brookhaven | PA | 19015 | USA |
| Pathmark Stores, Inc. | 840 Cottman Ave | Philadelphia | PA | 19111 | USA |
| Pathmark Stores, Inc. | 420 MacDade Blvd | Folsom | PA | 19033 | USA |
| Pathmark Stores, Inc. | 42 South 69th Street | Upper Darby | PA | 19082 | USA |
| Pathmark Stores, Inc. | 140 North MacDade Blvd | Glenolden | PA | 19036 | USA |
| Pathmark Stores, Inc. | 3020 Highway 35 | Hazlet | NJ | 07730 | USA |
| Pathmark Stores, Inc. | 1930 Highway 88 | Brick | NJ | 08724 | USA |
| Pathmark Stores, Inc. | 1600 St. Georges Ave | Avenel | NJ | 07001 | USA |
| Pathmark Stores, Inc. | 1043 Route 9 | Old Bridge | NJ | 08859 | USA |
| Pathmark Stores, Inc. | 1256 Indian Head Road | Toms River | NJ | 08755 | USA |

WEIL:\95391973\1\50482.0004

| Pathmark Stores, Inc. | 5100 Wellington Ave | Ventnor | NJ | 08406 | USA |
| Pathmark Stores, Inc. | 3901 Lancaster Pike | Wilmington | DE | 19805 | USA |
| Pathmark Stores, Inc. | 100 College Square | Newark | DE | 19711 | USA |
| Pathmark Stores, Inc. | 148 Sunset Blvd. | New Castle | DE | 19720 | USA |
| Pathmark Stores, Inc. | 101 Wicks Road | Brentwood | NY | 11717 | USA |
| Pathmark Stores, Inc. | 2060 Sunrise Highway | Bay Shore | NY | 11706 | USA |
| Pathmark Stores, Inc. | 300 West 145th Street | New York | NY | 10039 | USA |
| Pathmark Stores, Inc. | 5145 Nesconset Highway | Port Jefferson | NY | 11776 | USA |
| Pathmark Stores, Inc. | 130 Wheatley Plaza | Greenvale | NY | 11548 | USA |
| Pathmark Stores, Inc. | 160 East 125th Street | New York | NY | 10035 | USA |
| Pathmark Stores, Inc. | 410 West 207th Street | New York | NY | 10034 | USA |
| Pathmark Stores, Inc. | 492 East Atlantic Ave | East Rockaway | NY | 11518 | USA |
| Pathmark Stores, Inc. | 399 Route 112 | Patchogue | NY | 11772 | USA |
| Pathmark Stores, Inc. | 1251 Deer Park Ave | North Babylon | NY | 11703 | USA |
| Pathmark Stores, Inc. | 134-40 Springfield Blvd. | Springfield Gardens | NY | 11413 | USA |
| Pathmark Stores, Inc. | 625 Atlantic Ave | Brooklyn | NY | 11217 | USA |
| Pathmark Stores, Inc. | 31-06 Farrington Street | Whitestone | NY | 11354 | USA |
| Pathmark Stores, Inc. | 1764 Grand Ave | Baldwin | NY | 11510 | USA |
| Pathmark Stores, Inc. | 1245 61st Street | Brooklyn | NY | 11219 | USA |
| Pathmark Stores, Inc. | 4055 Merrick Road | Seaford | NY | 11783 | USA |
| Pathmark Stores, Inc. | 92-10 Atlantic Ave | Ozone Park | NY | 11417 | USA |
| Pathmark Stores, Inc. | 460 Franklin Ave | Franklin Square | NY | 11010 | USA |
| Pathmark Stores, Inc. | 111-10 Flatlands Ave | Brooklyn | NY | 11207 | USA |
| Pathmark Stores, Inc. | 1525 Albany Ave | Brooklyn | NY | 11210 | USA |

