WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
In re                                          :
                                               :      **Chapter 11**
**THE GREAT ATLANTIC & PACIFIC TEA**           :
**COMPANY, INC.,** *et al.,*                   :      **Case No. 15-23007 (RDD)**
                                               :
            **Debtors.**[1]                    :      **(Joint Administration Pending)**
                                               :
------------------------------------------------------------------x

### MOTION OF DEBTORS FOR INTERIM AND FINAL AUTHORITY TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2), (C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: The Great Atlantic & Pacific Tea Company, Inc. (0974); Montvale-Para Holdings, Inc. (2947); 2008 Broadway, Inc. (0986); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corp. (7132); APW Supermarkets, Inc. (9509); Borman's Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Great Atlantic & Pacific Tea Company, Inc. ("**A&P**") and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully represent:

## Jurisdiction

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory basis for the relief requested herein are sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**").

## Preliminary Statement[2]

3.      The Debtors commenced these Chapter 11 Cases to implement a comprehensive mergers and acquisitions strategy designed to result in the sale of as many of their 296 stores on a going concern basis as possible (the "**Sale Strategy**").  The Sale Strategy is the linchpin of these Chapter 11 Cases and the driving force behind the Debtors' ability to maximize recoveries for all creditors and preserve thousands of jobs.  The Debtors engaged Evercore Group LLC ("**Evercore**") to actively market the sale of and oversee the Sale Strategy with respect to 120 of the Debtors' stores and related assets (the "**Tier I Sale Process**").  As a

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Interim Order or the applicable DIP Documents.

WEIL:\95399539\2\50482.0004

result of the Debtors' and Evercore's efforts, the Debtors are able to enter into these Chapter 11 Cases with asset purchase commitments totaling approximately $600 million. The Debtors further crafted the Sale Strategy such that it will continue postpetition to facilitate the sale or orderly disposition of the remaining stores (the "**Tier II Sale Process**") pursuant to a robust marketing process conducted by Hilco Real Estate, LLC ("**Hilco**").

4.     To fund the transactions contemplated by the Sale Strategy and, importantly, bridge the liquidity gap between commencing these Chapter 11 Cases and receiving the proceeds of any store sales, the Debtors sought and procured a $100 million secured third lien postpetition term loan facility (the "**Junior Lien DIP Facility**" and the obligations thereunder, the "**DIP Obligations**") pursuant to that certain Senior Secured Debtor-in-Possession Term Credit Agreement (the "**DIP Credit Agreement**"),[3] dated as of July 19, 2015, amongst A&P, as borrower (the "**Borrower**"), each of the other Debtors (other than Kwik Save Inc.), as guarantors, Fortress Credit Corp. ("**Fortress**"), as administrative and collateral agent, and the lender parties thereto (the "**DIP Lenders**"). The Junior Lien DIP Facility before the Court, comprised of a new money term loan facility (together, the "**DIP Facilities**"), is the financing necessary to providing the Debtors with a sufficient runway to fund the Sale Strategy, stabilize their vendors and bridge the liquidity gap between the filing of this case and the realization of asset sale proceeds. The Junior Lien DIP Facility was procured at the conclusion of the Debtors' and Evercore's competitive prepetition marketing efforts and negotiations with various potential lenders and it contains competitive terms that are favorable to the company and its creditors.

5.     As further described in the Goldstein Declaration, obtaining debtor-in-possession financing ("**DIP Financing**") pursuant to the terms of the Junior Lien DIP Facility is

---

[3] A copy of the form of DIP Credit Agreement is annexed hereto as **Exhibit "C."**

an incredible feat for A&P.  Evercore was cognizant of the difficulties in obtaining DIP Financing given that all or substantially all of the Debtors' assets are encumbered.  Although the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties are oversecured, as clearly evidenced by the current amount by which the value of the Debtors' Collateral exceeds the outstanding borrowing under such facilities, the Debtors may lack the necessary collateral value to provide a sufficient equity cushion to adequately protect the interests of holders of Prepetition Senior Secured PIK Notes and Prepetition Convertible Notes.  Absent a priming fight, the Debtors would require (i) the consent or non-objection of the Prepetition Secured Party holding such interest to have its liens primed, or (ii) to locate a third-party lender willing to provide DIP Financing on an unsecured basis or secured by liens junior in priority to the approximately $1.2 billion of prepetition secured debt.  In this context, Evercore contacted lenders within the Debtors' existing prepetition capital structure and approximately ten other financial institutions ("**Potential DIP Lenders**") experienced in distressed lending and DIP financings.

6.      As discussed more fully in the Goldstein Declaration, Evercore assisted the Debtors' management team in undergoing a competitive process to secure the best available financing option under the circumstances.  This process resulted in a number of competing DIP Financing proposals, including from a lender within the prepetition capital structure.  As further detailed herein, upon reviewing the best and final terms submitted by certain of the Potential DIP Lenders, the Debtors, with the assistance of their advisors, concluded that Fortress' proposal offered the most favorable economic terms with flexible covenant and milestone provisions.  The Debtors entered into a commitment letter with Fortress on July 12, 2015, and advised the other potential DIP Financing lenders of its decision.

4

7.     On July 17, 2015, a new proposal was submitted by the Potential DIP Lender that participated in the initial process and proposed financing in conjunction with Wells Fargo (the "**Fourth DIP Proposal**").  The Fourth DIP Proposal nearly mirrored the terms agreed upon with Fortress except with respect to certain key provisions.  Upon receipt of the Fourth DIP Proposal, the Debtors reengaged Fortress and further negotiated the Fortress Proposal.  On July 18, 2015, Fortress modified its proposal such that the Debtors were offered even more advantageous terms memorialized in the form of the Junior Lien DIP Facility before the Court.

8.     In performing a side-by-side comparison of the Fourth DIP Proposal and the Junior Lien DIP Facility, the Debtors concluded that the proposal submitted by the DIP Lenders was superior in all material respects and was by far in the best interests of their estates and creditors.  The Junior Lien DIP Facility provides the Debtors with substantial flexibility to operate their businesses and implement the Sale Strategy, imposes virtually the same fees as the Fourth DIP Proposal, and is void of many of the harsh covenants and milestones proposed by any of the other Third Party Lenders or existing under the Prepetition Financing Documents.

9.     The Debtors have an immediate need for access to the Junior DIP Lien Facility and the use of Cash Collateral, in light of the immediate and irreparable harm that will be suffered by the Debtors' estates if they do not have access to the cash necessary to, among other things, satisfy their working capital and operational needs — all of which are vital to preserving and maintaining the Debtors' going-concern value for the benefit of the Sale Strategy and all parties in interest.   The Debtors' customers, their tens of thousands of employees, critical vendors, and all of the Debtors' constituents are depending on the Debtors' ability to keep its doors open and fund the Sale Strategy such that the maximum amount of stores can be sold as a going concern.

WEIL:\95399539\2\50482.0004

10. It is beyond peradventure that the Debtors' access to sufficient working capital and liquidity made through the use of Cash Collateral, incurrence of new indebtedness, and other financial accommodations, are vital to the preservation and maintenance of their going concern value. Further, given the realities of the Debtors' circumstances, including a capital structure that includes little to no available unencumbered assets, the terms of the prudently selected Junior Lien DIP Facility reflects the most reasonable and viable option for the Debtors.

11. For the reasons set forth herein, the Debtors believe that authority to obtain DIP Financing as provided under the DIP Facilities and use of the Cash Collateral is in the best interests of the Debtors, their estates and their creditors and should be granted.

### Concise Summary of the Terms of the Junior Lien DIP Facility[4]

12. In accordance with Bankruptcy Rules 4001(b) and 4001(d) and Local Rule 4001-2(a), the below charts summarize the significant terms of the Interim Order and the DIP Documents. The Debtors believe that the following provisions of the DIP Documents and the Interim Order are justified and necessary in the context and circumstances of these cases:

| MATERIAL TERMS OF THE JUNIOR LIEN DIP FACILITY | |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | The Great Atlantic & Pacific Tea Company, Inc. *See* **DIP Credit Agreement, [Preamble]; Interim Order Recital (IA).** |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each Debtor listed on Schedule 1.01(G) to the DIP Credit Agreement. *See* **DIP Credit Agreement, Preamble; Interim Order Recital (IA).** |

---

[4] This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Credit Agreement or the Interim DIP Order. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Credit Agreement, the provisions of the DIP Credit Agreement shall control. Any terms used but not defined in the chart shall have the meanings ascribed to such terms in the applicable DIP Credit Agreement or the proposed Interim Order, as applicable. **In accordance with Local Rule 4001-2, sections that must be highlighted for the Court are in bold and marked with an asterisk.**

| | |
|---|---|
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Fortress Credit Corp. and one or more of its designated affiliates or other lender parties thereto from time to time, as lenders.  ***See* DIP Credit Agreement Preamble; Interim Order Recital (IA).** |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Fortress Credit Corp. as administrative and collateral agent.  ***See* DIP Credit Agreement, Preamble; Interim Order Recital (IA).** |
| **Junior Lien DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(ii) | $100 million secured third priority new money term loan credit facility.  ***See* DIP Credit Agreement, Recitals; Interim Order Recital (IA)**. |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | Initial draw: $50 million<br><br>***See* Interim Order ¶ 13(b)**. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(2) | Use of Cash Collateral and proceeds of the Junior Lien DIP Facility are subject to a Budget, consisting of (i) weekly statement of receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing with the first week following the Commencement Date, and (ii) no less frequently than every four weeks, commencing on August 7, 2015.  ***See* DIP Credit Agreement §6.11; Interim Order ¶ 22(e).** |
| **Use of DIP Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Bankruptcy Rule 4001-2(a)(6)-(a)(7) | Provide general operating capital needs in accordance with the Budget<br><br>***See* DIP Credit Agreement §6.11; Interim Order ¶ (12)(b).** |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Base Rate:  LIBOR + 11.5% (1.00% Floor)<br>Default Interest Rate:  The Base Rate plus 2.00% per annum.<br><br>***See* DIP Credit Agreement § 2.09.** |
| **Expenses and Fees\***<br>Local Rule 4001-2(a)(3) | DIP Facility Administrative Fee: $25,000 payable on the Interim Funding Date.<br><br>Closing Fee: 2.5% of the original principal amount of the Junior Lien DIP Facility, half of which shall be earned and payable on the Interim Funding Date.<br><br>Make Whole:  A six month make whole equal to the present value of all required payments of interest on the amount prepaid or repaid or the amount of such reduction in the Junior Lien DIP Facility (using (a) an interest rate equal to the Adjusted LIBO Rate plus the Applicable Margin plus, if applicable, the Default Rate and (b) a discount rate equal to the Treasury Rate as of the date of determination plus 0.50%).  ***See* DIP Credit Agreement §2.09.** |

WEIL:\95399539\2\50482.0004

| | |
|---|---|
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(10) | The earlier of:<br>(i)    1 year after the Closing Date;<br>(ii)   45 days after Interim Order is entered if the Final Order has not been entered;<br>(iii)  the date the DIP Lenders accelerate the DIP Obligations and terminate commitments to make loans following an Event of Default;<br>(iv)  a sale, when taken with all previously consummated sales, effects a sale of all or substantially all of the Debtors' assets;<br>(v)   the effective date of a chapter 11 plan; and<br>(vi)  the occurrence of a Cash Collateral Termination Event.<br><br>*See* **DIP Credit Agreement § 2.04.** |
| **Prepayments**<br>Local Rule 4001-2(a)(13) | **Mandatory Prepayments:** The Debtors shall make mandatory prepayments and may make voluntary prepayments of the DIP Facility as and when provided under, and for application in accordance with, the terms of the DIP Documents.<br><br>*See* **DIP Credit Agreement §§ 2.05 and 2.07; Interim Order ¶ 16(d).** |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(ii);<br>Local Rule 4001-2(a)(4) | The DIP Obligations shall be secured by a third lien on the Term Priority Collateral and the ABL Priority Collateral (the "**DIP Liens**").<br><br>*See* **DIP Credit Agreement § 2.15; Interim Order ¶ 14.** |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B);Local Rule 4001-2(a)(2) | Customary borrowing conditions, including, among other things:<br><br>• Execution of the DIP Documents<br>• Interim Order approving the DIP Facility and Cash Collateral usage and granting a lien upon and security interest in the DIP Collateral<br>• Payment of fees and expenses<br>• The delivery of the Budget<br>• Execution of the Stalking Horse Asset Purchase Agreements ("**APAs**") covering stores with a minimum value attributable to the assets of $275 million (excluding inventory and prescriptions)<br>• Payment of all rent due with respect to lease locations that are subject to APAs<br><br>*See* **DIP Credit Agreement § 4.01.** |

WEIL:\95399539\2\50482.0004

| | |
|---|---|
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(8) | Usual and customary for financings of this type, including, among other things:<br><br>Covenants: Include minimum liquidity of $20 million, tested each Friday, delivery of financial statements, (actual amounts of disbursements not to exceed the applicable Budget by more than 15% on a cumulative basis for the last 3 week period and status updates re sale process.<br><br>Affirmative Covenants: Include delivery of financial statements and other information, maintenance of existence, payment of taxes and claims, maintenance of properties and insurance, inspections and compliance with laws.<br><br>Negative Covenants: Include limitations on indebtedness, liens, guarantees, negative pledges, restricted payments, subsidiary distributions, investments, fundamental changes, disposition of assets, acquisitions, disposal of subsidiary interests, sale and lease-backs, transactions with affiliates, conduct of business and deposit accounts.<br><br>*See* **DIP Credit Agreement § 7.15, Article VI, Article VII.** |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(10) | **Events of Default**. Usual and customary for financings of this type, including, among other things:<br>• Nonpayment when required.<br>• Failure to perform or observe any term, covenant or agreement<br>• Failure to perform is not cured within 30 days<br>• Making any misleading or false representations and warranties<br>• Challenge payments made to the DIP Agent or DIP Lenders<br>• Judgments entered against any Debtor in an aggregate amount exceeding $10 million and such judgment is unsatisfied and unstayed for a period of 45 days.<br>• Any provision under the DIP Credit Agreement, other than as expressly permitted, ceases to be in full force and effect; a Debtor challenges the validity of a provision; or a Debtor fails to make any installment payment with respect to its withdrawal liability under ERISA Multiemployer Plan or any installment in connection with an unfunded Pension Plan, in either case, in an aggregate amount in excess of $10 million 000 or which would reasonably likely result in a Material Adverse Effect<br>• Change of control<br>• Loss of collateral in excess of $1 million<br>• Filing of a motion seeking dismissal or a dismissal of any of the Chapter 11 Cases, filing of a motion to convert or a conversion of any of the Chapter 11 Cases to a Chapter 7 Case, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;<br>• termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;<br>• entry of an order granting any lien or claim which is senior to or *pari passu* with the DIP Agent's lien and claims under the Junior |

WEIL:\95399539\2\50482.0004

| | |
|---|---|
| | Lien DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief);<br>• entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full in cash of the Junior Lien DIP Facility as of the effective date of the plan;<br>• payment of or granting adequate protection with respect to prepetition debt;<br>• the failure of liens or superpriority claims granted with respect to the Junior Lien DIP Facility to be valid, perfected and enforceable;<br>• the entry of one or more orders of the Bankruptcy Court lifting the automatic stay with respect to assets having a value in excess of $25 million in the aggregate;<br>• the occurrence of a Cash Collateral Termination Event;<br>• the Interim Order or Final Order, as applicable shall be amended, modified, stayed or vacated without the written consent of the DIP Agent; and<br>• one or more asset purchase agreement(s) for the sale of the stores with a minimum aggregate value of at least $250 million, fail to become or cease being in full force and effect.<br>***See* DIP Credit Agreement Article VIII; Interim Order ¶ 23** |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi); Local Rule 4001-2(10) | The following are some of the pertinent milestones (the "**Milestones**"):<br>• Debtors will file a motion rejecting the Triple Negative Leases (as defined in the DIP Credit Agreement) and obtain an order authorizing the rejection. Debtors will vacate the premises within 60 days from the Commencement Date<br>• File a 363 sale motion seeking entry of an order approving bidding and auction procedures in connection with a sale of Debtors' Stores and other Real Estate and personal property having a minimum value of $275,000,000 (excluding Inventory and prescriptions)<br>• agreements with representatives of the collective bargaining units with respect to the collective bargaining agreements or, to the extent there is no such agreement, temporary relief pursuant to section 1113(e) of the Bankruptcy Code;<br>• On or before October 15, 2015, the Bankruptcy Court shall have entered an order approving the 363 Sale, with respect to the results of an auction for a value of at least $275,000,000 (the "**Tier I Auction**") in connection with such 363 Sale, which order shall be in form and substance reasonably acceptable to the DIP Agent;<br>• order approving procedures for the wind-down or sale of Debtors remaining stores within 60 days of the Commencement Date; and<br>• On or prior to the date of the entry of any sale order with respect to the sale of any Store, the Debtors shall have either (i) reached agreements in good faith with representatives of their collective bargaining units for relief from collective bargaining agreements |

WEIL:\95399539\2\50482.0004

| | |
|---|---|
| | applicable to personnel of such Store, or (ii) obtained entry of an order by the Bankruptcy Court authorizing relief from the Bankruptcy Court pursuant to section 1113 of the Bankruptcy Code.<br><br>*See* **DIP Credit Agreement §6.13.** |
| **Carve-Out**<br>Local Rule 4001-2(a)(5) | There shall be a carve-out for the payment (collectively, the "**Carve-out**") of :<br><br>all fees required to be paid to the clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code; all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $100,000;<br><br>all accrued and unpaid claims for unpaid fees, costs, and expenses incurred at any time before the Trigger Date (as defined below), or any monthly or success or transaction fees payable to estate professionals, in each case by persons or firms retained by the Debtors or the Creditors Committee (solely with respect to the Creditors Committee in an aggregate amount not to exceed the amount of Professional Fees set forth in the Budget for the Creditors Committee prior to the Trigger Date (as defined below), subject to entry of a Final Order), if any, whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**," and the fees, costs and expenses of Professional Persons, the "**Professional Fees**"); to the extent such Professional Fees are allowed by the Bankruptcy Court at any time (*i.e.*, before or after the Trigger Date) on an interim or final basis; and<br><br>all Professional Fees incurred on and after the Trigger Date by Professional Persons and allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date, whether by interim order, procedural order or otherwise; <u>provided</u> that, other than with respect to any success or transaction fees that may become due and payable to Professional Persons which shall not be included in the Carve Out Cap (as herein defined), the payment of any Professional Fees of the Professional Persons (but excluding fees and expenses of third party professionals employed by individual members of the Creditors' Committee) incurred on or after the Trigger Date (defined below) and allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date, on a final basis, shall not exceed $2,000,000 in the aggregate (the "**Carve Out Cap**").<br><br>The "**Trigger Date**" shall mean the first business day after the occurrence and during the continuance of a DIP Event of Default (as defined below) or a Cash Collateral Termination Event and delivery of written notice thereof (the "**Carve Out Notice**") (which may be delivered by electronic mail) by the DIP Agent or, in the case of a Cash Collateral Termination Event and subject to the Existing Intercreditor Agreement and Intercreditor Arrangements, the Prepetition ABL Agent, the Prepetition Term Loan Agent, Majority |

WEIL:\95399539\2\50482.0004

Holders of the Prepetition PIK Notes or Majority Holders of the Prepetition Convertible Notes to (i) the U.S. Trustee, (ii) the Debtors' and the Debtors' counsel, (iii) counsel for the Creditors' Committee, (iv) counsel for the Prepetition ABL Agent, (v) counsel for the Prepetition Term Loan Agent, (vi) counsel for the Majority Holders of the Prepetition PIK Notes, and (vii) counsel for the Majority Holders of the Prepetition Convertible Notes (collectively, the "**Carve-Out Notice Parties**").

Immediately upon delivery of a Carve Out Notice, the Debtors shall transfer from their concentration account to a segregated account (the "**Carve Out Account**") not subject to the control of the DIP Agent, DIP Lenders or the Prepetition Secured Parties an amount equal to the Carve Out Cap plus an amount equal to the aggregate unpaid fees, costs and expenses described in clause (iii) of the definition of "Carve Out," in each case as reasonably determined by a good faith estimate of the applicable Professional Person. The proceeds on deposit in the Carve Out Account shall be available only to satisfy obligations benefitting from the Carve Out, and the DIP Lenders and Prepetition Secured Parties (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve Out Account, and (ii) shall have security interests in any residual interests in the Carve Out Account available following satisfaction in full of all obligations benefitting from the Carve Out in the order of priority set forth in the Interim Order and shall receive distributions on accounts of such residual interests in accordance with such priority.

For the avoidance of doubt, the Carve Out shall be senior to any claims arising under or relating to and liens securing the Junior Lien DIP Facility, the Prepetition ABL Facility, the Prepetition Term Loan Facility, the Prepetition PIK Notes and the Prepetition Convertible Notes, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests.

*See* **Interim Order ¶ 22.**

| | |
|---|---|
| **Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br>Local Rule 4001-2(a)(ii) | Subject to the Interim Order and Budget, used for working capital and general corporate purposes; provided that the Debtors cannot use any Cash Collateral that has been posted to Cash Collateralize L/C Obligations (as each term is defined in the Prepetition ABL Credit Agreement) under the Prepetition ABL Facility.<br><br>*See* **DIP Credit Agreement 5; Interim Order ¶ 8.** |
| **Duration of Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Debtors' right to use the Cash Collateral shall terminate upon the earlier of<br><br>(i)    170 days from the Commencement Date;<br>(ii)    45 days from entry of the Interim Order if a Final Order is not entered;<br>(iii)    acceleration of the DIP Obligations; |

| | |
|---|---|
| | (iv) failure of the Debtors to make any adequate protection payments as and when required; |
| | (v) the failure of the Debtors to provide all Financial Reports or comply with the material terms of the DIP Orders; |
| | (vi) the effective date of a confirmed chapter 11 plan; |
| | (vii) any stay, reversal, vacatur, rescission or other modification of the terms of this Interim Order not consented to by the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of Prepetition PIK Notes and Majority Holders of Prepetition Convertible Notes; |
| | (viii) the failure to meet any of the Milestones; and |
| | (ix) dismissal or conversion of any of the chapter 11 cases or the appointment of a chapter 11 trustee. |
| | *See* **Interim Order ¶ 9.** |
| **Liens, Cash Payments or\* Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) and (c)(1)(B)(ii) | The Prepetition Secured Parties shall be granted the following adequate protection, in each case, subject and subordinate to the Carve Out: |
| | • Adequate Protection Liens: Subject to the Carve Out and solely to the extent of any diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral, the Prepetition Secured Parties will replacement and additional postpetition liens and security interests, (the "**Adequate Protection Liens**") on all assets of the Debtors (excluding avoidance actions) in the order of priority set forth in paragraph 19 of the Interim DIP Order. |
| | • Adequate Protection Superpriority Claims. The Prepetition Secured Parties will be granted, granted superpriority claims (the "**Adequate Protection Superpriority Claims**"), having priority over any and all Administrative Expense Claims, in the order of priority set forth in the Interim DIP Order. The Adequate Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject to entry of the Final Order, including, proceeds of Avoidance Actions or property recovered under such Avoidance Actions whether by judgment, settlement or otherwise. |
| | The Adequate Protection Superpriority Claims and the DIP Superpriority Claims shall be subject to the following order of priority: |
| | (i) First, the Adequate Protection Superpriority Claims in respect of the Prepetition ABL Obligations and Prepetition Term Loan Obligations |
| | (ii) Second, the DIP Superpriority Claims |
| | (iii) Third, the Adequate Protection Superpriority Claims in respect of the Prepetition Convertible Notes Obligations |
| | (iv) Fourth, the Adequate Protection Superpriority Claims in |

| | |
|---|---|
| | respect of the Prepetition Convertible Notes Obligations |
| | Adequate Protection Payments: Adequate protection payments will be made consisting of payments for certain specified professional fees and all interest and letter of credit fees, if applicable (collectively, the "**Adequate Protection Payments**"), when due or as soon as practicable thereafter, as set forth in the DIP Orders. |
| | Mandatory Prepayment in accordance with the paragraph 16 of the Interim DIP Order. |
| | *See* **Interim Order ¶ 16.** |
| **Liens on Avoidance\* Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Bankruptcy Rule 4001-2(a)(i)(C) | **The DIP Agent and the DIP Lenders will not receive a lien on causes of action under Chapter 5 of the Bankruptcy Code; however, upon entry of the Final Order they may receive a lien on the proceeds of such actions.** **Interim Order ¶ 16.** |
| **Determination Regarding Prepetition Claim** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulated findings of fact, including those related to the validity and enforceability of the Prepetition Secured Indebtedness, the liens securing the Prepetition Secured Parties. *See* **Interim Order ¶ 5.** There is a 75 day challenge period for a committee appointed under section 1102 of the Bankruptcy Code and other parties-in-interest to investigate and challenge the validity of the Prepetition Secured Interests. **Interim Order ¶ 6.** |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii),(viii) | The stipulations and admissions contained in the Interim Order shall be binding upon each Debtor, party to the DIP Credit Agreement and any party-in-interest. *See* **Interim Order ¶ 6.** |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | **Seven (7) days' prior notice to the Debtors and subject to termination of the automatic stay, the automatic stay is vacated for the limited purpose of permitting the Prepetition Secured Parties to exercise any and all of their respective rights and remedies with respect to the Common Collateral and Additional Collateral to the extent set forth in the DIP Orders.** *See* **DIP Credit Agreement § 8.02; Interim Order ¶ 7**. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests and liens in "Collateral" (as defined in the Interim Order) in the DIP Credit Agreement, shall be valid and perfected upon entry of the Interim Order. *See* **DIP Credit Agreement § 4.01(m); Interim Order ¶ 21.** |

14

| Section 506(c) Waiver* Bankruptcy Rule 4001(c)(1)(B)(x) | **Subject to entry of the Final Order, except to the extent of the Carve Out.** *See* **Interim Order ¶ 15** |
|---|---|
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to the Challenge period, the Prepetition Secured Parties get a release of claims. *See* **Interim Order ¶ 7.**<br><br>The Debtors exculpate the DIP Agent and the DIP Lenders of any claims in connection with the DIP Obligations, DIP Liens, DIP Collateral or the debtor-creditor relationship between the DIP Agent or the DIP Lenders on one hand and the Debtors on the other hand. *See* **Interim Order ¶ 32.** |

### Background

13.     On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

14.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

15.     Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**McGarry Declaration**"), sworn to on the date hereof, which has been filed with the Court contemporaneously herewith.

### Relief Requested

1 6 .     By this Motion, the Debtors request entry of an interim order, substantially in the form attached hereto as **Exhibit "B"** (the "**Interim Order**"), and final order (the "**Final**

WEIL:\95399539\2\50482.0004

**Order**," and, together with the Interim Order, the "**DIP Orders**") granting, among other things, the following relief:[5]

(a)     authority for A&P to be a borrower (in such capacity, the "**Borrower**") under the Junior Lien DIP Facility;

(b)     authority for each Debtor listed on Schedule 1.01(G) to the DIP Credit Agreement to serve as guarantor under the Junior Lien DIP Facility;

(c)     authority for the Borrower to execute and enter into the DIP Credit Agreement (and, together with any exhibits attached thereto and other agreements related thereto, including, without limitation, all guarantees, all security agreements, all related or ancillary documents and agreements, and any mortgages contemplated thereby, the "**DIP Documents**"), and to perform all such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

(d)     authority for the Borrowers to make an initial draw under the Junior Lien DIP Facility in the aggregate amount of up to $50 million to avoid immediate and irreparable harm;

(e)     approval of the intercreditor arrangements annexed as **Exhibit "1"** to the proposed Interim Order (the "**Intercreditor Arrangements**");

(f)     authority for the Debtors to grant security interest, liens, and superpriority claims to the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the Junior Lien DIP Facility in the order of priority and as provided in the DIP Orders and the DIP Documents;

(g)     authority for the Debtors to use Cash Collateral in accordance with the Budget;

(h)     authority for the Debtors to provide adequate protection on the terms set forth in the Interim Order and in the DIP Documents to the Prepetition Secured Parties;

(i)     modification of the automatic stay set forth in section 362 of the Bankruptcy Code on the terms and conditions set forth herein to the extent

---

[5] Additional facts and circumstances supporting this Motion and detailing the Debtors' DIP Financing marketing process are set forth in the *Declaration of Stephen R. Goldstein in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, (ii) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 and (iii) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)*, attached hereto as **Exhibit "A"** (the "**Goldstein Declaration**").

necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(j)      waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(k)      scheduling of a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to be held within fourteen (14) days of entry of this Interim Order to consider entry of an order granting the relief requested in the Motion on a final basis.

<u>**The Debtors' Prepetition Indebtedness**</u>

17.      As of the Commencement Date, the Debtors' domestic outstanding funded debt obligations are in the aggregate amount of approximately $1.2 billion (the "**Prepetition Debt Obligations**") which amount consists of (i) an asset-based revolving credit facility in an amount up to $300 million, subject to a borrowing base formula, (ii) a $75 million "Tranche A" term loan and a $195 million "Tranche B" term loan in senior secured borrowings under the Prepetition Term Loan Facility; (ii) approximately $215 million in principal amount of Prepetition PIK Notes, including accrued interest, and (iii) approximately $250 million in principal amount of Prepetition Convertible Notes including accrued interest.  *See* McGarry Decl. ¶¶ 74-82.  The Debtors have granted security interests and liens on all or substantially all of their assets to secure their Prepetition Debt Obligations.

18.      The relative priorities of the liens encumbering the Prepetition Secured Parties' assets are set forth in that certain intercreditor agreement, dated as of March 13, 2012 (as amended and supplemented, including pursuant to that certain Supplemental Senior Lien Intercreditor Agreement, as amended, the "**Existing Intercreditor Agreement**").  Pursuant to the Existing Intercreditor Agreement, the Debtors' obligations under the prepetition revolving loan and term loan facilities are collateralized by first-priority "criss-cross" liens on all of the Debtors' assets (with certain specified exceptions) (the "**Prepetition Collateral**"), with the asset-

based facility having a first-priority on all "ABL Priority Collateral" and the term loan facility having a first-priority lien on all "Term Priority Collateral." The PIK toggle notes have a third-priority lien on the Prepetition Collateral and the Prepetition Convertible Notes have a fourth-priority lien. The below chart illustrates the priorities granted with respect to the Prepetition Collateral:

|  | ABL Priority Collateral | Term Loan Priority Collateral |
|---|---|---|
| First Priority | ABL Secured Parties | Term Loan Secured Parties |
| Second Priority | Term Loan Secured Parties | ABL Secured Parties |
| Third Priority | Holders of PIK Notes | Holders of PIK Toggle Notes |
| Fourth Priority | Holders of Convertible Notes | Holders of Convertible Notes |

A.      Prepetition ABL Facility

19.      Pursuant to that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014, among Wells Fargo, as agent, letter of credit issuer and swing line lender, for itself and a syndicate of financial institutions and other institutional lenders (the agent, together with the lenders, and each "Credit Party" (as defined in the Prepetition ABL Credit Agreement) the "**Prepetition ABL Secured Parties**" and, together with the agent, the "**Prepetition ABL Secured Parties**"), and A&P, as lead borrower, together with its subsidiaries as co-borrowers, and Montvale-Para Holdings Inc. ("**Montvale**") and Montvale Holdings, Inc. as guarantors, the Prepetition ABL Secured Parties extended an asset-based revolving credit facility in an amount up to $300 million (the "**Prepetition ABL Facility**"), subject to a borrowing base formula.

B.      Prepetition Term Loan Facility

20.      Pursuant to that certain Amended and Restated Secured Term Credit Agreement, dated as of September 17, 2014, among Wells Fargo as agent, for itself and a syndicate of banks, financial institutions and other institutional lenders (the agent, together with

the lenders, the "**Prepetition Term Loan Secured Parties**"), A&P, as borrower, together with its subsidiaries and Montvale, as guarantors, the Prepetition Term Loan Lenders provided the Debtors with $270 million in total availability (the "**Prepetition Term Loan Facility**").

C.     PIK Toggle Notes

21.     Pursuant to that certain Indenture, dated as of March 13, 2012, between Montvale and U.S. Bank National Association, as trustee and collateral agent, Montvale issued Senior Secured PIK Toggle Notes due 2017 (the "**Prepetition PIK Notes**") in the aggregate principal amount of $215 million to the holders of the Prepetition PIK Notes (together with the trustee, the "**Prepetition PIK Notes Secured Parties**").  The Prepetition PIK Notes mature on September 13, 2017, and interest thereon is payable in kind or in cash at Montvale's option semi-annually.  The Debtors (other than Kwik Save Inc.) guaranteed Montvale's obligations under the Prepetition PIK Notes.

D.     Prepetition Convertible Notes

22.     Pursuant to that certain Indenture, dated as of March 13, 2012, between Montvale and U.S. Bank National Association, as trustee and collateral agent, Montvale issued Senior Secured Prepetition Convertible Notes (the "**Prepetition Convertible Notes**") in the aggregate principal amount of $250 million for the holders of the Prepetition Convertible Notes (together with the trustee, the "**Prepetition Convertible Notes Secured Parties**" and, together with the Prepetition PIK Notes Secured Parties, the Prepetition ABL Secured Parties and the Prepetition Convertible Notes Secured Parties, the "**Prepetition Secured Parties**").  The Prepetition Convertible Notes mature on March 13, 2018, and interest thereon is payable annually.  The Debtors (other than Kwik Save Inc.) guarantee Montvale's obligations under the Prepetition Convertible Notes.

WEIL:\95399539\2\50482.0004

### The Debtors' Need for DIP Financing

23.     As more fully set forth in the McGarry Declaration, the Debtors' chapter 11 strategy is focused on the expeditious and successful execution of the Sale Strategy. *See* McGarry Decl. ¶ 7.  Prepetition, the Debtors attempted to strengthen their footprint and improve their liquidity by engaging in various marketing initiatives and financial transactions.  The Debtors' prepetition efforts to restore their businesses to profitability have failed due to, among other things, significant legacy costs, including high labor costs, significant expenses incurred in operating stores that regularly operate at a loss, and inability to compete in the competitive grocery industry.  While the Debtors' have been able to invest in new stores and existing store remodels, robust pricing initiatives, and introduce technological advances and other initiatives to customize and improve the consumer experience, the Debtors have been hampered by an unsustainable cost structure.

24.     In the first four periods of 2015, the Debtors experienced cash burn rates averaging $14.5 million.  As of February 28, 2015, the Debtors reported total assets of approximately $1.6 billion and total liabilities of approximately $2.3 billion.  As noted in the McGarry Declaration, with maintenance capital expenditures (approximately $35 million), higher cash contributions for workers' compensation payments than expense (approximately $17 million), pension contributions greater than the actuarially-calculated book expenses (approximately $17 million), the tightening of accounts payables terms (approximately $24 million), and other staggering costs, the ability to satisfy certain payment obligations (approximately $38 million in interest and principle) due this year was impracticable.  *See* McGarry Decl.  ¶ 46.  Indeed these chapter 11 cases were foretold by the Debtors' ongoing

difficulty to regain their financial footing after emerging from the 2010 Cases (as defined in the McGarry Declaration).

25.     Given the shortage of alternatives available, the Debtors commenced these Chapter 11 Cases because it is in the best interests of their constituencies to implement the Sale Strategy.  The DIP Financing to be provided by Fortress is necessary to allow the Debtors to truly complete each phase of the Sale Strategy, which is designed to facilitate going concern sales for as many of the Debtors' stores as possible, in order to save jobs and stabilize vendor relationships.  The DIP Financing is essential to generally address the Debtors' working capital needs as they proceed with implementing the Sale Strategy.  Thus, the Junior DIP Lien Facility is intricately woven together with the Sale Strategy and both are part and parcel of the other.  The importance of the success of the Sale Strategy to the DIP Lenders is evident by the DIP Milestones (as defined in the McGarry Declaration), which condition the Debtors' access to the Junior Lien DIP Facility on satisfying certain sale-related markers.  For example, several of the DIP Milestones are tied to the Debtors' seeking certain relief to sell their assets or the date by which such sales must be consummated.

26.     As described below, the Junior Lien DIP Facility is the result of the Debtors' robust prepetition marketing efforts and negotiations with various potential lenders, and contains competitive terms that are favorable to the Debtors and their creditors.  Accordingly, subject to Court approval, the Debtors expect to soon have approximately $50 million in bank cash available on their balance sheet and approximately $50 million in additional borrowing capacity upon entry of an interim order approving the Junior Lien DIP Facility, and an additional $50 million upon entry of a final order approving the Junior Lien DIP Facility.  *See* McGarry Decl. ¶ 12.  The Debtors fully anticipate that the Junior Lien DIP Facility, together with the

consensual use of cash collateral, will provide them with sufficient liquidity to implement the Sale Strategy in an orderly and value-maximizing manner.

27.     The success of the Sale Strategy hinges on the Debtors' access to the Junior Lien DIP Facility and ability to use cash collateral on a consensual basis. An immediate infusion of liquidity is necessary to fund the Debtors' operations during the pendency of these Chapter 11 Cases.

### The Debtors' Marketing Efforts to Obtain Postpetition Financing

28.     Evercore commenced a competitive DIP Financing marketing process reflective of the practical realities of the Debtors' situation. In particular, Evercore sought to obtain the best DIP Financing available notwithstanding all or substantially all of the Debtors' assets being encumbered by valid and perfected liens and given the Debtors'. Marketing for the Debtors' DIP Financing began in June 2015 and Evercore reached out to Third Party Lenders in order to ascertain their interest in extending a $90 million postpetition financing facility to the Debtors, which under the circumstances, would be structured either as a loan that would prime the Prepetition Secured Parties or a third lien facility only ahead in priority to the liens securing the obligations in respect of the prepetition asset-based loan and term loan facilities.

29.     The Debtors initially received three term sheet proposals for the DIP Financing. Two proposals were received from certain of the Prepetition Secured Parties. The first proposal was provided by Wells Fargo Bank, National Association ("**Wells Fargo**"), in its capacity as agent for the Prepetition ABL Facility and the Prepetition Term Loan Facility, in conjunction with an existing lender to the Prepetition Term Loan Facility. The second proposal was provided by the DIP Lenders. A Third Party Lender that is not in the Debtors' current capital structure also submitted a proposal to provide DIP Financing. Two of the three proposals

received by the Debtors contemplated "third lien" postpetition financing subject to the first and second liens on ABL Priority Collateral and Term Priority Collateral, but senior and superior to the liens on such collateral held by the Prepetition Secured Notes. The Wells Fargo proposal contemplated a roll-up of prepetition debt.

30.     Over a period of almost three weeks, the Debtors and their advisors engaged in intense parallel-track negotiations with each of the bidders to obtain the best financing terms each was willing to offer. These negotiations were arm's length at all times and may be characterized as hard bargaining by all interested parties. *See* Goldstein Declaration ¶ 12. The Debtors requested final and best offers on July 10, 2015, and received responses form all three final bidders. The Debtors, together with their advisors, scrutinized in detail each submitted bid. The Debtors and their advisors and worked diligently to analyze the details of the competitive proposals, and the strengths and weaknesses of each. Following this marketing process, the Debtors chose the proposal submitted by Fortress and entered into a commitment letter on July 12, 2015. The Debtors informed the other Proposed DIP Lenders of their decision and commenced finalizing terms of potential DIP Financing. On July 17, 2015, the Debtors received a fourth proposal with competitive economic terms from the prepetition lender that initially proposed financing in conjunction with Wells Fargo (the "**Fourth DIP Proposal**").

31.     The Fourth DIP Proposal nearly mirrored the terms agreed upon with Fortress except with respect to certain key provisions. The Debtors immediately re-engaged the DIP Agent in an effort to further negotiate more favorable terms. Following extensive discussions, including internal meetings and calls, formal presentations to the Debtors' Board of Directors and negotiations amongst the parties' professionals, on July 18, 2015, the DIP Agent agreed to modify its initial proposal such that the Debtors were offered even more advantageous

terms when taken as a whole.  Accordingly, when compared side-by-side, the terms of the Junior

Lien DIP Facility are equivalent to or better than those of all other potential lenders.

## The Junior Lien DIP Facility

32.     As set forth above and in the Goldstein Declaration, the Debtors and the

DIP Lenders engaged in extensive, good faith, arms'-length negotiations with respect to the

terms and conditions of the proposed Junior Lien DIP Facility and the use of Cash Collateral (as

such term is defined in section 363 of the Bankruptcy Code).  These negotiations successfully

culminated in the agreed upon terms set forth in DIP Credit Agreement.  The Junior Lien DIP

Facility provides that the Debtors may draw $50 million upon entry of the Interim Order and,

upon entry of the Final Order, make an additional draw of $50 million.  The DIP Lenders'

commitments provide the Debtors with the flexibility to engage in a fluid sale process and to

satisfy their administrative obligations during these Chapter 11 Cases.

33.     The Junior Lien DIP Facility is the Debtors' best available financing

option for a variety of reasons. The Junior Lien DIP Facility will be secured by a third lien in the

Debtors' assets such that the facility does not prime the prepetition first and second lien debt.

The positioning of the DIP Lenders' liens alleviates the risk of a priming fight.  Also, while the

economic terms of the Junior Lien DIP Facility and the Fourth DIP Proposal are nearly on par,

the Junior Lien DIP Facility has considerably looser covenant and milestone provisions, it

doesn't hamstring the Debtors, and, significantly, the Debtors have access to some of the

proceeds from sale of their stores.  The immediate access to cash ensures that the Debtors will

have a sufficient runway to bridge the gap between the Commencement Date and consummation

of the first Tier I Sale store.

WEIL:\95399539\2\50482.0004

34.     To ensure that the proceeds under the Junior Lien DIP Facility are used in the manner most likely to maximize its value, the Debtors and the DIP Lenders have agreed upon weekly statement of receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing with the first week following the Commencement Date, including (i) aggregate "Total Disbursements" and (ii) the anticipated uses of the proceeds of the Junior Lien DIP Facility and Cash Collateral for such period (the "**Budget**"), in form and substance reasonably satisfactory to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the majority of holders of the Prepetition PIK Notes (the "**Majority of Holders of the Prepetition PIK Notes**") and the majority of holders of the Prepetition Convertible Notes (the "**Majority of Holders of the Prepetition Convertible Notes**").  A copy of the Budget is attached to the Interim Order as Exhibit 2.  The Debtors believe that the Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

### Basis for Relief

E.     The Debtors Should be Authorized to Obtain Third Lien Postpetition Financing

35.     Pursuant to section 364 of the Bankruptcy Code, a debtor is authorized to obtain secured or superpriority financing under certain circumstances.  The Debtors, with the assistance of their advisors, carefully reviewed the various DIP Financing options presented to them by Potential DIP Lenders and the DIP Lenders.  To assist in the decision making and review process, Evercore made a number of formal presentations to the Debtors' Board of Directors and had many scheduled calls with the Debtors' various professionals.  *See* Goldstein Decl. ¶ 14.  The Debtors carefully contemplated the advantages and disadvantages of the DIP Financing proposals submitted for their consideration and ultimately selected the proposal that is in the best interests of the Debtors, their estates and creditors.  The Junior Lien DIP Facility is

WEIL:\95399539\2\50482.0004

tailored to the Debtors' circumstances and will effectively facilitate the sale of the Debtors' assets as contemplated under the Sale Strategy.

36.     For the foregoing reasons and those discussed further below, the Debtors satisfy the necessary conditions under section 364(c) and (d) for authority to enter into the Junior Lien DIP Facility.

i.   *Entry into the Junior Lien DIP Facility is an Exercise of the Debtors'*
     *Sound Business Judgment*

37.     Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g.*, *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

38.     In determining whether the Debtors have exercised sound business judgment in selecting the Junior Lien DIP Facility, the Court should consider the economic terms of the Junior Lien DIP Facility in light of current market conditions.  *See* Hr'g Tr. at 734 35:24,

26

*In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable" as in the past). Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09–13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

39. The Debtors' determination to secure DIP Financing was a business decision guided by the Debtors' financial and restructuring needs. Specifically, the Debtors and their advisors determined that the Debtors require additional liquidity to fund and implement their Sale Strategy. *See* Goldstein Decl. ¶ 19. To support these anticipated costs, the DIP Lenders have fully committed to fund the DIP Facilities as an integral part of implementing the Sale Strategy. Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14 (footnote omitted). To determine whether the business judgment test is met, "the court 'is required to

27

examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc*., Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

40.     As discussed in the Goldstein Declaration, a fullsome marketing effort was undertaken and the available DIP Financing options were carefully evaluated by the Debtors' management.  Goldstein Decl. ¶¶ 12-13.  The Debtors selected the proposed Junior Lien DIP Facility only after engaging in marketing negotiation designed to provide them with the best options available.  Goldstein Decl. ¶¶ 12-13.  After choosing a lender, the Debtors received a fourth proposal with competitive economic terms.  Upon receiving notice of this proposal, the DIP Agent amended its terms to the benefit of the Debtors' estates.  Given this, and the fact that the fourth proposal would not allow the Debtors to retain any proceeds from asset sales until the DIP Financing is fully paid, the Debtors determined that the Junior Lien DIP Facility is in the best interests of the Debtors' estates.

41.     In addition to the reasons discussed herein, the Debtors ability to procure a secured DIP Financing facility that is junior to the Debtors' first and second lien debt, *i.e*., a non-priming DIP, is very advantageous and underscores the viability of the Sale Strategy.  The Junior Lien DIP Facility is superior to the Fourth DIP Proposal and the other proposals submitted in all material respects.  The Debtors submit that entry into the Junior Lien DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

*ii.* *The Debtors Should be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis*

42.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [or]
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

43.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R.

117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

44.     Despite their efforts and a competitive financing process with several potential financing sources, the Debtors were unable to obtain unsecured or, with respect to the Prepetition PIK Notes and the Prepetition Convertible Notes, subordinated secured financing. From the beginning of Evercore's engagement through the Commencement Date, Evercore contacted a number of financial institutions in an effort to acquire DIP Financing.  However, the Debtors were precluded from securing financing on terms other than secured superpriority basis because it would be difficult to prime the first and second lien holders absent their consent, the Debtors have an over-leveraged balance sheet, and lack significant unencumbered assets.  The Debtors believe that the Junior Lien DIP Facility is the best available facility and given its third-in position it provides the most advantageous terms a third party lender could provide.  The Court should, therefore, authorize the Debtors to provide the DIP Agent and the DIP Lenders a superpriority administrative expense status for any obligations arising under their respective DIP Documents as provided for in section 364(c)(1) of the Bankruptcy Code.

iii.     *The Debtors Should be Authorized to Obtain Postpetition Financing Secured by Liens Senior to the Third and Fourth Liens on the Prepetition Collateral*

45.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the

interests of existing lien holders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

46.     Here, the only parties who may have their interests in the Debtors' assets subject to a priming lien are the holders of the third and fourth-priority liens on the Prepetition Collateral (the Prepetition PIK Notes and the Prepetition Convertible Notes). When determining whether to authorize a debtor to obtain credit secured by a lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets. Courts consider a number of factors, including, without limitation:

- Whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and

reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008). The DIP Documents satisfy each of these factors.

47.     <u>First</u>, the holders of the Prepetition PIK Notes and the Prepetition Convertible Notes have consented to be primed by the Junior Lien DIP Facility. The Debtors therefore submit that such treatment is appropriate with respect to such parties.

48.     <u>Second</u>, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Lenders offered the best option for obtaining the postpetition financing that the Debtors require. The Debtors conducted arms'-length negotiations with the DIP Lenders regarding the terms of the Junior Lien DIP Facility and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer DIP Financing. The Debtors have not been able to obtain financing on equal or better terms from the DIP Lenders, or any other source, without granting third priority liens that prime the liens of the holders of the Prepetition PIK Notes and the Prepetition Convertible Notes.

49.     <u>Third</u>, the Debtors need the proceeds of the Junior Lien DIP Facility to effectuate their Sale Strategy. Indeed, without access to the Junior Lien DIP Facility and use of the Cash Collateral, the Debtors will be unable to prosecute their Sale Strategy. Moreover, providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Chapter 11 Cases is in the best interest of all stakeholders.

WEIL:\95399539\2\50482.0004

50.     <u>Fourth</u>, upon entry of the Interim Order, the DIP Financing will provide access to $50 million in incremental liquidity, which the Debtors and their advisors have independently determined is sufficient and necessary to allow the Debtors to maintain their operations and meet the various obligations they owed to key constituents notwithstanding the commencement of these Chapter 11 Cases.  Accordingly, the terms of the Junior Lien DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Chapter 11 Cases.

51.     <u>Fifth</u>, as described in greater detail above and in the Goldstein Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arms'-length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment.  The other proposed lenders submitted less favorable proposals that consisted of more restrictive covenants, higher interest rates and higher fees.  The DIP Lenders are truly the Debtors most logical and only choice.

   iv.     *The Interests of the Prepetition Secured Parties Are Adequately Protected*

52.     Parties with an interest in Cash Collateral or collateral that may be used to secure DIP Financing are entitled to adequate protection.  11 U.S.C. § 363(e).  In addition, a debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B).  Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. Thus, what constitutes adequate protection is decided on a case-by-case basis. *See*, *e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact specific inquiry . . . left to the

33

vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re*

*Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate

protection "is left to the vagaries of each case, but its focus is protection of the secured creditor

from diminution in the value of its collateral during the reorganization process") (citation

omitted). The critical purpose of adequate protection is to guard against the diminution of a

secured creditor's collateral during the period when such collateral is being used by the debtor in

possession. *See 495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to

safeguard the secured creditor from diminution in the value of its interest during the chapter 11

reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re*

*Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

53.     The Debtors have proposed to provide for adequate protection for the

Prepetition Secured Parties in the following manner:

- Adequate Protection Liens:  Subject to the Carve Out and solely to the extent of any diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral,  the Prepetition Secured Parties will replacement and additional postpetition liens and security interests on all assets of the Debtors (excluding avoidance actions) in the order of priority set forth in paragraph 19 of the Interim DIP Order.

- Adequate Protection Superpriority Claims.  The Prepetition Secured Parties will be granted, granted Adequate Protection Superpriority Claims, having priority over any and all Administrative Expense Claims, in the order of priority set forth in paragraph 19 of the Interim DIP Order.  The Adequate Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject to entry of the Final Order, including, proceeds of Avoidance Actions or property recovered under such Avoidance Actions whether by judgment, settlement or otherwise.

- The Adequate Protection Superpriority Claims and the DIP Superpriority Claims shall be subject to the following order of priority:
  - First, the Adequate Protection Superpriority Claims in respect of the Prepetition ABL Obligations and Prepetition Term Loan Obligations
  - Second, the DIP Superpriority Claims
  - Third, the Adequate Protection Superpriority Claims in respect of the Prepetition Convertible Notes Obligations

34

- Fourth, the Adequate Protection Superpriority Claims in respect of the Prepetition Convertible Notes Obligations

- Adequate Protection Payments: Adequate protection payments will be made consisting of payments for certain specified professional fees and all interest and letter of credit fees, if applicable (collectively, the "**Adequate Protection Payments**"), when due or as soon as practicable thereafter, as set forth in the DIP Orders.

54.      Moreover, the interests of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties are minimally impacted by the Junior Lien DIP Facility because the DIP Liens will be subject to the prepetition liens securing the Prepetition ABL Facility and the Prepetition Term Loan Facility.  In light of the above adequate protection provided to, among others, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties, the Debtors have appropriately provided for diminution in the value of such parties' interests in the Prepetition Collateral.  Likewise, the Debtors will also provide PIK Notes Secured Parties and the Prepetition Convertible Notes Secured Parties, whose liens on the Prepetition Collateral are being consensually primed, with adequate protection to account for any potential diminution in value of their interests.

55.      Based on the foregoing, the adequate protection granted to the Prepetition Secured Parties is both fair and reasonable, and sufficient to satisfy the requirements of section 364 of the Bankruptcy Code.

F.      The Debtors Should be Authorized to Use the Cash Collateral

56.      For the reasons set forth herein, the Debtors require use of Cash Collateral to provide working capital and implement the transactions contemplated by the Junior Lien DIP Facility.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
> (A) each entity that has an interest in such cash collateral consents; or

WEIL:\95399539\2\50482.0004

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

57.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral. Importantly, the Prepetition Secured Parties have consented to the use of the Cash Collateral, subject to the Budget and the Carve Out. Also, as described above, the Debtors are providing the Prepetition Secured Parties with Adequate Protection Liens on the Prepetition Collateral and Superpriority Claims for and equal in amount to any aggregate diminution in the value of each Prepetition Secured Parties' respective security interests and liens in the Prepetition Collateral. Accordingly, the Court should grant the Debtors the authority to use their Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

G.    The Debtors Should be Authorized to Pay the Fees Required
       by the Lenders and Honor Obligations Under the Commitment Letter

58.    As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their funding the DIP Facilities. Attached hereto as **Exhibit "D"** is the Fortress commitment letter (the "**Commitment Letter**"). The interest rate applicable to the DIP Financing will be LIBOR + 11.25% with a 1% LIBOR floor (*i.e.*, not less than 12.25%), which I believe is reasonable in light of the cost of the Prepetition Term Loan (11.85%, including default interest)—which will be senior to the Junior Lien DIP Facility. There is a closing fee of 2.5% of the aggregate commitments, of which 50% is payable on the Interim Funding Date and 50% on the Final Funding Date, and a $25,000 administrative

agent fee. The closing fee is equal to the Fourth DIP Proposal, is significantly lower than the initial competing proposals, and is consistent with postpetition financings of this nature. The Junior Lien DIP Facility is a reasonably priced facility and, as stated above, the cost of the facility is offset by the flexibility it provides to the Debtors. The Commitment Letter reflects the Debtors agreement to pay fees that are in line with those imposed in transactions of this type. The Debtors considered the fees described above and as set forth in the Fee Letters when determining in their sound business judgment that the Junior Lien DIP Facility were the best available. The Debtors submit that the terms of the Junior Lien DIP Facility, including the fees imposed thereunder, constitute the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their Chapter 11 Cases, and paying these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates, creditors, and other parties in interest.

H.     The Scope of the Carve Out is Appropriate

59.     The proposed Junior Lien DIP Facility subject the DIP Lenders' security interests and administrative expense claims to the Carve Out. The Carve Out is similar to other terms created for professional fees that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40.

60.     Without the Carve Out, the Debtors' estates or other parties-in-interest may be deprived of possible rights and powers because the services for which Professional Persons may be paid in these Chapter 11 Cases is restricted. *Id.* at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

WEIL:\95399539\2\50482.0004

Additionally, the Carve Out protects against administrative insolvency during the course of the case by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the Creditors' Committee, if appointed, notwithstanding the grant of superpriority and administrative liens and claims under the Junior Lien DIP Facility.

I.      The Lenders Should be Deemed Good Faith Lenders under Section 364(e)

61.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

62.     As explained in detail herein and in the Goldstein Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arms' length, good faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the Junior Lien DIP Facility be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith"

lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

J.    Modification of the Automatic Stay is Warranted

63.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to:  (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Documents), after the expiration of the applicable grace period, if any, or the occurrence of Maturity Date, as applicable, (a) certain immediate remedies, as further detailed in the Interim Order, with respect to the loans issued under the Junior Lien DIP Facility, and (b) certain other remedies under the DIP Documentation at any time seven (7) business days' after giving notice; and (iii) implement the terms of the proposed DIP Orders.

64.    Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  *See, e.g., In re Chassix Holdings, Inc.*, Case No. 15-10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67]; *In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2010) [Docket No. 43]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26]; *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59].

WEIL:\95399539\2\50482.0004

K.    The Debtors Require Immediate Access to the Cash Collateral and DIP Financing

65.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

66.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $50,000,000 under the DIP Financing, is not granted promptly after the Commencement Date. The Debtors have insufficient cash to fund operations, let alone their Sale Strategy, without immediate access to the DIP Financing. Further, the Debtors anticipate that the commencement of these Chapter 11 Cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these Chapter 11 Cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these Chapter 11 Cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their businesses, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

67.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this

district in similar circumstances. *See, e.g., In re Eastman Kodak Co*., Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 20, 2012) (order approving postpetition financing on an interim basis) [Docket No. 54]; *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (same) [Docket No. 43]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) (same) [Docket No. 26]; *In re Tronox Inc.*, Case No. 09-10156 (MEW) (Bankr. S.D.N.Y. Jan. 13, 2009) (same) [Docket No. 46]; *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same) [Docket No. 79]; *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. Aug. 5, 2008) (same) [Docket No. 433]. Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

L.     Request for Final Hearing

68.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no later than 14 days after entry of the Interim Order as a final hearing for consideration of entry of the Final Order.

69.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

**Reservation of Rights**

70.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of

any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## The Debtors Satisfy Bankruptcy Rule 6003(b)

71. Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the Petition Date. FED. R. BANKR. P. 6003(b). The Debtors require immediate access to the interim funding allowed under the Junior Lien DIP Facility. Based on the foregoing, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## Waiver of Bankruptcy Rules 6004(a) and (h)

72. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

73. Notice of this Motion has been provided to (i) the Office of the United States Trustee for Region 2; (ii) the holders of the four largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014; (v) the attorneys for Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Term Credit Agreement, dated as

WEIL:\95399539\2\50482.0004

of September 17, 2014; (vi) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured PIK Toggle Notes due 2017 (the "**Prepetition PIK Notes**"); (vii) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured Convertible Notes due 2018 (the "**Prepetition Convertible Notes**"); (viii) the attorneys for the holders of a majority of the Prepetition PIK Notes; (ix) the attorneys for the holders of a majority of the Prepetition Convertible Notes; (x) the attorneys for the DIP Agent; (xi) the attorneys for The Yucaipa Companies, LLC and their affiliated funds; (xii) the attorneys for the United Food and Commercial Workers Union International; (xiii) the Securities and Exchange Commission; (xiv) the Internal Revenue Service; and (xv) the United States Attorney's Office for the Southern District of New York. The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

74. No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: July 19, 2015
        New York, New York

/s/ Ray C. Schrock, P.C.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\95399539\2\50482.0004

**Exhibit A**

**Goldstein Declaration**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
**In re** :
: **Chapter 11**
**THE GREAT ATLANTIC & PACIFIC TEA** :
**COMPANY, INC.,** *et al.*, : **Case No. 15-23007 (RDD)**
:
**Debtors.**[1] : **(Joint Administration Pending)**
:
----------------------------------------------------------x

**DECLARATION OF STEPHEN R. GOLDSTEIN**
**IN SUPPORT OF DEBTORS' MOTION SEEKING AUTHORIZATION**
**TO (A) OBTAIN THIRD LIEN POSTPETITION FINANCING PURSUANT TO**
**11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e),**
**(B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2), (C) GRANT**
**CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES PURSUANT**
**TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A FINAL HEARING**
<u>**PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**</u>

Pursuant to 28 U.S.C. § 1746, I, Stephen R. Goldstein, hereby declare as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

1.      I am a Senior Managing Director at Evercore Group LLC ("**Evercore**"), a financial advisory and investment banking firm with offices around the world and financial advisor and investment banker to the above-captioned debtors and debtors in possession (the "**Debtors**").  Evercore was engaged in March 2015 by the Debtors to serve as their investment banker to lead the Debtors' sale and marketing process and to provide general restructuring advice.

2.      Since joining Evercore in 2012, I have advised both debtors and creditors in financial restructuring and distressed mergers and acquisitions; raised capital for troubled companies; and represented debtors and creditor constituencies in bankruptcy proceedings. Moreover, I have raised capital in many in-court and out-of-court financings, and have extensive experience in procuring, structuring, and negotiating debtor-in-position financing.

3.      Before joining Evercore, I was a Managing Director at Lazard Freres & Co. LLC ("**Lazard**"), where I specialized in corporate reorganizations and bankruptcy.  Before joining Lazard in 2002, I served in several investment banking positions at Thomas Weisel Partners and its predecessor firm, Montgomery Securities.  I began my career as an attorney at Morgan, Lewis & Bockius LLP, where I specialized in securities law and mergers and acquisitions.  I have over twenty (20) years of experience in a broad range of corporate finance activities, including restructurings, mergers and acquisitions, and debt and equity financings. I received my B.A. from Cornell University in 1992 and my J.D. from New York University School of Law in 1995.

4.      I submit this declaration ("**Declaration**") in support of the Debtors' motion for a fully committed junior third lien debtor-in-possession financing facility in the

amount of $100 million, provided by the DIP Lenders (the "**Motion**").[2]  In particular, I submit

this Declaration as evidence supporting my opinions, to a reasonable degree of expert certainty,

that the proposed Junior Lien DIP Facility is (a) the product of an arm's length negotiation

process, (b) the best available debtor-in-possession financing option for the Debtors, and (c) in

the best interests of the Debtors and their estates and creditors.

5.      Except as otherwise indicated, all facts set forth in this Declaration are

based upon my personal knowledge of the Debtors' operations and finances, my experience, my

review of relevant documents, information provided to me by Evercore employees working

under my supervision, or information provided to me by members of the Debtors' management

or their other advisors.  If called upon to testify, I could and would testify to the facts set forth

herein on that basis.

## The Debtors' Capital Structure and the Need for DIP Financing

6.      The Debtors' current capital structure is explained in the first day

declaration of Christopher W. McGarry.  As such, I will not repeat it here in detail.  To

summarize, the Debtors have approximately $1.2 billion in funded indebtedness and related

obligations, consisting of a prepetition secured asset-based revolving loan facility, a prepetition

secured term loan facility, senior secured PIK toggle notes, and senior secured convertible notes.

The Debtors' obligations under the prepetition revolving loan and term loan facilities are

collateralized by "criss-cross" first and second liens on substantially all of the Debtors' assets

(the "**Prepetition Collateral**"), with (i) the asset-based facility having a first-priority lien on all

"ABL Priority Collateral" and a second-priority lien on all "Term Priority Collateral," and

(ii) the term loan facility having a first-priority lien on all Term Priority Collateral and a second-

---

[2]  Capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

3

priority lien on all ABL Priority Collateral. The PIK toggle notes have a third-priority lien on the Prepetition Collateral and the convertible notes have a fourth-priority lien on such collateral. For ease of reference, the following chart reflects the order of priority with respect to the prepetition liens upon and security interests in the Prepetition Collateral:

| Priority | ABL Priority Collateral | Term Priority Collateral |
|---|---|---|
| First | Liens securing the Prepetition ABL Facility | Liens securing the Prepetition Term Loan Facility |
| Second | Liens securing the Prepetition Term Loan Facility | Liens securing the Prepetition ABL Facility |
| Third | Liens securing the Senior PIK Notes | |
| Fourth | Liens securing the Convertible Notes | |

7. As detailed in the first day declaration of Christopher W. McGarry, among other things, the combination of an increasingly competitive marketplace, unfavorable supply and logistics contracts and significant legacy costs has continued to constrain the Debtors' liquidity and their ability to maintain profitability. In March 2015, in an effort to address their deteriorating financial condition, the Debtors actively engaged in a strategic review process (led by Evercore) to identify various alternatives for the Debtors' businesses, including exploring the sale of certain assets in both an in-court and out-of-court process. This review culminated in the execution of three "stalking horse" bids that, in the aggregate, provide for the sale of 120 of the Debtors' stores for a purchase price of up to approximately $583.4 million[3] and are the cornerstone of the Debtors' strategic mergers and acquisition process (the "**Sale Strategy**").

8. The Debtors commenced the Chapter 11 Cases to implement the Sale Strategy and consummate the going concern sale of as many stores as possible. To fund the Sale

---

[3] Approximately $429.6 million for 120 stores plus approximately $153.8 million in inventory and other assets associated with said stores

Strategy that provides the framework for the Debtors' restructuring, the Debtors engaged Evercore to assist them in obtaining the best debtor-in-possession financing ("**DIP Financing**") available.

### The DIP Marketing Process

9. In my role as the Debtors' investment banker, I was actively involved in the solicitation and review of the proposals to procure DIP Financing, as well as in the negotiation process, which I led on behalf of the Debtors. Based on my experience and involvement in the marketing and negotiation of the various DIP Financing options available to the Debtors, including engaging in good faith and arm's length negotiations with all potential lenders, I believe that the Junior Lien DIP Facility should be approved. I believe the proposed facility is fair, reasonable, in the best interests of the Debtors' estates, and will provide the Debtors with the financing required for these Chapter 11 Cases on the best terms available in the market. In fact, in my opinion, it is quite extraordinary and advantageous to the Debtors to have secured DIP Financing that is junior to the holders of the first and second liens, *i.e.*, a non-priming DIP.

10. Evercore began the DIP Financing process on behalf of the Debtors in June 2015, to (a) provide the liquidity runway necessary to maximize value and facilitate a systematic sale of the Debtors' stores in accordance with the metrics set forth in their Sale Strategy, and (b) fund an orderly chapter 11 bankruptcy. Evercore included in its process a wide variety of potential lenders, including, among others: (a) lenders within the existing prepetition capital structure; and (b) approximately ten other financial institutions ("**Third Party Lenders**") experienced in distressed lending and DIP financings. Evercore requested proposals for a $90 million postpetition financing facility, which would be structured either as a loan that would

prime the Prepetition Secured Debt or a third lien facility subject only to the liens securing the obligations in respect of the prepetition asset-based loan and term loan facilities.

11.     The Debtors initially received three term sheet proposals for the DIP Financing. Two proposals were received from the prepetition lender groups (including their affiliates).  The first proposal was provided by Wells Fargo, as agent for the prepetition asset-based loan and term loan facilities, in conjunction with a lender under the existing term loan facilities.  The second proposal was provided by Fortress Credit Corp. ("**Fortress**" as administrative and collateral agent for the Junior Lien DIP Facility).  A Third Party Lender that was not already invested in the capital structure also submitted a proposal to the Debtors.  Two proposals, including the Fortress proposal, received by the Debtors contemplated "third lien" postpetition financing (*i.e.*, financing subject to the first and second liens on ABL Priority Collateral and Term Priority Collateral, but senior and superior to the liens on such collateral held by the prepetition secured notes).

12.     Over a period of almost three weeks, the Debtors and their advisors engaged in intense parallel-track negotiations with each of the bidders to obtain the best terms each was willing to offer.  These negotiations were arm's length at all times and may be characterized as hard bargaining by all interested parties.  Notably, the Wells Fargo proposal contemplated a roll-up of other prepetition debt, which the Debtors concluded was not in the best interest of their estates and creditors.  On July 10, 2015, the Debtors requested best and final offers from each of the three bidders.  Based upon the proposals presented, the Debtors, with the assistance of their advisors, concluded that Fortress' proposal offered the most favorable economic terms with flexible covenant and milestone provisions.  The Debtors entered into a

commitment letter with Fortress on July 12, 2015, and advised the other potential DIP Financing

lenders of its decision.

13.     Shortly thereafter, on July 17, 2015, a new proposal was submitted by the

prepetition lender that initially proposed financing in conjunction with Wells Fargo (the "**Fourth**

**DIP Proposal**").  The Fourth DIP Proposal nearly mirrored the terms agreed upon with Fortress

except with respect to certain key provisions.  Upon receipt of the Fourth DIP Proposal, the

Debtors reengaged Fortress and further negotiated the Fortress Proposal.  On July 18, 2015,

Fortress modified its proposal such that the Debtors were offered even more advantageous

economic terms (the "**Fortress Final Proposal**").

14.     The final DIP Financing proposals, including the Fourth DIP Proposal and

the Fortress Final Proposal, were analyzed in detail by the Debtors and their advisors.  Evercore

made a number of formal presentations to the Debtors' Board of Directors that analyzed the

details of the competitive proposals, answered numerous questions posed by the members of the

Board of Directors and made various observations and recommendations concerning the

strengths and weaknesses of each proposal.

## The Junior Lien DIP Facility

15.     I believe that the Junior Lien DIP Facility to be provided by Fortress is the

Debtors' best available financing option for a variety of reasons.

16.     **First**, as the Junior Lien DIP Facility will be secured by a third lien in the

Debtors' assets, the facility does not prime the prepetition first and second lien debt, alleviating

the risk of a potentially timely and very costly priming fight.  In addition, given that Fortress is

affiliated with an existing holder of convertible notes that are junior to the DIP, I believe that the

DIP Lenders are incentivized to align themselves with the Debtors' objectives to maximize value

and implement the most orderly Sale Strategy possible.

7

17.     **Second**, in comparison to the stringent case milestones included in the Fourth DIP Proposal, the Fortress Final Proposal provides material key benefits. The Fourth DIP Proposal (i) bars the Debtors from retaining any proceeds from asset sales until its DIP Financing is fully paid off, and (ii) requires the entry of a sale order for 177 stores within 90 days of the Commencement Date and consummation of such sales within 105 days of the Commencement Date. It is critical to the success of the Sale Strategy that the Debtors have a certain degree of flexibility and are not completely obstructed from accessing sale proceeds to address working capital needs.

18.     **Third**, the economic terms of the Fortress Final Proposal are competitive in terms of interest rate and upfront fees. The interest rate applicable to the DIP Financing will be LIBOR + 11.25% with a 1% LIBOR floor (*i.e.*, not less than 12.25%), which I believe is reasonable in light of the cost of the Prepetition Term Loan (11.85%, including default interest)—which will be senior to the Junior Lien DIP Facility. There is a closing fee of 2.5% of the aggregate commitments, of which 50% is payable on the Interim Funding Date and 50% on the Final Funding Date, and a $25,000 administrative agent fee. The closing fee is equal to the Fourth DIP Proposal, is significantly lower than the initial competing proposals, and is consistent with postpetition financings of this nature. The Junior Lien DIP Facility is a reasonably priced facility and, as stated above, the cost of the facility is offset by the flexibility it provides to the Debtors.

19.     When all the terms of the final proposals were studied side-by-side, the Debtors concluded that the proposal for the Junior Lien DIP Facility is superior and, in my opinion, in the best interests of their estates and creditors. The Junior Lien DIP Facility is fully committed, offers superior liquidity, and contains achievable milestones. All of this led Evercore

WEIL:\95406956\1\50482.0004

to recommend to the Debtors that the Junior Lien DIP Facility should be accepted and presented

to this Court for approval. The below chart compares the terms of the Fortress proposal to the

other DIP Financing proposals received by the Debtors.

| Key Terms | Fortress Proposal | Comments |
|---|---|---|
| **Credit Facility** | • $100 million third lien facility | • $10 million more availability, providing the Debtors with much needed additional liquidity and a longer runway to implement the Debtors' restructuring |
| **Interest Rates & Fees** | • LIBOR + 11.25% with a 1% floor<br>• 6 month "interest make whole"<br>• 2.5% OID/Upfront Fee<br>• $25,000 Admin Fee | • Competitive economic terms with respect to interest rate and upfront fees |
| **Mandatory Prepayment** | • After giving effect to such payments, the Debtors would have no less than $75 million in total of Week Ending Book Cash prior to October 31, 2015 or $60 million if after October 31, 2015 | • Allows the company to retain certain funds upon a sale, providing the flexibility needed to successfully implement the Debtors' restructuring |
| **Milestones and Covenants** | • Achievable sale milestones<br>• Minimum liquidity of $20 million; 15% variance to three week rolling disbursements | • Achievable sale milestones both in terms of the Debtors' restructuring timeline and threshold amount needed for stalking horse contracts and sales |

20.     Taking all of this into consideration, including the firm commitment, the

superior economic terms, the size of the facility, and the less restrictive milestones, the Debtors,

as authorized by the Board of Directors and in consultation with their advisors, accepted the

Fortress Final Proposal.

21.     Subject to approval by the Bankruptcy Court, the proceeds of the Junior

Lien DIP Facility will be used by the Debtors to provide working capital, satisfy operational

WEIL:\95406956\1\50482.0004

needs while the Debtors implement their Sale Strategy and fund the administrative costs of these Chapter 11 Cases.

## The Junior Lien DIP Facility Should Be Approved

22.     Based on my experience in general and specific involvement in the marketing and negotiation of the DIP Financing in this matter, I believe that the process was full and fair, it was comprehensive and it produced the best available financing option under the circumstances.  The negotiations with the lenders were conducted at arm's length and were productive, as the Debtors were able to improve upon the initial proposal.

23.     I also believe that the Junior Lien DIP Facility is fairly priced, superior to the offers made through the other proposals and a better fit for the Debtors at this time.  Indeed, as noted, in my view, it is quite exceptional to secure DIP Financing that is junior in priority to existing debt.  Moreover, the terms governing the Debtors' use of the Junior Lien DIP Facility are consistent with the terms generally provided in other similar Chapter 11 Cases.  Importantly, the Junior DIP Facility is subject to a disbursements-based Budget, which the Debtors, in consultation with their advisors, believe is achievable and sufficient.

24.     I believe that the Debtors require the proposed $100 million Junior Lien DIP Facility to operate their businesses while they work with key parties to implement their Sale Strategy.  For example, the Debtors' ability to sell stores in an orderly manner (to maximize value) hinges directly on the Debtors' means to maintain their customer base and provide the necessary assurance to their vendors and suppliers that the Debtors will continue to pay their obligations as they come due.  The Junior Lien DIP Facility will, among other things, reduce the Debtors' exposure to trade contraction and send a strong signal to employees, customers, and other parties that the Debtors have sufficient liquidity to successfully implement their restructuring proposal.  Accordingly, if approved, the Junior Lien DIP Facility will preserve and

10

enhance the value of the Debtors' businesses and, as such, is in the best interest of the Debtors' estates.

25.     Finally, I believe that the terms of Junior Lien DIP Facility provide adequate protection for the lenders under the asset-based revolving facility and the term loan facility and the holders of the prepetition secured notes, who hold the secured notes on a third and fourth lien basis, respectively.  I understand that all of the prepetition secured parties will be offered replacement and additional liens and security interests on account of their consent to the Junior Lien DIP Facility and the use of cash collateral, and the holders of the first and second liens will also receive certain mandatory prepayment rights.  Based on the foregoing, I believe the particular lenders are adequately protected.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 19, 2015
        New York, New York

                                             /s/ Stephen R. Goldstein
                                            Stephen R. Goldstein

**Exhibit B**

**Proposed Interim Order**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | |
| **COMPANY, INC.,** *et al.*, | : | **Case No. 15-23007 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

---------------------------------------------------------------x

## INTERIM ORDER AUTHORIZING DEBTORS TO (A) OBTAIN THIRD LIEN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2), (C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

Upon the motion (the "**Motion**")[2] of The Great Atlantic & Pacific Tea Company,

Inc. ("**A&P**") and certain of its affiliates and subsidiaries, as debtors and debtors in possession

(collectively, the "**Debtors**"), in the above captioned chapter 11 cases (the "**Chapter 11 Cases**"),

pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and

364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the

"**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "**Bankruptcy Rules**"), and Rule 4001–2 of the Local Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

Rules (the "**Local Rules**") for the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), seeking, among other things:

I        <u>Third Lien Postpetition Financing</u>

        A.        authorization of the Debtors to obtain $100,000,000 in secured third priority postpetition financing (the "**Junior Lien DIP Facility**"), pursuant to that certain Senior Secured Debtor-in-Possession Term Credit Agreement, substantially in the form annexed to the Motion as **Exhibit "C,"** (as such agreement may be amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**" and, together with any exhibits attached thereto and other agreements related thereto, including, without limitation, all notices, all guarantees, all security agreements, all related or ancillary documents and agreements, and any mortgages contemplated thereby, the "**DIP Documents**"), by and among A&P (in such capacity, the "**Borrower**"), each of the other Debtors (other than Kwik Save Inc.), as guarantors, Fortress Credit Corp., as administrative agent (in such capacity, the "**DIP Agent**"), and Fortress Credit Corp., or one or more of its designated affiliates or other lender parties thereto from time to time, as lenders (in its/their capacity as such, the "**DIP Lenders**");

        B.        authorization of the Debtors that are guarantors under the DIP Credit Agreement (together with the Borrower, the "**DIP Loan Parties**"), to guarantee A&P's obligations on a third lien secured basis in respect of the Junior Lien DIP Facility;

        C.        authorization of the Debtors to execute and enter into the DIP Documents and to perform all other and further acts as may be necessary or appropriate in connection with the same;

        D.        authorization of the Debtors to use $50 million of the Junior Lien DIP Facility upon entry of this interim order (the "**Interim Order**") to avoid immediate and irreparable harm;

2

E.    approval of the intercreditor arrangements (the "**Intercreditor Arrangements**") substantially in the form annexed to this Interim Order as **Exhibit "1"** with respect to the (i) Common Collateral (for the purposes of this Interim Order, "**Common Collateral**" shall mean "Collateral" as such term is defined in the Prepetition Term Loan Agreement Security Agreement, the Prepetition ABL Security Agreement, the Prepetition PIK Notes Indenture and the Prepetition Convertible Notes Indenture (in each case excluding any Additional Collateral)), and (ii) Additional Collateral (as defined in the Intercreditor Arrangements, which, for the avoidance of doubt includes, without limitation, the Additional Collateral Account (as defined in the DIP Credit Agreement));

F.    authorization of the Debtors to grant security interests, liens, and superpriority claims (including, as applicable, superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code), solely to the extent set forth in this Interim Order, to the DIP Agent, for the benefit of itself and the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the Junior Lien DIP Facility in the order of priority and as provided in the DIP Orders;

G.    authorization of the Debtors to use proceeds of the Junior Lien DIP Facility and Cash Collateral (as defined below) in accordance with, and for the purposes and in the amounts set forth in, the Budget (as defined below) and to make the Adequate Protection Payments;

II    Interim Use of Cash Collateral

A.    authorization of the Debtors to (i) use Cash Collateral pursuant to sections 361, 362 and 363 of the Bankruptcy Code, in accordance with the Budget; and (ii) provide adequate protection on the terms set forth in this Interim Order to (w) the Prepetition ABL

3

Secured Parties, (x) the Prepetition Term Loan Secured Parties, (y) the Prepetition PIK Notes Secured Parties, and (z) the Prepetition Convertible Notes Secured Parties (each capitalized term in clauses (w), (x), (y) and (z), as defined in Paragraph 5 and, collectively, the "**Prepetition Secured Parties**");

III    Certain Modifications and Waivers

A.    modification of the automatic stay set forth in section 362 of the Bankruptcy Code on the terms and conditions set forth herein to the extent necessary to implement and effectuate the terms of the DIP Documents and the DIP Orders;

B.    waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

IV    Final Hearing

A.    the scheduling of a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2, to be held within fourteen (14) days of entry of this Interim Order to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**");

The interim hearing on the Motion having been held on July 20, 2015 (the "**Interim Hearing**"); and based upon all of the pleadings and declarations filed with the Bankruptcy Court, the evidence presented at the Interim Hearing and the entire record of the Chapter 11 Cases; and there being no objections to the relief sought in the Motion that have not previously been withdrawn, waived, settled, or resolved; and the Bankruptcy Court having noted the appearance of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and the Debtors' estates and creditors; and the Debtors having provided notice of the Motion as set forth in the Motion and it appearing that no further or other

4

notice of the Motion need be given; and after due deliberation and consideration, and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED,**[3] that:

1.      <u>Approval of Motion</u>.  The Motion is approved on the terms and conditions set forth in this Interim Order.  This Interim Order shall become effective immediately upon its entry.  To the extent the terms of the DIP Documents differ in any respect from the terms of this Interim Order, this Interim Order shall control.

2.      <u>Jurisdiction and Venue</u>.  The Bankruptcy Court has core jurisdiction over the Chapter 11 Cases commenced on July 19, 2015 (the "**Commencement Date**"), the Motion and the parties affected by the Motion, and the Debtors' property pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      <u>Notice</u>.  Notice of this Motion has been provided to (i) the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**"); (ii) the holders of the five (5) largest secured claims against the Debtors (on a consolidated basis) that are not otherwise Notice Parties hereunder; (iii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for the DIP Agent; (v) the attorneys for Wells Fargo Bank, National Association ("**Wells Fargo**"), as agent under that Prepetition ABL Agreement (as defined below); (vi) the attorneys for Wells Fargo, as agent under that Prepetition Term Loan Agreement (as defined below); (vii) the Prepetition PIK Notes Trustee (as defined below); (viii) the attorneys for the Prepetition PIK Notes Trustee; (ix) the Prepetition Convertible Notes

---

[3] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

WEIL:\95406968\1\50482.0004

Trustee (as defined below); (x) the attorneys for the Prepetition Convertible Notes Trustee; (xi) the attorneys for the holders of a majority of the Prepetition PIK Notes (as defined below) (the "**Majority Holders of Prepetition PIK Notes**"); (xii) the attorneys for the holders of a majority of the Prepetition Convertible Notes (as defined below) (the "**Majority Holders of Prepetition Convertible Notes**"); (xiii) the attorneys for The Yucaipa Companies, LLC and their affiliated funds; (xiv) the attorneys for The United Food and Commercial Workers (UFCW) International; (xv) the attorneys for C&S Wholesale Grocers, Inc.; (xvi) the Securities and Exchange Commission; (xvii) the Internal Revenue Service; and (xviii) the United States Attorney's Office for the Southern District of New York (collectively, the "**Notice Parties**"). Under the circumstances, the notice given by the Debtors of the interim relief requested in the Motion and of the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and 9014, and Local Rule 4001–2, and no further notice of the relief sought at the Interim Hearing is necessary or required.

4.      Creditors Committee Formation.  No statutory committee of unsecured creditors has yet been appointed in any of these Chapter 11 Cases (a "**Creditors Committee**").

5.      Debtors' Stipulations.  Subject to Paragraph 6(b) below, the Debtors admit, stipulate, and agree that:

(a)      *Prepetition Indebtedness*.  As of the Commencement Date, the Debtors were unconditionally indebted and liable under the (i) Prepetition ABL Facility, (ii) Prepetition Term Loan Facility, (iii) Prepetition PIK Notes, and (iv) Prepetition Convertible Notes, as follows (each of the foregoing as defined herein):

(i)      *Prepetition ABL Facility*.  Pursuant to that certain Amended and Restated Senior Secured Revolving Credit Agreement (as amended,

6

supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition ABL Credit Agreement**"), dated as of September 17, 2014, among Wells Fargo, as agent (in such capacity, the "**Prepetition ABL Agent**"), letter of credit issuer and swing line lender, for itself and a syndicate of financial institutions and other institutional lenders (collectively, the "**Prepetition ABL Lenders**" and, together with the Prepetition ABL Agent, and each "Credit Party" (as defined in the Prepetition ABL Credit Agreement), the "**Prepetition ABL Secured Parties**"), and A&P, as lead borrower, together with its subsidiaries as co-borrowers, and Montvale-Para Holdings Inc. ("**Montvale**") and Montvale Holdings, Inc. as guarantors, the Prepetition ABL Secured Parties extended an asset-based revolving credit facility in an amount of up to $300 million (the "**Prepetition ABL Facility**"), subject to a borrowing base formula. As of the Commencement Date, the Debtors (other than Kwik Save Inc.) are liable to the Prepetition ABL Secured Parties, without objection, defense, counterclaim or offset of any kind, in the aggregate amount of letters of credit issued and outstanding of $198,063,821.21, pursuant to the Prepetition ABL Credit Agreement, plus unliquidated and other amounts including, without limitation, interest and letter of credit fees (in each case at the Default Rate) thereon and fees, expenses, charges and other obligations incurred in connection therewith as and to the extent chargeable or reimbursable under the Prepetition ABL Credit Agreement (the "**Prepetition ABL Obligations**"). The Prepetition ABL Obligations are unconditionally due and owing by the Debtors, on a joint and several basis, to the Prepetition ABL Secured Parties, and are not subject to any

7

avoidance, reduction, recharacterization, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or offset, or any other challenges under the Bankruptcy Code or any applicable non-bankruptcy law or regulation by any person or entity of any kind.

        (ii)    *Prepetition Term Loan Facility.* Pursuant to that certain Amended and Restated Senior Secured Term Credit Agreement (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition Term Loan Agreement**"), dated as of September 17, 2014, among Wells Fargo as agent (in such capacity, the "**Prepetition Term Loan Agent**" and, together with the Prepetition ABL Agents, the "**Prepetition Senior Agents**"), for itself and a syndicate of banks, financial institutions and other institutional lenders (collectively, the "**Prepetition Term Loan Lenders**" and, together with the Prepetition Term Loan Agent (on behalf of itself and on behalf of the Prepetition Term Loan Lenders), the "**Prepetition Term Loan Secured Parties**"), A&P, as borrower, together with its subsidiaries and Montvale, as guarantors, the Prepetition Term Loan Lenders provided the Debtors with $270 million in total loans (the "**Prepetition Term Loan Facility**") (other than Kwik Save Inc.). As of the Commencement Date, the Debtors are liable to the Prepetition Term Loan Lenders, without objection, defense, counterclaim or offset of any kind, in the aggregate amount of approximately $262,500,000 million, in respect of advances made, accrued and unpaid interest thereon, and fees and expenses, charges and other obligations to the extent chargeable or reimbursable under the Prepetition

8

Term Loan Agreement and related documents as of the Commencement Date, plus unliquidated and other amounts including, without limitation, interest (accruing at the default rate under the Prepetition Loan Agreement) thereon and fees (including, without limitation, any prepayment fee and the other fees set forth in Sections 2.09(a) and 2.09(b) of the Prepetition Term Loan Agreement), expenses, charges and other obligations incurred in connection therewith as provided under the Prepetition Term Loan Agreement (the "**Prepetition Term Loan Obligations**").  The Prepetition Term Loan Obligations are unconditionally due and owing by the Debtors, on a joint and several basis, to the Prepetition Term Loan Secured Parties, and are not subject to any avoidance, reduction, recharacterization, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or offset, or any other challenges under the Bankruptcy Code or any applicable non-bankruptcy law or regulation by any person or entity of any kind.

(iii)     *Prepetition PIK Notes.*  Pursuant to that certain Indenture, dated as of March 13, 2012 (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition PIK Notes Indenture**," and together with all other agreements, documents, notes, mortgages, security agreements, pledges, guarantees or instruments delivered pursuant thereto or in connection therewith (other than the Existing Intercreditor Agreement), each as may have been amended, modified or supplemented prior to the Commencement Date, the "**Prepetition PIK Notes Documents**"), between Montvale and U.S. Bank National Association, as trustee and collateral agent (in such capacity, the

9

"**Prepetition PIK Notes Trustee**"), Montvale issued Senior Secured PIK Toggle Notes due 2017 (the "**Prepetition PIK Notes**") in the aggregate principal amount of $215 million to the holders of the Prepetition PIK Notes (such holders, together with the Prepetition PIK Notes Trustee, on behalf of itself and on behalf of the holders of the Prepetition PIK Notes, the "**Prepetition PIK Notes Secured Parties**").  The Debtors (other than Kwik Save Inc.) guaranteed Montvale's obligations under the Prepetition PIK Notes.  As of the Commencement Date, the outstanding face amount of the Prepetition PIK Notes, exclusive of interest, was $215 million, plus unliquidated and other amounts, including, without limitation, interest fees, expenses, charges and other obligations to the extent chargeable or reimbursable under the Prepetition PIK Notes Documents (collectively, the "**Prepetition PIK Notes Obligations**"), all of which amounts are unconditionally due and owing by the Debtors, on a joint and several basis, to the Prepetition PIK Notes Secured Parties, and are not subject to any avoidance, reduction, recharacterization, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or offset, or any other challenges under the Bankruptcy Code or any applicable non-bankruptcy law or regulation by any person or entity of any kind.

> (iv)     *Prepetition Convertible Notes*.  Pursuant to that certain Indenture, dated as of March 13, 2012 (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition Convertible Notes Indenture**," and together with all other agreements, documents, notes, mortgages, security agreements, pledges, guarantees or instruments delivered pursuant thereto

WEIL:\95406968\1\50482.0004

or in connection therewith (other than the Existing Intercreditor Agreement), each as may have been amended, modified or supplemented prior to the Commencement Date, the "**Prepetition Convertible Notes Documents**," and together with the Existing Intercreditor Agreement, the Prepetition PIK Notes Documents, the Prepetition ABL Credit Agreement, the Prepetition Term Loan Agreement and all security, pledge and guaranty agreements and all other documentation executed, filed, recorded and/or delivered in connection with any of the foregoing, each as may have been amended, supplemented, or otherwise modified from time to time prior to the Commencement Date, the "**Prepetition Financing Documents**"), between Montvale and U.S. Bank National Association, as trustee and collateral agent (in such capacity, the "**Prepetition Convertible Notes Trustee**" and, together with the Prepetition PIK Notes Trustee, the "**Prepetition Indenture Trustees**"), Montvale issued Senior Secured Convertible Notes (the "**Prepetition Convertible Notes**") in the aggregate principal amount of $250 million to the holders of the Prepetition Convertible Notes (such holders, together with the Prepetition Convertible Notes Trustee (on behalf of itself and on behalf of the holders of the Prepetition Convertible Notes), the "**Prepetition Convertible Notes Secured Parties**"). The Debtors (other than Kwik Save Inc.) guarantee Montvale's obligations under the Prepetition Convertible Notes. As of the Commencement Date, the outstanding face amount of the Prepetition Convertible Notes, exclusive of interest, was $250 million, plus unliquidated and other amounts, including, without limitation, interest, fees, expenses, charges and other obligations to the extent chargeable or reimbursable under the Prepetition

11

Convertible Notes Documents (collectively, the "**Prepetition Convertible Notes Obligations,**" and together with the Prepetition ABL Obligations, the Prepetition Term Loan Obligations, and the Prepetition PIK Notes Obligations, the "**Prepetition Obligations**"), all of which amounts are unconditionally due and owing by the Debtors on a joint and several basis to the Prepetition Convertible Notes Secured Parties, and are not subject to any avoidance, reduction, recharacterization, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or offset, or any other challenges under the Bankruptcy Code or any applicable non-bankruptcy law or regulation by any person or entity of any kind.

(b)      *Prepetition Liens and Collateral.*  Prior to the Commencement Date, the Debtors granted to the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders), the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders), the Prepetition PIK Notes Trustee (on behalf of the Prepetition PIK Notes Secured Parties) and the Prepetition Convertible Notes Trustee (on behalf of the Prepetition Convertible Notes Secured Parties), liens upon and security interests, as follows:

(i)      *Prepetition ABL Facility.*  Pursuant to that certain Amended and Restated Security Agreement, dated as of September 17, 2014 (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition ABL Security Agreement**"), and the other "Security Documents" (as defined in the Prepetition ABL Credit Agreement), each as amended and in effect as of the Commencement Date, together with all other agreements, documents, recordings, filings and/or, instruments executed,

12

recorded, filed, and/or delivered in connection therewith, the Debtors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, a first-priority lien on the ABL Priority Collateral and a second-priority lien on the Term Priority Collateral (the "**Prepetition ABL Liens**");

(ii) *Prepetition Term Loan Facility.* Pursuant to that certain Amended and Restated Security Agreement, dated as of September 17, 2014 (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition Term Loan Security Agreement**"), and the other "Security Documents" (as defined in the Prepetition Term Loan Facility, each as amended and in effect as of the Commencement Date, together with all other agreements, documents, recordings, filings and/or instruments executed, recorded, filed and/or delivered in connection therewith), the Debtors granted to the Prepetition Term Loan Agent and other "Credit Parties" (as such term is defined in the Prepetition Term Loan Agreement) a first-priority lien on the Term Priority Collateral and a second-priority lien on the ABL Priority Collateral (the "**Prepetition Term Liens**");

(iii) *Prepetition PIK Notes*. Pursuant to the terms of the Prepetition PIK Notes Documents, including that certain Security Agreement, dated as of March 13, 2012, the Debtors granted the Prepetition PIK Notes Secured Parties a lien, (the "**Prepetition PIK Notes Liens**") on all Collateral (as defined in the Prepetition PIK Notes Indenture, in each case subject to the terms of the Existing Intercreditor Agreement; and

13

(iv) *Prepetition Convertible Notes*. Pursuant to the terms of the Prepetition Convertible Notes Documents, including that certain Security Agreement, dated as of March 13, 2012, the Debtors granted the Prepetition Convertible Notes Secured Parties a lien (the "**Prepetition Convertible Notes Liens**," and together with the Prepetition ABL Liens, the Prepetition Term Liens, and the Prepetition PIK Notes Liens, the "**Prepetition Liens**") on all Collateral (as defined in the Prepetition Convertible Notes Indenture), in each case subject to the terms of the Existing Intercreditor Agreement.

(c) The Prepetition PIK Notes and the Prepetition Convertible Notes were incurred pursuant to the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated February 17, 2012 (the "**2012 Plan**"), filed in the prior chapter 11 cases of the Debtors commenced on December 12, 2010 and jointly administered in the Bankruptcy Court (Case No. 10–24549) (the "**2012 Reorganization**"). The 2012 Plan was confirmed by order of the Bankruptcy Court in the 2012 Reorganization pursuant to *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Court*, entered on February 28, 2012 (the "**2012 Confirmation Order**") (Case No. 10-24549; ECF No 3477). The 2012 Confirmation Order further ordered the following:[4]

(i) pursuant to paragraph 114 thereof, upon execution of the relevant documentation and issuance thereof, the Prepetition PIK Notes and Prepetition Convertible Notes were "deemed to constitute valid, binding and enforceable agreements and obligations of the Reorganized Debtors and are not in conflict with any applicable laws.";

---

[4] The referenced paragraphs of the 2012 Confirmation Order are annexed hereto as **Exhibit "3."**

(ii)     pursuant to paragraph 115 thereof, that "[t]he Liens contemplated by and related to the [Prepetition PIK Notes] and the [Prepetition Convertible Notes], are valid, binding and enforceable Liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the [Prepetition PIK Notes] and the [Prepetition Convertible Notes].  The guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to or in connection with the [Prepetition PIK Notes] and the [Prepetition Convertible Notes], are granted in good faith as an inducement to the holders of such notes to extend credit thereunder and shall be, and hereby are, deemed not to constitute fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth in the intercreditor agreements and other definitive documentation executed in connection with the [Prepetition PIK Notes] and the [Prepetition Convertible Notes]."; and

(iii)     pursuant to paragraph 117 thereof, that "[t]he collateral agent for the [Prepetition PIK Notes] and the [Prepetition Convertible Notes] shall be granted Liens on the collateral, including all of the Debtors' leasehold interests, which Liens shall be deemed perfected and effective as of the Effective Date."

(d)     The Prepetition Obligations constitute the legal, valid, binding, unavoidable and enforceable obligations of the Debtors, and are not and shall not be subject to any challenge or defense, including, without limitation, avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined by section 101(5) of

15

the Bankruptcy Code, of any kind pursuant to the Bankruptcy Code or under any applicable non-bankruptcy law, regulation or otherwise by any person or entity (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act).

(e)     The Prepetition Liens are legal, valid, binding, perfected, unavoidable and enforceable liens upon and security interests in the Common Collateral, and are not and shall not be subject to any attachment, contest, attack, rejection, recoupment, reduction, defense, setoff, offset, recharacterization, avoidance or other claim, impairment, disallowance, subordination, cause of action or any other challenge or defense of any nature under the Bankruptcy Code (including, without limitation, under chapter 5 of the Bankruptcy Code), or under any applicable nonbankruptcy law, regulation or otherwise by any person or entity (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act).

(f)     Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, any and all cash released as a result of the termination and/or cancellation of any letters of credit issued for the benefit of Debtors that have been or may be cash collateralized prior to or after the Commencement Date, any amounts generated by the collection of accounts receivable or other disposition of Common Collateral and the proceeds and products of each of the foregoing, is the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("**Cash Collateral**"); provided that, until such time as the Junior Lien DIP Facility shall have been Paid in Full, Cash Collateral shall not include (i) any proceeds or products of Additional Collateral, (ii) cash or cash equivalents deposited or maintained in the Additional Collateral Account, and (iii) the Additional Collateral Account.

16

(g)     The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(c) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Common Collateral, including, without limitation, the Cash Collateral, to the extent of any diminution in the value of such interests, as a result of (i) the incurrence of the DIP Obligations (as defined below), (ii) the use of Cash Collateral as set forth in this Interim Order, (iii) the granting of the DIP Liens and DIP Superpriority Claims, (iv) the subordination of the Prepetition Obligations to the Carve Out (as defined below), (v) the subordination of the Prepetition PIK Notes Obligations and the Prepetition Convertible Notes Obligations to the DIP Obligations, (vi) any other diminution in the value of the Common Collateral arising from the Debtors' use, sale or disposition of Common Collateral (or the proceeds thereof), and (vii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "**Diminution in Value**").

(h)     None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, in their respective capacities as such, is a control person or insider of any of the Debtors by virtue of any action taken or omission to act by any of them in respect of or in connection with the DIP Documents, the Prepetition Financing Documents, or this Interim Order.

6.      Effect of Stipulations on Third Parties.

(a)     Subject to Paragraph 6(b), each stipulation, admission, waiver and agreement contained in this Interim Order, including, without limitation, the Debtors' stipulations in Paragraph 5 hereof, shall be binding upon the applicable Debtors, their respective estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes,

and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Commencement Date.

(b)     The stipulations and admissions contained in this Interim Order, including, without limitation, in Paragraph 5 hereof (collectively, the "**Debtors' Stipulations**"), shall be irrevocably binding on all other parties in interest, including, without limitation, the Creditors Committee and any subsequently appointed trustee or other estate representative, unless, and, solely to the extent that:  (x) the Creditors Committee, any subsequent chapter 7 or any other party in interest that is granted standing and requisite authority by the Bankruptcy Court (it being understood that nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), any such standing or authority) has timely commenced and properly filed an appropriate contested matter or adversary proceeding (a "**Challenge**") challenging any of the Debtors' Stipulations, including, without limitation, those related to the amount, validity, enforceability, perfection or priority of all or any portion of the Prepetition Obligations, the Prepetition Liens or the Prepetition Financing Documents no later than the latest to occur of (A) seventy five (75) days after the Commencement Date and (B) such date as ordered by the Bankruptcy Court for good cause shown (provided that the request for extension is made before the expiration of the period set forth in clause (A) above); and (y) a court of competent jurisdiction rules in a Final Court Order (as defined below) in favor of the plaintiff in any such timely filed Challenge (a "**Successful Challenge**").  If and to the extent that no such Challenge is timely commenced or if such a Challenge is timely commenced but is not ultimately a Successful Challenge, then, without further order of the Bankruptcy Court, (i) any and all such Challenges by any party (including, without limitation, the Creditors' Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in the Debtors' Chapter 11

18

Cases, or any chapter 7 trustee appointed in any Successor Cases) shall be deemed to be forever waived and barred, (ii) all of the Debtors' Stipulations shall be binding upon the Debtors' estates, the Creditors' Committee, all creditors, interest holders and parties in interest, any chapter 11 trustee, any examiner or any other estate representative appointed in the Debtors' Chapter 11 Cases, or any chapter 7 trustee appointed in any Successor Cases, and (iii) the Prepetition Obligations, the Common Collateral and the Prepetition Liens shall be deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases and shall not be subject to challenge by any party in interest as to validity, priority or otherwise.  For the avoidance of doubt, none of the Challenge provisions set forth in this Paragraph 6 shall apply to the Junior Lien DIP Facility, the DIP Obligations, the DIP Collateral, the DIP Liens, the DIP Agent or any of the DIP Lenders, and in no event shall the Junior Lien DIP Facility, the DIP Obligations, the DIP Collateral, or the DIP Lien be subject to challenge on avoidance or any other grounds by any party.

7. <u>Waiver and Release</u>.  Subject to the Challenge provisions provided in Paragraph 6 above, and  effective only upon entry of a Final Order, any and all claims by the Debtors, the Creditors' Committee or any third party, including, without limitation, claimants with rights under the Perishable Agricultural Commodities Act (PACA) and Packers and Stockyards Act (PASA), with respect to the Prepetition Financing Documents, Prepetition Obligations, Prepetition Liens, or Common Collateral, shall be deemed waived and the Debtors' obligations to the Prepetition Secured Parties shall be deemed allowed claims.

8. <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized, subject to the terms and conditions of the DIP Documents and this Interim Order, to use Cash Collateral, all proceeds of the Junior Lien DIP Facility and all proceeds of Additional Collateral (as defined in

19

the Intercreditor Arrangements) in accordance with, and for the purposes and in the amounts set forth in, the Budget (as defined below); provided, that the Debtors shall not be authorized to use any Cash Collateral that has been posted to Cash Collateralize L/C Obligations (as each term is defined in the Prepetition ABL Credit Agreement) under the Prepetition ABL Facility; provided further that (x) the L/C Obligations outstanding immediately prior to the Commencement Date shall not be required to be Cash Collateralized solely as a result of the commencement of the Chapter 11 Cases, and (y) the Debtors shall not be required to Cash Collateralize such L/C Obligations with any Cash Collateral except for Cash Collateral applied to mandatory prepayments of the Prepetition ABL Obligations pursuant to Paragraphs 14(d)(i)b and c hereof.   Notwithstanding the foregoing, (a) the Prepetition ABL Agent may Cash Collateralize L/Cs in connection with its exercise of rights subject to the Debtors' reservation of rights with respect to the non-consensual use of Cash Collateral set forth in Paragraph 10 hereof, and (b) Debtors shall not use any Cash Collateral to make any principal repayments in respect of the DIP Obligations unless and until all Prepetition ABL Obligations and all Prepetition Term Loan Obligations have been repaid in full in cash, terminated, satisfied (including Cash Collateralization for all outstanding and undrawn Letters of Credit (each term as defined in the Prepetition ABL Credit Agreement) shall remain outstanding, other than contingent indemnity obligations for which claims have not been made (such repayment, termination or satisfaction, "**Paid in Full**").

> 9. <u>Termination of Cash Collateral Use</u>.

> (a)     Subject to Paragraph 9(b) below, the Debtors' right to use the Cash Collateral pursuant to the terms set forth in this Interim Order shall terminate upon the earliest to occur of any of the following (each, a "**Cash Collateral Termination Event**"):

(i) the date that is one hundred seventy (170) days from the Commencement Date;

(ii) the date that is forty-five (45) days following the date of entry of the Interim Order if the Final Order reasonably acceptable to the Debtors, DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of Prepetition PIK Notes, and the Majority Holders of Prepetition Convertible Notes approving the use of Cash Collateral and the Junior Lien DIP Facility has not been entered by the Bankruptcy Court on or prior to such date;

(iii) the acceleration of the DIP Obligations (as defined below) in accordance with the DIP Documents and the commencement of the Remedies Notice Period;

(iv) the failure of the Debtors to make any Adequate Protection Payment (as defined below) to the Prepetition Secured Parties as and when required pursuant to the terms of this Interim Order;

(v) the effective date of a chapter 11 plan in any of the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court;

(vi) any stay, reversal, vacatur, rescission or other modification of the terms of this Interim Order not consented to by the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of Prepetition PIK Notes and Majority Holders of Prepetition Convertible Notes, each in their respective discretion;

21

(vii)    the failure of the Debtors to provide all Financial Reports (as defined below) as well as the Budget and any budget variance report required under the DIP Documents; <u>provided</u> that following receipt of the notice set forth in Paragraph 9(b)(i) below, the Debtors shall have the benefit of a seven (7) day cure period with respect to this clause 9(a)(vii); <u>provided</u> <u>further</u> that, notwithstanding the foregoing, with respect to a failure to provide borrowing base certificates, the Debtors shall have the benefit of a two (2) day cure period;

(viii)    the failure to comply with Paragraphs 25, 26 and 28 herein; and

(ix)    the dismissal of any of the Chapter 11 Cases, converting any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or appointing a chapter 11 trustee with expanded powers in any of the Chapter 11 Cases.

(b)    Upon the occurrence of a Cash Collateral Termination Event, (i) the Debtors' right to use Cash Collateral shall cease upon five (5) days' written notice provided to the Carve Out Notice Parties (as defined below) by the Prepetition ABL Agent or the Prepetition Term Loan Agent, the Majority Holders of the Prepetition PIK Notes or Majority Holders of the Prepetition Convertible Notes (all subject to the Existing Intercreditor Agreement and Intercreditor Arrangements); <u>provided</u> that during the period after such written notice is provided, the Debtors' use of Cash Collateral must conform to the Budget (with any variances as permitted under the Junior Lien DIP Facility); and (ii) upon seven (7) days' written notice to the Carve Out Notice Parties (the "**Remedies Notice Period**") (which may be delivered by electronic mail), and subject to Paragraph 24(c) below, the automatic stay of section 362 of the

WEIL:\95406968\1\50482.0004

Bankruptcy Code shall be terminated for the limited purpose of permitting the Prepetition

Secured Parties to exercise any and all of their respective rights and remedies with respect to the

Common Collateral and Additional Collateral (subject to the Intercreditor Arrangements), unless

the Debtors have obtained an order to use Cash Collateral on a non-consensual basis consistent

with Paragraph 10 below.

10.     Reservation of Debtors' Rights.  Notwithstanding anything to the contrary

herein, upon the occurrence of a Cash Collateral Termination Event, the Debtors may seek

authority from the Bankruptcy Court to use the Cash Collateral on a non-consensual basis;

provided that the Prepetition Secured Parties and the DIP Agent reserve all rights to object to

such request.

11.     Certain Other Rights With Respect to the Budget.  In the event that the

Debtors fail to comply with the Budget (with any variances as permitted under the Junior Lien

DIP Facility), the Prepetition Secured Parties and the DIP Agent shall have the right to obtain an

emergency hearing before the Bankruptcy Court to seek the termination of the Debtors' use of

Cash Collateral and/or obtain such other relief in connection therewith (as applicable), which

hearing (subject to the Bankruptcy Court's calendar) shall take place within five (5) days

following the delivery of notice to the Debtors, the Creditors' Committee, and the Bankruptcy

Court; provided that any notice given with respect to this Paragraph 11 shall in no event trigger a

Cash Collateral Termination Event in and of itself; provided further that nothing in this

Paragraph 11 impairs or waives the Debtors' right to contest the termination of the use of Cash

Collateral (subject to the Debtors' Stipulations).

WEIL:\95406968\1\50482.0004

12. <u>Findings Regarding Immediate Need for the Junior Lien DIP Facility and Use of Cash Collateral</u>.

(a) *Good Cause*.  Good cause has been shown for immediate entry of this Interim Order.

(b) *Need Regarding Postpetition Financing*.  The Debtors have an immediate and critical need to obtain third-priority lien postpetition financing under the Junior Lien DIP Facility and use the Cash Collateral in order to, among other things, preserve the going concern value of the Debtors, maintain business relationships with vendors, suppliers and customers, satisfy payroll obligations, pay for certain costs and expenses related to the Debtors' Chapter 11 Cases, conduct a comprehensive asset sales process, and satisfy other working capital and operational needs of the Debtors during these Chapter 11 Cases.  The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of new indebtedness for borrowed money under the Junior Lien DIP Facility and other financial accommodations are vital to the Debtors' ability to meet payroll and other operating expenses and to the Debtors' ability to conduct an orderly sale process to maximize recoveries for creditors.

(c) *No Credit Available on More Favorable Terms*.  The Debtors are unable to obtain financing, under existing circumstances, on more favorable terms and conditions from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code without granting the DIP Lenders, subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims (each

WEIL:\95406968\1\50482.0004

as herein defined), in each case on the terms and conditions set forth in this Interim Order and the DIP Documents.

(d) *Business Judgment*. The terms upon which the Debtors will be permitted to use Cash Collateral and proceeds of the Junior Lien DIP Facility as provided in the Junior Lien DIP Facility, the DIP Documents and this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are appropriate under the circumstances, and constitute reasonably equivalent value and fair consideration.

(e) *Good Faith – Junior Lien DIP Facility*. The Junior Lien DIP Facility has been negotiated in good faith and at arm's length. All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Junior Lien DIP Facility, the DIP Documents, and the DIP Orders including, without limitation, (i) all loans made to A&P pursuant to the DIP Credit Agreement and (ii) any obligations and indebtedness of the Debtors arising under or in connection with the DIP Documents and this Interim Order now and hereafter owing to the DIP Agent or any DIP Lender (all of the foregoing in clauses (i) and (ii), the "**DIP Obligations**"), shall be deemed to have been extended in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f) *Good Faith - Prepetition Secured Parties*. Based upon the record before the Bankruptcy Court, this Interim Order, including the terms of the use of Cash Collateral and the adequate protection granted in this Interim Order, have been negotiated at

25

arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, by each of the Debtors, the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, the Majority Holders of Prepetition PIK Notes and the Majority Holders of the Prepetition Convertible Notes, and are in the best interests of the Debtors, their estates and creditors and are consistent with the Debtors' fiduciary duties.

(g)     *Relief Essential; Best Interest*.   The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001–2.   Without access to the Junior Lien DIP Facility and the continued use of Cash Collateral, the Debtors and their estates would suffer immediate and irreparable harm.   The Debtors may be forced to cease business operations, terminate substantially all of their employees, and be unable to wind-down their operations in an orderly manner that preserves and maximizes value and recoveries for creditors.   Consummation of the Junior Lien DIP Facility and the use of the Cash Collateral in accordance with this Interim Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

### THE JUNIOR LIEN DIP FACILITY

13.     <u>Authorization of the DIP Documents and the Junior Lien DIP Facility</u>.

(a)     The terms and conditions of the DIP Documents are approved. The Debtors are expressly and immediately authorized to execute, deliver, enter into, and perform all obligations under the DIP Documents, including, without limitation, any exhibits attached thereto, all security agreements, all guarantees, all related or ancillary documents, notices and agreements, and any mortgages contemplated thereby, as hereafter amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms

26

thereof and hereof, and the DIP Loan Parties are authorized to borrow or guarantee, as applicable, all of the DIP Obligations, as set forth in Paragraph 13(b) below.

(b)     The Debtors are hereby authorized to borrow an interim principal amount of Loans (as defined in the DIP Credit Agreement) (the "**DIP Loans**") under the Junior Lien DIP Facility not to exceed $50 million in accordance with the DIP Documents (subject to any conditions precedent on borrowings thereunder), which amount shall be used for all purposes permitted under the DIP Documents and in accordance with, and for the purposes and in the amounts set forth in, the Budget.

(c)     In furtherance of the foregoing, and without further approval of the Bankruptcy Court, each Debtor is authorized and directed to perform all acts and to execute, deliver and perform all instruments and documents (including, without limitation, the execution or recordation of security agreement, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Junior Lien DIP Facility, including, without limitation, the following:

(i)     the execution, delivery and performance of the DIP Credit Agreement and any exhibits attached thereto and other agreements related thereto, including, without limitation, all security agreements and all related or ancillary documents, notices and agreements and any mortgages contemplated thereby (*i.e.*, the DIP Documents);

(ii)     the execution, delivery and performance of the guarantees by the DIP Loan Parties (other than the Borrower) of the obligations of the Borrower under the DIP Documents;

27

(iii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtors and the DIP Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any reasonable fees paid in connection therewith) that do not (w) restrict, limit or prohibit the payment of any Adequate Protection Payments as and when required under this Interim Order, (x) shorten the maturity or the scheduled termination date thereunder, (y) increase the commitments or the rate of interest (other than invoking the default rate upon a DIP Event of Default), or (z) require any new or additional payments of the principal of the amounts outstanding under the Junior Lien DIP Facility; provided that the DIP Documents shall not be amended or modified in a manner materially adverse to the respective rights and protections granted herein to a Prepetition Secured Party without consent of such Prepetition Secured Party; provided further that the Debtors shall provide notice of any amendment, waiver, consent or other modification under the DIP Documents to the attorneys for each of the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of Prepetition PIK Notes and the Majority Holders of Prepetition Convertible Notes.

(iv)     the non-refundable payment to the DIP Agent and the DIP Lenders, as the case may be, of the reasonable fees and expenses set forth in the DIP Documents, whether incurred before or after the Commencement Date, including, without limitation, the fees and expenses of the professionals retained

28

as provided for in the DIP Documents without the need to file retention motions or fee applications;

(v)     as soon as reasonably practicable following entry of this Interim Order, the addition of the DIP Agent, on behalf of itself and the DIP Lenders, as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral and, subject to the terms of this Interim Order, the distribution of any proceeds recovered or received in accordance with the terms of this Interim Order, the Intercreditor Arrangements and the other DIP Documents; and

(vi)    the performance of all other acts required under or in connection with the DIP Documents.

(d)     Upon execution and delivery of the DIP Documents, (i) the DIP Documents shall constitute legal, valid, binding, enforceable and unavoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party in accordance with the terms of this Interim Order and the DIP Documents, and (ii) the DIP Obligations shall constitute "allowed claims" within the meaning of section 502 of the Bankruptcy Code.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, rejection, subordination, disallowance, impairment, cross-claim,

WEIL:\95406968\1\50482.0004

counterclaim, or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise.

14.     <u>DIP Liens</u>.  As security for the full and timely payment of the DIP Obligations, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, valid, enforceable, unavoidable, and fully perfected security interests in and liens and mortgages (collectively, the "**DIP Liens**") upon all Common Collateral and Additional Collateral and all products and proceeds of the foregoing, whether existing prior to or arising or acquired after the Commencement Date (all of the property of the Debtors identified in this Paragraph 14, including, without limitation, subparagraphs (a), (b) and (c) below, the "**DIP Collateral**"), as follows and in all cases subject to the priorities set forth in Paragraph 19:

(a)     pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority lien on, and security interest in all Additional Collateral; <u>provided</u> that DIP Liens shall not attach to (x) the Excluded Property (as defined in the DIP Documents) and (y) actions or other avoidance claims under sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but shall, upon entry of the Final Order, attach to any proceeds or property recovered under chapter 5 of the Bankruptcy Code, whether by judgment, settlement or otherwise.

(b)     pursuant to section 364(c)(3) of the Bankruptcy Code, and subject to the priorities set forth in Paragraph 19, a valid, binding, continuing, enforceable, fully perfected junior lien on, and security interest in Common Collateral; and

(c)     pursuant to section 364(d)(1) of the Bankruptcy Code (and only with respect to the Prepetition PIK Notes Secured Parties and the Prepetition Convertible Notes

30

Secured Parties and any other lien holder (other than the Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties) who receives proper notice of this Interim Order), and subject to the priorities set forth in Paragraph 19, a valid, binding, continuing, enforceable, fully perfected priming lien on, and security interest in, Common Collateral, and any other tangible and intangible prepetition and postpetition property of the Debtors, whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens or security interests in existence immediately prior to the Commencement Date or to valid and unavoidable liens or security interests in existence immediately prior to the Commencement Date that are perfected after the Commencement Date as permitted by section 546(b) of the Bankruptcy Code; provided, that the DIP Liens shall not be (i) subject or subordinate to (x) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (y) unless otherwise provided for in the DIP Documents or this Interim Order, any liens arising after the Commencement Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise, except as provided in Paragraph 19.

15.     <u>DIP Superpriority Claims</u>.  Subject to the Carve Out , the DIP Agent, for the benefit of itself and each of the DIP Lenders, is hereby granted, superpriority senior administrative expense claims against the Debtors (the "**DIP Superpriority Claims**") for the full and timely payment of the DIP Obligations over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final

Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (collectively, "**Administrative Expense Claims**"), in the order of priority set forth in Paragraph 20 below.   The DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof.

16.    <u>Adequate Protection for Prepetition Secured Parties</u>.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(c) and 364(d)(1) of the Bankruptcy Code, to adequate protection against the risk of the Diminution in Value of their respective interests in the Common Collateral, including, without limitation, the Cash Collateral, as follows:

(a)    *Adequate Protection Liens*.  Solely to the extent of any postpetition Diminution in Value of the Prepetition Secured Parties' respective interests in the Common Collateral, each of the Prepetition Secured Parties shall be granted for its respective benefit, without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, replacement and additional postpetition liens and security interests, in each case, effective, valid, enforceable and automatically perfected upon entry of this Interim Order, on all assets of the Debtors, including, without limitation, the DIP Collateral (and the Common Collateral), whether in existence on the Commencement Date or thereafter created, acquired, or arising, and wherever located, and the proceeds of each of the foregoing (collectively, the "**Adequate Protection Liens**"), which Adequate Protection Liens shall be subject and subordinate to the Carve Out and shall be afforded the priority set forth in Paragraph 19 below; <u>provided</u> that the Adequate Protection Liens shall not attach to Avoidance Actions.

(b)    *Adequate Protection Superpriority Claims*.  As adequate protection for, and solely to the extent of, any postpetition Diminution in Value of the Prepetition Secured Parties' interest in the Common Collateral, the Prepetition Secured Parties, are hereby granted superpriority claims (the "**Adequate Protection Superpriority Claims**") as provided for in section 507(b) of the Bankruptcy Code, having priority over any and all Administrative Expense Claims, in the order of priority set forth in Paragraph 20 below.  The Adequate Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject to entry of the Final Order, including, proceeds of Avoidance Actions or property recovered under such Avoidance Actions whether by judgment, settlement or otherwise.

(c)    *Adequate Protection Payments*.  The Debtors are authorized and directed under sections 361, 363 and 364 of the Bankruptcy Code to make payments (together, the payments described in this clause (c) and clause (d) below, the "**Adequate Protection Payments**") when due, consisting of:  (i) cash payments to (A) the Prepetition ABL Agent for all professional fees and expenses payable to the Prepetition ABL Agent pursuant to the ABL Credit Agreement, (B) the Prepetition Term Loan Agent for all fees and expenses payable to the Prepetition Term Loan Agent pursuant to the terms of the Prepetition Term Loan Agreement, (C) the Majority Holders of the Prepetition PIK Notes for all professional fees and expenses, limited to the fees and expenses of (x) Stroock & Stroock & Lavan LLP and (y) The CDG Group, LLC (in accordance with the terms of that certain retention letter dated as of July 2, 2015), and (E) the Majority Holders of the Prepetition Convertible Notes for all professional fees and expenses, limited to the fees and expenses of Schulte Roth & Zabel LLP, and, in the case of each of the foregoing professional fees and expenses, the Debtors shall be authorized and

33

directed to pay any all such fees and expenses within ten (10) business days of delivery of a monthly statement or invoice for such fees and expenses (it being understood that such statements or invoices shall not be required to be maintained in accordance with the U.S. Trustee Guidelines, nor shall any such professional be required to file any interim or final fee applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any such payments) to the Debtors, the U.S. Trustee and the Creditors' Committee, unless, within such ten (10) business day period, the Debtors, the U.S. Trustee or the Creditors' Committee serves a written objection upon the requesting party, in which case, the Debtors shall only pay such amounts that are not the subject of any objection; and (ii) all interest and letter of credit fees, if applicable, as and to the extent payable under the Prepetition ABL Facility and Prepetition Term Loan Facility, which shall accrue and be payable at the Default Rate (as defined in the Prepetition ABL Credit Agreement and Prepetition Term Loan Agreement).  In the event that it is determined by a final order, which order shall not be subject to any appeal, stay, reversal or vacatur (a "**Final Court Order**"), that any of the Prepetition Secured Parties is not entitled to Adequate Protection Payments as adequate protection for the Diminution in Value of its respective interests in the Common Collateral, and that such Prepetition Secured Party is determined to be undersecured, then, subject to a further Final Court Order, such Adequate Protection Payments shall be applied toward repayment of the principal amount due on such Prepetition Obligations as are owing to such Prepetition Secured Party.

(d)     *Mandatory Prepayment.*  The Debtors are authorized and directed, to the extent applicable, to make the mandatory prepayments set forth below (the "**Mandatory Prepayments**").  All capitalized terms not otherwise defined in this Paragraph 16(d) shall have the meanings ascribed to them in the Prepetition ABL Credit Agreement.

34

(i)     *Prepetition ABL Facility.*  As further adequate protection, and subject to Paragraph 16(d)(iii) (except with respect to 16(d)(i)a below) and Paragraph 16(d)(iv) below, the Debtors shall, first pay to the Prepetition ABL Agent for the benefit of the Prepetition ABL Secured Parties the following amounts:

a.     if for any reason the Total Outstandings (other than L/C Obligations to the extent Cash Collateralized) at any time exceed the sum of (i) the Borrowing Base as in effect from time to time minus (ii) a carve out reserve minus (iii) a PACA reserve minus (iv) the amount of Availability required to be maintained by Section 7.15(b) of the Prepetition ABL Credit Agreement, the Debtors shall immediately prepay Loans and/or Cash Collateralized L/C Obligations in an amount equal to the lesser of (x) such excess and (y) the amount after payment of which the Debtors shall be in compliance with minimum liquidity set forth in Section 7.15(a) of the DIP Credit Agreement as in effect on the date hereof; provided that, notwithstanding anything in the Prepetition ABL Facility to the contrary, there shall be no additional reserves permitted;

b.     until the payment in full of the Prepetition ABL Obligations, the net proceeds from sales, dispositions, or casualty of the ABL Priority Collateral outside the ordinary course of business, including sales or disposition of the ABL Priority

35

Collateral with respect to the closing of the stores subject to the Triple Negative Leases (as defined in the DIP Credit Agreement), pursuant to section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales"; and

      c.      after payment in full of the Prepetition Term Facility, and until payment in full of the Prepetition ABL Obligations, all net proceeds from sales, dispositions, or casualty of the Term Priority Collateral outside the ordinary course of business, including sales or disposition of the Term Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases, pursuant to Section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales."

(ii)      *Prepetition Term Loan Facility*. As further adequate protection, and subject to Paragraph 16(d)(iii) and 16(d)(iii) below, the Debtors shall pay to the Prepetition Term Agent for the benefit of the Prepetition Term Secured Parties the following amounts:

      a.      until payment in full of the Prepetition Term Loan Obligations, the net proceeds from sales, dispositions, or casualty of the Term Priority Collateral outside the ordinary course of business, including sales or disposition of the Term Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases, pursuant to section 363 or section 365 of

36

the Bankruptcy Code or in connection with "Store Closing Sales";
and

   b.   after payment in full of the Prepetition ABL
Facility, and until payment in full of the Prepetition Term Loan
Obligations, all net proceeds from sales, dispositions, or casualty
of the ABL Priority Collateral in the ordinary course of business,
including sales or disposition of the ABL Priority Collateral with
respect to the closing of the stores subject to the Triple Negative
Leases, pursuant to section 363 or section 365 of the Bankruptcy
Code or in connection with "Store Closing Sales."

(iii)   Notwithstanding anything in Paragraph 16(d)(i) or
16(d)(ii), the Debtors shall not be required to make any payments pursuant
Paragraph 16(d)(i)(b) and (c) or 16(d)(ii) with the net proceeds from the ABL
Priority Collateral or Term Priority Collateral, as applicable, if after giving effect
to such payments, the Debtors would have less than $75 million in total of Week
Ending Book Cash (as defined in the Budget) if such proceeds are received prior
to October 31, 2015 or $60 million if such proceeds are received after October 31,
2015, provided that (A) any limitation of such payments shall be applied pro rata
(measured by the amount of net proceeds derived from each of the ABL Priority
Collateral, Term Priority Collateral and Additional Collateral received in
connection with a disposition of any of the foregoing collateral) to the amounts
otherwise required to be applied to the Prepetition ABL Facility and the
Prepetition Term Facility pursuant to Paragraph 16(d)(i) and (ii) above, and to the

37

amounts that would be required to be applied to such prepayment pursuant to Section 2.07(a)(i) and (ii) on such date pursuant to the DIP Credit Agreement and limited by Section 2.07(a)(v) of the DIP Credit Agreement; provided further, that, subject to payment in full of the Prepetition ABL Facility and the Prepetition Term Loan Facility, (i) on October 31, 2015 the Borrower (as defined in the DIP Credit Agreement) shall make a prepayment of the DIP Loans in an amount equal to the aggregate amount of Week Ending Book Cash on such date in excess of $60 million  Any payment made pursuant to Paragraph 16(d)(i) or (ii) shall, as applicable, prepay and permanently (x) reduce Loans and/or Cash Collateralize L/C Obligations under the Prepetition ABL Facility and (y) reduce Loans under the Prepetition Term Loan Facility.

(iv)     Subject to Paragraph 6 and this Paragraph 16, all Adequate Protection Payments and other payments made to the DIP Agent, DIP Lenders and any Prepetition Secured Party in accordance with this Interim Order shall be irrevocable when made and free and clear of all liens and claims, including, without limitation, any claims covered by the Carve Out.

17.     <u>Sufficiency of Adequate Protection</u>.  Under the circumstances, the Bankruptcy Court finds that the foregoing adequate protection is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; <u>provided</u> that the Prepetition PIK Notes reserve the right to contest the validity of the foregoing adequate protection under the circumstances.

18.     <u>Reservation of Rights</u>.  The Prepetition Secured Parties have either consented or do not object to the relief sought herein.  Nothing contained herein shall be deemed

a finding by the Court or an acknowledgement by the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect the Prepetition Secured Parties, and nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall be deemed to (i) limit, abridge, constitute a waiver of, expressly or implicitly, or otherwise affect the rights of any of the Prepetition Secured Parties to request at any time that the Court provide additional or further protection of their respective interests in the Common Collateral (including Cash Collateral), or to seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate, (ii) impair or modify any rights, claims or defenses available in law or equity to any Prepetition Secured Party, the DIP Agent or any DIP Lender, (iii) prejudice the rights of the Prepetition Secured Parties at any time, under the Bankruptcy Code or otherwise, to seek any other or supplemental relief in respect of the Debtors or the Chapter 11 Cases.

19.     Priority of Liens.  Subject in each case to (i) the Carve Out, and (ii) the Permitted Encumbrances (as such term is defined in the Prepetition ABL Credit Agreement and the Prepetition Term Loan Agreement) and Permitted Liens (as such term is defined in the Prepetition PIK Notes Indenture and the Prepetition Convertible Notes Indenture and, in each case, (x) that exist on, and are legal, valid, binding, enforceable, perfected and unavoidable as of, the Commencement Date and are permitted to be senior to the Prepetition Liens (as applicable) pursuant to the applicable Prepetition Financing Documents, (y) other than the Prepetition Liens), the priority of liens upon and security interest in the DIP Collateral shall be as follows:

(a)     in respect of the Common Collateral, as applicable:

(i)     first, in the case of the ABL Priority Collateral, to the Prepetition ABL Liens in favor of the Prepetition ABL Secured Parties and the

Adequate Protection Liens in favor of the Prepetition ABL Secured Parties (together, the "**ABL Liens**"), and, in the case of the Term Priority Collateral, the Prepetition Term Liens in favor of the Prepetition Term Loan Secured Parties and the Adequate Protection Liens in favor of the Prepetition Term Loan Secured Parties (together, the "**Term Liens**")

(ii)     <u>second</u>, in the case of the ABL Priority Collateral, to the Term Liens, and in the case of the Term Priority Collateral, to the ABL Liens;

(iii)     <u>third</u>, in the case of the Common Collateral, to the DIP Liens;

(iv)     <u>fourth</u>, in the case of Common Collateral, to the Prepetition PIK Notes Liens and the Adequate Protection Liens in favor of the Prepetition PIK Notes Secured Parties (together, the "**PIK Notes Liens**"); and

(v)     <u>fifth</u>, in the case of Common Collateral, to the Prepetition Convertible Notes Liens and the Adequate Protection Liens in favor of the Prepetition Convertible Notes Secured Parties (together, the "**Convertible Notes Liens**"); and

(b)     with respect to Additional Collateral, the DIP Liens in such collateral shall be senior and superior in priority to all other liens upon and security interests in the Additional Collateral.

20.     <u>Priority of Superpriority Administrative Claims</u>.  Subject in each case to the Carve Out, the Adequate Protection Superpriority Claims and the DIP Superpriority Claims shall constitute superpriority administrative expense claims over any and all Administrative

40

Expense Claims; <u>provided</u> that, as to each other, the Adequate Protection Superpriority Claims and the DIP Superpriority Claims shall be subject to the following order of priority:

(a) <u>first</u>, the Adequate Protection Superpriority Claims granted to the Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties, on a *pari passu* basis.

(b) <u>second</u>, the DIP Superpriority Claims;

(c) <u>third</u>, the Adequate Protection Superpriority Claims granted to the Prepetition PIK Notes Secured Parties; and

(d) <u>fourth</u>, the Adequate Protection Superpriority Claims granted to the Prepetition Convertible Notes Secured Parties.

21. <u>Postpetition Perfection of Liens</u>. The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as its true and lawful attorney, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over deposit accounts and securities accounts or any other asset, in each case, in order to validate and perfect the liens and security interests granted to them in the DIP Documents and this Interim Order. Whether or not the DIP Agent, on behalf of itself or the DIP Lenders, or the Prepetition Secured Parties, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over deposit accounts and securities accounts or any other assets, the DIP Liens shall be deemed legal, valid, perfected, allowed, enforceable, unavoidable and not subject to

41

challenge, dispute, impairment or subordination, at the time and on the date of entry of this Interim Order.

(a)     A certified copy of this Interim Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording. For the avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy Code shall be modified (and any stay of such modification under Bankruptcy Rule 4001(a)(3) is waived) to the extent necessary to permit the DIP Agent and Prepetition Secured Parties to take all actions permitted by this Paragraph 21.

(b)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, license, contract or other agreement, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the granting of postpetition liens hereunder on such leasehold interest, license, contract or other agreement or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties in accordance with the terms of the DIP Documents or this Interim Order.

WEIL:\95406968\1\50482.0004

22.    Carve Out.

(a)    For purposes hereof, the "**Carve Out**" shall mean an amount equal to the sum of:

(i)    all fees required to be paid to the clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code;

(ii)    all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $100,000;

(iii)    all accrued and unpaid claims for unpaid fees, costs, and expenses incurred at any time before the Trigger Date (as defined below), or any monthly or success or transaction fees payable to estate professionals, in each case by persons or firms retained by the Debtors or the Creditors Committee (solely with respect to the Creditors Committee in an aggregate amount not to exceed the amount of Professional Fees set forth in the Budget for the Creditors Committee prior to the Trigger Date (as defined below), subject to entry of a Final Order), if any, whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**," and the fees, costs and expenses of Professional Persons, the "**Professional Fees**"); to the extent such Professional Fees are allowed by the Bankruptcy Court at any time (*i.e.*, before or after the Trigger Date) on an interim or final basis; and

(iv)    all Professional Fees incurred on and after the Trigger Date by Professional Persons and allowed by the Bankruptcy Court at any time,

43

whether before or after the Trigger Date, whether by interim order, procedural

order or otherwise; <u>provided</u> that, other than with respect to any success or

transaction fees that may become due and payable to Professional Persons which

shall not be included in the Carve Out Cap (as herein defined), the payment of any

Professional Fees of the Professional Persons (but excluding fees and expenses of

third party professionals employed by individual members of the Creditors'

Committee) incurred on or after the Trigger Date (defined below) and allowed by

the Bankruptcy Court at any time, whether before or after the Trigger Date, on a

final basis, shall not exceed $2,000,000 in the aggregate (the "**Carve Out Cap**").

(b)     The "**Trigger Date**" shall mean the first business day after the

occurrence and during the continuance of a DIP Event of Default (as defined below) or a Cash

Collateral Termination Event and delivery of written notice thereof (the "**Carve Out Notice**")

(which may be delivered by electronic mail) by the DIP Agent or, in the case of a Cash

Collateral Termination Event and subject to the Existing Intercreditor Agreement and

Intercreditor Arrangements, the Prepetition ABL Agent, the Prepetition Term Loan Agent,

Majority Holders of the Prepetition PIK Notes or Majority Holders of the Prepetition Convertible

Notes to (i) the U.S. Trustee, (ii) the Debtors' and the Debtors' counsel, (iii) counsel for the

Creditors' Committee, (iv) counsel for the Prepetition ABL Agent, (v) counsel for the Prepetition

Term Loan Agent, (vi) counsel for the Majority Holders of the Prepetition PIK Notes, and

(vii) counsel for the Majority Holders of the Prepetition Convertible Notes (collectively, the

"**Carve-Out Notice Parties**").

(c)     Immediately upon delivery of a Carve Out Notice, the Debtors

shall transfer from their concentration account to a segregated account (the "**Carve Out**

**Account**") not subject to the control of the DIP Agent, DIP Lenders or the Prepetition Secured Parties an amount equal to the Carve Out Cap plus an amount equal to the aggregate unpaid fees, costs and expenses described in clause (iii) of the definition of "Carve Out," in each case as reasonably determined by a good faith estimate of the applicable Professional Person. The proceeds on deposit in the Carve Out Account shall be available only to satisfy obligations benefitting from the Carve Out, and the DIP Lenders and Prepetition Secured Parties (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve Out Account, and (ii) shall have security interests in any residual interests in the Carve Out Account available following satisfaction in full of all obligations benefitting from the Carve Out in the order of priority set forth in Paragraph 19, and shall receive distributions on accounts of such residual interests in accordance with such priority.

(d)     For the avoidance of doubt, the Carve Out shall be senior to any claims arising under or relating to and liens securing the Junior Lien DIP Facility, the Prepetition ABL Facility, the Prepetition Term Loan Facility, the Prepetition PIK Notes and the Prepetition Convertible Notes, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests.

(e)     *Budget.* Annexed as **Exhibit "2"** hereto and incorporated by reference herein is the weekly statement of receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing with the first week following the Commencement Date, including (i) individual line items for "Total Disbursements" and (ii) the anticipated uses of the proceeds of the DIP Loans and Cash Collateral for such period, in form and substance reasonably satisfactory to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of the Prepetition PIK Notes and the

Majority Holders of the Prepetition Convertible Notes (substantially similar to the form of budget annexed hereto, the "**Budget**").  No less frequently than every four weeks, commencing on August 7, 2015, the Debtors shall deliver an updated budget for the following four week period (the "**Proposed Budget**") simultaneously to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent and the current Majority Holders of Prepetition PIK Notes and the current Majority Holders of Prepetition Convertible Notes.  The Proposed Budget shall become the Budget upon the written consent of the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent and the current Majority Holders of Prepetition PIK Notes and the Majority Holders of the Prepetition Convertible Notes (in each case such consent not to be unreasonably withheld or delayed).  Each Proposed Budget shall be of no force and effect unless and until it is so approved or five (5) days have passed from delivery without objection, and until either condition has been satisfied, the prior approved Budget shall remain in effect.

(f)    On July [●], 2015, for the week-ended [●], 2015, and continuing every Friday of each calendar week (or the next business day if such date is not a business day) thereafter, the Debtors shall be required to deliver to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of Prepetition PIK Notes, the Majority Holders of Prepetition Convertible Notes, and the Creditors' Committee, a weekly variance report from the immediately preceding three calendar week period comparing on a cumulative basis the actual disbursements of the Debtors with disbursements in the Budget.

23.    <u>DIP Events of Default</u>.

(a)    In addition to the Events of Default (as defined in the DIP Documents) set forth in the DIP Documents, unless all DIP Obligations and all Adequate Protection Obligations shall have been indefeasibly Paid in Full (as set forth in Paragraph 16),

46

the following shall constitute a default under the DIP Documents and this Interim Order, unless the DIP Agent has waived such default in accordance with the DIP Documents (together with Events of Default (as defined in the DIP Documents), the "**DIP Events of Default**"):

(i)        the filing of a motion by the Debtors seeking dismissal of any of the Chapter 11 Cases, the dismissal of any of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;

(ii)        termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;

(iii)        other than as contemplated by this Interim Order, entry of an order granting any lien or claim which is senior to or *pari passu* with the DIP Agent's lien and claims under the Junior Lien DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief);

(iv)        entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full in cash of the Junior Lien DIP Facility as of the effective date of the plan;

WEIL:\95406968\1\50482.0004

(v)     payment of or granting adequate protection with respect to prepetition debt (other than as approved by the DIP Agent and the DIP Orders or as otherwise contemplated by the DIP Documents);

(vi)    the failure of liens or superpriority claims granted with respect to the Junior Lien DIP Facility to be valid, perfected and enforceable with the priority described herein;

(vii)   the entry of one or more orders of the Bankruptcy Court lifting the automatic stay with respect to assets having a value in excess of $25 million in the aggregate;

(viii)  the occurrence of a Cash Collateral Termination Event;

(ix)    the Interim Order or Final Order, as applicable shall be amended, modified, stayed or vacated without the written consent of the DIP Agent; and

(x)     if, at any time, one or more asset purchase agreement(s) for the sale of Debtors' stores and other real and personal property with a minimum aggregate value of at least $250 million (excluding scripts and inventory), fail to become or cease being in full force and effect.

24.     <u>Protection of DIP Lenders and Other Rights</u>.  As a requirement and precondition to the DIP Lenders' willingness to lend and in furtherance of the DIP Superpriority Claims, the DIP Agent and DIP Lenders shall have the following protections that may be enforced by the DIP Agent as authorized, approved, and granted pursuant to the provisions of the DIP Orders and in accordance with the terms of the DIP Credit Agreement:

48

(a)      If a DIP Event of Default shall have occurred and is continuing,

the DIP Agent shall, with respect to the DIP Collateral, be permitted and hereby is authorized,

approved and granted, without further approval or order of this Court, to do any or all of the

following:  (i) immediately (x) deliver a notice of a DIP Event of Default, (y) terminate the

Junior Lien DIP Facility, and (z) charge the default rate of interest on the DIP Loans, and

(ii) upon the expiration of the Remedies Notice Period to the Carve Out Notice Parties (which

may be delivered by electronic mail) and subject to Paragraph 25(c) below, the automatic stay of

section 362 of the Bankruptcy Code shall be terminated for the limited purpose of permitting the

DIP Agent or DIP Lenders to do any of the following: (x) foreclose on the DIP Collateral,

subject to the terms of this Interim Order and the Intercreditor Arrangements, (y) enforce all of

their guaranty rights; and (z) declare the principal of and accrued interest, fees and expenses

constituting the obligations under the Junior Lien DIP Facility to be due and payable.

(b)      The DIP Agent's or any DIP Lender's delay or failure to exercise

rights and remedies under the applicable DIP Documents or this Interim Order shall not

constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or

otherwise, unless any such waiver is pursuant to a written instrument executed in accordance

with the terms of the applicable DIP Documents.

(c)      After the occurrence of a Cash Collateral Termination Event or

DIP Event of Default, the automatic stay set forth in section 362 of the Bankruptcy Code, to the

extent applicable, shall be deemed terminated without the necessity of any further action by the

Bankruptcy Court in the event that the Debtors, the Creditors' Committee, the U.S. Trustee or

any other party in interest have not obtained an order from this Court to the contrary prior to the

expiration of the Remedies Notice Period.  The Debtors, Creditors' Committee, U.S. Trustee or

WEIL:\95406968\1\50482.0004

other party in interest shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay or to obtain any injunctive relief.

## Other Rights and Obligations

25. <u>Limitation on Use of DIP Proceeds and Cash Collateral</u>. Notwithstanding anything herein or in any other order by the Bankruptcy Court to the contrary, no borrowings, Cash Collateral, Carve Out or the Carve Out Cap may be used:

(a) to request authorization to obtain, other than from the DIP Agent or DIP Lenders and other than in accordance with this Interim Order and the DIP Documents, postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise that are (or are proposed to be) secured by any liens or security interests on any of the DIP Collateral (including Common Collateral) (unless such postpetition loans or other financial accommodations propose to indefeasibly pay in full all DIP Obligations);

(b) in connection with, or finance in any way, any claim, cause of action, counterclaim, investigation, action, suit, arbitration, proceeding, application, motion, or other litigation of any type (i) objecting to, challenging or contesting in any manner, invalidating, setting aside, avoiding, subordinating or raising any defenses to, in whole or in part, the amount, validity, extent, priority, enforceability or perfection of the DIP Obligations, the Prepetition Financing Documents, the DIP Documents, the DIP Liens, the Prepetition Obligations or the Prepetition Liens, or any other rights or interests of any of the DIP Agent, DIP Lenders or Prepetition Secured Parties (including, without limitation, with respect to the Adequate Protection Liens, Adequate Protection Payments, DIP Superpriority Claims or Adequate Protection Superpriority Claims, including, without limitation, any Challenge to the Debtors' Stipulations), or (ii) asserting or seeking any order, judgment, determination, or similar relief

against, or adverse to the interests of, in any capacity, the DIP Agent, the DIP Lenders or the

Prepetition Secured Parties or any of their respective officers, directors, employees, agents,

affiliates, representatives, attorneys, advisors, assigns, or successors with respect to any

transaction, occurrence, omission or action involving the Debtors;

        (c)     for or in connection with contesting, preventing, hindering,

impairing, interfering with, or otherwise delaying the exercise by any of the DIP Agent, DIP

Lenders or the Prepetition Secured Parties of any rights or remedies, in a manner inconsistent

with the terms of this Interim Order or the Prepetition Financing Documents;

        (d)     to seek, except in response to the final relief requested in the

Motion, to modify any of the rights granted to the DIP Agent, the DIP Lenders or any of the

Prepetition Secured Parties hereunder or under the DIP Documents, the Prepetition Financing

Documents, in each of the foregoing cases, without such parties' prior written consent or pay any

amount on account of any claims arising prior to the Commencement Date unless such payments

are approved by an order of this Court (including hereunder); <u>provided</u> that no more than

$100,000, in the aggregate, of the borrowings, Cash Collateral, Carve Out or the Carve Out Cap

or proceeds thereof may be used by the Creditors Committee solely to investigate (but not

prosecute, object or litigate) a Challenge in accordance with Paragraph 6 hereof.

        26.     <u>Prohibition on Granting of Additional Liens or Interests</u>.  No liens, claims,

interests or priority status, other than as granted in this Interim Order, having a lien or

administrative priority superior or *pari passu* with that of any of the DIP Liens, the DIP

Superpriority Claims, the Adequate Protection Liens, or Adequate Protection Superpriority

Claims, shall be granted while any portion of the DIP Obligations or Prepetition Obligations

remain outstanding, or any commitment under the DIP Documents or Prepetition Financing

51

Documents remains in effect, without the prior written consent of each of the DIP Agent, Majority Holders of Prepetition PIK Notes, and Majority Holders of Prepetition Convertible Notes, each in their respective sole and absolute discretion.

27.     <u>Intercreditor Arrangements</u>.  The Intercreditor Arrangements set forth in **Exhibit "1"** hereto are approved.  Notwithstanding anything to the contrary herein or in any other order of the Bankruptcy Court, the Intercreditor Arrangements shall supersede the Existing Intercreditor Agreement (to the extent applicable) solely to the extent expressly set forth in the Intercreditor Arrangements.  The Intercreditor Arrangements shall survive the conversion or dismissal of any of the Chapter 11 Cases or any relief from the automatic stay granted in the Chapter 11 Cases.

28.     <u>Mandatory Prepayments</u>. The Debtors are authorized, to the extent applicable, to make mandatory prepayments and voluntary prepayments (subject to the applicable priority provisions set forth in this Interim Order) of the Junior Lien DIP Facility as and when provided under, and for application in accordance with, the terms of the DIP Documents; provided that no such mandatory or voluntary prepayments (excluding, for the avoidance of doubt, any refinancing of the Junior Lien DIP Facility) shall be made with the proceeds of the Cash Collateral until the Prepetition ABL Obligations and the Prepetition Term Loan Obligations have been Paid in Full; provided, further, that the Debtors shall be permitted to make such mandatory or voluntary prepayments from the Additional Collateral (including, without limitation, proceeds or products thereof and any cash deposited or maintained in the Additional Collateral Account).

29.     <u>Payments</u>.  No payments with respect to the DIP Obligations or the Adequate Protection Obligations (to the extent approved hereunder) shall be subject to

52

Bankruptcy Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any such payments shall be required to file any interim or final fee applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any such payments.

30. <u>Financial Reporting</u>. The Debtors shall continue to provide (i) the Prepetition ABL Agent with financial and other reporting in compliance with the Prepetition ABL Facility, including weekly borrowing base certificates as and when required under the Prepetition ABL Credit Agreement, and any reports provided to the Prepetition Term Loan Agent and (ii) the Prepetition Term Loan Agent with financial and other reporting in compliance with the Prepetition Term Loan Facility (all such reporting referred to in clauses (i) and (ii) above, the "**Financial Reports**"). The Debtors shall simultaneously provide Financial Reports to (a) the DIP Agent, and (b) advisors to each of the Majority Holders of Prepetition PIK Notes and the Majority Holders of Prepetition Convertible Notes, and (c) subject to the execution of appropriate confidentiality agreement, to any of the Prepetition PIK Notes Secured Parties or Prepetition Convertible Notes Secured Parties, as applicable.

31. <u>Credit Bid</u>. Subject to the terms of the DIP Documents and the Intercreditor Arrangements, any of the DIP Agent, DIP Lenders and Prepetition Secured Parties shall be permitted to credit bid some or all of the outstanding DIP Obligations, Prepetition Obligations, DIP Superpriority Claims or Adequate Protection Superiority Claims, as applicable, as consideration in any sale of the DIP Collateral (or any part thereof) or Common Collateral (or any part thereof), in each case to the extent permitted by section 363(k) of the Bankruptcy Code, without the need for further order of the Bankruptcy Court, and whether that sale is effectuated

53

through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

32.    <u>Exculpation</u>.  Nothing in this Interim Order, the DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Agent or any DIP Lender any liability for any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising from, related to or in connection with the prepetition or postpetition activities of the Debtors in the operation of their businesses, their restructuring efforts, any aspect of the Junior Lien DIP Facility or the negotiation, consummation or enforcement of any of the DIP Documents or any ancillary documents and security arrangements related thereto.  In addition, (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors; <u>provided</u> that the foregoing shall not apply to any act or omission by the DIP Agent or the DIP Lenders that constitutes fraud, gross negligence or willful misconduct by the DIP Agent or the DIP Lenders as finally determined by a court of competent jurisdiction.

33.    <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting

WEIL:\95406968\1\50482.0004

the DIP Agent, DIP Lenders and Prepetition Secured Parties all protections and benefits afforded by section 364(e) of the Bankruptcy Code. Any financial accommodations made to the Debtor by the DIP Agent, DIP Lenders or any of the Prepetition Secured Parties shall be deemed to have been made in good faith, as such term is used in section 363(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, on appeal or otherwise, (i) such action shall not affect (1) the validity of any obligation, indebtedness or liability incurred or payment made hereunder by any of the Debtors to the DIP Agent, DIP Lenders or Prepetition Secured Parties or (2) the validity and enforceability of any lien or priority authorized, created or granted hereunder, and (ii) the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code.

34. <u>Waiver of Section 506(c) Claims</u>. Subject to and effective only upon entry of the Final Order, the Debtors waive (a) any costs or expenses of administration, which have been or may be incurred in these Chapter 11 Cases or any successor case at any time, or (b) any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Prepetition Secured Parties upon the Common Collateral, or the preservation, protection or enhancement of, or the realization by the DIP Agent or DIP Lenders upon, the DIP Collateral, in each case, may be surcharged against any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as applicable, or any of their respective claims, the Carve Out, the DIP Collateral (including Common Collateral), pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise. Notwithstanding anything contained herein to the contrary, nothing contained herein or the transactions contemplated hereby (including, without limitation, the approval of any Budget or the consent to the terms of this Interim Order)

55

shall constitute an admission or be deemed an admission, and no action, inaction or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (including, without limitation, the approval of any Budget or consent to the terms of this Interim Order) shall be deemed to be or shall constitute an admission (nor shall any consent be implied from any action, inaction or acquiescence by, either with or without notice to, the Prepetition Secured Parties) to any charge, lien, assessment or claim (excluding the Carve Out) against any of the DIP Agent, DIP Lenders or Prepetition Secured Parties or any of their respective claims, the Carve Out, the DIP Collateral (including Common Collateral), whether pursuant to section 506(c) of the Bankruptcy Code or otherwise.

35.     Section 552(b) Equities of the Case Waiver.  Each of the DIP Agent, DIP Lenders and Prepetition Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to and effective only upon entry of the Final Order, the Debtors hereby waive, and no person may assert, the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the DIP Agent, DIP Lenders, the DIP Liens, the Prepetition Secured Parties or the Prepetition Liens.

36.     No Marshaling.  Subject to and effective only upon entry of the Final Order, neither the DIP Agent, DIP Lenders nor any of the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral (including Common Collateral), as applicable.

37.     Proofs of Claim.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties will be required to file proofs of claim in any of Chapter 11 Cases or any successor case, and the Debtor's stipulations in this Interim Order shall be deemed to constitute a

WEIL:\95406968\1\50482.0004

timely filed proof of claim.  Any order entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim (including without limitation administrative claims) in the Chapter 11 Cases or any successor chapter 7 case shall not apply to the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

38.    <u>Order Governs</u>.  In the event of any inconsistency between the provisions of this Interim Order, if and when entered, and the DIP Documents, the provisions of this Interim Order, as applicable, shall govern.  Additionally, to the extent that there may be an inconsistency between the terms of this Interim Order or the Final Order, if and when entered, and the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures*, if and when entered, the terms of this Interim Order or Final Order, as applicable, shall govern.

39.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order, including all findings herein and the Intercreditor Arrangements, shall be binding upon all parties-in-interest in the Chapter 11 Cases on a permanent basis, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, as well as the Debtors, the Debtors' estates and the Debtors' respective successors and assigns (including any Chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors, or similar responsible person or similar designee or litigation trust hereinafter appointed or elected for the estates of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns, including after any

57

conversion or dismissal of any of the Chapter 11 Cases; provided that, except to the extent

expressly set forth in this Interim Order, the DIP Agent, the DIP Lenders, and the Prepetition

Secured Parties shall have no obligation to permit the use of Cash Collateral or extend any

financing to any Chapter 7 trustee, chapter 11 trustee or similar responsible person or similar

designee or litigation trust hereunder appointed for the estates of the Debtors.

40.     Limitation of Liability.  In determining to make any loan under the DIP

Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and

when permitted pursuant to this Interim Order , the DIP Documents or Prepetition Financing

Documents, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be

deemed to be in control of the operations of the Debtors or to be acting as a "responsible person"

or "owner or operator" with respect to or in connection with the Debtors' restructuring efforts or

the operation or management of the Debtors (as such terms, or any similar terms, are used in the

United States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing

in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to

impose or allow the imposition upon any of the DIP Agent, DIP Lenders or Prepetition Secured

Parties of any liability for any claims arising from the prepetition or postpetition activities of any

of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

41.     Effectiveness.  This Interim Order shall constitute findings of fact and

conclusions of law and shall take effect immediately upon execution hereof as of the

Commencement Date, and there shall be no stay of execution of effectiveness of this Interim

Order.  Any stay of the effectiveness of this Interim Order under Bankruptcy Rule 6004 or

otherwise is waived.

WEIL:\95406968\1\50482.0004

42.     Retention of Jurisdiction.  The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

43.     Headings.  The heading of any provision of this Order is intended only for convenience and shall not be construed to be or interpreted as a part, or limitation on the scope, any such provision.

44.     Final Hearing.  The Final Hearing on the Motion shall be held on _____, 2015 at __:__ _.m. (Eastern Time), before the Bankruptcy Court.

1.     Notice of Final Hearing and Objection Deadline.  The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with the Bankruptcy Court and to the Creditors Committee after the same has been appointed, or Creditors Committee counsel, if the same shall have been appointed.  Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections with the Bankruptcy Court in accordance with General Order M-399, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. and Sunny Singh, Esq.) and (ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on _____, 2015**.

Dated: _____, 2015
        New York, New York

                                    _____
                                    United States Bankruptcy Judge

59

**<u>Exhibit 1</u>**

**Intercreditor Arrangements**

WEIL:\95406968\1\50482.0004

## Exhibit 1

### Intercreditor Arrangements

Capitalized terms used herein shall have the meanings set forth in the Existing Intercreditor Agreement as in effect on the date hereof unless otherwise defined herein or in the Interim Order to which this Exhibit is attached (the "**Interim Order**").  Subject to the terms of the Interim Order, together with the relative rights and priorities of the DIP Secured Parties and the Prepetition Secured Parties set forth in the Interim Order, the following provisions constitute the intercreditor arrangements among the DIP Secured Parties and the Prepetition Secured Parties for purposes of the Interim Order.

As between and among the Prepetition Secured Parties only, the Existing Intercreditor Agreement and the other Prepetition Financing Documents shall remain in full force and effect (but subject to the Interim Order), subject to all parties' rights and defenses thereunder and under applicable law and except that Section 6 below shall replace the purchase rights in the Existing Intercreditor Agreement).

1.      *Definitions*.  The following terms, as used herein, have the following meanings:

"**ABL Priority Collateral**" has the meaning specified in the Existing Intercreditor Agreement, provided that "ABL Priority Collateral" shall not include any Additional Collateral.

"**Additional ABL Priority Collateral**" has the meaning set forth in Paragraph 4(b)  below.

"**Additional Collateral**" means all property of the Debtors, if any, that is not subject to a valid and perfected Lien in favor of either or both of the ABL Agent and the Term Loan Agent immediately prior to the Commencement Date and in which a Lien has been granted to the DIP Agent pursuant to the applicable Order, including the Additional Collateral Account (as defined in the DIP Credit Agreement) and all amounts and property credited thereto (including, without limitation, all products and proceeds of all of the foregoing property).  In addition, with respect to any property excluded from the Liens in favor of the DIP Agent because of contractual restrictions (including restrictions in leaseholds and subleaseholds) preventing the grant of such Liens (and with respect to which all required consents or waivers have not been obtained), Additional Collateral shall not include the Debtors' interests in such contracts, leaseholds or subleaseholds, but shall include any proceeds or products thereof.

"**Additional Term Priority Collateral**" has the meaning set forth in Paragraph 4(b) below.

"**Adequate Protection Lien Termination Date**" means, with respect to any Class of Secured Parties, the first date on which the indebtedness secured by the adequate protection lien granted to the applicable Class of Secured Parties pursuant to the Interim Order has been irrevocably paid in cash in full or such lien

is otherwise terminated, canceled or extinguished or any earlier date of a final order by a court of competition jurisdiction that such Class of Secured Parties, in its capacity as such, is not entitled to adequate protection under section 507(b) of the Bankruptcy Code.

"**Class**" refers to the determination in relation to any particular Type of Common Collateral or Additional Collateral, (i) with respect to any Secured Obligations, whether such Secured Obligations are First Priority Obligations, Second Priority Obligations, DIP Obligations, Third Priority Obligations or Fourth Priority Obligations and (ii) with respect to any Secured Party, whether such Secured Party is a First Priority Secured Party, a Second Priority Secured Party, a DIP Secured Party, a Third Priority Secured Party or a Fourth Priority Secured Party.

"**Common Collateral**" has the meaning specified in the Existing Intercreditor Agreement, provided that "Common Collateral" shall not include any Additional Collateral.

"**DIP Secured Party**" means the DIP Agent and the DIP Lenders.

"**DIP Termination Date**" means the date on which (i) the DIP Obligations (other than those that constitute taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding the principal of, and interest and premium (if any) on, and fees and expenses relating to, the DIP Obligations) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of DIP Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time) have been paid in cash in full, (ii) all commitments to extend credit under the applicable DIP Documents have been terminated and (iii) the DIP Agent has delivered a written notice to the Third Priority Representative and the Fourth Priority Representative stating that the DIP Termination Date has occurred to the satisfaction of the DIP Agent.

"**Enforcement Action**" means, with respect to any Class of Secured Obligations, (a) other than with respect to the DIP Secured Parties, any demand for payment or acceleration thereof and (b) with respect to all Classes of Secured Obligations, the exercise of any rights and remedies with respect to any Common Collateral or any Additional Collateral, as applicable, securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies under the Prepetition Financing Documents or the DIP Documents, as applicable, of such Class, or applicable law, including the exercise of any rights of set-off or recoupment, and the exercise of any such rights or remedies of a secured creditor under the Uniform Commercial Code, the Bankruptcy Code or other similar creditors' rights, bankruptcy, insolvency, reorganization or similar laws of any applicable jurisdiction.

"**First Priority Documents**" means, with respect to any Type of Common Collateral or Additional Collateral, the Prepetition Financing Documents governing the First Priority Obligations.

"**First Priority Obligations**" means (i) with respect to the ABL Priority Collateral and Additional ABL Priority Collateral, all ABL Secured Obligations and (ii) with respect to the Term Priority Collateral and Additional Term Priority Collateral, all Term Loan Secured Obligations. To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Debtor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, DIP Secured Party, Third Priority Secured Party, Fourth Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of the Existing Intercreditor Agreement and the Interim Order and the rights and obligations of the Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**First Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the First Priority Representative and the holders of the First Priority Obligations with respect to such Common Collateral or Additional Collateral.

"**Fourth Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the Convertible Notes Secured Parties.

"**Representatives**" means the ABL Agent, the Term Loan Agent, the DIP Agent, the PIK Toggle Notes Trustee and the Convertible Notes Trustee, as applicable.

"**Second Priority Documents**" means, with respect to any Type of Common Collateral or Additional Collateral, the Prepetition Financing Documents governing the Second Priority Obligations.

"**Second Priority Obligations**" means (i) with respect to the ABL Priority Collateral and the Additional ABL Priority Collateral, all Term Loan Secured Obligations and (ii) with respect to the Term Priority Collateral and the Additional Term Priority Collateral, all ABL Secured Obligations. To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Debtor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, DIP Secured Party, Third Priority Secured Party, Fourth Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of the Existing Intercreditor Agreement and the Interim Order and the rights and obligations of the Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

- 3 -

"**Second Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the Second Priority Representative and the holders of the Second Priority Obligations with respect to such Common Collateral or Additional Collateral.

"**Secured Obligations**"·means the First Priority Obligations, the Second Priority Obligations, the DIP Obligations, the Third Priority Obligations and the Fourth Priority Obligations.

"**Secured Parties**" means the First Priority Secured Parties, the Second Priority Secured Parties, the DIP Secured Parties, the Third Priority Secured Parties and the Fourth Priority Secured Parties.

"**Term Priority Collateral**" has the meaning specified in the Existing Intercreditor Agreement, provided that "Term Priority Collateral" shall not include any Additional Collateral.

"**Third Priority Documents**" mean the PIK Toggle Notes Documents as in effect on the date hereof.

"**Third Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the PIK Toggle Notes Secured Parties.

"**Type**" when used to describe (i) any Common Collateral, refers to whether such Common Collateral is ABL Priority Collateral or Term Priority Collateral and (ii) any Additional Collateral, refers to whether such Additional Collateral is Additional ABL Priority Collateral or Additional Term Priority Collateral.

2.    *Exclusive Enforcement with respect to Common Collateral.*

a)    With respect to each Type of Common Collateral, until the First Priority Obligations Payment Date, the First Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable First Priority Documents, without any consultation with or consent of any Second Priority Secured Party, any DIP Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Common Collateral.    With respect to each Type of Common Collateral, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the First Priority Documents), the First Priority Representative and the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable First Priority Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

b)    With respect to each Type of Common Collateral, after the First Priority Obligations Payment Date but before the Second Priority Obligations Payment Date, the Second Priority Secured Parties shall have the exclusive right to take

and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable Second Priority Documents, without any consultation with or consent of any DIP Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Common Collateral. With respect to each Type of Common Collateral, after the First Priority Obligations Payment Date but before the Second Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Second Priority Documents), the Second Priority Representative and the other Second Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable Second Priority Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

c)      With respect to each Type of Common Collateral, after the Second Priority Obligations Payment Date but before the DIP Termination Date, the DIP Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable DIP Documents, without any consultation with or consent of any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Common Collateral. With respect to each Type of Common Collateral, after the Second Priority Obligations Payment Date but before the DIP Termination Date, upon the occurrence and during the continuance of a DIP Event of Default (and subject to the provisions of the DIP Documents), the DIP Agent and the other DIP Secured Parties may take and continue any Enforcement Action with respect to the DIP Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

d)      With respect to each Type of Common Collateral, after the DIP Termination Date but before the Third Priority Obligations Payment Date, the Third Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable Third Priority Documents, without any consultation with or consent of any Fourth Priority Secured Party with respect to such Common Collateral. With respect to each Type of Common Collateral, after the DIP Termination Date but before the Third Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Third Priority Documents), the Third Priority Representative and the other Third Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable Third Priority Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

3.      *Standstill with respect to Common Collateral.*

a)      Notwithstanding the foregoing clauses of Paragraph 2, any Second Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the Second Priority Documents or applicable law after the passage of a period of [15] days (the "**Common Collateral Second Priority Standstill Period**") from the first date on which (x) such Second Priority Secured Party shall have delivered a notice in writing to the First Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event, and (y) the automatic stay shall have been terminated as to the applicable Common Collateral; provided that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral Second Priority Standstill Period, any First Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the Second Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by and consistent with the Interim Order;

b)      Notwithstanding the foregoing clauses of Paragraph 2, any DIP Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the DIP Documents or applicable law after the passage of a period of [30] days (or, if earlier, upon the expiration or termination of the Common Collateral Third Priority Standstill Period or the Common Collateral Fourth Priority Standstill Period) (the "**Common Collateral DIP Standstill Period**") from the first date on which (x) such DIP Secured Party shall have delivered a notice in writing to the First Priority Representative and the Second Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a DIP Event of Default, and (y) the automatic stay shall have been terminated as to the applicable Common Collateral; provided that, notwithstanding the foregoing, in no event shall any DIP Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral DIP Standstill Period, any First Priority Secured Party or Second Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the DIP Agent); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the DIP Agent and the DIP Secured Parties may take any action expressly permitted by and consistent with the Interim Order;

c)      Notwithstanding the foregoing clauses of Paragraph 2, any Third Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the Third Priority Documents or applicable law after the passage of a period of [45] days (or, if earlier, upon the expiration or earlier

termination of the Common Collateral Fourth Priority Standstill Period) (the "**Common Collateral Third Priority Standstill Period**") from the first date on which (x) such Third Priority Secured Party shall have delivered a notice in writing to the First Priority Representative, the Second Priority Representative and the DIP Agent of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event, and (y) the automatic stay shall have been terminated as to the applicable Common Collateral; provided that, notwithstanding the foregoing, in no event shall any Third Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral Third Priority Standstill Period, any First Priority Secured Party, Second Priority Secured Party or DIP Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the Third Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Third Priority Representative and the Third Priority Secured Parties may take any action expressly permitted by and consistent with the Interim Order; and

d)      Notwithstanding the foregoing clauses of Paragraph 2, any Fourth Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the Fourth Priority Documents or applicable law after the passage of a period of [60] days (the "**Common Collateral Fourth Priority Standstill Period**") from the first date on which (x) such Fourth Priority Secured Party shall have delivered a notice in writing to the First Priority Representative, the Second Priority Representative, the DIP Agent and the Third Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event, and (y) the automatic stay shall have been terminated as to the applicable Type of Common Collateral; provided that, notwithstanding the foregoing, in no event shall any Fourth Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral Fourth Priority Standstill Period, any First Priority Secured Party, Second Priority Secured Party, DIP Secured Party or Third Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the Fourth Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Fourth Priority Representative and the Fourth Priority Secured Parties may take any action expressly permitted by and consistent with the Interim Order.

4.      *Exclusive Enforcement with respect to Additional Collateral*.

a)      With respect to any Additional Collateral, until the DIP Termination Date, the DIP Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such

Additional Collateral in accordance with the applicable DIP Documents, without any consultation with or consent of any First Priority Secured Party, any Second Priority Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional Collateral. With respect to any Additional Collateral, upon the occurrence and during the continuance of a DIP Event of Default (and subject to the provisions of the DIP Documents), the DIP Agent and the other DIP Secured Parties may take and continue any Enforcement Action with respect to the DIP Obligations and such Additional Collateral in such order and manner as they may determine in their sole discretion.

b)   With respect to any Additional Collateral, on and after the DIP Termination Date:

i)    that would have constituted Term Priority Collateral if such Additional Collateral were encumbered by a prepetition Mortgage or was otherwise of a type described as "Term Priority Collateral" in the Existing Intercreditor Agreement) but was not perfected upon the filing of the Cases immediately ("**Additional Term Priority Collateral**"), prior to the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, the Term Loan Secured Parties shall have the right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Term Priority Collateral in accordance with the applicable Term Loan Documents (in each case, as amended, supplemented, or otherwise modified prior to the date hereof, the "**Prepetition Term Loan Documents**"), without any consultation with or consent of any ABL Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional Term Priority Collateral. With respect to such Additional Term Priority Collateral, after the DIP Termination Date but before the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition Term Loan Documents), the Term Loan Secured Parties may take and continue any Enforcement Action with respect to the applicable Term Loan Secured Obligations and such Additional Term Priority Collateral in such order and manner as they may determine in their sole discretion;

ii)   that is not Additional Term Priority Collateral ("**Additional ABL Priority Collateral**"), before the Adequate Protection Lien Termination Date for the ABL Secured Parties, the ABL Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional ABL Priority Collateral in accordance with the applicable ABL Loan Documents (in each case, as amended, supplemented, or otherwise modified prior to the date hereof, the "**Prepetition ABL Loan Documents**"), without any consultation with or consent of any Term Loan Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional ABL Priority Collateral. With respect to such Additional

- 8 -

ABL Priority Collateral, after the DIP Termination Date but before the Adequate Protection Lien Termination Date for the ABL Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition ABL Loan Documents), the ABL Secured Parties may take and continue any Enforcement Action with respect to the applicable ABL Secured Obligations and such Additional ABL Priority Collateral in such order and manner as they may determine in their sole discretion;

iii)   that constitutes Additional ABL Priority Collateral, after the ABL Termination Date but before the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, the Term Loan Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional ABL Priority Collateral in accordance with the applicable Prepetition Term Loan Documents, without any consultation with or consent of any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional ABL Priority Collateral. With respect to such Additional ABL Priority Collateral, after the ABL Termination Date but before the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition Term Loan Documents), the Term Loan Secured Parties may take and continue any Enforcement Action with respect to the applicable Term Loan Secured Obligations and such Additional ABL Priority Collateral in such order and manner as they may determine in their sole discretion; and

iv)   that constitutes Additional Term Priority Collateral, after the Term Loan Termination Date but before the Adequate Protection Lien Termination Date for the ABL Secured Parties, the ABL Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Term Priority Collateral in accordance with the applicable Prepetition ABL Loan Documents, without any consultation with or consent of any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional Term Priority Collateral. With respect to such Additional Term Priority Collateral, after the Term Loan Termination Date but before the Adequate Protection Lien Termination Date for the ABL Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition ABL Loan Documents), the ABL Secured Parties may take and continue any Enforcement Action with respect to the applicable ABL Secured Obligations and such Additional Term Priority Collateral in such order and manner as they may determine in their sole discretion.

- 9 -

c) With respect to any Additional Collateral, after the later to occur of the ABL Termination Date and the Term Loan Termination Date (the "Prepetition Senior Facilities Termination Date") but before the Adequate Protection Lien Termination Date for the Third Priority Secured Parties, the Third Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Collateral in accordance with the applicable Prepetition PIK Notes Documents, without any consultation with or consent of any Fourth Priority Secured Party with respect to such Additional Collateral. With respect to any Additional Collateral, after the Prepetition Senior Facilities Termination Date but before the Adequate Protection Lien Termination Date for the Third Priority Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition PIK Notes Documents), the Third Priority Representative and the other Third Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable Third Priority Obligations and such Additional Collateral in such order and manner as they may determine in their sole discretion.

5. *Standstill with respect to Additional Collateral.*

a) Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the First Priority Secured Parties, any First Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the First Priority Documents or applicable law after the passage of a period of [15] days (the "**Additional Collateral First Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; provided that, notwithstanding the foregoing, in no event shall any First Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral First Priority Standstill Period, any DIP Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the First Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the First Priority Representative and the First Priority Secured Parties may take any action expressly permitted by the Interim Order.

b) Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the Second Priority Secured Parties, any Second Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the Second Priority Documents or applicable law after the passage of a period of [30] days (the "**Additional Collateral Second Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent and the First Priority Representative of its intention to exercise such rights and remedies, which notice may only be

- 10 -

delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; provided that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral Second Priority Standstill Period, any DIP Secured Party or First Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the Second Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by the Interim Order.

c)  Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the Third Priority Secured Parties, any Third Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the Third Priority Documents or applicable law after the passage of a period of [45] days (the "**Additional Collateral Third Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent, the First Priority Representative and the Second Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; provided that, notwithstanding the foregoing, in no event shall any Third Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral Third Priority Standstill Period, any DIP Secured Party, First Priority Secured Party or Second Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the Third Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Third Priority Representative and the Third Priority Secured Parties may take any action expressly permitted by the Interim Order.

d)  Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the Fourth Priority Secured Parties, any Fourth Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the Fourth Priority Documents or applicable law after the passage of a period of [60] days (the "**Additional Collateral Fourth Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent, the First Priority Representative, the Second Priority Representative and the Third Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; provided that, notwithstanding the foregoing, in no event shall any Fourth Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral Fourth Priority

Standstill Period, any DIP Secured Party, First Priority Secured Party, Second Priority Secured Party or Third Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the Fourth Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Fourth Priority Representative and the Fourth Priority Secured Parties may take any action expressly permitted by the Interim Order.

6.    *Option to Purchase.*

a)    With respect to each Type of Common Collateral and Additional Collateral,

i)    prior to the First Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, (A) all or a portion of the Second Priority Secured Parties acting as a single group, (B) all or a portion of the DIP Secured Parties acting as a single group, (C) all or a portion of the Third Priority Secured Parties acting as a single group or (D) all or a portion of the Fourth Priority Secured Parties acting as a single group (in each case, the "**First Priority Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the relevant Representatives to purchase (w) in the case of clause (A), all of the First Priority Obligations from the First Priority Secured Parties, (x) in the case of clause (B), all of the First Priority Obligations from the First Priority Secured Parties and all of the Second Priority Obligations from the Second Priority Secured Parties, (y) in the case of clause (C), all of the First Priority Obligations from the First Priority Secured Parties, all of the Second Priority Obligations from the Second Priority Secured Parties and all of the DIP Obligations from the DIP Secured Parties and (z) in the case of clause (D), all of the First Priority Obligations from the First Priority Secured Parties, all of the Second Priority Obligations from the Second Priority Secured Parties, all of the DIP Obligations from the DIP Secured Parties and all of the Third Priority Obligations from the Third Priority Secured Parties (in each case, the "**First Priority Selling Secured Parties**").  Such notice from the relevant First Priority Purchasing Secured Parties to the Representatives of the relevant First Priority Selling Secured Parties shall be irrevocable unless otherwise agreed in writing by such Representatives;

ii)    after the First Priority Obligations Payment Date and prior to the Second Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, (A) all or a portion of the DIP Secured Parties acting as a single group, (B) all or a portion of the Third Priority Secured Parties acting as a single group or (C) all or a portion of the Fourth Priority Secured Parties acting as a single group (in each case, the "**Second Priority Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the relevant

- 12 -

Representatives to purchase (x) in the case of clause (A), all of the Second Priority Obligations from the Second Priority Secured Parties, (y) in the case of clause (B), all of the Second Priority Obligations from the Second Priority Secured Parties and all of the DIP Obligations from the DIP Secured Parties and (z) in the case of clause (C), all of the Second Priority Obligations from the Second Priority Secured Parties, all of the DIP Obligations from the DIP Secured Parties and all of the Third Priority Obligations from the Third Priority Secured Parties (in each case, the "**Second Priority Selling Secured Parties**"). Such notice from the relevant Second Priority Purchasing Secured Parties to the Representatives of the relevant Second Priority Selling Secured Parties shall be irrevocable unless otherwise agreed in writing by such Representatives;

iii)   after the Second Priority Obligations Payment Date and prior to the DIP Termination Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, (A) all or a portion of the Third Priority Secured Parties acting as a single group or (B) all or a portion of the Fourth Priority Secured Parties acting as a single group (in such capacity, the "**DIP Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the DIP Agent to purchase (x) in the case of clause (A), all of the DIP Obligations from the DIP Secured Parties and (y) in the case of clause (B), all of the DIP Obligations from the DIP Secured Parties and all of the Third Priority Obligations from the Third Priority Secured Parties (in such capacity, the "**DIP Selling Secured Parties**"). Such notice from the DIP Purchasing Secured Parties to the DIP Agent shall be irrevocable unless otherwise agreed in writing by the DIP Agent; and

iv)   after the DIP Termination Date and prior to the Third Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, all or a portion of the Fourth Priority Secured Parties acting as a single group (in such capacity, the "**Third Priority Purchasing Secured Parties**" and, together with the First Priority Purchasing Secured Parties, the Second Priority Purchasing Secured Parties and the DIP Purchasing Secured Parties, the "**Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the Third Priority Representative to purchase all of the Third Priority Obligations from the Third Priority Secured Parties (in such capacity, the "**Third Priority Selling Secured Parties**" and, together with the First Priority Selling Secured Parties, the Second Priority Selling Secured Parties and the DIP Selling Secured Parties, the "**Selling Secured Parties**"). Such notice from the Third Priority Purchasing Secured Parties to the Third Priority Representative shall be irrevocable unless otherwise agreed in writing by the Third Priority Representative.

b)   On the date (the "**Purchase Date**") specified by the relevant Purchasing Secured Parties in the notice contemplated by clauses (a)(i) through (a)(iv) above (which

- 13 -

shall not be less than five (5) business days, nor more than twenty (20) calendar days, after the receipt by the Representatives of the relevant Selling Secured Parties of the notice of the relevant Purchasing Secured Parties' election to exercise such option) or such other date agreed by such Representatives in writing, the relevant Selling Secured Parties shall sell to the relevant Purchasing Secured Parties, and the relevant Purchasing Secured Parties shall purchase (on a ratable basis in accordance with the outstanding principal amount of their respective Obligations (as defined in the applicable Prepetition Financing Documents or the DIP Documents, as applicable) or such other basis as agreed by such Purchasing Secured Parties) from the relevant Selling Secured Parties, the relevant Obligations, provided that, the relevant Selling Secured Parties and Purchasing Secured Parties (and the Representatives thereof) shall retain all rights to be indemnified or held harmless by the Debtors in accordance with the terms of the relevant Finance Documents but the relevant Selling Secured Parties shall not retain any rights to the security therefor (but the Selling Secured Parties shall be treated as paid in full).

c)   On the Purchase Date, the relevant Purchasing Secured Parties shall (i) pay to each Representative of the relevant Selling Secured Parties for the benefit of such Selling Secured Parties as the purchase price there for the full amount of all Obligations of such Selling Secured Parties then outstanding and unpaid (including principal, interest, fees and expenses (including, without limitation, (A) the Make Whole Fee, as defined in the DIP Credit Agreement, if the Selling Secured Parties are the DIP Secured Parties, or (B) any other applicable make whole fee or premium, to the extent due and payable, if the Selling Secured Parties are not the DIP Secured Parties), including reasonable attorneys' fees and legal expenses, (ii) furnish cash collateral to such Representative in a manner and in such amounts as such Representative determines is reasonably necessary to secure such Representative and such Selling Secured Parties in connection with any issued and outstanding letters of credit, Bank Product Obligations and Cash Management Obligations (each as defined in the Prepetition ABL Credit Agreement) secured by the relevant Prepetition Financing Documents or DIP Documents, as applicable, in each case to the extent applicable, (iii) agree to reimburse such Representative and such Selling Secured Parties for any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) in connection with any commissions, fees, costs or expenses related to any issued and outstanding letters of credit as described above and any checks or other payments provisionally credited to the Obligations of such Secured Parties, and/or as to which such Representative has not yet received final payment, (iv) agree to reimburse the such Selling Secured Parties in respect of indemnification obligations of the Debtors under the relevant Prepetition Financing Documents or DIP Documents, as applicable, as to matters or circumstances known to such Representative at the time of the purchase and sale which would reasonably be expected to result in any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) to such Selling Secured Parties and (v) agree to indemnify and hold harmless such Selling Secured Parties from and against any loss, liability, claim, damage or expense (including reasonable fees and expenses

- 14 -

of legal counsel) arising out of any claim asserted by a third party in respect of the Obligations of such Selling Secured Parties as a direct result of any acts by such Selling Secured Parties occurring after the date of such purchase. Such purchase price and cash collateral shall be remitted by wire transfer in federal funds to such bank account in New York, New York as each such Representative may designate in writing for such purpose.

d) Such purchase shall be expressly made (i) without representation or warranty of any kind by the relevant Selling Secured Parties (or the Representative thereof) and without recourse of any kind, except that such Selling Secured Parties shall represent and warrant: (A) the amount of the Obligations being purchased from it and (B) that such Selling Secured Parties are the sole legal and beneficial owner of such Obligations and have the right to assign such Obligations and the assignment is duly authorized and (ii) pursuant to definitive documentation reasonably acceptable to the relevant Selling Secured Parties and Purchasing Secured Parties.

7. *Application of Proceeds*

a) All proceeds of the ABL Priority Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

> *first*, to the ABL Agent to be applied in accordance with Section 8.03 of the Prepetition ABL Credit Agreement until the ABL Termination Date has occurred;

> *second*, to the Term Loan Agent to be applied in accordance with Section 8.03 of the Prepetition Term Loan Agreement until the Term Loan Termination Date has occurred;

> *third*, to the DIP Agent to be applied in accordance with Section 8.03 of the DIP Credit Agreement (or any corresponding provision with respect to any replacement DIP Credit Agreement) until the DIP Termination Date has occurred;

> *fourth*, to the PIK Toggle Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition PIK Notes Indenture until the PIK Toggle Notes Termination Date has occurred;

> *fifth*, to the Convertible Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition Convertible Notes Indenture until the Convertible Notes Termination Date has occurred; and

> *finally*, to the relevant Debtor, or as a court of competent jurisdiction may direct.

- 15 -

b)      All proceeds of the Term Priority Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

*first*, to the Term Loan Agent to be applied in accordance with Section 8.03 of the Prepetition Term Loan Agreement until the Term Loan Termination Date has occurred;

*second*, to the ABL Agent to be applied in accordance with Section 8.03 of the Prepetition ABL Credit Agreement until the ABL Termination Date has occurred;

*third*, to the DIP Agent to be applied in accordance with Section 8.03 of the DIP Credit Agreement (or any corresponding provision with respect to any replacement DIP Credit Agreement) until the DIP Termination Date has occurred;

*fourth*, to the PIK Toggle Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition PIK Notes Indenture until the PIK Toggle Notes Termination Date has occurred;

*fifth*, to the Convertible Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition Convertible Notes Indenture until the Convertible Notes Termination Date has occurred; and

*finally*, to the relevant Debtor, or as a court of competent jurisdiction may direct.

c)      All proceeds of the Additional Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

*first*, to the DIP Agent to be applied in accordance with Section 8.03 of the DIP Credit Agreement (or any corresponding provision with respect to any replacement DIP Credit Agreement) until the DIP Termination Date has occurred;

*second*, in the manner set forth in the Existing Intercreditor Agreement as and to the extent applicable, subject to any all rights and defenses available thereunder and under applicable law; and

*third*, after indefeasible payment in full of all First Priority Secured Obligations, Second Priority Secured Obligations, DIP Secured Obligations, Third Priority Secured Obligations and Fourth Priority Secured Obligations, to the relevant Debtor, or as a court of competent jurisdiction may direct.

8.      *Turnover Provisions with respect to Common Collateral*

NAI-1500444380v3

a)      With respect to each Type of Common Collateral, until the occurrence of the First Priority Obligations Payment Date, no Second Priority Secured Party, DIP Secured Party, Third Priority Secured Party or Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of the Second Priority Secured Obligations, DIP Obligations, Third Priority Secured Obligations or Fourth Priority Secured Obligations, as the case may be, in violation of Paragraph 7(a) or 7(b).  Any Common Collateral received by a Second Priority Secured Party, DIP Secured Party, Third Priority Secured Party or Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the First Priority Representative to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party, the DIP Agent, each Third Priority Secured Party and each Fourth Priority Secured Party hereby authorizes the First Priority Representative to make any such endorsements as agent for the Second Priority Representative, the DIP Agent, the Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable).  Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the Second Priority Obligations, the DIP Obligations, the Third Priority Obligations or the Fourth Priority Obligations, as the case may be, purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

b)      With respect to each Type of Common Collateral, after the First Priority Obligations Payment Date and prior to the Second Priority Obligations Payment Date, no DIP Secured Party, Third Priority Secured Party or Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of the DIP Obligations, Third Priority Secured Obligations or Fourth Priority Secured Obligations in violation of Paragraph 7(a) or 7(b).  Any Common Collateral received by a DIP Secured Party, a Third Priority Secured Party or a Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the Second Priority Representative to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each DIP Secured Party, Third Priority Secured Party and Fourth Priority Secured Party hereby authorizes the Second Priority Representative to make any such endorsements as agent for the DIP Agent, Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable).  Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the DIP Obligations, the Third Priority Obligations and Fourth Priority Obligations purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

c)    With respect to each Type of Common Collateral, after the Second Priority Obligations Payment Date and prior to the DIP Termination Date, no Third Priority Secured Party or Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of the Third Priority Secured Obligations or Fourth Priority Secured Obligations in violation of Paragraph 7(a) or 7(b). Any Common Collateral received by a Third Priority Secured Party or a Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the DIP Agent to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each Third Priority Secured Party and Fourth Priority Secured Party hereby authorizes the DIP Agent to make any such endorsements as agent for the Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable). Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the Third Priority Obligations and Fourth Priority Obligations purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

d)    With respect to each Type of Common Collateral, after the DIP Termination Date and prior to the Third Priority Obligations Payment Date, no Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of the Fourth Priority Secured Obligations in violation of Paragraph 7(a) or 7(b). Any Common Collateral received by a Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the Third Priority Representative to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each Fourth Priority Secured Party hereby authorizes the Third Priority Representative to make any such endorsements as agent for the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable). Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the Fourth Priority Obligations purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

9.    *Turnover Provisions with respect to Additional Collateral.*

a)    With respect to any Additional Collateral, until the occurrence of the DIP Termination Date, no First Lien Secured Party, Second Priority Secured Party, Third Priority Secured Party or Fourth Priority Secured Party may accept any such Additional Collateral, including any such Additional Collateral constituting proceeds, in satisfaction, in whole or in part, of the First Priority Secured Obligations, Second Priority Secured Obligations, Third Priority Secured Obligations or Fourth Priority Secured Obligations, as the case may be, in

- 18 -

violation of Paragraph 7(c). Any Additional Collateral received by a First Priority Secured Party, Second Priority Secured Party, Third Priority Secured Party or Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the DIP Agent to be applied in accordance with Paragraph 7(c), in the same form as received, with any necessary endorsements, and each First Priority Secured Party, each Second Priority Secured Party, each Third Priority Secured Party and each Fourth Priority Secured Party hereby authorizes the DIP Agent to make any such endorsements as agent for the First Priority Representative, the Second Priority Representative, the Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable). Upon the turnover of such Additional Collateral as contemplated by the immediately preceding sentence, the First Priority Obligations, the Second Priority Obligations, the Third Priority Obligations or the Fourth Priority Obligations, as the case may be, purported to be satisfied by the payment of such Additional Collateral shall be immediately reinstated in full as though such payment had never occurred.

10.  *Bailee for Perfection.*

a)      With respect to each Type of Common Collateral, each Representative hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over such Common Collateral pursuant to the First Priority Documents, such possession or control is also for the benefit of each other Representative for the other applicable Secured Parties, but solely to the extent required to perfect their security interest by possession or control in such Common Collateral as a gratuitous bailee for the other Secured Parties (such bailment being intended, among other things, to satisfy the requirements of Section 8-l06(d)(3), 8-30l(a)(2) and 9-313(c) of the UCC). Nothing in the preceding sentence shall be construed to impose any duty on the any such Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide any other Representative or any other Secured Party with respect to such Common Collateral with any rights with respect to such Common Collateral beyond those specified in the Interim Order, the Existing Intercreditor Agreement and the First Priority Documents, the Second Priority Documents, the DIP Documents, the Third Priority Documents or the Fourth Priority Documents, as the case may be, provided that with respect to each Type of Common Collateral, (i) promptly upon the First Priority Obligations Payment Date and prior to the Second Priority Obligations Payment Date, the First Priority Representative shall (x) deliver to the Second Priority Representative (and each Debtor hereby directs such First Priority Representative to so deliver and each of the Representatives (on behalf of itself and the other applicable Secured Parties), consents to such delivery) any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or

- 19 -

documents as the Second Priority Representative may reasonably request, all at the Debtors' sole cost and expense, (ii) promptly upon the Second Priority Obligations Payment Date and prior to the DIP Termination Date, the Second Priority Representative shall (x) deliver to the DIP Agent (and each Debtor hereby directs such Second Priority Representative to so deliver and each other Representative (on behalf of itself and the other Secured Parties) consents to such delivery), any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the DIP Agent may reasonably request, all at the Debtors' sole cost and expense, (iii) promptly upon the DIP Termination Date and prior to the Third Priority Obligations Payment Date, the DIP Agent shall (x) deliver to the Third Priority Representative (and each Debtor hereby directs such DIP Agent to so deliver and the Fourth Priority Representative (on behalf of itself and the other Fourth Priority Secured Parties) consents to such delivery), any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the Third Priority Representative may reasonably request, all at the Debtors' sole cost and expense and (iv) after the Third Priority Obligations Payment Date, the Third Priority Representative shall (x) to the extent any Fourth Priority Obligations remain outstanding, deliver to the Fourth Priority Representative (and each Debtor hereby directs such Third Priority Representative to so deliver), any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the Fourth Priority Representative may reasonably request, all at the Debtors' sole cost and expense.

b)      With respect to Additional Collateral, the DIP Agent hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over such Additional Collateral pursuant to the DIP Documents, such possession or control is also for the benefit of the Prepetition Secured Parties, but solely to the extent required to perfect their security interest by possession or control in such Additional Collateral as a gratuitous bailee for the Prepetition Secured Parties (such bailment being intended, among other things, to satisfy the requirements of Section 8-l06(d)(3), 8-30l(a)(2) and 9-313(c) of the UCC).  Nothing in the preceding sentence shall be construed to impose any duty on the DIP Agent (or any third party acting on its behalf) with respect to such Additional Collateral or provide any Prepetition Secured Party with respect to such Additional Collateral with any rights with respect to such Additional Collateral beyond those specified in the Interim Order, provided that with respect to any Additional Collateral, after the DIP Termination Date, the DIP Agent shall (x) deliver to the First Priority

- 20 -

Representative (for the benefit of all other Prepetition Secured Parties) (and each Debtor hereby directs the DIP Agent to so deliver and the First Priority Representative (on behalf of itself and the other First Priority Secured Parties), the Second Priority Representative (on behalf of itself and the other Second Priority Secured Parties), the Third Priority Representative (on behalf of itself and the other Third Priority Secured Parties) and the Fourth Priority Representative (on behalf of itself and the other Fourth Priority Secured Parties) consent to such delivery) at the Debtors' sole cost and expense, any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Additional Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Additional Collateral as a court of competent jurisdiction otherwise directs.

c) Paragraphs 10(a) and 10(b) are intended solely to effectuate the respective Lien priorities as between the Secured Parties and shall not impose on any Secured Party any obligations in respect of the disposition of any Common Collateral or Additional Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

d) Other than as set forth in the provisos in Paragraphs 10(a) and 10(b), any Secured Party, with physical possession of or control over Common Collateral or Additional Collateral shall not have any duty or liability to protect or preserve any rights pertaining to any of such Common Collateral or Additional Collateral, as applicable, and, except for gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction, each Secured Party hereby waives and releases such Person from all claims and liabilities arising pursuant to such Person's role as bailee with respect to such Common Collateral or Additional Collateral, as applicable.

11. *Credit Bidding*. Each Secured Party shall expressly have the right to bid or credit bid any of its Secured Obligations for or purchase the Additional Collateral or the Common Collateral at any public, private or judicial foreclosure or sale of any Additional Collateral or Common Collateral (including a "partial credit bid") or in an Insolvency Proceeding or otherwise; provided that (a) any such credit bid or partial credit bid of the DIP Obligations must provide for the payment in full in cash of the First Priority Obligations and the Second Priority Obligations on closing of any resulting disposition (to the extent then outstanding), (b) any such credit bid or partial credit bid of Third Priority Obligations must provide for the payment in full in cash of the First Priority Obligations, the Second Priority Obligations and the DIP Obligations on closing of any resulting disposition (in each case, to the extent then outstanding) and (c) any such credit bid or partial credit bid of Fourth Priority Obligations must provide for the payment in full in cash of the First Priority Obligations, the Second Priority Obligations, the DIP Obligations and the Third Priority Obligations on closing of any resulting disposition (in each case, to the extent then outstanding).

12. *Access to Additional Collateral by ABL Agent*.

a)  If the ABL Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure), enforcement, collection or execution with respect to the ABL Priority Collateral ("**ABL Priority Collateral Enforcement Actions**") or if the DIP Agent commences any action or proceeding with respect to any of its rights or remedies (including, but not limited to, any action of foreclosure), enforcement, collection or execution with respect to the Additional Collateral and the DIP Agent (or a purchaser at a foreclosure sale conducted in foreclosure of the DIP Agent's Liens) takes actual or constructive possession of the Additional Collateral of any Grantor ("**Additional Collateral Enforcement Actions**"), then (1) if the ABL Agent has commenced an ABL Priority Collateral Enforcement Action, the ABL Agent shall furnish the DIP Agent with prompt written notice of the commencement of such action (the "**ABL Priority Collateral Enforcement Action**") and (2) in all cases, the DIP Agent shall (x) cooperate with the ABL Agent (and with its officers, employees, representatives and agents) in its efforts to conduct ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral and to finish any work-in-process and process, ship, produce, store, complete, supply, lease, sell or otherwise handle, deal with, assemble or dispose of, in any lawful manner, the ABL Priority Collateral, (y) not hinder or restrict in any respect the ABL Agent from conducting ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral or from finishing any work-in-process or processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the ABL Priority Collateral and (z) permit the ABL Agent, its employees, agents, advisers and representatives, at the cost and expense of the ABL Secured Parties, to enter upon and use the Additional Collateral, for a period commencing on (I) the earlier of the date of the initial ABL Priority Collateral Enforcement Action or the date of delivery of the ABL Priority Collateral Enforcement Action Notice, as the case may be, and (II) ending on the earlier of the date occurring 120 days thereafter and the date on which all ABL Priority Collateral (other than ABL Priority Collateral abandoned by the ABL Agent in writing) has been sold or disposed of (such period, as the same may be extended with the written consent of the DIP Agent, the "**ABL Priority Collateral Processing and Sale Period**"),

*provided*, however, that nothing contained in this Agreement shall restrict the rights of the DIP Agent from selling, assigning or otherwise transferring any Additional Collateral prior to the expiration of such ABL Priority Collateral Processing and Sale Period if the purchaser, assignee or transferee thereof agrees in writing (for the benefit of the ABL Agent and the ABL Secured Parties) to be bound by the provisions of this Section 12.  If any stay or other order prohibiting the exercise of remedies with respect to the ABL Priority Collateral has been entered by a court of competent jurisdiction, such ABL Priority Collateral Processing and Sale Period shall be tolled during the pendency of any such stay or other order.

b)  During the period of actual occupation, use and/or control by the ABL Secured Parties and/or the ABL Agent (or their respective employees, agents, advisers and representatives) of any Additional Collateral, the ABL Secured Parties and the ABL Agent shall be obligated to repair at their expense any physical damage to

such Additional Collateral resulting from such occupancy, use or control, and to leave such Additional Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the ABL Secured Parties or the ABL Agent have any liability to the DIP Secured Parties pursuant to this Section 12 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Additional Collateral existing prior to the date of the exercise by the ABL Secured Parties (or the ABL Agent, as the case may be) of their rights under this Section 12 and the ABL Secured Parties shall have no duty or liability to maintain the Additional Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Secured Parties, or for any diminution in the value of the Additional Collateral that results from ordinary wear and tear resulting from the use of the Additional Collateral by the ABL Secured Parties in the manner and for the time periods specified under this Section 12. Without limiting the rights granted in this Section 12, the ABL Secured Parties and the ABL Agent shall cooperate with the DIP Secured Parties in connection with any efforts made by the DIP Secured Parties to sell the Additional Collateral.

13. *Access to Additional Collateral by DIP Agent or Term Loan Agent.*

a) If the DIP Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure), enforcement, collection or execution with respect to the Additional ABL Priority Collateral ("**Additional ABL Priority Collateral Enforcement Actions**") or if the Term Loan Agent commences any action or proceeding with respect to any of its rights or remedies (including, but not limited to, any action of foreclosure), enforcement, collection or execution with respect to the Additional Collateral and the Term Loan Agent (or a purchaser at a foreclosure sale conducted in foreclosure of the Term Loan Agent's Liens) takes actual or constructive possession of the Additional ABL Priority Collateral of any Grantor ("**Additional Collateral Enforcement Actions**"), then (1) if the DIP Agent has commenced a DIP Priority Collateral Enforcement Action, the DIP Agent shall furnish the Term Loan Agent with prompt written notice of the commencement of such action (the "**Additional ABL Priority Collateral Enforcement Action**") and (2) in all cases, the Term Loan Agent shall (x) cooperate with the ABL Agent (and with its officers, employees, representatives and agents) in its efforts to conduct Additional ABL Priority Collateral Enforcement Actions in the Additional ABL Priority Collateral and to finish any work-in-process and process, ship, produce, store, complete, supply, lease, sell or otherwise handle, deal with, assemble or dispose of, in any lawful manner, the Additional ABL Priority Collateral, (y) not hinder or restrict in any respect the DIP Agent from conducting Additional ABL Priority Collateral Enforcement Actions in the Additional ABL Priority Collateral or from finishing any work-in-process or processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the Additional ABL Priority Collateral and (z) permit the DIP Agent, its employees, agents, advisers and representatives, at the

- 23 -

cost and expense of the DIP Secured Parties, to enter upon and use the Additional Collateral, for a period commencing on (I) the earlier of the date of the initial Additional ABL Priority Collateral Enforcement Action or the date of delivery of the Additional ABL Priority Collateral Enforcement Action Notice, as the case may be, and (II) ending on the earlier of the date occurring 120 days thereafter and the date on which all Additional ABL Priority Collateral (other than Additional ABL Priority Collateral abandoned by the DIP Agent in writing) has been sold or disposed of (such period, as the same may be extended with the written consent of the Term Loan Agent, the "**Additional ABL Priority Collateral Processing and Sale Period**"),

*provided*, however, that nothing contained in this Agreement shall restrict the rights of the Term Agent from selling, assigning or otherwise transferring any Term Priority Collateral prior to the expiration of such Additional ABL Priority Collateral Processing and Sale Period if the purchaser, assignee or transferee thereof agrees in writing (for the benefit of the DIP Agent and the DIP Secured Parties) to be bound by the provisions of this Section 12. If any stay or other order prohibiting the exercise of remedies with respect to the Additional ABL Priority Collateral has been entered by a court of competent jurisdiction, such Additional ABL Priority Collateral Processing and Sale Period shall be tolled during the pendency of any such stay or other order.

b)     During the period of actual occupation, use and/or control by the Additional ABL Secured Parties and/or the Term  Agent (or their respective employees, agents, advisers and representatives) of any Term Priority Collateral, the ABL Secured Parties and the ABL Agent shall be obligated to repair at their expense any physical damage to such Term Priority Collateral resulting from such occupancy, use or control, and to leave such Term Priority Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the DIP Secured Parties or the Term Loan Agent have any liability to the Term Secured Parties pursuant to this Section 12 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Term Priority Collateral existing prior to the date of the exercise by the DIP Secured Parties (or the DIP Agent, as the case may be) of their rights under this Section 12 and the DIP Secured Parties shall have no duty or liability to maintain the Term Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the DIP Secured Parties, or for any diminution in the value of the Term Priority Collateral that results from ordinary wear and tear resulting from the use of the Term Priority Collateral by the DIP Secured Parties in the manner and for the time periods specified under this Section 12.

14.     In connection with any asset sale by a Debtor that includes both Common Collateral and Additional Collateral, the parties hereto will cooperate reasonably to allocate the consideration for such sale to the Common Collateral and the Additional Collateral.

15.     Upon the Adequate Protection Lien Termination Date with respect to the applicable Class, any adequate protection liens or adequate protection claims held by the applicable Class shall be deemed terminated, canceled and extinguished.

NAI-1500444380v3

**Exhibit 2**

**Budget**

WEIL:\95406968\1\50482.0004

The Great Atlantic and Pacific Tea Company
25-Week Cash Flow Model
($ in Millions)

| | FY15 P6 | | | | FY15 P7 | | | | FY15 P8 | | | | FY15 P9 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Period** | Period 6 | Period 6 | Period 6 | Period 6 | Period 7 | Period 7 | Period 7 | Period 7 | Period 8 | Period 8 | Period 8 | Period 8 | Period 9 | |
| **Actual/Forecast** | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| **Fiscal Week** | Week 21 | Week 22 | Week 23 | Week 24 | Week 25 | Week 26 | Week 27 | Week 28 | Week 29 | Week 30 | Week 31 | Week 32 | Week 33 | 13 Weeks |
| **Week Ending** | 25-Jul | 1-Aug | 8-Aug | 15-Aug | 22-Aug | 29-Aug | 5-Sep | 12-Sep | 19-Sep | 26-Sep | 3-Oct | 10-Oct | 17-Oct | Through |
| | | | | | | | | | | | | | | 17-Oct |
| **Forecast Week** | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
| | BX Filing | | | | | | | | Tier 1 Auction | | Tier 1 Sale | | | |
| Memo: Store Merch Sales Comp | -11.8% | -10.3% | -10.4% | -10.7% | -10.5% | -10.5% | -11.8% | -6.9% | -11.0% | -11.4% | -11.4% | -11.7% | -11.4% | -10.8% |
| Memo: Store Count | 296 | 296 | 296 | 295 | 295 | 295 | 270 | 270 | 270 | 270 | 270 | 252 | 234 | 234 |
| **Operating Receipts** | 94.9 | 98.7 | 102.2 | 100.8 | 96.8 | 97.5 | 97.1 | 97.0 | 92.0 | 89.2 | 91.9 | 86.8 | 76.0 | 1,322.5 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Merchandise Payments (C&S and DSD/Other Merch.) | 69.9 | 70.4 | 64.9 | 61.9 | 63.5 | 67.6 | 67.7 | 62.2 | 62.8 | 65.7 | 65.7 | 58.2 | 49.1 | 901.4 |
| Payroll/Benefits | 22.0 | 14.9 | 16.0 | 19.6 | 20.3 | 14.7 | 17.3 | 12.8 | 19.6 | 17.6 | 17.7 | 12.5 | 18.0 | 242.7 |
| Other Operating Expenses | 15.1 | 25.3 | 8.6 | 8.6 | 11.0 | 12.7 | 23.3 | 8.2 | 8.0 | 15.7 | 12.7 | 5.5 | 5.1 | 168.4 |
| Subtotal | 107.0 | 110.5 | 89.6 | 90.1 | 94.8 | 95.0 | 108.3 | 83.2 | 90.4 | 99.1 | 96.1 | 76.1 | 72.2 | 1,312.5 |
| **Operating Cash Flow** | (12.1) | (11.9) | 12.7 | 10.7 | 1.9 | 2.5 | (11.1) | 13.8 | 1.6 | (9.9) | (4.2) | 10.6 | 3.8 | 9.9 |
| **Non-Operating & Ch. 11 Disbursements/(Receipts)** | | | | | | | | | | | | | | |
| Maintenance Capital Expenditures | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.5 | 9.0 |
| Interest /Fees | 1.3 | 2.3 | 0.1 | - | 1.3 | - | 6.7 | - | - | - | 3.8 | - | - | 15.9 |
| Asset Sales/Other Proceeds | - | - | - | (5.9) | - | - | (8.9) | (0.9) | - | - | - | (213.1) | (119.9) | (350.4) |
| Professional Fees | 2.2 | 0.2 | - | - | 1.0 | 4.4 | 0.2 | - | - | - | 6.4 | 5.2 | - | 23.8 |
| Other Non-Operating and Ch. 11 Disbursements | 15.0 | 3.9 | 0.1 | 0.6 | 0.1 | 0.7 | 13.4 | - | - | 0.6 | 6.2 | 4.3 | 4.2 | 50.7 |
| Subtotal | 19.2 | 7.2 | 0.9 | (4.6) | 3.0 | 5.8 | 12.0 | (0.3) | 0.6 | 1.2 | 17.0 | (203.1) | (115.2) | (251.1) |
| **Net Cash Flow** | (31.2) | (19.1) | 11.8 | 15.3 | (1.0) | (3.3) | (23.2) | 14.1 | 1.0 | (10.5) | (21.2) | 213.7 | 119.0 | 261.1 |
| **Beginning Cash Balance - Bank** | 36.6 | 54.8 | 45.7 | 45.7 | 62.2 | 98.2 | 90.8 | 79.3 | 82.6 | 84.7 | 74.7 | 55.9 | 83.3 | 36.4 |
| Net Cash Flow | (31.2) | (19.1) | 11.8 | 15.3 | (1.0) | (3.3) | (23.2) | 14.1 | 1.0 | (10.5) | (21.2) | 213.7 | 119.0 | 261.1 |
| Pre petition Debt Borrowings/(Repayments & LC Cash Collateralization) | - | - | - | - | (12.8) | (3.5) | - | - | - | - | - | (182.9) | (119.9) | (319.0) |
| DIP Draw/(Repayment | 50.0 | - | - | - | 50.0 | - | - | - | - | - | - | - | - | 100.0 |
| Store Cash Reclass to Bank Cash | - | - | - | 0.0 | - | - | 1.7 | - | - | - | - | 2.4 | 2.0 | 6.2 |
| Change in Float | (0.5) | 9.9 | (11.8) | 1.3 | (0.3) | (0.5) | 9.9 | (10.7) | 1.1 | 0.4 | 2.4 | (5.9) | 0.2 | (0.1) |
| **Ending Available Cash Balance - Bank** | 54.8 | 45.7 | 45.7 | 62.2 | 98.2 | 90.8 | 79.3 | 82.6 | 84.7 | 74.7 | 55.9 | 83.3 | 84.6 | 84.6 |
| Less: Check Float | 12.5 | 22.4 | 10.6 | 11.9 | 11.6 | 11.0 | 21.0 | 10.2 | 11.4 | 11.8 | 14.2 | 8.3 | 8.5 | 8.5 |
| **Ending Available Cash Balance - Book** | 42.4 | 23.3 | 35.1 | 50.4 | 86.6 | 79.8 | 58.3 | 72.4 | 73.4 | 62.9 | 41.7 | 75.0 | 76.1 | 76.1 |

**Exhibit 3**

**2012 Confirmation Order Excerpts**

62

114.    In accordance with the terms of Article IV.J of the Plan, the Reorganized Debtors

and/or NewCo shall authorize, issue and distribute, pursuant to the Plan and the Securities

Purchase Agreements, the New Second Lien Notes, the New Convertible Third Lien Notes, the

NewCo Equity, the Investment Warrants, the new common stock of Reorganized A&P and any

other Securities to be authorized, issued and distributed pursuant to the Plan and Securities

Purchase Agreements, and the Debtors and the Reorganized Debtors as the case may be shall be

authorized to execute and deliver all documentation related thereto.    Upon execution and

delivery by the Debtors or Reorganized Debtors, as applicable, of the foregoing documents, or

issuance of the Securities related thereto, as the case may be, such documents and Securities

shall be deemed validly executed and delivered and deemed to constitute valid, binding and

enforceable agreements and obligations of the Reorganized Debtors and are not in conflict with

any applicable laws.    Upon issuance, the NewCo Equity and the new common stock of

Reorganized A&P issued to NewCo, including without limitation, any capital stock of

Reorganized A&P or NewCo shall be deemed pursuant to this Order, duly authorized, validly

K&E 21784620

issued, fully paid and non-assessable under all applicable laws.  In addition, any capital stock

issued pursuant to, including by way of conversion or exercise, the Investment Warrants, the

New Second Lien Notes, the New Convertible Third Lien Notes, and any documents related

thereto, are hereby deemed duly authorized, and, upon issuance, are deemed validly issued, fully-

paid and non-assessable under all applicable laws.

115.    The Liens contemplated by and related to the New Second Lien Notes and the

New Convertible Third Lien Notes, are valid, binding and enforceable Liens on the collateral

specified in the relevant agreements executed by the Reorganized Debtors in connection with the

New Second Lien Notes and the New Convertible Third Lien Notes.  The guarantees, mortgages,

pledges, Liens, and other security interests granted pursuant to or in connection with the New

Second Lien Notes and the New Convertible Third Lien Notes, are granted in good faith as an

inducement to the holders of such notes to extend credit thereunder and shall be, and hereby are,

deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise

be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth

in the intercreditor agreements and other definitive documentation executed in connection with

the New Second Lien Notes and the New Convertible Third Lien Notes.

K&E 21784620

117.    Any provision in any of the Debtors' leases that purports to require the consent of the lessor thereunder in order for the applicable loan party to mortgage, pledge or collaterally assign such leases (or to restrict, prohibit or void any such mortgage, pledge or collateral assignment) is hereby (and as additionally set forth in paragraph 112 of this Confirmation Order) invalidated for the sole and limited purpose of allowing the Debtors' leasehold interests to be included in the collateral security of the New Second Lien Notes and New Convertible Third Lien Notes. The collateral agent for the New Second Lien Notes and New Convertible Third Lien Notes shall be granted Liens on the collateral, including all of the Debtors' leasehold interests, which Liens shall be deemed perfected and effective as of the Effective Date (collectively, the "*Second Lien Pledge*" or the "*Convertible Third Lien Pledge*," respectively). For the avoidance of doubt, (i) it is expressly understood that, other than with respect to the Second Lien Pledge and the Convertible Third Lien Pledge, nothing herein or in the Plan shall broaden or limit any rights of the collateral agent or holders of the New Second Lien Notes or the New Convertible Third Lien Notes (in each case, whether arising under the applicable leases or applicable law, including, but not limited to and solely by way of example, any right to cure defaults, exercise remedies or compel delivery of notices from lessors) or of the lessors, in each case with respect to the Debtors' leasehold interests and (ii) to the extent any lessor under any of the Debtors' leases has not objected to the relief set forth herein or has withdrawn its objection or indicated its assent on the record at the Confirmation Hearing, such lessor shall be deemed to have consented to the Second Lien Pledge and the Convertible Third Lien Pledge (as described above and including clause (i)).

K&E 21784620

**Exhibit C**

**Draft Form DIP Credit Agreement**

**SENIOR SECURED DEBTOR-IN-POSSESSION TERM CREDIT AGREEMENT**

Dated as of July 20, 2015

among

**THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,**
as the Borrower

The Guarantors Named Herein

**FORTRESS CREDIT CORP.**
as Agent,

and

The Lenders Party Hereto

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS AND ACCOUNTING TERMS | 1 |
| 1.01 | Defined Terms | 1 |
| 1.02 | Other Interpretive Provisions | 37 |
| 1.03 | Accounting Terms | 38 |
| 1.04 | Rounding | 39 |
| 1.05 | Times of Day | 39 |
| | | |
| ARTICLE II | THE LOANS | 39 |
| 2.01 | Initial Term Loans and Delayed Draw Term Loans | 39 |
| 2.02 | Borrowings of Loans | 40 |
| 2.03 | Reserved | 41 |
| 2.04 | Repayment of Loans | 41 |
| 2.05 | Optional Prepayments | 41 |
| 2.06 | Reserved | 41 |
| 2.07 | Mandatory Prepayments | 41 |
| 2.08 | Interest | 42 |
| 2.09 | Fees | 43 |
| 2.10 | Computation of Interest and Fees | 43 |
| 2.11 | Evidence of Debt | 44 |
| 2.12 | Payments Generally; Agent's Clawback | 44 |
| 2.13 | Sharing of Payments by Lenders | 45 |
| 2.14 | Settlement Amongst Lenders | 45 |
| 2.15 | Priority and Liens | 46 |
| 2.16 | No Discharge; Survival of Claims | 46 |
| 2.17 | Defaulting Lenders | 47 |
| | | |
| ARTICLE III | TAXES, YIELD PROTECTION AND ILLEGALITY | 48 |
| 3.01 | Taxes | 48 |
| 3.02 | Illegality | 51 |
| 3.03 | Inability to Determine Rates | 51 |
| 3.04 | Increased Costs; Reserves on LIBO Rate Loans | 51 |
| 3.05 | Mitigation Obligations; Replacement of Lenders | 52 |
| 3.06 | Survival | 53 |
| | | |
| ARTICLE IV | CONDITIONS PRECEDENT TO THE CLOSING DATE | 53 |
| 4.01 | Conditions Precedent to the Occurrence of the Closing Date and to the Making of the Initial Term Loans | 53 |
| 4.02 | Conditions Precedent to Delayed Draw Term Loans | 56 |
| | | |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES | 58 |
| 5.01 | Existence, Qualification and Power | 58 |
| 5.02 | Authorization; No Contravention | 58 |
| 5.03 | Governmental Authorization; Other Consents | 58 |
| 5.04 | Binding Effect | 58 |
| 5.05 | Financial Statements; No Material Adverse Effect | 59 |
| 5.06 | Litigation | 59 |

| 5.07 | No Default | 59 |
|---|---|---|
| 5.08 | Ownership of Property; Liens | 59 |
| 5.09 | Environmental Compliance | 60 |
| 5.10 | Insurance | 61 |
| 5.11 | Taxes | 61 |
| 5.12 | ERISA Compliance | 62 |
| 5.13 | Subsidiaries; Equity Interests | 62 |
| 5.14 | Margin Regulations; Investment Company Act | 62 |
| 5.15 | Disclosure | 63 |
| 5.16 | Compliance with Laws | 63 |
| 5.17 | Intellectual Property; Licenses, Etc | 63 |
| 5.18 | Labor Matters | 63 |
| 5.19 | Security Documents | 64 |
| 5.20 | [Reserved] | 65 |
| 5.21 | Deposit Accounts; Credit Card Arrangements | 65 |
| 5.22 | Brokers | 65 |
| 5.23 | [Reserved] | 65 |
| 5.24 | Material Contracts | 65 |
| 5.25 | [Reserved] | 65 |
| 5.26 | Notices from Farm Products Sellers, etc | 65 |
| 5.27 | HIPAA Compliance | 66 |
| 5.28 | Foreign Assets Control Regulations, Anti-Money Laundering and Counter-Terrorism | 66 |
| 5.29 | Foreign Corrupt Practices | 67 |
| 5.30 | Compliance with Health Care Laws | 67 |
| **ARTICLE VI** | **AFFIRMATIVE COVENANTS** | 67 |
| 6.01 | Financial Statements | 67 |
| 6.02 | Certificates; Other Information | 68 |
| 6.03 | Notices | 69 |
| 6.04 | Payment of Obligations | 71 |
| 6.05 | Preservation of Existence, Etc | 71 |
| 6.06 | Maintenance of Properties | 71 |
| 6.07 | Maintenance of Insurance | 71 |
| 6.08 | Compliance with Laws | 73 |
| 6.09 | Books and Records; Accountants | 73 |
| 6.10 | Inspection Rights | 74 |
| 6.11 | Use of Proceeds | 74 |
| 6.12 | Additional Loan Parties | 74 |
| 6.13 | Milestones | 74 |
| 6.14 | Information Regarding the Collateral | 76 |
| 6.15 | Cash Management | 76 |
| 6.16 | Environmental Laws | 77 |
| 6.17 | Further Assurances | 77 |
| 6.18 | Compliance with Terms of Material Leases | 78 |
| 6.19 | Material Contracts | 78 |
| 6.20 | [Reserved] | 78 |
| 6.21 | ERISA | 78 |
| 6.22 | Agricultural Products | 79 |
| 6.23 | First Day Orders | 79 |

| | 6.24 | Post-Closing Obligations | 80 |
|---|---|---|---|
| ARTICLE VII | | NEGATIVE COVENANTS | 80 |
| | 7.01 | Liens | 80 |
| | 7.02 | Investments | 80 |
| | 7.03 | Indebtedness; Disqualified Stock | 80 |
| | 7.04 | Fundamental Changes | 80 |
| | 7.05 | Dispositions | 81 |
| | 7.06 | Restricted Payments | 81 |
| | 7.07 | Prepayments of Indebtedness and Payments of Certain Indebtedness | 82 |
| | 7.08 | Change in Nature of Business | 82 |
| | 7.09 | Transactions with Affiliates | 82 |
| | 7.10 | Burdensome Agreements | 82 |
| | 7.11 | Use of Proceeds | 83 |
| | 7.12 | Amendment of Material Documents | 83 |
| | 7.13 | Fiscal Year | 83 |
| | 7.14 | Deposit Accounts | 83 |
| | 7.15 | Financial Covenants | 83 |
| ARTICLE VIII | | EVENTS OF DEFAULT AND REMEDIES | 84 |
| | 8.01 | Events of Default | 84 |
| | 8.02 | Remedies Upon Event of Default | 87 |
| | 8.03 | Application of Funds | 88 |
| ARTICLE IX | | THE AGENT | 88 |
| | 9.01 | Appointment and Authority | 88 |
| | 9.02 | Rights as a Lender | 89 |
| | 9.03 | Exculpatory Provisions | 90 |
| | 9.04 | Reliance by Agent | 90 |
| | 9.05 | Delegation of Duties | 91 |
| | 9.06 | Resignation of Agent | 91 |
| | 9.07 | Non-Reliance on Agent and Other Lenders | 91 |
| | 9.08 | [Reserved] | 92 |
| | 9.09 | [Reserved] | 92 |
| | 9.10 | Collateral and Guaranty Matters | 92 |
| | 9.11 | Notice of Transfer | 92 |
| | 9.12 | Reports and Financial Statements | 92 |
| | 9.13 | Agency for Perfection | 93 |
| | 9.14 | Indemnification of Agent | 93 |
| | 9.15 | Relation among Lenders | 93 |
| ARTICLE X | | MISCELLANEOUS | 94 |
| | 10.01 | Amendments, Etc | 94 |
| | 10.02 | Notices; Effectiveness; Electronic Communications | 95 |
| | 10.03 | No Waiver; Cumulative Remedies | 96 |
| | 10.04 | Expenses; Indemnity; Damage Waiver | 96 |
| | 10.05 | Payments Set Aside | 98 |
| | 10.06 | Successors and Assigns | 98 |
| | 10.07 | Treatment of Certain Information; Confidentiality | 101 |

| | | |
|---|---|---|
| 10.08 | Right of Setoff | 102 |
| 10.09 | Interest Rate Limitation | 102 |
| 10.10 | Counterparts; Integration; Effectiveness | 102 |
| 10.11 | Survival | 103 |
| 10.12 | Severability | 103 |
| 10.13 | Replacement of Lenders | 103 |
| 10.14 | Governing Law; Jurisdiction; Etc | 104 |
| 10.15 | Waiver of Jury Trial | 105 |
| 10.16 | No Advisory or Fiduciary Responsibility | 105 |
| 10.17 | USA PATRIOT Act Notice | 106 |
| 10.18 | Foreign Asset Control Regulations | 106 |
| 10.19 | Foreign Corrupt Practices Act | 106 |
| 10.20 | Time of the Essence | 106 |
| 10.21 | [Reserved | 106 |
| 10.22 | Press Releases | 106 |
| 10.23 | Additional Waivers | 107 |
| 10.24 | No Strict Construction | 108 |
| 10.25 | Attachments | 108 |
| 10.26 | Intercreditor Arrangements | 108 |
| 10.27 | Orders Govern | 108 |

## SCHEDULES

| | |
|---|---|
| Schedule 1.01(D) | Direct Competitors |
| Schedule 1.01(G) | Guarantors |
| Schedule 1.01(I) | Immaterial Subsidiary |
| Schedule 1.01(P) | Permitted Holders |
| Schedule 1.01(T) | Triple Negative Leases |
| Schedule 1.02(D) | Warehouse Facilities |
| Schedule 2.01 | Commitments and Applicable Percentages |
| Schedule 5.01 | Loan Parties Organizational Information |
| Schedule 5.06 | Litigation |
| Schedule 5.08(b)(1) | Owned Real Estate |
| Schedule 5.08(b)(2) | Leased Real Estate |
| Schedule 5.09 | Environmental Matters |
| Schedule 5.10 | Insurance |
| Schedule 5.11 | Tax Sharing Agreements |
| Schedule 5.13 | Subsidiaries; Other Equity Investments |
| Schedule 5.17 | Intellectual Property Matters |
| Schedule 5.19 | UCC Financing Statements |
| Schedule 5.21(a) | DDAs |
| Schedule 5.21(b) | Credit Card Arrangements |
| Schedule 5.24 | Material Contracts |
| Schedule 6.03 | Material Leases |
| Schedule 6.24 | Post-Closing Obligations |
| Schedule 7.01 | Existing Liens |
| Schedule 7.02 | Existing Investments |
| Schedule 7.03 | Existing Indebtedness |
| Schedule 7.09 | Affiliate Transactions |
| Schedule 10.02 | Agent's Office; Certain Addresses for Notices |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption |
| Exhibit B | Form of Committed Loan Notice |
| Exhibit C-1 | Form of Coinstar Notification |
| Exhibit C-2 | Form of Compliance Certificate |
| Exhibit C-3 | Form of Credit Card Notification |
| Exhibit D | Form of DDA Notification |
| Exhibit E | Form of Interim Order |
| Exhibit F | Form of Note |
| Exhibit G | Form of Third Party Payor Notification |

# SENIOR SECURED DEBTOR-IN-POSSESSION TERM CREDIT AGREEMENT

This **SENIOR SECURED DEBTOR-IN-POSSESSION TERM CREDIT AGREEMENT** ("Agreement") is entered into as of July 20, 2015, among **THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.**, a Maryland corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), the Persons named on Schedule 1.01(G) hereto (collectively, the "Guarantors"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender") and **FORTRESS CREDIT CORP.** ("Fortress"), as administrative and collateral agent (the "Agent").

WHEREAS, on July 19, 2015 (the "Petition Date"), the Loan Parties (in such capacity, each a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "Cases" and each a "Case") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the Borrower has applied to the Lenders for a term loan facility in an aggregate principal amount of $100,000,000;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01** *Defined Terms.* As used in this Agreement, the following terms shall have the meanings set forth below:

"13-Week Projection" means a projected statement of receipts and disbursements of Debtors on a consolidated, line-item and weekly basis for the following 13 calendar weeks which shall (i) include projected cash receipts and disbursements for the 13 calendar weeks commencing on the Sunday that begins the week during which such statement is delivered, (ii) be in the same form as the Budget, and (iii) be reasonably satisfactory to the Agent. As used herein, "13-Week Projection" shall refer to the most recent 13-Week Projection delivered by the Borrower in accordance with Section 6.02.

"363 Sale" has the meaning provided in Section 6.13(b).

"ABL Priority Collateral" has the meaning set forth in the Orders.

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not constituting an "account" as defined in the UCC, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state. The term "Account" includes health-care-insurance receivables.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit, division or line of business of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or of any business unit, division or line of business of another Person, or a Controlling interest in the Equity Interests, of any Person, or (d) any purchase or acquisition of an existing leasehold or fee interest in any Store location from any Person which is the owner or lessee of such location (but not entering into a new lease for a Store location), in each case in any transaction or group of transactions which are part of a common plan.

"Additional Collateral" has the meaning given to that term in the Intercreditor Arrangements.

"Additional Collateral Account" has the meaning specified in Section 6.15(a).

"Adjusted LIBO Rate" means an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent) equal to (a) the LIBO Rate multiplied by (b) the Statutory Reserve Rate. The Adjusted LIBO Rate will be adjusted automatically as of the effective date of any change in the Statutory Reserve Rate.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, and (iii) any other Person directly or indirectly holding 10% or more of any voting class of the Equity Interests of that Person. For the purpose of this Agreement and the other Loan Documents, Mount Kellett Capital Management LP and its affiliates shall not be considered to be Affiliates of Fortress Credit Corp. and its affiliates, and vice versa.

"Agent" means Fortress, in its capacity as administrative and collateral agent under any of the Loan Documents, or any successor thereto.

"Agent's Office" means the Agent's address and account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Borrower and the Lenders.

"Aggregate Commitments" means the sum of the Commitments of all the Lenders. As of the Closing Date, the Aggregate Commitments are $100,000,000.

"Agreement" means this Senior Secured Debtor-in-Possession Credit Agreement.

"APAs" means the Initial APAs, together with the asset purchase agreements executed and delivered after the Closing Date for the disposition of assets of the Loan Parties, each to be in form and substance reasonably satisfactory to the Agent, and each subject to the prior written consent of the Agent (such consent not to be unreasonably withheld or delayed).

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means (i) in respect of LIBO Rate Loans, 11.25%; and (ii) in respect of Base Rate Loans, 10.25%.

"Applicable Percentage" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by the outstanding principal balance of such Lender's Loan at such time to the Total Outstandings at such time. The Applicable Percentage of each Lender is set forth opposite the name of such Lender on <u>Schedule 2.01</u> or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by <u>Section 10.06(b)</u>), and accepted by the Agent, in substantially the form of <u>Exhibit A</u> or any other form approved by the Agent.

"Audited Financial Statements" means the audited consolidated balance sheet of the Parent and its Subsidiaries for the Fiscal Year ended February 28, 2015, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Parent and its Subsidiaries, including the notes thereto.

"Bankruptcy Code" means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or any appellate court having jurisdiction over the Cases from time to time.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%), (b) the Adjusted LIBO Rate, which rate shall be determined daily, plus one percent (1.00%), or (c) the Prime Rate. Any change in the Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Bidding Procedures Order" has the meaning provided in <u>Section 6.13(b)</u>.

"Blocked Account" means any account established by a Loan Party which is the subject of a Blocked Account Agreement.

"Blocked Account Agreement" means with respect to an account established by a Loan Party (other than each Excluded DDA), an agreement, in form and substance reasonably satisfactory to the Agent, establishing control, pursuant to Section 9-104 of the UCC or other applicable section of the UCC,

of such account by the Agent and whereby the bank maintaining such account agrees to comply with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Board of Directors" means the board of directors of the Parent.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means a borrowing consisting of simultaneous Loans of the same Type made by each of the Lenders pursuant to Section 2.01.

"Budget" means (i) the weekly statement of receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing with the first week following the Petition Date, including (a) individual line items for "Total Disbursements" and (b) the anticipated uses of the DIP Term Loan Facility for such period, in form and substance reasonably satisfactory to the Agent, and (ii) all monthly updates thereto (if any) pursuant to the terms of the applicable Order, each in form and substance reasonably satisfactory to the Agent, and approved in accordance with the Orders.

"Business" means retail food, pharmacy and liquor operations through traditional and hard-discount retail food stores, providing wholesale distribution of products to independent retailers, and other businesses reasonably related thereto.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located and, if such day relates to any LIBO Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"C&S" means C&S Wholesale Grocers, Inc.

"C&S Contract" means that Supply, Distribution and Related Services Agreement, dated as of May 29, 2011, by and between the Borrower and C&S, as amended, amended and restated, modified, supplemented, extended or replaced from time to time to the extent permitted by this Agreement.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning given to that term in the Interim Order (or, when entered, the Final Order).

"Carve Out Account" has the meaning given to that term in the Interim Order (or, when entered, the Final Order).

"Carve Out Cap" has the meaning given to that term in the Interim Order (or, when entered, the Final Order).

NAI-1500433654v9

"Carve Out Notice" has the meaning given to that term in the Interim Order (or, when entered, the Final Order).

"Case" and "Cases" have the meanings assigned to such terms in the preamble.

"Cash and Cash Equivalents" means the Permitted Investments described in clauses (a) through (h) of the definition of Permitted Investments.

"Cash Collateral Termination Event" has the meaning specified in the applicable Order.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Certified Medicaid Provider" means any provider or supplier, including without limitation a pharmacy, that has in effect an agreement with a Governmental Authority of a State to participate in Medicaid.

"Certified Medicare Provider" means a provider or supplier, including without limitation a pharmacy, that has in effect an agreement with the Centers for Medicare and Medicaid Services to participate in Medicare.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall for the purpose of this Agreement, be deemed to be adopted after the Closing Date, regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)     during any period of 12 consecutive months, a majority of the members of the Board of Directors do not constitute Continuing Directors; or

(b)     any person or group (within the meaning of Sections 13(d) and 14(d) of the Securities and Exchange Act of 1934, as amended) other than a Permitted Holder shall have acquired by contract or otherwise control over the Equity Interests of the Parent entitled to vote for members of the board of directors or equivalent governing body of the Parent on a fully-diluted basis (and taking into account all such securities that such Person or group has the right to acquire pursuant to any option right) representing more than fifty (50%) percent of the combined voting power of such securities; or

(c)     any "change in control" event as defined in any Organization Document of any Loan Party or any other document governing Material Indebtedness of any Loan Party; or

(d)     the Parent fails at any time to own, directly or indirectly, 100% of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent and the Specified Permitted Liens), except where such failure is as a result of a transaction permitted by the Loan Documents.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Coinstar Installation Agreements" means that certain Coinstar Installation Agreement, dated April 29, 2002 as in effect on the Closing Date, between the Borrower and Coinstar, Inc., together with each other installation agreement between the Borrower (or any other Loan Parties) and Coinstar, Inc. as in effect on the Closing Date.

"Coinstar Notification" means a notice substantially in the form of Exhibit C-1 hereto.

"Collateral" means any and all "Collateral" or "Mortgaged Property" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents and the Orders to be subject to Liens in favor of the Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person, in the case of (a) and (b) (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) agrees to provide the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate for the purposes of assembling, repossessing, selling or otherwise disposing of such Collateral, and (iv) makes such other agreements with the Agent as the Agent may reasonably require.

"Commitments" means the Initial Term Loan Commitments and the Delayed Draw Term Loan Commitments.  The amount of each Lender's Commitment as of the Closing Date is set forth on Schedule 2.01 and the aggregate amount of the Commitments as of the Closing Date is $100,000,000 (in each case, before giving effect to the Loans made on the Closing Date and the Final Term Funding Date).

"Committed Loan Notice" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of LIBO Rate Loans, pursuant to Section 2.02, which, if in writing, shall be substantially in the form of Exhibit B.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-2.

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender's giving the Agent written notice of that Lender's objection to such course of action.

NAI-1500433654v9

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Continuing Directors" means (a) any member of the Board of Directors who was a director (or comparable manager) on the Closing Date, and (b) any individual who becomes a member of the Board of Directors after the Closing Date if such individual was approved, appointed or nominated for election to such Board of Directors by either the Permitted Holders or a majority of the applicable Continuing Directors.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Convertible Notes" means the notes issued pursuant to the Convertible Notes Indenture as in effect on the Closing Date.

"Convertible Notes Indenture" means the Indenture in respect of the Convertible Notes dated as of March 13, 2012 between the Parent and U.S. Bank National Association, as trustee and collateral trustee, as the same may be amended, amended and restated, modified or supplemented in accordance with this Agreement and the Intercreditor Arrangements.

"Convertible Notes SPA" means the Amended and Restated Securities Purchase Agreement (Third Lien Notes) dated as of March 13, 2012, by and among the Borrower, the Guarantors and the Investors party thereto, as the same may be amended, amended and restated, modified or supplemented in accordance with this Agreement and the Intercreditor Arrangements.

"Convertible Notes SPA Documents" means the Convertible Notes SPA and any other instrument or agreement (including the Convertible Notes Indenture, any and all Guarantees and collateral documents) now or hereafter executed and delivered in connection therewith, each as amended, amended and restated, modified or supplemented in accordance with this Agreement and the Intercreditor Arrangements.

"Credit Card Issuer" means any person (other than the Borrower or other Loan Party) who issues or whose members issue credit cards or debit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent in its Permitted Discretion.

"Credit Card Notification" means a notice substantially in the form of Exhibit C-3 hereto.

"Credit Card Processor" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Loan Party's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

NAI-1500433654v9

"Credit Card Receivables" means each right to payment, whether or not it constitutes a "payment intangible" or an "Account" (each quoted term as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from purchases by a customer of a Loan Party using credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Cases.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender, (ii) the Agent, (iii) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (iv) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (v) the permitted successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, all reasonable and documented out-of-pocket expenses and customary administrative charges incurred by the Agent and each of the Lenders in connection with this Agreement and the other Loan Documents, including without limitation (a) the reasonable and documented fees and disbursements of (i) counsel for the Agent and for each Lender, (ii) outside consultants for the Agent, (iii) appraisers, and (iv) commercial finance examinations, (b) in connection with (i) the syndication of the credit facilities provided for herein, (ii) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (iii) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce Agent's and the Lenders' rights in the Collateral, or (iv) any workout, restructuring or negotiations in respect of any Obligations, (c) all customary fees and charges (as adjusted from time to time) of the Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrower or other Loan Parties (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, and (d) all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agent, the Lender or any Affiliate of any of them, in connection with the enforcement or protection of their rights hereunder, including any workout or restructuring of the Obligations after and during the occurrence of an Event of Default, provided, that, such Credit Parties shall be entitled to reimbursement for no more than one (1) local counsel in each appropriate jurisdiction representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel) for the affected Credit Party.

"Customs Broker/Carrier Agreement" means an agreement in form and substance reasonably satisfactory to the Agent among a Loan Party, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA (other than Excluded DDAs that are not Specified Excluded DDAs) shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"DDA Notification" means a notice substantially in the form of Exhibit D hereto.

"Debtor" and "Debtors" have the meanings assigned to such terms in the preamble.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would constitute an Event of Default.

"Defaulting Lender" means, subject to Section 2.17(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.17(b)) as of the date established therefor by the Agent in a written notice of such determination, which shall be delivered by the Agent to the Borrower and each other Lender promptly following such determination.

"Default Rate" means when used with respect to the Loans and the other Obligations, an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such Loan pursuant to Section 2.08(a) plus 2% per annum.

"Delayed Draw Term Loan" has the meaning specified in Section 2.01(b).

"Delayed Draw Term Loan Commitment" means the commitment of a Lender to make or otherwise fund any Delayed Draw Term Loan pursuant to Section 2.01(b), and "Delayed Draw Term Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each

9

Lender's Delayed Draw Term Loan Commitment is set forth opposite such Lender's name on Schedule 2.01, or, if such Lender's Delayed Draw Term Loan Commitment has been assigned, in the applicable Assignment and Assumption Agreement, subject to any adjustment pursuant to the terms and conditions hereof. The aggregate amount of the Delayed Draw Term Commitments as of the Closing Date is $50,000,000 (before giving effect to the Delayed Draw Term Loans made on the Final Term Funding Date).

"DIP Superpriority Claim" has the meaning given to that term in the Interim Order (or, when entered, the Final Order).

"DIP Term Loan Facility" means the credit facility contemplated by this Agreement.

"Direct Competitor" means (a) each of the entities described on Schedule 1.01(D) attached hereto (as such schedule may be amended from time to time by the Borrower with a prior written approval of the Agent) and (b) any other company engaged principally in the business of supermarkets or other retail food or grocery stores, identified in writing from time to time by Borrower to Agent and approved by Agent and Required Lenders, the identities of which will be made available to Lenders upon request.

"Disposition" or "Dispose" means the sale, transfer, exclusive license, lease or other disposition (including any sale and leaseback transaction and any sale, transfer, license or other disposition of (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests by any Person or the granting of any option or other right to do any of the foregoing (except for the issuance of Equity Interests or grant of any option therein by the Parent)), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights or claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Equity Interests that do not constitute Disqualified Stock), pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature; provided, however, that (a) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (b) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Parent or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Parent or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Parent and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Distribution Centers" means the warehouse facilities operated by the Loan Parties on the Closing Date as set forth in Schedule 1.02(D).

"Dollars" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates; (b) a bank, insurance company, investment fund, mutual fund or company engaged in the business of making commercial loans; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, and (e) any other Person (other than a natural person) approved by (i) the Agent, and (ii) unless a Default or an Event of Default under Sections 8.01(a), 8.01(b) (solely as a result of the Borrower's failure to deliver a Compliance Certificate pursuant to Section 6.02(b), or the Borrower's failure to comply with Section 6.13 or Section 7.15) or Section 8.01(g) has occurred and is continuing, the Borrower (each such approval not to be unreasonably withheld or delayed); provided, that, notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of the Loan Parties' Affiliates or Subsidiaries, any Direct Competitor, or any Permitted Holder.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC and to the extent not included therein, all motor vehicles and other rolling stock.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting; provided, that, notwithstanding the foregoing, no Indebtedness (including Indebtedness issued pursuant to the Convertible Notes SPA Documents) shall constitute Equity Interests.

"ERISA" means the Employee Retirement Income Security Act of 1974.

NAI-1500433654v9

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification to the Borrower or any ERISA Affiliate that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; or (g) the receipt by any Loan party or any ERISA Affiliate of any determination that a Multiemployer Plan is, or is expected to be "insolvent" (within the meaning of Section 4245 of ERISA) or in "reorganization" (within the meaning of Section 4241 of ERISA).

"Event of Default" has the meaning specified in <u>Section 8.01</u>. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in <u>Section 10.01</u> hereof.

"Excluded DDAs" means any and all of the (i) payroll, trust and tax deposit accounts, (ii) deposit accounts used for managing employees' medical and dependent care flexible spending accounts (and solely for the periods required to be deposited in such accounts, the amounts on deposit therein), (iii) deposit accounts used for disbursement to (or debit against by) state redemption authorities for refundable bottle deposits proceeds, (iv) deposit accounts used for disbursement to (or debit against by) state lottery organizations for lottery sale proceeds, (v) deposit accounts used for disbursement to (or debit against by) transit authorities for transit card sale proceeds, (vi) Pathmark Stores Inc.'s deposit account nos. [xxx0352] at PNC Bank and [xxx3712] at One United Bank (or any replacement accounts thereof), relating to the We Care Fund and SCG Foundation, respectively, and used to disburse charitable donations to employees suffering through severe hardships or charitable organizations, with aggregate outstanding balances not to exceed at any time $1,000,000, (vii) Best Cellars Inc.'s deposit account nos. [xxx6292] at PNC Bank and [xxx16-99] at Bank of America, N.A. (or any replacement accounts thereof) with aggregate balances of less than $250,000 and from which balances are swept weekly to a Blocked Account, (viii) "zero balance" accounts from which balances are swept daily to a Blocked Account, (ix) Delaware County Dairies Inc.'s account nos. [xxx8336] and [xxx5202] at JPMorgan Chase Bank (or any replacement accounts thereof) used to disburse certain employee benefit and pension payments with respect to former employees of Delaware County Dairies Inc. with aggregate balances of less than $100,000, (x) the Carve Out Account, and (xi) other deposit accounts of the Loan Parties (other than DDAs and other accounts into which customer or other third party payments in respect of the Collateral are scheduled to be or regularly made) with aggregate balances of less than $100,000, exclusive of deposit accounts containing Qualified Cash. The Excluded DDAs referred to in clause (xi) of the immediately preceding sentence are referred to herein as the "<u>Specified Excluded DDAs</u>."

"Excluded Property" has the meaning specified in the Security Agreement.

"Excluded Subsidiaries" means each (a) Immaterial Subsidiary, (b) Foreign Subsidiary, (c) Insurance Captive, (d) a Subsidiary of the Parent that is not, directly or indirectly, wholly owned by the

Parent, (e) any direct or indirect Domestic Subsidiary of a direct or indirect Foreign Subsidiary of the Parent, (f) any direct or indirect Subsidiary that is a disregarded entity for U.S. federal income tax purposes that holds capital stock or equity interests of one or more Foreign Subsidiaries, (g) any direct or indirect Domestic Subsidiary of the Parent if substantially all of its assets consist of the Equity Interests of one or more direct or indirect Foreign Subsidiaries, and (h) any joint venture, provided that any Subsidiary that is a guarantor or borrower in respect of the Prepetition ABL Facility, the Prepetition Term Facility, the PIK Toggle Notes or the Convertible Notes shall not be an Excluded Subsidiary.

"Excluded Taxes" means, with respect to the Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it, in each case, (i) by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located or (ii) that are Other Connection Taxes, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Foreign Lender, any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (other than an assignee pursuant to a request by the Borrower under Section 10.13) or designates a new Lending Office, except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to Section 3.01(a), (d) Taxes attributable to a failure (other than as a result of a Change in Law) to comply with Section 3.01(e), (e) any U.S. federal, state or local backup withholding tax, and (f) any U.S. federal withholding tax imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.18.

"Existing Debt Documents" means (a) the Prepetition ABL Loan Documents, (b) Prepetition Term Loan Documents, (c) the PIK Toggle Notes SPA Documents, and (d) the Convertible Notes SPA Documents.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), indemnity payments (other than to the extent such payments are payable to a Person that is not an Affiliate of any Loan Party or any of its respective Subsidiaries) and any purchase price adjustments.

"Facility Guaranty" means the Guaranty, dated the Closing Date, made by the Guarantors in favor of the Agent and the other Credit Parties, in form reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Farm Products" has the meaning set forth in the Food Security Act and the UCC.

"Farm Products Sellers" means, collectively, sellers or suppliers to any Loan Party of any Farm Products and including any milk or dairy products, perishable agricultural commodity (as defined in PACA) or livestock (as defined in the PSA), meat, meat food products or livestock products derived therefrom or any poultry or products derived therefrom; sometimes referred to herein individually as a "Farm Products Seller".

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to

NAI-1500433654v9

comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the quotations for such day for such transactions received by the Agent from three federal funds brokers of recognized standing selected by it.

"Final Order" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications are satisfactory in form and substance to Agent and the Required Lenders in their reasonable discretion) and authorizing the Delayed Draw Term Loans.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Final Term Funding Date" has the meaning specified in Section 2.01(b).

"Fiscal Intermediary" means any qualified insurance company or other Person that has entered into an ongoing relationship with any Governmental Authority to make payments to payees under Medicare, Medicaid or any other Federal, state or local public health care or medical assistance program pursuant to any of the Health Care Laws.

"Fiscal Period" means any four (4) consecutive week period of any Fiscal Year, in accordance with the fiscal accounting calendar of the Parent, in effect on the date hereof.

"Fiscal Quarter" means the period consisting of the first four Fiscal Periods of each Fiscal Year and the next three periods of three Fiscal Periods each in such Fiscal Year.

"Fiscal Year" means any period of thirteen (13) consecutive Fiscal Periods ending on the last Saturday of February in any calendar year.

"Food Security Act" means the Food Security Act of 1984, 7 U.S.C. Section 1631 et. seq., as the same now exists or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules and regulations thereunder.

"Food Security Act Notices" is defined in Section 5.26(a) hereof.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.18.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary of the Parent that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other Obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness or other obligation to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning. The endorsement of negotiable instruments for collection in the ordinary course of business shall not constitute a "Guarantee".

"Guarantor" has the meaning specified in the introductory paragraph hereto and each other Subsidiary of the Parent that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12.

"Harlem Property" means the Store located at 160 East 125th Street, New York, New York 10035 which is, as of the Closing Date, operated under the "Pathmark" banner.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, damaged and friable asbestos or asbestos-containing materials, polychlorinated biphenyls (<50 ppm), infectious or medical wastes and all other substances or wastes of any nature regulated as a hazardous material or words of similar effect pursuant to any Environmental Law.

"Health Care Laws" means all Federal, state and local laws, rules, regulations, interpretations, guidelines, ordinances and decrees primarily relating to patient healthcare, any health care provider,

medical assistance and cost reimbursement programs, as now or at any time hereafter in effect, applicable to any Loan Party, including, but not limited to, the Social Security Act, the Social Security Amendments of 1972, the Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977, the Medicare and Medicaid Patient and Program Protection Act of 1987, HIPAA and the Patient Protection and Affordable Care Act of 2010.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as the same now exists or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules and regulations thereunder.

"HIPAA Compliance Plan" has the meaning set forth in Section 5.27(a).

"Immaterial Subsidiary" means (a) any Subsidiary that is listed on Schedule 1.01(I), and so long as each such entity continues to satisfy the requirements contained in clauses (b)(i)-(b)(iii) below (provided, that Borrower shall provide Agent with written notice upon such Subsidiary's failure to continue to satisfy the requirements of an Immaterial Subsidiary), and (b) at all times, after the Closing Date any Subsidiary that (i) does not conduct any business operations, (ii) has assets with a book value not in excess of $100,000, and (iii) does not have any Indebtedness outstanding.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     the Swap Termination Value under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than ninety (90) days after the date on which such trade account payable was due and payable);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     All Indebtedness of such Person in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock), or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

NAI-1500433654v9

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person or such Person has no liability therefor as a matter of law. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any Obligation of any Loan Party under any Loan Document.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial APAs" has the meaning specified in Section 4.01(p).

"Initial Term Loan Commitment" means, as to each Lender, its commitment to make an Initial Term Loan to the Borrower on the Closing Date (before giving effect to the Initial Term Loans made on the Closing Date) pursuant to Section 2.01(a), and "Initial Term Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Initial Term Loan Commitment as of the Closing Date is as set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement; provided, that the Initial Term Loan Commitments to make Initial Term Loans on the Closing Date shall not exceed $50,000,000 (in each case, before giving effect to the Initial Term Loans made on the Closing Date).

"Initial Term Loans" has the meaning specified in Section 2.01(a).

"Insurance Captive" means any Subsidiary that is subject to regulation as an insurance company. As of the date hereof, each of (a) Atlantic Choice Insurance & Indemnity, Inc., (b) St. Pancras Too, Limited, and (c) A&P Bermuda are Insurance Captives.

"Intellectual Property" means all of the Loan Parties' right, title and interest in and to all present and future:  trade secrets, confidential know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights; patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, customer lists, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source code, object code, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intellectual Property Security Agreement" means the Intellectual Property Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, granting a Lien in the Intellectual

Property and certain other assets of the Loan Parties, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Intercreditor Arrangements" means the Intercreditor Arrangements set forth in Exhibit 1 to the Orders.

"Intercreditor Provisions" has the meaning specified in Section 8.01(q).

"Interim Order" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit E, with changes to such form as are reasonably satisfactory to the Required Lenders in their sole discretion, approving the Loan Documents, which Interim Order shall, among other things (i) have been entered on such prior notice to such parties as may be satisfactory to the Required Lenders in their reasonable discretion, (ii) authorize the extensions of credit in respect of the DIP Term Loan Facility, each in the amounts and on the terms set forth herein, (iii) grant the DIP Superpriority Claim status and other Collateral and Liens referred to herein and in the other Loan Documents, and (iv) approve the payment by the Borrower of the fees provided for herein.

"Interim Order Entry Date" the date on which the Interim Order is entered by the Bankruptcy Court.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person in any other Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in any other Person. For purposes of covenant compliance, the amount of any outstanding Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment net of any repayments thereof. For the avoidance of doubt, the acquisition or construction of fixed or capital assets by a Loan Party or any Subsidiary that is a Loan Party shall not constitute an Investment.

"IRS" means the United States Internal Revenue Service.

"Joinder" means an agreement, in form satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as a Guarantor.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

18

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of Real Estate or any other space in a structure, land, improvements or premises for any period of time.

"Lease Extension Order" has the meaning provided in Section 6.13(g).

"Leasehold SPV" means A&P Real Property, LLC, a special purpose limited liability company organized under the laws of Delaware that is a wholly-owned direct or indirect Subsidiary of the Parent.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Agent.

"LIBO Rate" means with respect to a LIBO Rate Loan, the greater of (a) the rate per annum rate which appears on the Reuters Screen LIBOR01 page as of 11:00 a.m., London time, on the second London Business Day preceding the first day of each calendar month (or if such rate does not appear on the Reuters Screen LIBOR01 Page, then the rate as determined by the Agent from another recognized source or interbank quotation), for a period of one (1) month , and in an amount, of the amount of the LIBO Rate Loan requested (whether as a continuation of a LIBO Rate Loan or as a conversion of a Base Rate Loan to a LIBO Rate Loan) by Borrower in accordance with this Agreement (and, if any such rate is below zero, the LIBO Rate shall be deemed to be zero), which determination shall be made by Agent and shall be conclusive in the absence of manifest error or (b) 1.00% per annum.  If such rate is not available at such time for any reason, then the "LIBO Rate" shall be the rate of interest per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the first day of such calendar month in same day funds in the approximate amount of the LIBO Rate Loan being made, continued or converted, and for a period of one month, would be offered to first class banks in the London interbank eurodollar market at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such calendar month but in any event such rate shall not be less than 1.00% per annum.

"LIBO Rate Loan" means a Loan that bears interest at a rate based on the Adjusted LIBO Rate.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Documents" means this Agreement, each Note, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, the Facility Guaranty, the Intercreditor Arrangements, the Orders, and  any other instrument or agreement now or hereafter executed and delivered in connection herewith  or therewith.

"Loan Parties" means, collectively, the Borrower and the Guarantors.

"Loans" means the Initial Term Loans and the Delayed Draw Term Loans.

"Make Whole Date" has the meaning assigned to such term in Section 2.09(a).

"Make Whole Fee" means, with respect to any prepayment or repayment of the Loans or any reduction of the Commitments, in each case prior to the Make Whole Date, the present value, as of the date of determination, of all required payments of interest on the amount prepaid or repaid or the amount of such reduction in the Commitments, assuming that such Commitments had been drawn in full, from the date of determination until the Make Whole Date (using (a) an interest rate equal to the Adjusted LIBO Rate plus the Applicable Margin plus, if applicable, the Default Rate and (b) a discount rate equal to the Treasury Rate as of the date of determination plus 0.50%).

"Master Concentration Account" has the meaning specified in Section 5.21(a).

"Material Adverse Effect" means any (a) event or circumstance that has had or is reasonably likely to have a material adverse effect on the business, financial condition or results of operations of the Parent, the Borrower and their respective subsidiaries (taken as a whole) since February 28, 2015, but excluding any matters publicly disclosed prior to the filing of the Bankruptcy Cases and excluding the effect of the filing of the Bankruptcy Cases or the circumstances and events leading up thereto and disregarding any material adverse effect resulting from (i) changes in general financial market or geopolitical conditions, (ii) general changes or developments in any of the industries in which the Parent, the Borrower or any of their respective subsidiaries operate or (iii) changes in any applicable laws or GAAP or interpretations thereof after the date hereof, except, in the case of the foregoing clauses (i), (ii) and (iii), only to the extent that the Parent, the Borrower and their subsidiaries, taken as a whole, are disproportionately affected relative to other similarly situated companies; (b) a material impairment of the ability of the Loan Parties (taken as a whole) to perform their obligations under the Loan Documents; (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or with respect to any of the Collateral (other than Collateral having a value, either singly or in the aggregate of less than $1,000,000), or (d) a material adverse effect on the Agent's Liens (on behalf of itself and Lenders) on the Collateral or the priority of such Liens.

"Material Contract" means, with respect to any Person, (i) the C&S Contract, and (ii) each other contract to which such Person is a party the termination of which would have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations and any obligation in respect of any Store Lease constituting a Capital Lease Obligation) of the Loan Parties in an aggregate principal amount exceeding $25,000,000, and at all times shall include the Indebtedness outstanding under the Prepetition ABL Facility, the Prepetition Term Facility, the PIK Toggle Notes, and the Convertible Notes. For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Material Leases" means any of the Leases set forth on Schedule 6.03.

"Maturity Date" means the earliest of (a) the Scheduled Maturity Date, (b) the date which is 45 days following the Interim Order Entry Date if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (c) the acceleration of the Loans and the termination of the Commitments pursuant to Section 8.03, (d) the date of the consummation of a sale, that when taken with all previously consummated sales, effects the sale of all or substantially all of the Debtors' assets, (e) the effective date

of a Chapter 11 Plan that is confirmed pursuant to an order of the Bankruptcy Court, and (f) the occurrence of a Cash Collateral Termination Event.

"**Maximum Rate**" has the meaning specified in <u>Section 10.09</u>.

"**Medicaid**" means the health care financial assistance program jointly financed and administered by the Federal and State governments under Title XIX of the Social Security Act.

"**Medicare**" means the health care financial assistance program under Title XVIII of the Social Security Act.

"**Milestones**" has the meaning specified in <u>Section 6.13</u>.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgages**" means each and every fee and leasehold mortgage or deed of trust, security agreement and assignment by and between the Loan Party owning or holding the leasehold interest in the Real Estate encumbered thereby in favor of the Agent, each in form and substance reasonably satisfactory to the Agent.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Parent or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Proceeds**" means:

(a)      with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt, insurance proceeds or condemnation awards received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of Cash and Cash Equivalents received in connection with such transaction (including any Cash and Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by a Lien permitted hereunder, on the applicable asset which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, brokerage, legal, investment banking, title and recording or transfer tax expenses and commissions, success or transaction fees) paid by any Loan Party to third parties, including, without limitation, professional liquidators (other than Affiliates)), (C) taxes (including transfer tax and recording tax) paid or reasonably estimated to be payable by the applicable Loan Party or applicable subsidiary and that are directly attributable to such Disposition (as determined reasonably and in good faith by the chief financial officer of such Loan Party), (D) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (C) above) (1) related to any of the applicable business or assets and (2) retained by such Loan Party or any of its Subsidiaries, including, without limitation, liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability), but excluding employee liabilities of the kind referred to in <u>Section 2.07(a)(v)(B)</u> hereof, shall be deemed to be Net Proceeds of such transaction occurring on the date of such reduction), (E) all amounts deposited in trust or escrow in respect of any purchase price adjustment or escrow obligations of such Loan Party for the benefit of any third party or to which any

third party may be entitled in connection with such transaction and (F) in the case of any Disposition of the Inventory and Equipment, such Loan Party's or Subsidiary's costs and expenses incurred in connection with such Disposition; and

(b)     with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the Cash and Cash Equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Consenting Lender" has the meaning specified in Section 10.01.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" means a promissory note made by the Borrower in favor of a Lender evidencing the Loan made by such Lender, substantially in the form of Exhibit F as each may be amended, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all Loans, advances to, and debts (including principal, interest, fees (including the Make Whole Fees), costs, and expenses, liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document with respect to any Loan (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor)), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any of its Subsidiaries thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest ,fees, costs, expenses and indemnities are allowed claims in such proceeding.

"Orders" means collectively, the Interim Order and the Final Order.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Connection Taxes" means, with respect to the Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, Taxes imposed as a result of a present or former connection between such Agent, Lender or other recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Agent, Lender or other

recipient having executed, delivered, become a party to, performed its obligations under, received payments under, or received or perfected a security interest under any Loan Document).

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"PACA" means the Perishable Agricultural Commodities Act, 1930, as amended, 7 U.S.C. Section 499a et. seq., as the same now exists or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules and regulations thereunder.

"Parent" means Montvale-Para Holdings, Inc., a Delaware corporation.

"Participant" has the meaning specified in Section 10.06(d).

"Participant Register" has the meaning specified in Section 10.06(d).

"PASA" means the Packers and Stockyard Act, 1921; as the same now exists or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules and regulations thereunder.

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Parent, any Loan Party, or any ERISA Affiliate, to which the Parent, any Loan Party, or any ERISA Affiliate contributes or has an obligation to contribute, or for which the Parent, any Loan Party or any ERISA Affiliate has any liability or contingent liability.

"Perfection Certificate" has the meaning specified in the Security Agreement.

"Permitted Discretion" means as used in this Agreement with reference to Agent, a determination made in good faith in the exercise of its reasonable discretion.

"Permitted Disposition" means any of the following:

      (a)      Dispositions of Inventory in the ordinary course of business;

      (b)      Dispositions of the Inventory and Equipment of a Loan Party not in the ordinary course of business in connection with Store closings, at arm's length; provided, that, all Net Proceeds received in connection therewith are applied to the Obligations if then required in accordance with Section 2.07 hereof;

      (c)      non-exclusive licenses and sub-licenses of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business;

NAI-1500433654v9

(d)        licenses for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business; provided that, if requested by the Agent in the exercise of its Permitted Discretion, the Agent shall have entered into an intercreditor agreement with the Person operating such licensed department on terms and conditions reasonably satisfactory to the Agent;

(e)        Dispositions of Equipment in the ordinary course of business that is substantially worn-out, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary and is not replaced with similar property having at least equivalent value;

(f)        Dispositions among the Loan Parties (other than Dispositions to the Parent) or by any Subsidiary to a Loan Party (other than the Parent);

(g)        Dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party;

(h)        [reserved];

(i)        Dispositions of Accounts in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy, workout or similar proceedings, to the extent approved by the Bankruptcy Court;

(j)        [reserved];

(k)        Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth on the Closing Date in joint venture arrangements and similar binding arrangements;

(l)        the unwinding of any Swap Contract pursuant to its terms;

(m)        Dispositions consisting of short-term rentals of Equipment to its customers in the ordinary course of business;

(n)        [reserved];

(o)        the granting of Permitted Encumbrances;

(p)        any involuntary loss, damage or destruction of property;

(q)        any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(r)        (i) the lapse of registered patents, trademarks, copyrights and other intellectual property of Borrower or any of its Subsidiaries that are, in the reasonable business judgment of the Parent or such Subsidiary, no longer material to, or no longer used or useful in or not economically desirable, the business of the Parent or such Subsidiary and not required to be Disposed of pursuant to any APA or other agreement, or (ii) the abandonment of patents, trademarks, copyrights, or other intellectual property rights in the ordinary course of business, so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights and (B) such lapse is not materially adverse to the interests of the Credit Parties,

(s)     the making of Permitted Investments;

(t)     [reserved];

(u)     Dispositions of assets by any Immaterial Subsidiary that do not constitute Collateral;

(v)     transactions permitted under Section 7.04;

(w)     Dispositions of Cash and Cash Equivalents in the ordinary course of business;

(x)     the making of Restricted Payments that are expressly permitted to be made pursuant to Section 7.06 of this Agreement;

(y)     [reserved]; and

(z)     Dispositions pursuant to the APAs, other Dispositions required by Section 6.13 hereof, and Dispositions of other assets of the type not otherwise specified above in this definition, provided, that, in each case (i) as of the date of any such Disposition and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing, (ii) the Net Proceeds from any such Disposition shall be paid to the Loan Parties contemporaneously with consummation of the transaction, (iii) to the extent required, the Net Proceeds shall be applied to the repayment of the Obligations, and (iv) except for non-cash consideration in respect of the Harlem Property in the form of a seller note in an aggregate principal amount not to exceed $22,000,000 and otherwise in form and substance reasonably satisfactory to the Agent, 100% of the total consideration received contemporaneously with the consummation of the transaction shall be paid in Cash and Cash Equivalents.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for (i) pre-petition Taxes that were not yet due on the Petition Date or which are being contested in compliance with Section 6.04, (ii) pre-petition Taxes to the extent the payment thereof is stayed by reason of the Cases, the applicable Orders, or other applicable Bankruptcy Court orders, and (iii) post-petition Taxes that are not yet due and payable;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 6.04;

(c)     pledges and deposits of cash made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)     pledges and deposits of cash to secure or relating to the performance of bids, trade contracts, government contracts and leases (other than Indebtedness), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     Liens in respect of judgments that would not constitute an Event of Default hereunder;

25

(f)        easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property (including Real Estate) imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party at such Real Estate and such other minor title defects or survey matters that are disclosed by the most current survey as disclosed on Schedule B of the title insurance policies insuring the Mortgages, in each case, do not materially interfere with the current use of the Real Estate;

(g)        Liens existing on the Closing Date and listed on Schedule 7.01;

(h)        Liens on fixed or capital assets of any Loan Party securing Indebtedness that are permitted under clause (c) of the definition of Permitted Indebtedness so long as such Liens do not extend to any other property or assets of the Loan Parties;

(i)        Liens in favor of the Agent to secure the Obligations and Liens pursuant to the Orders;

(j)        statutory Liens of landlords and lessors in respect of rent not in default;

(k)        any possessory interest of a sublessee under a lease of real property pursuant to which any Loan Party is a sublessor, provided, that, such sublease is subordinate to the Lien of the applicable Mortgage and is otherwise in accordance with the terms of the applicable Lease;

(l)        possessory Liens in favor of brokers and dealers arising in connection with the disposition of Investments owned as of the Closing Date, provided that such liens (a) attach only to such Investments and (b) secure only obligations incurred in the ordinary course and arising in connection with the disposition of such Investments and not any obligation in connection with margin financing;

(m)        Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(n)        Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(o)        [reserved];

(p)        Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods solely to the extent the following conditions are satisfied: (A) such Liens secure obligations that are being contested in good faith by appropriate proceedings and which are not overdue, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(q)        encumbrances referred to in Schedule B-II of any title insurance policy issued in respect of any Loan Party's Real Estate;

(r)     Liens in favor of collecting or payor banks having a right of setoff, revocation, refund or chargeback with respect to money or instruments of any Loan Party or any Subsidiary thereof on deposit with or in possession of such bank;

(s)     (i) deposits of cash in the ordinary course of business to secure liability to insurance carriers and (ii) Liens in insurance policies and proceeds thereof securing the financing of the premiums with respect thereto;

(t)     Liens to secure the PIK Toggle Notes SPA Documents, the Convertible Notes SPA Documents, the Prepetition ABL Loan Documents and the Prepetition Term Loan Documents in each case which Liens are subject to the Intercreditor Arrangements and the Orders;

(u)     Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or equivalent statutes) on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business; provided that such Liens (A) attach only to such investments and (B) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or Disposition of such investments and not any obligation in connection with margin financing; and (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of setoff) and which are within the general parameters customary in the banking industry;

(v)     Liens consisting of an agreement to Dispose of any property in a Disposition permitted hereunder, in each case, solely to the extent such Disposition would have been a Permitted Disposition on the date of the creation of such Lien;

(w)     [reserved];

(x)     Liens or rights of setoff against credit balances of Loan Parties or their Subsidiaries with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to such Loan Party or their Subsidiaries in the ordinary course of business, but not Liens on or rights of setoff against any other property or assets of Loan Parties or such Subsidiaries to secure the obligations of Loan Parties or such Subsidiaries to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks or other amounts owed in respect of Credit Card Agreements;

(y)     Liens on goods purchased by any Loan Party arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into the ordinary course of business;

(z)     any interest or title of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses (including software and other technology licenses) entered into by the Borrower or any of its Subsidiaries as permitted by the terms of this Agreement; and

(aa)    in the case of any non-wholly owned Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth on the Closing Date in its Organization Documents or any related joint venture or similar agreement.

"Permitted Holder" means the persons listed on Schedule 1.01(P) hereto.

"Permitted Indebtedness" means each of the following:

NAI-1500433654v9

(a)       Indebtedness outstanding on the Closing Date and listed on <u>Schedule 7.03</u>;

(b)       Indebtedness of any Loan Party to any other Loan Party, Indebtedness of any Loan Party to a Subsidiary that is not a Loan Party (so long as such Indebtedness is subordinated in right of payment to the Obligations on terms reasonably satisfactory to the Agent), Indebtedness of any Subsidiary that is not a Loan Party to any Loan Party in an aggregate outstanding amount (when aggregated with Permitted Investments described in clause (j) of the definition thereof) at any time not exceeding $2,000,000, and Indebtedness of a Subsidiary that is not a Loan Party to another Subsidiary that is not a Loan Party;

(c)       purchase money Indebtedness of any Loan Party existing on the Closing Date and incurred to finance (or refinance) the acquisition of any personal property consisting solely of fixed or capital assets, including Capital Lease Obligations and sale and leaseback obligations, and any Indebtedness assumed prior to the Closing Date in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, <u>provided</u>, <u>however</u>, that the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed $75,000,000 at any time outstanding and further provided that, if requested by the Agent, the Loan Parties shall use commercially reasonable efforts to cause the holders of such Indebtedness to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Agent;

(d)       obligations (contingent or otherwise) of any Loan Party or any Subsidiary thereof existing or arising under any Swap Contract approved by the Bankruptcy Court, <u>provided</u> that such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates or foreign exchange rates or commodity prices, and not for purposes of speculation or taking a "market view";

(e)       contingent liabilities under surety bonds and similar instruments incurred in the ordinary course of business;

(f)       [reserved];

(g)       [reserved];

(h)       [reserved];

(i)       the Obligations;

(j)       Indebtedness evidenced by (i) the Prepetition ABL Loan Documents and (ii) the Prepetition Term Loan Documents, in each case in an amount not to exceed the aggregate principal amount outstanding on the Closing Date plus accrued but unpaid interest and fees thereon and in respect thereof, including any capitalized interest;

(k)       [reserved];

(l)       Indebtedness of the Parent and its Subsidiaries on account of the PIK Toggle Notes and other PIK Toggle Notes SPA Documents (including any Guarantees thereof), in an amount not to exceed the aggregate principal amount outstanding on the Closing Date plus accrued but unpaid interest and fees thereon and in respect thereof, including any capitalized interest;

(m)       Indebtedness of the Parent and its Subsidiaries on account of the Convertible Notes and the other Convertible Notes SPA Documents (including any Guarantees thereof), in an amount

not to exceed the aggregate principal amount outstanding on the Closing Date plus accrued but unpaid interest and fees thereon and in respect thereof, including any capitalized interest;

(n)     Indebtedness arising pursuant to agreements in connection with any Dispositions of any business, assets or Equity Interests of any Subsidiary permitted under Section 6.05 or Permitted Investments consisting of indemnification, adjustment of purchase price or similar obligations, or guarantees or letters of credit, bankers' acceptances, accommodation guarantees, surety bonds or performance bonds securing any obligations of the Parent or any of its Subsidiaries pursuant to such agreements, in any case incurred in connection with such Permitted Disposition or Permitted Investment (other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or capital stock of such Subsidiary for the purpose of financing such acquisition);

(o)     Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(p)     Indebtedness representing deferred compensation or similar obligations to employees of the Parent or any of its Subsidiaries incurred in the ordinary course of business so long as the aggregate amount of such Indebtedness incurred in any Fiscal Year does not exceed $1,000,000;

(q)     [reserved];

(r)     [reserved];

(s)     Guarantees of other Permitted Indebtedness;

(t)     software licenses required to be reflected as Indebtedness on the Borrower's consolidated balance sheet in an aggregate amount not exceeding the amount set forth thereon as of the Closing Date;

(u)     without duplication of any other Indebtedness permitted hereunder, liabilities for Leases of Real Estate characterized as Indebtedness for purposes of GAAP;

(v)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business (provided, however, that such Indebtedness is extinguished within ten (10) Business Days of its incurrence) or other cash management obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections and similar arrangements in each case in connection with deposit accounts or securities accounts in the ordinary course of business;

(w)     Indebtedness arising in connection with endorsements of instruments for deposit in the ordinary course of business;

(x)     Indebtedness incurred by the Parent or any of its Subsidiaries in respect of letters of credit, bank guarantees, supporting obligations, bankers' acceptances, performance bonds, surety bonds, statutory bonds, appeal bonds, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed by the due date thereof;

(y)  obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Parent or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business and consistent with past practice; and

(z)  unsecured Indebtedness not otherwise specifically described herein in an aggregate principal amount not to exceed $2,000,000 at any time outstanding.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)  readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)  commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(c)  time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $500,000,000, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(d)  Fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(e)  Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above having a weighted average maturity of not greater than 120 days;

(f)  Dollars and, in respect of Foreign Subsidiaries, local currency;

(g)  money market funds that are SEC.270.2a-7 compliant or enhanced cash funds having a weighted average maturity of not greater than 120 days;

(h)  Investments by Foreign Subsidiaries with governmental entities which are members of the Organisation for Economic Co-operation and Development or foreign banks organized

under the laws of countries which are members of the Organisation for Economic Co-operation and Development similar to the investments set forth in clauses (a), (b), (c), (d) and (e) above, so long as such foreign bank has combined capital and surplus of a Dollar Equivalent of not less than $500,000,000.

(i)     Investments existing on the Closing Date, and set forth on Schedule 7.02, but not any increase in the principal amount thereof or any other modification of the terms thereof;

(j)     (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties (other than the Parent) after the Closing Date, and (iii) additional Investments by Subsidiaries of the Loan Parties that are not Loan Parties in other Subsidiaries that are not Loan Parties;

(k)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business; and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss in each case in the ordinary course of business;

(l)     Guarantees of Permitted Indebtedness provided, that, the aggregate principal amount of Indebtedness of Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall not exceed $250,000;

(m)     Investments by any Loan Party in Swap Contracts approved by the Bankruptcy Court and entered into in the ordinary course of business and for bona fide business (and not speculative purposes) to protect against fluctuations in interest or currency rates or commodity prices in respect of the Obligations;

(n)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(o)     loans or advances to (or, in the case of clause (i) only, guarantees on behalf of) officers, directors, consultants and employees of any Loan Party (or any direct or indirect parent thereof) or any of the Subsidiaries (i) not to exceed $2,000,000 at any time outstanding for reasonable and customary relocation purposes made in the ordinary course of business in accordance with the relocation policy of the Borrower in effect as of the Closing Date, (ii) [reserved], (iii) [reserved]; and (iv) for any other purposes not described in the clause (i); provided that the aggregate principal amount under clause (iv) above shall not exceed $250,000 at any time outstanding;

(p)     [reserved];

(q)     earn-outs and other customary post-Disposition obligations arising out of Permitted Dispositions;

(r)     Investment constituting deposits made in the Excluded DDAs;

(s)     [reserved]; and

(t)     other Investments not otherwise specifically described herein and not exceeding $1,000,000 in the aggregate.

31

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meanings assigned to such term in the preamble.

"PIK Toggle Notes" means the notes issued pursuant to the PIK Toggle Indenture as in effect on the Closing Date.

"PIK Toggle Indenture" means the Indenture in respect of the PIK Toggle Notes dated as of March 13, 2012 between the Parent and U.S. Bank National Association, as trustee and collateral trustee, as the same may be amended, amended and restated, modified or supplemented in accordance with this Agreement and the Intercreditor Arrangements.

"PIK Toggle Notes SPA" means the Amended and Restated Securities Purchase Agreement (Second Lien Notes) dated as of March 13, 2012, by and among the Borrower, the other Guarantors and the Investors party thereto as the same may be amended, modified or supplemented in accordance with this Agreement and the Intercreditor Arrangements.

"PIK Toggle Notes SPA Documents" means the PIK Toggle Notes SPA, the Intercreditor Arrangements, the PIK Toggle Indenture and any other instrument or agreement (including any and all Guarantees and collateral documents) now or hereafter executed and delivered in connection therewith, each as amended, modified or supplemented in accordance with this Agreement and the Intercreditor Arrangements.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, other than a Multiemployer Plan.

"Prepayment Event" has the meaning set forth in Section 2.07(a).

"Prepetition ABL Agent" has the meaning set forth in the applicable Order.

"Prepetition ABL Credit Agreement" means (i) that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014, by and among the Borrower, the Parent, the other borrowers party thereto, the Prepetition ABL Agent and the lenders identified therein, as amended, amended and restated, modified, or supplemented from time to time to the extent permitted by the Intercreditor Arrangements, and (ii) any other replacement, refinancing, restructuring, extension, renewal or refinancing thereof to the extent permitted by this Agreement and the Intercreditor Arrangements.

"Prepetition ABL Facility" means the secured asset-based revolving credit facility made available pursuant to the Prepetition ABL Credit Agreement.

"Prepetition ABL Lenders" means the lenders under the ABL Credit Agreement.

"Prepetition ABL Loan Documents" has the meaning specified for the term "Loan Documents" in the Prepetition ABL Credit Agreement.

"Prepetition Holders" means, collectively, holders of the PIK Toggle Notes and Convertible Notes.

NAI-1500433654v9

"Prepetition Lenders" means, collectively, the Prepetition Term Loan Lenders and Prepetition ABL Lenders, in each case, as defined in the applicable Order.

"Prepetition Term Loan Agent" has the meaning set forth in the applicable Order.

"Prepetition Term Loan Agreement" means (i) that certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014, by and among the Borrower, the Parent, the Prepetition Term Loan Agent and the lenders identified therein, as amended, amended and restated, modified, or supplemented from time to time to the extent permitted by the Intercreditor Arrangements, and (ii) any other replacement, refinancing, restructuring, extension, renewal or refinancing thereof to the extent permitted by this Agreement and the Intercreditor Arrangements.

"Prepetition Term Facility" means the secured asset-based term loan facility made available pursuant to the Prepetition Term Loan Agreement.

"Prepetition Term Loan Documents" has the meaning set forth for "Loan Documents" in the Prepetition Term Loan Agreement.

"Prime Rate" means the rate of interest quoted in The Wall Street Journal, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks), as in effect from time to time.

"Qualified Cash" means Cash and Cash Equivalents owned by a Loan Party (including cash in stores and in-transit cash (but excluding Credit Card Receivables)), which are (a) available for use by Loan Parties, without condition or restriction,  (b) free and clear of any pledge or other Lien (other than the Lien in favor of Agent (subject as to the priority only to the Liens in favor of the Prepetition ABL Agent and the Prepetition Term Loan Agent) and the Liens of the bank or securities intermediary where the deposit account or investment account in which such Cash or Cash Equivalent is maintained for its customary fees and charges, and the other Specified Permitted Liens), (c) in an investment account(s) or deposit account(s) subject to the Lien of the Agent, and (d) for which Agent has received and shall continue to receive evidence, in form and substance reasonably satisfactory to Agent, of the amount of such Cash and Cash Equivalents held in such investment account or deposit accounts as of the applicable date of the calculation of compliance with Section 7.15(a) by Agent and the satisfaction of the other conditions herein.  Cash and Cash Equivalents subject to the Specified Permitted Liens and on deposit in an account subject to a Blocked Account Agreement shall not constitute restricted Cash and Cash Equivalents.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Recovery Event" means any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Loan Party.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Parent and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reorganization Plan" means a liquidation plan or plan of reorganization in any or all of the Cases of the Debtors.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided in Section 9.12(b).

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the sum of (a) the Total Outstandings, and (b) the unused Aggregate Commitments.  The unused Commitment of, and the portion of the Total Outstandings attributable to, any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Responsible Officer" means the chief executive officer, president, chief restructuring officer, vice-president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.  Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.  For the avoidance of doubt, no payment made to the holders of Convertible Notes pursuant to the Convertible Notes SPA Documents shall constitute a Restricted Payment unless and until such Indebtedness is converted into Equity Interests of the Parent.

"Reuters Screen LIBOR01 Page" means the display page LIBOR01 on the Reuters service or any successor display page, other published source, information vendor or provider that has been designated by the sponsor of Reuters Screen LIBOR01 page.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale Motion" has the meaning provided in Section 6.13(b).

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"Scheduled Maturity Date" means July 20, 2016 (or if not a Business Day, the next Business Day).

"Scripts Subsidiary" means A&P Live Better, LLC, a Delaware limited liability company and a wholly-owned direct Subsidiary of the Parent.

NAI-1500433654v9

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement, dated as of the Closing Date, among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the Mortgages, the DDA Notifications, the Credit Card Notifications, the Perfection Certificate and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Parent and its Subsidiaries as of that date determined in accordance with GAAP.

"Specified Excluded DDAs" has the meaning given to such term in the definition of "Excluded DDA."

"Specified Permitted Liens" means the Liens on the ABL Priority Collateral and on the Term Priority Collateral securing the obligations of the Loan Parties respectively under the Prepetition ABL Loan Documents, the Prepetition Term Loan Documents, the Convertible Notes SPA Documents and the PIK Toggle Notes SPA Documents, in each case, so long as such Liens are subject to, and have the priority specified in the applicable Order and the Intercreditor Arrangements.

"Specified Pharmacy Lease" means each of the Leases with respect to the following locations: (i) 2200 Maple Avenue, Fair Lawn, New Jersey; (ii) 1511 Route 22, Brewster, New York; (iii) 3301 (3399) Aramingo Avenue, Philadelphia, Pennsylvania; (iv) 1 Padanarum Road, Danbury, Connecticut; and (v) 4365 Kirkwood Highway, Wilmington, Delaware.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D.  LIBO Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Store" means any retail store (which may include any real property, fixtures, Equipment, Inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Store Lease" means a Lease in respect of a Store or Distribution Center.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party, but shall exclude Excluded Subsidiaries.

"Swap Contract" means (a) any and all rate swap, hedge, forward, future or derivative transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Priority Collateral" has the meaning set forth in the Orders.

"Third Party Payor" means any Person, such as a Fiscal Intermediary, Blue Cross/Blue Shield, or private health insurance company, which is obligated to reimburse or otherwise make payments to health care providers who provide medical care or medical assistance or other goods or services for eligible patients under any private insurance contract with private health insurers.

36

"Third Party Payor Notification" means a notice substantially in the form of Exhibit G.

"Tier 1 Auction" has the meaning provided in Section 6.13(i).

"Total Outstandings" means the aggregate outstanding principal amount of all Loans.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"Treasury Rate" means, as of any date of determination, the weekly average yield as of such date on actively traded United States Treasury securities adjusted to a constant maturity of one year.

"Trigger Date" has the meaning given to that term in the Interim Order (or, when entered, the Final Order).

"Triple Negative Leases" means the real property leases identified on Schedule 1.01(T) attached hereto.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a LIBO Rate Loan.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"Variance Report" mean a variance report on a weekly basis setting forth (1) actual disbursements for the three week period then most-recently ended, (2) all variances, on an aggregate basis, as compared to the Budget and the previously delivered 13-Week Projection on a cumulative basis for the three week period then most-recently ended, and (3) an explanation, in reasonable detail, for any material variance, certified by a Responsible Officer of the Parent.

"Week Ending Book Cash" has the meaning given such term in the Budget.

"Yucaipa Management Services Agreement" means that Management Services Agreement among the Parent and The Yucaipa Companies LLC, dated as of March 13, 2012 as in effect on the Closing Date.

**1.02** *Other Interpretive Provisions*. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

37

(a)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, unless otherwise expressly provided, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)     Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds or other collateral as may be requested by the Agent of all of the Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts) other than unasserted contingent indemnification Obligations.

**1.03**   *Accounting Terms*.

(a)     <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to

such change therein and (ii) the Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP and without including the effect of any changes to lease accounting that requires the assets and liabilities arising under operating leases to be recognized in any statement of financial position. Notwithstanding the foregoing, financial calculations under this Agreement shall be computed to exclude any change to lease accounting rules from those in effect pursuant to Financial Account Standards Board Account Standards Codification 840 (Leases) and other related lease account guidance as in effect on the Closing Date.

**1.04** *Rounding.* Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05** *Times of Day.* Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

# ARTICLE II
# THE LOANS

**2.01** *Initial Term Loans and Delayed Draw Term Loans.*

(a) <u>Initial Term Loans</u>. Each Lender having an Initial Term Loan Commitment agrees, severally and not jointly, subject to the terms and conditions set forth herein, to make on the Closing Date, subject to satisfaction (or waiver by all such Lenders having Initial Term Loan Commitments identified on <u>Schedule 2.01</u>) of the conditions precedent set forth in <u>Section 4.01</u>, term loans to the Borrower in a principal amount equal to such Lender's Initial Term Loan Commitment (each such loan being referred to herein as an "Initial Term Loan"). Once repaid, whether such repayment is voluntary or required, no portion of the Initial Term Loans may be reborrowed.

(b) <u>Delayed Draw Term Loans</u>. Each Lender having a Delayed Draw Term Loan Commitment agrees, severally and not jointly to make, subject to satisfaction (or waiver by all such Lenders having Delayed Draw Term Loan Commitments identified on <u>Schedule 2.01</u>) of the conditions precedent set forth in <u>Section 4.02</u> and in accordance with the procedures in <u>Section 2.02</u>, upon written request by the Borrower after the entry of the Final Order, on one occasion only, term loans to the Borrower in a principal amount equal to such Lender's Delayed Draw Term Loan Commitment (collectively, the "Delayed Draw Term Loans"; the date of the making of the Delayed Draw Term Loans, which may be no later than two (2) Business Days following the Final Order Entry Date, the "Final Term Funding Date"). Once repaid, whether such repayment is voluntary or required, no portion of the Delayed Draw Term Loans may be reborrowed

(c) Each Lender shall make each Loan to be made by it hereunder on the Closing Date or Final Term Funding Date, as the case may be, by wire transfer of immediately available funds by 2:00 p.m., New York, New York time, to the account of the Agent most recently designated by it for such purpose by notice to the Lenders. Upon satisfaction of the applicable conditions set forth in <u>Section 4.01</u> or <u>4.02</u>, as applicable, the Agent will make each such Loan(s) available to the Borrower by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Borrower. The failure of any Lender to make any Loan shall neither relieve any other Lender of its

obligation to fund its Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(d)     Unless the Agent shall have received notice from a Lender prior to the proposed date of any Loan to be made by such Lender that such Lender will not make available to the Agent such Lender's share of such borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its Loan available to the Agent, then such Lender and the Borrower jointly and severally agree to pay to the Agent forthwith on written demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at (i) in the case of any Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate set forth in Section 2.08(a) hereof.

(e)     The aggregate Initial Term Loan Commitments shall be automatically and permanently reduced to zero on the date of the Borrowing of the Initial Term Loans.  The aggregate Delayed Draw Term Loan Commitments shall be automatically and permanently reduced to zero on the Final Term Funding Date.  The Aggregate Commitments shall terminate on September 15, 2015 if the Closing Date has not occurred by such date.

(f)     During the period after the Closing Date but prior to the Final Term Funding Date, the Borrower may, upon notice to the Agent, from time to time terminate (in whole or in part) the unused portion of the aggregate Delayed Draw Term Loan Commitments; provided that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in a minimum amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof.

(g)     The Delayed Draw Term Loans and Initial Term Loans shall constitute a single class of Loans for all purposes of this Agreement and the other Loan Documents.

**2.02**     *Borrowings of Loans.*

(a)     Each Borrowing of Loans shall be made upon the Borrower's irrevocable notice to the Agent, which may be given by telephone.  Each such notice must be received by the Agent not later than 11:00 a.m. (i) on the Business Day of the Borrowing of the Initial Term Loans, and (ii) three Business Days prior to the requested date of the Borrowing of the Delayed Draw Term Loans.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Agent of a written Committed Loan Notice appropriately completed and signed by a Responsible Officer of the Borrower.  Each Borrowing of, conversion to or continuation of LIBO Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of Loans to be borrowed.

(b)     Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Loans.

(c)     Each Borrowing of Loans shall be made by the Lenders pro rata in accordance with their respective Applicable Percentages in respect of the Initial Term Loan Commitments and the Delayed Draw Term Loan Commitments.

(d)     The Agent, without the request of the Borrower, may advance any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account.  The Agent shall advise the Borrower of any such advance or charge promptly after the making thereof.  Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(d) shall bear interest at the interest rate then and thereafter applicable to Base Rate Loans.

(e)     During the existence of a Default or an Event of Default, no Loans may be requested as or continued as LIBO Rate Loans without the Consent of the Required Lenders.

(f)     The Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to LIBO Rate Loans upon determination of such interest rate.  At any time that Base Rate Loans are outstanding, the Agent shall notify the Borrower and the Lenders of any change in the Prime Rate used in determining the Base Rate promptly following the public announcement of such change.

**2.03**     *Reserved.*

**2.04**     *Repayment of Loans.*  The Borrower shall repay to the Agent, for the account of each Lender, the aggregate principal amount of all Loans outstanding on the Maturity Date.

**2.05**     *Optional Prepayments.*  The Borrower may, upon irrevocable notice from the Borrower to the Agent, at any time or from time to time voluntarily prepay Loans in whole or in part, plus all amounts due under Section 2.08(c) and Section 2.09; provided, that, (i) such notice must be received by the Agent not later than 11:00 a.m. (A) three Business Days prior to any date of prepayment, and (ii) any prepayment shall be in a principal amount of at least $5,000,000 or a whole multiple of $1,000,000 in excess thereof; in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.  Any notice delivered pursuant to this Section 2.05 in connection with a refinancing of this Agreement may state that such notice is conditioned upon the effectiveness of the other credit facility or receipt of proceeds from the issuance of new Indebtedness comprising such replacement financing, in which case such notice may be revoked (by written notice to Agent on or prior to the specified effective date of termination) if such effectiveness does not occur.

**2.06**     *Reserved.*

**2.07**     *Mandatory Prepayments.*

(a)     Subject in all respects to the Orders and the Intercreditor Arrangements, the outstanding Loans shall be prepaid in an amount equal to the Net Proceeds received by a Loan Party, as follows (each of the following being a "Prepayment Event"):

(i)     Subject to clause (v) below, on Friday of each week, the Borrower shall prepay the Loans in an amount equal to 100% of the Net Proceeds of all Dispositions by the Loan Parties or their respective Subsidiaries from and after the preceding Friday except (A) for Dispositions resulting from a Recovery Event, and then as set forth in clause (ii) below, and (B)

Dispositions described in clauses (a), (c), (f), (g), (o), (p), (q), (r), (s) and (w) of the definition of "Permitted Disposition".

(ii)     Subject to clause (v) below, the Borrower shall prepay the Loans in an amount equal to 100% of the Net Proceeds of any Recovery Event (and payments in lieu thereof) in respect of any property or asset of a Loan Party on the Friday immediately following the date of the receipt of such Net Proceeds unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent or to the lessor with respect to such property or asset pursuant to the applicable lease.

(iii)     Subject to clause (v) below, the Borrower shall prepay the Loans in an amount equal to 100% of the Net Proceeds of Extraordinary Receipts on the Friday immediately following the date of the receipt of such Net Proceeds.

(iv)     On October 31, 2015, the Borrower shall make a prepayment of the Loans in an amount equal to the aggregate amount of the Week Ending Book Cash on such date in excess of $60,000,000.

(v)     Notwithstanding anything to the contrary set forth above, except with respect to any prepayment with the Net Proceeds of any seller notes or other non-cash proceeds of Dispositions, the Loan Parties shall not be required to make any prepayment pursuant to clause (a)(i), (a)(ii) or (a)(iii) above to the extent that, after giving effect thereto, the Week Ending Book Cash would be less than $75,000,000 (which amount shall be reduced to $60,000,000 on October 31, 2015).

(vi)     Any limitation on mandatory prepayments by reason of the application of clause (a)(v) above shall be applied pro rata (measured by the amount of Net Proceeds derived from each of the ABL Priority Collateral, Term Priority Collateral and Additional Collateral received in connection with a disposition of any of the foregoing collateral) to the amounts otherwise required to be applied to the obligations in respect of the Prepetition ABL Facility, the obligations in respect of the Prepetition Term Facility, and the Obligations hereunder.  The Borrower shall deposit any proceeds of Additional Collateral into the Additional Collateral Account on the date on which such proceeds are received, and shall maintain such proceeds in the Additional Collateral Account until such proceeds are applied in accordance with the terms hereof.

(b)     All mandatory prepayments in respect of the Loans shall be applied pro rata to the Loans.

**2.08**     *Interest.*

(a)     Subject to the provisions of Section 2.08(b) and Sections 3.02 through Section 3.05 below, the Loans and the other Obligations shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Adjusted LIBO Rate plus the Applicable Margin and accrue from the date any Loan is advanced or the Obligation is incurred or payable, until paid by Borrower; and (ii) upon the occurrence of any event described in Sections 3.02 through 3.05, each Base Rate Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Base Rate plus the Applicable Margin.

(b)     (i)     If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise,

such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)     If any Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(iii)     Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)     Interest accrued on the Loans shall be due and payable in arrears, (i) on the first day of each month beginning September 1, 2015; (ii) on any date of any voluntary or mandatory prepayment, with respect to the principal amount of the Loan being prepaid; and (iii) on the Maturity Date.  Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on demand.  Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable on demand, in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09**     *Fees*.

(a)     Prepayment Premium.  In the event that prior to or on the date that is six (6) months after the Closing Date (the "Make Whole Date"): (i) the Maturity Date occurs, (ii) any voluntary prepayment of the Loans occurs, (iii) any optional commitment reduction occurs, or (iv) any mandatory prepayment of the Loans occurs, the Borrower shall pay to the Agent, for the account of each Lender in accordance with its Applicable Percentage, the Make Whole Fee, with respect to such payment, prepayment or reduction.

(b)     Other Fees.

(i)     The Borrower shall pay to Agent, for the account of each Lender in accordance with its Applicable Percentage, a closing fee (the "Closing Fee") in an amount equal to 2.5% of the aggregate Commitments as of the Closing Date (before giving effect to the Loans to be made on the Closing Date).  An amount equal to 50% of the Closing Fee shall be due and payable on the Closing Date and the balance of such Closing Fee shall be due and payable on the Final Term Funding Date.  Such Closing Fee shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(ii)     The Borrower shall pay to Agent, for its sole account, an administrative fee in an amount equal to $25,000.  Such administrative fee shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10**     *Computation of Interest and Fees*.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on the day such Loan is made and until but (but not including) the day on which such Loan (or such portion thereof) is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

43

**2.11**     *Evidence of Debt.*

(a)     The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  Upon the request of any Lender made through the Agent, the Borrower shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrower will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)     In the event of any conflict between the accounts and records maintained by the Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

**2.12**     *Payments Generally; Agent's Clawback.*

(a)     All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  Subject to Section 2.14 hereof, the Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Agent after 2:00 p.m., at the option of the Agent, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)     Unless the Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.  A notice of the Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(b) shall be conclusive, absent manifest error.

(c)     Except for payments and other amounts received by Agent and applied in accordance with the provisions of Section 8.03 (or required to be applied in accordance with Section 2.07), all payments and any other amounts received by the Agent from or for the benefit of the Borrower shall be applied as follows: first, to pay principal of, and interest on, any portion of the Loan the Agent may have advanced pursuant to the express provisions of this Agreement on behalf of any Lender, for which the Agent has not then been reimbursed by such Lender or the Borrower, second, to pay all other Obligations then due and payable and third, as the Borrower shall so designate. Except as otherwise expressly provided for herein, payments in respect of the Loans received by the Agent shall be distributed to each Lender in accordance with such Lender's pro rata share of the Loans; and all payments of fees and all other payments in respect of any other Obligation shall be allocated among such of the Lenders as are entitled thereto and, for such payments allocated to the Lenders, in proportion to their respective Applicable Percentages.

**2.13**     *Sharing of Payments by Lenders.*  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Obligations greater than its pro rata share thereof as provided herein (including as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14**     *Settlement Amongst Lenders.*

(a)     The amount of each Lender's Applicable Percentage of outstanding Loans shall be computed each time a payment is made by Borrower (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Loans and repayments of Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the receipt by Agent of any such payment. Interest shall cease to accrue on the portion of any Loan paid on the date such payment is made to Agent regardless of the Settlement Date.

(b)     The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Loans for the period and the amount of repayments received for the period. As reflected on the summary statement, and subject to Section 8.03, (i) the Agent

shall transfer to each Lender its Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent.  If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

       **2.15**    *Priority and Liens*.

       (a)    The Borrower hereby covenants and agrees that upon the entry of, and subject to the terms and provisions of, the Interim Order (and when applicable, the Final Order):

       (i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations shall at all times constitute an allowed DIP Superpriority Claim in the Cases, subject only to the Carve Out; and

       (ii)    pursuant to Section 364 of the Bankruptcy Code, the Obligations shall at all times be secured by valid, binding, continuing, enforceable perfected Liens with respect to the Additional Collateral of the Debtors, the ABL Priority Collateral of the Debtors and the Term Priority Collateral of the Debtors, all as set forth, and with the priority specified, in the Interim Order (and, when entered, the Final Order).

       (b)    All of the Liens described in this <u>Section 2.15</u> shall be effective and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Agent of, or over, any Collateral, as set forth in the Interim Order.

       (c)    Notwithstanding anything to the contrary herein, each Loan Party will cause all equity interests of each of its Subsidiaries and all of its tangible and intangible personal property, Real Estate and other assets in each case now owned or hereafter acquired by it to be subject at all times to a Lien in favor of the Agent, for the benefit of the Lenders, securing the Obligations, but excluding any Excluded Property.

       **2.16**    *No Discharge; Survival of Claims*.  The Borrower agrees that to the extent that its obligations under the Loan Documents have not been satisfied in full in cash, (i) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the DIP Superpriority Claim granted to the Agent and the Lenders pursuant to the Orders and the Liens granted to the Agent and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

NAI-1500433654v9

**2.17**    *Defaulting Lenders*.

(a)    <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Laws:

(i)    <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders".

(ii)    <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VIII</u> or otherwise) or received by the Agent from a Defaulting Lender pursuant to <u>Section 10.08</u> shall be applied at such time or times as may be determined by the Agent as follows:  <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; <u>second</u>, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; <u>third</u>, if so determined by the Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; <u>fourth</u>, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>fifth</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and <u>sixth</u>, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; <u>provided</u> that if (1) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (2) such Loans were at a time when the conditions set forth in <u>Section 4.02</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of  all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Aggregate Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this <u>Section 2.17(a)(ii)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    <u>Certain Fees</u>.  No Defaulting Lender shall be entitled to receive any fee payable under <u>Section 2.09(a)</u> for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    <u>Defaulting Lender Cure</u>.  If the Borrower and the Agent agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be

a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

**3.01** *Taxes*.

(a) <u>Payments Free of Taxes</u>. Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, <u>provided</u> that if the Loan Parties shall be required by applicable Law (as determined in the good faith discretion of an applicable withholding agent) to deduct any Indemnified Taxes (or Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this <u>Section 3.01(a)</u>) the Agent, Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions, and (iii) the Loan Parties shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b) <u>Payment of Other Taxes by the Loan Parties</u>. Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c) <u>Indemnification by the Loan Parties</u>. The Loan Parties shall indemnify the Agent, and each Lender, as applicable, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 3.01(c)</u>) payable or paid by the Agent or such Lender or required to be deducted or withheld from a payment to the Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of the Agent, or a Lender, shall be conclusive absent manifest error.

(d) <u>Evidence of Payments</u>. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e) <u>Status of Lenders</u>. Any Lender that may be entitled to an exemption from or reduction of withholding tax with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Agent), at the time or times prescribed by applicable Law or reasonably requested by the Borrower or the Agent, such properly completed and executed documentation prescribed by applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. Such delivery shall be provided on or before the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a

48

change in the documentation most recently delivered.  In addition, any Lender, if requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing:

(i)        any Lender that is a U.S. person (within the meaning of Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), duly completed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax; and

(ii)       any Lender that is not a U.S. person (within the meaning of Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Agent) and on or before such Lender designates a new Lending Office, whichever of the following is applicable:

(A)       duly completed copies of IRS Form W-8BEN or IRS Form W-8BEN-E claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(B)       duly completed copies of IRS Form W-8ECI,

(C)       in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of any of the Loan Parties within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) duly completed copies of IRS Form W-8BEN or W-8BEN-E,

(D)       to the extent a Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-9, a U.S. Tax Compliance Certificate, and/or other certification documents from each beneficial owner, as applicable; provided that if the Lender is a partnership and one or more direct or indirect partners of such Lender are claiming the portfolio interest exemption, such Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner, or

(E)       any other duly completed forms, documents or certifications prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Law or requested by the Borrower or Agent to permit the Borrower or Agent to determine the withholding or deduction required to be made, including under FATCA.

49

If a payment made by or on account of this Agreement or any other Loan Document would be subject to U.S. federal withholding Tax imposed under FATCA if a recipient of such payment fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such recipient shall deliver to the Borrower and the Agent at the time or times prescribed by Law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and other documentation reasonably requested by the Borrower or the Agent sufficient for the Borrower or the Agent to comply with their obligations under FATCA and to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (d)(ii)(A), "FATCA" shall include any amendment made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to Section 3.01 (including by the payment of additional amounts pursuant to Section 3.01), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 3.01(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 3.01(f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 3.01(f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 3.01(f) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)    The Agent or any Lender claiming any indemnity payment or additional payment amounts payable pursuant to this Section 3.01 shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Borrower or to change the jurisdiction of its Lending Office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or additional amount that may thereafter accrue, would not require such Agent or Lender to disclose any information such Agent or such Lender reasonably deems confidential, would not subject such Lender to any unreimbursed cost or expense and would not, in the good faith determination of such Agent or such Lender, be otherwise disadvantageous to such Agent or such Lender.

(h)    Indemnification by Lenders.  Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes or Other Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.06(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any

reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this <u>Section 3.01(h).</u>

(i)       <u>Survival</u>.  Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**3.02**       *Illegality*.  If any Lender reasonably determines that any Change in Law has made it unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, or to determine or charge interest rates based upon the LIBO Rate, or after the Closing Date any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Agent, any obligation of such Lender to  continue LIBO Rate Loans or to convert Base Rate Loans to LIBO Rate Loans shall be suspended until such Lender notifies the Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Immediately upon receipt of such notice, interest on the Loans shall accrue and be payable at the Base Rate plus the Applicable Margin.

**3.03**       *Inability to Determine Rates*.  If the Agent determines (based on events that have occurred after the Closing Date) that (a) adequate and reasonable means do not exist for determining the LIBO Rate, or (b) the LIBO Rate with respect to a LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of maintaining such Loan, the Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to maintain LIBO Rate Loans shall be suspended until the Agent (upon the instruction of the Required Lenders) revokes such notice.

**3.04**       *Increased Costs; Reserves on LIBO Rate Loans*.

(a)       <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)       impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate);

(ii)       subject any Lender to any tax of any kind whatsoever with respect to this Agreement, or any LIBO Rate Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)       impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBO Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other

amount) then, upon request of such Lender, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.05**     *Mitigation Obligations; Replacement of Lenders.*

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use commercially reasonable good faith efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or if any Lender gives notice pursuant to Section 3.02, the Borrower may replace such Lender in accordance with Section 10.13.

**3.06**     *Survival.*  All of the Obligations under this <u>Article III</u> shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO THE CLOSING DATE

**4.01**     *Conditions Precedent to the Occurrence of the Closing Date and to the Making of the Initial Term Loans.*  The occurrence of the Closing Date, and the obligation of each Lender to make Initial Term Loans on the Closing Date is subject to the fulfillment (or waiver in accordance with <u>Section 10.01</u>), to the satisfaction of the Agent and each Lender, of each of the following conditions precedent:

(a)     The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Agent:

(i)     executed counterparts of this Agreement;

(ii)     Notes executed by the Borrower in favor of each Lender requesting a Note;

(iii)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)     copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)     an opinion of Weil, Gotshal & Manges LLP, counsel to the Loan Parties and of applicable local counsel, each addressed to the Agent and each Lender and in form and substance reasonably satisfactory to the Agent, as to such matters concerning the Loan Parties and the Loan Documents as the Agent may reasonably request;

(vi)     a certificate signed by a Responsible Officer of the Borrower certifying (A) that the representations and warranties of each Loan Party contained in <u>Article V</u> or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, are (1) with respect to representations and warranties that contain a materiality qualification,  true and correct immediately prior to, and after giving effect to, the funding on the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier

date, and (2) with respect to representations and warranties that do not contain a materiality qualification, be true and correct in all material respects immediately prior to, and after giving effect to, the funding on the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (B) no Default or Event of Default shall exist or would result from the making of the Loans, (C) that there has been no event or circumstance since the date of the Audited Financial Statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, (D) [reserved], and (E) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)    except as otherwise provided in <u>Section 6.24</u>, evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(viii)    the Security Agreement, the Facility Guaranty and the Perfection Certificate, each duly executed by the applicable Loan Parties;

(ix)    except as otherwise provided in <u>Section 6.24</u>, all other Loan Documents, each duly executed by the applicable Loan Parties;

(x)    [reserved];

(xi)    except as otherwise provided in <u>Section 6.24</u>, results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases  or subordination agreements satisfactory to the Agent are being tendered or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made; and all filing and recording fees shall have been duly paid;

(xii)    except as otherwise provided in <u>Section 6.24,</u> all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the Liens intended to be created under the Security Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent;

(xiii)    [reserved];

(xiv)    the Agent shall have received a Committed Loan Notice in accordance with the requirements hereof; and

(xv)    such other assurances, certificates, documents, consents or opinions as the Agent reasonably may require.

(b)    [reserved].

(c)    [reserved].

NAI-1500433654v9

(d)     The Agent shall have received unaudited financial statements for any interim period or periods of the Parent and its Subsidiaries for the current Fiscal Year ended at least 30 days (in the case of Fiscal Period) or 45 days (in the case of Fiscal Quarters) prior to the Closing Date.  The Agent shall be reasonably satisfied that there has been no Material Adverse Effect since February 28, 2015.

(e)     (i) The Debtors have commenced the Cases in the Bankruptcy Court, (ii) the Bankruptcy Court shall have entered the Interim Order, in form and substance reasonably satisfactory to the Agent, approving the DIP Term Loan Facility, cash collateral usage and the transactions contemplated hereby, including without limitation, the granting of superpriority status, security interests and Liens as contemplated by the Interim Order and the Loan Documents, which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Agent, and (iii) all motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the Interim Order, the DIP Term Loan Facility and the approval thereof shall be in form and substance reasonably satisfactory to the Agent.

(f)     There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(g)     The Agent shall have received the initial 13-Week Projections and the initial Budget, each in form and substance reasonably acceptable to the Agent, and the Agent shall have received confirmation reasonably satisfactory to it that initial 13-Week Projections and the initial Budget are reasonably satisfactory to the Prepetition Term Loan Agent and the Prepetition ABL Agent.

(h)     The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document, and shall not have been enjoined, whether temporarily, preliminary or permanently.

(i)     All fees and expenses required to be paid to the Agent on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(j)     The Borrower shall have paid all fees, charges and disbursements of counsel to the Agent, the Lenders, the Prepetition Term Loan Agent and the Prepetition ABL Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Agent, the Lenders, the Prepetition Term Loan Agent and the Prepetition ABL Agent, respectively).

(k)     The Agent and the Lenders shall have received prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act,  to the extent requested in writing prior to the Closing Date, the results of which are satisfactory to the Agent.

(l)     The Closing Date shall have occurred on or before September 15, 2015.  The Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding on the Loan Parties.

NAI-1500433654v9

(m)     The Agent shall, upon the entry of the Interim Order, have valid and perfected Liens on and security interests in the Collateral with the priority described in the Interim Order and the Intercreditor Arrangements.

(n)     The Debtors shall have appointed Christopher McGarry or another person reasonably acceptable to the Agent, the Prepetition Term Loan Agent and the Prepetition ABL Agent as Chief Restructuring Officer of the Borrower.

(o)     To the extent feasible under the circumstances, all pleadings filed by the Debtors that could reasonably be expected to affect the DIP Term Loan Facility, the Collateral or the rights or remedies of the Agent shall be of the types to be agreed, and all orders entered by the Bankruptcy Court (including, without limitation, the Interim Order) shall be in form and substance reasonably satisfactory to the Agent.

(p)     The Loan Parties shall have executed asset purchase agreements (the "Initial APAs") covering Stores having assets with a minimum aggregate value of at least $275,000,000 (excluding Inventory and prescriptions) upon terms and conditions reasonably acceptable to the Agent, the Prepetition Term Loan Agent and the Prepetition ABL Agent.

(q)     The Debtors shall have paid all rent due with respect to their leased locations that are subject to the Initial APAs.

(r)     The Prepetition Lenders and Prepetition Holders, as applicable, representing a majority of the principal amount of each of the Prepetition ABL Facility, the Prepetition Term Facility, the PIK Toggle Notes and the Convertible Notes shall have consented to the DIP Term Loan Facility on the terms set forth herein.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02**     *Conditions Precedent to Delayed Draw Term Loans.*  No Lender shall be required to make any Delayed Draw Term Loan unless and until the following conditions are satisfied:

(a)     At the time of and immediately after giving effect to such Delayed Draw Term Loan, no Default or Event of Default shall exist or would result from the making of the Delayed Draw Term Loans.

(b)     The representations and warranties of each Loan Party set forth in the Loan Documents shall (1) with respect to representations and warranties that contain a materiality qualification, be true and correct immediately prior to, and after giving effect to, the funding on the Final Term Funding Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (2) with respect to representations and warranties that do not contain a materiality qualification, be true and correct in all material respects immediately prior to, and after giving effect to, the funding on the Final Term Funding Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

56

(c)     [Reserved].

(d)     The Agent shall have received a Committed Loan Notice in accordance with the requirements hereof executed and delivered by the Borrower to Agent regarding the Delayed Draw Term Loans to be made on the Final Term Funding Date.

(e)     The Final Order Entry Date shall have occurred concurrently with or prior to the Final Term Funding Date, and the Final Order shall be in full force and effect, in form and substance reasonably satisfactory to the Agent, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Required Lenders in their sole discretion, and shall not be subject to a stay, and the Agent shall have received a signed copy of the Final Order entered by the Bankruptcy Court.

(f)     The making of the Delayed Draw Term Loan shall not violate any applicable Law or any Organization Document of any Loan Party, and shall not be enjoined, temporarily, preliminary or permanently.

(g)     The Loan Parties shall have achieved the Milestones on or prior to the corresponding dates set forth in Section 6.13, to the extent such dates fall on or before the date of the Borrowing of the Delayed Draw Term Loans.

(h)     The Borrower shall not have been required to pay the deposit into the Carve Out Account pursuant to Section 6.15(b) as of the date of the Final Order.

(i)     All fees and expenses required to be paid to the Agent (including the reasonable fees, charges and disbursements of counsel to the Agent) on or before the Final Term Funding Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders (including the reasonable fees, charges and disbursements of counsel to the Lenders on or before the Final Term Funding Date shall have been paid in full.

(j)     Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

The Committed Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02 have been satisfied on and as of the date of the Borrowing of the Delayed Draw Term Loans.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.02, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Final Term Funding Date specifying its objection thereto.

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make the Loans hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01** *Existence, Qualification and Power.* Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation, (b) subject to the entry of the Orders and subject to the terms thereof, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02** *Authorization; No Contravention.* Subject to the entry of the Orders and subject to the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03** *Governmental Authorization; Other Consents.* Subject to the entry of the Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document to which such Person is a party, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the priority thereof as described in the Orders) or (b) such as have been obtained or made and are in full force and effect.

**5.04** *Binding Effect.* Subject to the entry of the Orders, this Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. Subject to the entry of the Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

NAI-1500433654v9

**5.05** *Financial Statements; No Material Adverse Effect*.

(a)     The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) to the extent required by GAAP, show all Material Indebtedness.

(b)     The unaudited Consolidated balance sheet of the Parent and its Subsidiaries dated May 23, 2015, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the Fiscal Period ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)     Since the date of the Audited Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)     [Reserved].

(e)     The Consolidated forecasted balance sheet and statements of income and cash flows of the Parent and its Subsidiaries delivered pursuant to <u>Section 4.01</u> were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Loan Parties' best estimate of its future financial performance (it being understood that projections by their nature are inherently uncertain and that, even though the projections are prepared in good faith on the basis of assumptions believed to be reasonable at the time such projections were prepared, the results reflected in the projections may not be achieved and actual results may differ and such differences may be material).

**5.06** *Litigation*.   There are no unstayed actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in <u>Schedule 5.06</u>, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and since March 13, 2012, there has been no adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described on <u>Schedule 5.06</u>.

**5.07** *No Default*.   As of the Closing Date, no Loan Party or any Subsidiary is in default in any material respect under or with respect to, any Material Contract or any Material Indebtedness except for any defaults triggered by the filing of the Bankruptcy Cases.  Subject to the entry of the Orders and subject to the terms thereof, no Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08** *Ownership of Property; Liens*.

(a)     Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in all Real Estate necessary or used in the ordinary conduct of its business, except for Permitted Encumbrances.  Each of the Loan Parties and each of its Subsidiaries has good title to, valid licenses or service agreements to use all personal property material to the ordinary conduct of its business, except in each case as does not have and would not reasonably be expected to have a Material Adverse Effect.  Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien reflected on title commitments delivered to the Agent thereon as of the Closing Date.

(b)     Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessors with respect to Material Leases.  Except as otherwise expressly permitted by Section 6.13 or 6.18, each of the Material Leases are in full force and effect, the Loan Parties and their Subsidiaries are not in default (beyond applicable cure periods) of the terms of any such Leases (including with respect to the payment of rent or other amounts due thereunder) and each of the Loan Parties and their Subsidiaries enjoys peaceful and undisturbed possession under all such Leases.  Each Lease (other than any Material Lease) is in full force and effect, the Loan Parties and their Subsidiaries are not in default (beyond applicable cure periods) of the terms of any such Leases and each of the Loan Parties and their Subsidiaries enjoys peaceful and undisturbed possession under all such Leases, except, in each case, as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     [reserved].

(d)     Schedule 7.01 sets forth a complete and accurate list of all Liens (other than Permitted Encumbrances described in clause (a) through (f) and (h) through (aa) of the definition thereof) on the property or assets of each Loan Party and each of its Subsidiaries, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto.  The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(e)     Schedule 7.02 sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party as of the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(f)     Schedule 7.03 sets forth a complete and accurate list of all Material Indebtedness (other than Permitted Indebtedness described in clauses (b) through (y) of the definition thereof) (other than the Obligations) of each Loan Party or any Subsidiary of a Loan Party as of the Closing Date, showing as of, and after giving effect to the occurrence, the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09**     *Environmental Compliance.*

(a)     Except as disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

NAI-1500433654v9

(b)     Except as disclosed in Schedule 5.09, (i) none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or, to the knowledge of any Loan Party, is adjacent to any such property; (ii) there are no and to the knowledge of any Loan Party never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; (iii) there is no damaged or friable asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and (iv) Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof, except, in each case of (i) through (iv), as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Except as otherwise set forth on Schedule 5.09, no Loan Party or any Subsidiary thereof is undertaking, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law except, in each case, as could not individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and (ii) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability under applicable Environmental Law to any Loan Party or any Subsidiary thereof.

5.10     *Insurance*.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts (after giving effect to any self-insurance not in excess of $750,000), with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates.  Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

5.11     *Taxes*.  The Loan Parties and their Subsidiaries have filed all Federal, material state and other material tax returns and, subject to any restrictions by reason of the Cases, the applicable Orders or any other applicable Bankruptcy Court order, reports required to be filed by them, and have paid all Federal, material state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed (other than Liens for (i) pre-petition Taxes that were not yet due on the Petition Date or which are being contested in compliance with Section 6.04, (ii) pre-petition Taxes to the extent the payment thereof is stayed by reason of the Cases, the applicable Order or any other applicable Bankruptcy Court order, and (iii) post-petition Taxes that are not yet due and payable) and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement other than as set forth on Schedule 5.11.

NAI-1500433654v9

**5.12** *ERISA Compliance.*

(a) The Parent, each of its ERISA Affiliates, and each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Sections 412 or 430 of the Code and to each Multiemployer Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Sections 412 or 430 of the Code has been made with respect to any Plan. No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or Multiemployer Plan.

(b) There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c) (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability in excess of $65,000,000; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13** *Subsidiaries; Equity Interests.* The Loan Parties have no Subsidiaries and own no Equity Interests other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents and Specified Permitted Liens. Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary. The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13. All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 (or in the case of the Parent, as disclosed to Agent) free and clear of all Liens except for those created under the Security Documents and the Specified Permitted Liens. The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14** *Margin Regulations; Investment Company Act.*

(a) No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Loans shall be used directly or indirectly for the purpose of purchasing

62

or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)     None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15**    *Disclosure*.  Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (excluding projected financial information, forward-looking statements and general industry or general economic data) (in each case, as modified or supplemented by other information so furnished) taken as whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that projections by their nature are inherently uncertain and that, even though the projections are prepared in good faith on the basis of assumptions believed to be reasonable at the time such projections were prepared, the results reflected in the projections may not be achieved and actual results may differ and such differences may be material).

**5.16**    *Compliance with Laws*.  Each of the Loan Parties and each Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.17**    *Intellectual Property; Licenses, Etc*.  The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are material to and reasonably necessary for the operation of their respective businesses, without, to the best knowledge of the Loan Parties, conflict with the rights of any other Person.  To the best knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary and material to it (or reasonably expected to be material to it, if now contemplated to be employed) infringes upon any rights held by any other Person.  Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18**    *Labor Matters*.  Except as could not reasonably be expected to have a Material Adverse Effect, (i) there are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened, (ii) the hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters in any material respect, and (iii) all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on

account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party or Subsidiary. Except as could not reasonably be expected to have a Material Adverse Effect, (i) there are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition, (ii) no Loan Party or any of its Subsidiaries has violated or breached any obligation under the Worker Adjustment and Retraining Act or similar state law, and (iii) there are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19**     *Security Documents.*

(a)     Subject to the entry of the Orders, the Security Agreement creates in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and to the extent not previously delivered to the Prepetition ABL Agent or the Prepetition Term Loan Agent, the Pledged Securities (as defined in the Security Agreement ) have been delivered to the Agent (together with stock powers or other appropriate instruments of transfer executed in blank form). Subject to the entry of the Orders, the Agent has a fully perfected Lien on, and security interest in, to and under all right, title and interest of each pledgor thereunder in the Pledged Securities, and such security interest has the priority set forth in the Orders (including the Intercreditor Arrangements).

(b)     [reserved].

(c)     The Loan Parties have delivered to the Prepetition Term Loan Agent or the Prepetition ABL Agent, as applicable, all possessory collateral required to be delivered by the Security Agreement and the Prepetition Term Loan Agent or the Prepetition ABL Agent, as applicable,  has obtained "control" (as defined in the UCC) over all of the Blocked Accounts. The Agent has a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected under the UCC (in effect on the date this representation is made) by filing, recording or registering a financing statement or by obtaining control or possession, in each case prior and superior in right to any other Person to the extent required by the Intercreditor Arrangements and subject to Permitted Encumbrances having priority under applicable Law, the Orders and/or the terms of the Intercreditor Arrangements.

(d)     Subject to the entry of the Orders, the Security Agreement (or the short form thereof) filed in the United States Patent and Trademark Office and the United States Copyright Office and the filed financing statements described on Schedule 5.19 are in appropriate form and create a perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each

case prior and superior in right to any other Person to the extent permitted by the Intercreditor Arrangements and as described in the Orders (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

(e)     Subject to the entry of the Orders, the Agent, for the benefit of the Credit Parties, will have, upon entry of the Interim Order, a legal, valid, continuing and enforceable Lien in the Mortgaged Property (as defined in the Mortgages), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. Subject to the entry of the Orders, upon entry of the Interim Order, the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Mortgaged Property prior and superior in right to any other Person, subject to Permitted Encumbrances having priority under applicable Law, the Orders and/or the terms of the Intercreditor Arrangements.

**5.20**     *[Reserved].*

**5.21**     *Deposit Accounts; Credit Card Arrangements.*

(a)     Annexed hereto as Schedule 5.21(a) is a list of all DDAs (including Blocked Accounts and the master concentration account indentified thereon (the "Master Concentration Account") maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.

(b)     Annexed hereto as Schedule 5.21(b) is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22**     *Brokers.* No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23**     *[Reserved].*

**5.24**     *Material Contracts.* Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date. The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Closing Date. The Loan Parties are not in breach or in default in any material respect of or under the C&S Contract or any APA.

**5.25**     *[Reserved].*

**5.26**     *Notices from Farm Products Sellers, etc.*

(a)     Each Loan Party has not, within the one (1) year period prior to the Closing Date, received any written notice pursuant to the applicable provisions of the PSA, PACA, the Food Security Act, the UCC or any other applicable local laws from (i) any Farm Products Seller or (ii) any lender to any Farm Products Seller or any other Person with a security interest in the assets of any Farm Products

Seller or (iii) the Secretary of State (or equivalent official) or other Governmental Authority of any State, Commonwealth or political subdivision thereof in which any Farm Products purchased by such Loan Party are produced, in any case advising or notifying such Loan Party of the intention of such Farm Products Seller or other Person to preserve the benefits of any trust applicable to any assets of the Borrower established in favor of such Farm Products Seller or other Person under the provisions of any law or claiming a Lien upon or other claim or encumbrance with respect to any perishable agricultural commodity or any other Farm Products which may be or have been purchased by a Loan Party or any related or other assets of such Loan Party (all of the foregoing, together with any such notices as any Loan Party may at any time hereafter receive, collectively, the "Food Security Act Notices").

(b)     No Loan Party is a "live poultry dealer" (as such term is defined in the PSA) or otherwise purchases or deals in live poultry of any type whatsoever.  The Loan Parties do not purchase livestock pursuant to cash sales as such term is defined in the PSA. Each Loan Party is not engaged in, and shall not engage in, raising, cultivating, propagating, fattening, grazing or any other farming, livestock or aquacultural operations.

**5.27**     *HIPAA Compliance.*

(a)     To the extent that and for so long as any Loan Party is a "covered entity" within the meaning of HIPAA, such Loan Party (i) has undertaken or will promptly undertake all appropriate surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of its business and operations required by HIPAA; (ii)  has developed or will promptly develop an appropriate plan and time line for becoming HIPAA Compliant (a "<u>HIPAA Compliance Plan</u>"); and (iii) has implemented or will implement those provisions of such HIPAA Compliance Plan in all material respects necessary to ensure that such Loan Party is or becomes HIPAA Compliant.

(b)     For purposes hereof, "<u>HIPAA Compliant</u>" shall mean that a Loan Party to the extent legally required (i) is or will use commercially reasonable efforts be in compliance in all material respects with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "HIPAA Compliance Date") and (ii) is not and would not reasonably be expected to become, as of any date following any such HIPAA Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that has had or would reasonably be expected to have a Material Adverse Effect.

(c)     Each Loan Party has entered into a business associate agreement with any third party acting on behalf of the Loan Party as a business associate as defined in 45 C.F.R. §160.103, where the failure to enter into such a business associate agreement has had or would reasonably be expected to have a Material Adverse Effect.

**5.28**     *Foreign Assets Control Regulations, Anti-Money Laundering and Counter-Terrorism.* No Loan Party or its Subsidiaries, nor to the knowledge of Borrower, any director, officer, agent, employee or Affiliate of any Loan Party or Subsidiary is currently subject to any U.S. sanctions administered by OFAC; and Loan Parties will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person for the purpose of financing the activities of any Person currently subject to any U.S. sanctions laws administered and enforced by OFAC.

**5.29**  *Foreign Corrupt Practices*.  To the extent applicable, each Loan Party and its respective Subsidiaries is in compliance, with the (a) Trading With the Enemy Act, and the Foreign Assets Control Regulations, and (b) PATRIOT Act.  No part of the proceeds of the Loans will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity for or on behalf of a foreign government, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.30**  *Compliance with Health Care Laws*.  Without limiting the generality of Sections 5.16 or 5.28, or any other representation or warranty made herein or in any of the other Loan Documents:

      (a)  Each Loan Party is in compliance in all material respects with all applicable Health Care Laws, including all Medicare and Medicaid program rules and regulations applicable to them.  Without limiting the generality of the foregoing, no Loan Party has received notice by a Governmental Authority of any violation of any provisions of the Medicare and Medicaid Anti-Fraud and Abuse or Anti-Kickback Amendments of the Social Security Act (presently codified in Section 1128(B)(b) of the Social Security Act) or the Medicare and Medicaid Patient and Program Protection Act of 1987.

      (b)  Each Loan Party has maintained in all material respects all records required to be maintained by the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy, the Federal and State Medicare and Medicaid programs and as otherwise required by applicable Health Care Laws and each Loan Party has all necessary permits, licenses, franchises, certificates and other approvals or authorizations of Governmental Authority as are required under applicable Health Care Laws.

      (c)  Each Loan Party and each Subsidiary who is a Certified Medicare Provider or Certified Medicaid Provider has in a timely manner filed all requisite cost reports, claims and other reports required to be filed in connection with all Medicare and Medicaid programs due on or before the date hereof, all of which are complete and correct in all material respects.  There are no known claims, actions or appeals pending before any Third Party Payor or Governmental Authority, including any Fiscal Intermediary, the Provider Reimbursement Review Board or the Administrator of the Centers for Medicare and Medicaid Services, with respect to any Medicare or Medicaid cost reports or claims filed by any Loan Party or Subsidiary on or before the date hereof.  There currently exist no restrictions, deficiencies, required plans of correction actions or other such remedial measures with respect to Federal and State Medicare and Medicaid certifications or licensure.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each Subsidiary to:

**6.01**  *Financial Statements*.  Deliver to the Agent, in form and detail satisfactory to the Agent:

      (a)  [reserved];

(b)　as soon as available, but in any event within 45 days after the end of each Fiscal Quarter of each Fiscal Year of the Parent (commencing with the Fiscal Quarter ended June 20, 2015), a Consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Quarter and for the portion of the Parent's Fiscal Year then ended, all in reasonable detail, such Consolidated statements to be certified by a Responsible Officer of the Borrower as fairly presenting the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)　as soon as available, but in any event within thirty (30) days after the end of each of the Fiscal Periods (other than with respect to such dates that are also the end of a Fiscal Quarter, in which case, within forty-five (45) days after the end of such Fiscal Period) of each Fiscal Year of the Parent (commencing with the Fiscal Period ended June 20, 2015), a consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Period, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Period, and for the portion of the Parent's Fiscal Year then ended, all in reasonable detail, such consolidated statements to be certified by a Responsible Officer of the Borrower as fairly presenting the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Subsidiaries as of the end of such Fiscal Period in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

**6.02**　*Certificates; Other Information*.　Deliver to the Agent, in form and detail satisfactory to the Agent:

(a)　no later than 5:00 p.m. on Friday of each calendar week (or the next Business Day, if such date is not a Business Day), an updated 13-Week Projection (with the first such delivery thereof on July 24, 2015) and a Variance Report (with the first such delivery thereof on August 7, 2015);

(b)　concurrently with the delivery of the financial statements (i) referred to in Sections 6.01(b) and (c), commencing with the Fiscal Period ending June 20, 2015, a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower and (ii) referred to in Section 6.01(b), a copy of management's discussion and analysis with respect to such financial statements;

(c)　weekly status updates to the Agent as to the sale process, in form and detail reasonably satisfactory to the Agent;

(d)　promptly upon receipt, copies of any "final" detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them;

(e)　promptly after the same are available, copies of (i) each annual report, proxy or financial statement or other report or material communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto, and (ii) all notices, requests and other documents received under or pursuant to any Existing Debt Document;

(f)　[reserved];

(g)     promptly after the furnishing thereof, copies of any statement or report furnished to any holder of Material Indebtedness of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(h)     promptly after Agent's reasonable request therefore a list of any "business associate agreement" (as such term is defined in HIPAA) that any Loan Party is a party to or bound by that is accurate in all material respects as of the date set forth therein and a copy of any standard form of such agreement used by any Loan Party.

(i)     as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

(j)     promptly after the Agent's reasonable request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness; and

(k)     promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(b) or (c) or Section 6.02(d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); provided that: (i) the Borrower shall deliver paper copies of such documents to the Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (ii) the Borrower shall notify the Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Agent. The Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

**6.03**     *Notices*. Promptly notify the Agent:

(a)     of the occurrence of any Default or Event of Default;

(b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)     of any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness by any Loan Party or any Subsidiary thereof;

(d)     of any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any

material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws, in each such case which could reasonably be expected to have a Material Adverse Effect;

        (e)     of the occurrence of any ERISA Event;

        (f)     of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

        (g)     of any change in any Loan Party's senior executive officers;

        (h)     of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

        (i)     of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

        (j)     of the filing of any Lien for unpaid Taxes against any Loan Party in excess of $250,000;

        (k)     of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

        (l)     the receipt of any notice from a supplier, seller, or agent pursuant to either PACA or PASA;

        (m)     of any transaction of the nature contained in <u>Article VII</u> hereof occurring after the Closing Date, consisting of: <u>(i)</u> the entry by a Loan Party into a Material Contract, <u>(ii)</u> [reserved], <u>(iii)</u> the voluntary or involuntary grant of any Lien other than a Permitted Encumbrance upon any property of a Loan Party; or <u>(iv)</u> the making of any Permitted Investments by a Loan Party in excess of $500,000 (other than in another Loan Party); and <u>(v)</u> mergers permitted under <u>Section 7.04</u>;

        (n)     the filing or commencement of any material action, suit or proceeding with respect to any Material Lease;

        (o)     the receipt by any Loan Party of any written notice from any lessor of such lessor's intention to terminate any Material Lease, together with a copy of all such written notices of intended termination from the lessors thereunder;

        (p)     the amendment, or any other modification of the C&S Contract or the entry into or of any supply contract constituting a Material Contract to which a Loan Party is or becomes a party, to the extent not previously noticed to the Agent pursuant to clause (m)(i) above;

        (q)     any material amendment or any modification of the Coinstar Installation Agreement;

        (r)     the entry into or material modification of any collective bargaining agreement to which a Loan Party is or becomes a party;

(s)     the entry into or any material modification of any APA or other document for the disposition of real or personal property of any Loan Party with respect to assets having a fair market value or consideration in excess of $25,000,000;

(t)     of any failure by any Loan Party to pay rent or such other amounts due at (i) any Distribution Centers or warehouses; (ii) any of the lease locations identified on Schedule 6.03, (iii) at any ten (10) store locations or (iv) any of a Loan Party's other locations, if such failure continues beyond the day on which such rent first came due and such failure would be reasonably likely to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

6.04     *Payment of Obligations.*  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d) no Lien has been filed with respect thereto and (e) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

6.05     *Preservation of Existence, Etc.*

(a)     Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property (i) is no longer used or useful in the conduct of the business of the Loan Parties or (ii) is not otherwise material to the business of any Loan Party or any of its Subsidiaries in any respect.

6.06     *Maintenance of Properties.*  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.07     *Maintenance of Insurance.*

(a)     Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent not Affiliates of the Loan Parties, insurance with respect to its properties and

business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards) as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent.

(b)     Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)     Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)     Cause business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, the Agent or any other party shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(e)     Cause each such policy referred to in this <u>Section 6.07</u> to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(f)     Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence satisfactory to the Agent of payment of the premium therefor.

(g)     [Reserved].

(h)     Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(i)     Permit any representatives that are designated by the Agent to inspect during normal business hours on reasonable prior notice the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

(j)     Deliver to the Agent, upon the Agent's reasonable request therefor, (i) copies and updated certificates of insurance for the insurance policies required by this <u>Section 6.07</u> and the

72

applicable provisions of the Security Documents, and (ii) duplicate originals or certified copies of all such policies covering any Collateral.

(k)     If at any time the area in which any Real Estate subject to a Mortgage is located is designated (i) a "special flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount (after giving effect to any self-insurance compatible with the following standards) as is customarily carried under similar circumstances by Persons engaged in the same or similar business and operating in the same or similar locations, and as is otherwise required by applicable Law and as is reasonably acceptable to Agent, and otherwise comply with the federal Flood Program, or (ii) obtain earthquake insurance in such total amount as is customarily carried under similar circumstances by Persons engaged in the same or similar business and operating in the same or similar locations, and as is otherwise required by applicable Law, and as is reasonably acceptable to the Agent.

(l)     [Reserved].

(m)     (i) Notify the Agent promptly whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 6.07 is taken out by any Loan Party, and (ii) deliver to the Agent a certificate of insurance for such policy or policies within thirty (30) days of such policy or policies (or, at the reasonable request of the Agent, duplicate originals thereof) being taken out by any Loan Party.

None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08**     *Compliance with Laws*.  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP, (ii) such contest effectively suspends enforcement of the contested Laws, and (iii) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09**     *Books and Records; Accountants*.

(a)     Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

73

(b)      at all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Agent and shall instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be reasonably raised by the Agent.

**6.10**     *Inspection Rights.*  Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the Loan Parties' business plan, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that when a Default or Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

**6.11**     *Use of Proceeds*.  Use the proceeds of the Loans (a) to finance the acquisition of working capital assets of the Loan Parties, including the purchase of Inventory and Equipment, in each case in the ordinary course of business, (b) to finance capital expenditures of the Loan Parties, and (c) for general corporate purposes of the Loan Parties, in each case in compliance with the Budget and the Orders and to the extent not prohibited under applicable Law and the Loan Documents.

**6.12**     *Additional Loan Parties*.  Notify the Agent at the time that any Person (x) becomes a Subsidiary or (y) who is an Excluded Subsidiary becomes a Subsidiary that is no longer an Excluded Subsidiary, and in each case promptly thereafter (and in any event within fifteen (15) Business Days or such longer period as may be agreed to by the Agent in its Permitted Discretion), (a) cause any such Person which is not an Excluded Subsidiary, to (i) become a Loan Party by executing and delivering to the Agent a Joinder to the Facility Guaranty or such other documents as the Agent shall deem reasonably appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral under the Security Documents to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, pledge such Equity Interests and promissory notes evidencing such Indebtedness, in each case in form, content and scope reasonably satisfactory to the Agent.  In no event shall compliance with this Section 6.12 waive or be deemed a waiver of or Consent to any transaction giving rise to the need to comply with this Section 6.12 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Guarantor.

**6.13**     *Milestones*.  Achieve each of the following milestones (as the same may be extended from time to time with the consent of the Agent; the "Milestones"):

(a)      On or before the date that is 10 days after the Petition Date, the Debtors shall have filed a motion to reject the Triple Negative Leases and shall have obtained entry of an order authorizing such rejection and shall have vacated the premises of each of the Triple Negative Leases within the 60 days of the Petition Date;

(b)      On or before the date that is 20 days after the Petition Date, the Debtors shall have filed a motion (the "Sale Motion") seeking entry of an order (the "Bidding Procedures Order")

74

approving bidding and auction procedures in connection with a sale of Debtors' Stores and other Real Estate and personal property having a minimum value of $275,000,000 (excluding Inventory and prescriptions), pursuant to Section 363 of the Bankruptcy Code, which Bidding Procedures Order and which Sale Motion (including all deadlines contained therein) shall each be reasonably satisfactory to the Agent (the "363 Sale");

(c)     On or before the date that is 30 days after the Petition Date, the Bankruptcy Court shall have issued an order authorizing the retention of consultants satisfactory of the Agent to sell Inventory at the Debtors' Stores subject to Triple Negative Leases;

(d)     On or before the date that is 30 days after the Petition Date, the Debtors shall have reached agreements with representatives of their collective bargaining units for relief from collective bargaining agreements, including the collective bargaining agreements applicable to the Triple Negative Leases and any other Stores as they are closed, to implement Store closing programs (which shall be reviewed with and reasonably satisfactory to the Agent), including relief from "bumping" and other provisions that may be necessary to implement the same, or to the extent that the Debtors have not reached such an agreement by such time, the Debtors shall have filed a motion for temporary relief from the Bankruptcy Court pursuant to section 1113(e) of the Bankruptcy Code and shall have obtained entry of an order authorizing such relief within 45 days of the Petition Date;

(e)     On or before the date that is 45 days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order which shall be in form and substance reasonably acceptable to the Agent;

(f)     On or before the date that is 60 days after the Petition Date, the Bankruptcy Court shall have entered an order approving procedures for the wind down or sale of the Debtors' remaining Stores not to be sold pursuant to the Tier I Auction (as defined below); and

(g)     On or before the date that is 75 days after the Petition Date, the Debtors shall have filed a motion seeking an order (the "Lease Extension Order") of the Bankruptcy Court extending the time period of the Debtors to assume or reject leases to a date that is not less than 210 days from the Petition Date;

(h)     On or before the date that is 120 days after the Petition Date, the Bankruptcy Court shall have entered the Lease Extension Order;

(i)     On or before October 15, 2015, the Bankruptcy Court shall have entered an order approving the 363 Sale, with respect to the results of an auction for a value of at least $275,000,000 (the "Tier I Auction") in connection with such 363 Sale, which order shall be in form and substance reasonably acceptable to the Agent;

(j)     The Debtors shall have consummated one or more 363 Sales, pursuant to a purchase agreement entered into among the Debtors and the winning bidder(s) at the Tier I Auction, such that (i) on or before December 31, 2015, the assets described in that certain Asset Purchase Agreement, dated as of the Petition Date, by and among the Borrower, certain Subsidiaries of the Borrower party thereto and Acme Markets, Inc. have been sold pursuant to and in accordance with the terms of thereof, (ii) on or before November 15, 2015, the assets described in that certain Asset Purchase Agreement, dated as of the Petition Date, by and among the Borrower, certain Subsidiaries of the Borrower party thereto and The Stop & Shop Supermarket Company, LLC have been sold pursuant to and in accordance with the terms of thereof; and (iii) on or before October 30, 2015, all assets sold in 363 Sales as part of the Tier I Auction process other than those described in clauses (j)(i) and (j)(ii) above shall have been sold;

75

provided that respect to sales of the assets described in this clause (iii), the Agent and the Debtors agree to negotiate in good faith with respect to any extensions of such October 30 deadline which are reasonably requested by the Debtors.

(k)        On or prior to the date of the entry of any sale order with respect to the sale of any Store, the Debtors shall have either (i) reached agreements in good faith with representatives of their collective bargaining units for relief from collective bargaining agreements applicable to personnel of such Store, or (ii) obtained entry of an order by the Bankruptcy Court authorizing relief from the Bankruptcy Court pursuant to section 1113 of the Bankruptcy Code.

**6.14** *Information Regarding the Collateral*.  Furnish to the Agent at least fifteen (15) days (or such shorter period as the Agent may agree) prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility, but excluding in-transit Collateral); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.  Except as otherwise agreed by the Agent, the Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

**6.15** *Cash Management*.

(a)        Establish and maintain a deposit account with a depositary bank reasonably acceptable to the Agent, subject to a deposit account control agreement in form and substance acceptable to the Agent, for the receipt and collection of Net Proceeds received by a Loan Party from any Person or from any source in respect of any Disposition of Additional Collateral (the "Additional Collateral Account").  From the time of receipt of any Net Proceeds until such Net Proceeds are required to be applied to prepayment in accordance with Section 2.07(a) (or are not so applied by reason of Section 2.07(a)(v), such Net Proceeds shall be held in such account.  Thereafter, until any amounts standing to the credit of the Additional Collateral Account are applied in accordance with the Budget, the Loan Parties shall hold such amounts in trust for the Agent and Lenders and such amounts shall not be commingled with any of such Loan Party's other funds or deposited in any other account of such Loan Party.  The Loan Parties acknowledge and agree that the funds on deposit in the Additional Collateral Account shall at all times be collateral security for the Obligations and shall be applied to the Obligations in accordance with the terms hereof.

(b)        Immediately upon delivery of a Carve Out Notice, transfer from the Master Concentration Account to the Carve Out Account an amount equal to the Carve Out Cap plus an amount equal to the aggregate unpaid fees, costs and expenses described in clauses (iii) and (iv) of the definition of "Carve Out," in each case as determined by a good faith estimate of the applicable Professional Person (as defined in the applicable Order).  The proceeds on deposit in the Carve Out Account shall be available only to satisfy obligations benefitting from the Carve Out, and the Agent (a) shall not sweep or foreclose on Cash and Cash Equivalents of the Debtors necessary to fund the Carve Out Account and (b) shall have a security interest, for the benefit of the Lenders, in any residual interest in the Carve Out Account available following satisfaction in full of all obligations benefitting from the Carve Out.

**6.16** *Environmental Laws*.  Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all material environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws in all material respects pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.17** *Further Assurances*.

(a) Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the Orders or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence reasonably satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents and by the Orders.

(b) If any material assets of the type constituting Collateral (with respect to Leases or other Real Estate of Loan Parties, "material" shall mean Leases or other Real Estate having an appraised value in excess of $1,000,000) are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents or the Orders that become subject to the perfected Lien under the Security Documents subject to the Intercreditor Arrangements upon acquisition thereof or other than assets with respect to which encumbrancing is prohibited by the terms of the Lease or the Loan Parties are not able to obtain consent from the applicable lessor after the use of commercially reasonable efforts), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.17(b) waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.17(b) if such transaction was not otherwise prohibited by this Agreement or the other Loan Documents.

(c) Use, and cause each of the Subsidiaries to use, their commercially reasonable efforts to obtain lease terms in any Lease entered into by any Loan Party after the Closing Date not expressly prohibiting the recording in the relevant real estate filing office of an appropriate memorandum of lease and the encumbrancing of the leasehold interest of such Loan Party in the property that is the subject of such Lease.

(d) Upon the reasonable request of the Agent, use commercially reasonable efforts to cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

(e)     Upon the reasonable request of the Agent, use commercially reasonable efforts to cause any of its landlords to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

(f)     Upon the indefeasible repayment in full in cash of (i) the obligations in respect of the Prepetition ABL Facility and (ii) the obligations in respect of the Prepetition Term Loan Facility, and at all times thereafter, the applicable Loan Parties shall take any actions as may be required under applicable Law, or which the Agent may reasonably request, to transfer all Collateral in the possession of the Prepetition ABL Agent or the Prepetition Term Loan Agent to the Agent and to execute and deliver to the Agent all such documents or items necessary, including without limitation, Blocked Account Agreements, to grant in favor of the Agent for the benefit of the Lenders, perfect, or continue the perfection or validity of, a first priority perfected Lien (subject to Permitted Liens) on the Collateral, all at the expense of the Loan Parties.

**6.18**     *Compliance with Terms of Material Leases.*  With respect to Material Leases, except for Permitted Dispositions and except as otherwise excused by the Bankruptcy Court, each Loan Party shall (a) make all payments and otherwise perform all material obligations in respect of each such Lease, (b) keep each such Lease in full force and effect, (c) not allow any such Lease to lapse or be terminated prior to its scheduled termination date (as in effect on the Closing Date) or any rights to renew any such Lease to be forfeited or cancelled, (d) notify the Agent of any default by any party with respect to any such Lease and cooperate with the Agent in all respects to cure any such default, and (e) cause each of its Subsidiaries to do the foregoing; provided, that, Loan Parties' and their Subsidiaries' failure to comply with any of the covenants set forth in clauses (a), (b), (d), and (e) above with respect to no more than eight (8) Material Leases at any time (so long as the aggregate appraised value of such Material Leases is equal to or less than $40,000,000), shall not be deemed an Event of Default hereunder.

**6.19**     *Material Contracts.*  Except as otherwise excused by the Bankruptcy Court, (a) perform and observe in all material respects all the terms and provisions (i) of each APA to be performed or observed by it, and (ii) of each Material Contract to be performed or observed by it, unless the failure to do perform such Material Contract could not reasonably be expected to have a Material Adverse Effect, (b) maintain each APA in full force and effect and maintain each Material Contract in full force and effect unless, in the case of Material Contracts only, determined by Board of Directors that termination of such Material Contract would not have Material Adverse Effect, provided, that, in any event with respect to the C&S Agreement, if a determination is made that such C&S Contract is to be terminated, Agent shall be notified at least sixty (60) days prior thereto, and Agent shall be reasonably satisfied that acceptable arrangements (which may include arrangements provided internally by the Loan Parties and their Subsidiaries) shall be in place upon the effective date of the termination of such C&S Contract to replace the services provided to the Loan Parties pursuant to such C&S Contract upon the termination of such C&S Contract, (c) use commercially reasonable efforts to enforce each APA and each Material Contract in accordance with its terms, (d) upon the occurrence and during the continuance of an Event of Default, at the request of the Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (e) cause each of its Subsidiaries to do the foregoing.

**6.20**     *[Reserved].*

**6.21**     *ERISA.*  Each Loan Party shall, and shall cause each of its ERISA Affiliates to: (i) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal and State law; (ii) cause each Plan which is qualified under Section 401(a) of the Code to maintain such qualification; (iii) not terminate any Pension Plan so as to incur any material liability to the Pension Benefit Guaranty Corporation; (iv) not allow or suffer to exist any prohibited

transaction involving any Plan or any trust created thereunder which would subject such Borrower, Guarantor or such ERISA Affiliate to a material tax or other liability on prohibited transactions imposed under Section 4975 of the Code or ERISA; (v) make all required contributions to any Plan which it is obligated to pay under Sections 302 or 303 of ERISA, Sections 412 or 430 of the Code, or the terms of such Plan; (vi) not allow or suffer to exist any violation of the "minimum funding standards" (within the meaning of Section 302 of ERISA and Section 412 of the Code), whether or not waived, with respect to any such Pension Plan; (vii) not engage in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; or (viii) not allow or suffer to exist any occurrence of a Reportable Event or any other event or condition which presents a material risk of termination by the PBGC of any Plan that is a single employer plan, which termination could result in any material liability to the PBGC.

**6.22** *Agricultural Products.*

(a) The Borrower shall at all times comply in all material respects with all existing and future Food Security Act Notices during their periods of effectiveness under the Food Security Act, including, without limitation, directions to make payments to the Farm Products Seller by issuing payment instruments directly to the secured party with respect to any assets of the Farm Products Seller or jointly payable to the Farm Products Seller and any secured party with respect to the assets of such Farm Products Seller, as specified in the Food Security Act Notice, so as to terminate or release the security interest in any Farm Products maintained by such Farm Products Seller or any secured party with respect to the assets of such Farm Products Seller under the Food Security Act.

(b) The Borrower shall take all other actions as may be reasonably required, if any, to ensure that any perishable agricultural commodity (in whatever form) or other Farm Products are purchased free and clear of any Lien or other claims in favor of any Farm Products Seller or any secured party with respect to the assets of any Farm Products Seller.

(c) The Borrower shall promptly notify Agent in writing after receipt by or on behalf of such Borrower of any Food Security Act Notice or amendment to a previous Food Security Act Notice, and including any notice from any Farm Products Seller of the intention of such Farm Products Seller to preserve the benefits of any trust applicable to any assets of any Loan Party under the provisions of the PSA, PACA or any other statute and upon the request of the Agent, such Borrower shall promptly provide Agent with a true, correct and complete copy of such Food Security Act Notice or amendment, as the case may be, and other information delivered to or on behalf of such Borrower pursuant to the Food Security Act.

(d) To the extent that the Borrower purchases any Farm Products from a Person who produces such Farm Products in a state with a central filing system certified by the United States Secretary of Agriculture, such Borrower shall immediately register, as a buyer, with the Secretary of State of such state (or the designated system operator). The Borrower shall forward promptly to Agent a copy of such registration as well as a copy of all relevant portions of the master list periodically distributed by any such Secretary of State (or the designated system operator). The Borrower shall comply with any payment of obligations in connection with the purchase of any Farm Products imposed by a secured party as a condition of the waiver or release of a security interest effective under the Food Security Act or other applicable law whether or not as a result of direct notice or the filing under any applicable central filing system. The Borrower shall also provide to Agent from time to time upon its request true and correct copies of all state filings recorded in any such central filing system in respect of a Person from whom the Borrower has purchased Farm Products within the preceding twelve (12) months.

**6.23** *First Day Orders.* Cause all proposed "first day" orders submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

**6.24**    *Post-Closing Obligations.*  Perform the obligations set forth on Schedule 6.24, as and when set forth therein.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01**    *Liens.*  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income other than, as to all of the above, Permitted Encumbrances, and in the case of the assignment or transfer of accounts or other rights to receive payment, except for Permitted Dispositions.

**7.02**    *Investments.*  Make any Investments, except Permitted Investments.

**7.03**    *Indebtedness; Disqualified Stock.*  (a)  Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; or (b) issue Disqualified Stock.

**7.04**    *Fundamental Changes.*

(a)    Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except (x) as contemplated by the APAs and (y) subject in all respects to the approval of the Bankruptcy Court, so long as no Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(i)    any Subsidiary which is not a Loan Party may merge with (i) a Loan Party, provided that the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties, provided that when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person; and

(ii)    any Subsidiary which is a Loan Party may merge into any Subsidiary which is a Loan Party or into the Borrower, provided that in any merger involving the Borrower, the Borrower shall be the continuing or surviving Person;

(b)    permit the Parent to engage in any material operating or business activities or have any material assets or material liabilities other than (i) its ownership of the Equity Interests of (and other investments in) the Borrower and the Scripts Subsidiary and activities incidental or reasonably related thereto, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to its Organization Documents, the Loan Documents, the Prepetition ABL Loan Documents, the Prepetition Term Loan Documents, the PIK Toggle Notes SPA Documents, the Convertible Notes SPA Documents and other Indebtedness, and any other documents executed in connection therewith, (iv) any public

offering of its common stock or any other issuance or sale of its Equity Interests (and activities related to an entity being public) or making of any Restricted Payments or Investments permitted hereunder, (v) financing activities permitted hereunder, including the issuance of securities, incurrence of debt, payment of dividends, making contributions to the capital of the Borrower and its Subsidiaries guaranteeing the obligations of the Borrower and its Subsidiaries, (vi) participating in tax, accounting and other administrative matters as a member of the consolidated group of the Parent and the Borrower or incurring liabilities under Title IV of ERISA as an ERISA Affiliate (solely as a result of being an ERISA Affiliate and not as a result of the Parent's acting as a "plan sponsor" of a Plan or an "employer" with respect to a Multiemployer Plan), (vii) holding any cash or property (but not operating any property), (viii) providing indemnification to officers, managers and directors, (ix) [reserved], and (x) any activities incidental or reasonably related to the foregoing;

(c)     permit Leasehold SPV to engage in any material operating or business activities or have any material assets or material liabilities other than (i) its ownership of Leases and activities (including intercompany transactions) incidental or reasonably related thereto, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the execution, delivery and performance of its obligations with respect to the Leases (and related documents and agreements), the Loan Documents, the Prepetition ABL Loan Documents, the Prepetition Term Loan Documents, the PIK Toggle Notes SPA Documents and the Convertible Notes SPA Documents and any other documents executed in connection therewith, (iv) participating in tax, accounting and other administrative matters as a member of the consolidated group of the Parent and the Borrower or incurring liabilities under Title IV of ERISA as an ERISA Affiliate (solely as a result of being an ERISA Affiliate and not as a result of the Leasehold SPV's acting as a "plan sponsor" of a Plan or an "employer" with respect to a Multiemployer Plan), (v) holding any cash or property (but not operating any property), (vi) providing indemnification to its officers, managers and directors and (vii) any activities incidental or reasonably related to the foregoing; and

(d)     permit Scripts Subsidiary to hold any Lease other than the Specified Pharmacy Leases.

**7.05**     *Dispositions*.  Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06**     *Restricted Payments*.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom:

(a)     each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party (other than to the Parent);

(b)     Loan Parties and their Subsidiaries may make Restricted Payments permitted by Sections 7.02, 7.04 or 7.09;

(c)     the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other Equity Interests (other than Disqualified Stock) of such Person;

(d)     [reserved];

(e)     [reserved];

NAI-1500433654v9

(f)     any Loan Party may repurchase Equity Interests (A) constituting fractional shares or (B) deemed to occur upon exercise of stock options or warrants or other securities convertible or exchangeable into Equity Interests if such Equity Interests represent all or a portion of the exercise price of such options or warrants; and

(g)     any Subsidiary which is not a Loan Party may make Restricted Payments on a pro rata basis to all holders of its Equity Interests.

**7.07**     *Prepayments of Indebtedness and Payments of Certain Indebtedness.*  Except in respect of the Obligations as provided for herein, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in respect of any violation of any subordination terms of, any Indebtedness of any Loan Party except as contemplated by the Orders.

**7.08**     *Change in Nature of Business.*  In the case of each of the Loan Parties (other than the Parent), engage in any material line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business reasonably related, complementary, ancillary or incidental thereto.

**7.09**     *Transactions with Affiliates.*  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties as would be obtainable by the Loan Parties at the time in a comparable arm's length transaction with a Person other than an Affiliate, <u>provided</u> that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) transactions described on <u>Schedule 7.09</u> hereto, (c) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees to the extent permitted under this Agreement, (d) [reserved], (e) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers, managers or employees of the Parent (or direct or indirect parent of the Parent) or any of its Subsidiaries, (f) [reserved], (g) Restricted Payments and other transactions permitted under <u>Sections 7.02</u>, <u>7.04</u>, <u>7.05</u>, <u>7.06</u> and <u>7.07</u>, (h) employment and severance arrangements between the Parent and its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business, (i) [reserved], and (j) transactions required or expressly contemplated by the Yucaipa Management Services Agreement (as in effect on the Closing Date) except as prohibited by this Agreement.

**7.10**     *Burdensome Agreements.*  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; <u>provided</u>, <u>however</u>, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person; <u>provided</u> that the foregoing clauses (a) and (b) shall not apply to (i) restrictions and conditions imposed by law or by any Prepetition ABL Loan Documents, Prepetition Term Loan Documents, PIK Toggle Notes SPA Document or Convertible Notes SPA Document (as in effect on the date hereof), (ii) customary provisions included in licenses, contracts, leases, agreements and other instruments restricting assignment and/or encumbrance, (iii) customary restrictions and conditions

contained in agreements relating to the sale of a Subsidiary or other assets pending such sale, provided such restrictions and conditions apply only to the Subsidiary or other assets that is to be sold (or to earnest money deposits in connection with such sale) and such sale is permitted hereunder, (iv) in the case of clause (a) above, restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (v) [reserved], (vi) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted hereunder, (vii) customary provisions restricting subletting, assignment or transfer of any Lease governing a leasehold interest of the Parent or any Subsidiary (subject to Section 6.17(c), other than in Material Leases), (viii) restrictions arising in connection with cash or other deposits permitted hereunder and limited to such cash or deposit, and (ix) restrictions in documents governing any Permitted Indebtedness existing on the date hereof, and (x) any amendments, modifications, restatements or renewals of the agreements, contracts or instruments referred to in clauses (i) through (ix) above, provided that such amendments, modifications, restatements, or renewals, taken as a whole, are not materially more restrictive with respect to such encumbrances or restrictions than those contained in such predecessor agreements, contracts or instruments.

**7.11**   *Use of Proceeds*.  Use the proceeds of any Loans, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those permitted under this Agreement.

**7.12**   *Amendment of Material Documents*.

(a)   Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner materially adverse to the Credit Parties, (b) any APA in a manner materially adverse to the Credit Parties, or (c) any Material Contract or Material Indebtedness, in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect, provided, that, the foregoing restrictions shall not apply to the Prepetition ABL Loan Documents, Prepetition Term Loan Documents, the PIK Toggle Note Documents, and the Convertible Note Documents, which may be amended, modified or waived with the consent of the Agent not to be unreasonably withheld or delayed and otherwise in accordance with the Intercreditor Arrangements.

(b)   Amend, modify or change in any manner any "first day order" in any material respect without the prior consent of the Required Lenders or take any other action that would materially impair the value of the interest or rights of any Loan Party thereunder or that would materially impair the ability of the Lenders to be repaid hereunder.

**7.13**   *Fiscal Year*.  Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP; provided, that the Loan Parties may, upon written notice to Agent, change their Fiscal Year to any other fiscal year reasonably acceptable to the Agent, in which case the Borrower and the Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such changes.

**7.14**   *Deposit Accounts*.  Except as expressly contemplated by this Agreement and the Security Documents, open or maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors.

**7.15**   *Financial Covenants*.

(a)    Qualified Cash.  Permit the amount of Qualified Cash on Friday of any calendar week to be less than $20,000,000.

(b)    Budget Variance.  As of Saturday of any week, permit the actual amounts of disbursements of the Loan Parties for the three calendar week period then ended to exceed the amount of disbursements specified in the applicable Budget for such period by more than 15.00%, calculated for the avoidance of doubt to measure the cumulative variance for the period from commencing on the Sunday of the calendar week set forth in such applicable Budget and ending on the Saturday of the third calendar week thereafter.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01**    *Events of Default*.  Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Borrower or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan and any Make Whole Fee, or (ii) any interest on any Loan, or any fee due hereunder within five (5) days of its due date (other than any Make Whole Fee), or (iii) any other amount payable hereunder or under any other Loan Document within five (5) days of its due date; or

(b)    Specific Covenants.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.07, 6.10, 6.11, 6.12, 6.13, 6.14, 6.18, 6.23 or 6.24 or Article VII; or (ii) any Guarantor fails to perform or observe any term, covenant or agreement contained in Section 6 of the Facility Guaranty; or (iii) any of the Loan Parties fails to perform or observe any term, covenant or agreement of the Security Agreement with respect to Collateral having a value in excess of $3,000,000 either singly or in the aggregate, or Section 4.01(b) or 4.01(e) of the Mortgages to which it is a party; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of (i) the date such Loan Party obtains knowledge of a breach of any such covenant or agreement or (ii) the Borrower's receipt of notice from the Agent of any such breach; or

(d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    Cross-Default.  (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness (after giving effect to the expiration of any applicable grace periods), or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs (after giving effect to the expiration of any applicable grace periods), the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be

NAI-1500433654v9

made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the "defaulting party" (as defined in such Swap Contract) or (B) any Termination Event (as defined in such Swap Contract) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as defined in such Swap Contract) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $10,000,000; or

(f)     [Reserved]; or

(g)     Challenges. Any Loan Party shall challenge, support or encourage a challenge of any payments made to the Agent or any Lender with respect to the Obligations; or

(h)     Judgments.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $10,000,000 and such judgments or orders shall continue unsatisfied or unstayed for a period of forty-five (45) days (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of forty-five (45) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(i)     ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $10,000,000 or which has or would reasonably be expected to result in a Material Adverse Effect when taken together with all other such ERISA Events, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan, or any installment in connection with an unfunded Pension Plan, in either case, in an aggregate amount in excess of $10,000,000 or which would reasonably likely result in a Material Adverse Effect; or

(j)     Invalidity of Loan Documents.  (i)  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect (other than in accordance with its terms); or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document (other than as a result of the discharge of such Loan Party in accordance with the terms of the applicable Loan Document), or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral (other than as a result of Agent's negligence with respect to failure to maintain the filing of a financing statement or loss of possessory Collateral), with the priority required by the applicable Security Document; or

(k)     Change of Control.  There occurs any Change of Control; or

(l)     [reserved]; or

(m)     <u>Loss of Collateral</u>.  There occurs any uninsured loss (in excess of any applicable insurance deductible) to Collateral with an aggregate value in excess of $1,000,000; or

(n)     <u>Breach of Contractual Obligation</u>.  Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of the C&S Contract or fails to observe or perform any other agreement or condition relating to any such C&S Contract or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit C&S to terminate such C&S Contract; or

(o)     <u>Indictment</u>.  The indictment by Governmental Authority of any Loan Party or any Subsidiary thereof under any criminal statute, rule, regulation, order, or other requirement having the force of law for a felony; or

(p)     <u>Guaranty</u>.  The termination or attempted termination by a Loan Party or any Affiliate thereof of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document; or

(q)     <u>Subordination</u>.  (i)  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness, or provisions of any Intercreditor Arrangement, any such provisions being referred to as the "Intercreditor Provisions", shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Indebtedness; or (ii) the Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Intercreditor Provisions, (B) that the Intercreditor Provisions exist for the benefit of the Credit Parties, or (C) in the case of Subordinated Indebtedness, that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Intercreditor Provisions; or

(r)     <u>Interim Order</u>.  The Debtors shall fail to obtain entry of the Interim Order authorizing and approving the use of cash collateral and the DIP Term Loan Facility within five (5) business days following the Petition Date; or

(s)     <u>Dismissal or Conversion of Cases</u>.  (i) The Debtors shall file any motion seeking (x) dismissal of any of the Cases under Chapter 11 of the Bankruptcy Code or (y) to convert any of the Cases under Chapter 11 of the Bankruptcy Code to a case under Chapter 7 of the Bankruptcy Code, (ii) any of the Cases under Chapter 11 of the Bankruptcy Code shall be dismissed, (iii) any Case under Chapter 11 of the Bankruptcy Code shall be converted to a case under Chapter 7 of the Bankruptcy Code, or (iv) a trustee shall be appointed in any of the Cases under Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall be appointed in any of the Cases under Chapter 11 of the Bankruptcy Code; or

(t)     <u>Exclusivity Period</u>.  The termination of the exclusivity period for the Debtors to file a Reorganization Plan in the Cases under Chapter 11 of the Bankruptcy Code; or

(u)     <u>Competing Claims</u>.  Other than as contemplated by the Loan Documents, entry of an order granting any Lien or claim which is senior to or pari passu with the Lien and claims of the Agent for the benefit of the Lender under the DIP Term Loan Facility (other than the Carve Out) without the prior written consent of the Agent (or the filing of any motion by the Debtors seeking such relief); or

86

(v)     No Repayment of Obligations.  The entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a Reorganization Plan that does not require indefeasible repayment in full in cash of the Obligations under DIP Term Loan Facility as of the effective date of such Reorganization Plan; or

(w)     Adequate Protection.  The payment of or granting adequate protection with respect to Prepetition Indebtedness (as defined in the applicable Order) (other than as approved by the Agent and the Bankruptcy Court or as otherwise contemplated by the Loan Documents); or

(x)     Superpriority Claims.  (i) The failure of Liens or DIP Superpriority Claims granted with respect to the DIP Term Loan Facility to be valid, perfected and enforceable in all respects with the priority described in the applicable Order, or (ii) the disallowance, expungement, extinguishment or impairment of any portion of the DIP Superpriority Claim;

(y)     Automatic Stay.  The entry of one or more orders of the Bankruptcy Court lifting the automatic stay with respect to assets of the Debtors having a value in excess of $25,000,000 in the aggregate;

(z)     Invalidity or Violation of Orders.  (i) The Interim Order or Final Order, as applicable, shall cease to be in full force and effect, or shall be amended, modified, stayed or vacated without the written consent of the Agent, or (ii) any Loan Party shall have violated the terms of the Interim Order or the Final Order, as applicable, in a manner which materially and adversely affects the rights and protections to the Agent and the Lenders afforded thereby.

(aa)     Purchase Agreements.  Any asset purchase agreement or agreements for the sale of Debtors' Stores and other Real Estate and personal property with a minimum aggregate value of at least $250,000,000 (excluding Inventory and prescriptions) shall cease to be in full force and effect; or

(bb)     Cash Collateral.  The occurrence of Cash Collateral Termination Event.

**8.02**     *Remedies Upon Event of Default*.  If any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions: (a) terminate the Commitments, (b) upon seven (7) Business Days' written notice to the Borrower (with a copy to counsel for the Creditors' Committee in the Cases and the U.S. Trustee (as defined in the Interim Order)) and subject to the termination of the automatic stay under Section 362 of the Bankruptcy Code: (i) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations (other than Obligations under any Swap Contract) to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; and (ii) to the extent not prohibited by the Intercreditor Arrangements and the Orders, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

Each of the Lenders agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, or other rights to, any of the Collateral.

**8.03** *Application of Funds.* Subject to the Intercreditor Arrangements, after the exercise of remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under <u>Article III</u>) payable to the Agent;

<u>Second</u>, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this clause <u>Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and fees payable in respect thereof, ratably among the Lenders in proportion to the respective amounts described in this clause <u>Third</u> payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause <u>Fourth</u> held by them until paid in full;

<u>Fifth</u>, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations), ratably among the Credit Parties in proportion to the respective amounts described in this clause <u>Fifth</u> held by them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

## ARTICLE IX
## THE AGENT

**9.01** *Appointment and Authority.*

(a) Each of the Lenders hereby irrevocably appoints Fortress to act on its behalf as the administrative and collateral agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

(b) Each of the Lenders (in its capacities as a Lender) hereby irrevocably appoints Fortress as Agent and authorizes the Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of

the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Agent, as "Agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Agent), shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 10.04(c)), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents, as if set forth in full herein with respect thereto.

(c)     Each Lender authorizes and directs the Agent to enter into this Agreement and the other Loan Documents to which it is a party. Each Lender agrees that any action taken by the Agent or the Required Lenders in accordance with the terms of this Agreement or the other Loan Documents and the exercise by the Agent or the Required Lenders of their respective powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

(d)     The Lenders acknowledge that the Obligations are secured by Liens on the Collateral and that the exercise of certain of the rights and remedies of Agent under the Loan Documents may be subject to the provisions of the Intercreditor Arrangements and the Orders. Each Lender irrevocably (i) consents to the subordination of Liens provided for in the applicable Order and the Intercreditor Arrangements and the other terms and conditions therein, (ii) authorizes and directs the Agent to take all actions (and execute all documents) required (or deemed advisable) by it in accordance with the terms of the applicable Order and the Intercreditor Arrangements, in each case, and without any further consent, authorization or other action by such Lender, (iii) agrees that  such Lender will be bound by the provisions of the applicable Order and the Intercreditor Arrangements as if it were a signatory thereto and will take no actions contrary to the provisions the applicable Order and the Intercreditor Arrangements, (iv) agrees that no Lender  shall have any right of action whatsoever against the Agent as a result of any action taken by Agent pursuant to this Section or in accordance with the terms of the applicable Order and the Intercreditor Arrangements and (v) acknowledges (or is deemed to acknowledge) that a copy of the applicable Order and the Intercreditor Arrangements has been delivered, or made available, to such Lender. Each Lender hereby further irrevocably authorizes and directs the Agent to enter into such amendments, supplements or other modifications to the applicable Order and the Intercreditor Arrangements as are approved by Agent and the Required Lenders, provided, that Agent may execute and deliver such amendments, supplements and modifications thereto as are contemplated by the applicable Order and the Intercreditor Arrangements in connection with any extension, renewal, refinancing or replacement of this Agreement or any refinancing of the Obligations, in each case, on behalf of such Lender and without any further consent, authorization or other action by any Lender. The Agent shall have the benefit of the provisions of this Article IX with respect to all actions taken by it pursuant to this Section or in accordance with the terms of the applicable Order and the Intercreditor Arrangements to the full extent thereof.

**9.02**     *Rights as a Lender*.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03**    *Exculpatory Provisions*.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties, a Lender. Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04**    *Reliance by Agent*.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice (including telephonic Committed Loan Notices), request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to

have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05** *Delegation of Duties*. The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

**9.06** *Resignation of Agent*. The Agent may at any time give written notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the approval of the Borrower (which shall not be required if an Event of Default has occurred and is continuing), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such Lender or bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders (subject to the approval of the Borrower, which approval shall not be required if an Event of Default has occurred and is continuing), appoint a successor Agent meeting the qualifications set forth above; <u>provided</u> that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and <u>Section 10.04</u> shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

**9.07** *Non-Reliance on Agent and Other Lenders*. Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such

documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in <u>Section 9.12</u>, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08** *[Reserved].*

**9.09** *[Reserved].*

**9.10** *Collateral and Guaranty Matters*. The Credit Parties irrevocably authorize the Agent, at its option and in its discretion,

(a)   to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), (ii) that is Disposed of or to be Disposed of as part of or in connection with any Disposition permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with <u>Section 10.01</u>;

(b)   to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h), (m), (u) or (v) of the definition of Permitted Encumbrances; and

(c)   to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty and each other Loan Document pursuant to this <u>Section 9.10</u>. In each case as specified in this <u>Section 9.10</u>, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this <u>Section 9.10</u>.

**9.11** *Notice of Transfer*. The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in <u>Section 10.06</u>.

**9.12** *Reports and Financial Statements*.

By signing this Agreement, each Lender:

(a)   [Reserved];

(b)   is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "<u>Reports</u>");

92

(c)     expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)     expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)     agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(f)     without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Loans that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or any portion thereof; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.13**     *Agency for Perfection*.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States can be perfected only by possession or control.  Should any Lender (other than the Agent) obtain possession or control of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.14**     *Indemnification of Agent*.  Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent and any Related Party, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's and its Related Parties' gross negligence, bad faith or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.15**     *Relation among Lenders*.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

# ARTICLE X
## MISCELLANEOUS

**10.01** *Amendments, Etc*. No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or the Agent at the direction of the Required Lenders), and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)       increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 2.01) without the written Consent of such Lender;

(b)       as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for any scheduled payment (including the Maturity Date) of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment;

(c)       as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written Consent of each Lender entitled to such amount; provided, however, that only the Consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)       as to any Lender, change Section 2.07(b), Section 2.12(c), Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby or the priority of such payments set forth therein without the written Consent of each Lender;

(e)       change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)       except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party or permit such Loan Party to assign its rights under the Loan Documents without the written Consent of each Lender;

(g)       [reserved];

(h)       except for Permitted Dispositions, release all or substantially all of the Collateral from the Liens of the Security Documents or release all or substantially all of the Guaranties without the written Consent of each Lender;

(i)       increase the Aggregate Commitments without the written Consent of each Lender;

(j)       [reserved];

(k)       [reserved]; and

NAI-1500433654v9

(l)        except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document.

If any Lender does not Consent (a "Non-Consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the Consent of each Lender and that has been approved by the Required Lenders, the Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Agent or Borrower to be made pursuant to this paragraph).

**10.02**   *Notices; Effectiveness; Electronic Communications.*

(a)        Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)        if to the Loan Parties, or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)        if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)        Electronic Communications.  Notices and other communications to the Loan Parties, Agent and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to any notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the

95

opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)　　　[reserved].

(d)　　　Change of Address, Etc.  Each of the Loan Parties, the Agent, may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)　　　Reliance by Agent and Lenders.  The Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03**　*No Waiver; Cumulative Remedies*.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04**　*Expenses; Indemnity; Damage Waiver*.

(a)　　　Costs and Expenses.  The Borrower shall pay all Credit Party Expenses.

(b)　　　Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement

and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such other Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     Reimbursement by Lenders. Without limiting their obligations under Section 9.14 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this subsection (c) are several and not joint. The failure of any Lender to make any payment under this subsection (c) shall not relieve any other Lender of its obligation to do so, and no Lender shall be responsible for the failure of any other Lender to make its required payment hereunder.

(d)     Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     Payments. All amounts due under this Section shall be payable on demand therefor.

(f)     Survival. The agreements in this Section shall survive the resignation of the Agent, the assignment of any portion of any Loan by any Lender, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations.

**10.05** *Payments Set Aside*. To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06** *Successors and Assigns*.

(a) <u>Successors and Assigns Generally</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of <u>Section 10.06(b)</u>, (ii) by way of participation in accordance with the provisions of subsection <u>Section 10.06(d)</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.06(f)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Assignments by Lenders</u>. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i) <u>Minimum Amounts</u>.

(A) in the case of an assignment of the entire remaining amount of the assigning Lender's Loan and/or unused Commitment at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B) in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date of the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $2,500,000 unless each of the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably

withheld or delayed and shall be deemed given if the Borrower has not responded to a request for such consent within seven (7) Business Days); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

        (ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans and/or the Commitments assigned;

        (iii)    Required Consents and Other Conditions.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section, and in addition:

        (A)    with respect to any Eligible Assignee pursuant to clause (e) of the definition of Eligible Assignee, the consent of the Borrower (such consent not to be unreasonably withheld or delayed and in any event such consent shall be deemed given if Agent shall not have received an objection within 3 days after such consent is requested by Agent) shall be required  if assignment is not to an Eligible Assignee unless (1) a Default or Event of Default specified in any of Section 8.01(a), Section 8.01(b) (solely as a result of the Borrower's failure to deliver a Compliance Certificate pursuant to Section 6.02(b), or the Borrower's failure to comply with Section 6.13 or Section 7.15), or 8.01(r) through 8.01(bb), has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund with respect to such Lender;

        (B)    the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Loans or Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

        (C)    no assignment may be made to a Loan Party or an Affiliate of a Loan Party.

        (iv)    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee

Lender and a Note or replacement Note to the assignor Lender (in the event of a replacement Note, the assignor Lender shall cancel and return to Borrower the superseded Note).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

            (c)        Register.  The Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

            (d)        Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.

         Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a), (b), (c) or (f) of the first proviso to Section 10.01 that affects such Participant.  Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01 and 3.04 (subject to the requirements and limitations of such Sections, including Section 3.01(e)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section  2.13 as though it were a Lender. Each Lender granting a participation shall, as a non-fiduciary agent of Borrower, maintain a register ("Participant Register") with respect to the ownership and transfer of each participation containing the information set forth in the Register described in Section 10.06(c); provided that, no Lender shall have any obligation to disclose all or any portion of any Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or other rights or obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Loan or other right or obligation is in registered form under Treasury Regulation Sections 5f.103-1(c) and 1.871-14(c). No transfer of a participation shall be effective unless recorded in such Participation Register. The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the right to receive a greater payment results from a Change in Law after the participant becomes a Participant.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Borrower is notified of the participation sold to such Participant and such Participant complies with Section 3.01(e) as though it were a Lender.

(f)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.07**     *Treatment of Certain Information; Confidentiality*.  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties (but only if such Credit Party has no actual knowledge that such source has breached a confidentiality obligation).

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof (provided that, if such information is furnished by a source actually known to such Credit Party to be subject to a confidentiality obligation, such source, to the knowledge of such Credit Party, is not in violation of such confidentiality obligation by such disclosure), provided that, in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as

confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08**   *Right of Setoff.*  Subject to the Orders, if an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender, and its respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, or its respective Affiliates may have.  Each Lender agrees to notify the Borrower and the Agent promptly after any such setoff and application, underlined provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09**   *Interest Rate Limitation*.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10**   *Counterparts; Integration; Effectiveness*.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11** *Survival.* All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Loans, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder (other than contingent indemnity obligations for which claims have not been made) shall remain unpaid or unsatisfied. Further, the provisions of Sections 3.01 and 3.04, and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, and the Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked and (y) any Obligations that may thereafter arise under Section 10.04.

**10.12** *Severability.* If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13** *Replacement of Lenders.* If any Lender requests compensation under Section 3.04, or if the Borrower are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or any Lender is a Defaulting Lender or has given a notice to the Borrower pursuant to Section 3.02 or any Lender is a Non-Consenting Lender, then the Borrower may, at Borrower's sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a) the Borrower shall have paid to the Agent the assignment fee specified in Section 10.06(b);

(b) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees, and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d) such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

NAI-1500433654v9

In connection with any such replacement, if any such Lender does not execute and deliver to the Agent a duly executed Assignment and Assumption reflecting such replacement within two (2) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender, then such Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of such Lender. Such purchase and sale shall be effective on the date of the payment of such amount to such Lender.

**10.14** *Governing Law; Jurisdiction; Etc.*

(a) GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b) SUBMISSION TO JURISDICTION. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c) WAIVER OF VENUE. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d) SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

NAI-1500433654v9

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM )JURISDICTION, SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15**    *Waiver of Jury Trial*.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16**    *No Advisory or Fiduciary Responsibility*.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (a) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (c) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (d) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17** *USA PATRIOT Act Notice.* Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the PATRIOT Act it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act.

**10.18** *Foreign Asset Control Regulations.* Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, to the best knowledge of each Loan Party, none of the Loan Parties or their respective Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19** *Foreign Corrupt Practices Act.* No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended

**10.20** *Time of the Essence.* Time is of the essence with respect to all provisions of the Loan Documents.

**10.21** *[Reserved.]*

**10.22** *Press Releases.*

(a)     Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b)     Each Loan Party consents to the publication by the Agent, any Lender or their respective representatives of advertising material, including any "tombstone," press release or comparable advertising, on its website or in other marketing materials of Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent or such Lender shall provide a draft reasonably in advance of any advertising material, "tomb stone" or press release to the Borrower for review and comment prior to the publication thereof. The Agent reserves the right to provide to industry trade organizations and loan syndication and

NAI-1500433654v9

pricing reporting services information necessary and customary for inclusion in league table measurements.

**10.23**  *Additional Waivers.*

(a)  The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)  The obligations of each Loan Party  shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations).

(c)  To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations.  The Agent and the other Credit Parties may, at their election, and subject to the Orders and the Intercreditor Arrangements, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash.  Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)  Each Loan Party is obligated to repay the Obligations as joint and several obligors under this Agreement.  Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations.  In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously

be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.

**10.24** *No Strict Construction*. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.25** *Attachments*. The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.26** *Intercreditor Arrangements*. The Loan Parties, the Agent, and the Lenders acknowledge that the exercise of certain of the Agent's rights and remedies hereunder may be subject to, and restricted by, the provisions of the Intercreditor Arrangements. In the event of any conflict between the terms of the Intercreditor Arrangements and this Agreement, the terms of the Intercreditor Arrangements shall control. Each Lender acknowledges and agrees that it shall be bound by the terms and conditions of the Intercreditor Arrangements

**10.27** *Orders Govern*. Notwithstanding anything herein to the contrary, the exercise of rights and remedies of the Agent and Lenders hereunder and under any other Loan Document is subject to the provisions of the Orders. In the event of any conflict between the terms of the Orders and the terms of this Agreement or any other Loan Document, the terms of the Orders shall govern and control.

[Signature Pages Follow]

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWER:**

**THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.**, as Borrower

By: _____
Name: _____
Title:_____

**GUARANTORS:**

**MONTVALE-PARA HOLDINGS, INC.**, as Parent and Guarantor

By: _____
Name: _____
Title:_____

**2008 BROADWAY, INC.**
**A&P LIVE BETTER, LLC**
**A&P REAL PROPERTY, LLC**
**APW SUPERMARKET CORPORATION**
**APW SUPERMARKETS, INC.**
**BORMAN'S INC.**
**DELAWARE COUNTY DAIRIES, INC.**
**FOOD BASICS, INC.**
**MCLEAN AVENUE PLAZA CORP.**
**MONTVALE HOLDINGS, INC.**
**ONPOINT, INC.**
**PATHMARK STORES, INC.**
**PLAINBRIDGE LLC**
**SHOPWELL, INC.**
**SUPER FRESH FOOD MARKETS, INC.**
**THE OLD WINE EMPORIUM OF WESTPORT, INC.**
**TRADEWELL FOODS OF CONN., INC.**
**WALDBAUM, INC.**, as Guarantors

By: _____
Name: _____
Title:_____

*[Signature Page to Credit Agreement]*

**FORTRESS CREDIT CORP.**, as Agent

By: _____
Name:
Its Authorized Signatory

**[FORTRESS CREDIT CORP.]**, as Lender

By: _____
Name:
Its Authorized Signatory

[●], as Lender

By: _____
Name:
Its Authorized Signatory

**Exhibit D**

**Commitment Letter**

**FORTRESS CREDIT CORP.**
**1345 Avenue of the Americas**
**46th Floor**
**New York, NY 10105**

July 11, 2015

The Great Atlantic & Pacific Tea Company, Inc.                    *CONFIDENTIAL*
2 Paragon Drive
Montvale, New Jersey  07645
Attention:  Tim Carnahan, Chief Financial Officer

Re: *Debtor-in-Possession Third Out Term Loan Facility*

Ladies and Gentlemen:

　　The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation ("***you***" or the
"***Company***"), Montvale-Para Holdings, Inc. (the "***Parent***") and each other Guarantor, as defined in the
Summary of Terms referred to below (each, together with the Parent, the "***Guarantors***" and,
collectively with the Company, the "***Debtors***"), have informed Fortress Credit Corp. (together with its
and its affiliates' managed funds and/or accounts, "***Fortress***" or the "***Initial Lender***") that the Debtors
are considering filing voluntary petitions (the "***Bankruptcy Cases***") under Chapter 11 of the United
States Bankruptcy Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the
Southern District of New York or such other jurisdiction as the Initial Lender may agree (the
"***Bankruptcy Court***").

　　In connection with the foregoing, you have requested that the Fortress commits to provide a
$100,000,000 debtor-in-possession third out term loan facility (the "***DIP Term Loan Facility***") on the
terms and conditions set forth in this letter and in the Summary of Term and Conditions attached
hereto as ***Exhibit A*** (the "***Summary of Terms***"; capitalized terms used herein and not defined herein
shall have the meanings specified in the Summary of Terms).  This letter, together with the Summary
of Terms, shall be referred to herein as the "***Commitment Letter***."

　　***Commitment***

　　Fortress hereby commits to provide the entire principal amount of the DIP Term Loan
Facility (the "***Commitment***") on the terms and subject to the conditions set forth in this Commitment
Letter.

　　***Fees***

　　The Company shall pay to the DIP Lenders and DIP Agent the fees required to be paid to
each of them pursuant to the Summary of Terms (the "***Fees***").  The Fees are an integral part of the
Commitment and undertaking of Fortress hereunder.  Payment by the Company of the Fees is an
express condition to the Commitment and any of the obligations of Fortress under this Commitment
Letter.  In the event that the Company elects to terminate this Commitment Letter in order to pursue
an alternative debtor-in-possession credit facility (an "***Alternative DIP Facility***") with any potential
financing source other than Fortress, then either (i) Fortress shall have the option to provide such

Alternative DIP Facility on terms substantially similar to those terms being offered to such financing source or (ii) the Company shall pay the Closing Fee to Fortress as described in the Summary of Terms upon the consummation of the Alternative DIP Facility.

### *Information*

The Company represents and warrants to Fortress that (i) all written information (other than any Projections) that has been or will hereafter be made available to Fortress, any DIP Lender or any potential DIP Lender by or on behalf of the Parent, the Company or any of their respective subsidiaries or their respective representatives in connection with the transactions contemplated pursuant to this Commitment Letter or otherwise relating to the Parent or any of its subsidiaries (collectively, the "***Information***") is and will be (when taken as a whole) correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in any material respect in light of the circumstances under which such statements were or are made (after giving effect to all supplements and updates thereto) and (ii) all projections ("***Projections***") have been or will be prepared by the Company and made available to Fortress, any DIP Lender or any potential DIP Lender have been or will be prepared in good faith based upon reasonable assumptions believed at the time so made to be reasonable (it being understood that projections are not viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the Company's control, and that no assurance can be given that any projections will be realized, that actual results may differ from those projected and that such differences may be material). The Company agrees to supplement the Information and Projections it has provided from time to time until the closing date of the DIP Term Loan Facility (the "***Closing Date***") so that the representations and warranties contained in this paragraph remain correct in all material respects (in the case of the foregoing clause (ii)) and in all respects (in the case of the foregoing clause (i)).

### *Confidentiality*

By accepting delivery of this Commitment Letter, the Company agrees that this Commitment Letter is for the Company's confidential use only and that neither the Commitment Letter (including its existence) nor any of the terms thereof will be disclosed by the Company to any person or entity except that such existence and contents may be disclosed to the directors, officers, employees, affiliates, advisors and agents of the Company on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby. Notwithstanding the foregoing, following the Company's acceptance of the provisions hereof and its return of an executed counterpart of this Commitment Letter as provided below, (i) the Company may file a copy of any portion of this Commitment Letter in any public record in which it is required by law (including pursuant to any court order or decree or any rule or regulation) to be filed, (ii) the Company may make such other public disclosures of any of the terms and conditions hereof as the Company is required by law, in the opinion of its counsel, to make and (iii) the Company may file a copy of this Commitment Letter in any proceeding relating to the Bankruptcy Cases or in any document prepared in connection therewith. The Company's obligations hereunder with respect to confidentiality and disclosure shall survive the expiration or termination of this Commitment Letter.

Except as required by law and except with respect to any information that otherwise becomes publicly available, the Initial Lender agrees that its officers, employees, affiliates and agents will treat any and all information furnished to Fortress pursuant to the terms of this Commitment Letter, and conspicuously marked "Confidential", confidentially in a manner consistent with industry practices, and will not use any of such information for any purpose other than as set forth herein, ***provided*** that

the obligation of the Initial Lender pursuant to this paragraph shall terminate one year from the date hereof.

### *Conditions*

The Commitment and other undertakings hereunder are subject to (a) the preparation, execution and delivery of definitive loan documentation for the DIP Facility in form and substance acceptable to Fortress (collectively, the "***Loan Documents***"); (b) the absence of any event or circumstance that has had or is reasonably likely to have a material adverse effect on the business, financial condition or operations of the Parent, the Company and their respective subsidiaries (taken as a whole) since December 31, 2014, but excluding any matters publicly disclosed prior to the filing of the Bankruptcy Cases and excluding the effect of the filing of the Bankruptcy Cases or the circumstances and events leading up thereto and disregarding any material adverse effect resulting from (i) changes in general financial market or geopolitical conditions, (ii) general changes or developments in any of the industries in which the Parent, the Company or any of their respective subsidiaries operate or (iii) changes in any applicable laws or GAAP or interpretations thereof after the date hereof, except, in the case of the foregoing clauses (i), (ii) and (iii), only to the extent that the Parent, the Company and their subsidiaries, taken as a whole, are disproportionately affected relative to other similarly situated companies (collectively, a "***Material Adverse Effect***"); (c) the accuracy in all material respects of all representations that the Company or any of its affiliates makes to the Initial Lender and all Information that the Company or any of its affiliates furnishes to the Initial Lender; (d) the Company's compliance in all material respects with the terms of this Commitment Letter; (e) the satisfaction of conditions precedent customary for facilities similar to the DIP Facility and agreed upon by you and the Initial Lender including, without limitation, each of the terms and conditions set forth under the heading "Conditions Precedent to Borrowing under the DIP Facility and Use of Cash Collateral and Other Requirements" in the Summary of Terms; and (f) the occurrence of the Closing Date on or before September 15, 2015 (such date, the "***Commitment Expiration Date***").

### *Termination*

The Commitment of the Initial Lender will terminate on the earlier of (i) the Commitment Expiration Date and (ii) the Closing Date, ***provided*** that the Commitment of the Initial Lender will terminate at 5:00 p.m., New York City time, on July 31, 2015 if the Interim Order shall not have been entered prior to such time.  Prior to the Commitment Expiration Date, the Commitment may be terminated by the Company at any time at its option upon payment of all fees, expenses or other amounts then due and owing hereunder, ***provided*** that the expense reimbursement, confidentiality, fees, indemnification and governing law provisions, as well as any other provision that expressly so provides, will survive the termination of this Commitment Letter.

### *Indemnification*

By your acceptance of this Commitment Letter, you hereby agree to indemnify and hold harmless Fortress and the other DIP Lenders and its and their respective affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors and agents of the foregoing (in each case only in their capacity as a lender providing its Commitment and making the loans contemplated hereunder and not in any other capacity (including, without limitation, as an existing shareholder or manager of, or lender to, or equity investor in, the Parent or any of its subsidiaries)) (each, an "***Indemnified Person***") from and against any and all losses, claims, costs, expenses, damages or liabilities (or actions or other proceedings commenced or threatened in respect thereof) that arise out of, result from or in any way relate to this Commitment Letter, the DIP Facility or any of the transactions contemplated hereby or the providing of the DIP Facility, and to reimburse

each Indemnified Person upon its demand for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such loss, claim, cost, expense, damage, liability or action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding), except as to any Indemnified Person, severally and not jointly, to the extent that any such loss, claim, cost, expense, damage or liability is determined by a final judgment of a court of competent jurisdiction to have primarily resulted by reason of the gross negligence or willful misconduct of such Indemnified Person in performing the services that are the subject of this Commitment Letter. You shall not be liable for any settlement of any such proceeding effected without your written consent (which shall not be unreasonably withheld, delayed or conditioned), but if settled with such consent or if there shall be a final non-appealable judgment for the plaintiff, you shall indemnify the Indemnified Persons from and against any loss or liability by reason of such settlement or judgment subject to your rights in this paragraph to claim exemption from your indemnity obligations. You shall not, without the prior written consent of any Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding. You also agree that (i) no Indemnified Person shall have any liability to any of the subsidiaries, affiliates or stockholders of the Parent or the Company or any other person or entity (other than the obligations of Fortress to the Company) in connection with or as a result of any matter referred to in this Commitment Letter, the DIP Facility or the transactions contemplated hereby, and (ii) in no event shall such Indemnified Person have any liability for any indirect, consequential or punitive damages in connection with or as a result of such Indemnified Person's activities related to this Commitment Letter. The Company agrees that the Initial Lender is not providing accounting, tax or legal advice to the Company in connection with the DIP Facility or otherwise and that the Company has consulted its own advisors with respect to such matters.

In addition, you agree to reimburse the Initial Lender from time to time for all reasonable costs and expenses (including reasonable documented travel expenses and reasonable documented fees, disbursements and other charges of counsel to the DIP Agent and the DIP Lenders, limited however, in the case of local counsel, to one firm of local counsel in each appropriate jurisdiction, and other firms reasonably necessary because of actual or potential conflicts of interest) incurred in connection with the preparation of this Commitment Letter and the definitive documentation for the DIP Facility, regardless of whether the transactions contemplated hereby are consummated or any Loan Documents actually executed. Upon execution of this letter agreement, you shall deliver to an account specified by Fortress by wire transfer an expense deposit in the amount of $250,000 in available funds (the "**_Expense Deposit_**"). You hereby authorize Fortress to incur expenses described in this paragraph and to apply the Expense Deposit to the payment thereof, and acknowledge that the Expense Deposit is non-refundable. The provisions contained in this paragraph and in the immediately preceding paragraph shall remain in full force and effect notwithstanding the termination of this Commitment Letter.

### Sharing Information; Absence of Fiduciary Relationship

The Company acknowledges that the Initial Lender and each other DIP Lender and/or their respective affiliates may provide financing, equity capital or other services (including financial advisory services) to parties whose interests may conflict with the interests of the Debtors. None of the Initial Lender, any other DIP Lender or any of their respective affiliates will use in connection with the transactions contemplated hereby, or furnish to the Debtors, confidential information that the Initial Lender, such other DIP Lender or any of their respective affiliates has obtained or may obtain from any other person.

The Company further acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Company, on the one hand, and any DIP Lender, on the other hand, has been or will be created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the DIP Lenders or their respective affiliates have advised or are advising you on other matters, and (b) the Company will not bring or otherwise assert any claim against any DIP Lender for breach of fiduciary duty or alleged breach of fiduciary duty and agree that none of the DIP Lenders shall have any liability (whether direct or indirect) to the Company in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including the Company's stockholders, employees or creditors.

*Miscellaneous*

This Commitment Letter and the Commitment and undertakings hereunder shall not be assignable by (a) the Company without the prior written consent of the Initial Lender or (b) the Initial Lender without the prior written consent of the Company; ***provided***, that the Initial Lender may assign its Commitment hereunder to Mount Kellett Capital Management LP ("***Mount Kellett***") or one or more of the Initial Lender's or Mount Kellett's respective affiliates without the prior written consent of the Company; ***provided***, ***further***, that the Initial Lender shall not be relieved of its obligation to provide the Commitment hereunder in the event that its affiliate fails to fund such Commitment when required in accordance with the terms of this Commitment Letter.  This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the party against whom enforcement of the same is sought.  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter.  This Commitment Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto.  By executing this Commitment Letter, the Company acknowledges that this Commitment Letter is the only agreement between the Company or its affiliates, on one hand, and the Initial Lender or its affiliates, on the other hand, with respect to the DIP Facility and set forth the entire understanding of the parties with respect to the subject matter thereof.  This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York.  Each party hereto irrevocably waives all right to trial by jury in any action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby.

The Initial Lender hereby notifies you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "***Patriot Act***"), the Lenders are required to obtain, verify and record information that identifies the Debtors, which information includes the name, address, tax identification number and other information regarding the Debtors that will allow the DIP Lenders to identify the Debtors in accordance with the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective as to each DIP Lender.

Please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Initial Lender the enclosed duplicate originals of this Commitment Letter not later than 5:00 p.m., New York time, on July 12, 2015, at which time (if not so accepted prior thereto) this Commitment Letter and the Commitment and undertakings hereunder will expire; ***provided***, that this Commitment Letter and the Commitment and undertakings hereunder will terminate in the event that the Company seeks protection under the Bankruptcy Code prior to such time without having accepted the terms hereof.

The Initial Lender is pleased to have been given the opportunity to assist you in this important transaction.

Very truly yours,

**FORTRESS CREDIT CORP., ON BEHALF OF IT AND ITS AFFILIATES FUNDS AND/OR MANAGED ACCOUNTS**

By: _____
Name: JAMES F. NOBLE
Title: SECRETARY

Accepted and agreed to as of
_____, 2015

**THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.**

By: _____
Name: TIMOTHY J. CARNAHAN
Title: CHIEF FINANCIAL OFFICER

EXHIBIT A

**TERM SHEET FOR PROPOSED CONSENSUAL USE OF CASH COLLATERAL AND DEBTOR-IN-POSSESSION THIRD OUT TERM LOAN FACILITY**
DATED July 11, 2015

> In the event that **THE GREAT ATLANTIC & PACIFIC TEA COMPANY**, and certain of its direct and indirect subsidiaries determine to file a petition for relief under Chapter 11 of the United States Bankruptcy Code, the following describes the proposed terms of consensual use of cash collateral and debtor-in-possession financing to be used to, among other uses, fund working capital during the pendency of such Chapter 11 cases.

| | |
|---|---|
| **Borrower:** | The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation ("***A&P***") in the capacity as borrower under the DIP Facility (as defined below) (the "***Borrower***"). |
| **Guarantors:** | Montvale-Para Holdings, Inc. ("***Parent***") and each entity required to guarantee the obligations under the Prepetition Term Facility (the "***Guarantors***"); and together with Borrower, all of which shall be debtors and debtors-in-possession (in such capacity, the "***Debtors***") in jointly administered cases (collectively the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") to be filed in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"). The date the Chapter 11 Cases are commenced is referred to herein as the "***Petition Date***". |
| **Existing Debt Arrangements/Prepetition Facilities:** | That certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014 among A&P, as borrower, Wells Fargo Bank, National Association, as agent (the "***Prepetition Term Agent***") and lender, and other lender parties thereto (the "***Prepetition Term Loan Lenders***"; together with the Prepetition Term Agent, the "***Prepetition Term Loan Secured Parties***"), as amended, supplemented or otherwise modified prior to the Petition Date, the "***Prepetition Term Credit Agreement***", and including all exhibits and other ancillary documentation in respect thereof, the "***Prepetition Term Facility***", and all instruments and documents executed at any time in connection with the Prepetition Term Facility, shall be referred to collectively as the "***Prepetition Term Loan Documents***". |
| | That certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014 among A&P, as lead borrower, the other borrowers, Wells Fargo, Bank, National Association, as agent (the "***Prepetition ABL Agent***"), letter of credit issuer and swing line lender, and other lender parties (collectively with the Prepetition ABL Agent the "***Prepetition ABL Secured Parties***") hereto (in each case as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition ABL Credit Agreement***", and including all exhibits and other ancillary documentation in respect thereof, the "***Prepetition ABL Facility***"; and all instruments and documents executed at any time in connection with the Prepetition ABL Facility, shall be referred to collectively as the "***Prepetition ABL Documents***"). |
| | That certain Indenture, dated as of March 13, 2012, among Montvale-Para Holdings, Inc. and U.S Bank National Association, as trustee and collateral agent (the "***Prepetition PIK/Toggle Notes Agent***") for the holders of the Notes (as defined therein; the , "***Prepetition PIK/Toggle Notes Secured Parties***") (in each case as amended, supplemented or otherwise modified prior to the date |

1

hereof, and including all exhibits and other ancillary documentation in respect thereof, the "***Prepetition PIK/Toggle Notes Indenture***"; and all instruments and documents executed at any time in connection with the Prepetition PIK/Toggle Notes, shall be referred to collectively as the "***Prepetition PIK/Toggle Notes Documents***").

That certain Indenture, dated as of March 13, 2012, among Montvale-Para Holdings, Inc. and U.S Bank National Association, as trustee and collateral agent (the "***Prepetition Convertible Notes Agent***") for the holders of the Notes (as defined therein; the , "***Prepetition Convertible Notes Secured Parties***") (in each case as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "***Prepetition Convertible Notes Indenture***"; and all instruments and documents executed at any time in connection with the Prepetition PIK/Toggle Notes, shall be referred to collectively as the "***Prepetition Convertible Notes Documents***").

That certain Intercreditor Agreement, dated as of March 13, 2012, among the Prepetition ABL Agent, the Prepetition Term Agent, the Prepetition PIK/Toggle Notes Agent, the Prepetition Convertible Notes Agent and Parent and certain other Obligors parties thereto as amended pursuant to that certain Amendment No. 1 to Intercreditor Agreement, dated September 17, 2014 (the "***Initial Intercreditor Agreement***") and that certain Supplemental Senior Lien Intercreditor Agreement, dated as of September 17, 2014, among the Prepetition ABL Agent and Prepetition Term Agent (the "***Supplemental Intercreditor Agreement***" together with the Original Intercreditor Agreement, the "***Existing Intercreditor Agreements***").

Any capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Prepetition Term Loan Documents.

## USE OF CASH COLLATERAL

**Use of Cash Collateral and Consent to DIP Facility:**    Subject to the terms and conditions set forth herein, the Prepetition ABL Secured Parties, the Prepetition Term Loan Secured Parties, the Prepetition PIK/Toggle Notes Secured Parties and the Prepetition Convertible Notes Secured Parties shall consent to the Debtors' use of cash collateral pursuant to Section 363 of the Bankruptcy Code.

**Adequate Protection:**    As adequate protection for the Debtors' use of cash collateral and consent to the DIP Facility, the Prepetition ABL Secured Parties, the Prepetition Term Loan Secured Parties, the Prepetition PIK/Toggle Notes Secured Parties and the Prepetition Convertible Notes Secured Parties shall receive the following adequate protection:

(a)    <u>Adequate Protection Liens</u>.  Solely to the extent of any postpetition diminution in the value of the Prepetition ABL Secured Parties', the Prepetition Term Loan Secured Parties', the Prepetition PIK/Toggle Notes Secured Parties' and the Prepetition Convertible Notes Secured Parties' respective interests in the prepetition collateral on account of (i) the liens and administrative expense claims granted in favor of the DIP Facility, (ii) the Debtors' use of cash collateral, and (iii) any decline in the value of the prepetition collateral from the imposition

2

of the automatic stay or the Debtors' use, sale, or disposition of prepetition collateral (or the proceeds thereof), each of (w) the Prepetition ABL Agent under the Prepetition ABL Facility, on behalf of itself and the Prepetition ABL Secured Parties, (x) the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties, (y) the Prepetition PIK/Toggle Notes Agent, on behalf of itself and the Prepetition PIK/Toggle Notes Secured Parties, and (z) the Prepetition Convertible Notes Agent, on behalf of itself and the Prepetition Convertible Notes Secured Parties, shall be granted for their benefit, effective and perfected as of the entry of the Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a replacement security interest in and lien on all assets of the Debtors (together, the "***Adequate Protection Liens***") in the same order of priority existing prepetition under the prepetition agreements (including the Existing Intercreditor Agreement), subject and subordinate to the Carve-out (as defined below) and, in the case of the Prepetition PIK/Toggle Notes Secured Parties and the Prepetition Convertible Notes Secured Parties, the DIP Liens (as defined below); <u>provided</u>, that the Adequate Protection Liens shall not encumber avoidance actions under Chapter 5 of the Bankruptcy Code but shall, subject to the entry of the Final Order, attach to proceeds thereof.

(b)     <u>Adequate Protection Claims</u>.  Solely to the extent of any postpetition diminution in the value of the Prepetition ABL Secured Parties', the Prepetition Term Loan Secured Parties', the Prepetition PIK/Toggle Notes Secured Parties' and the Prepetition Convertible Notes Secured Parties' respective interests in the prepetition collateral on account of (i) the liens and administrative expense claims granted in favor of the DIP Facility, (ii) the Debtors' use of cash collateral, and (iii) any decline in the value of the prepetition collateral from the imposition off the automatic stay or the Debtors' use, sale, or disposition of prepetition collateral (or the proceeds thereof), each of (w) the Prepetition ABL Agent under the Prepetition ABL Facility, on behalf of itself and the Prepetition ABL Secured Parties, (x) the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties, (y) the Prepetition PIK/Toggle Notes Agent, on behalf of itself and the Prepetition PIK/Toggle Notes Secured Parties, and (z) the Prepetition Convertible Notes Agent, on behalf of itself and the Prepetition Convertible Notes Secured Parties, shall be granted for their benefit, administrative expense claims having priority over all other administrative expense claims against the Debtors at any time arising (together, the "***Adequate Protection Claims***") in the same order of priority existing prepetition under the prepetition agreements (including the Existing Intercreditor Agreement), subject and subordinate to the Carve-out and, in the case of the Prepetition PIK/Toggle Notes Secured Parties and the Prepetition Convertible Notes Secured Parties, the DIP Administrative Claims (as defined below). The Adequate Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code.

3

(c)    <u>Waiver and Release</u>: Subject only to a "challenge period" available to the unsecured creditors' committee, any and all claims by the Debtors or any third party, including PACA claimants and any unsecured creditor, with respect to the claims of the Prepetition ABL Secured Parties, the Prepetition Term Loan Secured Parties, the Prepetition PIK/Toggle Notes Secured Parties and the Prepetition Convertible Notes Secured Parties, or the liens securing the obligations under the Prepetition ABL Facility, the Prepetition Term Facility, the Prepetition PIK/Toggle Notes Indenture and the Prepetition Convertible Notes Indenture, shall be deemed waived and the Debtors' obligations to the Prepetition ABL Secured Parties, the Prepetition Term Loan Secured Parties, the Prepetition PIK/Toggle Notes Secured Parties and the Prepetition Convertible Notes Secured Parties shall be deemed allowed secured claims pursuant to Section 506 of the Bankruptcy Code.

(d)    <u>506(c) and 552(b) Waivers</u>:  The final order authorizing the use of cash collateral and approving the DIP Facility shall provide waivers of the estates' rights under sections 506(c) and 552(b) of the Bankruptcy Code in favor of each of the Prepetition ABL Secured Parties, the Prepetition Term Loan Secured Parties, the Prepetition PIK/Toggle Notes Secured parties and the Prepetition Convertible Notes Secured Parties.

(e)    <u>Interest and Fees</u>.  All interest and all Letter of Credit Fees, if applicable, shall accrue at the Default Rate under the Prepetition ABL Facility and Prepetition Term Facility.  The Debtors shall pay all such interest, Letter of Credit Fees and other fees to the Prepetition ABL Agent and the Prepetition Term Agent in accordance with the Prepetition ABL Facility and Prepetition Term Facility, as applicable.

(f)    <u>Fees and Expenses</u>.  Current cash payments shall be made to (i) the Prepetition ABL Agent of all professional fees and expenses payable to the Prepetition ABL Agent pursuant to the terms of the Prepetition ABL Credit Agreement, limited to the fees and expenses of Choate, Hall & Stewart LLP, (ii) the Prepetition Term Loan Agent of all fees and expenses payable to the Prepetition Term Loan Agent pursuant to the terms of the Prepetition Term Credit Agreement, limited to the fees and expenses of Otterbourg P.C., (iii) the Prepetition PIK/Toggle Notes Secured Parties of professional fees and expenses, limited to the fees and expenses of Stroock & Stroock & Lavan LLP, and (iv) the Prepetition Convertible Notes Secured Parties of professional fees and expenses, limited to the fees and expenses of Schulte Roth & Zabel LLP.

(g)    <u>Financial Reporting</u>.  The Debtors shall continue to provide (i) the Prepetition ABL Agent under the Prepetition ABL Facility with financial and other reporting in compliance with the Prepetition ABL Facility, including weekly Borrowing Base Certificates, any reporting described below, and any reports provided to the Prepetition Term Agent and (ii) the Prepetition Term Loan Agent under the Prepetition Term Facility with financial and other reporting in compliance with the Prepetition Term Facility.  The Debtors shall provide the same financial reporting as provided in clause (i) above

4

to each of the Prepetition PIK/Toggle Notes Secured Parties and the Prepetition Convertible Notes Secured Parties upon written request (and subject to the execution of any appropriate confidentiality agreement).

(h)   Use of Cash Collateral. The Debtors shall be authorized to use cash collateral in accordance with the Cash Collateral Order (including the Budget (as defined below), which Cash Collateral Order shall be in form and substance reasonably acceptable to the DIP Agent (as defined below),[1] the Prepetition ABL Agent, the Prepetition Term Agent and to the majority of the Prepetition PIK/Toggle Notes holders and the majority of the Prepetition Convertible Notes holders). The Debtors shall not be authorized to use any cash collateral which has been posted to cash collateralize the L/C Obligations or other amounts outstanding under the Prepetition ABL Facility; provided, that, for the avoidance of doubt, the L/C Obligations outstanding immediately prior to the Petition Date shall not be required to be Cash Collateralized solely as a result of the commencement of the Chapter 11 Cases.

(i)   Mandatory Prepayments; Prepetition ABL Facility: In addition to the payment of interest, Letter of Credit Fees and Fees and Expenses set forth above, the Debtors shall pay to the Prepetition ABL Agent for the benefit of the Prepetition ABL Secured Parties the following amounts: (i) if for any reason the Total Outstandings (other than L/C Obligations to the extent Cash Collateralized) at any time exceed the Loan Cap, the Debtors shall immediately prepay Loans and/or Cash Collateralize L/C Obligations in an amount equal to such excess; (ii) the liquidation proceeds from sales, dispositions, or casualty of ABL Priority Collateral outside the ordinary course of business, including sales or disposition of ABL Priority Collateral with respect to the closing of the stores subject to the Triple Negative Lease (as defined below), pursuant to Section 363 of the Bankruptcy Code or in connection with "Store Closing Sales"; (iii) after payment in full of the Prepetition Term Facility, all proceeds from sales, dispositions, or casualty of Term Priority Collateral outside the ordinary course of business, including sales or disposition of Term Priority Collateral with respect to the closing of the stores subject to the Triple Negative Lease (as defined below), pursuant to Section 363 of the Bankruptcy Code or in connection with "Store Closing Sales"; and (iv) upon the occurrence of a Cash Collateral Termination Event all Obligations under the Prepetition ABL Facility shall be immediately paid; provided, that notwithstanding the foregoing, A&P shall be permitted to retain proceeds of ABL Priority Collateral in the amount of the greater of: (x) to the extent provided in the Budget and (y) that provides A&P with $75 million in total of cash on hand (including (i) existing cash and (ii) pro forma for employee liabilities related to asset sales but not paid at the time of the consummation of such sales up to a maximum of $30 million) if such proceeds are received prior to October 31, 2015 or $60 million if such proceeds are received after October 31, 2015; provided that on October 31, 2015 any cash on hand in excess of $60 million shall be applied to repay the DIP

---

[1] In each instance where the consent or approval of the DIP Agent is required, it shall mean the DIP Agent acting at the direction of Required DIP Lenders under the DIP Credit Facility.

DOC ID - 23241036.4
WEIL:\95395704\8\50482.0004

Term Loans.  Any payment made pursuant to clauses (i) through (iv) above shall prepay and permanently reduce Loans and/or Cash Collateralize L/C Obligations under the Prepetition ABL Facility.

(j)   <u>Mandatory Prepayments; Prepetition Term Facility</u>: In addition to the payment of interest and Fees and Expenses set forth above, the Debtors shall pay to the Prepetition Term Agent for the benefit of the Prepetition Term Secured Parties the following amounts: (i) the liquidation proceeds from sales, dispositions, or casualty of Term Priority Collateral outside the ordinary course of business, including sales or disposition of Term Priority Collateral with respect to the closing of the stores subject to the Triple Negative Lease (as defined below), pursuant to Section 363 of the Bankruptcy Code or in connection with "Store Closing Sales";  and (ii) after payment in full of the Prepetition ABL Facility, all proceeds from sales, dispositions, or casualty of ABL Priority Collateral ordinary course of business, including sales or disposition of ABL Priority Collateral with respect to the closing of the stores subject to the Triple Negative Lease (as defined below), pursuant to Section 363 of the Bankruptcy Code or in connection with "Store Closing Sales"; <u>provided</u>, that notwithstanding the foregoing, A&P shall be permitted to retain proceeds of Term Priority Collateral in the amount of the greater of: (x) to the extent provided in the Budget and (y) that provides A&P with $75 million in total of cash on hand (including (i) existing cash and (ii) pro forma for employee liabilities related to asset sales but not paid at the time of the consummation of such sales up to a maximum of $30 million) if such proceeds are received prior to October 31, 2015 or $60 million if such proceeds are received after October 31, 2015; <u>provided</u> that on October 31, 2015 any cash on hand in excess of $60 million shall be applied to repay the DIP Term Loans.  Any payment made pursuant to clauses (i) and (ii) above shall prepay and permanently reduce Loans under the Prepetition Term Facility.

**Termination Event:**   The Debtors' right to use cash collateral shall immediately terminate upon the earlier of any of the following ("***Cash Collateral Termination Event***"):

(i)   One year from the date of entry of the Interim Order;

(ii)  the date which is 30 days following the date of entry of the Interim Order if a final order reasonably acceptable to the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Prepetition PIK/Toggle Notes Secured Parties and the Prepetition Convertible Notes Secured Parties approving the use of cash collateral and the DIP Term Facility has not been entered by the Bankruptcy Court on or prior to such date;

(iii) the acceleration of the obligations under the DIP Facility;

(iv)  the failure of the Debtors to make all adequate protection payments as and when required (including any cure period);

(v)   the failure of the Debtors to provide all Financial Reports or comply with the material terms and conditions of the Interim Order or Final Order (in each case subject to any applicable cure period);

6

the effective date of a Chapter 11 Plan that is confirmed pursuant to an order of the Bankruptcy Court;

(vii) the failure to meet any of the Milestones (as defined below) (as the same may be extended from time to time with the consent of the DIP Agent); or

(viii) dismissal of any of the Chapter 11 Cases, the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee in any of the Chapter 11 Cases.

**Remedies:** Upon the occurrence of a Cash Collateral Termination Event, (i) without any further notice or action the Debtors' right to use cash collateral shall immediately cease and all cash collateral shall be paid to the Prepetition ABL Agent and the Prepetition Term Loan Agent, subject to the Interim Order or the Final Order (each as defined below), as applicable, which shall incorporate relevant provisions from the Existing Intercreditor Agreement and (ii) upon 7 business days' written notice, the automatic stay of Section 362 of the Bankruptcy Code shall be terminated for the limited purpose of permitting the Prepetition ABL Agent and the Prepetition Term Loan Agent to exercise any and all of its rights and remedies with respect to the Collateral and any of the Loan Parties.

**Consent to DIP Facility:** Subject to the terms and conditions hereof the (i) Prepetition ABL Agent and Prepetition ABL Secured Parties, (ii) the Prepetition Term Loan Agent and the Prepetition Term Loan Secured Parties, (iii) the Prepetition PIK/Toggle Notes Agent and the Prepetition PIK/Toggle Notes Secured Parties, and (iv) the Prepetition Convertible Notes Agent and the Prepetition Convertible Notes Secured Parties shall consent to the Debtors entering into the DIP Facility set forth below. The DIP Facility shall be subject to the intercreditor provisions set forth in the Interim Order or the Final Order, as applicable, which shall incorporate relevant provisions from the Existing Intercreditor Agreement and the matters set forth in this Term Sheet.

## DEBTOR-IN-POSSESSION FACILITY COMPRISED OF
## THIRD OUT TERM LOAN FACILITY

**DIP Facility:** A Term Loan Facility in the aggregate principal amount of $100,000,000 (the "***DIP Facility***") comprised of "last out" term loans (the "***DIP Term Loans***").

**DIP Term Agent:** An entity to be designated by the DIP Lenders (as defined below) and reasonably acceptable to the Borrower (the "***DIP Agent***").

**DIP Term Lenders:** Mount Kellett Capital Management LP and Fortress Investment Group, or, as applicable, one or more of their designated affiliates or other parties identified by them and reasonably acceptable to the Debtors (the "***DIP Lenders***").

**Uses of Proceeds:** The DIP Facility will be used to provide liquidity for the Debtors throughout the Chapter 11 Cases in accordance with the DIP budget (which may be updated monthly with the consent of the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent and the majority of the Prepetition PIK/Toggle Notes holders and the majority of the Prepetition Convertible Notes holders (in each case such consent not to be unreasonably withheld or delayed); the "***Budget***").

7

| | |
|---|---|
| **DIP Facility Interim Funding Date:** | $50 million; generally such date as all conditions to the interim funding of the DIP Facility, including the filing of voluntary petitions to commence the Chapter 11 Cases, and entry of interim orders from the Bankruptcy Court in form and substance reasonably acceptable to the DIP Agent approving the DIP Facility and use of cash collateral (the "***Interim Order***") have been satisfied (the "***Interim Funding Date***"). |
| **DIP Facility Final Funding Date:** | Remaining $50 million; upon entry by the Bankruptcy Court of the final order (the "***Final Order Funding Date***") approving the DIP Facility, in form and substance reasonably acceptable to the DIP Agent ("***Final Order***"). |
| **DIP Facility Maturity Date:** | The DIP Facility shall mature on the earliest to occur of the following (any such date, the "***DIP Term Loan Maturity Date***"): |

    (i)      One year from the date of entry of the Interim Order;

    (ii)    the date which is 30 days following the date of entry of the Interim Order if a final order reasonably acceptable to the DIP Agent approving the DIP Facility has not been entered by the Bankruptcy Court on or prior to such date;

    (iii)   the date on which the DIP Lenders accelerate the Obligations outstanding under the terms of the DIP Facility and terminate the commitments to make Loans under the DIP Facility after the occurrence of an event of default in accordance with the terms of the DIP Facility;

    (iv)   the consummation of a sale of all or substantially all of the Debtors' assets;

    (v)    the effective date of a Chapter 11 Plan that is confirmed pursuant to an order of the Bankruptcy Court; and

    (vi)   the occurrence of a Cash Collateral Termination Event.

| | |
|---|---|
| **Interest Rates** | All rates shall be calculated on a 360-day basis. |
| **Interest Rate on DIP Facility:** | LIBOR + 12%, payable monthly with a LIBOR floor of 1.00%. |
| **Default Interest Rate:** | 2% per annum. |
| **DIP Facility Fees:** | |

<u>Make Whole</u>. If, on or prior to the date that is 6 months after the Interim Funding Date (the "***Make Whole Date***") the Borrower pays, for any reason (including, but not limited to, any optional payment whether before or after the occurrence of an Event of Default or after acceleration of the Term Loan), all or any part of the principal balance of the DIP Term Loans, or it is reduced or terminated, Borrower shall pay to the DIP Agent, for the benefit of the DIP Lenders, an amount (the "***Make Whole***") equal to the aggregate amount of interest which would have otherwise been payable on the amount of the principal payment of the DIP Term Loans from the date of payment or reduction until the Make Whole Date (subject to a customary discount).

<u>Closing Fee</u>. A Closing Fee in the amount of 2.5% of the original principal

8

amount of the DIP Facility, half of which shall be earned and payable on the Interim Funding Date and another half of which shall be earned and payable on the Final Funding Date.

<u>DIP Facility Administrative Fee</u>. $25,000 to be paid to the DIP Term Agent; earned in full and payable solely to the DIP Term Agent on the Interim Funding Date.

**Amortization:** No scheduled amortization prior to the DIP Term Loan Maturity Date.

**Cash Management:** Subject to changes required to comply with the requirements of section 345 of the Bankruptcy Code, cash management arrangements acceptable to the Prepetition ABL Agent (including full cash dominion) will be implemented and will be the subject of a "first day" Motion filed by the Borrower and an order of the Bankruptcy Court approving such cash management arrangements, such motion and order to be reasonably acceptable to the DIP Agent and the Prepetition ABL Agent (the "***Cash Management Order***").

**Mandatory Prepayments:** After payment in full of all obligations under the Prepetition ABL Facility (including cash collateralizing all outstanding Letters of Credit) and Prepetition Term Facility, all liquidation proceeds from sales, dispositions, or casualty of Collateral outside the ordinary course of business, including sales or disposition of Collateral with respect to the closing of the stores subject to the Triple Negative Lease (as defined below), pursuant to Section 363 of the Bankruptcy Code or in connection with "Store Closing Sales", shall be used to pay the amounts outstanding under the DIP Facility , <u>provided</u>, that notwithstanding the foregoing, A&P shall be permitted to retain proceeds of Collateral in the amount of the greater of: (x) to the extent provided in the Budget and (y) that provides A&P with $75 million in total of cash on hand (including (i) existing cash and (ii) pro forma for employee liabilities related to asset sales but not paid at the time of the consummation of such sales up to a maximum of $30 million) if such proceeds are received prior to October 31, 2015 or $60 million if such proceeds are received after October 31, 2015; <u>provided</u> that on October 31, 2015 any cash on hand in excess of $60 million shall be applied to repay the DIP Term Loans.

Subject to the Carve-out and the terms of the Interim Order or the Final Order, as applicable, (i) payments with the proceeds of Term Loan Priority Collateral shall be applied first, to obligations outstanding under the Prepetition Term Facility, second, to obligations under the Prepetition ABL Facility and third, to the obligations outstanding under the DIP Facility and (ii) payments with the proceeds of ABL Priority Collateral shall be applied first, to obligations outstanding under the Prepetition ABL Facility, second, to obligations under the Prepetition Term Facility and third, to the obligations outstanding under the DIP Facility.

**Collateral; Administrative Expense Claim:** Subject to the Carve-out, (i) the DIP Agent, for the benefit of the DIP Lenders, shall have fully perfected, third priority security interests and liens on all ABL Priority Collateral (junior to the liens of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties) and fully perfected, third priority security interests and liens on all Term Priority Collateral (junior to the liens of the Prepetition Term Loan Secured Parties and the Prepetition ABL Secured Parties) (the "***DIP Liens***"). Notwithstanding the foregoing, the DIP

9

Agent, for the benefit of the DIP Lenders, shall have security interests and liens on all assets of the Debtors (including all cash accounts but excluding (x) voting stock in excess of 65% and assets of St. Pancras Too, Limited and A&P Bermuda and (y) any asset the granting of a security interest in which would be void or illegal under any applicable law, or pursuant thereto would result in, or permit the termination, invalidation, cancellation, loss or abandonment of, such asset), regardless of whether such assets constituted ABL Priority Collateral or Term Priority Collateral prior to the Petition Date.

The DIP Agent, for the benefit of the DIP Lenders, shall also be granted an administrative expense claim having priority over all other administrative expense claims in the Debtors' Chapter 11 Cases, other than those granted as adequate protection to the Prepetition ABL Agent and the Prepetition Term Agent (the "***DIP Administrative Claims***") and the Carve-out.

| | |
|---|---|
| **Financial, Reporting, and Other Covenants:** | Covenants customary and appropriate for DIP financings and use of cash collateral of this type including, but not limited to, (a) minimum liquidity of $20 million, to be tested on Friday of each calendar week, (b) delivery of financial statements (including monthly P&L, balance sheet, statement cash flows, weekly cash flow variance reporting, and weekly updated 13-week cash flows), (c) actual amounts of disbursements may not exceed the applicable Budget by more than 15% on a cumulative basis for the last three week period then ended (the "***Budget Variances***") and (d) periodic status updates as to sale process. |

The covenants will include compliance with the Milestones (defined below). All Bankruptcy Court orders referenced herein shall be reasonably satisfactory to the DIP Agent.

| | |
|---|---|
| **Affirmative Covenants:** | Customary and appropriate for DIP financing and use of cash collateral, and generally consistent with the Prepetition Term Loan (with such modifications as are necessary to reflect the terms set forth in the Term Sheet (including the Debtors' asset sale strategy) and the nature of the DIP Facility as a debtor-in-possession facility and to reflect administrative agency and operational matters reasonably acceptable to the DIP Agent and the Borrower, the "***Documentation Principles***"), including without limitation, delivery of financial statements and other information, maintenance of existence, payment of taxes and claims, maintenance of properties and insurance, inspections and compliance with laws. |
| **Negative Covenants:** | Customary and appropriate for DIP financing and use of cash collateral, and generally consistent with the Documentation Principles and including limitations on indebtedness, liens, guarantees, negative pledges, restricted payments, subsidiary distributions, investments, fundamental changes, disposition of assets, acquisitions, disposal of subsidiary interests, sale and lease-backs, transactions with affiliates, conduct of business and deposit accounts. |
| **Representations and Warranties, and Indemnification:** | Customary and appropriate for DIP financing and use of cash collateral, and generally consistent with the Documentation Principles. |
| **Events of Default:** | Events of default (each an "***Event of Default***") customary and appropriate for DIP financing and use of cash collateral, and generally consistent with the Documentation Principles and also including the following related specifically |

to the Chapter 11 Cases:

    i.    the failure of the Debtors to obtain entry of the interim order authorizing and approving the use of cash collateral and the DIP Facility within five (5) business days following the Petition Date;

    ii.    the filing of a motion by the Debtors seeking dismissal of any of the Chapter 11 Cases, the dismissal of any of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;

    iii.    termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;

    iv.    other than as contemplated by this Term Sheet, entry of an order granting any lien or claim which is senior to or *pari passu* with the DIP Agent's lien and claims under the DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief);

    v.    entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full in cash of the DIP Facility as of the effective date of the plan;

    vi.    payment of or granting adequate protection with respect to prepetition debt (other than as approved by the DIP Agent and the Bankruptcy Court or as otherwise contemplated by the Loan Documents);

    vii.    failure of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein;

    viii.    the entry of one or more orders of the Bankruptcy Court lifting the automatic stay with respect to assets having a value in excess of $25,000,000 in the aggregate;

    ix.    the Interim Order or Final Order, as applicable, shall cease to be in full force and effect, or shall be amended, modified, stayed or vacated without the written consent of the DIP Agent;

    x.    asset purchase agreement(s) for the sale of Debtors' stores and other real and personal property with a minimum aggregate value of $250,000,000 (excluding inventory and scripts) shall cease to be in full force and effect;

    xi.    failure to comply with the Budget Variances;

    xii.    a Cash Collateral Termination Event; and

DOC ID - 23241036.4
WEIL:\95395704\8\50482.0004

|                | xiii. | failure to comply with any of Milestones (as the same may be extended from time to time with the consent of the DIP Agent). |

**Remedies:** Upon the occurrence and during the continuance of an Event of Default and subject to the Interim Order or the Final Order, as applicable, the DIP Agent may, in its sole and absolute discretion: (i) immediately (x) deliver a notice of an Event of Default, (y) terminate the DIP Facility, and (z) charge the default rate of interest on the DIP Term Loans; and (ii) upon 7 business days' written notice, the automatic stay of Section 362 of the Bankruptcy Code shall be terminated for the limited purpose of permitting the Lenders to do any of the following: (w) foreclose on the Collateral; (x) enforce all of their guaranty rights; and (y) declare the principal of and accrued interest, fees and expenses constituting the obligations under the DIP Facility to be due and payable.

**Milestones:** The following are the sale milestones with respect to the use of Cash Collateral and the DIP Facility (which dates may be extended with the consent of the DIP Agent; the "***Milestones***"):

i. On or before the date that is 10 days after the Petition Date, the Debtors shall have filed a motion to reject the real property leases identified on a schedule to be provided to the DIP Agent prior to the Interim Funding Date (the "***Triple Negative Leases***") and shall have obtained entry of an order authorizing such rejection and shall have vacated the premises of each of the Triple Negative Leases within the 60 days of the Petition Date;

ii. On or before (30) days after the Petition Date, the Bankruptcy Court shall have issued an order authorizing the retention of consultants to sell inventory at the Debtor's stores subject to Triple Negative Leases;

iii. On or before (30) days after the Petition Date, the Debtors shall have reached agreements with representatives of their collective bargaining units for relief from collective bargaining agreements, including the collective bargaining agreements applicable to the Triple Negative Leases and any other stores as they are closed, to implement store closing programs (which shall be reviewed with and reasonably satisfactory to the DIP Agent), including relief from "bumping" and other provisions that may be necessary to implement the same, or to the extent that the Debtors have not reached such an agreement by such time, the Debtors shall have filed a motion for temporary relief from the Bankruptcy Court pursuant to section 1113(e) of the Bankruptcy Code and shall have obtained entry of an order authorizing such relief within 45 days of the Petition Date;

iv. On or before the date that is 75 days after the Petition Date, the Debtors shall have filed a motion seeking an order ("***Lease Extension Order***") of the Bankruptcy Court extending the time period of the Debtors to assume or reject leases to not less than 210 days from the Petition Date;

v. On or before 120 days after the Petition Date, the Bankruptcy

DOC ID - 23241036.4
WEIL:\95395704\8\50482.0004

Court shall have entered the Lease Extension Order;

vi.    On or before the date that is 20 days after the Petition Date, the Debtors shall have filed a motion (the "**Sale Motion**") seeking entry of an order (the "**Bidding Procedures Order**") approving bidding and auction procedures in connection with a sale of Debtors' stores and other real and personal property with a minimum value of $275,000,000 (excluding inventory and scripts), pursuant to Section 363 of the Bankruptcy Code, which Sale Motion (including all deadlines contained therein) shall be reasonably satisfactory to the DIP Agent (the "**363 Sale**");

vii.   On or before the date that is 45 days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order which shall be in form and substance reasonably acceptable to the DIP Agent;

viii.  On or before October 15, 2015, the Bankruptcy Court shall have entered an order approving  the 363 Sale, with respect to the results of an auction of at least [__] stores for a value of at least [_____] (the "**Tier I Auction**") in connection with such 363 Sale, which order shall be in form and substance reasonably acceptable to the DIP Agent, and the winning bid received at the Tier I Auction;

ix.    On or before October 30, 2015, the Debtors shall have consummated the 363 Sale, pursuant to a purchase agreement entered into among the Debtors and the winning bidder(s) at the Tier I Auction;

x.     On or before the date that is 60 days after the Petition Date, the Bankruptcy Court shall have entered an order approving procedures for the wind down or sale of Debtors remaining stores not sold pursuant to the Tier I Auction;

xi.    On or prior to the date of the entry of any sale order, the Debtors shall either (i) reached agreements in good faith with representatives of their collective bargaining units for relief from collective bargaining agreements applicable to personnel of the stores subject to such sale, or (ii) shall have obtained entry of an order by the Bankruptcy Court authorizing relief from the Bankruptcy Court pursuant to section 1113 of the Bankruptcy Code.

**Carve Out and Professional Fees:**    There shall be a carve-out for the payment (collectively, the "**Carve-out**") of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $250,000, (iii)  all accrued and unpaid claims for unpaid fees, costs, and expenses incurred at any time before the Trigger Date (defined below), or any monthly or success or transaction fees payable to estate professionals, in each case by persons or firms retained by the Debtors or the Creditors' Committee, if any, whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 or 1103 of the Bankruptcy Code

13

(collectively, the "***Professional Persons***," and the fees, costs and expenses of Professional Persons, the "***Professional Fee***"), to the extent such Professional Fees are allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date (defined below) and (iv) all Professional Fees incurred on and after the Trigger Date (defined below) by Professional Persons and allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date, whether by interim order, procedural order or otherwise; <u>provided</u> that, other than with respect to any success or transaction fees that may become due and payable to Professional Persons which shall not be included in the Carve-out Cap, the payment of any Professional Fees of the Professional Persons (but excluding fees and expenses of third party professionals employed by Creditors' Committee's members) incurred on or after the Trigger Date (defined below) and allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date, whether by interim order, procedural order or otherwise, shall not exceed $2,000,000 in the aggregate (the "***Carve-out Cap***").

The "***Trigger Date***" shall mean the first business day after the occurrence and during the continuance of an Event of Default (as defined below) and delivery of written notice thereof (the "***Carve-out Notice***") to (A) the United States Trustee for the Southern District of New York, (B) A&P and A&P's counsel and (C) counsel for the Official Committee of Unsecured Creditors (the "***Creditors' Committee***").

Immediately upon delivery of a Carve-out Notice, the Debtors shall be required to transfer from their concentration account to a segregated account (the "***Carve-out Account***") not subject to the control of The DIP Agent an amount equal to the Carve-out Cap plus an amount equal to the aggregate unpaid fees, costs and expenses described in clauses (iii) and (iv) of the definition of "Carve-out," in each case as determined by a good faith estimate of the applicable Professional Person. The proceeds on deposit in the Carve-out Account shall be available only to satisfy obligations benefitting from the Carve-out, and The DIP Agent (1) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-out Account and (2) shall have a security interest in any residual interest in the Carve-out Account available following satisfaction in full of all obligations benefitting from the Carve-out.

For the avoidance of doubt, the Carve-out shall be senior to any claims arising under or relating to and liens securing the DIP Facility, the Prepetition Revolving ABL Credit Agreement, the Prepetition Term Credit Agreement, the PIK Toggle Notes and the Convertible Notes, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests.

| | |
|---|---|
| **Conditions Precedent to Borrowing under the DIP Facility and Use of Cash Collateral and Other Requirements:** | Customary for facilities of this type, including: |

i.    The preparation, authorization and execution of the Loan Documents with respect to the DIP Facility consistent with the terms hereof and in form and substance reasonably satisfactory to the DIP Agent, the Prepetition Term Agent and Prepetition ABL Agent.

ii.    The Debtors shall have commenced the Chapter 11 Cases in the Bankruptcy

DOC ID - 23241036.4
WEIL:\95395704\8\50482.0004

Court.

iii. The Bankruptcy Court shall have entered the Interim Order, in form and substance reasonably satisfactory to the DIP Agent, the Prepetition Term Agent and Prepetition ABL Agent and approving the DIP Facility, cash collateral usage and the transactions contemplated thereby, including, without limitation, the granting of superpriority status, security interests and liens as contemplated herein, which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agent, the Prepetition Term Agent and Prepetition ABL Agent and (ii) all motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to the DIP Agent, the Prepetition Term Agent and Prepetition ABL Agent.

iv. All fees and expenses (including reasonable and documented out-of pocket fees and expenses of counsel) required to be paid to the DIP Agent, the Prepetition Term Agent and Prepetition ABL Agent on or before the closing date shall have been paid.

v. The delivery of 13-week cash flow projections and an initial DIP budget in form and substance reasonably acceptable to the DIP Agent, the Prepetition Term Agent and Prepetition ABL Agent.

vi. The DIP Agent shall have received a satisfactory opinion of Weil, Gotshal & Manges LLP, counsel to the Borrower and the Guarantors, addressing such matters as the DIP Agent shall reasonably request, including due authorization, execution, delivery and enforceability of all Loan Documents and the perfection of security interests.

vii. The DIP Agent shall have a valid and perfected lien on and security interest in the Collateral with the priority described in this Term Sheet.

viii. All filings, recordations and searches necessary in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid.

ix. The Debtors shall have appointed Christopher McGarry or another person reasonably acceptable to the DIP Agent, the Prepetition Term Agent and Prepetition ABL Agent as Chief Restructuring Officer.

x. To the extent feasible under the circumstances, all pleadings filed by the Debtors that could reasonably be expected to affect the DIP Facility, the Collateral or the rights or remedies of the DIP Agent and are of the types to be agreed, and all orders entered by the Bankruptcy Court (including, without limitation, the Interim Order) shall be in form and substance reasonably acceptable to the DIP Agent.

xi. The Loan Parties shall have executed Stalking Horse Asset Purchase Agreements ("*APAs*") covering stores with a minimum value attributable to the assets of $275,000,000 (excluding inventory and scripts) upon terms and conditions reasonably acceptable to the DIP Agent, the Prepetition Term Agent and the Prepetition ABL Agent.

15

xii. The Debtors shall have paid all rent due with respect to their lease locations that are subject to APAs.

xiii. The Bankruptcy Court shall have entered an Interim Order approving the DIP Facility and cash collateral usage and the DIP Facility shall have closed in accordance therewith.

xiv. The Lenders and Holders, as applicable, representing a majority of the principal amount of each of the Prepetition ABL Facility, the Prepetition Term Facility, the PIK Toggle Notes and the Convertible Notes shall have consented to the DIP Facility on the terms set forth in this Term Sheet.

xv. There shall exist no default under the DIP loan documents.

xvii. The representations and warranties of the Loan Parties contained in the DIP loan documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, the funding on the Interim Funding Date or the Final Order Funding Date, as appropriate.

xviii. The making of such DIP Term Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

**Choice of Law:**    State of New York (or other such jurisdiction with which the Borrower files the Petition)

**Expenses:**    The Borrower agrees to fully reimburse reasonable and documented out-of-pocket expenses of legal counsel to each of the DIP Agent and the DIP Lenders in their capacities as such, limited however, in the case of local counsel, to one firm of local counsel in each appropriate jurisdiction.

*This Indicative Term Sheet is intended for discussion purposes only does not purport to summarize all the terms, conditions, representations, warranties and other provisions with respect to the transactions referred to herein. This Indicative Term Sheet does not constitute an offer, agreement, or commitment by The DIP Agent or any of its affiliates to enter into any transaction. Any such commitment (i) will be subject to completion of our credit approval process, (ii) will be subject to the execution and delivery of a definitive Commitment Letter reasonably acceptable to all parties and their respective counsel, (iii) will be subject to the completion of our legal and business due diligence and our satisfaction with the results thereof and (iv) will assume the accuracy and completeness in all material respects of the information provided by or on behalf of the Borrower. This Indicative Term Sheet is confidential and may not be disclosed to any person or entity other than the Borrower's respective officers, directors and professional advisors. NOTE THAT ALL INDICATIVE INTEREST RATES AND INDICATIVE OTHER TERMS REFERRED TO HEREIN ARE SUBJECT TO CHANGE BASED ON PREVAILING MARKET CONDITIONS AND SHOULD BE CONSIDERED INDICATIVE FOR THE INTENDED TRANSACTION FOR ONLY SEVEN DAYS FROM THE DATE FIRST WRITTEN ABOVE.*

[Remainder of Page Intentionally Blank]

DOC ID - 23241036.4
WEIL:\95395704\8\50482.0004