WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** : | |
| **COMPANY, INC.,** *et al.*, : | **Case No. 15-23007 (RDD)** |
| : | |
| **Debtors.**[1] : | **(Joint Administration Pending)** |
| : | |

-------------------------------------------------------------x

## MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363, 365 AND 554 FOR APPROVAL OF (I) GLOBAL PROCEDURES FOR (A) STORE CLOSINGS, (B) THE EXPEDITED SALE, TRANSFER, OR ABANDONMENT OF DE MINIMIS ASSETS, AND (C) REJECTING UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES, AND (II) ENTRY INTO A LIQUIDATION CONSULTING AGREEMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Two Thousand Eight Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent:

### Preliminary Statement

1.        The Debtors are pursuing a strategic mergers and acquisitions strategy (the "**Sale Strategy**") with the goal of consummating as many going concern sales of their 297 stores as possible.  The Sale Strategy contemplates a multi-tiered process.  The Debtors intend to sell approximately 120 of their core stores, with the possibility of additional stores added to the auction process (the "**Tier I Stores**"), to certain third-party bidders in connection with the extensive prepetition marketing and sales process that the Debtors conducted with the assistance of Evercore Partners LLC ("**Evercore**").[2]  Running on a parallel track, the Debtors are seeking approval of procedures for the sales of certain of their remaining 177 stores (the "**Tier II Stores**") that will be facilitated by a robust marketing process conducted by Hilco Real Estate, LLC ("**Hilco**").[3]  The relief requested by this motion provides for the orderly disposition of the Debtors stores (the "**Tier III Stores**") or assets for which no third-party has acquired, or made or is likely to make a firm offer.

2.        The Debtors have designed procedures to liquidate certain of their inventory, furniture, fixtures and equipment (the "**FF&E**") and sell or transfer of prescription

---

[2] Contemporaneously herewith, the Debtors have filed a motion seeking approval of the procedures to sell the Tier I Stores and the terms and conditions provided for under certain purchase agreements.  The Debtors have also filed a motion seeking authority to retain Evercore in these chapter 11 cases.

[3] Contemporaneously herewith, the Debtors have filed motions seeking approval of the procedures to sell the Tier II Stores and authority to retain Hilco in these chapter 11 cases.

WEIL:\95399474\5\50482.0004

drug products and the customer prescriptions themselves (the "**Pharmaceutical Assets**" and, together with the FF&E, the "**Store Closing Assets**").  The procedures also provide for the ability to sell, transfer, or abandon certain surplus, obsolete, non-core, or burdensome assets (the "**De Minimis Assets**") and for the rejection of unexpired nonresidential real property leases.  To run a seamless and efficient large-scale store closing process and to maximize the value of the Store Closing Assets and Pharmaceutical Assets, the Debtors are seeking authority to enter into a liquidation consulting agreement (the "**Liquidation Consulting Agreement**"), with a liquidation consulting firm that the Debtors determine in their business judgment proposes the most favorable terms (the "**Liquidation Consultant**").

3.     Currently, the Debtors and their advisors have identified a subset of 25 Tier III Stores that are underperforming (the "**Initial Closing Stores**") and are seeking to reject the leases (the "**Initial Closing Store Leases**") associated therewith.  A list of the Initial Closing Stores is attached hereto as **Exhibit "A"**.  Given the significant operating losses continuing in the Initial Closing Stores and the Debtors' liquidity constraints, the Debtors need to immediately begin the closing process.  The Initial Closing Stores have an aggregate daily negative cash flow rate of approximately $75,000 and approximately $2.5 million each month.  The Debtors estimate that closure of the Initial Closing Stores will generate approximately $20 million in savings for the remainder of the 2015 fiscal year.  Additionally, the sale of the Store Closing Assets located in Initial Closing Stores will yield approximately $48 million in gross proceeds, providing the Debtors with a necessary and significant cash infusion.

4.     The closing procedures that the Debtors are seeking to implement are similar to those previously approved by this Court during the Debtors' chapter 11 cases that were commenced on December 12, 2010 (Case No. 10-24549) [ECF No. 1004] (the "**2010 Chapter**

3

**11 Cases**"), and generally exercised on a smaller scale by the Debtors in the ordinary course of business.[4] The relief requested in this motion is integral to maximize the value of the Debtors' estates. It will permit the orderly closing of Tier III Stores and provide liquidity needed to facilitate the Sale Strategy.

<u>**Background**</u>

5.       On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors (the "**Creditors' Committee**") has been appointed in these chapter 11 cases.

6.       Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

7.       Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**McGarry Declaration**"), sworn to on the date hereof, which has been filed with the Court contemporaneously herewith.

---

[4] The Debtors believe that the Store Closing Sales may qualify as an ordinary course activity for which specific court approval would not be required under 363(c) of the Bankruptcy Code and are requesting the relief herein to ensure that they have the imprimatur of this Court to conduct the necessary liquidation sales without having to comply with lease and local law restrictions that may impede such sales. The Debtors reserve their right to conduct future ordinary course sales and related activities without relief from the Court.

4

## Jurisdiction

8.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

9.     By this Motion, pursuant to sections 105(a), 363, 365 and 554 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006, the Debtors request entry of an order granting the authority, but not the direction, to (I) implement procedures to (A) sell Store Closing Assets, free and clear of liens, claims or encumbrances, and (B) sell, transfer, or abandon De Minimis Assets, (II) enter into a Liquidation Consulting Agreement, and (III) (A) implement procedures to reject unexpired nonresidential real property leases and (B) reject the Initial Closing Store Leases.  The Debtors request interim relief with respect to the relief requested in (I) and (II) above.  Such relief, including any and all authorizations or payments requested herein, shall be subject to and implemented in accordance with the provisions of the applicable DIP Orders (as defined in the McGarry Declaration).

10.     Proposed forms of the interim order and the final order are attached hereto as **Exhibit "B"** and **Exhibit "C"**, respectively.

## The Proposed Global Store Closing Procedures

11.     The Debtors and their advisors have engaged in a systematic process to determine the value for each of their stores and market the stores as part of the Sale Strategy.  The Tier III Stores are generally characterized as having negative "four-wall" EBITDA[5] and

---

[5] "Four-wall" EBITDA measures earnings before interest, taxes, depreciation, and amortization on a store-by-store basis so that while the costs of operating each store are taken into account, there is no allocation for corporate overhead costs or store-level capital expenditures.

WEIL:\95399474\5\50482.0004

leasehold-value locations. For each Tier III Store the Debtors considered the potential cash proceeds from inventory liquidation, the potential to monetize the underlying leasehold interest, ongoing capital expenditure requirements and store closing costs, including hung marketing costs, warehouse costs, and labor costs.[6] In each case, there is a net benefit to the Debtors' estates of closing the Tier III Stores.

12. The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, their prepetition secured lenders (the "**Prepetition Secured Lenders**")[7] and their proposed postpetition debtor-in-position financing lenders (the "**Proposed DIP Lenders**"),[8] that retaining a Liquidation Consultant and implementing the procedures outlined below will provide the best and most efficient means of disposing of Store Closing Assets to maximize their value to the estate.

**A.      The Global Store Closing Procedures**

13. The Debtors propose to implement the following procedures (the "**Store Closing Procedures**") to effectively close any store or location (the "**Store Closing Sales**"):

> a.      The Store Closing Sales will be conducted during normal business hours or such hours as otherwise permitted by the applicable unexpired lease and the Debtors will abide by any applicable shopping center guidelines regarding maintenance, security, and trash removal.
>
> b.      The Store Closing Sales will be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Store Closing Sales

---

[6] Certain allocated costs cannot be eliminated upon closing a store, including certain fixed warehouse expenses, marketing expenses and the labor costs attendant with terminating employees.

[7] Prepetition Secured Lenders are the parties to that certain (i) Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014, (ii) Amended and Restated Secured Term Credit Agreement, (iii) Indenture, dated as of March 13, 2012, providing for the issuance of Senior Secured PIK Toggle Notes due 2017, and (iv) Indenture, dated as of March 13, 2012, providing for the issuance of Senior Secured Convertible Notes due 2018.

[8] Contemporaneously herewith, the Debtors have filed a motion seeking, *inter alia*, authority to obtain postpetition financing, use cash collateral and grant certain protections to prepetition secured parties.

will be conducted on Sunday unless the Debtors have been operating such stores on Sundays.

c.       All display and hanging signs used by the Debtors in connection with the Store Closing Sales will be professionally lettered and all hanging signs will be hung in a professional manner. No additional restrictions will be imposed on the Debtors that are not contained in the applicable lease. In addition, the Debtors will be permitted to utilize exterior banners and sign-walkers.

d.       If Store Closing Sales are to be considered "final," conspicuous signs will be posted in each of the affected stores to the effect that all sales are "final."

e.       The Debtors will not make any alterations to interior or exterior store lighting, and will not use any type of amplified sound to advertise the Store Closing Sales or solicit customers.

f.       No alterations will be made to the Closing Stores, except as authorized pursuant to the applicable lease. The hanging of exterior banners or other signage will not constitute an alteration to a store.

g.       No property of any landlord will be removed or sold during the Store Closing Sales.

h.       The Debtors will keep store premises and surrounding areas clear and orderly, consistent with past practices.

i.       The Liquidation Consultant, at the Debtors direction, will negotiate any particular modifications to the Store Closing Procedures in regards to number and placement of signs or banners.

j.       The Debtors do not have to comply with lease provisions or covenants that are inconsistent with these procedures.

k.       The Debtors do not have to comply with the Liquidation Laws (as defined below).

l.       Pharmaceutical Assets will be sold or transferred in accordance with applicable state law.

m.       The Liquidation Consultant, on behalf and at the direction of the Debtors, may sell, transfer or abandon De Minimis Assets in accordance with the procedures for selling, transferring or abandonment of De Minimis Assets set forth below (the "**De Minimis Asset Procedures**").

n.       An unexpired nonresidential real property lease will only be deemed rejected in accordance with the lease rejection procedures set forth below (the "**Lease Rejection Procedures**").

WEIL:\95399474\5\50482.0004

14.     In conjunction with the filing of this Motion, the Debtors have notified affected landlords, unions, and relevant regulatory authorities, among other parties, to apprise them of the Initial Closing Stores to which the Store Closing Procedures will apply upon Court approval.[9]   As additional Closing Stores are identified, the Debtors will similarly notify the affected parties.

i.      ***Compliance with Liquidation Sale Laws and Lease Provisions***:

15.     Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local laws, statutes, rules, regulations, and ordinances (the "**Liquidation Sale Laws**").   Liquidation Sale Laws establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closing Sales. Such requirements may hamper the Debtors' efforts to maximize estate value in selling their inventory, a significant portion of which consists of perishable items.   The Debtors intend to conduct the Store Closing Sales in accordance with the Store Closing Procedures without complying with the Liquidation Sale Laws.[10]

16.     Similarly, the Debtors respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors' ability to maximize recovery through the Store Closing Sales.   The Tier III Stores are located on properties that are leased by the Debtors.   In certain cases, the contemplated Store Closing Sales may be inconsistent with

---

[9] The Debtors have served upon affected employees and their union representatives required notice under the Worker Adjustment and Retraining Notification Act.

[10] The Debtors will continue to comply with laws, statutes, rules, or ordinances which are for the protection of the health and safety of the public and consumer protection laws.

certain provisions of leases, subleases or other documents with respect to any such leased premises, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.

      **ii.**    *Disposition of Pharmaceutical Assets*:

    17.    The Debtors operate pharmacies at many of their stores, including 23 of the Initial Closing Stores. The Pharmaceutical Assets located in pharmacies at a Closing Store will not be sold to the general public. The Debtors are required by applicable state law to make the customer prescriptions available to customers at pharmacies in close proximity to the location of the Closing Store.[11] Where the Debtors operate a pharmacy in a Tier I Store or Tier II Store that is near a Closing Store, the Pharmaceutical Assets will be transferred to such Tier I Store or Tier II Store. Where a Tier I Store or Tier II Store is not in close proximity, the Debtors will market and sell the Pharmaceutical Assets at cost to other pharmacies located in close proximity that have signed confidentiality agreements. The prescription drug products will be sold at cost given that a potential purchaser will not have a reason to pay more when they can obtain the same drugs at equal or less cost directly from the drug manufacturer. The Debtors' customers need access to their prescription drugs immediately and any delay in the transfer of Pharmaceutical Assets will greatly depress any potential bid from third-party purchasers. Based on the Debtors' historical experience with pharmaceutical sales and the Debtors' average estimated per-store Pharmaceutical Asset value, the Debtors estimate that the aggregate value of the Pharmaceutical Assets at the Initial Closing Stores is between $10 million and $15 million.

---

[11] *See, e.g.,* N.J. Admin. Code §§ 13:39-4.10 and 13:39-4.11 (2010) (providing that where a pharmacy is to be discontinued and closed for any reason, all medications, prescriptions, and copies of patient profiles must be transferred to another location); N.Y. Educ. Law § 6812 (McKinney 2010) (same); 24 Del. Admin. Code § 2500-4 (2011) (same).

WEIL:\95399474\5\50482.0004

### iii.    *Proposed Liquidation Consulting Agreement*

18.    The Debtors weighed several considerations before determining to engage a liquidation consulting firm on terms similarly to those approved during the 2010 Chapter 11 Cases and reflective of the market.  The Debtors knew that they would need to immediately apply the Store Closing Procedures to the Initial Closing Stores to avoid incurring significant and unnecessary expenses and losses.  The number of Initial Closing Stores that need to be simultaneously closed warrants the use of a liquidation firm.  A similar need for a liquidator arose during the 2010 Chapter 11 Cases in order to close a sizeable group of the Debtors' stores and this Court approved such relief.  Retaining a liquidation consulting firm will achieve the maximum value for the Store Closing Assets and minimize administrative expenses.

