**Hearing To Consider Entry Of Global Bidding Procedures Order**
**Objection Deadline:** August 3, 2015, at 4:00 p.m. (Eastern Time)
**Proposed Hearing Date and Time:** August 10, 2015, at 10:00 a.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | **Case No. 15-23007 (RDD)** |
| **COMPANY, INC.,** *et al.*, | : | |
| | : | **(Joint Administration Pending)** |
| Debtors.[1] | : | |

---------------------------------------------------------------x

### MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363, 365 AND 503 AND FED. R. BANKR. P. 2002, 6004 AND 6006 FOR APPROVAL OF: (I) (A) GLOBAL BIDDING PROCEDURES, (B) BID PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF SALE TRANSACTIONS AND SALE HEARING, AND (D) ASSUMPTION AND ASSIGNMENT PROCEDURES; AND (II) (A) PURCHASE AGREEMENTS (B) SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corp. (7132); APW Supermarkets, Inc. (9509); Borman's Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent:

**<u>Preliminary Statement</u>**

1. The consummation of value-maximizing, job-preserving, going-concern sales of the Debtors' stores is the cornerstone of these prearranged chapter 11 cases. To that end, the Debtors secured three separate stalking horse agreements (collectively, the "**Stalking Horse Bids**") for the sale of a total of 120 of their 296 stores. These stores currently employ approximately 12,800 of the Debtors' employees. The total purchase price for these Stalking Horse Bids is nearly $600 million, subject to certain adjustments and subject to higher or otherwise better offers.

2. The Stalking Horse Bids were submitted by: Acme Markets, Inc.; The Stop & Shop Supermarket Company, LLC; and Key Food Stores Co-Operative, Inc. (each a "**Stalking Horse Bidder**"). The stores included in each Stalking Horse Bid are identified on **Exhibit A** attached hereto. The stalking horse agreements are attached hereto as **Exhibit C**, **Exhibit D**, and **Exhibit E** (each a "**Stalking Horse Agreement**").

3. The Stalking Horse Bids are the result of extensive prepetition marketing efforts and analysis. Given the exigencies of the Debtors' financial condition and the restrictions in the Debtors' postpetition financing and the Stalking Horse Bids themselves, the immediate sale of these stores and the Debtors' other stores is the only means to avoid a fire-sale liquidation of all of the Debtors' estates, which would result in significantly less value for all stakeholders and likely the loss of jobs for virtually all of the Debtors' 28,467 employees.

4. Accordingly, in consultation with various stakeholders, the Debtors and their advisors developed uniform bidding and auction procedures for the sale of substantially all of their stores and related assets (the "**Global Bidding Procedures**"). Under the Global Bidding Procedures, parties may submit bids for:

a.  all of the stores in a particular stalking horse bid (a "**Stalking Horse Store Package**"); or

b.  one or more of the Debtors' stores, in any combination, whether or not such stores are included in a Stalking Horse Store Package.

5. The Global Bidding Procedures are deliberately flexible, aimed at preserving jobs and generating the greatest level of interest and the highest or best value for all of the Debtors' stores (collectively, the "**Stores**"). At the same time, the Global Bidding Procedures are uniform, providing clarity to the bidding and auction process by establishing global dates for submitting bids, conducting auctions, and approving sales.

6. By this motion, the Debtors seek, among other things, approval of the Global Bidding Procedures and separate orders (each a "**Sale Order**") approving sales of each Stalking Horse Store Package and any other Stores to the applicable Stalking Horse Bidder and/or the bidders who submit the highest or otherwise best offers (the "**Sale Transactions**").

## Background

7. On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

8.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

9.    Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, sworn to on the date hereof (the "**McGarry Declaration**"), which has been filed with the Court contemporaneously herewith.

## Jurisdiction

10.    This Court has subject matter jurisdiction to consider and determine this motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

11.    Pursuant to sections 105, 363, 365 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the Debtors seek entry of:

a.    the "**Global Bidding Procedures Order**," substantially in the form attached hereto as **Exhibit B**[2]:

  i.    authorizing and approving the "**Global Bidding Procedures**" attached as **Exhibit 1** thereto;

  ii.    authorizing and approving certain bidding protections to the Stalking Horse Bidders, including break-up fees and expense reimbursements, each subject to the occurrence of certain conditions set forth in the applicable Stalking Horse Agreements (namely, the consummation of a higher or better sale transaction);

  iii.    scheduling one or more auctions (each an "**Auction**") for the Stores to be held on **September 24 and 25, 2015**;

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the applicable Stalking Horse Agreement or the Global Bidding Procedures Order, as applicable.

iv.     scheduling a hearing (the "**Sale Hearing**") to consider approval of the Stalking Horse Store Packages for **September 22, 2015, at 10:00 a.m. (Eastern Time)**, if the Stalking Horse Bids are the only Qualified Bids received, or **October 1, 2015, at 10:00 a.m. (Eastern Time)**, if more than one Qualified Bid is received and the Auction is conducted;

v.      authorizing and approving the procedures included in paragraphs 14-23 of the Global Bidding Procedures Order (the "**Assumption and Assignment Procedures**") for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs;

vi.     approving various deadlines in connection with the foregoing; and

vii.    authorizing and approving (i) notice of the Auction and Sale Hearing in the forms attached as **Exhibit 2** (the "**Global Sale Notice**") and **Exhibit 3** (the "**Global Publication Sale Notice**") thereto  and (ii) notice of the proposed cure costs and the assumption and assignment of certain contracts of the Debtors in the form attached as **Exhibit 4** thereto (the "**Cure Notice**"); and

b.      each Sale Order attached to the Stalking Horse Agreements, authorizing and approving:

i.      the sale of certain Stores free and clear of liens, claims, interests and other encumbrances; and

ii.     the assumption and assignment of executory contracts and/or unexpired leases of the Debtors that are to be assumed and assigned as part of a particular sale transaction.

**Prepetition Marketing and Sale Process**

12.     The Debtors' pursuit of going concern sale transactions began in the first quarter of 2015, following a thorough diligence process and evaluation of all options available to the Debtors to satisfy their fiduciary obligations.   In March 2015, the Debtors retained Evercore Group LLC ("**Evercore**") to serve as their investment banker and to market substantially all of their assets.

13.     Between April and June 2015, Evercore and the Debtors contacted over thirty potential buyers, including twenty strategic buyers (*i.e.*, companies already operating in the

grocery industry) and over ten financial buyers (such as private equity firms), with the aim of attracting one or more bidders for the Debtors' assets. During this process, parties that executed confidentiality agreements were granted access to an electronic data room containing significant diligence and other confidential information about all of the Debtors' businesses. As the result of Evercore's extensive marketing efforts to these potential buyers, the Debtors received eight proposals, all of which contemplated a sale of assets free and clear of liens and claims pursuant to section 363 of the Bankruptcy Code. In evaluating the proposals, the Debtors and Evercore analyzed, among other things: (i) the consideration offered by each potential buyer; (ii) the profitability of the stores included in each proposal; (iii) the leasehold value of the stores included in each proposal based on an appraisal from May 2014 conducted by Hilco Real Estate LLC, the Debtors' real estate advisors; and (iv) each proposal's treatment of and effect on labor.

14. The Debtors selected six bidders to participate in a second round of bidding. During this round, the Debtors provided the bidders with further diligence information and allowed bidders to conduct numerous store visits over a period of weeks. Evercore and the Debtors continued negotiating with bidders to increase the value per store of the bids, the number of stores in each bid, and the value and number of stores in the aggregate.

15. After extensive deliberations with their advisors, and separate negotiations with six bidders regarding the terms of an asset purchase agreement, the Debtors elected to proceed with the Stalking Horse Bids submitted by the Stalking Horse Bidders.[3]

### The Need for a Timely Sale Process

16. The need for a prompt sale process is driven, in large part, by the Debtors' significant cash burn: an average of $14.5 million during the first four periods of Fiscal Year

---

[3] A more detailed description of the Debtors' and Evercore's robust and extensive marketing and evaluation process will be set forth in a declaration that the Debtors intend to file prior to a hearing on this Motion.

2015. This cash burn is expected to accelerate postpetition. Given this state of financial affairs, the Debtors' Junior Lien DIP Facility (the "DIP Facility") imposes strict milestones on the Debtors to accomplish various objectives in a prompt and timely manner, including milestones tied to the relief sought in this Motion. In particular,

a. within 45 days of the Commencement Date, the Court shall have entered the Global Bidding Procedures Order;

b. on or before October 15, 2015, the Court shall have entered Sale Orders approving sale transactions with a minimum value of $275 million (excluding inventory and prescriptions); and

c. on or before October 30, 2015, the Debtors shall have consummated certain sale transactions.

Cognizant of their deteriorating financial condition and the tight timeline that would govern upon the commencement of these chapter 11 cases, the Debtors accomplished as much as possible with respect to the sale process prior to the Commencement Date. With three Stalking Horse Bids in place, the Debtors and their professionals are now prepared to hit the ground running. The Debtors' advisors, including Evercore, are prepared to launch an aggressive and extensive postpetition marketing process, consistent with the non-solicitation clauses contained in the Stalking Horse Agreements, which do not apply to the Additional Stores and run only through the entry of the Global Bidding Procedures Order. The proposed timeline for this marketing and sale process is reasonable and necessary under the circumstances of these chapter 11 cases.

17. Absent the sale process and transactions contemplated by this Motion, the Debtors believe they will be unable to realize the maximum value of their Stores for the benefit of all stakeholders. Although the stores included in the Stalking Horse Bids include some of the Debtors' most profitable stores, the Debtors' corporate and capital structures are not organized on a store-by-store basis. The Debtors' declining revenues are insufficient to support the continued operation of the Stalking Horse Stores in light of the unsustainable and

insurmountable costs of the Debtors' business as a whole. Thus, a prompt sale of the Stalking

Horse Stores and any Additional Stores is necessary to ensure that such assets are sold at their

going concern values.

**The Proposed Sale Transactions**

A.      **The Stalking Horse Agreements**[4]

18.      Collectively, the Stalking Horse Agreements represent binding bids for an

aggregate of 120 of the Debtors' 296 stores, including stores operating under the following

banners: A&P, SuperFresh, Pathmark, Waldbaum's, Food Basics and The Food Emporium. The

total consideration to be realized by the Debtors is nearly $600 million, subject to certain

adjustments. The Stalking Horse Agreements share the same general structure and many of the

same key provisions.

19.      The assets proposed to be purchased include the unexpired leases of each

store to be acquired (the "**Transferred Contracts**") and certain inventory, equipment,

furnishings, books and records, prescriptions and other pharmaceutical goods, and customer data.

In the event that the sale to any Stalking Horse Bidder is consummated, the Debtors would

assume and assign the Transferred Contracts to such Stalking Horse Bidder. The Debtors are

responsible for paying any cure costs (the "**Cure Costs**") related to the assumption and

assignment of Transferred Contracts to Acme Markets, Inc. and The Stop & Shop Supermarket

Company, LLC. Key Food Stores Co-Operative, Inc. is responsible for the first $150,000 in

Cure Costs, and the Debtors are responsible for any Cure Costs in excess of $150,000.

---

[4] In the event of any inconsistencies between the provisions of the Stalking Horse Agreements and the general description of such agreements in this Motion, the Stalking Horse Agreements shall control. The term "Debtors" shall mean, as applicable, the "Sellers," as such term is defined in the applicable Stalking Horse Agreement.

20.	The Global Bidding Procedures provide for standard bid protections, such as initial overbid amounts and subsequent bidding increments.  The Stalking Horse Agreements include provisions for the payment of break-up fees and capped expense reimbursements (together, the "**Termination Payment**"), as an administrative expense, upon the Debtors' consummation of a transaction for the applicable Stalking Horse Store Package with another bidder.

21.	Each of the Stalking Horse Bidders (other than Acme Markets, Inc.) has agreed to act as a "Back Up Bidder" and, as such, hold open its binding offer to purchase the applicable Stalking Horse Store Package for a period of time after the Auction in case the winning bid is not consummated.

22.	The Stalking Horse Agreements include various customary representations, warranties and covenants by and from the Debtors and the Stalking Horse Bidders (the "**Parties**"), as well as certain conditions to closing and rights of termination.  The Stalking Horse Agreements contain certain labor-related covenants as well.  In particular, the Stalking Horse Bidders have agreed to either assume the collective bargaining agreements implicated by their bids without modification, or to engage in good faith negotiations with affected unions, in coordination with the Debtors, to reach mutually satisfactory modifications of such agreements.  In addition, the Stalking Horse Agreements contain certain other covenants related to offers of continuing employment, liability under the Worker Adjustment and Retraining Notification Act, and other employee and labor-related concerns.

23.	The Stalking Horse Agreements include covenants, conditions and termination rights related to these chapter 11 cases.  The transactions contemplated by the

WEIL:\95403306\7\50482.0004

Stalking Horse Agreement are subject to approval by the Bankruptcy Court and entry of the

Global Bidding Procedures Order and the Sale Orders.

**B.     Terms of Specific Stalking Horse Bids**

24.     Certain material terms of each of the Stalking Horse Agreements are

described below:

a.     <u>Stalking Horse Agreement with Acme Markets, Inc.</u>

- ▪ **Acquired Assets**.  76 stores and other assets for a Cash Purchase Price of approximately $256 million, plus other consideration.

- ▪ **Termination Payment**.  Break-up fee of 1.5% of the Cash Purchase Price, plus reimbursement of up to $4.5 million of reasonable and documented expenses in connection with the Stalking Horse Bidder's purchase of IT equipment required to consummate the transactions contemplated by this Agreement.

- ▪ **Back-Up Bidder**.  The Stalking Horse Bidder did not agree to be a Back-Up Bidder.

- ▪ **Treatment of Affected Labor Agreements**.  With respect to Covered Employees under an Affected Labor Agreement, Stalking Horse Bidder shall engage in good faith negotiations, in coordination with Sellers, to reach mutually satisfactory modifications to the relevant Affected Labor Agreement with each of the Affected Unions and to enter into a Modified Labor Agreement with each of the Affected Unions.

- ▪ **Bankruptcy Milestones**.  Bankruptcy Court must enter the Global Bidding Procedures Order within 45 days of the Commencement Date and the Sale Order by October 15, 2015.

- ▪ **Sale Closing**.  The closing of the sale to the Stalking Horse Bidder will occur over a period of time, with groups of stores being transferred on different closing dates, with the initial closing to occur no later than October 31, 2015.

- ▪ **Records Retention**.  The Stalking Horse Bidder will acquire certain books and records of the Debtors' and, subject to the terms and conditions of Section 6.2 of the applicable Stalking Horse Agreement, will allow reasonable access to such books and records, which shall be maintained consistent with the Stalking Horse Bidder's retention policy for six (6) years following the applicable closing.

WEIL:\95403306\7\50482.0004

b.  Stalking Horse Agreement with The Stop & Shop Supermarket Company, LLC

- **Acquired Assets**. 25 stores and other assets for a Cash Purchase Price of over $146 million, plus other consideration.

- **Termination Payment**. Break-up fee of 3% of the Cash Purchase Price, plus reimbursement of up to $1 million of reasonable and documented expenses.

- **Back-Up Bidder**. The Stalking Horse Bidder agreed to hold its offer until the first to occur of (a) sixty (60) days after the entry of a Sale Order approving a Competing Bid, (b) consummation of the transaction with a winning bidder at the Auction, (c) the Debtor's release of the Stalking Horse Bidder's obligations to serve as Back-Up Bidder, and (d) November 30, 2015.

- **Treatment of Affected Labor Agreements**. With respect to Covered Employees under an Affected Labor Agreement, Stalking Horse Bidder may (a) agree to assume the Affected Labor Agreement with respect to the applicable Stores without modification, (b) meet with Affected Union representatives at reasonable times, and confer and negotiate in good faith with the Affected Unions to reach mutually satisfactory modifications to the relevant Affected Labor Agreement with each of the Affected Unions and to enter into a Modified Labor Agreement with each of the Affected Unions, or (c) negotiate with the Affected Unions to arrange a transfer at the applicable Closing of all or any Covered Employees from any Affected Labor Agreement to any collective bargaining agreement that Stalking Horse Bidder may have with the applicable Affected Union or any collective bargaining agreement that Stalking Horse Bidder may have with another union that represents Stalking Horse Bidder's employees at Stalking Horse Bidder's existing stores located in the same area as the relevant Stores.

- **Bankruptcy Milestones**. Bankruptcy Court must enter the Global Bidding Procedures Order within 45 days of the Commencement Date.

- **Sale Closing**. The closing of the sale to the Stalking Horse Bidder will occur over a period of time, with groups of stores being transferred on different closing dates, with the initial closing taking place the second (2nd) Saturday following the entry of the Sale Order and the final closing taking place no later than the earlier of (x) thirty (30) days following the initial closing and (y) November 15, 2015.

- **Records Retention**. The Stalking Horse Bidder will acquire certain books and records of the Debtors' and, subject to the terms and conditions of Section 6.2 of the applicable Stalking Horse Agreement, will allow reasonable access to such records until these chapter 11 cases are closed and will maintain such records consistent with the Stalking Horse Bidder's retention policy for six (6) months following the applicable closing.

11

c. <u>Stalking Horse Agreement with Key Food Stores Co-Operative, Inc.</u>

- **Acquired Assets**.  19 stores and other assets for a Cash Purchase Price of approximately $28 million, plus other consideration.

- **Termination Payment**.  Break-up fee of 3% of the Cash Purchase Price, plus reimbursement of up to $250,000 in reasonable and documented expenses; <u>provided</u> that the Termination Payment is contingent upon the Debtors' approval of the Stalking Horse Bidder's financing commitment letter.

- **Back-Up Bidder**.  The Stalking Horse Bidder agreed to hold its offer until the first to occur of (a) sixty (60) days after the entry of a Sale Order approving a Competing Bid, (b) consummation of the transaction with a winning bidder at the Auction, (c) the Debtor's release of the Stalking Horse Bidder's obligations to serve as Back-Up Bidder, and (d) November 30, 2015.

- **Treatment of Affected Labor Agreements**.  With respect to Covered Employees under an Affected Labor Agreement, the Stalking Horse Bidder shall either (a) agree to assume the Affected Labor Agreement without modification or (b) engage in good faith negotiations, in coordination with Sellers, toward reaching mutually satisfactory modifications to the relevant Affected Labor Agreement with each of the Affected Unions and to enter into a Modified Labor Agreement with each of the Affected Unions.

- **Bankruptcy Milestones**.  Bankruptcy Court must enter the Global Bidding Procedures Order within 45 days of the Commencement Date and the Sale Order within 105 days of the Commencement Date.

- **Closing**.  Closing to occur no later than October 31, 2015.

- **Records Retention**.  The Stalking Horse Bidder will acquire certain books and records of the Debtors'  and, subject to the terms and conditions of Section 6.2 of the applicable Stalking Horse Agreement, the Debtors will have reasonable access to such records, which will be maintained consistent with the Stalking Horse Bidder's retention policy for six (6) years following the applicable closing.

<b><u>The Global Bidding Procedures</u></b>

A. <u>Overview</u>

25.     A description of certain key rules applicable to the Global Bidding Procedures is set forth below and is accompanied by, in certain instances, the rationale for such rules:

a.    <u>Additional Stores</u>.  One of the primary goals of the Global Bidding Procedures is to stimulate bidding on as many stores on a going concern basis as possible.  With this goal in mind, the Global Bidding Procedures include procedures for the sale of not just the Stalking Horse Store Packages, but any of the Debtors' other Stores (the "**Additional Stores**"), including certain executory contracts and unexpired leases related thereto (such contracts and leases, the "**Additional Contracts**").  The Additional Stores are set forth on **<u>Schedule 2</u>** attached to the Global Bidding Procedures Order.

b.    <u>Purchase Price; Minimum Bid</u>.

    1.    <u>Stalking Horse Store Package</u>.  Each Bid submitted in connection with a Stalking Horse Store Package (other than the Separable Store) must (i) be a Bid for all of the Stores contained in the applicable Stalking Horse Store Package, (ii) exceed the applicable cash purchase price by the Minimum Overbid Amount, and (iii) propose an alternative transaction that provides substantially similar or better terms than the applicable Stalking Horse Bid, or (iv) propose to purchase the Stalking Horse Store Package for cash, and assume the corresponding liabilities on similar or better terms as the applicable Stalking Horse Bid.

    2.    <u>Bids for Individual Stores or Combination of Stores</u>.  Bidders may also submit Bids for individual Stores or combinations of Stores, whether or not such Stores are included in a Stalking Horse Store Package (each a "**Partial Bid**").  The Debtors will determine, after consultation with the Consultation Parties, whether such Bids qualify as Qualified Bids.  Generally, to be considered a Qualified Bid, the Debtors, in consultation with the Consultation Parties, must conclude that a Partial Bid, when taken together with other Partial Bids, satisfies the criteria for being a Qualified Bid.

    If a Bid includes one or more Stores currently included in a Stalking Horse Store Package (other than a Separable Store), but is not for all of the Stores included in such Stalking Horse Store Package (not taking into account the Separable Store), such Bid will not be considered to be a "Qualified Bid" unless the Debtors receive one or more Bids for the remaining Stores in such Stalking Horse Store Package (other than the Separable Store) that, in combination with one or more other Bids, constitute a higher or better bid than the applicable Stalking Horse Bid.

c.    <u>The Separable Store</u>.  A bid for the A&P located in Mount Kisco, New York (the "**Separable Store**") may be considered a Qualified Bid, notwithstanding a failure to receive one or more bids for the remaining Stores in the Stalking Horse Store Package to which the Separable Store belongs.  Thus, it is possible that the Debtors will sell the Separable Store separate and apart from the remainder of the Stores in its Stalking Horse Store Package.  No Termination Payment will be payable to a Stalking Horse Bidder as a result of the consummation of a sale of

the Separable Store to a person or entity other than the applicable Stalking Horse Bidder.

d.     <u>Cancellation of the Auction</u>.  If a competing Qualified Bid is not received in respect of a particular Stalking Horse Store Package, the Debtors will cancel the Auction for that Stalking Horse Store Package and seek approval of a sale to the applicable Stalking Horse Bidder at a Sale Hearing on **September 22, 2015, at 10:00 a.m. (Eastern Time)**.  The cancellation of an Auction for a particular Stalking Horse Package shall have no impact on the sale process for any other Stalking Horse Package.

e.     <u>Determination and Announcement of Baseline Bids</u>.  In consultation with the Consultation Parties, the Debtors shall make a determination regarding:

1. the Store or combination of Stores to be auctioned by the Debtors, including a Stalking Horse Store Package (each, an "**Auction Package**"); <u>provided</u> that an Auction Package for a Stalking Horse Store Package may not include less than all of the Stores in such Stalking Horse Store Package, unless such Auction Package includes solely the Separable Store;

2. the Store or Stores included in an Auction Package;

3. the highest or best Qualified Bid (or collection of Qualified Bids) for each Auction Package (each, a "**Baseline Bid**") to serve as the starting point at the Auction for such Auction Package;

4. which bids have been determined to be Qualified Bids and the Auction Package applicable to such Qualified Bid (provided that the Debtors may permit a Qualified Bidder to bid on any other Auction Package); and

5. the time and place for the Auction of each such Auction Package.

On **September 18, 2015, at 5:00 p.m. (Eastern Time)**, the Debtors shall file notice of the foregoing on the Court's docket and publish such notice on the website of their claims and noticing agent and in the Data Room.

**B.**      **Key Dates and Deadlines**

26.     The Global Bidding Procedures establish the following key dates for the

sale process:

| **August 24, 2015** | Global Non-Binding Indication of Interest Date |
| --- | --- |
| **September 11, 2015, at** | Global Binding Bid Deadline |

| | |
|---|---|
| **5:00 p.m.** | |
| **September 11, 2015, at 5:00 p.m.** | Objection Deadline to Sale / Assumption and Assignment of Transferred Contracts |
| **September 18, 2015, at 5:00 p.m.** | Deadline to Designate and Publish Qualified Bidders; select Baseline Bids; and select Auction Packages |
| **September 22, 2015, at 10:00 a.m.** | Sale Hearing if no other Qualified Bids Received for Stalking Horse Store Package |
| **September 24 and 25, 2015** | Auction<br><br>Location: To Be Announced |
| **October 1, 2015, at 5:00 p.m.** | Sale Hearing if Auction is Conducted<br><br>Adequate Assurance Objection Deadline for Successful Bidders other than the Stalking Horse and for Additional Contracts |

27. In addition, the Global Bidding Procedures provide for the following sale notice procedures, sale objection deadline, and Global Bid Deadline:

    a. <u>Notice of Sale, Auction, and Sale Hearing</u>:

        i. Within three (3) days after entry of the Global Bidding Procedures Order, the Debtors shall cause the Global Sale Notice to be served by email, mail, facsimile or overnight delivery on: (i) counsel for each Stalking Horse Bidder; (ii) all persons and entities known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to a Store during the past twelve (12) months; (iii) all persons and entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in a Store (for whom identifying information and addresses are available to the Debtors); (iv) all non-Debtor parties to the Transferred Contracts and Additional Contracts (for whom identifying information and addresses are available to the Debtors); (v) any Governmental Authority known to have a claim in these chapter 11 cases; (vi) the United States Attorney for the Southern District of New York; (vii) the Office of the Attorney General in each state in which the Debtors operate; (viii) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (ix) all of the multiemployer pension plans to which any of the Debtors is a contributing employer and all of the single employer defined benefit plans to which any Debtor is a contributor; (x) all of the labor unions that represent employees of any Debtor; (xi) the Federal Trade Commission; (xii) the United States Attorney General/Antitrust

Division of Department of Justice; (xiii) all of the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); (xiv) all applicable local environmental enforcement agencies; (xv) the United States Environmental Protection Agency; and (xvi) all other Persons as directed by the Court (for whom identifying information and addresses are available to the Debtors) (collectively, the "**Sale Notice Parties**")

ii. Within five (5) days after entry of the Global Bidding Procedures Order, the Debtors shall cause the Global Publication Sale Notice to be published on the website of the Debtors' claims and noticing agent and once in *The New York Times*, national edition.

b. Objection Deadline for Sale Transaction:  The Global Bidding Procedures Order establishes **September 11, 2015 at 5:00 p.m. (Eastern Time)** ("**Sale Objection Deadline**") as the deadline to file and serve objections to the sale of any Stores.

c. Global Bid Deadline.  The Global Bidding Procedures establish **September 11, 2015, at 5:00 p.m. (Eastern Time)** (the "**Global Bid Deadline**") as the deadline for the submission of any and all bids.

28.     The Debtors believe that the time periods set forth in the Global Bidding Procedures are reasonable.  Under the proposed timeline, there will be fifty-three (53) days between the filing of this Motion and the Sale Objection Deadline and the Global Bid Deadline. This period will provide parties with sufficient time to formulate bids to purchase any Stores. The Debtors' businesses have been extensively marketed to both strategic and financial buyers in recent years, and information regarding all of the Debtors' businesses has been made available in an electronic data room during the process.  As such, many parties that may have an interest in bidding at the Auction likely have already conducted diligence and evaluated the Debtors' businesses and will not be bidding in a vacuum.  In addition, potential bidders who have not previously conducted diligence on the Debtors' businesses will have immediate access to, subject to the execution of an appropriate confidentiality agreement, a substantial body of information regarding the Stores, including information gathered based upon specific due diligence requests of the Stalking Horse Bidders and other bidders.

WEIL:\95403306\7\50482.0004

## The Assumption and Assignment Procedures

29.     The Assumption and Assignment Procedures will, among other things, govern the Debtors' provision of notice to counterparties to Transferred Contracts and Additional Contracts that such contracts may be assumed and assigned to a Stalking Horse Bidder (or another Successful Bidder) and of the Cure Costs the Debtors believe are necessary pursuant to section 365 of the Bankruptcy Code to assume and assign such contracts.

30.     Pursuant to the Assumption and Assignment Procedures, within three (3) days after the entry of the Global Bidding Procedures Order, the Debtors shall file with the Court and serve on each party to the Transferred Contracts the Cure Notice.  Any objection to proposed Cure Costs (a "**Cure Objection**") or to a Stalking Horse Bidder's provisions of adequate assurance of future performance (an "**Adequate Assurance Objection**") must be filed with the Court and served on the Objection Notice Parties by **September 11, 2015 at 5:00 p.m. (Eastern Time)**.

31.     If a Stalking Horse Bid is outbid at the Auction, the Debtors will consummate a Sale Transaction with a party other than the applicable Stalking Horse Bidder. Likewise, a Sale Transaction might include the purchase of Additional Stores and, therefore, the assumption and assignment of Additional Contracts.  Accordingly, the Debtors will provide the following additional notice and opportunities to object to the assumption and assignment of Transferred Contracts and Additional Contracts.

a.      If a Successful Bidder other than a Stalking Horse Bidder prevails at the Auction, then (a) as soon as possible after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court a notice that identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Transferred Contracts and any Additional Contracts to the Successful Bidder; and (b) the deadline to file and serve an Adequate Assurance Objection shall be extended to two (2) days prior to Sale Hearing; provided that the deadline to object to Cure Costs shall not be extended.

b.      By **September 21, 2015**, the Debtors shall serve by first class mail upon each non-Debtor counterparty to an Additional Contract included in an Auction Package a notice indicating (a) the applicable Cure Costs for the Additional Contract and (b) that the Debtors' may seek to assume and assign the Additional Contracts to a Successful Bidder or a Stalking Horse Bidder, as applicable (such notice, an "**Additional Cure Notice**").  The Debtors shall also post a copy of any Additional Cure Notices on the website for these chapter 11 cases maintained by the Debtors' claims and noticing agent.  Any Cure Objection for an Additional Contract must be filed and served within seven (7) days of service of the Additional Cure Notice.  Any Adequate Assurance Objection for an Additional Contract must be filed and served two (2) days prior to the Sale Hearing.

### Extraordinary Provisions Under Local Guidelines

32.     Collectively, the Global Bidding Procedures and the Stalking Horse Bids

contain the following provisions, which the Guidelines for the Conduct of Asset Sales, adopted

by General Order M-331, require to be separately disclosed:

a.      Deadlines that Effectively Limit Notice.  As is common for auctions in chapter 11 cases, the identify of a Successful Bidder will not be known until shortly before the Sale Hearing; in this case, six (6) days before the Sale Hearing.  The Debtors request that the time for filing an adequate assurance objection be shortened to two (2) days before the Sale Hearing.  In addition, with respect to Additional Contracts that may be assumed and assigned, the Debtors request that the fourteen (14) day notice period be shortened to ten (10) days with respect to such Additional Contracts; provided that the Debtors will still provide counterparties to such Additional Contracts seven (7) days to object to proposed Cure Costs (the same as they would have received under a fourteen (14) day notice period).

b.      Use of Proceeds:  Other than payment of a Termination Payment from the proceeds of a Competing Transaction (with respect to certain Stalking Horse Agreements), no Stalking Horse Agreement contemplates an allocation of sale proceeds.

c.      Records Retention:  As noted above, each Stalking Horse Agreement provides that the Stalking Horse Bidder will acquire the books and records related to the applicable Stalking Horse Package.  The Stalking Horse Agreements grant the Debtors reasonable access to such records, and the Debtors will be able to administer their bankruptcy cases, notwithstanding the sale of any books and records.

d.      Requested Findings as to Successor Liability:  Each Stalking Horse Agreement requires that the Sale Order contain findings of fact and conclusions of law limiting the Stalking Horse Bidder's successor liability.

WEIL:\95403306\7\50482.0004

e. Requested Findings as to Fraudulent Conveyances or Transfers:  The proposed Sale Orders for each Stalking Horse Bidder contains finding of fact and conclusions of law with respect to the consideration paid and the elements of a fraudulent transfer.

f. No Sale Free and Clear of Leases:  The proposed Sale Orders provide that the sales of the Stores will be free and clear of all liens, claims, encumbrances, and other interests except for those permitted encumbrances and Assumed Liabilities, as specified in each Stalking Horse Agreement.  At this time, the Debtors are not aware of any proposed sale of property free and clear of a possessory leasehold interest.

g. Relief from Bankruptcy Rules 6004(h) and 6006(d):  The Debtors seek relief from the fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

**The Relief Requested Is Warranted
And in the Best Interests of the Debtors and Their Economic Stakeholders**

**A.      Sale of the Stores**

33.      Ample authority exists for approval of the sales envisioned by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009).  Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  *Gen. Motors*, 407 B.R. at 493-94; *In re Betty Owens Sch.*, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); *accord In re Delaware and*

*Hudson Ry. Co.*, 124 B.R. at 166; *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002).

34.     As described above and as will be explained in a declaration filed with the Court, an orderly but expeditious sale of the Stores is critical to preserving and realizing their going concern value and, in turn, to maximize recovery for the Debtors' economic stakeholders and preserve jobs.  A prompt sale is also required by the express terms of the DIP Facility and the Stalking Horse Bids themselves.  Pursuing the Stalking Horse Agreements and other Store sales represents a reasonable exercise of the Debtors' business judgment and is in the best interests of all parties.

35.     The notice that the Debtors propose to provide, as set forth in the Global Bidding Procedures Order and Global Bidding Procedures, is more than adequate and reasonable.  Such notice will ensure that actual notice of the Auction, Sale Hearing and Sale Transactions will be provided to all known creditors of the Debtors, in addition to notice by publication.  Such notice, together with the authority pursuant to section 363 and 365 of the Bankruptcy Code, will enable the Court to make findings at the Sale Hearing and in the Sale Order that Purchaser shall not be liable under theories of successor liability in connection with Stores sold to a Successful Bidder.

36.     The Debtors believe that the Purchase Price is fair and reasonable, but the Court and parties in interest will be assured at the Sale Hearing, after an extended diligence period and marketing by the Debtors' advisors, that the Debtors will have selected parties with the highest or best offers for the Stores.  The Debtors' compliance with the Global Bidding Procedures Order and the Global Bidding Procedures will provide the basis to find that any sale of the Stores does not constitute a fraudulent transfer because the purchase price represents

reasonably equivalent value and is fair and reasonable. It will also establish that the Debtors and the Stalking Horse Bidders, or any other Successful Bidders, have proceeded in good faith.

### B. Sale Free and Clear of Liens, Claims, Encumbrances and Interests

37. In the interest of attracting the best offers, the sale of the Stores should be free and clear of any and all liens, claims, encumbrances and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and other interests attaching to the proceeds of the sale. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if applicable non-bankruptcy law permits sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f)(1) – (5). With respect to any party asserting a lien, claim, encumbrance or other interest against the Stores, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).

### C. Protections As a Good Faith Purchaser

38. Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

21

11 U.S.C. § 363(m). Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp*., No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143, 147 3d Cir. 1986). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc*., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

39. The selection of Successful Bidders will be the product of arm's-length, good faith negotiations in as competitive a purchasing process as is possible under the circumstances. Based upon the record to be made at the Sale Hearing, the Debtors will request a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

### D. <u>Global Bidding Procedures</u>

40. The Debtors believe the Global Bidding Procedures are fair and reasonable and will ensure that the bidding process and any Auction (to the extent necessary) will yield the maximum value for the Debtors' estates and creditors. The Global Bidding Procedures allow all parties in interest an opportunity to conduct in-depth diligence. The Global Bidding Procedures also provide an appropriate framework for the Debtors to review, analyze and compare all bids received to determine which bid(s) are in the best interests of the Debtors and their economic stakeholders. The Global Bidding Procedures clearly set forth the

participation requirements for Qualified Bidders and bid requirements for Qualified Bids (as such terms are defined in the Global Bidding Procedures). In addition, the Global Bidding Procedures are prudently designed to stimulate bidding on as many stores on a going concern basis as possible by (i) permitting parties to submit bids for one or more of the debtors' stores, in any combination, whether or not such stores are included in a Stalking Horse Store Package, and (ii) allowing the Debtors to combine bids for less than a Stalking Horse Store Package in order to compete with such package (subject to certain exceptions). Accordingly, approval of the Global Bidding Procedures, including the dates established thereby for the Auction and the Sale Hearing, is warranted.

### E. The Termination Payments and Other Bid Protections

41. The Global Bidding Procedures contain certain bid protections for the Stalking Horse Bidders, such as the initial overbid requirement and the subsequent bidding increments. Each Stalking Horse Agreement contains additional bid protections; namely, the provision of a Termination Payment (including a break-up fee and expense reimbursement), which is payable in the event that a higher or better competing bid in respect of a Stalking Horse Package is consummated (such Termination Payment, together with the initial and subsequent bid increments, the "**Bid Protections**"). Each of the Termination Payments included in the Stalking Horse Bids is slightly different, and the one applicable to Key Food Stores Co-Operative, Inc. is conditioned upon committed financing.

42. Approval of termination fees and expense reimbursements as an administrative expense claim as a form of bidder protection in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced

recovery through an auction process.[5]  Courts in this District have held that break-up fees should

be approved as long as (i) the relationship between the parties is not tainted by self-dealing, (ii)

the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the

size of the transaction.  *See, e.g., Official Committee of Subordinated Bondholders v. Integrated*

*Resources, Inc.* (*In re Integrated Resources, Inc.*), 147 B.R. 657 (S.D.N.Y. 1992), *appeal*

*dismissed*, 3 F.3d 49 (2d Cir. 1993).  Bankruptcy courts have approved bidding incentives similar

to the ones contemplated in the applicable Stalking Horse Agreements under the "business

judgment rule," pursuant to which courts typically grant deference to the actions of a

corporation's board of directors taken in good faith and in the exercise of honest judgment.

43.      The Bid Protections provided in the Global Bidding Procedures and

Stalking Horse Agreements meet the "business judgment rule" standard.  These protections,

individually and collectively, were a material inducement for, and condition of, each Stalking

Horse Bidder's entry into, the applicable Stalking Horse Agreement.  These Stalking Horse

Bidders are unwilling to commit to hold open their offers under the terms of their Stalking Horse

Agreements unless assured of payment of the applicable Termination Payment under the

conditions set forth in their agreements.  The Termination Payments promote more competitive

bidding by inducing the Stalking Horse Bidders to hold their offers open as a minimum or floor

---

[5] *See, e.g.*, *In re Finlay Enters., Inc., et al.*, Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009) (approving break-up fee); *In re Lehman Bros. Holdings Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving break-up fee and expense reimbursement); *In re Steve & Barry's Manhattan LLC, et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee and expense reimbursement); *In re Fortunoff Fine Jewelry and Silverware, LLC*, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving break-up fee); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); *In re G+G Retail, Inc.*, Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *In re Footstar, Inc.* Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); *In re Twinlab Corp., et al.*, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); *In re Adelphia Business Solutions, Inc., et al.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

bid on which other bidders – and the Debtors – can rely.  The Stalking Horse Bids increase the likelihood that the price at which the Stores are sold will reflect their true worth, and these Stalking Horse Bidders are entitled to be compensated as a result.

44.     The applicable Termination Payments are fair and reasonable in amount under the circumstances, particularly because the Termination Payment will be paid out of the proceeds of any Competing Transaction and the Stalking Horse Bidders.  Further, there is ample precedent for approving (i) a break-up fee of 1.5% and an expense reimbursement of up to $4.5 million (Acme Markets, Inc.); (ii) a break-up fee of 3% and an expense reimbursement of up to $1 million (The Stop & Shop Supermarket Company, LLC); and (iii) a break-up fee of 3% and an expense reimbursement of $250,000 (Key Food Stores Co-Operative, Inc.).  *See, e.g.*, *In re Hostess Brands, Inc.*, Case No. 12-22052 (Bankr. S.D.N.Y. 2013) (break-up fee equal to 3.5%); *In re Global Crossing Ltd.*, Case No. 02-40187 (Bankr. S.D.N.Y. 2002) (break-up fee equal to 4%); *In re LTV Steel Company, Inc.*, Case No. 00-43866 (Bankr. N.D. Ohio 2000) (break-up fee equal to 7.5%); *In re Fruit of the Loom, Inc.*, Case No. 99-4497 (Bankr. D. Del. 1999) (break-up fee equal to 3.59%); *In re Graham-Field Health Products, Inc.*, Case No. 99-4457 (Bankr. D. Del. 1999) (break-up fee equal to 4.65%).

45.     The foregoing bid protections will not deter or chill bidding, are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of their estates

### F.      Assumption and Assignment of Contracts

46.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease,

courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich* (*In re Klein Sleep Prods.*, *Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993).

47.     In connection with these proposed sales, the Debtors will assume and assign only the Transferred Contracts (*i.e.*, the executory contracts or unexpired leases included in the Stalking Horse Bids) and any Additional Contracts (*i.e.*, the executory contracts or unexpired leases added by a Stalking Horse Bidder or other Successful Bidder).  In each Sale Transaction, the Debtors' assumption of the Transferred Contracts and Additional Contracts will be contingent upon payment or reserve of Cure Costs and effective only upon the applicable Closing.  Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Pursuant to section 365(k), the Debtors will therefore be relieved from any liability for any breach of any Transferred Contract and Additional Contract after an assignment to the Successful Bidder.  As such, the assumption of the Transferred Contracts and Additional Contracts constitutes an exercise of the Debtors' sound business judgment.

48.     Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Transferred Contracts and Additional Contracts that will be assumed must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtors propose to file with the Court, and serve on each counterparty to a Transferred Contracts and Additional Contracts that will be assumed, a Cure Notice indicating the Debtors' calculation of the Cure Costs for each such contract.  Contract counterparties shall

have the opportunity to lodge any objections to the proposed assumption and assignment to the Successful Bidder and, if applicable, the proposed Cure Amount.

49.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is whether rent will be paid).

50.     At the Sale Hearing, to the extent necessary, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the ability of each Successful Bidder to perform under the applicable Transferred Contracts and Additional Contracts.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the

ability of each Successful Bidder to provide adequate assurance of future performance, as required by section 365(b)(1)(C) of the Bankruptcy Code.  Accordingly, it is requested that at the conclusion of the Sale Hearing, the proposed assumption and assignment of the applicable Transferred Contracts and Additional contracts be approved.

51.     To facilitate the assumption and assignment of Transferred Contracts and Additional Contracts, the Debtors further request the Court find all anti-assignment provisions of the applicable Transferred Contracts and Additional contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[6]

### G.     Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

52.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6006(d).

53.     In light of the current circumstances and financial condition of the Debtors, the Debtors believe that in order to maximize value and preserve jobs, the sale of the Stores should be consummated as soon as practicable.  Accordingly, the Debtors request that

---

[6] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease…"  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

each Sale Order be effective immediately upon entry of such order and that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

**Notice**

54.     No trustee or examiner has been appointed in these chapter 11 cases.  In addition to serving the Global Sale Notice and Cure Notice as provided in the Global Bidding Procedures Order, the Debtors will serve notice of this Motion upon (i) the Office of the United States Trustee for Region 2; (ii) the holders of the four largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014; (v) the attorneys for Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014; (vi) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured PIK Toggle Notes due 2017 (the "**Prepetition PIK Notes**"); (vii) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured Convertible Notes due 2018 (the "**Prepetition Convertible Notes**"); (viii) the attorneys for the holders of a majority of the Prepetition PIK Notes; (ix) the attorneys for the holders of a majority of the Prepetition Convertible Notes; (x) the attorneys for the DIP Agent; (xi) the attorneys for The Yucaipa Companies, LLC and their affiliated funds; (xii) the attorneys for the United Food and Commercial Workers Union International; (xiii) the Securities and Exchange Commission; (xiv) the Internal Revenue Service; (xv) the United States Attorney's Office for the Southern District of New York; (xi) all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; (xii) all entities known or reasonably believed to have

asserted a lien, encumbrance, claim or other interest in any of the Asset; and (xiii) all parties to the Transferred Contracts.  The Debtors submit that no further notice need be provided.

55.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: July 19, 2015
      New York, New York

/s/ Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

# **Exhibit A**

Stalking Horse Store Packages

## 76 Stores Included in Stalking Horse Bid of Acme Markets, Inc.

| # | Store | Banner | City | Address | State |
|---|-------|--------|------|---------|-------|
| 1 | 70927 | A&P | Wall Township | 2007 State Route 35 | NJ |
| 2 | 70205 | A&P | Yorktown | 100 Triangle Center | NY |
| 3 | 70620 | A&P | Midland Park | 137 Lake Street | NJ |
| 4 | 70677 | A&P | Mahwah | 125 Franklin Tnpk | NJ |
| 5 | 70408 | A&P | New Providence | 1260 Springfield Ave | NJ |
| 6 | 70233 | Superfresh | Philadelphia | 180 West Girard Ave | PA |
| 7 | 70787 | A&P | Thornwood | 610 Columbus Ave. | NY |
| 8 | 70479 | A&P | Fort Lee | 2160 Lemoine Ave | NJ |
| 9 | 70659 | A&P | Woodcliff Lake | 520 Chestnut Ridge Road | NJ |
| 10 | 70186 | A&P | Yonkers | 660 Mclean Ave | NY |
| 11 | 70107 | A&P | Mohegan Lake | 3105 East Main Street | NY |
| 12 | 70649 | A&P | Denville | 123-125 Main Street | NJ |
| 13 | 70640 | A&P | Jersey City | 125 18th Street | NJ |
| 14 | 72112 | Pathmark | Jersey City | 321 Stadium Plaza | NJ |
| 15 | 70639 | A&P | Allendale | 45 Demercurio Drive | NJ |
| 16 | 70784 | A&P | Croton on Hudson | 2005 Albany Post Rd. | NY |
| 17 | 70154 | A&P | Brewster | 1511 Rte 22 | NY |
| 18 | 70867 | A&P | Kenilworth | 801 Kenilworth Blvd | NJ |
| 19 | 70650 | A&P | South Plainfield | 907D Oak Tree Road | NJ |
| 20 | 70642 | A&P | Jefferson Township | 5774 Berkshire Valley Rd. | NJ |
| 21 | 70621 | A&P | Vernon | 530 Rt 515 Unit 1 | NJ |
| 22 | 70185 | A&P | Yonkers | 1233 Nepperhan Ave. | NY |
| 23 | 70821 | A&P | Little Silver | 507 Prospect Ave. | NJ |
| 24 | 70606 | A&P | Hoboken | 614 Clinton St | NJ |
| 25 | 70207 | A&P | Goldens Bridge | Rt 22 and Rt 138 | NY |
| 26 | 70167 | A&P | Hopewell Junction | 829 Route 82 | NY |
| 27 | 72181 | Pathmark | Elmwood Park | 58 Broad Way | NJ |
| 28 | 70768 | A&P | Bronxville | 12-14 Cedar Street | NY |
| 29 | 70864 | A&P | Montclair | 510 Valley Road | NJ |
| 30 | 70874 | Superfresh | Ocean City | 9507Coastal Hwy | MD |
| 31 | 70780 | A&P | Stamford | 1201 High Ridge Road | CT |
| 32 | 70773 | A&P | Bedford | 422 Old Post Road | NY |
| 33 | 72190 | Pathmark | Edgewater | 481 River Road | NJ |
| 34 | 70164 | A&P | Mahopac | 3 Village Center | NY |
| 35 | 70826 | A&P | Clark | 1060 Raritan  Road | NJ |
| 36 | 70208 | A&P | Millwood | 230 Saw Mill River Road | NY |
| 37 | 70908 | A&P | Ortley Beach | 5 Ortley Plaza | NJ |
| 38 | 70684 | A&P | Sussex | 455 Rt23 North | NJ |
| 39 | 70728 | A&P | Rye Brook | 261 South Ridge St. | NY |
| 40 | 70740 | A&P | Greenwich | 160 West Putnam Avenue | CT |
| 41 | 70763 | A&P | Briarcliff Manor | 1886 Pleasantville Road | NY |
| 42 | 70456 | A&P | Blairstown | 152 Route 94 | NJ |

| # | Store | Banner | City | Address | State |
|---|-------|--------|------|---------|-------|
| 43 | 70750 | A&P | Riverside | 1261 East Putnam Avenue | CT |
| 44 | 76710 | Pathmark | Philadelphia | 2101-41 Cottman Ave. | PA |
| 45 | 70766 | A&P | Eastchester | 777 White Plains Road | NY |
| 46 | 70664 | A&P | Park Ridge | 199 Kinderkamack Rd | NJ |
| 47 | 70786 | A&P | Greenburgh | 103 Knollwood Road | NY |
| 48 | 70189 | Superfresh | Haverton | 1305West Chester Pike | PA |
| 49 | 70153 | A&P | Shrub Oak | 1366 East Main Street | NY |
| 50 | 70761 | A&P | West New York | 55 Riverwalk Drive West | NJ |
| 51 | 70516 | A&P | New Rochelle | 23 Quaker Ridge Road | NY |
| 52 | 70094 | A&P | Pleasant Valley | Rte 44 & North Ave | NY |
| 53 | 70500 | A&P | New Canaan | 288 Elm Street | CT |
| 54 | 70626 | A&P | Tinton Falls | 990 Shrewsbury Ave | NJ |
| 55 | 72178 | Pathmark | Weehawken | 4100 Park Avenue | NJ |
| 56 | 70811 | A&P | Old Bridge | 3500 Route #9 | NJ |
| 57 | 72194 | Pathmark | Bergenfield | 80 New Bridge Road | NJ |
| 58 | 70471 | Superfresh | Manahawkin | 609 East Bay Avenue | NJ |
| 59 | 70391 | A&P | Saddle Brook | 75 Mayhill Street | NJ |
| 60 | 72186 | Pathmark | Newark | 281-295 Ferry Street | NJ |
| 61 | 70252 | Superfresh | Richboro | 800 2nd Street Pike | PA |
| 62 | 70584 | Superfresh | Wilmington | 1812 Marsh Rd | DE |
| 63 | 70730 | Superfresh | Philadelphia | 305 S. Fifth St. | PA |
| 64 | 70477 | Superfresh | Ocean City | 800 West Ave | NJ |
| 65 | 72587 | Pathmark | Ventnor | 5100 Wellington Avenue | NJ |
| 66 | 76725 | Pathmark | Philadelphia | 7700 Crittendan St | PA |
| 67 | 70747 | Superfresh | Philadelphia | 1001 South Street | PA |
| 68 | 70801 | A&P | Warrenville | 177 Washington Valley Rd. | NJ |
| 69 | 70559 | Superfresh | Rehoboth | 18578 Coastal Highway | DE |
| 70 | 72590 | Pathmark | Newark | 100 College Square | DE |
| 71 | 72586 | Pathmark | Wilmington | 4365 Kirkwood Highway | DE |
| 72 | 70474 | Superfresh | Wildwood | 2400 Delaware Avenue | NJ |
| 73 | 76585 | Pathmark | Boothwyn | 643 Conchester Highway | PA |
| 74 | 70293 | Superfresh | Wynnewood | 250 E Lancaster | PA |
| 75 | 70294 | Superfresh | Gladwynne | 1025 Youngsford Road | PA |
| 76 | 70588 | Superfresh | Newark | 401 New London Rd. | DE |

## 25 Stores Included in Stalking Horse Bid of The Stop & Shop Supermarket Company, LLC

| | Store | Banner | City | Address | State |
|---|---|---|---|---|---|
| 1 | 70226 | A&P | Mt Kisco | 195 North Bedford Rd | NY |
| 2 | 72270 | Pathmark | South Orange | 407 Valley Street | NJ |
| 3 | 72633 | Pathmark | Franklin Square | 460 Franklin Avenue | NY |
| 4 | 72608 | Pathmark | Greenvale | 130 Wheatley Plaza | NY |
| 5 | 72667 | Pathmark | Bronx | 1720 Eastchester Road | NY |
| 6 | 72647 | Pathmark | Bronx | 2136 Bartow Avenue | NY |
| 7 | 72619 | Pathmark | Brooklyn | 625 Atlantic Avenue | NY |
| 8 | 72638 | Pathmark | Brooklyn | 2965 Cropsey Avenue | NY |
| 9 | 72616 | Pathmark | Jamaica | 134-40 Springfield Blvd | NY |
| 10 | 72626 | Pathmark | Ozone Park | 92-10 Atlantic Avenue | NY |
| 11 | 72622 | Pathmark | Whitestone | 31-06 Farrington Street | NY |
| 12 | 70658 | Waldbaums | Long Beach | 85 E. Park Ave. | NY |
| 13 | 70465 | Waldbaums | Massapequa | 702 Hicksville Road | NY |
| 14 | 72625 | Pathmark | Seaford | 4055 Merrick Road | NY |
| 15 | 70260 | Waldbaums | Southampton | 167 Main St. Jagger Lane | NY |
| 16 | 70452 | Waldbaums | Baldwin | 905 Atlantic Ave. | NY |
| 17 | 70651 | Waldbaums | Howard Beach | 156-01 Crossbay Blvd. | NY |
| 18 | 70236 | Waldbaums | Huntington | 60 Wall Street | NY |
| 19 | 72685 | Pathmark | Staten Island | 1351 Forest Avenue | NY |
| 20 | 70257 | Waldbaums | Easthampton | 67 Newtown Lane | NY |
| 21 | 70616 | Waldbaums | Bell Harbor | 112-15 Beach Channel Drive | NY |
| 22 | 72661 | Pathmark | Bronx | 961 East 174th Street | NY |
| 23 | 70632 | Waldbaums | Bay Terrace | 213-15 26th Avenue | NY |
| 24 | 70695 | A&P | Closter | 400 Demarest Avenue | NJ |
| 25 | 72284 | Pathmark | Kinnelon | 25 Kinnelon Road | NJ |

## 19 Stores Included in Stalking Horse Bid of Key Food Stores Co-Operative, Inc.

|   | Store | Banner | City | Address | State |
|---|-------|--------|------|---------|-------|
| 1 | 59502 | Food Basics | Paterson | 465 Getty Ave | NJ |
| 2 | 70295 | Waldbaums | Flushing | 196-35 Horace Harding Expressway | NY |
| 3 | 70657 | Waldbaums | Bayside | 35-09 Francis Lewis Blvd | NY |
| 4 | 70669 | Waldbaums | Albertson | 1050 Willis Avenue | NY |
| 5 | 59504 | Food Basics | Glen Rock | 937 Lincoln Ave | NJ |
| 6 | 70655 | Waldbaums | Glen Head | 1-1 Park Plaza | NY |
| 7 | 70762 | A&P | Bronx | 5661 Riverdale Ave | NY |
| 8 | 70442 | Waldbaums | Howard Beach | 82-35 153rd Ave | NY |
| 9 | 36715 | Food Emporium | New York | 10 Union Sq 14th & Park | NY |
| 10 | 70749 | A&P | Harrison | 355 Halsted Ave | NY |
| 11 | 59524 | Food Basics | Fairview | 289 Bergen Blvd. | NJ |
| 12 | 59503 | Food Basics | Brooklyn | 2185 Coyle Street | NY |
| 13 | 70296 | Waldbaums | Brooklyn | 81-21 N Utrecht Ave. | NY |
| 14 | 70641 | Waldbaums | Jackson Heights | 75-55 31St Ave. | NY |
| 15 | 72637 | Pathmark | Brooklyn | 1525 Albany Avenue | NY |
| 16 | 70292 | Waldbaums | South Flatbush | 2424 Flatbush Avenue | NY |
| 17 | 70613 | Waldbaums | Glen Oaks | 259-01 Union Turnpike | NY |
| 18 | 70849 | Waldbaums | Rosebank | 375 Tompkins Ave. | NY |
| 19 | 72610 | Pathmark | New York | 410 West 207th Street | NY |

**Exhibit B**

Global Bidding Procedures Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re                                  :

                                       :       **Chapter 11**

**THE GREAT ATLANTIC & PACIFIC TEA**   :

**COMPANY, INC., et al.,**            :       **Case No. 15-23007 (RDD)**

                                       :

          **Debtors.[1]**            :       **(Jointly Administered)**

                                       :

-----------------------------------------------------------------x

## ORDER APPROVING (A) GLOBAL BIDDING PROCEDURES, (B) BID PROTECTIONS GRANTED TO CERTAIN STALKING HORSE PURCHASERS, (C) THE FORM AND MANNER OF NOTICE OF AUCTIONS, SALE TRANSACTIONS AND SALE HEARING, (D) THE ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (E) THE DATE FOR AUCTIONS, IF NECESSARY, AND SALE HEARINGS

Upon the motion, dated July 19, 2015 (the "**Motion**"),[2] of the Debtors in the

above-captioned chapter 11 cases for an order pursuant to sections 105, 363, 365, 503 and 507 of

the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014:  (i) approving (a) the

Global Bidding Procedures attached hereto as **Exhibit 1**, (b) the Bid Protections granted to each

Stalking Horse Bidder as provided in such bidder's Stalking Horse Agreement, (c) the form and

manner of notice of each Auction, Sale Transaction and Sale Hearing, (d) the Assumption and

Assignment Procedures, including the procedures for determining cure costs, and (e) a date for

the Auctions and Sale Hearings (collectively, the "**Bidding and Auction Process**"); and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms utilized but not defined herein shall have the meanings given them in the Motion or the Global Bidding Procedures.

(ii) authorizing (a) the sale of the Acquired Assets, as defined and identified in each Stalking Horse Agreement (including any Additional Stores), and any Additional Stores free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code and (b) the assumption and assignment of Transferred Contracts, as defined and identified in each Stalking Horse Agreement (including any Additional Contracts) (collectively, the "**Sale Transactions**"), all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been given as provided in the Motion; and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion as to the Bidding and Auction Process (the "**Hearing**"); and all of the proceedings had before the Court; and the Court having reviewed the Motion, the McGarry Declaration, and the Goldstein Declaration filed in support of the Motion; and the Court having found and determined that the relief sought in the Motion as to the Bidding and Auction Process is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

## FOUND AND DETERMINED THAT:[3]

A.     This Court has jurisdiction to hear and determine the Motion and to grant
the relief requested herein with respect to the Bidding and Auction Process pursuant to 28
U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is
proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     The statutory and legal predicates for the relief requested in the Motion are
sections 105, 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004,
6006, and 9014.

C.     Good and sufficient notice of the Motion, the Bidding and Auction
Process and the relief sought in the Motion has been given under the circumstances, and no other
or further notice is required except as set forth herein and in the Global Bidding Procedures.  A
reasonable opportunity to object or be heard regarding the relief provided herein has been
afforded to parties in interest.

D.     The Debtors and their advisors, including Evercore Group LLC and Hilco
Real Estate LLC, engaged in a robust and extensive marketing and sale process before and after
the Commencement Date, over a period of more than four months, to solicit and develop the
highest or best offer for the Stores.

E.     The bid of each Stalking Horse Bidder as reflected in the Stalking Horse
Agreement of such Stalking Horse Bidder (such Stalking Horse Bidder, the "**Applicable
Stalking Horse Bidder**" and the Stalking Horse Agreement applicable to such Stalking Horse
Bidder, the "**Applicable Stalking Horse Agreement**"), represents the highest or best offer the

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the
extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the
extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Debtors have received to purchase the Acquired Assets included in an Applicable Stalking Horse Agreement (the "**Applicable Acquired Assets**").

F.       Each of [ ], [ ], and [ ], shall act as the "**Stalking Horse Bidder**" under a Stalking Horse Agreement, respectively, and be subject to higher or better offers in accordance with the Global Bidding Procedures.

G.       Pursuit of each Applicable Stalking Horse Bidder as a "stalking-horse" and its Applicable Stalking Horse Agreement as a "stalking-horse" sale agreement is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.  The Applicable Stalking Horse Agreement provides the Debtors with the opportunity to sell the Applicable Acquired Assets, in order to preserve and realize their going concern value.  Each of the Applicable Stalking Horse Agreements will enable the Debtors to continue their operations, preserve jobs, minimize disruption to the Debtors' businesses, and secure a fair and adequate baseline price for the Applicable Acquired Assets at the auction for the Applicable Acquired Assets (the "**Applicable Auction**") and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.

H.       The Bid Protections, including, but not limited to, any Termination Payments (as such term is defined in an Applicable Stalking Horse Agreement, the "**Applicable Termination Payment**"), (i) have been negotiated by the Applicable Stalking Horse Bidder and the Debtors and their respective advisors at arms' length and in good faith and (ii) are necessary to ensure that the Applicable Stalking Horse Bidders will continue to pursue its Applicable Stalking Horse Agreement and the sale transaction contemplated thereby (the "**Applicable Sale Transaction**").  The Applicable Termination Payment, to the extent payable under the

Applicable Stalking Horse Agreement, (x) is (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code and (ii) shall be treated as an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code, (y) is commensurate to the real and material benefits conferred upon the Debtors' estates by the Applicable Stalking Horse Bidder, and (z) is fair, reasonable and appropriate, including in light of the size and nature of the Applicable Sale Transaction, the necessity to announce a sale transaction for the Applicable Acquired Assets and the efforts that have been and will be expended by the Applicable Stalking Horse Bidder. The Bid Protections, including, but not limited to, any Applicable Termination Payments are a material inducement for, and condition of, each Applicable Stalking Horse Bidder's execution of the Applicable Stalking Horse Agreement. Unless it is assured that the Bid Protections, including, but not limited to, any Applicable Termination Payment, will be available, the Applicable Stalking Horse Bidder is unwilling to remain obligated to consummate the Applicable Sale Transaction or otherwise be bound under the Applicable Stalking Horse Agreement (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Global Bidding Procedures).

I. The Debtors have articulated good and sufficient business reasons for the Court to approve (i) the Global Bidding Procedures, (ii) the Assumption and Assignment Procedures, (iii) the Bid Protections, including, but not limited to, any Applicable Termination Payment (to the extent payable under the Applicable Stalking Horse Agreement), and (iv) the form and manner of notice of the Applicable Auction and Sale Hearing for the Applicable Sale Transaction.

J.     The Global Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Applicable Acquired Assets.

K.     None of the Applicable Stalking Horse Bidders is an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Applicable Stalking Horse Bidder and the Debtors.  The Applicable Stalking Horse Bidder and its respective counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Applicable Stalking Horse Bidders' negotiation of its Bid Protections and the Global Bidding Procedures and the Applicable Stalking Horse Bidders' negotiation and entry into the Applicable Stalking Horse Agreement.

L.     The Assumption and Assignment Procedures, including notice of proposed cure costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures have been tailored to provide adequate opportunity for all non-Debtor counterparties to the Transferred Contracts (as defined in each Applicable Stalking Horse Agreement, the "**Applicable Transferred Contracts**") to raise any objections to the proposed assumption and assignment or to the cure costs.

M.     The Global Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Global Bidding Procedures, the Assumption and Assignment Procedures, the Applicable Auctions, the Sale Hearings and the Applicable Sale Transactions (including the sale of the Applicable Acquired Assets (as set forth

under the Applicable Stalking Horse Agreement) free and clear of any liens, claims, encumbrances or interests pursuant to section 363(f) of the Bankruptcy Code) (with such liens, claims, encumbrances or interests attaching to the proceeds of any such sale), and any and all objection deadlines related thereto, and no other or further notice shall be required for the Sale Motion, the Applicable Sale Transactions or the assumption and assignment of the Applicable Transferred Contracts  except as expressly required herein.

N.      Nothing contained herein shall prejudice or impair the right to credit bid, as set forth in the Global Bidding Procedures (and subject to the terms of the Intercreditor Agreement, as such term is defined in the Global Bidding Procedures) of (A) Fortress Investment Group, as agent under that certain Senior Secured Debtors-in-Possession Term Credit Agreement (the "**DIP Lender**"), (B) Wells Fargo Bank, National Association ("**Wells Fargo**"), as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014, (C) Wells Fargo, as agent under that certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014, (D) the majority holders of the Senior Secured PIK Toggle Notes due 2017, and (E) the majority holders of the Senior Secured Convertible Notes due 2018 (each, a "**Secured Lender**").

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      The Motion is granted to the extent set forth herein.

2.      All Objections to the relief granted herein that have not been withdrawn with prejudice, waived or settled, and all reservations of rights included in such objections, hereby are overruled and denied on the merits with prejudice.

**<u>Notice of Sale Transaction</u>**

3.      The Global Sale Notice and the Global Publication Sale Notice, substantially in the forms annexed hereto as **<u>Exhibit 2</u>** and **<u>Exhibit 3</u>**, respectively, are approved.

4.      All parties in interest shall receive or be deemed to have received good and sufficient notice of (a) the Motion, (b) the Assumption and Assignment Procedures, including the proposed assumption and assignment of the Applicable Transferred Contracts to the Applicable Stalking Horse Bidder pursuant to the Applicable Stalking Horse Agreement or to a Successful Bidder, (c) the Applicable Auction, (d) the Applicable Sale Transaction, including the sale of the Applicable Acquired Assets (as set forth under the Applicable Stalking Horse Agreement) free and clear of all liens, claims, encumbrances or other interest, and (e) the Sale Hearings, and no further notice of the foregoing shall be required, if:

(a)      As soon as practicable, but no later than three (3) days after entry of this Order, the Debtors cause the Global Sale Notice to be served by email, mail, facsimile or overnight delivery on: (i) counsel for the Applicable Stalking Horse Bidder; (ii) all Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Applicable Acquired Assets or any Additional Stores during the past twelve (12) months; (iii) all entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in the Applicable Acquired Assets or any Additional Stores (for whom identifying information and addresses are available to the Debtors); (iv) all non-Debtor parties to the Applicable Transferred Contracts and Additional Contracts (for whom identifying information and addresses are available to the Debtors); (v) any Governmental Authority (as defined in the Applicable Stalking Horse Agreement) known to have a claim in the above-captioned chapter 11 estates; (vi) the United States Attorney for the Southern District of New York; (vii) the Office of the Attorney General in each state in which the Debtors operate; (iix) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (ix) all of the multiemployer pension plans to which any of the Debtors is a contributing employer and all of the single employer defined benefit plans to which any Debtor is a contributor; (x) all of the labor unions that represent employees of any Debtor; (xi) the Federal Trade Commission; (xii) the United States Attorney General/Antitrust Division of Department of Justice; (xiii) all of the Debtors' known creditors (for whom identifying information and

addresses are available to the Debtors); (xiv) all local environmental enforcement agencies; (xv) the United States Environmental Protection Agency; and (xvi) all other Persons as directed by the Court (for whom identifying information and addresses are available to the Debtors) (collectively, the "**Sale Notice Parties**"); and

(b)     As soon as practicable, but no later than five (5) days after entry of this Order, the Debtors cause the Global Publication Sale Notice to be published on the website of the Debtors' claims and noticing agent and once in The New York Times, national edition.

## The Global Bidding Procedures and the Auctions

5.      The Global Bidding Procedures, attached hereto as **Exhibit 1**, are incorporated herein and approved, and shall apply with respect to any bids for, and the auction and sale of, all of the Debtors' stores and related assets, including the Applicable Acquired Assets set forth under the Applicable Stalking Horse Agreement.  The Debtors are authorized to take all actions necessary or appropriate to implement the Global Bidding Procedures.

6.      The deadline for submitting Qualified Bids (the "**Global Bid Deadline**") is **September 11, 2015 at 5:00 p.m. (Eastern Time)**.  Any party that does not submit a Qualified Bid by the Global Bid Deadline in accordance with the Global Bidding Procedures will not be allowed to (a) submit any offer after the Global Bid Deadline or (b) participate in the Applicable Auction; provided that the foregoing shall not preclude the Debtors after the Global Bid Deadline from marketing to any person, or auctioning, or any parties from bidding on, any Stores not included in an Applicable Auction, including pursuant to the Tier II Procedures; provided further that to the extent there is no Applicable Auction for the Applicable Acquired Assets of a Stalking Horse Bid, the prior proviso shall not be applicable to such Applicable Acquired Assets.  Each Applicable Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Applicable Stalking Horse Agreement is a Qualified Bid for all purposes and requirements pursuant to the Global Bidding Procedures.

7.       All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Applicable Auction and the terms and conditions of the sale or transfer of the Applicable Acquired Assets identified under the Applicable Stalking Horse Agreement.

8.       If the Applicable Stalking Horse Bidder's bid, as reflected in the Applicable Stalking Horse Agreement, is the only Qualified Bid in respect of the Applicable Acquired Assets identified under the Applicable Stalking Horse Agreement that is received by the Debtors by the Global Bid Deadline, no Applicable Auction will be conducted for the Applicable Acquired Assets, and the Applicable Stalking Horse Bidder will be the Successful Bidder for the Applicable Acquired Assets.

9.       Each Qualified Bidder participating in the Applicable Auction shall confirm in writing  that (a) it has not engaged in any collusion with respect to the submission of any bid, the bidding or the Applicable Auction and (b) its Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as a Successful Bidder.  All proceedings at an Applicable Auction shall be transcribed.

10.       Subject to the rights of an Applicable Stalking Horse Bidder under its Applicable Stalking Horse Agreement, the Global Bidding Procedures (including the consultation rights of the Consultation Parties described therein) and this Order, the Debtors shall have the right as they may reasonably determine to be in the best interests of their estates to carry out the Global Bidding Procedures, including, without limitation, to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is a Baseline Bid (as such terms are defined in the Global Bidding Procedures); (d) determine which bids are the Successful Bid and Back-Up Bid (as such terms are defined in the

Global Bidding Procedures), each as it relates to an Applicable Auction; (e) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Global Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (f) adjourn or cancel an Applicable Auction and/or the applicable Sale Hearing in open court without further notice or as provided in the Global Bidding Procedures; (g) modify the Global Bidding Procedures consistent with their fiduciary duties and bankruptcy law; and (h) withdraw the Sale Motion at any time with or without prejudice.

## The Sale Hearings and Sale Objections Deadlines

11.     If more than one Qualified Bid is received for the Applicable Acquired Assets, the applicable Sale Hearing shall be held before this Court on **October 1, 2015 at 10:00 a.m. (Eastern Time).**  If the bid of the Applicable Stalking Horse Bidder, as reflected in the Applicable Stalking Horse Agreement, is the only Qualified Bid received for the Applicable Acquired Assets, the applicable Sale Hearing shall be held before this Court on **September 22, 2015, at 10:00 a.m. (Eastern Time)**.  The Debtors may (after consultation with the Consultation Parties and the Applicable Stalking Horse Bidder or, if an Applicable Auction has been held, the Successful Bidder and the Consultation Parties) seek an adjournment of the applicable Sale Hearing as the Debtors deem appropriate in the exercise of their reasonable business judgment.

12.     Objections to an Applicable Sale Transaction (including the sale of the Applicable Acquired Assets subject to such objection free and clear of liens, claims, encumbrances and interests pursuant to section 363(f) of the Bankruptcy Code) and entry of the Sale Orders (other than objections to the provision of adequate assurance of future performance by a Successful Bidder other than the Applicable Stalking Horse Bidder) (each, a "**Sale Objection**") must: (a) be in writing and specify the nature of such objection; (b) comply with the

Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"); and (c) be filed with the Court and served on (i) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Garrett A. Fail, Esq. and Sunny Singh, Esq.), and (ii) counsel to the Creditors' Committee, if any, (iii) counsel to the Applicable Stalking Horse Bidder, (iv) counsel to Wells Fargo, as ABL Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110 (attn.: Kevin J. Simard, Esq. and John F. Ventola, Esq.), and (v) counsel to Wells Fargo, as Term Agent, Otterbourg, O.C., 230 Park Avenue, New York, New York 10169 (Attn: Jonathan N. Helfat, Esq. and Daniel F. Fiorillo, Esq.) (collectively, the "**Objection Notice Parties**") by **September 11, 2015 at 5:00 p.m. (Eastern Time)**.  All Sale Objections will be heard by the Court at the applicable Sale Hearing.

13.     The failure of any objecting person or entity to timely file and serve a Sale Objection shall be a bar to the assertion, at any Sale Hearing or thereafter, of any objection to the Sale Motion, or to the consummation and performance of the Applicable Sale Transaction contemplated by a Applicable Stalking Horse Agreement or any purchase agreement with a Successful Bidder, including the transfer of the Applicable Acquired Assets (as set forth under the Applicable Stalking Horse Agreement subject to the untimely Sale Objection) to the Applicable Stalking Horse Bidder or the Successful Bidder, free and clear of all liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code.

## The Assumption and Assignment Procedures

14.     The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor counterparties, comply in all respects with the Bankruptcy Code, and are approved.

15.    As soon as practicable, but not later than **three (3)** days after the entry of this Order, the Debtors shall file with the Court and serve by first class mail on each non-Debtor party to the Applicable Transferred Contracts a notice (the "**Cure Notice**") that shall: (i) provide a description of each such Applicable Transferred Contract, (ii) state the amount, if any, that the Debtors believe are necessary to cure, or compensate the non-Debtor party for, any and all defaults under such Applicable Transferred Contract pursuant to section 365 of the Bankruptcy Code (the "**Cure Costs**"); (iii) notify the non-Debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Applicable Acquired Assets; (iv) state the date of the Sale Hearing and that objections to any Cure Costs or to assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors (subject to the consent of the Applicable Stalking Horse Bidder or, if an Applicable Auction has been held, the Successful Bidder) in accordance with this Order; and (iv) state the appropriate deadline by which the non-Debtor party must file an objection to the Cure Costs or assumption and assignment of the Applicable Transferred Contracts.  Upon service of the Cure Notice, all counterparties to the Applicable Transferred Contracts shall receive or be deemed to have received good and sufficient notice of the Cure Costs for, and the proposed assumption and assignment of, the Applicable Transferred Contracts.  The Debtors shall also post a copy of the Cure Notice on the website for these chapter 11 cases maintained by the Debtors' claims and noticing agent.

16.    All Objections to any proposed Cure Costs (each, a "**Cure Objection**") and to the provision of adequate assurance of future performance (each, an "**Adequate Assurance Objection**") must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) with respect to a Cure Objection, state with specificity what cure costs the

objecting party believes are required; and (d) be filed with the Court and served on the Objection Notice Parties.

17.     Any Cure Objection or Adequate Assurance Objection in respect of an Applicable Transferred Contract must be filed and served by **September 11, 2015 at 5:00 p.m. (Eastern Time)**; provided that if a Successful Bidder other than the Applicable Stalking Horse Bidder prevails at the Auction, then (a) the deadline to file and serve an Adequate Assurance Objection in respect of an Applicable Transferred Contract shall be extended to two (2) days prior to the Sale Hearing, and (b) as soon as possible after the conclusion of the Applicable Auction, the Debtors shall file with the Bankruptcy Court a notice that identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Applicable Transferred Contracts and any Additional Contracts to the Successful Bidder.

18.     By **September 21, 2015**, the Debtors shall serve by first class mail upon each non-Debtor counterparty to an Additional Contract included in an Auction Package (as such term is defined in the Global Bidding Procedures Order) a notice indicating (a) the applicable Cure Costs for the Additional Contract and (b) that the Debtors' may seek to assume and assign the Additional Contracts to a Successful Bidder or a Stalking Horse Bidder, as applicable (such notice, an "**Additional Cure Notice**").  The Debtors shall also post a copy of any Additional Cure Notices on the website for these chapter 11 cases maintained by the Debtors' claims and noticing agent.  Any Cure Objection for an Additional Contract must be filed and served within seven (7) days of service of the Additional Cure Notice.  Any Adequate Assurance Objection for an Additional Contract must be filed and served two (2) days prior to the Sale Hearing.  Upon service of the Additional Cure Notice, all counterparties included on such Additional Contract

Notice shall receive or be deemed to have received good and sufficient notice of the Cure Costs for, and the proposed assumption and assignment of, the Additional Contracts..

19.     If a timely Cure Objection or Adequate Assurance Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the applicable Sale Hearing; provided that a Cure Objection (only) may, at the Debtors' discretion (after consultation with the Applicable Stalking Horse Bidder or, if an Applicable Auction is held, the Successful Bidder), be adjourned to a subsequent hearing if, pending resolution of such Cure Objection (an "**Adjourned Cure Objection**"), the Debtors maintain a cash reserve equal to the cure cost the objecting party believes is required, as set forth in the Cure Objection (the "**Cure Cost Reserve**").  An Adjourned Cure Objection may be resolved after the applicable Closing Date; provided that the Debtors maintain the Cure Cost Reserve. Upon resolution of such Adjourned Cure Objection and the payment of the applicable Cure Cost, if any, the Applicable Transferred Contract or Additional Contract that was the subject of such Adjourned Cure Objection shall be deemed assumed and assigned to the Applicable Stalking Horse Bidder or, if any Applicable Auction is held, the Successful Bidder, as of the applicable Closing Date.

20.     If no timely Cure Objection is filed and served in respect of an Applicable Transferred Contract or Additional Contract, the Cure Cost identified on the Cure Notice or Additional Cure Notice will be the only amount necessary under section 365(b) of the Bankruptcy Code to cure all defaults under such Applicable Transferred Contract or Additional Contract.  Any party failing to timely file a Cure Objection shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates, the Applicable Stalking Horse Bidder or, if an Applicable Auction is held,

the applicable Successful Bidder.  If no timely Adequate Assurance Objection is filed and served with respect to an Applicable Transferred Contract or Additional Contract, the Applicable Stalking Horse Bidder or, if an Auction is held, the applicable Successful Bidder will be deemed to have provided adequate assurance of future performance for such Transferred Contract or Additional Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code.

21.     The Debtors' assumption and assignment of the Applicable Transferred Contracts and any Additional Contracts to a Successful Bidder is subject to Court approval and the consummation of an applicable Sale Transaction.  Accordingly, absent the closing of such sale, the Applicable Transferred Contracts and Additional Contracts (if any) shall not be deemed assumed or assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.

22.     The inclusion of a contract or other document or Cure Cost on a Cure Notice or Additional Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the Applicable Stalking Horse Bidder or any other party in interest that such contract or other document is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Cost is due (all rights with respect thereto being expressly reserved).  The Debtors reserve all of their rights, claims and causes of action with respect to each contract or other document listed on the Cure Notice and Additional Cure Notice. The Debtors' inclusion of an executory contract or unexpired lease on the Cure Notice or Additional Cure Notice shall not be a guarantee that such executory contract or unexpired lease will ultimately be assumed or assumed and assigned.  The Cure Notice shall be without prejudice to each Stalking Horse Bidder's rights, if any, under the Stalking Horse Agreement to

subsequently (i) exclude a Applicable Transferred Contract from assumption or assignment or (ii) to include Additional Contracts for assumption and assignment.

23.     The Debtors shall provide written notice to the parties to all Transferred Contracts and Additional Contracts that are ultimately assumed and assigned to a Successful Bidder of (a) such assumption and assignment and (b) the identity of the Successful Bidder.

## Bid Protections

24.     The Bid Protections are approved in their entirety, including, without limitation, the following Applicable Termination Payments payable in accordance with, and subject to the terms of, the Applicable Stalking Horse Agreement:

> a.     Stalking Horse Bidder, [ ], shall be granted the right to a Termination Payment comprised of a break-up fee of [ ]% of the cash purchase price, plus reimbursement for up to $[ ] million of expenses.
>
> b.     Stalking Horse Bidder, [ ], shall be granted the right to a Termination Payment comprised of a break-up fee of [ ]% of the cash purchase price, plus reimbursement for up to $[ ] of expenses.
>
> c.     Stalking Horse Bidder, [ ], shall be granted the right to a Termination Payment comprised of a break-up fee of [ ]% of the cash purchase price, plus reimbursement for up to $[ ] of expenses.

Except as expressly provided for herein, no other termination payments are authorized or permitted under this Order.  Notwithstanding anything to the contrary herein, no Termination Payment shall be payable with respect to a Separable Store in the event that such Separable Store is sold to a party other than the Applicable Stalking Horse.

25.     The Debtors are authorized and directed to pay the Applicable Termination Payment, to the extent payable under the Applicable Stalking Horse Agreement, without further order of the Court.  The Applicable Termination Payment, to the extent payable under the Applicable Stalking Horse Agreement, shall constitute an allowed administrative

expense claim against the Debtors' estates pursuant to sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code. Subject to the foregoing, the Applicable Termination Payment shall be (a) paid in cash from the proceeds of any approved sale or (b) credited against the purchase price if, after an Applicable Auction, the Applicable Stalking Horse Bidder's bid, as enhanced at the Applicable Auction, is the Successful Bid and the sale contemplated by the Applicable Stalking Horse Agreement (as enhanced at the Applicable Auction) is consummated.

## General Provisions

26. All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes relating to the bidding process, the Auction and/or any Sale Transaction) to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (b) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

27. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any applicable provisions of the Local Rules or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this order.

28. The requirements set forth in Local Rules 6004-1, 9006-1 and 9013-1 are hereby satisfied or waived.

29. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order

Dated: _____, 2015
       White Plains, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

Global Bidding Procedures

# GLOBAL BIDDING PROCEDURES

## Overview

On July [19], 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On July [], 2015, the United States Bankruptcy Court for the Southern District of New York entered an order (the "**Global Bidding Procedures Order**"), which, among other things, authorized the Debtors to solicit bids and approved these procedures (the "**Global Bidding Procedures**") for the consideration of the highest or otherwise best price for **all** of their stores and related assets (each, a "**Store**"), on the terms and conditions set forth herein.

Three stalking horse bids (collectively, the "**Stalking Horse Bids**") have been submitted by [ ]; [ ]; and [ ] (collectively, the "**Stalking Horse Bidders**"). Each of the Stalking Horse Bidders has executed a separate agreement (each, a "**Stalking Horse Agreement**") for the purchase of non-overlapping groups of Stores (each such group, a "**Stalking Horse Store Package**"). For reference, the Stalking Horse Bids and the Stores that are part of the related Stalking Horse Store Packages are set forth on Schedule 1 attached hereto.

The Stalking Horse Bids are subject to higher or better offers submitted in accordance with the terms and conditions of these Global Bidding Procedures. These Global Bidding Procedures describe, among other things: (A) the procedures for bidders to submit bids for one or more Stores, including the Stalking Horse Store Packages; (B) the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined below); (C) the negotiation of bids received; (D) the conduct of one or more subsequent auctions (an "**Auction**"); and (E) the ultimate selection of the Successful Bidder(s) (as defined below) and Court approval thereof (collectively, the "**Bidding Process**").

The Debtors reserve the right to extend any of the bidding deadlines or other dates set forth in these Global Bidding Procedures without further Order of the Bankruptcy Court subject to providing notice as described below; provided that nothing herein shall authorize the Debtors to unilaterally extend any date or deadlines set forth in a Stalking Horse Agreement.

In addition to these Global Bidding Procedures, the Bankruptcy Court has authorized the Debtors, with the assistance of their advisors to market and sell Stores and other assets pursuant to omnibus procedures (the "**Tier II Procedures**"). Notwithstanding anything to the contrary herein, the Debtors may choose to utilize the Tier II Procedures to market or sell any of their Stores that are not included in a Stalking Horse Store Package.

| August 24, 2015 | Global Non-Binding Indication of Interest Date |
|---|---|
| September 11, 2015, at 5:00 p.m. | Global Binding Bid Deadline |
| September 11, 2015, at 5:00 p.m. | Objection Deadline to Sale / Assumption and Assignment of Transferred Contracts[1] |
| September 18, 2015, at 5:00 p.m. | Deadline for Debtors to Designate and Publish Qualified Bidders; select Baseline Bids; and Publish Stores to be included in the Auction |
| September 22, 2015, at 10:00 a.m. | Sale Hearing if no other Qualified Bids Received for Stalking Horse Store Package |
| September 24 and 25, 2015 | Auction<br><br>Location: To Be Announced |
| October 1, 2015 | Sale Hearing if Auction is Conducted<br><br>Adequate Assurance Objection Deadline for Successful Bidders other than the Stalking Horse Bidders and for Additional Contracts |

## **Marketing Process**

Assets to be Sold

All of the Debtors' Stores are available for sale. A party who is interested in purchasing any of the Stores may submit a bid to purchase:

(A)     a Stalking Horse Store Package;

(B)     the Mount Kisco Store (referred to herein as a "**Separable Store**"); or

(C)     one or more Stores, in any combination, whether or not such Store is included in a Stalking Horse Store Package.

---

[1] This objection deadline applies to all objections to the sale of the Stores, with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than one of the Stalking Horse Bidders.

<u>Global Non-Binding Indication of Interest Date</u>

        If you are interested in purchasing any of the Stores, whether individually, in combination or in connection with a Stalking Horse Store Package, you should contact the Debtors' advisors by **<u>no later than August 24, 2015</u>** (the "**Global Indication of Interest Date**") in writing expressing your interest and identifying the Stores in which you are expressing such interest at:

    (A)    Evercore Group LLC ("**Evercore**"), by contacting Stephen Goldstein and Paul Billyard (Stephen.Goldstein@Evercore.com and Billyard@Evercore.com); and/or

    (B)    Hilco Real Estate LLC ("**Hilco**"), by contacting Gregory Apter (gapter@hilcoglobal.com).

        Note that submitting an indication of interest by the Global Indication of Interest Date does not obligate you to submit a formal bid or to participate in the sale process and does not exempt you from also having to submit a Qualified Bid by the Global Bid Deadline in order to participate in any subsequence Auction for the Stores on which you are indicating an interest, all as described below.

<u>Access to Diligence</u>

        To participate in the diligence process and receive access to due diligence information with respect to any of the Stores, a party must submit to the Debtors or their advisors:

    (A)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder(s);

    (B)    a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties (as defined below), that the interested party has a *bona fide* interest in consummating a sale transaction;

    (C)    sufficient information, as determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion); and

    (D)    a non-binding written indication of interest identifying the Stores in which the party is interest in purchasing.

An interested party shall be a "**Potential Bidder**" if the Debtors determine in their reasonable discretion, after consultation with the Consultation Parties, that an interested party has satisfied the above requirements. As soon as practicable, the Debtors will deliver to such Potential Bidder: (A) an information package containing information and financial data with respect to the Stores in which such Potential Bidder has expressed an interest; and (B) access to the Debtors' confidential electronic data room concerning the Stores (the "**Data Room**").

Once an interested party is deemed a Potential Bidder, its identity may, in the Debtors' discretion, be disclosed to the Stalking Horse Bidders.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

Due Diligence

Until the Global Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to:

(A)     Paul Billyard and Will Jurist of Evercore (Billyard@Evercore.com and William.Jurist@Evercore.com);

(B)     Gregory Apter of Hilco Real Estate LLC (gapter@hilcoglobal.com)

(C)     Weil at *APDiligence@weil.com.*

The Debtors will simultaneously distribute via the Data Room in written form any additional diligence materials not previously provided to the Stalking Horse Bidders or any other Potential Bidder to all Potential Bidders for the Stores to which such diligence materials relate (including, if applicable, the Stalking Horse Bidders) and the Consultation Parties.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (A) the Potential Bidder does not become a Qualified Bidder (as defined below) or (B) these Global Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Stores to any person or entity who is not a Potential Bidder or a Consultation Party or who does not comply with the participation requirements set forth above.

<u>**Auction Qualification Procedures**</u>

<u>Global Bid Deadline</u>

A Potential Bidder that desires to make a bid on one or more Stores shall deliver written and electronic copies of its bid in <u>both</u> PDF and MS-WORD format to the Notice Parties so as to be received no later than **September 11, 2015 at 5:00 p.m. (Eastern Time)** (the "***Global Bid Deadline***"); <u>provided</u> that the Debtors may extend the Global Bid Deadline without further Order of the Bankruptcy Court, subject to providing notice to all Potential Bidders and the Consultation Parties.

**Any party that does not submit a bid by the Global Bid Deadline will not be allowed to (A) submit any offer after the Global Bid Deadline, or (B) participate in any Auction;** <u>provided</u> that the foregoing shall not preclude the Debtors from marketing to any person, or auctioning, or any parties from bidding on, any Stores not included in the Auction after the Global Bid Deadline, including pursuant to the Tier II Procedures.

<u>Form and Content of Qualified Bid</u>

A bid is a signed document from a Potential Bidder received by the Global Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a sale transaction), and any other party that will be participating in connection with the bid or the sale transaction, and includes, at a minimum, the following information (each, a "**Bid**"):

A.    <u>Proposed Stores and Valuation</u>. Each Bid must clearly identify and list the particular Stores, additional assets (such as inventory or prescriptions) and liabilities that the Potential Bidder seeks to acquire, whether individually, in combination or in connection with a Stalking Horse Store Package. The Bid must identify, on a per Store basis, the valuations, in U.S. dollars, that the Potential Bidder associates with each of those Stores and a description of any significant assumptions on which such valuations are based. To the extent the Bid proposes to purchase additional assets associated with the Stores, such as inventory or prescriptions, the Bid shall clearly identify the value, in U.S. dollars, associated with such assets.

B.    <u>Marked Agreement</u>. Each Bid must include a copy of an asset purchase agreement reflecting the terms and conditions of its Bid, which agreement must be marked to show any proposed amendments and modifications to the form of purchase agreement posted by the Debtors in the Data Room (the "**Marked Agreement**").

C.  Unconditional Offer.  A statement that the Bid is formal, binding and unconditional (except for those conditions expressly set forth in the applicable Marked Agreement) and is not subject to any due diligence or financing contingency and is irrevocable until the first business day following the closing of the proposed sale transaction, except as otherwise provided in these Global Bidding Procedures.

D.  Form of Consideration.  Unless the Bid includes a credit bid (as described below), a statement confirming that the Bid is based on an all-cash offer, including, in the case of a bid for a Stalking Horse Store Package, sufficient cash consideration to pay any applicable Termination Payment (as such term is defined in the applicable Stalking Horse Agreement); provided that any Bid that includes a credit bid shall also include a cash component sufficient to pay, and earmarked exclusively for payment of, any applicable Termination Payment (if such Bid relates to a Stalking Horse Store Package) and shall comply with that certain Intercreditor Agreement, dated as of March 13, 2012 (as amended and supplemented, including pursuant to that certain Supplemental Senior Lien Intercreditor Agreement as amended) (the "**Intercreditor Agreement**"), including Section 5.06 thereof.

E.  Purchase Price; Minimum Bid.

    1.  Stalking Horse Store Package.  Each Bid submitted in connection with a Stalking Horse Store Package (other than the Separable Store) must (i) be a Bid for all of the Stores contained in the applicable Stalking Horse Store Package, (ii) exceed the applicable cash purchase price by the Minimum Overbid Amount, and (iii) propose an alternative transaction that provides substantially similar or better terms than the applicable Stalking Horse Bid, or (iv) propose to purchase the Stalking Horse Store Package for cash, and assume the corresponding liabilities on similar or better terms as the applicable Stalking Horse Bid.

    2.  Bids for Individual Stores or Combination of Stores.  Bidders may also submit Bids for individual Stores or combinations of Stores, whether or not such Stores are included in a Stalking Horse Store Package (each a "**Partial Bid**").  The Debtors will determine, after consultation with the Consultation Parties, whether such Bids qualify as Qualified Bids. Generally, to be considered a Qualified Bid, the Debtors, in consultation with the Consultation Parties, must conclude that a Partial Bid, when taken together with other Partial Bids, satisfies the criteria for being a Qualified Bid.

    If a Bid includes one or more Stores currently included in a Stalking Horse Store Package (other than a Separable Store), but is not for all of the Stores included in such Stalking Horse Store Package (not taking into account the Separable Store), such Bid will not be considered to be a "Qualified Bid" unless the Debtors receive one or more Bids for the

remaining Stores in such Stalking Horse Store Package (other than the Separable Store) that, in combination with one or more other Bids, constitute a higher or better bid than the applicable Stalking Horse Bid.

F.    <u>Employee and Labor Terms</u>.  If the Bid contemplates a going concern sale of Stores, a statement of proposed terms for unionized and non-unionized employees, which shall include, alternatively:  (i) a statement that the Potential Bidder will assume the Affected Labor Agreements (as such term is defined in the applicable Stalking Horse Agreement) without modification; or (ii) if the Potential Bidder will not assume the Affected Labor Agreements without modification, a statement that the Potential Bidder will enter into good faith negotiations with each of the Affected Unions to enter into Modified Labor Agreements (as such terms are defined in the Purchase Agreement), including a term sheet, which shall be attached to the Marked Agreement, proposing post-closing work rules and conditions to be offered to unionized employees.  Such statement shall also include an acknowledgment of the requirements of sections 1113 and 1114 of the Bankruptcy Code and an agreement to use good faith reasonable best efforts to cooperate with the Debtors in ensuring compliance with any applicable provisions thereof in the event that mutually satisfactory Modified Labor Agreements have not been entered into between the Potential Bidder and the affected unions prior to the closing of a sale contemplated by these Global Bidding Procedures.

G.    <u>Required Approvals</u>.  A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the business and stores included in its Bid from and after closing the sale transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals.  A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Marked Agreement.

H.    <u>No Entitlement to Expense Reimbursement or Other Amounts</u>.  Except as provided with respect to a Stalking Horse Bidder in a Stalking Horse Agreement, a statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets.

A Potential Bidder must also accompany its Bid with: (A) a Deposit (as defined below); (B) the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid

submitted by the Potential Bidder; (C) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the applicable Marked Agreement) and such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement, as acceptable in the Debtors' business judgment, including a description of each investor and any additional party or parties investing in the transaction included in the applicable bid and such party's financial position; (D) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Marked Agreement; (E) a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; (F) in the case of a Bid for a Stalking Horse Package, if the value of the Bid relative to the applicable Stalking Horse Agreement includes additional non-cash components (such as fewer contingencies than are in the Purchase Agreement), a detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value; and (G) if the Bid includes an asset purchase agreement that is not executed, a signed statement that such Bid is irrevocable until the first business day following the closing or closings of the applicable sale transaction.

The submission of a Bid by the Global Bid Deadline shall constitute a binding and irrevocable offer to acquire the Stores or other assets reflected in such Bid.

Deposit

To qualify as a Qualified Bid (as defined below), each Bid (other than Stalking Horse Bids or credit bids) must be accompanied by a good faith cash deposit in the amount of ten percent (10%) of the proposed purchase price (the "**Deposit**") (or, other than for a Stalking Horse Store Package, another amount agreed to by the Debtors, after consultation with the Consultation Parties), to be deposited, prior to the Global Bid Deadline, with an escrow agent selected by the Debtors (the "***Escrow Agent***") pursuant to the escrow agreement to be provided by the Debtors to the Potential Bidders (the "***Escrow Agreement***").

Review of Bids

The Debtors will deliver, within one (1) business day after receipt thereof, copies of all Bids to the Consultation Parties.

The Debtors will evaluate timely submitted bids, in consultation with the Consultation Parties, and may engage in negotiations with Potential Bidders who submitted Bids complying with the preceding paragraphs as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid. In evaluating the bids, the Debtors may take into consideration:

     1.  the amount of the Bid and the Stores and other assets proposed to be acquired;

2. the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates after the payment of any applicable Termination Payment; provided that the Debtors shall review, evaluate and consider any Bids for a Stalking Horse Store Package (including a combination of Bids for a Stalking Horse Package) separate from and independent of, and shall not take into consideration when evaluating such Bid for a Stalking Horse Store Package, any other Stores that may be included in such Bid.

3. any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities through a credit bid;

4. the value to be provided to the Debtors under the Bid for the Stores included therein (individually and in the aggregate);

5. the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals;

6. the impact on employees; and

7. any other factors the Debtors may reasonably deem relevant.

Designation of Qualified Bidders

A bid will be considered a "**Qualified Bid**," and each Potential Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**," if the Debtors determine, after consultation with the Consultation Parties, that such Bid:

(A) meets the requirements set forth in these Global Bidding Procedures; and

(B) satisfies the following:

i. with respect to a Bid for a Stalking Horse Store Package (excluding a Separable Store) or a combination of Bids that together cover at least all of the Stores included in a Stalking Horse Store Package (excluding a Separable Store), is higher or better than the transaction contemplated by the applicable Stalking Horse Agreement;

ii. with respect to a Bid for a Separable Store, is higher or better than the purchase price contemplated by the applicable Stalking Horse Agreement for the Separable Store; and/or

iii. with respect to a Store that is not included in a Stalking Horse Store Package, such Bid proposes a purchase price that would be acceptable to the Debtors for such Store or the Debtors believe

should proceed to an auction for one or a combination of Stores included in such Bid.

The Debtors reserve the right to work with any Bidder in advance of the Auctions to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid. The Debtors may accept a single Bid or multiple Bids for non-overlapping Stores such that, if taken together, would otherwise meet the standards for a single Qualified Bid as to a Stalking Horse Store Package or any other Store or combination of Stores that the Debtors determine to auction (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the applicable Auction). If a Bid is received and, in the Debtors' judgment, after consultation with the Consultation Parties, it is not clear whether the Bid is a Qualified Bid, the Debtors may consult with the Potential Bidder and seek additional information in an effort to establish whether or not the Bid is a Qualified Bid.

The Debtors, after consultation with the Consultation Parties, will have the right to determine that a Bid is not a Qualified Bid if any of the following conditions are satisfied:

(A)    A Potential Bidder has failed to comply with reasonable requests for additional information from the Debtors;

(B)    If the Bid includes a credit bid, such Bid does not include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment) or fails to comply with the terms of the Intercreditor Agreement; provided that any Bid for Stores included in the Stalking Horse Store Package that does not include a cash component sufficient to pay, and earmarked exclusively for payment of, an applicable Termination Payment shall not be a Qualified Bid; or

(C)    The terms of the Bid are burdensome or conditional in view of the proposed purchase price or, in the case of a Bid or combination of Bids for a Stalking Horse Store Package, are materially more burdensome or conditional than the terms of the applicable Stalking Horse Agreement, and are not offset by a material increase in purchase price, which determination (as made by the Debtors in consultation with the Consultation Parties) may take into consideration, among other things:

(i)    whether the Bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including, if applicable, any Termination Payment);

(ii)    whether the Bid includes a non-cash instrument or similar consideration that is not freely marketable.

Each Stalking Horse Bidder is a Qualified Bidder and each Stalking Horse Bid is a Qualified Bid as to the applicable Stalking Horse Store Package. Should it decide to credit bid, each of (A) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September

17, 2014, (B) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014, (C) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured PIK Toggle Notes due 2017, dated as of March 13, 2012, or the majority holder of the Senior Secured PIK Toggle Notes due 2017, (D) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured Convertible Notes due 2018, dated as of March 13, 2012, or the majority holder of the Senior Secured Convertible Notes due 2018, and (E) the DIP Lenders is a Qualified Bidder and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Global Bid Deadline, complies with the above requirements set forth under the heading "Designation of Qualified Bidders," complies with section 363(k) of the Bankruptcy Code, complies with the requirements for a credit bid, complies with section 5.06(d) of the Intercreditor Agreement and includes, to the extent the credit bid is for a Stalking Horse Store Package a cash component sufficient to pay, and earmarked exclusively for payment of, an applicable Termination Payment, and all obligations secured by senior liens on the applicable assets to be purchased.

## Pre-Auction Procedures

### Determination and Announcement of Baseline Bids

In consultation with the Consultation Parties, the Debtors shall make a determination regarding:

(A)     the Store or combination of Stores to be auctioned by the Debtors, including a Stalking Horse Store Package (each, an "**Auction Package**"); provided that an Auction Package for a Stalking Horse Store Package may not include less than all of the Stores in such Stalking Horse Store Package, unless such Auction Package includes solely the Separable Store;

(B)     the Store or Stores included in an Auction Package;

(C)     the highest or best Qualified Bid (or collection of Qualified Bids) determine for each Auction Package (each, a "**Baseline Bid**" and such bidder or group of bidders, a "**Baseline Bidder**") to serve as the starting point at the Auction for such Auction Package;

(D)     which Bids have been determined to be Qualified Bids and the Auction Package applicable to such Qualified Bid (provided that the Debtors may permit a Qualified Bidder to bid on any other Auction Package);

(E)     the time and place for the auction (each, an "**Auction**") of each such Auction Package.

On **September 18, 2015, at 5:00 p.m. (Eastern Time)** (the "**Designation Deadline**"), the Debtors shall file notice of the foregoing on the Court's docket and publish such notice on the website of their claims and noticing agent and in the Data Room. As soon as practicable but no later than two (2) days prior to the Auction, the Debtors will provide copies of each Baseline Bid to the Consultation Parties and the Stalking Horse Bidders.

Between the date the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of the Debtors, a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for the Debtors, during the period that such Qualified Bid remains binding as specified herein; provided that any Qualified Bid may be improved at the Auction as set forth herein.

Except as provided in a Stalking Horse Agreement, the Debtors are under no obligation to (A) select any Baseline Bid, (B) conduct separate Auctions for any Stores, whether before or after selecting a Baseline Bid, or (C) sell the Separable Store separate and apart from the applicable Stalking Horse Agreement. Notwithstanding anything to the contrary contained herein, the Debtors may elect, in their reasonable discretion, and after consultation with the Consultation Parties, to adjourn any Auction.

Failure to Receive Two or More Qualified Bids

With respect to each Stalking Horse Store Package, if no Qualified Bid other than the one submitted by the applicable Stalking Horse Bidder (including, if applicable, a Separable Store) is received by the Global Bid Deadline, the Debtors will not conduct the Auction for that Stalking Horse Store Package (including the Separable Store), and shall file and serve a notice indicating that the Auction has been cancelled with respect to such Stalking Horse Store Package, that the applicable Stalking Horse Bidder is the Successful Bidder as to such Stalking Horse Store Package and that the Sale Hearing as to the applicable Stalking Horse Bidder will be conducted on **September 22, 2015, at 10:00 a.m. (Eastern Time)**.

With respect to Stores not included a Stalking Horse Store Package, if only one Qualified Bid is received by the Global Bid Deadline, the Debtors may, after consultation with the Consultation Parties, determine to consummate a sale transaction with a Qualified Bidder (to the extent one is received) and shall file and serve a notice identifying the Qualified Bidder, the terms of the Qualified Bid, and notice of the sale hearing applicable to such Qualified Bid.

Except as provided in a Stalking Horse Agreement, nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder.

## The Sale Hearing and Sale Order

At one or more hearings before the Bankruptcy Court (each, a "***Sale Hearing***"), the Debtors will seek the entry of orders authorizing and approving, *inter alia*, the applicable sale transactions (each, a "***Sale Order***"). Each Sale Order shall authorize and approve the applicable sale transaction:

(A)     if no other Qualified Bid (which, for purposes of this subparagraph includes a combination of Bids that together would constitute a Qualified Bid for the Stores in such Stalking Horse Package (not taking into account the Separable Store)) is received by the Debtors in respect of a particular Stalking Horse Store Package, to the applicable Stalking Horse Bidder that

submitted a bid for such package pursuant to the terms and conditions set forth in the Applicable Stalking Horse Agreement;

(B)      if another Qualified Bid is received by the Debtors in respect of a particular Stalking Horse Store Package, to the applicable Stalking Horse Bidder that submitted a Qualified Bid for such package and/or such other Qualified Bidder(s) that submitted a Qualified Bid for such package as the Debtors, in the exercise of their business judgment and, after consultation with the Consultation Parties, determine, following an auction, to have made the highest or best bid, consistent with these Global Bidding Procedures; or

(C)      with respect to any Stores not included in a Stalking Horse Store Package (or a Separable Store) that is auctioned pursuant to these Procedures, to the highest or best bidder(s) for one or more Stores.

In the Debtors' reasonable discretion (after consultation with the Consultation Parties and the applicable Stalking Horse Bidder or, if an Auction is held, the Successful Bidder and the Consultation Parties), any Sale Hearing may be adjourned or rescheduled without notice or with limited and shortened notice to parties, including by (A) an announcement of such adjournment at the Sale Hearing or at the Auction or (B) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Sale Hearing; provided that nothing herein shall authorize the Debtors to unilaterally extend any date or deadline set forth in a Stalking Horse Agreement.

## Auction Procedures

If there are two or more Qualified Bids for an Auction Package, the Debtors may conduct one or more Auctions for such Auction Package on **September 24-25, 2015 at 9:30 a.m. (Eastern Time)**, at a location to be determined and announced, or such other time as the Debtors, after consultation with the Baseline Bidder and the Consultation Parties, may notify Qualified Bidders who have submitted Qualified Bids. Only a Qualified Bidder will be eligible to participate at an Auction, subject to such limitations as the Debtors may impose in good faith. Professionals and/or other representatives of the Consultation Parties will be permitted to attend and observe an Auction.

At any Auction, Qualified Bidders (including the Stalking Horse Bidders) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the purchase price and terms proposed in the applicable Baseline Bid, and will proceed thereafter in increments of 2% of the applicable Baseline Bid (a "**Minimum Overbid Amount**"). If a Stalking Horse Bidder bids at an Auction for its Stalking Horse Store Package, that Stalking Horse Bidder will be entitled to a "credit" in the amount of the applicable Termination Payment to be counted towards its bid such that the cash and other consideration proposed by the Stalking Horse Bidder plus the Termination Payment "credit" must exceed the most recent bid by at least the Minimum Overbid amount.

The Debtors may adopt rules, after consultation with the Consultation Parties, for an Auction at any time that the Debtors reasonably determine to be appropriate to promote the goals of the Bidding Process and are not inconsistent with these Global Bidding Procedures. At the start of an Auction, the Debtors shall describe the terms of the applicable Baseline Bid. Any rules adopted by the Debtors will not unilaterally modify any of the terms of a Stalking Horse Agreement (as may be consensually modified at any Auction) without the consent of the applicable Stalking Horse Bidder. Any rules developed by the Debtors will provide that all bids in a particular Auction will be made and received in one room, on an open basis, and all other bidders participating in that Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders participating in that Auction and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be fully disclosed to all other bidders throughout the entire Auction. Each Qualified Bidder will be permitted what the Debtors reasonably determine to be an appropriate amount of time to respond to the previous bid at the Auction.

The Debtors reserve the right to and may, after consultation with the Consultation Parties, reject at any time before entry of the relevant Sale Order any bid that, in the Debtors' judgment, is: (A) inadequate or insufficient; (B) not in conformity with the requirements of the Bankruptcy Code, these Global Bidding Procedures or the terms and conditions of the applicable sale transaction; or (C) contrary to the best interests of the Debtors and their estates, except that if a Stalking Horse Bidder's bid as reflected in a Stalking Horse Agreement is the only Qualified Bid for a Stalking Horse Store Package, the foregoing provisions of this sentence will be inoperative. In doing so, the Debtors may take into account the factors set forth above regarding the form and content of Qualified Bids and the Debtors' review of bids. No attempt by the Debtors to reject a bid under this paragraph will modify any rights of the Debtors or any Stalking Horse Bidder under a Stalking Horse Agreement (as may be consensually modified at any Auction).

Prior to the conclusion of an Auction, the Debtors, after consultation with the Consultation Parties, will: (A) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating a sale transaction; provided that in reviewing and evaluating the bids, the Debtors shall review, evaluate and consider any Bids for a Stalking Horse Package (including a combination of Bids for a Stalking Horse Package) separate from and independent of, and shall not take into consideration when evaluating such bid for a Stalking Horse Package, any other Stores or related assets that may be included in such bid; (B) determine the highest or best offer or collection of offers for an Auction Package (as applicable to each Auction Package, a "***Successful Bid***"); (C) except as provided in a Stalking Horse Agreement, determine which Qualified Bid is the next highest or best bid for such Auction Package (as applicable to each Auction Package, the "***Back-Up Bid***"); and (D) notify all Qualified Bidders participating in an Auction, prior to its conclusion, the successful bidder for such Auction Package (the "***Successful Bidder***"), the amount and other material terms of the Successful Bid and the identity of the party that submitted the Back-Up Bid for such Auction Package (the "***Back-Up Bidder***").

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding or the Auction.

## Post-Auction Process

A Successful Bidder shall, within one (1) business day after the close of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid. Promptly following the submission of such documentation, the Debtors shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder. The Successful Bid may not be assigned to any party without the consent of the Debtors after consultation with the Consultation Parties.

Except to the extent otherwise provided in a Stalking Horse Purchase Agreement, the Back-Up Bid shall remain open and irrevocable until the earliest to occur of (A) 120 days after the completion of the Auction, or such other date as may be provided for in an applicable Stalking Horse Agreement, (B) the consummation of the transaction with the Successful Bidder, or (C) the release of such bid by the Debtors (such date, the "**Back-Up Bid Expiration Date**"). If the transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

At a Sale Hearing, the Debtors will present a Successful Bid to the Bankruptcy Court for approval.

Unless otherwise required pursuant to the Debtors' fiduciary duties, the Debtors shall not consider any bids submitted after the conclusion of the Auction.

## Treatment and Return of Deposits

Potential Bidders

Within three (3) business days after the Designation Deadline, the Escrow Agent shall return to each Potential Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Potential Bidder's Deposit, plus any interest accrued thereon. Upon the authorized return of such Potential Bidder's Deposit, the bid of such Potential Bidder shall be deemed revoked and no longer enforceable.

Qualified Bidders

The Deposit of a Qualified Bidder will be forfeited to the Debtors if (A) the applicable Qualified Bidder attempts to modify, amend or withdraw its Qualified Bid, except as permitted by these Global Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Global Bidding Procedures, or (B) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the transaction according to these Global Bidding Procedures and the terms of the applicable transaction documents with respect to the Successful Bid. The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account

designated by the Debtors two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of the Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

With the exception of the Deposit of a Successful Bidder and a Back-Up Bidder, the Escrow Agent shall return to any other Qualified Bidder any Deposit, plus any interest accrued thereon, three (3) business days after the execution by the Successful Bidder and the Debtors of the documentation memorializing the Successful Bid, but in no event later than seven (7) business days after the conclusion of a Sale Hearing.

Notwithstanding anything to the contrary herein, the good faith deposit provided by a Stalking Horse Bidder pursuant to a Stalking Horse Agreement (including any required return of such deposit) shall be governed by the terms and conditions of the applicable Stalking Horse Agreement.

Back-Up Bidder

The Escrow Agent shall return a Back-Up Bidder's Deposit, plus any interest accrued thereon, within three (3) business days after the occurrence of the applicable Back-Up Bid Expiration Date.

The Successful Bidder

The Deposit of a Successful Bidder shall be applied against the cash portion of the Purchase Price of such Successful Bidder upon the consummation of the transaction proposed in the applicable Successful Bid.

Joint Notice to Escrow Agent

The Debtors and, as applicable, the Potential Bidder, Qualified Bidder, and/or Back-Up Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit, to the extent such return is required by these Global Bidding Procedures. If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

## **Notice and Consultation Parties**

Contact Parties

Information that must be provided to the "***Notice Parties***" under these Global Bidding Procedures must be provided to the following parties: (A) The Great Atlantic and Pacific Tea Company, Inc., 2 Paragon Drive, Montvale, New Jersey 07645 (Attn: Christopher W. McGarry and Matthew Bennett); (B) counsel to the Debtors, Weil, Gotshal & Manges LLP ("***Weil***"), 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Garrett A. Fail, Esq. and Sunny Singh, Esq.); (C) Evercore Group, LLC, 55 East 52nd Street, New York, New York 10055 (Attn: Stephen Goldstein); and (D) Hilco Real Estate LLC, 5 Revere Dr., Suite 206, Northbrook, IL 60062 (Attn: Greg Apter).

Consultation Parties

The term "**Consultation Parties**" as used in these Global Bidding Procedures shall mean: (A) the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "**Creditors' Committee**"); (B) Fortress Investment Group, as agent under that certain Senior Secured Debtors-in-Possession Term Credit Agreement, (C) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014; (D) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014; (E) the majority holders of the Senior Secured PIK Toggle Notes due 2017; (F) the majority holders of the Senior Secured Convertible Notes due 2018; (G) The Yucaipa Companies, LLC and their affiliated funds; and (H) the attorneys for the United Food and Commercial Workers Union International.

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Global Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

In the event that any Consultation Party or any member of the Creditors' Committee or an affiliate of any of the foregoing, submits a bid that is a Qualified Bid, any obligation of the Debtors to consult with the bidding party established under these Global Bidding Procedures will be waived, discharged and released without further action; provided that the bidding party will have the same rights as any other Potential Bidder set forth above, and will retain any rights it has under existing orders regarding debtor in possession financing and/or use of cash collateral (to the extent applicable).

If a member of the Creditors' Committee submits a Qualified Bid, the Creditors' Committee will continue to have Consultation Rights; provided that the Creditors' Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any information regarding the sale of the Assets to such member.

## Consent to Jurisdiction and Authority as Condition to Bidding

All Potential Bidders (including the Stalking Horse Bidders) shall be deemed to have (A) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to the Global Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, (B) waived any right to a jury trial in connection with any disputes relating to the Global Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, and (C) consented to the entry of a final order or judgment in any way related to the Global Bidding Procedures, an Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## Reservation of Rights

The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties, to alter or terminate these Global Bidding Procedures, to waive terms and conditions set forth herein with respect to all potential bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers and investors (except for the Buyer) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with these Global Bidding Procedures and/or the Global Bidding Procedures Order; provided further that the Debtors' exercise of their discretion in evaluating bids and administering the bidding and auction process does not permit, and shall not be construed as permitting, the Debtors to materially deviate from the procedures, terms, conditions and protections set forth in these Global Bidding Procedures and/or the Global Bidding Procedures Order.

## **Schedule 1**

Stalking Horse Store Packages

## 76 Stores Included in Stalking Horse Bid of Acme Markets, Inc.

| # | Store | Banner | City | Address | State |
|---|---|---|---|---|---|
| 1 | 70927 | A&P | Wall Township | 2007 State Route 35 | NJ |
| 2 | 70205 | A&P | Yorktown | 100 Triangle Center | NY |
| 3 | 70620 | A&P | Midland Park | 137 Lake Street | NJ |
| 4 | 70677 | A&P | Mahwah | 125 Franklin Tnpk | NJ |
| 5 | 70408 | A&P | New Providence | 1260 Springfield Ave | NJ |
| 6 | 70233 | Superfresh | Philadelphia | 180 West Girard Ave | PA |
| 7 | 70787 | A&P | Thornwood | 610 Columbus Ave. | NY |
| 8 | 70479 | A&P | Fort Lee | 2160 Lemoine Ave | NJ |
| 9 | 70659 | A&P | Woodcliff Lake | 520 Chestnut Ridge Road | NJ |
| 10 | 70186 | A&P | Yonkers | 660 Mclean Ave | NY |
| 11 | 70107 | A&P | Mohegan Lake | 3105 East Main Street | NY |
| 12 | 70649 | A&P | Denville | 123-125 Main Street | NJ |
| 13 | 70640 | A&P | Jersey City | 125 18th Street | NJ |
| 14 | 72112 | Pathmark | Jersey City | 321 Stadium Plaza | NJ |
| 15 | 70639 | A&P | Allendale | 45 Demercurio Drive | NJ |
| 16 | 70784 | A&P | Croton on Hudson | 2005 Albany Post Rd. | NY |
| 17 | 70154 | A&P | Brewster | 1511 Rte 22 | NY |
| 18 | 70867 | A&P | Kenilworth | 801 Kenilworth Blvd | NJ |
| 19 | 70650 | A&P | South Plainfield | 907D Oak Tree Road | NJ |
| 20 | 70642 | A&P | Jefferson Township | 5774 Berkshire Valley Rd. | NJ |
| 21 | 70621 | A&P | Vernon | 530 Rt 515 Unit 1 | NJ |
| 22 | 70185 | A&P | Yonkers | 1233 Nepperhan Ave. | NY |
| 23 | 70821 | A&P | Little Silver | 507 Prospect Ave. | NJ |
| 24 | 70606 | A&P | Hoboken | 614 Clinton St | NJ |
| 25 | 70207 | A&P | Goldens Bridge | Rt 22 and Rt 138 | NY |
| 26 | 70167 | A&P | Hopewell Junction | 829 Route 82 | NY |
| 27 | 72181 | Pathmark | Elmwood Park | 58 Broad Way | NJ |
| 28 | 70768 | A&P | Bronxville | 12-14 Cedar Street | NY |
| 29 | 70864 | A&P | Montclair | 510 Valley Road | NJ |
| 30 | 70874 | Superfresh | Ocean City | 9507Coastal Hwy | MD |
| 31 | 70780 | A&P | Stamford | 1201 High Ridge Road | CT |
| 32 | 70773 | A&P | Bedford | 422 Old Post Road | NY |
| 33 | 72190 | Pathmark | Edgewater | 481 River Road | NJ |
| 34 | 70164 | A&P | Mahopac | 3 Village Center | NY |
| 35 | 70826 | A&P | Clark | 1060 Raritan  Road | NJ |
| 36 | 70208 | A&P | Millwood | 230 Saw Mill River Road | NY |
| 37 | 70908 | A&P | Ortley Beach | 5 Ortley Plaza | NJ |
| 38 | 70684 | A&P | Sussex | 455 Rt 23 North | NJ |
| 39 | 70728 | A&P | Rye Brook | 261 South Ridge St. | NY |
| 40 | 70740 | A&P | Greenwich | 160 West Putnam Avenue | CT |
| 41 | 70763 | A&P | Briarcliff Manor | 1886 Pleasantville Road | NY |
| 42 | 70456 | A&P | Blairstown | 152 Route 94 | NJ |

| # | Store | Banner | City | Address | State |
|---|-------|--------|------|---------|-------|
| 43 | 70750 | A&P | Riverside | 1261 East Putnam Avenue | CT |
| 44 | 76710 | Pathmark | Philadelphia | 2101-41 Cottman Ave. | PA |
| 45 | 70766 | A&P | Eastchester | 777 White Plains Road | NY |
| 46 | 70664 | A&P | Park Ridge | 199 Kinderkamack Rd | NJ |
| 47 | 70786 | A&P | Greenburgh | 103 Knollwood Road | NY |
| 48 | 70189 | Superfresh | Haverton | 1305West Chester Pike | PA |
| 49 | 70153 | A&P | Shrub Oak | 1366 East Main Street | NY |
| 50 | 70761 | A&P | West New York | 55 Riverwalk Drive West | NJ |
| 51 | 70516 | A&P | New Rochelle | 23 Quaker Ridge Road | NY |
| 52 | 70094 | A&P | Pleasant Valley | Rte 44 & North Ave | NY |
| 53 | 70500 | A&P | New Canaan | 288 Elm Street | CT |
| 54 | 70626 | A&P | Tinton Falls | 990 Shrewsburry Ave | NJ |
| 55 | 72178 | Pathmark | Weehawken | 4100 Park Avenue | NJ |
| 56 | 70811 | A&P | Old Bridge | 3500 Route #9 | NJ |
| 57 | 72194 | Pathmark | Bergenfield | 80 New Bridge Road | NJ |
| 58 | 70471 | Superfresh | Manahawkin | 609 East Bay Avenue | NJ |
| 59 | 70391 | A&P | Saddle Brook | 75 Mayhill Street | NJ |
| 60 | 72186 | Pathmark | Newark | 281-295 Ferry Street | NJ |
| 61 | 70252 | Superfresh | Richboro | 800 2nd Street Pike | PA |
| 62 | 70584 | Superfresh | Wilmington | 1812 Marsh Rd | DE |
| 63 | 70730 | Superfresh | Philadelphia | 305 S. Fifth St. | PA |
| 64 | 70477 | Superfresh | Ocean City | 800 West Ave | NJ |
| 65 | 72587 | Pathmark | Ventnor | 5100 Wellington Avenue | NJ |
| 66 | 76725 | Pathmark | Philadelphia | 7700 Crittendan St | PA |
| 67 | 70747 | Superfresh | Philadelphia | 1001 South Street | PA |
| 68 | 70801 | A&P | Warrenville | 177 Washington Valley Rd. | NJ |
| 69 | 70559 | Superfresh | Rehoboth | 18578 Coastal Highway | DE |
| 70 | 72590 | Pathmark | Newark | 100 College Square | DE |
| 71 | 72586 | Pathmark | Wilmington | 4365 Kirkwood Highway | DE |
| 72 | 70474 | Superfresh | Wildwood | 2400 Delaware Avenue | NJ |
| 73 | 76585 | Pathmark | Boothwyn | 643 Conchester Highway | PA |
| 74 | 70293 | Superfresh | Wynnewood | 250 E Lancaster | PA |
| 75 | 70294 | Superfresh | Gladwynne | 1025 Youngsford Road | PA |
| 76 | 70588 | Superfresh | Newark | 401 New London Rd. | DE |

## 25 Stores Included in Stalking Horse Bid of The Stop & Shop Supermarket Company, LLC

|  | Store | Banner | City | Address | State |
|---|---|---|---|---|---|
| 1 | 70226 | A&P | Mt Kisco | 195 North Bedford Rd | NY |
| 2 | 72270 | Pathmark | South Orange | 407 Valley Street | NJ |
| 3 | 72633 | Pathmark | Franklin Square | 460 Franklin Avenue | NY |
| 4 | 72608 | Pathmark | Greenvale | 130 Wheatley Plaza | NY |
| 5 | 72667 | Pathmark | Bronx | 1720 Eastchester Road | NY |
| 6 | 72647 | Pathmark | Bronx | 2136 Bartow Avenue | NY |
| 7 | 72619 | Pathmark | Brooklyn | 625 Atlantic Avenue | NY |
| 8 | 72638 | Pathmark | Brooklyn | 2965 Cropsey Avenue | NY |
| 9 | 72616 | Pathmark | Jamaica | 134-40 Springfield Blvd | NY |
| 10 | 72626 | Pathmark | Ozone Park | 92-10 Atlantic Avenue | NY |
| 11 | 72622 | Pathmark | Whitestone | 31-06 Farrington Street | NY |
| 12 | 70658 | Waldbaums | Long Beach | 85 E. Park Ave. | NY |
| 13 | 70465 | Waldbaums | Massapequa | 702 Hicksville Road | NY |
| 14 | 72625 | Pathmark | Seaford | 4055 Merrick Road | NY |
| 15 | 70260 | Waldbaums | Southampton | 167 Main St. Jagger Lane | NY |
| 16 | 70452 | Waldbaums | Baldwin | 905 Atlantic Ave. | NY |
| 17 | 70651 | Waldbaums | Howard Beach | 156-01 Crossbay Blvd. | NY |
| 18 | 70236 | Waldbaums | Huntington | 60 Wall Street | NY |
| 19 | 72685 | Pathmark | Staten Island | 1351 Forest Avenue | NY |
| 20 | 70257 | Waldbaums | Easthampton | 67 Newtown Lane | NY |
| 21 | 70616 | Waldbaums | Bell Harbor | 112-15 Beach Channel Drive | NY |
| 22 | 72661 | Pathmark | Bronx | 961 East 174th Street | NY |
| 23 | 70632 | Waldbaums | Bay Terrace | 213-15 26th Avenue | NY |
| 24 | 70695 | A&P | Closter | 400 Demarest Avenue | NJ |
| 25 | 72284 | Pathmark | Kinnelon | 25 Kinnelon Road | NJ |

## 19 Stores Included in Stalking Horse Bid of Key Food Stores Co-Operative, Inc.

|   | Store | Banner | City | Address | State |
|---|-------|--------|------|---------|-------|
| 1 | 59502 | Food Basics | Paterson | 465 Getty Ave | NJ |
| 2 | 70295 | Waldbaums | Flushing | 196-35 Horace Harding Expressway | NY |
| 3 | 70657 | Waldbaums | Bayside | 35-09 Francis Lewis Blvd | NY |
| 4 | 70669 | Waldbaums | Albertson | 1050 Willis Avenue | NY |
| 5 | 59504 | Food Basics | Glen Rock | 937 Lincoln Ave | NJ |
| 6 | 70655 | Waldbaums | Glen Head | 1-1 Park Plaza | NY |
| 7 | 70762 | A&P | Bronx | 5661 Riverdale Ave | NY |
| 8 | 70442 | Waldbaums | Howard Beach | 82-35 153rd Ave | NY |
| 9 | 36715 | Food Emporium | New York | 10 Union Sq 14th & Park | NY |
| 10 | 70749 | A&P | Harrison | 355 Halsted Ave | NY |
| 11 | 59524 | Food Basics | Fairview | 289 Bergen Blvd. | NJ |
| 12 | 59503 | Food Basics | Brooklyn | 2185 Coyle Street | NY |
| 13 | 70296 | Waldbaums | Brooklyn | 81-21 N Utrecht Ave. | NY |
| 14 | 70641 | Waldbaums | Jackson Heights | 75-55 31St Ave. | NY |
| 15 | 72637 | Pathmark | Brooklyn | 1525 Albany Avenue | NY |
| 16 | 70292 | Waldbaums | South Flatbush | 2424 Flatbush Avenue | NY |
| 17 | 70613 | Waldbaums | Glen Oaks | 259-01 Union Turnpike | NY |
| 18 | 70849 | Waldbaums | Rosebank | 375 Tompkins Ave. | NY |
| 19 | 72610 | Pathmark | New York | 410 West 207th Street | NY |

## **Schedule 2**

Additional Stores

# 176 Additional Stores

| # | Store | Banner | City | Address | State |
|---|-------|--------|------|---------|-------|
| 1 | 19243 | Liquor | New Canaan | 282 Elm Street | CT |
| 2 | 19254 | Liquor | Ridgefield | 46B Danbury Rd. | CT |
| 3 | 70074 | A&P | Danbury | 1 Padanaram Rd | CT |
| 4 | 19129 | Liquor | Old Lyme | 28A Halls Rd (P.O. Box 491) | CT |
| 5 | 70951 | A&P | Mt Olive | 7 Naughright Rd | NJ |
| 6 | 70806 | A&P | Califon | 431 County Road 513 | NJ |
| 7 | 72280 | Pathmark | Montclair | 35 Lackawanna Plaza | NJ |
| 8 | 72198 | Pathmark | Fairlawn | 22-00 Maple Avenue | NJ |
| 9 | 72175 | Pathmark | Clifton | 85 Ackerman Avenue | NJ |
| 10 | 59036 | Food Basics | East Paterson | 498 East 30th St | NJ |
| 11 | 72578 | Pathmark | Brick Twp. | 1930 Route 88 | NJ |
| 12 | 72223 | Pathmark | Newark | 167 Bergen Street | NJ |
| 13 | 72609 | Pathmark | New York | 160 East 125th Street | NY |
| 14 | 70611 | Waldbaums | Rocky Point | 245 Route 25A | NY |
| 15 | 72624 | Pathmark | Brooklyn | 1245 61St Street | NY |
| 16 | 72603 | Pathmark | New York | 300 West 145th Street | NY |
| 17 | 72679 | Pathmark | Staten Island | 100 Greaves Lane | NY |
| 18 | 72653 | Pathmark | Bethpage | 3901 Hempstead Turnpike | NY |
| 19 | 72649 | Pathmark | New Hyde Park | 2335 New Hyde Park Road | NY |
| 20 | 70212 | Waldbaums | Riverhead | 1510 Old Country Road | NY |
| 21 | 72646 | Pathmark | Shirley | 800 Montauk Highway | NY |
| 22 | 72652 | Pathmark | Massapequa | 941 Carmans Road | NY |
| 23 | 70298 | Waldbaums | Melville | 890 Walt Whitman Road | NY |
| 24 | 72614 | Pathmark | Patchogue | 399 Route 112 | NY |
| 25 | 70232 | Waldbaums | West Hampton | 70 Sunset Ave | NY |
| 26 | 70279 | Waldbaums | Merrick | 1686 Merrick Rd. | NY |
| 27 | 70241 | Waldbaums | N. Patchoque | 440 W. Sunrise Highway | NY |
| 28 | 72642 | Pathmark | Brooklyn | 1-37 12th Street | NY |
| 29 | 72634 | Pathmark | Brooklyn | 111-10 Flatlands Avenue | NY |
| 30 | 70263 | Waldbaums | Mattituck | Rt.25 and Factory Ave. | NY |
| 31 | 72600 | Pathmark | Brentwood | 101 Wicks Road | NY |
| 32 | 70240 | Waldbaums | Brooklyn | 2149 Ralph Ave | NY |
| 33 | 70235 | Waldbaums | Brooklyn | 3100 Ocean Ave | NY |
| 34 | 70275 | Waldbaums | College Point | 133-11 20th Avenue | NY |
| 35 | 70229 | Waldbaums | Ctr Moriches | 812 Montauk Hwy. | NY |
| 36 | 70699 | Waldbaums | Deer Park | 1960 Deer Park Ave. | NY |
| 37 | 72611 | Pathmark | East Rockaway | 492 East Atlantic Avenue | NY |
| 38 | 70617 | Waldbaums | Great Neck | 40 Great Neck Road | NY |

| 39 | 36703 | Food Emporium | New York | 1175 3rd Avenue | NY |
| 40 | 36711 | Food Emporium | New York | 1331 1St Avenue | NY |
| 41 | 36727 | Food Emporium | New York | 452 West 43 St. | NY |
| 42 | 36732 | Food Emporium | New York | 810 8th Ave | NY |
| 43 | 36707 | Food Emporium | New York | 969 Second Ave | NY |
| 44 | 36777 | Food Emporium | New York | 316 Greenwich St | NY |
| 45 | 36742 | Food Emporium | New York | 1066 3rd Avenue | NY |
| 46 | 36706 | Food Emporium | New York | 1450 3rd Avenue | NY |
| 47 | 36783 | Food Emporium | New York | 405 East 59th St. | NY |
| 48 | 36708 | Food Emporium | New York | 2415 Broadway | NY |
| 49 | 70662 | Waldbaums | Selden | 211 Middle Country Road | NY |
| 50 | 72678 | Pathmark | Staten Island | 2730 Arthur Kill Road | NY |
| 51 | 72682 | Pathmark | Staten Island | 2875 Richmond Avenue | NY |
| 52 | 70813 | Waldbaums | Tottenville | 6400 Amboy Road | NY |
| 53 | 70270 | Waldbaums | Whitestone | 153-01 10th Ave | NY |
| 54 | 72558 | Pathmark | Brookhaven | 5005 Edgemont Avenue | PA |
| 55 | 72569 | Pathmark | Glenolden | 140 North Mcdade Boulevard | PA |
| 56 | 72552 | Pathmark | Philadelphia | 330 Oregon Avenue | PA |
| 57 | 72550 | Pathmark | Philadelphia | 176-82 West Chelten Avenue | PA |
| 58 | 72522 | Pathmark | Philadelphia | 3399 Aramingo Avenue | PA |
| 59 | 19104 | Liquor | Bristol | 767 Pine Street | CT |
| 60 | 19110 | Liquor | Mystic | 25 Broadway Ave. | CT |
| 61 | 19119 | Liquor | Newington | 2400 Berlin Tpk. | CT |
| 62 | 19106 | Liquor | Newington | 40 Fenn Road | CT |
| 63 | 19246 | Liquor | Riverside | 1237 East Putnam Ave. | CT |
| 64 | 19121 | Liquor | Waterford | 117 Boston Post Rd | CT |
| 65 | 70562 | Superfresh | Claymont | 2105 Philadelphia Pike | DE |
| 66 | 72593 | Pathmark | New Castle | 148 Sunset Boulevard | DE |
| 67 | 70586 | Superfresh | New Castle | 2044 New Castle Avenue | DE |
| 68 | 72589 | Pathmark | Wilmington | 3901 Lancaster Avenue | DE |
| 69 | 70888 | Superfresh | Ocean City | 12741 Ocean Gateway | MD |
| 70 | 70417 | A&P | Basking Ridge | 407 King George Road | NJ |

| 71 | 59506 | Food Basics | Belleville | 414 Main St. | NJ |
|----|-------|-------------|------------|--------------|-----|
| 72 | 72128 | Pathmark | Belleville | 115 Belmont Avenue | NJ |
| 73 | 70936 | A&P | Belvidere | 525 East Route 46 | NJ |
| 74 | 70752 | A&P | Bloomfield | 19 Bellville Ave. | NJ |
| 75 | 70610 | A&P | Boonton | 550 Myrtle Ave | NJ |
| 76 | 70802 | A&P | Bricktown | 64 Brick Plaza | NJ |
| 77 | 72185 | Pathmark | Clifton | 895 Paulison Avenue | NJ |
| 78 | 70949 | A&P | Clinton | 49 Old Route 22 | NJ |
| 79 | 72538 | Pathmark | East Brunswick | 50 Racetrack Road & Route 18 | NJ |
| 80 | 70515 | A&P | Edison | 1185 Amboy Ave | NJ |
| 81 | 72535 | Pathmark | Edison | 561 Route 1 | NJ |
| 82 | 72288 | Pathmark | Elizabeth | 211 Elmora Avenue | NJ |
| 83 | 70618 | A&P | Fairview | 425 Anderson Avenue | NJ |
| 84 | 70895 | A&P | Fanwood | 105 South Ave | NJ |
| 85 | 72450 | Pathmark | Garwood | 10 South Avenue | NJ |
| 86 | 72153 | Pathmark | Hackensack | 405 State Route 17 South | NJ |
| 87 | 37602 | Liquor | Hackettstown | 57 Route 46 | NJ |
| 88 | 37905 | Liquor | Haskell | 1069 Ringwood Ave | NJ |
| 89 | 72573 | Pathmark | Hazlet | 3020 Route 35 & Bethany Road | NJ |
| 90 | 70656 | A&P | Holmdel | 2101 Route 35 | NJ |
| 91 | 72527 | Pathmark | Hopelawn | 95-101 New Brunswick Ave | NJ |
| 92 | 72224 | Pathmark | Irvington | 474-79 Lyons Avenue | NJ |
| 93 | 72114 | Pathmark | Jersey City | 420 Grand Street | NJ |
| 94 | 72261 | Pathmark | Landing | 175 Lakeside Boulevard & Center | NJ |
| 95 | 37993 | Liquor | Ledgewood | 1103 Howard Blvd | NJ |
| 96 | 72512 | Pathmark | Linden | 651 North Stiles Street | NJ |
| 97 | 70956 | A&P | Marlboro | 460 County Line Road Route 520 | NJ |
| 98 | 70597 | A&P | Matawan | 325 Highway 35 South | NJ |
| 99 | 37872 | Liquor | Metuchen | 45 Pearl Street | NJ |
| 100 | 72436 | Pathmark | Middlesex | 242 Lincoln Boulevard | NJ |
| 101 | 70924 | A&P | Navesink | 1002 Rte 36 | NJ |
| 102 | 59512 | Food Basics | North Bergen | 1425 Kennedy Blvd. | NJ |
| 103 | 70887 | A&P | North Brunswick | 510 Milltown Road | NJ |
| 104 | 72581 | Pathmark | Old Bridge | 1043 Route 9 North | NJ |
| 105 | 70441 | A&P | Old Tappan | 216 Old Tappan Rd | NJ |
| 106 | 37995 | Liquor | Palisade Park | 534 Bergen Blvd. | NJ |
| 107 | 72282 | Pathmark | Parsippany | 1157 Route 46 East | NJ |
| 108 | 59501 | Food Basics | Passaic | 514 Van Houten Ave. | NJ |
| 109 | 70638 | A&P | Pompton Lakes | 47 Wanaque Avenue | NJ |
| 110 | 37866 | Liquor | Pt Pleasant | 1205 Richmond Ave | NJ |

| 111 | 72299 | Pathmark | Ramsey | 10 Triangle Plaza - Lake Road Ext. | NJ |
|-----|-------|----------|--------|-----------------------------------|-----|
| 112 | 70688 | A&P | Randolph | 148 Center Grove Road | NJ |
| 113 | 37814 | Liquor | Summit | 23 Summit Ave | NJ |
| 114 | 72582 | Pathmark | Toms River | 1256 Indian Head Road | NJ |
| 115 | 70807 | A&P | Washington | 459 Route 31 South | NJ |
| 116 | 70439 | A&P | Washington Township | 315 Pascack Rd | NJ |
| 117 | 70668 | A&P | Wayne | 560 Valley Road | NJ |
| 118 | 70685 | A&P | West Milford | 1938 Unionvalley Road | NJ |
| 119 | 37661 | Liquor | Westwood | 30 Irvington Ave | NJ |
| 120 | 72580 | Pathmark | Woodbridge | 1600 St Georges Avenue | NJ |
| 121 | 70701 | A&P | Woodland Park | 1730 Route 46 West | NJ |
| 122 | 72286 | Pathmark | Woodport | 757 Rt. 15 | NJ |
| 123 | 72623 | Pathmark | Baldwin | 1764 Grand Avenue | NY |
| 124 | 72602 | Pathmark | Bayshore | 2060 Sunrise Highway | NY |
| 125 | 70343 | Waldbaums | Carle Place | 2 Westbury Ave. | NY |
| 126 | 72663 | Pathmark | Centereach | 2150 Middle Country Road | NY |
| 127 | 70203 | Waldbaums | Commack | 84 Jericho Tpke | NY |
| 128 | 72664 | Pathmark | Dix Hills | 683 Old Country Road | NY |
| 129 | 70434 | Waldbaums | East Meadow | 1530 Front Street | NY |
| 130 | 70277 | Waldbaums | East Setauket | 4054 Nesconset Highway | NY |
| 131 | 70223 | Waldbaums | Garden City | 2475 Jericho Turnpike | NY |
| 132 | 70217 | Waldbaums | Greenlawn | 777 Pulaski Road | NY |
| 133 | 70769 | A&P | Hastings | 87 Main Street | NY |
| 134 | 70214 | Waldbaums | Hauppauge | 1236 Veterans Highway | NY |
| 135 | 72641 | Pathmark | Holbrook | 5801 Sunrise Highway | NY |
| 136 | 72639 | Pathmark | Islip | 155 Islip Avenue | NY |
| 137 | 70289 | Waldbaums | Jericho | 336 North Broadway | NY |
| 138 | 70003 | A&P | Lagrange | 1642 Route 82 | NY |
| 139 | 70251 | Waldbaums | Lindenhurst | 50 E. Hoffman | NY |
| 140 | 70151 | A&P | Mamaroneck | 805 Mamaroneck Ave | NY |
| 141 | 70256 | Waldbaums | Massapequa | 5508 Sunrise Hwy | NY |
| 142 | 72292 | Pathmark | Nanuet | 195 Rockland Center East Rt 59 | NY |
| 143 | 72615 | Pathmark | North Babylon | 1251 Deer Park Avenue | NY |
| 144 | 70288 | Waldbaums | Oakdale | 4560 Sunrise Hwy | NY |
| 145 | 70213 | Waldbaums | Oceanside | 3620 Long Beach Rd. | NY |
| 146 | 70126 | A&P | Patterson | 3101 Route 22 | NY |
| 147 | 70194 | A&P | Peekskill | 20 Welcher Ave | NY |
| 148 | 72297 | Pathmark | Port Chester | 130 Midland Avenue | NY |
| 149 | 72604 | Pathmark | Port Jeff.Sta. | 5145 Nesconset Highway | NY |
| 150 | 70192 | A&P | Scarsdale | 668 Central Park Avenue | NY |
| 151 | 72298 | Pathmark | Scarsdale | 2540 Centralpark Avenue | NY |

| 152 | 72171 | Pathmark | Staten Island | 2660 Hylan Avenue | NY |
|-----|-------|----------|---------------|-------------------|-----|
| 153 | 70601 | Waldbaums | Stony Brook | 2162 Nesconset Highway | NY |
| 154 | 19918 | Liquor | Unclassified | 1175 Third Ave Suite A | NY |
| 155 | 70794 | A&P | Valley Cottage | 14 Lake Ridge Plaza | NY |
| 156 | 72644 | Pathmark | West Babylon | 531 Montauk Highway | NY |
| 157 | 72293 | Pathmark | Yonkers | 1757 Central Park Avenue | NY |
| 158 | 76248 | Pathmark | Berwyn (Devon) | 450 W Swedesford Rd. | PA |
| 159 | 70314 | Superfresh | Center Square | 1301 Skippack Pike | PA |
| 160 | 72528 | Pathmark | Cheltenham | 1000 Easton Road | PA |
| 161 | 72529 | Pathmark | Fairless Hills | 500 Lincoln Highway | PA |
| 162 | 72567 | Pathmark | Folsom | 420 Mcdade Boulevard | PA |
| 163 | 70244 | Superfresh | Kenneth Square | 863 East Baltimore Pike | PA |
| 164 | 70718 | Superfresh | New Hope | 323 West Bridge Street | PA |
| 165 | 59530 | Food Basics | Philadelphia | 15501 Bustleton Ave. | PA |
| 166 | 70982 | Superfresh | Philadelphia | #N/A | PA |
| 167 | 59510 | Food Basics | Philadelphia | 8920 Frankford Avenue | PA |
| 168 | 72556 | Pathmark | Philadelphia | 4160 Monument Road | PA |
| 169 | 72553 | Pathmark | Philadelphia | 8700 Frankford Avenue | PA |
| 170 | 70726 | Superfresh | Philadelphia | 1851 S. Columbus Blvd. | PA |
| 171 | 72532 | Pathmark | Philadelphia | 3021 Grays Ferry Avenue | PA |
| 172 | 72564 | Pathmark | Philadelphia | 840 Cottman Avenue | PA |
| 173 | 72557 | Pathmark | Philadelphia | 2900 N. Broad St. & Glenwood Ave. | PA |
| 174 | 76723 | Pathmark | Philadelphia | 85 Franklin Mills Blvd | PA |
| 175 | 72568 | Pathmark | Upper Darby | 421 S. 69th Street | PA |
| 176 | 76363 | Pathmark | Walnutport | 300 South Best Ave. | PA |

## **Exhibit 2**

Global Sale Notice

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                                   :
                                                        :       **Chapter 11**
**THE GREAT ATLANTIC & PACIFIC TEA**                    :
**COMPANY, INC.,** *et al.,*                            :       **Case No. 15-23007 (RDD)**
                                                        :
Debtors.[5]                                             :       **(Jointly Administered)**
-------------------------------------------------------------x

## NOTICE OF SALE OF A SUBSTANTIALLY ALL ASSETS

The Great Atlantic & Pacific Tea Company, Inc. and its affiliates identified in the footnote below (collectively, the "<u>Debtors</u>") are seeking to sell or assign substantially all of their stores, leases, and related assets (the "<u>Stores</u>"), including stores operating under the following banners: A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, The Food Emporium, Best Cellars, and A&P Liquors.

Three parties have already submitted binding bids (the "<u>Bids</u>") for a total of 120 Stores. Each Bid remains subject to higher and better offers. **A list of the Stores included in each Bid is attached as Exhibit A.**

**A list of the Debtors' 176 other Stores is attached as <u>Exhibit B</u>.**

By order, dated [   ], 2015 (the "<u>Bid Procedures Orders</u>"), the Bankruptcy Court approved certain "<u>Bid Procedures</u>" that govern the sale of all of the Debtors' Stores to the highest or best bidders.

The Debtors have requested the Bankruptcy Court enter orders (the "<u>Sale Orders</u>"), which provide, among other things, for the sale of the Stores free and clear of liens, claims, encumbrances and other interests, to the extent permissible by law, and the assumption by successful bidders of certain liabilities. A separate notice will be provided to counterparties to executory contracts and unexpired leases with the Debtors that may be assumed and assigned.

Copies of the Asset Purchase Agreements, the Bid Procedures Order, the Bid Procedures, and the proposed Sale Orders are available upon request to the Debtors' noticing agent, Prime Clerk, at (844) 239-9273 or apinfo@primeclerk.com, and are available for download at https://cases.primeclerk.com/aptea.

---

[5] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corp. (7132); APW Supermarkets, Inc. (9509); Borman's Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).

**ANY INTERESTED BIDDER SHOULD CONTACT THE DEBTORS' ADVISORS AT:**

| **Evercore Group LLC** | **Hilco Real Estate LLC** |
|---|---|
| Paul Billyard at 212-857-3150, billyard@evercore.com | Gregory Apter at gapter@hilcoglobal.com |
| Will Jurist at 212-849-3637, William.jurist@evercore.com | Matt Tabloff at mtabloff@hilcoglobal.com |

**PLEASE TAKE NOTE OF THE FOLLOWING IMPORTANT DEADLINES:**

- The **deadline to submit a bid** for one or more Stores is **September 11, 2015 at 5:00 p.m. (ET)**. A bid must include a deposit in the amount of ten percent (10%) of the proposed purchase price. The failure to abide by the procedures and deadlines set forth in the Bid Procedures Order and the Bid Procedures may result in the denial of your bid.

- The deadline to lodge an objection with the Bankruptcy Court to the proposed sale of the Stores is **September 11, 2015 at 5:00 p.m. (ET)** (the "Sale Objection Deadline"). Objections must be filed and served in accordance with the Bid Procedures Order.

- Auctions for Stores have been scheduled for **September 24 and 25, 2015 at 9:30 a.m. (ET)**.

- The Bankruptcy Court will conduct a hearing (the "Sale Hearing") to consider the proposed sales on:

  - **September 22, 2015 at 10:00 a.m. (Eastern Time)** if a Bid is the only Qualified Bid (as such term is defined in the Bid Procedures) received; and/or

  - **October 1, 2015 at 10:00 a.m. (Eastern Time)** if more than one Qualified Bid (as such term is defined in the Bidding Procedures) is received.

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION BY THE SALE OBJECTION DEADLINE SHALL BE A BAR TO THE ASSERTION BY SUCH PERSON OR ENTITY OF ANY OBJECTION TO THE SALE MOTION, SALE ORDERS, THE PROPOSED TRANSACTIONS, OR THE DEBTORS' CONSUMMATION AND PERFORMANCE OF THE ASSET PURCHASE AGREEMENTS (INCLUDING, WITHOUT LIMITATION, THE DEBTORS' TRANSFER OF THE STORES AND ASSUMPTION AND ASSIGNMENT OF STORE LEASES, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS).**

Dated _____, 2015

_____

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

## **Exhibit 3**

Global Publication Sale Notice

[Form to be provided.]

## Exhibit 4

Cure Notice

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | **Case No. 15-23007 (RDD)** |
| **COMPANY, INC.,** *et al.*, | : | |
| | : | **(Jointly Administered)** |
| Debtors.⁶ | : | |

----------------------------------------------------------------x

### NOTICE OF ASSUMPTION, ASSIGNMENT AND CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS

The Great Atlantic & Pacific Tea Company, Inc. and its chapter 11 affiliates identified in the footnote below (collectively, the "Debtors") are seeking to assume and assign substantially all of their executory contracts and unexpired leases in connection with the sale of substantially all of their stores (the "Stores"), including Stores operating under the following banners: A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, The Food Emporium, Best Cellars, and A&P Liquors. Three parties (the "Bidders") have already submitted binding bids (the "Bids") for a total of 120 Stores, and the Debtors are seeking Court approval of these Bids (or such higher and better bids) pursuant to a motion, dated _____, 2015 (Docket No. __).

**You are receiving this Notice because you may be a party to an executory contract or unexpired lease that is proposed to be assumed and assigned to the Bidders (collectively, the "Transferred Contracts"), or to such other bidders that submit higher or better offers for the Stores**.

The current Bidders are: Acme Markets, Inc.; The Stop & Shop Supermarket Company, LLC; and Key Food Stores Co-Operative, Inc. A list of the Transferred Contracts is attached hereto as Exhibit A. Copies of the Bids are available at https://cases.primeclerk.com/aptea or by calling 844-239-9273.

The Debtors have determined the current amounts owing (the "Cure Costs") under each Transferred Contract and have listed the applicable Cure Costs on Exhibit A. The Cure Costs are the only amounts proposed to be paid upon the assumption and assignment of the Transferred Contracts.

---

⁶ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: The Great Atlantic & Pacific Tea Company, Inc. (0974); Montvale-Para Holdings, Inc. (2947); 2008 Broadway, Inc. (0986); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corp. (7132); APW Supermarkets, Inc. (9509); Borman's Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

To the extent that a non-Debtor party objects to (i) the assumption and assignment of such party's Transferred Contract or (ii) the applicable Cure Costs, the non-Debtor counterparty must file and serve an objection in accordance with the Global Bidding Procedures Order (Docket No. __), so as to be received by the parties specified therein by September 11, 2015 at 5:00 p.m. (Eastern Time).  Copies of the Global Bidding Procedures Order are available for download at https://cases.primeclerk.com/aptea.

If no objection is timely received, (i) the counterparty to a Transferred Contract shall be deemed to have consented to the assumption and assignment of the Transferred Contract and shall be forever barred from asserting any objection with regard to such assumption or assignment, and (ii) the Cure Costs set forth on Exhibit A attached hereto shall be controlling, notwithstanding anything to the contrary in any Transferred Contract, or any other document, and the counterparty to a Transferred Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Transferred Contract against the Debtors or the applicable transferee, or the property of any of them.

If no Qualified Bids (as such term is defined in the Global Bidding Procedures), other than those of the Bidders, are received for the Stores, the Debtors will seek to assume and assign the Transferred Contracts at a hearing before the Honorable _____, in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (a "**Sale Hearing**") on _____, 2015, at ___ _.m. (Eastern Time), or at a later hearing, as determined by the Debtors.  A hearing regarding the Cure Costs, if any, may be adjourned at the discretion of the Debtors.

If one or more Qualified Bids are received, other than those of the Bidders, auctions for the Stores, including the Transferred Contracts, will be conducted, and the Sale Hearing will be held on _____, 2015, at ___ _.m. (Eastern Time).  After the auctions, the Debtors will file, but not serve, a notice that identifies the successful bidders for the Stores, including any Transferred Contracts.  If a successful bidder at an auction is not one of the Bidders, then the deadline to object to adequate assurance of future performance by a successful bidder will be extended to two (2) days prior to the Sale Hearing; provided that the deadline to object to the Cure Costs shall not be extended.

Dated: [      ], 2015

_____

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

**Exhibit C**

ASSET PURCHASE AGREEMENT

BY AND AMONG

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.

SUPER FRESH FOOD MARKETS, INC.

WALDBAUM, INC.

PATHMARK STORES, INC.

A&P LIVE BETTER, LLC

TRADEWELL FOODS OF CONN., INC.

A&P REAL PROPERTY, LLC

AND

ACME MARKETS, INC.

JULY 19, 2015

# Table of Contents

ARTICLE I DEFINITIONS ...................................................................................................1

    Section 1.1    Definitions .............................................................................1
    Section 1.2    Interpretations .....................................................................16

ARTICLE II PURCHASE AND SALE..............................................................................17

    Section 2.1    Purchase and Sale of Assets ...............................................17
    Section 2.2    Assumed Liabilities ............................................................17
    Section 2.3    Consideration; Deposit; Escrow Amounts ..........................18
    Section 2.4    Closing; Closing Schedule..................................................19
    Section 2.5    Closing Payments and Deliveries. ......................................20
    Section 2.6    Inventory.............................................................................23
    Section 2.7    Allocation ...........................................................................24
    Section 2.8    Prorations Generally; Percentage Rents. ............................25
    Section 2.9    Removal of Excluded Assets ..............................................26
    Section 2.10   Cooperation.........................................................................26

ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES................................26

    Section 3.1    Organization of Sellers; Good Standing..............................26
    Section 3.2    Authorization of Transaction ..............................................27
    Section 3.3    Noncontravention; Government Filings................................27
    Section 3.4    Title to Assets; Sufficiency.................................................28
    Section 3.5    Real Property ......................................................................28
    Section 3.6    Litigation; Decrees .............................................................28
    Section 3.7    Labor Relations ..................................................................28
    Section 3.8    Brokers' Fees ......................................................................29
    Section 3.9    Taxes. .................................................................................29
    Section 3.10   Tangible Personal Property.................................................30
    Section 3.11   Transferred Contracts.........................................................30
    Section 3.12   Employee Benefits. .............................................................31
    Section 3.13   Compliance with Laws; Permits. ........................................31
    Section 3.14   Environmental Matters .......................................................32
    Section 3.15   HIPAA................................................................................32
    Section 3.16   Compliance with Healthcare Laws. ....................................33
    Section 3.17   Statement of Sales ..............................................................34
    Section 3.18   Insurance ............................................................................34
    Section 3.19   No Other Representations or Warranties..............................34

ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES................................35

    Section 4.1    Organization of Buyer; Good Standing................................35
    Section 4.2    Authorization of Transaction ..............................................35
    Section 4.3    Noncontravention................................................................35
    Section 4.4    Litigation; Decrees .............................................................36

WEIL:\95382886\18\50482.0004

| | | |
|---|---|---:|
| Section 4.5 | Brokers' Fees | 36 |
| Section 4.6 | Sufficient Funds; Adequate Assurances | 36 |
| Section 4.7 | HIPAA | 36 |
| **ARTICLE V PRE-CLOSING COVENANTS** | | 36 |
| Section 5.1 | Efforts; Cooperation; Permits. | 36 |
| Section 5.2 | Conduct of the Business Pending each Closing | 37 |
| Section 5.3 | Regulatory Approvals | 39 |
| Section 5.4 | Bankruptcy Court Matters. | 41 |
| Section 5.5 | Notice of Developments | 44 |
| Section 5.6 | Access; No Contact. | 44 |
| Section 5.7 | Bulk Transfer Laws | 45 |
| Section 5.8 | Replacement Bonding Requirements | 45 |
| Section 5.9 | Assumption and Assignment of Transferred Contracts; Cure Costs. | 45 |
| Section 5.10 | Cooperation with Financing | 46 |
| Section 5.11 | Ocean City Litigation | 47 |
| Section 5.12 | Monthly Reporting | 47 |
| Section 5.13 | Subleases | 47 |
| **ARTICLE VI OTHER COVENANTS** | | 47 |
| Section 6.1 | Further Assurances | 47 |
| Section 6.2 | Access; Enforcement; Record Retention | 47 |
| Section 6.3 | Treatment of Affected Labor Agreements | 48 |
| Section 6.4 | Covered Employees. | 48 |
| Section 6.5 | Certain Tax Matters. | 51 |
| Section 6.6 | Insurance Matters | 51 |
| Section 6.7 | Acknowledgements. | 52 |
| Section 6.8 | Press Releases and Public Announcements | 52 |
| Section 6.9 | Seller Marks | 53 |
| **ARTICLE VII CONDITIONS TO OBLIGATION TO CLOSE** | | 53 |
| Section 7.1 | Conditions to Buyer's Obligations to Effect the Initial Closing | 53 |
| Section 7.2 | Conditions to Sellers' Obligations to Effect the Initial Closing | 54 |
| Section 7.3 | Conditions to Buyer's Obligations to Effect each Subsequent Closing | 54 |
| Section 7.4 | Conditions to Sellers' Obligations to Effect each Subsequent Closing | 55 |
| Section 7.5 | No Frustration of Closing Conditions | 56 |
| **ARTICLE VIII TERMINATION RIGHTS** | | 56 |
| Section 8.1 | Termination of Agreement | 56 |
| Section 8.2 | Effect of Termination | 58 |
| Section 8.3 | Termination and Adjustment Rights of Buyer as to Stores and Related Acquired Assets. | 58 |

WEIL:\95382886\18\50482.0004

ARTICLE IX MISCELLANEOUS .................................................................................60

Section 9.1    Survival.....................................................................................60
Section 9.2    Expenses ...................................................................................60
Section 9.3    Entire Agreement .....................................................................61
Section 9.4    Incorporation of Exhibits and Disclosure Schedule ....................61
Section 9.5    Amendments and Waivers ........................................................61
Section 9.6    Succession and Assignment.......................................................61
Section 9.7    Notices .....................................................................................61
Section 9.8    Governing Law .........................................................................62
Section 9.9    Submission to Jurisdiction; Service of Process ...........................63
Section 9.10   Waiver of Jury Trial .................................................................63
Section 9.11   Specific Performance ...............................................................63
Section 9.12   Severability ..............................................................................63
Section 9.13   No Third Party Beneficiaries ...................................................64
Section 9.14   Non-Recourse ..........................................................................64
Section 9.15   Mutual Drafting........................................................................64
Section 9.16   Disclosure Schedule .................................................................64
Section 9.17   Headings; Table of Contents.....................................................65
Section 9.18   Counterparts; Facsimile and Electronic Signatures ...................65
Section 9.19   Time of Essence .......................................................................65
Section 9.20   Integrated Transactions ...........................................................65

Exhibit A – Form of Bidding Procedures Order
Exhibit B – Escrow Agreement
Exhibit C – Form of Sale Order
Exhibit D – Form of Bill of Sale
Exhibit E – Form of Assignment and Assumption Agreement
Exhibit F – Form of Lease Assignment Agreement

<u>ASSET PURCHASE AGREEMENT</u>

This Asset Purchase Agreement (this "<u>Agreement</u>") is entered into as of July 19, 2015 by and among (a) The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation ("<u>A&P</u>"), Super Fresh Food Markets, Inc., a Delaware corporation, Waldbaum, Inc., a New York corporation, Pathmark Stores, Inc., a Delaware corporation, A&P Live Better, LLC, a Delaware limited liability company, Tradewell Foods Of Conn., Inc., a Connecticut corporation, and A&P Real Property, LLC, a Delaware limited liability company (each, a wholly-owned Subsidiary of A&P and, together with A&P, "<u>Sellers</u>"), and (b) Acme Markets, Inc., a Delaware corporation ("<u>Buyer</u>").  Sellers and Buyer are each referred to herein as a "<u>Party</u>" and collectively as the "<u>Parties</u>".

WITNESSETH

WHEREAS, Sellers and certain of their Affiliates contemplate filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on or about July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, Sellers operate the 76 supermarkets at the locations set forth in Section 3.5 of the Disclosure Schedule under the names "A&P," "Pathmark," and "Superfresh" (each a "<u>Store</u>" and, collectively, the "<u>Stores</u>"); and

WHEREAS, subject to the terms and upon the conditions set forth herein, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets and Assumed Liabilities, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.1    <u>Definitions</u>.  For purposes of this Agreement:

"<u>A&P</u>" has the meaning set forth in the preamble.

"<u>Acquired Assets</u>" means all of Sellers' right, title, and interests in, to and under all of the business, assets, properties, contractual rights, goodwill, going concern value, rights and claims primarily related to the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of Sellers (other than the Excluded Assets) to be acquired, in the aggregate, at the Closings and, with respect to each Closing, as the same shall exist on the applicable Closing Date.  Without limiting the foregoing, the Acquired Assets include all of Sellers' rights, title and interests in, to and under each of the following assets:

(a)     the Inventory (other than Excluded Inventory);

(b)     the Furnishings and Equipment;

(c)     to the maximum extent permitted by the Bankruptcy Code, the Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and (to the maximum extent transferable and permitted by the Bankruptcy Code) all rights arising therefrom (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Leases;

(d)     to the maximum extent permitted by the Bankruptcy Code, all Transferred Contracts (other than, subject to clause (c) immediately above, Leases) and the rights and benefits accruing thereunder;

(e)     all deposits (including security deposits, prepaid rent, electricity, telephone or otherwise and environmental-related deposits related to the Stores) and prepaid or deferred charges and expenses previously paid by Sellers relating to the Transferred Contracts or any Permit transferred to Buyer (not including any amounts paid in connection with any Affected Labor Agreement or other Contract with any Covered Employee, agent or consultant related to the Business, none of which amounts, if any, shall be deemed a reimbursable expense to Sellers under this Agreement) (collectively, the "Prepaid Expenses"), all as set forth on Section 1.1 of the Disclosure Schedule under the heading "Prepaid Expenses";

(f)     to the extent transferrable under applicable Law, all files, documents, instruments, papers, books, computer files and records and all other records of Sellers in any media relating to the patients, doctors, pharmaceuticals, controlled substances, or prescriptions of, administered by or filled by the Stores (collectively, the "Pharmacy Records") in Sellers' possession or control; provided, however, if Buyer determines in its sole discretion to purchase documents subject to applicable Law regarding privacy related to the Business, the costs of a privacy ombudsman relating solely to such documents purchased by Buyer, to the extent that the Bankruptcy Court requires a privacy ombudsman to be appointed, shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand (and, for the avoidance of doubt, except as set forth in clause (p), in all other circumstances, the costs of the privacy ombudsman shall not be borne by Buyer);

(g)     all files, documents, instruments, papers, computer files, information and records and all other books and records of Sellers (other than Pharmacy Records) in any media primarily relating to the Acquired Assets, including real property documents, surveys (boundary and topographical), construction drawings, soil reports, all records relating to Liabilities which constitute Assumed Liabilities, asbestos inspections, environmental reports and assessments, fixture plans, personnel records, ledgers, journals, studies, reports, budgets, forecasts, projections and competitive or capital spending analysis of the Stores, and information relating to Taxes (collectively, the "Files and Records");

(h)     to the extent applicable, all audio and video tapes or devices that are available for sale or rental at the Stores to the extent they are owned by Sellers;

2

(i)     to the extent requested by Buyer and to the extent assignable to Buyer under applicable Law, all Permits held, used or intended to be used by Sellers exclusively in connection with or exclusively related to the Business, including pharmacy, liquor and similar Permits, and all of the rights and benefits accruing thereunder (for the avoidance of doubt, solely to the extent that the applicable Government Authority consents or otherwise approves the assignment or transfer of the applicable Permit (but only to the extent such consent or approval is required by the terms of such Permit));

(j)     all automobiles, trucks, tractors, and trailers used or held for use exclusively in the Business (collectively, the "Rolling Stock"), and all vehicle leases which constitute Transferred Contracts;

(k)     all insurance proceeds received by Sellers in respect of any damage to or loss of any Store as a result of events or circumstances occurring prior to the applicable Closing Date, to the extent such damage or loss has not been repaired or restored at the time of applicable Closing;

(l)     $25,000.00 in cash to be left at each Store following the close of business on the date which is the day before the applicable Closing Date;

(m)     all rights to refunds of Taxes to the extent such Taxes constitute Assumed Liabilities;

(n)     any rights, demands, claims, causes of action, prepayments, refunds, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation and other claims of Sellers or their Affiliates against any Person other than Sellers, Buyer or any of their respective Affiliates (collectively, "Causes of Action") arising out of or relating to any of the Acquired Assets, including any rights against third parties under Transferred Contracts;

(o)     all rights, title and interest of Sellers in and to any property subject to a Personal Property Lease that is used in or held for use in the Business, to the extent any such Personal Property Lease is a Transferred Contract;

(p)     subject to applicable customer protections, all customer data and information derived from branded loyalty promotion or co-branded credit card programs (to the extent in existence) and other similar information related to customer purchases at the Stores; provided, however, if Buyer determines in its sole discretion to purchase data and records subject to applicable Law regarding privacy related to Sellers' business, the costs of a privacy ombudsman relating solely to such data and records purchased by Buyer, to the extent that the Bankruptcy Court requires a privacy ombudsman to be appointed, shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand (and, for the avoidance of doubt, except as set forth in clause (f), in all other circumstances, the costs of the privacy ombudsman shall not be borne by Buyer);

(q)     to the extent transferable, all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent primarily relating to the Business or any of the Acquired Assets, or any services provided to Sellers primarily in connection with the Business or the Acquired Assets, or to the extent

WEIL:\95382886\18\50482.0004

otherwise primarily affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining exclusively to any Excluded Assets; and

(r)     without limiting the foregoing, all other business, assets, rights or properties used exclusively in or located at the Stores and not specifically set forth herein.

"Additional Privacy Requirements" has the meaning set forth in Section 3.15.

"Advance" has the meaning set forth in Section 2.3(c).

"Affected Labor Agreements" means the collective bargaining agreements covering any of the Covered Employees, each of which is listed on Section 1.1 of the Disclosure Schedule under the heading "Affected Labor Agreements".

"Affected Unions" means the unions identified on Section 1.1 of the Disclosure Schedule under the heading "Affected Unions".

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by Contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocated Amount" has the meaning set forth in Section 5.3(c).

"Allocation Objection Notice" has the meaning set forth in Section 2.7.

"Allocation Principles" has the meaning set forth in Section 2.7.

"Antitrust Law" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws and Decrees that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.5(a)(i)(C).

"Assumed Liabilities" means, subject to the terms and conditions set forth in this Agreement, and provided that the following shall not include any Excluded Liabilities, effective as of the applicable Closing, the following obligations of Sellers related to the portion of the Acquired Assets acquired in respect of such Closing, and no others shall be assumed by Buyer:

(a)     all Liabilities relating to Buyer's ownership or operation of the Acquired Assets, to the extent arising from events, facts or circumstances that occur from and after the applicable Closing, but excluding any Liabilities to the extent relating to Sellers' ownership or operation of

the Acquired Assets prior to the applicable Closing or relating to any services that were sold or provided prior to the applicable Closing;

(b)      all Liabilities of Sellers under the Transferred Contracts (excluding all Cure Costs), in each case to the extent arising and relating solely to the period from and after the applicable Closing; and

(c)      all amounts allocated to Buyer under <u>Section 2.8</u> and all Transfer Taxes and property and ad valorem Taxes allocated to Buyer pursuant to <u>Section 6.5</u>.

Notwithstanding the foregoing or any other provisions of this Agreement, Buyer shall not assume hereunder, and "Assumed Liabilities" shall not include, Liabilities under any Contract to the extent such Liabilities arise as a result of a breach or failure of such Contract occurring prior to, as of, or as a result of, the applicable Closing (including Cure Costs).

"<u>Assumption Notice</u>" has the meaning set forth in <u>Section 5.9(b)</u>.

"<u>Auction</u>" means the auction undertaken pursuant to the Bidding Procedures Order.

"<u>Bankruptcy and Equity Exception</u>" has the meaning set forth in <u>Section 3.2</u>.

"<u>Bankruptcy Cases</u>" means the contemplated Chapter 11 cases of Sellers and certain of their Affiliates.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Milestones</u>" has the meaning set forth in <u>Section 5.4(e)</u>.

"<u>Bidding Procedures Order</u>" means an order of the Bankruptcy Court, substantially in the form attached hereto as <u>Exhibit A</u> with such changes as are reasonably acceptable to each Party that, among other things, (a) approves and authorizes the payment of the Termination Payment on the terms and conditions set forth in <u>Section 5.4</u>, (b) grants administrative expense status to the Termination Payment pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, (c) establishes procedures for the Auction process, and (d) establishes a date for the Sale Hearing.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 2.5(a)(i)(B)</u>.

"<u>Bonding Requirements</u>" means standby letters of credit, guarantees, indemnity bonds, and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets.

"<u>Break-Up Fee</u>" has the meaning set forth in <u>Section 5.4(a)</u>.

"<u>Business</u>" means the operation of the Stores by Sellers.

"<u>Business Day</u>" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions

located in the State of New York are authorized or required by Law or other governmental action to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Termination Payment" means an amount equal to ten percent (10%) of the Cash Purchase Price; provided, that on the occurrence of each Closing following the Initial Closing, the Buyer Termination Payment shall be reduced so as to equal ten percent (10%) of the product of (a) the Cash Purchase Price multiplied by (b) a fraction, (i) the numerator of which is the sum of (A) the portion of the Cash Purchase Price for the Acquired Assets acquired at such Closing, and (B) the aggregate portion of the Cash Purchase Price for the Acquired Assets acquired at all prior Closings, if any, and (ii) the denominator of which shall be the Cash Purchase Price; provided, that in no event shall the Buyer Termination Payment be reduced to an amount that is less than the lesser of (x) three percent (3%) of the Cash Purchase Price and (y) fifty percent (50%) of the remaining Cash Purchase Price that has not yet been paid to Sellers for subsequent Closings.

"Buyer Proration Amount" means the net amount of all prorated charges or amounts owed, payable or credited to Buyer by Sellers as provided in this Agreement, including the prorations set forth in Section 2.8.

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Cash Purchase Price" has the meaning set forth in Section 2.3(a).

"Casualty / Condemnation Event" has the meaning set forth in Section 8.3(a).

"Causes of Action" has the meaning set forth in the definition of Acquired Assets.

"Closing" means the closing of the acquisition transactions of particular Store location(s) as contemplated by this Agreement.

"Closing Date" has the meaning set forth in Section 2.4(a).

"Closing Schedule" has the meaning set forth in Section 2.4(b).

"COBRA" has the meaning set forth in Section 6.4(f).

"Competing Bid" has the meaning set forth in Section 5.4(b).

"Confidentiality Agreement" means the confidentiality agreement, dated as of March 30, 2015, by and among Montvale-Para Holdings, Inc., Cerberus Capital Management, L.P. and AB Acquisition LLC.

"Consent" means any consent, waiver, approval, exemption, order or authorization of, or registration, declaration or filing with or notice to, any Person.

"Contract" means any written agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document, sales order, purchase order or other similar understanding that is binding on any Person or any part of its property under applicable Law (including commitments to enter into any of such).

"Contracting Parties" has the meaning set forth in Section 9.14.

"Covered Employee" means an employee of A&P or any of its Subsidiaries at the applicable Closing whose duties relate primarily to the operation of any of the Stores, excluding any such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the applicable Closing.

"CTA" means the Connecticut Property Transfer Act, Conn. Gen. Stat. §22a-134 et seq.

"Cure Costs" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to section 365(b)(1) of the Bankruptcy Code to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Buyer of the Transferred Contracts, as determined by the Bankruptcy Court or agreed to by Sellers and the non-Seller counterparty to the applicable Transferred Contract.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" has the meaning set forth in Section 3.12(a).

"Environmental Law" means any applicable foreign, federal, state or local Law currently in effect relating to pollution, the protection of the environment or natural resources.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow" means the escrow established with the Escrow Agent pursuant to the Escrow Agreement.

"Escrow Agent" means Wells Fargo Bank, National Association.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Buyer, and the Escrow Agent, a copy of which is attached hereto as Exhibit B.

"Excluded Assets" means all assets of Sellers in and to the following:

(a) any asset of Sellers that is not primarily related to the Business, including, except as otherwise included as part of Files and Records, (i) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to

foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (ii) books and records related to (A) Taxes paid or payable by Sellers or (B) any Liabilities not included in Assumed Liabilities; and (iii) except as otherwise provided in this Agreement, any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to any Seller;

(b) all capital stock of A&P or any of its Subsidiaries;

(c) all Cash Equivalents (except as otherwise included as part of the Acquired Assets as provided herein) and accounts receivable;

(d) all Permits that are not part of the Acquired Assets as provided herein;

(e) all insurance policies and binders and, except to the extent otherwise included as part of the Acquired Assets or set forth in <u>Section 8.3</u>, all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(f) all of Sellers' rights under this Agreement or any Related Agreement;

(g) all Causes of Action arising out of or related to the Excluded Assets;

(h) any and all Rolling Stock that are not used or held for use exclusively in the Business;

(i) except as otherwise provided in this Agreement, any other payment, reimbursement, rebate or refund arising from the operation of the Stores prior to the applicable Closing;

(j) all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the name "A&P Liquors," "A&P," "Waldbaums," "Superfresh," "Food Emporium," "Food Basics," "Best Cellars," "Pathmark," "Foodmart" and all other marks set forth on Section 1.1 of the Disclosure Schedule under the heading "Seller Marks", any name or trademark, service mark, trade name, logo, trade dress, Internet domain name or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, all rights and goodwill associated therewith and any name or trademark, service mark, trade name, logo, Internet domain name, or other indicia of origin that is confusingly similar thereto or derived therefrom (collectively, the "<u>Seller Marks</u>");

(k) all Contracts other than the Transferred Contracts;

(l) all Excluded Inventory;

(m) all rights and interests in Employee Benefit Plans;

8

(n)     except as otherwise included as part of the Acquired Assets, all other assets bearing any of the Seller Marks;

(o)     those items set forth on Section 1.1 of the Disclosure Schedule under the heading "Other Excluded Assets" (as amended or supplemented from time to time in accordance with this Agreement); and

(p)     any lease, sublease, license, sublicense or other Contract relating to the installation, use or operation of ATM or similar banking machines, in-store banking facilities, photo-finishing equipment, audio and video rental facilities ("In-Store Operations") at the Stores or as part of the operations of the Stores (and any interest of Sellers in such equipment).

"Excluded Inventory" has the meaning set forth in Section 2.6(a) of the Disclosure Schedule.

"Excluded Liabilities" means any Liabilities of Sellers or any predecessor or Affiliate of Sellers, of any nature whatsoever, existing before or on the applicable Closing Date or arising thereafter, other than the Assumed Liabilities.  All of the Liabilities of Sellers or of any predecessor or Affiliate of Sellers (including as described in the preceding sentence) not specifically and expressly assumed by Buyer pursuant to this Agreement shall be referred to herein collectively as the "Excluded Liabilities." For the avoidance of doubt, and without limiting the foregoing, Buyer shall not be obligated to assume, and it does not assume, and hereby disclaims all of the following Liabilities of Sellers or of any predecessor or Affiliate of Sellers other than the Assumed Liabilities (and any such Liabilities shall be considered Excluded Liabilities for all purposes of this Agreement):

(a)     any Liability arising out of, under or in connection with the Excluded Assets;

(b)     any Liability of Sellers for Taxes (except as provided for in Section 6.5);

(c)     all accounts payable;

(d)     all Cure Costs;

(e)     all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(f)     all Liabilities regarding any vacation days, sick day or other paid time off or any bonus amounts accrued with respect to Covered Employees for services performed prior to the Closing;

(g)     all Liabilities of Sellers under any Affected Labor Agreement, any Employee Benefit Plan or other Contract with any Covered Employee, agent or consultant related to the Business; and

(h)     any Liability that is not an Assumed Liability.

"Files and Records" has the meaning set forth in the definition of Acquired Assets.

"Final Closing Period" has the meaning set forth in Section 2.5(c).

"Financing" has the meaning set forth in Section 5.10.

"Financing Sources" means the Persons that have entered into agreements with Buyer in connection with the Financing, and the parties to any joinder agreements, indentures or credit agreements entered pursuant thereto or relating thereto, together with their respective Affiliates, and their and their respective Affiliates' respective Representatives involved with the Financing and their respective successors and assigns.

"FIRPTA Affidavit" means an affidavit of an officer of each Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner), sworn to under penalty of perjury, setting forth such Seller's (or, if applicable, regarded owner's) name, address and federal tax identification number and stating that such Seller (or, if applicable, regarded owner) is not a "foreign person" within the meaning of section 1445 of the IRC and otherwise complying with the Treasury Regulations issued pursuant to section 1445 of the IRC.

"Furnishings and Equipment" means all tangible personal property (other than Inventory and Intellectual Property), including fixtures, trade fixtures, store models, shelving, and equipment (including information technology (other than such technology used by Sellers pursuant to licenses that prohibit the sublicense or transfer thereof) and refrigeration equipment), in each case that is located in the Stores and used or intended to be used in the Business; "Furnishings and Equipment" includes tangible personal property bearing Seller Marks, such as, to the extent applicable and by way of example only, shopping carts at the Stores.

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Hazardous Materials" means (a) any petroleum, petroleum-derived substances or petroleum products, flammable explosives, radioactive materials, radon, asbestos, or PCBs and (b) any chemicals, wastes, materials or substances which are regulated, classified or defined as "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "pollutant" or "contaminant" or any similar denomination under any Environmental Law.

"Healthcare Governmental Authority" means the United States Department of Health and Human Services, the Centers for Medicare and Medicaid Services, the U.S. Drug Enforcement Administration and any applicable state board of pharmacy.

"Healthcare Laws" has the meaning set forth in Section 3.16.

"HIPAA" has the meaning set forth in Section 3.15.

"HIPAA Commitments" has the meaning set forth in Section 3.15.

WEIL:\95382886\18\50482.0004

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Initial Closing" has the meaning set forth in Section 2.4(a).

"Initial Escrow Amount" has the meaning set forth in Section 2.3(b).

"In-Store Operations" has the meaning set forth in the definition of Excluded Assets.

"Insurance Policies" has the meaning set forth in Section 3.18.

"Intellectual Property" means (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrights, together with all registrations and applications for registration therefor and renewals in connection therewith; (d) all trade secrets, know-how, technology, improvements, and inventions; and (e) all computer software (including data and databases).

"Inventory" means all food, beverages (including, to the extent transferable to Buyer under applicable Law, alcohol), and other merchandise and products (including general merchandise items but excluding greeting cards) offered for sale to customers at the Stores.

"Inventory Date" has the meaning set forth in Section 2.6(a).

"Inventory Purchase Instructions" has the meaning set forth in Section 2.6(a).

"Inventory Purchase Price" has the meaning set forth in Section 2.6(a).

"Inventory Taker" has the meaning set forth in Section 2.6(a).

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"ISRA" means the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1-6K et seq.

"Joint Written Instructions" means written instructions from Sellers and Buyer, a form of which is attached to the Escrow Agreement as an exhibit thereto, directing the Escrow Agent to deliver the amounts to be released from the Escrow as provided for under this Agreement.

"Knowledge" of Sellers (and other words of similar import) means the actual knowledge of those persons set forth on Section 1.1 of the Disclosure Schedules under the heading "Seller Knowledge Parties". "Knowledge" of Buyer (and other words of similar import) means the actual knowledge of those persons set forth on Section 1.1 of the Disclosure Schedules under the heading "Buyer Knowledge Parties".

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

11

"<u>Lease Assignment Agreement</u>" has the meaning set forth in <u>Section 2.5(a)(i)(D)</u>.

"<u>Leases</u>" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Store.

"<u>Liability</u>" means all indebtedness, losses, claims (including "claims" as defined in section 101(5) of the Bankruptcy Code), damages, expenses, fines or other penalties, costs, royalties, proceedings, deficiencies, duties, obligations and other liabilities (including those arising out of any Litigation, such as any settlement or compromise thereof or judgment or award therein) of a Person (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, or whether known or unknown, or whether due or to become due, and whether in Contract, tort, strict liability or otherwise, and whether or not resulting from third-party claims).

"<u>Lien</u>" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, right of first offer, servitude, easement, hypothecation, restrictive covenant, encroachment, security agreement, equitable interest, earn-out, conditional sale or other title retention device or arrangement, deed of trust, or other similar encumbrance or restriction of any kind, in each case whether contingent, fixed or otherwise or whether relating to any property or right or the income or profits therefrom; <u>provided</u>, <u>however</u>, that "Lien" shall not be deemed to include any license of Intellectual Property.

"<u>Litigation</u>" means any action, cause of action, arbitration, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, investigative or arbitral, whether at Law or in equity and whether before any Governmental Authority.

"<u>Material Adverse Effect</u>" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments or events has had, or would reasonably be expected to have, a material adverse effect on the business, assets, operation, condition (financial or otherwise) or results of operation of the Business or the Acquired Assets (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, other than any effect, change, condition, circumstance, development or event arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail grocery generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or natural disaster, including any fire, flood, hurricane, tornado, or other weather event; (f) changes in Law or accounting rules; (g) the taking of any action expressly contemplated by this Agreement or any Related Agreement or taken with the prior written consent of Buyer; (h) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code with respect to any unions,

employees, retirees, retiree benefits or collective bargaining agreements (but not any strike or labor dispute arising as a result thereof); (i) the sale of any other assets or stores to any third parties by any Seller or any of its Affiliates; (j) any effects or changes arising from or related to the breach of the Agreement by Buyer; or (k) the filing of the Bankruptcy Cases; provided, however, that in the case of the foregoing clauses (a) through (f), such effects, changes, conditions, circumstances, developments or events shall be taken into account in determining whether any material adverse effect has occurred to the extent that any such effects, changes, conditions, circumstances, developments or events have, or would reasonably be expected to have, a disproportionate effect on the Business (excluding the Excluded Assets and the Excluded Liabilities) or the Acquired Assets relative to other participants operating in the retail grocery industry.

"Material Casualty" has the meaning set forth in Section 8.3(a).

"Modified Labor Agreement" means a new collective bargaining agreement with an Affected Union that is entered into by Buyer and an Affected Union.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Party" and "Parties" have the meaning set forth in the preamble.

"PCBs" means polychlorinated biphenyls.

"Permit" means any franchise, approval, authorization, consent, clearance, permit, license, order, registration, certificate, variance or similar right issued, granted by, given by or under the authority of a Governmental Authority or pursuant to any Law.

"Permitted Lien" means (a) Liens for Taxes not yet delinquent; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business, that in each case have been bonded over or otherwise secured in a manner acceptable to Buyer in Buyer's reasonable discretion; (c) with respect to leased or licensed real or personal property, the terms and conditions of the Lease applicable thereto; (d) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects with respect to any Store that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (f) matters that would be disclosed on an accurate survey of the real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (g) any liens shown in any title commitment, report or policy, or otherwise of record that do not or would not reasonably be expected to adversely affect the current occupancy or use of the real property in any material

WEIL:\95382886\18\50482.0004

respect; (h) any other Liens that Buyer has expressly stated are acceptable to Buyer in a writing delivered to Sellers; and (i) other than any of the Liens set forth in the foregoing clauses (a) through (g) and other than any Lien that is required to be removed or cured by the applicable tenant under the applicable Lease or was created by such tenant, any Liens on the fee property underlying any Lease that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect or impose any material adverse obligations on Buyer following the applicable Closing.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Personal Property Leases" has the meaning set forth in Section 3.10.

"Petition Date" has the meaning set forth in Section 5.4(e)(i).

"Pharmacy Records" has the meaning set forth in the definition of Acquired Assets.

"Potentially Excluded Stores" has the meaning set forth in Section 5.3(c).

"Prepaid Expenses" has the meaning set forth in the definition of Acquired Assets.

"Prepaid Expenses Amount" has the meaning set forth in Section 2.3(a).

"Proration Period" has the meaning set forth in Section 6.5(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.7.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement and the Lease Assignment Agreement.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment.

"Remaining Cash Purchase Price" has the meaning set forth in Section 2.3(c).

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Required Information" means (i) any financial information of Sellers provided to Buyer pursuant to Section 5.12 and (ii) the written sales figures provided to Buyer for the Stores as of the date hereof, as referenced on Section 3.17 of the Disclosure Schedule.

"Rolling Stock" has the meaning set forth in the definition of Acquired Assets.

WEIL:\95382886\18\50482.0004

"<u>Sale Hearing</u>" means a hearing before the Bankruptcy Court to approve this Agreement and the Sale Order.

"<u>Sale Order</u>" means an order of the Bankruptcy Court, substantially in the form attached hereto as <u>Exhibit C</u> (with such changes as are reasonably acceptable to each Party), among other things, (a) approving (i) this Agreement and the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby, (ii) the sale of the Acquired Assets to Buyer free and clear of all Liens (other than any Permitted Liens), (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein and (iv) the assumption and assignment to Buyer of the Transferred Contracts on the terms set forth herein; (b) determining that Buyer is a good faith purchaser and has provided adequate assurance of future performance with respect to the Transferred Contracts; and (c) providing that (w) each Closing will occur in accordance with the terms and conditions hereof; (x) Buyer will not have any derivative, successor, transferee or vicarious Liability for Liabilities of Sellers or any Affiliates of Sellers by reason of any theory of Law or equity (whether under federal or state Law or otherwise) as a result of the transactions contemplated by this Agreement, including Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Business prior to, with respect to each Acquired Asset, the applicable Closing for such Acquired Asset; and (y) to the maximum extent permitted by the Bankruptcy Code, the so-called "bulk sales," "bulk transfer" and similar Laws (including those relating to Taxes) in any applicable jurisdictions do not apply.

"<u>Second Request Recommendation</u>" has the meaning set forth in <u>Section 5.3(c)</u>.

"<u>Second Requests</u>" has the meaning set forth in <u>Section 5.3(a)</u>.

"<u>Seller Marks</u>" has the meaning set forth in the definition of Excluded Assets.

"<u>Seller Proration Amount</u>" means the net amount of all prorated charges or amounts owed, payable or credited to Sellers by Buyer as provided in this Agreement, including the prorations set forth in <u>Section 2.8</u>.

"<u>Sellers</u>" has the meaning set forth in the preamble.

"<u>Separable Stores</u>" means the Stores set forth on Schedule 1.1 under the heading "<u>Separable Stores,</u>" together with any Store added in accordance with <u>Section 5.3(c)</u> and <u>Section 8.3(d)</u>.

"<u>Social Security Act</u>" means the Social Security Act of 1935.

"<u>Store Withdrawal Deadline</u>" has the meaning set forth in <u>Section 5.3(c)</u>.

"<u>Stores</u>" has the meaning set forth in the recitals.

"<u>Subsequent Escrow Funds</u>" has the meaning set forth in <u>Section 2.3(c)</u>.

"<u>Subsidiary</u>" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such

WEIL:\95382886\18\50482.0004

Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent (50%) of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Target Amount" has the meaning set forth in Section 2.3(c).

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Payment" has the meaning set forth in Section 5.4(a).

"Transfer Tax" has the meaning set forth in Section 6.5(a).

"Transferred Contracts" has the meaning set forth in Section 5.9(a).

Section 1.2    Interpretations.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

WEIL:\95382886\18\50482.0004

(f)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)     All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)     References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References to any Contract are to that Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.  References from or through any date means, unless otherwise specified, from and including or through and including such date, respectively.

(i)     Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)     References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers on or prior to 5:00 p.m. Eastern time on the date that is at least three (3) Business Days prior to the Initial Closing or provided to Buyer or its Representatives in response to requests for materials or information.

(k)     References to "days" shall refer to calendar days unless Business Days are specified.  If any period expires on a day which is not a Business Day or any event or condition is required by the terms of this Agreement to occur or be fulfilled on a day which is not a Business Day, such period shall expire or such event or condition shall occur or be fulfilled, as the case may be, on the next succeeding Business Day.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1     Purchase and Sale of Assets.   On the terms and subject to the conditions set forth in this Agreement, Buyer will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer on the applicable Closing Date the applicable portion of the Acquired Assets applicable to such Closing, free and clear of all Liens (other than any Permitted Liens).  Nothing herein shall be deemed to sell, transfer, assign, convey or deliver the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest in, to, and under the Excluded Assets.

Section 2.2     Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, Buyer shall assume only the Assumed Liabilities applicable to such Closing at the applicable Closing.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all such Assumed Liabilities in accordance with

the terms thereof.  Notwithstanding anything in this Agreement to the contrary, Buyer shall not assume, and shall be deemed not have assumed, any of the Excluded Liabilities.

Section 2.3    Consideration; Deposit; Escrow Amounts.

(a)    The consideration for the Acquired Assets shall be (i) an aggregate Dollar amount equal to the sum of (A) $255,700,000 (the "Cash Purchase Price"), *plus* (B) the amount of the Inventory Purchase Price, *plus* (C) the amount of the Prepaid Expenses (the "Prepaid Expenses Amount"), *plus* (D) the Seller Proration Amount, if any, *minus* (E) the Buyer Proration Amount, if any (such calculation, the "Purchase Price"), and (ii) Buyer's assumption of the Assumed Liabilities, in each case subject to adjustment in accordance with Section 5.3(c) and Section 8.3.

(b)    Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Buyer shall, within two (2) Business Days following the date hereof, deposit with the Escrow Agent the sum of $63,925,000 by wire transfer of immediately available funds (the "Initial Escrow Amount"), to be released by the Escrow Agent and delivered to the Parties in accordance with the provisions of the Escrow Agreement.

(c)    Subject to the occurrence of the Initial Closing and provided that this Agreement has not been terminated thereafter in accordance with Section 8.1(k), Section 8.1(l) or Section 8.1(m), on October 31, 2015, (i) the Parties shall determine the remaining Cash Purchase Price payable for the Acquired Assets to be acquired following October 31, 2015 based on the Closing Schedule (the "Remaining Cash Purchase Price") and (ii) Buyer shall pay to Sellers, by wire transfer of immediately available funds to the account specified by Sellers to Buyer in writing, an advance in the amount of $25,000,000 (the "Advance") against amounts otherwise payable at subsequent Closings.  In the event that, on October 31, 2015, the amount equal to 62.5% of the Remaining Cash Purchase Price minus the Advance (the "Target Amount") is greater than the amount held in the Escrow at such time, Buyer shall deposit with the Escrow Agent the amount of such difference by wire transfer of immediately available funds to be released by the Escrow Agent and delivered to the Parties in accordance with the provisions of the Escrow Agreement.  In the event that, on October 31, 2015, the amount held in the Escrow is greater than the Target Amount, the Parties shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver the amount of such difference to Buyer. The funds held in the Escrow following the adjustment, if any, contemplated by this Section 2.3(c), as the same are from time to time reduced upon the occurrence of each Closing subsequent to October 31, 2015 in accordance with this Agreement, are referred to herein as the "Subsequent Escrow Funds".

(d)    Pursuant to and in accordance with the Escrow Agreement:

(i)    if this Agreement is terminated by Sellers pursuant to Section 8.1(e), the Parties shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver (x) an amount equal to the Buyer Termination Payment to Sellers, and (y) the remaining funds in the Escrow after payment of the Buyer Termination Payment (together with all accrued investment income on the funds in Escrow, if any) to Buyer;

18

(ii)      if this Agreement is terminated by Sellers pursuant to <u>Section 8.1(l)</u>, the Parties shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver (x) an amount equal to the Buyer Termination Payment (taking into account any reductions thereto prior to such termination) to Sellers, and (y) the remaining funds in the Escrow after payment of the Buyer Termination Payment (together with all accrued investment income on the funds in Escrow, if any) to Buyer; and

(iii)      if this Agreement is terminated for any reason other than by any Seller pursuant to <u>Section 8.1(e)</u> or <u>Section 8.1(l)</u>, the Parties shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver all funds held in Escrow (together with all accrued investment income thereon, if any) to Buyer.

(iv)      Sellers acknowledge and agree that, except in the case of fraud or willful misconduct, payment and delivery of the Buyer Termination Payment pursuant to <u>Section 2.3(d)(i)</u> or <u>Section 2.3(d)(ii)</u> will constitute liquidated damages and be the sole and exclusive remedy of Sellers and their respective Representatives and Affiliates, whether at Law or in equity, in the event of termination of this Agreement pursuant to <u>Section 8.1(e)</u> or <u>Section 8.1(l)</u> and upon the payment and delivery thereof to Sellers, Sellers and their respective Representatives and Affiliates will be deemed to have fully released and discharged Buyer and its Representatives and Affiliates from any Liability resulting from the termination of this Agreement;

(e)      Buyer and Sellers agree to deliver to the Escrow Agent, by 10:00 a.m. Eastern time on each Closing Date, and in accordance with the Closing Schedule, Joint Written Instructions with respect to the applicable Closing.

Section 2.4      <u>Closing; Closing Schedule</u>.

(a)      Each Closing shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m. Eastern time on a date (each, the "<u>Closing Date</u>") that is (i) in the case of the initial Closing (the "<u>Initial Closing</u>"), the third (3rd) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in <u>Section 7.1</u> and <u>Section 7.2</u> (other than conditions that by their nature are to be satisfied at the Initial Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, (ii) in the case of each subsequent Closing, on the date that is the third (3rd) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in <u>Section 7.3</u> and <u>Section 7.4</u> (other than conditions that by their nature are to be satisfied at the applicable Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or (c) with respect to any Closing, on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.  Subject to <u>Section 8.3(c)</u>, for purposes of this Agreement and the transactions contemplated hereby, each Closing will be deemed to occur and be effective, and title to and risk

of loss associated with the applicable Acquired Assets, shall be deemed to occur at 12:01 a.m., Eastern time, on the applicable Closing Date.

(b)     As promptly as reasonably practicable following the date of the Auction (but in no event later than ten (10) days thereafter), Buyer, after consultation with Sellers in good faith, taking into account Sellers' considerations, shall provide to Sellers a Closing schedule, which shall include the timing of each Closing, the Store(s) to be purchased at such Closing and the amount of the Purchase Price allocated to such Store(s) and the related Acquired Assets located thereat as set forth on Section 5.3(c) of the Disclosure Schedule (such Closing schedule, as amended from time to time in accordance with this Section 2.4(b), the "Closing Schedule"). The Parties agree to cooperate to facilitate each Closing according to the Closing Schedule. The Parties shall reasonably cooperate with each other to (i) make adjustments, as may be reasonably requested in writing by Buyer or Sellers from time to time, to the Closing Schedule and (ii) facilitate the Closings on the Acquired Assets according to the Closing Schedule as adjusted; provided, that such adjustments shall be conditioned upon (x) the Closings not extending for a period longer than ninety (90) days following the date that the Sale Order becomes a Final Order (and in any event not later than December 31, 2015) and (y) the prior written approval of Sellers, which approval shall not be unreasonably withheld, conditioned or delayed.

Section 2.5     Closing Payments and Deliveries.

(a)     On the Initial Closing Date:

(i)     Buyer shall:

(A)     pay to Sellers the Purchase Price applicable to the Acquired Assets to be acquired in the Initial Closing, which shall be paid by wire transfer of immediately available funds;

(B)     deliver to Sellers a Bill of Sale substantially in the form of Exhibit D (the "Bill of Sale"), duly executed by Buyer, for the Acquired Assets to be acquired in the Initial Closing;

(C)     deliver to Sellers an Assignment and Assumption Agreement substantially in the form of Exhibit E (the "Assignment and Assumption Agreement"), duly executed by Buyer, for the Acquired Assets to be acquired in the Initial Closing;

(D)     deliver to Sellers an Assignment and Assumption of Lease substantially in the form of Exhibit F (a "Lease Assignment Agreement"), duly executed by Buyer, for each Lease to be assigned and assumed in the Initial Closing; and

(E)     deliver to Sellers a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) is satisfied.

WEIL:\95382886\18\50482.0004

(ii)     Sellers shall:

(A)     deliver to Buyer a duly executed Bill of Sale for the Acquired Assets to be acquired in the Initial Closing;

(B)     deliver to Buyer a duly executed Assignment and Assumption Agreement for the Acquired Assets and Assumed Liabilities to be acquired in the Initial Closing;

(C)     deliver to Buyer a duly executed Lease Assignment Agreement for each Lease to be assigned and assumed in the Initial Closing;

(D)     deliver to Buyer a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> is satisfied; and

(E)     deliver to Buyer a duly executed FIRPTA Affidavit from each Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner). If, on or before the Initial Closing Date, Buyer shall not have received each FIRPTA Affidavit, Buyer may withhold from the Purchase Price such sums as are required to be withheld therefrom under section 1445 of the IRC.

(b)     Upon the occurrence of each Closing from and after the Initial Closing through and including October 31, 2015:

(i)     Buyer shall:

(A)     pay to Sellers, by wire transfer of immediately available funds, the Purchase Price applicable to the Acquired Assets to be acquired in such Closing;

(B)     deliver to Sellers a duly executed Bill of Sale for the Acquired Assets to be acquired in such Closing;

(C)     deliver to Sellers a duly executed Assignment and Assumption Agreement for the Acquired Assets to be acquired in such Closing;

(D)     deliver to Sellers a duly executed Lease Assignment Agreement for each Lease to be assigned and assumed in such Closing; and

(E)     deliver to Sellers a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in <u>Section 7.4(a)</u> and <u>Section 7.4(b)</u> is satisfied.

WEIL:\95382886\18\50482.0004

(ii)     Sellers shall:

(A)     deliver to Buyer a duly executed Bill of Sale for the Acquired Assets to be acquired in such Closing;

(B)     deliver to Buyer a duly executed Assignment and Assumption Agreement for the Acquired Assets to be acquired in such Closing;

(C)     deliver to Buyer a duly executed Lease Assignment Agreement for each Lease to be assigned and assumed in such Closing; and

(D)     deliver to Buyer a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.3(a) and Section 7.3(b) is satisfied.

(c)     Upon the occurrence of each Closing after October 31, 2015 through and including the final Closing (the "Final Closing Period"):

(i)     Buyer shall:

(A)     deliver to Sellers a duly executed Bill of Sale for the Acquired Assets to be acquired in such Closing;

(B)     deliver to Sellers a duly executed Assignment and Assumption Agreement for the Acquired Assets to be acquired in such Closing;

(C)     deliver to Sellers a duly executed Lease Assignment Agreement for each Lease to be assigned and assumed in such Closing; and

(D)     deliver to Sellers a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.4(a) and Section 7.4(b) is satisfied.

(ii)     Sellers shall:

(A)     deliver to Buyer a duly executed Bill of Sale for the Acquired Assets to be acquired in such Closing;

(B)     deliver to Buyer a duly executed Assignment and Assumption Agreement for the Acquired Assets to be acquired in such Closing;

WEIL:\95382886\18\50482.0004

(C)    deliver to Buyer a duly executed Lease Assignment Agreement for each Lease to be assigned and assumed in such Closing; and

(D)    deliver to Buyer a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.3(a) and Section 7.3(b) is satisfied.

(iii)    The Purchase Price for the Acquired Assets to be acquired at such Closing shall be paid in the following manner:

(A)    first, from the Advance until such time as the aggregate Purchase Price for the Acquired Assets acquired during the Final Closing Period equals the amount of the Advance;

(B)    second, by Buyer's wire transfer of immediately available funds to Sellers, until such time that the aggregate Cash Purchase Price for the remaining Acquired Assets to be acquired during the Final Closing Period equals the Target Amount; and

(C)    third, (1) by Buyer's wire transfer of immediately available funds to Sellers, the Purchase Price applicable to such Acquired Assets, excluding the Cash Purchase Price allocated thereto based on the Closing Schedule and (2) the Parties shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver the Cash Purchase Price applicable to such Acquired Assets to Sellers.

Section 2.6    Inventory.

(a)    Commencing at 5:00 p.m. Eastern Time on the date immediately preceding the anticipated Closing Date for each Store as set forth in the Closing Schedule, or on such other date or at such other time as the Parties may mutually agree in writing (the date of such Inventory with respect to a Closing being an "Inventory Date"), a physical count of the Inventory, and calculation of the value thereof, at each of the Stores being acquired at such Closing Date shall be made by a nationally-recognized, independent inventory service (the "Inventory Taker") selected and engaged by Sellers, in their sole discretion. The Inventory Taker will conduct the physical inventory in accordance with instructions set forth in Section 2.6(a) of the Disclosure Schedule ("Inventory Purchase Instructions") and otherwise in accordance with the terms and conditions of this Section 2.6. Each Party shall be entitled to have Representatives present during the inventory and the fees and expenses of the Inventory Taker shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers. The physical inventory (and the Inventory Purchase Price to be paid by Buyer for the Inventory) shall not include the Excluded Inventory. The Inventory Taker shall value all Inventory carried in the Stores on the applicable Inventory Date, excluding the Excluded Inventory, at the percentages of the segment retail price set forth in Section 2.6(a) of the Disclosure Schedule (such value, the "Inventory Purchase Price").

(b)     Buyer shall make application to the applicable authorities to transfer any liquor or other alcoholic beverages located at the Stores and proposed to be included in the Inventory to Buyer, and any such application shall be made promptly after the execution of this Agreement and shall be diligently pursued by Buyer, at Buyer's sole cost and expense; provided, that Buyer shall not be required to make any such application with respect to any particular Store or Stores if Buyer would be prohibited under applicable Law from selling liquor or other alcoholic beverages therefrom without eliminating such sales from other locations of Buyer (e.g., because Buyer currently has the maximum number of stores that are permitted under applicable Law to sell alcoholic beverages in the State of New Jersey, Buyer need not make application to sell liquor or other alcoholic beverages from Stores in New Jersey that are part of the Acquired Assets). To the extent Buyer has not received the Consent of all applicable Governmental Authorities to sell liquor or other alcoholic beverages from any particular Store that is part of the Acquired Assets, or if Buyer is prohibited by applicable Law from engaging in such sales as provided in the immediately preceding sentence, then Inventory shall not include, and the Inventory Purchase Price shall be reduced by the cost of, the liquor and alcoholic beverage inventory located at such Store. Sellers, at no out-of-pocket cost or expense to Sellers, shall reasonably cooperate with Buyer and use their commercially reasonable efforts to provide any documents and/or information necessary to assist in effectuating said transfer and execute such Consents or other papers as may reasonably be required. With respect to any liquor (or similar) Permit or liquor or other alcoholic beverage Inventory conveyed hereunder, the Parties shall comply with all applicable Laws, including the creation of any necessary escrow and the disbursement or release of any funds held in such escrow.

(c)     The complete inventory prepared by the Inventory Taker shall be prepared in accordance with the usual and customary practices of the industry and shall show the total cost of the Inventory for each Store determined in the manner provided above. Notwithstanding Sellers' obligations in Section 5.2 to conduct Business in the Ordinary Course of Business and to maintain comparable levels and mix of Inventory at the Stores, Sellers may sell down private label inventory without replenishment commencing fourteen (14) days prior to the applicable Inventory Date for each particular Store. Sellers shall remove at their expense all of the remaining Excluded Inventory from the Stores prior to the applicable Inventory Date (but in any event not until following the Tour (as defined in Section 2.6(a) of the Disclosure Schedule)) in order to avoid accidental inclusion thereof in the Inventory count.

Section 2.7     Allocation.  Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles").  No later than sixty (60) days after the final Closing Date, Sellers shall deliver to Buyer an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the final Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Buyer's review. Buyer shall have an opportunity to review the proposed Purchase Price Allocation for a period of twenty (20) days after receipt of the proposed Purchase Price Allocation.  If Buyer disagrees with any aspect of the proposed Purchase Price Allocation, Buyer shall notify Sellers in writing prior to the end of such twenty (20)-day period (an "Allocation Objection Notice"), setting forth Buyer's proposed Purchase Price Allocation and specifying, in reasonable detail, any good faith dispute as to Sellers' Purchase Price Allocation.

If prior to the conclusion of such twenty (20)-day period, Buyer notifies Sellers in writing that it will not provide any Allocation Objection Notice or if Buyer does not deliver an Allocation Objection Notice within such twenty (20)-day period, then the proposed Purchase Price Allocation shall be deemed final, conclusive and binding upon each of the Parties. Sellers and Buyer shall use commercially reasonable efforts to resolve any objection by Buyer to the proposed Purchase Price Allocation. If, within ten (10) days after Sellers receive an Allocation Objection Notice, the Parties have not resolved all objections and agreed upon a final Purchase Price Allocation, the Parties shall engage an independent accounting firm mutually acceptable to Buyer and Sellers to resolve any outstanding disputes, and such resolution shall be final, conclusive and binding upon each of the Parties. The fees and disbursements of such independent accounting firm shall be shared equally by Sellers, on the one hand, and Buyer, on the other hand. Sellers and Buyer shall make appropriate adjustments to the Purchase Price Allocation to reflect any adjustments to the Purchase Price. Buyer and Sellers agree (and agree to cause their respective Subsidiaries and Affiliates) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the final Purchase Price Allocation, and none of the Parties will take any position inconsistent with the final Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, in each case unless otherwise required by a change in Law or pursuant to the good faith resolution of a Tax contest. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.7 shall survive the final Closing without limitation.

Section 2.8    Prorations Generally; Percentage Rents.

(a)    As to the Acquired Assets being transferred on an applicable Closing, any and all Lease payments or receipts, rentals, costs, charges, fees or expenses (other than Taxes, which shall be governed by Section 6.5) connected with or used in the Business and limited to the applicable portion of the Acquired Assets acquired on the applicable Closing Date, including all common area costs and costs under the Leases or revenues from Acquired Assets such as copy machines, vending machines, pay phones and the like, shall be prorated between Buyer, on the one hand, and Sellers, on the other hand, on the applicable Closing Date or as soon thereafter as reasonably practicable and Sellers shall bear their proportion thereof through the day prior to the applicable Closing Date.

(b)    For purposes of prorating the current year's percentage rent, the current year's percentage rent shall be deemed to be an amount equal to the amount of percentage rent payable for the lease year prior to the applicable Closing. Sellers shall be responsible for the fraction of the lease year that precedes the applicable Closing Date, and such amount shall be deducted from the Purchase Price (to the extent payment for such percentage rents has not been previously made by Sellers). The amount thereof shall be deemed final (regardless of the actual amount of percentage rent that may be due). Sellers shall provide in form readily accessible to Buyer the data used to determine percentage rent as provided in the immediately preceding sentence. Sellers shall be responsible for any penalties and interest payable for rent or other items under each Store Lease where the same are due as a result of an underpayment or late payment by Sellers prior to the applicable Closing Date. Within five (5) Business Days after the applicable Closing for each Store, Sellers shall provide gross sales information to Buyer for all facilities subject to this Section 2.8(b).

(c)     If the precise amounts any of the items described above cannot be finally determined at the applicable Closing because of the unavailability of the amounts which are to be apportioned or otherwise, then apportionment and proration shall be computed on the basis of the amount payable for each respective item during the corresponding period in the immediately preceding year, or during the immediately preceding calendar year to the extent any of such amounts are calculated on a calendar year basis, and such apportionment and proration shall be deemed final, regardless of the actual amount of any such items as the same may be determined thereafter.

(d)     For purposes of calculating prorations, the Sellers shall be deemed to have maintained their interest in the Stores through each applicable Closing. All such prorations shall be made on the basis of the actual number of days of the year and month which shall have elapsed as of each applicable Closing.

(e)     Sellers shall attempt to obtain final meter readings for utilities at the Stores as of each applicable Closing Date and shall pay for all utilities to such date. In the event it shall not be practicable to obtain the meter reading for any utility as of that date or there are utilities which are not metered, then apportionment and proration shall be computed on the basis of the amount payable for each respective utility amount during the corresponding period in the immediately preceding year, or during the immediately preceding calendar year to the extent any of such amounts are calculated on a calendar year basis, and such apportionment and proration shall be deemed final, regardless of the actual amount as the same may be determined thereafter.

Section 2.9     Removal of Excluded Assets.     As promptly as practicable following the applicable Closing Date (and in any event within ten (10) Business Days following such Closing Date), Sellers shall remove at their expense all of the Excluded Assets that are located at the Stores. Sellers shall, in connection with such removal and the removal of the Excluded Inventory in accordance with Section 2.6(c), exercise commercially reasonable efforts to avoid damage to any of the Acquired Assets, and to the extent any of the Acquired Assets are damaged in connection with such removal, Sellers shall promptly repair such damage at Sellers' sole cost and expense.

Section 2.10     Cooperation.     Buyer and Sellers hereby agree that following the Initial Closing, Buyer and Sellers shall deliver Joint Written Instructions to the Escrow Agent in accordance with this Agreement so as to give effect to the terms hereof, including to effect the Closings in accordance with the Closing Schedule.

# ARTICLE III
# SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule").

Section 3.1     Organization of Sellers; Good Standing.     Each Seller is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the Laws of the state of its incorporation or formation, as applicable, and

has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate or limited liability company (as applicable) power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except where the failure to be so organized, existing, qualified or licensed, in good standing or to have such power and authority, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect.

Section 3.2    Authorization of Transaction.    Subject to the Bankruptcy Court's entry of the Bidding Procedures Order, Sale Order and any other necessary order to close the sale of the Acquired Assets, each Seller has full power and authority (including full corporate or other organizational power and authority) to execute and deliver this Agreement, the Related Agreements and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.    The execution, delivery, and performance of this Agreement, the Related Agreements and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.    Upon due execution hereof and thereof by each Seller, this Agreement, the Related Agreements and all other agreements contemplated hereby to which each Seller is a party (assuming in each case due authorization, execution and delivery by Buyer where applicable) shall constitute, subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Sale Order and any other necessary order to close the sale of the Acquired Assets, the valid and legally binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity (the "Bankruptcy and Equity Exception").

Section 3.3    Noncontravention; Government Filings.    Except as set forth on Section 3.3 of the Disclosure Schedule, neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach or violation of or default under the organizational documents of any Seller, (b) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, materially conflict with, or result in any material violation or material breach of or material default (with or without notice or lapse of time, or both) under any Law or Decree to which any Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, materially conflict with, result in a material breach or violation of, constitute a material default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract or Permit constituting an Acquired Asset to which any Seller is a party or to which any of the Acquired Assets is subject.    Other than (x) the applicable requirements of the HSR Act, and (y) as required or pursuant to the Bankruptcy Code, the Bidding Procedures Order, the Sale Order, and any other necessary order to close the sale of the Acquired Assets, neither Seller is required to give any notice to, make any material filing with, or obtain any material Consent from any Person in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement.

27

Section 3.4    Title to Assets; Sufficiency.  Immediately prior to the applicable Closing, Sellers will have, and, upon delivery to Buyer on the applicable Closing Date of the Related Agreements, and subject to the terms of the Sale Order and any other necessary order to close the sale of the Acquired Assets, Sellers will thereby transfer to Buyer, good and valid title to, or, in the case of property leased by Sellers, a valid leasehold interest in, all of the Acquired Assets to be transferred as part of the applicable Closing, free and clear of all Liens (other than any Permitted Liens).  Immediately prior to the applicable Closing, Sellers will have, and upon delivery to Buyer on the applicable Closing Date of the Related Agreements, and subject to the terms of the Sale Order, Sellers will thereby transfer to Buyer, valid leasehold interests in the Leases to be transferred as part of the applicable Closing, free and clear of all Liens (other than any Permitted Liens).  Except for the Excluded Assets and any other assets, each of which is set forth on Section 3.4 of the Disclosure Schedule, the Acquired Assets constitute all of the assets and properties, used or held for use in the Business and are sufficient for Buyer to conduct the Business from and after the applicable Closing Date as currently conducted.

Section 3.5    Real Property.  Section 3.5 of the Disclosure Schedule sets forth the location of each Store, each of which is leased to a Seller by a third party, and a list of all Store lease agreements and, to the extent in the possession or control of any Seller, all material documents related thereto.  Sellers have made available to Buyer a true and complete copy of each Lease in Sellers' possession or control.  With respect to each Lease, (a) such Lease is in full force and effect, (b) subject to the Bankruptcy and Equity Exception, Sellers have a valid and enforceable leasehold interest under such Lease, free and clear of all Liens except Permitted Liens, and (c) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in material breach or material default under such Lease, except for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases and that would not be a Liability of Buyer at or after the applicable Closing).  To the Knowledge of Sellers, there does not exist any actual or threatened or contemplated condemnation or eminent domain proceedings that affect any Leases or any part thereof, and no Seller has received any notice, oral or written, of the intention of any Governmental Authority or other Person to take or use all or any part thereof.

Section 3.6    Litigation; Decrees.  Other than the Bankruptcy Case or with respect to any Excluded Liabilities, (i) there is no material Litigation pending, or, to Sellers' Knowledge, threatened by or before any Governmental Authority, nor, to Sellers' Knowledge, is there any material investigation pending by and Governmental Authority, in each case, against Sellers in connection with the Business and (ii) neither Sellers nor any of their respective assets or properties is subject to any outstanding material Decree applicable to the Business.

Section 3.7    Labor Relations.  Except as set forth in Section 3.7 of the Disclosure Schedule, (a) neither Seller is a party to or bound by any collective bargaining agreement covering the Covered Employees, (b) there are no strikes, work stoppages, slowdowns, lockouts, or arbitrations pending, or to the Knowledge of Sellers, threatened against or involving any of the Stores, (c) there are no material grievances or other labor disputes pending or, to the Knowledge of Sellers, threatened against or involving any of the Stores and (d) there are no material unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Seller, threatened by or on behalf of any of the Covered Employees (including,

solely for purposes of this Section 3.7, employees of the Stores who are on short-term disability, long-term disability or any other approved leave of absence).

Section 3.8 Brokers' Fees. Other than the fees and expenses payable to Evercore Group L.L.C. in connection with the transactions contemplated hereby, which shall be borne by Sellers, neither Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer or any of its Affiliates could become liable or obligated to pay.

Section 3.9 Taxes.

(a) In each case with respect to the Acquired Assets and the Business, Sellers have timely filed all material Tax Returns required to be filed with the appropriate Tax authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers), and all such Tax Returns are true, correct and complete in all material respects; and all material amounts of Taxes payable by or on behalf of each Seller have been timely paid (except as prohibited by the Bankruptcy Court).

(b) No Seller is a foreign person within the meaning of section 1445 of the IRC.

(c) All deficiencies asserted or assessments in respect of a material amount of Tax made as a result of any examinations by any Tax authority of the Tax Returns related to the Acquired Assets or the Business have been fully paid, and there are no other audits or investigations by any Tax authority in progress (other than audits or investigations of which the Sellers have not received written notice and as to which the Sellers have not sent anything in writing to the applicable Tax authority), nor has any Seller received any written notice from any Tax authority that it intends to conduct such an audit or investigation, in each case, related to the Acquired Assets or the Business (other than any proof of claim filed by a taxing authority in the Bankruptcy Cases).

(d) Sellers have complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes with respect to the Acquired Assets and the Business and have duly and timely withheld and paid over to the appropriate Tax authorities all material amounts required to be so withheld and paid over under all applicable Laws with respect to the Acquired Assets and the Business.

(e) Since April 1, 2012, no written claim has been made by a Tax authority in a jurisdiction in which Sellers do not currently file a Tax Return such that any Seller is or may be subject to taxation by that jurisdiction with respect to the Acquired Assets or the Business.

(f) No agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of Taxes (including any applicable statute of limitation) has been executed or filed with any Tax authority by or on behalf of any Seller that would be binding on Buyer with respect to the Acquired Assets and the Business (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business).

(g)     There are no Liens for a material amount of Taxes upon the Acquired Assets, except for Permitted Liens.

(h)     None of the Acquired Assets is an interest (other than indebtedness within the meaning of section 163 of the IRC) in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for U.S. federal income tax purposes.

Section 3.10     Tangible Personal Property.

(a)     Sellers have good and valid title to all Furnishings and Equipment, free and clear of all Liens other than Permitted Liens.

(b)     Section 3.10(b) of the Disclosure Schedule sets forth a list of all Transferred Contracts that constitute leases of personal property ("Personal Property Leases") relating to personal property held, used or intended to be used by Sellers in the Business.  Sellers have made available to Buyer true and complete copies of the Personal Property Leases.

(c)     Sellers have a valid and enforceable leasehold interest under each of the Personal Property Leases, subject to the Bankruptcy and Equity Exception.  Each of the Personal Property Leases is in full force and effect.  There is no material default under any Personal Property Lease by any Seller or, to the Knowledge of Sellers, by any other party thereto, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a default thereunder.   No party to any of the Personal Property Leases has exercised any termination rights with respect thereto.

Section 3.11     Transferred Contracts.

(a)     Each of the Transferred Contracts is in full force and effect and is a valid and binding obligation of the applicable Seller(s) and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms and conditions, in each case subject to the terms of the Sale Order and the Bankruptcy and Equity Exception.  Sellers have made available to Buyer true and complete copies of each Transferred Contract in Sellers' possession or control.  There is no material default under any of the Transferred Contracts by any Seller or, to the Knowledge of Sellers, by any other party thereto, and Sellers have not received any written notice of any default or event that with notice or lapse of time or both would constitute a default by Sellers under any Transferred Contract. Subject only to the satisfaction of the Cure Costs applicable to the Transferred Contracts and the entry of the Sale Order, each Transferred Contract may be assumed by Sellers and assigned to Buyer pursuant to section 365 of the Bankruptcy Code. For purposes of this Section 3.11(a), the term "Transferred Contract" shall be deemed to exclude Leases.

(b)     Section 3.11(b) of the Disclosure Schedule sets forth a list of all Bonding Requirements required as of the date hereof with respect to the Transferred Contracts, with the amount of such Bonding Requirements set forth in Section 3.11(b) of the Disclosure Schedule next to each such Transferred Contract.

WEIL:\95382886\18\50482.0004

Section 3.12    Employee Benefits.

(a)    Section 3.12(a) of the Disclosure Schedule lists all Employee Benefit Plans.  "Employee Benefit Plans" means "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers and their Subsidiaries with respect to Covered Employees (including, solely for purposes of this Section 3.12(a), employees of the Stores who are on short-term disability, long-term disability or any other approved leave of absence).

(b)    True, correct and complete copies of the following documents, with respect to each of the Employee Benefit Plans (excluding Employee Benefit Plan documents which relate to multiemployer plans (within the meaning of 3(37) of ERISA)), have been made available to Buyer (A) any plan documents, and all material amendments thereto, (B) the most recent Forms 5500, (C) the most recent summary plan descriptions (including letters or other documents updating such descriptions) and (D) the most recent IRS determination letter.

(c)    Each of the Employee Benefit Plans sponsored by Sellers and its Subsidiaries that is intended to qualify under section 401 of the IRC has been determined by the IRS to be so qualified, and, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)    Each of the Employee Benefit Plans (excluding any Employee Benefits Plans which are multiemployer plans (within the meaning of Section 3(37) of ERISA)) has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.

Section 3.13    Compliance with Laws; Permits.

(a)    Sellers are in compliance in all material respects with all Laws applicable to the Business (except for Laws addressed in Section 3.14, Section 3.15 and Section 3.16). Sellers have not received any material written notice of or been charged with the material breach or violation of any Laws applicable to the Business.  To the Knowledge of Sellers, there are no investigations pending or threatened against Sellers regarding the possible material breach or violation of any Laws applicable to the Business.

(b)    Section 3.13(b) of the Disclosure Schedule sets forth a Store-by-Store list of all material Permits held, used or intended to be used by Sellers, or otherwise required, in connection with or related to the Business, including pharmacy, liquor and similar Permits and all such Permits required pursuant to any Environmental Law, in each case that are in effect on the date hereof, and all applications for any such Permits that are in process on the date hereof. Sellers are in compliance in all material respects with all such Permits.  Sellers hold all of such material Permits and such Permits constitute all Permits which are required for the Business as presently conducted.  Each such Permit is in full force and effect and has not expired.  All

31

applications required to have been filed for the renewal of such Permits have been duly filed on a timely basis with the appropriate Governmental Authority, and all other filings required to have been made with respect to such Permits have been duly made on a timely basis with the appropriate Governmental Authority.  No Seller has received any notice from any Governmental Authority or issuer of any such Permit with respect to the revocation, suspension, restriction, limitation or termination thereof nor is there any Litigation pending or, to Sellers' Knowledge, threatened, the object of which is to revoke, restrict, limit or terminate any such Permit.  Sellers are not in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation) of any term, condition or provision of any such Permit to which they are parties.

(c)     Section 3.13(c) of the Disclosure Schedule sets forth a list of all Bonding Requirements required as of the date hereof with respect to the Permits listed in Section 3.13(b) of the Disclosure Schedule, with the amount of such Bonding Requirements set forth in Section 3.13(c) of the Disclosure Schedule next to each such Permit.

Section 3.14     Environmental Matters.  With respect to each Store and the business and operations conducted at each Store by the applicable Seller:

(a)     each Seller is in, and during the past three (3) years has been in, material compliance with all Environmental Laws, and no Seller has received any material written notice of or been charged with the material breach or violation of any Environmental Laws which remains outstanding;

(b)     there is no material Litigation pending, or to Sellers' Knowledge, threatened against Sellers pursuant to any Environmental Law or otherwise with respect to any alleged violation of Environmental Law or Release of, or exposure to any Hazardous Materials;

(c)     there has been no Release of any Hazardous Material into the indoor or outdoor environment (whether on-site or off-site) arising from Sellers' operation of any Store in material violation of or in a manner or location that could reasonably be expected to require any remediation or other response actions which would reasonably be expected to result in Sellers incurring material Liabilities under Environmental Laws;

(d)     to the Knowledge of Sellers, there is not now at, on, under or in any Store, any of the following: (i) underground storage tanks; (ii) dry cleaning establishments or other business operations using chlorinated solvents in any capacity at any Store; or (iii) PCBs; and

(e)     no Consent of or filing with any Governmental Authority, or action by Buyer or Sellers, is required pursuant to ISRA or CTA in connection with the execution and delivery of this Agreement or the consummation of any of the transactions contemplated by this Agreement.

Section 3.15     HIPAA.  Sellers are in, and during the past three (3) years have been in, compliance in all material respects with the applicable obligations as a "Covered Entity" with respect to its "Health Plan" and the pharmacies it operates, and as a "Business Associate" where applicable (as such capitalized terms are defined in the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic

and Clinical Health Act ("HIPAA")). With respect to any applicable data privacy or security requirements under HIPAA (collectively, the "HIPAA Commitments"), or any other privacy or security requirements imposed by federal or state Law on the healthcare data held, collected, used or disclosed by Sellers, including state healthcare data breach notification Laws and related state consumer protection Laws (collectively, the "Additional Privacy Requirements"), (i) to the Knowledge of Sellers, Sellers are in material compliance with the HIPAA Commitments and the Additional Privacy Requirements and (ii) Sellers have not received (A) any written inquiry from, or notice that they are under investigation by, any Healthcare Governmental Authority regarding Sellers' compliance with the HIPAA Commitments or the Additional Privacy Requirements or (B) any written notice from any party with whom they have a Business Associate Contract (as such term is defined under HIPAA) of any allegation that they have been in material breach or violation of any of the Business Associate Contracts to which they are parties. To the Knowledge of Sellers, no Seller has, during the past three (3) years, engaged in an activity that would trigger a reporting requirement under any HIPAA Commitments or the Additional Privacy Requirements. To the Knowledge of Sellers, Sellers have not, during the past three (3) years, suffered any unauthorized acquisition, access, use or disclosure of any patient health information that, individually or in the aggregate, is a material violation of the HIPAA Commitments or the Additional Privacy Requirements. Compliance with Healthcare Laws.

(a) Sellers are conducting, and during the past three (3) years have conducted, the Business in compliance in all material respects with, and neither Sellers, nor to the Knowledge of Sellers any of their respective Representatives, has engaged in any activities in connection with the Business that would constitute a material breach or violation of, applicable Law of any Healthcare Governmental Authority with respect to regulatory matters relating to the sale and dispensing of pharmaceuticals and controlled substances, and the provision, administration, and/or payment for pharmacy products or services (collectively, "Healthcare Laws"), including, to the extent applicable, (i) any state licensure, credentialing, accreditation or certification requirement, including those limiting the scope of activities of Persons acting without such license, credential, accreditation or certification, (ii) any billing, coding, coverage or reimbursement rules and regulations applicable to the services provided by Sellers, (iii) rules and regulations governing the operation and administration of Medicare, Medicaid, Tricare, or any other federal health care programs (as defined in the Social Security Act) and any other state health care program, (iv) the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(b)), the Ethics in Patient Referral Act (42 U.S.C. §135nn), the False Claims Act (31 U.S.C. §3729 et seq.), the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b, the Exclusion Laws, 42 U.S.C. § 1320a-7, and state anti-kickback, self-referral and false claims Laws, (v) rules and regulations of the U.S. Food and Drug Administration and (vi) the Controlled Substances Act of 1970.

(b) To the Knowledge of Sellers, during the past three (3) years, (i) no Seller has received any written notice or communication from any Healthcare Governmental Authority alleging material noncompliance with any Healthcare Laws applicable to the Business, (ii) there has not been, and there is no, Litigation, search warrant, subpoena, civil investigative demand, demand letter or request for information by or from any enforcement agency related to material noncompliance with any Healthcare Laws applicable to the Business pending, or to the Knowledge of Sellers, threatened against Sellers, (iii) submissions or reports by Sellers to any Healthcare Governmental Authority were true and accurate, in all material respects, when

WEIL:\95382886\18\50482.0004

submitted or were subsequently amended or corrected, (iv) no Seller has been a defendant in any *qui tam*/False Claims Act litigation in connection with the Business, (v) no Seller has any reporting obligations pursuant to any written settlement agreement or any other written agreements entered into with any Healthcare Governmental Authority or are a party to a corporate integrity agreement a Healthcare Governmental Authority, in each case in connection with the Business and (vi) Sellers have maintained all records required to be in material compliance under any Healthcare Laws applicable to the Business.

Section 3.17    Statement of Sales.  As of the date hereof, the written sales figures provided to Buyer for the Stores, as referenced on Section 3.17 of the Disclosure Schedule, (a) are complete and correct in all material respects, (b) present fairly in all material respects the sales of each Store for the period specified and (c) have been prepared in good faith using substantially the same accounting methods, practices, principles, policies and procedures used in the preparation of such sales figures for prior periods in the Ordinary Course of Business, in each case, in all material respects.

Section 3.18    Insurance.  All of Sellers' material policies of insurance by which the Acquired Assets (the "Insurance Polices") are covered are in full force and effect.  All premiums due on such Insurance Policies have been paid or, if due and payable prior to the applicable Closing, will be paid prior to such Closing in accordance with the payment terms of such Insurance Policies.  All such Insurance Policies are valid and binding in accordance with their terms and have not been subject to a lapse in coverage.  Sellers have not received any written notice of cancellation or non-renewal of any such Insurance Policy.  There are no material claims related to the Business pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights.  No Seller is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons operating retail grocery stores comparable to the Stores, including fire and casualty insurance on all improvements to the Stores, sufficient in amount (subject to commercially reasonable deductibles that do not require self-insured retention) to cover the costs of replacing any such improvements of any Store that might be damaged or destroyed with like improvements.

Section 3.19    No Other Representations or Warranties.    Except for the representations and warranties contained in Article IV and in the certificate delivered to Sellers pursuant to Section 2.5(a)(i)(E), Section 2.5(b)(i)(E) and Section 2.5(c)(i)(D), Sellers acknowledge that neither Buyer nor any of its Representatives has made, and Sellers have not relied upon, any representation or warranty, whether express or implied, with respect to Buyer or any of Buyer's Subsidiaries or their respective businesses, affairs, assets, liabilities, financial condition, results of operations, future operating or financial results, estimates, projections, forecasts, plans or prospects (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans or prospects) or with respect to the accuracy or completeness of any other information provided or made available to Sellers by or on behalf of Buyer.

WEIL:\95382886\18\50482.0004

# ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to each Seller that the statements contained in this Article IV are true and correct.

Section 4.1    Organization of Buyer; Good Standing.    Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to own, lease, and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except where the failure to be so organized, existing, qualified or licensed, in good standing or to have such power and authority would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.2    Authorization of Transaction.    Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement, the Related Agreements and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement, the Related Agreements and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer.  Upon due execution hereof and thereof, this Agreement, the Related Agreements and all other agreements contemplated hereby to which Buyer is a party (assuming in each case due authorization, execution and delivery by Sellers) shall constitute the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to the Bankruptcy and Equity Exception.

Section 4.3    Noncontravention.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II) will (a) conflict with or result in a breach or violation of or default under the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (b) conflict with, or result in any violation or breach of or default (with or without notice or lapse of time, or both) under any Law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach or violation of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or clause (c), for such conflicts, breaches, violations, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.  Subject to requisite Bankruptcy Court approval, as applicable, and other than the applicable requirements of the HSR Act, Buyer is not required to give any notice to, make any material filing with, or obtain any material Consent from any Person in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement.

Section 4.4     Litigation; Decrees.  There is no Litigation pending or, to Buyer's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Buyer is not subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5     Brokers' Fees.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6     Sufficient Funds; Adequate Assurances.  Buyer has, and upon the Initial Closing will have, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

Section 4.7     HIPAA.  Buyer is a "Covered Entity" as defined by HIPAA.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and each applicable Closing (except as otherwise expressly stated to apply to a different period, and solely with respect to the Acquired Assets not sold pursuant to prior Closings):

Section 5.1     Efforts; Cooperation; Permits.

(a)     Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use its commercially reasonable efforts (except as set forth in Section 5.3) to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner reasonably practicable, the transactions contemplated hereby (including by giving, or causing to be given, any notices to, making any filings with, and using commercially reasonable efforts to obtain any Consents of Governmental Authorities as are necessary and appropriate to consummate the transactions contemplated hereby).  Subject to Section 5.3, without limiting the generality of the foregoing, (a) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 and Section 7.3 that are within its control or influence to be satisfied or fulfilled, (b) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 and Section 7.4 that are within its control or influence to be satisfied or fulfilled and (c) in the event the Bankruptcy Court requires a consumer privacy ombudsman to be appointed in connection with the transactions contemplated by this Agreement, Buyer shall provide any

36

cooperation reasonably requested by such ombudsman and shall use commercially reasonable efforts to take all reasonable actions recommended by such ombudsman in any report provided to the Bankruptcy Court.

(b)     As soon as practicable following the date of this Agreement, Sellers shall, at Buyer's sole cost and expense, use commercially reasonable efforts to assist Buyer in obtaining all Permits required for Buyer's ownership and operation (including maintenance and repairs) of the Acquired Assets from and after the date of the applicable Closing. Sellers, at no out-of-pocket cost or expense to Sellers, shall reasonably cooperate with Buyer and use their commercially reasonable efforts to provide any documents and/or information necessary to assist in obtaining such Permits and execute such papers as may reasonably be required. If a pharmacy Permit regarding a particular Store is not issued to Buyer prior to the applicable Closing, Sellers shall, if legally permissible, grant Buyer the right to use Sellers' pharmacy Permit in that Store until the earlier of (i) the issuance to Buyer of a pharmacy Permit by the applicable Governmental Authority and (y) the sixtieth (60th) day following the applicable Closing. The Parties will cooperate to comply with, to the extent possible, all applicable Laws so that Buyer may operate the Business in the ordinary course of business until all of the Permits requested by Buyer can be transferred. To the extent permitted by applicable Law, each Seller shall, consistent with applicable Law, execute a power of attorney authorizing Buyer to operate using such Seller's Permits and to execute and file, at Buyer's sole cost and expense, any documents or instruments (including fictitious name consents, which shall be withdrawn as soon as Buyer obtains its own Permits), required in order to permit Buyer to lawfully operate under such Seller's Permits in accordance with the foregoing, and with respect to Liquor, with the consent of any Governmental Authority required. Buyer shall indemnify and hold Sellers harmless for any Liability arising out of, related to, or resulting from any of the foregoing, including the granting of the power of attorney, other than to the extent arising out of Sellers' fraud or willful misconduct.

Section 5.2     Conduct of the Business Pending each Closing.

(a)     The Parties acknowledge that Sellers are operating the Stores in the context of the Bankruptcy Cases, and that Sellers shall use their commercially reasonable efforts to maintain the Stores, their condition, the Acquired Assets and the Store employees in the current condition to the extent possible. Subject to the foregoing, except (i) as set forth on Section 5.2(a) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), each Seller shall (A) conduct the Business only in the Ordinary Course of Business and (B) use its commercially reasonable efforts to (1) preserve the present business operations, organization and goodwill of the Business and (2) preserve the present relationships with material vendors and suppliers of the Business. Without limiting the generality of the foregoing, each Seller agrees from the date of this Agreement until the applicable Closing to: (I) maintain comparable hours of operation in the Stores except as a result of security concerns or as required by applicable Law; (II) exercise good faith in pricing merchandise in the Stores in the Ordinary Course of Business, including not to increase such prices other than in the Ordinary Course of Business (including as consistent with Sellers' normal pricing strategy) and to maintain ordinary advertising and promotion practices (including reduced price promotions) with respect to the

Business in the Ordinary Course of Business (provided, however, that Sellers may take the actions contemplated by Section 2.6(a) of the Disclosure Schedule with respect to the Excluded Inventory); (III) perform necessary repair and maintenance on Store properties and Furnishings and Equipment in the Ordinary Course of Business and as required by the Leases; (IV) subject to the limitations set forth in Section 5.2(b)(i), use commercially reasonable efforts to maintain at least baseline staff levels at the Stores, including employees and store managers; (V) use commercially reasonable efforts to maintain and preserve the Acquired Assets in their present condition (including by using their commercially reasonable efforts to renew any Permits constituting Acquired Assets that come up for renewal in the Ordinary Course of Business), other than reasonable wear and tear and sales of Inventory in the Ordinary Course of Business; and (VI) except as provided on Section 5.2(a) of the Disclosure Schedule, use commercially reasonable efforts to maintain comparable levels and mix of Inventory, section by section, located on the Store shelves.

(b)      Except (i) as set forth on Section 5.2(b) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), neither Seller shall, solely as it relates to the Business:

(i)      (x) other than in the Ordinary Course of Business or as required by any Affected Labor Agreement or applicable Law, (A) increase the annual level of compensation of any employee of a Store or (B) increase the coverage or benefits with respect to any employee of a Store available under any (or create any new) Employee Benefit Plan, (y) other than as required by any Affected Labor Agreement or applicable Law, grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any employee of a Store or (z) hire any employee or permit to be transferred to any Store any employee of Sellers or any other affiliate of Sellers, other than any hiring or transfer in replacement of an employee terminated for cause, or who otherwise resigned (which replacement employee will not be hired at a base salary or bonus amount greater than the terminated or resigned employee);

(ii)      introduce any material change with respect to the Business, including any material change in the types, nature, composition or quality of Inventory, services or other products, or, other than in the Ordinary Course of Business, make any material change in Inventory or other product specifications or prices or terms of distributions of such Inventory or other products;

(iii)      display any signs or conduct any advertising (including direct mailing, point-of-purchase coupons, or the like) that indicates such Seller is moving its operations to another location or that a Store will close;

(iv)      conduct any "going out of business", "close-out", liquidation or similar sales or promotions at or relating to any Store;

(v)     other than the sale of Inventory in the Ordinary Course of Business, sell, lease (as lessor), transfer (including the transfer from a Store to a non-acquired store), assign, convey or otherwise dispose of, or impose or suffer to be imposed any Lien (except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral) on, any of the Acquired Assets;

(vi)    enter into or renew any material Transferred Contract;

(vii)   other than as may be necessary to separate the Excluded Assets from the Acquired Assets, amend, modify or supplement in a material manner or terminate any Transferred Contract, Permit (constituting an Acquired Asset) or any other Acquired Asset, waive, compromise or grant any release or relinquishment of any material rights or claims under any Transferred Contract, Permit (constituting an Acquired Asset) or any other Acquired Asset or otherwise take any action not required by the terms of any Transferred Contract, Permit (constituting an Acquired Asset) or any other Acquired Asset that would result in any increase in any payments to be made thereunder or that would adversely affect Sellers' rights thereunder or impose additional non-monetary obligations on Sellers;

(viii)  transfer any employees based at any Store on the date hereof (or in anticipation of this Agreement) to other places of business of any Seller or any of their Affiliates; or

(ix)    agree to do anything prohibited by this Section 5.2.

(c)     Sellers shall notify Buyer in writing at least ten (10) Business Days prior to the expiration of any renewal option under any Lease and shall comply with Buyer's written instructions regarding whether to exercise such renewal option.

Section 5.3     Regulatory Approvals.  Prior to the Initial Closing:

(a)     Each of the Parties shall, unless otherwise extended by mutual agreement, not later than July 29, 2015 make to the extent required under Antitrust Laws its respective filing under the HSR Act with respect to the transactions contemplated hereby.  In addition, the Parties shall mutually agree to make any and all other filings required pursuant to other Antitrust Laws as promptly as reasonably practicable following the date hereof.  Further, subject to the terms and conditions of Section 5.3(c), Buyer and Seller shall each use its reasonable best efforts to, as promptly as reasonably practicable, (i) supply any additional information and documentary material that reasonably may be requested or required pursuant to any Antitrust Law, including the HSR Act and (ii) cause the expiration or termination of any applicable waiting periods under the HSR Act or any other Antitrust Law.  Immediately prior to the end of the initial fifteen (15) day HSR waiting period, Buyer shall pull and refile its filing under the HSR Act so as to re-start the Federal Trade Commission's initial waiting period, unless (x) staff of the Federal Trade Commission notifies the Parties during the initial fifteen (15) day waiting period that it will allow the applicable HSR waiting period to expire without the need for issuance of Requests for

Additional Information and Documentary Material ("Second Requests") or (y) the Parties agree that Buyer shall not pull and refile its filing under the HSR Act. The Buyer shall not, without prior written consent from Sellers, pull and refile its HSR filing more than one (1) time.

(b)     In connection with seeking to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under any Antitrust Law, the Parties shall use their reasonable best efforts to (i) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) as promptly as reasonably practicable after the date hereof, jointly contact and meet with the staff of the Federal Trade Commission regarding the transactions contemplated hereby; (iii) keep each other informed in all material respects of any material communication received from, or given to, any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby; and (iv) permit the other Party to review any material communication given to it, and consult with the other Party in advance of any meeting or conference with, any Governmental Authority, including in connection with any proceeding by a private party, and, unless prohibited by an applicable Governmental Authority, provide the opportunity to attend or participate in such meeting, conference, or proceeding. The foregoing obligations in this Section 5.3(b) shall be subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege. The Parties expect their outside counsel to enter into a written joint defense agreement or common interest agreement to facilitate the exchange of such privileged materials without waiving any such privilege. Notwithstanding anything to the contrary in this Section 5.3(b) or in this Agreement, however, Sellers shall be permitted to communicate privately with any Governmental Authority regarding Sellers' financial condition and matters relating to competing bidders for Sellers' Stores, and Buyer and Buyer's outside counsel shall not have the right to attend or participate in such meetings, conferences, or proceedings, and shall not have access to material prepared by Sellers relating to such matters.

(c)     Buyer shall have the right not to acquire any or all of the Stores if, and only if, (i) any Governmental Authority with jurisdiction over the enforcement of any Antitrust Law, including the Federal Trade Commission, including its staff, or any state attorney general, (A) indicates in writing that it has recommended or made the determination to issue Second Requests or similar subpoenas to further investigate whether the acquisition of such Store(s) may violate any Antitrust Law (a "Second Request Recommendation") or (B) issues a Second Request or similar subpoena seeking information concerning such Store(s), or (ii) if any suit is threatened or instituted by any Governmental Authority or private party challenging the acquisition of any such Store(s) as violative of any Antitrust Law. In the event that, subject to the limitations set forth herein, Buyer chooses to preserve its right not to acquire any Store(s), Buyer shall notify Sellers in writing and identify any such Store(s) (the "Potentially Excluded Stores") by no later than August 31, 2015. In the event that Buyer chooses to exercise its right not to acquire any Potentially Excluded Stores, Buyer shall notify Sellers and identify any such Store(s) in writing by September 11, 2015 (the "Store Withdrawal Deadline"), and (1) Buyer shall have no further right to acquire such Store(s) and (2) such Stores shall be added to the list of Separable Stores; provided, however, that Buyer may continue to advocate with any Governmental Authority with jurisdiction over the enforcement of any Antitrust Law to seek to resolve any objections or challenges that such Governmental Authority may have to Buyer's

potential acquisition of any such Store(s).  Further, for any Store(s) Buyer elects not to acquire pursuant to this Section 5.3(c), the Purchase Price shall be reduced by the amount of the Purchase Price allocated to such Store(s) and the related Acquired Assets located thereat as set forth on Section 5.3(c) of the Disclosure Schedule (the "Allocated Amount").  For the avoidance of doubt, except as provided in Section 5.3(d), if there is a Second Request Recommendation, Second Request or similar subpoena as set forth above, or if any suit is threatened or instituted by any Governmental Authority or private party challenging the acquisition of any such Store(s) as violative of any Antitrust Law, neither Buyer nor its Affiliates shall have any obligation to (i) seek to resolve such objections or challenges as such Governmental Authority or private party may have to such transactions, including to vacate, lift, reverse, or overturn any order, whether temporary, preliminary, or permanent, so as to permit consummation of the transactions contemplated by this Agreement, (ii) respond to or otherwise resolve any Second Requests or similar subpoenas received from any Governmental Authority or any other Person in connection with the transactions contemplated by this Agreement, (iii) prosecute or otherwise pursue any Litigation under any Antitrust Law seeking clearance or approval of the transactions contemplated by this Agreement, or (iv) offer, negotiate or agree to, by consent decree, hold separate order or otherwise, any sale, divestiture, license, or other disposition of or restriction on, any of Sellers' or Buyer's respective assets (including the Acquired Assets), Stores, or interests therein, so as to permit consummation of the transactions contemplated by this Agreement.

(d)  Notwithstanding any other provision in this Agreement, with respect to any Stores that Buyer has not withdrawn pursuant to its rights under Section 5.3(c) on or before the Store Withdrawal Deadline, Buyer shall, and shall cause its Affiliates to, promptly take and diligently pursue any or all other actions to the extent necessary to eliminate each and every impediment under any Antitrust Law that may be asserted by any Governmental Authority or any other Person in opposition to the consummation of any transaction contemplated hereby, so as to enable the Parties to consummate the transactions contemplated by this Agreement as soon as reasonably practicable, but in any event not later than the Outside Date, including, without limitation, by offering, negotiating, effecting, and agreeing to, by consent decree, hold separate order or otherwise, any sale, divestiture, license, or other disposition of or restriction on, any of Sellers' or Buyer's respective assets (including the Acquired Assets), Stores, or interests therein; provided, however, that any such sale, divestiture, license, disposition, restriction on, holding separate, or other similar arrangement or action is conditioned on the occurrence of, and shall become effective only from and after, the applicable Closing Date.

(e)  Actions or agreements required of Buyer pursuant to this Section 5.3 shall under no circumstances be considered a Material Adverse Effect.

Section 5.4  Bankruptcy Court Matters.

(a)  Approval of Break-Up Fee and Expense Reimbursement.  In the event that a Competing Bid is consummated (except for a Competing Bid solely with respect to a Separable Store), in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay Buyer, in accordance with the terms hereof (including Article VIII) and the Bidding Procedures Order, a break-up fee in an amount equal to (i) one and a half percent (1.5%) of the Cash Purchase Price as may be reduced to account for any reductions

pursuant to Section 5.3 and Section 8.3 (the "Break-Up Fee"), *plus* (ii) up to $4,500,000 of the actual, reasonable and documented expenses of Buyer incurred in connection with Buyer's purchase of IT equipment required to consummate the transactions contemplated by this Agreement (such expense reimbursement, together with the Break-Up Fee, the "Termination Payment") by wire transfer of immediately available funds to the account specified by Buyer to Sellers in writing. The Termination Payment shall be paid on the first Business Day following the date of consummation of a Competing Bid (except for a Competing Bid solely with respect to a Separable Store) from the proceeds of such Competing Bid if no material breach by Buyer of this Agreement has occurred. Nothing in this Section 5.4 shall relieve Buyer or Sellers of any Liability for a breach of this Agreement prior to the date of termination; provided, that except in the case of fraud or willful misconduct, Buyer's Liability hereunder for any and all such breaches shall be capped as provided for under Section 8.2. Except as set forth in the immediately preceding sentence, upon payment of the Termination Payment to Buyer solely as a result of the consummation of a Competing Bid in accordance with the terms of this Agreement, Sellers and their respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Sellers, their Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses. Buyer acknowledges and agrees that, except in the case of fraud or willful misconduct, payment and delivery of the Termination Payment pursuant to this Section 5.4(a) will constitute liquidated damages and be the sole and exclusive remedy of Buyer and its Representatives and Affiliates, whether at Law or in equity, and upon the payment and delivery thereof to Buyer, Buyer and its Representatives and Affiliates will be deemed to have fully released and discharged Sellers and their respective Representatives and Affiliates from any Liability resulting from the termination of this Agreement.

(b) No Solicitation. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher and/or better competing bids in respect of all of the Acquired Assets (any such competing bid, a "Competing Bid"). From the date hereof until the entry of the Bidding Procedures Order, (i) Sellers shall, and shall instruct and direct their Representatives to, immediately cease and terminate any ongoing solicitation, discussions and negotiations with respect to any Competing Bid and (ii) Sellers shall not, and shall not permit or cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, or provide any non-public information to, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any Competing Bid; provided, however, that Sellers and their Representatives shall have the authority to respond to any inquiries or offers to purchase all or any part of the Acquired Assets, including supplying information relating to the Business and the assets of Sellers to prospective purchasers. Following the entry of the Bidding Procedures Order, Sellers may market and pursue a Competing Bid and may perform any and all acts related thereto subject to and in accordance with the Bankruptcy Code, the Bidding Procedures Order and any other applicable Law.

WEIL:\95382886\18\50482.0004

(c)     Bankruptcy Court Filings.

(i)     Subject in all respects to the Bankruptcy Milestones set forth in Section 5.4(e), following the execution of this Agreement and the Petition Date, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order (which shall, among other things, approve and authorize payment of the Termination Payment in accordance with this Section 5.4) and the Sale Order.  Buyer agrees that it will promptly furnish such affidavits or other documents or information for filing with the Bankruptcy Court as are reasonably requested by Sellers to assist Sellers in obtaining entry of the Bidding Procedures Order and Sale Order, including a finding of adequate assurance of future performance by Buyer.  Sellers shall provide Buyer with advance drafts of any motions, pleadings or Bankruptcy Court filings relating to the Bidding Procedures Order, the sale of the Acquired Assets, or the Sale Order as soon as reasonably practicable but in any event no later than two (2) Business Days prior to the date Sellers intend to file such motion, pleading or Bankruptcy Court filing.  Buyer may file or join in any motion, pleading or Bankruptcy Court filing in support or seeking approval of, and reply to any response or objection to, the Bidding Procedures Order (including the bidding procedures set forth therein), the sale of the Acquired Assets hereunder, and the Sale Order.  In the event the entry of the Bidding Procedures Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(ii)     Subject in all respects to the Bankruptcy Milestones set forth in Section 5.4(e), Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the Cure Costs; provided, that subject to Section 5.9, nothing herein shall preclude Sellers from filing such motions, including from and after the Petition Date, to reject any Contracts that are not Transferred Contracts.

(d)     Sale Order.  Subject in all respects to the Bankruptcy Milestones set forth in Section 5.4(e), provided Buyer is selected as the winning bidder in respect of the Acquired Assets at the Auction, Sellers shall seek entry of the Sale Order and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the closing of the Auction in accordance with the terms and conditions hereof, and Sellers shall provide notice of the Sale Order to all Persons necessary to provide Buyer with the benefits and protections set forth in the Sale Order (including notice to all applicable Tax authorities).  Buyer and Sellers understand and agree that the transaction is subject to approval by the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order.  In the event the entry of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(e)     Bankruptcy Milestones.  In addition to the conditions set forth in Section 7.1 and Section 7.3, Buyer's obligations to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or occurrence of the following milestones (collectively, the "Bankruptcy Milestones"):

(i)     on or before forty-five (45) days after the date on which Sellers shall have commenced the Bankruptcy Cases in the Bankruptcy Court (the date of such commencement, the "Petition Date"), the Bankruptcy Court shall have entered the Bidding Procedures Order; and

(ii)    on or before October 15, 2015, the Bankruptcy Court shall have entered the Sale Order.

(f)     Back-Up Bidder.  For the avoidance of doubt, in no event shall Buyer be required to consummate the transactions contemplated hereby or to serve as a back-up bidder if Buyer is not the winning bidder at the Auction, unless Buyer in its sole discretion otherwise agrees.

Section 5.5     Notice of Developments.  Each Seller and Buyer will give prompt written notice to the other Party of (a) the existence of any fact or circumstance, or the occurrence of any action or event, of which it has Knowledge that has caused, or would reasonably be likely to cause, a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be timely satisfied, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement.  Without limiting the foregoing, Sellers shall also give Buyer prompt written notice of any Casualty / Condemnation Event.  The delivery of any notice pursuant to this Section 5.5 shall not have any effect on the representations, warranties, covenants and agreements contained in this Agreement for purposes of determining satisfaction of any condition herein and shall not be deemed to amend or supplement this Agreement.  The failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.6     Access; No Contact.

(a)     Upon the reasonable request of Buyer and to the extent not otherwise prohibited by applicable Law, Sellers will permit Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, books and records, Permits and Transferred Contracts included in the Acquired Assets during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of any Seller;  provided, however, that, for avoidance of doubt, (i) the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto, (ii) any access to Pharmacy Records shall be provided in accordance with HIPAA and any other applicable federal or state privacy or disclosure Laws as determined by each Seller in its reasonable discretion and (iii) Buyer and its Representatives shall not conduct any intrusive sampling or testing of environmental media such as soil or groundwater.  No such access or examination, whether occurring prior to or after the date of this Agreement, shall diminish or obviate any of the representations, warranties, covenants or agreements of Sellers contained in this Agreement or the Related Agreements.  Without limiting the foregoing, from and after the date hereof, Sellers shall reasonably cooperate with Buyer and use their commercially reasonable efforts to provide early access to the Stores to facilitate timely conversion of the Stores, including to provide the materials and take the actions set forth in Section 5.6(a) of the Disclosure Schedule;  provided, that (A) such access shall not interfere

44

unreasonably with the normal business operations of any Seller and (B) Sellers may, at their sole discretion, chaperone any such visits to the Stores prior to the applicable Closing.

(b)     Prior to the applicable Closing, except as set forth in this <u>Section 5.6(b)</u> and <u>Section 8.3(d)</u>, Buyer shall not, and shall cause its Representatives not to, contact any landlords, vendors, suppliers or licensors of any Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller; <u>provided, however</u>, that from and after the date hereof, Buyer shall have the right to pursue Contracts with Sellers' operators relating to In-Store Operations, and in furtherance thereof, Sellers shall (i) upon Buyer's request, provide Buyer with any names of the appropriate contacts necessary to allow Buyer to pursue such Contracts, (ii) not object to Buyer entering into any such Contract and (iii) if necessary, waive any exclusivity provisions in Sellers' Contracts relating thereto.

Section 5.7     <u>Bulk Transfer Laws</u>.     Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws or similar Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.8     <u>Replacement Bonding Requirements</u>.     Buyer shall use commercially reasonable efforts to cause itself or one or more of its Affiliates to provide replacement guarantees, standby letters of credit or other assurances of payment with respect to all Bonding Requirements set forth on Section 3.11(b) and Section 3.13(c) of the Disclosure Schedule, in form and substance reasonably satisfactory to Sellers and any banks or other counterparty thereto and cooperate with Sellers to obtain a release in form and substance reasonably satisfactory to Buyer and Sellers with respect to all such Bonding Requirements. To the extent Buyer is unable to make such arrangements with respect to such Bonding Requirements as of the applicable Closing Date, Buyer shall (a) use commercially reasonable efforts to effect such arrangements as soon as practicable after the applicable Closing Date, but in any event with six (6) months thereof and (b) promptly reimburse and indemnify, defend and hold harmless Sellers with respect to any such Bonding Requirements.

Section 5.9     <u>Assumption and Assignment of Transferred Contracts; Cure Costs</u>.

(a)     Section 5.9 of the Disclosure Schedule contains a list of those Contracts (including leases set forth on Schedule 3.5 and, to the extent in the possession or control of any Seller, all material documents related thereto) that Buyer elects to have assumed and assigned to Buyer on the applicable Closing Date (collectively, the "<u>Transferred Contracts</u>").  At Buyer's reasonable request, Sellers shall make reasonably available to Buyer the appropriate employees of Sellers necessary to discuss the outstanding Contracts to which any Seller or any of its Affiliates is a party that primarily relates to the Business or any Store or any of the other Acquired Assets or is otherwise material to the Business.

(b)     As soon as practicable after entry of the Bidding Procedures Order, Sellers shall file a notice of assumption (the "<u>Assumption Notice</u>") with the Bankruptcy Court and serve such notice via first class mail on each counterparty to a Contract listed thereon. The Assumption Notice shall identify all Contracts of Sellers related to the Acquired Assets that Sellers believe

WEIL:\95382886\18\50482.0004

may be assumed and assigned in connection with the sale of the Acquired Assets and set forth a good faith estimate of the amount of the Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00").

(c)     The Cure Costs necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Transferred Contracts, shall be paid by Sellers, on or before the applicable Closing, and not by Buyer, and Buyer shall have no liability therefor.

(d)     Notwithstanding anything in this Agreement to the contrary, from and after the date hereof through each applicable Closing, Sellers will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, repudiate or disclaim any Contract primarily related to the Acquired Assets without the prior written consent of Buyer.

(e)     Notwithstanding anything in this Agreement to the contrary, Buyer shall have no obligation to purchase, acquire or assume any Contract (or any Liabilities thereunder) if a true and complete copy of such Contract has not been made available by Sellers to Buyer in accordance with Section 3.11.

Section 5.10    Cooperation with Financing.  Prior to the Initial Closing, Sellers shall, and shall direct their respective Representatives to, use their commercially reasonable efforts to provide, at Buyer's sole cost and expense, customary cooperation reasonably requested by Buyer in connection with obtaining financing in connection with the transactions contemplated by this Agreement (the "Financing") (so long as such cooperation does not interfere with the ongoing operations of Sellers or their respective Subsidiaries), including (a) furnishing Buyer the Required Information, (b) providing customary authorization letters for inclusion in the bank information memoranda and rating agency presentations and lender presentations relating to the Financing and (c) using commercially reasonable efforts to cooperate with the Financing Sources' due diligence investigation to the extent customary and reasonable; provided, that in no event shall the Financing Sources' due diligence investigation include intrusive sampling or testing of environmental media such as soil and groundwater at the properties or premises. Anything in this Section 5.10 to the contrary notwithstanding, neither Sellers nor any of their respective Affiliates, nor any of their respective officers or directors (or other Representatives) shall be required (x) to take any action that could reasonably be expected to conflict with or violate any Laws or Sellers' organizational documents or result in the contravention of, or that could reasonably be expected to result in a violation or breach of, or a default under, any Contract to which Sellers or any of their respective Affiliates, nor any of their respective officers or directors is a party, (y) to pay any fees or incur any liability (or take any action that could reasonably be expected to result in or cause any liability (personal or otherwise)) or (z) to execute any documents (other than as provided in clause (b) above) that will be effective prior to the Initial Closing Date.  Buyer shall promptly, upon the written request of Sellers, reimburse Sellers for all reasonable and documented out-of-pocket costs (including reasonable attorneys' fees) incurred by Sellers or any of their respective Subsidiaries or their respective Representatives in connection with any actions taken pursuant this Section 5.10. Buyer acknowledges and agrees that obtaining the Financing is not a condition to the any

Closing and acknowledges its obligation to consummate the Transactions irrespective and independently of the availability of the Financing.

Section 5.11    Ocean City Litigation.  Prior to the Initial Closing, Sellers shall use commercially reasonable efforts (consistent with past practice) to resolve the Litigation referred to in Item 2 of Section 3.6 of the Disclosure Schedule at Sellers' sole cost and expense and shall, upon such resolution, provide Buyer with written evidence thereof.

Section 5.12    Monthly Reporting.  From the date of this Agreement until the Initial Closing, Sellers shall deliver to Buyer (i) monthly profit and loss statements and (ii) weekly sales figures, if, as and when such figures are received by any of the Sellers for any or all of the Stores, immediately after such figures are received.

Section 5.13    Subleases.  Prior to the each applicable Closing for the Stores listed on Section 5.13 of the Disclosure Schedule, the applicable Seller shall, in addition to its other obligations with respect to such Stores as provided in this Agreement, assign to Buyer its interest in the respective Lease (which may be a master lease) for each of such Stores.  Simultaneously therewith and subject to the following, Buyer shall enter into a sublease with the applicable Seller, which sublease shall include all rights of use and occupancy with respect to all other store spaces (other than the Stores) in the respective shopping centers in which the Stores are located, and shall be on terms and conditions reasonably acceptable to the Parties.  The foregoing notwithstanding, if Buyer and the applicable Seller cannot, with respect to any of the Stores, enter into a sublease because of restrictions or prohibitions in the respective Lease or in any subleases in existence as of the date of this Agreement for any store spaces within such shopping centers, or if the Parties fail to reach a mutually acceptable agreement on the terms and conditions of the subleases between Buyer and the applicable Sellers as described herein, then the Parties shall cooperate to establish an alternative solution with respect to the proposed interest of the applicable Sellers with respect to the store spaces as described above.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after any Closing:

Section 6.1    Further Assurances.  In case at any time after any Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

Section 6.2    Access; Enforcement; Record Retention.  From and after any Closing, upon the written request by any Seller, Buyer will permit Sellers and their Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Buyer, to all premises, properties, personnel, books and records, and Contracts of or related to the Acquired Assets or

the Assumed Liabilities for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations of any Seller under this Agreement or any of the Related Agreements, or (c) complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations.  Buyer agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the applicable Closing.

Section 6.3    Treatment of Affected Labor Agreements.    With respect to Covered Employees under an Affected Labor Agreement, Buyer shall engage in good faith negotiations, in coordination with Sellers, to reach mutually satisfactory modifications to the relevant Affected Labor Agreement with each of the Affected Unions and to enter into a Modified Labor Agreement with each of the Affected Unions.  For the avoidance of doubt, such negotiations are not required to be completed prior to any Closing.  For all purposes under this Section 6.3, Buyer acknowledges the requirements of sections 1113 and 1114 of the Bankruptcy Code and agrees to use good faith reasonable best efforts to cooperate with Sellers in ensuring compliance with any applicable provisions thereof.

Section 6.4    Covered Employees.

(a)    Offer of Employment.    As promptly as practicable following the date hereof (and in any event no later than one (1) day following the date of the commencement of the Auction), Sellers shall provide Buyer with a list of all Covered Employees including their current base wage and hourly rate, incentive bonus opportunities, and other material compensation terms.  At least five (5) days prior to the applicable Closing (except in the case of the Initial Closing, one (1) day prior thereto) Buyer shall make an offer of employment, effective as of such date and contingent upon the applicable Closing, to substantially all of the Covered Employees who are then employed by Sellers or their respective Subsidiaries at the Stores to be acquired in such Closing (at the same base wage or hourly rate and on substantially comparable terms and conditions of employment as in effect immediately prior to the Initial Closing, or consistent with the Modified Labor Agreement), subject to a ninety (90) day probationary period for Buyer to evaluate such Covered Employees.  Notwithstanding the foregoing, nothing herein shall be construed as to prevent Buyer from terminating the employment of any Covered Employee, consistent with applicable Law and the Modified Labor Agreements, at any time following the Initial Closing.

(b)    Compensation and Benefits.    Commencing on the applicable Closing Date and continuing through the first anniversary of such Closing Date, Buyer or its Affiliates shall provide or cause to be provided to the Covered Employees who are not union represented compensation and employee benefits that are in the aggregate (including base salary and incentive bonus opportunities) substantially comparable to the compensation and employee benefits provided by Sellers and their Subsidiaries to such Covered Employees immediately prior to such Closing.  With respect to union-represented Covered Employees, Buyer or its Affiliates

WEIL:\95382886\18\50482.0004

agrees to apply to all such Covered Employees the terms and conditions set forth in the Modified Labor Agreements, as they may be modified or further modified from time to time.

(c)　_Service Credit_.　Each Covered Employee shall be given credit for all service with Sellers and their Subsidiaries, and their respective predecessors under any employee benefit plans or arrangements of Buyer and its Affiliates maintained by Buyer or its Affiliates in which such Covered Employees participate following the applicable Closing Date, for purposes of eligibility and vesting (but, except as required by a Modified Labor Agreement, not for entitlement to benefits).　Notwithstanding the foregoing, nothing in this Section 6.4(c) shall be construed to require crediting of service that would result in a duplication of benefits.

(d)　_Waiver of Pre-Existing Conditions_.　No later than the applicable Closing Date, Buyer or its Affiliates shall provide at its own expense for Covered Employees who are not union represented access to Buyer's currently established benefit plans under the terms and conditions of those plans.　Buyer or its Affiliates shall cause the waiver of all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Covered Employees who are not union represented under any such welfare benefit plans to the extent that such conditions, exclusions or waiting periods would not apply under the Employee Benefit Plans.

(e)　_401(k) Plan Rollovers_.　Buyer agrees to cause the Buyer's 401(k) plan to accept a "direct rollover" to Buyer's 401(k) plan of each Covered Employee's account balances (including promissory notes evidencing all outstanding loans, to the extent commercially practicable) under Sellers' 401(k) plans if such rollover is elected in accordance with applicable Law by such Covered Employee.

(f)　_Welfare Benefit Claims; COBRA_.　On the applicable Closing Date, Sellers and their Subsidiaries shall cease to provide welfare coverage to each Covered Employee and his or her covered dependents, and Buyer or its Affiliates shall commence providing such coverage to such individuals. Sellers shall be responsible in accordance with its applicable welfare plans (and the applicable welfare plans of their Subsidiaries) in effect prior to the applicable Closing Date for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, under Sellers' or their Subsidiaries' Employee Benefit Plans that are welfare benefit plans prior to the applicable Closing Date by the Covered Employees and their dependents.　Buyer or its Affiliates shall be responsible in accordance with the applicable welfare plans of Buyer or its Affiliates for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, on or after the applicable Closing Date (or the date of commencement of employment with Buyer, if later) by Covered Employees and their dependents.　For purposes of this Section 6.4(f), a claim shall be deemed to have been incurred as follows: (i) for health, dental and prescription drug benefits, upon provision of such services, and (ii) for life, accidental death and dismemberment and business travel accident insurance benefits, upon the death, disability or accident giving rise to such benefits.　Sellers or their Subsidiaries shall provide coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") under Sellers' or their Subsidiaries' Employee Benefit Plans that are group health plans with respect to qualifying events occurring prior to the applicable Closing Date.　Buyer and its Affiliates shall provide coverage required by COBRA to

Covered Employees and their eligible dependents or beneficiaries under Buyer's group health plans with respect to qualifying events occurring on and after the applicable Closing Date.

(g)     Tax Reporting.  Buyer and Sellers shall adopt the "standard procedure" for preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53.  Under this procedure, Sellers will not be relieved from filing a Form W-2 with respect to any Covered Employees, and Buyer will undertake to file (or cause to be filed) a Form W-2 for each such Covered Employee only with respect to the portion of the year during which such Covered Employees are employed by Buyer that includes the applicable Closing Date, excluding the portion of such year that such Covered Employee was employed by Sellers.  Buyer and Sellers shall also adopt the "standard procedure" of Revenue Procedure 2004-53 for purposes of Internal Revenue Service Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate).

(h)     No Third Party Beneficiary Rights.  The Parties agree that nothing in this Section 6.4, whether express or implied, is intended to create any third party beneficiary rights in any Covered Employee.

(i)     Cooperation.  After the applicable Closing Date, Buyer shall, and shall cause its Affiliates to, cooperate with Sellers to provide such current information regarding the Covered Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Covered Employees under any applicable employee benefit that continues to be maintained by A&P or its Affiliates.  Buyer shall, and shall cause its Affiliates to, permit Covered Employees to provide such assistance to A&P as may be required in respect of claims against A&P or its Affiliates, whether asserted or threatened, to the extent that, in A&P's opinion, (i) a Covered Employee has knowledge of relevant facts or issues, or (ii) a Covered Employee's assistance is reasonably necessary in respect of any such claim.

(j)     Access to Employees.  From and after the date of the Auction, Buyer and/or its Representatives may meet and otherwise communicate with employees of Sellers at each of the Stores, upon prior written notice to Sellers (in a manner so as not to interfere unreasonably with the normal business operations of any Seller) in order to discuss the impact of the pending transaction and Buyer's intentions with respect to Sellers' employees at the Stores in the event Buyer is successful in acquiring any or all of the Stores, and to interview and offer employment pursuant to the terms of this Section 6.4 to Sellers' employees at the Stores.  Sellers may elect to have Representatives present during such communications, and Buyer shall provide Sellers with copies of written communications to such employees at least at least two (2) Business Days prior to distribution thereof to such employees; Buyer shall consider any comments from Sellers in good faith.  Notwithstanding the foregoing, (i) commencing not later than July 27, 2015, Buyer shall be permitted to introduce itself to the employees of the Stores at in-person meetings, and attend additional in-person meetings with employees of the Stores following the initial meetings, in each case, in the presence of Representatives of the Sellers at such locations and times as Buyer may reasonably request and (ii) Buyer and Sellers shall cooperate in good faith in developing and implementing an employee communication plan pursuant to which one or more written communications about the Buyer, the transactions contemplated hereby and Buyer's plans or intentions with respect to the future operation of the

stores will, from time to time, be distributed to employees and pursuant to which meetings of Buyer with employees of the Stores may be scheduled. Notwithstanding anything to the contrary in this Section 6.4, prior to the entry of the Sale Order, Buyer shall not engage in any solicited communication with any employees of the Stores without Sellers' prior consent (not to be unreasonably withheld), it being understood that Sellers shall not be required to be present for any interviews, and the Parties acknowledge and agree to reasonably cooperate with each other with respect to such communication.

Section 6.5    Certain Tax Matters.

(a)    Transfer Taxes.  All stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated hereby (a "Transfer Tax") shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand.  The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes shall prepare and timely file such Tax Returns; provided, however, that the other Parties shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by such preparing Party, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to the other Parties' approval, which shall not be unreasonably withheld, delayed, or conditioned. The Parties hereto shall cooperate to permit the filing party to prepare and timely file any such Tax Returns and shall provide each other with any applicable exemption certificates.

(b)    Tax Adjustments.  Property and ad valorem Taxes (other than Transfer Taxes) imposed upon or assessed directly against the portion of the Acquired Assets acquired in respect of the applicable Closing (including real estate Taxes, personal property Taxes and similar Taxes) for the Tax period in which such Closing occurs (the "Proration Period") will be apportioned and prorated between Sellers and Buyer as of the applicable Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of such Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the applicable Closing Date, and Sellers shall bear the remaining portion of such Taxes; and any refunds of such Taxes for the Tax period in which the applicable Closing occurs shall be apportioned in a like manner.  If the precise amount of any such Tax cannot be ascertained on the applicable Closing Date, apportionment and proration shall be computed as of the applicable Closing Date on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and such apportionment and proration shall be deemed final, regardless of the actual amount of any such Tax (or refund thereof) as the same may be determined thereafter.  As of the applicable Closing Date, if Sellers have paid more than their allocated portion of such Taxes prior to the applicable Closing, Buyer shall pay to Sellers an amount equal to such excess; and if Sellers have paid less than their allocated portion of such Taxes prior to the applicable Closing, Sellers shall pay to Buyer an amount equal to such deficiency.

Section 6.6    Insurance Matters.  Buyer acknowledges that, upon the applicable Closing, all insurance coverage provided in relation to Sellers, the Stores, or the Acquired Assets transferred in such Closing that is maintained by any Seller or its Affiliates (whether such

policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer, the Stores, or the Acquired Assets transferred in such Closing and no further coverage shall be available to Buyer, the Stores, or such Acquired Assets under any such policies.

Section 6.7    Acknowledgements.

(a)    Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics.  Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; and (iii) neither Buyer nor any other Person shall have any claim against any Seller or any of its respective directors, officers, Affiliates, agents, or other Representatives with respect thereto.  Accordingly, without limiting the generality of Section 9.1, Buyer acknowledges that no Seller nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information.

(b)    Buyer acknowledges that, except for the representations and warranties expressly set forth in Article III and in the certificate delivered to Buyer pursuant to Section 2.5(a)(ii)(D), Section 2.5(b)(ii)(D) and Section 2.5(c)(ii)(D) (which representations and warranties shall terminate and be of no further force or effect as of the applicable Closing), no Seller nor any other Person makes any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding either Seller, the Stores, any Acquired Assets, any Assumed Liabilities or any other matter, and neither Seller nor any other Person will be subject to any Liability to Buyer or any other Person resulting from such matters or the distribution to Buyer, or the use of, any such information.  Buyer acknowledges that, should a Closing occur, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities in an "as is" condition and on a "where is" basis, without any representation or warranty of any kind, express or implied (including any with respect to environmental, health or safety matters), including any implied warranty of merchantability or fitness for a particular purpose.  Without limiting any representation, warranty, or covenant of any Seller expressly set forth herein, Buyer acknowledges that it has waived and hereby waives as a condition to each Closing any further due diligence reviews, inspections, or examinations with respect to any Seller, the Stores, the Acquired Assets, the Assumed Liabilities, or any other matter, including with respect to engineering, environmental, title, survey, financial, operational, regulatory, and legal compliance matters.

Section 6.8    Press Releases and Public Announcements.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Party, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court.  If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Party prior notice of, and an opportunity to comment on, the proposed disclosure.  The Parties acknowledge that Sellers shall

file this Agreement with the Bankruptcy Court in connection with obtaining the Bidding Procedures Order and/or Sale Order.

Section 6.9 <u>Seller Marks</u>. The Seller Marks may appear on some of the Acquired Assets, including on signage. Buyer acknowledges and agrees that it does not have and, upon consummation of the transactions contemplated by this Agreement, will not have, any right, title, interest, license, or other right to use the Seller Marks; <u>provided</u>, <u>however</u>, that Buyer shall be entitled, for a period of three (3) weeks following the applicable Closing, to sell all items included in the Inventory notwithstanding that such items may be labeled with Sellers' or Sellers' Affiliates' trademark or similar intangible. Subject to the immediately preceding sentence, Buyer shall, as soon as reasonably practicable but in no event later than fifteen (15) Business Days after the applicable Closing Date, remove the Seller Marks from, or cover or conceal the Seller Marks on, any Acquired Assets, or otherwise refrain from the use and display of the Acquired Assets on which the Seller Marks are affixed.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1 <u>Conditions to Buyer's Obligations to Effect the Initial Closing</u>. Buyer's obligation to consummate the transactions contemplated hereby in connection with the Initial Closing is subject to satisfaction or waiver of the following conditions:

(a) the representations and warranties set forth in <u>Article III</u> shall have been true and correct on the date hereof and as of the Initial Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

(b) Sellers shall have performed and complied with its covenants and agreements hereunder through the Initial Closing in all material respects;

(c) the Bankruptcy Court (i) shall have entered the Bidding Procedures Order, the Sale Order, and any other order necessary to close the sale of the Acquired Assets, (ii) no order staying, reversing, modifying or amending such orders shall be in effect on the Initial Closing Date, and (iii) the Sale Order shall not be subject to any challenge that challenges Buyer's good faith under section 363(m) of the Bankruptcy Code;

(d) all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(e) no Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement;

(f) each delivery contemplated by <u>Section 2.5(a)(ii)</u> to be delivered to Buyer shall have been delivered; and

(g)     Sellers shall have complied with sections 1113 and 1114 of the Bankruptcy Code.

For the avoidance of doubt, Buyer shall have the right to waive any of the conditions set forth in this Section 7.1 (including Section 7.1(c)) in its sole and absolute discretion.

Section 7.2     Conditions to Sellers' Obligations to Effect the Initial Closing. Sellers' obligations to consummate the transactions contemplated hereby in connection with the Initial Closing are subject to satisfaction or waiver of the following conditions:

(a)     the representations and warranties set forth in Article IV shall have been true and correct on the date hereof and as of the Initial Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date) except for any failures to be so true and correct that would not, individually or in the aggregate, prevent or materially impair or materially delay Buyer's ability to consummate the transactions contemplated hereby;

(b)     Buyer shall have performed and complied with its covenants and agreements hereunder through the Initial Closing in all material respects;

(c)     the Bankruptcy Court shall have entered (i) the Bidding Procedures Order, (ii) the Sale Order, and (iii) any other order necessary to close the sale of the Acquired Assets, and no order staying, reversing, modifying or amending such orders shall be in effect on the Initial Closing Date;

(d)     all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(e)     no Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement;

(f)     the payment contemplated by Section 2.5(a)(i)(A) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(a)(i) to be delivered to Sellers shall have been delivered; and

(g)     Sellers shall have complied with sections 1113 and 1114 of the Bankruptcy Code.

For the avoidance of doubt, Sellers shall have the right to waive any of the conditions set forth in this Section 7.2 (including Section 7.2(c)) in their sole and absolute discretion.

Section 7.3     Conditions to Buyer's Obligations to Effect each Subsequent Closing. Buyer's obligation to consummate the transactions contemplated hereby in connection with each Closing following the Initial Closing is subject to satisfaction or waiver of the following conditions:

(a)     the representations and warranties set forth in Article III shall have been true and correct on the date hereof and as of the applicable Closing (except to the extent

expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder with respect to the Acquired Assets and Stores subject to the applicable Closing through the applicable Closing Date in all material respects;

(c)    no Decree shall be in effect that prohibits consummation of the applicable Closing; and

(d)    each delivery contemplated by Section 2.5(b)(ii) or Section 2.5(c)(ii) (as the case may be) to be delivered to Buyer shall have been delivered; and

(e)    (i) no order staying, reversing, modifying or amending the Sale Order shall be in effect on the date of the applicable subsequent Closing and (ii) the Sale Order shall not be subject to any challenge that challenges Buyer's good faith under section 363(m) of the Bankruptcy Code.

For the avoidance of doubt, Buyer shall have the right to waive any of the conditions set forth in this Section 7.3 in its sole and absolute discretion.

Section 7.4    Conditions to Sellers' Obligations to Effect each Subsequent Closing. Sellers' obligations to consummate the transactions contemplated hereby in connection with each Closing following the Initial Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article IV shall have been true and correct on the date hereof and as of the applicable Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date) except for any failures to be so true and correct that would not, individually or in the aggregate, prevent or materially impair or materially delay Buyer's ability to consummate the transactions contemplated hereby;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder with respect to the Acquired Assets and Stores subject to the applicable Closing through the applicable Closing Date in all material respects;

(c)    no Decree shall be in effect that prohibits consummation of the applicable Closing; and

(d)    the payment (if any) contemplated by Section 2.5(c)(iii) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(b)(i) or Section 2.5(c)(i) (as the case may be) to be delivered to Sellers shall have been delivered.

For the avoidance of doubt, Sellers shall have the right to waive any of the conditions set forth in this Section 7.4 in their sole and absolute discretion.

WEIL:\95382886\18\50482.0004

Section 7.5    No Frustration of Closing Conditions.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1, Section 7.2, Section 7.3 or Section 7.4 as the case may be, to be satisfied if such failure was primarily caused by such Party's failure to perform its obligations hereunder.

# ARTICLE VIII
# TERMINATION RIGHTS

Section 8.1    Termination of Agreement.    The Parties may terminate this Agreement at any time prior to the Initial Closing (or, if set forth below, prior to any subsequent Closings not yet occurred) as provided below:

(a)    by the mutual written consent of the Parties;

(b)    by any Party by giving written notice to the other Parties if:

(i)    any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to a Party if the failure to consummate the Initial Closing because of such action by a Governmental Authority shall be due to the failure of such Party to have fulfilled any of its obligations under this Agreement; or

(ii)    the Initial Closing shall not have occurred prior to October 31, 2015 (the "Outside Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(b)(ii);

(c)    only if (i)  the Auction has commenced on or before September 25, 2015 and (ii) the Bankruptcy Court has entered the Sale Order on or before October 15, 2015, by any Seller if the final Closing has not occurred prior to December 31, 2015; provided, however, that if the final Closing shall not have occurred on or before December 31, 2015 due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(c);

(d)    by Buyer by giving written notice to each Seller if (i) the representation and warranty of Sellers set forth in Section 3.17 is not true and correct on the date hereof in all respects, (ii) there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at the Initial Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach or unsatisfied condition has not been waived by Buyer, or, if such breach or unsatisfied

condition is curable (including any payment default), cured by such Seller prior to the earlier to occur of (A) ten (10) days after receipt of Buyer's notice of intent to terminate and (B) the Outside Date or (iii) Sellers fail to satisfy any of the Bankruptcy Milestones set forth in Section 5.4(e) by the date applicable to each such Bankruptcy Milestone;

(e)     by any Seller by giving written notice to Buyer and the other Sellers if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at the Initial Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by such Seller, or, if such breach is curable (including any payment default), cured by Buyer prior to the earlier to occur of (A) ten (10) days after receipt of such Seller's notice of intent to terminate or (B) the Outside Date;

(f)     by any Seller in the event that the Initial Escrow Amount is not deposited by Buyer within two (2) Business Days following the date hereof;

(g)     in the event that Buyer is not the winning bidder at the Auction, by Buyer by giving written notice to each Seller at any time after the conclusion of the Auction;

(h)     by Buyer by giving written notice to each Seller if the Bankruptcy Court denies that portion of the bidding procedures motion with respect to the Termination Payment, in whole or in part;

(i)     by Buyer by giving written notice to each Seller if (i) the Bankruptcy Cases are converted to cases under chapter 7 of the Bankruptcy Code prior to the Initial Closing or (ii) the Bankruptcy Cases are dismissed;

(j)     by Sellers or Buyer by giving written notice to the other Party, if (i) (x) any Sellers enter into a definitive agreement with respect to a Competing Bid (except for a Competing Bid solely with respect to a Separable Store), (y) the Bankruptcy Court enters an order approving a Competing Bid (except for a Competing Bid solely with respect to a Separable Store) and (z) the Person making the Competing Bid (except for a Competing Bid solely with respect to a Separable Store) consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement, subject to Buyer's right to payment of the Termination Payment, if applicable, in accordance with the provisions of Section 5.4;

(k)     with respect to each Closing following the Initial Closing, by Buyer by giving written notice to each Seller if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at the Initial Closing set forth in Section 7.3(a) and Section 7.3(b), and such breach or unsatisfied condition has not been waived by Buyer, or, if such breach or unsatisfied condition is curable (including any payment default), cured by such Seller prior to ten (10) days after receipt of Buyer's notice of intent to terminate;

(l)     with respect to each Closing following the Initial Closing, by any Seller by giving written notice to Buyer and each other Seller if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented

the satisfaction of the conditions to the obligations of Sellers at such Closing set forth in Section 7.4(a) and Section 7.4(b), and such breach has not been waived by such Seller, or, if such breach is curable (including any payment default), cured by Buyer prior to ten (10) days after receipt of such Seller's notice of intent to terminate; or

(m)     with respect to each Closing following the Initial Closing, by Sellers or Buyer by giving written notice to the other Party if any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting such Closing and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(m) shall not be available to a Party if the failure to consummate such Closing because of such action by a Governmental Authority shall be due to the failure of such Party to have fulfilled any of its obligations under this Agreement.

Section 8.2     Effect of Termination.  If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 2.3(d)(i)-(iv), Section 5.4(a), Section 6.7, Article IX, and this Section 8.2 (and the definitions of all defined terms appearing in the foregoing sections) shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 5.4(a)) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from any liability or damages (which the Parties agree shall be determined by the courts referred to in Section 9.9 and, to the extent proven, shall not necessarily be limited to reimbursement of expenses or out of pocket costs) for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, that, upon entry of the Bidding Procedures Order and the Bankruptcy Court's approval of Buyer as the stalking horse purchaser of the Acquired Assets, any such damages caused to Buyer shall be treated as an administrative expense claim against each Seller's bankruptcy estate pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code and payable by each Seller from its bankruptcy estate.  Notwithstanding anything in this Agreement to the contrary, except in the event of fraud, willful misconduct or claims under Section 5.1(b), (a) the maximum liability of Sellers under this Agreement shall not exceed ten percent (10%) of the Cash Purchase Price and (b) the maximum liability of Buyer under this Agreement shall not exceed (i) prior to the Initial Closing, the amount of the Buyer Termination Payment, (ii) during the period from and after the Initial Closing until October 31, 2015, twenty-five percent (25%) of the Cash Purchase Price, and (iii) during the Final Closing Period, an amount equal to the Subsequent Escrow Funds.

Section 8.3     Termination and Adjustment Rights of Buyer as to Stores and Related Acquired Assets.

(a)     If a material portion of the Acquired Assets relating to any Store is materially damaged or destroyed, or the physical condition thereof is materially and adversely changed (including as a result of environmental contamination that occurs from and after the date hereof), or any Stores or any part thereof, or any property reasonably necessary for the operation of any Store as conducted on the date hereof (the absence of which would have an adverse impact on such Store in any material respect), in each case is subject to a condemnation or other

taking of a material portion thereof (each of the foregoing, a "Casualty / Condemnation Event") at any time from the date of this Agreement up to and including the final Closing Date, such that (i) restoration of such Store to substantially the same condition prior to such Casualty / Condemnation Event would take nine (9) months or longer, (ii) in the case of a condemnation, to the extent such Store or property cannot be substantially restored to the condition prior to such condemnation, (iii) the applicable landlord shall have the right to terminate the Lease with respect to such Store or (iv) any applicable landlord or lender is entitled to receive the awards or proceeds otherwise attributable to the leasehold interest (and is not required to make such award or proceeds available for purposes of restoration and repair) (each, a "Material Casualty"), Buyer shall elect to either (A) take possession of such Store at the applicable Closing and close on such Store and, at Buyer's option, either (1) the Purchase Price with respect to such Store and the related Acquired Assets shall be reduced by an amount mutually agreed upon by Sellers and Buyer or (2) Sellers shall assign to Buyer any right Sellers have to any insurance proceeds or condemnation award or proceeds relating to such Casualty / Condemnation Event at applicable Closing less any amounts used by Sellers for restoration and repair (it being understood that no adjustment of the Purchase Price shall occur as a result thereof except as set forth in Section 8.3), or (B) treat such Store and related Acquired Assets as an Excluded Asset, in which case the Purchase Price shall be reduced by the Allocated Amount with respect to such Store and the related Acquired Assets located thereat. Notwithstanding the foregoing, a Material Casualty which occurs solely as a result of clause (iv) in this Section 8.3(a) shall no longer be a Material Casualty if Sellers agree to pay to Buyer an amount equal to the proceeds or awards applicable to the leasehold which the applicable landlord or lender does not otherwise make available for restoration and repair of the applicable Store.

(b)     In the case of a casualty or condemnation other than a Material Casualty, (i) Sellers may elect to restore such Store but shall have no obligation to do so, and (ii) Sellers shall, at the applicable Closing, assign to Buyer all awards or other proceeds for such taking by eminent domain or condemnation or the right to receive proceeds of any insurance for such damage or destruction.

(c)     In connection with any assignment of awards, proceeds or insurance under this Section 8.3, (i) the portion of the Purchase Price allocated to the applicable Store under the Closing Schedule shall be reduced by an amount equal to the applicable deductible or self-insured retention amount under Sellers' insurance (provided, that such reduction shall not exceed the amount by which the cost, as of the applicable Closing Date, to repair the damage is greater than the amount of insurance proceeds assigned to Buyer), (ii) such assignment of proceeds or awards shall not include any awards, proceeds or insurance to the extent attributable to lost rents or similar costs applicable to any period prior to the applicable Closing, and (iii) such assignment of proceeds or awards shall be reduced by the amount of (x) all actual and documented, out-of-pocket repair costs incurred by Sellers in connection with such damage or destruction, (y) all actual and documented, out-of-pocket collection costs of Sellers respecting any awards or other proceeds, and (z) any amounts required to be paid (and solely to the extent actually paid) by Sellers or the insurance company to the applicable landlord under the applicable Lease or to such landlord's lender as required pursuant to any of such lender's financing, as applicable.

(d)     With respect to each Store set forth on Section 8.3(d) of the Disclosure Schedule, Buyer shall have the right to contact the landlords with respect to such Stores on a

confidential basis in accordance with this Section 8.3(d), and in furtherance thereof, Sellers shall promptly (and in any event no later than one (1) Business Day following the date hereof) provide Buyer with the contact information for each such landlord. In the event that Buyer is unable to reach an agreement with the landlord of the applicable Store with respect to the matters set forth on Section 8.3(d) of the Disclosure Schedule on terms satisfactory to Buyer in its sole discretion (provided, that Buyer shall negotiate in good faith with each applicable landlord) by August 31, 2015 (or such longer period as may be agreed by Sellers), then Buyer may elect, by delivering written notice to Sellers by the Store Withdrawal Deadline, to treat the applicable Store and the related Acquired Assets as Excluded Assets, in which case the Purchase Price shall be reduced by the Allocated Amount with respect to such Store and the related Acquired Assets located thereat; provided, that in the event Buyer fails to deliver such notice in accordance with this Section 8.3(d), then the applicable Store and the related Acquired Assets shall be deemed to be Excluded Assets and the Purchase Price shall be reduced in accordance with the foregoing. Any Stores that are treated as Excluded Assets in accordance with this Section 8.3(d) shall be added to the list of Separable Stores.

(e)     Buyer shall have the right to treat a Store and related Acquired Assets as an Excluded Asset, in which case the Purchase Price shall be reduced by the Allocated Amount with respect to such Store and the related Acquired Assets located thereat, if any Consent from any Person (other than a Governmental Authority) has not been obtained from such Person or has not otherwise been provided for pursuant to the Sale Order, the absence of which prevents the acquisition of a material portion of the Acquired Assets relating to any Store being acquired at the applicable Closing or would otherwise affect the value of, or the current occupancy or use of, the Acquired Assets relating to any Store being acquired at such Closing; provided, that if the failure to obtain such Consent is curable, Sellers shall have ten (10) days after receipt of Buyer's notice of intent to terminate to obtain such Consent.

(f)     Buyer may exercise its right to terminate this Agreement with respect to any Store (and the related Acquired Assets and Assumed Liabilities) as provided in this Section 8.3 by giving written notice thereof from time to time to Sellers in the manner required under Section 9.7 specifying the terminated Store and the basis for its termination in reasonable detail.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1     Survival.  Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the applicable Closing (including any covenants to be performed in connection with any subsequent Closing), none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(a)(i)(E), Section 2.5(a)(ii)(D), Section 2.5(b)(i)(E), Section 2.5(b)(ii)(D), Section 2.5(c)(i)(D) or Section 2.5(c)(ii)(D) shall survive, and each of the same shall terminate and be of no further force or effect as of, the final Closing.

Section 9.2     Expenses.  Except as otherwise expressly set forth herein (including Section 2.6(a), Section 2.7 and Section 6.5(a)), each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby,

including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.

        Section 9.3    <u>Entire Agreement</u>. This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

        Section 9.4    <u>Incorporation of Exhibits and Disclosure Schedule</u>. The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

        Section 9.5    <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.5</u> except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof. Notwithstanding anything to the contrary in this Agreement, this sentence of this <u>Section 9.5</u>, <u>Section 9.8</u>, the last sentence of <u>Section 9.13</u>, and <u>Section 9.14</u> may not be amended, modified, waived or terminated in a manner adverse in any respect to the Financing Sources without the prior written consent of the Financing Sources, such consent not to be unreasonably withheld, conditioned or delayed.

        Section 9.6    <u>Succession and Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that Buyer may assign this Agreement and any or all rights or obligations hereunder (including Buyer's rights to purchase the Acquired Assets and assume the Assumed Liabilities) to any Affiliate of Buyer; <u>provided</u>, that any such assignment shall not relieve Buyer of its obligations under this Agreement. Upon any such permitted assignment, the references in this Agreement to Buyer shall also apply to any such assignee unless the context otherwise requires.

        Section 9.7    <u>Notices</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by

reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller:      The Great Atlantic and Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention: Christopher W. McGarry
                Matthew Bennett
E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Sellers) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C. and Gavin Westerman
Facsimile: (212) 310-8007
E-mail: ray.schrock@weil.com; gavin.westerman@weil.com

If to Buyer:      Acme Markets, Inc.
c/o New Albertson's, Inc.
250 East Parkcenter Boulevard
Boise, Idaho 83706
Attention: Legal Department
Facsimile: (208) 395-6575
E-mail:   Justin.Ewing@albertsons.com
          Todd.Williams@albertsons.com
With a copy (which shall not constitute notice to Buyer) to:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attention: Gregory Bray
E-mail: GBray@milbank.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this <u>Section 9.7</u>.

Section 9.8    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    Submission to Jurisdiction; Service of Process.  Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court; provided, however, that if the Bankruptcy Cases have not been commenced, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such Litigation.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.7; provided, however, that nothing in this Section 9.9 shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    Waiver of Jury Trial.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    Specific Performance.  Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Buyer or Sellers may have under law or equity, either Party shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement by the other Party and to enforce specifically this Agreement and the terms and provisions hereof.

Section 9.12    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13    No Third Party Beneficiaries.  Except as set forth in Section 9.14 and this Section 9.13, this Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns. Notwithstanding anything in this Section 9.13 to the contrary, the Parties acknowledge and agree that the Financing Sources shall be express third party beneficiaries of Section 2.3(d)(iv), Section 9.5, Section 9.8, Section 9.8, Section 9.10, this Section 9.13 and Section 9.14, and the Financing Parties may enforce such provisions.

Section 9.14    Non-Recourse.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.  No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender (including the Financing Sources) to, any of the foregoing ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any causes of action or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such causes of action and Liabilities against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 9.14.

Section 9.15    Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16    Disclosure Schedule.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure

WEIL:\95382886\18\50482.0004

Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure for all purposes of this Agreement, to the extent that such disclosure is reasonably apparent on its face. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced. The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.17 <u>Headings; Table of Contents</u>. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18 <u>Counterparts; Facsimile and Electronic Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

Section 9.19 <u>Time of Essence</u>. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 9.20 <u>Integrated Transactions</u>. The Parties acknowledge and agree that the transactions contemplated by this Agreement, including the sale and transfer of a Store or group of Stores, as applicable, on the Initial Closing and each subsequent Closing to Buyer, are inextricably linked technically and economically and collectively constitute a single, integrated transaction.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.

By: _____

Name: Christopher W. McGarry

Title: Executive Vice President and Chief Administrative Officer


SUPER FRESH FOOD MARKETS, INC.

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary


WALDBAUM, INC.

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary


PATHMARK STORES, INC.

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary


A&P LIVE BETTER, LLC

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary


TRADEWELL FOODS OF CONN., INC.

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary

A&P REAL PROPERTY, LLC

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary

ACME MARKETS, INC.

By: _____

Name:

Title: **SUSAN A. MCMILLAN**
**AUTHORIZED SIGNATORY**

# Exhibit D

ASSET PURCHASE AGREEMENT

BY AND AMONG

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,

APW SUPERMARKETS, INC.,

PATHMARK STORES, INC.,

A&P REAL PROPERTY, LLC,

AND

THE STOP & SHOP SUPERMARKET COMPANY, LLC

JULY 19, 2015

ARTICLE I    DEFINITIONS ............................................................................................. 1
    Section 1.1    Definitions .............................................................................................. 1
    Section 1.2    Interpretations ...................................................................................... 13

ARTICLE II    PURCHASE AND SALE ............................................................................ 13
    Section 2.1    Purchase and Sale of Assets ................................................................ 13
    Section 2.2    Assumed Liabilities ............................................................................. 14
    Section 2.3    Consideration; Deposit; Escrow Amount ........................................... 14
    Section 2.4    Closing................................................................................................. 15
    Section 2.5    Pre-Closing Determinations; Closing Payments and Deliveries ....... 15
    Section 2.6    Inventory.............................................................................................. 17
    Section 2.7    Allocation ............................................................................................ 18
    Section 2.8    Proration ............................................................................................. 18
    Section 2.9    Possession of Stores; Removal of Excluded Assets ......................... 20

ARTICLE III    SELLERS' REPRESENTATIONS AND WARRANTIES ........................ 20
    Section 3.1    Organization of Sellers; Good Standing .............................................. 20
    Section 3.2    Authorization of Transaction ................................................................ 20
    Section 3.3    Noncontravention; Government Filings ................................................ 21
    Section 3.4    Title to Assets ...................................................................................... 21
    Section 3.5    Real Property ....................................................................................... 21
    Section 3.6    Litigation; Decrees .............................................................................. 22
    Section 3.7    Labor Relations ................................................................................... 22
    Section 3.8    Brokers' Fees ....................................................................................... 22
    Section 3.9    Taxes.................................................................................................... 22
    Section 3.10    Tangible Personal Property ................................................................. 23
    Section 3.11    Employee Benefits .............................................................................. 23
    Section 3.12    Compliance with Laws; Permits ......................................................... 23
    Section 3.13    Pharmacy Records ............................................................................... 24
    Section 3.14    Pharmacy Operations........................................................................... 24
    Section 3.15    Disclaimer of Other Representations and Warranties......................... 24

ARTICLE IV    BUYER'S REPRESENTATIONS AND WARRANTIES ......................... 25
    Section 4.1    Organization of Buyer; Good Standing ............................................... 25
    Section 4.2    Authorization of Transaction ................................................................ 25
    Section 4.3    Noncontravention ................................................................................ 25
    Section 4.4    Litigation; Decrees .............................................................................. 25
    Section 4.5    Brokers' Fees ....................................................................................... 25
    Section 4.6    Sufficient Funds; Adequate Assurances .............................................. 26
    Section 4.7    HIPAA ................................................................................................. 26

ARTICLE V    PRE-CLOSING COVENANTS ................................................................. 26
    Section 5.1    Efforts; Cooperation ............................................................................ 26
    Section 5.2    Conduct of the Business Pending the Closing ..................................... 26
    Section 5.3    Regulatory Approvals .......................................................................... 27
    Section 5.4    Bankruptcy Court Matters ................................................................... 29
    Section 5.5    Estoppel Certificates ........................................................................... 31
    Section 5.6    Notice of Developments ...................................................................... 31
    Section 5.7    Pharmacy Records; Pharmacy Licenses .............................................. 31
    Section 5.8    Access; No Contact ............................................................................. 32
    Section 5.9    Bulk Transfer Laws ............................................................................. 33

| | | |
|---|---|---|
| Section 5.10 | Replacement Bonding Requirements | 33 |
| Section 5.11 | Damage or Destruction; Insurance Matters | 33 |
| **ARTICLE VI** | **OTHER COVENANTS** | **34** |
| Section 6.1 | Further Assurances | 34 |
| Section 6.2 | Access; Enforcement; Record Retention | 34 |
| Section 6.3 | Treatment of Affected Labor Agreements | 35 |
| Section 6.4 | Covered Employees | 35 |
| Section 6.5 | Certain Tax Matters | 39 |
| Section 6.6 | Insurance Matters | 40 |
| Section 6.7 | Acknowledgements | 40 |
| Section 6.8 | Press Releases and Public Announcements | 40 |
| Section 6.9 | Seller Marks | 41 |
| Section 6.10 | HIPAA Privacy Standards | 41 |
| Section 6.11 | Master Leases | 41 |
| **ARTICLE VII** | **CONDITIONS TO OBLIGATION TO CLOSE** | **41** |
| Section 7.1 | Conditions to Buyer's Obligations | 41 |
| Section 7.2 | Conditions to Sellers' Obligations | 42 |
| Section 7.3 | Conditions to Buyer's Obligations | 43 |
| Section 7.4 | Conditions to Sellers' Obligations to each Subsequent Closing | 43 |
| Section 7.5 | No Frustration of Closing Conditions | 43 |
| **ARTICLE VIII** | **TERMINATION** | **44** |
| Section 8.1 | Termination of Agreement | 44 |
| Section 8.2 | Effect of Termination | 45 |
| Section 8.3 | Return of Escrow Amount | 46 |
| **ARTICLE IX** | **MISCELLANEOUS** | **46** |
| Section 9.1 | Survival | 46 |
| Section 9.2 | Expenses | 46 |
| Section 9.3 | Entire Agreement | 46 |
| Section 9.4 | Incorporation of Exhibits and Disclosure Schedule | 46 |
| Section 9.5 | Amendments and Waivers | 46 |
| Section 9.6 | Succession and Assignment | 47 |
| Section 9.7 | Notices | 47 |
| Section 9.8 | Governing Law | 48 |
| Section 9.9 | Submission to Jurisdiction; Service of Process | 48 |
| Section 9.10 | Waiver of Jury Trial | 48 |
| Section 9.11 | Specific Performance | 48 |
| Section 9.12 | Severability | 49 |
| Section 9.13 | No Third Party Beneficiaries | 49 |
| Section 9.14 | Non-Recourse | 49 |
| Section 9.15 | Mutual Drafting | 49 |
| Section 9.16 | Disclosure Schedule | 49 |
| Section 9.17 | Headings; Table of Contents | 50 |
| Section 9.18 | Counterparts; Facsimile and Electronic Signatures | 50 |

Exhibit A – Bidding Procedures Order
Exhibit B – Escrow Agreement
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Assignment and Assumption Agreement

WEIL:\95398962\13\50482.0004

Exhibit E – Form of Sale Order
Exhibit F – List of Stores and Per-Store Purchase Price
Exhibit G – Form of Lease Assignment and Assumption
Exhibit H – Proposal

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of July 19, 2015 by and among The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation ("A&P"), APW Supermarkets, Inc., a New York corporation, Pathmark Stores, Inc., a Delaware corporation, A&P Real Property, LLC, a Delaware limited liability company (each, a wholly-owned Subsidiary of A&P and, together with A&P, "Sellers"), and The Stop & Shop Supermarket Company, LLC, a Delaware limited liability company ("Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties".

### WITNESSETH

WHEREAS, Sellers and certain of their affiliates contemplate filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on or about July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Sellers operate the 25 supermarkets at the locations set forth in Schedule 3.5 of the Disclosure Schedule (as defined below) under the names "A&P", "Pathmark", and "Waldbaums" (each a "Store" and, collectively, the "Stores"); and

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets (as defined below) and Assumed Liabilities (as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement:

"A&P" has the meaning set forth in the preamble.

"Acquired Assets" means all of Sellers' right, title, and interest in and to all of the following assets of Sellers used or held for use exclusively in the operation of the Stores and (to the extent applicable) located at the Stores on the applicable Closing Date, and to be acquired, in the aggregate, at the Closings:

    (a)    the General Inventory (other than Excluded Inventory);

    (b)    the Pharmacy Inventory (other than Excluded Inventory);

    (c)    to the extent transferable under applicable Law, the Pharmacy Records; provided, however, if Buyer determines to purchase documents subject to applicable Law regarding privacy related to the Business, the costs of a privacy ombudsman relating solely to such documents purchased by Buyer, to the extent that the Bankruptcy Court requires a privacy ombudsman to be appointed, shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand;

    (d)    the Furnishings and Equipment owned by Sellers (other than Excluded Furnishings and Equipment);

(e)     the Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Leases;

(f)     the Affected Labor Agreements, solely to the extent assumed (collectively with the Leases, the "Transferred Contracts");

(g)     without duplication of any Prorated Charges, all of Sellers' security deposits listed on Schedule 1.1(a), prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases and, to the extent transferable, other deposits relating to the Stores under any of the Transferred Contracts (collectively, the "Prepaid Expenses");

(h)     to the extent assignable or transferable, all warranties related to any of the foregoing;

(i)     all rights, privileges, refunds, credits, claims, counterclaims, defenses, demands, causes of action, choses in action, indemnification rights, rights of recovery or setoff of any kind relating to the Acquired Assets or the Assumed Liabilities;

(j)     subject to Section 5.11, all insurance claims pending, and any proceeds therefrom, in respect of any of the Acquired Assets or the Assumed Liabilities (the "Assigned Insurance Claims");

(k)     all Permits of Sellers relating exclusively to the Stores that are assignable or transferable to Buyer pursuant to the Bankruptcy Code and other applicable Law (the "Assigned Permits") (for the avoidance of doubt, solely to the extent the applicable Governmental Authority consents to or otherwise approves the assignment or transfer of the applicable Permit (but only to the extent that such consent or approval is required by the terms of such Permit));

(l)     all rights to the telephone and facsimile lines and numbers of the Stores (to the extent assignable or transferable to Buyer);

(m)     copies of personnel files of the Covered Employees who accept offers of employment (excluding medical records and subject to employee consent to the extent required by applicable Law);

(n)     subject to applicable customer protections, all customer data and information derived from branded loyalty promotion or co-branded credit card programs (to the extent in existence) and other similar information related to customer purchases at the Stores; provided, however, if Buyer determines to purchase data and records subject to applicable Law regarding privacy related to Sellers' business, the costs of a privacy ombudsman relating solely to such data and records purchased by Buyer, to the extent that the Bankruptcy Court requires a privacy ombudsman to be appointed, shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand;

(o)     all state lottery equipment which can be assigned or transferred with the consent of the state lottery (but subject to the receipt of such consent); and

(p)     Improvements located at a Store;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Additional Privacy Considerations" means any privacy or security requirements (other than HIPAA Commitments) imposed by federal or state Law on healthcare data, including state healthcare data breach notification Laws and related state consumer protection Laws.

"Affected Assets" has the meaning set forth in Section 5.11(a).

"Affected Labor Agreements" means the collective bargaining agreements covering any of the Covered Employees, each of which is listed on Schedule 1.1(b), other than any Affected Labor Agreement that is deemed an Excluded Asset pursuant to Section 6.3.

"Affected Unions" means the unions identified on Schedule 1.1(c).

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Objection Notice" has the meaning set forth in Section 2.7.

"Allocation Principles" has the meaning set forth in Section 2.7.

"Antitrust Law" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other laws and orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"Assigned Insurance Claims" has the meaning set forth in the definition of Acquired Assets.

"Assigned Permits" has the meaning set forth in the definition of the Acquired Assets.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.5(c).

"Assumed Liabilities" means the following Liabilities of each of the Sellers, which shall be assumed by Buyer, in the aggregate, at the Closings:

(a)     all Liabilities under the Leases arising from and after the applicable Closing Date, excluding all applicable Cure Costs;

(b)     all amounts allocated to Buyer under Section 2.8 and Section 6.5;

(c)     all Liabilities relating to or arising out of the ownership or operation of the Stores or any Acquired Asset from and after the applicable Closing Date; and

(d)     (i) to the extent Buyer agrees to assume an Affected Labor Agreement, all Liabilities under such Affected Labor Agreement to be assumed by Buyer in accordance with the provisions of Section 6.3 (for the avoidance of doubt, including any related Cure Costs) or (ii) to the extent that any Affected Union enters into a Modified Labor Agreement with Buyer, all Liabilities arising under such Modified Labor Agreement, in each case, arising from and after the applicable Closing Date.

"Auction" has the meaning set forth in Section 5.4(d).

"Back-up Termination Date" means the first to occur of (a) sixty (60) days after the entry of the sale order approving a Competing Bid, (b) consummation of the transaction with the winning bidder at the Auction, (c) Buyer's receipt of notice from Sellers of the release by Sellers of Buyer's obligations under Section 5.4(d), and (d) November 30, 2015.

"Bankruptcy Cases" means the contemplated Chapter 11 cases of Sellers and certain of their Affiliates.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in substantially the form as set forth in Exhibit A with such changes as are reasonably acceptable to Buyer and Sellers that, among other things, (a) approves and authorizes the payment of the Termination Payment on the terms and conditions set forth in Section 5.4, (b) establishes procedures for the Auction process, and (c) establishes a date for a hearing on the Sale Order.

"Bill of Sale" has the meaning set forth in Section 2.5(c).

"Bonding Requirements" means standby letters of credit, guarantees, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets.

"Break-Up Fee" has the meaning set forth in Section 5.4(a).

"Business" means the operation of the Stores by Sellers.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Labor Agreement" has the meaning set forth in Section 6.3.

"Buyer Proration Amount" has the meaning set forth in Section 2.8(a).

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Cash Purchase Price" has the meaning set forth in Section 2.3(a).

"Closing" has the meaning set forth in Section 2.4.

"Closing Cash Payment" shall mean, with respect to any Closing, an amount in cash equal to the sum of (a) the aggregate amount of the Per-Store Purchase Price for the Stores being acquired at the applicable Closing as set forth on Exhibit F hereto, *plus* (b) the aggregate Inventory Purchase Price for the Stores being acquired at the applicable Closing, *plus* (c) the aggregate Prepaid Expenses Amount in respect of the Stores being acquired at the applicable Closing, *plus* (d) the aggregate Seller Proration Amount in respect of the Stores being acquired at the applicable Closing, if any, *minus* (e) the aggregate Buyer Proration Amount in respect of the Stores being acquired at the applicable Closing, and *minus* (f) the aggregate Percentage Rent Reduction Amount in respect of the Stores being acquired at the applicable

4

Closing, if any (such sum, as may be adjusted pursuant to Section 2.3(c), Section 5.7, Section 5.11 and/or Section 6.5 at each Closing).

"Closing Date" has the meaning set forth in Section 2.4(b).

"Closing Statement" has the meaning set forth in Section 2.5(a).

"COBRA" has the meaning set forth in Section 6.4(f).

"Competing Bid" has the meaning set forth in Section 5.4(b).

"Confidentiality Agreement" means the confidentiality agreement, dated as of June 8, 2015, by and between A&P and Buyer.

"Consent" means any consent, approval, authorization, waiver, or notification of a Person.

"Contract" means any agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and any amendments thereto.

"Contracting Parties" has the meaning set forth in Section 9.14.

"Covered Employee" means an employee of A&P or any of its Subsidiaries at the Closing whose duties relate primarily to the operation of any of the Stores, including such employees who are on short-term disability or any other approved leave of absence as of the Closing.

"Cure Costs" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to section 365(b)(1) of the Bankruptcy Code to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Buyer of the Transferred Contracts, as determined by the Bankruptcy Court or agreed to by Sellers and the non-Seller counterparty to the applicable Transferred Contract.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" has the meaning set forth in Section 3.11(a).

"Environmental Law" means any applicable foreign, federal, state or local statute, regulation, ordinance, or rule of common law currently in effect relating to pollution, the protection of the environment or natural resources.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means Wells Fargo Bank, National Association, a national banking association.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Buyer, and the Escrow Agent, a copy of which is attached hereto as Exhibit B.

"Escrow Amount" has the meaning set forth in Section 2.3(b).

WEIL:\95398962\13\50482.0004

"<u>Excluded Assets</u>" means all assets of Sellers as of each applicable Closing that are not expressly included in the Acquired Assets, including:

(a)      any asset of Sellers that is (i) not located in the Stores and not used or held for use exclusively in the operation of the Stores or (ii) inseparable from any other business of Sellers or any of their Affiliates (other than the operation of the Stores), in each case, including (A) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (B) books and records related to (1) Taxes paid or payable by Sellers or (2) any claims, obligations or liabilities not included in Assumed Liabilities; (C) any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to either of the Sellers, other than a Tax refund or credit that is attributable to any Tax for which Buyer is responsible under <u>Section 2.8</u> or <u>Section 6.5</u>; and (D) any assets not customarily based or located at the Stores;

(b)      capital stock of any of A&P's Subsidiaries;

(c)      all Cash Equivalents and accounts receivable;

(d)      all Permits other than the Assigned Permits;

(e)      all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders, other than the Assigned Insurance Claims;

(f)      all of Sellers' rights under this Agreement or any Related Agreement;

(g)      all of Sellers' rights under any Contracts primarily related to any Excluded Asset and under all other Contracts other than the Transferred Contracts;

(h)      any and all automobiles, trucks, tractors, and trailers;

(i)      any other rebate or refund arising from the operation of the Stores prior to the applicable Closing;

(j)      all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the names "A&P Liquors," "A&P," "Waldbaums," "Superfresh," "Food Emporium," "Food Basics," "Best Cellars," "Pathmark," "Foodmart" and all other marks set forth on <u>Schedule 1.1(d)</u> of the Disclosure Schedule, any name or trademark, service mark, trade name, logo, trade dress, Internet domain name or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, all rights and goodwill associated therewith and any name or trademark, service mark, trade name, logo, Internet domain name, or other indicia of origin that is confusingly similar thereto or derived therefrom (collectively, the "<u>Seller Marks</u>");

(k)      all leased equipment located at or used in the Stores as listed on <u>Schedule 1.1(e)</u> and all POS/order entry equipment and other computer systems (including, but not limited to, front-end scanners, scales, keyboards, displays and store controllers; DSD receiving system; global equipment/check cashing system; Veriphone/RBS Lynk/credit processing; store time and attendance system (PC and clock); and store ordering handhelds (Telxons), if any), and other in-store processors, direct access storage devices, and electronic funds transfer devices;

(l)     the Furnishings and Equipment described on <u>Schedule 1.1(f)</u> (the "<u>Excluded Furnishings and Equipment</u>");

(m)     all Contracts other than the Transferred Contracts;

(n)     all Excluded Inventory;

(o)     all other assets bearing any of the Seller Marks, other than Furnishings and Equipment; and

(p)     those items, if any, set forth on <u>Schedule 1.1(g)</u>.

"<u>Excluded Furnishings and Equipment</u>" has the meaning set forth in the definition of Excluded Assets.

"<u>Excluded Inventory</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Excluded Liabilities</u>" means all Liabilities of Sellers that are not Assumed Liabilities, including, without limitation, the following:

(a)     any Liability not relating to or arising out of the Stores or the Acquired Assets, including any Liability relating to or arising out of the Excluded Assets;

(b)     any Liability for Taxes (that are not Assumed Liabilities) (i) attributable to the Acquired Assets or the operation of the Stores with respect to any taxable period or portion thereof that ends on or prior to the applicable Closing Date, (ii) imposed on Sellers, or (iii) allocated to Sellers pursuant to <u>Section 2.8</u> and <u>Section 6.5</u>;

(c)     except as provided in <u>Section 6.4</u>, all Liabilities relating to employees of Sellers or any of their respective Subsidiaries (including, without limitation, the Covered Employees) in connection with withheld payroll Taxes, payroll, workman's compensation benefits, and employee withholding, or otherwise relating to such employees for periods on or prior to the applicable Closing Date;

(d)     all accounts payable;

(e)     all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(f)     all Liabilities allocable to the period prior to the applicable Closing Date under or with respect to the Transferred Contracts;

(g)     all Cure Costs (other than those with respect to any Affected Labor Agreements, to the extent assumed by Sellers at the direction of Buyer);

(h)     for the avoidance of doubt, all Liabilities relating to the ownership or operation of the Stores or any Acquired Asset prior to the applicable Closing Date, except as provided in <u>Section 2.8</u> and <u>Section 6.5</u>; and

(i)     except as provided in <u>Section 6.4</u>, all Liabilities of Sellers or any of their respective Subsidiaries or any ERISA Affiliate with respect to any Employee Benefit Plan or any other compensation or benefit plan, program, policy, agreement or arrangement of any Seller or any Subsidiary thereof.

WEIL:\95398962\13\50482.0004

"Excluded Store" has the meaning set forth in Section 5.3(c).

"Furnishings and Equipment" means all trade fixtures, shopping carts, aisle markers, store models, shelving, display racks and refrigeration equipment owned by Sellers and located at the Stores, but excluding any such items bearing any Seller Mark if such Seller Mark cannot be concealed or removed by Buyer in accordance with Section 6.9.

"GAAP" means United States generally accepted accounting principles consistently applied.

"General Inventory" means all usable and saleable food, beverages (including, to the extent transferable to Buyer under applicable Law, alcohol), and other merchandise and products (including general merchandise but excluding greeting cards) located at and offered for sale to customers at the Stores on the applicable Closing Date, but not including Excluded Inventory.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Healthcare Governmental Authority" means the United States Department of Health and Human Services, the Centers for Medicare and Medicaid Services, the U.S. Drug Enforcement Administration, and any applicable state board of pharmacy.

"Healthcare Laws" means any applicable Law of any Healthcare Governmental Authority with respect to regulatory matters relating to the sale and dispensing of pharmaceuticals and controlled substances, and the provision, administration, and/or payment for pharmacy products or services.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act.

"HIPAA Commitments" means any applicable data privacy or security requirements under HIPAA.

"HIPPA Privacy Standards" has the meaning set forth in Section 6.10(a).

"Hired Covered Employee" means a Covered Employee who is hired by, and commences work with, Buyer at a Store acquired by Buyer under this Agreement.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Improvements" means Seller's interest in all of the buildings, building fixtures and improvements located on, attached to or within the Stores which are not Excluded Assets.

"Initial Closing" has the meaning set forth in Section 2.4(a).

"Initial Closing Date" has the meaning set forth in Section 2.4(a).

"Intellectual Property" means (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrights, together with all registrations and applications for registration therefor and renewals in connection therewith; (d) all trade secrets, know-how, technology, improvements, and inventions; and (e) all computer software (including data and databases).

"Inventory" means all General Inventory and Pharmacy Inventory.

"Inventory Date" has the meaning set forth in Section 2.6(a).

"Inventory Purchase Price" has the meaning set forth in Section 2.6(a).

"Inventory Report" has the meaning set forth in Section 2.6(a).

"Inventory Taker" has the meaning set forth in Section 2.6(a).

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Knowledge" of Sellers (and other words of similar import) means the actual knowledge of any Person holding a position of senior vice president or senior thereto at Sellers.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"Lease Assignment and Assumption Agreement" has the meaning set forth in Section 2.5(c).

"Leases" means all master leases, leases, subleases, licenses, concessions, options, contracts, easements, reciprocal easements, termination agreements, subordination agreements, nondisturbance and attornment agreements, lease guarantees, estoppel certificates and other agreements (written or oral), and any amendments, assignments, extensions, renewals or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds or has granted any leasehold or subleasehold estates and other rights to use or occupy any Store or any premises used exclusively in connection with a Store or a store or other premises located in a shopping center in which a Store is located.

"Liability" means any indebtedness, liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether matured or unmatured, whether determined or determinable, and whether due or to become due) regardless of when arising.

"Lien" means (a) any mortgage, pledge, lien, charge, hypothecation, claim, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property, including any conditional sale or other title retention Contract or lease in the nature thereof; and (b) any subordination arrangement in favor of another Person; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity and whether before any Governmental Authority.

"Master Leases" means the master leases for the properties set forth on Section 1.1(h) of the Disclosure Schedules under the heading "Master Leases".

"Material Adverse Effect" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments or events has had, or would reasonably be expected to have, a material adverse effect on the business, assets, operation, condition (financial or otherwise) or results of operation of the Business or the Acquired Assets (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, other than any effect, change, condition, circumstance, development or event arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail grocery generally; (c) national or international political or

social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or natural disaster, including any fire, flood, hurricane, tornado, or other weather event; (f) changes in Law or accounting rules; (g) the taking of any action expressly contemplated by this Agreement or any Related Agreement or taken with the prior written consent of Buyer; (h) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code with respect to any unions, employees, retirees, retiree benefits or collective bargaining agreements; (i) the sale of any other assets or stores (other than the Acquired Assets) to any third parties by any Seller or any of its Affiliates; (j) any effects or changes arising from or related to the breach of the Agreement by Buyer; or (k) the filing of the Bankruptcy Cases or (l) any strike or labor dispute; provided, however, that in the case of the foregoing clauses (a) through (f), such effects, changes, conditions, circumstances, developments or events shall be taken into account in determining whether any material adverse effect has occurred to the extent that any such effects, changes, conditions, circumstances, developments or events have, or would reasonably be expected to have, a disproportionate effect on the Business (excluding the Excluded Assets and the Excluded Liabilities) or the Acquired Assets relative to other participants operating in the retail grocery industry.

"Modified Labor Agreement" means a new collective bargaining agreement with an Affected Union that is entered into by Buyer and an Affected Union.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Parties" has the meaning set forth in the preamble.

"Percentage Rent Reduction Amount" has the meaning set forth in Section 2.8(f).

"Permit" means any franchise, approval, authorization, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business, that in each case have been bonded over or otherwise secured in a manner acceptable to Buyer in Buyer's reasonable discretion; (c) with respect to leased or licensed real or personal property, the terms and conditions of the Lease applicable thereto; (d) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects with respect to any Store that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (f) matters that would be disclosed on an accurate survey of the real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (g) any liens shown in any title commitment, report or policy, or otherwise of record that do not or would not reasonably be expected to adversely affect the current occupancy or use of the real property in any material respect; (h) any other Liens that Buyer has expressly stated are acceptable to Buyer in a writing delivered to Sellers; and (i) any Liens on the fee property

10

underlying any Lease not created by such tenant under such Lease, and that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"<u>Per-Store Purchase Price</u>" shall mean the amount set forth opposite the name and store number for each Store on <u>Exhibit F</u>.

"<u>Pharmacy Inventory</u>" shall mean all pharmaceutical inventories owned by Sellers and located at the Stores as of the applicable Inventory Date, including (a) all legend drugs and controlled substances required by Law to be dispensed under the supervision of a registered or licensed pharmacist and (b) all over-the-counter pharmaceutical inventories, but excluding any proprietary branded products.

"<u>Pharmacy Licenses</u>" has the meaning set forth in <u>Section 5.7(b)</u>.

"<u>Pharmacy Records</u>" shall mean all files, prescription records, customer records, lists and profiles, documents, instruments, papers, books, in-store computer files and records and all other records of Sellers and in any media solely to the extent exclusively related to the Stores; in each case, relating to the patients, doctors, pharmaceuticals, controlled substances and prescriptions dispensed by or filled at the Stores.

"<u>Pre-Closing Loss</u>" has the meaning set forth in <u>Section 5.11(a)</u>.

"<u>Prepaid Expenses</u>" has the meaning set forth in the definition of Acquired Assets.

"<u>Prepaid Expenses Amount</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Proposal</u>" has the meaning set forth in <u>Section 6.3</u>.

"<u>Prorated Charges</u>" has the meaning set forth in <u>Section 2.8(a)</u>.

"<u>Proration Period</u>" has the meaning set forth in <u>Section 6.5(b)</u>.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Purchase Price Allocation</u>" has the meaning set forth in <u>Section 2.7</u>.

"<u>Purchase Price Reduction</u>" has the meaning set forth in <u>Section 2.3(c)</u>.

"<u>Related Agreements</u>" means the Bills of Sale and the Assignment and Assumption Agreements.

"<u>Removed Store</u>" has the meaning set forth in <u>Section 5.11(b)(iii)(x)</u>.

"<u>Representative</u>" means, when used with respect to a Person, such Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"<u>Sale Hearing</u>" means a hearing before the Bankruptcy Court to approve this Agreement and the Sale Order.

"<u>Sale Order</u>" means an order of the Bankruptcy Court, in substantially the form set forth in <u>Exhibit E</u> with such changes as are reasonably satisfactory to the Parties, (a) approving (i) this Agreement

WEIL:\95398962\13\50482.0004

and the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Acquired Assets to Buyer free and clear of all Liens, other than any Permitted Liens or any Assumed Liabilities; (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein; and (iv) the assumption and assignment to Buyer of the Transferred Contracts on the terms set forth herein; (b) determining that Buyer is a good faith purchaser; and (c) providing that the Closings will occur in accordance with the terms and conditions hereof.

"Second Request Recommendation" has the meaning set forth in Section 5.3(c).

"Second Requests" has the meaning set forth in Section 5.3(a).

"Seller Marks" has the meaning set forth in the definition of Excluded Assets.

"Seller Proration Amount" has the meaning set forth in Section 2.8(a).

"Sellers" has the meaning set forth in the preamble.

"Sellers' Accounts" has the meaning set forth in Section 2.5(b).

"Separable Stores" means the Stores denoted with an asterisk (*) set forth on Exhibit F.

"Store Withdrawal Deadline" has the meaning set forth in Section 5.3(c).

"Stores" has the meaning set forth in the recitals.

"Subsequent Closing" has the meaning set forth in Section 2.4(b).

"Subsequent Closing Date" has the meaning set forth in Section 2.4(b).

"Subsidiary" means, with respect to any Person, on any date, any other Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent (50%) of the profits or losses are, as of such date, owned, controlled or held by such Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Payment" has the meaning set forth in Section 5.4(a).

"Transfer Tax" has the meaning set forth in Section 6.5(a).

"Transferred Contracts" has the meaning set forth in the definition of Acquired Assets.

WEIL:\95398962\13\50482.0004

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local law.

Section 1.2    Interpretations.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)    References herein to a Person are also to its successors and permitted assigns. Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)    The Parties acknowledge and agree that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and no Party shall use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)    References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information (i) made available as of the date hereof to Buyer or its Representatives in the data room prepared by Sellers or (ii) provided to Buyer or its Representatives in response to written requests for materials or information.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, Buyer will purchase from Sellers, and Sellers will sell, transfer, assign,

convey, and deliver to Buyer, all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens) in accordance with this Agreement.

Section 2.2    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, effective as of the applicable Closing Date, Buyer will assume and become responsible for the Assumed Liabilities being assumed at such Closing.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all such Assumed Liabilities in a timely manner in accordance with the terms thereof.  Notwithstanding anything to the contrary contained in this Agreement, Buyer shall not assume or become responsible for, and shall not be obligated to (or to cause any other Person to) pay, perform, honor or discharge the Excluded Liabilities.

Section 2.3    Consideration; Deposit; Escrow Amount.

(a)    The consideration for the Acquired Assets shall be (i) an aggregate Dollar amount equal to the sum of (A) $146,300,000 (the "Cash Purchase Price"), *plus* (B) the amount of the aggregate Inventory Purchase Price for the Stores being acquired at all the Closings, *plus* (C) the amount of the aggregate Prepaid Expenses (the "Prepaid Expenses Amount") for the Stores being acquired at all the Closings, *plus* (D) the aggregate Seller Proration Amount, if any, to be paid in respect of the Stores being acquired at all the Closings, *minus* (E) the aggregate Buyer Proration Amount, if any, to be paid in respect of the Stores being acquired at all the Closings, and *minus* (F) the aggregate Percentage Rent Reduction Amount in respect of the Stores being acquired at all the Closings, if any (such sum, as may be adjusted pursuant to Section 5.7, Section 5.11 and/or Section 6.5, the "Purchase Price"), and (ii) Buyer's assumption of the Assumed Liabilities. At Closing, all security deposits held by Sellers pursuant to the subleases on Schedule 3.5 shall be assigned and delivered to Buyer or an amount equal to such deposits credited to Buyer. All such security deposits (as of the date set forth on Schedule 3.5) are set forth on Schedule 2.3.

(b)    Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Buyer shall immediately deposit with the Escrow Agent the sum of $14,630,000 by wire transfer of immediately available funds (the "Escrow Amount"), to be released by the Escrow Agent and delivered to either Buyer or Sellers, in accordance with the provisions of the Escrow Agreement.  Pursuant to the Escrow Agreement, the Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows:

(i)    the Escrow Amount shall be held by the Escrow Agent and applied towards the Purchase Price payable by Buyer to Sellers under Section 2.3(a) at the final Subsequent Closing, and all accrued investment income thereon, if any, shall be delivered to Buyer at the final Subsequent Closing;

(ii)    if this Agreement is terminated by Sellers pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers; and

(iii)    if this Agreement is terminated for any reason other than by Sellers pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, shall in each case be returned to Buyer.

(c)    Notwithstanding anything to the contrary contained in this Agreement, in the event that (i) after the Auction a sale order is entered pursuant to the Bidding Procedures Order in which any Person other than the Buyer purchases one or more of the Separable Stores, (ii) Buyer exercises its right to exclude any Excluded Store pursuant to Section 5.3(c), or (iii) Buyer or any Seller exercises its right to exclude any Removed Store pursuant to Section 5.11(b)(iii)(x), then

14

this Agreement shall be automatically amended to give effect to the following: (i) such Separable Stores, Excluded Stores and Removed Stores, as applicable, and all Acquired Assets related to such Separable Stores, Excluded Stores and Removed Stores, as applicable, shall be excluded from the Acquired Assets, (ii) all Assumed Liabilities related to such Separable Stores, Excluded Stores and Removed Stores, as applicable, shall be excluded from the Assumed Liabilities, and (iii) the Purchase Price and Closing Cash Payment shall be reduced by an aggregate amount equal to the sum of the Per-Store Purchase Price for each such Separable Store, Excluded Store and Removed Store, as applicable (the sum of such reduction, the "Purchase Price Reduction").

Section 2.4     Closings. The closings of the transactions contemplated by this Agreement (each, a "Closing") shall take place as follows:

(a)     the first closing (the "Initial Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m. local time on a date (the "Initial Closing Date") that is the second (2nd) Saturday following the entry of the Sale Order, provided, that all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby at the Initial Closing set forth in Article VII (other than conditions that by their nature are to be satisfied at the Initial Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto; and

(b)     each subsequent Closing (each, a "Subsequent Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m. local time on a date and all Subsequent Closings shall take place no later than the earlier of (x) thirty (30) days following the Initial Closing and (y) November 15, 2015 (each such date of a Subsequent Closing, a "Subsequent Closing Date" and each Subsequent Closing Date and the Initial Closing Date is referred to as a "Closing Date") that is the next Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby at such Subsequent Closing set forth in Article VII (other than conditions that by their nature are to be satisfied at such Subsequent Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. Buyer and Sellers agree to commence each Subsequent Closing as soon as practicable after the Initial Closing;

(c)     within thirty (30) Business Days following the date hereof, Buyer shall provide to Sellers a schedule of the Stores and the related Acquired Assets to be acquired at the Initial Closing and at each Subsequent Closing; and

(d)     for purposes of this Agreement and the transactions contemplated hereby, each Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets to be acquired by Buyer at such Closing shall be deemed to occur at 12:01 am, New York City time, on each Closing Date.

Section 2.5     Pre-Closing Determinations; Closing Payments and Deliveries.

(a)     The Parties shall cooperate in good faith to calculate and agree upon, no later than one (1) day prior to each Closing Date: (i) the aggregate Inventory Purchase Price in accordance with Section 2.6(a), for the Stores to be acquired at such Closing Date, (ii) the aggregate Prepaid Expenses Amount in accordance with Section 2.3(a), for the Stores to be acquired at such Closing Date, (iii) the aggregate Seller Proration Amount or the aggregate Buyer Proration Amount, as the case may be, in accordance with Section 2.8(a), for the Stores (and

Acquired Assets) to be acquired at such Closing Date, (iv) the Percentage Rent Reduction Amount, if any, in accordance with Section 2.8(f), for the Stores (and Acquired Assets) to be acquired at such Closing Date, and (v) a statement (the "Closing Statement") setting forth the calculation of the items set forth in subparagraphs (i) through (iv) and the applicable Closing Cash Payment and the Purchase Price (as may be adjusted pursuant to Section 5.7, Section 5.11 and/or Section 6.5) based thereon.

(b)     On the Initial Closing Date, Buyer shall pay to Sellers the applicable Closing Cash Payment (net of any Taxes required by Law to be withheld, if any) for the Stores (and Acquired Assets) being acquired at the Initial Closing Date, which shall be paid by wire transfer of immediately available funds into an account or accounts designated by Sellers at least three (3) Business Days prior to the Initial Closing (the "Sellers' Accounts").  On each Subsequent Closing Date, Buyer shall pay the applicable Closing Cash Payment (net of any Taxes required by Law to be withheld, if any, and with respect to the final Subsequent Closing, less the Escrow Amount, which shall be released to Sellers by the Escrow Agent) to Sellers for the Stores (and Acquired Assets) being acquired at each such Subsequent Closing Date, which shall be paid by wire transfer of immediately available funds into the Sellers' Accounts.

(c)     At the Initial Closing, Sellers will deliver to Buyer (i) a duly executed Bill of Sale substantially in the form of Exhibit C (the "Bill of Sale") for each Store and the Acquired Assets being acquired at the Initial Closing; (ii) a duly executed Assignment and Assumption Agreement substantially in the form of Exhibit D (the "Assignment and Assumption Agreement") for each Transferred Contract (other than the Leases) being acquired at the Initial Closing; (iii) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) is satisfied; (iv) a certification of non-foreign status duly executed by each Seller dated as of the Initial Closing Date and satisfying the requirements of Treasury Regulation Section 1.1445-2(b)(2)(i); (v) a schedule of all lease agreements and related amendments of the Leases of the Stores acquired at such Closing and the original Lease files for such Stores in Sellers' possession (including, to the extent in Sellers' possession, all original, fully executed copies of all Leases, correspondence files, common area maintenance files, any waivers, consents or notices related to the Leases, all zoning/permitting related files and documents, and all other related documents); (vi) any estoppel certificates obtained in accordance with Section 5.5 in respect of such Stores; (vii) a duly executed Lease Assignment and Assumption Agreement substantially in the form of Exhibit G (the "Lease Assignment and Assumption Agreement") for each Lease being acquired at the Initial Closing; and (viii) all assigned warranties, Assigned Permits and personnel files of the Covered Employees who accept offers of employment with Buyer, in each case included in the Acquired Assets and in Sellers' possession for the Stores purchased at the Initial Closing.

(d)     At each Subsequent Closing, Sellers will deliver to Buyer (i) the duly executed Bill of Sale for each Store and the Acquired Assets being acquired at such Closing; (ii) a duly executed Assignment and Assumption Agreement for each Transferred Contract (other than the Leases) being acquired at such Closing; (iii) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.3(a) and Section 7.3(b) is satisfied; (iv) a schedule of all lease agreements and related amendments of the Leases of the Stores acquired at such Closing and the original Lease files for such Stores in Sellers' possession (including, to the extent in Sellers' possession, all original, fully executed copies of all Leases, correspondence files, common area maintenance files, any waivers, consents or notices related to the Leases, all zoning/permitting related files and documents, and all other related documents); (v) any estoppel certificates obtained in accordance with Section 5.5 in respect of such Stores; (vi) a duly executed Lease Assignment and Assumption Agreement for each Lease being acquired at such Subsequent Closing; and (vii) all assigned warranties, Assigned Permits and

personnel files of the Covered Employees who accept offers of employment with Buyer, in each case included in the Acquired Assets and in Sellers' possession for the Stores purchased at such Subsequent Closing.

(e)     At each Closing, Buyer will deliver to Sellers (i) the Bill of Sale duly executed by Buyer for each Store and the Acquired Assets being acquired at such Closing; (ii) the Assignment and Assumption Agreements duly executed by Buyer for each Transferred Contract (other than the Leases) being acquired at such Closing; (iii) a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b), or in Section 7.4(a), as applicable, are satisfied; and (iv) the Lease Assignment and Assumption Agreements duly executed by Buyer for each Lease being acquired at such Closing.

Section 2.6     Inventory.

(a)     A physical count of the Inventory, and a calculation of the value thereof, at each of the Stores shall be made by Retail Grocery Inventory Service or another nationally-recognized, independent inventory service (the "Inventory Taker") mutually agreed to by the Parties, after the close of business on the day that  is two (2) days prior to the Initial Closing Date or any Subsequent Closing Date, as applicable, or on such other date as the Parties may mutually agree (the date of each such inventory count being an "Inventory Date"). The Inventory Taker will conduct the physical inventory in accordance with instructions set forth in Schedule 2.6(a) and otherwise in accordance with the terms and conditions of this Section 2.6. Each Party shall be entitled to have Representatives present during each inventory count and the fees and expenses of the Inventory Taker shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers. The Inventory Taker shall promptly upon completion of each inventory count, but in no event later than the close of business on the date that is one (1) day prior to each Closing, deliver a report (each, an "Inventory Report") of the Inventory to be acquired at the applicable Closing and the net value of the Inventory to be acquired at the applicable Closing determined in accordance with the procedures and using the retail-to-cost conversions set forth on Schedule 2.6(a) as of the date it conducted such inventory (the net value as reported in each such Inventory Report, the "Inventory Purchase Price") to each Party. The physical inventory (and the Inventory Purchase Price to be paid by Buyer for the Inventory to be acquired at the applicable Closing) shall not include Inventory that is (i) A&P branded and other private label inventory; (ii) damaged, defective, spoiled, perishable (the term "perishable" to include, without limitation, such merchandise as fresh, smoked or processed meats, produce, deli items, bakery items, frozen food and dairy items needing refrigeration), outdated (any merchandise that has a manufacturer's date by which it must be sold that is less than thirty (30) days after the applicable Inventory Date being deemed outdated for this purpose), obsolete, expired, consignment, continuity, recalled or otherwise unsaleable at normal retail price in the Ordinary Course of Business at the Stores; (iii) not transferable to Buyer under applicable Law; (iv) direct store delivery vendor products; (v) promotional or seasonal merchandise; (vi) books or greeting cards; (vii) tobacco and cigarette products; (viii) non-matched inventory (i.e., inventory of a size, brand or variety that Buyer does not carry); (ix) Inventory ordered in the Ordinary Course of Business at the Stores not received at the Stores on or before the applicable Inventory Date; or (x) supplies, maintenance supplies, containers, labels, spare parts and supply items, such as paper bags, polyfilm, and the like (collectively, the "Excluded Inventory").

(b)     Buyer shall make application to the applicable authorities to transfer any alcohol included in the Inventory to Buyer, and any such application shall be made promptly after the execution of this Agreement and shall be diligently pursued by Buyer, at Buyer's sole cost and expense. Sellers, at no out of pocket cost or expense to Sellers, shall reasonably cooperate with Buyer and use their commercially reasonable efforts to provide any documents and/or

17

information necessary to assist in effectuating said transfer and execute such consents or other papers as may reasonably be required. Notwithstanding anything to the contrary contained in this Agreement, if the approval of the applicable authorities to transfer such alcohol to Buyer is not obtained prior to each applicable Closing, such alcohol will be deemed Excluded Inventory for all purposes in this Agreement.

(c)     The complete inventory prepared by the Inventory Taker shall be prepared in accordance with the usual and customary practices of the industry (and otherwise consistent with Schedule 2.6(a)), and each Inventory Report shall set forth the portion of the Inventory Purchase Price attributable to the Inventory for each Store being acquired at the applicable Closing, determined in the manner provided above. In the event that the Parties do not agree on the value of the Inventory for any Store because the Parties disagree as to whether certain items should be counted as Excluded Inventory or as to Sellers' cost of Inventory, the opinion of the Inventory Taker shall be final and binding.

Section 2.7     Allocation.  Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles").  No later than ninety (90) days after the last Subsequent Closing Date, Buyer shall deliver to Sellers an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the last Subsequent Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Sellers' review. Sellers shall have an opportunity to review the proposed Purchase Price Allocation for a period of twenty (20) days after receipt of the proposed Purchase Price Allocation. If Sellers disagree with any aspect of the proposed Purchase Price Allocation, Sellers shall notify Buyer in writing prior to the end of such twenty (20)-day period (an "Allocation Objection Notice"), setting forth Sellers' proposed Purchase Price Allocation and specifying, in reasonable detail, any good faith dispute as to Buyer's Purchase Price Allocation. Buyer and Sellers shall use commercially reasonable efforts to resolve any objection by Sellers to the proposed Purchase Price Allocation. If, within ten (10) days after Buyer receives an Allocation Objection Notice, the Parties have not resolved all objections and agreed upon a final Purchase Price Allocation, the Parties shall engage an independent accounting firm mutually acceptable to Buyer and Sellers to resolve any outstanding disputes, and such resolution shall be final, conclusive and binding on each of the Parties. The fees and disbursements of such independent accounting firm shall be shared equally by Buyer, on the one hand, and Sellers, on the other hand. Buyer and Sellers shall make appropriate adjustments to the Purchase Price Allocation to reflect any adjustments to the Purchase Price. Buyer and Sellers agree (and agree to cause their respective subsidiaries and Affiliate) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the Purchase Price Allocation.  None of the Parties will take any position inconsistent with the Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, unless otherwise required by Law or a final determination by a Governmental Authority.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.7 shall survive the Closings without limitation.

Section 2.8     Proration.

(a)     On each Closing Date all property related expenses including rent (other than any percentage rent) paid or received, common area maintenance fees, real estate taxes, utility charges (unless final meter readings are obtained)  and similar items under each of the Leases transferred at such Closing (the "Prorated Charges") shall be apportioned and prorated between Sellers and Buyer as of such Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges under such Lease for the applicable month (or installment period as to real estate taxes,  water, sewer and vault charges or

18

assessments) and the denominator being the total number of days in the lease month or installment period in which such Closing occurs, times (B) the number of days in such lease month or installment period, as applicable, following the day that immediately precedes such Closing Date and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to such Closing, and (ii) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers). The net amount of all Prorated Charges owed to Buyer and Sellers as determined pursuant to this Section 2.8(a) shall be referred to as the "Buyer Proration Amount" if owed to Buyer or the "Seller Proration Amount" if owed to Sellers. Sellers shall, not less than five (5) Business Days prior to the applicable Closing Date, provide Buyer with a statement setting forth in reasonable detail its calculation of (x) the Prepaid Expenses Amount as of such Closing Date and (y) the Prorated Charges and the Buyer Proration Amount or Seller Proration amount, if any and as the case may be. Buyer shall give notice to Sellers within three (3) days after delivery of such statement of any disputes Buyer has with Sellers' calculation therein, and the Parties shall negotiate in good faith to determine and agree upon, no later than one (1) day prior to the applicable Closing Date, the Prepaid Expenses Amount and the amount of the Buyer Proration Amount or Seller Proration Amount, if any and as the case may be. In the event the Parties are unable to resolve any such dispute, the Parties shall request the Bankruptcy Court to make a determination on an expedited basis.

(b)      As to real estate Taxes and assessments, if the applicable Closing shall occur before a new real estate or personal property Tax rate is fixed for the applicable property, the apportionment of Taxes for such property at the applicable Closing shall be upon the basis of the old Tax rate for the preceding fiscal year applied to the latest assessed valuation. Promptly after the new Tax rate is fixed, the apportionment of Taxes shall be recomputed and any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at the applicable Closing shall be promptly corrected and the proper party reimbursed.

(c)      If on the applicable Closing Date any tenant is in arrears in the payment of rent or has not paid the rent payable by it and which is attributable to the month in which the applicable Closing occurs (whether or not it is in arrears for such month on the applicable Closing Date), any rent received by Buyer or Sellers after the applicable Closing shall be applied to amounts due and payable by such tenant in the following order of priority: first, to rent attributable to the month in which the applicable Closing occurred, and, thereafter, ratably, between rent attributable to the months following the month in which the applicable Closing occurred and rent attributable to the months preceding the month in which the applicable Closing occurred. If rent or any portion thereof received by Sellers or Buyer after the applicable Closing is due and payable to the other party by reason of the foregoing allocation, the appropriate sum shall be promptly paid to such other party.

(d)      Following the applicable Closing Date, at no cost to Sellers, Buyer shall use commercially reasonable efforts to collect rent owed to Sellers by any tenant allocable to the period up to and including the applicable Closing Date. Buyer agrees to reasonably cooperate with Sellers at no cost to Buyer in connection with all efforts by Sellers to collect such rent. Notwithstanding the foregoing, Buyer shall not be obligated to pursue, be involved in or cooperate in connection with any Litigation regarding the efforts to collect rent owed to Sellers by any tenant allocable to the period up to and including the applicable Closing Date.

(e)      If any of the items subject to apportionment under the foregoing provisions cannot be apportioned at the applicable Closing because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the applicable Closing are discovered subsequent to the applicable Closing,

WEIL:\95398962\13\50482.0004

then such item shall be reapportioned and such errors and omissions corrected as soon as practicable after the applicable Closing Date and the proper party reimbursed.

(f)     Sellers shall, not less than five (5) Business Days prior to the applicable Closing Date, provide Buyer with a statement setting forth in reasonable detail: (i) each Lease (and the corresponding Store) which provides for the payment of percentage rent by Sellers; (ii) the sales of such Store during the current lease year or other applicable current percentage rent period and projected sales through the applicable Closing Date; (iii) the sales of such Store annualized through the end of the current lease year; (iv) a calculation of the amount of percentage rent payable under such Lease based on such annualized sales, if any; (v) a calculation of Sellers' pro rata share of such percentage rent based upon the number of days of the current fiscal year Sellers occupied such Store; and (vi) the aggregate amount of such pro rata shares of percentage rent for all such Stores being acquired at the applicable Closing (such aggregate amount, the "Percentage Rent Reduction Amount"). Buyer shall give notice to Sellers within three (3) days after delivery of such statement of any disputes Buyer has with Sellers' calculations therein, and the Parties shall negotiate in good faith to determine and agree upon, no later than one (1) day prior to the applicable Closing Date, the Percentage Rent Reduction Amount. In the event the Parties are unable to resolve any such dispute, the Parties shall request the Bankruptcy Court to make a determination on an expedited basis.

Section 2.9     Possession of Stores; Removal of Excluded Assets. Possession of the Stores and other Acquired Assets being transferred hereunder shall be delivered to Buyer at each applicable Closing, free and clear of (a) all Excluded Assets (which shall be removed by Sellers within twenty four (24) hours of the Inventory count for such Closing at Sellers' sole cost and expense) and (b) rubbish and debris, and shall be broom clean. The keys to the Stores and the combinations to all safes at the Stores shall be delivered to Buyer or its designated Representative at the applicable Closing. Prior to each applicable Closing, the Parties shall cooperate in effecting a transfer of the utilities servicing the Stores from Sellers to Buyer so as to avoid any interruption of utility service to the Stores. Sellers shall continue to operate all heat and air conditioning and all refrigerators and freezers in the Stores through and including the applicable Closing Date, in the Ordinary Course of Business.

# ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct as of the date of this Agreement, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule").

Section 3.1     Organization of Sellers; Good Standing. Each Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of its incorporation and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted, except where the failure to be so qualified or licensed, in good standing or to have such power and authority, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect.

Section 3.2     Authorization of Transaction. Subject to the Bankruptcy Court's entry of the Sale Order, each Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller. Upon due execution hereof by each Seller, this Agreement (assuming due

authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.3 <u>Noncontravention; Government Filings</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of either Seller, (b) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, violate any Law or Decree to which either Seller is subject in respect of the Acquired Assets, (c) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which either Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Other than (x) the applicable requirements of the HSR Act, and (y) as required or pursuant to the Bankruptcy Code, the Bidding Procedures Order, the Sale Order or the Confirmation Order, neither Seller is required to give any notice to, make any filing with, or obtain any Consent of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such Consent has not had and would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay either Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4 <u>Title to Assets</u>. Immediately prior to the applicable Closing, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens). Pursuant to the Sale Order, Sellers will convey to Buyer such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens), at each applicable Closing.

Section 3.5 <u>Real Property</u>.

(a) <u>Schedule 3.5</u> of the Disclosure Schedule sets forth the location of each Store, each of which is leased to a Seller by a third party, and a list of all leases with respect to such property. Sellers have made available to Buyer a true and complete copy of each Lease, to the extent in their possession, prior to the date hereof. With respect to each Lease: (i) such Lease is in full force and effect and constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity; (ii) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, except for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases); (iii) no event or circumstance has occurred that, with notice or lapse of time or both, would constitute a default or breach under any Lease, and (iv) except under valid subleases, sublicenses or licenses made available to Buyer and as set forth in <u>Schedule 3.5</u> of the Disclosure Schedule, the applicable Seller party is the sole occupant of the Store and no Seller has entered into any agreement with any other Person for occupancy of any Store or any portion thereof.

WEIL:\95398962\13\50482.0004

(b)     None of the Improvements materially encroach on any land that is not the subject of the Lease or on any easement or servitude, and there are no encroachments on any portion of such real property by any buildings or improvements from adjoining real property, which encroachment would materially interfere with the use or occupancy of such real property or the applicable Store or the continued operation of the Acquired Assets. To Sellers' Knowledge, (i) use of the Improvements for a grocery store (and current ancillary uses) is permitted under all applicable zoning and other land use Law; and (ii) all Improvements are in material compliance with all applicable Law, including those pertaining to zoning, building and the disabled.

(c)     To Sellers' Knowledge, there is no legal impediment (whether arising out of any matter of record, title, or out of any building, zoning, fire, health, safety or Environmental Law, or otherwise, or any other lease of premises in any shopping center) to the use of any Store as a food supermarket and/or pharmacy or to the exercise and enjoyment by Buyer of its rights and privileges as tenant under the Leases.

Section 3.6     Litigation; Decrees.  Except as set forth in Schedule 3.6 of the Disclosure Schedule and other than the Bankruptcy Case, there is no material Litigation pending or, to Sellers' Knowledge, threatened, (a) with respect to any Acquired Asset or (b) that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Other than the Bankruptcy Case, neither Seller is subject to any outstanding Decree that (a) would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (b) would prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.7     Labor Relations.  Except as set forth in Schedule 3.7 of the Disclosure Schedule, neither Seller is a party to or bound by any collective bargaining agreement covering the Covered Employees.

Section 3.8     Brokers' Fees.  Other than the fees and expenses payable to Evercore Group L.L.C. in connection with the transactions contemplated hereby, which shall be borne by Sellers, neither Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.9     Taxes.

(a)     (i) In each case with respect to the operation of the Stores or ownership of the Acquired Assets, Sellers have timely filed all material Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers); and (ii) all Taxes shown as due on such Tax Returns have been paid (except as prohibited by the Bankruptcy Code).

(b)     All material Taxes that Sellers were required by Law to withhold or collect with respect to the operation of the Stores or ownership of the Acquired Assets in connection with amounts paid or owing to any employee, independent contractor, creditor or other third party, in all material respects, have been duly withheld or collected and have been timely paid to the appropriate authorities to the extent due and payable (except as prohibited by the Bankruptcy Code).

(c)     Sellers are not foreign persons within the meaning of section 1445 of the IRC.

Section 3.10    Tangible Personal Property.    Schedule 3.10 of the Disclosure Schedule sets forth all Transferred Contracts that constitute leases of personal property used by Sellers in the Business.

Section 3.11    Employee Benefits.

(a)    Schedule 3.11(a) of the Disclosure Schedule lists all "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, employment, change in control, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers and their Subsidiaries with respect to Covered Employees (the "Employee Benefit Plans").

(b)    True, correct and complete copies of the following documents, with respect to each of the Employee Benefit Plans, have been made available to Buyer (A) any plan documents, and all material amendments thereto, (B) the most recent Forms 5500 and (C) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)    Each of the Employee Benefit Plans sponsored by Sellers and its Subsidiaries that is intended to qualify under section 401 of the IRC has received a favorable determination letter from the IRS that such plan is be so qualified, and, except as disclosed on Schedule 3.11(c) of the Disclosure Schedule, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)    Each of the Employee Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.  No Seller has incurred, and no event has occurred and no condition or circumstance exists that could result, directly or indirectly, in, any unsatisfied Liability (including, without limitation, any indirect, contingent or secondary Liability) of any Seller under Title IV of ERISA or Section 412 or 430 of the Code or Section 302 or 303 of ERISA.

Section 3.12    Compliance with Laws; Permits.

(a)    Except as set forth on Schedule 3.12(a) of the Disclosure Schedule, Sellers are in compliance in all material respects with all Laws (including Environmental Laws and employment Laws, but except for Laws addressed in Section 3.13 and Section 3.14) and Decrees applicable to the Business. Sellers have not received any written notice of or been charged with the violation of any Laws (including Environmental Laws and employment Laws) or Decrees, which remain outstanding or otherwise could be considered material.  To Sellers' Knowledge, there is no pending or threatened, action, investigation or inquiry of any sort (other than non-material routine or periodic inspections or reviews) regarding the possible material breach or violation of any Laws applicable to the Business. Except as set forth on Schedule 3.12(a) of the Disclosure Schedule, to Sellers' Knowledge, Sellers have not conducted any dry cleaning operations at any of the Stores. With respect to the environmental issues for which Sellers were responsible at Store 658 (Long Beach, NY) on Schedule 3.12(a) of the Disclosure Schedule, Sellers have accomplished full closure of such issues to the satisfaction of all applicable Governmental Authorities such that no further monitoring, reporting or remediation is required.  To Sellers' Knowledge, with respect to Store 626 (Ozone Park, NY), there are no current conditions, which would reasonably be expected to result in the Sellers incurring material

23

liabilities under Environmental Laws, including liabilities related to investigation or remediation of the Store.

(b) Schedule 3.12(b) of the Disclosure Schedule sets forth a Store-by-Store list of all material Permits held, used or intended to be used by Sellers, or otherwise required, in connection with or related to the Business, in each case that are in effect on the date hereof. Sellers are in compliance in all material respects with all such Permits. Sellers hold all of such material Permits and such Permits constitute all Permits which are required for the Business as presently conducted. Each such Permit is in full force and effect and has not expired. Sellers are not in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation) of any term, condition or provision of any such Permit to which they are parties.

Section 3.13    Pharmacy Records.    The Pharmacy Records that are included in the Acquired Assets are true and complete in all material respects and have been maintained in all material respects in accordance with all applicable Laws, including all Healthcare Laws.

Section 3.14    Pharmacy Operations.

(a) Sellers are duly qualified for participation in the Medicare and Medicaid programs with respect to all pharmacy operations conducted at the Stores. Sellers have not received any written notice indicating that such qualification may be terminated or withdrawn. Sellers are in material compliance with all filing requirements with respect to claims or other reports required to be filed with respect to the purchase of products or services by third-party payors (including, without limitation, Medicare and Medicaid), and Sellers do not have any material Liability to any payor with respect thereto.

(b) With respect to pharmacy operations at the Stores, Sellers have complied in all material respects with all applicable Laws, including Healthcare Laws and the regulations issued pursuant thereto and all statutes and regulations relating to the possession, distribution, maintenance and documentation of controlled substances.

Section 3.15    Disclaimer of Other Representations and Warranties.    Except for the representations and warranties contained in this Article III (as modified by the Disclosure Schedule) or expressly contained in any Related Agreement, neither Sellers nor any other Person shall be deemed to have made any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding either Seller, any Acquired Assets, any Assumed Liabilities or any other matter. Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III (as modified by the Disclosure Schedule) or any Related Agreement, NEITHER SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. BUYER ACKNOWLEDGES THAT, SHOULD THE CLOSINGS OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS). Sellers disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Sellers or any

24

of their Affiliates), except for the representations and warranties contained in this <u>Article III</u> (as modified by the Disclosure schedule) or expressly contained in any Related Agreement.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to each Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date of this Agreement.

Section 4.1 <u>Organization of Buyer; Good Standing</u>. Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2 <u>Authorization of Transaction</u>. Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer. This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 4.3 <u>Noncontravention</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (b) violate any Law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer. Other than the applicable requirements of the HSR Act, Buyer is not required to give any notice to, make any filing with, or obtain any Consent of any Governmental Authority in order for Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such Consent would not reasonably be expected to, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4 <u>Litigation; Decrees</u>. There is no Litigation pending or, to Buyer's knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby. Neither Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5 <u>Brokers' Fees</u>. Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

25

Section 4.6    Sufficient Funds; Adequate Assurances.    Buyer has, and at the Initial Closing (and each Subsequent Closing) will have, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

Section 4.7    HIPAA.    Buyer is a "Covered Entity" as defined HIPAA.    The transactions contemplated by this Agreement will not violate any of the HIPAA Commitments or any Additional Privacy Requirements.

# ARTICLE V
# PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the applicable Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby (including by giving, or causing to be given, any notices to, making any filings with, and using commercially reasonable efforts to obtain any Consents of Governmental Authorities, as are necessary and appropriate to consummate the transactions contemplated hereby). Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 and Section 7.3 that are within its control or influence to be satisfied or fulfilled, and (ii) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 and Section 7.4 that are within its control or influence to be satisfied or fulfilled.

(b)    Without limiting the generality of Section 5.1(a) (but for the avoidance of doubt, subject to Section 5.3) no Party shall take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any Party to consummate, or materially delay any Party's ability to consummate, the transactions contemplated hereby, including any action that is intended or would reasonably be expected to result in any of the conditions to any Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

Section 5.2    Conduct of the Business Pending the Closing.

(a)    Prior to the Closing applicable to any given Store or Acquired Asset, except (i) as set forth on Schedule 5.2(a) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), each Seller shall (A) conduct the Business only in the Ordinary Course of Business, (B) use its commercially reasonable efforts to (1) preserve the present business operations, organization and goodwill of the Business, and (2) preserve the present relationships

26

with material vendors and suppliers of the Business, and with the Stores' landlords, (C) maintain the Acquired Assets in their existing condition and repair, subject to ordinary wear and tear; (D) other than in the Ordinary Course of Business, not add or remove any Furnishing and Equipment to or from any Store except (i) in accordance with the terms hereof or (ii) if broken or in need of repair; (E) except for Excluded Inventory, not transfer any Inventory to or from the Stores from or to other stores or supermarkets operated by Sellers or their Affiliates or to any third parties (except sales of Inventory to customers in the ordinary course of business); (F) not amend, modify, waive, or replace any Transferred Contract (for the avoidance of doubt, excluding any renewal options contained in any Leases on the date hereof); (G) keep all insurance policies currently maintained with respect to the Stores and the Acquired Assets, or suitable replacements or renewals, in full force and effect through the close of business on the applicable Closing Date; (H) maintain all Permits used in the Business, including Pharmacy Licenses, file all applicable renewals in connection therewith, and use commercially reasonable efforts to prevent termination or expiration of any existing Permit (including Pharmacy Licenses) or Medicare and Medicaid provider numbers related to any such Store.

(b)    Except (i) as set forth on <u>Schedule 5.2(b)</u> of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), neither Seller shall, solely as it relates to the Business:

(i)    (x) other than as required by any applicable collective bargaining agreement or by Law, (A) materially increase the annual level of compensation of any Covered Employee, (B) materially increase the coverage or benefits available under any (or create any new) Employee Benefit Plan; (y) announce, implement or effect any material reduction in force, lay-off, early retirement program, severance program or other program or effort concerning the termination of employment of employees (other than routine employee terminations for cause); or (z) hire any employee or permit to be transferred to any Store any employee of Sellers or any other affiliate of Sellers, other than any hiring or transfer in replacement of an employee terminated for cause, or who otherwise resigned (which replacement employee will not be hired at a base salary or bonus amount greater than the terminated or resigned employee);

(ii)    subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral;

(iii)    agree to do anything prohibited by this <u>Section 5.2</u>.

(c)    Notwithstanding anything in this <u>Section 5.2</u> to the contrary, with respect to each Store, during the period commencing on the date that is (i) thirty (30) days prior to the anticipated Closing Date for such Store in the case of Excluded Inventory described in <u>Sections 2.6(a)(v)</u>, <u>(vi)</u> and <u>(vii)</u>, and (ii) ten (10) days prior to the anticipated Closing Date for such Store in the case of all other categories of Excluded Inventory, Seller will have no obligation to purchase or maintain levels of such Excluded Inventory at each such Store.

Section 5.3    <u>Regulatory Approvals</u>.

(a)    Each of the Parties hereto shall make, to the extent required, its respective filing under the HSR Act with respect to the transactions contemplated hereby on or before July 31, 2015.  In addition, the Parties shall mutually agree to make any and all other filings required pursuant to other Antitrust Laws as promptly as reasonably practicable following the date that this

Agreement is executed. Further, Buyer shall use its reasonable best efforts to: (i) supply as promptly as reasonably practicable any additional information and documentary material that may be requested or required pursuant to any Antitrust Law, including the HSR Act; and (ii) cause the expiration or termination of any applicable waiting periods under the HSR Act or any other Antitrust Law as soon as reasonably practicable. Immediately prior to the end of the initial fifteen (15) day HSR waiting period, Buyer may pull and refile its filing under the HSR Act so as to re-start the Federal Trade Commission's initial waiting period, unless staff of the Federal Trade Commission notifies the Parties during the initial fifteen (15) day waiting period that it will allow the applicable HSR waiting period to expire without the need for issuance of Requests for Additional Information and Documentary Material ("Second Requests").

(b)    In connection with seeking all requisite approvals and authorizations for the transactions contemplated by this Agreement under any Antitrust Law or any state Law, the Parties shall use reasonable best efforts to: (i) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) as promptly as reasonably practicable after the date on which this Agreement is executed, jointly contact and meet with the staff of the Federal Trade Commission regarding the transactions contemplated hereby; (iii) keep each other reasonably informed in all material respects of any material communication received by such Party from, or given by such Party to, any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby; and (iv) permit each other to review any material communication given to it by, and, to the extent reasonably practicable, consult with each other in advance of any meeting or conference with, any Governmental Authority, including in connection with any proceeding by a private party. The foregoing obligations in this Section 5.3(b) shall be subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege. Sellers shall be permitted to communicate privately with any Governmental Authority regarding Sellers' financial condition and, on a confidential basis and without divulging any confidential information regarding the Buyer, matters relating to competing bidders for the Stores, and Buyer and Buyer's outside counsel shall not have the right to attend or participate in such meetings, conferences, or proceedings, and shall not have access to material prepared by Sellers relating to such matters.

(c)    Buyer shall have the right not to acquire, and Sellers shall have the right not to sell, any or all of the Stores if, and only if: (i) any Governmental Authority with jurisdiction over the enforcement of any Antitrust Law, including the Federal Trade Commission, including its staff, or any state attorney general, indicates in writing that it has recommended or made the determination to issue Second Requests or similar subpoenas to further investigate whether the acquisition of such Store(s) may violate any Antitrust Law (a "Second Request Recommendation"), issues a Second Request or similar subpoena seeking information concerning such Store(s), or indicates that such Store(s) at present raise or may raise competitive issues; or (ii) if any Litigation is threatened or instituted by any Governmental Authority or private party challenging the acquisition of any such Store(s) as violative of any Antitrust Law. In the event that, subject to the limitations set forth herein, Buyer or Sellers choose to exercise their right not to acquire any Store(s), the Party exercising such right shall notify the other Party in writing and identify any such Store(s) ("Excluded Stores") by no later than 11:59 p.m. New York Time on August 31, 2015 ("Store Withdrawal Deadline"), and Buyer shall have no further right or obligation to acquire, and Seller shall have no further right or obligation to sell, such Store(s) or any Acquired Assets associated with such Store(s), or assume any Assumed Liabilities associated with such Store(s). For the avoidance of doubt, except as provided in Section 5.3(d) below, if there is a Second Request Recommendation, Second Requests or similar subpoena as set forth

WEIL:\95398962\13\50482.0004

above, or if any Litigation is threatened or instituted by any Governmental Authority or private party challenging the acquisition, ownership or operation of any such Store(s) (or the continued ownership and operation of Buyer's other assets) as violative of any Antitrust Law, neither Buyer nor its Affiliates shall have any obligation to: (A) seek to resolve such objections or challenges as such Governmental Authority or private party may have to such transactions, including to vacate, lift, reverse, or overturn any order, whether temporary, preliminary, or permanent, so as to permit consummation of the transactions contemplated by this Agreement, (B) respond to or otherwise resolve any Second Requests or similar subpoenas received from any Governmental Authority or any other Person in connection with the transactions contemplated by this Agreement, (C) prosecute or otherwise pursue any Litigation under any Antitrust Law seeking clearance or approval of the transactions contemplated by this Agreement, or (D) offer, negotiate or agree to, by consent decree, hold separate order or otherwise, any sale, divestiture, license, or other disposition of or restriction on, any of Sellers' or Buyer's respective assets (including the Acquired Assets), Stores, or interests therein, so as to permit consummation of the transactions contemplated by this Agreement.

(d)     Notwithstanding any other provision in this Agreement, with respect to any Stores that Buyer or Sellers have not withdrawn pursuant to their rights under Section 5.3(c) on or before the Store Withdrawal Deadline, Buyer shall use its reasonable best efforts to eliminate each and every impediment under any Antitrust Law that may be asserted by any Governmental Authority or any other Person in opposition to the consummation of any transaction contemplated hereby, so as to enable the Parties to consummate the transactions contemplated by this Agreement as soon as practicable, but in any event not later than the Outside Date, including, without limitation, by offering, negotiating, effecting, and agreeing to, by consent decree, hold separate order or otherwise, any sale, divestiture, license, or other disposition of or restriction on, any of the Acquired Assets, Stores, or interests therein (but excluding, for the avoidance of doubt, any of the Buyer's other assets); provided, however, that any such sale, divestiture, license, disposition, restriction on, holding separate, or other similar arrangement or action is conditioned on the occurrence of, and shall become effective only from and after, the Closing Date; and provided, further, that nothing in this Section 5.3(d) shall require Buyer to defend or initiate any Litigation with any Person.

(e)     Actions or agreements required of Buyer pursuant to this Section 5.3 shall under no circumstances be considered a Material Adverse Effect.

Section 5.4     Bankruptcy Court Matters.

(a)     Approval of Break-Up Fee and Expense Reimbursement.  In the event that a Competing Bid is consummated (except for a Competing Bid with respect to a Separable Store), in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay Buyer, in accordance with the terms hereof (including Article VIII) and the Bidding Procedures Order, a break-up fee in an amount equal to (i) 3% of the sum of Cash Purchase Price less the Purchase Price Reduction, if any (the "Break-Up Fee"), plus (ii) up to $1,000,000 of the reasonable and documented expenses of Buyer incurred in connection with the transactions contemplated hereby (such expense reimbursement, together with the Break-Up Fee, the "Termination Payment"). For the avoidance of doubt, the Termination Payment shall be calculated without any reduction or proration of any kind if a Competing Bid is consummated with respect to all or any part, including any individual Store(s) other a Separable Store, of the Acquired Assets.  The Termination Payment shall be paid on the first Business Day following the date of consummation of a Competing Bid (except for a Competing Bid with respect to a Separable Store) from the proceeds of a Competing Bid if no material breach by Buyer of this

29

Agreement has occurred. Nothing in this <u>Section 5.4</u> shall relieve Buyer or Sellers of any Liability for a breach of this Agreement prior to the date of termination; <u>provided</u>, that, except in the case of fraud or willful misconduct, (x) Sellers' Liability hereunder for any and all such breaches shall be capped at an amount equal to the Termination Payment and (y) Buyer's Liability hereunder for any and all such breaches shall be capped at an amount equal to the Escrow Amount (as set forth in <u>Section 8.3(a)</u>). Upon payment of the Termination Payment to Buyer in accordance with this <u>Section 5.4(a)</u>, Sellers and their respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Sellers, their Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses.

(b) <u>Competing Transaction</u>. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Acquired Assets (whether in combination with other assets of the Sellers or their Affiliates or otherwise) (each a "<u>Competing Bid</u>"). Subject to the provisions of the Bidding Procedures Order, from the date of entry of such order and until the transactions contemplated hereby are consummated, Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any sale or other disposition of the Acquired Assets. In addition, Sellers and their Representatives and Affiliates shall have the authority to respond to any inquiries or offers to purchase all or any part of the Acquired Assets (whether in combination with other assets of the Sellers or their Affiliates or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including supplying information relating to the Business and the assets of Sellers to prospective purchasers.

(c) <u>Bankruptcy Court Filings</u>.

(i) As soon as reasonably practicable following the execution of this Agreement and not later than two (2) Business Days following the commencement of the Bankruptcy Cases, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order (which shall, among other things, approve and authorize payment of the Termination Payment in accordance with this <u>Section 5.4</u>) and Sale Order. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to obtain the Bankruptcy Court's entry of the Bidding Procedures Order and Sale Order, including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder, except to the extent necessary to further the terms of this Agreement. In the event the entry of the Bidding Procedures Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(ii) Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of

the Cure Costs; provided, that nothing herein shall preclude Sellers from filing such motions, including upon commencement of the Bankruptcy Cases, to reject any Contracts that are not Transferred Contracts.

(d)     Back-up Bidder.  Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the auction undertaken pursuant to the Bidding Procedures Order (the "Auction"), if and only if (i) Buyer submits the second highest or second best bid at the Auction or the terms of this Agreement constitute the second highest or best bid, and (ii) Sellers give written notice to Buyer on or before the Back-up Termination Date, stating that Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyer shall, subject to the fulfillment or waiver of the conditions set forth in Section 7.1 and Section 7.3, promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Buyer at the Auction.

(e)     Sale Order.  Provided Buyer is selected as the winning bidder in respect of the Acquired Assets at the Auction, Sellers shall seek entry of the Sale Order and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the closing of the Auction in accordance with the terms and conditions hereof.  Buyer and Sellers understand and agree that the transaction is subject to approval by the Bankruptcy Court.  Buyer and Sellers agree to use their respective commercially reasonable efforts to, and promptly take all actions as are reasonably necessary to, obtain the entry of the Sale Order.  In the event the entry of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(f)     Other Matters.  Notwithstanding anything to the contrary contained in this Agreement, Buyer shall be permitted to exercise all rights set forth in paragraph 18 of the Confidentiality Agreement in the manner described therein.

Section 5.5     Estoppel Certificates. Sellers shall use their commercially reasonable efforts to deliver to any landlord under a Lease specified in writing by Buyer, an estoppel certificate, in a completed form provided to Sellers by Buyer (and reasonably acceptable to Sellers).

Section 5.6     Notice of Developments.  Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.6 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.7     Pharmacy Records; Pharmacy Licenses.

(a)     Promptly as practicable after the execution of this Agreement, Buyer shall make application to the applicable authorities to transfer the Pharmacy Records, if and as necessary, from Sellers to Buyer.  Such application shall be made on a timely basis and shall be pursued by Buyer, at its sole cost and expense.  Sellers, at Buyer's cost and expense, shall cooperate with Buyer and provide any documents and/or information necessary to assist in effectuating such transfer and execute such consents or other papers as may reasonably be required subject to

31

applicable patient privacy rights. At each applicable Closing, Sellers shall, subject to applicable patient privacy rights and to the extent not otherwise prohibited by applicable Law, assign, transfer, and convey to Buyer all of their right, title, and interest in and to the applicable Pharmacy Records, and Buyer hereby agrees to purchase and accept from Sellers all of the applicable Pharmacy Records as of each applicable Closing. Notwithstanding the foregoing, in the event all or any portion of the Pharmacy Records will not be transferred to Buyer at the applicable Closing (whether due to a denial of Buyer's application by the applicable authority or otherwise), Buyer may elect, at its sole option (i) for such non-transferred Pharmacy Records to be deemed Excluded Assets, and the Parties shall negotiate in good faith to agree on a reduction of the Purchase Price that appropriately reflects the value of such non-transferred Pharmacy Records or (ii) to proceed with the Closing, in which event Sellers shall continue to cooperate with Buyer and shall transfer any such non-transferred Pharmacy Records to Buyer after such transfer to Buyer becomes permissible.

(b)     Buyer or a designee of Buyer will file, or cause to be filed, all applications necessary, and will use its commercially reasonable efforts, to obtain all permits, licenses or approvals (including, without limitation, all applicable state permits, United States Drug Enforcement Agency numbers, National Council for Prescription Drug Programs numbers, National Provider Identifier numbers, CDS numbers and Medicare and Medicaid numbers) (collectively, the "Pharmacy Licenses") necessary to operate any pharmacy within any Store within ten (10) Business Days after the entry of the Sale Order. In the event that any Pharmacy License necessary for the Buyer's operation of any pharmacy within an applicable Store is not obtained prior to the applicable Closing, Sellers acknowledge and agree that, beginning on each applicable Closing Date and subject to the immediately following sentence, Buyer shall be entitled to utilize, only in connection with Buyer's operation of any pharmacy located within any Store and only to the extent permitted by applicable Law, the Pharmacy Licenses of Sellers related to such pharmacy. To affect the foregoing authorization, at or prior to each applicable Closing and only to the extent that Buyer has not obtained the applicable Pharmacy License, Sellers and Buyer shall (i) enter into a Pharmacy Permit Agreement on terms and conditions satisfactory to Buyer and Sellers and (ii) execute such documents, if any, as may be required or requested by a Governmental Authority, including any affidavits of sale. As a condition precedent to the Sellers' execution of such Pharmacy Permit Agreement or any other documents required or requested by a Governmental Authority, Buyer shall also agree that (i) during the period of Buyer's use of Sellers' Pharmacy Licenses Buyer shall own and/or operate the Acquired Assets or any Store in accordance with applicable Law and (ii) Buyer shall indemnify the Sellers against all losses arising out of Buyer's use of such Pharmacy Licenses, instruments or Pharmacy Permit Agreement. Buyer's use of the Pharmacy Licenses with respect to any pharmacy shall automatically terminate upon the issuance to Buyer of all of the Pharmacy Licenses necessary for Buyer to lawfully operate such pharmacy.

Section 5.8     Access; No Contact. Upon the reasonable request of Buyer and to the extent not otherwise prohibited by applicable Law, Sellers will permit Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, books and records and the Acquired Assets, including the Transferred Contracts, and the Stores after normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of any Seller; provided, however, that, for avoidance of doubt, (i) the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto and (ii) any access to Pharmacy Records shall be provided in accordance with HIPAA and any other applicable federal or state privacy or disclosure laws as determined by each Seller in its sole discretion. Sellers shall have the right to have a Representative of Seller present at any such visit. Prior to the applicable Closing, except as otherwise required, contemplated or permitted by this Agreement, Buyer

shall not, and shall cause its Representatives not to, contact any employees (other than in connection with Buyer's obligations under <u>Section 6.4</u>), vendors, suppliers, landlords, or licensors of any Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller.  Notwithstanding anything to the contrary contained in this Agreement, no investigation conducted by Buyer or its Affiliates or their respective Representatives, or any knowledge acquired (or capable of being acquired) by Buyer, its Affiliates or their respective Representatives, at any time, shall affect the representations and warranties of Sellers contained in this Agreement or Buyer's obligation to consummate the transactions contemplated hereby.

Section 5.9    <u>Bulk Transfer Laws</u>.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws or similar Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.10    <u>Replacement Bonding Requirements</u>.  <u>Schedule 5.10</u> of the Disclosure Schedule sets forth a true and complete list of all Bonding Requirements.  On or prior to each applicable Closing Date, Buyer shall provide replacement guarantees, standby letters of credit or other assurances of payment with respect to all relevant Bonding Requirements for such Closing, in form and substance reasonably satisfactory to Sellers and any banks or other counterparty thereto, and, both prior to and following the applicable Closing Date, Buyer and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Buyer and Sellers with respect to all Bonding Requirements.  To the extent Buyer is unable to make such arrangements with respect to any Bonding Requirements prior to the applicable Closing, Buyer shall deliver to Sellers an irrevocable, unconditional standby letter of credit in favor of Sellers in an amount equal to the amount of such relevant Bonding Requirements, issued by a bank rated "A" or better by Standard and Poor's, in form and substance reasonably satisfactory to Sellers.

Section 5.11    <u>Damage or Destruction; Insurance Matters</u>.

(a)    In the event of any material damage to, or condemnation or destruction of, any Acquired Asset (other than normal wear and tear) prior to the applicable Closing for such Acquired Asset (a "<u>Pre-Closing Loss</u>"), Sellers shall promptly give notice thereof to Buyer.  If any such Pre-Closing Loss is covered by insurance policies, all right and claim of Sellers to any proceeds of insurance for such Pre-Closing Loss shall be assigned and (if previously received by Sellers and not used prior to the applicable Closing Date to repair such damage or destruction or negate the effect of such condemnation or for collection of such proceeds or awards) paid to Buyer at Closing, and Buyer shall not be entitled to any reduction in the Purchase Price with respect to such Pre-Closing Loss.  If all or any portion of such Pre-Closing Loss is not covered by insurance policies, Buyer shall have the right to reduce the Purchase Price by an amount equal to (i) the estimated cost to repair or restore the Acquired Assets affected by such Pre-Closing Loss not covered by insurance policies (the "<u>Affected Assets</u>") to substantially their condition immediately prior to the occurrence of such Pre-Closing Loss or (ii) if such Affected Assets are destroyed or damaged beyond repair or reconstruction or if such condemnation has a material adverse effect on the use of such Affected Assets, the replacement cost of the Affected Assets and, in either case, all compensation payable on account of such Pre-Closing Loss shall be retained by Sellers.  If Buyer elects to reduce the Purchase Price pursuant to this <u>Section 5.11(a)</u>, the amount of such reduction shall be equal to the value assigned to such Affected Asset in the Purchase Price Allocation or, if no such value is assigned therein, an equitable amount determined by the Parties in good faith.

(b)    Notwithstanding <u>Section 5.11(a)</u>, if as a result of a Pre-Closing Loss, (i) a Store  is destroyed or damaged beyond repair or reconstruction, (ii) a Store is damaged and the repair or restoration of such Store to substantially its condition immediately prior to such damage is (A) estimated to cost in excess of US\$1,000,000 or (B) reasonably expected to take more than six (6) months, or (iii) any portion of the real property on which the Store is located is condemned and such condemnation has a

material adverse effect on Buyer's ability to operate such Store in its usual manner, then Buyer may, at its sole discretion, opt to (x) treat such Store and all related Acquired Assets as Excluded Assets (such Store, a "Removed Store"), or (y) continue to treat such Store and all related Acquired Assets as Acquired Assets, in which case at the applicable Closing, Sellers shall remit to Buyer any insurance proceeds received in respect of such Pre-Closing Loss and, if such proceeds received as of the applicable Closing are insufficient to restore such Store and its related Acquired Assets to substantially their condition immediately prior to the occurrence of such Pre-Closing Loss, Buyer shall have the right to offset against the applicable Closing Cash Payment an amount equal to the amount by which such proceeds are insufficient to so restore such Store and its related Acquired Assets, and Sellers shall be entitled to retain any additional compensation received after the applicable Closing in respect of such Pre-Closing Loss.

(c) Sellers shall pursue all Assigned Insurance Claims with reasonable diligence (or at the request of Buyer, Sellers shall use their commercially reasonable efforts to cause Buyer to be subrogated in respect of any such Assigned Insurance Claims), including filing claims with respect to any Pre-Closing Loss. Promptly following the resolution of any Assigned Insurance Claim, whether before or after the applicable Closing, Sellers shall remit any proceeds (net of any deductible, costs of recovery, and other costs required to be paid, or incurred, by Sellers with respect thereto) received in respect of such Assigned Insurance Claim to Buyer by the later to occur of (i) the applicable Closing and (ii) the third (3rd) Business Day after the receipt of such proceeds (but only to the extent such amount was not deducted from the Closing Cash Payment at the applicable Closing). The Parties shall cooperate in good faith in the resolution with the insurance companies of any Assigned Insurance Claim, and Sellers shall provide notice to Buyer of any correspondence received in connection with any Assigned Insurance Claim.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing applicable to any given Store:

Section 6.1    Further Assurances. In the event at any time after the applicable Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

Section 6.2    Access; Enforcement; Record Retention. Until the Bankruptcy Cases are closed pursuant to the Bankruptcy Code (or with respect to Tax matters, a period of three (3) years) after the applicable Closing, Buyer and Sellers agree to provide or cause to be provided to each other (or their Representatives) upon reasonable advance written notice and at the sole cost and expense of the requesting Party, reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Buyer or Sellers, as the case may be, to all premises, properties, personnel, books and records, and Transferred Contracts of or related to the Acquired Assets or the Assumed Liabilities for the purposes of (a) preparing Tax Returns, or (b) complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer or Sellers to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations. Buyer and Sellers agree to maintain the files or records which are contemplated by the first (1st) sentence of this Section 6.2 in a manner consistent in all material

34

respects with its document retention and destruction policies, as in effect from time to time, for six (6) months following the applicable Closing.

Section 6.3     Treatment of Affected Labor Agreements.  With respect to Covered Employees under an Affected Labor Agreement, Buyer may (a) agree to assume the Affected Labor Agreement with respect to the applicable Stores without modification and thereafter comply with the obligations set forth in Section 6.4 with respect to Covered Employees under such assumed Affected Labor Agreement, (b) meet with Affected Union representatives at reasonable times, and confer and negotiate in good faith with the Affected Unions to reach mutually satisfactory modifications to the relevant Affected Labor Agreement with each of the Affected Unions and to enter into a Modified Labor Agreement with each of the Affected Unions, or (c) negotiate with the Affected Unions to arrange a transfer at the applicable Closing of all or any Covered Employees from any Affected Labor Agreement to any collective bargaining agreement that Buyer may have with the applicable Affected Union or any collective bargaining agreement that Buyer may have with another union that represents Buyer's employees at Buyer's existing stores located in the same area as the relevant Stores (each, a "Buyer Labor Agreement").  Buyer shall keep Sellers reasonably informed as to the status of its negotiations with the Affected Unions. Buyer may, at any time prior to the Sale Hearing, agree to have an Affected Labor Agreement assigned to it without modification by providing notice of such agreement to Sellers and the applicable Affected Union.  Upon the commencement of the Bankruptcy Cases, to the extent Buyer is not assuming the Affected Labor Agreements, Buyer shall, in coordination with Sellers, (i) propose a Modified Labor Agreement to each Affected Union that is consistent with the terms set forth on Exhibit H (each, a "Proposal"), which Proposal may be modified as a result of Buyer's and/or Sellers' good faith negotiations with the Affected Unions, or (ii) pursue such negotiations as Buyer deems appropriate in connection with transferring Covered Employees to a Buyer Labor Agreement.  The Parties agree to cooperate with each other in providing each Affected Union with complete and reliable information to allow the Affected Unions to evaluate the Proposal.  For all purposes under this Section 6.3, the Parties acknowledge the requirements of sections 1113 and 1114 of the Bankruptcy Code and agree to use good faith efforts to cooperate with each other (and to negotiate in good faith with the Affected Unions) in ensuring compliance with any applicable provisions thereof. If the applicable Affected Union (x) agrees to the transfer from an Affected Labor Agreement of all Covered Employees thereunder to a Buyer Labor Agreement, at the applicable Closing, or (y) does not reach agreement with the Buyer on the terms of a Modified Labor Agreement or a transfer to a Buyer Labor Agreement, then Buyer shall have the right, at its sole discretion, to deem such Affected Labor Agreement an Excluded Asset, such Affected Labor Agreement shall not be assumed by Buyer, and Sellers shall take all reasonable actions to the extent required under sections 1113 and 1114 of the Bankruptcy Code.

Section 6.4     Covered Employees.

(a)     Offer of Employment.  Sellers shall provide Buyer with details regarding the Covered Employees' salaries, wages, incentive compensation, benefits and employment records as Buyer within ten (10) days of the date hereof and shall provide an updated schedule of the same upon Buyer's request. At least the (10) days prior to the Initial Closing Date, Buyer shall make an offer of at-will employment, effective as of the applicable Closing Date and contingent upon such applicable Closing, to substantially all of the union-represented Covered Employees who are then employed by Sellers or their respective Subsidiaries (at the same base wage or hourly rate as in effect immediately prior to the applicable Closing), subject to and in accordance with Buyer's business needs and normal hiring process; provided, however, that any offer of employment shall be contingent upon the applicable Closing actually occurring.  With respect to union-represented Covered Employees, such offers shall also be consistent with the terms and conditions required by the governing Affected Labor Agreements, Modified Labor Agreements or Buyer Labor Agreements, if any, or otherwise consistent with the terms and conditions of the Proposal if the Buyer exercises its right to treat as an Excluded Asset any

35

Affected Labor Agreement in accordance with the last sentence of Section 6.3. Prior to the applicable Closing Date, Buyer may, in its sole discretion, interview and make an offer of at-will employment, effective as of such Closing Date, to any of the Covered Employees who are not union-represented who are selected by Buyer in its sole discretion, subject to and in accordance with Buyer's business needs and normal hiring practices; provided, however, that any offer of employment shall be contingent upon such Closing actually occurring. Prior to the applicable Closing Date, Sellers shall permit, and cause their respective Subsidiaries to permit, Buyer to contact, interview and make arrangements with Covered Employees regarding employment or prospective employment by Buyer after the applicable Closing. The employment by Sellers or their respective Subsidiaries of each Hired Covered Employee shall terminate effective as of the applicable Closing Date. Sellers shall waive and assign to Buyer any non-competition or other restrictions that might prevent or restrict any Hired Covered Employee from accepting any such offer of employment, including by forwarding a letter to each Hired Covered Employee, upon request by Buyer and in a form satisfactory to Buyer, expressly releasing such Hired Covered Employee from any obligations he or she may have to Sellers or their Affiliates. Notwithstanding the foregoing, nothing herein shall be construed as to prevent Buyer from terminating the employment of any Hired Covered Employee, consistent with applicable Law and the governing Affected Labor Agreements, the Modified Labor Agreements or Buyer Labor Agreements, as applicable, at any time following the applicable Closing Date.

(b) Compensation and Benefits. Commencing on the applicable Closing Date and continuing through the first anniversary of the applicable Closing Date, Buyer or its Affiliates shall provide or cause to be provided to the Hired Covered Employees who are not union represented and who receive offers of employment from Buyer or its Affiliates compensation and employee benefits that are in the aggregate (including base salary and incentive bonus opportunities) substantially comparable to the compensation and employee benefits provided by Buyer to similarly situated employees of Buyer from time to time (excluding for purposes of this sentence, equity-based compensation, pension, post-retirement welfare benefits, change in control, severance, retention or similar benefits or compensation). With respect to union-represented Hired Covered Employees, Buyer or its Affiliates agrees to apply to all such Hired Covered Employees the terms and conditions set forth in the governing Affected Labor Agreements, the Modified Labor Agreements or Buyer Labor Agreements, if applicable, or as otherwise set forth in the Proposal, as they may be modified or further modified from time to time.

(c) Service Credit. Each Hired Covered Employee who is not represented by a union and receives an offer of employment from Buyer or its Affiliates shall be given credit for all service with Sellers and their Subsidiaries, and their respective predecessors under any employee benefit plans of Buyer and its Affiliates maintained by Buyer or its Affiliates in which such Hired Covered Employees participate following the applicable Closing Date, for purposes of eligibility, vesting, and entitlement to benefits, including for severance benefits and vacation entitlement (but not for accrual of pension benefits). With respect to union-represented Hired Covered Employees, Buyer or its Affiliates agree to apply to all such Hired Covered Employees the service date set forth in the governing Affected Labor Agreements, the Modified Labor Agreements or Buyer Labor agreements, if applicable, or as otherwise set forth in the Proposal. Notwithstanding the foregoing, nothing in this Section 6.4(c) shall be construed to require crediting of service that would result in a duplication of benefits to the extent such service is credited for similar purposes under any similar Employee Benefit Plan.

(d) Waiver of Pre-Existing Conditions; Crediting of Deductibles. Buyer shall cause (i) the waiver of all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Hired Covered Employees

36

under any welfare benefit plans maintained by Buyer in which any such Hired Covered Employee participates, to the extent that such conditions, exclusions or waiting periods would not apply under the Employee Benefit Plans, and (ii) for the plan year in which the applicable Closing Date occurs, the crediting of each Hired Covered Employee with any co-payments and deductibles paid prior to participation in such welfare plans in satisfying any applicable deductible or out-of-pocket requirements thereunder, to the extent so credited under the similar Employee Benefit Plans. Sellers shall promptly provide all information requested by Buyer regarding the Hired Covered Employees in order for Buyer to comply with the provisions of this Section 6.4(d).

(e)      401(k) Plan Rollovers.  Sellers shall take such action as is necessary to provide that all Hired Covered Employees who are participants in Sellers' 401(k) plans have a fully vested and non-forfeitable interest in their entire respective account balances under such plans as of the applicable Closing Date (regardless of their years of vesting credit under such plans). On or prior to the applicable Closing Date, with respect to all of the Hired Covered Employees, Sellers shall contribute all contributions to Sellers' 401(k) plans (i) which are required to be made on or before the applicable Closing Date under any such plans, and (ii) which relate to service or employee salary deferral contributions on or prior to the applicable Closing Date, whether or not required to be made on prior to the applicable Closing Date under Sellers' 401(k) plans. Buyer agrees to cause the Buyer's 401(k) plan to accept a "direct rollover" to Buyer's 401(k) plan of each Hired Covered Employee's account balances (including promissory notes evidencing all outstanding loans) under Sellers' 401(k) plans if such rollover is elected in accordance with applicable Law by such Hired Covered Employee; provided, that prior to the applicable Closing Sellers provide Buyer with evidence satisfactory to Buyer in its sole discretion of the tax-qualified status of Sellers' 401(k) Plan.

(f)      Welfare Benefit Claims; COBRA.  On the applicable Closing Date, Sellers and their Subsidiaries shall cease to provide welfare coverage to each relevant Covered Employee and his or her covered dependents.  Sellers shall be responsible in accordance with its applicable welfare plans (and the applicable welfare plans of their Subsidiaries) in effect prior to the applicable Closing Date for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, under Sellers' or their Subsidiaries' Employee Benefit Plans that are welfare benefit plans prior to the applicable Closing Date by the Covered Employees and their dependents.  Buyer or its Affiliates shall be responsible in accordance with the applicable welfare plans of Buyer or its Affiliates for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, on or after the applicable Closing Date (or the date of commencement of employment with Buyer, if later) by Hired Covered Employees and their dependents.  For purposes of this Section 6.4(f), a claim shall be deemed to have been incurred as follows:  (i) for health, dental and prescription drug benefits, upon provision of such services or benefits, (ii) for life, disability, accidental death and dismemberment and business travel accident insurance benefits, upon the death, disability or accident giving rise to such benefits, and (iii) for the benefits that become payable with respect to any hospital confinement, upon the commencement of such confinement.  Sellers or their Subsidiaries shall provide coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") under Sellers' or their Subsidiaries' Employee Benefit Plans that are group health plans with respect to qualifying events occurring prior to the applicable Closing Date; provided, however, that to the extent that a dependent of a Hired Covered Employee is receiving continuation coverage under COBRA as of the applicable Closing Date, Buyer or its Affiliates shall be obligated to continue to provide COBRA continuation coverage to such dependent on and following the applicable Closing Date for the period required under applicable Law.  Buyer and its Affiliates shall provide coverage required by COBRA to Hired Covered

Employees and their eligible dependents or beneficiaries under Buyer's group health plans with respect to qualifying events occurring on and after the applicable Closing Date.

(g)     WARN Act.  Prior to the applicable Closing Date, Sellers shall provide to any current or former employee of Sellers any notice required (or anticipated to be required) pursuant to the WARN Act. Provided that on or before the applicable Closing Date A&P provides Buyer with a complete and accurate list, by date and location, of employee layoffs implemented by Sellers with respect to employees of the Stores in the ninety (90) day period preceding the applicable Closing Date, Buyer shall indemnify and hold harmless each Seller and its Affiliates and their respective Representatives with respect to any Liability arising under the WARN Act with respect to Hired Covered Employees of the Stores arising after the applicable Closing Date in whole or part from the actions or omissions of Buyer from and after the applicable Closing Date. Sellers shall indemnify and hold harmless Buyer and its Affiliates and their respective Representatives with respect to any Liability arising under the WARN Act (i) with respect to current or former employees of the Stores arising on, prior to or after the applicable Closing Date (but only arising on or prior to the applicable Closing Date with respect to Covered Employees except as set forth in clause (ii)) or (ii) arising in whole or part at any time from (A) A&P's failure to provide the list referenced in the first (1st) sentence of this paragraph and/or any inaccuracies contained in such list, (B) any other obligations of Sellers' and/or their Affiliates' contained in this Section 6.4(g) and/or under the WARN Act and/or (C) any other obligations arising as a result of or in connection with the consummation of the transactions contemplated by this Agreement.

(h)     Tax Reporting.  Buyer shall use commercially reasonable efforts to adopt the "alternate procedure" for preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53, with respect to the Covered Employees for the calendar year in which the applicable Closing Date occurs. Under this procedure, Buyer as the successor employer shall provide Forms W-2 to Hired Covered Employees reflecting all wages paid and Taxes withheld with respect to such Hired Covered Employees for the calendar year in which the applicable Closing Date occurs.  Sellers as the predecessor employers shall have no employment tax reporting responsibilities for the Covered Employees following the applicable Closing Date.  Buyer shall also use commercially reasonable efforts to adopt the "alternate procedure" of Revenue Procedure 2004-53 for purposes of Internal Revenue Service Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate). Sellers shall provide Buyer with such wage, wage withholding and other human resources and payroll-related information as is reasonably required for Buyer to implement the "successor employer" regulations relating to wage withholding contained in Treasury Regulation § 31.3121(a)(1)-1(b) and Revenue Procedure 2004-53 (including, without limitation, the transfer to Buyer all Forms W-4 and W-5 with respect to the Hired Covered Employees for the calendar year in which the applicable Closing Date occurs) and transition payroll processing and employer recordkeeping with respect to the Hired Covered Employees to Buyer as of the applicable Closing Date. Notwithstanding the foregoing, Buyer shall not assume any Liabilities with respect to such information, and all such Liabilities shall be the sole responsibility of Sellers.  Sellers shall pay all such Liabilities as and when due.  Sellers and Buyer shall cooperate in good faith to adopt procedures under applicable state, municipal, county, local, or other Laws.

(i)     No Third Party Beneficiary Rights.  The Parties agree that nothing in this Section 6.4, whether express or implied, is intended to (i) create any third party beneficiary rights in any Covered Employee or any other employee of Buyer, Sellers or their respective Affiliates, (ii) amend or alter any benefit plan of any Buyer, Seller or any of their Subsidiaries or (iii)

prevent Buyer from amending or terminating any benefit plans from and after the applicable Closing Date.

(j)     Cooperation.     After the applicable Closing Date, Buyer shall reasonably cooperate with Sellers to provide such current information regarding the Hired Covered Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Hired Covered Employees under any applicable employee benefit that continues to be maintained by A&P or its Affiliates. After the applicable Closing Date, Sellers shall, and shall cause their Affiliates to, reasonably cooperate with Buyer and its Affiliates to provide such current information regarding the Hired Covered Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Hired Covered Employees under any applicable employee benefit plan that continues to be maintained by Buyer or its Affiliates.

Section 6.5     Certain Tax Matters.

(a)     Transfer Taxes.     All stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated hereby (a "Transfer Tax") shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand. The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes shall prepare and timely file such Tax Returns; provided, however, that the other Parties shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by such preparing Party, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to the other Parties' approval, which shall not be unreasonably withheld, delayed, or conditioned. Sellers and Buyer shall cooperate in making, in a timely manner, all Tax Returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such Laws, the amount of any such Transfer Taxes.

(b)     Tax Adjustments.     Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets being sold at the applicable Closing (including real estate Taxes (other than those subsumed in Section 2.8), personal property Taxes and similar Taxes) for the Tax period in which the applicable Closing occurs (each, a "Proration Period") will be apportioned and prorated between Sellers and Buyer as of the applicable Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the applicable Closing Date, and Sellers shall bear the remaining portion of such Taxes. If the precise amount of any such Tax cannot be ascertained on the applicable Closing Date, apportionment and proration shall be computed on the applicable Closing Date on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period. When the actual amounts become known, such proration shall be recalculated by Buyer and Sellers, and Buyer or Sellers, as the case may be, promptly (but not later than ten (10) days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment (including in respect of any refund) so that the correct prorated amount is paid by each of Buyer and Sellers.

WEIL:\95398962\13\50482.0004

Section 6.6    <u>Insurance Matters</u>.    Buyer acknowledges that all insurance coverage provided in relation to Sellers, the applicable Stores, or the applicable Acquired Assets that is maintained by either Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer, the applicable Stores, or the applicable Acquired Assets as of the Closing Date in which such Store or the Acquired Assets are to be acquired, and no further coverage shall be available to Buyer, the applicable Stores, or the applicable Acquired Assets under any such policies.

Section 6.7    <u>Acknowledgements</u>.

(a)    Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics. Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; and (iii) neither Buyer nor any other Person shall have any claim against either Seller or any of its respective directors, officers, Affiliates, agents, or other Representatives with respect thereto. Accordingly, without limiting the generality of <u>Section 3.15</u> or <u>Section 9.1</u>, Buyer acknowledges that neither Seller nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information, except, to the extent applicable, the representations and warranties of Sellers set forth in <u>Article III</u>.

(b)    Buyer acknowledges that, except for the representations and warranties expressly set forth in <u>Article III</u> (as modified by the information referenced on the Disclosure Schedule (which representations and warranties shall terminate and be of no further force or effect as of the Closing), and without limiting the generality of <u>Section 3.15</u>, neither Seller nor any other Person makes any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding either Seller, the Stores, any Acquired Assets, any Assumed Liabilities or any other matter and neither Seller nor any other Person will be subject to any Liability to Buyer or any other Person resulting from such matters or the distribution to Buyer, or the use of, any such information. Buyer acknowledges that, should the Closings occur, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities in an "as is" condition and on a "where is" basis, without any representation or warranty of any kind, express or implied (including with respect to environmental, health or safety matters). Buyer acknowledges that it has waived and hereby waives as a condition to each Closing any further due diligence reviews, inspections, or examinations with respect to either Seller, the Stores, the Acquired Assets, the Assumed Liabilities, or any other matter, including with respect to engineering, environmental, title, survey, financial, operational, regulatory, and legal compliance matters.

Section 6.8    <u>Press Releases and Public Announcements</u>.    No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court or, in the case of Buyer, is otherwise consistent with paragraph 18 of the Confidentiality Agreement. If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party required to make such announcement or disclosure shall give the other Parties prior notice of, and an opportunity to comment on, the proposed announcement or disclosure, which shall be reasonably satisfactory to all of the Parties. The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Bidding Procedures Order and/or the Sale Order.

Section 6.9     Seller Marks.  The Seller Marks may appear on some of the Acquired Assets, including on signage.  Buyer acknowledges and agrees that it does not have and, upon consummation of the transactions contemplated by this Agreement, will not have, any right, title, interest, license, or other right to use the Seller Marks.  Buyer shall within ten (10) Business Days after the applicable Closing Date remove the Seller Marks from, or cover or conceal the Seller Marks on, any Acquired Assets, or otherwise retrain thereafter from the use and display of the Acquired Assets on which the Seller Marks remain affixed and visible.

Section 6.10     HIPAA Privacy Standards.

(a)     After the Closing, Buyer shall make all Pharmacy Records available for access and amendment to individuals in accordance with HIPAA privacy standards (the "HIPAA Privacy Standards") and other applicable Laws.  Buyer shall respond to individuals' requests for accountings of disclosures of protected health information for periods prior to the Closing in accordance with HIPAA Privacy Standards.  Buyer shall maintain the Pharmacy Records and all protected health information transferred by Sellers in accordance with HIPAA.  All inquiries and responses by Buyer relating to patient rights under HIPAA relating to uses and disclosures of health information made prior to the Closing shall be forwarded to Sellers pursuant to Section 9.7.

(b)     In addition, Buyer shall maintain the Pharmacy Records and all protected health information transferred by the Sellers in accordance with HIPAA security standards governing electronic protected health information.

(c)     All inquiries and responses by Buyer relating to patient rights under HIPAA Privacy Standards relating to uses or disclosures of health information made prior to the Closing Date shall be forwarded to the Seller in accordance with the notice provisions set forth herein.

Section 6.11     Master Leases.  Between the date hereof and the date of the entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers and Buyer agree to discuss in good faith to assess whether any additional consideration may be appropriate in respect of the sale of the Master Leases to Buyer (including after taking into account, among other factors, the rights, obligations and liabilities of the tenants under the Master Leases, the Per-Store Purchase Price for each relevant Store, and the value ascribed by Buyer to the sublease income and other revenue streams from subtenants in developing its Per-Store Purchase Price for such Stores).

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1     Conditions to Buyer's Obligations to the Initial Closing.  Buyer's obligation to consummate the transactions contemplated hereby in connection with the Initial Closing is subject to the satisfaction of, or the waiver in writing by Buyer of, the following conditions:

(a)     (x) the representations and warranties set forth in Article III (other than the representations and warranties set forth in Section 3.4) shall have been true and correct on the date hereof and as of the Initial Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect, and (y) the representations and warranties set forth in Section 3.4 shall have been true and correct, on the date hereof and as of the Initial closing Date, in all material respects;

41

(b)     each Seller shall have performed and complied with its covenants and agreements hereunder through the Initial Closing Date in all material respects;

(c)     the Bankruptcy Court shall have entered (i) the Bidding Procedures Order, and (ii) the Sale Order, and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Initial Closing Date;

(d)     all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(e)     no Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement;

(f)     Sellers shall have, consistent with section 365(b)(1)(A) of the Bankruptcy Code, paid all Cure Costs consistent with the terms of the Sale Order or other Bankruptcy Court order;

(g)     the Parties shall have agreed on a Closing Statement for the Initial Closing in accordance with Section 2.5(a); and

(h)     each delivery contemplated by Section 2.5(c) to be delivered to Buyer shall have been delivered with respect to the Initial Closing.

Section 7.2     Conditions to Sellers' Obligations to the Initial Closing.     Sellers' obligations to consummate the transactions contemplated hereby in connection with the Initial Closing are subject to the satisfaction of, or the waiver in writing by Sellers of, the following conditions:

(a)     (x) the representations and warranties set forth in Article IV (other than the representations and warranties set forth in Section 4.6) shall have been true and correct on the date hereof and as of the Initial Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct has not resulted in a material adverse effect on the ability of the Buyer to consummate the transactions at the Initial Closing; (y) the representations and warranties set forth in Section 4.6 shall have been true and correct, on the date hereof and as of the Initial closing Date, in all material respects;

(b)     Buyer shall have performed and complied with its covenants and agreements hereunder through the Initial Closing Date in all material respects;

(c)     the Bankruptcy Court shall have entered (i) the Bidding Procedures Order, and (ii) the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Initial Closing Date;

(d)     all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(e)     no Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement;

(f)     the Parties shall have agreed on a Closing Statement for the Initial Closing in accordance with Section 2.5(a); and

(g)     each payment contemplated by Section 2.5(b) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(e) to be delivered to Sellers shall have been delivered with respect to the Initial Closing.

Section 7.3    Conditions to Buyer's Obligations to each Subsequent Closing.  Buyer's obligation to consummate the transactions contemplated hereby in connection with each Subsequent Closing is subject to the satisfaction of, or the waiver in writing by Buyer of, the following conditions:

(a)    (x) each representation and warranty set forth in Section 3.1 (Organization of Sellers; Good Standing) and Section 3.2 (Authorization of Transaction) shall have been true and correct as of the date hereof and as of the applicable Subsequent Closing Date in all respects, except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect, and (y) each representation and warranty set forth in Section 3.4 (Title to Assets) shall have been true and correct as of the date hereof and as of the applicable Subsequent Closing Date in all material respects;

(b)    each Seller shall have performed and complied with its covenants and agreements hereunder with respect to the Acquired Assets and the Stores subject to the applicable Subsequent Closing through the applicable Subsequent Closing Date, in all material respects;

(c)    no Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement;

(d)    Sellers shall have paid all Cure Costs consistent with the terms of the Sale Order or other Bankruptcy Court order; and

(e)    each delivery contemplated by Section 2.5(d) to be delivered to Buyer shall have been delivered with respect to such Subsequent Closing.

Section 7.4    Conditions to Sellers' Obligations to each Subsequent Closing.  Sellers' obligations to consummate the transactions contemplated hereby in connection with each Subsequent Closing are subject to the satisfaction of, or the waiver in writing by Sellers of, the following conditions:

(a)    (x) the representations and warranties set forth in Section 4.1 and Section 4.2 shall have been true and correct as of the date hereof and as of the applicable Subsequent Closing Date, except where the failure of such representations and warranties to be so true and correct has not resulted in a material adverse effect on the ability of the Buyer to consummate the transactions at such Subsequent Closing; (y) the representations and warranties set forth in Section 4.6 shall have been true and correct as of the date hereof and as of the applicable Subsequent Closing Date in all material respects;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder with respect to the Acquired Assets and the Stores subject to the applicable Subsequent Closing through the applicable Subsequent Closing Date, in all material respects;

(c)    no Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(d)    each payment contemplated by Section 2.5(b) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(e) to be delivered to Sellers shall have been delivered with respect to such Subsequent Closing.

Section 7.5    No Frustration of Closing Conditions.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1, Section 7.2, Section 7.3 or Section 7.4, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its commercially reasonable efforts (or, in the case of Section 5.3, reasonable best efforts) to satisfy the conditions to the

43

consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

# ARTICLE VIII
## TERMINATION

Section 8.1     Termination of Agreement.  The Parties may terminate this Agreement at any time prior to the Initial Closing (or, to the extent provided below, any Subsequent Closing) as provided below:

(a)     by the mutual written consent of the Parties;

(b)     by any Party by giving written notice to the other Parties if:

(i)     any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to Buyer or any Seller, as the case may be, if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of Buyer or any Seller, as the case may be, to have fulfilled any of its material obligations under this Agreement;

(ii)     (x) the Initial Closing shall not have occurred on or before October 31, 2015 or (y) the final Closing shall not have occurred on or before November 15, 2015 (as applicable, the "Outside Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(b)(ii); or

(iii)     if all Stores have been deemed Excluded Stores by Buyer in accordance with Section 5.3(c).

(c)     by Buyer by giving written notice to each Seller:

(i)     prior to the Initial Closing, if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of any condition to the obligations of Buyer at Closing set forth in Section 7.1(a) or Section 7.2(b), as the case may be, and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) ten (10) days after receipt of Buyer's notice of intent to terminate or (B) the Outside Date;

(ii)     following the Initial Closing and prior to the final Closing, if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of any condition to the obligations of Buyer at Closing set forth in Section 7.3(a) or Section 7.3(b), as the case may be, and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) ten (10) days after receipt of Buyer's notice of intent to terminate or (B) the Outside Date;

(iii)　upon the conversion of any Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or the dismissal of any Bankruptcy Case;

(iv)　upon the entry of an order of the Bankruptcy Court for the appointment of a trustee or examiner with expanded powers, other than at the request of Buyer or any of its Affiliates, under Bankruptcy Code section 1104 and such trustee or examiner takes any action to interfere with or impair the transactions contemplated by this Agreement;

(v)　the Bankruptcy Court has not entered the Bidding Procedures Order by the forty-fifth (45th) day following the date on which Sellers shall have commenced the Bankruptcy Cases in the Bankruptcy Court; or

(vi)　if Sellers have not commenced the Bankruptcy Case by July 31, 2015.

(d)　by Sellers by giving written notice to Buyer:

(i)　prior to the Initial Closing, if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of any condition to the obligations of Sellers at Closing set forth in Section 7.2(a) or Section 7.2(b), as the case may be, and such breach has not been waived by Sellers, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (A) ten (10) days after receipt of such Seller's notice of intent to terminate or (B) the Outside Date; or

(ii)　following the Initial Closing and prior to the final Closing, if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of any condition to the obligations of Sellers at Closing set forth in Section 7.4(a) or Section 7.4(b), as the case may be, and such breach has not been waived by Sellers, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (A) ten (10) days after receipt of such Seller's notice of intent to terminate or (B) the Outside Date; or

(e)　by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid (except for a Competing Bid with respect to a Separable Store), (y) the Bankruptcy Court enters an order approving a Competing Bid (except for a Competing Bid with respect to a Separable Store) and (z) the Person making the Competing Bid (except for a Competing Bid with respect to a Separable Store) consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement, in each case, subject to Buyer's right to payment of the Termination Payment, if applicable, in accordance with the provisions of Section 5.4.

(f)　by Buyer, if the Back-up Termination Date has occurred, subject to Buyer's right to payment of the Termination Payment, if applicable, in accordance with the provisions of Section 5.4.

Section 8.2　Effect of Termination.　If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 3.15, Section 6.7, Section 8.3, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 5.4 and Section 8.3) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in

WEIL:\95398962\13\50482.0004

this Agreement; provided, further, that, other than in the case of fraud or willful misconduct, (a) the maximum Liability of Sellers under this Agreement shall not exceed the amount of the Termination Payment and (b) the maximum Liability of Buyer under this Agreement shall not exceed the Escrow Amount. Buyer acknowledges and agrees that payment and delivery of the Termination Payment pursuant to Section 5.4(a) will constitute liquidated damages and not a penalty and, except in the case of fraud or willful misconduct, be the sole and exclusive remedy of Buyer and its Representatives and Affiliates, whether at Law or in equity, and upon the payment and delivery thereof to Buyer, Buyer and its Representatives and Affiliates will be deemed to have fully released and discharged Sellers and their respective Representatives and Affiliates from any Liability resulting from the termination of this Agreement

Section 8.3    Return of Escrow Amount.

(a)    If this Agreement is terminated by Sellers pursuant to Section 8.1(d), Sellers shall be entitled to the Escrow Amount as liquidated damages and not a penalty and, except in the case of fraud or willful misconduct, as Sellers' sole and exclusive remedy, which shall be paid to Sellers in accordance with the Escrow Agreement (and Buyer shall instruct the Escrow Agent to distribute the Escrow Amount to Sellers by wire transfer of immediately available funds to Sellers' bank account(s) set forth in the Escrow Agreement) and without further order of the Bankruptcy Court.

(b)    If this Agreement is terminated under any circumstances other than the circumstance set forth in Section 8.3(a), the Escrow Amount shall be returned to Buyer in accordance with the Escrow Agreement (and Sellers shall instruct the Escrow Agent to return the Escrow Amount to Buyer by wire transfer of immediately available funds to Buyer's bank account set forth in the Escrow Agreement) and without further order from the Bankruptcy Court.

# ARTICLE IX
# MISCELLANEOUS

Section 9.1    Survival. Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the applicable Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(c) or Section 2.5(d) shall survive, and each of the same shall terminate and be of no further force or effect as of, the applicable Closing.

Section 9.2    Expenses. Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.

Section 9.3    Entire Agreement. This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    Incorporation of Exhibits and Disclosure Schedule. The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any

default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties; provided, that Buyer may assign its rights, interests and obligations hereunder to any Affiliate of Buyer (provided, that no such assignment to any such Affiliate shall in any way relieve Buyer of its obligations under this Agreement).  Any attempted assignment in violation of this Section 9.6 will be void.

Section 9.7    Notices.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to either Seller:    The Great Atlantic & Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention:   Christopher W. McGarry
                     Matthew Bennett
E-mail:  mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Sellers) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Ray C. Schrock, P.C. and Gavin Westerman
Facsimile:  (212) 310-8007
E-mail:  ray.schrock@weil.com; gavin.westerman@weil.com

If to Buyer:    The Stop & Shop Supermarket Company, LLC
1385 Hancock Street
Quincy, MA 02169
Attention:  Thomas Hippler
E-mail:  thippler@aholdusa.com

With a copy (which shall not constitute notice to Buyer) to:

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Attention:  John Reiss, John Cunningham and Dan Latham
E-mail:        jreiss@whitecase.com;        jcunningham@whitecase.com;
dlatham@whitecase.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 9.7.

Section 9.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    Submission to Jurisdiction; Service of Process.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court; provided, however, that if the Bankruptcy Cases have not been commenced, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.7; provided, however, that nothing in this Section 9.9 shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    Waiver of Jury Trial.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    Specific Performance.  The Parties acknowledge and agree that the other Parties and their respective estates, as applicable, would be damaged irreparably in the event the Parties do not perform their respective obligations under this Agreement in accordance with its specific terms or otherwise breach this Agreement, so that, in addition to any other remedy that the Parties may have under law or equity, each Party shall be entitled, without the requirement of posting a bond or other security, to

48

injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

Section 9.12    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13    No Third Party Beneficiaries.  Except as set forth in Section 9.14, this Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

Section 9.14    Non-Recourse.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.  No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 9.14.

Section 9.15    Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16    Disclosure Schedule.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure for all other sections of the Disclosure Schedule to the extent the relevance of such matter to such other sections is readily apparent from the face of such disclosure.  The listing of any matter shall expressly not be deemed to constitute an

admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced.  The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.17    Headings; Table of Contents.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18    Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

[Remainder of page intentionally left blank.]

WEIL:\95398962\13\50482.0004

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.

By: _____
Name: Christopher W. McGarry
Title: Executive Vice President and Chief Administrative Officer


APW SUPERMARKETS, INC.

By: _____
Name: Christopher W. McGarry
Title: Vice President & Secretary


PATHMARK STORES, INC.

By: _____
Name: Christopher W. McGarry
Title: Vice President & Secretary


A&P REAL PROPERTY, LLC

By: _____
Name: Christopher W. McGarry
Title: Vice President & Secretary

THE STOP & SHOP SUPERMARKET COMPANY, LLC

By: _____
Name: Thomas A. Hippler
Title: General Counsel and Secretary

**<u>Exhibit E</u>**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,**

**FOOD BASICS, INC.,**

**APW SUPERMARKETS, INC.,**

**SHOPWELL, INC.,**

**PATHMARK STORES, INC.,**

**A&P REAL PROPERTY, LLC**

**AND**

**KEY FOOD STORES CO-OPERATIVE, INC.**

**July 19, 2015**

ARTICLE I

DEFINITIONS.................................................................................1

Section 1.1    Definitions.................................................................................1
Section 1.2    Interpretations .........................................................................15

ARTICLE II

PURCHASE AND SALE...............................................................16

Section 2.1    Purchase and Sale of Assets.....................................................16
Section 2.2    Assumed Liabilities..................................................................16
Section 2.3    Consideration; Deposit; Escrow Amount...................................16
Section 2.4    Closing.....................................................................................17
Section 2.5    Closing Payments and Deliveries..............................................17
Section 2.6    Inventory..................................................................................18
Section 2.7    Allocation.................................................................................19
Section 2.8    Proration..................................................................................20
Section 2.9    Removal of Excluded Assets.....................................................21
Section 2.10   Damaged or Destroyed Store Closing........................................21
Section 2.11   Specified Environmental Stores.................................................22

ARTICLE III

SELLERS' REPRESENTATIONS AND WARRANTIES ...........23

Section 3.1    Organization of Sellers; Good Standing.....................................23
Section 3.2    Authorization of Transaction.....................................................23
Section 3.3    Noncontravention; Government Filings......................................23
Section 3.4    Title to Assets; Sufficiency of Assets........................................24
Section 3.5    Real Property............................................................................24
Section 3.6    Litigation; Decrees....................................................................24
Section 3.7    Labor Relations.........................................................................25
Section 3.8    Brokers' Fees............................................................................25
Section 3.9    Taxes........................................................................................25
Section 3.10   Tangible Personal Property.......................................................25
Section 3.11   Employee Benefits....................................................................25
Section 3.12   Compliance with Laws; Permits................................................26
Section 3.13   Contracts..................................................................................27
Section 3.14   Condemnation...........................................................................27
Section 3.15   Inventory..................................................................................27
Section 3.16   Environmental Matters..............................................................27
Section 3.17   Disclaimer of Other Representations and Warranties...................28

ARTICLE IV

BUYER'S REPRESENTATIONS AND WARRANTIES ............28

Section 4.1    Organization of Buyer; Good Standing......................................28
Section 4.2    Authorization of Transaction.....................................................28
Section 4.3    Noncontravention......................................................................29
Section 4.4    Litigation; Decrees....................................................................29

Section 4.5    Brokers' Fees. ...........................................................................................29
Section 4.6    Sufficient Funds; Adequate Assurances. ....................................................29
Section 4.7    HIPAA. .........................................................................................................29

ARTICLE V

              PRE-CLOSING COVENANTS ......................................................................30

Section 5.1    Efforts; Cooperation. .....................................................................................30
Section 5.2    Conduct of the Business Pending the Closing. ............................................30
Section 5.3    Regulatory Approvals. ...................................................................................31
Section 5.4    Bankruptcy Court Matters. ............................................................................33
Section 5.5    Notice of Developments. ...............................................................................35
Section 5.6    Access; No Contact. .......................................................................................35
Section 5.7    Bulk Transfer Laws. .......................................................................................35
Section 5.8    Replacement Bonding Requirements. ............................................................36
Section 5.9    Financing. .......................................................................................................36

ARTICLE VI

              OTHER COVENANTS ..................................................................................38

Section 6.1    Further Assurances. ........................................................................................38
Section 6.2    Access; Enforcement; Record Retention. .....................................................38
Section 6.3    Treatment of Affected Labor Agreements. ....................................................38
Section 6.4    Covered Employees. .......................................................................................39
Section 6.5    Certain Tax Matters. ......................................................................................40
Section 6.6    Insurance Matters. ..........................................................................................41
Section 6.7    Acknowledgements. ........................................................................................41
Section 6.8    Press Releases and Public Announcements. ..................................................41
Section 6.9    Seller Marks. ..................................................................................................42
Section 6.10   Certain Litigation Matters. ............................................................................42

ARTICLE VII

              CONDITIONS TO OBLIGATION TO CLOSE ............................................42

Section 7.1    Conditions to Buyer's Obligations. ...............................................................42
Section 7.2    Conditions to Sellers' Obligations. ...............................................................43
Section 7.3    No Frustration of Closing Conditions. ..........................................................43

ARTICLE VIII

              TERMINATION .............................................................................................43

Section 8.1    Termination of Agreement. ............................................................................43
Section 8.2    Effect of Termination. ....................................................................................46
Section 8.3    Lease Indemnity. ............................................................................................47

ARTICLE IX

              MISCELLANEOUS .......................................................................................47

Section 9.1    Survival. ..........................................................................................................47

| | | |
|---|---|---|
| Section 9.2 | Expenses. | 48 |
| Section 9.3 | Entire Agreement. | 48 |
| Section 9.4 | Incorporation of Exhibits and Disclosure Schedule | 48 |
| Section 9.5 | Amendments and Waivers. | 48 |
| Section 9.6 | Succession and Assignment | 48 |
| Section 9.7 | Notices. | 49 |
| Section 9.8 | Governing Law. | 50 |
| Section 9.9 | Submission to Jurisdiction; Service of Process. | 50 |
| Section 9.10 | Waiver of Jury Trial. | 50 |
| Section 9.11 | Specific Performance. | 51 |
| Section 9.12 | Severability. | 51 |
| Section 9.13 | No Third Party Beneficiaries. | 52 |
| Section 9.14 | Non-Recourse. | 52 |
| Section 9.15 | Mutual Drafting. | 52 |
| Section 9.16 | Disclosure Schedule. | 52 |
| Section 9.17 | Headings; Table of Contents. | 53 |
| Section 9.18 | Counterparts; Facsimile and Electronic Signatures | 53 |
| Section 9.19 | Limitations Under Applicable Law.. | 53 |

Exhibit A – Bidding Procedures Order
Exhibit B –  Escrow Agreement
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Assignment and Assumption Agreement
Exhibit E – Sale Order
Exhibit F – Form of Quitclaim Deed

<u>ASSET PURCHASE AGREEMENT</u>

This Asset Purchase Agreement (this "<u>Agreement</u>") is entered into as of July 19, 2015 by and among The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation ("<u>A&P</u>"), Food Basics, Inc., a Delaware corporation and a wholly-owned subsidiary of A&P ("<u>Food Basics</u>"), APW Supermarkets, Inc., a New York corporation and a wholly-owned subsidiary of A&P ("<u>APW</u>"), Shopwell, Inc., a Delaware corporation and a wholly-owned subsidiary of A&P ("<u>Shopwell</u>"), Pathmark Stores, Inc., a Delaware corporation and a wholly-owned subsidiary of A&P ("<u>Pathmark</u>"), A&P Real Property, LLC, a Delaware limited liability company and a wholly-owned subsidiary of A&P ("<u>A&P Real Property</u>" and, together with A&P, Food Basics, APW, Shopwell and Pathmark, "<u>Sellers</u>"), and Key Food Stores Co-Operative, Inc., a New York corporation or any of its permitted assignees ("<u>Buyer</u>"). Sellers and Buyer are referred to collectively herein as the "<u>Parties</u>".

WITNESSETH

WHEREAS, Sellers and certain of their affiliates contemplate filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on or about July 20, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, Sellers operate the nineteen (19) supermarkets at the locations set forth in <u>Section 3.5</u> of the Disclosure Schedule (as defined below) under the names "A&P," "Food Basics," "Food Emporium," "Pathmark" and "Waldbaums" (each a "<u>Store</u>" and, collectively, the "<u>Stores</u>"); and

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets (as defined below) and Assumed Liabilities (as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.1     <u>Definitions</u>.  For purposes of this Agreement:

"<u>A&P</u>" has the meaning set forth in the preamble.

"<u>Acquired Assets</u>" means all of Sellers' right, title, and interest in and to all of the following assets of Sellers used or held for use primarily in the operation of the Stores, including (to the extent applicable) assets located at the Stores (unless otherwise specified herein) on the Closing Date:

(a)     the Inventory (other than Excluded Inventory);

1

(b)     the Furnishings and Equipment owned by Sellers (other than Excluded Furnishings and Equipment);

(c)     to the maximum extent permitted by the Bankruptcy Code and in accordance with the terms herein, the Leases, other than those Leases that expire or that are terminated prior to Closing, together with (to the extent of Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Leases;

(d)     the Owned Real Property;

(e)     to the maximum extent permitted by the Bankruptcy Code and in accordance with the terms herein, all rights under those Contracts set forth on Schedule 1.1(b), other than those Contracts that expire or that are terminated prior to the Closing (such Contracts, together with the Leases (but, for the avoidance of doubt, excluding all Affected Labor Agreements), the "Transferred Contracts");

(f)     all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases and, to the extent transferable, other deposits relating to the Stores under any of the Transferred Contracts (collectively, the "Prepaid Expenses");

(g)     an amount equal to $100 in cash in each till and point of sale register for each Store ("Register Cash");

(h)     to the extent requested by Buyer and to the extent assignable to Buyer under applicable Law, all Permits required for the operation of the Stores (for the avoidance of doubt, solely to the extent the applicable Governmental Authority consents to or otherwise approves the assignment or transfer of the applicable Permit);

(i)     all books, records, files and papers, whether in hard copy or electronic format, including sales and promotional literature, manuals and data, sales and purchase correspondence, customer lists (including, but not limited to, all customer data and information derived from branded loyalty promotion or co-branded credit card programs and other similar information related to customer purchases at the Stores to the extent permitted under applicable Law and Sellers' privacy policies), lists of suppliers, personnel and employment records, in each case that are primarily used in the operation of the Stores; provided, however, if Buyer determines in its sole discretion to purchase documents subject to applicable Law regarding privacy related to the Business, all costs of a privacy ombudsman related to the Stores, to the extent that the Bankruptcy Court requires a privacy ombudsman to be appointed with respect to the Stores, shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers;

(j)     all goodwill of Sellers arising, directly or indirectly, primarily out of the operation or conduct of the Business;

2

(k)     all of Sellers' causes of action, claims, credits, demands, remedies or rights of set-off against third parties arising out of the operation of the Business;

(l)     all of Sellers' rights under warranties, indemnities and all similar rights against third parties to the extent related to any Acquired Assets;

(m)     all assets related to the in-store pharmacies, including all non-expired Pharmaceutical Inventory, scripts, prescription lists, Furnishings and Equipment and Permits of certain Stores to the extent transferable under applicable Law as set forth on Schedule 1.1(c); provided, however, if Buyer determines in its sole discretion to purchase documents subject to applicable Law regarding privacy related to the Business, all costs of a privacy ombudsman related to the Stores, to the extent that the Bankruptcy Court requires a privacy ombudsman to be appointed with respect to the Stores, shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers;

(n)     trailers identified on Schedule 1.1(d) ("Transferred Trailers"); and

(o)     to the extent transferable, all warranties related to any of the foregoing;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Affected Labor Agreements" means the collective bargaining agreements covering any of the Covered Employees, each of which is listed on Schedule 1.1(e).

"Affected Union Covered Employees" has the meaning set forth in Section 6.4(a).

"Affected Unions" means the unions identified on Schedule 1.1(f).

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocated Amount" has the meaning set forth in Section 5.3(c).

"Allocation Objection Notice" has the meaning set forth in Section 2.7.

"Allocation Principles" has the meaning set forth in Section 2.7.

"Antitrust Law" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other laws and orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

3

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.5(b).

"Assumed Liabilities" means the following Liabilities of Sellers:

(a)     all Liabilities under the Transferred Contracts (excluding all Cure Costs thereof, other than those with respect to any Affected Labor Agreements, to the extent assumed);

(b)     all amounts allocated to Buyer under Section 2.8 and all Transfer Taxes and other Taxes allocated to Buyer pursuant to Section 6.5;

(c)     all Liabilities relating to or arising out of the ownership or operation of the Stores or any Acquired Asset arising from events occurring from and after the Closing Date; and

(d)     (i) to the extent Buyer agrees to assume an Affected Labor Agreement, all Liabilities under such Affected Labor Agreement(s) to be assumed by Buyer in accordance with the provisions of Section 6.4, or (ii) to the extent that any Affected Union enters into a Modified Labor Agreement with Buyer all Liabilities arising under such Modified Labor Agreement;

provided, however, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"Auction" has the meaning set forth in Section 5.4(d).

"Back-up Termination Date" means the first to occur of (a) sixty (60) days after the entry of the sale order approving a Competing Bid, (b) consummation of the transaction with the winning bidder at the Auction, (c) Buyer's receipt of notice from Seller of the release by Seller of Buyer's obligations under Section 5.4(d), and (d) November 30, 2015.

"Bankruptcy Cases" means the contemplated Chapter 11 cases of Sellers and certain of their Affiliates.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in substantially the form attached hereto as Exhibit A, with such changes as are reasonably acceptable to Buyer and Sellers that, among other things, (a) approves and authorizes the payment of the Termination Payment on the terms and conditions set forth in Section 5.4, (b) establishes procedures for the Auction process and (c) establishes a date for a hearing on the Sale Order.

"Bill of Sale" has the meaning set forth in Section 2.5(b).

"Bonding Requirements" means standby letters of credit, guarantees, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets, as set forth on Schedule 1.1(m).

4

"Break-Up Fee" has the meaning set forth in <u>Section 5.4(a)</u>.

"Business" means the operation of the Stores by Sellers.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Proration Amount" has the meaning set forth in <u>Section 2.8(a)</u>.

"Cap" has the meaning set forth in <u>Section 8.1(k)(iii)</u>.

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Cash Purchase Price" has the meaning set forth in <u>Section 2.3(a)</u>.

"Casualty / Condemnation Store" has the meaning set forth in <u>Section 2.10(a)</u>.

"Challenge Recommendation" has the meaning set forth in <u>Section 5.3(c)</u>.

"Closing" has the meaning set forth in <u>Section 2.4</u>.

"Closing Date" has the meaning set forth in <u>Section 2.4</u>.

"Competing Bid" has the meaning set forth in <u>Section 5.4(b)</u>.

"Confidentiality Agreement" means the confidentiality agreement, dated as of May 15, 2015, by and between A&P and Buyer.

"Contract" means any agreement, contract, license, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and to which each of the parties are subject and intend to be bound, other than the Leases.

"Contracting Parties" has the meaning set forth in <u>Section 9.14</u>.

"Covered Employee" means an employee of A&P or any of its Subsidiaries at the Closing whose duties relate primarily to the operation of any of the Stores, including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

"Cure Costs" means any and all amounts or obligations that must be cured pursuant to section 365(b)(1) of the Bankruptcy Code to effectuate the assumption by the applicable Seller

and assignment to Buyer of the Transferred Contracts, as defined by the Bankruptcy Court or agreed to by the Parties.

"Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

"Debt Commitment Letter" has the meaning set forth in Section 5.9.

"Debt Financing" means the debt financing incurred or intended to be incurred pursuant to the Debt Commitment Letter, as amended, supplemented or replaced in compliance with this Agreement.

"Debt Financing Commitment" has the meaning set forth in Section 5.9.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plans" has the meaning set forth in Section 3.11(a).

"Environmental Law" means any applicable foreign, federal, state or local statute, regulation, ordinance, or rule of common law currently in effect relating to pollution, the protection of the environment or natural resources.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means Wells Fargo Bank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Buyer, and the Escrow Agent, a copy of which is attached hereto as Exhibit B.

"Escrow Amount" has the meaning set forth in Section 2.3(b).

"Excluded Assets" means all assets of Sellers as of the Closing that are not expressly included in the Acquired Assets, including, but not limited to:

(a) any asset of Sellers that is (i) not (A) located in the Stores and/or (B) used or held for use primarily in the operation of the Stores or (ii) inseparable from any other business of Sellers or any of their Affiliates (other than (x) the operation of the Stores and (y) only to the extent not used or held for use primarily in the operation of the Stores), in each case, including (1) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (2) books and

6

records related to (a) Taxes paid or payable by Sellers or (b) any claims, obligations or liabilities not included in Assumed Liabilities; and (3) any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset of Sellers (excluding such items that are Prepaid Expenses);

(b)     capital stock of any of A&P's Subsidiaries;

(c)     all cash and Cash Equivalents (other than Register Cash) and accounts receivable;

(d)     all Permits that are not part of the Acquired Assets as provided herein;

(e)     all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(f)     all of Sellers' rights under this Agreement or any Related Agreement;

(g)     all of Sellers' rights under any Contracts primarily related to any Excluded Asset;

(h)     any and all automobiles, trucks, tractors, and trailers (other than the Transferred Trailers);

(i)     any other rebate, payment, reimbursement or refund arising from the operation of the Stores prior to the Closing;

(j)     all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the name "A&P Liquors," "A&P," "Waldbaums," "Superfresh," "Food Emporium," "Food Basics," "Best Cellars," "Pathmark," "Foodmart" and all other marks set forth on Schedule 1.1(g), any name or trademark, service mark, trade name, logo, trade dress, Internet domain name or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, all rights and goodwill associated therewith and any name or trademark, service mark, trade name, logo, Internet domain name, or other indicia of origin that is confusingly similar thereto or derived therefrom (collectively, the "Seller Marks");

(k)     the Furnishings and Equipment described on Schedule 1.1(h) (the "Excluded Furnishings and Equipment");

(l)     all Contracts and Leases other than the Transferred Contracts;

(m)     all Excluded Inventory;

(n)     all other assets bearing any of the Seller Marks, other than Furnishings and Equipment (subject to Section 6.9); and

(o)     those items set forth on Schedule 1.1(i).

7

"Excluded Furnishings and Equipment" has the meaning set forth in the definition of Excluded Assets.

"Excluded Inventory" has the meaning set forth in Section 2.6(a).

"Excluded Liabilities" means all Liabilities of Sellers that are not expressly assumed by Buyer as an Assumed Liability, including, but not limited to:

(a)     any Liability not relating to or arising out of the operation of the Stores or the Acquired Assets, including any Liability primarily relating to or primarily arising out of the Excluded Assets;

(b)     (i) any Liability of Sellers for Taxes (except for those Taxes allocated to Buyer pursuant to Section 2.8 and Section 6.5, but including those Taxes allocated to Sellers pursuant to Section 2.8 and Section 6.5) whether or not relating to Sellers or any of their Affiliates and whether or not incurred prior to the Closing; (ii) any Liability of Sellers or any of their Affiliates for the unpaid Taxes of any Person (including Taxes imposed on Sellers or any of their Affiliates) as a transferee or successor, by contract or otherwise; (iii) any Liability for Taxes related to the Acquired Assets apportioned to Sellers under Section 6.5 and (iv) any Liability of Sellers relating to escheat or unclaimed property obligations;

(c)     all accounts payable;

(d)     all Cure Costs (other than those with respect to any Affected Labor Agreement, to the extent assumed);

(e)     any withdrawal liability incurred by Sellers (or either of them) or any of their Affiliates in connection with a complete withdrawal or partial withdrawal from a Multiemployer Plan under Title IV of ERISA (or any similar contractual Liability imposed by the terms of a Multiemployer Plan), including, for the avoidance of doubt, any such withdrawal liability or similar contractual Liability arising out of the transactions contemplated by this Agreement or any Related Agreement (and, for the further avoidance of doubt, nothing herein shall be construed as requiring Buyer to take or cause to be taken any measures or to agree to any undertakings to avoid or limit any such withdrawal liability or similar contractual Liability of Sellers (or either of them) or any of their Affiliates);

(f)     all Liabilities relating to or arising out of pre-Closing periods, including, but not limited to, any indebtedness, Litigation, product liability claims and any other indemnification claims, in each case except as otherwise described herein in Section 2.8 and Section 6.5 and other than Assumed Liabilities;

(g)     all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(h)     all Liabilities under or relating to any assumed Affected Labor Agreements arising at or prior to the Closing; provided that nothing in this subsection (h) shall be construed as limiting the generality or scope of subsection (e) above; and

(i)     and all Transfer Taxes allocated to Sellers pursuant to Section 6.5;

(j)     all Seller Transaction Expenses; and

(k)     all Liabilities arising at or prior to the Closing with respect to any Covered Employee.

"Excluded Stores" has the meaning set forth in Section 5.3(c).

"Fee Letters" has the meaning set forth in Section 5.9(a).

"Financing Commitment Notice" has the meaning set forth in Section 5.9(a).

"Financing Failure" has the meaning set forth in Section 8.1(b)(2).

"Fundamental Representations" has the meaning set forth in Section 7.1(a).

"Furnishings and Equipment" means all trade fixtures, store models, shelving, refrigeration equipment and point of sale equipment owned by Sellers and located at the Stores, including those items listed on Schedule 1.1(j).

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, arbitrator, mediator, department, or other governmental entity.

"Hazardous Substance" means any substance, material or waste that is defined, classified or otherwise characterized under Environmental Laws as "toxic," or "hazardous" or as a "pollutant" or "contaminant," including petroleum, or any fraction thereof.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Initial Escrow Amount" has the meaning set forth in Section 2.3(b).

"Intellectual Property" means intellectual property of any type or nature however denominated, throughout the world, including (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof; (b) all brands and symbols used as indicia of quality, source or nature, including trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all rights of privacy and publicity; (d) all proprietary works of authorship, including designs and copyrights, together with all registrations and applications for registration therefor and renewals in connection therewith; (e) all trade secrets, know-how,

technology, improvements, and inventions; (f) all computer software (including data and databases); and (g) all rights of action and remedies arising from or relating to the foregoing.

"Inventory" means all food, beverages (including, to the extent transferable to Buyer or its designee under applicable Law, alcohol and Pharmaceutical Inventory), and other merchandise and products (including general merchandise items described in Schedule 1.1(k) but excluding greeting cards) offered for sale to customers at the Stores (including any such Inventory held at a warehouse or offsite location primarily used at or as supply to the Stores).

"Inventory Date" has the meaning set forth in Section 2.6(a).

"Inventory Purchase Price" has the meaning set forth in Section 2.6(a).

"Inventory Taker" has the meaning set forth in Section 2.6(a).

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Knowledge" of Sellers (and other words of similar import) means the actual knowledge of persons holding a position of senior vice president or senior thereto at Sellers, in each case assuming reasonable inquiry by each such person. "Knowledge" of Buyer (and other words of similar import) means the actual knowledge of Dean Janeway, in each case assuming reasonable inquiry by each such person.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"Leases" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Store.

"Lenders" has the meaning set forth in Section 5.9.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred or consequential, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Lien" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, charge, complaint, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

"Material Adverse Effect" means any effect or change that, when considered individually or taken as a whole, together with all other adverse events, changes, facts, conditions, circumstances or occurrences with respect to which such phrase is used in this Agreement, has had or would be reasonably expect to have a material adverse effect on the condition of the Acquired Assets or the Business other than any events, changes, facts, conditions, circumstances or occurrences arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail grocery generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (f) changes in Law or GAAP; (g) the taking of any action expressly contemplated by this Agreement or any Related Agreement or taken with the written consent of the other Party; (h) any effects or changes as a result of the announcement or pendency of this Agreement; (i) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (j) the sale of any other assets or stores to any third parties by any Seller or any of its Affiliates; (k) any effects or changes arising from or related to the breach of the Agreement by Buyer; (l) or (m) any effect resulting from the filing of the Bankruptcy Cases; provided that the effects of the events described in clauses (a) through (f) shall be excluded only to the extent they do not materially disproportionately impact the Acquired Assets as compared to other entities engaged primarily in lines of business similar to the Business.

"Material Event" has the meaning set forth in Section 2.10(a).

"Member" means a member of Buyer.

"Modified Labor Agreement" means a new collective bargaining agreement with an Affected Union that is entered into by Buyer and an Affected Union.

"Multiemployer Plan" means a multiemployer plan as defined in section 3(37) or section 4001(a)(3) of ERISA.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Order" means any decree, order, injunction, rule, judgment, decision or consent of or by any Governmental Authority.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

11

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Owned Real Property" means the fee-owned real property, including, without limitation, all buildings, structures, improvements and fixtures located thereon, easements, rights-of-way and all other appurtenant rights thereto (such as appurtenant rights in and to public streets) to the extent of Sellers' interest therein, as more particularly described on Schedule 1.1(l).

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, consent, license, order, registration, certificate, privilege, variance or similar right issued by or otherwise obtained from any Governmental Authority.

"Permitted Lien" means (a) statutory Liens for Taxes not yet delinquent; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business; (c) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto; (d) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not reasonably be expected to have a Material Adverse Effect; (f) matters that would be disclosed on an accurate survey of the real property; (g) any liens shown in any title commitment, report or policy, or otherwise of record; and (h) other Liens that Buyer has expressly stated are acceptable to Buyer in a writing delivered to Sellers; with respect to each of the foregoing (a) through (h), to the extent in connection with a leasehold property, Permitted Liens shall include Liens not required to be removed or cured by the tenant under the applicable Lease and which were not otherwise created by such tenant.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Personal Property Leases" has the meaning set forth in Section 3.10.

"Petition Date" means the date Sellers file petitions commencing the Bankruptcy Cases.

"Pharmaceutical Inventory" means prescription pharmaceuticals and prescription products.

"Prepaid Expenses" has the meaning set forth in the definition of Acquired Assets.

"Prepaid Expenses Amount" has the meaning set forth in Section 2.3(a).

"Proceeds" has the meaning set forth in Section 2.10(a).

"Proposal" has the meaning set forth in Section 6.3.

12

"Proposed Debt Commitment Letter" has the meaning set forth in Section 5.9(a).

"Prorated Charges" has the meaning set forth in Section 2.8(a).

"Proration Period" has the meaning set forth in Section 6.5(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.7.

"Register Cash" has the meaning set forth in the definition of Acquired Assets.

"Related Agreements" means the Bill of Sale and the Assignment and Assumption Agreement.

"Related Party" has the meaning set forth in Section 8.2(b).

"Removed Store Escrow Amount" has the meaning set forth in Section 2.3(b)(iv).

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Reserved Amount" has the meaning set forth in Section 2.6(b).

"Sale Hearing" means a hearing before the Bankruptcy Court to approve this Agreement and the Sale Order.

"Sale Motion" means the motion of Sellers, in a form reasonably acceptable to Buyer, seeking Bankruptcy Court approval of the Agreement and the transactions contemplated hereby.

"Sale Order" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit E with such changes as are reasonably satisfactory to the Parties (a) approving (i) this Agreement and the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Acquired Assets to Buyer free and clear of all Liens, other than any Permitted Liens or any Assumed Liabilities; (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein; and (iv) the assumption and assignment to Buyer of the Transferred Contracts on the terms set forth herein; (b) determining that the transactions contemplated hereby are fair and reasonable, entered into on an arms-length basis, and that Buyer is a good faith purchaser; (c) determining that Buyer is not a successor to any of Sellers and incurs no successor liability, and (d) providing that the Closing will occur in accordance with the terms and conditions hereof.

"Seller Marks" has the meaning set forth in the definition of Excluded Assets.

"Seller Proration Amount" has the meaning set forth in Section 2.8(a).

"Seller Transaction Expenses" means all costs, fees and expenses incurred in connection with or in anticipation of the negotiation, execution and delivery of this Agreement and the Related Agreements or the consummation of the transactions contemplated by this Agreement, in each case to the extent unpaid at the time of determination (which, unless otherwise expressly indicated herein, will be the Closing), including but not limited to (i) the fees and expenses of the Inventory Taker to be borne by Sellers pursuant to Section 2.6(a), (ii) the portion of the Change in Control Payments to be borne by Sellers and (iii) the portion of the cost of the privacy ombudsman to be borne by Sellers.

"Sellers" has the meaning set forth in the preamble.

"Specified Environmental Stores" means the Stores set forth on Schedule 2.11.

"Specified Liquor Store" means those Stores set forth on Schedule 2.6(b).

"Store Alcohol Licenses" has the meaning set forth in Section 2.6(b).

"Store Withdrawal Deadline" has the meaning set forth in Section 5.3(c).

"Stores" has the meaning set forth in the recitals.

"Subsequent Escrow Amount" has the meaning set forth in Section 2.3(b).

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Payment" has the meaning set forth in Section 5.4(a).

14

"Transfer Tax" has the meaning set forth in Section 6.5(a).

"Transferred Contracts" has the meaning set forth in the definition of Acquired Assets.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local law.

Section 1.2    Interpretations.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)    References herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)    References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers or provided to Buyer or its Representatives in response to requests for materials or information.

15

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, (a) Buyer or its permitted designees will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer or its permitted designees at the Closing all of the Acquired Assets and (b) Sellers will assume the Transferred Contracts and assign to Buyer all such Transferred Contracts to the maximum extent permitted by the Bankruptcy Code.

Section 2.2    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, Buyer will assume and become responsible for the Assumed Liabilities at the Closing.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof.

Section 2.3    Consideration; Deposit; Escrow Amount.

(a)    The consideration for the Acquired Assets shall be (i) an aggregate Dollar amount equal to the sum of (A) $27,550,000 (the "Cash Purchase Price"), *plus* (B) the amount of the Inventory Purchase Price, *plus* (C) the amount of the Prepaid Expenses (the "Prepaid Expenses Amount"), *plus* (D) the Seller Proration Amount, if any, *minus* (E) the Buyer Proration Amount, if any, *plus* (F) the amount that Sellers are required to pay as Cure Costs up to $150,000, *plus* (G) the Register Cash (such sum, the "Purchase Price") and (ii) Buyer's assumption of the Assumed Liabilities.

(b)    Upon the execution of this Agreement, Buyer shall immediately deposit with the Escrow Agent the sum of $1,377,500 by wire transfer of immediately available funds (the "Initial Escrow Amount"), to be released by the Escrow Agent and delivered to either Buyer or Sellers, in accordance with the provisions of the Escrow Agreement.  Upon the approval of the Proposed Debt Commitment Letter, then on the immediately following Business Day, by Sellers and the execution thereof by Buyer, pursuant to the terms of the Escrow Agreement, Buyer shall immediately deposit with the Escrow Agent the sum of $2,066,250 by wire transfer of immediately available funds (the "Subsequent Escrow Amount" and, together with the Initial Escrow Amount, the "Escrow Amount"), to be released by the Escrow Agent and delivered to either Buyer or Sellers, in accordance with the provisions of the Escrow Agreement.  If any deposit is required on a day that is not a Business Day, such deposit shall be made on the immediately following Business Day.  Pursuant to the Escrow Agreement and subject to the terms of this Agreement, the Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows:

(i)    if the Closing shall occur, the Escrow Amount shall be paid to Sellers and applied towards the Purchase Price payable by Buyer to Sellers under Section 2.3(a) and all accrued investment income thereon, if any, shall be delivered to Buyer at the Closing;

16

(ii)     if this Agreement is terminated by Sellers pursuant to <u>Section 8.1(d)</u> or Section <u>8.1(f)</u> or by Buyer pursuant to <u>Section 8.1(b)(ii)</u> in a situation where Sellers also have a right to terminate pursuant to <u>Section 8.1(f)</u> (and, for the avoidance of doubt, assuming that Sellers could provide the notices set forth therein rather than such notices already having been provided), the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers;

(iii)    if this Agreement is terminated for any reason other than the circumstances described in the foregoing clause (ii), the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Buyer; or

(iv)     if any Store is excluded from the list of Stores pursuant to <u>Section 2.10</u> (Damaged or Destroyed Store Closing), <u>Section 5.3</u> (Antitrust), <u>Section 5.4(b)</u> (Competing Transaction) or <u>Section 8.1(k)</u> (Exclusion of Certain Stores), an amount equal to five percent (5%) of the Purchase Price (or twelve and a half percent (12.5%) of the Purchase Price, after the Subsequent Escrow Amount is deposited) allocated to such Store as set forth on <u>Section 3.5</u> of the Disclosure Schedule (the "<u>Removed Store Escrow Amount</u>") shall be returned to Buyer within three (3) Business Days of notice to the Escrow Agent of such removal, and the Sellers shall provide Joint Written Instructions authorizing the release of such funds pursuant to the Escrow Agreement accordingly.

Section 2.4     <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m. local time on a date (the "<u>Closing Date</u>") that is the third (3rd) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in <u>Article VII</u> (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.

Section 2.5     <u>Closing Payments and Deliveries</u>.

(a)     On the Closing Date, Buyer shall pay the Purchase Price (less the Escrow Amount, which shall be released to Sellers by the Escrow Agent) to Sellers, which shall be paid by wire transfer of immediately available funds into an account designated by Sellers.

(b)     At the Closing, Sellers will deliver to Buyer (i) a duly executed Bill of Sale substantially in the form of <u>Exhibit C</u> (the "<u>Bill of Sale</u>"); (ii) a duly executed Assignment and Assumption Agreement substantially in the form of <u>Exhibit D</u> (the "<u>Assignment and Assumption Agreement</u>"); (iii) a duly executed certificate from an officer of each Seller to the

effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) is satisfied and (iv) a quitclaim deed for the Owned Real Property substantially in the form of Exhibit F.

(c)  At the Closing, Buyer will deliver to Sellers (i) the Bill of Sale duly executed by Buyer; (ii) the Assignment and Assumption Agreement duly executed by Buyer; and (iii) a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) are satisfied.

(d)  At the Closing, each Seller will deliver to Buyer a duly executed certificate meeting the requirements of Section 1.1445-2(b)(2) of the Treasury Regulations stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code.

Section 2.6    Inventory.

(a)  A physical count of the Inventory, and calculation of the value thereof, at each of the Stores shall be made by a nationally-recognized, independent inventory service (the "Inventory Taker") selected and engaged by Sellers, in their sole discretion, two (2) days prior to the anticipated Closing Date, or on such other date as the Parties may mutually agree (the date of such inventory being the "Inventory Date"). The Inventory Taker will conduct the physical inventory in accordance with instructions set forth in Schedule 2.6(a) and otherwise in accordance with the terms and conditions of this Section 2.6. Each Party shall be entitled to have a Representative present during the inventory and the fees and expenses of the Inventory Taker shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers. The physical inventory (and the Inventory Purchase Price to be paid by Buyer for the Inventory) shall not include Inventory that (i) is A&P branded (including any of Sellers' Affiliates' branded) private label inventory; (ii) is damaged, spoiled, perishable, outdated (any merchandise that has a manufacturer's date by which it must be sold that is less than fourteen (14) days after the Inventory Date being deemed outdated for this purpose), obsolete, or otherwise unsaleable at normal retail price in the Ordinary Course of Business at the Stores; or (iii) is not transferable to Buyer under applicable Law (collectively, the "Excluded Inventory"). The Inventory Taker shall value all Inventory carried in the Stores on the Inventory Date, excluding the Excluded Inventory (but including any portion or all of the Excluded Inventory described in clause (ii) or (iii) above that Buyer deems Inventory), at the percentages of the segment retail price set forth in Schedule 2.6(a) (such value, the "Inventory Purchase Price").

(b)  Buyer shall make application to the applicable authorities to (A) transfer any alcohol included in the Inventory to Buyer, (B) transfer to Buyer any licenses held by any Seller or any of its Subsidiaries or issuance of new licenses to Buyer, in each case, permitting the sale of alcohol in the applicable Stores (the "Store Alcohol Licenses"), and any such application shall be made promptly after the execution of this Agreement and shall be diligently pursued by Buyer, at Buyer's sole cost and expense. Sellers, at no out-of-pocket cost or expense to Sellers, shall reasonably cooperate with Buyer and use their commercially reasonable efforts to provide any documents and/or information necessary to assist in effectuating said transfer and execute such consents or other papers as may reasonably be required. With respect to the Stores listed on Schedule 2.6(b), no later than August 9, 2015, Buyer shall notify Seller of its election to (x) purchase such Store in accordance with the terms hereof; (y) not purchase the Store Alcohol Licenses and alcohol constituting such inventory at such Stores and accordingly reduce the

18

Purchase Price by an amount specified opposite the applicable Specified Liquor Store (the "Reserved Amount"), with such Reserved Amount being payable to Seller, if and when the applicable Store Alcohol License is obtained or (z) exclude the Store in accordance with Section 8.1(k)(ii) of this Agreement. If Buyer does not make such election prior to August 9, 2015, Buyer shall be deemed to have elected to purchase such Stores in accordance with the terms of this Agreement.

(c)     The complete inventory prepared by the Inventory Taker shall be prepared in accordance with the usual and customary practices of the industry and shall show the total cost of the Inventory for each Store determined in the manner provided above. In the event that the Parties do not agree on the value of the Inventory for any Store because the Parties disagree as to whether certain items should be counted as Excluded Inventory or as to Sellers' cost of Inventory, the opinion of the Inventory Taker shall be final and binding.

Section 2.7     Allocation. Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles"). No later than sixty (60) days after the Closing Date, Buyer shall deliver to Sellers an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Sellers' review. Sellers shall have an opportunity to review the proposed Purchase Price Allocation for a period of twenty (20) days after receipt of the proposed Purchase Price Allocation. If Sellers disagree with any aspect of the proposed Purchase Price Allocation, Sellers shall notify Buyer in writing prior to the end of such twenty (20)-day period (an "Allocation Objection Notice"), setting forth Sellers' proposed Purchase Price Allocation and specifying, in reasonable detail, any good faith dispute as to Buyer's proposed Purchase Price Allocation. If prior to the conclusion of such twenty (20)-day period, Sellers notify Buyer in writing that they will not provide any Allocation Objection Notice or if Sellers do not deliver an Allocation Objection Notice within such twenty (20)-day period, then the proposed Purchase Price Allocation shall be deemed final, conclusive and binding on each of the Parties. Buyer and Sellers shall use commercially reasonable efforts to resolve any objection by Sellers to the proposed Purchase Price Allocation. If, within ten (10) days after Buyer receives an Allocation Objection Notice, the Parties have not resolved all objections and agreed upon a final Purchase Price Allocation, the Parties shall engage an independent accounting firm mutually acceptable to Buyer and Sellers to resolve any outstanding disputes, and such resolution shall be final, conclusive and binding on each of the Parties. The fees and disbursements of such independent accounting firm shall be shared equally by Buyer, on the one hand, and Sellers, on the other hand. Buyer and Sellers shall make appropriate adjustments to the Purchase Price Allocation to reflect any adjustments to the Purchase Price. Buyer and Sellers agree (and agree to cause their respective Subsidiaries and Affiliates) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the final Purchase Price Allocation. For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the parties do not agree with respect to such determination, such matter shall be resolved in accordance with the process outlined in this

Section 2.7, provided further, that such Tax Return shall be amended if the Purchase Price Allocation is subsequently adjusted pursuant to the procedures described above. None of the Parties will take any position inconsistent with the final Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, in each case unless otherwise required by applicable Law or by a final determination by a Governmental Authority. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.7 shall survive the Closing without limitation.

Section 2.8    Proration.

(a)    On the Closing Date all monthly payments for the month in which the Closing occurs (including base rent, common area maintenance fees, and utility charges) under the Leases transferred at the Closing (the "Prorated Charges") shall be apportioned and prorated between Sellers and Buyer as of the Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges under the applicable Lease and the denominator being the total number of days in the lease month in which the Closing occurs, times (B) the number of days in such lease month following the day that immediately precedes the Closing Date and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the Closing, and (ii) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers). The net amount of all Prorated Charges owed to Buyer and Sellers under this shall be referred to as the "Buyer Proration Amount" if owed to Buyer or the "Seller Proration Amount" if owed to Sellers. Except as set forth in this Section 2.8 and in Section 6.5, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyer.

(b)    As to all non-monthly real estate related payments or any other Prepaid Expenses, the same shall be apportioned between Sellers and Buyer as of 12:01 a.m. on the Closing Date. If any amounts are payable in installments, all installments due through the Closing together with the accrued but unpaid portion of any other installments not yet due as of the Closing shall be prorated based on the periods of time covered by such installments occurring before and after the Closing Date.

(c)    As to real estate Taxes and assessments, if the Closing shall occur before a new real estate or personal property Tax rate is fixed for the applicable property, the apportionment of Taxes for such property at the Closing shall be upon the basis of the old Tax rate for the preceding fiscal year applied to the latest assessed valuation. Promptly after the new Tax rate is fixed, the apportionment of Taxes shall be recomputed by the Parties and any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at the Closing shall be promptly corrected and the proper party reimbursed within ten (10) days following such recomputation.

(d)    If on the Closing Date any tenant is in arrears in the payment of rent, or has not paid the rent payable by it and which is attributable to the month in which the Closing occurs (whether or not it is in arrears for such month on the Closing Date), any rent received by

20

Buyer or Sellers after the Closing shall be applied to amounts due and payable by such tenant in the following order of priority: first, to rent attributable to the month in which the Closing occurred, and, thereafter, ratably, between rent attributable to the months following the month in which the Closing occurred and rent attributable to the months preceding the month in which the Closing occurred. If rent or any portion thereof received by Sellers or Buyer after the Closing is due and payable to the other party by reason of the foregoing allocation, the appropriate sum shall be promptly paid to such other party.

(e)     Following the Closing Date, Buyer agrees to reasonably cooperate with Sellers at no cost to Buyer in connection with all efforts by Sellers to collect such rent owed to Seller by any tenant allocable to the period up to and including the Closing Date.

(f)     If any of the items subject to apportionment under the foregoing provisions cannot be apportioned at the Closing because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the Closing are discovered subsequent to the Closing, then such item shall be reapportioned and such errors and omissions corrected as soon as practicable after the Closing Date and the proper party reimbursed.

Section 2.9     Removal of Excluded Assets.     As promptly as practicable following the Closing Date (and in any event within ten (10) Business Days), Buyer shall allow Sellers to remove at Sellers' sole cost and expense all Excluded Assets that are located at the Stores and, if requested by Sellers, Buyer shall arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' sole cost and expense (an estimated amount of which shall be paid in advance by Sellers based on Buyer's good faith estimate) from the real property. Such removal shall be done in a manner so as to avoid any damage to the Stores and any unreasonable disruption of the business operations to be conducted by Buyer after the Closing. If Sellers have not removed such Excluded Assets as described above, Buyer in its sole discretion may dispose of such Excluded Assets at Sellers' sole cost and expense or sell such Excluded Assets to any Person without paying any consideration or incurring any liability thereof.

Section 2.10     Damaged or Destroyed Store Closing.

(a)     If, during the period beginning on the date hereof and ending on the Closing Date, any Acquired Assets (but not including Inventory) or any Stores (such store, the "Casualty / Condemnation Store") are materially damaged, or destroyed, by fire or other casualty or subject to a taking such that restoration of such Store to substantially the same condition prior to such casualty/condemnation would (i) take nine (9) months or longer, (ii) in the case of a condemnation, such Store cannot be substantially restored to the condition prior to such condemnation or (iii) the applicable landlord of such Store shall have the right to terminate the applicable Lease as a result of such casualty or condemnation (each of the foregoing, a "Material Event"), then Sellers shall remit to the applicable Buyer any insurance proceeds or condemnation awards ("Proceeds") received by Sellers in respect of any such damage or destruction on the later of (x) the Closing and (y) the third (3rd) Business Day after Sellers' receipt of such proceeds, and shall, upon the request of Buyer, assign to such Buyer, effective upon the Closing Date, Sellers' rights to receive any such Proceeds (but, in each case, only if the applicable Purchase Price has

21

not been reduced as a result of such damage or destruction pursuant to this <u>Section 2.10</u> and then only to the extent such amount was not applied by Sellers toward the repair or replacement of such Acquired Assets prior to Closing). Notwithstanding the foregoing, subject to the consent of Sellers as to the assets proposed to be excluded, upon the occurrence of a Material Event, Buyer may elect to treat all or a portion of the damaged Acquired Assets related to such Casualty / Condemnation Store as Excluded Assets, and all or a portion of the Assumed Liabilities related to such Excluded Assets, other than any portion of the Leased space, as Excluded Liabilities, in which case the applicable Purchase Price shall be reduced by an amount equal to the portion of the original Purchase Price allocated to such assets or group of assets (excluding any applicable insurance proceeds received with respect thereto), and any insurance proceeds related to such Excluded Assets shall be property of Sellers. To the extent Sellers do not agree to the exclusion of the assets proposed to be excluded by Buyer pursuant to this <u>Section 2.10(a)</u>, upon Buyer's election (a) the entire Casualty / Condemnation Store and related Acquired Assets shall be deemed to be Excluded Assets, and the Purchase Price shall be reduced by the amount allocated to such Store as set forth on <u>Section 3.5</u> of the Disclosure Schedule or (b) the Proceeds received by Sellers shall be remitted to Buyer as provided in this <u>Section 2.10(a)</u>. For the avoidance of doubt, the foregoing shall be subject to any rights of the applicable landlord or its lender(s) as to any affected Store.

(b) Other than any casualty and condemnation events that are Material Events as set forth above, this Agreement shall stay in full force and effect, with respect to any Store subject to a casualty or condemnation. Sellers may elect to restore such Store but shall have no obligation to do so.

(c) Any assignment of Proceeds under this <u>Section 2.10</u> shall not include any Proceeds to the extent attributable to lost rents or similar costs applicable to any period prior to the Closing, nor any uncollected Proceeds which Sellers may be entitled to receive from such damage, destruction or taking, and shall be reduced by (i) the amount of all costs incurred by Sellers in connection with any repair of such damage or destruction, (ii) the collection costs of Sellers with respect to any Proceeds and (iii) any amounts required to be paid to the applicable landlord under the applicable Lease or to any lender pursuant to any financing, as applicable, in each case with respect to such damage, destruction or taking.

Section 2.11 <u>Specified Environmental Stores</u>. With respect to the Specified Environmental Stores, no later than August 9, 2015, Buyer shall notify Seller of its election to (x) purchase such Store in accordance with the terms hereof; (y) renegotiate the Purchase Price to reflect the value of each such Store (including without limitation taking into account any escrow or other deposits, any reserves or accruals or other amounts set aside for remediation or similar costs), or (z) exclude the Store in accordance with <u>Section 8.1(k)(iv)</u> of this Agreement. If Buyer does not make such election prior to August 9, 2015, Buyer shall be deemed to have elected to purchase such Stores in accordance with the terms of this Agreement.

# ARTICLE III
# SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"):

Section 3.1    Organization of Sellers; Good Standing.    Each Seller is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of the state of its formation. Each Seller has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized, existing, or in good standing or have such power and authority would not reasonably be expected to have a Material Adverse Effect.

Section 3.2    Authorization of Transaction.    Subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Sale Order and any other necessary order to close the sale of the Acquired Assets, each Seller has full power and authority (including full corporate or other organizational power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller. Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Sale Order and any other necessary order to close the sale of the Acquired Assets, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3    Noncontravention; Government Filings.    Except as set forth on Section 3.3 of the Disclosure Schedule, neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of either Seller, (b) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, violate any law or Decree to which either Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which either Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Other than as required or pursuant to the Bankruptcy Code, the Bidding Procedures Order, the Sale Order and any other necessary order to close the sale of the Acquired Assets, neither Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in

23

order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay either Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4    Title to Assets; Sufficiency of Assets.    At the Closing, subject to any Permitted Liens, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets and valid leasehold interests in the Leases and sole and exclusive, good and insurable fee simple title to the Owned Real Property.  Pursuant to the Sale Order and any other necessary order to close the sale of the Acquired Assets, Sellers will convey at closing a good and valid title to, or rights to use, the tangible Acquired Assets and leasehold interest in all the Leases, free and clear of all Liens (other than Permitted Liens).  The Acquired Assets will constitute all material assets that are used primarily in the conduct of the Business as conducted immediately prior to the Closing by Sellers (other than (a) the Excluded Assets and (b) assets, services and other obligations of the parties that will be provided pursuant to a Related Agreement).

Section 3.5    Real Property.  Section 3.5 of the Disclosure Schedule sets forth the location of each Store, each of which is leased to a Seller by a third party, and a list of all Store lease agreements and related amendments.  Sellers have made available to Buyer a true and complete copy of each Lease in Sellers' possession.  With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in material breach or material default under such Lease, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect.

Section 3.6    Litigation; Decrees.    Except as set forth in Section 3.6 of the Disclosure Schedule and other than the Bankruptcy Case, there is no Litigation pending or, to the Knowledge of Sellers, threatened that (a) would reasonably be expected to have a Material Adverse Effect or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Other than the Bankruptcy Case, neither Seller is subject to any outstanding Decree that would (a) reasonably be expected to have a Material Adverse Effect or (b) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

24

Section 3.7    Labor Relations.    Except as set forth in Section 3.7 of the Disclosure Schedule, neither Seller is a party to or bound by any collective bargaining agreement covering the Covered Employees.

Section 3.8    Brokers' Fees.    Other than the fees and expenses payable to Evercore Group L.L.C. in connection with the transactions contemplated hereby, which shall be borne by Sellers, neither Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.9    Taxes.

(a)    Except for matters that would not be reasonably expected to result in a Material Adverse Effect, (i) Sellers have timely filed all Tax Returns required to be filed by Sellers or with respect to the Business or the Acquired Assets with the appropriate tax authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted); and (ii) all Taxes (whether or not shown due on such Tax Returns) owed by Seller or with respect to the Business or the Acquired Assets have been timely paid in full (except as prohibited by the Bankruptcy Court).

(b)    Sellers are not foreign persons within the meaning of section 1445 of the IRC.

(c)    There are no Liens with respect to a material amount of Taxes upon the Acquired Assets, except for Permitted Liens.

(d)    Except with respect to any proof of claim filed by a Tax authority in the Bankruptcy Cases, (i) there are no material amounts of Taxes or assessments in respect of a material amount of Taxes with respect to the Acquired Assets that are outstanding or unpaid, other than amounts not yet due and payable; and (ii) to Sellers' Knowledge, no such assessments or levies are pending or threatened in respect of a material amount of Taxes.

(e)    There is not now pending any proceeding or application for a material reduction in the real estate tax assessment of the Acquired Assets to the extent such action could be binding on, or adversely affect, Buyer.

Section 3.10    Tangible Personal Property.    Section 3.10 of the Disclosure Schedule sets forth all Transferred Contracts that constitute leases of personal property ("Personal Property Leases") relating to personal property used by Sellers in the Business.    To the Knowledge of Sellers, Sellers have not received any written notice of any default or event that with notice or lapse of time or both would constitute a default by Sellers under any of the Personal Property Leases.

Section 3.11    Employee Benefits.

(a)    Section 3.11(a) of the Disclosure Schedule lists all "employee benefit plans," as defined in section 3(3) of ERISA, including all Multiemployer Plans, and all other

25

material employee benefit plans, policies, agreements or arrangements (other than governmental plans and statutorily required benefit arrangements), whether written or unwritten, covering one or more persons and whether subject to ERISA or not, including bonus or incentive plans, deferred compensation arrangements, employment agreements, fringe benefit plans, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by one or more of Sellers and their Subsidiaries, or with respect to which one or more of Sellers and their Subsidiaries could have any Liability, with respect to one or more Covered Employees (the "Employee Benefit Plans").

(b)    True, correct and complete copies of the following documents, as applicable, with respect to each of the Employee Benefit Plans, have been made available to Buyer: (A) any plan documents, and all material amendments thereto (or in the case of each unwritten Employee Benefit Plan, a written summary of its material terms), (B) the most recent Forms 5500, (C) the most recent summary plan descriptions (including letters or other documents updating such descriptions), (D) in the case of any Employee Benefit Plan that is intended to be qualified under IRC section 401(a), a copy of the most recent determination or opinion letter from the IRS and any related correspondence, and a copy of any pending request for such a determination letter, and (E) with respect to each Employee Benefit Plan that is a Multiemployer Plan, for which documents are in the possession of Sellers, (i) all documents related to the funded status of the Multiemployer Plan, (ii) the current rehabilitation plan or funding improvement plan, as applicable, (iii) all correspondence to or from the Multiemployer Plan, and (iv) all information available to Sellers regarding a restructuring or amendment of the Multiemployer Plan that could affect future contributions or contributing-employer liability for prior or future periods.

(c)    Sellers and each Person that is (or at any relevant time, was) considered a single employer with a Seller under ERISA have made all required contributions to each Multiemployer Plan to which any of them has an obligation to contribute.

(d)    Each of the Employee Benefit Plans sponsored by one or more of Sellers and its Subsidiaries that is intended to qualify under section 401 of the IRC is the subject of a current favorable determination letter from the IRS that it is so qualified, and, except as disclosed on Section 3.11(c) of the Disclosure Schedule, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination or otherwise adversely affect such qualification.

(e)    Each of the Employee Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.

Section 3.12    Compliance with Laws; Permits.

(a)    Sellers are in compliance in all material respects with all material Laws applicable to the Business. Sellers have not received any written notice of or been charged with the violation of any Laws, except where such violation would not be reasonably expected to result in a Material Adverse Effect.

(b)　　　Sellers have all material Permits which are required for the operation of the Business as presently conducted and the ownership and use of the Acquired Assets in all material respects.　Schedule 3.12(b) describes each material Permit, including all pharmacy licenses, affecting, or relating to, the Acquired Assets or the Business together with the Governmental Authority responsible for issuing such Permit.　Sellers are not in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation) of any term, condition or provision of any material Permit to which they are parties or give any Governmental Authority grounds to suspend, revoke or terminate any such Permit.

Section 3.13　　Contracts.

(a)　　　The attached Schedule 3.13(a) contains an accurate and complete list of each of the material Contracts to which either Seller is a party (or is subject to or participates in) that is primarily used or held for use in the conduct of the Business.

(b)　　　Except at set forth on Schedule 3.13(b), there is no material breach of or material default under any of the Contracts listed on Schedule 3.13(a) by any Seller or, to the Knowledge of Sellers, by any other party thereto, and Sellers have not received any written notice of any default or event that with notice or lapse of time or both would constitute a default by Sellers under any such Contract, except for defaults that would not be material to the Business.

Section 3.14　　Condemnation.　To Sellers' Knowledge, no condemnation proceedings are pending as to any Store.

Section 3.15　　Inventory.　All of the Inventory consists of a quantity and quality usable and salable in the Ordinary Course of Business, and is not obsolete, expired, defective or damaged, and is merchantable and fit for its intended use.　Each of the Stores has an appropriate amount of Inventory to conduct the Business in the Ordinary Course of Business.　The attached Schedule 3.14 sets forth the physical location of Inventory relating to the Stores (other than the Stores).

Section 3.16　　Environmental Matters.　Except as set forth in Schedule 3.16 or except as would not reasonably be expected to result in Sellers incurring material Liabilities under Environmental Laws: (a) the Stores are in compliance with Environmental Laws, (b) to Sellers' Knowledge, there has been no release of any Hazardous Substance on, upon, into or from the Stores by Sellers in quantities greater than those allowed under Environmental Laws, (c) to Sellers' Knowledge, there have been no Hazardous Substances generated by the Stores that have been disposed of or come to rest at any site that has been included in any published U.S. federal, state or local "superfund" site list or any other similar list of hazardous or toxic waste sites published by any Governmental Authority in the United States, (d) to Sellers' Knowledge, there are no underground storage tanks controlled by Sellers and located on, and no hazardous waste as defined by the Resource Conservation and Recovery Act stored on, the Stores, except for the storage of hazardous waste in compliance with Environmental Laws and (e) Sellers have made available to Buyer accurate and complete copies of all material and non-privileged environmental records, reports, certificates of need, permits, pending permit applications, and

27

environmental studies or assessments for each Store to the extent such documents are in Sellers' possession or reasonable control.

Section 3.17    Disclaimer of Other Representations and Warranties.  Except for the representations and warranties contained in this Article III (as modified by the Disclosure Schedule) or expressly contained in any Related Agreement, neither Sellers nor any other Person shall be deemed to have made any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding either Sellers, any Acquired Assets, any Assumed Liabilities or any other matter.  Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, NEITHER SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.    BUYER ACKNOWLEDGES THAT, SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS).  Sellers disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Sellers or any of their Affiliates).

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to each Seller that the statements contained in this Article IV are true and correct.

Section 4.1    Organization of Buyer; Good Standing.  Buyer is a cooperative corporation duly organized, validly existing, and in good standing under the laws of the State of New York and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2    Authorization of Transaction.  Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.    The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer.  This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3    Noncontravention.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (b) violate any law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyer.  Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4    Litigation; Decrees.    There is no Litigation pending or, to Buyer's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Neither Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees.    Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds; Adequate Assurances.    At the Closing, assuming the funding in full of the Debt Financing contemplated by the Commitments Letters on the Closing Date, Buyer will have immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  At the Closing, Buyer will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

Section 4.7    HIPAA.    As of the Closing Date, Buyer will be a "Covered Entity" as defined by HIPAA.  The transactions contemplated by this Agreement will not violate any applicable data privacy or security requirements under HIPAA or any other privacy or security requirements imposed by federal or state Law on the healthcare data held, collected, used or disclosed by Sellers, including state healthcare data breach notification Laws and related state consumer protection Laws.

51004561_20

**ARTICLE V**
**PRE-CLOSING COVENANTS**

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use (except as otherwise set forth in Section 5.3) its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby (including by giving, or causing to be given, any notices to, making any filings with, and using commercially reasonable efforts to obtain any consents of Governmental Authorities, as applicable, as are necessary and appropriate to consummate the transactions contemplated hereby). Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within its control or influence to be satisfied or fulfilled, and (ii) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled.

(b)    Without limiting the generality of Section 5.1(a), neither Party shall take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any Party to consummate, or materially delay any Party's ability to consummate, the transactions contemplated hereby, including any action that is intended or would reasonably be expected to result in any of the conditions to any Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

Section 5.2    Conduct of the Business Pending the Closing.

(a)    Prior to the Closing, except (i) as set forth on Section 5.2(a) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), each Seller shall (A) conduct the Business only in the Ordinary Course of Business, including but not limited to, retaining and maintaining Furnishings and Equipment in the Ordinary Course of Business and maintaining a normal amount of Inventory, except, in anticipation of the Closing, for Excluded Inventory, on the shelves in the Stores, it being understood and acknowledged that Sellers will not be required to maintain Inventory for post-Closing holiday periods, and (B) use its commercially reasonable efforts to (1) preserve the present business operations, organization and goodwill of the Business, and (2) preserve the present relationships with material vendors and suppliers of the Business.

(b)    Except (i) as set forth on Section 5.2(b) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be

30

unreasonably withheld, conditioned or delayed), neither Seller shall, solely as it relates to the Business:

(i)  (x) other than in the Ordinary Course of Business or as required by any applicable collective bargaining agreement or Law or pursuant to any Contract or policy in effect as of the date of this Agreement, (A) materially increase the annual level of compensation of any Covered Employee or independent contractor or (B) materially increase the coverage or benefits available under any (or create any new) Employee Benefit Plan (or plan, policy, agreement or arrangement that would be an Employee Benefit Plan if in existence on the date hereof) or (y) hire any employee or permit to be transferred to any Store any employee of Sellers or any other affiliate of Sellers, other than any hiring or transfer in replacement of an employee terminated for cause, or who otherwise resigned (which replacement employee will not be hired at a base salary or bonus amount greater than the terminated or resigned employee or be represented by a union or collective bargaining agreement other than the Affected Union);

(ii)  subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral;

(iii)  sell, transfer, assign, license, sub-license, or otherwise dispose of any Acquired Asset, except in the Ordinary Course of Business;

(iv)  other than in the Ordinary Course of Business, remove any tangible Acquired Asset from the Stores; or

(v)  agree to do anything prohibited by this Section 5.2.

Section 5.3  Regulatory Approvals.

(a)  Each of the Parties hereto shall use its best efforts to cooperate in connection with any filing or submission and to resolve any inquiry or investigation by any Governmental Authority, and any proceeding initiated by a private party, relating to the transactions contemplated by this Agreement under any Antitrust Law or any state law.

(b)  With respect to any such investigation, inquiry, or proceeding, the Parties hereby agree to: (i) cooperate with each other in connection with any submissions and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep each other informed in all material respects of any material communication received by them from, or given by them to, any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby; and (iii) permit the other Party to review any material communication given to it by, and consult with the other Party in advance of any meeting or conference with, any Governmental Authority, including in connection with any proceeding by a private party, and, unless prohibited by an applicable

31

Governmental Authority, provide the opportunity to attend or participate in such meeting, conference, or proceeding. The foregoing obligations in this Section 5.3(b) shall be subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege. The Parties expect their outside counsel to enter into a joint defense agreement or common interest agreement to facilitate the exchange of such privileged materials without waiving any such privilege. Notwithstanding anything to the contrary in this Section 5.3(b) or in this Agreement, however, Sellers shall be permitted to communicate privately with any Governmental Authority regarding Sellers' financial condition and matters relating to competing bidders for Sellers' Stores, and Buyer and Buyer's outside counsel shall not have the right to attend or participate in such meetings, conferences, or proceedings, and shall not have access to material prepared by Sellers relating to such matters.

(c) Buyer shall have the right not to acquire any of the Stores and Sellers shall have the right not to sell any such Stores if, and only if, any Governmental Authority with jurisdiction over the enforcement of any Antitrust Law, including the Federal Trade Commission, including its staff, or any state attorney general, (i) indicates in writing that it has concerns that the acquisition of any such Store(s) may violate any Antitrust Law ("Challenge Recommendation"), or (ii) threatens or initiates litigation challenging the acquisition of any such Store(s) as violative of any Antitrust Law. In the event that, subject to the limitations set forth herein, Buyer chooses to exercise its right not to acquire any Store(s), Buyer shall notify Sellers in writing and identify any such Store(s) ("Excluded Stores") by no later than August 31, 2015 ("Store Withdrawal Deadline"), and Buyer shall have no further right to acquire such Store(s). Further, for any Store(s) Buyer elect not to acquire pursuant to this Section 5.3(c), the Purchase Price shall be reduced by the amount of the Purchase Price allocated to such Store(s) as set forth on Section 5.3(c) of the Disclosure Schedule ("Allocated Amount"). For the avoidance of doubt, except as provided in Section 5.3(c) below, if there is a Challenge Recommendation, or if any suit is threatened or instituted by any Governmental Authority or private party challenging the acquisition of any such Store(s) as violative of any Antitrust Law, neither Buyer nor its Affiliates shall have any obligation to (i) seek to resolve such objections or challenges as such Governmental Authority or private party may have to such transactions, including to vacate, lift, reverse, or overturn any order, whether temporary, preliminary, or permanent, so as to permit consummation of the transactions contemplated by this Agreement, (ii) respond to or otherwise resolve any Second Requests or similar subpoenas received from any Governmental Authority or any other Person in connection with the transactions contemplated by this Agreement, (iii) prosecute or otherwise pursue any Litigation under any Antitrust Law seeking clearance or approval of the transactions contemplated by this Agreement, or (iv) offer, negotiate or agree to, by consent decree, hold separate order or otherwise, any sale, divestiture, license, or other disposition of or restriction on, any of Sellers' or Buyer's respective assets (including the Acquired Assets), Stores, or interests therein, so as to permit consummation of the transactions contemplated by this Agreement.

(d) Notwithstanding any other provision in this Agreement, with respect to any Stores that either Buyer or Seller have not withdrawn pursuant to its rights under Section 5.3(c) on or before the Store Withdrawal Deadline, Buyer shall, and shall cause its Affiliates to, promptly take and diligently pursue any or all other actions to the extent necessary to eliminate each and every impediment under any Antitrust Law that may be asserted by any Governmental

Authority or any other Person in opposition to the consummation of any transaction contemplated hereby, so as to enable the Parties to consummate the transactions contemplated by this Agreement as soon as practicable, but in any event not later than the Outside Date, including, without limitation, by offering, negotiating, effecting, and agreeing to, by consent decree, hold separate order or otherwise, any sale, divestiture, license, or other disposition of or restriction on, the Acquired Assets, Stores, or interests therein; provided, however, that any such sale, divestiture, license, disposition, restriction on, holding separate, or other similar arrangement or action is conditioned on the occurrence of, and shall become effective only from and after, the Closing Date.

(e)    Actions or agreements required of Buyer pursuant to this Section 5.3 shall under no circumstances be considered a Material Adverse Effect.

Section 5.4    Bankruptcy Court Matters.  The Parties hereby agree that this Section 5.4 shall only be deemed effective in the event that the Proposed Debt Commitment Letter has been approved by Sellers in accordance with Section 5.9 hereof.

(a)    Approval of Termination Payment.  In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay Buyer, in accordance with the terms hereof (including Article VIII) and the Bidding Procedures Order, upon consummation of a Competing Bid, a break-up fee in an amount equal to (x) 3% of the Cash Purchase Price (the "Break-Up Fee"), *plus* (y) the amount of the reasonable and documented expenses of Buyer incurred in connection with the transactions contemplated hereby up to an aggregate amount of $250,000 (such expense reimbursement, together with the Break-Up Fee, the "Termination Payment").  The Termination Payment shall be due and owing and payable on the first Business Day following the date of consummation of a Competing Bid from the proceeds of such Competing Bid, if no material breach by Buyer of this Agreement has occurred.  Subject to the terms of Section 8.2(b), nothing in this Section 5.4 shall relieve Buyer or Sellers of any Liability for a breach of this Agreement prior to the date of termination; provided, that Sellers' Liability hereunder for any and all such breaches shall be capped at an amount equal to the Termination Payment and Buyer's liability shall be capped at the Escrow Amount in accordance with Section 8.2(b), in each case, except in the case of fraud or willful misconduct.  Upon payment of the Termination Payment to Buyer in accordance with this Section 5.4(a), Sellers and their respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Sellers, their Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses.

(b)    Competing Transaction.  From the date hereof until entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers are not permitted to and are not permitted to cause their Representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid; provided, however, that Sellers shall be

33

permitted and shall have the authority to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, including supplying information relating to the Business and the assets of Sellers to prospective purchasers. Upon entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers shall be permitted to perform all of the foregoing activities with respect to all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law. This Agreement shall be subject to approval by the Bankruptcy Court and, after entry of the Bidding Procedures Order, the consideration by Sellers of higher or better competing bids in respect of all or any part of the Acquired Assets (whether in combination with other assets of Sellers or their Affiliates or otherwise) (any such competing bid, a "Competing Bid").

(c)     Bankruptcy Court Filings.

(i)     As soon as reasonably practicable following the execution of this Agreement and the commencement of the Bankruptcy Cases, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order (which shall be substantially in the form attached hereto as Exhibit A, and among other things, approve and authorize payment of the Termination Payment in accordance with this Section 5.4) and a proposed Sale Order, substantially in the form attached hereto as Exhibit E. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and, if Buyer is selected as the winning bidder at the Auction, entry of the Sale Order, including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the approval of this Agreement. In the event the entry of the Bidding Procedures Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(ii)     Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude Sellers from filing such motions, including upon commencement of the Bankruptcy Cases, to reject any Contracts that are not Transferred Contracts.

(d)     Back-up Bidder. Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the auction undertaken pursuant to the Bidding Procedures Order (the "Auction"), if and only if (i) Buyer submits the second highest or second best bid at the Auction or the terms of this Agreement constitute the second highest or best bid, and (ii) Sellers give written notice to Buyer on or before the Back-up Termination Date, stating that Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the

purchase agreement with the winning bidder, Buyer shall promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Buyer at the Auction.

(e)     Sale Order.  Provided Buyer is selected as the winning bidder in respect of the Acquired Assets at the Auction, Sellers shall seek entry of the Sale Order and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the closing of the Auction in accordance with the terms and conditions hereof.  Buyer and Sellers understand and agree that the transaction is subject to approval by the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order.  In the event the entry of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

Section 5.5     Notice of Developments.  Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.5 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.6     Access; No Contact.  Upon the reasonable request of Buyer, and to the extent not otherwise prohibited by applicable Law, Sellers will permit Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, books and records and Transferred Contracts included in the Acquired Assets during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of either Seller, including, without limitation, reasonable access to Sellers' information technology systems and infrastructure and personnel responsible for such systems in order to facilitate transition post-Closing; provided, however, that, for avoidance of doubt, (a) the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto and (b) any access to assets related to the in-store pharmacies, including scripts and prescription lists shall be provided in accordance with HIPAA and any other applicable federal or state privacy or disclosure Laws as determined by each Seller in its sole discretion.  Prior to the Closing, Buyer shall not, and shall cause its Representatives not to, contact any employees, vendors, suppliers, landlords, or licensors of either Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller (which consent shall not be unreasonably withheld, conditioned or delayed).

Section 5.7     Bulk Transfer Laws.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

51004561_20

Section 5.8     Replacement Bonding Requirements.  On or prior to the Closing Date, Buyer shall provide replacement guarantees, standby letters of credit or other assurances of payment with respect to all Bonding Requirements, in form and substance reasonably satisfactory to Sellers and any banks or other counterparty thereto, and, both prior to and following the Closing Date, Buyer and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Buyer and Sellers with respect to all Bonding Requirements. To the extent Buyer is unable to make such arrangements with respect to any Bonding Requirements prior to the Closing, with Sellers' consent in lieu thereof, Buyer shall deliver to Sellers an irrevocable, unconditional standby letter of credit in favor of Sellers in an amount equal to the amount of such Bonding Requirements, issued by a bank rated "A" or better by Standard and Poor's, in form and substance reasonably satisfactory to Sellers.

Section 5.9     Financing.

(a)     Commencing on the date hereof, Buyer shall use reasonable best efforts to enter into a commitment letter (a "Proposed Debt Commitment Letter" and, following its submission to Sellers and its approval, or deemed approval, by Sellers as provided below, "Debt Commitment Letter") from one or more lenders to be determined by Buyer (the "Lenders"), pursuant to which the Lenders shall commit (subject to the terms and conditions set forth therein) to provide to Buyer Debt Financing in an available amount equal to the difference between (x) the Purchase Price minus (y) the Escrow Amount minus (z) an amount equal to the cash certified to Sellers by Buyer as held by Buyer and reserved to pay the balance of the Purchase Price, on terms and conditions described in the Debt Commitment Letter  (the "Debt Financing Commitment").  Upon execution of a Proposed Debt Commitment Letter, Buyer shall submit the same to Sellers for review and approval (the "Financing Commitment Notice"), together with any related fee letters (the "Fee Letters"), which approval shall not be unreasonably withheld, conditioned or delayed; provided, that if Sellers fail to provide a response to Buyer either approving or rejecting the Proposed Debt Commitment Letter within three (3) calendar days (with reasonable specificity of the bases for rejection), the Proposed Debt Commitment Letter shall be deemed accepted by the Sellers and shall thereafter be the "Debt Commitment Letter". If Sellers reject the Proposed Debt Commitment Letter, Buyer shall have the right to make modifications to the rejected Proposed Debt Commitment Letter and re-submit such modified Proposed Debt Commitment Letter for Sellers' review no later than the Business Day immediately following the date of such rejection in accordance with the procedure outlined in the foregoing sentence, provided, that, if Sellers fail to provide a response to Buyer either approving or rejecting the modified Proposed Debt Commitment Letter within two (2) calendar days (with reasonable specificity of the bases for rejection), the modified Proposed Debt Commitment Letter shall be deemed accepted by Sellers and shall thereafter be the "Debt Commitment Letter".  In the event a modified Proposed Debt Commitment Letter has been submitted for Sellers' review, Sellers shall have a right to terminate the Agreement pursuant to Section 8.1(j) only upon the later of 11:59 pm on August 11, 2015 or the two (2) calendar day period after the submission of such modified Proposed Debt Commitment Letter (which for the avoidance of doubt shall be no later than 11:59 pm on August 13, 2015).  Buyer shall keep Sellers informed of the progress of obtaining the Proposed Debt Commitment Letter and to the extent practicable, share any drafts thereof with Sellers.

36

(b)　Following Buyer's execution of a Debt Commitment Letter, Buyer shall, and shall cause its Affiliates to, use its reasonable best efforts to obtain the Debt Financing at Closing on the terms and conditions described in the Debt Commitment Letter (<u>provided</u> that Buyer may (i) amend the Debt Commitment Letter to add lenders, lead arrangers, bookrunners, syndication agents or similar entities who had not executed the original Debt Commitment Letter, (ii) amend the Debt Commitment Letter, and the Fee Letters, as applicable, to implement any flex provisions applicable thereto or (iii) otherwise replace or amend, or agree to any waivers in respect of, the Debt Commitment Letter or the Fee Letters so long as, in each case, such action would not reasonably be expected to delay or prevent the Closing or impair the availability of the Debt Financing and the terms are not less beneficial to Buyer, with respect to conditionality or enforcement, than those in the Debt Commitment Letter as in effect on Sellers' approval thereof, thereof), including using, and causing its Affiliates to use, reasonable best efforts to (A) take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary, proper or advisable in connection therewith, (B) maintain in effect the Debt Financing Commitment for as long as the transactions contemplated by this Agreement are required to be consummated, (C) satisfy on a timely basis all conditions applicable to Buyer in the Debt Commitment Letter and otherwise comply in all material respects with its obligations thereunder, (D) negotiate definitive agreements with respect thereto on the terms and conditions (including, to the extent the same are exercised, the flex provisions) contemplated by the Debt Commitment Letter or the Fee Letters, as applicable, or on other terms acceptable to Buyer that would not (x) reduce the aggregate amount of the Debt Financing or (y) impose new or additional conditions precedent to the receipt of the Debt Financing, (E) if all of the conditions to Buyer's obligations under <u>Section 7.1</u> (other than those conditions that, by their terms, will be satisfied on the Closing Date) have been satisfied or waived, consummate the Debt Financing at Closing and (F) enforce their rights under the Debt Commitment Letter and the Fee Letters, including through litigation pursued in good faith.　Without limiting the generality of the foregoing, Buyer shall give Sellers prompt notice: (1) of any material breach or default by any party to either Debt Commitment Letter or any Fee Letter and (2) of the receipt of any written notice or other written communication from any person with respect to any: (x) breach, default, termination or repudiation by any party to either Debt Commitment Letter or any Fee Letter or (y) material dispute between or among any parties to either Debt Commitment Letter or any Fee Letter.　If any portion of the Debt Financing becomes unavailable on the terms and conditions (including the flex provisions) contemplated in the Debt Commitment Letter or the Fee Letters, Buyer shall use its reasonable best efforts to obtain alternative financing from alternative sources in an amount sufficient to consummate the transactions contemplated by this Agreement as promptly as practicable following the occurrence of such event; it being understood that Buyer shall have no obligation to accept terms that are materially less favorable, taken as a whole (after taking into account any flex provisions), to Buyer than those included in the Debt Commitment Letter or the Fee Letters, as applicable, as of the date of the original Debt Commitment Letter.

(c)　Buyer shall keep Seller informed on a reasonably current basis in reasonable detail of the status of its efforts to arrange the Debt Financing, and, after obtaining the Debt Financing Commitment, to complete the Debt Financing (subject to any applicable restrictions in the Debt Commitment Letter).

51004561_20

**ARTICLE VI**
**OTHER COVENANTS**

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.    In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

Section 6.2    Access; Enforcement; Record Retention.    From and after the Closing, upon request by either Seller, Buyer will permit Sellers and their Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Buyer, to all premises, properties, personnel, books and records, and Contracts of or related to the Acquired Assets or the Assumed Liabilities for the purposes of (a) preparing Tax Returns (b) as may be reasonably requested by the other Party, monitoring or enforcing rights or obligations of either Seller under this Agreement or any of the Related Agreements, or (c) complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations. Buyer agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing.

Section 6.3    Treatment of Affected Labor Agreements.    With respect to Covered Employees under an Affected Labor Agreement, Buyer shall either (a) agree to assume the Affected Labor Agreement without modification and thereafter comply with the obligations set forth in Section 6.4 with respect to Covered Employees under such assumed Affected Labor Agreement or (b) engage in good faith negotiations, in coordination with Sellers, toward reaching mutually satisfactory modifications to the relevant Affected Labor Agreement with each of the Affected Unions and to enter into a Modified Labor Agreement with each of the Affected Unions. Buyer may, at any time prior to the Sale Hearing, agree to have an Affected Labor Agreement assigned to it without modification by providing notice of such agreement to Sellers and the applicable Affected Union. Upon the commencement of the Bankruptcy Cases, to the extent Buyer is not assuming the Affected Labor Agreements, Buyer, in coordination with Sellers, shall propose a Modified Labor Agreement on a Store-by-Store basis to each Affected Union (each, a "Proposal"), which Proposal may be modified as a result of Buyer's and/or Sellers' good faith negotiations with the Affected Unions. Buyer agrees to cooperate with Sellers in providing each Affected Union with complete and reliable information to allow the Affected Unions to evaluate the Proposal. For all purposes under this Section 6.3, Buyer acknowledges the requirements of sections 1113 and 1114 of the Bankruptcy Code and agrees to

38

use good faith reasonable best efforts to cooperate with Sellers in ensuring compliance with any applicable provisions thereof.

Section 6.4    Covered Employees.

(a)    Obligations of Buyer.  With respect to Covered Employees who are represented by an Affected Union and are legally authorized to work in the capacity in which they were employed immediately prior to the Closing ("Affected Union Covered Employees"), at least ten (10) days prior to the Closing Date, Buyer shall make an offer of employment, which shall be effective as of the Closing Date and contingent upon the Closing, and shall be consistent with the terms and conditions required by the governing Affected Labor Agreements or Modified Labor Agreements, to the extent applicable.  With respect to any Affected Union Covered Employee who is on a long-term disability leave of absence as of the Closing Date, such offer shall be contingent upon such Affected Union Covered Employee returning to active status within a period of six months following the Closing.  Notwithstanding the foregoing, nothing herein shall be construed as to prevent Buyer from terminating the employment of any Covered Employee, consistent with applicable law and the governing Affected Labor Agreements or the Modified Labor Agreements, as applicable, at any time following the Closing Date.  Buyer shall have no obligation with respect to any Covered Employee, including making any offer of employment to any such Covered Employee, who, as of immediately prior to the Closing, is not represented by an Affected Union.

(b)    WARN Act.  Provided that on or before the Closing Date A&P provides Buyer with a list, by date and location, of employee layoffs implemented by Sellers with respect to employees of the Stores in the ninety (90) day period preceding the Closing Date, Buyer shall indemnify and hold harmless each Seller and its Affiliates and their respective Representatives with respect to any Liability arising under the WARN Act with respect to employees of the Stores arising in whole or part from the actions or omissions of Buyer that occur after the Closing.

(c)    Tax Reporting.  The Parties shall cooperate in good faith to determine the method of preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate) consistent with Revenue Procedure 2004-53 for the year in which the Closing occurs.

(d)    No Third Party Beneficiary Rights.  The Parties agree that nothing in this Section 6.4, whether express or implied, is intended to, or shall, (i) create any third party beneficiary rights in any Covered Employee or (ii) serve as an amendment to, or the adoption of, any employee benefit plan, policy, policy, agreement or arrangement of Sellers, Buyer or any Affiliate of any of the foregoing.

(e)    Cooperation.  Cooperation.  After the Closing Date, Buyer shall, and shall cause its Affiliates to, cooperate with Sellers to provide such current information regarding the Affected Union Covered Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Affected Union Covered Employees under any applicable employee benefit that continues to be maintained by A&P or its

39

Affiliates. Buyer shall, and shall cause its Affiliates to, permit Affected Union Covered Employees to provide such assistance to A&P as may be required in respect of claims against A&P or its Affiliates, whether asserted or threatened, to the extent that, in A&P's reasonable opinion, (i) an Affected Union Covered Employee has knowledge of relevant facts or issues, or (ii) an Affected Union Covered Employee's assistance is reasonably necessary in respect of any such claim.

Section 6.5    Certain Tax Matters.

(a)    Transfer Taxes.  Buyer, on the one hand, and Sellers, on the other hand, shall each pay fifty percent (50%) of any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee or governmental charge imposed under applicable Law in connection with the transactions contemplated hereby (a "Transfer Tax").  Accordingly, if either Seller is required by Law to pay any such Transfer Taxes, Buyer shall promptly reimburse such Seller for Buyer's fifty percent (50%) of the amount of such Transfer Taxes actually paid by such Seller.  Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by such Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned.  The party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall, subject to Section 2.7, prepare and timely file such Tax Returns. Buyer and Sellers shall cooperate in making, in a timely manner, all Tax Returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such Laws, the amount of any such Transfer Taxes.

(b)    Tax Adjustments.  Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes (other than those subsumed in Section 2.8), personal property Taxes and similar Taxes) for the Tax period in which the Closing occurs (the "Proration Period") will be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes.  If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period.  When the actual amounts become known, such proration shall be promptly recalculated by Buyer and Sellers, and Buyer or Sellers, as the case may be, promptly (but not later than ten (10) days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment or refund so that the correct prorated amount is paid by each of Buyer and Sellers.

Section 6.6    Insurance Matters.  Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers, the Stores, or the Acquired Assets that is maintained by either Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer, the Stores, or the Acquired Assets and no further coverage shall be available to Buyer, the Stores, or the Acquired Assets under any such policies.

Section 6.7    Acknowledgements.

(a)    Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics.  Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; and (iii) neither Buyer nor any other Person shall have any claim against either Seller or any of its respective directors, officers, Affiliates, agents, or other Representatives with respect thereto.  Accordingly, without limiting the generality of Section 3.13 or Section 9.1, Buyer acknowledges that neither Seller nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information.

(b)    Buyer acknowledges that, except for the representations and warranties expressly set forth in Article III (which representations and warranties shall terminate and be of no further force or effect as of the Closing), and without limiting the generality of Section 3.14, neither Seller nor any other Person makes any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding either Seller, the Stores, any Acquired Assets, any Assumed Liabilities or any other matter, and neither Seller nor any other Person will be subject to any Liability to Buyer or any other Person resulting from such matters or the distribution to Buyer, or the use of, any such information.  Buyer acknowledges that, should the Closing occur, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities in an "as is" condition and on a "where is" basis, without any representation or warranty of any kind, express or implied (including any with respect to environmental, health or safety matters).  Further, without limiting any representation, warranty, or covenant of either Seller expressly set forth herein, Buyer acknowledges that it has waived and hereby waives as a condition to the Closing any further due diligence reviews, inspections, or examinations with respect to either Seller, the Stores, the Acquired Assets, the Assumed Liabilities, or any other matter, including with respect to engineering, environmental, title, survey, financial, operational, regulatory, and legal compliance matters.

Section 6.8    Press Releases and Public Announcements.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court.  If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure.  The Parties acknowledge that Sellers

41

shall file this Agreement with the Bankruptcy Court in connection with obtaining the Bidding Procedures Order and/or Sale Order.

Section 6.9    Seller Marks.    The Seller Marks may appear on some of the Acquired Assets, including on signage.  Buyer acknowledges and agrees that it does not have and, upon consummation of the transactions contemplated by this Agreement, will not have, any right, title, interest, license, or other right to use the Seller Marks.  Buyer shall within ten (10) Business Days after the Closing Date remove the Seller Marks from, or cover or conceal the Seller Marks on, any Acquired Assets, or otherwise refrain from the use and display of the Acquired Assets on which the Seller Marks are affixed.

Section 6.10    Certain Litigation Matters. Promptly after the Closing, Sellers shall or shall cause the action pending in New York Supreme Court, Kings County, bearing Index No. 50667/2015 A&P Real Property LLC, and Waldbaum, Inc. against 81-21 New Utrecht LLC, Blanche Ezrol, Wendy K Sherbert, Terri Anderson, Brandi M. Seda, Renae M. Tedesco, and the Estate of Peggy Anderson, to be voluntarily discontinued with prejudice.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    Conditions to Buyer's Obligations.    Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    The representations and warranties set forth in Article III (other than those contained in Section 3.1 (Organization of Sellers; Good Standing), Section 3.2 (Authorization of Transaction), the first and third sentences of Section 3.4 (Title to Assets) and Section 3.8 (Brokers' Fees) (collectively, the "Fundamental Representations")) shall have been true and correct on the date hereof and on and as of the Closing Date as those made on such date (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect.  The Fundamental Representations shall be true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) in all material respects on the date hereof and on and as of the Closing Date as those made on such date (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date).

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered (i) the Bidding Procedures Order, (ii) the Sale Order and (iii) any other order necessary to close the sale of the Acquired Assets, and no order staying, reversing, modifying or amending such orders shall be in effect on the Closing Date;

42

(d)  no material Decree shall be in effect that prohibits the consummation of the transactions contemplated by this Agreement; and

(e)  each delivery contemplated by Section 2.5(b) to be delivered to Buyer shall have been delivered.

Section 7.2  Conditions to Sellers' Obligations.  Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)  the representations and warranties set forth in Article IV shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)  Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)  the Bankruptcy Court shall have entered (i) the Bidding Procedures Order, (ii) the Sale Order and (iii) any other order necessary to close the sale of the Acquired Assets, and no order staying, reversing, modifying or amending such orders shall be in effect on the Closing Date;

(d)  no material Decree shall be in effect that prohibits the consummation of the transactions contemplated by this Agreement; and

(e)  each payment contemplated by Section 2.5(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(c) to be delivered to Sellers shall have been delivered.

Section 7.3  No Frustration of Closing Conditions.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or best efforts, with respect to those matters contemplated by Section 5.3, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1  Termination of Agreement.  The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)  by the mutual written consent of the Parties;

(b)  by any Party by giving written notice to the other Parties if:

43

(i)　　any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to Buyer if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of Buyer to have fulfilled any of its obligations under this Agreement; or

(ii)　　the Closing shall not have occurred prior to October 31, 2015 (the "Outside Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(b)(ii); provided, further, that Buyer's failure to consummate the transactions contemplated by this Agreement in accordance with the terms of this Agreement as a result of the Lenders being unwilling or unable to provide the Debt Financing at or prior to the time of the Closing was required to occur pursuant to the terms of this Agreement (a "Financing Failure") shall not in any way limit Buyer's termination right pursuant to this Section 8.1(b)(ii).

(c)　　by Buyer by giving written notice to each Seller if there has been a breach by either Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) ten (10) days after receipt of Buyer's notice of intent to terminate or (B) the Outside Date;

(d)　　by either Seller by giving written notice to Buyer and the other Seller if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (A) ten (10) days after receipt of such Seller's notice of intent to terminate or (B) the Outside Date;

(e)　　by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid, (y) the Bankruptcy Court enters an order approving a Competing Bid and (z) the Person making the winning Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement, in each case, subject to Buyer's right to payment of the Termination Payment, if applicable, in accordance with the provisions of Section 5.4;

(f)　　by Sellers, if (i) all of the conditions set forth in Section 7.1 have been satisfied (other than those conditions which are to be satisfied by actions taken at the Closing and

44

which were, at the time of termination, capable of satisfaction), (ii) Sellers have indicated in writing to Buyer that all of the conditions set forth in Section 7.2 (other than those conditions that by their nature are to be satisfied by actions taken at the Closing) have been satisfied or that Sellers are willing to waive such conditions, (iii) Sellers have confirmed to Buyer in writing that they are ready, willing and able to consummate the Closing, and (iv) Buyer fails to consummate the Closing within two (2) Business Days after the date of receipt of such notice from Sellers;

(g)     by Buyer, if (i) the Bidding Procedures Order shall not have been approved by the Bankruptcy Court by the date that is forty-five (45) days after the Petition Date unless waived or such date is extended by Buyer or (ii) a Sale Order approving this Agreement shall not have been approved by the Bankruptcy Court by the day that is one-hundred and five (105) days after the Petition Date unless waived or such date is extended by Buyer; or (iii) Sellers withdraw the Sale Motion or file any motion with the Bankruptcy Court that seeks (A) termination of this Agreement or (B) withdrawal of the Sale Motion; or

(h)     by Buyer upon entry of any order of the Bankruptcy Court prior to the Closing Date dismissing the Bankruptcy Case;

(i)     by Buyer, at any time after 11:59 pm on August 11, 2015 and prior to the approval of a Proposed Debt Commitment Letter in accordance with Section 5.9, provided that Buyer is in compliance with its covenants and agreements under this Agreement, including under Section 5.9;

(j)     by Seller, subject to Section 5.9 (a), at any time after 11:59 pm on August 11, 2015 if a Debt Commitment Letter has not been entered into by Buyer and approved (or deemed approved) by Sellers; or

(k)     by Buyer:

(i)     with respect to any Excluded Store, at any time prior to August 31, 2015;

(ii)     with respect to any Specified Liquor Store at any time prior to August 9, 2015 in accordance with Section 2.6(b); or

(iii)     with respect to a maximum of five (5) Stores (the "Cap") at any time prior to August 9, 2015 if Buyer has not entered into a Modified Labor Agreement with the applicable Affected Union, in form and substance reasonably satisfactory to Buyer;

(iv)     with respect to the Specified Environmental Stores, at any time prior to August 9, 2015.

provided, that with respect to any termination with respect to a particular Store pursuant to this Section 8.1(k), (i) Section 3.5 (or Section 1.1(l) as to the Owned Real Property) of the Disclosure Schedule, as applicable, shall be amended to delete such Store from such schedule, which for the avoidance of doubt shall mean that such Store shall be treated as an Excluded Asset and all of the Liabilities related to such Store shall thereafter be treated as Excluded Liabilities, (ii) the

Purchase Price shall be reduced (1) for each Excluded Store under Section 5.3(c), by the applicable Allocated Amount and (2) for any Store excluded pursuant to Section 8.1(k)(ii), Section 8.1(k)(iii) or Section 8.1(k)(iv), by the amount allocated to such Store as set forth on Section 3.5 (or Section 1.1(l) as to the Owned Real Property) of the Disclosure Schedule, (iii) the Termination Payment shall be recalculated to take into account such reduction in the Purchase Price and (iv) an amount equal to Removed Store Escrow Amount shall be released from the Escrow Amount and be delivered to Buyer promptly after such removal. For the avoidance of doubt, if any Store is excluded pursuant to this Section 8.1(k), no Party shall have a right to seek specific performance with respect to such excluded Stores and no amount(s) shall be due or owing with respect to such excluded Stores.

Section 8.2    Effect of Termination.

(a)    If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 3.13, Section 5.4, Section 6.7, Section 8.3, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 5.4 and Section 8.3) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, that other than in the case of fraud or willful misconduct, (a) the maximum Liability of Sellers under this Agreement shall not exceed the amount of the Termination Payment and (b) the maximum Liability of Buyer under this Agreement shall not exceed, in the aggregate, the Escrow Amount.

(b)    Each of the parties hereto acknowledges and agrees that the agreements contained in this Section 8.2(b) are an integral part of this Agreement, and that, without these agreements, the parties would not have entered into this Agreement, and (a) the Escrow Amount, when delivered to Sellers pursuant to Section 2.3(b)(ii), and (b) the Termination Payment, if delivered to Buyer pursuant to Section 5.4(a), in each case, is not a penalty, but rather constitutes liquidated damages in a reasonable amount that will compensate Sellers or Buyer, as the case may be, in the circumstances in which the Escrow Amount is not returned or the Termination Payment is paid, as applicable. In no event shall Buyer be required to pay more than one Escrow Amount, and in no event shall Sellers be required to pay more than one Termination Payment. Notwithstanding anything to the contrary in this Agreement, if Buyer fails to effect the Closing when required by this Agreement for any or no reason or otherwise breaches this Agreement (whether willfully, intentionally, unintentionally or otherwise) or fails to perform hereunder (whether willfully, intentionally, unintentionally or otherwise), then other than in the case of fraud or willful misconduct, (i) except for the right of Sellers to seek an injunction, specific performance or other equitable relief pursuant to, and only to the extent expressly permitted by, Section 9.11, Sellers' and each of their respective Affiliates' sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) against Buyer or any of its former, current and future direct or indirect equity holders, members, controlling persons, stockholders, directors, officers, employees, agents, representatives, Affiliates, members, managers, general or limited partners, lenders or assignees (each a "Related Party" and collectively, the "Related Parties") or any Related Party of any Related Party of Buyer for any breach, loss or damage shall be to terminate this Agreement and keep the Escrow Amount, in each case, only to the extent provided

46

by Section 2.3(b)(ii) and this Section 8.2(b) (subject to the limitations contained therein), and (ii) except as provided in the immediately foregoing clause (i), none of the Related Parties of Buyer or any Related Party of a Related Party of Buyer will have any liability to Sellers or any of its Affiliates or any other party to this Agreement or any of their Affiliates relating to or arising out of this Agreement, the Debt Financing Commitment or in respect of any other document or theory of law or equity or in respect of any oral representations made or alleged to be made in connection herewith or therewith, whether at law or equity, in contract, in tort or otherwise. Other than in the case of fraud or willful misconduct, upon delivery of the Escrow Amount to Sellers pursuant to Section 2.3(b)(iii), none of the Related Parties of Buyer or any Related Party of any Related Party of Buyer shall have any further liability to Sellers or any of its Affiliates or any other party to this Agreement or any of their Affiliates relating to or arising out of this Agreement, the Debt Financing Commitment or in respect of any other document, or any transaction contemplated hereby or thereby or any theory of law or equity or in respect of any oral representations made or alleged to be made in connection herewith or therewith, whether at law or equity, in contract, in tort or otherwise, and none of the Related Parties of Buyer or any Related Party of any Related Party of Buyer shall have any further liability to Sellers or any of their Affiliates or any other party to this Agreement or any of their Affiliates relating to or arising out of this Agreement or the transactions contemplated hereby. Other than in the case of fraud or willful misconduct, in the event of delivery of the Termination Payment to Buyer pursuant to Section 5.4(a), none of the Related Parties of Sellers or any Related Party of any Related Party of Sellers shall have any further liability to Buyer or any of its Affiliates or any other party to this Agreement or any of their Affiliates relating to or arising out of this Agreement or in respect of any other document, or any transaction contemplated hereby or thereby or any theory of law or equity or in respect of any oral representations made or alleged to be made in connection herewith or therewith, whether at law or equity, in contract, in tort or otherwise, and none of the Related Parties of Sellers or any Related Party of any Related Party of Sellers shall have any further liability to Buyer or any of their Affiliates or any other party to this Agreement or any of their Affiliates relating to or arising out of this Agreement or the transactions contemplated hereby.

Section 8.3     Lease Indemnity.   If this Agreement is terminated pursuant to Section 8.1(b) or Section 8.1(d) due to a material failure of Buyer to have fulfilled any of its obligations under this Agreement, Buyer shall indemnify Sellers for all Liabilities and Damages arising out of any Lease assumed by Sellers pursuant to section 365(k) of the Bankruptcy Code; provided, however, that maximum Liability of Buyer under this Agreement in the aggregate (except Liability with respect to breaches that are willful or fraudulent as provided in Section 8.2 above) shall not exceed the Escrow Amount.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1     Survival.   Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(b)(iii) or Section 2.5(c)(iii) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

47

Section 9.2     Expenses.  Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with the preparation and execution of this Agreement, the Related Agreements, the compliance herewith and therewith and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.

Section 9.3     Entire Agreement.  This Agreement together with any documents, instruments and certificates explicitly referred to herein, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4     Incorporation of Exhibits and Disclosure Schedule.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5     Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein; provided that, Sections 8.2(b) (Effect of Termination), 9.5 (Amendments), 9.10 (Waiver of Jury Trial) and 9.12 (No Third Party Beneficiaries) may only be amended with the consent of the Lenders.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6     Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties; provided that Buyer may assign and transfer this Agreement and (A) any of its rights and obligations under this Agreement, in whole or in part, without the prior written consent of any Party hereto, to one or more of the Members, or designate one or more of the Members to perform its obligations hereunder, in whole or in part, and (B) following the Closing, any of its rights to any of the financing sources of Buyer (including the Lenders), to the extent necessary for purposes of creating a security interest herein or otherwise assigning as collateral in respect of the Debt Financing; provided, that no such transfer or assignment will relieve Buyer of any of its obligations hereunder.

48

Section 9.7    Notices.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to either Seller:    The Great Atlantic & Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention: Christopher W. McGarry
                   Matthew Bennett
E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Sellers) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C. and Gavin Westerman
Facsimile: (212) 310-8007
E-mail: ray.schrock@weil.com; gavin.westerman@weil.com

If to Buyer:    Key Food Stores Co-Operative, Inc.
1200 South Avenue
Staten Island, NY 10314
Attention: Dean Janeway
Facsimile: (718) 697-8296
E-mail: DeanJ@HQ.Keyfoods.com

With a copy (which shall not constitute notice to Buyer) to:

Ropes & Gray, LLP
1211 Avenue of the Americas
New York, New York 10036-8704
Attention: Robert S. Fischler and Jane D. Goldstein
Facsimile: (696) 728-1625
                   and
            (617) 235-0376
E-mail: Robert.Fischler@ropesgray.com or
Jane.Goldstein@ropesgray.com

49

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 9.7.

Section 9.8    Governing Law.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    Submission to Jurisdiction; Service of Process.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.    Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court; provided, however, that if the Bankruptcy Cases have not been commenced, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.    Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.    Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.7; provided, however, that nothing in this Section 9.9 shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.    Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.    The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    Waiver of Jury Trial.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT (INCLUDING THE DEBT FINANCING) OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, INCLUDING IN ANY ACTION, PROCEEDING OR COUNTERCLAIM AGAINST ANY LENDERS AND ANY OF THEIR RESPECTIVE FORMER, CURRENT OR FUTURE EQUITY HOLDERS, CONTROLLING PERSONS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS, MEMBERS, MANAGERS, MANAGEMENT COMPANIES, ARRANGERS, GENERAL OR LIMITED PARTNERS, ASSIGNEES OR AFFILIATES. EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH

OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

Section 9.11    Specific Performance.

(a)    Each of the Parties acknowledges and agrees that the other Party and in the case of Sellers, their respective estates, would be damaged irreparably in the event such Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that such other Party may have under law or equity, such Party shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

(b)    Notwithstanding anything to the contrary contained in Section 9.11(b), it is explicitly agreed that the right of Sellers to seek specific performance or other equitable remedies to cause Buyer to consummate the Closing shall be subject to the requirements that (i) all of the conditions to Closing set forth in Section 7.1 have been satisfied or waived (other than those conditions that by their terms are to be satisfied by actions taken at Closing) at the time when the Closing would have been required to occur in accordance with Section 2.4, (ii) the Debt Financing has been funded in accordance with the terms thereof or will be funded in accordance with the terms thereof at the Closing, and (iii) Sellers have irrevocably committed to Buyer in writing that, if the Debt Financing is funded, Sellers will consummate the Closing. For the avoidance of doubt, notwithstanding anything to the contrary contained in Section 9.11(a), it is hereby acknowledged and agreed that (i) Sellers shall not be entitled to seek specific performance or other equitable remedies to cause Buyer to enforce, including against anticipatory breach, the obligations of the Lenders to fund the Debt Financing under the Debt Commitment Letter and (ii) only Buyer (and not Sellers or any Affiliate of the foregoing) shall be permitted to bring or support any action against any Lender for failure to satisfy any obligations to fund any debt financing pursuant to the terms of any Debt Commitment Letter (provided in any event, that the Lenders are intended to be express third party beneficiaries of Section 9.11(b)). For the avoidance of doubt, while Sellers may pursue both a grant of specific performance or other equitable remedies to the extent permitted by this Section 9.11 and the payment of the Escrow Amount, under no circumstances shall Sellers be permitted or entitled to receive both (A) a grant of specific performance or other equitable remedies to require Buyer to consummate the Closing and (B) payment of the Escrow Amount. If, prior to the Outside Date, any Party brings an action to enforce specifically the performance of the terms and provisions of this Agreement by another Party, the Outside Date shall automatically be extended by the amount of time during which such action is pending.

Section 9.12    Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions

51

shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns; provided that the Lenders are intended third-party beneficiaries of, and may enforce, Sections 8.2(b) (Effect of Termination), 9.5 (Amendments), 9.10 (Waiver of Jury Trial) and 9.11(b) (Specific Performance) and the Related Parties are intended third party beneficiaries of Section 8.2(b) (Effect of Termination) and 9.11(b) (Specific Performance).

Section 9.14    Non-Recourse.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.  No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or Lender to, any of the foregoing ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 9.14.

Section 9.15    Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16    Disclosure Schedule.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The

representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure for all purposes of this Agreement and all other sections of the Disclosure Schedule to which such matter relates to the extent that such disclosure is reasonably apparent on its face. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced. The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.17   <u>Headings; Table of Contents</u>.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18   <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

Section 9.19   <u>Limitations Under Applicable Law</u>.  Notwithstanding anything to the contrary contained in this Agreement, Sellers' obligations hereunder shall be subject to limitations under applicable Law, including, without limitation, Sections 1113 and 1114 of the Bankruptcy Code.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.

By: _____

Name: Christopher W. McGarry

Title: Executive Vice President and Chief Administrative Officer


FOOD BASICS, INC.

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary


APW SUPERMARKETS, INC.

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary


SHOPWELL, INC.

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary


PATHMARK STORES, INC.

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary


A&P REAL PROPERTY, LLC

By: _____

Name: Christopher W. McGarry

Title: Vice President & Secretary

KEY FOOD STORES CO-OPERATIVE, INC.

By: _____

Name: Dean Janeway
Title: Chief Executive Officer