UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | |
| **COMPANY, INC.,** *et al.,* | : | **Case No. 15-23007 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

------------------------------------------------------------x

## <u>NOTICE OF FILING AMENDED INTERIM DIP ORDER</u>

**PLEASE TAKE NOTICE** that, on July 19, 2015 (the "**Commencement Date**")

The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates and subsidiaries, as

debtors and debtors in possession (collectively, the "**Debtors**"), each filed a voluntary petition

for relief under chapter 11 of title 11 of the United States Code with the United States

Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that, on July 20, 2015, the Debtors filed

the *Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing*

*Pursuant to 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e),*

*(B) Use Cash Collateral Pursuant to 11 U.S.C. §362(c)(2), (C) Grant Certain Protections to*

*Prepetition Secured Parties Pursuant to 11 U.S.C. §§361, 362, 363 and 364, and (D) Schedule a*

*Final Hearing Pursuant to Fed R. Bankr. P. 4001(b) and (c)* [ECF No. 18] (the "**DIP Motion**").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

**PLEASE TAKE FURTHER NOTICE** that, on July 21, 2015, the Bankruptcy

Court entered an order granting the DIP Motion on an interim basis (the "**Interim DIP Order**")

[ECF No. 88].  Annexed as **Exhibit "1"** to the DIP Motion is a draft proposed form of

Intercreditor Arrangements (the "**Intercreditor Arrangements**").

**PLEASE TAKE FURTHER NOTICE** that the Intercreditor Arrangements has

been revised and finalized.  Annexed as **Exhibit "A"** hereto is the amended Interim DIP Order

(the "**Amended Interim DIP Order**"), attached to which is the finalized Intercreditor

Arrangements (Amended Exhibit 1).  Further, annexed as **Exhibit "B"** hereto is a comparison of

the Interim DIP Order and the Amended Interim DIP Order.


Dated:  New York, New York
        July 22, 2015


                                    /s/ Ray C. Schrock, P.C.
                                    Ray C. Schrock, P.C.
                                    Garrett A. Fail

                                    **WEIL, GOTSHAL & MANGES LLP**
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    *Proposed Attorneys for Debtors*
                                    *and Debtors in Possession*

WEIL:\95410048\1\50482.0004

**<u>Exhibit A</u>**

**Amended Interim DIP Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re                                                                  :        **Chapter 11**
                                                                       :
**THE GREAT ATLANTIC & PACIFIC TEA**                                   :
**COMPANY, INC.,** *et al.*,                                           :        **Case No. 15-23007 (RDD)**
                                                                       :
                    **Debtors.**[1]                                    :        **(Jointly Administered)**

------------------------------------------------------------x

### AMENDED INTERIM ORDER AUTHORIZING DEBTORS TO (A) OBTAIN THIRD LIEN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2), (C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

Upon the motion (the "**Motion**")[2] of The Great Atlantic & Pacific Tea Company,

Inc. ("**A&P**") and certain of its affiliates and subsidiaries, as debtors and debtors in possession

(collectively, the "**Debtors**"), in the above captioned chapter 11 cases (the "**Chapter 11 Cases**"),

pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and

364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the

"**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "**Bankruptcy Rules**"), and Rule 4001–2 of the Local Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

Rules (the "**Local Rules**") for the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), seeking, among other things:

I        <u>Third Lien Postpetition Financing</u>

A.        authorization of the Debtors to obtain $100,000,000 in secured third priority postpetition financing (the "**Junior Lien DIP Facility**"), pursuant to that certain Senior Secured Debtor-in-Possession Term Credit Agreement, substantially in the form annexed to the Motion as **Exhibit "C,"** (as such agreement may be amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**" and, together with any exhibits attached thereto and other agreements related thereto, including, without limitation, all notices, all guarantees, all security agreements, all related or ancillary documents and agreements, and any mortgages contemplated thereby, the "**DIP Documents**"), by and among A&P (in such capacity, the "**Borrower**"), each of the other Debtors (other than Kwik Save Inc.), as guarantors, Fortress Credit Corp., as administrative agent (in such capacity, the "**DIP Agent**"), and Fortress Credit Corp., or one or more of its designated affiliates or other lender parties thereto from time to time, as lenders (in its/their capacity as such, the "**DIP Lenders**");

B.        authorization of the Debtors that are guarantors under the DIP Credit Agreement (together with the Borrower, the "**DIP Loan Parties**"), to guarantee A&P's obligations on a third lien secured basis in respect of the Junior Lien DIP Facility;

C.        authorization of the Debtors to execute and enter into the DIP Documents and to perform all other and further acts as may be necessary or appropriate in connection with the same;

D.        authorization of the Debtors to use $50 million of the Junior Lien DIP Facility upon entry of this interim order (the "**Interim Order**") to avoid immediate and irreparable harm;

2

E.      approval of the intercreditor arrangements (the "**Intercreditor Arrangements**") substantially in the form annexed to this Interim Order as **Exhibit "1"** with respect to the (i) Common Collateral (for the purposes of this Interim Order, "**Common Collateral**" shall mean "Collateral" as such term is defined in the Prepetition Term Loan Agreement Security Agreement, the Prepetition ABL Security Agreement, the Prepetition PIK Notes Indenture and the Prepetition Convertible Notes Indenture (in each case excluding any Additional Collateral)), and (ii) Additional Collateral (as defined in the Intercreditor Arrangements, which, for the avoidance of doubt includes, without limitation, the Additional Collateral Account (as defined in the DIP Credit Agreement));

F.      authorization of the Debtors to grant security interests, liens, and superpriority claims (including, as applicable, superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code), solely to the extent set forth in this Interim Order, to the DIP Agent, for the benefit of itself and the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the Junior Lien DIP Facility in the order of priority and as provided in the DIP Orders;

G.      authorization of the Debtors to use proceeds of the Junior Lien DIP Facility and Cash Collateral (as defined below) in accordance with, and for the purposes and in the amounts set forth in, the Budget (as defined below) and to make the Adequate Protection Payments;

II      Interim Use of Cash Collateral

A.      authorization of the Debtors to (i) use Cash Collateral pursuant to sections 361, 362 and 363 of the Bankruptcy Code, in accordance with the Budget; and (ii) provide adequate protection on the terms set forth in this Interim Order to (w) the Prepetition ABL

3

Secured Parties, (x) the Prepetition Term Loan Secured Parties, (y) the Prepetition PIK Notes

Secured Parties, and (z) the Prepetition Convertible Notes Secured Parties (each capitalized term

in clauses (w), (x), (y) and (z), as defined in Paragraph 5 and, collectively, the "**Prepetition**

**Secured Parties**");

       III      <u>Certain Modifications and Waivers</u>

          A.      modification of the automatic stay set forth in section 362 of the

Bankruptcy Code on the terms and conditions set forth herein to the extent necessary to

implement and effectuate the terms of the DIP Documents and the DIP Orders;

          B.      waiver of any applicable stay with respect to the effectiveness and

enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

       IV      <u>Final Hearing</u>

          A.      the scheduling of a final hearing (the "**Final Hearing**"), pursuant to

Bankruptcy Rule 4001 and Local Rule 4001–2, to be held at least fourteen (14) days after entry

of this Interim Order to consider entry of an order granting the relief requested in the Motion on

a final basis (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**");

          The interim hearing on the Motion having been held on July 20, 2015 (the

"**Interim Hearing**"); and based upon all of the pleadings and declarations filed with the

Bankruptcy Court, the evidence presented at the Interim Hearing and the entire record of the

Chapter 11 Cases; and there being no objections to the relief sought in the Motion that have not

previously been withdrawn, waived, settled, or resolved; and the Bankruptcy Court having noted

the appearance of all parties in interest; and it appearing that the relief requested in the Motion

and granted herein is in the best interests of the Debtors and the Debtors' estates and creditors;

and the Debtors having provided notice of the interim relief sought in the Motion and the Interim

Hearing as set forth in the Motion, and it appearing that no further or other notice of such request

4

for relief need be given; and after due deliberation and consideration, and sufficient cause

appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED,**[3] that:

1.      <u>Approval of Motion</u>.  The Motion is approved on an interim basis on the

terms and conditions set forth in this Interim Order.  This Interim Order shall become effective

immediately upon its entry.  To the extent the terms of the DIP Documents differ in any respect

from the terms of this Interim Order, this Interim Order shall control.

2.      <u>Jurisdiction and Venue</u>.  The Bankruptcy Court has core jurisdiction over

the Chapter 11 Cases, commenced on July 19, 2015 (the "**Commencement Date**"), the Motion

and the parties affected by the Motion, and the Debtors' property pursuant to 28 U.S.C.

§§ 157(a)-(b) and 1334(b).  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C.

§§ 1408 and 1409.

3.      <u>Notice</u>.  Notice of the Motion has been provided to (i) the Office of the

United States Trustee for Region 2 (the "**U.S. Trustee**"); (ii) the holders of the five (5) largest

secured claims against the Debtors (on a consolidated basis) that are not otherwise Notice Parties

hereunder; (iii) the holders of the forty (40) largest unsecured claims against the Debtors (on a

consolidated basis); (iv) the attorneys for the DIP Agent; (v) the attorneys for Wells Fargo Bank,

National Association ("**Wells Fargo**"), as agent under that Prepetition ABL Agreement (as

defined below); (vi) the attorneys for Wells Fargo, as agent under that Prepetition Term Loan

Agreement (as defined below); (vii) the Prepetition PIK Notes Trustee (as defined below);

(viii) the attorneys for the Prepetition PIK Notes Trustee; (ix) the Prepetition Convertible Notes

---

[3] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

WEIL:\95410057\1\50482.0004

Trustee (as defined below); (x) the attorneys for the Prepetition Convertible Notes Trustee; (xi) the attorneys for the holders of a majority of the Prepetition PIK Notes (as defined below) (the "**Majority Holders of Prepetition PIK Notes**"); (xii) the attorneys for the holders of a majority of the Prepetition Convertible Notes (as defined below) (the "**Majority Holders of Prepetition Convertible Notes**"); (xiii) the attorneys for The Yucaipa Companies, LLC and their affiliated funds; (xiv) the attorneys for The United Food and Commercial Workers (UFCW) International; (xv) the attorneys for C&S Wholesale Grocers, Inc.; (xvi) the Securities and Exchange Commission; (xvii) the Internal Revenue Service; and (xviii) the United States Attorney's Office for the Southern District of New York (collectively, the "**Notice Parties**"). Under the circumstances, the notice given by the Debtors of the interim relief requested in the Motion and of the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and 9014, and Local Rule 4001–2, and no further notice of the relief sought at the Interim Hearing is necessary or required.

   4. <u>Creditors Committee Formation</u>.  No statutory committee of unsecured creditors has yet been appointed in any of these Chapter 11 Cases (a "**Creditors' Committee**").

   5. <u>Debtors' Stipulations</u>.  Subject to Paragraph 6(b) below, the Debtors admit, stipulate, and agree that:

   (a) *Prepetition Indebtedness*.  As of the Commencement Date, the Debtors were unconditionally indebted and liable under the (i) Prepetition ABL Facility, (ii) Prepetition Term Loan Facility, (iii) Prepetition PIK Notes, and (iv) Prepetition Convertible Notes, as follows (each of the foregoing as defined herein):

   (i) *Prepetition ABL Facility*.  Pursuant to that certain Amended and Restated Senior Secured Revolving Credit Agreement (as amended,

6

supplemented, or otherwise modified prior to the Commencement Date, the

"**Prepetition ABL Credit Agreement**"), dated as of September 17, 2014, among

Wells Fargo, as agent (in such capacity, the "**Prepetition ABL Agent**"), letter of

credit issuer and swing line lender, for itself and a syndicate of financial

institutions and other institutional lenders (collectively, the "**Prepetition ABL**

**Lenders**" and, together with the Prepetition ABL Agent, and each "Credit Party"

(as defined in the Prepetition ABL Credit Agreement), the "**Prepetition ABL**

**Secured Parties**"), and A&P, as lead borrower, together with its subsidiaries as

co-borrowers, and Montvale-Para Holdings Inc. ("**Montvale**") and Montvale

Holdings, Inc. as guarantors, the Prepetition ABL Secured Parties extended an

asset-based revolving credit facility in an amount of up to $300 million (the

"**Prepetition ABL Facility**"), subject to a borrowing base formula.  As of the

Commencement Date, the Debtors (other than Kwik Save Inc.) are liable to the

Prepetition ABL Secured Parties, without objection, defense, counterclaim or

offset of any kind, in the aggregate amount of letters of credit issued and

outstanding of $198,063,821.21, pursuant to the Prepetition ABL Credit

Agreement, plus unliquidated and other amounts including, without limitation,

interest and letter of credit fees (in each case at the Default Rate) thereon and fees,

expenses, charges and other obligations incurred in connection therewith as and to

the extent chargeable or reimbursable under the Prepetition ABL Credit

Agreement (the "**Prepetition ABL Obligations**").  The Prepetition ABL

Obligations are unconditionally due and owing by the Debtors, on a joint and

several basis, to the Prepetition ABL Secured Parties, and are not subject to any

7

avoidance, reduction, recharacterization, subordination pursuant to the

Bankruptcy Code or applicable non-bankruptcy law, objection, defense,

counterclaim, cross-claims, set-off or offset, or any other challenges under the

Bankruptcy Code or any applicable non-bankruptcy law or regulation by any

person or entity of any kind.

          (ii)     *Prepetition Term Loan Facility*.  Pursuant to that certain

Amended and Restated Senior Secured Term Credit Agreement (as amended,

supplemented, or otherwise modified prior to the Commencement Date, the

"**Prepetition Term Loan Agreement**"), dated as of September 17, 2014, among

Wells Fargo as agent (in such capacity, the "**Prepetition Term Loan Agent**" and,

together with the Prepetition ABL Agents, the "**Prepetition Senior Agents**"), for

itself and a syndicate of banks, financial institutions and other institutional lenders

(collectively, the "**Prepetition Term Loan Lenders**" and, together with the

Prepetition Term Loan Agent (on behalf of itself and on behalf of the Prepetition

Term Loan Lenders), the "**Prepetition Term Loan Secured Parties**"), A&P, as

borrower, together with its subsidiaries and Montvale, as guarantors, the

Prepetition Term Loan Lenders provided the Debtors with $270 million in total

loans (the "**Prepetition Term Loan Facility**") (other than Kwik Save Inc.).  As

of the Commencement Date, the Debtors are liable to the Prepetition Term Loan

Lenders, without objection, defense, counterclaim or offset of any kind, in the

aggregate amount of approximately $262,500,000 million, in respect of advances

made, accrued and unpaid interest thereon, and fees and expenses, charges and

other obligations to the extent chargeable or reimbursable under the Prepetition

8

Term Loan Agreement and related documents as of the Commencement Date, plus unliquidated and other amounts including, without limitation, interest (accruing at the default rate under the Prepetition Loan Agreement) thereon and fees (including, without limitation, any prepayment fee and the other fees set forth in Sections 2.09(a) and 2.09(b) of the Prepetition Term Loan Agreement), expenses, charges and other obligations incurred in connection therewith as provided under the Prepetition Term Loan Agreement (the "**Prepetition Term Loan Obligations**").  The Prepetition Term Loan Obligations are unconditionally due and owing by the Debtors, on a joint and several basis, to the Prepetition Term Loan Secured Parties, and are not subject to any avoidance, reduction, recharacterization, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or offset, or any other challenges under the Bankruptcy Code or any applicable non-bankruptcy law or regulation by any person or entity of any kind.

(iii)   *Prepetition PIK Notes.*  Pursuant to that certain Indenture, dated as of March 13, 2012 (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition PIK Notes Indenture**," and together with all other agreements, documents, notes, mortgages, security agreements, pledges, guarantees or instruments delivered pursuant thereto or in connection therewith (other than the Existing Intercreditor Agreement), each as may have been amended, modified or supplemented prior to the Commencement Date, the "**Prepetition PIK Notes Documents**"), between Montvale and U.S. Bank National Association, as trustee and collateral agent (in such capacity, the

9

"**Prepetition PIK Notes Trustee**"), Montvale issued Senior Secured PIK Toggle

Notes due 2017 (the "**Prepetition PIK Notes**") in the aggregate principal amount

of $215 million to the holders of the Prepetition PIK Notes (such holders, together

with the Prepetition PIK Notes Trustee, on behalf of itself and on behalf of the

holders of the Prepetition PIK Notes, the "**Prepetition PIK Notes Secured**

**Parties**").  The Debtors (other than Kwik Save Inc.) guaranteed Montvale's

obligations under the Prepetition PIK Notes.  As of the Commencement Date, the

outstanding face amount of the Prepetition PIK Notes, exclusive of interest, was

$215 million, plus unliquidated and other amounts, including, without limitation,

interest fees, expenses, charges and other obligations to the extent chargeable or

reimbursable under the Prepetition PIK Notes Documents (collectively, the

"**Prepetition PIK Notes Obligations**"), all of which amounts are unconditionally

due and owing by the Debtors, on a joint and several basis, to the Prepetition PIK

Notes Secured Parties, and are not subject to any avoidance, reduction,

recharacterization, subordination pursuant to the Bankruptcy Code or applicable

non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or

offset, or any other challenges under the Bankruptcy Code or any applicable non-

bankruptcy law or regulation by any person or entity of any kind.

(iv)    *Prepetition Convertible Notes*.  Pursuant to that certain

Indenture, dated as of March 13, 2012 (as amended, supplemented, or otherwise

modified prior to the Commencement Date, the "**Prepetition Convertible Notes**

**Indenture**," and together with all other agreements, documents, notes, mortgages,

security agreements, pledges, guarantees or instruments delivered pursuant thereto

10

or in connection therewith (other than the Existing Intercreditor Agreement), each as may have been amended, modified or supplemented prior to the Commencement Date, the "**Prepetition Convertible Notes Documents**," and together with the Existing Intercreditor Agreement, the Prepetition PIK Notes Documents, the Prepetition ABL Credit Agreement, the Prepetition Term Loan Agreement and all security, pledge and guaranty agreements and all other documentation executed, filed, recorded and/or delivered in connection with any of the foregoing, each as may have been amended, supplemented, or otherwise modified from time to time prior to the Commencement Date, the "**Prepetition Financing Documents**"), between Montvale and U.S. Bank National Association, as trustee and collateral agent (in such capacity, the "**Prepetition Convertible Notes Trustee**" and, together with the Prepetition PIK Notes Trustee, the "**Prepetition Indenture Trustees**"), Montvale issued Senior Secured Convertible Notes (the "**Prepetition Convertible Notes**") in the aggregate principal amount of $250 million to the holders of the Prepetition Convertible Notes (such holders, together with the Prepetition Convertible Notes Trustee (on behalf of itself and on behalf of the holders of the Prepetition Convertible Notes), the "**Prepetition Convertible Notes Secured Parties**").  The Debtors (other than Kwik Save Inc.) guarantee Montvale's obligations under the Prepetition Convertible Notes.  As of the Commencement Date, the outstanding face amount of the Prepetition Convertible Notes, exclusive of interest, was $250 million, plus unliquidated and other amounts, including, without limitation, interest, fees, expenses, charges and other obligations to the extent chargeable or reimbursable under the Prepetition

11

Convertible Notes Documents (collectively, the "**Prepetition Convertible Notes**

**Obligations,**" and together with the Prepetition ABL Obligations, the Prepetition

Term Loan Obligations, and the Prepetition PIK Notes Obligations, the

"**Prepetition Obligations**"), all of which amounts are unconditionally due and

owing by the Debtors on a joint and several basis to the Prepetition Convertible

Notes Secured Parties, and are not subject to any avoidance, reduction,

recharacterization, subordination pursuant to the Bankruptcy Code or applicable

non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or

offset, or any other challenges under the Bankruptcy Code or any applicable non-

bankruptcy law or regulation by any person or entity of any kind.

(b)     *Prepetition Liens and Collateral.*  Prior to the Commencement

Date, the Debtors granted to the Prepetition ABL Agent (for the benefit of itself and the

Prepetition ABL Lenders), the Prepetition Term Loan Agent (for the benefit of itself and the

Prepetition Term Loan Lenders), the Prepetition PIK Notes Trustee (on behalf of the Prepetition

PIK Notes Secured Parties) and the Prepetition Convertible Notes Trustee (on behalf of the

Prepetition Convertible Notes Secured Parties), liens upon and security interests, as follows:

(i)     *Prepetition ABL Facility.*  Pursuant to that certain

Amended and Restated Security Agreement, dated as of September 17, 2014 (as

amended, supplemented, or otherwise modified prior to the Commencement Date,

the "**Prepetition ABL Security Agreement**"), and the other "Security

Documents" (as defined in the Prepetition ABL Credit Agreement), each as

amended and in effect as of the Commencement Date, together with all other

agreements, documents, recordings, filings and/or, instruments executed,

12

recorded, filed, and/or delivered in connection therewith, the Debtors granted to

the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL

Lenders, a first-priority lien on the ABL Priority Collateral and a second-priority

lien on the Term Priority Collateral (the "**Prepetition ABL Liens**");

        (ii)    *Prepetition Term Loan Facility.*  Pursuant to that certain

Amended and Restated Security Agreement, dated as of September 17, 2014 (as

amended, supplemented, or otherwise modified prior to the Commencement Date,

the "**Prepetition Term Loan Security Agreement**"), and the other "Security

Documents" (as defined in the Prepetition Term Loan Facility, each as amended

and in effect as of the Commencement Date, together with all other agreements,

documents, recordings, filings and/or instruments executed, recorded, filed and/or

delivered in connection therewith), the Debtors granted to the Prepetition Term

Loan Agent and other "Credit Parties" (as such term is defined in the Prepetition

Term Loan Agreement) a first-priority lien on the Term Priority Collateral and a

second-priority lien on the ABL Priority Collateral (the "**Prepetition Term

Liens**");

        (iii)    *Prepetition PIK Notes*.  Pursuant to the terms of the

Prepetition PIK Notes Documents, including that certain Security Agreement,

dated as of March 13, 2012, the Debtors granted the Prepetition PIK Notes

Secured Parties a lien, (the "**Prepetition PIK Notes Liens**") on all Collateral (as

defined in the Prepetition PIK Notes Indenture, in each case subject to the terms

of the Existing Intercreditor Agreement; and

13

(iv)    *Prepetition Convertible Notes*.  Pursuant to the terms of the Prepetition Convertible Notes Documents, including that certain Security Agreement, dated as of March 13, 2012, the Debtors granted the Prepetition Convertible Notes Secured Parties a lien (the "**Prepetition Convertible Notes Liens**," and together with the Prepetition ABL Liens, the Prepetition Term Liens, and the Prepetition PIK Notes Liens, the "**Prepetition Liens**") on all Collateral (as defined in the Prepetition Convertible Notes Indenture), in each case subject to the terms of the Existing Intercreditor Agreement.

(c)    The Prepetition PIK Notes and the Prepetition Convertible Notes were incurred pursuant to the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated February 17, 2012 (the "**2012 Plan**"), filed in the prior chapter 11 cases of the Debtors commenced on December 12, 2010 and jointly administered in the Bankruptcy Court (Case No. 10–24549) (the "**2012 Reorganization**").  The 2012 Plan was confirmed by order of the Bankruptcy Court in the 2012 Reorganization pursuant to *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Court*, entered on February 28, 2012 (the "**2012 Confirmation Order**") (Case No. 10-24549; ECF No 3477).  The 2012 Confirmation Order further ordered the following:[4]

(i)    pursuant to paragraph 114 thereof, upon execution of the relevant documentation and issuance thereof, the Prepetition PIK Notes and Prepetition Convertible Notes were "deemed to constitute valid, binding and enforceable agreements and obligations of the Reorganized Debtors and are not in conflict with any applicable laws.";

---

[4] The referenced paragraphs of the 2012 Confirmation Order are annexed hereto as **Exhibit "3."**

14

(ii)    pursuant to paragraph 115 thereof, that "[t]he Liens contemplated by and related to the [Prepetition PIK Notes] and the [Prepetition Convertible Notes], are valid, binding and enforceable Liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the [Prepetition PIK Notes] and the [Prepetition Convertible Notes]. The guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to or in connection with the [Prepetition PIK Notes] and the [Prepetition Convertible Notes], are granted in good faith as an inducement to the holders of such notes to extend credit thereunder and shall be, and hereby are, deemed not to constitute fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth in the intercreditor agreements and other definitive documentation executed in connection with the [Prepetition PIK Notes] and the [Prepetition Convertible Notes]."; and

(iii)    pursuant to paragraph 117 thereof, that "[t]he collateral agent for the [Prepetition PIK Notes] and the [Prepetition Convertible Notes] shall be granted Liens on the collateral, including all of the Debtors' leasehold interests, which Liens shall be deemed perfected and effective as of the Effective Date."

(d)    The Prepetition Obligations constitute the legal, valid, binding, unavoidable and enforceable obligations of the Debtors, and are not and shall not be subject to any challenge or defense, including, without limitation, avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined by section 101(5) of

15

the Bankruptcy Code, of any kind pursuant to the Bankruptcy Code or under any applicable non-bankruptcy law, regulation or otherwise by any person or entity (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act).

(e)     The Prepetition Liens are legal, valid, binding, perfected, unavoidable and enforceable liens upon and security interests in the Common Collateral, and are not and shall not be subject to any attachment, contest, attack, rejection, recoupment, reduction, defense, setoff, offset, recharacterization, avoidance or other claim, impairment, disallowance, subordination, cause of action or any other challenge or defense of any nature under the Bankruptcy Code (including, without limitation, under chapter 5 of the Bankruptcy Code), or under any applicable nonbankruptcy law, regulation or otherwise by any person or entity (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act).

(f)     Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, any and all cash released as a result of the termination and/or cancellation of any letters of credit issued for the benefit of Debtors that have been or may be cash collateralized prior to or after the Commencement Date, any amounts generated by the collection of accounts receivable or other disposition of Common Collateral and the proceeds and products of each of the foregoing, is the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("**Cash Collateral**"); provided, that, until such time as the Junior Lien DIP Facility shall have been Paid in Full, Cash Collateral shall not include (i) any proceeds or products of Additional Collateral, (ii) cash or cash equivalents deposited or maintained in the Additional Collateral Account, and (iii) the Additional Collateral Account.

16

(g)    The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(c) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Common Collateral, including, without limitation, the Cash Collateral, to the extent of any diminution in the value of such interests, as a result of (i) the incurrence of the DIP Obligations (as defined below), (ii) the use of Cash Collateral as set forth in this Interim Order, (iii) the granting of the DIP Liens and DIP Superpriority Claims, (iv) the subordination of the Prepetition Obligations to the Carve Out (as defined below), (v) the subordination of the Prepetition PIK Notes Obligations and the Prepetition Convertible Notes Obligations to the DIP Obligations, (vi) any other diminution in the value of the Common Collateral arising from the Debtors' use, sale or disposition of Common Collateral (or the proceeds thereof), and (vii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "**Diminution in Value**").

(h)    None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, in their respective capacities as such, is a control person or insider of any of the Debtors by virtue of any action taken or omission to act by any of them in respect of or in connection with the DIP Documents, the Prepetition Financing Documents, or this Interim Order.

6.    <u>Effect of Stipulations on Third Parties</u>.

(a)    Subject to Paragraph 6(b), each stipulation, admission, waiver and agreement contained in this Interim Order, including, without limitation, the Debtors' stipulations in Paragraph 5 hereof, shall be binding upon the applicable Debtors, their respective estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes,

17

and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Commencement Date.

(b)     The stipulations and admissions contained in this Interim Order, including, without limitation, in Paragraph 5 hereof (collectively, the "**Debtors' Stipulations**"), shall be irrevocably binding on all other parties in interest and the Debtors' estates, including, without limitation, the Creditors' Committee and any subsequently appointed trustee or other estate representative, unless, and solely to the extent that:  (x) the Creditors' Committee, any subsequent chapter 7 trustee or any other party in interest that is granted standing and requisite authority by the Bankruptcy Court (it being understood that nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), any such standing or authority) has timely commenced and properly filed an appropriate contested matter or adversary proceeding (a "**Challenge**") challenging any of the Debtors' Stipulations, including, without limitation, those related to the amount, validity, enforceability, perfection or priority of all or any portion of the Prepetition Obligations, the Prepetition Liens or the Prepetition Financing Documents no later than the latest to occur of (A) seventy five (75) days after the Commencement Date and (B) such date as ordered by the Bankruptcy Court for good cause shown (provided that the request for extension is made before the expiration of the period set forth in clause (A) above); and (y) a court of competent jurisdiction rules in a Final Court Order (as defined below) in favor of the plaintiff in any such timely filed Challenge (a "**Successful Challenge**").  If and to the extent that no such Challenge is timely commenced or if such a Challenge is timely commenced but is not ultimately a Successful Challenge, then, without further order of the Bankruptcy Court, (i) any and all such Challenges by any party (including, without limitation, the Creditors' Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in the Debtors'

18

Chapter 11 Cases, or any chapter 7 trustee appointed in any Successor Cases) shall be deemed to

be forever waived and barred, (ii) all of the Debtors' Stipulations shall be binding upon the

Debtors' estates, the Creditors' Committee, all creditors, interest holders and parties in interest,

any chapter 11 trustee, any examiner or any other estate representative appointed in the Debtors'

Chapter 11 Cases, or any chapter 7 trustee appointed in any Successor Cases, and (iii) the

Prepetition Obligations, the Common Collateral and the Prepetition Liens shall be deemed to be

finally allowed for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases and

shall not be subject to challenge by any party in interest as to validity, priority or otherwise;

provided, that nothing in this Interim Order fixes the allowed amount of any secured claim of the

Prepetition Secured Parties under section 506(a) of the Bankruptcy Code based on the value of

their collateral at any given date or any rights of such parties under section 506(b) of the

Bankruptcy Code.   For the avoidance of doubt, none of the Challenge provisions set forth in this

Paragraph 6 shall apply to the Junior Lien DIP Facility, the DIP Obligations, the DIP Collateral,

the DIP Liens, the DIP Agent or any of the DIP Lenders, and in no event shall the Junior Lien

DIP Facility, the DIP Obligations, the DIP Collateral, or the DIP Lien be subject to challenge on

avoidance or any other grounds by any party.

        7.     Waiver and Release.  Subject to the Challenge provisions provided in

Paragraph 6 above, and  effective only upon entry of a Final Order granting the Motion, any and

all claims by the Debtors, the Creditors' Committee or any third party, including, without

limitation, claimants with rights under the Perishable Agricultural Commodities Act of 1930, as

amended, 7 U.S.C. §§ 499a et seq. ("**PACA**") and Packers and Stockyards Act of 1921 as

amended, 7 U.S.C. § 181 et seq. ("**PASA**"), with respect to the Prepetition Financing

Documents, Prepetition Obligations, Prepetition Liens, or Common Collateral, shall be deemed

19

waived and the Debtors' obligations to the Prepetition Secured Parties shall be deemed allowed

claims; _provided_, that, notwithstanding anything herein to the contrary, (a) nothing in this

Interim Order shall in any way limit, subordinate, or constitute a waiver of any rights and

priorities of claimants with trust rights under PACA or PASA, all such rights hereby being

expressly reserved, and (b) nothing herein in any way purports to grant any liens, including but

not limited to, DIP liens or Adequate Protection Liens, or priorities contrary to the statutory trust

protections afforded under PACA or PASA.

8.      _Use of Cash Collateral_.  The Debtors are hereby authorized, subject to the

terms and conditions of the DIP Documents and this Interim Order, to use Cash Collateral, all

proceeds of the Junior Lien DIP Facility and all proceeds of Additional Collateral (as defined in

the Intercreditor Arrangements) in accordance with, and for the purposes and in the amounts set

forth in, the Budget (as defined below); _provided_, that the Debtors shall not be authorized to use

any Cash Collateral that has been posted to Cash Collateralize L/C Obligations (as each term is

defined in the Prepetition ABL Credit Agreement) under the Prepetition ABL Facility; _provided_,

_further_ that (x) the L/C Obligations outstanding immediately prior to the Commencement Date

shall not be required to be Cash Collateralized solely as a result of the commencement of the

Chapter 11 Cases, and (y) the Debtors shall not be required to Cash Collateralize such L/C

Obligations with any Cash Collateral except for Cash Collateral applied to mandatory

prepayments of the Prepetition ABL Obligations pursuant to Paragraphs 14(d)(i)b and c

hereof.   Notwithstanding the foregoing, (a) the Prepetition ABL Agent may Cash Collateralize

L/Cs in connection with its exercise of rights subject to the Debtors' reservation of rights with

respect to the non-consensual use of Cash Collateral set forth in Paragraph 10 hereof, and

(b) Debtors shall not use any Cash Collateral to make any principal repayments in respect of the

20

DIP Obligations unless and until all Prepetition ABL Obligations and all Prepetition Term Loan

Obligations have been repaid in full in cash, terminated, satisfied (including Cash

Collateralization for all outstanding and undrawn Letters of Credit (each term as defined in the

Prepetition ABL Credit Agreement) that shall remain outstanding), other than contingent

indemnity obligations for which claims have not been made (such repayment, termination or

satisfaction, "**Paid in Full**").

        9.      <u>Termination of Cash Collateral Use</u>.

        (a)      Subject to Paragraph 9(b) below, the Debtors' right to use the Cash

Collateral pursuant to the terms set forth in this Interim Order shall terminate upon the earliest to

occur of any of the following (each, a "**Cash Collateral Termination Event**"):

        (i)      the date that is one hundred seventy (170) days from the

Commencement Date;

        (ii)      the date that is forty-five (45) days following the date of

entry of the Interim Order if the Final Order reasonably acceptable to the Debtors,

DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the

Majority Holders of Prepetition PIK Notes, and the Majority Holders of

Prepetition Convertible Notes approving the use of Cash Collateral and the Junior

Lien DIP Facility has not been entered by the Bankruptcy Court on or prior to

such date;

        (iii)      the acceleration of the DIP Obligations (as defined below)

in accordance with the DIP Documents or the commencement of the Remedies

Notice Period;

21

(iv)     the failure of the Debtors to make any Adequate Protection Payment (as defined below) to the Prepetition Secured Parties as and when required pursuant to the terms of this Interim Order;

(v)     the effective date of a chapter 11 plan in any of the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court;

(vi)     any stay, reversal, vacatur, rescission or other modification of the terms of this Interim Order not consented to by the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of Prepetition PIK Notes and Majority Holders of Prepetition Convertible Notes, each in their respective discretion;

(vii)     the failure of the Debtors to provide all Financial Reports (as defined below) as well as the Budget and any budget variance report required under the DIP Documents; provided, that following receipt of the notice set forth in Paragraph 9(b)(i) below, the Debtors shall have the benefit of a seven (7) day cure period with respect to this clause 9(a)(vii); provided, further that, notwithstanding the foregoing, with respect to a failure to provide borrowing base certificates, the Debtors shall have the benefit of a two (2) day cure period;

(viii)     the failure to comply with Paragraphs 25, 26 and 28 herein; and

(ix)     the dismissal of any of the Chapter 11 Cases, the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the appointment of a chapter 11 trustee with expanded powers in any of the Chapter 11 Cases.

22

(b)       Upon the occurrence of a Cash Collateral Termination Event,

(i) the Debtors' right to use Cash Collateral shall cease upon five (5) days' written notice

provided to the Carve Out Notice Parties (as defined below) by the Prepetition ABL Agent or the

Prepetition Term Loan Agent, the Majority Holders of the Prepetition PIK Notes or Majority

Holders of the Prepetition Convertible Notes (all subject to the Existing Intercreditor Agreement

and Intercreditor Arrangements); provided, that during the period after such written notice is

provided, the Debtors' use of Cash Collateral must conform to the Budget (with any variances as

permitted under the Junior Lien DIP Facility); and (ii) upon seven (7) days' written notice to the

Carve Out Notice Parties (the "**Remedies Notice Period**") (which may be delivered by

electronic mail), and subject to Paragraph 24(c) below, the automatic stay of section 362 of the

Bankruptcy Code shall be terminated for the limited purpose of permitting the Prepetition

Secured Parties to exercise any and all of their respective rights and remedies with respect to the

Common Collateral and Additional Collateral (subject to the Intercreditor Arrangements), unless

the Debtors have obtained an order to use Cash Collateral on a non-consensual basis consistent

with Paragraph 10 below.

10.       Reservation of Debtors' Rights.  Notwithstanding anything to the contrary

herein, upon the occurrence of a Cash Collateral Termination Event, the Debtors may seek

authority from the Bankruptcy Court to use the Cash Collateral on a non-consensual basis;

provided, that the Prepetition Secured Parties and the DIP Agent reserve all rights to object to

such request.

