WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | |
| **COMPANY, INC.,** *et al.*, | : | **Case No. 15-23007 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

## NOTICE OF SUPPLEMENT TO MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363, 365 AND 554 FOR APPROVAL OF (I) GLOBAL PROCEDURES FOR (A) STORE CLOSINGS, (B) THE EXPEDITED SALE, TRANSFER, OR ABANDONMENT OF DE MINIMIS ASSETS, AND (C) REJECTING UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES, AND (II) ENTRY INTO A LIQUIDATION CONSULTING AGREEMENT

**PLEASE TAKE NOTICE** that on July 20, 2015, The Great Atlantic & Pacific

Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), filed the *Motion of Debtors Pursuant to*

*11 U.S.C. §§ 105, 363, 365 and 554 for Approval of (I) Global Procedures for (A) Store*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Two Thousand Eight Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

*Closings, (B) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and*

*(C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry Into a Liquidation*

*Consulting Agreement* [Docket No. 20] (the "**Motion**").

        **PLEASE TAKE FURTHER NOTICE** that in connection with the hearing on

the Motion to be held before the Honorable Robert R. Drain, United States Bankruptcy Judge, at

the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas

Street, Room 248, White Plains, New York 10601, on **July 27, 2015 at 9:00 a.m. (Prevailing**

**Eastern Time)**, the Debtors hereby file a supplement to the Motion (the "**Supplement**"), dated

July 26, 2015.

        **PLEASE TAKE FURTHER NOTICE** that attached to the Supplement as

**Exhibit "C"** is the revised proposed order granting the Motion on an interim basis (the "**Revised**

**Proposed Order**").  Attached as **Exhibit "D"** of the Revised Proposed Order is a redline version

of the Revised Proposed Order marked to reflect the changes made to the proposed interim order

annexed to the Motion.

Dated: July 26, 2015
      New York, New York

                    /s/ Ray C. Schrock, P.C.
                    Ray C. Schrock, P.C.
                    Garrett A. Fail
                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York  10153
                    Telephone:  (212) 310-8000
                    Facsimile:  (212) 310-8007

                    *Proposed Attorneys for Debtors*
                    *and Debtors in Possession*

Hearing Date and Time:  July 27, 2015 at 9:00 a.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | |
| **COMPANY, INC.,** *et al.,* | : | **Case No. 15-23007 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

**SUPPLEMENT TO MOTION OF DEBTORS PURSUANT TO
11 U.S.C. §§ 105, 363, 365 AND 554 FOR APPROVAL OF (I) GLOBAL
PROCEDURES FOR (A) STORE CLOSINGS, (B) THE EXPEDITED
SALE, TRANSFER, OR ABANDONMENT OF DE MINIMIS ASSETS,
AND (C) REJECTING UNEXPIRED NONRESIDENTIAL REAL PROPERTY
LEASES, AND (II) ENTRY INTO A LIQUIDATION CONSULTING AGREEMENT**

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as

debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

"**Debtors**"), submit this supplement to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365 and 554 for Approval of (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry Into a Liquidation Consulting Agreement* [Docket No. 20] (the "**Motion**"), and respectfully represent:[2]

## <u>Supplement</u>

1.    On July 20, 2015, the Debtors filed the Motion seeking to establish orderly procedures to close their stores that will not continue as a going concern.  The Store Closing Procedures address the Debtors' need to liquidate Inventory and FF&E, sell Pharmaceutical Assets, dispose of De Minimis Assets and reject unexpired nonresidential real property leases. As discussed in the Motion, the Debtors need to immediately implement the Store Closing Procedures on the Initial Closing Stores or continue to face a daily EBITDA burn rate in the aggregate amount of $75,000.  The Store Closing Procedures facilitate the orderly and efficient closing of stores, and, moreover, are necessary in order for the Debtors to satisfy certain milestones under the DIP Credit Agreement (as defined in the McGarry Declaration). Specifically, the DIP Credit Agreement requires the Debtors to vacate the Initial Closing Stores by September 19, 2015, and file a motion rejecting the Initial Closing Stores' leases on or before ten days after the Commencement Date.

2.    The Debtors file this supplement to the Motion (the "**Supplement**") to apprise the Court and parties- in-interest of (i) additional details concerning the sale of Pharmaceutical Assets, (ii) the selection of the Liquidation Consultant and the terms of its engagement, and (iii) revisions to the Proposed Orders reflecting comments received from

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

2

certain parties-in-interest, including the Creditors' Committee and affected landlords.  This

Supplement, together with the revisions to the proposed interim order, resolve all informal and

formal objections received.

**A.      Disposition of Pharmaceutical Assets**

3.      As noted in the Motion, the Debtors operate pharmacies at many of their

stores, including 23 of the Initial Closing Stores.[3]  The Debtors and their advisors are developing

a marketing process designed to ensure the Debtors receive the best value for their

Pharmaceutical Assets.   In regards to the most valuable of the Pharmaceutical Assets, the

customer prescriptions (the "**Scripts**"), the Debtors intend to market the Scripts to other nearby

operating pharmacies for the highest or best offer.   To the extent that the sale of any Script may

be contrary the Debtors' prepetition policy governing the transfer of personally identifiable

information to non-Debtor entities; such sale will involve the assistance of a disinterested

consumer privacy ombudsman.[4]  As provided for in the order approving the Motion, the Debtors

will comply with applicable federal and state laws in connection with the sale of any

Pharmaceutical Assets.   The Debtors have requested for all bids to be submitted by August 3,

2015.  The Debtors' estimate that the aggregate value of the Pharmaceutical Assets at the Initial

Closing Stores is between $10 million and $15 million.

**B.      Proposed Liquidation Consulting Agreement**

4.      As noted in the Motion, prior to the Commencement Date, the Debtors

contacted four nationally recognized liquidation consulting firms and provided each firm with

---

[3] The Debtors' pharmacies that operate in Tier I Stores identified in the three stalking horse agreements secured prepetition, will continue as a going concern.  *See* Docket No. 26.

[4] The Debtors intend to file a motion pursuant to section 332 of the Bankruptcy Code seeking appointment of a consumer privacy ombudsman.

3

solicitation packages containing (i) a form of baseline terms to start negotiations, (ii) store-level profit-and-loss data for the past year, (iii) store-level inventory data on a cost basis for the last four week period, (iv) store-level fixed asset data, and (v) store-level inventory data at retail. The Debtors received bids from all four firms approached.  The Debtors reviewed the bids received and actively engaged in negotiations with the firms to ensure that the best terms were arrived at.  After final bids were submitted at the Debtors' direction, between July 15, 2015 and July 19, 2014, the Debtors selected Gordon Brothers Retail Partners, LLC ("**Gordon Brothers**") to serve as their Liquidation Consultant for the Initial Closing Stores, pursuant to the negotiated Liquidation Consulting Agreement.  A copy of the Liquidation Consulting Agreement is attached hereto as Exhibit A.  Gordon Brothers submitted the most favorable economic terms to the Debtors.  Moreover, Gordon Brothers is very familiar with the Debtors' businesses given its engagement as a liquidation consultant during the 2010 Chapter 11 Cases and its engagement by the Debtors on April 10, 2013, to perform a real estate portfolio valuation and inventory/store closing sale analysis.[5]

5.      Gordon Brothers has agreed to provide the services generally described in the Motion and as specifically set forth in the Liquidation Consulting Agreement.  In consideration of the services to be provided, Gordon Brothers will earn an Inventory Fee in the amount of 1% and that fee could be decreased depending on the recovery percentage obtained through the sales.  For example, a recovery percentage of 100% or greater results in an Inventory Fee of 1% while a recovery percentage of anything below 100% would decrease the Inventory Fee to zero.  This compensation structure will incentivize Gordon Brothers to

---

[5] Attached hereto as **Exhibit "B"** is the declaration submitted by Gordon Brothers containing various disclosures pertaining to their relationship with the Debtors and their engagement as the Liquidation Consultant for the Initial Closing Stores.

WEIL:\95413790\3\50482.0004

maximize recovery for the Debtors and their estates. The Liquidation Consulting Agreement also provides that Gordon Brothers will earn a FF&E Commission in the amount of 10%. Additionally, and as proposed in the Motion, the Debtors will reimburse Gordon Brothers for certain reasonable out-of-pocket expenses incurred in connection with the sale or other disposition of the Store Closing Assets, currently capped at $26,000 per store in connection with the sale of all Inventory and $6,000 per store for the sale of FF&E. Given the competitive marketing process involving four national liquidation firms and Gordon Brothers' agreement to forego receipt of an Inventory Fee in the event that its recovery percentage is less than 100%, the Debtors submit that the Liquidation Consulting Agreement is market-tested and reflects the reasonableness and fairness of the terms and conditions agreed upon.

6.      Gordon Brothers is needed to facilitate running a seamless and efficient store closing process and maximizing the value of the Store Closing Assets and Pharmaceutical Assets. Additionally, the engagement of Gordon Brothers' ensures that the Debtors' resources and attention are not diverted by certain aspects of a store closing, such as hosting multiple liquidation auctions and negotiating modifications to the Store Closing Procedures with affected landlords. For any additional Closing Stores later identified by the Debtors after a final hearing on the Motion , the Debtors will provide parties-in-interest, including the Creditors' Committee and any affected landlords, ten calendar days' notice. The Debtors have not made any final decisions regarding hiring additional liquidation consultants for additional store closings. To the extent that the Debtors choose to engage another liquidation consulting firm to implement the Store Closing Procedures for other stores closures after a final hearing on the Motion, the

5

Debtors will consult with the Creditors' Committee and the DIP Agent, and will provide five business days' notice to parties in interest.[6]

7.        For the reasons set forth in the Motion and amplified in this Supplement, the relief requested by the Debtors should be approved.  The relief requested is consistent with the Debtors' Sale Strategy and the relief provided by this Court in the 2010 Chapter 11 Cases.

8.        A revised proposed form of order granting the relief requested in the Motion as supplemented herein on an interim basis, and a blackline reflecting the changes from the order submitted with the Motion, is attached hereto as **Exhibit "C"** and **Exhibit "D"**, respectively.

### Notice

9.        No trustee has been appointed in these chapter 11 cases.  Notice of this Supplement has been provided all parties in interest in accordance with the procedures set forth in the order entered on July 20, 2015, governing case management and administrative procedures for these cases [ECF No. 62].  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

---

[6] The Debtors reserve the right to run any additional competitive bidding processes in connection with engaging other Liquidation Consultants.  Notice of the selection of an additional Liquidation Consultant will be made in accordance with the procedures set forth in the order entered on July 20, 2015, governing case management and administrative procedures for these cases [ECF No. 62].

6

10.    Except as requested by the Motion, no previous request for the relief

sought as supplemented herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested in the Motion, as supplemented herein, and such other and further relief as is

just.

Dated:  July 26, 2015
         New York, New York

/s/ Ray C. Schrock, P.C.
Ray C. Schrock, P.C.
Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors
and Debtors in Possession*

WEIL:\95413790\3\50482.0004

**Exhibit A**

**Liquidation Consulting Agreement**

## GOB SERVICES AGREEMENT

This GOB SERVICES AGREEMENT (this "Agreement") is made as of July 23, 2015 (the "Effective Date") by and between THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation, having an address at 2 Paragon Drive, Montvale, NJ 07645, on behalf of itself and certain of its affiliates (collectively, the "Company") and Gordon Brothers Retail Partners, LLC, a Delaware limited liability company having an address at 800 Boylston Street, 27th Floor, Boston, MA 02199 (the "Consultant").

## RECITALS

WHEREAS, Company operates certain supermarkets and liquor stores in six Northeastern states (the "Stores");

WHEREAS, Company is entering into this Agreement after a voluntary filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, in furtherance of its strategic business plan and under the auspices of the Bankruptcy Court, Company intends to initially close and liquidate the 25 stores attached hereto as **Exhibit A** (each an "Initial Closing Store" and collectively, "Initial Closing Stores") as well as subsequently identify additional stores during the Company's bankruptcy case to close and liquidate (the "Additional Closing Stores" and, together with the Initial Closing Stores, the "Closing Stores"); and

WHEREAS, Company desires to retain Consultant to provide certain "going out of business", "store closing", or similar theme sale and liquidation services for the Closing Stores, under the terms and conditions contained herein, and Consultant is willing to provide such services.