WEIL:\95391973\1\50482.0004

| | | | | | |
|---|---|---|---|---|---|
| Pathmark Stores, Inc. | 2965 Cropsey Ave | Brooklyn | NY | 11214 | USA |
| Pathmark Stores, Inc. | 155 Islip Ave | Islip | NY | 11751 | USA |
| Pathmark Stores, Inc. | 5801 Sunrise Highway | Sayville | NY | 11741 | USA |
| Pathmark Stores, Inc. | 1-37 12th Street | Brooklyn | NY | 11215 | USA |
| Pathmark Stores, Inc. | 531 Montauk Highway | West Babylon | NY | 11704 | USA |
| Pathmark Stores, Inc. | 800 Montauk Highway | Shirley | NY | 11967 | USA |
| Pathmark Stores, Inc. | 2136 Bartow Ave | Bronx | NY | 10475 | USA |
| Pathmark Stores, Inc. | 2335 New Hyde Park Road | New Hyde Park | NY | 11040 | USA |
| Pathmark Stores, Inc. | 941 Carmans Road | Massapequa | NY | 11758 | USA |
| Pathmark Stores, Inc. | 3901 Hempstead Tpke. | Bethpage | NY | 11714 | USA |
| Pathmark Stores, Inc. | 961 East 174th Street | Bronx | NY | 10460 | USA |
| Pathmark Stores, Inc. | 2150 Middle Country Road | Centereach | NY | 11720 | USA |
| Pathmark Stores, Inc. | 683 Old Country Road | Dix Hills | NY | 11746 | USA |
| Pathmark Stores, Inc. | 1720 Eastchester Road | Bronx | NY | 10461 | USA |
| Pathmark Stores, Inc. | 2730 Arthur Kill Road | Staten Island | NY | 10309 | USA |
| Pathmark Stores, Inc. | 100 Greaves Lane | Staten Island | NY | 10308 | USA |
| Pathmark Stores, Inc. | 2875 Richmond Ave | Staten Island | NY | 10314 | USA |
| Pathmark Stores, Inc. | 1351 Forest Ave | Staten Island | NY | 10302 | USA |
| Shopwell, Inc. | 1175 Third Ave | New York | NY | 10021 | USA |
| Shopwell, Inc. | 1450 Third Ave | New York | NY | 10028 | USA |
| Shopwell, Inc. | 969 Second Ave | New York | NY | 10022 | USA |
| Shopwell, Inc. | 2415 Broadway | New York | NY | 10024 | USA |
| Shopwell, Inc. | 1331 First Ave | New York | NY | 10021 | USA |
| Shopwell, Inc. | 10 Union Square | New York | NY | 10003 | USA |

WEIL:\95391973\1\50482.0004

| | | | | | |
|---|---|---|---|---|---|
| Shopwell, Inc. | 452 W 43rd St | New York | NY | 10036 | USA |
| Shopwell, Inc. | 810 8th Ave | New York | NY | 10019 | USA |
| Shopwell, Inc. | 1066 3rd Ave | New York | NY | 10021 | USA |
| Shopwell, Inc. | 316 Greenwich St. | New York | NY | 10013 | USA |
| Shopwell, Inc. | 401 E 59th Street | New York | NY | 10022 | USA |
| Shopwell, Inc. | 1175 Third Avenue Suite A | New York | NY | 10021 | USA |
| Super Fresh Food Markets, Inc. | 1305 West Chester Pike | Haverton | PA | 19083 | USA |
| Super Fresh Food Markets, Inc. | 180 West Girard Ave | Philadelphia | PA | 19123 | USA |
| Super Fresh Food Markets, Inc. | 863 E. Baltimore Pike, | Kennett Square | PA | 19348 | USA |
| Super Fresh Food Markets, Inc. | 800 Bustleton Pike | Richboro | PA | 18954 | USA |
| Super Fresh Food Markets, Inc. | 250 E Lancaster | Wynnewood | PA | 19096 | USA |
| Super Fresh Food Markets, Inc. | 1025 Youngsford | Gladwyne | PA | 19035 | USA |
| Super Fresh Food Markets, Inc. | 1301 W. Skippack Pike | Center Square | PA | 19422 | USA |
| Super Fresh Food Markets, Inc. | 609 E. Bay Ave | Manahawkin | NJ | 08050 | USA |
| Super Fresh Food Markets, Inc. | 2400 Delaware Ave. | Wildwood | NJ | 08260 | USA |
| Super Fresh Food Markets, Inc. | 800 West Ave. | Ocean City | NJ | 08226 | USA |
| Super Fresh Food Markets, Inc. | 18578 Coastal Highway, Unit 13 | Rehoboth Beach | DE | 19971 | USA |
| Super Fresh Food Markets, Inc. | 2105 Philadelphia Pike | Claymont | DE | 19703 | USA |
| Super Fresh Food Markets, Inc. | 1812 Marsh Rd. Unit 1 | Wilmington | DE | 19810 | USA |
| Super Fresh Food Markets, Inc. | 2044 New Castle | New Castle | DE | 19720 | USA |
| Super Fresh Food Markets, Inc. | 401 New London | Newark | DE | 19711 | USA |
| Super Fresh Food Markets, Inc. | 322 W. Bridge St. | New Hope | PA | 18938 | USA |
| Super Fresh Food Markets, Inc. | 1851 S. Christopher Columbus Blvd. Unit 3 | Philadelphia | PA | 19148 | USA |
| Super Fresh Food Markets, Inc. | 309 S. 5th St. | Philadelphia | PA | 19106 | USA |