19.    Prior to the Commencement Date, the Debtors ran a request-for-proposal process for a liquidation consultant to assist with the Store Closing Sales.  To facilitate a competitive process, the Debtors contacted four nationally recognized liquidation consulting firms.  The Debtors provided all four firms with solicitation packages containing (i) a form of baseline terms to start negotiations, (ii) store-level profit-and-loss data for the past year, (iii) store-level inventory data on a cost basis for the last four week period, (iv) store-level fixed asset data, and (v) store-level inventory data at retail.  The Debtors received bids from all four firms approached.  The Debtors are in the process of reviewing the bids received and are actively engaged in negotiations with the firms to ensure that the best terms were arrived at.  The Debtors anticipate selecting a Liquidation Consultant to serve as their consultant in accordance with terms and conditions similar to those set forth in the Liquidation Consulting Agreement within a

week of the Commencement Date.[12]  Upon selection, the Debtors and the Liquidation Consultant will formulate a comprehensive store closing schedule to begin by the end of July at the latest.

20.     The Liquidation Consulting Agreement generally provides that the Liquidation Consultant will advise the Debtors with respect to the sale of their Store Closing Assets.  Specifically, the Liquidation Consultant will, among other things, (a) provide the Debtors with qualified supervisors as independent contractors to oversee the management of the Closing Stores, (b) determine the appropriate pricing of the Store Closing Assets, staffing levels for the Closing Stores, and advertising of the Store Closing Sales, (c) coordinate accounting functions for the Closing Stores, including evaluation of the sales of Inventory by category, sales reporting, and monitoring of expenses using the Debtors' infrastructure, (d) coordinate with the landlords and any other tenants or subtenants, as necessary (e) dispose of any unsold Store Closing Assets, and (f) clean the premises to "broom clean" condition.

21.     In consideration of the services to be rendered, the Debtors propose to provide the Liquidation Consultant with a fee equal to a percentage of the gross sale proceeds related to the Inventory (the "**Inventory Fee**").  The Liquidation Consultant may also sell the FF&E in the Tier III Stores at the direction of the Debtors, will receive a commission equal to a percentage of the gross receipts from all sales or other dispositions of FF&E at the Tier III (the "**FF&E Commission**").  In addition, the Debtors propose to reimburse the Liquidation Consultant for certain reasonable out-of-pocket expenses incurred in connection with the sale or other disposition of the Store Closing Assets pursuant to a budget agreed to between the parties. The Debtors submit that the terms proposed under the Liquidation Consulting Agreement are

---

[12] Although the Debtors are not retaining the Liquidation Consultant pursuant to section 327 of the Bankruptcy Code, upon selection, the Liquidation Consultant will file a declaration setting forth its connections, if any, with certain parties-in-interest as evidence of its disinterestedness.

reasonable and the Debtors' selection process will ensure that the Inventory Fee, FF&E Commission, and any other fees agreed to by the Debtors are reasonable and market based. Payments to the Liquidation Consultant shall be subject to the applicable provisions of the DIP Order.

iv. ***Global Procedures to Sell, Transfer or Abandon De Minimis Assets***

22.     Periodic sales of De Minimis Assets, such as FF&E, leases, and liquor licenses, are a necessary, ordinary-course element of the Debtors' businesses and will be beneficial to the Debtors' estates. In connection with the operation of their business, the Debtors regularly sell De Minimis Assets. Disposition of obsolete or no-longer-needed equipment and assets serve to bolster the Debtors' cash position and the Debtors need to have established procedures in place to reduce costs to the Debtors' estates in disposing of these assets.

23.     The proposed procedures below will streamline the disposition of De Minimis Assets and at the same time, ensure that parties in interest receive appropriate notice of dispositions above a specific threshold. The proposed procedures are consistent with the customary procedures approved in cases of this size and in this district (including in the 2010 Chapter 11 Case).

24.     The Debtors propose to sell or transfer each of the De Minimis Assets for the highest and best offer received, taking into consideration the exigencies and circumstances in each such sale or transfer, using the following procedures (the "**De Minimis Asset Sale Procedures**"):

(a)     For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a sale price, as measured by the amount of cash and other consideration to be received by the Debtors on account of the assets to be sold ("**Sale Price**"), less than or equal to $250,000:

(i)     the Debtors are authorized to consummate such transactions if the

WEIL:\95399474\5\50482.0004

Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court or notice to any party;

(ii)     any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction; and

(iii)    each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser.

(b)     For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a Sale Price greater than $250,000 and less than or equal to $5,000,000:

(i)     the Debtors are authorized to consummate such transactions if the Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court, subject to the procedures set forth herein;

(ii)     any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction;

(iii)    each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser;

(iv)    the Debtors shall, at least five (5) calendar days prior to closing such sale or effectuating such transfer, serve a written notice of such sale or transfer by e-mail, facsimile, or overnight delivery service (each notice, a "**De Minimis Asset Sale Notice**") to (a) the Office of the United States Trustee for Region 2; (b) proposed counsel to the Creditors' Committee, if any; (c) any known affected creditor(s), including counsel to any creditor asserting a lien claim or encumbrance on the relevant De Minimis Assets, and their respective counsel, if known; (d) those parties requesting notice pursuant to Bankruptcy Rule 2002; (e) counsel to the agent for the Debtors' Proposed DIP Lender, if approved; (f) counsel to the agent for the Debtors' Prepetition Secured Lenders; (U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured PIK Toggle Notes due 2017 (the "**Prepetition PIK Notes**"); (g) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured Convertible Notes due 2018 (the "**Prepetition Convertible Notes**");

13

(h) counsel for the holders of a majority of the Prepetition PIK Notes; and (i) counsel for the holders of a majority of the Prepetition Convertible Notes (collectively, the "**Notice Parties**");

(v)     the content of the De Minimis Asset Sale Notice shall consist of:
- identification of the De Minimis Assets being sold or transferred and its location;
- identification of the purchaser of the assets and any relationship such party has with the Debtors;
- identification of any parties known to the Debtors as holding liens or encumbrances on the assets subject to the De Minimis Assets being sold and a statement indicating whether all such liens or encumbrances are capable of monetary satisfaction;
- the purchase price;
- any other significant terms of the sale or transfer; and
- date and time within which objections may be filed and served on the Debtors;

(vi)     Objections, if any, must be in writing and served on the other Notice Parties and counsel to the Debtors so as to be received by all such parties prior to 4:00 p.m. (Eastern Time) on the fifth calendar day after service of the De Minimis Asset Sale Notice and must state with specificity the grounds for the objection;

(vii)     if no written objections are filed by any of the Notice Parties within five (5) calendar days of service of such De Minimis Asset Sale Notice, the Debtors are authorized to immediately consummate such transaction; and

(viii)     if a written objection is received from a Notice Party within such five-day (5-day) period that cannot be resolved, the objection will be deemed a request for a hearing on the objection at the next scheduled hearing, subject to adjournment by the Debtors, and the relevant De Minimis Asset(s) shall only be sold upon withdrawal of such written objection or further order of the Court specifically approving the sale or transfer of the De Minimis Asset(s).

25.     The Debtors intend to sell the De Minimis Assets where possible, however, if the Debtors are unable to find purchasers for any De Minimis Asset, the Debtors seek authority to abandon property pursuant to the following procedures (the "**De Minimis Asset Abandonment Procedures**") where, in the exercise of their reasonable business

14

judgment, the Debtors determine that the cost of continuing to maintain, relocate, and store such De Minimis Assets outweighs any potential recovery from a future sale:

    (a)    For De Minimis Assets that the Debtors believe in their sound business judgment have a book value, as recorded in the Debtors' books and records ("**Book Value**"), less than or equal to $250,000:

        (i)    the Debtors are authorized to abandon such De Minimis Assets if the Debtors determine in the reasonable exercise of their business judgment that such abandonment is in the best interest of the estates, without further order of the Court or notice to any party.

    (b)    For De Minimis Assets that the Debtors believe in their sound business judgment have a Book Value greater than $250,000 but less than or equal to $5,000,000:

        (i)    The Debtors shall, at least five (5) calendar days prior to abandoning De Minimis Assets, serve a written notice of such abandonment by e-mail, facsimile, or overnight delivery service (each notice, an "**Abandonment Notice**") to the Notice Parties;

        (ii)    the content of the Abandonment Notice shall consist of: (a) identification of the De Minimis Assets being abandoned and location; and (b) a summary of the reasons for abandoning such De Minimis Assets;

        (iii)    if a written objection is received from a De Minimis Notice Party within such five-day (5-day) period that cannot be resolved, the relevant De Minimis Assets shall only be abandoned upon withdrawal of such written objection or further order of the Court.

26.    The Debtors will file a report with the Court and serve on all parties entitled to notice in the cases, within 30 days after each calendar quarter, summarizing any sales, transfers, or abandonments consummated pursuant to the De Minimis Asset Procedures.

**Global Procedures to Reject
Unexpired Nonresidential Real Property Leases**

27.    The Debtors, together with the assistance of their advisors, are analyzing all of the unexpired nonresidential real property leases to ensure, *inter alia*, that the Debtors harness their value or shed their expense for the benefit of the Debtors' estates. In connection

15

with this process, the Debtors and their advisors identified the Initial Closing Stores as stores with: (1) negative 4-wall EBITDA; (2) no interest from potential buyers; and (3) leases with a negative market value.

28.     The Debtors, in their business judgment, have decided to close the Initial Closing Stores and to reject the associated Initial Closing Store Leases.  The Initial Closing Store Leases represent an unnecessary expense to the estates, contribute no value to the Debtors' balance sheet, and will cost the Debtors approximately $3.85 million a month in labor costs, $1.63 million a month in rent charges, and, *inter alia*, $1.24 million in operating expenses.  In addition to the significant savings obtained by shedding the Initial Closing Stores' expenses, the Debtors stand to receive gross proceeds of approximately $48 million upon selling the Initial Closing Stores' Store Closing Assets.

29.     The Debtors  propose the following Lease Rejection Procedures to reject other unexpired nonresidential real property leases and/or subleases deemed unmarketable:

(a)     Rejection Notice.  The Debtors will file a notice (the "**Rejection Notice**") to reject the identified unexpired lease(s) and/or sublease(s) pursuant to section 365 of the Bankruptcy Code, which Rejection Notice shall set forth, among other things: (i) the unexpired lease(s) and/or sublease(s) to be rejected; (ii) the names and addresses of the counterparties to such unexpired lease(s) and/or sublease(s); (iii) the proposed effective date of the rejection for each such unexpired lease(s) and/or sublease(s) ("**Rejection Date**"); and (iv) the deadlines and procedures for filing objections to the Rejection Notice (as set forth below). The Rejection Notice shall include the proposed order approving rejection of the unexpired lease(s) and/or sublease(s) (the "**Rejection Order**").

(b)     Rejection Date.  The Rejection Date for any unexpired lease not sublet to a third party shall not be before the later of: (i) service of the Rejection Notice; (ii) the Debtors' unequivocal surrender of the leased premises in broom clean condition with all property that is not owned by the lease or sublease counterparty removed from the premises including any and all hazardous (as such term is defined in any federal, state or local law, rule, regulation or ordinance) materials and the delivery of the keys, key codes, and alarm codes to the premises to the applicable lease counterparty; or (iii) five (5) days after the Notice of Abandonment (as defined herein) is

sent to applicable third parties. The Rejection Date for any unexpired lease sublet to a third party and any related sublease shall not be before ten (10) days after the service of the Rejection Notice.

(c) <u>Service of the Rejection Notice</u>. The Debtors will cause the Rejection Notice to be served by (i) overnight mail upon the unexpired lease or sublease counterparties, and their counsel, if known, affected by the Rejection Notice and (ii) e-mail upon the Notice Parties.

(d) <u>Objection Procedures</u>. Parties objecting to a proposed rejection must file and serve a written objection so that such objection is filed with the Court and is actually received by the Notice Parties no later than ten (10) calendar days after the date the Debtors serve the relevant Rejection Notice (the "**Rejection Objection Deadline**").

(e) <u>Event of No Objection</u>. Absent an objection being filed by the Rejection Objection Deadline, the Debtors shall submit the proposed Rejection Order within five (5) days of the Rejection Objection Deadline, together with a statement confirming the absence of any timely objections to the relief granted by the Rejection Order. The Rejection Order shall set forth the applicable bar date for filing claims arising from the rejection of such unexpired lease(s) and/or sublease(s) and the Rejection Date.

(f) <u>Unresolved Objections</u>. If an objection to the rejection of any unexpired lease(s) and/or sublease(s) is timely filed and not withdrawn or resolved, the Debtors shall file a notice for a hearing for the Court to consider the objection for the unexpired lease(s) and/or sublease(s) to which such objection(s) relates at the next scheduled omnibus hearing after the Rejection Objection Deadline, unless the Debtors and lease and sublease counterparties, as applicable, agree to an earlier hearing date and subject to the Court's schedule. If such objection is overruled or withdrawn, such unexpired lease(s) and/or sublease(s) shall be deemed rejected as of the Rejection Date or such other date to which the Debtors and the counterparty to such unexpired lease(s) and/or sublease(s) have agreed or such other date as determined by the Court.

## <u>The Relief Requested Should be Granted</u>

### I. The Store Closing Procedures Are A Sound Exercise of the Debtors' Business Judgment

30. The Court may grant the relief requested herein pursuant to sections 105(a) and 363 of the Bankruptcy Code. Section 105(a) provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the

17

provisions of this title."  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).

31.     To obtain Court approval to use property under section 363(b) of the Bankruptcy Code for the purpose of a store closing sale, the Debtors need only show a legitimate business justification for the proposed action.  *See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.") (citation omitted).  When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1990) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence." *Integrated Res.*, 147 B.R. at 656 (citations omitted).

32.     Ample business justification for the Store Closing Sales exists.  Prior to the Commencement Date, the Debtors, with the assistance of their advisors, engaged in an extensive review of each of their stores to (a) identify underperforming and unprofitable stores, (b) consider whether the store's performance can be improved by various initiatives, and

18

(c) determine what stores should be closed immediately to eliminate their ongoing negative impact on the Debtors' liquidity and financial performance. This process has already resulted in the Debtors' identification of the Initial Closing Stores to be closed on or around September [19], 2015. Additionally, the ability to sell or transfer the Pharmaceutical Assets located at the Initial Closing Stores is a necessary step in ensuring the Debtors are capable of closing the unprofitable Initial Closing Stores on the desired schedule and the bid process utilized by the Debtors will ensure the best price is received for any Pharmaceutical Assets sold. Any Store Closing Assets that are not sold during the Store Closing Sales will be transferred to surrounding locations or abandoned pursuant to the procedures provided for herein for abandonment of De Minimis Assets.