11.       Certain Other Rights With Respect to the Budget.  In the event that the

Debtors fail to comply with the Budget (with any variances as permitted under the Junior Lien

DIP Facility), the Prepetition Secured Parties and the DIP Agent shall have the right to obtain an

23

emergency hearing before the Bankruptcy Court to seek the termination of the Debtors' use of

Cash Collateral and/or obtain such other relief in connection therewith (as applicable), which

hearing (subject to the Bankruptcy Court's calendar) shall take place within five (5) days

following the delivery of notice to the Debtors, the Creditors' Committee, and the Bankruptcy

Court; provided, that any notice given with respect to this Paragraph 11 shall in no event trigger

a Cash Collateral Termination Event in and of itself; provided, further that nothing in this

Paragraph 11 impairs or waives the Debtors' right to contest the termination of the use of Cash

Collateral (subject to the Debtors' Stipulations).

12.     Findings Regarding Immediate Need for the Junior Lien DIP Facility and
Use of Cash Collateral.

(a)     *Good Cause*.  Good cause has been shown for immediate entry of
this Interim Order.

(b)     *Need Regarding Postpetition Financing*.  The Debtors have an

immediate and critical need to obtain third-priority lien postpetition financing under the Junior

Lien DIP Facility and use of the Cash Collateral in order to, among other things, preserve the

going concern value of the Debtors, maintain business relationships with vendors, suppliers and

customers, satisfy payroll obligations, pay for certain costs and expenses related to the Debtors'

Chapter 11 Cases, conduct a comprehensive asset sales process, and satisfy other working capital

and operational needs of the Debtors during these Chapter 11 Cases.  The access of the Debtors

to sufficient working capital and liquidity made available through the use of Cash Collateral,

incurrence of new indebtedness for borrowed money under the Junior Lien DIP Facility and

other financial accommodations are vital to the Debtors' ability to meet payroll and other

24

operating expenses and to the Debtors' ability to conduct an orderly sale process to maximize recoveries for creditors.

(c)  *No Credit Available on More Favorable Terms.*  The Debtors are unable to obtain financing, under existing circumstances, on more favorable terms and conditions from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents, including, without limitation, that they are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense and that they also are unable to obtain secured credit allowable under sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code without granting the DIP Lenders, subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims (each as herein defined), in each case on the terms and conditions set forth in this Interim Order and the DIP Documents.

(d)  *Business Judgment.*  The terms upon which the Debtors will be permitted to use Cash Collateral and proceeds of the Junior Lien DIP Facility as provided in the Junior Lien DIP Facility, the DIP Documents and this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are appropriate under the circumstances, and constitute reasonably equivalent value and fair consideration.

(e)  *Good Faith – Junior Lien DIP Facility.*  The Junior Lien DIP Facility has been negotiated in good faith and at arm's length.  All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Junior Lien DIP Facility, the DIP Documents, and the DIP Orders including, without limitation, (i) all loans made to A&P pursuant to the DIP Credit Agreement and (ii) any obligations and indebtedness of the Debtors arising under or in connection with the DIP Documents and this Interim Order now and hereafter

25

owing to the DIP Agent or any DIP Lender (all of the foregoing in clauses (i) and (ii), the "**DIP Obligations**"), shall be deemed to have been extended in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)       *Good Faith - Prepetition Secured Parties*.   Based upon the record before the Bankruptcy Court, this Interim Order, including the terms of the use of Cash Collateral and the adequate protection granted in this Interim Order, have been negotiated at arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, by each of the Debtors, the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, the Majority Holders of Prepetition PIK Notes and the Majority Holders of the Prepetition Convertible Notes, and are in the best interests of the Debtors, their estates and creditors and are consistent with the Debtors' fiduciary duties.

(g)       *Relief Essential; Best Interest*.   The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001–2.   Without access to the Junior Lien DIP Facility and the continued use of Cash Collateral, the Debtors and their estates would suffer immediate and irreparable harm, including that the Debtors may be forced to cease business operations, terminate substantially all of their employees, and be unable to wind-down their operations in an orderly manner that preserves and maximizes value and recoveries for creditors.   Consummation of the Junior Lien DIP Facility and the use of the Cash Collateral in accordance with this Interim Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

WEIL:\95410057\1\50482.0004

## THE JUNIOR LIEN DIP FACILITY

13.    Authorization of the DIP Documents and the Junior Lien DIP Facility.

(a)    The terms and conditions of the DIP Documents are approved on an interim basis.  The Debtors are expressly and immediately authorized to execute, deliver, enter into, and perform all obligations under the DIP Documents, including, without limitation, any exhibits attached thereto, all security agreements, all guarantees, all related or ancillary documents, notices and agreements, and any mortgages contemplated thereby, as hereafter amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, and the DIP Loan Parties are authorized to borrow or guarantee, as applicable, all of the DIP Obligations, as set forth in Paragraph 13(b) below.

(b)    The Debtors are hereby authorized to borrow an interim principal amount of Loans (as defined in the DIP Credit Agreement) (the "**DIP Loans**") under the Junior Lien DIP Facility not to exceed $50 million in accordance with the DIP Documents (subject to any conditions precedent on borrowings thereunder), which amount shall be used for all purposes permitted under the DIP Documents and in accordance with, and for the purposes and in the amounts set forth in, the Budget.

(c)    In furtherance of the foregoing, and without further approval of the Bankruptcy Court, each Debtor is authorized and directed to perform on an interim basis all acts and to execute, deliver and perform all instruments and documents (including, without limitation, the execution or recordation of security agreement, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Junior Lien DIP Facility, including, without limitation, the following:

27

(i)    the execution, delivery and performance of the DIP Credit Agreement and any exhibits attached thereto and other agreements related thereto, including, without limitation, all security agreements and all related or ancillary documents, notices and agreements and any mortgages contemplated thereby (*i.e.*, the DIP Documents);

(ii)    the execution, delivery and performance of the guarantees by the DIP Loan Parties (other than the Borrower) of the obligations of the Borrower under the DIP Documents;

(iii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtors and the DIP Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any reasonable fees paid in connection therewith) that do not (w) restrict, limit or prohibit the payment of any Adequate Protection Payments as and when required under this Interim Order, (x) shorten the maturity or the scheduled termination date thereunder, (y) increase the commitments or the rate of interest (other than invoking the default rate upon a DIP Event of Default), or (z) require any new or additional payments of the principal of the amounts outstanding under the Junior Lien DIP Facility; provided, that the DIP Documents shall not be amended or modified in a manner materially adverse to the respective rights and protections granted herein to a Prepetition Secured Party without consent of such Prepetition Secured Party or to the Debtors; provided, further that

28

WEIL:\95410057\1\50482.0004

the Debtors shall provide notice of any amendment, waiver, consent or other

modification under the DIP Documents to the attorneys for each of the Prepetition

ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of

Prepetition PIK Notes and the Majority Holders of Prepetition Convertible Notes

and any Creditors' Committee.

(iv)     the non-refundable payment to the DIP Agent and the DIP

Lenders, as the case may be, of the reasonable fees and expenses set forth in the

DIP Documents, whether incurred before or after the Commencement Date,

including, without limitation, the fees and expenses of the professionals retained

as provided for in the DIP Documents; provided, that  Debtors shall be authorized

and directed to pay any all such reasonable fees and expenses within ten (10)

business days of delivery of a monthly statement or invoice for such fees and

expenses (it being understood that such statements or invoices shall not be

required to be maintained in accordance with the U.S. Trustee Guidelines, nor

shall any such professional be required to file any interim or final fee applications

with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any

such payments) to the Debtors, the U.S. Trustee and the Creditors' Committee,

unless, within such ten (10) business day period, the Debtors, the U.S. Trustee or

the Creditors' Committee serve a written objection upon the requesting party, in

which case, the Debtors shall pay only such amounts that are not the subject of

any objection and the withheld amount subsequently agreed by the parties or

ordered by the Court to be paid;

29

(v)    as soon as reasonably practicable following entry of this

Interim Order, the addition of the DIP Agent, on behalf of itself and the DIP

Lenders, as an additional insured and loss payee on each insurance policy

maintained by the Debtors that in any way relates to the DIP Collateral and,

subject to the terms of this Interim Order, the distribution of any proceeds

recovered or received in accordance with the terms of this Interim Order, the

Intercreditor Arrangements and the other DIP Documents; and

(vi)    the performance of all other acts required under or in

connection with the DIP Documents.

(d)    Upon execution and delivery of the DIP Documents, (i) the DIP

Documents shall constitute legal, valid, binding, enforceable and unavoidable obligations of the

DIP Loan Parties, enforceable against each DIP Loan Party in accordance with the terms of this

Interim Order and the DIP Documents, and (ii) the DIP Obligations shall constitute "allowed

claims" within the meaning of section 502 of the Bankruptcy Code.  No obligation, payment,

transfer or grant of security under the DIP Documents or this Interim Order shall be stayed,

restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any

applicable nonbankruptcy law (including without limitation, under chapter 5 of the Bankruptcy

Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent

Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff,

recoupment, recharacterization, rejection, subordination, disallowance, impairment, cross-claim,

counterclaim, or any other claims, causes of action or challenges of any nature under the

Bankruptcy Code, any other applicable law or regulation or otherwise.

WEIL:\95410057\1\50482.0004

14.    <u>DIP Liens</u>.  As security for the full and timely payment of the DIP

Obligations, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted,

valid, enforceable, unavoidable, and fully perfected security interests in and liens and mortgages

(collectively, the "**DIP Liens**") upon all Common Collateral and Additional Collateral and all

products and proceeds of the foregoing, whether existing prior to or arising or acquired after the

Commencement Date (all of the property of the Debtors identified in this Paragraph 14,

including, without limitation, subparagraphs (a), (b) and (c) below, the "**DIP Collateral**"), as

follows and in all cases subject to the priorities set forth in Paragraph 19:

(a)    pursuant to section 364(c)(2) of the Bankruptcy Code, a valid,

binding, continuing, enforceable, fully perfected first priority lien on, and security interest in all

Additional Collateral; <u>provided</u>, that DIP Liens shall not attach to (x) the Excluded Property (as

defined in the DIP Documents) and (y) actions or other avoidance claims under sections 502(d),

544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions

under the Bankruptcy Code (collectively, "**Avoidance Actions**") or the proceeds thereof, but

shall, upon entry of the Final Order granting the Motion, attach to any proceeds or property

recovered under chapter 5 of the Bankruptcy Code, whether by judgment, settlement or

otherwise.

(b)    pursuant to section 364(c)(3) of the Bankruptcy Code, and subject

to the priorities set forth in Paragraph 19, a valid, binding, continuing, enforceable, fully

perfected junior lien on, and security interest in Common Collateral; and

(c)    pursuant to section 364(d)(1) of the Bankruptcy Code (and only

with respect to the Prepetition PIK Notes Secured Parties and the Prepetition Convertible Notes

Secured Parties and any other lien holder (other than the Prepetition ABL Secured Parties and

31

Prepetition Term Loan Secured Parties (except with respect to the Additional Collateral)) who

receives proper notice of this Interim Order), and subject to the priorities set forth in Paragraph

19, a valid, binding, continuing, enforceable, fully perfected priming lien on, and security

interest in, Common Collateral, and any other tangible and intangible prepetition and postpetition

property of the Debtors, whether now existing or hereafter acquired, that is subject to valid,

perfected and unavoidable liens or security interests in existence immediately prior to the

Commencement Date or to valid and unavoidable liens or security interests in existence

immediately prior to the Commencement Date that are perfected after the Commencement Date

as permitted by section 546(b) of the Bankruptcy Code; provided, that the DIP Liens shall not be

(i) subject or subordinate to (x) any lien or security interest that is avoided and preserved for the

benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (y) unless

otherwise provided for in the DIP Documents or this Interim Order, any liens arising after the

Commencement Date or (ii) subordinated to or made *pari passu* with any other lien or security

interest under sections 363 or 364 of the Bankruptcy Code or otherwise, except as provided in

Paragraph 19.

        15.    DIP Superpriority Claims.  Subject to the Carve Out , the DIP Agent, for

the benefit of itself and each of the DIP Lenders, is hereby granted superpriority senior

administrative expense claims against the Debtors (the "**DIP Superpriority Claims**") for the full

and timely payment of the DIP Obligations over any and all administrative expenses, adequate

protection claims and all other claims against the Debtors, now existing or hereafter arising, of

any kind whatsoever, including, without limitation, all administrative expenses of the kind

specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other

claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final

32

Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses

or claims may become secured by a judgment lien or other non-consensual lien, levy or

attachment (collectively, "**Administrative Expense Claims**"), in the order of priority set forth in

Paragraph 20 below.   The DIP Superpriority Claims shall be payable from and have recourse to

all prepetition and postpetition property of the Debtors and all proceeds thereof.

16.    <u>Adequate Protection for Prepetition Secured Parties</u>.  The Prepetition

Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(c) and 364(d)(1) of the

Bankruptcy Code, to adequate protection against the Diminution in Value of their respective

interests in the Common Collateral, including, without limitation, the Cash Collateral, as follows:

(a)    *Adequate Protection Liens*.  Solely to the extent of any postpetition

Diminution in Value of the Prepetition Secured Parties' respective interests in the Common

Collateral, each of the Prepetition Secured Parties shall be granted for its respective benefit,

without the necessity of the execution or filing of mortgages, security agreements, pledge

agreements, financing statements or other agreements, replacement and additional postpetition

liens and security interests, in each case, effective, valid, enforceable and automatically perfected

upon entry of this Interim Order, on all assets of the Debtors, including, without limitation, the

DIP Collateral (and the Common Collateral), whether in existence on the Commencement Date

or thereafter created, acquired, or arising, and wherever located, and the proceeds of each of the

foregoing (collectively, the "**Adequate Protection Liens**"), which Adequate Protection Liens

shall be subject and subordinate to the Carve Out and shall be afforded the priority set forth in

Paragraph 19 below; <u>provided</u>, that the Adequate Protection Liens shall not attach to Avoidance

Actions or the proceeds thereof.

33

(b)     *Adequate Protection Superpriority Claims*.  As adequate protection for, and solely to the extent of, any postpetition Diminution in Value of the Prepetition Secured Parties' interest in the Common Collateral, the Prepetition Secured Parties, are hereby granted superpriority claims (the "**Adequate Protection Superpriority Claims**") as provided for in section 507(b) of the Bankruptcy Code, having priority over any and all Administrative Expense Claims, in the order of priority set forth in Paragraph 20 below.  The Adequate Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject to entry of the Final Order, including, proceeds of Avoidance Actions or property recovered under such Avoidance Actions whether by judgment, settlement or otherwise.

(c)     *Adequate Protection Payments*.  The Debtors are authorized and directed under sections 361, 363 and 364 of the Bankruptcy Code to make payments (together, the payments described in this clause (c) and clause (d) below, the "**Adequate Protection Payments**") when due, consisting of:  (i) cash payments to (A) the Prepetition ABL Agent for all professional fees and expenses payable to the Prepetition ABL Agent pursuant to the ABL Credit Agreement, (B) the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties for all professional fees and expenses payable to the Prepetition Term Loan Agent and for all professional fees and expenses of one additional counsel payable to the Prepetition Term Loan Secured Parties, in each case pursuant to the terms of the Prepetition Term Loan Agreement, (C) the Majority Holders of the Prepetition PIK Notes for all professional fees and expenses, limited to the fees and expenses of (x) Stroock & Stroock & Lavan LLP and (y) The CDG Group, LLC (in accordance with the terms of that certain retention letter dated as of July 2, 2015), and (E) the Majority Holders of the Prepetition Convertible Notes for all professional fees

34

and expenses, limited to the fees and expenses of Schulte Roth & Zabel LLP, and, in the case of

each of the foregoing professional fees and expenses, the Debtors shall be authorized and

directed to pay any all such fees and expenses within ten (10) business days of delivery of a

monthly statement or invoice for such fees and expenses (it being understood that such

statements or invoices shall not be required to be maintained in accordance with the U.S. Trustee

Guidelines, nor shall any such professional be required to file any interim or final fee

applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any

such payments) to the Debtors, the U.S. Trustee and the Creditors' Committee, unless, within

such ten (10) business day period, the Debtors, the U.S. Trustee or the Creditors' Committee

serve a written objection upon the requesting party, in which case, the Debtors shall pay only

such amounts that are not the subject of any objection; and (ii) all interest and letter of credit

fees, if applicable, as and to the extent payable under the Prepetition ABL Facility and

Prepetition Term Loan Facility, which shall accrue and be payable at the Default Rate (as

defined in the Prepetition ABL Credit Agreement and Prepetition Term Loan Agreement).  All

such payments shall be applied to the applicable Prepetition Secured Parties' allowed secured

claim.  In the event that it is determined by a final order, which order shall not be subject to any

appeal, stay, reversal or vacatur (a "**Final Court Order**"), that any Prepetition Secured Party is

not entitled to Adequate Protection Payments as adequate protection for the Diminution in Value

of its respective interests in the Common Collateral, and that such Prepetition Secured Party is

determined to be undersecured, then such Adequate Protection Payments shall be applied toward

repayment of the principal amount due on such Prepetition Obligations as are owing to such

Prepetition Secured Party.

35

(d)    *Mandatory Prepayment.*  The Debtors are authorized and directed, to the extent applicable, to make the mandatory prepayments set forth below (the "**Mandatory Prepayments**").  All capitalized terms not otherwise defined in this Paragraph 16(d) shall have the meanings ascribed to them in the Prepetition ABL Credit Agreement.

(i)    *Prepetition ABL Facility.*  As further adequate protection, and subject to Paragraph 16(d)(iii) (except with respect to 16(d)(i)a below) and Paragraph 16(d)(iv) below, the Debtors shall, first, pay to the Prepetition ABL Agent for the benefit of the Prepetition ABL Secured Parties the following amounts:

a.    if for any reason the Total Outstandings (other than L/C Obligations to the extent Cash Collateralized) at any time exceed the sum of (i) the Borrowing Base as in effect from time to time minus (ii) a carve out reserve minus (iii) a PACA reserve minus (iv) the amount of Availability required to be maintained by Section 7.15(b) of the Prepetition ABL Credit Agreement, the Debtors shall immediately prepay Loans and/or Cash Collateralized L/C Obligations in an amount equal to the lesser of (x) such excess and (y) the amount after payment of which the Debtors shall be in compliance with minimum liquidity set forth in Section 7.15(a) of the DIP Credit Agreement as in effect on the date hereof; provided, that, notwithstanding anything in the Prepetition ABL Facility to the contrary, there shall be no additional reserves permitted;

36

b.      until the payment in full of the Prepetition ABL Obligations, the net proceeds from sales, dispositions, or casualty of the ABL Priority Collateral outside the ordinary course of business, including sales or disposition of the ABL Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases (as defined in the DIP Credit Agreement), pursuant to section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales"; and

c.      after payment in full of the Prepetition Term Facility, and until payment in full of the Prepetition ABL Obligations, all net proceeds from sales, dispositions, or casualty of the Term Priority Collateral outside the ordinary course of business, including sales or disposition of the Term Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases, pursuant to Section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales."

(ii)      *Prepetition Term Loan Facility*.  As further adequate protection, and subject to Paragraph 16(d)(iii) and 16(d)(iv) below, the Debtors shall pay to the Prepetition Term Agent for the benefit of the Prepetition Term Secured Parties the following amounts:

a.      until payment in full of the Prepetition Term Loan Obligations, the net proceeds from sales, dispositions, or casualty of the Term Priority Collateral outside the ordinary course

37

of business, including sales or disposition of the Term Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases, pursuant to section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales"; and

b.        after payment in full of the Prepetition ABL Facility, and until payment in full of the Prepetition Term Loan Obligations, all net proceeds from sales, dispositions, or casualty of the ABL Priority Collateral in the ordinary course of business, including sales or disposition of the ABL Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases, pursuant to section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales."

(iii)      Notwithstanding anything in Paragraph 16(d)(i) or 16(d)(ii), the Debtors shall not be required to make any payments pursuant Paragraph 16(d)(i)(b) and (c) or 16(d)(ii) with the net proceeds from the ABL Priority Collateral or Term Priority Collateral, as applicable, to the extent that, after giving effect to such payments, the Debtors would have less than $75 million in total of Week Ending Book Cash (as defined in the Budget) if such proceeds are received prior to October 31, 2015 or $60 million if such proceeds are received after October 31, 2015, provided, that (A) any limitation of such payments shall be applied pro rata (measured by the amount of net proceeds derived from each of the ABL Priority Collateral, Term Priority Collateral and

38

Additional Collateral received in connection with a disposition of any of the

foregoing collateral) to the amounts otherwise required to be applied to the

Prepetition ABL Facility and the Prepetition Term Facility pursuant to Paragraph

16(d)(i) and (ii) above, and to the amounts that would be required to be applied to

such prepayment pursuant to Section 2.07(a)(i) and (ii) on such date pursuant to

the DIP Credit Agreement and limited by Section 2.07(a)(v) of the DIP Credit

Agreement; provided, further, that, subject to payment in full of the Prepetition

ABL Facility and the Prepetition Term Loan Facility, (i) on October 31, 2015 the

Borrower (as defined in the DIP Credit Agreement) shall make a prepayment of

the DIP Loans in an amount equal to the aggregate amount of Week Ending Book

Cash on such date in excess of $60 million  Any payment made pursuant to

Paragraph 16(d)(i) or (ii) shall, as applicable, prepay and permanently (x) reduce

Loans and/or Cash Collateralize L/C Obligations under the Prepetition ABL

Facility and (y) reduce Loans under the Prepetition Term Loan Facility.  All

payments made pursuant to section 16(d)(i) and (ii) shall be applied to the

respective Prepetition Secured Party's allowed secured claim.

(iv)     Subject to Paragraph 6 and this Paragraph 16, all Adequate

Protection Payments and other payments made to the DIP Agent, DIP Lenders and any

Prepetition Secured Party in accordance with this Interim Order shall be irrevocable when made

and free and clear of all liens and claims, including, without limitation, any claims covered by

the Carve Out.

17.     <u>Sufficiency of Adequate Protection</u>.  Under the circumstances, the

Bankruptcy Court finds that the foregoing adequate protection is reasonable and sufficient to

39

protect the interests of the Prepetition Secured Parties; provided, that the Prepetition PIK Notes

reserve the right to contest the validity of the foregoing adequate protection under the

circumstances.

18.    Reservation of Rights.  The Prepetition Secured Parties have either

consented or do not object to the relief sought herein.  Nothing contained herein shall be deemed

a finding by the Court or an acknowledgement by the Prepetition Secured Parties that the

adequate protection granted herein does in fact adequately protect the Prepetition Secured

Parties, and nothing contained in this Interim Order (including, without limitation, the

authorization of the use of any Cash Collateral) shall be deemed to (i) limit, abridge, constitute a

waiver of, expressly or implicitly, or otherwise affect the rights of any of the Prepetition Secured

Parties to request at any time that the Court provide additional or further adequate protection of

their respective interests in the Common Collateral (including Cash Collateral), or to seek further

or additional adequate protection in the event the adequate protection provided herein proves to

be inadequate, (ii) impair or modify any rights, claims or defenses available in law or equity to

any Prepetition Secured Party, the DIP Agent or any DIP Lender, (iii) prejudice the rights of the

Prepetition Secured Parties at any time, under the Bankruptcy Code or otherwise, to seek any

other or supplemental relief in respect of the Debtors or the Chapter 11 Cases.

19.    Priority of Liens.  Subject in each case to (i) the Carve Out, and (ii) the

Permitted Encumbrances (as such term is defined in the Prepetition ABL Credit Agreement and

the Prepetition Term Loan Agreement) and Permitted Liens (as such term is defined in the

Prepetition PIK Notes Indenture and the Prepetition Convertible Notes Indenture and, in each

case, (x) that exist on, and are legal, valid, binding, enforceable, perfected and unavoidable as of,

the Commencement Date and are permitted to be senior to the Prepetition Liens (as applicable)

40

pursuant to the applicable Prepetition Financing Documents, (y) other than the Prepetition

Liens), the priority of liens upon and security interest in the DIP Collateral shall be as follows:

(a)    in respect of the Common Collateral, as applicable:

(i)    first, in the case of the ABL Priority Collateral, to the

Prepetition ABL Liens in favor of the Prepetition ABL Secured Parties and the

Adequate Protection Liens in favor of the Prepetition ABL Secured Parties

(together, the "**ABL Liens**"), and, in the case of the Term Priority Collateral, the

Prepetition Term Liens in favor of the Prepetition Term Loan Secured Parties and

the Adequate Protection Liens in favor of the Prepetition Term Loan Secured

Parties (together, the "**Term Liens**")

(ii)    second, in the case of the ABL Priority Collateral, to the

Term Liens, and in the case of the Term Priority Collateral, to the ABL Liens;

(iii)    third, in the case of the Common Collateral, to the DIP

Liens;

(iv)    fourth, in the case of Common Collateral, to the Prepetition

PIK Notes Liens and the Adequate Protection Liens in favor of the Prepetition

PIK Notes Secured Parties (together, the "**PIK Notes Liens**"); and

(v)    fifth, in the case of Common Collateral, to the Prepetition

Convertible Notes Liens and the Adequate Protection Liens in favor of the

Prepetition Convertible Notes Secured Parties (together, the "**Convertible Notes

Liens**"); and

41

(b)        with respect to Additional Collateral, the DIP Liens in such

collateral shall be senior and superior in priority to all other liens upon and security interests in

the Additional Collateral.

20.        Priority of Superpriority Administrative Claims.  Subject in each case to

the Carve Out, the Adequate Protection Superpriority Claims and the DIP Superpriority Claims

shall constitute superpriority administrative expense claims over any and all Administrative

Expense Claims; provided, that, as to each other, the Adequate Protection Superpriority Claims

and the DIP Superpriority Claims shall be subject to the following order of priority:

(a)        first, the Adequate Protection Superpriority Claims granted to the

Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties, on a *pari passu*

basis.

(b)        second, the DIP Superpriority Claims;

(c)        third, the Adequate Protection Superpriority Claims granted to the

Prepetition PIK Notes Secured Parties; and

(d)        fourth, the Adequate Protection Superpriority Claims granted to

the Prepetition Convertible Notes Secured Parties.

21.        Postpetition Perfection of Liens.  The DIP Agent, the DIP Lenders, and

the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to

execute in the name of the Debtors, as its true and lawful attorney, with full power of

substitution, to the maximum extent permitted by law) financing statements, trademark filings,

copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take

possession of or control over deposit accounts and securities accounts or any other asset, in each

case, in order to validate and perfect the liens and security interests granted to them in the DIP

42

Documents and this Interim Order.  Whether or not the DIP Agent, on behalf of itself or the DIP

Lenders, or the Prepetition Secured Parties, choose to file such financing statements, trademark

filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of

or control over deposit accounts and securities accounts or any other assets, the DIP Liens shall

be deemed legal, valid, perfected, allowed, enforceable, unavoidable and not subject to

challenge, dispute, impairment or subordination, at the time and on the date of entry of this

Interim Order.

        (a)      A certified copy of this Interim Order may, in the discretion of the

DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such

financing statements, mortgages, notices of lien or similar instruments, and all filing offices are

hereby authorized to accept such certified copy of this Interim Order for filing and recording.

For the avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy

Code shall be modified (and any stay of such modification under Bankruptcy Rule 4001(a)(3) is

waived) to the extent necessary to permit the DIP Agent and Prepetition Secured Parties to take

all actions permitted by this Paragraph 21.

        (b)      Subject to entry of a Final Order on the Motion, any provision of

any lease or other license, contract or other agreement that requires (i) the consent or approval of

one or more landlords or other parties or (ii) the payment of any fees or obligations to any

governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer

any such leasehold interest, license, contract or other agreement, or the proceeds thereof, or other

collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of

the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the

granting of postpetition liens hereunder on such leasehold interest, license, contract or other

43

agreement or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the

DIP Agent, the DIP Lenders or the Prepetition Secured Parties in accordance with the terms of

the DIP Documents or this Interim Order.  Notwithstanding anything to the contrary in the

foregoing, the provisions of this Paragraph 21(b) shall not (i) render any contract or lease unable

to be assumed and/or assigned by any Debtor or (ii) impair or limit the ability or right of (A) any

Debtor to assume and/or assign any contract or lease or (B) any lessor to object to such relief on

any other grounds, including, but not limited to, sections 365(b)(3) or 1123 of the Bankruptcy

Code.

> 22.    <u>Carve Out</u>.

> (a)    For purposes hereof, the "**Carve Out**" shall mean an amount equal

to the sum of:

> > (i)    all fees required to be paid to the clerk of the Bankruptcy

Court and to the U.S. Trustee under section 1930(a) of title 28 of the United

States Code and 31 U.S.C §3717;

> > (ii)    all reasonable fees and expenses incurred by a trustee under

section 726(b) of the Bankruptcy Code not to exceed $100,000;

> > (iii)    all accrued and unpaid claims for unpaid fees, costs, and

expenses incurred at any time before the Trigger Date (as defined below), or any

monthly or success or transaction fees payable to estate professionals, in each

case by persons or firms retained by the Debtors or the Creditors Committee

(solely with respect to the Creditors' Committee in an aggregate amount not to

exceed the amount of Professional Fees set forth in the Budget for the Creditors'

Committee prior to the Trigger Date (as defined below), subject to entry of a Final

44

Order), if any, whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**," and the fees, costs and expenses of Professional Persons, the "**Professional Fees**"), to the extent such Professional Fees are allowed by the Bankruptcy Court at any time (*i.e.*, before or after the Trigger Date) on an interim or final basis; and

      (iv)    all Professional Fees incurred on and after the Trigger Date by Professional Persons and allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date, whether by interim order, procedural order or otherwise; <u>provided</u>, that, other than with respect to any success or transaction fees that may become due and payable to Professional Persons, which shall not be included in the Carve Out Cap (as herein defined), the payment of any Professional Fees of the Professional Persons (but excluding fees and expenses of third party professionals employed by individual members of the Creditors' Committee) incurred on or after the Trigger Date (defined below) and allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date, on a final basis, shall not exceed $2,000,000 in the aggregate (the "**Carve Out Cap**").

      (b)    The "**Trigger Date**" shall mean the first business day after the occurrence and during the continuance of a DIP Event of Default (as defined below) or a Cash Collateral Termination Event and delivery of written notice thereof (the "**Carve Out Notice**") (which may be delivered by electronic mail) by the DIP Agent or, in the case of a Cash Collateral Termination Event and subject to the Existing Intercreditor Agreement and Intercreditor Arrangements, the Prepetition ABL Agent, the Prepetition Term Loan Agent,

45

Majority Holders of the Prepetition PIK Notes or Majority Holders of the Prepetition Convertible

Notes to (i) the U.S. Trustee, (ii) the Debtors' and the Debtors' counsel, (iii) counsel for the

Creditors' Committee, (iv) counsel for the Prepetition ABL Agent, (v) counsel for the Prepetition

Term Loan Agent, (vi) counsel for the Majority Holders of the Prepetition PIK Notes,

(vii) counsel for the Majority Holders of the Prepetition Convertible Notes, and (viii) counsel for

the DIP Agent (collectively, the "**Carve-Out Notice Parties**").

        (c)     Immediately upon delivery of a Carve Out Notice, the Debtors

shall transfer from their concentration account to a segregated account (the "**Carve Out**

**Account**") not subject to the control of the DIP Agent, DIP Lenders or the Prepetition Secured

Parties an amount equal to the Carve Out Cap plus an amount equal to the aggregate unpaid fees,

costs and expenses described in clause (iii) of the definition of "Carve Out," in each case as

reasonably determined by a good faith estimate of the applicable Professional Person.  The

proceeds on deposit in the Carve Out Account shall be available only to satisfy obligations

benefitting from the Carve Out, and the DIP Lenders and Prepetition Secured Parties (i) shall not

sweep or foreclose on cash of the Debtors necessary to fund the Carve Out Account, and

(ii) shall have security interests in any residual interests in the Carve Out Account available

following satisfaction in full of all obligations benefitting from the Carve Out in the order of

priority set forth in Paragraph 19, and shall receive distributions on accounts of such residual

interests in accordance with such priority.

        (d)     For the avoidance of doubt, the Carve Out shall be senior to any

claims arising under or relating to and liens securing the Junior Lien DIP Facility, the Prepetition

ABL Facility, the Prepetition Term Loan Facility, the Prepetition PIK Notes and the Prepetition

WEIL:\95410057\1\50482.0004

Convertible Notes, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests.

(e)    *Budget.*  Annexed as **Exhibit "2"** hereto and incorporated by reference herein is the weekly statement of receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing with the first week following the Commencement Date, including (i) individual line items for "Total Disbursements" and (ii) the anticipated uses of the proceeds of the DIP Loans and Cash Collateral for such period, in form and substance reasonably satisfactory to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of the Prepetition PIK Notes and the Majority Holders of the Prepetition Convertible Notes (substantially similar to the form of budget annexed hereto, the "**Budget**").  No less frequently than every four weeks, commencing on August 7, 2015, the Debtors shall deliver an updated budget for the following four week period (the "**Proposed Budget**") simultaneously to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent and the current Majority Holders of Prepetition PIK Notes and the current Majority Holders of Prepetition Convertible Notes and counsel to the Creditors' Committee.  The Proposed Budget shall become the Budget upon the written consent of the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent and the current Majority Holders of Prepetition PIK Notes and the Majority Holders of the Prepetition Convertible Notes (in each case such consent not to be unreasonably withheld or delayed).  Each Proposed Budget shall be of no force and effect unless and until it is so approved or five (5) days have passed from delivery without objection, and until either condition has been satisfied, the prior approved Budget shall remain in effect.

47

(f)       On August 14, 2015, for the week-ended August 7, 2015, and continuing every Friday of each calendar week (or the next business day if such date is not a business day) thereafter, the Debtors shall be required to deliver to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of Prepetition PIK Notes, the Majority Holders of Prepetition Convertible Notes, and counsel to the Creditors' Committee, a weekly variance report from the immediately preceding three calendar week period comparing on a cumulative basis the actual disbursements of the Debtors with disbursements in the Budget.

23.       DIP Events of Default.

(a)       In addition to the Events of Default (as defined in the DIP Documents) set forth in the DIP Documents, unless all DIP Obligations and all Adequate Protection Obligations shall have been indefeasibly Paid in Full (as set forth in Paragraph 16), the following shall constitute a default under the DIP Documents and this Interim Order, unless the DIP Agent has waived such default in accordance with the DIP Documents (together with Events of Default (as defined in the DIP Documents), the "**DIP Events of Default**"):

(i)       the filing of a motion by the Debtors seeking dismissal of any of the Chapter 11 Cases, the dismissal of any of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;

48

(ii)      termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;

(iii)      other than as contemplated by this Interim Order, entry of an order granting any lien or claim which is senior to or *pari passu* with the DIP Agent's lien and claims under the Junior Lien DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief);

(iv)      entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full in cash of the Junior Lien DIP Facility as of the effective date of the plan;

(v)      payment of or granting adequate protection with respect to prepetition debt (other than as approved by the DIP Agent and the DIP Orders or as otherwise contemplated by the DIP Documents);

(vi)      the failure of liens or superpriority claims granted with respect to the Junior Lien DIP Facility to be valid, perfected and enforceable with the priority described herein;

(vii)      the entry of one or more orders of the Bankruptcy Court lifting the automatic stay under section 362 of the Bankruptcy Code with respect to assets having a value in excess of $25 million in the aggregate;

(viii)      the occurrence of a Cash Collateral Termination Event;

49

(ix)    the Interim Order or Final Order, as applicable, shall be amended, modified, stayed or vacated without the written consent of the DIP Agent; and

(x)    if, at any time, one or more asset purchase agreement(s) for the sale of Debtors' stores and other real and personal property with a minimum aggregate value of at least $250 million (excluding scripts and inventory), fail to become or cease being in full force and effect unless the Debtors have entered into a mutually similar agreement or agreements representing at least equivalent or higher or better offers for such assets.

24.    <u>Protection of DIP Lenders and Other Rights</u>.  As a requirement and precondition to the DIP Lenders' willingness to lend and in furtherance of the DIP Superpriority Claims, the DIP Agent and DIP Lenders shall have the following protections that may be enforced by the DIP Agent as authorized, approved, and granted pursuant to the provisions of the DIP Orders and in accordance with the terms of the DIP Credit Agreement:

(a)    If a DIP Event of Default shall have occurred and is continuing, the DIP Agent shall, with respect to the DIP Collateral, be permitted and hereby is authorized, approved and granted, without further approval or order of this Court, to do any or all of the following:  (i) immediately (x) deliver a notice of a DIP Event of Default, (y) terminate the Junior Lien DIP Facility, and (z) charge the default rate of interest on the DIP Loans, and (ii) upon the expiration of the Remedies Notice Period to the Carve Out Notice Parties (which may be delivered by electronic mail) and subject to Paragraph 25(c) below, the automatic stay of section 362 of the Bankruptcy Code shall be terminated for the limited purpose of permitting the DIP Agent or DIP Lenders to do any of the following: (x) foreclose on the DIP Collateral,

50

subject to the terms of this Interim Order and the Intercreditor Arrangements, (y) enforce all of their guaranty rights; and (z) declare the principal of and accrued interest, fees and expenses constituting the obligations under the Junior Lien DIP Facility to be due and payable.