NOW, THEREFORE, in consideration of the facts set forth in the Recitals above, the mutual covenants and conditions below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   Term of Agreement. This Agreement shall commence on the first day following, and the parties' obligations hereunder shall be subject to, the entry of the Approval Order, and this Agreement shall remain in full force and effect until the closing of the Company's bankruptcy case or on the date that is thirty (30) days from written notice issued by Company to Consultant terminating the Agreement for cause (the "Term"); provided however, that Consultant shall have the right to earlier termination of this Agreement if all Services at all of the Initial Closing Stores (and at any Additional Closing Stores that became subject to this Agreement) have been satisfactorily completed and finally reconciled. Termination for "cause" shall mean any termination as a result of Consultant's completion of Services or failure to diligently perform the Services or any fraud, material misrepresentation, gross negligence, willful misconduct or material breach by Consultant of the terms of this Agreement.

a.   Effect of Termination.   Upon termination of this Agreement by Company, Consultant shall: (i) immediately discontinue all Services; and (ii) deliver to Company all information, reports, papers, and other materials prepared or obtained by Consultant in performing the Services, whether completed or in process.   Upon termination, the Company shall be liable only for payment of accrued and unpaid amounts provided for under this Agreement as of the effective date of the termination and no compensation shall be due to Consultant unless such fees have been earned by Consultant as of the effective date of termination in accordance with Section 2(b) or 3(b) below (unless the

EXECUTION VERSION

Bankruptcy Court determines that there was actually no "cause" to justify the Company's termination of this Agreement, in which case the parties will mutually agree upon (or the Bankruptcy Court will determine) appropriate compensation due from the Company to the Consultant.

2.    <u>Inventory Liquidation</u>.

(a)    <u>Services</u>.    "Inventory" means all food products, general merchandise and other inventory that is customarily sold to the public at the Closing Stores, but shall not include the following: postal stamps, lottery tickets, tobacco, prescription drugs and medication and devices designed to be used primarily in connection with prescription drugs/medications, in-store services (such as Western Union, video rentals, Coin-Star, ATM, bottle redemption, banking services, vending machines, Rug Dr., and film development), prescription related lists (aka scripts) and any liquor or other licenses used in the operation of the Closing Stores. Consultant shall develop and implement a program for the orderly and efficient sale and liquidation of the Inventory at each closing store (the "Inventory Project"). The Inventory Project shall include, without limitation, the following services:

(i)    Consultant shall recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Inventory during the Term and shall directly market and advertise the Inventory Project to the public using a "store closing" handle, including, without limitation, the use of circulars, in-store signs and banners, exterior signs and banners, mailings, sign walkers, and print, radio, and other media, provided, that the content all of advertising shall be subject to the reasonable approval of the Company. All advertising shall reflect that sales are "final sales" and the Inventory is being sold in its "as is" condition;

(ii)    Consultant shall establish discounting for the Inventory and modify the discounting during the course of the Inventory Project in an effort to maximize return on the Inventory;

(iii)    Consultant shall establish and provide oversight of accounting functions for the Inventory Project, including evaluation of sales of inventory by category, sales reporting and expense monitoring;

(iv)    Consultant shall provide adequate supervisory staffing at each Closing Store to oversee the Inventory Project, and such staff member shall have industry-specific experience conducting "store closing", "bankruptcy liquidation", or similarly themed sales and shall act in a professional manner, provided, that unless the Company otherwise consents (which consent shall not unreasonably be withheld or delayed) Consultant shall assign at least one full time, on-site supervisor level staff person for every two (2) Closing Stores; and provided further that if the Company is dissatisfied with any specific supervisor then the Consultant will use reasonable efforts to promptly replace such supervisor with an alternate/acceptable supervisor (it being understood that the reason for the Company's dissatisfaction must not be discriminatory or otherwise unlawful).

(v)    Consultant shall coordinate the Inventory Project with the Company at both the store and corporate level to insure that the Inventory Project is conducted in an orderly and efficient manner, provided however, that the Company shall have the ultimate control of store personnel and shall handle the cash, debit, and charge card payments for all Inventory sold in accordance with Company's customary cash management procedures; and provided further that the Company shall be solely responsible for the computing, collecting, holding, reporting, and paying all sales taxes associated with the sale of Inventory in the Inventory Project (and Consultant shall have absolutely no responsibilities or liabilities therefor);

WEIL:\95397372\8\58399.0011

EXECUTION VERSION

(vi)     Consultant shall make recommendations to the Company on appropriate staffing levels for the Closing Stores during the course of the Inventory Project;

(vii)     Consultant shall advise the company on loss prevention and stock loss initiatives;

(viii)     Consultant shall provide written reports to Company during the Inventory Project in such frequency as reasonably determined by Company;

(ix)     Consultant shall ensure each Closing Store is vacated in a "broom clean" condition (subject to Consultant's right to abandon unsold FF&E and Excluded FF&E as provided in Section 3 below);

(x)     Consultant shall, as necessary, coordinate with the landlords and any other tenants or other subtenants on the property in which the Closing Stores are located to minimize any possible disruptions caused by the Inventory Project;

(xi)     To the extent that there is any unsold Inventory remaining after the Inventory Project, Consultant shall remove and dispose of same off-site; provided, that any income resulting from the disposal shall belong to Company but shall be part of Gross Sales (defined below); and provided further that the costs and expenses of such removal/disposal shall be the responsibility of the Company in accordance with a mutually agreed upon and reasonable budget determined at such later time; and

(xii)     Consultant and Company shall comply with the respective provisions applicable to them in the Approval Order (as defined in Section 6 below).

(xiii)     Consultant shall fix a term of the Inventory Project in respect of the Initial Closing Stores ("Initial Inventory Project"), and if applicable a term of the Inventory Project in respect of one or more sets of Additional Closing Stores, if applicable; provided however that in each case Consultant shall have the right to earlier terminate any such fixed term at any one or more Closing Stores/Additional Closing Stores with the consent of the Company (which consent shall not unreasonably be withheld or delayed).  The parties agree that the term of the Initial Inventory Project shall commence on the first day following entry of the Approval Order and shall end five (5) weeks thereafter.

(b)     <u>Compensation</u>.
(i)     As used in this Agreement:

(A) The term "Retail Value" with respect to each item of Inventory shall be determined using the "Gross Rings Methodology" using file retail prices established the day prior to the commencement of the Inventory Project with respect to each Store.

(B) The term "Gross Sales" shall mean the gross proceeds of the sale of the Inventory during the Inventory Project at and with respect to the Initial Closing Stores (and independently at the conclusion of the Inventory Project at and with respect to each one or more sets of Additional Closing Stores, if applicable), in each case net only of sales taxes, including without limitation, liquor and similar taxes.

(C) The "Cost Value" with respect to each item of Inventory shall be determined with reference to the cost value reflected by the Company on its books and records maintained in the ordinary course consistent with historic practices and periods, <u>and</u> consistent with the information provided by the Company to the Consultant in connection with the due diligence process leading up to the execution of this Agreement.

EXECUTION VERSION

(D)   The term "Recovery Percentage" shall mean the Gross Sales divided by the Cost Value.

(ii)   At the conclusion of the Inventory Project at and with respect to the Initial Closing Stores (and, unless otherwise agreed upon, independently at the conclusion of the Inventory Project at and with respect to each one or more sets of Additional Closing Stores, if applicable), the Company shall pay the Consultant a percentage of the Gross Sales based upon the following Recovery Percentage Schedule (on a "back-to-first-dollar" rather than "incremental" basis):

| Recovery Percentage | Gross Sales Percentage Fee |
|---|---|
| 100% or greater | 1.00% |
| Less than 100% | 0% |

Provided however, that for purposes of calculating the compensation contemplated by this Section 2(b), perishable items of Inventory brought into the Stores after the commencement of the Inventory Project at a Closing Store (which the Company agrees it will do in consultation with the Consultant) shall not be taken into account for purposes of calculation of the compensation.

For example, assuming the Cost Value of the Inventory of the Initial Closing Stores is $24,000,000, and the Gross Sales at the end of the Initial Inventory Project is $25,000,000, then the Recovery Percentage is 104.17%, and the fee for the Initial Inventory Project will be $250,000 ($25,000,000 x 1.00%).

(iii)   The compensation contemplated hereby shall be determined and paid no later than the first Monthly Reconciliation following the completion of the Inventory during the Inventory Project at and with respect to the Initial Closing Stores (and independently at the conclusion of the Inventory Project at and with respect to each one or more sets of Additional Closing Stores, if applicable).

(iv)   The parties agree that the Recovery Percentage hurdles and the Gross Sales Percentage Fee formulations have been established based upon the Consultant's understanding from the Company that: (a) the Cost Value-to-Retail Value relationship of the Inventory included in the Initial Inventory Project (and, unless otherwise agreed upon, the Cost Value-to-Retail Value relationship of the Inventory included in one or more sets of Additional Closing Stores, if applicable), shall be not greater than 62.4%; and (b) the Company has not since the date hereof (and will not without the Consultant's approval, not to be unreasonably withheld or delayed with reference to the establishment of such hurdles/formulations) transfer Inventory into or out of the Initial Stores outside of the ordinary course of business consistent with historic periods and practices; and (c) any Company circular sales, POS discounts, and/or similar promotions covering the Closing Stores will cease applying to sales made at such Closing Stores on the Thursday immediately preceding the start of the respective Inventory Project at such Closing Stores.

3.   FF&E Liquidation.

(a)   "FF&E" means all of the furniture, fixtures, equipment, supplies and other tangible personal property located at the Closing Stores as of the Sale Commencement Date, but shall not include (i) any intangible property, such as liquor or other licenses used in the operation of the Closing Store or (ii) any "Excluded FF&E" (as defined below). Consultant shall develop and implement a program for the orderly and efficient sale and liquidation of any and all FF&E (the "FF&E Project", and together with the Inventory Project, the "Services"). The FF&E Project shall include, without limitation, the following services:

(i)   Consultant shall directly conduct the sale of any and all FF&E;

(ii)     Consultant shall remove and dispose off-site all rubbish so that all of the Closing Stores are restored to a "broom clean condition" no later than the close of business on the day following the conclusion of the Initial Inventory Project (and the close of business on the day following the conclusion of any subsequent one or more sets of Inventory Projects with respect to Additional Closing Stores, if applicable);

(iii)     Consultant shall properly cap/fill/repair (as applicable) any exposed electrical, plumbing, HVAC and roofing connections resulting from the removal of the FF&E Project, all in compliance with local building codes;

(iv)     Consultant shall obtain any and all permits, licenses, or other governmental approvals required to perform the FF&E Project;

(v)     Consultant shall provide adequate security and otherwise properly maintain and secure the Closing Stores until the conclusion of the FF&E Project, provided, that Consultant shall not be liable for any loss or theft unless resulting from Consultant's gross negligence;

(vi)     Consultant shall, as necessary and subject to the terms of the Approval Order, coordinate with the landlords and any other tenants or other subtenants on the property in which the Closing Stores are located to minimize any possible disruptions caused by the FF&E Project;

(vii)     Consultant shall provide written reports to Company during the FF&E Project in such frequency as reasonably determined by Company;

(viii)     On or before the third day following the commencement of the Initial Inventory Project (and the third day following the commencement of any subsequent one or more sets of Inventory Projects with respect to Additional Closing Stores, if applicable), Company and Consultant shall conduct a joint walk-through of the Closing Stores and prepare written sign-offs to confirm that Consultant has performed all of the services outlined in this Section 3(a);

(ix)     For the avoidance of doubt, coolers, freezers and walk-in storage boxes shall be included as FF&E (e.g. such items shall not be Excluded FF&E); and

(x)     Notwithstanding any other provision of this Agreement to the contrary: (1) Consultant shall have the right to abandon (in favor of the Company, and not in favor of any landlord or other third party) all unsold FF&E; (2) Consultant shall have no responsibility for removing or disposing of any unsold FF&E or any Excluded FF&E; and (3) Consultant shall have no responsibility for removing, disposing of, or otherwise handling any hazardous materials (including without limitation Freon) in connection with its Services relating to FF&E (the full responsibility of which shall remain with the Company whether or not FF&E containing such hazardous materials is or is not sold).

(b)     Compensation.   The Company shall pay the Consultant a commission equal to ten percent (10%) of the gross sales of all FF&E (net only of sales taxes), monthly on account of sales of FF&E made during the prior month as part of each Monthly Reconciliation (as defined in Section 4(b) below).