WEIL:\95391973\1\50482.0004

| Super Fresh Food Markets, Inc. | 1001 South St. | Philadelphia | PA | 19147 | USA |
|---|---|---|---|---|---|
| Super Fresh Food Markets, Inc. | 7162 Ridge Ave | Philadelphia | PA | 19128 | USA |
| Super Fresh Food Markets, Inc. | 450 W Swedeford Rd | Devon | PA | 19333 | USA |
| Super Fresh Food Markets, Inc. | 300 S Best Ave | Walnutport | PA | 18088 | USA |
| Super Fresh Food Markets, Inc. | 643 Conchester Hwy | Boothwyn | PA | 19061 | USA |
| Super Fresh Food Markets, Inc. | 2101-41 Cottman Avenue | Philadelphia | PA | 19149 | USA |
| Super Fresh Food Markets, Inc. | 85 Franklin Mills Blvd. | Philadelphia | PA | 19154 | USA |
| Super Fresh Food Markets, Inc. | 7700 Crittenden St. | Philadelphia | PA | 19118 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 9507 Coastal Hwy | Ocean City | MD | 21842 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 12641 Ocean Gateway | Ocean City | MD | 21842 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 771 Pine St | Bristol | CT | 06011 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 40 Fenn Road | Newington | CT | 06111 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 25 Broadway Ave. | Mystic | CT | 06355 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 117 Boston Post Road | Waterford | CT | 06385 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 28 Halls Rd. | Old Lyme | CT | 06371 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 282 Elm St | New Canaan | CT | 06840 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1259 Boston Post Road | Riverside | CT | 06878 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 42 Danbury Rd | Ridgefield | CT | 05877 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 57 Route 46 | Hackettstown | NJ | 07840 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 30 Irvington Av | Westwood | NJ | 07675 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 21 Summit St | Summit | NJ | 07901 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1205 Richmond Ave. | Pt. Pleasant Beach | NJ | 08742 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 45 Pearl St | Metuchen | NJ | 08840 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1069 Ringwood Ave Suite 108 | Haskell | NJ | 07420 | USA |

9

| | | | | | |
|---|---|---|---|---|---|
| The Great Atlantic & Pacific Tea Company, Inc. | 1103 Rte 46 | Ledgewood | NJ | 07852 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 534 Bergen Blvd | Palisades Park | NJ | 07024 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1643 Route 82 | Lagrangeville | NY | 12540 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 13 N. Ave | Pleasant Valley | NY | 12569 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 3105 E. Main St. | Mohegan Lake | NY | 10547 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 3101 Route 22 | Patterson | NY | 12563 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 805 Mamaroneck Ave. | Mamaroneck | NY | 10543 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1366 E. Main St | Shrub Oak | NY | 10588 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 3 Village Center | Mahopac | NY | 10541 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 829 Route 82 | Hopewell Junction | NY | 12533 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1223 Nepperhan Ave. | Yonkers | NY | 10703 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 660 Mclean Ave. | Yonkers | NY | 10704 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 668 Central Ave | Scarsdale | NY | 10583 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 20 Welcher Ave. | Peekskill | NY | 10566 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 132 Bedford Rd | Katonah | NY | 10536 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 100 Triangle Center | Yorktown | NY | 10598 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | Rt. 22 & Rt. 138 | Goldens Brdg | NY | 10526 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 230 Saw Mill Rd. | Millwood | NY | 10546 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 195 N. Bedford Rd. | Mount Kisco | NY | 10549 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 75 Mayhill St | Saddle Brook | NJ | 07663 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1260 Springfield Ave | New Providence | NJ | 07974 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 403 King George Road | Basking Ridge | NJ | 07920 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 315 Pascack Rd | Township of Washington | NJ | 07676 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 216 Old Tappan Rd | Old Tappan | NJ | 07675 | USA |