33.     Implementing the Store Closing Procedures will provide the Debtors with needed liquidity to satisfy their obligations during these chapter 11 cases and increase recovery to their creditors. The Debtors will select any additional Tier III Stores to undergo the Store Closing Procedures after a comprehensive analysis of those stores' profitability, ability to be sold during the Debtors' sales process conducted by Evercore or Hilco, and negative leasehold value. Store Closing Procedures may also be used in conjunction with a Tier I or Tier II Store sale process, including for the disposition of otherwise excluded assets. While the Debtors seek to have the Store Closing Procedures and authority to enter into a Liquidation Consultant Agreement apply immediately to the Initial Closing Stores, the Debtors will await a final hearing to obtain the authority to apply such procedures to any later identified Closing Stores, which will give all parties in interest an opportunity to be heard by the Court.

34.     Any interruption or delay in the Debtors' ability to efficiently close store locations during these chapter 111 cases could have serious negative consequences for the

Debtors' estates. Closing of the Initial Closing Stores alone will generate an approximate $20 million savings for the remainder of fiscal year 2015. Delays in a liquidation process have unique implications for the Debtors, as grocers, given the limited shelf-life of much of the Inventory they sell. Thus, to maintain the value of the Store Closing Assets, it is important that the Court permit the Debtors to act in the most expeditious and efficient manner possible. The Debtors submit that there is a sufficient business justification for the Debtors to immediately begin implementing the Store Closing Procedures.

35. This Court approved nearly identical procedures in the Debtors' 2010 Chapter 11 Cases. *See also In re Delia's, Inc.*, Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 10, 2014). Additionally, other courts in this district and elsewhere have approved store closing or liquidation sales in chapter 11 cases involving retail debtors. *See, e.g., In re Blockbuster, Inc., Case No.* 10-14997 (Bankr. S.D.N.Y. Jan. 20, 2011); *In re Movie Gallery, Inc., Case No.* 10-30696 (Bankr. E.D. Va. Feb. 4, 2010); *In re Finlay Enters., Inc., Case No.* 09-14873 (Bankr. S.D.N.Y. Sept. 25, 2009); *In re Value City Holdings, Inc.*, Case No. 08-14203 (Bankr. S.D.N.Y. Nov. 20, 2008); *In re Circuit City Stores, Inc., Case No.* 08-35653 (Bankr. E.D. Va. Nov. 10, 2008); *In re Steve and Barry's Manhattan LLC*, Case No. 08-12579 (Bankr. S.D.N.Y. Aug. 22, 2008); *In re BFW Liquidation, LLC, f/k/a Bruno's Supermarkets, LLC, Case No.* 09-00634 (Bankr. N.D. Ala. March 2, 2009); *In re Goody's Family Clothing, Case No.* 08-11153 (Bankr. D. Del. June 13, 2008); *In re Sharper Image Corp.*, Case No. 08-10322 (Bankr. D. Del. Mar. 14, 2008); *In re Winn-Dixie Stores, Inc.*, Case No. 05-03817 (Bankr. M.D. Fla. July 27, 2005).

WEIL:\95399474\5\50482.0004

**A.  Sales of the Store Closing Assets Free And Clear Of All Liens, Claims or Encumbrances Is Warranted**

36.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

37.    The Debtors anticipate that, to the extent there are liens on the Store Closing Assets that would be the subject of the Store Closing Sales, the Prepetition Secured Lenders, the Proposed DIP Lender (if approved), and all other known holders of any liens on such assets, have each consented or will each consent to the sales thereof because such sales provide the most effective, efficient, and time-sensitive approach to realizing proceeds for, among other things, the repayment of amounts due to such parties.  Any and all liens on the Store Closing Assets sold under the Store Closing Sales would be satisfied or would attach to the remaining net proceeds of such sales with the same force, effect, and priority as such liens currently have on these assets, subject to the rights and defenses, if any, of the Debtors and of any party-in-interest herein with respect thereto.  Application of the sale proceeds will generally be subject to the terms of the postpetition debtor-in-possession financing approved by the Court.

WEIL:\95399474\5\50482.0004

38.     Moreover, all identified lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Any such entity that does not object to the sale should be deemed to have consented.  *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold." (internal citations omitted)); *Hargrave v. Twp. of Pemberton* (*In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *Citicorp Homeowners Serv., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *see also In re Enron Corp.*, Case No. 01-16034, 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. July 28, 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

39.     Accordingly, the Debtors submit that the sale of the Store Closing Assets free and clear of any liens, claims, encumbrances, and other interests satisfy the statutory requirements of section 365(f) of the Bankruptcy Code.

**B.      The Court Should Invalidate Contractual Restrictions That Impair the Debtors' Ability to Conduct the Store Closing Sales**

40.     Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors.  Such sales are consistently approved by courts, despite provisions of recorded documents or agreements purporting to forbid such sales.  Indeed, this Court as well as other courts in this district have deemed such restrictive contractual provisions unenforceable in other chapter 11cases as impermissible restraints on a debtor's ability to maximize the value of

its assets under section 363 of the Bankruptcy Code. *See, e.g., In re the Great Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549 (RDD) (Bank. S.D.N.Y. Mar. 10, 2011) (relieving the debtors of any restrictions in a lease agreement or similar document that was inconsistent with the Store Closing Procedures); *In re Blockbuster Inc.*, Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) (any restrictions in leases or comparable documents purporting to limit the debtors' ability to conduct store closing sales are unenforceable); *In re Bradlees Stores, Inc.*, Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 4, 2001) (authorizing debtors to conduct "going out of business" sales notwithstanding restrictive lease provisions restricting debtors' ability to conduct such sales); *In re R.H. Macy & Co.*, 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (finding anti-store closing sale covenant in lease unenforceable against debtor "because it conflicts with the debtor's fiduciary duty to maximize estate assets"). Moreover, the Store Closing Procedures, like the sale guidelines approved in other cases cited herein, provide the appropriate protections for any legitimate concerns that landlords might otherwise have with respect to the conduct of the Store Closing Sales.

41.     Accordingly, the Debtors request that the Court authorize the Debtors to conduct the Store Closing Sales without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

### C.     The Court Should Waive Compliance with Any State and Local Laws, Statutes, Rules, and Ordinances Restricting Store Closing Sales

42.     The Debtors submit that there is various support for granting them the authority to not comply with the Liquidation Laws. First, it is generally accepted that statutes and regulations provide that, if a liquidation or bankruptcy sale is court authorized, then a company need not comply with the Liquidation Sale Laws. Second, pursuant to section 105(a)

of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Sale Laws.

43.     Third, this Court will be able to supervise the Store Closing Sales because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. Creditors and the public interest are adequately protected by the notice of this Motion and the ongoing jurisdiction and supervision of this Court. Moreover, 28 U.S.C. § 959, which requires trustees (and, thus, debtors in possession) to comply with state and other laws in performance of their duties, does not apply to the Store Closing Sales. Courts have held that 28 U.S.C. § 959 does not apply to debtors or their agents when they are liquidating assets. *See, e.g., In re Borne Chemical Co.*, 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is only applicable when property is being managed or operated for the purpose of continuing operations).

44.     Fourth, even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtors submit that, to the extent such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief available under section 363 of the Bankruptcy Code. Consistent with this premise, bankruptcy courts have recognized that federal bankruptcy laws preempt state and local laws that contravene the underlying policies of the Bankruptcy Code. *See, e.g., Belculfine v. Aloe (In re Shenango Grp., Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . [A] state statute [ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."). While preemption of state law is not always appropriate, as when the protection of

WEIL:\95399474\5\50482.0004

public health and safety is involved, *see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake)*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation. *Id.* at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

45.     Here, section 363 of the Bankruptcy Code, which requires the Debtors to operate their business in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of Liquidation Sale Laws because the Liquidation Sale Laws may constrain the Debtors' ability to marshal and maximize assets for the benefit of its estate.  In addition to this Court granting nearly identical relief during the Debtors' 2010 Chapter 11 Cases, similar relief has been granted in other bankruptcy cases in this district.  *See In re Blockbuster Inc.*, Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) (authorizing the debtors to conduct store closing sales notwithstanding federal, state, and local laws governing the conduct of store closing and liquidation sales); *In re Finlay Enters., Inc.*, Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) (authorizing debtors to conduct "going out of business" sales "without the necessity of compliance" with certain "going out of business" laws); *In re Steve & Barry's Manhattan LLC*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) (authorizing store closing sales without requiring compliance with laws affecting store closing or liquidation sales).

46.     The Debtors also request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the

Store Closing Sales or the advertising and promotion (including through the posting of signs) of Store Closing Sales.

## II. The Lease Rejection Procedures Are In the Best Interests of the Estates

47. As designed, the Lease Rejection Procedures will allow the Debtors to quickly minimize administrative expenses for rejected leases and will eliminate substantial legal expenses that would otherwise be incurred if multiple hearings were held on separate motions with respect to every lease that the Debtors seek to reject. The Lease Rejection Procedures are also fair and reasonable to lease counterparties because they afford parties in interest the opportunity to appear and be heard with respect to the rejection of the Debtors' leases. The ability to reject burdensome nonresidential real property leases is an important tool provided to Debtors under the Bankruptcy Code.

48. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

49. The standard to be applied by a court in determining whether the assumption or rejection of an unexpired nonresidential real property lease pursuant to section 365(a) of the Bankruptcy Code should be approved is the "business judgment" test, which requires that the debtor have determined that the requested assumption or rejection would be beneficial to its estate. *See, e.g., Group of Inst. Investors, Inc. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) (noting "the question [of assumption] is one of business judgment"); *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (finding that to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one); *Nat'l Sugar Ref. Co. v. Stroehmann Bros. Co.* (*In re Nat'l Sugar*

*Ref. Co.*), 26 B.R. 765, 767 (Bankr. S.D.N.Y. 1983) (holding that absent invalidation, a debtor seeking to assume a profitable contract should be allowed to do so); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996) (finding that the decision to assume was good business judgment where assumption would allow the debtor estate to substantially reduce an outstanding proof of claim and receive payments in the future).

50. Upon finding that a debtor has exercised its sound business judgment in determining that the assumption or rejection of an executory contract or unexpired lease is in the best interests of the debtors, its creditors and all parties in interest, the court should approve such assumption or rejection under section 365(a) of the Bankruptcy Code. *See, e.g., In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc.* (*In re Bradlees Stores, Inc.*), 194 B.R. 555, 558 (Bankr. S.D.N.Y. 1996); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989).

51. As described above, the Initial Closing Stores satisfy objectively negative criteria, and the Debtors decided, in their business judgment, to close the them as promptly as is practicable. To complete any such closing, the Initial Closing Store Leases encumbering the Initial Closing Stores must be rejected. The Debtors have determined that the Initial Closing Store Leases constitute an unnecessary drain on the Debtors' resources, and rejection of the Initial Closing Store Leases reflects the Debtors' exercise of sound business judgment.

52. It is beyond peradventure that any lease encumbering a store that the Debtors are no longer operating is an unnecessary financial burden for the estates to bear and should be rejected. Accordingly, in an effort to reduce postpetition administrative costs and in the exercise of the Debtors' sound business judgment, the rejection of unmarketable leases

WEIL:\95399474\5\50482.0004

pursuant to the Lease Rejection Procedures is in the best interests of the estates because it will eliminate significant future rent obligations.

### A. The Lease Rejection Procedures Comply with the Procedural Requirements of Bankruptcy Rule 6006

53.     As a procedural matter, "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease . . . is governed by Rule 9014." FED. R. BANKR. P. 6006(a).  Bankruptcy Rule 9014 provides that:  "In a contested matter . . . , not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought." FED. R. BANKR. P. 9014(a).  The notice and hearing requirements for contested matters under Bankruptcy Rule 9014 are satisfied if appropriate notice and an opportunity for hearing are given in light of the particular circumstances.  *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" or a similar phrase to mean such notice and an opportunity for hearing "as [are] appropriate in the particular circumstances").  The Lease Rejection Procedures provide for notice to unexpired lease counterparties and an opportunity to be heard at a hearing, and thus satisfy the requirement of Bankruptcy Rules 6006(a) and 9014.

54.     Under Bankruptcy Rule 6006(e), a debtor may join requests for authority to assume and assign or reject multiple unexpired leases in one motion, subject to Bankruptcy Rule 6006(f).  *See* FED. R. BANKR. P. 6006(e).  Bankruptcy Rule 6006(f) sets forth six requirements that motions to assume or reject multiple unexpired leases must satisfy.  These requirements are procedural in nature.  A motion to assume or reject multiple unexpired leases that are not between the same parties shall:

(a)     state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;

(b)     list parties alphabetically and identify the corresponding contract or lease;

28

(c) specify the terms, including the curing of defaults, for each requested assumption or assignment;

(d) specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;

(e) be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases; and

(a) be limited to no more than 100 executory contracts or unexpired leases.

FED. R. BANKR. P. 6006(f).

55.     The Lease Rejection Procedures satisfy Bankruptcy Rule 6006(f).  The clear purpose of Bankruptcy Rule 6006(f) is to protect the due process rights of counterparties to the Debtors' leases.   Counterparties must be able to locate their leases and readily determine whether their leases are being assumed or rejected.  The Debtors will comply with all applicable procedural requirements of Bankruptcy Rule 6006(f) when serving the Rejection Notices.  The Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6006(f) in regards to the Initial Closing Store Leases set forth on Exhibit A hereto.

56.     Under the circumstances, given the number of leases the Debtors are party to, obtaining separate Court approval of each rejection would impose unnecessary administrative burdens on the Debtors and the Court and result in costs to the Debtors' estates that would decrease the economic benefits of rejection or assumption and assignment.   Therefore, the Debtors request approval of the Lease Rejection Procedures as the most efficient and economical way for the Debtors to address any rejection of their unexpired leases.

III.     **The De Minimis Asset Procedures Are in the Best Interests of the Estates**

57.     The proposed De Minimis Asset Sale Procedures should be approved because they:  (1) constitute an exercise of the Debtors' sound business judgment; (2) satisfy the notice and hearing requirements of section 363(b)(1); (3) satisfy the requirements of section

363(f) allowing the Debtors to sell property free and clear; and (4) are within the Courts authority under section 105(a) of the Bankruptcy Code.