(b)      The DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the applicable DIP Documents or this Interim Order shall not constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

(c)      After the occurrence of a Cash Collateral Termination Event or DIP Event of Default, the automatic stay set forth in section 362 of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Bankruptcy Court in the event that the Debtors, the Creditors' Committee, the U.S. Trustee or any other party in interest have not obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice Period.  The Debtors, Creditors' Committee, U.S. Trustee or other party in interest shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay or to obtain any injunctive relief.

## Other Rights and Obligations

25.      <u>Limitation on Use of DIP Proceeds and Cash Collateral</u>.  Notwithstanding anything herein or in any other order by the Bankruptcy Court to the contrary, no borrowings, Cash Collateral, Carve Out or the Carve Out Cap may be used:

(a)      to request authorization to obtain, other than from the DIP Agent or DIP Lenders and other than in accordance with this Interim Order and the DIP Documents, postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the

51

Bankruptcy Code or otherwise that are (or are proposed to be) secured by any liens or security

interests on any of the DIP Collateral (including Common Collateral) (unless such postpetition

loans or other financial accommodations propose to indefeasibly pay in full all DIP Obligations);

(b)       in connection with, or finance in any way, any claim, cause of

action, counterclaim, investigation, action, suit, arbitration, proceeding, application, motion, or

other litigation of any type (i) objecting to, challenging or contesting in any manner, invalidating,

setting aside, avoiding, subordinating or raising any defenses to, in whole or in part, the amount,

validity, extent, priority, enforceability or perfection of the DIP Obligations, the Prepetition

Financing Documents, the DIP Documents, the DIP Liens, the Prepetition Obligations or the

Prepetition Liens, or any other rights or interests of any of the DIP Agent, DIP Lenders or

Prepetition Secured Parties (including, without limitation, with respect to the Adequate

Protection Liens, Adequate Protection Payments, DIP Superpriority Claims or Adequate

Protection Superpriority Claims, including, without limitation, any Challenge to the Debtors'

Stipulations), or (ii) asserting or seeking any order, judgment, determination, or similar relief

against, or adverse to the interests of, in any capacity, the DIP Agent, the DIP Lenders or the

Prepetition Secured Parties or any of their respective officers, directors, employees, agents,

affiliates, representatives, attorneys, advisors, assigns, or successors with respect to any

transaction, occurrence, omission or action involving the Debtors; provided, that the Creditors'

Committee should be able to use funds to challenge the Prepetition Liens to the extent of the

value of any excluded collateral.

(c)       for or in connection with contesting, preventing, hindering,

impairing, interfering with, or otherwise delaying the exercise by any of the DIP Agent, DIP

WEIL:\95410057\1\50482.0004

Lenders or the Prepetition Secured Parties of any rights or remedies, in a manner inconsistent with the terms of this Interim Order or the Prepetition Financing Documents;

(d)      to seek, except in response to the final relief requested in the Motion, to modify any of the rights granted to the DIP Agent, the DIP Lenders or any of the Prepetition Secured Parties hereunder or under the DIP Documents, the Prepetition Financing Documents, in each of the foregoing cases, without such parties' prior written consent or pay any amount on account of any claims arising prior to the Commencement Date unless such payments are approved by an order of this Court (including hereunder);  provided, that no more than $100,000, in the aggregate, of the borrowings, Cash Collateral, Carve Out or the Carve Out Cap or proceeds thereof may be used by the Creditors' Committee solely to investigate (but not prosecute, object or litigate) a Challenge in accordance with Paragraph 6 hereof; provided, further that such parties shall reasonably cooperate in providing their underlying documents evidencing their secured claim to counsel to the Creditors' Committee.

26.      Prohibition on Granting of Additional Liens or Interests.  No liens, claims, interests or priority status, other than as granted in this Interim Order, having a lien or administrative priority superior or *pari passu* with that of any of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, or Adequate Protection Superpriority Claims, shall be granted while any portion of the DIP Obligations or Prepetition Obligations remain outstanding, or any commitment under the DIP Documents or Prepetition Financing Documents remains in effect, without the prior written consent of each of the DIP Agent, Majority Holders of Prepetition PIK Notes, and Majority Holders of Prepetition Convertible Notes, each in their respective sole and absolute discretion.

WEIL:\95410057\1\50482.0004

27.    <u>Intercreditor Arrangements</u>.  The Intercreditor Arrangements set forth in

**Exhibit "1"** hereto are approved.  Notwithstanding anything to the contrary herein or in any

other order of the Bankruptcy Court, the Intercreditor Arrangements shall supersede the Existing

Intercreditor Agreement (to the extent applicable) solely to the extent expressly set forth in the

Intercreditor Arrangements.  The Intercreditor Arrangements shall survive the conversion or

dismissal of any of the Chapter 11 Cases or any relief from the automatic stay granted in the

Chapter 11 Cases.

28.    <u>Mandatory Prepayments</u>. The Debtors are authorized, to the extent

applicable, to make mandatory prepayments and voluntary prepayments (subject to the

applicable priority provisions set forth in this Interim Order) of the Junior Lien DIP Facility as

and when provided under, and for application in accordance with, the terms of the DIP

Documents (including, without limitation, the prepayments set forth in Section 2.05 and Section

2.07 of the DIP Credit Agreement); <u>provided</u>, that no such mandatory or voluntary prepayments

(excluding, for the avoidance of doubt, any refinancing of the Junior Lien DIP Facility) shall be

made with the proceeds of the Cash Collateral until the Prepetition ABL Obligations and the

Prepetition Term Loan Obligations have been Paid in Full; <u>provided</u>, further, that the Debtors

shall be permitted to make such mandatory or voluntary prepayments from the Additional

Collateral (including, without limitation, proceeds or products thereof and any cash deposited or

maintained in the Additional Collateral Account).

29.    <u>Payments</u>.  No payments with respect to the DIP Obligations or the

Adequate Protection Obligations (to the extent approved hereunder) shall be subject to

Bankruptcy Court approval or required to be maintained in accordance with the U.S. Trustee

Guidelines, and no recipient of any such payments shall be required to file any interim or final

54

fee applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any such payments.

30.   Financial Reporting.  The Debtors shall continue to provide (i) the Prepetition ABL Agent with financial and other reporting in compliance with the Prepetition ABL Facility, including weekly borrowing base certificates as and when required under the Prepetition ABL Credit Agreement, and any reports provided to the Prepetition Term Loan Agent and (ii) the Prepetition Term Loan Agent with financial and other reporting in compliance with the Prepetition Term Loan Facility (all such reporting referred to in clauses (i) and (ii) above, the "**Financial Reports**").  The Debtors shall simultaneously provide Financial Reports to (a) the DIP Agent, and (b) advisors to each of the Majority Holders of Prepetition PIK Notes and the Majority Holders of Prepetition Convertible Notes, and (c) subject to the execution of appropriate confidentiality agreement, to any of the Prepetition PIK Notes Secured Parties or Prepetition Convertible Notes Secured Parties, as applicable.

31.   Credit Bid.  Subject to the terms of the DIP Documents and the Intercreditor Arrangements, any of the DIP Agent, DIP Lenders and Prepetition Secured Parties shall be permitted to credit bid some or all of the outstanding DIP Obligations, Prepetition Obligations, DIP Superpriority Claims or Adequate Protection Superiority Claims, as applicable, as consideration in any sale of the DIP Collateral (or any part thereof) or Common Collateral (or any part thereof), in each case to the extent permitted by section 363(k) of the Bankruptcy Code, without the need for further order of the Bankruptcy Court, and whether that sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

55

32.     <u>Exculpation</u>.  Nothing in this Interim Order, the DIP Documents, or any

other documents related to the transactions contemplated hereby shall in any way be construed or

interpreted to impose or allow the imposition upon any DIP Agent or any DIP Lender any

liability for any and all claims, controversies, disputes, liabilities, obligations, demands,

damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens,

actions and causes of action of any and every nature whatsoever, whether arising in law or

otherwise, and whether or not known or matured, arising from, related to or in connection with

the prepetition or postpetition activities of the Debtors in the operation of their businesses, their

restructuring efforts, any aspect of the Junior Lien DIP Facility or the negotiation, consummation

or enforcement of any of the DIP Documents or any ancillary documents and security

arrangements related thereto.  In addition, (a) the DIP Agent and the DIP Lenders shall not, in

any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any

loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any

diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee,

custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of

the DIP Collateral shall be borne by the Debtors; <u>provided</u>, that the foregoing shall not apply to

any act or omission by the DIP Agent or the DIP Lenders that constitutes fraud, gross negligence

or willful misconduct by the DIP Agent or the DIP Lenders as finally determined by a court of

competent jurisdiction.

33.     <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered

pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting

the DIP Agent, DIP Lenders and Prepetition Secured Parties all protections and benefits afforded

by section 364(e) of the Bankruptcy Code.  Any financial accommodations made to the Debtor

56

by the DIP Agent, DIP Lenders or any of the Prepetition Secured Parties shall be deemed to have

been made in good faith, as such term is used in section 363(e) of the Bankruptcy Code.  If any

or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed,

on appeal or otherwise, (i) such action shall not affect (1) the validity of any obligation,

indebtedness or liability incurred or payment made hereunder by any of the Debtors to the DIP

Agent, DIP Lenders or Prepetition Secured Parties or (2) the validity and enforceability of any

lien or priority authorized, created or granted hereunder, and (ii) the DIP Liens, DIP

Superpriority Claims, Adequate Protection Liens and Adequate Protection Superpriority Claims

shall be entitled to the full protection of section 364(e) of the Bankruptcy Code.

        34.     <u>Waiver of Section 506(c) Claims</u>.  Subject to and effective only upon

entry of the Final Order granting the Motion, the Debtors waive (a) any costs or expenses of

administration, which have been or may be incurred in these Chapter 11 Cases or any successor

case at any time, or (b) any costs and expenses incurred in connection with the preservation,

protection or enhancement of, or realization by the Prepetition Secured Parties upon the

Common Collateral, or the preservation, protection or enhancement of, or the realization by the

DIP Agent or DIP Lenders upon, the DIP Collateral, in each case, may be surcharged against any

of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as applicable, or any of

their respective claims, the Carve Out, the DIP Collateral (including Common Collateral),

pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise.  Notwithstanding

anything contained herein to the contrary, nothing contained herein or the transactions

contemplated hereby (including, without limitation, the approval of any Budget or the consent to

the terms of this Interim Order) shall constitute an admission or be deemed an admission, and no

action, inaction or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured

57

Parties (including, without limitation, the approval of any Budget or consent to the terms of this

Interim Order) shall be deemed to be or shall constitute an admission (nor shall any consent be

implied from any action, inaction or acquiescence by, either with or without notice to, the

Prepetition Secured Parties) to any charge, lien, assessment or claim (excluding the Carve Out)

against any of the DIP Agent, DIP Lenders or Prepetition Secured Parties or any of their

respective claims, the Carve Out, the DIP Collateral (including Common Collateral), whether

pursuant to section 506(c) of the Bankruptcy Code or otherwise.

35.    Section 552(b) Equities of the Case Waiver.  Each of the DIP Agent, DIP

Lenders and Prepetition Secured Parties are entitled to all of the rights and benefits of section

552(b) of the Bankruptcy Code.  Subject to and effective only upon entry of the Final Order

granting the Motion, the Debtors hereby waive, and no person may assert, the "equities of the

case" exception under section 552(b) of the Bankruptcy Code with respect to proceeds, product,

offspring or profits of any of the DIP Collateral or the DIP Agent, DIP Lenders, the DIP Liens,

the Prepetition Secured Parties or the Prepetition Liens.

36.    No Marshaling.  Subject to and effective only upon entry of the Final

Order granting the Motion, neither the DIP Agent, DIP Lenders nor any of the Prepetition

Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine

with respect to the DIP Collateral (including Common Collateral), as applicable.

37.    Proofs of Claim.  None of the DIP Agent, DIP Lenders, or the Prepetition

Secured Parties in such capacities will be required to file proofs of claim in any of Chapter 11

Cases or any successor case, and the Debtor's stipulations in this Interim Order shall be deemed

to constitute a timely filed proof of claim with respect to their respective claims.  Any order

entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim

WEIL:\95410057\1\50482.0004

(including without limitation administrative claims) in the Chapter 11 Cases or any successor

chapter 7 case shall not apply to the DIP Agent, the DIP Lenders, or the Prepetition Secured

Parties acting in such capacities.

38.     <u>Order Governs</u>.  In the event of any inconsistency between the provisions

of this Interim Order, if and when entered, and the DIP Documents, the provisions of this Interim

Order, as applicable, shall govern.  Additionally, to the extent that there may be an inconsistency

between the terms of this Interim Order or the Final Order, if and when entered, and the *Order*

*Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing*

*Certain Notice and Case Management Procedures*, if and when entered, the terms of this Interim

Order or Final Order, as applicable, shall govern.

39.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the

provisions of this Interim Order, including all findings herein and the Intercreditor

Arrangements, shall be binding upon all parties-in-interest in the Chapter 11 Cases, including

without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any

statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, as well as

the Debtors, the Debtors' estates and the Debtors' respective successors and assigns (including

any Chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an

examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary

appointed as a legal representative of any of the Debtors, or similar responsible person or similar

designee or litigation trust hereinafter appointed or elected for the estates of the Debtors) and

shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and

the Debtors and their respective successors and assigns, including after any conversion or

dismissal of any of the Chapter 11 Cases; <u>provided</u>, that, except to the extent expressly set forth

59

in this Interim Order, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or extend any financing to any Chapter 7 trustee, chapter 11 trustee or similar responsible person or similar designee or litigation trust hereunder appointed for the estates of the Debtors.

40.     _Limitation of Liability_.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents or Prepetition Financing Documents, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to or in connection with the Debtors' restructuring efforts or the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Agent, DIP Lenders or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

41.     _Effectiveness_.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof as of the Commencement Date, and there shall be no stay of execution of effectiveness of this Interim Order.  Any stay of the effectiveness of this Interim Order under Bankruptcy Rule 6004 or otherwise is waived.

60

42.     <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

43.     <u>Headings</u>.  The heading of any provision of this Order is intended only for convenience and shall not be construed to be or interpreted as a part, or limitation on the scope, any such provision.

44.     <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on **August 10, 2015 at 10:00 a.m. (Eastern Time)**, before the Bankruptcy Court.

45.     <u>Notice of Final Hearing and Objection Deadline</u>.  The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with the Bankruptcy Court and to the Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.  Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections with the Bankruptcy Court in accordance with General Order M-399, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. and Sunny Singh, Esq.) and (ii) the Notice Parties, with a copy to the Court's chambers, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on August 5, 2015**.

Dated: _____, 2015
          White Plains, New York

                                                        _____
                                                        United States Bankruptcy Judge

61

**<u>Exhibit 1</u>**

**Intercreditor Arrangements**

62

## Amended Exhibit 1

### Intercreditor Arrangements

Capitalized terms used herein shall have the meanings set forth in the Existing Intercreditor Agreement as in effect on the date hereof unless otherwise defined herein or in the Interim Order to which this Exhibit is attached (the "**Interim Order**").  Subject to the terms of the Interim Order, together with the relative rights and priorities of the DIP Secured Parties and the Prepetition Secured Parties set forth in the Interim Order, the following provisions constitute the intercreditor arrangements among the DIP Secured Parties and the Prepetition Secured Parties for purposes of the Interim Order.

As between and among the Prepetition Secured Parties only, the Existing Intercreditor Agreement and the other Prepetition Financing Documents shall remain in full force and effect (but subject to the Interim Order), subject to all parties' rights and defenses thereunder and under applicable law and except that Paragraph 6 below shall replace the purchase rights in the Existing Intercreditor Agreement).

1.    *Definitions*.  The following terms, as used herein, have the following meanings:

"**ABL Priority Collateral**" has the meaning specified in the Existing Intercreditor Agreement, provided that "ABL Priority Collateral" shall not include any Additional Collateral.

"**Additional ABL Priority Collateral**" has the meaning set forth in Paragraph 4(b) below.

"**Additional Collateral**" means (i) all property of the Debtors, if any, that is not subject to a valid and perfected Lien in favor of either or both of the ABL Agent and the Term Loan Agent immediately prior to the Commencement Date and in which a Lien has been granted to the DIP Agent pursuant to the applicable Order, including the Additional Collateral Account (as defined in the DIP Credit Agreement) and all amounts and property credited thereto (including, without limitation, all products and proceeds of all of the foregoing property) and (ii) all proceeds of leaseholds, subleaseholds and similar agreements in respect of real property interests that are not subject to a valid and perfected Lien in favor of either or both of the ABL Agent and the Term Loan Agent immediately prior to the Commencement Date under applicable law.  In addition, with respect to any property excluded from the Liens in favor of the DIP Agent because of contractual restrictions (including restrictions in leaseholds and subleaseholds) preventing the grant of such Liens (and with respect to which all required consents or waivers have not been obtained), Additional Collateral shall not include the Debtors' interests in such contracts, leaseholds or subleaseholds, but shall include any proceeds or products thereof.

"**Additional Term Priority Collateral**" has the meaning set forth in Paragraph 4(b) below.

"**Adequate Protection Lien Termination Date**" means, with respect to any Class of Secured Parties, the first date on which the indebtedness secured by the adequate protection lien granted to the applicable Class of Secured Parties pursuant to the Interim Order has been irrevocably paid in cash in full or such lien is otherwise terminated, canceled or extinguished or any earlier date of a final order by a court of competition jurisdiction that such Class of Secured Parties, in its capacity as such, is not entitled to adequate protection under section 507(b) of the Bankruptcy Code.

"**Class**" refers to the determination in relation to any particular Type of Common Collateral or Additional Collateral, (i) with respect to any Secured Obligations, whether such Secured Obligations are First Priority Obligations, Second Priority Obligations, DIP Obligations, Third Priority Obligations or Fourth Priority Obligations and (ii) with respect to any Secured Party, whether such Secured Party is a First Priority Secured Party, a Second Priority Secured Party, a DIP Secured Party, a Third Priority Secured Party or a Fourth Priority Secured Party.

"**Common Collateral**" has the meaning specified in the Existing Intercreditor Agreement, provided that "Common Collateral" shall not include any Additional Collateral.

"**DIP Secured Party**" means the DIP Agent and the DIP Lenders.

"**DIP Termination Date**" means the date on which (i) the DIP Obligations (other than those that constitute taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding the principal of, and interest and premium (if any) on, and fees and expenses relating to, the DIP Obligations) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of DIP Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time) have been paid in cash in full, (ii) all commitments to extend credit under the applicable DIP Documents have been terminated and (iii) the DIP Agent has delivered a written notice to the Third Priority Representative and the Fourth Priority Representative stating that the DIP Termination Date has occurred to the satisfaction of the DIP Agent.

"**Enforcement Action**" means, with respect to any Class of Secured Obligations, (a) other than with respect to the DIP Secured Parties, any demand for payment or acceleration thereof and (b) with respect to all Classes of Secured Obligations, the exercise of any rights and remedies with respect to any Common Collateral or any Additional Collateral, as applicable, securing such obligations or the commencement or prosecution of enforcement of any such rights and remedies under the Prepetition Financing Documents or the DIP Documents, as applicable, of such Class, or applicable law, including the exercise of any rights of set-off or recoupment, and the exercise of any such rights or remedies of a secured creditor under the Uniform Commercial Code, the Bankruptcy Code or other similar

- 2 -

creditors' rights, bankruptcy, insolvency, reorganization or similar laws of any applicable jurisdiction.

"**First Priority Documents**" means, with respect to any Type of Common Collateral or Additional Collateral, the Prepetition Financing Documents governing the First Priority Obligations.

"**First Priority Obligations**" means (i) with respect to the ABL Priority Collateral and Additional ABL Priority Collateral, all ABL Secured Obligations and (ii) with respect to the Term Priority Collateral and Additional Term Priority Collateral, all Term Loan Secured Obligations. To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Debtor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, DIP Secured Party, Third Priority Secured Party, Fourth Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of the Existing Intercreditor Agreement and the Interim Order and the rights and obligations of the Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**First Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the First Priority Representative and the holders of the First Priority Obligations with respect to such Common Collateral or Additional Collateral.

"**Fourth Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the Convertible Notes Secured Parties.

"**Representatives**" means the ABL Agent, the Term Loan Agent, the DIP Agent, the PIK Toggle Notes Trustee and the Convertible Notes Trustee, as applicable.

"**Second Priority Documents**" means, with respect to any Type of Common Collateral or Additional Collateral, the Prepetition Financing Documents governing the Second Priority Obligations.

"**Second Priority Obligations**" means (i) with respect to the ABL Priority Collateral and the Additional ABL Priority Collateral, all Term Loan Secured Obligations and (ii) with respect to the Term Priority Collateral and the Additional Term Priority Collateral, all ABL Secured Obligations. To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Debtor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, DIP Secured Party, Third Priority Secured Party, Fourth Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of the Existing

NAI-1500444380v11

Intercreditor Agreement and the Interim Order and the rights and obligations of the Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Second Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the Second Priority Representative and the holders of the Second Priority Obligations with respect to such Common Collateral or Additional Collateral.

"**Secured Obligations**"·means the First Priority Obligations, the Second Priority Obligations, the DIP Obligations, the Third Priority Obligations and the Fourth Priority Obligations.

"**Secured Parties**" means the First Priority Secured Parties, the Second Priority Secured Parties, the DIP Secured Parties, the Third Priority Secured Parties and the Fourth Priority Secured Parties.

"**Term Priority Collateral**" has the meaning specified in the Existing Intercreditor Agreement, <u>provided</u> that "Term Priority Collateral" shall not include any Additional Collateral.

"**Third Priority Documents**" mean the PIK Toggle Notes Documents.

"**Third Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the PIK Toggle Notes Secured Parties.

"**Type**" when used to describe (i) any Common Collateral, refers to whether such Common Collateral is ABL Priority Collateral or Term Priority Collateral and (ii) any Additional Collateral, refers to whether such Additional Collateral is Additional ABL Priority Collateral or Additional Term Priority Collateral.

2.    *Exclusive Enforcement with respect to Common Collateral*.

a)    With respect to each Type of Common Collateral, until the First Priority Obligations Payment Date, the First Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable First Priority Documents, without any consultation with or consent of any Second Priority Secured Party, any DIP Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Common Collateral.    With respect to each Type of Common Collateral, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the First Priority Documents), the First Priority Representative and the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable First Priority Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

- 4 -

b)      With respect to each Type of Common Collateral, after the First Priority Obligations Payment Date but before the Second Priority Obligations Payment Date, the Second Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable Second Priority Documents, without any consultation with or consent of any DIP Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Common Collateral.   With respect to each Type of Common Collateral, after the First Priority Obligations Payment Date but before the Second Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Second Priority Documents), the Second Priority Representative and the other Second Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable Second Priority Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

c)      With respect to each Type of Common Collateral, after the Second Priority Obligations Payment Date but before the DIP Termination Date, the DIP Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable DIP Documents, without any consultation with or consent of any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Common Collateral.   With respect to each Type of Common Collateral, after the Second Priority Obligations Payment Date but before the DIP Termination Date, upon the occurrence and during the continuance of a DIP Event of Default (and subject to the provisions of the DIP Documents), the DIP Agent and the other DIP Secured Parties may take and continue any Enforcement Action with respect to the DIP Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

d)      With respect to each Type of Common Collateral, after the DIP Termination Date but before the Third Priority Obligations Payment Date, the Third Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable Third Priority Documents, without any consultation with or consent of any Fourth Priority Secured Party with respect to such Common Collateral.   With respect to each Type of Common Collateral, after the DIP Termination Date but before the Third Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Third Priority Documents), the Third Priority Representative and the other Third Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable Third Priority Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

NAI-1500444380v11

3.    *Standstill with respect to Common Collateral.*

    a)    Notwithstanding the foregoing clauses of Paragraph 2, any Second Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the Second Priority Documents or applicable law after the passage of a period of [15] days (the "**Common Collateral Second Priority Standstill Period**") from the first date on which (x) such Second Priority Secured Party shall have delivered a notice in writing to the First Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event, and (y) the automatic stay shall have been terminated as to the applicable Common Collateral; <u>provided</u> that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral Second Priority Standstill Period, any First Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the Second Priority Representative); and <u>provided</u>, <u>further</u>, that in any Insolvency Proceeding commenced by or against any Debtor, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by and consistent with the Interim Order;

    b)    Notwithstanding the foregoing clauses of Paragraph 2, any DIP Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the DIP Documents or applicable law after the passage of a period of [30] days (or, if earlier, upon the expiration or termination of the Common Collateral Third Priority Standstill Period or the Common Collateral Fourth Priority Standstill Period) (the "**Common Collateral DIP Standstill Period**") from the first date on which (x) such DIP Secured Party shall have delivered a notice in writing to the First Priority Representative and the Second Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a DIP Event of Default, and (y) the automatic stay shall have been terminated as to the applicable Common Collateral; <u>provided</u> that, notwithstanding the foregoing, in no event shall any DIP Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral DIP Standstill Period, any First Priority Secured Party or Second Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the DIP Agent); and <u>provided</u>, <u>further</u>, that in any Insolvency Proceeding commenced by or against any Debtor, the DIP Agent and the DIP Secured Parties may take any action expressly permitted by and consistent with the Interim Order;

    c)    Notwithstanding the foregoing clauses of Paragraph 2, any Third Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of

- 6 -

Common Collateral under the Third Priority Documents or applicable law after the passage of a period of [45] days (or, if earlier, upon the expiration or earlier termination of the Common Collateral Fourth Priority Standstill Period) (the "**Common Collateral Third Priority Standstill Period**") from the first date on which (x) such Third Priority Secured Party shall have delivered a notice in writing to the First Priority Representative, the Second Priority Representative and the DIP Agent of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event, and (y) the automatic stay shall have been terminated as to the applicable Common Collateral; <u>provided</u> that, notwithstanding the foregoing, in no event shall any Third Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral Third Priority Standstill Period, any First Priority Secured Party, Second Priority Secured Party or DIP Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the Third Priority Representative); and <u>provided</u>, <u>further</u>, that in any Insolvency Proceeding commenced by or against any Debtor, the Third Priority Representative and the Third Priority Secured Parties may take any action expressly permitted by and consistent with the Interim Order; and

d)   Notwithstanding the foregoing clauses of Paragraph 2, any Fourth Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the Fourth Priority Documents or applicable law after the passage of a period of [60] days (the "**Common Collateral Fourth Priority Standstill Period**") from the first date on which (x) such Fourth Priority Secured Party shall have delivered a notice in writing to the First Priority Representative, the Second Priority Representative, the DIP Agent and the Third Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event, and (y) the automatic stay shall have been terminated as to the applicable Type of Common Collateral; <u>provided</u> that, notwithstanding the foregoing, in no event shall any Fourth Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral Fourth Priority Standstill Period, any First Priority Secured Party, Second Priority Secured Party, DIP Secured Party or Third Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the Fourth Priority Representative); and <u>provided</u>, <u>further</u>, that in any Insolvency Proceeding commenced by or against any Debtor, the Fourth Priority Representative and the Fourth Priority Secured Parties may take any action expressly permitted by and consistent with the Interim Order.

4.   *Exclusive Enforcement with respect to Additional Collateral.*

a)    With respect to any Additional Collateral, until the DIP Termination Date, the DIP Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Collateral in accordance with the applicable DIP Documents, without any consultation with or consent of any First Priority Secured Party, any Second Priority Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional Collateral.  With respect to any Additional Collateral, upon the occurrence and during the continuance of a DIP Event of Default (and subject to the provisions of the DIP Documents), the DIP Agent and the other DIP Secured Parties may take and continue any Enforcement Action with respect to the DIP Obligations and such Additional Collateral in such order and manner as they may determine in their sole discretion.

b)    With respect to any Additional Collateral, on and after the DIP Termination Date:

i)    that would have constituted Term Priority Collateral if such Additional Collateral were encumbered by a  prepetition Mortgage or was otherwise of a type described as "Term Priority Collateral" in the Existing Intercreditor Agreement) but was not perfected upon the filing of the Cases immediately ("**Additional Term Priority Collateral**"), prior to the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, the Term Loan Secured Parties shall have the right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Term Priority Collateral in accordance with the applicable Term Loan Documents (in each case, as amended, supplemented, or otherwise modified prior to the date hereof, the "**Prepetition Term Loan Documents**"), without any consultation with or consent of any ABL Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional Term Priority Collateral.   With respect to such Additional Term Priority Collateral, after the DIP Termination Date but before the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition Term Loan Documents), the Term Loan Secured Parties may take and continue any Enforcement Action with respect to the applicable Term Loan Secured Obligations and such Additional Term Priority Collateral in such order and manner as they may determine in their sole discretion;

ii)    that is not Additional Term Priority Collateral ("**Additional ABL Priority Collateral**"), before the Adequate Protection Lien Termination Date for the ABL Secured Parties, the ABL Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional ABL Priority Collateral in accordance with the applicable ABL Loan Documents (in each case, as amended, supplemented, or otherwise modified prior to the date hereof, the "**Prepetition ABL Loan Documents**"), without any

- 8 -

consultation with or consent of any Term Loan Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional ABL Priority Collateral. With respect to such Additional ABL Priority Collateral, after the DIP Termination Date but before the Adequate Protection Lien Termination Date for the ABL Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition ABL Loan Documents), the ABL Secured Parties may take and continue any Enforcement Action with respect to the applicable ABL Secured Obligations and such Additional ABL Priority Collateral in such order and manner as they may determine in their sole discretion;

iii)    that constitutes Additional ABL Priority Collateral, after the ABL Termination Date but before the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, the Term Loan Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional ABL Priority Collateral in accordance with the applicable Prepetition Term Loan Documents, without any consultation with or consent of any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional ABL Priority Collateral. With respect to such Additional ABL Priority Collateral, after the ABL Termination Date but before the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition Term Loan Documents), the Term Loan Secured Parties may take and continue any Enforcement Action with respect to the applicable Term Loan Secured Obligations and such Additional ABL Priority Collateral in such order and manner as they may determine in their sole discretion; and

iv)    that constitutes Additional Term Priority Collateral, after the Term Loan Termination Date but before the Adequate Protection Lien Termination Date for the ABL Secured Parties, the ABL Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Term Priority Collateral in accordance with the applicable Prepetition ABL Loan Documents, without any consultation with or consent of any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional Term Priority Collateral. With respect to such Additional Term Priority Collateral, after the Term Loan Termination Date but before the Adequate Protection Lien Termination Date for the ABL Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition ABL Loan Documents), the ABL Secured Parties may take and continue any Enforcement Action with respect to the applicable ABL

- 9 -

Secured Obligations and such Additional Term Priority Collateral in such order and manner as they may determine in their sole discretion.

c)    With respect to any Additional Collateral, after the later to occur of the ABL Termination Date and the Term Loan Termination Date (the "Prepetition Senior Facilities Termination Date") but before the Adequate Protection Lien Termination Date for the Third Priority Secured Parties, the Third Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Collateral in accordance with the applicable Prepetition PIK Notes Documents, without any consultation with or consent of any Fourth Priority Secured Party with respect to such Additional Collateral.  With respect to any Additional Collateral, after the Prepetition Senior Facilities Termination Date but before the Adequate Protection Lien Termination Date for the Third Priority Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition PIK Notes Documents), the Third Priority Representative and the other Third Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable Third Priority Obligations and such Additional Collateral in such order and manner as they may determine in their sole discretion.

5.    *Standstill with respect to Additional Collateral.*

a)    Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the First Priority Secured Parties, any First Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the First Priority Documents or applicable law after the passage of a period of [15] days (the "**Additional Collateral First Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; provided that, notwithstanding the foregoing, in no event shall any First Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral First Priority Standstill Period, any DIP Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the First Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the First Priority Representative and the First Priority Secured Parties may take any action expressly permitted by the Interim Order.

b)    Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the Second Priority Secured Parties, any Second Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the Second Priority Documents or applicable law after the passage of a period of [30] days (the "**Additional**

- 10 -

**Collateral Second Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent and the First Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; provided that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral Second Priority Standstill Period, any DIP Secured Party or First Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the Second Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by the Interim Order.

c)      Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the Third Priority Secured Parties, any Third Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the Third Priority Documents or applicable law after the passage of a period of [45] days (the "**Additional Collateral Third Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent, the First Priority Representative and the Second Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; provided that, notwithstanding the foregoing, in no event shall any Third Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral Third Priority Standstill Period, any DIP Secured Party, First Priority Secured Party or Second Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the Third Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Third Priority Representative and the Third Priority Secured Parties may take any action expressly permitted by the Interim Order.

d)      Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the Fourth Priority Secured Parties, any Fourth Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the Fourth Priority Documents or applicable law after the passage of a period of [60] days (the "**Additional Collateral Fourth Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent, the  First Priority Representative, the Second Priority Representative and the Third Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination

- 11 -

Event; <u>provided</u> that, notwithstanding the foregoing, in no event shall any Fourth Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral Fourth Priority Standstill Period, any DIP Secured Party, First Priority Secured Party, Second Priority Secured Party or Third Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the Fourth Priority Representative); and <u>provided</u>, <u>further</u>, that in any Insolvency Proceeding commenced by or against any Debtor, the Fourth Priority Representative and the Fourth Priority Secured Parties may take any action expressly permitted by the Interim Order.