(c)     As used herein, "Excluded FF&E" shall mean those items of furniture, fixtures, equipment, supplies and other tangible personal property located at Stores as of the Sale Commencement Date that the Company (i) wishes to exclude from the FF&E Project in its sole discretion and (ii) does not own or otherwise does the have the right to authorize Consultant to sell. "Excluded FF&E" also shall

mean all wall systems. The Company shall provide the Consultant with a list of Excluded FF&E no later than the fifth (5th) day following the Sale Commencement Date. The Consultant shall have no responsibility for the sale, removal, handling, disposal, or cleanup of any Excluded FF&E.  Until the Inventory Project at a particular Closing Store has concluded, the Company may not remove any Excluded FF&E from such Closing Store without the Consultant's prior consent.

(d)    Notwithstanding the foregoing provisions of this Section 3, the Consultant shall promptly following the commencement of the Initial Inventory Project (and, promptly following the commencement of the Inventory Project at one or more sets of Additional Closing Stores, if applicable), solicit dealer bids (estimated or firm) for the FF&E at each Closing Store (which dealer bids may serve as a valuation floor), and communicate those respective bids (and whether they are estimates or firm bids) to the Company.  In consultation with one another, the Company and the Consultant shall jointly (acting reasonably and promptly) determine (on a Closing Store-by-Closing Store basis) whether to accept such dealer bids, to accept such dealer bids on a "stalking horse" basis, or to treat the FF&E at the Closing Store in question as Excluded FF&E.

4.    Reimbursable Expenses.

(a)    Consultant shall deliver to Company a budget relating to the Services (including both the Inventory and FF&E related Services)  that describes in reasonable detail certain projected expenses (the "Budget") and which shall be subject to the Company's prior written consent in all respects, which consent shall not be unreasonably withheld.  Subject to the Budget (which may be updated from time to time with the mutual consent of the Company and the Consultant; and which must be updated in connection with the inclusion of any Additional Closing Stores with the mutual consent of the Company and the Consultant), all Expenses (defined below) shall be borne by the Company, and Consultant shall be entitled to reimbursement from Company for all Expenses as part of each Monthly Reconciliation. "Expenses" mean all reasonable, documented (through receipts or invoices) out-of-pocket expenses incurred by Company in connection with its performance of its Services hereunder, including, without limitation: supervision, FF&E-related sale expenses, reasonable expenses of advertising, marketing, coach travel and transportation, including, the cost of out-of-town travel and postage and courier/overnight express fees and other mutually agreed upon expenses incurred in connection with performing the Services.

(b)    The parties will meet no less frequently than monthly ("Monthly Reconciliations") during the Term to review any  matters reasonably requested by either party; and all amounts reimbursable to Consultant for the prior month (or the partial month in the case of the first and last months) shall be reconciled and paid immediately thereafter.  From time to time upon request, each party shall prepare and deliver to the other party such other reports as either party may reasonably request.  Each party to this Agreement shall, at all times during the Term and during the one (1) year period thereafter, provide the other with access to all information, books and records relating to the Services and to this Agreement.  All records and reports shall be made available to Consultant and Company during regular business hours upon reasonable notice.

5.    Intentionally Left Blank.

6.    Bankruptcy Court Approval.  Consultant acknowledges and agrees that the Company has filed for bankruptcy, and the parties respective obligations under this Agreement (including without limitation the Company's compensation and reimbursement obligations, and the Consultant's Services obligations, contemplated herein) will be subject to the prior approval of the Bankruptcy Court (the "Approval Order").    Notwithstanding anything in this Agreement to the contrary, the effectiveness of this Agreement, the Consultant's obligations to provide services, the terms and conditions of the liquidation of

the Closing Stores, and the payment of the compensation contemplated herein, shall be subject to entry of the Approval Order.

7.    Scope of Agreement.

(a)    Company Cooperation.    Company shall make all relevant documentation relating to the Closing Stores available to the Consultant. If documentation is available electronically, Company shall send it to the Consultant. If documentation is only available in paper form, Consultant shall be provided access to review and copy documentation at Company's headquarters. During the Term of the Agreement, Company shall assist and cooperate with Consultant whenever reasonably necessary by making Company personnel available to Consultant for consultation, and providing other information and data reasonably necessary for the performance of the Services.

(b)    Meetings and Written Reports.    Consultant shall deliver written status reports to the Company Representative regarding the status of all activities, marketing efforts, prospective assignees, negotiations and other transactions on a regular basis, at least weekly. If requested by Company, Consultant shall meet with or participate in telephone conferences with the Company Representative regarding such status of activities.

(c)    Consultant Cooperation with Bankruptcy Process.    Consultant acknowledges and agrees that it is being retained by Company because of its expertise in assisting debtors in liquidation matters during the course of a bankruptcy proceeding. Consultant, at no charge to Company, shall reasonably cooperate and work with all interested parties in connection with the Company's bankruptcy case, including without limitation, any postpetition debtor-in-possession financing lenders, statutory committee of creditors appointed in the Company's bankruptcy case, the prepetition secured parties that comprise the Company's capital structure, the Company's other advisors, and if requested Company, Consultant shall, at no charge to Company, provide written reports, meet with or participate in telephone conferences with such parties, and provide oral testimony or written affidavits for the Bankruptcy Court regarding its activities under this Agreement; provided, that Consultant shall not communicate with any such parties or their advisors regarding this Agreement without the prior written instruction of the Company. The Company acknowledges that the Consultant and/or its affiliates may have, or may have had, certain relationships with such interested parties that may need to be disclosed to the Bankruptcy Court as part of the retention by the Company of the Consultant, and the parties will work cooperatively to make all such required disclosures.

(d)    Consultant's Business Conduct.    Consultant shall use commercially reasonable efforts, diligence and good business judgement to achieve the purpose of this Agreement; provided however that the Company acknowledges that the Consultant is not guaranteeing any results under this Agreement.

(e)    Consultant's Affiliates.    Consultant shall not disclose to its affiliates or its joint venture partners the specific nature of the Services provided under this Agreement, but may generically disclose the fact that it is providing store closing services to Company.

8.    Company's Representative.    Nirup Krishnamurthy shall be Company's representative ("Company's Representative") in dealing with Consultant, duly and fully authorized by Company to act for it with respect to the performance hereof. Company reserves the right, at any time and from time to time, upon written notice to Consultant, to designate a successor representative and to limit the authority of the representative in any respect. Consultant shall report regularly to the Company's Representative in order to keep him/her fully advised of Consultant's obligations. Consultant shall be solely responsible for all matters relating to payment of Consultant's personnel, including, but not limited to, compliance with

workers' compensation, unemployment, disability insurance, social security, withholding and all other federal, state and local laws, rules and regulations governing such matters.

9.     <u>Independent Contractor</u>.  This agreement does not establish an employer-employee relationship between Company and Consultant. Consultant's personnel are not employees or agents of Company, and Consultant retains the right to exercise full control and supervision over the performance, employment, direction, compensation and discharge of any and all of Consultant's personnel assisting in the performance of Consultant's obligations.

10.     <u>Default</u>.  If either party fails to perform its obligations in accordance with the terms hereof, and does not cure such failure within three (3) days following written notice of such default, the other party shall have the right to terminate this Agreement by notice of termination to the non-performing party.

11.     <u>Assignment</u>.  This Agreement relates to personal services to be performed by Consultant, and Consultant shall not have the right to assign this Agreement, or subcontract the Services, without Company's written consent, which may be withheld in Company's sole discretion.

12.     <u>Notices</u>.  All notices, requests, consents, approvals, payments in connection with this Agreement, or communications which either party desires or is required or permitted to give or make to the other party under this Agreement shall be deemed to have been given, made and delivered, only when made or given in writing and personally served, upon delivery by reputable overnight courier (e.g., UPS or Federal Express), or three days after having been deposited in the United States mail, certified or registered mail, postage prepaid, and addressed to the parties as follows:

|  |  |
|---|---|
| To Company: | The Great Atlantic & Pacific Tea Company, Inc.<br>2 Paragon Drive<br>Montvale, NJ 07645<br>Attn: Nirup Krishnamurthy<br>Email: NirupK@aptea.com |
|  | With a copy to the attention of General Counsel, at the same address. |
| To Consultant: | Gordon Brothers Retail Partners, LLC<br>800 Boylston Street, 27th Floor<br>Boston, MA 02199<br>Attention: Michael Chartock, General Counsel<br>Email: mchartock@gordonbrothers.com |
|  | With a copy to:<br>Steven Fox<br>Riemer & Braunstein, LLP<br>7 Times Square, Suite 2506<br>New York, NY 10036<br>Email: sfox@riemerlaw.com |

13.     <u>Compliance with Laws</u>.  Subject to the terms of the Approval Order, Consultant shall comply with all applicable federal, state and local laws, regulations, and codes in the performance of the Services. Without limiting the generality of the foregoing, to the extent that the sale, discounting or advertising of certain Inventory is regulated by law, such as may be in the case of liquor sales, the Consultant shall comply with any Company directives regarding such regulations (provided that the Company shall inform

EXECUTION VERSION

the Consultant of any such applicable laws, with specificity, at least 5 days prior to the start of the Inventory Project at any Closing Store where such laws apply).

14.   Insurance.

      a.   Each of the Company and the Consultant shall maintain its own commercial general liability insurance policy (including where applicable umbrella coverage) having a coverage limit of not less than Two Million Dollars ($2,000,000.00) per occurrence for bodily injury, personal injury and property damage (the "General Liability Insurance Policy"), and no such policy may have a self-insured retention in excess of $750,000 per occurrence in the case of the Company, and $100,000 per occurrence in the case of the Consultant. Each such General Liability Insurance Policy shall name the other party as an additional insured, and each respective policy shall be primary to any coverage maintained by the additional insureds to the extent of each respective party's gross negligence (or the negligence of each respective party' officers, directors, employees, contractors, and other representatives). Consultant and Company shall each maintain any and all required workers' compensation insurance in accordance law. All policies are to be written by an insurer reasonably acceptable to the other party, and both parties shall attempt to have such insurance policies contain a statement indicating that such insurance policy cannot be canceled by the insurer unless the insurer provides the other party with not less than ten (10) days written notice of its intention to cancel. Upon or prior to execution of this Agreement Consultant shall furnish to the Company Representative, and Company shall furnish to Consultant Representative, a certificate of insurance demonstrating that the foregoing insurance coverage is in effect, and at least fifteen (15) days prior to the expiration of any such insurance policy, Consultant shall provide Company and Company shall provide Consultant (as the case may be) an acceptable renewal certificate.

      b.   Any sub-contractor engaged by Consultant, and any FF&E buyer identified by Consultant, in each case in connection with the transactions contemplated by this Agreement, shall either: (i) be covered by Consultant's commercial general liability insurance contemplated in subsection (a) above; or (ii) have its own commercial general liability insurance with at least the same coverage amounts as Consultant is required to have pursuant to subsection (a) above (in which case Consultant shall be responsible for using a reasonable method to verify the existence of such coverage).

15.   Waivers and Amendments.   Waiver by either party of any default by the other party shall not be deemed a waiver of any other default. No provision of this Agreement shall be deemed waived, amended, or modified by either party, unless it is in writing and signed by both parties. Notwithstanding the foregoing, Company may add additional Closing Stores to Exhibit A by email to Consultant; provided however, that all such additions shall require the parties' mutual agreement of a reasonable increase to the Budget reflecting such additions.

16.   Confidentiality.   Consultant acknowledges that in doing business with the Company it may be provided or exposed to or have access to, learn of and/or obtain non-public and confidential financial, proprietary and/or trade secret information of the Company (collectively, "Confidential Information"). Consultant agrees that it and its Representatives (as defined below) will hold, transmit and treat all Confidential Information in all forms (including, but not limited to, electronic forms) in a confidential manner and will not, without prior written consent of the Company, use such Confidential Information for any purpose other than in connection with its performance of the Services. Consultant will only reveal Confidential Information in connection with performing the Services in accordance with the advance authorization of the Company or to Consultant's directors, officers, partners, members or employees (each, a "Representative") who are informed by Consultant of the confidential nature of the Confidential Information and who agree to be bound by this confidential covenant, and will take appropriate steps to ensure that any Representative to whom Confidential Information is disclosed abides by the provisions herein.  In the event Consultant receives a request or demand to disclose all or any part of the Confidential

EXECUTION VERSION

Information, including under the terms of a subpoena or order issued by a court of competent jurisdiction, the Consultant agrees to promptly notify the Company and use its reasonable good faith efforts to assist the Company in obtaining a protective order or other remedy the Company deems desirable.  The obligations contained in this paragraph shall survive termination of this Agreement for a period of one (1) year.  Consultant further agrees that upon request of the Company, it will promptly return or destroy all Confidential Information furnished to it or in the possession of Consultant or its Representatives.