10

| | | | | | |
|---|---|---|---|---|---|
| The Great Atlantic & Pacific Tea Company, Inc. | 152 Route 94 | Blairstown | NJ | 07825 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 2160 Lemoine Ave | Fort Lee | NJ | 07024 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1185 Amboy Ave | Edison | NJ | 08817 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 23 Quaker Ridge | New Rochelle | NY | 10804 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 325 State Highway 35 | Matawan | NJ | 07721 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 614 Clinton Street | Hoboken | NJ | 07030 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 550 Myrtle Ave | Boonton | NJ | 07005 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 425 Anderson Av | Fairview | NJ | 07022 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 137 Lake St | Midland Park | NJ | 07432 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 530 Rt 515 Unit 1 | Vernon | NJ | 07462 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 990 Shrewsbury Ave | Tinton Falls | NJ | 07724 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 63 Wanaque Ave | Pomton Lakes | NJ | 07442 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 45 Demercurio Dr. | Allendale | NJ | 07401 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 5734 Berkshire Valley Rd | Jefferson | NJ | 07438 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 125 Main Street | Denville | NJ | 07834 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 907 Oak Tree Road | S. Plainfield | NJ | 07080 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 2101 Route 35 | Holmdel | NJ | 07733 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 520 Chestnut Ridge Rd | Woodcliff Lake | NJ | 07677 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 199 Kinderkamack Rd. | Park Ridge | NJ | 07656 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 560 Valley Road | Wayne | NJ | 07470 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 117 Franklin Tpk. | Mahwah | NJ | 07430 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 455 Rt 23 North | Sussex | NJ | 07461 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1938 Union Valley Rd. | West Milford | NJ | 07421 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 148 Center Grove Rd | Randolph | NJ | 07869 | USA |

11

| The Great Atlantic & Pacific Tea Company, Inc. | 396 Demarest Ave | Closter | NJ | 07624 | USA |
|---|---|---|---|---|---|
| The Great Atlantic & Pacific Tea Company, Inc. | 1730 Rt 46 West | Woodland Park | NJ | 07424 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 261 S Ridge St | Rye Brook | NY | 10573 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 160 W Putnam Av | Greenwich | CT | 06830 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 355 Halstead Ave. | Harrison | NY | 10528 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1261 East Putnam Ave. | Riverside | CT | 06878 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 19 Belleville Ave. | Bloomfield | NJ | 07003 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 55 Riverwalk Dr. | West New York | NJ | 07093 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 5661 Riverdale Ave. | Bronx | NY | 10471 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1886 Pleasantville Rd. | Briarcliff Manor | NY | 10510 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 777 White Plains Rd. | Scarsdale | NY | 10583 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 12-14 Cedar St | Bronxville | NY | 10708 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 87 Main Street | Hastings | NY | 10706 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 422 Old Post Rd. | Bedford | NY | 10506 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1201 High Ridge Rd. | Stamford | CT | 06905 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 2005 Albany Post Rd. | Croton-on-Hudson | NY | 10520 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 103 Knollwood Rd. | Greenburgh | NY | 10607 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 610 Columbus Ave | Thornwood | NY | 10594 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 14 Lake Ridge Plaza | Valley Cottage | NY | 10989 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 117 Washington Valley Rd | Warren | NJ | 07059 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 64 Brick Plaza | Bricktown | NJ | 08723 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 431 County Rd. Route 513 | Califon | NJ | 07830 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 459 Rt. 31 South | Washington | NJ | 07882 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 3500 Rt. 9 | Old Bridge | NJ | 08857 | USA |