58.     Further, the proposed De Minimis Asset Abandonment Procedures should be approved because they are necessary to the efficient administration of the Debtors' estates and satisfy the requirements of section 554 of the Bankruptcy Code.  Section 554(a) of the Bankruptcy Code provides that a debtor in possession "after a notice and hearing . . . may abandon any property of the estate that . . . is of inconsequential value and benefit to the estate." The right to abandon property is, except for certain exceptions inapplicable in the present case, unfettered.  *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 506–07 (1986) (noting one such exception and holding that section 554(a) does not preempt state laws aimed at protecting the public's health and safety).

A.     **De Minimis Asset Sale Procedures**

59.     The Debtors submit that the sale of property pursuant to the De Minimis Asset Sale Procedures is both an exercise of sound business judgment and in the best interests of the estates and their creditors.  Disposing of these De Minimis Assets in the manner proposed herein is the most efficient and cost-effective means of maximizing the value to be realized. Obtaining Court approval for each such sale transaction would result in unnecessary administrative costs attendant to drafting, serving, and filing pleadings, as well as time incurred by attorneys for Court appearances, which could drastically reduce the ultimate net value of these assets.  The proceeds generated by consummated De Minimis Asset sale transactions do not warrant the incurrence of such expenses.  The Debtors, their advisors, and the Liquidation Consultant have significant experience with these types of sales and, as a result, are very well versed in obtaining the best sale price possible.

WEIL:\95399474\5\50482.0004

60. Moreover, the Debtors often face stringent time constraints in meeting the closing deadlines established by interested purchasers, as well as in selling assets before they significantly decline in value. The expedited procedures set forth herein will permit the Debtors to be responsive to the needs of interested purchasers (and thereby guard against lost sales due to delay), while still providing interested parties with the ability to review significant transactions. Notably, while the Debtors request authorization to sell assets for a Sale Price of up to $5 million, the Debtors believe that many individual transactions will, in fact, be for substantially less. Further, in light of the immense size of the Debtors' estates, the proposed sale price limitations are relatively modest and appropriate. The estates are further protected by the opportunity for the Creditors' Committee (if any), the U.S. Trustee, the Prepetition Secured Lenders and the Proposed DIP Lender to review and object to any De Minimis Sale Notice.

61. The notice and hearing requirements contained in section 363(b)(1) are satisfied if appropriate notice and an opportunity for a hearing are given in light of the particular circumstances of the proposed sale. Generally, Bankruptcy Rules 2002(a)(2) and 2002(i) require that a minimum of twenty days' notice of proposed sales of property outside the ordinary course of business be provided by mail to "the debtor, the trustee, all creditors and indenture trustees" and any committee appointed under section 1102 of the Bankruptcy Code, unless a debtor shows "cause." Moreover, courts are authorized to limit notice of asset sales outside of the ordinary course of a debtor's business, even without a prior showing of cause, to any official committee appointed under section 1102 of the Bankruptcy Code and any creditor or equity holder requesting notice. *See* FED. R. BANKR. P. 2002(i). The Debtors submit that sufficient cause exists to implement the modified notice provisions proposed herein because these modified

notice procedures will improve the efficiency of the sale process for De Minimis Assets and maximize the value of the assets to the Debtors' estates.

62.     Furthermore, as stated above, the sale of property outside of the ordinary course of business may occur only "after notice and a hearing." 11 U.S.C. § 363(b)(1).  Such sales are authorized without an actual hearing, however, if no party in interest timely requests such a hearing.  *See* 11 U.S.C. § 102(1)(B)(i) (notwithstanding the statutory requirement for "notice and a hearing," the Bankruptcy Code "authorizes an act without an actual hearing if such notice is given properly and if such a hearing is not requested timely by a party in interest").

63.     The proposed De Minimis Asset Sale Procedures comport with the hearing requirements of the Bankruptcy Code, as well as due process, by providing interested parties with an opportunity to present objections on each proposed Noticed De Minimis Sale and then have a hearing with respect to the proposed Noticed De Minimis Sale and objection.  Under these circumstances, a Noticed De Minimis Sale may be approved without a hearing if no Interested Party has filed an objection with respect thereto.  Furthermore, under the proposed De Minimis Asset Sale Procedures, any known holder of a lien on any Non-Noticed De Minimis Sale will receive adequate notice of this Motion, and an opportunity to object.

64.     Assets encumbered by interests held by other parties may be sold pursuant to the De Minimis Asset Sale Procedures only if those interests are capable of monetary satisfaction or the holders of these interests consent to the proposed Non-Noticed or Noticed De Minimis Sale.  As such, the requirements of section 363(f) of the Bankruptcy Code would be satisfied for any proposed Non-Noticed or Noticed De Minimis Sale free and clear of liens, claims or encumbrances.  Moreover, as noted above, the Debtors propose that such interests attach to the proceeds of the sales.

## B.     De Minimis Asset Abandonment Procedures

65.     Section 554(a) of the Bankruptcy Code provides that a debtor in possession "after a notice and hearing . . . may abandon any property of the estate that . . . is of inconsequential value and benefit to the estate."  The right to abandon property is, except for certain exceptions inapplicable in the present case, unfettered.  *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 506–07 (1986) (noting one such exception and holding that section 554(a) does not preempt state laws aimed at protecting the public's health and safety).

66.     The Debtors submit that implementation of the De Minimis Asset Abandonment Procedures is appropriate in these chapter 11 cases and well within the Court's equitable powers under section 105 of the Bankruptcy Code.  The proposed De Minimis Asset Abandonment Procedures are necessary to the efficient administration of the Debtors' estates because they provide the Debtors with a mechanism by which they can:  (1) stop the accrual of various burdensome expenses associated with retaining certain illiquid assets; (2) avoid the oftentimes difficult process of location buyers for assets that are damaged or on premises that the Debtors no longer use, as well as fees associated with locating such buyers; and (3) minimize any distraction that may result from the challenges involved in attempting to sell illiquid assets that are of inconsequential value to the Debtors' estates.

67.     In light of the demonstrable benefits of streamlined procedures to sell or abandon relatively small assets and the legal justifications described above, procedures similar to the De Minimis Asset Sale Procedures and De Minimis Asset Abandonment Procedures have been approved by courts in this and other districts.  *See, e.g., In re Patriot Coal*, Case No. 15-32450 (KLP) (Bankr. E.D.Va. Jun. 25, 2015) (authorizing the abandonment of assets with a book value less than $10 million on ten days' notice);  *In re NII Holdings, Inc.*, Case No. 14-12611 (SCC) (Bankr. S.D.N.Y. Nov. 12, 2014) (authorizing abandonment of assets with a book value

less than $250,000 and no advance notice if book value is less than $50,000); *In re NII Holdings, Inc.*, Case No. 14-12611 (SCC) (Bankr. S.D.N.Y. Nov. 12, 2014) (authorizing abandonment of assets with a book value less than $250,000 and no advance notice if book value is less than $50,000); *In re Eastman Kodak Company*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 28, 2012) (authorizing abandonment of assets with book value less than $3 million without notice and greater than $3 million but less than $10 million on ten days' notice); *In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. March 10, 2011) (authorizing sales less than $500,000 with no advance notice and sales greater than $500,000 and less than or equal to $4,000,000 on seven days' advance notice to interested or affected parties); *In re Lehman Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.NY. Jun. 17, 2009) (authorizing abandonment of assets (without a cap) that, in the debtors' business judgment, are not necessary to their winding down, are of inconsequential value to their estates, or for which the costs associated with a sale exceed the proceeds that would be generated from such sale, on five days' notice).

## IV. Entry into the Liquidation Consulting Agreement is in the Best Interests of the Debtors and Their Estates

68.     As described above, to use estate property to, the Debtors need only show a legitimate business justification.  *See, e.g., In re Lionel Corp.*, 722 F.2d at 1070.[13]  The Debtors' decision to utilize the services of a Liquidation Consultant and pay it for such services is a reasonable exercise of their business judgment.  To maximize the value of the Store Closing Assets through the Store Closing Sales, the Debtors determined it was necessary to hire a

---

[13] The Debtors believe entry into the Liquidation Consulting Agreement may be an ordinary course activity for which Court approval is not required given that the Debtors have entered such agreements historically and that such agreements are common in the industry for conducting store closings, but are nonetheless seeking Court approval out of an abundance of caution and to give transparency to the selection process.

national liquidator with significant experience in a large-scale liquidation. The firms that the Debtors have solicited proposals from each have extensive expertise in conducting store closing sales and can oversee, and assist in the management and implementation of, the Store Closing Sales in an efficient and cost effective manner. The Liquidation Consulting Agreement will enable the Debtors to utilize the experience, skills, and resources of the selected Liquidation Consultant to effectively and efficiently conduct the Store Closing Sales and, thus, significantly improve the potential value to be received through the Store Closing Sales for the benefit of all stakeholders.

69.    Further, each of the Liquidation Consultant's fees will be based on the successful sale of the Store Closing Assets. The Debtors believe that the competitive marketing process will ensure the fee percentages they ultimately agree to will be market based, and consistent with the fees this Court and other courts have approved in connection with entry into liquidating consulting agreements. *See, e.g., In re Lack's Stores, Inc.*, No. 10-60149 (Bankr. S.D. Tex. Nov. 16, 2010) (approving a $4,500 per store base fee, a fee equal to 20% of net proceeds of sales of merchandise in excess of 64% of the cost value of the merchandise, and 15% of proceeds from sales of furniture, fixtures, and equipment); *In re Bruno's Supermarkets, LLC,* No. 09-00634 (Bankr. N.D. Ala. Mar. 2, 2009) (approving a fee equal to 3% of net proceeds of sales of merchandise and 15% of proceeds from sales of furniture, fixtures, and equipment; *In re Value City Holdings, Inc.*, No. 08-14197 (Bankr. S.D.N.Y. Nov. 20, 2008) (approving a $25,00 per store base fee, up to a $25,000 per store success fee based on a 54.6% gross return on merchandise adjusted downward for lower gross return percentages, and a fee equal to 10% of gross proceeds from sales of furniture, fixtures, and equipment).

WEIL:\95399474\5\50482.0004

70.     As noted above, the Debtors believe that the Liquidation Consultant will use its expertise to assist the Debtors in the disposition of their Tier III Stores.  Value realized in such transactions will inure to the benefit of the Debtors' estates which will more than offset any expenses incurred through the Liquidation Consultant's retention.  Thus, the decision to employ the Liquidation Consultant is a sound exercise of the Debtors' business judgment.

### The Debtors Satisfy Bankruptcy Rule 6003 and Request Waiver of Bankruptcy Rule 6004

71.     Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve "a motion to assume or assign an executory contract or unexpired lease in accordance with § 365" or "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate" prior to 21 days after the commencement date.  FED. R. BANKR. P. 6003(b).  As discussed more fully above, the Debtors and their estates and creditors will be irreparably harmed if entry of the Interim Order is delayed for 21 days after the Commencement Date.  For the same reasons, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  *See* FED. R. BANKR. P. 6004(a) and (h).

### Reservation of Rights

72.     Nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's

WEIL:\95399474\5\50482.0004

order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### Notice

73.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for Region 2; (ii) the holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014; (v) the attorneys for Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014; (vi) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured PIK Toggle Notes due 2017 (the "**Prepetition PIK Notes**"); (vii) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured Convertible Notes due 2018 (the "**Prepetition Convertible Notes**"); (viii) the attorneys for the holders of a majority of the Prepetition PIK Notes; (ix) the attorneys for the holders of a majority of the Prepetition Convertible Notes; (x) the attorneys for the DIP Agent; (xi) the attorneys for The Yucaipa Companies, LLC and their affiliated funds; (xii) attorneys for the United Food and Commercial Workers Union International; (xiii) the Securities and Exchange Commission; (xiv) the Internal Revenue Service; (xv) the United States Attorney's Office for the Southern District of New York; and (xiv) the counterparties to the Initial Closing Store Leases.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

WEIL:\95399474\5\50482.0004

74.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: July 19, 2015
       New York, New York

/s/ Ray C. Schrock, P.C.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors
and Debtors in Possession*

WEIL:\95399474\5\50482.0004

# Exhibit A

## Rejected Initial Closing Store Leases

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 70212 | Riverhead Centre, LLC | A&P Real Property, LLC | 1510 Old Country Rd. Riverhead, NY | Jul. 31, 2023 |
| 70213 | 3620 Long Beach Road LLC (as successor in interest to Nathan Serota) | A&P Real Property, LLC | 3620 Long Beach Rd Oceanside, NY | June 30, 2021 |
| 70244 | East Marlboro Associates | A&P Real Property, LLC | 863 E. Baltimore Pike Kenneth Square, PA | Aug. 31, 2017 |
| 70314 | Center Square Plaza Associates | A&P Real Property, LLC | 1301 Skippack Pike Center Square, PA | May 22, 2020 |
| 70343 | AVR CP-TWO, LLC | A&P Real Property, LLC | 2 Westbury Avenue Carle Place, NY | Aug. 31, 2015 |
| 70562 | C'PIA, LLC | A&P Real Property, LLC | Route 13 & Maple Rd (aka 2105 Philadelphia Pike) Claymont DE | Apr. 30, 2020 |
| 70597 | Basser-Kaufman of Matawan, L.L.C. | A&P Real Property, LLC | 325 Route 35 Cliffwood, NJ | Mar. 31, 2023 |
| 70656 | Holmdel Towne Center, LLC | A&P Real Property, LLC | 2101 Route 35 Holmdel, NJ | Mar. 31, 2018 |
| 70726 | Delaware 1851 Associates, LP | A&P Real Property, LLC | 1851 S. Christopher Columbus Blvd Philadelphia, PA | Sept. 30, 2020 |
| 72128 | BOIV Belleville MCB, LLC | A&P Real Property, LLC | 115 Belmont Ave Belleville, NJ | Jan. 31, 2034 |
| 72175 | Cliffpass SPE Corp., successor to Cliffpass Development, Inc. | A&P Real Property, LLC | Botany Plaza 85 Ackerman Ave Clifton, NJ | Mar. 31, 2017 |
| 72185 | Clifton Grocery Stores, LLC | A&P Real Property, LLC | 895 Paulison Ave Clifton, NJ | Mar. 31, 2033 |
| 72512 | Valley Circle, Inc. | A&P Real Property, LLC | 651 North Stiles St Linden, NJ | Jan. 31, 2019 |
| 72535 | Wick Shopping Plaza Associates, L.L.C. | A&P Real Property, LLC | 561 Route 1, Unit B Edison, NJ | Oct. 31, 2017 |
| 72538 | MCB East Brunswick, LLC | A&P Real Property, LLC | 50 Race Track Rd East Brunswick, NJ | Oct. 31, 2033 |
| 72564 | OLP-MCB Philly-Cottman, LP, as successor in interest to 840 Cottman Associates, LLC | A&P Real Property, LLC | 840 Cottman Ave. Philadelphia, PA | Sept. 30, 2021 |