6. *Option to Purchase*.

a)   With respect to each Type of Common Collateral and Additional Collateral,

i)   prior to the First Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, (A) all or a portion of the Second Priority Secured Parties acting as a single group, (B) all or a portion of the DIP Secured Parties acting as a single group, (C) all or a portion of the Third Priority Secured Parties acting as a single group or (D) all or a portion of the Fourth Priority Secured Parties acting as a single group (in each case, the "**First Priority Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the relevant Representatives to purchase (w) in the case of clause (A), all of the First Priority Obligations from the First Priority Secured Parties, (x) in the case of clause (B), all of the First Priority Obligations from the First Priority Secured Parties and all of the Second Priority Obligations from the Second Priority Secured Parties, (y) in the case of clause (C), all of the First Priority Obligations from the First Priority Secured Parties, all of the Second Priority Obligations from the Second Priority Secured Parties and all of the DIP Obligations from the DIP Secured Parties and (z) in the case of clause (D), all of the First Priority Obligations from the First Priority Secured Parties, all of the Second Priority Obligations from the Second Priority Secured Parties, all of the DIP Obligations from the DIP Secured Parties and all of the Third Priority Obligations from the Third Priority Secured Parties (in each case, the "**First Priority Selling Secured Parties**").  Such notice from the relevant First Priority Purchasing Secured Parties to the Representatives of the relevant First Priority Selling Secured Parties shall be irrevocable unless otherwise agreed in writing by such Representatives;

ii)   after the First Priority Obligations Payment Date and prior to the Second Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, (A) all or a portion of the DIP Secured Parties acting as a single group, (B) all or a portion of the Third Priority Secured Parties acting as a single group or (C) all or a

- 12 -

portion of the Fourth Priority Secured Parties acting as a single group (in each case, the "**Second Priority Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the relevant Representatives to purchase (x) in the case of clause (A), all of the Second Priority Obligations from the Second Priority Secured Parties, (y) in the case of clause (B), all of the Second Priority Obligations from the Second Priority Secured Parties and all of the DIP Obligations from the DIP Secured Parties and (z) in the case of clause (C), all of the Second Priority Obligations from the Second Priority Secured Parties, all of the DIP Obligations from the DIP Secured Parties and all of the Third Priority Obligations from the Third Priority Secured Parties (in each case, the "**Second Priority Selling Secured Parties**").    Such notice from the relevant Second Priority Purchasing Secured Parties to the Representatives of the relevant Second Priority Selling Secured Parties shall be irrevocable unless otherwise agreed in writing by such Representatives;

iii)    (1) upon (x) any submission by the DIP Agent of a credit bid in writing for any of the Debtors' assets before the applicable deadline for the submission of such bids (a "**Credit Bid**"), (y) the scheduling by the Debtors of an auction for the sale of such assets (a "**Specified Auction**") and (z) the qualification of the DIP Agent as a bidder in such auction (and upon the reasonable request by the Third Priority Secured Parties or the Fourth Priority Secured Parties, the DIP Agent will confirm whether it has so qualified as a bidder), or (2) after the Second Priority Obligations Payment Date and prior to the DIP Termination Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, (A) all or a portion of the Third Priority Secured Parties acting as a single group or (B) all or a portion of the Fourth Priority Secured Parties acting as a single group  (in such capacity, the "**DIP Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the DIP Agent to purchase (x) in the case of clause (A), all of the DIP Obligations from the DIP Secured Parties and (y) in the case of clause (B), all of the DIP Obligations from the DIP Secured Parties and all of the Third Priority Obligations from the Third Priority Secured Parties (in such capacity, the "**DIP Selling Secured Parties**").    Such notice from the DIP Purchasing Secured Parties to the DIP Agent shall be irrevocable unless otherwise agreed in writing by the DIP Agent; and

iv)    after the DIP Termination Date and prior to the Third Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, all or a portion of the Fourth Priority Secured Parties acting as a single group (in such capacity, the "**Third Priority Purchasing Secured Parties**" and, together with the First Priority Purchasing Secured Parties, the Second Priority Purchasing Secured Parties and the DIP Purchasing Secured Parties, the "**Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the Third Priority Representative to purchase all of the Third

- 13 -

Priority Obligations from the Third Priority Secured Parties (in such capacity, the "**Third Priority Selling Secured Parties**" and, together with the First Priority Selling Secured Parties, the Second Priority Selling Secured Parties and the DIP Selling Secured Parties, the "**Selling Secured Parties**").  Such notice from the Third Priority Purchasing Secured Parties to the Third Priority Representative shall be irrevocable unless otherwise agreed in writing by the Third Priority Representative.

b)     On the date (the "**Purchase Date**") specified by the relevant Purchasing Secured Parties in the notice contemplated by clauses (a)(i) through (a)(iv) above (which shall not be less than five (5) business days, nor more than twenty (20) calendar days, after the receipt by the Representatives of the relevant Selling Secured Parties of the notice of the relevant Purchasing Secured Parties' election to exercise such option and which, in the case of an election in respect of a Credit Bid, shall be the second Business Day prior to the date scheduled for the Specified Auction, as such date may be rescheduled from time to time (or, if the DIP Agent has qualified as a bidder after such date, immediately prior to the Specified Auction) or such other date agreed by such Representatives in writing, the relevant Selling Secured Parties shall sell to the relevant Purchasing Secured Parties, and the relevant Purchasing Secured Parties shall purchase (on a ratable basis in accordance with the outstanding principal amount of their respective Obligations (as defined in the applicable Prepetition Financing Documents or the DIP Documents, as applicable) or such other basis as agreed by such Purchasing Secured Parties) from the relevant Selling Secured Parties, the relevant Obligations, provided that, the relevant Selling Secured Parties and Purchasing Secured Parties (and the Representatives thereof) shall retain all rights to be indemnified or held harmless by the Debtors in accordance with the terms of the relevant Finance Documents but the relevant Selling Secured Parties shall not retain any rights to the security therefor (but the Selling Secured Parties shall be treated as paid in full), provided that, no such sale and purchase shall occur with respect to an election in respect of a Credit Bid if the DIP Agent notifies the Representative for the relevant Purchasing Secured Parties that the DIP Agent has withdrawn its Credit Bid or determined not to participate in the Specified Auction (in each case in compliance with the applicable bidding procedures) reasonably in advance of the time specified for the funding of the sale and purchase.

c)     On the Purchase Date, the relevant Purchasing Secured Parties shall (i) pay to each Representative of the relevant Selling Secured Parties for the benefit of such Selling Secured Parties as the purchase price there for the full amount of all Obligations of such Selling Secured Parties then outstanding and unpaid (including principal, interest, fees and expenses (including, without limitation, (A) the Make Whole Fee, as defined in the DIP Credit Agreement, if the Selling Secured Parties are the DIP Secured Parties, or (B) any other applicable make whole fee or premium, if the Selling Secured Parties are not the DIP Secured Parties), including reasonable attorneys' fees and legal expenses, (ii) furnish cash collateral to such Representative in a manner and in such amounts as such Representative determines is reasonably necessary to secure such Representative

- 14 -

and such Selling Secured Parties in connection with any issued and outstanding letters of credit, Bank Product Obligations and Cash Management Obligations (each as defined in the Prepetition ABL Credit Agreement) secured by the relevant Prepetition Financing Documents or DIP Documents, as applicable, in each case to the extent applicable, (iii) agree to reimburse such Representative and such Selling Secured Parties for any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) in connection with any commissions, fees, costs or expenses related to any issued and outstanding letters of credit as described above and any checks or other payments provisionally credited to the Obligations of such Secured Parties, and/or as to which such Representative has not yet received final payment, (iv) agree to reimburse the such Selling Secured Parties in respect of indemnification obligations of the Debtors under the relevant Prepetition Financing Documents or DIP Documents, as applicable, as to matters or circumstances known to such Representative at the time of the purchase and sale which would reasonably be expected to result in any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) to such Selling Secured Parties and (v) agree to indemnify and hold harmless such Selling Secured Parties from and against any loss, liability, claim, damage or expense (including reasonable fees and expenses of legal counsel) arising out of any claim asserted by a third party in respect of the Obligations of such Selling Secured Parties as a direct result of any acts by such Selling Secured Parties occurring after the date of such purchase.  Such purchase price and cash collateral shall be remitted by wire transfer in federal funds to such bank account in New York, New York as each such Representative may designate in writing for such purpose.

d)      Such purchase shall be expressly made (i) without representation or warranty of any kind by the relevant Selling Secured Parties (or the Representative thereof) and without recourse of any kind, except that such Selling Secured Parties shall represent and warrant:  (A) the amount of the Obligations being purchased from it and (B) that such Selling Secured Parties are the sole legal and beneficial owner of such Obligations and have the right to assign such Obligations and the assignment is duly authorized and (ii) pursuant to definitive documentation reasonably acceptable to the relevant Selling Secured Parties and Purchasing Secured Parties.

7.      *Application of Proceeds*

a)      All proceeds of the ABL Priority Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

> *first*, to the ABL Agent to be applied in accordance with Section 8.03 of the Prepetition ABL Credit Agreement until the ABL Termination Date has occurred;

- 15 -

*second*, to the Term Loan Agent to be applied in accordance with Section 8.03 of the Prepetition Term Loan Agreement until the Term Loan Termination Date has occurred;

*third*, to the DIP Agent to be applied in accordance with Section 8.03 of the DIP Credit Agreement (or any corresponding provision with respect to any replacement DIP Credit Agreement) until the DIP Termination Date has occurred;

*fourth*, to the PIK Toggle Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition PIK Notes Indenture until the PIK Toggle Notes Termination Date has occurred;

*fifth*, to the Convertible Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition Convertible Notes Indenture until the Convertible Notes Termination Date has occurred; and

*finally*, to the relevant Debtor, or as a court of competent jurisdiction may direct.

b)    All proceeds of the Term Priority Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

*first*, to the Term Loan Agent to be applied in accordance with Section 8.03 of the Prepetition Term Loan Agreement until the Term Loan Termination Date has occurred;

*second*, to the ABL Agent to be applied in accordance with Section 8.03 of the Prepetition ABL Credit Agreement until the ABL Termination Date has occurred;

*third*, to the DIP Agent to be applied in accordance with Section 8.03 of the DIP Credit Agreement (or any corresponding provision with respect to any replacement DIP Credit Agreement) until the DIP Termination Date has occurred;

*fourth*, to the PIK Toggle Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition PIK Notes Indenture until the PIK Toggle Notes Termination Date has occurred;

*fifth*, to the Convertible Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition Convertible Notes Indenture until the Convertible Notes Termination Date has occurred; and

*finally*, to the relevant Debtor, or as a court of competent jurisdiction may direct.

- 16 -

c)      All proceeds of the Additional Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

> *first*, to the DIP Agent to be applied in accordance with Section 8.03 of the DIP Credit Agreement (or any corresponding provision with respect to any replacement DIP Credit Agreement) until the DIP Termination Date has occurred;

> *second*, in the manner set forth in the Existing Intercreditor Agreement as and to the extent applicable, subject to any all rights and defenses available thereunder and under applicable law; and

> *third*, after indefeasible payment in full of all First Priority Secured Obligations, Second Priority Secured Obligations, DIP Secured Obligations, Third Priority Secured Obligations and Fourth Priority Secured Obligations, to the relevant Debtor, or as a court of competent jurisdiction may direct.

8.      *Turnover Provisions with respect to Common Collateral*

a)      With respect to each Type of Common Collateral, until the occurrence of the First Priority Obligations Payment Date, no Second Priority Secured Party, DIP Secured Party, Third Priority Secured Party or Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of the Second Priority Secured Obligations, DIP Obligations, Third Priority Secured Obligations or Fourth Priority Secured Obligations, as the case may be, in violation of Paragraph 7(a) or 7(b).  Any Common Collateral received by a Second Priority Secured Party, DIP Secured Party, Third Priority Secured Party or Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the First Priority Representative to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party, the DIP Agent, each Third Priority Secured Party and each Fourth Priority Secured Party hereby authorizes the First Priority Representative to make any such endorsements as agent for the Second Priority Representative, the DIP Agent, the Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable).  Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the Second Priority Obligations, the DIP Obligations, the Third Priority Obligations or the Fourth Priority Obligations, as the case may be, purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

- 17 -

b)      With respect to each Type of Common Collateral, after the First Priority Obligations Payment Date and prior to the Second Priority Obligations Payment Date, no DIP Secured Party, Third Priority Secured Party or Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of the DIP Obligations, Third Priority Secured Obligations or Fourth Priority Secured Obligations in violation of Paragraph 7(a) or 7(b).    Any Common Collateral received by a DIP Secured Party, a Third Priority Secured Party or a Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the Second Priority Representative to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each DIP Secured Party, Third Priority Secured Party and Fourth Priority Secured Party hereby authorizes the Second Priority Representative to make any such endorsements as agent for the DIP Agent, Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable).    Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the DIP Obligations, the Third Priority Obligations and Fourth Priority Obligations purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

c)      With respect to each Type of Common Collateral, after the Second Priority Obligations Payment Date and prior to the DIP Termination Date, no Third Priority Secured Party or Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of the Third Priority Secured Obligations or Fourth Priority Secured Obligations in violation of Paragraph 7(a) or 7(b).    Any Common Collateral received by a Third Priority Secured Party or a Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the DIP Agent to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each Third Priority Secured Party and Fourth Priority Secured Party hereby authorizes the DIP Agent to make any such endorsements as agent for the Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable).    Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the Third Priority Obligations and Fourth Priority Obligations purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

d)      With respect to each Type of Common Collateral, after the DIP Termination Date and prior to the Third Priority Obligations Payment Date, no Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of

- 18 -

the Fourth Priority Secured Obligations in violation of Paragraph 7(a) or 7(b). Any Common Collateral received by a Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the Third Priority Representative to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each Fourth Priority Secured Party hereby authorizes the Third Priority Representative to make any such endorsements as agent for the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable).  Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the Fourth Priority Obligations purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

9.      *Turnover Provisions with respect to Additional Collateral.*

   a)      With respect to any Additional Collateral, until the occurrence of the DIP Termination Date, no First Lien Secured Party, Second Priority Secured Party, Third Priority Secured Party or Fourth Priority Secured Party may accept any such Additional Collateral, including any such Additional Collateral constituting proceeds, in satisfaction, in whole or in part, of the First Priority Secured Obligations, Second Priority Secured Obligations, Third Priority Secured Obligations or Fourth Priority Secured Obligations, as the case may be, in violation of Paragraph 7(c).  Any Additional Collateral received by a First Priority Secured Party, Second Priority Secured Party, Third Priority Secured Party or Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the DIP Agent to be applied in accordance with Paragraph 7(c), in the same form as received, with any necessary endorsements, and each First Priority Secured Party, each Second Priority Secured Party, each Third Priority Secured Party and each Fourth Priority Secured Party hereby authorizes the DIP Agent to make any such endorsements as agent for the First Priority Representative, the Second Priority Representative, the Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable).  Upon the turnover of such Additional Collateral as contemplated by the immediately preceding sentence, the First Priority Obligations, the Second Priority Obligations, the Third Priority Obligations or the Fourth Priority Obligations, as the case may be, purported to be satisfied by the payment of such Additional Collateral shall be immediately reinstated in full as though such payment had never occurred.

10.     *Bailee for Perfection.*

   a)      With respect to each Type of Common Collateral, each Representative hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over such Common Collateral pursuant to the First Priority Documents, such

- 19 -

possession or control is also for the benefit of each other Representative for the other applicable Secured Parties, but solely to the extent required to perfect their security interest by possession or control in such Common Collateral as a gratuitous bailee for the other Secured Parties (such bailment being intended, among other things, to satisfy the requirements of Section 8-l06(d)(3), 8-30l(a)(2) and 9-313(c) of the UCC).  Nothing in the preceding sentence shall be construed to impose any duty on the any such Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide any other Representative or any other Secured Party with respect to such Common Collateral with any rights with respect to such Common Collateral beyond those specified in the Interim Order, the Existing Intercreditor Agreement and the First Priority Documents, the Second Priority Documents, the DIP Documents, the Third Priority Documents or the Fourth Priority Documents, as the case may be, provided that with respect to each Type of Common Collateral, (i) promptly upon the First Priority Obligations Payment Date and prior to the Second Priority Obligations Payment Date, the First Priority Representative shall (x) deliver to the Second Priority Representative (and each Debtor hereby directs such First Priority Representative to so deliver and each of the Representatives (on behalf of itself and the other applicable Secured Parties),  consents to such delivery) any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the Second Priority Representative may reasonably request, all at the Debtors' sole cost and expense, (ii) promptly upon the Second Priority Obligations Payment Date and prior to the DIP Termination Date, the Second Priority Representative shall (x) deliver to the DIP Agent (and each Debtor hereby directs such Second Priority Representative to so deliver and each other Representative (on behalf of itself and the other Secured Parties) consents to such delivery), any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the DIP Agent may reasonably request, all at the Debtors' sole cost and expense, (iii) promptly upon the DIP Termination Date and prior to the Third Priority Obligations Payment Date, the DIP Agent shall (x) deliver to the Third Priority Representative (and each Debtor hereby directs such DIP Agent to so deliver and the Fourth Priority Representative (on behalf of itself and the other Fourth Priority Secured Parties) consents to such delivery), any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the Third Priority Representative may reasonably request, all at the Debtors' sole cost and expense and (iv) after the Third Priority Obligations Payment Date, the Third Priority Representative shall (x) to the extent any Fourth Priority Obligations

- 20 -

remain outstanding, deliver to the Fourth Priority Representative (and each Debtor hereby directs such Third Priority Representative to so deliver), any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the Fourth Priority Representative may reasonably request, all at the Debtors' sole cost and expense.

b)      With respect to Additional Collateral, the DIP Agent hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over such Additional Collateral pursuant to the DIP Documents, such possession or control is also for the benefit of the Prepetition Secured Parties, but solely to the extent required to perfect their security interest by possession or control in such Additional Collateral as a gratuitous bailee for the Prepetition Secured Parties (such bailment being intended, among other things, to satisfy the requirements of Section 8-l06(d)(3), 8-30l(a)(2) and 9-313(c) of the UCC).   Nothing in the preceding sentence shall be construed to impose any duty on the DIP Agent (or any third party acting on its behalf) with respect to such Additional Collateral or provide any Prepetition Secured Party with respect to such Additional Collateral with any rights with respect to such Additional Collateral beyond those specified in the Interim Order, provided that with respect to any Additional Collateral, after the DIP Termination Date, the DIP Agent shall (x) deliver to the First Priority Representative (for the benefit of all other Prepetition Secured Parties) (and each Debtor hereby directs the DIP Agent to so deliver and the First Priority Representative (on behalf of itself and the other First Priority Secured Parties), the Second Priority Representative (on behalf of itself and the other Second Priority Secured Parties),  the Third Priority Representative (on behalf of itself and the other Third Priority Secured Parties) and the Fourth Priority Representative (on behalf of itself and the other Fourth Priority Secured Parties) consent to such delivery) at the Debtors' sole cost and expense, any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Additional Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Additional Collateral as a court of competent jurisdiction otherwise directs.

c)      Paragraphs 10(a) and 10(b) are intended solely to effectuate the respective Lien priorities as between the Secured Parties and shall not impose on any Secured Party any obligations in respect of the disposition of any Common Collateral or Additional Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

d)      Other than as set forth in the provisos in Paragraphs 10(a) and 10(b), any Secured Party, with physical possession of or control over Common Collateral or Additional Collateral shall not have any duty or liability to protect or preserve any

- 21 -

rights pertaining to any of such Common Collateral or Additional Collateral, as applicable, and, except for gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction, each Secured Party hereby waives and releases such Person from all claims and liabilities arising pursuant to such Person's role as bailee with respect to such Common Collateral or Additional Collateral, as applicable.

11.  *Credit Bidding.*  Each Secured Party shall expressly have the right to bid or credit bid any of its Secured Obligations for or purchase the Additional Collateral or the Common Collateral at any public, private or judicial foreclosure or sale of any Additional Collateral or Common Collateral (including a "partial credit bid") or in an Insolvency Proceeding or otherwise; underline provided that (a) any such credit bid or partial credit bid of the DIP Obligations must provide for the payment in full in cash of the First Priority Obligations and the Second Priority Obligations on closing of any resulting disposition (to the extent then outstanding), (b) any such credit bid or partial credit bid of Third Priority Obligations must provide for the payment in full in cash of the First Priority Obligations, the Second Priority Obligations and the DIP Obligations on closing of any resulting disposition (in each case, to the extent then outstanding) and (c) any such credit bid or partial credit bid of Fourth Priority Obligations must provide for the payment in full in cash of the First Priority Obligations, the Second Priority Obligations, the DIP Obligations and the Third Priority Obligations on closing of any resulting disposition (in each case, to the extent then outstanding).

12.  *Access to Additional Collateral by ABL Agent.*

a)  If the ABL Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure), enforcement, collection or execution with respect to the ABL Priority Collateral ("**ABL Priority Collateral Enforcement Actions**") or if the DIP Agent commences any action or proceeding with respect to any of its rights or remedies (including, but not limited to, any action of foreclosure), enforcement, collection or execution with respect to the Additional Collateral and the DIP Agent (or a purchaser at a foreclosure sale conducted in foreclosure of the DIP Agent's Liens) takes actual or constructive possession of the Additional Collateral of any Grantor ("**Additional Collateral Enforcement Actions**"), then (1) if the ABL Agent has commenced an ABL Priority Collateral Enforcement Action, the ABL Agent shall furnish the DIP Agent with prompt written notice of the commencement of such action (the "**ABL Priority Collateral Enforcement Action**") and (2) in all cases, the DIP Agent shall (x) cooperate with the ABL Agent (and with its officers, employees, representatives and agents) in its efforts to conduct ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral and to finish any work-in-process and process, ship, produce, store, complete, supply, lease, sell or otherwise handle, deal with, assemble or dispose of, in any lawful manner, the ABL Priority Collateral, (y) not hinder or restrict in any respect the ABL Agent from conducting ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral or from finishing any work-in-process or processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling,

dealing with, assembling or disposing of, in any lawful manner, the ABL Priority Collateral and (z) permit the ABL Agent, its employees, agents, advisers and representatives, at the cost and expense of the ABL Secured Parties, to enter upon and use the Additional Collateral, for a period commencing on (I) the earlier of the date of the initial ABL Priority Collateral Enforcement Action or the date of delivery of the ABL Priority Collateral Enforcement Action Notice, as the case may be, and (II) ending on the earlier of the date occurring 120 days thereafter and the date on which all ABL Priority Collateral (other than ABL Priority Collateral abandoned by the ABL Agent in writing) has been sold or disposed of (such period, as the same may be extended with the written consent of the DIP Agent, the "**ABL Priority Collateral Processing and Sale Period**"),

provided, however, that nothing contained in this Agreement shall restrict the rights of the DIP Agent from selling, assigning or otherwise transferring any Additional Collateral prior to the expiration of such ABL Priority Collateral Processing and Sale Period if the purchaser, assignee or transferee thereof agrees in writing (for the benefit of the ABL Agent and the ABL Secured Parties) to be bound by the provisions of this Section 12. If any stay or other order prohibiting the exercise of remedies with respect to the ABL Priority Collateral has been entered by a court of competent jurisdiction, such ABL Priority Collateral Processing and Sale Period shall be tolled during the pendency of any such stay or other order.

b) During the period of actual occupation, use and/or control by the ABL Secured Parties and/or the ABL Agent (or their respective employees, agents, advisers and representatives) of any Additional Collateral, the ABL Secured Parties and the ABL Agent shall be obligated to repair at their expense any physical damage to such Additional Collateral resulting from such occupancy, use or control, and to leave such Additional Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the ABL Secured Parties or the ABL Agent have any liability to the DIP Secured Parties pursuant to this Section 12 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Additional Collateral existing prior to the date of the exercise by the ABL Secured Parties (or the ABL Agent, as the case may be) of their rights under this Section 12 and the ABL Secured Parties shall have no duty or liability to maintain the Additional Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Secured Parties, or for any diminution in the value of the Additional Collateral that results from ordinary wear and tear resulting from the use of the Additional Collateral by the ABL Secured Parties in the manner and for the time periods specified under this Section 12. Without limiting the rights granted in this Section 12, the ABL Secured Parties and the ABL Agent shall cooperate with the DIP Secured Parties in connection with any efforts made by the DIP Secured Parties to sell the Additional Collateral.

13.   *Access to Additional Collateral by DIP Agent or Term Loan Agent.*

NAI-1500444380v11

a)     If the DIP Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure), enforcement, collection or execution with respect to the Additional ABL Priority Collateral ("**Additional ABL Priority Collateral Enforcement Actions**") or if the Term Loan Agent commences any action or proceeding with respect to any of its rights or remedies (including, but not limited to, any action of foreclosure), enforcement, collection or execution with respect to the Additional Collateral and the Term Loan Agent (or a purchaser at a foreclosure sale conducted in foreclosure of the Term Loan Agent's Liens) takes actual or constructive possession of the Additional ABL Priority Collateral of any Grantor ("**Additional Collateral Enforcement Actions**"), then (1) if the DIP Agent has commenced a DIP Priority Collateral Enforcement Action, the DIP Agent shall furnish the Term Loan Agent with prompt written notice of the commencement of such action (the "**Additional ABL Priority Collateral Enforcement Action**") and (2) in all cases, the Term Loan Agent shall (x) cooperate with the ABL Agent (and with its officers, employees, representatives and agents) in its efforts to conduct Additional ABL Priority Collateral Enforcement Actions in the Additional ABL Priority Collateral and to finish any work-in-process and process, ship, produce, store, complete, supply, lease, sell or otherwise handle, deal with, assemble or dispose of, in any lawful manner, the Additional ABL Priority Collateral, (y) not hinder or restrict in any respect the DIP Agent from conducting Additional ABL Priority Collateral Enforcement Actions in the Additional ABL Priority Collateral or from finishing any work-in-process or processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the Additional ABL Priority Collateral and (z) permit the DIP Agent, its employees, agents, advisers and representatives, at the cost and expense of the DIP Secured Parties, to enter upon and use the Additional Collateral, for a period commencing on (I) the earlier of the date of the initial Additional ABL Priority Collateral Enforcement Action or the date of delivery of the Additional ABL Priority Collateral Enforcement Action Notice, as the case may be, and (II) ending on the earlier of the date occurring 120 days thereafter and the date on which all Additional ABL Priority Collateral (other than Additional ABL Priority Collateral abandoned by the DIP Agent in writing) has been sold or disposed of (such period, as the same may be extended with the written consent of the Term Loan Agent, the "**Additional ABL Priority Collateral Processing and Sale Period**"),

provided, however, that nothing contained in this Agreement shall restrict the rights of the Term Agent from selling, assigning or otherwise transferring any Term Priority Collateral prior to the expiration of such Additional ABL Priority Collateral Processing and Sale Period if the purchaser, assignee or transferee thereof agrees in writing (for the benefit of the DIP Agent and the DIP Secured Parties) to be bound by the provisions of this Section 12. If any stay or other order prohibiting the exercise of remedies with respect to the Additional ABL Priority Collateral has been entered by a court of competent jurisdiction, such Additional ABL Priority Collateral Processing and Sale Period shall be tolled during the pendency of any such stay or other order.

b)      During the period of actual occupation, use and/or control by the Additional ABL Secured Parties and/or the Term  Agent (or their respective employees, agents, advisers and representatives) of any Term Priority Collateral, the ABL Secured Parties and the ABL Agent shall be obligated to repair at their expense any physical damage to such Term Priority Collateral resulting from such occupancy, use or control, and to leave such Term Priority Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted.  Notwithstanding the foregoing, in no event shall the DIP Secured Parties or the Term Loan Agent have any liability to the Term Secured Parties pursuant to this Section 12 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Term Priority Collateral existing prior to the date of the exercise by the DIP Secured Parties (or the DIP Agent, as the case may be) of their rights under this Section 12 and the DIP Secured Parties shall have no duty or liability to maintain the Term Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the DIP Secured Parties, or for any diminution in the value of the Term Priority Collateral that results from ordinary wear and tear resulting from the use of the Term Priority Collateral by the DIP Secured Parties in the manner and for the time periods specified under this Section 12.

14.     In connection with any asset sale by a Debtor that includes both Common Collateral and Additional Collateral, the parties hereto will cooperate reasonably to allocate the consideration for such sale to the Common Collateral and the Additional Collateral.

15.     Upon the Adequate Protection Lien Termination Date with respect to the applicable Class, any adequate protection liens or adequate protection claims held by the applicable Class shall be deemed terminated, canceled and extinguished.

- 25 -

**Exhibit 2**

**Budget**

**The Great Atlantic and Pacific Tea Company**
**25-Week Cash Flow Model**
**($ in Millions)**

| | FY15 P6 | | | | FY15 P7 | | | | FY15 P8 | | | | FY15 P9 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period | Period 6 | Period 6 | Period 6 | Period 6 | Period 7 | Period 7 | Period 7 | Period 7 | Period 8 | Period 8 | Period 8 | Period 8 | Period 9 | |
| Actual/Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | 13 Weeks |
| Fiscal Week | Week 21 | Week 22 | Week 23 | Week 24 | Week 25 | Week 26 | Week 27 | Week 28 | Week 29 | Week 30 | Week 31 | Week 32 | Week 33 | Through |
| Week Ending | 25-Jul | 1-Aug | 8-Aug | 15-Aug | 22-Aug | 29-Aug | 5-Sep | 12-Sep | 19-Sep | 26-Sep | 3-Oct | 10-Oct | 17-Oct | 17-Oct |
| Forecast Week | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 Tier 1 Auction | Week 10 | Week 11 Tier 1 Sale | Week 12 | Week 13 | |
| **BX Filing** | | | | | | | | | | | | | | |
| Memo: Store Merch Sales Comp | -11.8% | -10.3% | -10.4% | -10.7% | -10.5% | -10.5% | -11.8% | -6.9% | -11.0% | -11.4% | -11.4% | -11.7% | -11.4% | -10.8% |
| Memo: Store Count | 296 | 296 | 296 | 295 | 295 | 295 | 270 | 270 | 270 | 270 | 270 | 252 | 234 | 234 |
| Operating Receipts | 94.9 | 98.7 | 102.2 | 100.8 | 96.8 | 97.5 | 97.1 | 97.0 | 92.0 | 89.2 | 91.9 | 86.8 | 76.0 | 1,322.5 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Merchandise Payments (C&S and DSD/Other Merch.) | 69.9 | 70.4 | 64.9 | 61.9 | 63.5 | 67.6 | 67.7 | 62.2 | 62.8 | 65.7 | 65.7 | 58.2 | 49.1 | 901.4 |
| Payroll/Benefits | 22.0 | 14.9 | 16.0 | 19.6 | 20.3 | 14.7 | 17.3 | 12.8 | 19.6 | 17.6 | 17.7 | 12.5 | 18.0 | 242.7 |
| Other Operating Expenses | 15.1 | 25.3 | 8.6 | 8.6 | 11.0 | 12.7 | 23.3 | 8.2 | 8.0 | 15.7 | 12.7 | 5.5 | 5.1 | 168.4 |
| Subtotal | 107.0 | 110.5 | 89.6 | 90.1 | 94.8 | 95.0 | 108.3 | 83.2 | 90.4 | 99.1 | 96.1 | 76.1 | 72.2 | 1,312.5 |
| **Operating Cash Flow** | **(12.1)** | **(11.9)** | **12.7** | **10.7** | **1.9** | **2.5** | **(11.1)** | **13.8** | **1.6** | **(9.9)** | **(4.2)** | **10.6** | **3.8** | **9.9** |
| **Non-Operating & Ch. 11 Disbursements/(Receipts)** | | | | | | | | | | | | | | |
| Maintenance Capital Expenditures | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.5 | 9.0 |
| Interest /Fees | 1.3 | 2.3 | 0.1 | - | 1.3 | - | 6.7 | - | - | - | 3.8 | - | - | 15.9 |
| Asset Sales/Other Proceeds | - | - | - | (5.9) | - | - | (8.9) | (0.9) | - | - | - | (213.1) | (119.9) | (350.4) |
| Professional Fees | 2.2 | 0.2 | - | - | - | 1.0 | 0.2 | - | - | - | 6.4 | 5.2 | - | 23.8 |
| Other Non-Operating and Ch. 11 Disbursements | 15.0 | 3.9 | 0.1 | 0.6 | 0.1 | 0.7 | 13.4 | - | - | 0.6 | 6.2 | 4.3 | 4.2 | 50.7 |
| Subtotal | 19.2 | 7.2 | 0.9 | (4.6) | 3.0 | 5.8 | 12.0 | (0.3) | 0.6 | 0.6 | 17.0 | (203.1) | (115.2) | (251.1) |
| **Net Cash Flow** | **(31.2)** | **(19.1)** | **11.8** | **15.3** | **(1.0)** | **(3.3)** | **(23.2)** | **14.1** | **1.0** | **(10.5)** | **(21.2)** | **213.7** | **119.0** | **261.1** |
| **Beginning Cash Balance - Bank** | **36.6** | **54.8** | **45.7** | **45.7** | **62.2** | **98.2** | **90.8** | **79.3** | **82.6** | **84.7** | **74.7** | **55.9** | **83.3** | **36.4** |
| Net Cash Flow | (31.2) | (19.1) | 11.8 | 15.3 | (1.0) | (3.3) | (23.2) | 14.1 | 1.0 | (10.5) | (21.2) | 213.7 | 119.0 | 261.1 |
| Pre petition Debt Borrowings/(Repayments & LC Cash Collateralization) | - | - | - | - | (12.8) | (3.5) | - | - | - | - | - | (182.9) | (119.9) | (319.0) |
| DIP Draw/(Repayment) | 50.0 | - | - | - | 50.0 | - | - | - | - | - | - | - | - | 100.0 |
| Store Cash Reclass to Bank Cash | - | - | - | 0.0 | - | - | 1.7 | - | - | - | - | 2.4 | 2.0 | 6.2 |
| Change in Float | (0.5) | 9.9 | (11.8) | 1.3 | (0.3) | (0.5) | 9.9 | (10.7) | 1.1 | 0.4 | 2.4 | (5.9) | 0.2 | (0.1) |
| **Ending Available Cash Balance - Bank** | **54.8** | **45.7** | **45.7** | **62.2** | **98.2** | **90.8** | **79.3** | **82.6** | **84.7** | **74.7** | **55.9** | **83.3** | **84.6** | **84.6** |
| Less: Check Float | 12.5 | 22.4 | 10.6 | 11.9 | 11.6 | 11.0 | 21.0 | 10.2 | 11.4 | 11.8 | 14.2 | 8.3 | 8.5 | 8.5 |
| **Ending Available Cash Balance - Book** | **42.4** | **23.3** | **35.1** | **50.4** | **86.6** | **79.8** | **58.3** | **72.4** | **73.4** | **62.9** | **41.7** | **75.0** | **76.1** | **76.1** |

**<u>Exhibit 3</u>**

**2012 Confirmation Order Excerpts**

WEIL:\95410057\1\50482.0004

114.    In accordance with the terms of Article IV.J of the Plan, the Reorganized Debtors and/or NewCo shall authorize, issue and distribute, pursuant to the Plan and the Securities Purchase Agreements, the New Second Lien Notes, the New Convertible Third Lien Notes, the NewCo Equity, the Investment Warrants, the new common stock of Reorganized A&P and any other Securities to be authorized, issued and distributed pursuant to the Plan and Securities Purchase Agreements, and the Debtors and the Reorganized Debtors as the case may be shall be authorized to execute and deliver all documentation related thereto.   Upon execution and delivery by the Debtors or Reorganized Debtors, as applicable, of the foregoing documents, or issuance of the Securities related thereto, as the case may be, such documents and Securities shall be deemed validly executed and delivered and deemed to constitute valid, binding and enforceable agreements and obligations of the Reorganized Debtors and are not in conflict with any applicable laws.   Upon issuance, the NewCo Equity and the new common stock of Reorganized A&P issued to NewCo, including without limitation, any capital stock of Reorganized A&P or NewCo shall be deemed pursuant to this Order, duly authorized, validly

53

issued, fully paid and non-assessable under all applicable laws. In addition, any capital stock issued pursuant to, including by way of conversion or exercise, the Investment Warrants, the New Second Lien Notes, the New Convertible Third Lien Notes, and any documents related thereto, are hereby deemed duly authorized, and, upon issuance, are deemed validly issued, fully-paid and non-assessable under all applicable laws.

115.    The Liens contemplated by and related to the New Second Lien Notes and the New Convertible Third Lien Notes, are valid, binding and enforceable Liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the New Second Lien Notes and the New Convertible Third Lien Notes. The guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to or in connection with the New Second Lien Notes and the New Convertible Third Lien Notes, are granted in good faith as an inducement to the holders of such notes to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth in the intercreditor agreements and other definitive documentation executed in connection with the New Second Lien Notes and the New Convertible Third Lien Notes.

K&E 21784620

117.    Any provision in any of the Debtors' leases that purports to require the consent of the lessor thereunder in order for the applicable loan party to mortgage, pledge or collaterally assign such leases (or to restrict, prohibit or void any such mortgage, pledge or collateral assignment) is hereby (and as additionally set forth in paragraph 112 of this Confirmation Order) invalidated for the sole and limited purpose of allowing the Debtors' leasehold interests to be included in the collateral security of the New Second Lien Notes and New Convertible Third Lien Notes. The collateral agent for the New Second Lien Notes and New Convertible Third Lien Notes shall be granted Liens on the collateral, including all of the Debtors' leasehold interests, which Liens shall be deemed perfected and effective as of the Effective Date (collectively, the "***Second Lien Pledge***" or the "***Convertible Third Lien Pledge***," respectively). For the avoidance of doubt, (i) it is expressly understood that, other than with respect to the Second Lien Pledge and the Convertible Third Lien Pledge, nothing herein or in the Plan shall broaden or limit any rights of the collateral agent or holders of the New Second Lien Notes or the New Convertible Third Lien Notes (in each case, whether arising under the applicable leases or applicable law, including, but not limited to and solely by way of example, any right to cure defaults, exercise remedies or compel delivery of notices from lessors) or of the lessors, in each case with respect to the Debtors' leasehold interests and (ii) to the extent any lessor under any of the Debtors' leases has not objected to the relief set forth herein or has withdrawn its objection or indicated its assent on the record at the Confirmation Hearing, such lessor shall be deemed to have consented to the Second Lien Pledge and the Convertible Third Lien Pledge (as described above and including clause (i)).