17.    Indemnification.  Consultant agrees to indemnify, save, hold harmless and defend the Company, its directors, officers, employees, agents and other representatives (each a "Company Representative"), including reasonable attorney fees and expenses, from and against an and all claims, loss or liability arising in any manner from or in connection with any grossly negligent, willful, or unlawful acts or omissions by Consultant, other than claims resulting from the bad faith, fraud, criminal conduct, self-dealing, breach of fiduciary duty, to the extent one is found to exist, gross negligence or willful misconduct on the part of such Company Representative. Company agrees to indemnify, save, hold harmless and defend Consultant, its directors, officers, employees, agents and other representatives (each a "Consultant Representative"), including reasonable attorney fees and expenses, from and against any and all claims, loss or liability arising in any manner from or in connection with any grossly negligent, willful, or unlawful acts or omissions by Company, other than claims resulting from the bad faith, fraud, criminal conduct, self-dealing, breach of fiduciary duty, to the extent one is found to exist, gross negligence or willful misconduct on the part of such Consultant Representative.

18.    Intentionally Left Blank.

19.    Severability.  Each provision hereof shall be interpreted in such a manner as to be effective and valid under applicable law. If any provision or application thereof is held invalid or unenforceable, then it shall, to that extent alone, be ineffective only to the extent of such prohibition or invalidity without affecting the validity of the remaining provisions or the application of such provision to other circumstances.

20.    Survival.  The terms, conditions, indemnities and warranties contained in this Agreement that are intended to survive the expiration or termination of this Agreement shall survive.

21.    Entire Agreement.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof. All prior agreements, representations, statements, negotiations, understandings, and undertakings are superseded by this Agreement.

22.    Execution.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which together shall constitute one document. A facsimile, email, pdf or electronic signature shall be deemed an original signature. Each party represents that the persons signing this Agreement on its behalf have the requisite corporate authority to enter into this Agreement and thereby can bind the Company and the Consultant, as applicable.

23.    Governing Law/Jurisdiction.  This Agreement shall be governed by and construed in accordance with the federal bankruptcy laws and the laws of the State of New Jersey. Any disputes arising out of this Agreement shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

24.    Exculpation.  Consultant shall look solely to the Company for the satisfaction of each and every remedy of Consultant in the event of any breach by the Company of any of the terms and conditions of this Agreement to be performed by the Company, and there shall be absolutely no personal liability on the part of the officers, employees or agents of the Company who are natural persons with respect to any of the terms and conditions of this Agreement; such exculpation of personal liability to be absolute and

WEIL:\95397372\8\58399.0011

EXECUTION VERSION

without any exception whatsoever. Company shall look solely to the Consultant for the satisfaction of and every remedy of Company in the event of any breach by the Consultant of any of the terms and conditions of this Agreement to be performed by the Consultant, and there should be absolutely no personal liability on the part of the officers, employees or agents of the Consultant who are natural persons with respect to any of the terms and conditions of this Agreement; such exculpation of personal liability to be absolute and without any exception whatsoever.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives.

COMPANY:
THE   GREAT   ATLANTIC   &   PACIFIC   TEA COMPANY, INC., a Maryland corporation, on behalf of itself and certain of its affiliates

By: _____

Print Name and Title: NIRUP KRISHNAMURTHY CSO

CONSULTANT
GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____

Print Name and Title:
Richard Edwards
Co-President- Retail

11

**Exhibit B**

**Gordon Brothers Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re

| | |
|---|---|
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., et al.[1], | Chapter 11<br>Case No. 15-23007 (RDD) |
| Debtors. | Jointly Administered |

-----------------------------------------------------------x

### DISCLOSURE OF GORDON BROTHERS RETAIL PARTNERS, LLC IN CONNECTION WITH DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, 365 AND 554 FOR APPROVAL OF (I) GLOBAL PROCEDURES FOR (A) STORE CLOSINGS, (B) THE EXPEDITED SALE, TRANSFER, OR ABANDONMENT OF DE MINIMIS ASSETS, AND (C) REJECTING UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES, AND (II) ENTRY INTO A LIQUIDATION CONSULTING AGREEMENT

I, Michael D. Chartock, being duly sworn, state the following under penalty of perjury:

1.    I am a Senior Managing Director and the General Counsel of Gordon Brothers Retail Partners, LLC ("GBRP"), a retail consulting firm that maintains offices at Prudential Tower, 800 Boylston Street, Boston, MA 02199. I am authorized to make this Declaration (the "Declaration") on behalf of GBRP. I am over the age of twenty-one (21) years and am competent to make this Declaration. I have undertaken a reasonable investigation of the facts stated in this Declaration. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

2.    I submit this Declaration in connection with the "*Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365 and 554 for Approval of (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry Into a Liquidation Consulting Agreement*" [Docket

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

No. 20] (the "Motion"). Pursuant to the Motion, GBRP will serve as retail consultant to the Debtors for purposes of conducting certain store closing and inventory/FF&E liquidation sales at those of Debtors' store locations identified in the Motion, together with such additional store locations, if any, that may be later identified by the Debtors consistent with the procedures outlined in the Motion, and as otherwise provided in that certain Consulting Agreement, dated July 24, 2015, between and among the Debtors and GBRP, as consultant.

3.      GBRP is a retail consulting firm with significant experience in the representation of debtors concerning the disposition of retail inventory and other retail assets in bankruptcy proceedings. GBRP is well qualified to act as retail consultant to the Debtors in these jointly administered Chapter 11 cases.

4.      GBRP itself is not being retained by Debtors as a "professional person" under 11 U.S.C. § 327, and therefore the disclosures contained herein may not be required. However, out of an abundance of caution, GBRP makes the following disclosures.

## GBRP'S CONNECTIONS

5.      To the best of my knowledge and belief, after reasonable inquiry, neither I, GBRP, nor any principal, consultant or employee thereof, has any connection with the Debtors, their parties in interest known to GBRP (collectively, the "Parties-in-Interest"), their respective attorneys, the U.S. Trustee or any person employed in the office of the U.S. Trustee (in each case as identified to us by the Debtors), except as disclosed or otherwise described herein, including:

a)  Prior to the Petition Date (as defined in the Motion), a joint venture in which GBRP was a participant was engaged by the Debtors to serve as a retail inventory and fixture ("FF&E") liquidation consultant for purposes of conducting certain store closing and inventory/FF&E liquidation sales at certain of Debtors' store locations. The most recent such engagement was concluded in 2012;

b)  Prior to the Petition Date, GBRP's parent company, Gordon Brothers Group, LLC ("GBG") was engaged (as of April 10, 2013) by the Debtors to perform (i) a real estate portfolio valuation (which report was delivered in September of 2013, and which consulting engagement was concluded in the first quarter of 2014) and (ii) an inventory/store closing sale analysis (which analysis was delivered May and June 2013, and which consulting engagement was concluded in July 2013);

c) Prior to the Petition Date, DJM Realty Services, LLC ("DJM"), an affiliate of GBRP, entered into a confidentiality agreement with the Debtors (as of April 10, 2015) in connection with a potential real estate services transaction, but no such transaction with DJM occurred as a result;

d) Effective as of October 31, 2014, Gordon Brothers Finance Company ("GBFC"), acquired the majority of the loan portfolio and professional team of GB Credit Partners, LLC ("GBCP"), an investment management affiliate of GBG. Included among the portfolio interests acquired by GBFC were the direct and/or indirect participation interests in certain term loan obligations of the Debtors then held by certain investment funds managed by GBCP. As of the date hereof, GBCP nominally remains the agent under the subject term loan facility; however, by separate agreement, GBCP has transferred all decision-making authority in respect of such agency rights to GBFC, such that as of this date GBCP exercises no discretion whatsoever with respect to those agency rights with respect to the subject term loan interests. GBFC is not an affiliate of GBRP, GBCP, or GBG; rather GBG owns a minority interest in and has certain contractual relationships with GBFC. Neither GBG, GBCP, GBRP nor any other affiliate holds any note, claim or participation, or other interest in the pre-petition term loan facility or any other credit facility under which the Debtors are obligated; and

e) As a part of a large and diverse business operation, GBRP, its parent, subsidiaries and affiliates each has previously, is currently, and may in the future appear or participate in numerous cases, proceedings, transactions and engagements involving professional advisors (e.g., attorneys, accountants, investment bankers and financial consultants) as well as principals (e.g., operating companies, investment funds or other "financial investors"). In such interactions, GBRP, its parent, subsidiaries and affiliates may act as advisor, agent/consultant (whether on a fee or equity basis), or principal investor or party, and in each such capacity may be a co-advisor, consultant, or principal acting in concert with, or as a counterparty to, such other professional advisors and principals. Such professional advisors and principals involved in the foregoing interactions with GBRP, its parent, subsidiaries and affiliates may be involved in these proceedings and may represent or may be Parties-in-Interest in these Chapter 11 cases. Except as disclosed herein, none of the interactions between or among GBRP, its parent, subsidiaries and affiliates on the one hand, and any of such professional advisors and principal parties on the other hand, are matters directly connected or relating to the Debtors or these Chapter 11 cases. Further, except as disclosed in this Declaration, none of GBRP, its parent, subsidiaries and affiliates have represented, do represent, nor will any of them represent any of such professional advisors or principal parties in connection with these Chapter 11 cases. GBRP does not believe that any relationship, arrangement, investment, transaction or engagement with or relating to any of the professional advisors or other entities who may be involved in these Chapter 11 cases will interfere with or impair the services to be rendered to the Debtors by GBRP in these cases.

6.    Except as otherwise may be disclosed herein, to the best of my knowledge and belief, after reasonable inquiry, neither I, GBRP, nor any principal, consultant or employee thereof:

a) are creditors, equity security holders, or insiders of the Debtors; and/or

b) are (or within two (2) years before the date of the filing of the Debtors' Chapter 11 petitions were) a director or officer of the Debtors.

7.      Insofar as other connections with Parties-in-Interest are concerned, it is possible that one or more associates or staff members of GBRP may have personal or social connections with certain parties-in-interest.

8.      The disclosures identified above are based upon all information reasonably available to GBRP at this time. GBRP will, to the extent necessary, supplement this Declaration as may be required by the Bankruptcy Code and Rules if and when any other relationships exist or are modified during the term of the subject store closing sales.

Dated:  July 25, 2015
        Boston, Massachusetts

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____

        Name:   Michael D. Chartock
        Its:    Senior Managing Director and
                General Counsel

COMMONWEALTH OF MASSACHUSETTS ) 
                                                             ) ss:
COUNTY OF SUFFOLK                          )

On July 25, 2015, before me, Michael D. Chartock, a Senior Managing Director and the General Counsel of Gordon Brothers Retail Partners, LLC, personally appeared who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the Commonwealth of Massachusetts that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

(seal) ex. March, 11, 2022

1865071.4

**Exhibit C**

**Interim Order**

**(Clean Version)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | |
| **COMPANY, INC.,** *et al.,* | : | **Case No. 15-23007 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 365 AND 554 APPROVING (I) GLOBAL PROCEDURES FOR (A) STORE CLOSINGS, (B) THE EXPEDITED SALE, TRANSFER, OR ABANDONMENT OF DE MINIMIS ASSETS, AND (C) REJECTING UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES, AND (II) ENTRY INTO A LIQUIDATION CONSULTING AGREEMENT

Upon the motion (the "**Motion**")[2] of The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates and subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant, pursuant to sections 105(a), 363, 365, and 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), for an order authorizing the Debtors to (i) implement the Store Closing Procedures, (ii) sell, transfer or abandon De Minimis Assets pursuant to the De Minimis Asset Procedures, (iii) enter into a Liquidation Consulting Agreement, (iv) implement the Lease Rejection

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Two Thousand Eight Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion or McGarry Declaration, as applicable.