12

| The Great Atlantic & Pacific Tea Company, Inc. | 507 Prospect Ave. | Little Silver | NJ | 07739 | USA |
|---|---|---|---|---|---|
| The Great Atlantic & Pacific Tea Company, Inc. | 1060 Raritan Road | Clark | NJ | 07066 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 510 Valley Rd | Montclair | NJ | 07043 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 80 Market Street | Kenilworth | NJ | 07033 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 510 Milltown Rd | North Brunswick | NJ | 08902 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 105 South Ave | Fanwood | NJ | 07023 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 5 Ortley Plaza | Ortley Beach | NJ | 08751 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 1002 Rt. 36 | Navesink | NJ | 07716 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 2007 Route 35 | Wall Township | NJ | 07719 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 525 E. Route 46 | Belvidere | NJ | 07823 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 49 Old Route 22 | Clinton | NJ | 08809 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 7 Naughbright Rd. | Mt. Olive | NJ | 07840 | USA |
| The Great Atlantic & Pacific Tea Company, Inc. | 460 County Line Rd./Route 520 | Marlboro | NJ | 07746 | USA |
| The Old Wine Emporium of Westport, Inc. | 2400 Berlin Turnpike | Newington | CT | 06111 | USA |
| Tradewell Foods of Connecticut, Inc. | 280 Elm St. | New Canaan | CT | 06840 | USA |
| Waldbaum, Inc. | 125 18th Street | Jersey City | NJ | 07310 | USA |

13

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors have assets of more than $1.5 billion, as provided in Schedule 4, with substantial assets in Connecticut, Delaware, Maryland, New Jersey, New York, and Pennsylvania.

### Books and Records

The Debtors' books and records are located at Two Paragon Drive, Montvale, New Jersey 07645.

### Debtors' Assets Outside the United States

The Debtors do not have significant assets located outside of the territorial limits of the United States.

## **Schedule 9**

### **Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of  the Debtors' knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Commencement Date, where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilities & Experience |
|---|---|
| **Paul Hertz**<br><br>*President & Chief Executive Officer* | Mr. Hertz has served as the President and Chief Executive Officer of Montvale-Para Holdings, Inc. ("**Montvale**") and The Great Atlantic & Pacific Tea Company, Inc. ("**A&P**") since March 2014. Prior to assuming those roles, he served as an Executive Vice President and as the Chief Operating Officer of A&P, where he was responsible for overseeing all of the Debtors' store and back-office operations.   Prior to his tenure at A&P, Mr. Hertz served as an Executive Vice President of Retail Stores of Office Max from 2007 to 2010 and Senior Vice President of Stores at Wild Oats from 2006 to 2007.   Mr. Hertz has over 25 years of experience in the supermarket retailing industry. |
| **Christopher McGarry**<br><br>*Chief Restructuring Officer* | Mr. McGarry was appointed as Chief Restructuring Officer on July 19, 2015.  Prior to that appointment, he served as an Executive Vice President and as the Chief Administrative Officer of Montvale and A&P since March 2014.  Mr. McGarry manages the Debtors' day-to-day business operations and regularly reports to Mr. Hertz. Prior to assuming his current roles, Mr. McGarry served as a Senior Vice President and as the General Counsel of A&P.  Prior to his tenure at A&P, Mr. McGarry served as the General Counsel of Exel, Inc. and as Assistant General Counsel and Head of Real Estate of the Grand Union Company.  Mr. McGarry has over 20 years of relevant industry experience. |