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 72567 | Garnet Company | A&P Real Property, LLC | 420 MacDade Blvd Folsom, PA | May 31, 2017 |
| 72581 | Old Bridge Plaza Associates, LLC | A&P Real Property, LLC | 1043 US Route 9 Old Bridge, NJ | Oct. 31, 2017 |
| 72582 | Indian Head Plaza Associates, successor in interest to Peter L. Levine | A&P Real Property, LLC | 1256 Indian Head Road Toms River, NJ | Jan. 31, 2020 |
| 72589 | Realty Income Corporation as successor to Inland Diversified Wilmington Lancaster, L.L.C. as successor to WE APP Wilmington LLC | A&P Real Property, LLC | 3901 Lancaster Pike Wilmington, DE | Nov. 30, 2030 |
| 72623 | First Real Estate Investment Trust of New Jersey | A&P Real Property, LLC | 399 Route 112 Patchogue, NY | May 31, 2022 |
| 72663 | Kimco Centereach, LLC | A&P Real Property, LLC | 2150 Middle Country Rd Centereach, NY | Sept. 30, 2020 |
| 76248 | Echo Swedesford Associates LP as successor in interest to 400 West Swedesford Road Holdings LLC, as successor in interest to Swedesford Shopping Center Acquisition, LLC | A&P Real Property, LLC | 400-450 W. Swedesford Rd Devon, PA | Apr. 30, 2021 |
| 76363 | Walnutport Associates | Super Fresh Food Markets, Inc. and/or A&P Real Property, LLC as successor in interest | 300 S. Best Ave & Main St Walnutport, PA | June 30, 2021 |
| 76723 | US Bank National Association, as successor in interest to Liberty Plaza Limited Partnership | A&P Real Property, LLC | 85 Franklin Mills Blvd Philadelphia, PA | Nov. 30, 2020 |

2

**Exhibit B**

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                               :

In re                                :        **Chapter 11**
                                               :

**THE GREAT ATLANTIC & PACIFIC TEA**   :       **Case No. 15-23007 (RDD)**
**COMPANY, INC.,** *et al.*,                 :
                                               :       **(Joint Administration Pending)**

            **Debtors.**[1]               :
-----------------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C.**
**§§ 105, 363, 365 AND 554 APPROVING (I) GLOBAL**
**PROCEDURES FOR (A) STORE CLOSINGS, (B) THE EXPEDITED**
**SALE, TRANSFER, OR ABANDONMENT OF DE MINIMIS ASSETS,**
**AND (C) REJECTING UNEXPIRED NONRESIDENTIAL REAL PROPERTY**
**LEASES, AND (II) ENTRY INTO A LIQUIDATION CONSULTING AGREEMENT**

Upon the motion (the "**Motion**")[2] of The Great Atlantic & Pacific Tea Company, Inc.

and certain of its affiliates and subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant, pursuant to sections 105(a),

363, 365, and 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), for an order

authorizing the Debtors to (i) implement the Store Closing Procedures, (ii) sell, transfer or

abandon De Minimis Assets pursuant to the De Minimis Asset Procedures, (iii) enter into a

Liquidation Consulting Agreement, (iv) implement the Lease Rejection Procedures, and

(v) reject the Triple Negative Leases identified on **Exhibit 1** attached hereto, all as more fully set

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Two Thousand Eight Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given to the Notice Parties as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and upon the Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, filed contemporaneously with the Motion, the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis to the extent set forth herein; and it is further

ORDERED that the Debtors are authorized, but not directed, pursuant to section 105(a), 363, 365 and 554 of the Bankruptcy Code, to conduct Store Closing Sales at Closing Stores pursuant to the following store closing procedures (the "**Store Closing Procedures**"):

> 1.  The Store Closing Sales will be conducted during normal business hours or such hours as otherwise permitted by the applicable unexpired lease, and the

Debtors will abide by any applicable shopping center guidelines regarding maintenance, security, and trash removal.

2.      The Store Closing Sales will be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Store Closing Sales will be conducted on Sunday unless the Debtors have been operating such stores on Sundays.

3.      All display and hanging signs used by the Debtors in connection with the Store Closing Sales will be professionally lettered and all hanging signs will be hung in a professional manner.  No additional restrictions will be imposed on the Debtors that are not contained in the applicable lease. In addition, the Debtors will be permitted to utilize exterior banners and sign-walkers.

4.      If Store Closing Sales are to be considered "final," conspicuous signs will be posted in each of the affected stores to the effect that all sales are "final."

5.      The Debtors will not make any alterations to interior or exterior store lighting, and will not use any type of amplified sound to advertise the Store Closing Sales or solicit customers.

6.      No alterations will be made to the Closing Stores, except as authorized pursuant to the applicable lease.  The hanging of exterior banners or other signage will not constitute an alteration to a store.

7.      No property of any landlord will be removed or sold during the Store Closing Sales.

8.      The Debtors will keep store premises and surrounding areas clear and orderly, consistent with past practices.

9.      The Liquidation Consultant, at the Debtors direction, will negotiate any particular modifications to the Store Closing Procedures with any landlord in regards to number and placement of signs or banners.

10.     The Debtors do not have to comply with lease provisions or covenants that are inconsistent with these procedures.

11.     The Debtors do not have to comply with the Liquidation Laws (as defined below).

12.     Pharmaceutical Assets will be sold or transferred in accordance with applicable state law.

13.     The Liquidation Consultant, on behalf and at the direction of the Debtors, may abandon De Minimis Assets in accordance with the De Minimis Asset Procedures.

WEIL:\95402463\1\50482.0004

14.     An unexpired nonresidential real property lease will only be deemed rejected in accordance with the Lease Rejection Procedures.

provided that the Debtors and landlords of any Closing Store are authorized to enter into agreements modifying the Store Closing Procedures without further order of the Court; provided further that such agreements do not have a material adverse effect on the Debtors or their estates; and it is further

ORDERED that the Debtors are authorized to sell the Pharmaceutical Assets to the highest and best bidder(s) as identified by the Debtors in their business judgment and subject to applicable public health, safety and privacy requirements imposed by applicable non-bankruptcy law.  To the extent applicable, the Debtors shall comply with the De Minimis Asset Sale Procedures, as approved by this Court; and it is further

ORDERED that  pursuant to section 363(f) of the Bankruptcy Code, the Store Closing Assets being sold shall be sold free and clear of any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation, any and all "claims" as defined in section 101(5) of the Bankruptcy Code), including, without limitation, the liens and security interests of the Proposed DIP Lenders (collectively, the "**Liens**"), with such Liens, if any, attaching to the proceeds with the same validity, and enforceability, to the same extent and with the same priority as they attached to such assets immediately prior to the closing of the applicable sale; and it is further

ORDERED that no entity, including, without limitation, utilities, landlords, creditors and all persons acting for or on their behalf (but not Governmental Units, as defined in section 101(27)) shall interfere with or otherwise impede the conduct of the Store Closing Sales,

or institute any action against the Debtors or landlords in any court (other than in this Court) or before any administrative body which in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closing Sales; and it is further

ORDERED that any restrictions in any lease agreement, restrictive covenant, or similar documents purporting to limit, condition, or impair the Debtors' ability to conduct the Store Closing Sales shall not be enforceable, nor shall any breach of such provisions constitute a default under a lease or provide a basis to terminate the lease; and it is further

ORDERED that the Closing Stores may "go-dark" during the Store Closing Sales and remain "dark" despite any lease restriction, real estate local act, local law, or ordinance to the contrary, and any "continuous operation" or similar clause in any of the leases (or any lease provision that purports to increase the rent or impose any penalty for "going dark") may not be enforced to hinder or interrupt the Store Closing Sales (and the "going dark" under such leases shall not be a basis to cancel or terminate the leases); and it is further

ORDERED that, subject to applicable state and local public health and safety laws (the "**Safety Laws**'"), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, the "**General Laws**"), but excluding Liquidation Sale Laws, the Debtors are authorized to take such actions as necessary and appropriate to conduct the Store Closing Sales without the necessity of a further order of this Court, including, but not limited to, advertising the Store Closing Sales; and it is further

ORDERED that, provided the Store Closing Sales are conducted in accordance with the terms of this Interim Order and the Store Closing Procedures, and in light of the provisions in the laws of many local and state laws that exempt court-ordered sales from their

WEIL:\95402463\1\50482.0004

provisions, the Debtors shall be presumed to be in compliance or otherwise excused from compliance with any Liquidation Sale Laws, and are authorized to conduct the Store Closing Sales in accordance with the terms of this Interim Order without the necessity of compliance with any such Liquidation Sale Laws; and it is further

ORDERED that the Debtors shall be entitled to use sign walkers, hang signs, and/or interior or exterior banners advertising the Store Closing Sales in accordance with the Store Closing Procedures (or as otherwise agreed between the Debtors and the respective landlords), including, without limitation, advertising the Store Closing Sales as "store closing," "sale on everything," or similar themed sales and by means of media advertising, A-frames, banners, and similar signage, without further consent of any person and without compliance with the Liquidation Sale Laws; provided, that the use of banners and sign walkers is done in a safe and responsible manner, such sign walkers and banners, in and of themselves, shall not be deemed to be in violation of Safety Laws and/or General Laws; and it is further

ORDERED that each and every federal, state, or local agency, departmental or governmental unit with regulatory authority over the Store Closing Sales and all newspapers and other advertising media in which the Store Closing Sales are advertised shall consider this Order as binding authority that no further approval, license, or permit of any governmental unit shall be required, nor shall the Debtors be required to post any bond, to conduct the Store Closing Sales; and it is further

ORDERED that state and/or local authorities shall not fine, assess, or otherwise penalize the Debtors or any of the landlords of the Closing Stores for conducting or advertising the Store Closing Sales in a manner inconsistent with state or local law; provided, that the Store

6

Closing Sales are conducted and advertised in a manner contemplated by this Interim Order; and it is further

## De Minimis Asset Procedures

ORDERED that the Debtors are authorized, but not directed, to sell or transfer De Minimis Assets under the following procedures (the "**De Minimis Asset Sale Procedures**"):

(a)     For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a sale price, as measured by the amount of cash and other consideration to be received by the Debtors on account of the assets to be sold ("**Sale Price**"), less than or equal to $250,000:

   (i)     the Debtors are authorized to consummate such transactions if the Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court or notice to any party;

   (ii)     any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction; and

   (iii)     each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser.

(b)     For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a Sale Price greater than $250,000 and less than or equal to $5,000,000:

   (i)     the Debtors are authorized to consummate such transactions if the Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court, subject to the procedures set forth herein;

   (ii)     any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction;

   (iii)     each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser;

7

(iv)     the Debtors shall, at least five (5) calendar days prior to closing such sale or effectuating such transfer, serve a written notice of such sale or transfer by e-mail, facsimile, or overnight delivery service (each notice, a "**De Minimis Asset Sale Notice**") to (a) the U.S. Trustee; (b) proposed counsel to the Creditors' Committee, if any; (c) any known affected creditor(s), including counsel to any creditor asserting a lien claim or encumbrance on the relevant De Minimis Assets, and their respective counsel, if known; (d) those parties requesting notice pursuant to Bankruptcy Rule 2002; (e) counsel to the agent for the Debtors' Proposed DIP Lender, if approved; (f) counsel to each agent for the Debtors' Prepetition Secured Lenders; (g) majority holders of Senior Secured PIK Toggle Notes due 2017 issued by the Debtors; (h) majority holders of Senior Secured Convertible Notes due 2018 (collectively, the "**Notice Parties**");

(v)      the content of the De Minimis Asset Sale Notice shall consist of:
- identification of the De Minimis Assets being sold or transferred and its location;
- identification of the purchaser of the assets and any relationship such party has with the Debtors;
- identification of any parties known to the Debtors as holding liens or encumbrances on the assets subject to the De Minimis Assets being sold and a statement indicating whether all such liens or encumbrances are capable of monetary satisfaction;
- the purchase price; and
- any other significant terms of the sale or transfer; and
- date and time within which objections may be filed and served on the Debtors;

(vi)     Objections, if any, must be in writing and served on the other Notice Parties and counsel to the Debtors so as to be received by all such parties prior to 4:00 p.m. (Eastern Time) on the fifth calendar day after service of the De Minimis Asset Sale Notice and must state with specificity the grounds for the objection;

(vii)    if no written objections are filed by any of the Notice Parties within five (5) calendar days of service of such De Minimis Asset Sale Notice, the Debtors are authorized to immediately consummate such transaction; and

(viii)   if a written objection is received from a Notice Party within such five-day (5-day) period that cannot be resolved, the objection will be deemed a request for a hearing on the objection at the next scheduled hearing, subject to adjournment by the Debtors, and the relevant De Minimis Asset(s) shall only be sold upon withdrawal of such written objection or further order of the Court specifically approving the sale

WEIL:\95402463\1\50482.0004

or transfer of the De Minimis Asset(s).

, and it is further;

ORDERED that, the De Minimis Asset Sale Procedures shall not apply to any sales or transfers of assets that involve an employee or an "insider" of the Debtors as such term is defined in section 101(31) of the Bankruptcy Code; and it is further

ORDERED that sales of De Minimis Assets that are consummated pursuant to the De Minimis Asset Sale Procedures shall be deemed arm's-length transactions entitled to the protections of section 363(m) of the Bankruptcy Code; and it is further

ORDERED that nothing in the De Minimis Asset Sale Procedures shall exempt the Debtors from the requirements of section 365 of the Bankruptcy Code with respect to unexpired leases of non-residential real property; and it is further

ORDERED that the absence of an objection to the relief requested in the Motion combined with the absence of a timely objection to the sale or transfer of the De Minimis Assets in accordance with the terms of this Interim Order shall be determined to be "consent" to such sale or transfer within the meaning of section 363(f)(2); and it is further

ORDERED that, except as specifically provided in the applicable sale or transfer document, sales and transfers of De Minimis Assets shall be free and clear of all Liens, with such Liens attaching to the proceeds of such sale or transfer with the same validity, enforceability, extent and priority as had attached to such De Minimis Assets immediately prior to the closing of such sale or transfer; and it is further

9

ORDERED that the Debtors are authorized, but not directed, to abandon De Minimis Assets under the following procedures (the "**De Minimis Asset Abandonment Procedures**"):

(a)     For De Minimis Assets that the Debtors believe in their sound business judgment have a book value, as recorded in the Debtors' books and records ("**Book Value**"), less than or equal to $250,000:

   (i)     the Debtors are authorized to abandon such De Minimis Assets if the Debtors determine in the reasonable exercise of their business judgment that such abandonment is in the best interest of the estates, without further order of the Court or notice to any party.