55

**<u>Exhibit B</u>**

**Blackline of Amended Interim DIP Order**

WEIL:\95410048\1\50482.0004

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ————————————————x | |
| In re : | Chapter 11 |
| : | |
| THE GREAT ATLANTIC & PACIFIC TEA : | |
| COMPANY, INC., *et al.*, : | Case No. 15-23007 (RDD) |
| : | |
| Debtors.[1] : | (Jointly Administered) |
| ————————————————x | |

**AMENDED INTERIM ORDER AUTHORIZING DEBTORS TO**
**(A) OBTAIN THIRD LIEN POSTPETITION FINANCING PURSUANT TO**
**11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND**
**364(e), (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2),**
**(C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES**
**PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A FINAL**
**FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

Upon the motion (the "**Motion**")[2] of The Great Atlantic & Pacific Tea

Company, Inc. ("**A&P**") and certain of its affiliates and subsidiaries, as debtors and debtors in

possession (collectively, the "**Debtors**"), in the above captioned chapter 11 cases (the

"**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et

seq. (as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal

Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), and Rule 4001–2 of

the Local Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

Rules (the "**Local Rules**") for the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), seeking, among other things:

I        <u>Third Lien Postpetition Financing</u>

A.     authorization of the Debtors to obtain $100,000,000 in secured third priority postpetition financing (the "**Junior Lien DIP Facility**"), pursuant to that certain Senior Secured Debtor-in-Possession Term Credit Agreement, substantially in the form annexed to the Motion as **Exhibit "C,"** (as such agreement may be amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**" and, together with any exhibits attached thereto and other agreements related thereto, including, without limitation, all notices, all guarantees, all security agreements, all related or ancillary documents and agreements, and any mortgages contemplated thereby, the "**DIP Documents**"), by and among A&P (in such capacity, the "**Borrower**"), each of the other Debtors (other than Kwik Save Inc.), as guarantors, Fortress Credit Corp., as administrative agent (in such capacity, the "**DIP Agent**"), and Fortress Credit Corp., or one or more of its designated affiliates or other lender parties thereto from time to time, as lenders (in its/their capacity as such, the "**DIP Lenders**");

B.     authorization of the Debtors that are guarantors under the DIP Credit Agreement (together with the Borrower, the "**DIP Loan Parties**"), to guarantee A&P's obligations on a third lien secured basis in respect of the Junior Lien DIP Facility;

C.     authorization of the Debtors to execute and enter into the DIP Documents and to perform all other and further acts as may be necessary or appropriate in connection with the same;

D.     authorization of the Debtors to use $50 million of the Junior Lien DIP Facility upon entry of this interim order (the "**Interim Order**") to avoid immediate and irreparable harm;

2

E.    approval of the intercreditor arrangements (the "**Intercreditor Arrangements**") substantially in the form annexed to this Interim Order as **Exhibit "1"** with respect to the (i) Common Collateral (for the purposes of this Interim Order, "**Common Collateral**" shall mean "Collateral" as such term is defined in the Prepetition Term Loan Agreement Security Agreement, the Prepetition ABL Security Agreement, the Prepetition PIK Notes Indenture and the Prepetition Convertible Notes Indenture (in each case excluding any Additional Collateral)), and (ii) Additional Collateral (as defined in the Intercreditor Arrangements, which, for the avoidance of doubt includes, without limitation, the Additional Collateral Account (as defined in the DIP Credit Agreement));

F.    authorization of the Debtors to grant security interests, liens, and superpriority claims (including, as applicable, superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code), solely to the extent set forth in this Interim Order, to the DIP Agent, for the benefit of itself and the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the Junior Lien DIP Facility in the order of priority and as provided in the DIP Orders;

G.    authorization of the Debtors to use proceeds of the Junior Lien DIP Facility and Cash Collateral (as defined below) in accordance with, and for the purposes and in the amounts set forth in, the Budget (as defined below) and to make the Adequate Protection Payments;

II    Interim Use of Cash Collateral

A.    authorization of the Debtors to (i) use Cash Collateral pursuant to sections

361, 362 and 363 of the Bankruptcy Code, in accordance with the Budget; and (ii) provide

adequate protection on the terms set forth in this Interim Order to (w) the Prepetition ABL

3

Secured Parties, (x) the Prepetition Term Loan Secured Parties, (y) the Prepetition PIK Notes

Secured Parties, and (z) the Prepetition Convertible Notes Secured Parties (each capitalized

term in clauses (w), (x), (y) and (z), as defined in Paragraph 5 and, collectively, the

"**Prepetition Secured Parties**");

      III     <u>Certain Modifications and Waivers</u>

      A.     modification of the automatic stay set forth in section 362 of

the Bankruptcy Code on the terms and conditions set forth herein to the extent

necessary to implement and effectuate the terms of the DIP Documents and the DIP

Orders;

      B.     waiver of any applicable stay with respect to the effectiveness

and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

      IV     <u>Final Hearing</u>

      A.     the scheduling of a final hearing (the "**Final Hearing**"), pursuant to

Bankruptcy Rule 4001 and Local Rule 4001–2, to be held at least fourteen (14) days after

entry of this Interim Order to consider entry of an order granting the relief requested in the

Motion on a final basis (the "**Final Order**" and, together with the Interim Order, the "**DIP**

**Orders**");

      The interim hearing on the Motion having been held on July 20, 2015 (the

"**Interim Hearing**"); and based upon all of the pleadings and declarations filed with the

Bankruptcy Court, the evidence presented at the Interim Hearing and the entire record of the

Chapter 11 Cases; and there being no objections to the relief sought in the Motion that have

not previously been withdrawn, waived, settled, or resolved; and the Bankruptcy Court having

noted the appearance of all parties in interest; and it appearing that the relief requested in the

Motion and granted herein is in the best interests of the Debtors and the Debtors' estates and

creditors; and the Debtors having provided notice of the interim relief sought in the Motion

and the Interim Hearing as set forth in the Motion, and it appearing that no further or other

notice of such request

for relief need be given; and after due deliberation and consideration, and sufficient

cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED,**[3] that:

1.      <u>Approval of Motion.</u> The Motion is approved on an interim basis on

the terms and conditions set forth in this Interim Order. This Interim Order shall become

effective immediately upon its entry. To the extent the terms of the DIP Documents differ in

any respect from the terms of this Interim Order, this Interim Order shall control.

2.      <u>Jurisdiction and Venue.</u> The Bankruptcy Court has core jurisdiction

over the Chapter 11 Cases, commenced on July 19, 2015 (the "**Commencement Date**"), the

Motion and the parties affected by the Motion, and the Debtors' property pursuant to 28

U.S.C.

§§ 157(a)-(b) and 1334(b). Venue is proper before the Bankruptcy Court pursuant to 28

U.S.C. §§ 1408 and 1409.

3.      <u>Notice.</u> Notice of the Motion has been provided to (i) the Office of the

United States Trustee for Region 2 (the "**U.S. Trustee**"); (ii) the holders of the five (5) largest

secured claims against the Debtors (on a consolidated basis) that are not otherwise Notice

Parties hereunder; (iii) the holders of the forty (40) largest unsecured claims against the

Debtors (on a consolidated basis); (iv) the attorneys for the DIP Agent; (v) the attorneys for

Wells Fargo Bank, National Association ("**Wells Fargo**"), as agent under that Prepetition ABL

Agreement (as defined below); (vi) the attorneys for Wells Fargo, as agent under that

Prepetition Term Loan Agreement (as defined below); (vii) the Prepetition PIK Notes Trustee

(as defined below); (viii) the attorneys for the Prepetition PIK Notes Trustee; (ix) the

Prepetition Convertible Notes

---

[3]  The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

Trustee (as defined below); (x) the attorneys for the Prepetition Convertible Notes Trustee; (xi) the attorneys for the holders of a majority of the Prepetition PIK Notes (as defined below) (the "**Majority Holders of Prepetition PIK Notes**"); (xii) the attorneys for the holders of a majority of the Prepetition Convertible Notes (as defined below) (the "**Majority Holders of Prepetition Convertible Notes**"); (xiii) the attorneys for The Yucaipa Companies, LLC and their affiliated funds; (xiv) the attorneys for The United Food and Commercial Workers (UFCW) International; (xv) the attorneys for C&S Wholesale Grocers, Inc.; (xvi) the Securities and Exchange Commission; (xvii) the Internal Revenue Service; and (xviii) the United States Attorney's Office for the Southern District of New York (collectively, the "**Notice Parties**"). Under the circumstances, the notice given by the Debtors of the interim relief requested in the Motion and of the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and 9014, and Local Rule 4001–2, and no further notice of the relief sought at the Interim Hearing is necessary or required.

    4. <u>Creditors Committee Formation.</u> No statutory committee of unsecured creditors has yet been appointed in any of these Chapter 11 Cases (a "**Creditors' Committee**").

    5. <u>Debtors' Stipulations.</u> Subject to Paragraph 6(b) below, the Debtors admit, stipulate, and agree that:

      (a) *Prepetition Indebtedness.* As of the Commencement Date, the Debtors were unconditionally indebted and liable under the (i) Prepetition ABL Facility, (ii) Prepetition Term Loan Facility, (iii) Prepetition PIK Notes, and (iv) Prepetition Convertible Notes, as follows (each of the foregoing as defined herein):

        (i) *Prepetition ABL Facility.* Pursuant to that certain Amended and Restated Senior Secured Revolving Credit Agreement (as

amended,

supplemented, or otherwise modified prior to the Commencement Date, the

"**Prepetition ABL Credit Agreement**"), dated as of September 17, 2014,

among Wells Fargo, as agent (in such capacity, the "**Prepetition ABL Agent**"),

letter of credit issuer and swing line lender, for itself and a syndicate of financial

institutions and other institutional lenders (collectively, the "**Prepetition ABL**

**Lenders**" and, together with the Prepetition ABL Agent, and each "Credit

Party" (as defined in the Prepetition ABL Credit Agreement), the "**Prepetition**

**ABL Secured Parties**"), and A&P, as lead borrower, together with its

subsidiaries as co-borrowers, and Montvale-Para Holdings Inc. ("**Montvale**"")

and Montvale Holdings, Inc. as guarantors, the Prepetition ABL Secured Parties

extended an asset-based revolving credit facility in an amount of up to $300

million (the "**Prepetition ABL Facility**"), subject to a borrowing base formula.

As of the Commencement Date, the Debtors (other than Kwik Save Inc.) are

liable to the Prepetition ABL Secured Parties, without objection, defense,

counterclaim or offset of any kind, in the aggregate amount of letters of credit

issued and outstanding of $198,063,821.21, pursuant to the Prepetition ABL

Credit Agreement, plus unliquidated and other amounts including, without

limitation, interest and letter of credit fees (in each case at the Default Rate)

thereon and fees, expenses, charges and other obligations incurred in connection

therewith as and to the extent chargeable or reimbursable under the Prepetition

ABL Credit Agreement (the "**Prepetition ABL Obligations**"). The Prepetition

ABL Obligations are unconditionally due and owing by the Debtors, on a joint

and several basis, to the Prepetition ABL Secured Parties, and are not subject to

any

avoidance, reduction, recharacterization, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or offset, or any other challenges under the Bankruptcy Code or any applicable non-bankruptcy law or regulation by any person or entity of any kind.

(ii) *Prepetition Term Loan Facility*. Pursuant to that certain Amended and Restated Senior Secured Term Credit Agreement (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition Term Loan Agreement**"), dated as of September 17, 2014, among Wells Fargo as agent (in such capacity, the "**Prepetition Term Loan Agent**" and, together with the Prepetition ABL Agents, the "**Prepetition Senior Agents**"), for itself and a syndicate of banks, financial institutions and other institutional lenders (collectively, the "**Prepetition Term Loan Lenders**" and, together with the Prepetition Term Loan Agent (on behalf of itself and on behalf of the Prepetition Term Loan Lenders), the "**Prepetition Term Loan Secured Parties**"), A&P, as borrower, together with its subsidiaries and Montvale, as guarantors, the Prepetition Term Loan Lenders provided the Debtors with $270 million in total loans (the "**Prepetition Term Loan Facility**") (other than Kwik Save Inc.). As of the Commencement Date, the Debtors are liable to the Prepetition Term Loan Lenders, without objection, defense, counterclaim or offset of any kind, in the aggregate amount of approximately $262,500,000 million, in respect of advances made, accrued and unpaid interest thereon, and fees and expenses, charges and other obligations to the extent chargeable or reimbursable under the Prepetition

Term Loan Agreement and related documents as of the Commencement Date, plus unliquidated and other amounts including, without limitation, interest (accruing at the default rate under the Prepetition Loan Agreement) thereon and fees (including, without limitation, any prepayment fee and the other fees set forth in Sections 2.09(a) and 2.09(b) of the Prepetition Term Loan Agreement), expenses, charges and other obligations incurred in connection therewith as provided under the Prepetition Term Loan Agreement (the "**Prepetition Term Loan Obligations**"). The Prepetition Term Loan Obligations are unconditionally due and owing by the Debtors, on a joint and several basis, to the Prepetition Term Loan Secured Parties, and are not subject to any avoidance, reduction, recharacterization, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or offset, or any other challenges under the Bankruptcy Code or any applicable non-bankruptcy law or regulation by any person or entity of any kind.

(iii) *Prepetition PIK Notes*. Pursuant to that certain Indenture, dated as of March 13, 2012 (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition PIK Notes Indenture**," and together with all other agreements, documents, notes, mortgages, security agreements, pledges, guarantees or instruments delivered pursuant thereto or in connection therewith (other than the Existing Intercreditor Agreement), each as may have been amended, modified or supplemented prior to the Commencement Date, the "**Prepetition PIK Notes Documents**"), between Montvale and U.S. Bank National Association, as trustee and collateral agent (in such capacity, the

"**Prepetition PIK Notes Trustee**"), Montvale issued Senior Secured PIK Toggle Notes due 2017 (the "**Prepetition PIK Notes**") in the aggregate principal amount of $215 million to the holders of the Prepetition PIK Notes (such holders, together with the Prepetition PIK Notes Trustee, on behalf of itself and on behalf of the holders of the Prepetition PIK Notes, the "**Prepetition PIK Notes Secured Parties**"). The Debtors (other than Kwik Save Inc.) guaranteed Montvale's obligations under the Prepetition PIK Notes. As of the Commencement Date, the outstanding face amount of the Prepetition PIK Notes, exclusive of interest, was $215 million, plus unliquidated and other amounts, including, without limitation, interest fees, expenses, charges and other obligations to the extent chargeable or reimbursable under the Prepetition PIK Notes Documents (collectively, the "**Prepetition PIK Notes Obligations**"), all of which amounts are unconditionally due and owing by the Debtors, on a joint and several basis, to the Prepetition PIK Notes Secured Parties, and are not subject to any avoidance, reduction, recharacterization, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or offset, or any other challenges under the Bankruptcy Code or any applicable non-bankruptcy law or regulation by any person or entity of any kind.

(iv) *Prepetition Convertible Notes*. Pursuant to that certain Indenture, dated as of March 13, 2012 (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition Convertible Notes Indenture**," and together with all other agreements, documents, notes, mortgages, security agreements, pledges, guarantees or instruments delivered

pursuant thereto

or in connection therewith (other than the Existing Intercreditor Agreement), each as may have been amended, modified or supplemented prior to the Commencement Date, the "**Prepetition Convertible Notes Documents**," and together with the Existing Intercreditor Agreement, the Prepetition PIK Notes Documents, the Prepetition ABL Credit Agreement, the Prepetition Term Loan Agreement and all security, pledge and guaranty agreements and all other documentation executed, filed, recorded and/or delivered in connection with any of the foregoing, each as may have been amended, supplemented, or otherwise modified from time to time prior to the Commencement Date, the "**Prepetition Financing Documents**"), between Montvale and U.S. Bank National Association, as trustee and collateral agent (in such capacity, the "**Prepetition Convertible Notes Trustee**" and, together with the Prepetition PIK Notes Trustee, the "**Prepetition Indenture Trustees**"), Montvale issued Senior Secured Convertible Notes (the "**Prepetition Convertible Notes**") in the aggregate principal amount of $250 million to the holders of the Prepetition Convertible Notes (such holders, together with the Prepetition Convertible Notes Trustee (on behalf of itself and on behalf of the holders of the Prepetition Convertible Notes), the "**Prepetition Convertible Notes Secured Parties**"). The Debtors (other than Kwik Save Inc.) guarantee Montvale's obligations under the Prepetition Convertible Notes. As of the Commencement Date, the outstanding face amount of the Prepetition Convertible Notes, exclusive of interest, was $250 million, plus unliquidated and other amounts, including, without limitation, interest, fees, expenses, charges and other obligations to the extent chargeable or reimbursable under the Prepetition

Convertible Notes Documents (collectively, the "**Prepetition Convertible Notes Obligations,**" and together with the Prepetition ABL Obligations, the Prepetition Term Loan Obligations, and the Prepetition PIK Notes Obligations, the "**Prepetition Obligations**"), all of which amounts are unconditionally due and owing by the Debtors on a joint and several basis to the Prepetition Convertible Notes Secured Parties, and are not subject to any avoidance, reduction, recharacterization, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, objection, defense, counterclaim, cross-claims, set-off or offset, or any other challenges under the Bankruptcy Code or any applicable non-bankruptcy law or regulation by any person or entity of any kind.

(b)      *Prepetition Liens and Collateral*. Prior to the Commencement Date, the Debtors granted to the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders), the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders), the Prepetition PIK Notes Trustee (on behalf of the Prepetition PIK Notes Secured Parties) and the Prepetition Convertible Notes Trustee (on behalf of the Prepetition Convertible Notes Secured Parties), liens upon and security interests, as follows:

(i)      *Prepetition ABL Facility*. Pursuant to that certain Amended and Restated Security Agreement, dated as of September 17, 2014 (as amended, supplemented, or otherwise modified prior to the Commencement Date, the "**Prepetition ABL Security Agreement**"), and the other "Security Documents" (as defined in the Prepetition ABL Credit Agreement), each as amended and in effect as of the Commencement Date, together with all other agreements, documents, recordings, filings and/or, instruments executed,

recorded, filed, and/or delivered in connection therewith, the Debtors granted

to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL

Lenders, a first-priority lien on the ABL Priority Collateral and a second-

priority lien on the Term Priority Collateral (the "**Prepetition ABL Liens**");

(ii)    *Prepetition Term Loan Facility.* Pursuant to that certain

Amended and Restated Security Agreement, dated as of September 17, 2014 (as

amended, supplemented, or otherwise modified prior to the Commencement

Date, the "**Prepetition Term Loan Security Agreement**"), and the other

"Security Documents" (as defined in the Prepetition Term Loan Facility, each as

amended and in effect as of the Commencement Date, together with all other

agreements, documents, recordings, filings and/or instruments executed,

recorded, filed and/or delivered in connection therewith), the Debtors granted to

the Prepetition Term Loan Agent and other "Credit Parties" (as such term is

defined in the Prepetition Term Loan Agreement) a first-priority lien on the

Term Priority Collateral and a second-priority lien on the ABL Priority

Collateral (the "**Prepetition Term Liens**");

(iii) *Prepetition PIK Notes.* Pursuant to the terms of the

Prepetition PIK Notes Documents, including that certain Security Agreement,

dated as of March 13, 2012, the Debtors granted the Prepetition PIK Notes

Secured Parties a lien, (the "**Prepetition PIK Notes Liens**") on all Collateral

(as defined in the Prepetition PIK Notes Indenture, in each case subject to the

terms of the Existing Intercreditor Agreement; and

(iv) *Prepetition Convertible Notes*. Pursuant to the terms of the Prepetition Convertible Notes Documents, including that certain Security Agreement, dated as of March 13, 2012, the Debtors granted the Prepetition Convertible Notes Secured Parties a lien (the "**Prepetition Convertible Notes Liens**," and together with the Prepetition ABL Liens, the Prepetition Term Liens, and the Prepetition PIK Notes Liens, the "**Prepetition Liens**") on all Collateral (as defined in the Prepetition Convertible Notes Indenture), in each case subject to the terms of the Existing Intercreditor Agreement.

(c)      The Prepetition PIK Notes and the Prepetition Convertible Notes were incurred pursuant to the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated February 17, 2012 (the "**2012 Plan**"), filed in the prior chapter 11 cases of the Debtors commenced on December 12, 2010 and jointly administered in the Bankruptcy Court (Case No. 10–24549) (the "**2012 Reorganization**"). The 2012 Plan was confirmed by order of the Bankruptcy Court in the 2012 Reorganization pursuant to *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Court*, entered on February 28, 2012 (the "**2012 Confirmation Order**") (Case No. 10-24549; ECF No 3477). The 2012 Confirmation Order further ordered the following:[4]

(i)      pursuant to paragraph 114 thereof, upon execution of the relevant documentation and issuance thereof, the Prepetition PIK Notes and Prepetition Convertible Notes were "deemed to constitute valid, binding and enforceable agreements and obligations of the Reorganized Debtors and are not in conflict with any applicable laws.";

[4] The referenced paragraphs of the 2012 Confirmation Order are annexed hereto as **Exhibit "3."**

(ii)    pursuant to paragraph 115 thereof, that "[t]he Liens contemplated by and related to the [Prepetition PIK Notes] and the [Prepetition Convertible Notes], are valid, binding and enforceable Liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the [Prepetition PIK Notes] and the [Prepetition Convertible Notes]. The guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to or in connection with the [Prepetition PIK Notes] and the [Prepetition Convertible Notes], are granted in good faith as an inducement to the holders of such notes to extend credit thereunder and shall be, and hereby are, deemed not to constitute fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth in the intercreditor agreements and other definitive documentation executed in connection with the [Prepetition PIK Notes] and the [Prepetition Convertible Notes]."; and

(iii)    pursuant to paragraph 117 thereof, that "[t]he collateral agent for the [Prepetition PIK Notes] and the [Prepetition Convertible Notes] shall be granted Liens on the collateral, including all of the Debtors' leasehold interests, which Liens shall be deemed perfected and effective as of the Effective Date."

(d)    The Prepetition Obligations constitute the legal, valid, binding, unavoidable and enforceable obligations of the Debtors, and are not and shall not be subject to any challenge or defense, including, without limitation, avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined by section 101(5) of

the Bankruptcy Code, of any kind pursuant to the Bankruptcy Code or under any applicable non-bankruptcy law, regulation or otherwise by any person or entity (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act).

(e)    The Prepetition Liens are legal, valid, binding, perfected, unavoidable and enforceable liens upon and security interests in the Common Collateral, and are not and shall not be subject to any attachment, contest, attack, rejection, recoupment, reduction, defense, setoff, offset, recharacterization, avoidance or other claim, impairment, disallowance, subordination, cause of action or any other challenge or defense of any nature under the Bankruptcy Code (including, without limitation, under chapter 5 of the Bankruptcy Code), or under any applicable nonbankruptcy law, regulation or otherwise by any person or entity (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act).

(f)    Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, any and all cash released as a result of the termination and/or cancellation of any letters of credit issued for the benefit of Debtors that have been or may be cash collateralized prior to or after the Commencement Date, any amounts generated by the collection of accounts receivable or other disposition of Common Collateral and the proceeds and products of each of the foregoing, is the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("**Cash Collateral**"); provided, that, until such time as the Junior Lien DIP Facility shall have been Paid in Full, Cash Collateral shall not include (i) any proceeds or products of Additional Collateral,

(ii) cash or cash equivalents deposited or maintained in the Additional Collateral Account, and

(iii) the Additional Collateral Account.

(g)      The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(c) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Common Collateral, including, without limitation, the Cash Collateral, to the extent of any diminution in the value of such interests, as a result of (i) the incurrence of the DIP Obligations (as defined below), (ii) the use of Cash Collateral as set forth in this Interim Order, (iii) the granting of the DIP Liens and DIP Superpriority Claims, (iv) the subordination of the Prepetition Obligations to the Carve Out (as defined below), (v) the subordination of the Prepetition PIK Notes Obligations and the Prepetition Convertible Notes Obligations to the DIP Obligations, (vi) any other diminution in the value of the Common Collateral arising from the Debtors' use, sale or disposition of Common Collateral (or the proceeds thereof), and (vii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "**Diminution in Value**").

(h)      None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, in their respective capacities as such, is a control person or insider of any of the Debtors by virtue of any action taken or omission to act by any of them in respect of or in connection with the DIP Documents, the Prepetition Financing Documents, or this Interim Order.

6.      <u>Effect of Stipulations on Third Parties.</u>

(a)      Subject to Paragraph 6(b), each stipulation, admission, waiver and agreement contained in this Interim Order, including, without limitation, the Debtors' stipulations in Paragraph 5 hereof, shall be binding upon the applicable Debtors, their respective estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes,

and the Debtors are deemed to have irrevocably waived and relinquished all Challenges

(as defined below) as of the Commencement Date.

    (b)    The stipulations and admissions contained in this Interim Order,

including, without limitation, in Paragraph 5 hereof (collectively, the "**Debtors' Stipulations**"),

shall be irrevocably binding on all other parties in interest and the Debtors' estates, including,

without limitation, the Creditors' Committee and any subsequently appointed trustee or other

estate representative, unless, and solely to the extent that: (x) the Creditors' Committee, any

subsequent chapter 7 trustee or any other party in interest that is granted standing and requisite

authority by the Bankruptcy Court (it being understood that nothing in this Interim Order vests

or confers on any person (as defined in the Bankruptcy Code), any such standing or authority)

has timely commenced and properly filed an appropriate contested matter or adversary

proceeding (a "**Challenge**") challenging any of the Debtors' Stipulations, including, without

limitation, those related to the amount, validity, enforceability, perfection or priority of all or

any portion of the Prepetition Obligations, the Prepetition Liens or the Prepetition Financing

Documents no later than the latest to occur of (A) seventy five (75) days after the

Commencement Date and (B) such date as ordered by the Bankruptcy Court for good cause

shown (provided that the request for extension is made before the expiration of the period set

forth in clause (A) above); and (y) a court of competent jurisdiction rules in a Final Court

Order (as defined below) in favor of the plaintiff in any such timely filed Challenge (a

"**Successful Challenge**"). If and to the extent that no such Challenge is timely commenced or if

such a Challenge is timely commenced but is not ultimately a Successful Challenge, then,

without further order of the Bankruptcy Court, (i) any and all such Challenges by any party

(including, without limitation, the Creditors' Committee, any chapter 11 trustee, any examiner

or any other estate representative appointed in the Debtors'

Chapter 11 Cases, or any chapter 7 trustee appointed in any Successor Cases) shall be deemed to be forever waived and barred, (ii) all of the Debtors' Stipulations shall be binding upon the Debtors' estates, the Creditors' Committee, all creditors, interest holders and parties in interest, any chapter 11 trustee, any examiner or any other estate representative appointed in the Debtors' Chapter 11 Cases, or any chapter 7 trustee appointed in any Successor Cases, and (iii) the Prepetition Obligations, the Common Collateral and the Prepetition Liens shall be deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases and shall not be subject to challenge by any party in interest as to validity, priority or

otherwise; provided, that nothing in this Interim Order fixes the allowed amount of any secured claim of the Prepetition Secured Parties under section 506(a) of the Bankruptcy Code based on the value of their collateral at any given date or any rights of such parties under section 506(b) of the Bankruptcy Code. For the avoidance of doubt, none of the Challenge provisions set forth in this Paragraph 6 shall apply to the Junior Lien DIP Facility, the DIP Obligations, the DIP Collateral, the DIP Liens, the DIP Agent or any of the DIP Lenders, and in no event shall the Junior Lien DIP Facility, the DIP Obligations, the DIP Collateral, or the DIP Lien be subject to challenge on avoidance or any other grounds by any party.

7.     Waiver and Release. Subject to the Challenge provisions provided in Paragraph 6 above, and effective only upon entry of a Final Order granting the Motion, any and all claims by the Debtors, the Creditors' Committee or any third party, including, without limitation, claimants with rights under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et seq. ("**PACA**") and Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 et seq. ("**PASA**"), with respect to the Prepetition Financing Documents, Prepetition Obligations, Prepetition Liens, or Common Collateral, shall be deemed

waived and the Debtors' obligations to the Prepetition Secured Parties shall be deemed allowed claims; provided, that, notwithstanding anything herein to the contrary, (a) nothing in this Interim Order shall in any way limit, subordinate, or constitute a waiver of any rights and priorities of claimants with trust rights under PACA or PASA, all such rights hereby being expressly reserved, and (b) nothing herein in any way purports to grant any liens, including but not limited to, DIP liens or Adequate Protection Liens, or priorities contrary to the statutory trust protections afforded under PACA or PASA.

8.      Use of Cash Collateral. The Debtors are hereby authorized, subject to the terms and conditions of the DIP Documents and this Interim Order, to use Cash Collateral, all proceeds of the Junior Lien DIP Facility and all proceeds of Additional Collateral (as defined in the Intercreditor Arrangements) in accordance with, and for the purposes and in the amounts set forth in, the Budget (as defined below); provided, that the Debtors shall not be authorized to use any Cash Collateral that has been posted to Cash Collateralize L/C Obligations (as each term is defined in the Prepetition ABL Credit Agreement) under the Prepetition ABL Facility; provided, further that (x) the L/C Obligations outstanding immediately prior to the Commencement Date shall not be required to be Cash Collateralized solely as a result of the commencement of the Chapter 11 Cases, and (y) the Debtors shall not be required to Cash Collateralize such L/C Obligations with any Cash Collateral except for Cash Collateral applied to mandatory prepayments of the Prepetition ABL Obligations pursuant to Paragraphs 14(d)(i)b and c hereof. Notwithstanding the foregoing, (a) the Prepetition ABL Agent may Cash Collateralize L/Cs in connection with its exercise of rights subject to the Debtors' reservation of rights with respect to the non-consensual use of Cash Collateral set forth in Paragraph 10 hereof, and (b) Debtors shall not use any Cash Collateral to make any principal

repayments in respect of the

the DIP Obligations unless and until all Prepetition ABL Obligations and all Prepetition

Term Loan Obligations have been repaid in full in cash, terminated, satisfied (including Cash

Collateralization for all outstanding and undrawn Letters of Credit (each term as defined in

the Prepetition ABL Credit Agreement) that shall remain outstanding), other than contingent

indemnity obligations for which claims have not been made (such repayment, termination or

satisfaction, "**Paid in Full**").

        9.      <u>Termination of Cash Collateral Use.</u>

        (a)     Subject to Paragraph 9(b) below, the Debtors' right to use the Cash

Collateral pursuant to the terms set forth in this Interim Order shall terminate upon the earliest

to occur of any of the following (each, a "**Cash Collateral Termination Event**"):

        (i)     the date that is one hundred seventy (170) days from

the Commencement Date;

        (ii)     the date that is forty-five (45) days following the date of

entry of the Interim Order if the Final Order reasonably acceptable to the

Debtors, DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan

Agent, the Majority Holders of Prepetition PIK Notes, and the Majority Holders

of Prepetition Convertible Notes approving the use of Cash Collateral and the

Junior Lien DIP Facility has not been entered by the Bankruptcy Court on or

prior to such date;

        (iii) the acceleration of the DIP Obligations (as defined below) in

accordance with the DIP Documents or the commencement of the Remedies

Notice Period;

(iv) the failure of the Debtors to make any Adequate Protection Payment (as defined below) to the Prepetition Secured Parties as and when required pursuant to the terms of this Interim Order;

(v) the effective date of a chapter 11 plan in any of the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court;

(vi) any stay, reversal, vacatur, rescission or other modification of the terms of this Interim Order not consented to by the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of Prepetition PIK Notes and Majority Holders of Prepetition Convertible Notes, each in their respective discretion;

(vii) the failure of the Debtors to provide all Financial Reports (as defined below) as well as the Budget and any budget variance report required under the DIP Documents; _provided,_ that following receipt of the notice set forth in Paragraph 9(b)(i) below, the Debtors shall have the benefit of a seven (7) day cure period with respect to this clause 9(a)(vii); _provided, further_ that, notwithstanding the foregoing, with respect to a failure to provide borrowing base certificates, the Debtors shall have the benefit of a two (2) day cure period;

(viii) the failure to comply with Paragraphs 25, 26 and 28 herein; and

(ix) the dismissal of any of the Chapter 11 Cases, the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the appointment of a chapter 11 trustee with expanded powers in any of the Chapter 11 Cases.

(b)      Upon the occurrence of a Cash Collateral Termination Event,

(i) the Debtors' right to use Cash Collateral shall cease upon five (5) days' written notice

provided to the Carve Out Notice Parties (as defined below) by the Prepetition ABL Agent or

the Prepetition Term Loan Agent, the Majority Holders of the Prepetition PIK Notes or

Majority Holders of the Prepetition Convertible Notes (all subject to the Existing Intercreditor

Agreement and Intercreditor Arrangements); provided, that during the period after such written

notice is provided, the Debtors' use of Cash Collateral must conform to the Budget (with any

variances as permitted under the Junior Lien DIP Facility); and (ii) upon seven (7) days' written

notice to the Carve Out Notice Parties (the "**Remedies Notice Period**") (which may be

delivered by electronic mail), and subject to Paragraph 24(c) below, the automatic stay of

section 362 of the Bankruptcy Code shall be terminated for the limited purpose of permitting

the Prepetition Secured Parties to exercise any and all of their respective rights and remedies

with respect to the Common Collateral and Additional Collateral (subject to the Intercreditor

Arrangements), unless the Debtors have obtained an order to use Cash Collateral on a non-

consensual basis consistent with Paragraph 10 below.

10.      Reservation of Debtors' Rights. Notwithstanding anything to the contrary

herein, upon the occurrence of a Cash Collateral Termination Event, the Debtors may seek

authority from the Bankruptcy Court to use the Cash Collateral on a non-consensual

basis; provided, that the Prepetition Secured Parties and the DIP Agent reserve all rights to

object to such request.

11.      Certain Other Rights With Respect to the Budget. In the event that the

Debtors fail to comply with the Budget (with any variances as permitted under the Junior Lien

DIP Facility), the Prepetition Secured Parties and the DIP Agent shall have the right to obtain

an

emergency hearing before the Bankruptcy Court to seek the termination of the Debtors' use

of Cash Collateral and/or obtain such other relief in connection therewith (as applicable),

which hearing (subject to the Bankruptcy Court's calendar) shall take place within five (5)

days following the delivery of notice to the Debtors, the Creditors' Committee, and the

Bankruptcy Court; provided, that any notice given with respect to this Paragraph 11 shall in

no event trigger a Cash Collateral Termination Event in and of itself; provided, further that

nothing in this Paragraph 11 impairs or waives the Debtors' right to contest the termination of

the use of Cash Collateral (subject to the Debtors' Stipulations).

      12.   Findings Regarding Immediate Need for the Junior Lien DIP Facility and Use of Cash Collateral.

      (a)   *Good Cause*. Good cause has been shown for immediate entry of this Interim Order.

      (b)   *Need Regarding Postpetition Financing*. The Debtors have an immediate and critical need to obtain third-priority lien postpetition financing under the Junior Lien DIP Facility and use of the Cash Collateral in order to, among other things, preserve the going concern value of the Debtors, maintain business relationships with vendors, suppliers and customers, satisfy payroll obligations, pay for certain costs and expenses related to the Debtors' Chapter 11 Cases, conduct a comprehensive asset sales process, and satisfy other working capital and operational needs of the Debtors during these Chapter 11 Cases. The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of new indebtedness for borrowed money under the Junior Lien DIP Facility and other financial accommodations are vital to the Debtors' ability to meet payroll and other

operating expenses and to the Debtors' ability to conduct an orderly sale process to maximize recoveries for creditors.

(c)    *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing, under existing circumstances, on more favorable terms and conditions from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents, including, without limitation, that they are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense and that they also are unable to obtain secured credit allowable under sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code without granting the DIP Lenders, subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims (each as herein defined), in each case on the terms and conditions set forth in this Interim Order and the DIP Documents.

(d)    *Business Judgment.* The terms upon which the Debtors will be permitted to use Cash Collateral and proceeds of the Junior Lien DIP Facility as provided in the Junior Lien DIP Facility, the DIP Documents and this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are appropriate under the circumstances, and constitute reasonably equivalent value and fair consideration.

(e)    *Good Faith – Junior Lien DIP Facility.* The Junior Lien DIP Facility has been negotiated in good faith and at arm's length. All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Junior Lien DIP Facility, the DIP Documents, and the DIP Orders including, without limitation, (i) all loans made to A&P pursuant to the DIP Credit Agreement and (ii) any obligations and indebtedness of the Debtors arising under or in connection with the DIP Documents and this Interim Order now and hereafter

owing to the DIP Agent or any DIP Lender (all of the foregoing in clauses (i) and (ii), the "**DIP Obligations**"), shall be deemed to have been extended in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)    *Good Faith - Prepetition Secured Parties*. Based upon the record before the Bankruptcy Court, this Interim Order, including the terms of the use of Cash Collateral and the adequate protection granted in this Interim Order, have been negotiated at arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, by each of the Debtors, the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Agent, the Majority Holders of Prepetition PIK Notes and the Majority Holders of the Prepetition Convertible Notes, and are in the best interests of the Debtors, their estates and creditors and are consistent with the Debtors' fiduciary duties.

(g)    *Relief Essential; Best Interest*. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001–2. Without access to the Junior Lien DIP Facility and the continued use of Cash Collateral, the Debtors and their estates would suffer immediate and irreparable harm, including that the Debtors may be forced to cease business operations, terminate substantially all of their employees, and be unable to wind-down their operations in an orderly manner that preserves and maximizes value and recoveries for creditors. Consummation of the Junior Lien DIP Facility and the use of the Cash Collateral in accordance with this Interim Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

## THE JUNIOR LIEN DIP FACILITY

13.   Authorization of the DIP Documents and the Junior Lien DIP Facility.

(a)   The terms and conditions of the DIP Documents are approved on an interim basis. The Debtors are expressly and immediately authorized to execute, deliver, enter into, and perform all obligations under the DIP Documents, including, without limitation, any exhibits attached thereto, all security agreements, all guarantees, all related or ancillary documents, notices and agreements, and any mortgages contemplated thereby, as hereafter amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, and the DIP Loan Parties are authorized to borrow or guarantee, as applicable, all of the DIP Obligations, as set forth in Paragraph 13(b) below.