Procedures, and (v) reject the Initial Closing Stores' Leases identified on Exhibit 1 attached hereto, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given to the Notice Parties as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and upon the Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**McGarry Declaration**"), filed contemporaneously with the Motion, the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis to the extent set forth herein; and it is further

ORDERED that the Debtors are authorized, but not directed, pursuant to section 105(a), 363, 365 and 554 of the Bankruptcy Code, to conduct Store Closing Sales at Closing Stores pursuant to the following store closing procedures (the "**Store Closing Procedures**"):

2

1.      The Store Closing Sales will be conducted during normal business hours or such hours as otherwise permitted by the applicable unexpired lease, and the Debtors will abide by any applicable shopping center guidelines regarding maintenance, security, and trash removal.

2.      The Store Closing Sales will be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Store Closing Sales will be conducted on Sunday unless the Debtors have been operating such stores on Sundays.

3.      All display and hanging signs used by the Debtors in connection with the Store Closing Sales will be professionally lettered and all hanging signs will be hung in a professional manner.  No additional restrictions will be imposed on the Debtors that are not contained in the applicable lease. In addition, the Debtors will be permitted to utilize exterior banners and sign-walkers.

4.      If Store Closing Sales are to be considered "final," conspicuous signs will be posted in each of the affected stores to the effect that all sales are "final."

5.      The Debtors will not make any alterations to interior or exterior store lighting, and will not use any type of amplified sound to advertise the Store Closing Sales or solicit customers.

6.      No alterations will be made to the Closing Stores, except as authorized pursuant to the applicable lease.  The hanging of exterior banners or other signage will not constitute an alteration to a store.

7.      No property of any landlord will be removed or sold during the Store Closing Sales.

8.      The Debtors will keep store premises and surrounding areas clear and orderly, consistent with past practices.

9.      The Liquidation Consultant, at the Debtors direction, will negotiate any particular modifications to the Store Closing Procedures with any landlord in regards to number and placement of signs or banners.

10.     The Debtors do not have to comply with lease provisions or covenants that are inconsistent with these procedures.

11.     The Debtors do not have to comply with the Liquidation Laws (as defined below).

12.     Pharmaceutical Assets will be sold or transferred in accordance with applicable state law.

WEIL:\95402463\5\50482.0004

13.    The Liquidation Consultant, on behalf and at the direction of the Debtors, may abandon De Minimis Assets in accordance with the De Minimis Asset Procedures.

14.    An unexpired nonresidential real property lease will only be deemed rejected in accordance with the Lease Rejection Procedures.

provided that the Debtors and landlords of any Closing Store are authorized to enter into agreements modifying the Store Closing Procedures (each a "**Landlord Agreement**") without further order of the Court; provided further that such agreements do not have a material adverse effect on the Debtors or their estates; and it is further

ORDERED that the Debtors are authorized to sell or otherwise dispose of the Pharmaceutical Assets to the highest or best bidder(s) as identified by the Debtors in their business judgment and subject to applicable federal and state law, including, without limitation, public health, safety and privacy requirements imposed by applicable non-bankruptcy law. To the extent applicable, the Debtors shall comply with the De Minimis Asset Sale Procedures, as approved by this Court; and it is further

ORDERED that pursuant to section 363(f) of the Bankruptcy Code, the Store Closing Assets being sold shall be sold free and clear of any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation, any and all "claims" as defined in section 101(5) of the Bankruptcy Code), including, without limitation, the liens and security interests of the Proposed DIP Lenders (collectively, the "**Liens**"), with such Liens, if any, attaching to the proceeds with the same validity, and enforceability, to the same extent and with the same priority as they attached to such assets immediately prior to the closing of the applicable sale; and it is further

4

ORDERED that no entity, including, without limitation, utilities, landlords, creditors and all persons acting for or on their behalf (but not Governmental Units, as defined in section 101(27)) shall interfere with or otherwise impede the conduct of the Store Closing Sales, or institute any action against the Debtors or landlords in any court (other than in this Court) or before any administrative body which in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closing Sales; and it is further

ORDERED that any restrictions in any lease agreement, restrictive covenant, or similar documents purporting to limit, condition, or impair the Debtors' ability to conduct the Store Closing Sales shall not be enforceable, nor shall any breach of such provisions in these chapter 11 cases constitute a default under a lease or provide a basis to terminate the lease provided the Store Closing Sales are conducted in accordance with the terms of this Interim Order, the Store Closing Procedures and any Landlord Agreement; and it is further

ORDERED that the Closing Stores may "go-dark" during the Store Closing Sales and remain "dark" despite any lease restriction, real estate local act, local law, or ordinance to the contrary, and any "continuous operation" or similar clause in any of the leases (or any lease provision that purports to increase the rent or impose any penalty for "going dark") may not be enforced to hinder or interrupt the Store Closing Sales (and the "going dark" under such leases shall not be a basis to cancel or terminate the leases); and it is further

ORDERED that, subject to applicable federal, state and local public health and safety laws (the "**Safety Laws**"), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, the "**General Laws**"), but excluding Liquidation Sale Laws, the Debtors are authorized to take such actions as necessary and appropriate to conduct the Store

5

Closing Sales without the necessity of a further order of this Court, including, but not limited to, advertising the Store Closing Sales; and it is further

ORDERED that, provided the Store Closing Sales are conducted in accordance with the terms of this Interim Order, the Store Closing Procedures and any applicable Landlord Agreement, and in light of the provisions in the laws of many local and state laws that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance or otherwise excused from compliance with any Liquidation Sale Laws, and are authorized to conduct the Store Closing Sales in accordance with the terms of this Interim Order without the necessity of compliance with any such Liquidation Sale Laws; and it is further

ORDERED that the Debtors shall be entitled to use sign walkers, hang signs, and/or interior or exterior banners advertising the Store Closing Sales in accordance with the Store Closing Procedures and any applicable Landlord Agreement, including, without limitation, advertising the Store Closing Sales as "store closing," "sale on everything," or similar themed sales and by means of media advertising, A-frames, banners, and similar signage, without further consent of any person and without compliance with the Liquidation Sale Laws; provided, that the use of banners and sign walkers is done in a safe and responsible manner, such sign walkers and banners, in and of themselves, shall not be deemed to be in violation of Safety Laws and/or General Laws; and it is further

ORDERED that each and every federal, state, or local agency, departmental or governmental unit with regulatory authority over the Store Closing Sales and all newspapers and other advertising media in which the Store Closing Sales are advertised shall consider this Order as binding authority that no further approval, license, or permit of any governmental unit

6

shall be required, nor shall the Debtors be required to post any bond, to conduct the Store

Closing Sales; and it is further

ORDERED that state and/or local authorities shall not fine, assess, or otherwise

penalize the Debtors or any of the landlords of the Closing Stores for conducting or advertising

the Store Closing Sales in a manner inconsistent with state or local law; provided, that the

Store Closing Sales are conducted and advertised in a manner contemplated by this Interim

Order; and it is further

ORDERED that the Debtors may not transfer any Inventory or FF&E located at

a Tier I Store or Tier II Store to any Initial Closing Store; and it is further

ORDERED that the Debtors shall consult with the Creditors' Committee and the

DIP Agent (including providing information requested by the Creditors' Committee and/or the

DIP Agent) in connection with (a) Store Closing Sales, (b) sales of Pharmaceutical Assets, and

(c) any modification of the Store Closing Procedures; and it is further

ORDRED that the Debtors may conduct additional Store Closing Sales in

accordance with the terms of this Interim Order at locations other than the Initial Closing Stores

by filing and serving the Notice Parties (as defined below) and any landlord at an affected

location with (i) notice of intent to conduct a Store Closing Sale pursuant to this Interim Order,

and (ii) a copy of this Interim Order. The Notice Parties and affected landlord(s) will have 10

calendar days from the filing and service of the notice of intent to conduct additional Store

Closing Sales to object to the terms of the Store Closing Procedures and request a hearing on

the objection. If no objection is filed, the Debtors may conduct Store Closing Sales at such

locations in accordance with the terms of this Interim Order; and it is further

7

**De Minimis Asset Procedures**

ORDERED that the Debtors are authorized, but not directed, to sell or transfer De Minimis Assets under the following procedures (the "**De Minimis Asset Sale Procedures**"):

(a)    For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a sale price, as measured by the amount of cash and other consideration to be received by the Debtors on account of the assets to be sold ("**Sale Price**"), less than or equal to $250,000:

   (i)    the Debtors are authorized to consummate such transactions if the Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court or notice to any party;

   (ii)    any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction; and

   (iii)    each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser.

(b)    For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a Sale Price greater than $250,000 and less than or equal to $5,000,000:

   (i)    the Debtors are authorized to consummate such transactions if the Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court, subject to the procedures set forth herein;

   (ii)    any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction;

   (iii)    each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser;

   (iv)    the Debtors shall, at least five (5) business days prior to closing such sale or effectuating such transfer, serve a written notice of such sale or transfer by e-mail, facsimile, or overnight delivery service (each

8

notice, a "**De Minimis Asset Sale Notice**") to (a) the U.S. Trustee; (b) proposed counsel to the Creditors' Committee; (c) any known affected creditor(s) and their respective counsel, if known, asserting a lien claim or encumbrance on the relevant De Minimis Assets; (d) those parties requesting notice pursuant to Bankruptcy Rule 2002; (e) counsel to the DIP Agent (as defined in the DIP Orders); (f) counsel to each agent for the Debtors' Prepetition Secured Lenders; (g) majority holders of Senior Secured PIK Toggle Notes due 2017 issued by the Debtors; and (h) majority holders of Senior Secured Convertible Notes due 2018 (collectively, the "**Notice Parties**");

(v)   the content of the De Minimis Asset Sale Notice shall consist of:
- identification of the De Minimis Assets being sold or transferred and its location;
- identification of the purchaser of the assets and any relationship such party has with the Debtors;
- identification of any parties known to the Debtors as holding liens or encumbrances on the assets subject to the De Minimis Assets being sold and a statement indicating whether all such liens or encumbrances are capable of monetary satisfaction;
- the purchase price; and
- any other significant terms of the sale or transfer; and
- date and time within which objections may be filed and served on the Debtors;

(vi)   Objections, if any, must be in writing and served on the other Notice Parties and counsel to the Debtors so as to be received by all such parties prior to 4:00 p.m. (Eastern Time) on the fifth business day after service of the De Minimis Asset Sale Notice and must state with specificity the grounds for the objection;

(vii)   if no written objections are filed by any of the Notice Parties within five (5) business days of service of such De Minimis Asset Sale Notice, the Debtors are authorized to immediately consummate such transaction; and

(viii)   if a written objection is received from a Notice Party within such five (5) business day period that cannot be resolved, the objection will be deemed a request for a hearing on the objection at the next scheduled hearing, subject to adjournment by the Debtors, and the relevant De Minimis Asset(s) shall only be sold upon withdrawal of such written objection or further order of the Court specifically approving the sale or transfer of the De Minimis Asset(s);

and it is further

9

ORDERED that, the De Minimis Asset Sale Procedures shall not apply to any sales or transfers of assets that involve an employee or an "insider" of the Debtors as such term is defined in section 101(31) of the Bankruptcy Code; and it is further

ORDERED that sales of De Minimis Assets that are consummated pursuant to the De Minimis Asset Sale Procedures shall be deemed arm's-length transactions entitled to the protections of section 363(m) of the Bankruptcy Code; and it is further

ORDERED that the De Minimis Asset Sale Procedures shall not apply to any transaction that involves the assumption and the assignment of unexpired leases of nonresidential real property or the requirements of section 365 of the Bankruptcy Code; and it is further

ORDERED that the absence of an objection to the relief requested in the Motion combined with the absence of a timely objection to the sale or transfer of the De Minimis Assets in accordance with the terms of this Interim Order shall be determined to be "consent" to such sale or transfer within the meaning of section 363(f)(2); and it is further

ORDERED that, except as specifically provided in the applicable sale or transfer document, sales and transfers of De Minimis Assets shall be free and clear of all Liens, with such Liens attaching to the proceeds of such sale or transfer with the same validity, enforceability, extent and priority as had attached to such De Minimis Assets immediately prior to the closing of such sale or transfer; and it is further

ORDERED that the Debtors are authorized, but not directed, to abandon De Minimis Assets under the following procedures (the "**De Minimis Asset Abandonment Procedures**"):

(a)    For De Minimis Assets that the Debtors believe in their sound business judgment have a fair market value ("**Market Value**"), less than or equal to $250,000:

10

(i)     the Debtors are authorized to abandon such De Minimis Assets if the Debtors determine in the reasonable exercise of their business judgment that such abandonment is in the best interest of the estates, without further order of the Court or notice to any party; <u>provided</u> that the Debtors shall, at least five (5) business days prior to abandoning De Minimis Assets, serve notice of such abandonment by e-mail, facsimile or overnight delivery service (each notice, an "**Abandonment Notice**") on the landlord of the premises for which the De Minimis Assets are being abandoned.