| Name & Position | Responsibilities & Experience |
|---|---|
| **Tim Carnahan**<br><br>*Senior Vice President, Chief Financial Officer & Treasurer (Montvale & A&P)*<br><br>*President (all other Debtors)* | Mr. Carnahan has served as a Senior Vice President and as the Chief Financial Officer and Treasurer of Montvale and A&P since August 2014.   In these capacities, he manages the Debtors' financial risk and is responsible for financial planning and recordkeeping.   His duties also include overseeing the Debtors' centralized cash management system and managing personnel in the Debtors' finance department.   In addition, Mr. Carnahan serves as the President of each of the other Debtors.   Mr. Carnahan has over 30 years of grocery and related industry experience and has held management positions at Big V/ShopRite Supermarkets, The Grant Union Company, Office Depot, and Kroger. |
| **Nirup Krishnamurthy**<br><br>*Executive Vice President & Chief Strategy Officer* | Mr. Krishnamurthy has served as an Executive Vice President and as the Chief Strategy Office of Montvale and A&P since March 2014.   In these capacities, he assists Mr. Hertz and Mr. McGarry with the development, communication, and execution of the Debtors' strategic initiatives.   Prior to assuming these roles, Mr. Krishnamurthy served as a Senior Vice President and as the Chief Information Officer of A&P from September 2011 to March 2014.   Mr. Krishnamurthy has over 20 years of experience in the technology industry, including extensive background in driving large-scale business optimization and transformation efforts.   Prior to his tenure at A&P, Mr. Krishnamurthy served as the Chief Information Officer of United Airlines and as the Chief Technology Officer at Northern Trust Bank. |
| **Eric Kanterman**<br><br>*Executive Vice President & Chief Merchandising Officer* | Mr. Kanterman has served as an Executive Vice President and as the Chief Merchandising Officer of Montvale and A&P since December 2014.   He oversees the sales and merchandising operations of the Debtors' retail supermarket stores. Prior to assuming these roles, Mr. Kanterman held several management positions at A&P, including Regional Sales Manager, Vice President of Sales and Merchandising, Senior Vice President of Operations, and Chief Operating Officer.   Mr. Kanterman has nearly 30 years of experience in the supermarket retailing industry. |

WEIL:\95392006\1\50482.0004

| Name & Position | Responsibilities & Experience |
|---|---|
| **Brian Fitzpatrick**<br><br>*Executive Vice President & Chief Operating Officer* | Mr. Fitzpatrick has served as an Executive Vice President and as the Chief Operating Officer of Montvale and A&P since December 2014.   He oversees the ongoing business operations of the Debtors' businesses.   Prior to assuming these roles, Mr. Fitzpatrick held several management positions at A&P, including Senior Vice President of Operations, Vice President of Labor/Operational Effectiveness, Director of Retail Support, and Director of Labor Productivity.   Mr. Fitzpatrick has over 35 years of operations experience in the supermarket retailing industry. |
| **Richard Angelillo**<br><br>*Vice President & Chief Information Officer* | Mr. Angelillo has served as a Vice President and as the Chief Information Officer of Montvale and A&P since December 2014.   Mr. Angelillo is responsible for overseeing the Debtors' information technology systems.   Prior to assuming these roles, Mr. Angelillo held several management positions at A&P, including Vice President of Application Integration/Information Systems Management, Vice President of Data Management, and Director of Project Management. |
| **Matthew Bennett**<br><br>*Vice President, General Counsel & Secretary* | Mr. Bennett has served as a Vice President and as the General Counsel and Secretary of Montvale and A&P since December 2014.   In these capacities, he serves as the chief attorney of the Debtors' legal department, manages the Debtors' records, and acts as a liaison between senior management and the Debtors' boards of directors/managers.   Prior to assuming these roles, Mr. Bennett served as the Vice President of Legal Services and as Senior Counsel. |
| **Joan Baker**<br><br>*Treasurer (all Debtors other than Montvale and A&P)* | Ms. Baker has served as the Treasurer for each of the Debtors other than Montvale and A&P since August 2014.   In this capacity, she is responsible for overseeing and managing the financial records and treasury departments of the applicable Debtors.   Ms. Baker also assists Mr. Carnahan with the management of the Debtors' centralized cash management system. |

3

## Schedule 11

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $53,900,000.00 |
| **Payments to Officers, Stockholders, and Directors** | $410,000.00 |
| **Payments to Financial and Business Consultants** | $1,335,000.00 |

**Schedule 12**

**Cash Receipts and Disbursements,**
**Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $398,000,000.00 |
| **Cash Disbursements** | $405,400,000.00 |
| **Net Cash Loss** | Not applicable |
| **Unpaid Obligations** | $130,000,000.00 |
| **Uncollected Receivables** | $76,600,000.00 |