(b)     For De Minimis Assets that the Debtors believe in their sound business judgment have a Book Value greater than $250,000 but less than or equal to $5,000,000:

   (i)     The Debtors shall, at least five (5) calendar days prior to abandoning De Minimis Assets, serve a written notice of such abandonment by e-mail, facsimile, or overnight delivery service (each notice, an "**Abandonment Notice**") to the Notice Parties;

   (ii)     the content of the Abandonment Notice shall consist of: (a) identification of the De Minimis Assets being abandoned and location; and (b) a summary of the reasons for abandoning such De Minimis Assets;

   (iii)     if a written objection is received from a De Minimis Notice Party within such five-day (5-day) period that cannot be resolved, the relevant De Minimis Assets shall only be abandoned upon withdrawal of such written objection or further order of the Court.

, and it is further;

ORDERED that the Debtors will file a report with the Court and serve on all parties entitled to notice in the cases, within 30 days after each calendar quarter, summarizing any sales, transfers, or abandonments consummated pursuant to the De Minimis Asset Procedures; and it is further

WEIL:\95402463\1\50482.0004

ORDERED that with respect any De Minimis Assets abandoned under the De Minimis Asset Abandonment Procedures herein and located at one of the Debtors' leased properties, the applicable landlord or other designee shall be free to dispose of such property without liability to any party; provided, however, that notwithstanding anything to the contrary in this Order, the Debtors are not authorized hereunder to abandon any hazardous (as such term is defined in federal, state, or local law, rule, regulation or ordinance) materials at any premises subject to a nonresidential real property lease or sublease. Landlords' rights, if any, to file claims for the costs of disposal of such property are fully reserved, as are the rights of any party in interest to object to such claims; and it is further

ORDERED that service of the De Minimis Asset Sale Notice and/or the De Minimis Asset Abandonment Notice is sufficient notice of the sale, transfer, and/or abandonment of such De Minimis Assets; and it is further

ORDERED that the Debtors are authorized to pay those reasonable and necessary fees and expenses incurred in the sale, transfer, or abandonment of De Minimis Assets, including reasonable commission fees to agents, brokers, auctioneers and liquidators, if any; and it is further

ORDERED that any payment made or to be made under this Interim Order, and any authorization contained in this Interim Order, shall be subject to the terms of the DIP Orders; and it is further

**Liquidation Consulting Agreement**

ORDERED that the Debtors are authorized to enter into a Liquidation Consulting Agreement with a Liquidation Consultant; and it is further

ORDERED that any payment made or to be made under this Interim Order, and any authorization contained in this Interim Order, shall be subject to the terms of the DIP Orders; and it is further

ORDERED that the requirements of Bankruptcy Rule 6003(b) have been satisfied; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that the Final Hearing on the Motion shall be held on _____, **2015, at _____ (Prevailing Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Garrett A. Fail, Esq. and Sunny Singh, Esq.); and (ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on _____, 2015**; and it is further

ORDERED that nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Order, other than as expressly provided for herein, is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; and it is further

WEIL:\95402463\1\50482.0004

ORDERED that notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party; and it is further

ORDERED that this Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; provided that, the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order; and it is further

ORDERED that the Debtors are authorized to take all action necessary to carry out this Interim Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

Dated: _____, 2015
      White Plains, New York

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\95402463\1\50482.0004

## Exhibit 1

## Triple Negative Leases

## Rejection Schedule of Triple Negative Leases

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 70212 | Riverhead Centre, LLC | A&P Real Property, LLC | 1510 Old Country Rd. Riverhead, NY | Jul. 31, 2023 |
| 70213 | 3620 Long Beach Road LLC (as successor in interest to Nathan Serota) | A&P Real Property, LLC | 3620 Long Beach Rd Oceanside, NY | June 30, 2021 |
| 70244 | East Marlboro Associates | A&P Real Property, LLC | 863 E. Baltimore Pike Kenneth Square, PA | Aug. 31, 2017 |
| 70314 | Center Square Plaza Associates | A&P Real Property, LLC | 1301 Skippack Pike Center Square, PA | May 22, 2020 |
| 70343 | AVR CP-TWO, LLC | A&P Real Property, LLC | 2 Westbury Avenue Carle Place, NY | Aug. 31, 2015 |
| 70562 | C'PIA, LLC | A&P Real Property, LLC | Route 13 & Maple Rd (aka 2105 Philadelphia Pike) Claymont DE | Apr. 30, 2020 |
| 70597 | Basser-Kaufman of Matawan, L.L.C. | A&P Real Property, LLC | 325 Route 35 Cliffwood, NJ | Mar. 31, 2023 |
| 70656 | Holmdel Towne Center, LLC | A&P Real Property, LLC | 2101 Route 35 Holmdel, NJ | Mar. 31, 2018 |
| 70726 | Delaware 1851 Associates, LP | A&P Real Property, LLC | 1851 S. Christopher Columbus Blvd Philadelphia, PA | Sept. 30, 2020 |
| 72128 | BOIV Belleville MCB, LLC | A&P Real Property, LLC | 115 Belmont Ave Belleville, NJ | Jan. 31, 2034 |
| 72175 | Cliffpass SPE Corp., successor to Cliffpass Development, Inc. | A&P Real Property, LLC | Botany Plaza 85 Ackerman Ave Clifton, NJ | Mar. 31, 2017 |
| 72185 | Clifton Grocery Stores, LLC | A&P Real Property, LLC | 895 Paulison Ave Clifton, NJ | Mar. 31, 2033 |
| 72512 | Valley Circle, Inc. | A&P Real Property, LLC | 651 North Stiles St Linden, NJ | Jan. 31, 2019 |
| 72535 | Wick Shopping Plaza Associates, L.L.C. | A&P Real Property, LLC | 561 Route 1, Unit B Edison, NJ | Oct. 31, 2017 |
| 72538 | MCB East Brunswick, LLC | A&P Real Property, LLC | 50 Race Track Rd East Brunswick, NJ | Oct. 31, 2033 |
| 72564 | OLP-MCB Philly-Cottman, LP, as successor in interest to 840 Cottman Associates, LLC | A&P Real Property, LLC | 840 Cottman Ave. Philadelphia, PA | Sept. 30, 2021 |
| 72567 | Garnet Company | A&P Real Property, LLC | 420 MacDade Blvd Folsom, PA | May 31, 2017 |

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 72581 | Old Bridge Plaza Associates, LLC | A&P Real Property, LLC | 1043 US Route 9 Old Bridge, NJ | Oct. 31, 2017 |
| 72582 | Indian Head Plaza Associates, successor in interest to Peter L. Levine | A&P Real Property, LLC | 1256 Indian Head Road Toms River, NJ | Jan. 31, 2020 |
| 72589 | Realty Income Corporation as successor to Inland Diversified Wilmington Lancaster, L.L.C. as successor to WE APP Wilmington LLC | A&P Real Property, LLC | 3901 Lancaster Pike Wilmington, DE | Nov. 30, 2030 |
| 72623 | First Real Estate Investment Trust of New Jersey | A&P Real Property, LLC | 399 Route 112 Patchogue, NY | May 31, 2022 |
| 72663 | Kimco Centereach, LLC | A&P Real Property, LLC | 2150 Middle Country Rd Centereach, NY | Sept. 30, 2020 |
| 76248 | Echo Swedesford Associates LP as successor in interest to 400 West Swedesford Road Holdings LLC, as successor in interest to Swedesford Shopping Center Acquisition, LLC | A&P Real Property, LLC | 400-450 W. Swedesford Rd Devon, PA | Apr. 30, 2021 |
| 76363 | Walnutport Associates | Super Fresh Food Markets, Inc. and/or A&P Real Property, LLC as successor in interest | 300 S. Best Ave & Main St Walnutport, PA | June 30, 2021 |
| 76723 | US Bank National Association, as successor in interest to Liberty Plaza Limited Partnership | A&P Real Property, LLC | 85 Franklin Mills Blvd Philadelphia, PA | Nov. 30, 2020 |

**EXHIBIT 2**

## Form Rejection Notice

## NOTICE OF REJECTION OF CERTAIN
## UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES

**PLEASE TAKE NOTICE** that, on [_____], 2015 (the "**Commencement Date**"), The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[3] filed chapter 11 petitions commencing chapter 11 cases under the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that, on the Commencement Date, the Debtors filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365 and 554 for Approval of (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry into a Liquidation Consulting Agreement* [Docket No. ___] (the "**Motion**"). On [_____], 2015 the Bankruptcy Court entered the order granting the Motion on an interim basis [Docket No. __] and on [_____], 2015, entered the order granting the Motion on a final basis [Docket No. __] (together, the "**Order**").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, the Debtors hereby provide notice of their intent to reject the lease(s) referenced below (the "**Lease**"):

---

[3] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Two Thousand Eight Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

| 1) Landlord | |
|---|---|
| 2) Debtor Entity | |
| 3) Store ID Number | |
| 4) Real Property Lease Address | |
| 5) Expiration Date of Lease | |

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, the rejection of the Lease shall become effective as of the date hereof (the "**Rejection Date**") without further notice, hearing or order of this Court.

**PLEASE TAKE FURTHER NOTICE** that, should you object to the Debtors' rejection of the Lease, you must file and serve a written objection so that such objection is filed with the Bankruptcy Court and **actually received** no later than 10 calendar days after the date that the Debtors served this "Notice of Rejection of Certain Nonresidential Real Property Leases" (the "**Rejection Notice**") on the following parties (the "**Notice Parties**"): (i) counsel for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn.: Ray C. Schrock, P.C., Garrett A. Fail, Esq. and Sunny Singh, Esq.; (ii) counsel to any committee appointed in these chapter 11 cases, and until such appointment, the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure; and (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York, Attn: Brian Masumoto, Esq.

**PLEASE TAKE FURTHER NOTICE that absent such an objection being filed and served in compliance with the foregoing, the rejection of the Lease shall become**

**effective as of the Rejection Date without further notice, hearing or order of the Bankruptcy Court.**

      **PLEASE TAKE FURTHER NOTICE** that, if an objection is properly filed and served on the Notice Parties as specified above, the Bankruptcy Court will schedule a hearing to consider that objection.  If the Bankruptcy Court upholds the objection and determines the effective date of rejection of such lease, that date shall be the rejection date.  If such objection is overruled or withdrawn or the Bankruptcy Court does not determine the date of rejection, the rejection date of such lease shall be deemed to have occurred on the Rejection Date.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, if the Debtors have deposited monies with a lessor as a security deposit or arrangement, such lessor or contract counterparty may not off-set or otherwise use such deposit without prior authorization from the Bankruptcy Court.

      **PLEASE TAKE FURTHER NOTICE** that copies of the Order and the Motion are available at https://cases.primeclerk.com/aptea.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at https://ecf.nysb.uscourts.gov.

Dated: [_____], 2015
   New York, New York

         _____

         WEIL, GOTSHAL & MANGES LLP
         767 Fifth Avenue
         New York, New York  10153
         Telephone:  (212) 310-8000
         Facsimile:  (212) 310-8007
         Ray C. Schrock, P.C.
         Garrett A. Fail
         Sunny Singh

         *Proposed Attorneys for Debtors*
         *and Debtors in Possession*

**Exhibit C**

**Final Order**

----------------------------------------------------------------x
                                       :

In re                               :         **Chapter 11**
                                         :

**THE GREAT ATLANTIC & PACIFIC TEA**  :        **Case No. 15-23007 (RDD)**
**COMPANY, INC.,** *et al.*,
                                         :         **(Joint Administration Pending)**

               Debtors.[1]            :
----------------------------------------------------------------x

**FINAL ORDER PURSUANT TO 11 U.S.C.
§§ 105, 363, 365 AND 554 APPROVING (I) GLOBAL
PROCEDURES FOR (A) STORE CLOSINGS, (B) THE EXPEDITED
SALE, TRANSFER, OR ABANDONMENT OF DE MINIMIS ASSETS,
AND (C) REJECTING UNEXPIRED NONRESIDENTIAL REAL PROPERTY
LEASES, AND (II) ENTRY INTO A LIQUIDATION CONSULTING AGREEMENT**

Upon the motion (the "**Motion**")[2] of The Great Atlantic & Pacific Tea Company, Inc.
and certain of its affiliates and subsidiaries, as debtors and debtors in possession in the above-
captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant, pursuant to sections 105(a),
363, 365, and 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), for an order
authorizing the Debtors to (i) implement the Store Closing Procedures, (ii) sell, transfer or
abandon De Minimis Assets pursuant to the De Minimis Asset Procedures, (iii) enter into a
Liquidation Consulting Agreement, (iv) implement the Lease Rejection Procedures, and
(v) reject the Triple Negative Leases identified on **Exhibit 1** attached hereto, all as more fully set

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Two Thousand Eight Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given to the Notice Parties as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and the Court having held hearings to consider the relief requested in the Motion on an interim (the "**Interim Hearing**") and final basis (the "**Final Hearing**"); and the Court having entered an order granting the relief requested in the Motion on an interim basis; and upon the Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, filed contemporaneously with the Motion, the record of the Interim Hearing, the Final Hearing, and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis to the extent set forth herein; and it is further

ORDERED that the Debtors are authorized, but not directed, pursuant to section 105(a), 363, 365 and 554 of the Bankruptcy Code, to conduct Store Closing Sales at Closing Stores pursuant to the following store closing procedures (the "**Store Closing Procedures**"):

1.      The Store Closing Sales will be conducted during normal business hours or such hours as otherwise permitted by the applicable unexpired lease, and the

WEIL:\95404910\1\50482.0004

Debtors will abide by any applicable shopping center guidelines regarding maintenance, security, and trash removal.