(b)   The Debtors are hereby authorized to borrow an interim principal amount of Loans (as defined in the DIP Credit Agreement) (the "**DIP Loans**") under the Junior Lien DIP Facility not to exceed $50 million in accordance with the DIP Documents (subject to any conditions precedent on borrowings thereunder), which amount shall be used for all purposes permitted under the DIP Documents and in accordance with, and for the purposes and in the amounts set forth in, the Budget.

(c)   In furtherance of the foregoing, and without further approval of the Bankruptcy Court, each Debtor is authorized and directed to perform on an interim basis all acts and to execute, deliver and perform all instruments and documents (including, without limitation, the execution or recordation of security agreement, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Junior Lien DIP Facility, including, without limitation, the following:

(i)      the execution, delivery and performance of the DIP Credit Agreement and any exhibits attached thereto and other agreements related thereto, including, without limitation, all security agreements and all related or ancillary documents, notices and agreements and any mortgages contemplated thereby (*i.e.*, the DIP Documents);

(ii)      the execution, delivery and performance of the guarantees by the DIP Loan Parties (other than the Borrower) of the obligations of the Borrower under the DIP Documents;

(iii) the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtors and the DIP Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any reasonable fees paid in connection therewith) that do not (w) restrict, limit or prohibit the payment of any Adequate Protection Payments as and when required under this Interim Order, (x) shorten the maturity or the scheduled termination date thereunder, (y) increase the commitments or the rate of interest (other than invoking the default rate upon a DIP Event of Default), or (z) require any new or additional payments of the principal of the amounts outstanding under the Junior Lien DIP Facility; provided, that the DIP Documents shall not be amended or modified in a manner materially adverse to the respective rights and protections granted herein to a Prepetition Secured Party without consent of such Prepetition Secured Party or to the Debtors;

provided, further that

the Debtors shall provide notice of any amendment, waiver, consent or other

modification under the DIP Documents to the attorneys for each of the

Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders

of Prepetition PIK Notes and the Majority Holders of Prepetition Convertible

Notes and any Creditors' Committee.

(iv) the non-refundable payment to the DIP Agent and the DIP

Lenders, as the case may be, of the reasonable fees and expenses set forth in the

DIP Documents, whether incurred before or after the Commencement Date,

including, without limitation, the fees and expenses of the professionals retained

as provided for in the DIP Documents; provided, that Debtors shall be

authorized and directed to pay any all such reasonable fees and expenses within

ten (10) business days of delivery of a monthly statement or invoice for such

fees and expenses (it being understood that such statements or invoices shall not

be required to be maintained in accordance with the U.S. Trustee Guidelines,

nor shall any such professional be required to file any interim or final fee

applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's

approval of any such payments) to the Debtors, the U.S. Trustee and the

Creditors' Committee, unless, within such ten (10) business day period, the

Debtors, the U.S. Trustee or the Creditors' Committee serve a written objection

upon the requesting party, in which case, the Debtors shall pay only such

amounts that are not the subject of any objection and the withheld amount

subsequently agreed by the parties or ordered by the Court to be paid;

(v)        as soon as reasonably practicable following entry of this

Interim Order, the addition of the DIP Agent, on behalf of itself and the

DIP Lenders, as an additional insured and loss payee on each insurance

policy maintained by the Debtors that in any way relates to the DIP

Collateral and, subject to the terms of this Interim Order, the distribution

of any proceeds recovered or received in accordance with the terms of this

Interim Order, the Intercreditor Arrangements and the other DIP

Documents; and

(vi) the performance of all other acts required under or in

connection with the DIP Documents.

(d)        Upon execution and delivery of the DIP Documents, (i) the DIP

Documents shall constitute legal, valid, binding, enforceable and unavoidable obligations of the

DIP Loan Parties, enforceable against each DIP Loan Party in accordance with the terms of

this Interim Order and the DIP Documents, and (ii) the DIP Obligations shall constitute

"allowed claims" within the meaning of section 502 of the Bankruptcy Code. No obligation,

payment, transfer or grant of security under the DIP Documents or this Interim Order shall be

stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under

any applicable nonbankruptcy law (including without limitation, under chapter 5 of the

Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform

Fraudulent Conveyance Act or similar statute or common law), or subject to any defense,

reduction, setoff, recoupment, recharacterization, rejection, subordination, disallowance,

impairment, cross-claim, counterclaim, or any other claims, causes of action or challenges of

any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise.

14.    <u>DIP Liens.</u> As security for the full and timely payment of the DIP

Obligations, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted,

valid, enforceable, unavoidable, and fully perfected security interests in and liens and

mortgages (collectively, the "**DIP Liens**") upon all Common Collateral and Additional

Collateral and all products and proceeds of the foregoing, whether existing prior to or arising

or acquired after the Commencement Date (all of the property of the Debtors identified in

this Paragraph 14, including, without limitation, subparagraphs (a), (b) and (c) below, the

"**DIP Collateral**"), as follows and in all cases subject to the priorities set forth in Paragraph

19:

(a)    pursuant to section 364(c)(2) of the Bankruptcy Code, a valid,

binding, continuing, enforceable, fully perfected first priority lien on, and security interest in

all Additional Collateral; <u>provided,</u> that DIP Liens shall not attach to (x) the Excluded

Property (as defined in the DIP Documents) and (y) actions or other avoidance claims under

sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or any other

avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") or the

proceeds thereof, but shall, upon entry of the Final Order granting the Motion, attach to any

proceeds or property recovered under chapter 5 of the Bankruptcy Code, whether by

judgment, settlement or otherwise.

(b)    pursuant to section 364(c)(3) of the Bankruptcy Code, and

subject to the priorities set forth in Paragraph 19, a valid, binding, continuing, enforceable,

fully perfected junior lien on, and security interest in Common Collateral; and

(c)    pursuant to section 364(d)(1) of the Bankruptcy Code (and only

with respect to the Prepetition PIK Notes Secured Parties and the Prepetition Convertible

Notes Secured Parties and any other lien holder (other than the Prepetition ABL Secured

Parties and

Prepetition Term Loan Secured Parties (except with respect to the Additional Collateral)) who receives proper notice of this Interim Order), and subject to the priorities set forth in Paragraph 19, a valid, binding, continuing, enforceable, fully perfected priming lien on, and security interest in, Common Collateral, and any other tangible and intangible prepetition and postpetition property of the Debtors, whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens or security interests in existence immediately prior to the Commencement Date or to valid and unavoidable liens or security interests in existence immediately prior to the Commencement Date that are perfected after the Commencement Date as permitted by section 546(b) of the Bankruptcy Code; provided, that the DIP Liens shall not be (i) subject or subordinate to (x) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (y) unless otherwise provided for in the DIP Documents or this Interim Order, any liens arising after the Commencement Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise, except as provided in Paragraph 19.

15.    DIP Superpriority Claims. Subject to the Carve Out , the DIP Agent, for the benefit of itself and each of the DIP Lenders, is hereby granted superpriority senior administrative expense claims against the Debtors (the "**DIP Superpriority Claims**") for the full and timely payment of the DIP Obligations over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final

Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (collectively, "**Administrative Expense Claims**"), in the order of priority set forth in Paragraph 20 below. The DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof.

16.    <u>Adequate Protection for Prepetition Secured Parties.</u> The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(c) and 364(d)(1) of the Bankruptcy Code, to adequate protection against the Diminution in Value of their respective interests in the Common Collateral, including, without limitation, the Cash Collateral, as follows:

(a)    *Adequate Protection Liens.* Solely to the extent of any postpetition

Diminution in Value of the Prepetition Secured Parties' respective interests in the Common Collateral, each of the Prepetition Secured Parties shall be granted for its respective benefit, without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, replacement and additional postpetition liens and security interests, in each case, effective, valid, enforceable and automatically perfected upon entry of this Interim Order, on all assets of the Debtors, including, without limitation, the DIP Collateral (and the Common Collateral), whether in existence on the Commencement Date or thereafter created, acquired, or arising, and wherever located, and the proceeds of each of the foregoing (collectively, the "**Adequate Protection Liens**"), which Adequate Protection Liens shall be subject and subordinate to the Carve Out and shall be afforded the priority set forth in Paragraph 19 below; <u>provided,</u> that the Adequate Protection Liens shall not attach to Avoidance Actions or the proceeds thereof.

(b)    *Adequate Protection Superpriority Claims.* As adequate

protection for, and solely to the extent of, any postpetition Diminution in Value of the

Prepetition Secured Parties' interest in the Common Collateral, the Prepetition Secured Parties,

are hereby granted superpriority claims (the "**Adequate Protection Superpriority Claims**") as

provided for in section 507(b) of the Bankruptcy Code, having priority over any and all

Administrative Expense Claims, in the order of priority set forth in Paragraph 20 below. The

Adequate Protection Claims shall be payable from and have recourse to all prepetition and

postpetition property of the Debtors and all proceeds thereof, subject to entry of the Final

Order, including, proceeds of Avoidance Actions or property recovered under such Avoidance

Actions whether by judgment, settlement or otherwise.

(c)    *Adequate Protection Payments.* The Debtors are authorized and

directed under sections 361, 363 and 364 of the Bankruptcy Code to make payments

(together, the payments described in this clause (c) and clause (d) below, the "**Adequate**

**Protection Payments**") when due, consisting of: (i) cash payments to (A) the Prepetition ABL

Agent for all professional fees and expenses payable to the Prepetition ABL Agent pursuant to

the ABL Credit Agreement, (B) the Prepetition Term Loan Agent and the other Prepetition

Term Loan Secured Parties for all professional fees and expenses payable to the Prepetition

Term Loan Agent and for all professional fees and expenses of one additional counsel payable

to the Prepetition Term Loan Secured Parties, in each case pursuant to the terms of the

Prepetition Term Loan

Agreement, (C) the Majority Holders of the Prepetition PIK Notes for all

professional fees and expenses, limited to the fees and expenses of (x) Stroock & Stroock &

Lavan LLP and (y) The CDG Group, LLC (in accordance with the terms of that certain

retention letter dated as of July 2, 2015), and (E) the Majority Holders of the Prepetition

Convertible Notes for all professional fees

and expenses, limited to the fees and expenses of Schulte Roth & Zabel LLP, and, in the case

of each of the foregoing professional fees and expenses, the Debtors shall be authorized and

directed to pay any all such fees and expenses within ten (10) business days of delivery of a

monthly statement or invoice for such fees and expenses (it being understood that such

statements or invoices shall not be required to be maintained in accordance with the U.S.

Trustee Guidelines, nor shall any such professional be required to file any interim or final fee

applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any

such payments) to the Debtors, the U.S. Trustee and the Creditors' Committee, unless, within

such ten (10) business day period, the Debtors, the U.S. Trustee or the Creditors' Committee

serve a written objection upon the requesting party, in which case, the Debtors shall pay only

such amounts that are not the subject of any objection; and (ii) all interest and letter of credit

fees, if applicable, as and to the extent payable under the Prepetition ABL Facility and

Prepetition Term Loan Facility, which shall accrue and be payable at the Default Rate (as

defined in the Prepetition ABL Credit Agreement and Prepetition Term Loan Agreement). All

such payments shall be applied to the applicable Prepetition Secured Parties' allowed secured

claim. In the event that it is determined by a final order, which order shall not be subject to any

appeal, stay, reversal or vacatur (a "**Final Court Order**"), that any Prepetition Secured Party is

not entitled to Adequate Protection Payments as adequate protection for the Diminution in

Value of its respective interests in the Common Collateral, and that such Prepetition Secured

Party is determined to be undersecured, then such Adequate Protection Payments shall be

applied toward repayment of the principal amount due on such Prepetition Obligations as are

owing to such Prepetition Secured Party.

(d)      *Mandatory Prepayment.* The Debtors are authorized and directed, to the extent applicable, to make the mandatory prepayments set forth below (the "**Mandatory Prepayments**"). All capitalized terms not otherwise defined in this Paragraph 16(d) shall have the meanings ascribed to them in the Prepetition ABL Credit Agreement.

(i)      *Prepetition ABL Facility.* As further adequate protection, and subject to Paragraph 16(d)(iii) (except with respect to 16(d)(i)a below) and Paragraph 16(d)(iv) below, the Debtors shall, first, pay to the Prepetition ABL Agent for the benefit of the Prepetition ABL Secured Parties the following amounts:

a.      if for any reason the Total Outstandings (other than L/C Obligations to the extent Cash Collateralized) at any time exceed the sum of (i) the Borrowing Base as in effect from time to time minus (ii) a carve out reserve minus (iii) a PACA reserve minus (iv) the amount of Availability required to be maintained by Section 7.15(b) of the Prepetition ABL Credit Agreement, the Debtors shall immediately prepay Loans and/or Cash Collateralized L/C Obligations in an amount equal to the lesser of (x) such excess and (y) the amount after payment of which the Debtors shall be in compliance with minimum liquidity set forth in Section 7.15(a) of the DIP Credit Agreement as in effect on the date hereof; provided, that, notwithstanding anything in the Prepetition ABL Facility to the contrary, there shall be no additional reserves permitted;

b.        until the payment in full of the Prepetition ABL Obligations, the net proceeds from sales, dispositions, or casualty of the ABL Priority Collateral outside the ordinary course of business, including sales or disposition of the ABL Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases (as defined in the DIP Credit Agreement), pursuant to section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales"; and

c.        after payment in full of the Prepetition Term Facility, and until payment in full of the Prepetition ABL Obligations, all net proceeds from sales, dispositions, or casualty of the Term Priority Collateral outside the ordinary course of business, including sales or disposition of the Term Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases, pursuant to Section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales."

(ii)        *Prepetition Term Loan Facility*. As further adequate protection, and subject to Paragraph 16(d)(iii) and 16(d)(iv) below, the Debtors shall pay to the Prepetition Term Agent for the benefit of the Prepetition Term Secured Parties the following amounts:

a.        until payment in full of the Prepetition Term Loan Obligations, the net proceeds from sales, dispositions, or

casualty of the Term Priority Collateral outside the ordinary

course

of business, including sales or disposition of the Term Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases, pursuant to section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales"; and

> b. after payment in full of the Prepetition ABL Facility, and until payment in full of the Prepetition Term Loan Obligations, all net proceeds from sales, dispositions, or casualty of the ABL Priority Collateral in the ordinary course of business, including sales or disposition of the ABL Priority Collateral with respect to the closing of the stores subject to the Triple Negative Leases, pursuant to section 363 or section 365 of the Bankruptcy Code or in connection with "Store Closing Sales."

(iii)    Notwithstanding anything in Paragraph 16(d)(i) or 16(d)(ii), the Debtors shall not be required to make any payments pursuant Paragraph 16(d)(i)(b) and (c) or 16(d)(ii) with the net proceeds from the ABL Priority Collateral or Term Priority Collateral, as applicable, to the extent that, after giving effect to such payments, the Debtors would have less than $75 million in total of Week Ending Book Cash (as defined in the Budget) if such proceeds are received prior to October 31, 2015 or $60 million if such proceeds are received after October 31, 2015, provided, that (A) any limitation of such payments shall be applied pro rata (measured by the amount of net proceeds derived from each of the ABL Priority Collateral, Term Priority Collateral and

Additional Collateral received in connection with a disposition of any of the foregoing collateral) to the amounts otherwise required to be applied to the Prepetition ABL Facility and the Prepetition Term Facility pursuant to Paragraph 16(d)(i) and (ii) above, and to the amounts that would be required to be applied to such prepayment pursuant to Section 2.07(a)(i) and (ii) on such date pursuant to the DIP Credit Agreement and limited by Section 2.07(a)(v) of the DIP Credit Agreement; provided, further, that, subject to payment in full of the Prepetition ABL Facility and the Prepetition Term Loan Facility, (i) on October 31, 2015 the Borrower (as defined in the DIP Credit Agreement) shall make a prepayment of the DIP Loans in an amount equal to the aggregate amount of Week Ending Book Cash on such date in excess of $60 million Any payment made pursuant to Paragraph 16(d)(i) or (ii) shall, as applicable, prepay and permanently (x) reduce Loans and/or Cash Collateralize L/C Obligations under the Prepetition ABL Facility and (y) reduce Loans under the Prepetition Term Loan Facility.

All payments made pursuant to section 16(d)(i) and (ii) shall be applied to the respective Prepetition Secured Party's allowed secured claim.

(iv)    Subject to Paragraph 6 and this Paragraph 16, all Adequate Protection Payments and other payments made to the DIP Agent, DIP Lenders and any Prepetition Secured Party in accordance with this Interim Order shall be irrevocable when made and free and clear of all liens and claims, including, without limitation, any claims covered by the Carve Out.

17.    Sufficiency of Adequate Protection. Under the circumstances, the

Bankruptcy Court finds that the foregoing adequate protection is reasonable and sufficient to

protect the interests of the Prepetition Secured Parties; provided, that the Prepetition PIK

Notes reserve the right to contest the validity of the foregoing adequate protection under the

circumstances.

18.    Reservation of Rights. The Prepetition Secured Parties have either

consented or do not object to the relief sought herein. Nothing contained herein shall be

deemed a finding by the Court or an acknowledgement by the Prepetition Secured Parties that

the adequate protection granted herein does in fact adequately protect the Prepetition Secured

Parties, and nothing contained in this Interim Order (including, without limitation, the

authorization of the use of any Cash Collateral) shall be deemed to (i) limit, abridge, constitute

a waiver of, expressly or implicitly, or otherwise affect the rights of any of the Prepetition

Secured Parties to request at any time that the Court provide additional or further adequate

protection of their respective interests in the Common Collateral (including Cash Collateral), or

to seek further or additional adequate protection in the event the adequate protection provided

herein proves to be inadequate, (ii) impair or modify any rights, claims or defenses available in

law or equity to any Prepetition Secured Party, the DIP Agent or any DIP Lender, (iii)

prejudice the rights of the Prepetition Secured Parties at any time, under the Bankruptcy Code

or otherwise, to seek any other or supplemental relief in respect of the Debtors or the Chapter

11 Cases.

19.    Priority of Liens. Subject in each case to (i) the Carve Out, and (ii) the

Permitted Encumbrances (as such term is defined in the Prepetition ABL Credit Agreement

and the Prepetition Term Loan Agreement) and Permitted Liens (as such term is defined in the

Prepetition PIK Notes Indenture and the Prepetition Convertible Notes Indenture and, in each

case, (x) that exist on, and are legal, valid, binding, enforceable, perfected and unavoidable as

of, the Commencement Date and are permitted to be senior to the Prepetition Liens (as

applicable)

pursuant to the applicable Prepetition Financing Documents, (y) other than the Prepetition Liens), the priority of liens upon and security interest in the DIP Collateral shall be as follows:

        (a)    in respect of the Common Collateral, as applicable:

        (i)    <u>first</u>, in the case of the ABL Priority Collateral, to the Prepetition ABL Liens in favor of the Prepetition ABL Secured Parties and the Adequate Protection Liens in favor of the Prepetition ABL Secured Parties (together, the "**ABL Liens**"), and, in the case of the Term Priority Collateral, the Prepetition Term Liens in favor of the Prepetition Term Loan Secured Parties and the Adequate Protection Liens in favor of the Prepetition Term Loan Secured Parties (together, the "**Term Liens**")

        (ii)    <u>second</u>, in the case of the ABL Priority Collateral, to the Term Liens, and in the case of the Term Priority Collateral, to the ABL Liens;

        (iii) <u>third</u>, in the case of the Common Collateral, to the DIP Liens;

        (iv)    <u>fourth</u>, in the case of Common Collateral, to the Prepetition PIK Notes Liens and the Adequate Protection Liens in favor of the Prepetition PIK Notes Secured Parties (together, the "**PIK Notes Liens**"); and

        (v)    <u>fifth</u>, in the case of Common Collateral, to the Prepetition Convertible Notes Liens and the Adequate Protection Liens in favor of the Prepetition Convertible Notes Secured Parties (together, the "**Convertible Notes Liens**"); and

(b)     with respect to Additional Collateral, the DIP Liens in such

collateral shall be senior and superior in priority to all other liens upon and security interests

in the Additional Collateral.

20.     _Priority of Superpriority Administrative Claims._ Subject in each case to

the Carve Out, the Adequate Protection Superpriority Claims and the DIP Superpriority

Claims shall constitute superpriority administrative expense claims over any and all

Administrative Expense Claims; _provided,_ that, as to each other, the Adequate Protection

Superpriority Claims and the DIP Superpriority Claims shall be subject to the following

order of priority:

(a)     _first,_ the Adequate Protection Superpriority Claims granted to

the Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties, on a _pari_

_passu_ basis.

(b)     _second,_ the DIP Superpriority Claims;

(c)     _third,_ the Adequate Protection Superpriority Claims granted to

the Prepetition PIK Notes Secured Parties; and

(d)     _fourth,_ the Adequate Protection Superpriority Claims granted

to the Prepetition Convertible Notes Secured Parties.

21.     _Postpetition Perfection of Liens._ The DIP Agent, the DIP Lenders, and

the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and

to execute in the name of the Debtors, as its true and lawful attorney, with full power of

substitution, to the maximum extent permitted by law) financing statements, trademark filings,

copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take

possession of or control over deposit accounts and securities accounts or any other asset, in

each case, in order to validate and perfect the liens and security interests granted to them in

the DIP

Documents and this Interim Order. Whether or not the DIP Agent, on behalf of itself or the DIP Lenders, or the Prepetition Secured Parties, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over deposit accounts and securities accounts or any other assets, the DIP Liens shall be deemed legal, valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute, impairment or subordination, at the time and on the date of entry of this Interim Order.

(a)     A certified copy of this Interim Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording. For the avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy Code shall be modified (and any stay of such modification under Bankruptcy Rule 4001(a)(3) is waived) to the extent necessary to permit the DIP Agent and Prepetition Secured Parties to take all actions permitted by this Paragraph 21.

(b)     Subject to entry of a Final Order on the Motion, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, license, contract or other agreement, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the granting of postpetition liens hereunder on such leasehold interest, license, contract or other

agreement or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the

DIP Agent, the DIP Lenders or the Prepetition Secured Parties in accordance with the terms

of the DIP Documents or this Interim Order. Notwithstanding anything to the contrary in the

foregoing, the provisions of this Paragraph 21(b) shall not (i) render any contract or lease

unable to be assumed and/or assigned by any Debtor or (ii) impair or limit the ability or right

of (A) any Debtor to assume and/or assign any contract or lease or (B) any lessor to object to

such relief on any other grounds, including, but not limited to, sections 365(b)(3) or 1123 of

the Bankruptcy Code.

22

22.    Carve Out.

(a)    For purposes hereof, the "**Carve Out**" shall mean an amount equal

to the sum of:

(i)    all fees required to be paid to the clerk of the

Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of

the United States Code and 31 U.S.C §3717;

(ii)    all reasonable fees and expenses incurred by a trustee

under section 726(b) of the Bankruptcy Code not to exceed $100,000;

(iii) all accrued and unpaid claims for unpaid fees, costs, and expenses incurred at any time before the Trigger Date (as defined below), or any monthly or success or transaction fees payable to estate professionals, in each case by persons or firms retained by the Debtors or the Creditors Committee (solely with respect to the Creditors' Committee in an aggregate amount not to exceed the amount of Professional Fees set forth in the Budget for the Creditors' Committee prior to the Trigger Date (as defined below), subject to entry of a Final

Order), if any, whose retention is approved by the Bankruptcy Court pursuant to

sections 327, 328, 363 or 1103 of the Bankruptcy Code (collectively, the

"**Professional Persons**," and the fees, costs and expenses of Professional

Persons, the "**Professional Fees**"), to the extent such Professional Fees are

allowed by the Bankruptcy Court at any time (*i.e.*, before or after the Trigger

Date) on an interim or final basis; and

    (iv) all Professional Fees incurred on and after the Trigger

Date

by Professional Persons and allowed by the Bankruptcy Court at any time,

whether before or after the Trigger Date, whether by interim order, procedural

order or otherwise; provided, that, other than with respect to any success or

transaction fees that may become due and payable to Professional Persons, which

shall not be included in the Carve Out Cap (as herein defined), the payment of

any Professional Fees of the Professional Persons (but excluding fees and

expenses of third party professionals employed by individual members of the

Creditors' Committee) incurred on or after the Trigger Date (defined below) and

allowed by the Bankruptcy Court at any time, whether before or after the

Trigger Date, on a final basis, shall not exceed $2,000,000 in the aggregate (the

"**Carve Out Cap**").

    (b) The "**Trigger Date**" shall mean the first business day after the

occurrence and during the continuance of a DIP Event of Default (as defined below) or a

Cash Collateral Termination Event and delivery of written notice thereof (the "**Carve Out**

**Notice**") (which may be delivered by electronic mail) by the DIP Agent or, in the case of a

Cash

Collateral Termination Event and subject to the Existing Intercreditor Agreement and

Intercreditor Arrangements, the Prepetition ABL Agent, the Prepetition Term Loan

Agent,

Majority Holders of the Prepetition PIK Notes or Majority Holders of the Prepetition

Convertible Notes to (i) the U.S. Trustee, (ii) the Debtors' and the Debtors' counsel, (iii)

counsel for the Creditors' Committee, (iv) counsel for the Prepetition ABL Agent, (v) counsel

for the Prepetition Term Loan Agent, (vi) counsel for the Majority Holders of the Prepetition

PIK Notes,

(vii) counsel for the Majority Holders of the Prepetition Convertible Notes, and (viii) counsel

for the DIP Agent (collectively, the "**Carve-Out Notice Parties**").

        (c)      Immediately upon delivery of a Carve Out Notice, the Debtors

shall transfer from their concentration account to a segregated account (the "**Carve Out**

**Account**") not subject to the control of the DIP Agent, DIP Lenders or the Prepetition

Secured Parties an amount equal to the Carve Out Cap plus an amount equal to the aggregate

unpaid fees, costs and expenses described in clause (iii) of the definition of "Carve Out," in

each case as reasonably determined by a good faith estimate of the applicable Professional

Person. The proceeds on deposit in the Carve Out Account shall be available only to satisfy

obligations benefitting from the Carve Out, and the DIP Lenders and Prepetition Secured

Parties (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve

Out Account, and (ii) shall have security interests in any residual interests in the Carve Out

Account available following satisfaction in full of all obligations benefitting from the Carve Out

in the order of priority set forth in Paragraph 19, and shall receive distributions on accounts of

such residual interests in accordance with such priority.

        (d)      For the avoidance of doubt, the Carve Out shall be senior to any

claims arising under or relating to and liens securing the Junior Lien DIP Facility, the

Prepetition ABL Facility, the Prepetition Term Loan Facility, the Prepetition PIK Notes and

the Prepetition

Convertible Notes, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests.

(e) *Budget.* Annexed as **Exhibit "2"** hereto and incorporated by reference herein is the weekly statement of receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing with the first week following the Commencement Date, including (i) individual line items for "Total Disbursements" and (ii) the anticipated uses of the proceeds of the DIP Loans and Cash Collateral for such period, in form and substance reasonably satisfactory to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of the Prepetition PIK Notes and the Majority Holders of the Prepetition Convertible Notes (substantially similar to the form of budget annexed hereto, the "**Budget**"). No less frequently than every four weeks, commencing on August 7, 2015, the Debtors shall deliver an updated budget for the following four week period (the "**Proposed Budget**") simultaneously to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent and the current Majority Holders of Prepetition PIK Notes and the current Majority Holders of Prepetition Convertible Notes and counsel to the Creditors' Committee. The Proposed Budget shall become the Budget upon the written consent of the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent and the current Majority Holders of Prepetition PIK Notes and the Majority Holders of the Prepetition Convertible Notes (in each case such consent not to be unreasonably withheld or delayed). Each Proposed Budget shall be of no force and effect unless and until it is so approved or five (5) days have passed from delivery without objection, and until either condition has been satisfied, the prior approved Budget shall remain in effect.

(f)      On August 14, 2015, for the week-ended August 7, 2015, and continuing every Friday of each calendar week (or the next business day if such date is not a business day) thereafter, the Debtors shall be required to deliver to the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Majority Holders of Prepetition PIK Notes, the Majority Holders of Prepetition Convertible Notes, and counsel to the Creditors' Committee, a weekly variance report from the immediately preceding three calendar week period comparing on a cumulative basis the actual disbursements of the Debtors with disbursements in the Budget.

23.   DIP Events of Default.

(a)      In addition to the Events of Default (as defined in the DIP Documents) set forth in the DIP Documents, unless all DIP Obligations and all Adequate Protection Obligations shall have been indefeasibly Paid in Full (as set forth in Paragraph 16), the following shall constitute a default under the DIP Documents and this Interim Order, unless the DIP Agent has waived such default in accordance with the DIP Documents (together with Events of Default (as defined in the DIP Documents), the "**DIP Events of Default**"):

(i)      the filing of a motion by the Debtors seeking dismissal of any of the Chapter 11 Cases, the dismissal of any of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;

(ii) termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;

(iii) other than as contemplated by this Interim Order, entry of an order granting any lien or claim which is senior to or *pari passu* with the DIP Agent's lien and claims under the Junior Lien DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief);

(iv) entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full in cash of the Junior Lien DIP Facility as of the effective date of the plan;

(v) payment of or granting adequate protection with respect to prepetition debt (other than as approved by the DIP Agent and the DIP Orders or as otherwise contemplated by the DIP Documents);

(vi) the failure of liens or superpriority claims granted with respect to the Junior Lien DIP Facility to be valid, perfected and enforceable with the priority described herein;

(vii) the entry of one or more orders of the Bankruptcy Court lifting the automatic stay under section 362 of the Bankruptcy Code with respect to assets having a value in excess of $25 million in the aggregate;

(viii) the occurrence of a Cash Collateral Termination Event;

(ix)    the Interim Order or Final Order, as applicable, shall be amended, modified, stayed or vacated without the written consent of the DIP Agent; and

(x)    if, at any time, one or more asset purchase agreement(s) for the sale of Debtors' stores and other real and personal property with a minimum aggregate value of at least $250 million (excluding scripts and inventory), fail to become or cease being in full force and effect unless the Debtors have entered into a mutually similar agreement or agreements representing at least equivalent or higher or better offers for such assets.

24.    <u>Protection of DIP Lenders and Other Rights.</u> As a requirement and precondition to the DIP Lenders' willingness to lend and in furtherance of the DIP Superpriority Claims, the DIP Agent and DIP Lenders shall have the following protections that may be enforced by the DIP Agent as authorized, approved, and granted pursuant to the provisions of the DIP Orders and in accordance with the terms of the DIP Credit Agreement:

(a)    If a DIP Event of Default shall have occurred and is continuing, the DIP Agent shall, with respect to the DIP Collateral, be permitted and hereby is authorized, approved and granted, without further approval or order of this Court, to do any or all of the following: (i) immediately (x) deliver a notice of a DIP Event of Default, (y) terminate the Junior Lien DIP Facility, and (z) charge the default rate of interest on the DIP Loans, and (ii) upon the expiration of the Remedies Notice Period to the Carve Out Notice Parties (which may be delivered by electronic mail) and subject to Paragraph 25(c) below, the automatic stay of section 362 of the Bankruptcy Code shall be terminated for the limited purpose of permitting the DIP Agent or DIP Lenders to do any of the following: (x) foreclose on the DIP Collateral,

subject to the terms of this Interim Order and the Intercreditor Arrangements, (y) enforce all

of their guaranty rights; and (z) declare the principal of and accrued interest, fees and

expenses constituting the obligations under the Junior Lien DIP Facility to be due and

payable.

(b)     The DIP Agent's or any DIP Lender's delay or failure to

exercise rights and remedies under the applicable DIP Documents or this Interim Order shall

not constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder,

thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed

in accordance with the terms of the applicable DIP Documents.

(c)     After the occurrence of a Cash Collateral Termination Event or

DIP Event of Default, the automatic stay set forth in section 362 of the Bankruptcy Code, to

the extent applicable, shall be deemed terminated without the necessity of any further action

by the Bankruptcy Court in the event that the Debtors, the Creditors' Committee, the U.S.

Trustee or any other party in interest have not obtained an order from this Court to the

contrary prior to the expiration of the Remedies Notice Period. The Debtors, Creditors'

Committee, U.S. Trustee or other party in interest shall have the burden of proof at any

hearing on any request by them to reimpose or continue the automatic stay or to obtain any

injunctive relief.

## Other Rights and Obligations

25.     <u>Limitation on Use of DIP Proceeds and Cash Collateral.</u> Notwithstanding

anything herein or in any other order by the Bankruptcy Court to the contrary, no

borrowings, Cash Collateral, Carve Out or the Carve Out Cap may be used:

(a)     to request authorization to obtain, other than from the DIP Agent

or DIP Lenders and other than in accordance with this Interim Order and the DIP

Documents, postpetition loans or other financial accommodations pursuant to section 364(c)

or (d) of the

Bankruptcy Code or otherwise that are (or are proposed to be) secured by any liens or security interests on any of the DIP Collateral (including Common Collateral) (unless such postpetition loans or other financial accommodations propose to indefeasibly pay in full all DIP Obligations);

(b)     in connection with, or finance in any way, any claim, cause of action, counterclaim, investigation, action, suit, arbitration, proceeding, application, motion, or other litigation of any type (i) objecting to, challenging or contesting in any manner, invalidating, setting aside, avoiding, subordinating or raising any defenses to, in whole or in part, the amount, validity, extent, priority, enforceability or perfection of the DIP Obligations, the Prepetition Financing Documents, the DIP Documents, the DIP Liens, the Prepetition Obligations or the Prepetition Liens, or any other rights or interests of any of the DIP Agent, DIP Lenders or Prepetition Secured Parties (including, without limitation, with respect to the Adequate Protection Liens, Adequate Protection Payments, DIP Superpriority Claims or Adequate Protection Superpriority Claims, including, without limitation, any Challenge to the Debtors' Stipulations), or (ii) asserting or seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the DIP Agent, the DIP Lenders or the Prepetition Secured Parties or any of their respective officers, directors, employees, agents, affiliates, representatives, attorneys, advisors, assigns, or successors with respect to any transaction, occurrence, omission or action involving the Debtors; provided, that the Creditors' Committee should be able to use funds to challenge the Prepetition Liens to the extent of the value of any excluded collateral.

(c)     for or in connection with contesting, preventing, hindering, impairing, interfering with, or otherwise delaying the exercise by any of the DIP Agent, DIP

Lenders or the Prepetition Secured Parties of any rights or remedies, in a manner

inconsistent with the terms of this Interim Order or the Prepetition Financing Documents;

(d)     to seek, except in response to the final relief requested in the

Motion, to modify any of the rights granted to the DIP Agent, the DIP Lenders or any of the

Prepetition Secured Parties hereunder or under the DIP Documents, the Prepetition Financing

Documents, in each of the foregoing cases, without such parties' prior written consent or pay

any amount on account of any claims arising prior to the Commencement Date unless such

payments are approved by an order of this Court (including hereunder); _provided,_ that no more

than $100,000, in the aggregate, of the borrowings, Cash Collateral, Carve Out or the Carve

Out Cap or proceeds thereof may be used by the Creditors' Committee solely to investigate

(but not prosecute, object or litigate) a Challenge in accordance with Paragraph 6 hereof;

_provided,_ further that such parties shall reasonably cooperate in providing their underlying

documents evidencing their secured claim to counsel to the Creditors' Committee.

26.     Prohibition on Granting of Additional Liens or Interests. No liens, claims,

interests or priority status, other than as granted in this Interim Order, having a lien or

administrative priority superior or _pari passu_ with that of any of the DIP Liens, the DIP

Superpriority Claims, the Adequate Protection Liens, or Adequate Protection Superpriority

Claims, shall be granted while any portion of the DIP Obligations or Prepetition Obligations

remain outstanding, or any commitment under the DIP Documents or Prepetition Financing

Documents remains in effect, without the prior written consent of each of the DIP Agent,

Majority Holders of Prepetition PIK Notes, and Majority Holders of Prepetition Convertible

Notes, each in their respective sole and absolute discretion.

27. <u>Intercreditor Arrangements.</u> The Intercreditor Arrangements set forth in **Exhibit "1"** hereto are approved. Notwithstanding anything to the contrary herein or in any other order of the Bankruptcy Court, the Intercreditor Arrangements shall supersede the Existing Intercreditor Agreement (to the extent applicable) solely to the extent expressly set forth in the Intercreditor Arrangements. The Intercreditor Arrangements shall survive the conversion or dismissal of any of the Chapter 11 Cases or any relief from the automatic stay granted in the Chapter 11 Cases.