(b)     For De Minimis Assets that the Debtors believe in their sound business judgment have a Fair Market Value greater than $250,000 but less than or equal to $5,000,000:

(i)     The Debtors shall, at least five (5) business days prior to abandoning De Minimis Assets, serve an Abandonment Notice on the Notice Parties;

(ii)    the content of the Abandonment Notice shall consist of: (a) the location and identification of the De Minimis Assets being abandoned; and (b) a summary of the reasons for abandoning such De Minimis Assets;

(iii)   if a written objection is received from a De Minimis Notice Party within such five (5) business day period that cannot be resolved, the relevant De Minimis Assets shall only be abandoned upon withdrawal of such written objection or further order of the Court.

and it is further;

ORDERED that the Debtors will file a report with the Court and serve on all parties entitled to notice in the cases, within 30 days after each calendar quarter, summarizing any sales, transfers, or abandonments consummated pursuant to the De Minimis Asset Procedures; and it is further

ORDERED that any personal property of the Debtors remaining at a Closing Store after the effective date of rejection of the lease shall be deemed abandoned as of the Rejection Date; and it is further

11

ORDERED that with respect any De Minimis Assets abandoned under the De Minimis Asset Abandonment Procedures herein and located at one of the Debtors' leased properties, the applicable landlord or other designee shall be free to dispose of such property without liability to any party and without further notice or order of the Court; provided, that notwithstanding anything to the contrary in this Interim Order, the Debtors are not authorized hereunder to abandon and are directed to remove any hazardous (as such term is defined in federal, state, or local law, rule, regulation or ordinance) materials at any premises subject to a nonresidential real property lease or sublease.  Landlords' rights, if any, to file claims for the costs of disposal of such property are fully reserved, as are the rights of any party in interest to object to such claims; and it is further

ORDERED that service of the De Minimis Asset Sale Notice and/or the De Minimis Asset Abandonment Notice is sufficient notice of the sale, transfer, and/or abandonment of such De Minimis Assets; and it is further

ORDERED that the Debtors are authorized to pay those reasonable and necessary fees and expenses incurred in the sale, transfer, or abandonment of De Minimis Assets, including reasonable commission fees to agents, brokers, auctioneers and liquidators, if any; and it is further

ORDERED that any payment made or to be made under this Interim Order, and any authorization contained in this Interim Order, shall be subject to the terms of the DIP Orders; and it is further

### Liquidation Consulting Agreement

ORDERED that the Debtors are authorized to enter into a Liquidation Consulting Agreement with the Liquidation Consultant; and it is further

12

ORDERED that any payment made or to be made under this Interim Order, and any authorization contained in this Interim Order, shall be subject to the terms of the DIP Orders; and it is further

ORDERED that notwithstanding anything herein to the contrary, (a) nothing in this Interim Order shall in any way limit, subordinate, or constitute a waiver of any rights and priorities of claimants with trust rights under the Perishable Agricultural Commodities Act ("**PACA**") or the Packers and Stockyards Act ("**PASA**"), all such rights hereby being expressly reserved, and (b) nothing herein in any way purports to grant any liens or priorities contrary to the statutory trust protections afforded under PACA or PASA; and it is further

ORDERED that the rights and interests, if any, of Union County Realty Group LLC, solely with respect to the FF&E at the Debtors' store located at 651 N. Stiles Street, Linden, New Jersey 07036, operating under the Pathmark banner, are preserved and notice shall be given to it and its counsel appearing on its behalf in these chapter 11 cases, before any sale of such FF&E; and it is further

ORDERED that the requirements of Bankruptcy Rule 6003(b) have been satisfied; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that the Final Hearing on the Motion shall be held on **August 10, 2015, at 10:00 a.m. (Prevailing Eastern Time)** and any objections or responses to the Motion

13

shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Garrett A. Fail, Esq. and Sunny Singh, Esq.); (ii) attorneys for Gordon Brothers, Reimer Braunstein LLP, Seven Times Square, Suite 2506, New York, New York 10036 (Attn:  Steven Fox, Esq.); and (iii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on August 5, 2015**; and it is further

ORDERED that nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Order, other than as expressly provided for herein, is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; and it is further

ORDERED that notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party; and it is further

ORDERED that this Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; provided that, the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order; and it is further

ORDERED that the Debtors are authorized to take all action necessary to carry out this Interim Order; and it is further

WEIL:\95402463\5\50482.0004

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order and any Landlord Agreement.

Dated: _____, 2015
       White Plains, New York

_____
UNITED STATES BANKRUPTCY JUDGE

15

**Exhibit 1**

Initial Closing Stores

**Rejection Schedule of Initial Closing Store Leases**

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 70212 | Riverhead Centre, LLC | A&P Real Property, LLC | 1510 Old Country Rd. Riverhead, NY | Jul. 31, 2023 |
| 70213 | 3620 Long Beach Road LLC (as successor in interest to Nathan Serota) | A&P Real Property, LLC | 3620 Long Beach Rd Oceanside, NY | June 30, 2021 |
| 70244 | East Marlboro Associates | A&P Real Property, LLC | 863 E. Baltimore Pike Kenneth Square, PA | Aug. 31, 2017 |
| 70314 | Center Square Plaza Associates | A&P Real Property, LLC | 1301 Skippack Pike Center Square, PA | May 22, 2020 |
| 70343 | AVR CP-TWO, LLC | A&P Real Property, LLC | 2 Westbury Avenue Carle Place, NY | Aug. 31, 2015 |
| 70562 | C'PIA, LLC | A&P Real Property, LLC | Route 13 & Maple Rd (aka 2105 Philadelphia Pike) Claymont DE | Apr. 30, 2020 |
| 70597 | Basser-Kaufman of Matawan, L.L.C. | A&P Real Property, LLC | 325 Route 35 Cliffwood, NJ | Mar. 31, 2023 |
| 70656 | Holmdel Towne Center, LLC | A&P Real Property, LLC | 2101 Route 35 Holmdel, NJ | Mar. 31, 2018 |
| 70726 | Delaware 1851 Associates, LP | A&P Real Property, LLC | 1851 S. Christopher Columbus Blvd Philadelphia, PA | Sept. 30, 2020 |
| 72128 | BOIV Belleville MCB, LLC | A&P Real Property, LLC | 115 Belmont Ave Belleville, NJ | Jan. 31, 2034 |
| 72175 | Cliffpass SPE Corp., successor to Cliffpass Development, Inc. | A&P Real Property, LLC | Botany Plaza 85 Ackerman Ave Clifton, NJ | Mar. 31, 2017 |
| 72185 | Clifton Grocery Stores, LLC | A&P Real Property, LLC | 895 Paulison Ave Clifton, NJ | Mar. 31, 2033 |
| 72512 | Union County Realty Group LLC, as successor in interest to Valley Circle, Inc. | A&P Real Property, LLC | 651 North Stiles St Linden, NJ | Jan. 31, 2025 |
| 72535 | Wick Shopping Plaza Associates, L.L.C. | A&P Real Property, LLC | 561 Route 1, Unit B Edison, NJ | Oct. 31, 2017 |
| 72538 | MCB East Brunswick, LLC | A&P Real Property, LLC | 50 Race Track Rd East Brunswick, NJ | Oct. 31, 2033 |
| 72564 | OLP-MCB Philly-Cottman, LP, as successor in interest to 840 Cottman Associates, LLC | A&P Real Property, LLC | 840 Cottman Ave. Philadelphia, PA | Sept. 30, 2021 |

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 72567 | Garnet Company | A&P Real Property, LLC | 420 MacDade Blvd Folsom, PA | May 31, 2017 |
| 72581 | Old Bridge Plaza Associates, LLC | A&P Real Property, LLC | 1043 US Route 9 Old Bridge, NJ | Oct. 31, 2017 |
| 72582 | Indian Head Plaza Associates, successor in interest to Peter L. Levine | A&P Real Property, LLC | 1256 Indian Head Road Toms River, NJ | Jan. 31, 2020 |
| 72589 | Realty Income Corporation as successor to Inland Diversified Wilmington Lancaster, L.L.C. as successor to WE APP Wilmington LLC | A&P Real Property, LLC | 3901 Lancaster Pike Wilmington, DE | Nov. 30, 2030 |
| 72623 | New York Grocery DST | A&P Real Property, LLC | 1764 Grand Avenue, Baldwin NY | Nov. 30, 2030 |
| 72663 | Kimco Centereach, LLC | A&P Real Property, LLC | 2150 Middle Country Rd Centereach, NY | Sept. 30, 2020 |
| 76248 | Echo Swedesford Associates LP as successor in interest to 400 West Swedesford Road Holdings LLC, as successor in interest to Swedesford Shopping Center Acquisition, LLC | A&P Real Property, LLC | 400-450 W. Swedesford Rd Devon, PA | Apr. 30, 2021 |
| 76363 | Walnutport Associates | Super Fresh Food Markets, Inc. and/or A&P Real Property, LLC as successor in interest | 300 S. Best Ave & Main St Walnutport, PA | June 30, 2021 |
| 76723 | US Bank National Association, as successor in interest to Liberty Plaza Limited Partnership | A&P Real Property, LLC | 85 Franklin Mills Blvd Philadelphia, PA | Nov. 30, 2020 |

**Exhibit D**

**Interim Order**

**(Redline Version)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                             :

**In re**                                     :           **Chapter 11**

**THE GREAT ATLANTIC & PACIFIC TEA**  :

**COMPANY, INC., et al.,**           :           **Case No. 15-23007 (RDD)**

                                      :           ~~**(Joint Administration Pending)**~~

       **Debtors.**[1]                :           **(Jointly Administered)**

                                      :
----------------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C.**
**§§ 105, 363, 365 AND 554 APPROVING (I) GLOBAL**
**PROCEDURES FOR (A) STORE CLOSINGS, (B) THE EXPEDITED**
**SALE, TRANSFER, OR ABANDONMENT OF DE MINIMIS ASSETS,**
**AND (C) REJECTING UNEXPIRED NONRESIDENTIAL REAL PROPERTY**
**LEASES, AND (II) ENTRY INTO A LIQUIDATION CONSULTING AGREEMENT**

Upon the motion (the "**Motion**")[2] of The Great Atlantic & Pacific Tea

Company, Inc. and certain of its affiliates and subsidiaries, as debtors and debtors in possession

in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant, pursuant to

sections 105(a), 363, 365, and 541 of title 11 of the United States Code (the "**Bankruptcy**

**Code**"), for an order authorizing the Debtors to (i) implement the Store Closing Procedures,

(ii) sell, transfer or abandon De Minimis Assets pursuant to the De Minimis Asset Procedures,

(iii) enter into a Liquidation Consulting Agreement, (iv) implement the Lease Rejection

Procedures, and (v) reject the ~~Triple Negative~~Initial Closing Stores' Leases identified on

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion or McGarry Declaration, as applicable.

Exhibit 1 attached hereto, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given to the Notice Parties as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and upon the Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**McGarry Declaration**"), filed contemporaneously with the Motion, the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis to the extent set forth herein; and it is further

ORDERED that the Debtors are authorized, but not directed, pursuant to section 105(a), 363, 365 and 554 of the Bankruptcy Code, to conduct Store Closing Sales at Closing Stores pursuant to the following store closing procedures (the "**Store Closing Procedures**"):

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

1.      The Store Closing Sales will be conducted during normal business hours or such hours as otherwise permitted by the applicable unexpired lease, and the Debtors will abide by any applicable shopping center guidelines regarding maintenance, security, and trash removal.

2.      The Store Closing Sales will be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Store Closing Sales will be conducted on Sunday unless the Debtors have been operating such stores on Sundays.

3.      All display and hanging signs used by the Debtors in connection with the Store Closing Sales will be professionally lettered and all hanging signs will be hung in a professional manner.  No additional restrictions will be imposed on the Debtors that are not contained in the applicable lease. In addition, the Debtors will be permitted to utilize exterior banners and sign-walkers.

4.      If Store Closing Sales are to be considered "final," conspicuous signs will be posted in each of the affected stores to the effect that all sales are "final."

5.      The Debtors will not make any alterations to interior or exterior store lighting, and will not use any type of amplified sound to advertise the Store Closing Sales or solicit customers.