2.      The Store Closing Sales will be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Store Closing Sales will be conducted on Sunday unless the Debtors have been operating such stores on Sundays.

3.      All display and hanging signs used by the Debtors in connection with the Store Closing Sales will be professionally lettered and all hanging signs will be hung in a professional manner.  No additional restrictions will be imposed on the Debtors that are not contained in the applicable lease. In addition, the Debtors will be permitted to utilize exterior banners and sign-walkers.

4.      If Store Closing Sales are to be considered "final," conspicuous signs will be posted in each of the affected stores to the effect that all sales are "final."

5.      The Debtors will not make any alterations to interior or exterior store lighting, and will not use any type of amplified sound to advertise the Store Closing Sales or solicit customers.

6.      No alterations will be made to the Closing Stores, except as authorized pursuant to the applicable lease.  The hanging of exterior banners or other signage will not constitute an alteration to a store.

7.      No property of any landlord will be removed or sold during the Store Closing Sales.

8.      The Debtors will keep store premises and surrounding areas clear and orderly, consistent with past practices.

9.      The Liquidation Consultant, at the Debtors direction, will negotiate any particular modifications to the Store Closing Procedures with any landlord in regards to number and placement of signs or banners.

10.     The Debtors do not have to comply with lease provisions or covenants that are inconsistent with these procedures.

11.     The Debtors do not have to comply with the Liquidation Laws (as defined below).

12.     Pharmaceutical Assets will be sold or transferred in accordance with applicable state law.

13.     The Liquidation Consultant, on behalf and at the direction of the Debtors, may abandon De Minimis Assets in accordance with the De Minimis Asset Procedures.

WEIL:\95404910\1\50482.0004

14. An unexpired nonresidential real property lease will only be deemed rejected in accordance with the Lease Rejection Procedures.

provided that the Debtors and landlords of any Closing Store are authorized to enter into agreements modifying the Store Closing Procedures without further order of the Court; provided further that such agreements do not have a material adverse effect on the Debtors or their estates; and it is further

ORDERED that the Debtors are authorized to sell the Pharmaceutical Assets to the highest and best bidder(s) as identified by the Debtors in their business judgment and subject to applicable public health, safety and privacy requirements imposed by applicable non-bankruptcy law. To the extent applicable, the Debtors shall comply with the De Minimis Asset Sale Procedures, as approved by this Court; and it is further

ORDERED that pursuant to section 363(f) of the Bankruptcy Code, the Store Closing Assets being sold shall be sold free and clear of any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation, any and all "claims" as defined in section 101(5) of the Bankruptcy Code), including, without limitation, the liens and security interests of the Proposed DIP Lenders (collectively, the "**Liens**"), with such Liens, if any, attaching to the proceeds with the same validity, and enforceability, to the same extent and with the same priority as they attached to such assets immediately prior to the closing of the applicable sale; and it is further

ORDERED that no entity, including, without limitation, utilities, landlords, creditors and all persons acting for or on their behalf (but not Governmental Units, as defined in section 101(27)) shall interfere with or otherwise impede the conduct of the Store Closing Sales,

WEIL:\95404910\1\50482.0004

or institute any action against the Debtors or landlords in any court (other than in this Court) or before any administrative body which in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closing Sales; and it is further

ORDERED that any restrictions in any lease agreement, restrictive covenant, or similar documents purporting to limit, condition, or impair the Debtors' ability to conduct the Store Closing Sales shall not be enforceable, nor shall any breach of such provisions constitute a default under a lease or provide a basis to terminate the lease; and it is further

ORDERED that the Closing Stores may "go-dark" during the Store Closing Sales and remain "dark" despite any lease restriction, real estate local act, local law, or ordinance to the contrary, and any "continuous operation" or similar clause in any of the leases (or any lease provision that purports to increase the rent or impose any penalty for "going dark") may not be enforced to hinder or interrupt the Store Closing Sales (and the "going dark" under such leases shall not be a basis to cancel or terminate the leases); and it is further

ORDERED that, subject to applicable state and local public health and safety laws (the "**Safety Laws**'"), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, the "**General Laws**"), but excluding Liquidation Sale Laws, the Debtors are authorized to take such actions as necessary and appropriate to conduct the Store Closing Sales without the necessity of a further order of this Court, including, but not limited to, advertising the Store Closing Sales; and it is further

ORDERED that, provided the Store Closing Sales are conducted in accordance with the terms of this Final Order and the Store Closing Procedures, and in light of the provisions in the laws of many local and state laws that exempt court-ordered sales from their provisions,

the Debtors shall be presumed to be in compliance or otherwise excused from compliance with any Liquidation Sale Laws, and are authorized to conduct the Store Closing Sales in accordance with the terms of this Final Order without the necessity of compliance with any such Liquidation Sale Laws; and it is further

ORDERED that the Debtors shall be entitled to use sign walkers, hang signs, and/or interior or exterior banners advertising the Store Closing Sales in accordance with the Store Closing Procedures (or as otherwise agreed between the Debtors and the respective landlords), including, without limitation, advertising the Store Closing Sales as "store closing," "sale on everything," or similar themed sales and by means of media advertising, A-frames, banners, and similar signage, without further consent of any person and without compliance with the Liquidation Sale Laws; provided, that the use of banners and sign walkers is done in a safe and responsible manner, such sign walkers and banners, in and of themselves, shall not be deemed to be in violation of Safety Laws and/or General Laws; and it is further

ORDERED that each and every federal, state, or local agency, departmental or governmental unit with regulatory authority over the Store Closing Sales and all newspapers and other advertising media in which the Store Closing Sales are advertised shall consider this Order as binding authority that no further approval, license, or permit of any governmental unit shall be required, nor shall the Debtors be required to post any bond, to conduct the Store Closing Sales; and it is further

ORDERED that state and/or local authorities shall not fine, assess, or otherwise penalize the Debtors or any of the landlords of the Closing Stores for conducting or advertising the Store Closing Sales in a manner inconsistent with state or local law; provided, that the Store

6

Closing Sales are conducted and advertised in a manner contemplated by this Final Order; and it

is further

**De Minimis Asset Procedures**

ORDERED that the Debtors are authorized, but not directed, to sell or transfer De

Minimis Assets under the following procedures (the "**De Minimis Asset Sale Procedures**"):

(a) For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a sale price, as measured by the amount of cash and other consideration to be received by the Debtors on account of the assets to be sold ("**Sale Price**"), less than or equal to $500,000:

  (i) the Debtors are authorized to consummate such transactions if the Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court or notice to any party;

  (ii) any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction; and

  (iii) each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser.

(b) For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a Sale Price greater than $500,000 and less than or equal to $5,000,000:

  (i) the Debtors are authorized to consummate such transactions if the Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court, subject to the procedures set forth herein;

  (ii) any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction;

  (iii) each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser;

WEIL:\95404910\1\50482.0004

(iv)     the Debtors shall, at least five (5) calendar days prior to closing such sale or effectuating such transfer, serve a written notice of such sale or transfer by e-mail, facsimile, or overnight delivery service (each notice, a "**De Minimis Asset Sale Notice**") to (a) the U.S. Trustee; (b) proposed counsel to the Creditors' Committee, if any; (c) any known affected creditor(s), including counsel to any creditor asserting a lien claim or encumbrance on the relevant De Minimis Assets, and their respective counsel, if known; (d) those parties requesting notice pursuant to Bankruptcy Rule 2002; (e) counsel to the agent for the Debtors' Proposed DIP Lender, if approved; (f) counsel to the agent for the Debtors' Prepetition Secured Lenders; (g) majority Senior Secured PIK Toggle Notes due 2017 issued by the Debtors; (h) majority holders of Senior Secured Convertible Notes due 2018 (collectively, the "**Notice Parties**");

(v)     the content of the De Minimis Asset Sale Notice shall consist of:
- identification of the De Minimis Assets being sold or transferred and its location;
- identification of the purchaser of the assets and any relationship such party has with the Debtors;
- identification of any parties known to the Debtors as holding liens or encumbrances on the assets subject to the De Minimis Assets being sold and a statement indicating whether all such liens or encumbrances are capable of monetary satisfaction;
- the purchase price; and
- any other significant terms of the sale or transfer; and
- date and time within which objections may be filed and served on the Debtors;

(vi)     Objections, if any, must be in writing and served on the other Notice Parties and counsel to the Debtors so as to be received by all such parties prior to 4:00 p.m. (Eastern Time) on the fifth calendar day after service of the De Minimis Asset Sale Notice and must state with specificity the grounds for the objection;

(vii)     if no written objections are filed by any of the Notice Parties within five (5) calendar days of service of such De Minimis Asset Sale Notice, the Debtors are authorized to immediately consummate such transaction; and

WEIL:\95404910\1\50482.0004

(viii)  if a written objection is received from a Notice Party within such five-day (5-day) period that cannot be resolved, the objection will be deemed a request for a hearing on the objection at the next scheduled hearing, subject to adjournment by the Debtors, and the relevant De Minimis Asset(s) shall only be sold upon withdrawal of such written objection or further order of the Court specifically approving the sale or transfer of the De Minimis Asset(s).

, and it is further;

ORDERED that, the De Minimis Asset Sale Procedures shall not apply to any sales or transfers of assets that involve an employee or an "insider" of the Debtors as such term is defined in section 101(31) of the Bankruptcy Code; and it is further

ORDERED that sales of De Minimis Assets that are consummated pursuant to the De Minimis Asset Sale Procedures shall be deemed arm's-length transactions entitled to the protections of section 363(m) of the Bankruptcy Code; and it is further

ORDERED that nothing in the De Minimis Asset Sale Procedures shall exempt the Debtors from the requirements of section 365 of the Bankruptcy Code with respect to unexpired leases of non-residential real property; and it is further

ORDERED that the absence of an objection to the relief requested in the Motion combined with the absence of a timely objection to the sale or transfer of the De Minimis Assets in accordance with the terms of this Final Order shall be determined to be "consent" to such sale or transfer within the meaning of section 363(f)(2); and it is further

ORDERED that, except as specifically provided in the applicable sale or transfer document, sales and transfers of De Minimis Assets shall be free and clear of all Liens, with such Liens attaching to the proceeds of such sale or transfer with the same validity, enforceability, extent and priority as had attached to such De Minimis Assets immediately prior to the closing of such sale or transfer; and it is further

9

ORDERED that the Debtors are authorized, but not directed, to abandon De Minimis Assets under the following procedures (the "**De Minimis Asset Abandonment Procedures**"):

(a)    For De Minimis Assets that the Debtors believe in their sound business judgment have a book value, as recorded in the Debtors' books and records ("**Book Value**"), less than or equal to $250,000:

    (i)    the Debtors are authorized to abandon such De Minimis Assets if the Debtors determine in the reasonable exercise of their business judgment that such abandonment is in the best interest of the estates, without further order of the Court or notice to any party.

(b)    For De Minimis Assets that the Debtors believe in their sound business judgment have a Book Value greater than $250,000 but less than or equal to $5,000,000:

    (i)    The Debtors shall, at least five (5) calendar days prior to abandoning De Minimis Assets, serve a written notice of such abandonment by e-mail, facsimile, or overnight delivery service (each notice, an "**Abandonment Notice**") to the Notice Parties;

    (ii)    the content of the Abandonment Notice shall consist of: (a) identification of the De Minimis Assets being abandoned and location; and (b) a summary of the reasons for abandoning such De Minimis Assets;

    (iii)    if a written objection is received from a De Minimis Notice Party within such five-day (5-day) period that cannot be resolved, the relevant De Minimis Assets shall only be abandoned upon withdrawal of such written objection or further order of the Court.

, and it is further;

ORDERED that the Debtors will file a report with the Court and serve on all parties entitled to notice in the cases, within 30 days after each calendar quarter, summarizing any sales, transfers, or abandonments consummated pursuant to the De Minimis Asset Procedures; and it is further

WEIL:\95404910\1\50482.0004

ORDERED that with respect any De Minimis Assets abandoned under the De Minimis Asset Abandonment Procedures herein and located at one of the Debtors' leased properties, the applicable landlord or other designee shall be free to dispose of such property without liability to any party; provided, however, that notwithstanding anything to the contrary in this Order, the Debtors are not authorized hereunder to abandon any hazardous (as such term is defined in federal, state, or local law, rule, regulation or ordinance) materials at any premises subject to a nonresidential real property lease or sublease. Landlords' rights, if any, to file claims for the costs of disposal of such property are fully reserved, as are the rights of any party in interest to object to such claims; and it is further

ORDERED that service of the De Minimis Asset Sale Notice and/or the De Minimis Asset Abandonment Notice is sufficient notice of the sale, transfer, and/or abandonment of such De Minimis Assets; and it is further

ORDERED that the Debtors are authorized to pay those reasonable and necessary fees and expenses incurred in the sale, transfer, or abandonment of De Minimis Assets, including reasonable commission fees to agents, brokers, auctioneers and liquidators, if any; and it is further

ORDERED that any payment made or to be made under this Final Order, and any authorization contained in this Final Order, shall be subject to the terms of the DIP Orders; and it is further

**Lease Rejection Procedures**

ORDERED that the following procedures for the Debtors' rejection of unexpired nonresidential real property leases and/or subleases pursuant to section 365 of the Bankruptcy Code (the is hereby approved and established in the Debtors' chapter 11 cases:

(a)     Rejection Notice.  The Debtors will file a notice (the "**Rejection Notice**") substantially in the form attached hereto as **Exhibit 2** to reject the identified unexpired lease(s) and/or sublease(s) pursuant to section 365 of the Bankruptcy Code, which Rejection Notice shall set forth, among other things: (i) the unexpired lease(s) and/or sublease(s) to be rejected; (ii) the names and addresses of the counterparties to such unexpired lease(s) and/or sublease(s); (iii) the proposed effective date of the rejection for each such unexpired lease(s) and/or sublease(s) ("**Rejection Date**"); and (iv) the deadlines and procedures for filing objections to the Rejection Notice (as set forth below). The Rejection Notice shall include the proposed order approving rejection of the unexpired lease(s) and/or sublease(s) (the "**Rejection Order**").