28. <u>Mandatory Prepayments.</u> The Debtors are authorized, to the extent applicable, to make mandatory prepayments and voluntary prepayments (subject to the applicable priority provisions set forth in this Interim Order) of the Junior Lien DIP Facility as and when provided under, and for application in accordance with, the terms of the DIP Documents (including, without limitation, the prepayments set forth in Section 2.05 and Section 2.07 of the DIP Credit Agreement); <u>provided,</u> that no such mandatory or voluntary prepayments (excluding, for the avoidance of doubt, any refinancing of the Junior Lien DIP Facility) shall be made with the proceeds of the Cash Collateral until the Prepetition ABL Obligations and the Prepetition Term Loan Obligations have been Paid in Full; <u>provided,</u> further, that the Debtors shall be permitted to make such mandatory or voluntary prepayments from the Additional Collateral (including, without limitation, proceeds or products thereof and any cash deposited or maintained in the Additional Collateral Account).

29. <u>Payments.</u> No payments with respect to the DIP Obligations or the Adequate Protection Obligations (to the extent approved hereunder) shall be subject to Bankruptcy Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any such payments shall be required to file any interim or final

fee applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any such payments.

30.   Financial Reporting. The Debtors shall continue to provide (i) the Prepetition ABL Agent with financial and other reporting in compliance with the Prepetition ABL Facility, including weekly borrowing base certificates as and when required under the Prepetition ABL Credit Agreement, and any reports provided to the Prepetition Term Loan Agent and (ii) the Prepetition Term Loan Agent with financial and other reporting in compliance with the Prepetition Term Loan Facility (all such reporting referred to in clauses (i) and (ii) above, the "**Financial Reports**"). The Debtors shall simultaneously provide Financial Reports to (a) the DIP Agent, and (b) advisors to each of the Majority Holders of Prepetition PIK Notes and the Majority Holders of Prepetition Convertible Notes, and (c) subject to the execution of appropriate confidentiality agreement, to any of the Prepetition PIK Notes Secured Parties or Prepetition Convertible Notes Secured Parties, as applicable.

31.   Credit Bid. Subject to the terms of the DIP Documents and the Intercreditor Arrangements, any of the DIP Agent, DIP Lenders and Prepetition Secured Parties shall be permitted to credit bid some or all of the outstanding DIP Obligations, Prepetition Obligations, DIP Superpriority Claims or Adequate Protection Superiority Claims, as applicable, as consideration in any sale of the DIP Collateral (or any part thereof) or Common Collateral (or any part thereof), in each case to the extent permitted by section 363(k) of the Bankruptcy Code, without the need for further order of the Bankruptcy Court, and whether that sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

32.    <u>Exculpation.</u> Nothing in this Interim Order, the DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Agent or any DIP Lender any liability for any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising from, related to or in connection with the prepetition or postpetition activities of the Debtors in the operation of their businesses, their restructuring efforts, any aspect of the Junior Lien DIP Facility or the negotiation, consummation or enforcement of any of the DIP Documents or any ancillary documents and security arrangements related thereto. In addition, (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors; <u>provided,</u> that the foregoing shall not apply to any act or omission by the DIP Agent or the DIP Lenders that constitutes fraud, gross negligence or willful misconduct by the DIP Agent or the DIP Lenders as finally determined by a court of competent jurisdiction.

33.    <u>Subsequent Reversal or Modification.</u> This Interim Order is entered pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting the DIP Agent, DIP Lenders and Prepetition Secured Parties all protections and benefits afforded by section 364(e) of the Bankruptcy Code. Any financial accommodations made to the Debtor

by the DIP Agent, DIP Lenders or any of the Prepetition Secured Parties shall be deemed to have been made in good faith, as such term is used in section 363(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, on appeal or otherwise, (i) such action shall not affect (1) the validity of any obligation, indebtedness or liability incurred or payment made hereunder by any of the Debtors to the DIP Agent, DIP Lenders or Prepetition Secured Parties or (2) the validity and enforceability of any lien or priority authorized, created or granted hereunder, and (ii) the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code.

34.    Waiver of Section 506(c) Claims. Subject to and effective only upon entry of the Final Order granting the Motion, the Debtors waive (a) any costs or expenses of administration, which have been or may be incurred in these Chapter 11 Cases or any successor case at any time, or (b) any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Prepetition Secured Parties upon the Common Collateral, or the preservation, protection or enhancement of, or the realization by the DIP Agent or DIP Lenders upon, the DIP Collateral, in each case, may be surcharged against any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as applicable, or any of their respective claims, the Carve Out, the DIP Collateral (including Common Collateral), pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise. Notwithstanding anything contained herein to the contrary, nothing contained herein or the transactions contemplated hereby (including, without limitation, the approval of any Budget or the consent to the terms of this Interim Order) shall constitute an admission or be deemed an admission, and no action, inaction or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition

Secured

Parties (including, without limitation, the approval of any Budget or consent to the terms of this Interim Order) shall be deemed to be or shall constitute an admission (nor shall any consent be implied from any action, inaction or acquiescence by, either with or without notice to, the Prepetition Secured Parties) to any charge, lien, assessment or claim (excluding the Carve Out) against any of the DIP Agent, DIP Lenders or Prepetition Secured Parties or any of their respective claims, the Carve Out, the DIP Collateral (including Common Collateral), whether pursuant to section 506(c) of the Bankruptcy Code or otherwise.

35.     Section 552(b) Equities of the Case Waiver. Each of the DIP Agent, DIP Lenders and Prepetition Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. Subject to and effective only upon entry of the Final Order granting the Motion, the Debtors hereby waive, and no person may assert, the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the DIP Agent, DIP Lenders, the DIP Liens, the Prepetition Secured Parties or the Prepetition Liens.

36.     No Marshaling. Subject to and effective only upon entry of the Final Order granting the Motion, neither the DIP Agent, DIP Lenders nor any of the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral (including Common Collateral), as applicable.

37.     Proofs of Claim. None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties in such capacities will be required to file proofs of claim in any of Chapter 11 Cases or any successor case, and the Debtor's stipulations in this Interim Order shall be deemed to constitute a timely filed proof of claim with respect to their respective claims. Any order entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim

(including without limitation administrative claims) in the Chapter 11 Cases or any

successor chapter 7 case shall not apply to the DIP Agent, the DIP Lenders, or the

Prepetition Secured Parties acting in such capacities.

38.    <u>Order Governs.</u> In the event of any inconsistency between the provisions

of this Interim Order, if and when entered, and the DIP Documents, the provisions of this

Interim Order, as applicable, shall govern. Additionally, to the extent that there may be an

inconsistency between the terms of this Interim Order or the Final Order, if and when entered,

and the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and*

*9007 Implementing Certain Notice and Case Management Procedures*, if and when entered,

the terms of this Interim Order or Final Order, as applicable, shall govern.

39.    <u>Binding Effect; Successors and Assigns.</u> The DIP Documents and the

provisions of this Interim Order, including all findings herein and the Intercreditor

Arrangements, shall be binding upon all parties-in-interest in the Chapter 11 Cases, including

without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any

statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, as well as

the Debtors, the Debtors' estates and the Debtors' respective successors and assigns (including

any Chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an

examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary

appointed as a legal representative of any of the Debtors, or similar responsible person or

similar designee or litigation trust hereinafter appointed or elected for the estates of the

Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition

Secured Parties and the Debtors and their respective successors and assigns, including after

any conversion or dismissal of any of the Chapter 11 Cases; <u>provided,</u> that, except to the

extent expressly set forth

in this Interim Order, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or extend any financing to any Chapter 7 trustee, chapter 11 trustee or similar responsible person or similar designee or litigation trust hereunder appointed for the estates of the Debtors.

40.     Limitation of Liability. In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents or Prepetition Financing Documents, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to or in connection with the Debtors' restructuring efforts or the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Agent, DIP Lenders or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

41.     Effectiveness. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof as of the Commencement Date, and there shall be no stay of execution of effectiveness of this Interim Order. Any stay of the effectiveness of this Interim Order under Bankruptcy Rule 6004 or otherwise is waived.

42.  <u>Retention of Jurisdiction.</u> The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

43.  <u>Headings.</u> The heading of any provision of this Order is intended only for convenience and shall not be construed to be or interpreted as a part, or limitation on the scope, any such provision.

44.  <u>Final Hearing.</u> The Final Hearing on the Motion shall be held on **August 10, 2015 at 10:00 a.m. (Eastern Time)**, before the Bankruptcy Court.

~~1~~45.  <u>Notice of Final Hearing and Objection Deadline.</u> The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with the Bankruptcy Court and to the Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed. Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections with the Bankruptcy Court in accordance with General Order M-399, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. and Sunny Singh, Esq.) and (ii) the Notice Parties, with a copy to the Court's chambers, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on August 5, 2015**.

Dated: ~~July 21~~_____, 2015
       White Plains, New York

                                    _____
                                    ~~/s/Robert D. Drain~~
                                    United States Bankruptcy Judge

**Exhibit 1**

**Intercreditor Arrangements**

**Exhibit 2**

**Budget**

**Exhibit 3**

**2012 Confirmation Order Excerpts**

JD DRAFT
7/21/15

## Amended Exhibit 1

### Intercreditor Arrangements

Capitalized terms used herein shall have the meanings set forth in the Existing Intercreditor Agreement as in effect on the date hereof unless otherwise defined herein or in the Interim Order to which this Exhibit is attached (the "**Interim Order**"). Subject to the terms of the Interim Order, together with the relative rights and priorities of the DIP Secured Parties and the Prepetition Secured Parties set forth in the Interim Order, the following provisions constitute the intercreditor arrangements among the DIP Secured Parties and the Prepetition Secured Parties for purposes of the Interim Order.

As between and among the Prepetition Secured Parties only, the Existing Intercreditor Agreement and the other Prepetition Financing Documents shall remain in full force and effect (but subject to the Interim Order), subject to all parties' rights and defenses thereunder and under applicable law and except that Paragraph 6 below shall replace the purchase rights in the Existing Intercreditor Agreement).

1.    *Definitions*. The following terms, as used herein, have the following meanings:

> "**ABL Priority Collateral**" has the meaning specified in the Existing Intercreditor Agreement, provided that "ABL Priority Collateral" shall not include any Additional Collateral.

> "**Additional ABL Priority Collateral**" has the meaning set forth in Paragraph 4(b) below.

> "**Additional Collateral**" means (i) all property of the Debtors, if any, that is not subject to a valid and perfected Lien in favor of either or both of the ABL Agent and the Term Loan Agent immediately prior to the Commencement Date and in which a Lien has been granted to the DIP Agent pursuant to the applicable Order, including the Additional Collateral Account (as defined in the DIP Credit Agreement) and all amounts and property credited thereto (including, without limitation, all products and proceeds of all of the foregoing property) and (ii) all proceeds of leaseholds, subleaseholds and similar agreements in respect of real property interests that are not subject to a valid and perfected Lien in favor of either or both of the ABL Agent and the Term Loan Agent immediately prior to the Commencement Date under applicable law. In addition, with respect to any property excluded from the Liens in favor of the DIP Agent because of contractual restrictions (including restrictions in leaseholds and subleaseholds) preventing the grant of such Liens (and with respect to which all required consents or waivers have not been obtained), Additional Collateral shall not include the Debtors' interests in such contracts, leaseholds or subleaseholds, but shall include any proceeds or products thereof.

> "**Additional Term Priority Collateral**" has the meaning set forth in Paragraph 4(b) below.

"**Adequate Protection Lien Termination Date**" means, with respect to any Class of Secured Parties, the first date on which the indebtedness secured by the adequate protection lien granted to the applicable Class of Secured Parties pursuant to the Interim Order has been irrevocably paid in cash in full or such lien is otherwise terminated, canceled or extinguished or any earlier date of a final order by a court of competition jurisdiction that such Class of Secured Parties, in its capacity as such, is not entitled to adequate protection under section 507(b) of the Bankruptcy Code.

"**Class**" refers to the determination in relation to any particular Type of Common Collateral or Additional Collateral, (i) with respect to any Secured Obligations, whether such Secured Obligations are First Priority Obligations, Second Priority Obligations, DIP Obligations, Third Priority Obligations or Fourth Priority Obligations and (ii) with respect to any Secured Party, whether such Secured Party is a First Priority Secured Party, a Second Priority Secured Party, a DIP Secured Party, a Third Priority Secured Party or a Fourth Priority Secured Party.

"**Common Collateral**" has the meaning specified in the Existing Intercreditor Agreement, underlined provided that "Common Collateral" shall not include any Additional Collateral.

"**DIP Secured Party**" means the DIP Agent and the DIP Lenders.

"**DIP Termination Date**" means the date on which (i) the DIP Obligations (other than those that constitute taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding the principal of, and interest and premium (if any) on, and fees and expenses relating to, the DIP Obligations) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of DIP Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time) have been paid in cash in full, (ii) all commitments to extend credit under the applicable DIP Documents have been terminated and (iii) the DIP Agent has delivered a written notice to the Third Priority Representative and the Fourth Priority Representative stating that the DIP Termination Date has occurred to the satisfaction of the DIP Agent.

"**Enforcement Action**" means, with respect to any Class of Secured Obligations, (a) other than with respect to the DIP Secured Parties, any demand for payment or acceleration thereof and (b) with respect to all Classes of Secured Obligations, the exercise of any rights and remedies with respect to any Common Collateral or any Additional Collateral, as applicable, securing such obligations or the commencement or prosecution of enforcement of any such rights and remedies under the Prepetition Financing Documents or the DIP Documents, as applicable, of such Class, or applicable law, including the exercise of any rights of set-off or recoupment, and the exercise of any such rights or remedies of a secured creditor under the Uniform Commercial Code, the Bankruptcy Code or

other similar

creditors' rights, bankruptcy, insolvency, reorganization or similar laws of any applicable jurisdiction.

"**First Priority Documents**" means, with respect to any Type of Common Collateral or Additional Collateral, the Prepetition Financing Documents governing the First Priority Obligations.

"**First Priority Obligations**" means (i) with respect to the ABL Priority Collateral and Additional ABL Priority Collateral, all ABL Secured Obligations and (ii) with respect to the Term Priority Collateral and Additional Term Priority Collateral, all Term Loan Secured Obligations. To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Debtor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, DIP Secured Party, Third Priority Secured Party, Fourth Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of the Existing Intercreditor Agreement and the Interim Order and the rights and obligations of the Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**First Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the First Priority Representative and the holders of the First Priority Obligations with respect to such Common Collateral or Additional Collateral.

"**Fourth Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the Convertible Notes Secured Parties.

"**Representatives**" means the ABL Agent, the Term Loan Agent, the DIP Agent, the PIK Toggle Notes Trustee and the Convertible Notes Trustee, as applicable.

"**Second Priority Documents**" means, with respect to any Type of Common Collateral or Additional Collateral, the Prepetition Financing Documents governing the Second Priority Obligations.

"**Second Priority Obligations**" means (i) with respect to the ABL Priority Collateral and the Additional ABL Priority Collateral, all Term Loan Secured Obligations and (ii) with respect to the Term Priority Collateral and the Additional Term Priority Collateral, all ABL Secured Obligations. To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Debtor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, DIP Secured Party, Third Priority Secured Party, Fourth Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of the Existing

- 3 -

Intercreditor Agreement and the Interim Order and the rights and obligations of the Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Second Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the Second Priority Representative and the holders of the Second Priority Obligations with respect to such Common Collateral or Additional Collateral.

"**Secured Obligations**"·means the First Priority Obligations, the Second Priority Obligations, the DIP Obligations, the Third Priority Obligations and the Fourth Priority Obligations.

"**Secured Parties**" means the First Priority Secured Parties, the Second Priority Secured Parties, the DIP Secured Parties, the Third Priority Secured Parties and the Fourth Priority Secured Parties.

"**Term Priority Collateral**" has the meaning specified in the Existing Intercreditor Agreement, underline provided that "Term Priority Collateral" shall not include any Additional Collateral.

"**Third Priority Documents**" mean the PIK Toggle Notes Documents.

"**Third Priority Secured Parties**" means, with respect to any Type of Common Collateral or Additional Collateral, the PIK Toggle Notes Secured Parties.

"**Type**" when used to describe (i) any Common Collateral, refers to whether such Common Collateral is ABL Priority Collateral or Term Priority Collateral and (ii) any Additional Collateral, refers to whether such Additional Collateral is Additional ABL Priority Collateral or Additional Term Priority Collateral.

2.    *Exclusive Enforcement with respect to Common Collateral.*

a)    With respect to each Type of Common Collateral, until the First Priority Obligations Payment Date, the First Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable First Priority Documents, without any consultation with or consent of any Second Priority Secured Party, any DIP Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Common Collateral. With respect to each Type of Common Collateral, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the First Priority Documents), the First Priority Representative and the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable First Priority Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

15-23007-rdd Doc 88-1 Filed 07/21/15 Entered 07/21/15 13:09:44 Exhibit 1
15-23007-rdd Doc 110 Filed 07/22/15 Entered 07/22/15 14:29:04 Main Document
Pg 185 of 234

Pg 5 of 25

b)   With respect to each Type of Common Collateral, after the First Priority Obligations Payment Date but before the Second Priority Obligations Payment Date, the Second Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable Second Priority Documents, without any consultation with or consent of any DIP Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Common Collateral. With respect to each Type of Common Collateral, after the First Priority Obligations Payment Date but before the Second Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Second Priority Documents), the Second Priority Representative and the other Second Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable Second Priority Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

c)   With respect to each Type of Common Collateral, after the Second Priority Obligations Payment Date but before the DIP Termination Date, the DIP Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable DIP Documents, without any consultation with or consent of any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Common Collateral. With respect to each Type of Common Collateral, after the Second Priority Obligations Payment Date but before the DIP Termination Date, upon the occurrence and during the continuance of a DIP Event of Default (and subject to the provisions of the DIP Documents), the DIP Agent and the other DIP Secured Parties may take and continue any Enforcement Action with respect to the DIP Obligations and such Common Collateral in such order and manner as they may determine in their sole discretion.

d)   With respect to each Type of Common Collateral, after the DIP Termination Date but before the Third Priority Obligations Payment Date, the Third Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Common Collateral in accordance with the applicable Third Priority Documents, without any consultation with or consent of any Fourth Priority Secured Party with respect to such Common Collateral. With respect to each Type of Common Collateral, after the DIP Termination Date but before the Third Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Third Priority Documents), the Third Priority Representative and the other Third Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable Third Priority Obligations and such Common Collateral

in such order and manner as they may determine in their sole discretion.

- 5 -

3.    *Standstill with respect to Common Collateral.*

    a)    Notwithstanding the foregoing clauses of Paragraph 2, any Second Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the Second Priority Documents or applicable law after the passage of a period of [15] days (the "**Common Collateral Second Priority Standstill Period**") from the first date on which (x) such Second Priority Secured Party shall have delivered a notice in writing to the First Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event, and (y) the automatic stay shall have been terminated as to the applicable Common Collateral; <u>provided</u> that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral Second Priority Standstill Period, any First Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the Second Priority Representative); and <u>provided, further,</u> that in any Insolvency Proceeding commenced by or against any Debtor, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by and consistent with the Interim Order;

    b)    Notwithstanding the foregoing clauses of Paragraph 2, any DIP Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the DIP Documents or applicable law after the passage of a period of [30] days (or, if earlier, upon the expiration or termination of the Common Collateral Third Priority Standstill Period or the Common Collateral Fourth Priority Standstill Period) (the "**Common Collateral DIP Standstill Period**") from the first date on which (x) such DIP Secured Party shall have delivered a notice in writing to the First Priority Representative and the Second Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a DIP Event of Default, and (y) the automatic stay shall have been terminated as to the applicable Common Collateral; <u>provided</u> that, notwithstanding the foregoing, in no event shall any DIP Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral DIP Standstill Period, any First Priority Secured Party or Second Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the DIP Agent); and <u>provided, further,</u> that in any Insolvency Proceeding commenced by or against any Debtor, the DIP Agent and the DIP Secured Parties may take any action expressly permitted by and consistent with the Interim Order;

    c)    Notwithstanding the foregoing clauses of Paragraph 2, any Third Priority Secured Party may exercise its rights and remedies in respect of the applicable

Type of

Common Collateral under the Third Priority Documents or applicable law after the passage of a period of [45] days (or, if earlier, upon the expiration or earlier termination of the Common Collateral Fourth Priority Standstill Period) (the "**Common Collateral Third Priority Standstill Period**") from the first date on which (x) such Third Priority Secured Party shall have delivered a notice in writing to the First Priority Representative, the Second Priority Representative and the DIP Agent of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event, and (y) the automatic stay shall have been terminated as to the applicable Common Collateral; <u>provided</u> that, notwithstanding the foregoing, in no event shall any Third Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral Third Priority Standstill Period, any First Priority Secured Party, Second Priority Secured Party or DIP Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the Third Priority Representative); and <u>provided, further,</u> that in any Insolvency Proceeding commenced by or against any Debtor, the Third Priority Representative and the Third Priority Secured Parties may take any action expressly permitted by and consistent with the Interim Order; and

d) Notwithstanding the foregoing clauses of Paragraph 2, any Fourth Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Common Collateral under the Fourth Priority Documents or applicable law after the passage of a period of [60] days (the "**Common Collateral Fourth Priority Standstill Period**") from the first date on which (x) such Fourth Priority Secured Party shall have delivered a notice in writing to the First Priority Representative, the Second Priority Representative, the DIP Agent and the Third Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event, and (y) the automatic stay shall have been terminated as to the applicable Type of Common Collateral; <u>provided</u> that, notwithstanding the foregoing, in no event shall any Fourth Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Common Collateral Fourth Priority Standstill Period, any First Priority Secured Party, Second Priority Secured Party, DIP Secured Party or Third Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Common Collateral (prompt notice of such exercise to be given to the Fourth Priority Representative); and <u>provided, further,</u> that in any Insolvency Proceeding commenced by or against any Debtor, the Fourth Priority Representative and the Fourth Priority Secured Parties may take any action expressly permitted by and consistent with the Interim Order.

4.      *Exclusive Enforcement with respect to Additional Collateral.*

- 7 -

a)      With respect to any Additional Collateral, until the DIP Termination Date, the DIP Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Collateral in accordance with the applicable DIP Documents, without any consultation with or consent of any First Priority Secured Party, any Second Priority Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional Collateral. With respect to any Additional Collateral, upon the occurrence and during the continuance of a DIP Event of Default (and subject to the provisions of the DIP Documents), the DIP Agent and the other DIP Secured Parties may take and continue any Enforcement Action with respect to the DIP Obligations and such Additional Collateral in such order and manner as they may determine in their sole discretion.

b)      With respect to any Additional Collateral, on and after the DIP Termination Date:

    i)      that would have constituted Term Priority Collateral if such Additional Collateral were encumbered by a prepetition Mortgage or was otherwise of a type described as "Term Priority Collateral" in the Existing Intercreditor Agreement) but was not perfected upon the filing of the Cases immediately ("**Additional Term Priority Collateral**"), prior to the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, the Term Loan Secured Parties shall have the right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Term Priority Collateral in accordance with the applicable Term Loan Documents (in each case, as amended, supplemented, or otherwise modified prior to the date hereof, the "**Prepetition Term Loan Documents**"), without any consultation with or consent of any ABL Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional Term Priority Collateral. With respect to such Additional Term Priority Collateral, after the DIP Termination Date but before the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition Term Loan Documents), the Term Loan Secured Parties may take and continue any Enforcement Action with respect to the applicable Term Loan Secured Obligations and such Additional Term Priority Collateral in such order and manner as they may determine in their sole discretion;

    ii)     that is not Additional Term Priority Collateral ("**Additional ABL Priority Collateral**"), before the Adequate Protection Lien Termination Date for the ABL Secured Parties, the ABL Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional ABL Priority Collateral in accordance with the applicable ABL Loan Documents (in each case, as amended, supplemented, or otherwise

modified prior to the date hereof, the "**Prepetition ABL Loan Documents**"), without any

consultation with or consent of any Term Loan Secured Party, any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional ABL Priority Collateral. With respect to such Additional ABL Priority Collateral, after the DIP Termination Date but before the Adequate Protection Lien Termination Date for the ABL Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition ABL Loan Documents), the ABL Secured Parties may take and continue any Enforcement Action with respect to the applicable ABL Secured Obligations and such Additional ABL Priority Collateral in such order and manner as they may determine in their sole discretion;

iii)   that constitutes Additional ABL Priority Collateral, after the ABL Termination Date but before the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, the Term Loan Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional ABL Priority Collateral in accordance with the applicable Prepetition Term Loan Documents, without any consultation with or consent of any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional ABL Priority Collateral. With respect to such Additional ABL Priority Collateral, after the ABL Termination Date but before the Adequate Protection Lien Termination Date for the Term Loan Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition Term Loan Documents), the Term Loan Secured Parties may take and continue any Enforcement Action with respect to the applicable Term Loan Secured Obligations and such Additional ABL Priority Collateral in such order and manner as they may determine in their sole discretion; and

iv)   that constitutes Additional Term Priority Collateral, after the Term Loan Termination Date but before the Adequate Protection Lien Termination Date for the ABL Secured Parties, the ABL Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Term Priority Collateral in accordance with the applicable Prepetition ABL Loan Documents, without any consultation with or consent of any Third Priority Secured Party or any Fourth Priority Secured Party with respect to such Additional Term Priority Collateral. With respect to such Additional Term Priority Collateral, after the Term Loan Termination Date but before the Adequate Protection Lien Termination Date for the ABL Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition ABL Loan Documents), the ABL Secured Parties may take

and continue any Enforcement Action with respect to the applicable ABL

- 9 -

Secured Obligations and such Additional Term Priority Collateral in such order and manner as they may determine in their sole discretion.

c)    With respect to any Additional Collateral, after the later to occur of the ABL Termination Date and the Term Loan Termination Date (the "Prepetition Senior Facilities Termination Date") but before the Adequate Protection Lien Termination Date for the Third Priority Secured Parties, the Third Priority Secured Parties shall have the exclusive right to take and continue (or refrain from taking or continuing) any Enforcement Action with respect to such Additional Collateral in accordance with the applicable Prepetition PIK Notes Documents, without any consultation with or consent of any Fourth Priority Secured Party with respect to such Additional Collateral. With respect to any Additional Collateral, after the Prepetition Senior Facilities Termination Date but before the Adequate Protection Lien Termination Date for the Third Priority Secured Parties, upon the occurrence and during the continuance of a Cash Collateral Termination Event (and subject to the provisions of the Prepetition PIK Notes Documents), the Third Priority Representative and the other Third Priority Secured Parties may take and continue any Enforcement Action with respect to the applicable Third Priority Obligations and such Additional Collateral in such order and manner as they may determine in their sole discretion.

5.    *Standstill with respect to Additional Collateral.*

a)    Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the First Priority Secured Parties, any First Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the First Priority Documents or applicable law after the passage of a period of [15] days (the "**Additional Collateral First Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; <u>provided</u> that, notwithstanding the foregoing, in no event shall any First Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral First Priority Standstill Period, any DIP Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the First Priority Representative); and <u>provided, further,</u> that in any Insolvency Proceeding commenced by or against any Debtor, the First Priority Representative and the First Priority Secured Parties may take any action expressly permitted by the Interim Order.

b)    Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the Second Priority Secured Parties, any Second Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the Second Priority

Documents or applicable law after the passage of a period of [30] days (the "**Additional**

15-23007-rdd Doc 88-1 Filed 07/21/15 Entered 07/21/15 13:09:44 Exhibit 1
15-23007-rdd   Doc 110   Filed 07/22/15   Entered 07/22/15 14:29:04   Main Document
Pg 197 of 234

Pg 11 of 25

**Collateral Second Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent and the First Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; provided that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral Second Priority Standstill Period, any DIP Secured Party or First Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the Second Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by the Interim Order.

c)      Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the Third Priority Secured Parties, any Third Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the Third Priority Documents or applicable law after the passage of a period of [45] days (the "**Additional Collateral Third Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent, the First Priority Representative and the Second Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination Event; provided that, notwithstanding the foregoing, in no event shall any Third Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral Third Priority Standstill Period, any DIP Secured Party, First Priority Secured Party or Second Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the Third Priority Representative); and provided, further, that in any Insolvency Proceeding commenced by or against any Debtor, the Third Priority Representative and the Third Priority Secured Parties may take any action expressly permitted by the Interim Order.

d)      Notwithstanding the foregoing clauses of Paragraph 4, before the Adequate Protection Lien Termination Date for the Fourth Priority Secured Parties, any Fourth Priority Secured Party may exercise its rights and remedies in respect of the applicable Type of Additional Collateral under the Fourth Priority Documents or applicable law after the passage of a period of [60] days (the "**Additional Collateral Fourth Priority Standstill Period**") from the date of delivery of a notice in writing to the DIP Agent, the First Priority Representative, the Second Priority Representative and the Third Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of a Cash Collateral Termination

- 11 -

Event; _provided_ that, notwithstanding the foregoing, in no event shall any Fourth Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Additional Collateral Fourth Priority Standstill Period, any DIP Secured Party, First Priority Secured Party, Second Priority Secured Party or Third Priority Secured Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to any of such Additional Collateral (prompt notice of such exercise to be given to the Fourth Priority Representative); and _provided, further,_ that in any Insolvency Proceeding commenced by or against any Debtor, the Fourth Priority Representative and the Fourth Priority Secured Parties may take any action expressly permitted by the Interim Order.

6.    _Option to Purchase._

a)    With respect to each Type of Common Collateral and Additional Collateral,

i)    prior to the First Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, (A) all or a portion of the Second Priority Secured Parties acting as a single group, (B) all or a portion of the DIP Secured Parties acting as a single group, (C) all or a portion of the Third Priority Secured Parties acting as a single group or (D) all or a portion of the Fourth Priority Secured Parties acting as a single group (in each case, the "**First Priority Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the relevant Representatives to purchase (w) in the case of clause (A), all of the First Priority Obligations from the First Priority Secured Parties, (x) in the case of clause (B), all of the First Priority Obligations from the First Priority Secured Parties and all of the Second Priority Obligations from the Second Priority Secured Parties, (y) in the case of clause (C), all of the First Priority Obligations from the First Priority Secured Parties, all of the Second Priority Obligations from the Second Priority Secured Parties and all of the DIP Obligations from the DIP Secured Parties and (z) in the case of clause (D), all of the First Priority Obligations from the First Priority Secured Parties, all of the Second Priority Obligations from the Second Priority Secured Parties, all of the DIP Obligations from the DIP Secured Parties and all of the Third Priority Obligations from the Third Priority Secured Parties (in each case, the "**First Priority Selling Secured Parties**"). Such notice from the relevant First Priority Purchasing Secured Parties to the Representatives of the relevant First Priority Selling Secured Parties shall be irrevocable unless otherwise agreed in writing by such Representatives;

ii)    after the First Priority Obligations Payment Date and prior to the Second Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, (A) all or a portion of the DIP Secured Parties acting as a single group, (B) all or a portion of the Third Priority Secured Parties acting as a single group or (C) all or a

15-23007-rdd Doc 88-1 Filed 07/21/15 Entered 07/21/15 13:09:44 Exhibit 1
15-23007-rdd Doc 110 Filed 07/22/15 Entered 07/22/15 14:29:04 Main Document
Pg 200 of 234

Pg 13 of 25

portion of the Fourth Priority Secured Parties acting as a single group (in each case, the "**Second Priority Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the relevant Representatives to purchase (x) in the case of clause (A), all of the Second Priority Obligations from the Second Priority Secured Parties, (y) in the case of clause (B), all of the Second Priority Obligations from the Second Priority Secured Parties and all of the DIP Obligations from the DIP Secured Parties and (z) in the case of clause (C), all of the Second Priority Obligations from the Second Priority Secured Parties, all of the DIP Obligations from the DIP Secured Parties and all of the Third Priority Obligations from the Third Priority Secured Parties (in each case, the "**Second Priority Selling Secured Parties**"). Such notice from the relevant Second Priority Purchasing Secured Parties to the Representatives of the relevant Second Priority Selling Secured Parties shall be irrevocable unless otherwise agreed in writing by such Representatives;

iii)   (1) upon (x) any submission by the DIP Agent of a credit bid in writing for any of the Debtors' assets before the applicable deadline for the submission of such bids (a "**Credit Bid**"), (y) the scheduling by the Debtors of an auction for the sale of such assets (a "**Specified Auction**") and (z) the ~~determination by~~qualification of the DIP Agent ~~following such bid deadline to participate~~as a bidder in such auction (and upon the reasonable request by the Third Priority Secured Parties or the Fourth Priority Secured Parties, the DIP Agent will confirm whether it has ~~determined~~ so ~~to participate in such auction~~qualified as a bidder), or (2) after the Second Priority Obligations Payment Date and prior to the DIP Termination Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, (A) all or a portion of the Third Priority Secured Parties acting as a single group or (B) all or a portion of the Fourth Priority Secured Parties acting as a single group (in such capacity, the "**DIP Purchasing Secured Parties**") shall have the option at any time upon prior written notice to the DIP Agent to purchase (x) in the case of clause (A), all of the DIP Obligations from the DIP Secured Parties and (y) in the case of clause (B), all of the DIP Obligations from the DIP Secured Parties and all of the Third Priority Obligations from the Third Priority Secured Parties (in such capacity, the "**DIP Selling Secured Parties**"). Such notice from the DIP Purchasing Secured Parties to the DIP Agent shall be irrevocable unless otherwise agreed in writing by the DIP Agent; and

iv)   after the DIP Termination Date and prior to the Third Priority Obligations Payment Date, upon the occurrence and during the continuance of a Cash Collateral Termination Event, all or a portion of the Fourth Priority Secured Parties acting as a single group (in such capacity, the "**Third Priority Purchasing Secured Parties**" and,

together with the First Priority Purchasing Secured Parties, the Second Priority Purchasing Secured Parties and the DIP Purchasing Secured Parties, the "**Purchasing Secured Parties**") shall have the option at any time upon prior written

- 13 -

notice to the Third Priority Representative to purchase all of the Third

- 13 -

Priority Obligations from the Third Priority Secured Parties (in such capacity, the "**Third Priority Selling Secured Parties**" and, together with the First Priority Selling Secured Parties, the Second Priority Selling Secured Parties and the DIP Selling Secured Parties, the "**Selling Secured Parties**"). Such notice from the Third Priority Purchasing Secured Parties to the Third Priority Representative shall be irrevocable unless otherwise agreed in writing by the Third Priority Representative.

b)    On the date (the "**Purchase Date**") specified by the relevant Purchasing Secured Parties in the notice contemplated by clauses (a)(i) through (a)(iv) above (which shall not be less than five (5) business days, nor more than twenty (20) calendar days, after the receipt by the Representatives of the relevant Selling Secured Parties of the notice of the relevant Purchasing Secured Parties' election to exercise such option and which, in the case of an election in respect of a Credit Bid, shall be the second Business Day prior to the date scheduled for the Specified Auction, as such date may be rescheduled from time to time (or, if the DIP Agent has qualified as a bidder after such date, immediately prior to the Specified Auction) or such other date agreed by such Representatives in writing, the relevant Selling Secured Parties shall sell to the relevant Purchasing Secured Parties, and the relevant Purchasing Secured Parties shall purchase (on a ratable basis in accordance with the outstanding principal amount of their respective Obligations (as defined in the applicable Prepetition Financing Documents or the DIP Documents, as applicable) or such other basis as agreed by such Purchasing Secured Parties) from the relevant Selling Secured Parties, the relevant Obligations, _provided_ that, the relevant Selling Secured Parties and Purchasing Secured Parties (and the Representatives thereof) shall retain all rights to be indemnified or held harmless by the Debtors in accordance with the terms of the relevant Finance Documents but the relevant Selling Secured Parties shall not retain any rights to the security therefor (but the Selling Secured Parties shall be treated as paid in full), _provided_ that, no such sale and purchase shall occur with respect to an election in respect of a Credit Bid if the DIP Agent notifies the Representative for the relevant Purchasing Secured Parties ~~prior to the Purchase Date~~ that the DIP Agent has withdrawn its Credit Bid or determined not to participate in the Specified Auction (in each case in compliance with the applicable bidding procedures) reasonably in advance of the time specified for the funding of the sale and purchase.

c)    On the Purchase Date, the relevant Purchasing Secured Parties shall (i) pay to each Representative of the relevant Selling Secured Parties for the benefit of such Selling Secured Parties as the purchase price there for the full amount of all Obligations of such Selling Secured Parties then outstanding and unpaid (including principal, interest, fees and expenses (including, without limitation, (A) the Make Whole Fee, as defined in the DIP Credit Agreement, if the Selling Secured Parties are the DIP Secured Parties, or (B) any other applicable make whole fee or premium, if the Selling Secured Parties are not the DIP Secured Parties), including reasonable attorneys' fees and legal expenses, (ii) furnish cash collateral to such Representative in a manner and in such amounts as such Representative determines is reasonably necessary to secure such Representative

and such Selling Secured Parties in connection with any issued and outstanding letters of credit, Bank Product Obligations and Cash Management Obligations

(each as defined in the Prepetition ABL Credit Agreement) secured by the relevant Prepetition Financing Documents or DIP Documents, as applicable, in each case to the extent applicable, (iii) agree to reimburse such Representative and such Selling Secured Parties for any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) in connection with any commissions, fees, costs or expenses related to any issued and outstanding letters of credit as described above and any checks or other payments provisionally credited to the Obligations of such Secured Parties, and/or as to which such Representative has not yet received final payment, (iv) agree to reimburse the such Selling Secured Parties in respect of indemnification obligations of the Debtors under the relevant Prepetition Financing Documents or DIP Documents, as applicable, as to matters or circumstances known to such Representative at the time of the purchase and sale which would reasonably be expected to result in any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) to such Selling Secured Parties and (v) agree to indemnify and hold harmless such Selling Secured Parties from and against any loss, liability, claim, damage or expense (including reasonable fees and expenses of legal counsel) arising out of any claim asserted by a third party in respect of the Obligations of such Selling Secured Parties as a direct result of any acts by such Selling Secured Parties occurring after the date of such purchase. Such purchase price and cash collateral shall be remitted by wire transfer in federal funds to such bank account in New York, New York as each such Representative may designate in writing for such purpose.

d) Such purchase shall be expressly made (i) without representation or warranty of any kind by the relevant Selling Secured Parties (or the Representative thereof) and without recourse of any kind, except that such Selling Secured Parties shall represent and warrant: (A) the amount of the Obligations being purchased from it and (B) that such Selling Secured Parties are the sole legal and beneficial owner of such Obligations and have the right to assign such Obligations and the assignment is duly authorized and (ii) pursuant to definitive documentation reasonably acceptable to the relevant Selling Secured Parties and Purchasing Secured Parties.