6.      No alterations will be made to the Closing Stores, except as authorized pursuant to the applicable lease.  The hanging of exterior banners or other signage will not constitute an alteration to a store.

7.      No property of any landlord will be removed or sold during the Store Closing Sales.

8.      The Debtors will keep store premises and surrounding areas clear and orderly, consistent with past practices.

9.      The Liquidation Consultant, at the Debtors direction, will negotiate any particular modifications to the Store Closing Procedures with any landlord in regards to number and placement of signs or banners.

10.      The Debtors do not have to comply with lease provisions or covenants that are inconsistent with these procedures.

11.      The Debtors do not have to comply with the Liquidation Laws (as defined below).

12.      Pharmaceutical Assets will be sold or transferred in accordance with applicable state law.

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

13.    The Liquidation Consultant, on behalf and at the direction of the Debtors, may abandon De Minimis Assets in accordance with the De Minimis Asset Procedures.

14.    An unexpired nonresidential real property lease will only be deemed rejected in accordance with the Lease Rejection Procedures.

provided that the Debtors and landlords of any Closing Store are authorized to enter into agreements modifying the Store Closing Procedures (each a "**Landlord Agreement**") without further order of the Court; provided further that such agreements do not have a material adverse effect on the Debtors or their estates; and it is further

ORDERED that the Debtors are authorized to sell or otherwise dispose of the Pharmaceutical Assets to the highest ~~and~~or best bidder(s) as identified by the Debtors in their business judgment and subject to applicable federal and state law, including, without limitation, public health, safety and privacy requirements imposed by applicable non-bankruptcy law. To the extent applicable, the Debtors shall comply with the De Minimis Asset Sale Procedures, as approved by this Court; and it is further

ORDERED that~~-~~ pursuant to section 363(f) of the Bankruptcy Code, the Store Closing Assets being sold shall be sold free and clear of any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation, any and all "claims" as defined in section 101(5) of the Bankruptcy Code), including, without limitation, the liens and security interests of the Proposed DIP Lenders (collectively, the "**Liens**"), with such Liens, if any, attaching to the proceeds with the same validity, and enforceability, to the same extent and with the same priority as they attached to such assets immediately prior to the closing of the applicable sale; and it is further

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

ORDERED that no entity, including, without limitation, utilities, landlords, creditors and all persons acting for or on their behalf (but not Governmental Units, as defined in section 101(27)) shall interfere with or otherwise impede the conduct of the Store Closing Sales, or institute any action against the Debtors or landlords in any court (other than in this Court) or before any administrative body which in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closing Sales; and it is further

ORDERED that any restrictions in any lease agreement, restrictive covenant, or similar documents purporting to limit, condition, or impair the Debtors' ability to conduct the Store Closing Sales shall not be enforceable, nor shall any breach of such provisions in these chapter 11 cases constitute a default under a lease or provide a basis to terminate the lease provided the Store Closing Sales are conducted in accordance with the terms of this Interim Order, the Store Closing Procedures and any Landlord Agreement; and it is further

ORDERED that the Closing Stores may "go-dark" during the Store Closing Sales and remain "dark" despite any lease restriction, real estate local act, local law, or ordinance to the contrary, and any "continuous operation" or similar clause in any of the leases (or any lease provision that purports to increase the rent or impose any penalty for "going dark") may not be enforced to hinder or interrupt the Store Closing Sales (and the "going dark" under such leases shall not be a basis to cancel or terminate the leases); and it is further

ORDERED that, subject to applicable federal, state and local public health and safety laws (the "**Safety Laws**"), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, the "**General Laws**"), but excluding Liquidation Sale Laws, the Debtors are authorized to take such actions as necessary and appropriate to conduct the Store

5

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

Closing Sales without the necessity of a further order of this Court, including, but not limited to, advertising the Store Closing Sales; and it is further

ORDERED that, provided the Store Closing Sales are conducted in accordance with the terms of this Interim Order and, the Store Closing Procedures and any applicable Landlord Agreement, and in light of the provisions in the laws of many local and state laws that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance or otherwise excused from compliance with any Liquidation Sale Laws, and are authorized to conduct the Store Closing Sales in accordance with the terms of this Interim Order without the necessity of compliance with any such Liquidation Sale Laws; and it is further

ORDERED that the Debtors shall be entitled to use sign walkers, hang signs, and/or interior or exterior banners advertising the Store Closing Sales in accordance with the Store Closing Procedures (or as otherwise agreed between the Debtors and the respectiveand any applicable lLandlords )Agreement, including, without limitation, advertising the Store Closing Sales as "store closing," "sale on everything," or similar themed sales and by means of media advertising, A-frames, banners, and similar signage, without further consent of any person and without compliance with the Liquidation Sale Laws; provided, that the use of banners and sign walkers is done in a safe and responsible manner, such sign walkers and banners, in and of themselves, shall not be deemed to be in violation of Safety Laws and/or General Laws; and it is further

ORDERED that each and every federal, state, or local agency, departmental or governmental unit with regulatory authority over the Store Closing Sales and all newspapers and other advertising media in which the Store Closing Sales are advertised shall consider this

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

Order as binding authority that no further approval, license, or permit of any governmental unit shall be required, nor shall the Debtors be required to post any bond, to conduct the Store Closing Sales; and it is further

ORDERED that state and/or local authorities shall not fine, assess, or otherwise penalize the Debtors or any of the landlords of the Closing Stores for conducting or advertising the Store Closing Sales in a manner inconsistent with state or local law; provided, that the Store Closing Sales are conducted and advertised in a manner contemplated by this Interim Order; and it is further

ORDERED that the Debtors may not transfer any Inventory or FF&E located at a Tier I Store or Tier II Store to any Initial Closing Store; and it is further

ORDERED that the Debtors shall consult with the Creditors' Committee and the DIP Agent (including providing information requested by the Creditors' Committee and/or the DIP Agent) in connection with (a) Store Closing Sales, (b) sales of Pharmaceutical Assets, and (c) any modification of the Store Closing Procedures; and it is further

ORDRED that the Debtors may conduct additional Store Closing Sales in accordance with the terms of this Interim Order at locations other than the Initial Closing Stores by filing and serving the Notice Parties (as defined below) and any landlord at an affected location with (i) notice of intent to conduct a Store Closing Sale pursuant to this Interim Order, and (ii) a copy of this Interim Order. The Notice Parties and affected landlord(s) will have 10 calendar days from the filing and service of the notice of intent to conduct additional Store Closing Sales to object to the terms of the Store Closing Procedures and request a hearing on the objection. If no objection is filed, the Debtors may conduct Store Closing Sales at such locations in accordance with the terms of this Interim Order; and it is further

7

**De Minimis Asset Procedures**

ORDERED that the Debtors are authorized, but not directed, to sell or transfer De Minimis Assets under the following procedures (the "**De Minimis Asset Sale Procedures**"):

    (a)    For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a sale price, as measured by the amount of cash and other consideration to be received by the Debtors on account of the assets to be sold ("**Sale Price**"), less than or equal to $250,000:

        (i)    the Debtors are authorized to consummate such transactions if the Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court or notice to any party;

        (ii)    any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction; and

        (iii)    each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser.

    (b)    For sales or transfers of De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with a Sale Price greater than $250,000 and less than or equal to $5,000,000:

        (i)    the Debtors are authorized to consummate such transactions if the Debtors determine in the reasonable exercise of their business judgment that such sales are in the best interest of the estates, without further order of the Court, subject to the procedures set forth herein;

        (ii)    any such transactions shall be free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the transaction;

        (iii)    each purchaser of a De Minimis Asset will be afforded the protections of section 363(m) of the Bankruptcy Code as a good faith purchaser;

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

(iv)   the Debtors shall, at least five (5) ~~calendar~~business days prior to closing such sale or effectuating such transfer, serve a written notice of such sale or transfer by e-mail, facsimile, or overnight delivery service (each notice, a "**De Minimis Asset Sale Notice**") to (a) the U.S. Trustee; (b) proposed counsel to the Creditors' Committee~~, if any~~; (c) any known affected creditor(s) ~~, including~~and their respective counsel ~~to any creditor~~, if known, asserting a lien claim or encumbrance on the relevant De Minimis Assets~~, and their respective counsel, if known~~; (d) those parties requesting notice pursuant to Bankruptcy Rule 2002; (e) counsel to the ~~agent for the Debtors' Proposed DIP Lender, if approved~~DIP Agent (as defined in the DIP Orders); (f) counsel to each agent for the Debtors' Prepetition Secured Lenders; (g) majority holders of Senior Secured PIK Toggle Notes due 2017 issued by the Debtors; and (h) majority holders of Senior Secured Convertible Notes due 2018 (collectively, the "**Notice Parties**");

(v)   the content of the De Minimis Asset Sale Notice shall consist of:
- identification of the De Minimis Assets being sold or transferred and its location;
- identification of the purchaser of the assets and any relationship such party has with the Debtors;
- identification of any parties known to the Debtors as holding liens or encumbrances on the assets subject to the De Minimis Assets being sold and a statement indicating whether all such liens or encumbrances are capable of monetary satisfaction;
- the purchase price; and
- any other significant terms of the sale or transfer; and
- date and time within which objections may be filed and served on the Debtors;

(vi)   Objections, if any, must be in writing and served on the other Notice Parties and counsel to the Debtors so as to be received by all such parties prior to 4:00 p.m. (Eastern Time) on the fifth ~~calendar~~business day after service of the De Minimis Asset Sale Notice and must state with specificity the grounds for the objection;

(vii)   if no written objections are filed by any of the Notice Parties within five (5) ~~calendar~~business days of service of such De Minimis Asset Sale Notice, the Debtors are authorized to immediately consummate such transaction; and

(viii)   if a written objection is received from a Notice Party within such ~~five-day~~five (5-) business day ~~)~~period that cannot be resolved, the objection will be deemed a request for a hearing on the objection at the next scheduled hearing, subject to adjournment by the Debtors, and the relevant De Minimis Asset(s) shall only be sold upon withdrawal of

9

such written objection or further order of the Court specifically approving the sale or transfer of the De Minimis Asset(s)~~;~~.

~~,~~ and it is further~~;~~

ORDERED that, the De Minimis Asset Sale Procedures shall not apply to any sales or transfers of assets that involve an employee or an "insider" of the Debtors as such term is defined in section 101(31) of the Bankruptcy Code; and it is further

ORDERED that sales of De Minimis Assets that are consummated pursuant to the De Minimis Asset Sale Procedures shall be deemed arm's-length transactions entitled to the protections of section 363(m) of the Bankruptcy Code; and it is further

ORDERED that ~~nothing in~~ the De Minimis Asset Sale Procedures shall ~~exempt the Debtors from~~ not apply to any transaction that involves the assumption and the assignment of unexpired leases of nonresidential real property or the requirements of section 365 of the Bankruptcy Code ~~with respect to unexpired leases of non-residential real property~~; and it is further

ORDERED that the absence of an objection to the relief requested in the Motion combined with the absence of a timely objection to the sale or transfer of the De Minimis Assets in accordance with the terms of this Interim Order shall be determined to be "consent" to such sale or transfer within the meaning of section 363(f)(2); and it is further

ORDERED that, except as specifically provided in the applicable sale or transfer document, sales and transfers of De Minimis Assets shall be free and clear of all Liens, with such Liens attaching to the proceeds of such sale or transfer with the same validity, enforceability, extent and priority as had attached to such De Minimis Assets immediately prior to the closing of such sale or transfer; and it is further

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

ORDERED that the Debtors are authorized, but not directed, to abandon De Minimis Assets under the following procedures (the "**De Minimis Asset Abandonment Procedures**"):

(a)     For De Minimis Assets that the Debtors believe in their sound business judgment have a ~~book~~fair market value~~, as recorded in the Debtors' books and records ("Book~~("**Market** Value"), less than or equal to $250,000:

    (i)     the Debtors are authorized to abandon such De Minimis Assets if the Debtors determine in the reasonable exercise of their business judgment that such abandonment is in the best interest of the estates, without further ~~order of the Court or notice to any party~~; provided that the Debtors shall, at least five (5) business days prior to abandoning De Minimis Assets, serve notice of such abandonment by e-mail, facsimile or overnight delivery service (each notice, an "**Abandonment Notice**") on the landlord of the premises for which the De Minimis Assets are being abandoned.