(b)     Rejection Date.  The Rejection Date for any unexpired lease not sublet to a third party shall not be before the later of: (i) service of the Rejection Notice; (ii) the Debtors' unequivocal surrender of the leased premises in broom clean condition with all property that is not owned by the lease or sublease counterparty removed from the premises including any and all hazardous (as such term is defined in any federal, state or local law, rule, regulation or ordinance) materials and the delivery of the keys, key codes, and alarm codes to the premises to the applicable lease counterparty; or (iii) five (5) days after the Notice of Abandonment (as defined herein) is sent to applicable third parties. The Rejection Date for any unexpired lease sublet to a third party and any related sublease shall not be before ten (10) days after the service of the Rejection Notice.

(c)     Service of the Rejection Notice.  The Debtors will cause the Rejection Notice to be served by (i) overnight mail upon the unexpired lease or sublease counterparties, and their counsel, if known, affected by the Rejection Notice and (ii) e-mail upon the Notice Parties.

(d)     Objection Procedures.  Parties objecting to a proposed rejection must file and serve a written objection so that such objection is filed with the Court and is actually received by the Notice Parties no later than ten (10) calendar days after the date the Debtors serve the relevant Rejection Notice (the "**Rejection Objection Deadline**").

(e)     Event of No Objection.  Absent an objection being filed by the Rejection Objection Deadline, the Debtors shall submit the proposed Rejection Order within five (5) days of the Rejection Objection Deadline, together with a statement confirming the absence of any timely objections to the relief granted by the Rejection Order. The Rejection Order shall set forth the applicable bar date for filing claims arising from the rejection of such unexpired lease(s) and/or sublease(s) and the Rejection Date.

(f)     Unresolved Objections.  If an objection to the rejection of any unexpired lease(s) and/or sublease(s) is timely filed and not withdrawn or resolved,

the Debtors shall file a notice for a hearing for the Court to consider the objection for the unexpired lease(s) and/or sublease(s) to which such objection(s) relates at the next scheduled omnibus hearing after the Rejection Objection Deadline, unless the Debtors and lease and sublease counterparties, as applicable, agree to an earlier hearing date and subject to the Court's schedule. If such objection is overruled or withdrawn, such unexpired lease(s) and/or sublease(s) shall be deemed rejected as of the Rejection Date or such other date to which the Debtors and the counterparty to such unexpired lease(s) and/or sublease(s) have agreed or such other date as determined by the Court.

ORDERED that, pursuant to section 365 of the Bankruptcy Code, the Debtors' rejection of any unexpired nonresidential real property lease and/or sublease, in accordance with the Lease Rejection Procedures set forth in this Order is hereby approved; and it is further

ORDERED that the Debtors' rejection of the Triple Negative Store Leases pursuant to section 365(a) of the Bankruptcy Code is an exercise of the Debtors' sound business judgment and is in the best interest of the Debtors' estates and creditors; and it is further

ORDERED that, to the extent that the Debtors determine that property located in the Triple Negative Stores or any other premises that are the subject of any rejected unexpired nonresidential real property lease or sublease has little or no value or that the preservation thereof will be burdensome to their estates compared with the expense of removing and storing such property, the Debtors are authorized to abandon, in their sole discretion, such property as of the Rejection Date pursuant to section 554 of the Bankruptcy Code, consistent with the requirements set forth in the De Minimis Abandonment Procedures; provided that the Debtors shall provide any known third party holding or asserting a Lien against such property, any known third party to a personal property lease pertaining to such property with five (5) days prior notice of such Notice of Abandonment and shall afford such third parties the opportunity to make arrangements to remove such property in a manner acceptable to the Debtors and the applicable landlords by the Rejection Date; and provided further, however, that the Debtors are not

WEIL:\95404910\1\50482.0004

authorized, without further order of the Court, to abandon any hazardous (as such term is defined in any federal, state or local law, rule, regulation or ordinance) materials at any premises subject to a unexpired lease and/or sublease; and it is further

ORDERED that any property located on the premises of a lease that is rejected in accordance with the terms hereof and that is not removed by the Rejection Date by a third party who received Notice of Abandonment with respect to such property shall be deemed abandoned pursuant to section 554 of the Bankruptcy Code without further order of this Court, free and clear of any interests of any other party, and any landlord or other designee shall be free to dispose of same without liability to any party. Landlords' rights, if any, to file claims for the costs of disposal of such property are fully reserved, as are the rights of all parties in interest to object to such claims; and it is further

ORDERED pursuant to section 554(a) of the Bankruptcy Code and Bankruptcy Rule 6007, the Debtors are authorized, in their sole discretion, to abandon their property located within a Triple Negative Store, free and clear of any interests, effective as of the Rejection Date for such lease; and it is further,

ORDERED that the counterparties to unexpired nonresidential real property leases and/or subleases that are rejected pursuant to the Lease Rejection Procedures are hereby required to file a proof of claim relating to the rejection of such unexpired nonresidential real property leases and/or subleases, if any, by the later of (a) any applicable claims bar date established in these chapter 11 cases or (b) thirty (30) days after the entry of the Rejection Order; and it is further

ORDERED that the Lease Rejection Procedures shall not invalidate or modify any right the DIP Lenders may have to notice of any rejection of any unexpired nonresidential real property leases and/or subleases pursuant to the DIP Order; and it is further

ORDERED that the Lease Rejection Procedures comply with the requirements of Bankruptcy Rule 6006(f); and it is further

ORDERED that the approval of the Lease Rejection Procedures and this Order will not prevent the Debtors from seeking to reject or assume an unexpired lease by separate motion; and it is further

## Liquidation Consulting Agreement

ORDERED that the Debtors are authorized to enter into a Liquidation Consulting Agreement with a Liquidation Consultant; and it is further

ORDERED that any payment made or to be made under this Final Order, and any authorization contained in this Final Order, shall be subject to the terms of the DIP Orders; and it is further

ORDERED that nothing contained in the Motion or this Final Order or any payment made pursuant to the authority granted by this Order, other than as expressly provided for herein, is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; and it is further

ORDERED that notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party; and it is further

WEIL:\95404910\1\50482.0004

ORDERED that the requirements of Bankruptcy Rule 6003(b) have been satisfied; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that the Debtors are authorized to take all action necessary to carry out this Final Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final Order.

Dated: _____, 2015
      White Plains, New York

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\95404910\1\50482.0004

**Exhibit 1**

**Triple Negative Leases**

# Rejection Schedule of Triple Negative Leases

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 70212 | Riverhead Centre, LLC | A&P Real Property, LLC | 1510 Old Country Rd. Riverhead, NY | Jul. 31, 2023 |
| 70213 | 3620 Long Beach Road LLC (as successor in interest to Nathan Serota) | A&P Real Property, LLC | 3620 Long Beach Rd Oceanside, NY | June 30, 2021 |
| 70244 | East Marlboro Associates | A&P Real Property, LLC | 863 E. Baltimore Pike Kenneth Square, PA | Aug. 31, 2017 |
| 70314 | Center Square Plaza Associates | A&P Real Property, LLC | 1301 Skippack Pike Center Square, PA | May 22, 2020 |
| 70343 | AVR CP-TWO, LLC | A&P Real Property, LLC | 2 Westbury Avenue Carle Place, NY | Aug. 31, 2015 |
| 70562 | C'PIA, LLC | A&P Real Property, LLC | Route 13 & Maple Rd (aka 2105 Philadelphia Pike) Claymont DE | Apr. 30, 2020 |
| 70597 | Basser-Kaufman of Matawan, L.L.C. | A&P Real Property, LLC | 325 Route 35 Cliffwood, NJ | Mar. 31, 2023 |
| 70656 | Holmdel Towne Center, LLC | A&P Real Property, LLC | 2101 Route 35 Holmdel, NJ | Mar. 31, 2018 |
| 70726 | Delaware 1851 Associates, LP | A&P Real Property, LLC | 1851 S. Christopher Columbus Blvd Philadelphia, PA | Sept. 30, 2020 |
| 72128 | BOIV Belleville MCB, LLC | A&P Real Property, LLC | 115 Belmont Ave Belleville, NJ | Jan. 31, 2034 |
| 72175 | Cliffpass SPE Corp., successor to Cliffpass Development, Inc. | A&P Real Property, LLC | Botany Plaza 85 Ackerman Ave Clifton, NJ | Mar. 31, 2017 |
| 72185 | Clifton Grocery Stores, LLC | A&P Real Property, LLC | 895 Paulison Ave Clifton, NJ | Mar. 31, 2033 |
| 72512 | Valley Circle, Inc. | A&P Real Property, LLC | 651 North Stiles St Linden, NJ | Jan. 31, 2019 |
| 72535 | Wick Shopping Plaza Associates, L.L.C. | A&P Real Property, LLC | 561 Route 1, Unit B Edison, NJ | Oct. 31, 2017 |
| 72538 | MCB East Brunswick, LLC | A&P Real Property, LLC | 50 Race Track Rd East Brunswick, NJ | Oct. 31, 2033 |
| 72564 | OLP-MCB Philly-Cottman, LP, as successor in interest to 840 Cottman Associates, LLC | A&P Real Property, LLC | 840 Cottman Ave. Philadelphia, PA | Sept. 30, 2021 |
| 72567 | Garnet Company | A&P Real Property, LLC | 420 MacDade Blvd Folsom, PA | May 31, 2017 |

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 72581 | Old Bridge Plaza Associates, LLC | A&P Real Property, LLC | 1043 US Route 9 Old Bridge, NJ | Oct. 31, 2017 |
| 72582 | Indian Head Plaza Associates, successor in interest to Peter L. Levine | A&P Real Property, LLC | 1256 Indian Head Road Toms River, NJ | Jan. 31, 2020 |
| 72589 | Realty Income Corporation as successor to Inland Diversified Wilmington Lancaster, L.L.C. as successor to WE APP Wilmington LLC | A&P Real Property, LLC | 3901 Lancaster Pike Wilmington, DE | Nov. 30, 2030 |
| 72623 | First Real Estate Investment Trust of New Jersey | A&P Real Property, LLC | 399 Route 112 Patchogue, NY | May 31, 2022 |
| 72663 | Kimco Centereach, LLC | A&P Real Property, LLC | 2150 Middle Country Rd Centereach, NY | Sept. 30, 2020 |
| 76248 | Echo Swedesford Associates LP as successor in interest to 400 West Swedesford Road Holdings LLC, as successor in interest to Swedesford Shopping Center Acquisition, LLC | A&P Real Property, LLC | 400-450 W. Swedesford Rd Devon, PA | Apr. 30, 2021 |
| 76363 | Walnutport Associates | Super Fresh Food Markets, Inc. and/or A&P Real Property, LLC as successor in interest | 300 S. Best Ave & Main St Walnutport, PA | June 30, 2021 |
| 76723 | US Bank National Association, as successor in interest to Liberty Plaza Limited Partnership | A&P Real Property, LLC | 85 Franklin Mills Blvd Philadelphia, PA | Nov. 30, 2020 |

WEIL:\95404910\1\50482.0004

**EXHIBIT 2**

**Form Rejection Notice**

**NOTICE OF REJECTION OF CERTAIN**
**UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES**

**PLEASE TAKE NOTICE** that, on [_____], 2015 (the "**Commencement Date**"), The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[1] filed chapter 11 petitions commencing chapter 11 cases under the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that, on the Commencement Date, the Debtors filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365 and 554 for Approval of (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry into a Liquidation Consulting Agreement* [Docket No. ___] (the "**Motion**"). On [_____], 2015 the Bankruptcy Court entered the order granting the Motion on an interim basis [Docket No. __] and on [_____], 2015, entered the order granting the Motion on a final basis [Docket No. __] (together, the "**Order**").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, the Debtors hereby provide notice of their intent to reject the lease(s) referenced below (the "**Lease**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Two Thousand Eight Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

| | |
|---|---|
| 1) Landlord | |
| 2) Debtor Entity | |
| 3) Store ID Number | |
| 4) Real Property Lease Address | |
| 5) Expiration Date of Lease | |

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, the rejection of the Lease shall become effective as of the date hereof (the "**Rejection Date**") without further notice, hearing or order of this Court.

**PLEASE TAKE FURTHER NOTICE** that, should you object to the Debtors' rejection of the Lease, you must file and serve a written objection so that such objection is filed with the Bankruptcy Court and **actually received** no later than 10 calendar days after the date that the Debtors served this "Notice of Rejection of Certain Nonresidential Real Property Leases" (the "**Rejection Notice**") on the following parties (the "**Notice Parties**"): (i) counsel for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn.: Ray C. Schrock, P.C., Garrett A. Fail, Esq. and Sunny Singh, Esq.; (ii) counsel to any committee appointed in these chapter 11 cases, and until such appointment, the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure; and (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York, Attn: Brian Masumoto, Esq.

**PLEASE TAKE FURTHER NOTICE that absent such an objection being filed and served in compliance with the foregoing, the rejection of the Lease shall become**

2

**effective as of the Rejection Date without further notice, hearing or order of the Bankruptcy Court.**

    **PLEASE TAKE FURTHER NOTICE** that, if an objection is properly filed and served on the Notice Parties as specified above, the Bankruptcy Court will schedule a hearing to consider that objection.  If the Bankruptcy Court upholds the objection and determines the effective date of rejection of such lease, that date shall be the rejection date.  If such objection is overruled or withdrawn or the Bankruptcy Court does not determine the date of rejection, the rejection date of such lease shall be deemed to have occurred on the Rejection Date.

    **PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, if the Debtors have deposited monies with a lessor as a security deposit or arrangement, such lessor or contract counterparty may not off-set or otherwise use such deposit without prior authorization from the Bankruptcy Court.

    **PLEASE TAKE FURTHER NOTICE** that copies of the Order and the Motion are available at https://cases.primeclerk.com/aptea.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at https://ecf.nysb.uscourts.gov.

Dated: [_____], 2015
   New York, New York

             _____

            WEIL, GOTSHAL & MANGES LLP
            767 Fifth Avenue
            New York, New York  10153
            Telephone:  (212) 310-8000
            Facsimile:  (212) 310-8007
            Ray C. Schrock, P.C.
            Garrett A. Fail
            Sunny Singh

            *Proposed Attorneys for Debtors*
            *and Debtors in Possession*

WEIL:\95404910\1\50482.0004