7. *Application of Proceeds*

a) All proceeds of the ABL Priority Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

*first*, to the ABL Agent to be applied in accordance with Section 8.03 of the Prepetition ABL Credit Agreement until the ABL Termination Date has occurred;

*second*, to the Term Loan Agent to be applied in accordance with Section 8.03 of the Prepetition Term Loan Agreement until the Term Loan Termination Date has occurred;

15

*third*, to the DIP Agent to be applied in accordance with Section 8.03 of the DIP Credit Agreement (or any corresponding provision with respect to any replacement DIP Credit Agreement) until the DIP Termination Date has occurred;

*fourth*, to the PIK Toggle Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition PIK Notes Indenture until the PIK Toggle Notes Termination Date has occurred;

*fifth*, to the Convertible Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition Convertible Notes Indenture until the

Convertible Notes Termination Date has occurred; and

*finally*, to the relevant Debtor, or as a court of competent jurisdiction may direct.

b)      All proceeds of the Term Priority Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

*first*, to the Term Loan Agent to be applied in accordance with Section 8.03 of the Prepetition Term Loan Agreement until the Term Loan Termination Date has occurred;

*second*, to the ABL Agent to be applied in accordance with Section 8.03 of the Prepetition ABL Credit Agreement until the ABL Termination Date has occurred;

*third*, to the DIP Agent to be applied in accordance with Section 8.03 of the DIP Credit Agreement (or any corresponding provision with respect to any replacement DIP Credit Agreement) until the DIP Termination Date has occurred;

*fourth*, to the PIK Toggle Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition PIK Notes Indenture until the PIK Toggle Notes Termination Date has occurred;

*fifth*, to the Convertible Notes Trustee to be applied in accordance with Section 8.03 of the Prepetition Convertible Notes Indenture until the

Convertible Notes Termination Date has occurred; and

*finally*, to the relevant Debtor, or as a court of competent jurisdiction may direct.

c)      All proceeds of the Additional Collateral (including any interest earned thereon) resulting from any Enforcement Action, and whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:

*first*, to the DIP Agent to be applied in accordance with Section 8.03 of the DIP Credit Agreement (or any corresponding provision with respect to any replacement DIP Credit Agreement) until the DIP Termination Date has occurred;

*second*, in the manner set forth in the Existing Intercreditor Agreement as and to the extent applicable, subject to any all rights and defenses available thereunder and under applicable law; and

*third*, after indefeasible payment in full of all First Priority Secured Obligations, Second Priority Secured Obligations, DIP Secured Obligations, Third Priority Secured Obligations and Fourth Priority Secured Obligations, to the relevant Debtor, or as a court of competent jurisdiction may direct.

8. *Turnover Provisions with respect to Common Collateral*

a) With respect to each Type of Common Collateral, until the occurrence of the First

Priority Obligations Payment Date, no Second Priority Secured Party, DIP Secured Party, Third Priority Secured Party or Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of the Second Priority Secured Obligations, DIP Obligations, Third Priority Secured Obligations or Fourth Priority Secured Obligations, as the case may be, in violation of Paragraph 7(a) or 7(b). Any Common Collateral received by a Second Priority Secured Party, DIP Secured Party, Third Priority Secured Party or Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the First Priority Representative to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party, the DIP Agent, each Third Priority Secured Party and each Fourth Priority Secured Party hereby authorizes the First Priority Representative to make any such endorsements as agent for the Second Priority Representative, the DIP Agent, the Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable). Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the Second Priority Obligations, the DIP Obligations, the Third Priority Obligations or the Fourth Priority Obligations, as the case may be, purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

NAI-1500444380v9 18

b)      With respect to each Type of Common Collateral, after the First Priority Obligations Payment Date and prior to the Second Priority Obligations Payment Date, no DIP Secured Party, Third Priority Secured Party or Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of

– 17 –

the DIP Obligations, Third Priority Secured Obligations or Fourth Priority Secured Obligations in violation of Paragraph 7(a) or 7(b). Any Common Collateral received by a DIP Secured Party, a Third Priority Secured Party or a Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the Second Priority Representative to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each DIP Secured Party, Third Priority Secured Party and Fourth Priority Secured Party hereby authorizes the Second Priority Representative to make any such endorsements as agent for the DIP Agent, Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable). Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the DIP Obligations, the Third Priority Obligations and Fourth Priority Obligations purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

c)    With respect to each Type of Common Collateral, after the Second Priority Obligations Payment Date and prior to the DIP Termination Date, no Third Priority Secured Party or Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of the Third Priority Secured Obligations or Fourth Priority Secured Obligations in violation of Paragraph 7(a) or 7(b). Any Common Collateral received by a Third Priority Secured Party or a Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the DIP Agent to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the same form as received, with any necessary endorsements, and each Third Priority Secured Party and Fourth Priority Secured Party hereby authorizes the DIP Agent to make any such endorsements as agent for the Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable). Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the Third Priority Obligations and Fourth Priority Obligations purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

d)    With respect to each Type of Common Collateral, after the DIP Termination Date and prior to the Third Priority Obligations Payment Date, no Fourth Priority Secured Party may accept any such Common Collateral, including any such Common Collateral constituting proceeds, in satisfaction, in whole or in part, of

the Fourth Priority Secured Obligations in violation of Paragraph 7(a) or 7(b). Any Common Collateral received by a Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the Third Priority Representative to be applied in accordance with Paragraph 7(a) or 7(b), as the case may be, in the

same form as received, with any necessary endorsements, and each Fourth Priority Secured Party hereby authorizes the Third Priority Representative to make any such endorsements as agent for the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable). Upon the turnover of such Common Collateral as contemplated by the immediately preceding sentence, the Fourth Priority Obligations purported to be satisfied by the payment of such Common Collateral shall be immediately reinstated in full as though such payment had never occurred.

9.    *Turnover Provisions with respect to Additional Collateral.*

a)    With respect to any Additional Collateral, until the occurrence of the DIP Termination Date, no First Lien Secured Party, Second Priority Secured Party, Third Priority Secured Party or Fourth Priority Secured Party may accept any such Additional Collateral, including any such Additional Collateral constituting proceeds, in satisfaction, in whole or in part, of the First Priority Secured Obligations, Second Priority Secured Obligations, Third Priority Secured Obligations or Fourth Priority Secured Obligations, as the case may be, in violation of Paragraph 7(c). Any Additional Collateral received by a First Priority Secured Party, Second Priority Secured Party, Third Priority Secured Party or Fourth Priority Secured Party that is not permitted to be received pursuant to the preceding sentence shall be segregated and held in trust and promptly turned over to the DIP Agent to be applied in accordance with Paragraph 7(c), in the same form as received, with any necessary endorsements, and each First Priority Secured Party, each Second Priority Secured Party, each Third Priority Secured Party and each Fourth Priority Secured Party hereby authorizes the DIP Agent to make any such endorsements as agent for the First Priority Representative, the Second Priority Representative, the Third Priority Representative and the Fourth Priority Representative (which authorization, being coupled with an interest, is irrevocable). Upon the turnover of such Additional Collateral as contemplated by the immediately preceding sentence, the First Priority Obligations, the Second Priority Obligations, the Third Priority Obligations or the Fourth Priority Obligations, as the case may be, purported to be satisfied by the payment of such Additional Collateral shall be immediately reinstated in full as though such payment had never occurred.

10.    *Bailee for Perfection.*

a)    With respect to each Type of Common Collateral, each Representative hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over such Common Collateral pursuant to the First Priority Documents, such

- 19 -

possession or control is also for the benefit of each other Representative for the other applicable Secured Parties, but solely to the extent required to perfect their security interest by possession or control in such Common Collateral as a gratuitous bailee for the other Secured Parties (such bailment being intended, among other things, to satisfy the requirements of Section 8-l06(d)(3), 8-30l(a)(2)

-19-

and 9-313(c) of the UCC). Nothing in the preceding sentence shall be construed to impose any duty on the any such Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide any other Representative or any other Secured Party with respect to such Common Collateral with any rights with respect to such Common Collateral beyond those specified in the Interim Order, the Existing Intercreditor Agreement and the First Priority Documents, the Second Priority Documents, the DIP Documents, the Third Priority Documents or the Fourth Priority Documents, as the case may be, <u>provided</u> that with respect to each Type of Common Collateral, (i) promptly upon the First Priority Obligations Payment Date and prior to the Second Priority Obligations Payment Date, the First Priority Representative shall (x) deliver to the Second Priority Representative (and each Debtor hereby directs such First Priority Representative to so deliver and each of the Representatives (on behalf of itself and the other applicable Secured Parties), consents to such delivery) any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the Second Priority Representative may reasonably request, all at the Debtors' sole cost and expense, (ii) promptly upon the Second Priority Obligations Payment Date and prior to the DIP Termination Date, the Second Priority Representative shall (x) deliver to the DIP Agent (and each Debtor hereby directs such Second Priority Representative to so deliver and each other Representative (on behalf of itself and the other Secured Parties) consents to such delivery), any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the DIP Agent may reasonably request, all at the Debtors' sole cost and expense, (iii) promptly upon the DIP Termination Date and prior to the Third Priority Obligations Payment Date, the DIP Agent shall (x) deliver to the Third Priority Representative (and each Debtor hereby directs such DIP Agent to so deliver and the Fourth Priority Representative (on behalf of itself and the other Fourth Priority Secured Parties) consents to such delivery), any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the Third Priority Representative may reasonably request, all at the Debtors' sole cost and expense and (iv) after the Third Priority Obligations Payment Date, the Third Priority Representative shall (x) to the extent any Fourth Priority Obligations

remain outstanding, deliver to the Fourth Priority Representative (and each Debtor hereby directs such Third Priority Representative to so deliver), any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Common Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Common Collateral as a

court of competent jurisdiction otherwise directs, and deliver any other notices or documents as the Fourth Priority Representative may reasonably request, all at the Debtors' sole cost and expense.

b)      With respect to Additional Collateral, the DIP Agent hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over such Additional Collateral pursuant to the DIP Documents, such possession or control is also for the benefit of the Prepetition Secured Parties, but solely to the extent required to perfect their security interest by possession or control in such Additional Collateral as a gratuitous bailee for the Prepetition Secured Parties (such bailment being intended, among other things, to satisfy the requirements of Section 8-l06(d)(3), 8-30l(a)(2) and 9-313(c) of the UCC). Nothing in the preceding sentence shall be construed to impose any duty on the DIP Agent (or any third party acting on its behalf) with respect to such Additional Collateral or provide any Prepetition Secured Party with respect to such Additional Collateral with any rights with respect to such Additional Collateral beyond those specified in the Interim Order, provided that with respect to any Additional Collateral, after the DIP Termination Date, the DIP Agent shall (x) deliver to the First Priority Representative (for the benefit of all other Prepetition Secured Parties) (and each Debtor hereby directs the DIP Agent to so deliver and the First Priority Representative (on behalf of itself and the other First Priority Secured Parties), the Second Priority Representative (on behalf of itself and the other Second Priority Secured Parties), the Third Priority Representative (on behalf of itself and the other Third Priority Secured Parties) and the Fourth Priority Representative (on behalf of itself and the other Fourth Priority Secured Parties) consent to such delivery) at the Debtors' sole cost and expense, any stock certificates, promissory notes or other possessory collateral evidencing or constituting such Additional Collateral in its possession together with any necessary endorsements or (y) direct and deliver such Additional Collateral as a court of competent jurisdiction otherwise directs.

c)      Paragraphs 10(a) and 10(b) are intended solely to effectuate the respective Lien priorities as between the Secured Parties and shall not impose on any Secured Party any obligations in respect of the disposition of any Common Collateral or Additional Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

d)      Other than as set forth in the provisos in Paragraphs 10(a) and 10(b), any Secured Party, with physical possession of or control over Common Collateral or Additional Collateral shall not have any duty or liability to protect or preserve any

- 21 -

rights pertaining to any of such Common Collateral or Additional Collateral, as applicable, and, except for gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction, each Secured Party hereby waives and releases such Person from all claims and

21

liabilities arising pursuant to such Person's role as bailee with respect to such Common Collateral or Additional Collateral, as applicable.

11. *Credit Bidding*. Each Secured Party shall expressly have the right to bid or credit bid any of its Secured Obligations for or purchase the Additional Collateral or the Common Collateral at any public, private or judicial foreclosure or sale of any Additional Collateral or Common Collateral (including a "partial credit bid") or in an Insolvency Proceeding or otherwise; provided that (a) any such credit bid or partial credit bid of the DIP Obligations must provide for the payment in full in cash of the First Priority Obligations and the Second Priority Obligations on closing of any resulting disposition (to the extent then outstanding), (b) any such credit bid or partial credit bid of Third Priority Obligations must provide for the payment in full in cash of the First Priority Obligations, the Second Priority Obligations and the DIP Obligations on closing of any resulting disposition (in each case, to the extent then outstanding) and (c) any such credit bid or partial credit bid of Fourth Priority Obligations must provide for the payment in full in cash of the First Priority Obligations, the Second Priority Obligations, the DIP Obligations and the Third Priority Obligations on closing of any resulting disposition (in each case, to the extent then outstanding).

12. *Access to Additional Collateral by ABL Agent*.

a) If the ABL Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure), enforcement, collection or execution with respect to the ABL Priority Collateral ("**ABL Priority Collateral Enforcement Actions**") or if the DIP Agent commences any action or proceeding with respect to any of its rights or remedies (including, but not limited to, any action of foreclosure), enforcement, collection or execution with respect to the Additional Collateral and the DIP Agent (or a purchaser at a foreclosure sale conducted in foreclosure of the DIP Agent's Liens) takes actual or constructive possession of the Additional Collateral of any Grantor ("**Additional Collateral Enforcement Actions**"), then (1) if the ABL Agent has commenced an ABL Priority Collateral Enforcement Action, the ABL Agent shall furnish the DIP Agent with prompt written notice of the commencement of such action (the "**ABL Priority Collateral Enforcement Action**") and (2) in all cases, the DIP Agent shall (x) cooperate with the ABL Agent (and with its officers, employees, representatives and agents) in its efforts to conduct ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral and to finish any work-in-process and process, ship, produce, store, complete, supply, lease, sell or otherwise handle, deal with, assemble or dispose of, in any lawful manner, the ABL Priority Collateral, (y) not hinder or restrict in any respect the ABL Agent from conducting ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral or from finishing any work-in-process or processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling,

dealing with, assembling or disposing of, in any lawful manner, the ABL Priority Collateral and (z) permit the ABL Agent, its employees, agents, advisers and representatives, at the cost and expense of the ABL Secured Parties, to enter upon and use the Additional Collateral, for a period commencing on (I) the earlier of

the date of the initial ABL Priority Collateral Enforcement Action or the date of delivery of the ABL Priority Collateral Enforcement Action Notice, as the case may be, and (II) ending on the earlier of the date occurring 120 days thereafter and the date on which all ABL Priority Collateral (other than ABL Priority Collateral abandoned by the ABL Agent in writing) has been sold or disposed of (such period, as the same may be extended with the written consent of the DIP Agent, the "**ABL Priority Collateral Processing and Sale Period**"),

provided, however, that nothing contained in this Agreement shall restrict the rights of the DIP Agent from selling, assigning or otherwise transferring any Additional Collateral prior to the expiration of such ABL Priority Collateral Processing and Sale Period if the purchaser, assignee or transferee thereof agrees in writing (for the benefit of the ABL Agent and the ABL Secured Parties) to be bound by the provisions of this Section 12. If any stay or other order prohibiting the exercise of remedies with respect to the ABL Priority Collateral has been entered by a court of competent jurisdiction, such ABL Priority Collateral Processing and Sale Period shall be tolled during the pendency of any such stay or other order.

b)      During the period of actual occupation, use and/or control by the ABL Secured Parties and/or the ABL Agent (or their respective employees, agents, advisers and representatives) of any Additional Collateral, the ABL Secured Parties and the ABL Agent shall be obligated to repair at their expense any physical damage to such Additional Collateral resulting from such occupancy, use or control, and to leave such Additional Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the ABL Secured Parties or the ABL Agent have any liability to the DIP Secured Parties pursuant to this Section 12 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Additional Collateral existing prior to the date of the exercise by the ABL Secured Parties (or the ABL Agent, as the case may be) of their rights under this Section 12 and the ABL Secured Parties shall have no duty or liability to maintain the Additional Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Secured Parties, or for any diminution in the value of the Additional Collateral that results from ordinary wear and tear resulting from the use of the Additional Collateral by the ABL Secured Parties in the manner and for the time periods specified under this Section 12. Without limiting the rights granted in this Section 12, the ABL Secured Parties and the ABL Agent shall cooperate with the DIP Secured Parties in connection with any efforts made by the DIP Secured Parties to sell the Additional Collateral.

13.      *Access to Additional Collateral by DIP Agent or Term Loan Agent.*

a)      If the DIP Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure), enforcement, collection or execution with respect to the Additional ABL Priority Collateral ("**Additional ABL Priority Collateral Enforcement Actions**") or if the Term Loan Agent commences any action or proceeding with respect to any of its rights or remedies

23

(including, but not limited to, any action of foreclosure), enforcement, collection or execution with respect to the Additional Collateral and the Term Loan Agent (or a purchaser at a foreclosure sale conducted in foreclosure of the Term Loan Agent's Liens) takes actual or constructive possession of the Additional ABL Priority Collateral of any Grantor ("**Additional Collateral Enforcement Actions**"), then (1) if the DIP Agent has commenced a DIP Priority Collateral Enforcement Action, the DIP Agent shall furnish the Term Loan Agent with prompt written notice of the commencement of such action (the "**Additional ABL Priority Collateral Enforcement Action**") and (2) in all cases, the Term Loan Agent shall (x) cooperate with the ABL Agent (and with its officers, employees, representatives and agents) in its efforts to conduct Additional ABL Priority Collateral Enforcement Actions in the Additional ABL Priority Collateral and to finish any work-in-process and process, ship, produce, store, complete, supply, lease, sell or otherwise handle, deal with, assemble or dispose of, in any lawful manner, the Additional ABL Priority Collateral, (y) not hinder or restrict in any respect the DIP Agent from conducting Additional ABL Priority Collateral Enforcement Actions in the Additional ABL Priority Collateral or from finishing any work-in-process or processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the Additional ABL Priority Collateral and (z) permit the DIP Agent, its employees, agents, advisers and representatives, at the cost and expense of the DIP Secured Parties, to enter upon and use the Additional Collateral, for a period commencing on (I) the earlier of the date of the initial Additional ABL Priority Collateral Enforcement Action or the date of delivery of the Additional ABL Priority Collateral Enforcement Action Notice, as the case may be, and (II) ending on the earlier of the date occurring 120 days thereafter and the date on which all Additional ABL Priority Collateral (other than Additional ABL Priority Collateral abandoned by the DIP Agent in writing) has been sold or disposed of (such period, as the same may be extended with the written consent of the Term Loan Agent, the "**Additional ABL Priority Collateral Processing and Sale Period**"),

provided, however, that nothing contained in this Agreement shall restrict the rights of the Term Agent from selling, assigning or otherwise transferring any Term Priority Collateral prior to the expiration of such Additional ABL Priority Collateral Processing and Sale Period if the purchaser, assignee or transferee thereof agrees in writing (for the benefit of the DIP Agent and the DIP Secured Parties) to be bound by the provisions of this Section 12. If any stay or other order prohibiting the exercise of remedies with respect to the Additional ABL Priority Collateral has been entered by a court of competent jurisdiction, such Additional ABL Priority Collateral Processing and Sale Period shall be tolled during the pendency of any such stay or other order.

b)      During the period of actual occupation, use and/or control by the Additional ABL

Secured Parties and/or the Term Agent (or their respective employees, agents, advisers and representatives) of any Term Priority Collateral, the ABL Secured Parties and the ABL Agent shall be obligated to repair at their expense any physical damage to such Term Priority Collateral resulting from such occupancy, use or control, and to leave such Term Priority Collateral in substantially the same

condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the DIP Secured Parties or the Term Loan Agent have any liability to the Term Secured Parties pursuant to this Section 12 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Term Priority Collateral existing prior to the date of the exercise by the DIP Secured Parties (or the DIP Agent, as the case may be) of their rights under this Section 12 and the DIP Secured Parties shall have no duty or liability to maintain the Term Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the DIP Secured Parties, or for any diminution in the value of the Term Priority Collateral that results from ordinary wear and tear resulting from the use of the Term Priority Collateral by the DIP Secured Parties in the manner and for the time periods specified under this Section 12.

14.    In connection with any asset sale by a Debtor that includes both Common Collateral and Additional Collateral, the parties hereto will cooperate reasonably to allocate the consideration for such sale to the Common Collateral and the Additional Collateral.

15.    Upon the Adequate Protection Lien Termination Date with respect to the applicable Class, any adequate protection liens or adequate protection claims held by the applicable Class shall be deemed terminated, canceled and extinguished.

- 25 -

**Exhibit**

**2 Budget**

63

07/21/15 13:09:44 Exhibit 2 -
DIP Budget Pg 1 of 1



The Great Atlantic and Pacific Tea Company 25 - Week Cash Flow Model
($ in Millions)

**The Great Atlantic and Pacific Tea Company**
**25-Week Cash Flow Model**
($ in Millions)

| Period / Week | Period 6 Forecast Week 21 25-Jul | Period 6 Forecast Week 22 1-Aug | Period 6 Forecast Week 23 8-Aug | Period 6 Forecast Week 24 15-Aug | Period 7 Forecast Week 25 22-Aug | Period 7 Forecast Week 26 29-Aug | Period 7 Forecast Week 27 5-Sep | Period 7 Forecast Week 28 12-Sep | Period 8 Forecast Week 29 19-Sep | Period 8 Forecast Week 30 26-Sep | Period 8 Forecast Week 31 3-Oct | Period 8 Forecast Week 32 10-Oct | Period 9 Forecast Week 33 17-Oct | 13 Weeks Through 17-Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Forecast Week** | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
|  | BX Filing | | | | | | | | Tier 1 Auction | | Tier 1 Sale | | | |
| **Memo: Store Merch Sales Comp** | -11.8% | -10.3% | -10.4% | -10.7% | -10.5% | -10.5% | -11.8% | -6.9% | -11.0% | -11.4% | -11.4% | -11.7% | -11.4% | -10.8% |
| **Memo: Store Count** | 296 | 296 | 296 | 295 | 295 | 295 | 270 | 270 | 270 | 270 | 270 | 252 | 234 | 234 |
| **Operating Receipts** | 94.9 | 98.7 | 102.2 | 100.8 | 96.8 | 97.5 | 97.1 | 97.0 | 92.0 | 89.2 | 91.9 | 86.8 | 76.0 | 1,322.5 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Merchandise Payments (C&S and DSD/Other Merch.) | 69.9 | 70.4 | 64.9 | 61.9 | 63.5 | 67.6 | 67.7 | 62.2 | 62.8 | 65.7 | 65.7 | 58.2 | 49.1 | 901.4 |
| Payroll/Benefits | 22.0 | 14.9 | 16.0 | 19.6 | 20.3 | 14.7 | 17.3 | 12.8 | 19.6 | 17.6 | 17.7 | 12.5 | 18.0 | 242.7 |
| Other Operating Expenses | 15.1 | 25.3 | 8.6 | 8.6 | 11.0 | 12.7 | 23.3 | 8.2 | 8.0 | 15.7 | 12.7 | 5.5 | 5.1 | 168.4 |
| Subtotal | 107.0 | 110.5 | 89.6 | 90.1 | 94.8 | 95.0 | 108.3 | 83.2 | 90.4 | 99.1 | 96.1 | 76.1 | 72.2 | 1,312.5 |
| **Operating Cash Flow** | (12.1) | (11.9) | 12.7 | 10.7 | 1.9 | 2.5 | (11.1) | 13.8 | 1.6 | (9.9) | (4.2) | 10.6 | 3.8 | 9.9 |
| **Non-Operating & Ch. 11 Disbursements/(Receipts)** | | | | | | | | | | | | | | |
| Maintenance Capital Expenditures | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.5 | 9.0 |
| Interest /Fees | 1.3 | 2.3 | 0.1 | – | 1.3 | – | 6.7 | – | – | – | 3.8 | – | – | 15.9 |
| Asset Sales/Other Proceeds | – | – | – | (5.9) | – | – | (8.9) | (0.9) | – | – | – | (213.1) | (119.9) | (350.4) |
| Professional Fees | 2.2 | 0.2 | – | – | 1.0 | 4.4 | 0.2 | – | – | – | 6.4 | 5.2 | – | 23.8 |
| Other Non-Operating and Ch. 11 Disbursements | 15.0 | 3.9 | 0.1 | 0.6 | 0.1 | 0.7 | 13.4 | – | – | 4.3 | 6.2 | 4.2 | – | 50.7 |
| Subtotal | 19.2 | 7.2 | 0.9 | (4.6) | 3.0 | 5.8 | 12.0 | (0.3) | 0.6 | 6.6 | 17.0 | (203.1) | (119.9) | (251.1) |
| **Net Cash Flow** | (31.2) | (19.1) | 11.8 | 15.3 | (1.0) | (3.3) | (23.2) | 14.1 | 1.0 | (10.5) | (21.2) | 213.7 | 119.0 | 261.1 |
| **Beginning Cash Balance – Bank** | 36.6 | 54.8 | 45.7 | 45.7 | 62.2 | 98.2 | 90.8 | 79.3 | 82.6 | 84.7 | 74.7 | 55.9 | 83.3 | 36.4 |
| Net Cash Flow | (31.2) | (19.1) | 11.8 | 15.3 | (1.0) | (3.3) | (23.2) | 14.1 | 1.0 | (10.5) | (21.2) | 213.7 | 119.0 | 261.1 |
| Pre petition Debt Borrowings/(Repayments & LC Cash Collateralization) | – | – | – | – | (12.8) | (3.5) | – | – | – | – | – | (182.9) | (119.9) | (319.0) |
| DIP Draw/(Repayment) | 50.0 | – | – | – | 50.0 | – | – | – | – | – | – | – | – | 100.0 |
| Store Cash Reclass to Bank Cash | – | – | – | 0.0 | – | 1.7 | – | – | – | – | – | 2.4 | 2.0 | 6.2 |
| Change in Float | (0.5) | 9.9 | (11.8) | 1.3 | (0.3) | (0.5) | 0.9 | (10.7) | 1.1 | 0.4 | 2.4 | (5.9) | 0.2 | (0.1) |
| **Ending Available Cash Balance – Bank** | 54.8 | 45.7 | 45.7 | 62.2 | 98.2 | 90.8 | 79.3 | 82.6 | 84.7 | 74.7 | 55.9 | 83.3 | 84.6 | 84.6 |
| Less: Check Float | 12.5 | 22.4 | 10.6 | 11.9 | 11.6 | 11.0 | 21.0 | 10.2 | 11.4 | 11.8 | 14.2 | 8.3 | 8.5 | 8.5 |
| **Ending Available Cash Balance – Book** | 42.4 | 23.3 | 35.1 | 50.4 | 86.6 | 79.8 | 58.3 | 72.4 | 73.4 | 62.9 | 41.7 | 75.0 | 76.1 | 76.1 |

**Exhibit 3**

**2012 Confirmation Order Excerpts**

WEIL:\95410057\1\50482.0004

Forecast Week

Tier 1

Week 1 Week 2 Week 3 Week 4 Week 5 Week 6 Week 7 Week 8 Week 9 Week 10 W

|  | BX Filing | | | | | | | Auction | | Tier |
|---|---|---|---|---|---|---|---|---|---|---|
| **Memo: Store Merch Sales Comp** | -11.8% | -10.3% | -10.4% | -10.7% | -10.5% | -10.5% | -11.8% | -6.9% | -11.0% | -11.4% |
| **Memo: Store Count** | 296 | 296 | 296 | 295 | 295 | 295 | 270 | 270 | 270 | 270 |
| **Operating Receipts** | 94.9 | 98.7 | 102.2 | 100.8 | 96.8 | 97.5 | 97.1 | 97.0 | 92.0 | 89.2 |
| **Operating Disbursements** | | | | | | | | | | |
| Merchandise Payments (C&S and DSD/Other Merch.) | 69.9 | 70.4 | 64.9 | 61.9 | 63.5 | 67.6 | 67.7 | 62.2 | 62.8 | 65.7 |
| Payroll/Benefits | 22.0 | 14.9 | 16.0 | 19.6 | 20.3 | 14.7 | 17.3 | 12.8 | 19.6 | 17.6 |
| Other Operating Expenses | 15.1 | 25.3 | 8.6 | 8.6 | 11.0 | 12.7 | 23.3 | 8.2 | 8.0 | 15.7 |
| Subtotal | 107.0 | 110.5 | 89.6 | 90.1 | 94.8 | 95.0 | 108.3 | 83.2 | 90.4 | 99.1 |
| **Operating Cash Flow** | (12.1) | (11.9) | 12.7 | 10.7 | 1.9 | 2.5 | (11.1) | 13.8 | 1.6 | (9.9) |
| **Non-Operating & Ch. 11 Disbursements/(Receipts)** | | | | | | | | | | |
| Maintenance Capital Expenditures | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| Interest /Fees | 1.3 | 2.3 | 0.1 | - | 1.3 | - | 6.7 | - | - | - |
| Asset Sales/Other Proceeds | - | - | - | (5.9) | - | - | (8.9) | (0.9) | - | - |
| Professional Fees | 2.2 | 0.2 | - | - | 1.0 | 4.4 | 0.2 | - | - | - |
| Other Non-Operating and Ch. 11 Disbursements | 15.0 | 3.9 | 0.1 | 0.6 | 0.1 | 0.7 | 13.4 | - | - | - |
| Subtotal | 19.2 | 7.2 | 0.9 | (4.6) | 3.0 | 5.8 | 12.0 | (0.3) | 0 | |
| **Net Cash Flow** | (31.2) | (19.1) | 11.8 | 15.3 | (1.0) | (3.3) | (23.2) | 14.1 | 1.0 | (10.5) |
| **Beginning Cash Balance – Bank** | 36.6 | 54.8 | 45.7 | 45.7 | 62.2 | 98.2 | 90.8 | 79.3 | 82.6 | 84.7 |
| Net Cash Flow | (31.2) | (19.1) | 11.8 | 15.3 | (1.0) | (3.3) | (23.2) | 14.1 | 1.0 | (10.5) |
| Pre-petition Debt Borrowings/(Repayments & LC Cash Collateralization) | - | - | - | - | (12.8) | (3.5) | - | - | - | - |
| DIP Draw/(Repayment) | 50.0 | - | - | - | 50.0 | - | - | - | - | - |
| Store Cash Reclass to Bank Cash | - | - | - | 0.0 | - | - | 1.7 | - | - | - |
| Change in Float | (0.5) | 9.9 | (11.8) | 1.3 | (0.3) | (0.5) | 9.9 | (10.7) | 1.1 | 0.4 |
| **Ending Available Cash Balance – Bank** | 54.8 | 45.7 | 45.7 | 62.2 | 98.2 | 90.8 | 79.3 | 82.6 | 84.7 | 74.7 |
| Less: Check Float | 12.5 | 22.4 | 10.6 | 11.9 | 11.6 | 11.0 | 21.0 | 10.2 | 11.4 | 11.8 |
| **Ending Available Cash Balance – Book** | 42.4 | 23.3 | 35.1 | 50.4 | 86.6 | 79.8 | 58.3 | 72.4 | 73.4 | 62.9 |

114. In accordance with the terms of Article IV.J of the Plan, the Reorganized Debtors and/or NewCo shall authorize, issue and distribute, pursuant to the Plan and the Securities Purchase Agreements, the New Second Lien Notes, the New Convertible Third Lien Notes, the NewCo Equity, the Investment Warrants, the new common stock of Reorganized A&P and any other Securities to be authorized, issued and distributed pursuant to the Plan and Securities Purchase Agreements, and the Debtors and the Reorganized Debtors as the case may be shall be authorized to execute and deliver all documentation related thereto. Upon execution and delivery by the Debtors or Reorganized Debtors, as applicable, of the foregoing documents, or issuance of the Securities related thereto, as the case may be, such documents and Securities shall be deemed validly executed and delivered and deemed to constitute valid, binding and enforceable agreements and obligations of the Reorganized Debtors and are not in conflict with any applicable laws. Upon issuance, the NewCo Equity and the new common stock of Reorganized A&P issued to NewCo, including without limitation, any capital stock of Reorganized A&P or NewCo shall be

5 3

deemed pursuant to this Order, duly authorized, validly

issued, fully paid and non-assessable under all applicable laws. In addition, any capital stock issued pursuant to, including by way of conversion or exercise, the Investment Warrants, the New Second Lien Notes, the New Convertible Third Lien Notes, and any documents related thereto, are hereby deemed duly authorized, and, upon issuance, are deemed validly issued, fully-paid and non-assessable under all applicable laws.

115. The Liens contemplated by and related to the New Second Lien Notes and the New Convertible Third Lien Notes, are valid, binding and enforceable Liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the New Second Lien Notes and the New Convertible Third Lien Notes. The guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to or in connection with the New Second Lien Notes and the New Convertible Third Lien Notes, are granted in good faith as an inducement to the holders of such notes to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth in the intercreditor agreements and other definitive documentation executed in connection with the New Second Lien Notes and the New Convertible Third Lien Notes.

117. Any provision in any of the Debtors' leases that purports to require the consent of the lessor thereunder in order for the applicable loan party to mortgage, pledge or collaterally assign such leases (or to restrict, prohibit or void any such mortgage, pledge or collateral assignment) is hereby (and as additionally set forth in paragraph 112 of this Confirmation Order) invalidated for the sole and limited purpose of allowing the Debtors' leasehold interests to be included in the collateral security of the New Second Lien Notes and New Convertible Third Lien Notes. The collateral agent for the New Second Lien Notes and New Convertible Third Lien Notes shall be granted Liens on the collateral, including all of the Debtors' leasehold interests, which Liens shall be deemed perfected and effective as of the Effective Date (collectively, the "*Second Lien Pledge*" or the "*Convertible Third Lien Pledge*," respectively). For the avoidance of doubt, (i) it is expressly understood that, other than with respect to the Second Lien Pledge and the Convertible Third Lien Pledge, nothing herein or in the Plan shall broaden or limit any rights of the collateral agent or holders of the New Second Lien Notes or the New Convertible Third Lien Notes (in each case, whether arising under the applicable leases or applicable law, including, but not limited to and solely by way of example, any right to cure defaults, exercise remedies or compel delivery of notices from lessors) or of the lessors, in each case with respect to the Debtors' leasehold interests and (ii) to the extent any lessor under any of the Debtors' leases has not objected to the relief set forth herein or has withdrawn its objection or indicated its assent on the record at the Confirmation Hearing, such lessor shall be deemed to have consented to the Second Lien Pledge and the Convertible Third Lien Pledge (as described above and including clause (i)).