(b)     For De Minimis Assets that the Debtors believe in their sound business judgment have a ~~Book~~Fair Market Value greater than $250,000 but less than or equal to $5,000,000:

    (i)     The Debtors shall, at least five (5) ~~calendar~~business days prior to abandoning De Minimis Assets, serve ~~a written notice of such abandonment by e-mail, facsimile, or overnight delivery service (each notice, an "~~an Abandonment Notice ~~") to~~on the Notice Parties;

    (ii)     the content of the Abandonment Notice shall consist of: (a) the location and identification of the De Minimis Assets being abandoned~~ and location~~; and (b) a summary of the reasons for abandoning such De Minimis Assets;

    (iii)     if a written objection is received from a De Minimis Notice Party within such ~~five-day~~five (5) business day ~~)~~ period that cannot be resolved, the relevant De Minimis Assets shall only be abandoned upon withdrawal of such written objection or further order of the Court.

~~,~~and it is further;

ORDERED that the Debtors will file a report with the Court and serve on all parties entitled to notice in the cases, within 30 days after each calendar quarter, summarizing any

11

sales, transfers, or abandonments consummated pursuant to the De Minimis Asset Procedures; and it is further

ORDERED that any personal property of the Debtors remaining at a Closing Store after the effective date of rejection of the lease shall be deemed abandoned as of the Rejection Date; and it is further

ORDERED that with respect any De Minimis Assets abandoned under the De Minimis Asset Abandonment Procedures herein and located at one of the Debtors' leased properties, the applicable landlord or other designee shall be free to dispose of such property without liability to any party and without further notice or order of the Court; provided, however, that notwithstanding anything to the contrary in this Interim Order, the Debtors are not authorized hereunder to abandon and are directed to remove any hazardous (as such term is defined in federal, state, or local law, rule, regulation or ordinance) materials at any premises subject to a nonresidential real property lease or sublease. Landlords' rights, if any, to file claims for the costs of disposal of such property are fully reserved, as are the rights of any party in interest to object to such claims; and it is further

ORDERED that service of the De Minimis Asset Sale Notice and/or the De Minimis Asset Abandonment Notice is sufficient notice of the sale, transfer, and/or abandonment of such De Minimis Assets; and it is further

ORDERED that the Debtors are authorized to pay those reasonable and necessary fees and expenses incurred in the sale, transfer, or abandonment of De Minimis Assets, including reasonable commission fees to agents, brokers, auctioneers and liquidators, if any; and it is further

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

ORDERED that any payment made or to be made under this Interim Order, and any authorization contained in this Interim Order, shall be subject to the terms of the DIP Orders; and it is further

### Liquidation Consulting Agreement

ORDERED that the Debtors are authorized to enter into a Liquidation Consulting Agreement with a the Liquidation Consultant; and it is further

ORDERED that any payment made or to be made under this Interim Order, and any authorization contained in this Interim Order, shall be subject to the terms of the DIP Orders; and it is further

ORDERED that notwithstanding anything herein to the contrary, (a) nothing in this Interim Order shall in any way limit, subordinate, or constitute a waiver of any rights and priorities of claimants with trust rights under the Perishable Agricultural Commodities Act ("**PACA**") or the Packers and Stockyards Act ("**PASA**"), all such rights hereby being expressly reserved, and (b) nothing herein in any way purports to grant any liens or priorities contrary to the statutory trust protections afforded under PACA or PASA; and it is further

ORDERED that the rights and interests, if any, of Union County Realty Group LLC, solely with respect to the FF&E at the Debtors' store located at 651 N. Stiles Street, Linden, New Jersey 07036, operating under the Pathmark banner, are preserved and notice shall be given to it and its counsel appearing on its behalf in these chapter 11 cases, before any sale of such FF&E; and it is further

ORDERED that the requirements of Bankruptcy Rule 6003(b) have been satisfied; and it is further

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

ORDERED that the requirements of Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that the Final Hearing on the Motion shall be held on **August 10**, **2015, at** **10:00 a.m.** **(Prevailing Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Garrett A. Fail, Esq. and Sunny Singh, Esq.); ~~and~~ (ii) attorneys for Gordon Brothers, Reimer Braunstein LLP, Seven Times Square, Suite 2506, New York, New York 10036 (Attn: Steven Fox, Esq.); and (iii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on** **August 5**, **2015**; and it is further

ORDERED that nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Order, other than as expressly provided for herein, is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; and it is further

ORDERED that notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party; and it is further

14

ORDERED that this Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; provided that, the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order; and it is further

ORDERED that the Debtors are authorized to take all action necessary to carry out this Interim Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order and any Landlord Agreement.

Dated: _____, 2015
        White Plains, New York

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\95402463\1\50482.0004
WEIL:\95402463\5\50482.0004

**Exhibit** ~~**Triple Negative Leases**~~

**1**

Initial Closing Stores

**Rejection Schedule o~~Triple Negative~~f Initial Closing Store Leases**

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 70212 | Riverhead Centre, LLC | A&P Real Property, LLC | 1510 Old Country Rd. Riverhead, NY | Jul. 31, 2023 |
| 70213 | 3620 Long Beach Road LLC (as successor in interest to Nathan Serota) | A&P Real Property, LLC | 3620 Long Beach Rd Oceanside, NY | June 30, 2021 |
| 70244 | East Marlboro Associates | A&P Real Property, LLC | 863 E. Baltimore Pike Kenneth Square, PA | Aug. 31, 2017 |
| 70314 | Center Square Plaza Associates | A&P Real Property, LLC | 1301 Skippack Pike Center Square, PA | May 22, 2020 |
| 70343 | AVR CP-TWO, LLC | A&P Real Property, LLC | 2 Westbury Avenue Carle Place, NY | Aug. 31, 2015 |
| 70562 | C'PIA, LLC | A&P Real Property, LLC | Route 13 & Maple Rd (aka 2105 Philadelphia Pike) Claymont DE | Apr. 30, 2020 |
| 70597 | Basser-Kaufman of Matawan, L.L.C. | A&P Real Property, LLC | 325 Route 35 Cliffwood, NJ | Mar. 31, 2023 |
| 70656 | Holmdel Towne Center, LLC | A&P Real Property, LLC | 2101 Route 35 Holmdel, NJ | Mar. 31, 2018 |
| 70726 | Delaware 1851 Associates, LP | A&P Real Property, LLC | 1851 S. Christopher Columbus Blvd Philadelphia, PA | Sept. 30, 2020 |
| 72128 | BOIV Belleville MCB, LLC | A&P Real Property, LLC | 115 Belmont Ave Belleville, NJ | Jan. 31, 2034 |
| 72175 | Cliffpass SPE Corp., successor to Cliffpass Development, Inc. | A&P Real Property, LLC | Botany Plaza 85 Ackerman Ave Clifton, NJ | Mar. 31, 2017 |
| 72185 | Clifton Grocery Stores, LLC | A&P Real Property, LLC | 895 Paulison Ave Clifton, NJ | Mar. 31, 2033 |
| 72512 | Union County Realty Group LLC, as successor in interest to Valley Circle, Inc. | A&P Real Property, LLC | 651 North Stiles St Linden, NJ | Jan. 31, ~~2019~~2025 |
| 72535 | Wick Shopping Plaza Associates, L.L.C. | A&P Real Property, LLC | 561 Route 1, Unit B Edison, NJ | Oct. 31, 2017 |
| 72538 | MCB East Brunswick, LLC | A&P Real Property, LLC | 50 Race Track Rd East Brunswick, NJ | Oct. 31, 2033 |
| 72564 | OLP-MCB Philly-Cottman, LP, as successor in interest to 840 Cottman Associates, LLC | A&P Real Property, LLC | 840 Cottman Ave. Philadelphia, PA | Sept. 30, 2021 |

| STORE ID NO. | COUNTERPARTY-LANDLORD | DEBTOR | PROPERTY ADDRESS | LEASE EXPIRATION DATE |
|---|---|---|---|---|
| 72567 | Garnet Company | A&P Real Property, LLC | 420 MacDade Blvd Folsom, PA | May 31, 2017 |
| 72581 | Old Bridge Plaza Associates, LLC | A&P Real Property, LLC | 1043 US Route 9 Old Bridge, NJ | Oct. 31, 2017 |
| 72582 | Indian Head Plaza Associates, successor in interest to Peter L. Levine | A&P Real Property, LLC | 1256 Indian Head Road Toms River, NJ | Jan. 31, 2020 |
| 72589 | Realty Income Corporation as successor to Inland Diversified Wilmington Lancaster, L.L.C. as successor to WE APP Wilmington LLC | A&P Real Property, LLC | 3901 Lancaster Pike Wilmington, DE | Nov. 30, 2030 |
| 72623 | ~~First Real Estate Investment Trust of~~ New ~~Jersey~~York Grocery DST | A&P Real Property, LLC | 1764 Grand Avenue, Baldwin NY~~399 Route 112 Patchogue, NY~~ | ~~May 31~~Nov. 30, ~~2022~~2030 |
| 72663 | Kimco Centereach, LLC | A&P Real Property, LLC | 2150 Middle Country Rd Centereach, NY | Sept. 30, 2020 |
| 76248 | Echo Swedesford Associates LP as successor in interest to 400 West Swedesford Road Holdings LLC, as successor in interest to Swedesford Shopping Center Acquisition, LLC | A&P Real Property, LLC | 400-450 W. Swedesford Rd Devon, PA | Apr. 30, 2021 |
| 76363 | Walnutport Associates | Super Fresh Food Markets, Inc. and/or A&P Real Property, LLC as successor in interest | 300 S. Best Ave & Main St Walnutport, PA | June 30, 2021 |
| 76723 | US Bank National Association, as successor in interest to Liberty Plaza Limited Partnership | A&P Real Property, LLC | 85 Franklin Mills Blvd Philadelphia, PA | Nov. 30, 2020 |

**EXHIBIT 2**

**Form Rejection Notice**

## NOTICE OF REJECTION OF CERTAIN
## UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES

**PLEASE TAKE NOTICE** that, on [_____], 2015 (the "**Commencement Date**"), The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[3] filed chapter 11 petitions commencing chapter 11 cases under the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that, on the Commencement Date, the Debtors filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365 and 554 for Approval of (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry into a Liquidation Consulting Agreement* [Docket No. ___] (the "**Motion**"). On [_____], 2015 the Bankruptcy Court entered the order granting the Motion on an interim basis [Docket No. __] and on [_____], 2015, entered the order granting the Motion on a final basis [Docket No. __] (together, the "**Order**").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, the Debtors hereby provide notice of their intent to reject the lease(s) referenced below (the "**Lease**"):

---

[3] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Two Thousand Eight Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc. (3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

| | |
|---|---|
| 1) Landlord | |
| 2) Debtor Entity | |
| 3) Store ID Number | |
| 4) Real Property Lease Address | |
| 5) Expiration Date of Lease | |

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, the rejection of the Lease shall become effective as of the date hereof (the "**Rejection Date**") without further notice, hearing or order of this Court.

**PLEASE TAKE FURTHER NOTICE** that, should you object to the Debtors' rejection of the Lease, you must file and serve a written objection so that such objection is filed with the Bankruptcy Court and **actually received** no later than 10 calendar days after the date that the Debtors served this "Notice of Rejection of Certain Nonresidential Real Property Leases" (the "**Rejection Notice**") on the following parties (the "**Notice Parties**"):  (i) counsel for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn.:  Ray C. Schrock, P.C., Garrett A. Fail, Esq. and Sunny Singh, Esq.; (ii) counsel to any committee appointed in these chapter 11 cases, and until such appointment, the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure; and (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York, Attn:  Brian Masumoto, Esq.

**PLEASE TAKE FURTHER NOTICE** that absent such an objection being filed and served in compliance with the foregoing, the rejection of the Lease shall become effective as of the Rejection Date without further notice, hearing or order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that, if an objection is properly filed and served on the Notice Parties as specified above, the Bankruptcy Court will schedule a hearing to consider that objection.  If the Bankruptcy Court upholds the objection and determines the effective date of rejection of such lease, that date shall be the rejection date.  If such objection is overruled or withdrawn or the Bankruptcy Court does not determine the date of rejection, the rejection date of such lease shall be deemed to have occurred on the Rejection Date.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, if the Debtors have deposited monies with a lessor as a security deposit or arrangement, such lessor or contract counterparty may not off-set or otherwise use such deposit without prior authorization from the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Order and the Motion are available at https://cases.primeclerk.com/aptea.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at https://ecf.nysb.uscourts.gov.

Dated:  [_____], 2015
          New York, New York

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*