WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
**In re**                                        :        **Chapter 11**
                                                 :
**THE GREAT ATLANTIC & PACIFIC TEA**   :        **Case No. 15-23007 (RDD)**
**COMPANY, INC.,** *et al.*,                     :
                                                 :        **(Jointly Administered)**
                    **Debtors.**[1]              :
---------------------------------------------------------------x

## NOTICE OF FILING OF LIQUIDATION CONSULTING AGREEMENT

On July 20, 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates and subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365 and 554 for Approval of (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry Into a Liquidation Consulting Agreement*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Two Thousand Eight Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[Docket No. 20] (the "**Motion**"). A supplement to the Motion was filed on July 26, 2015 [Docket No. 178] (the "**Supplement**").

On July 27, 2015, a hearing was held to consider the relief requested in the Motion, as supplemented by the Supplement, before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York (White Plains Division), 300 Quarropas Street, White Plains, New York, 10601, and on July 28, 2015, an order granting the relief requested on an interim basis was entered and approved [Docket No. 204].

**PLEASE TAKE NOTICE** that a true and correct copy of the Liquidation Consulting Agreement entered into with Gordon Brothers Retail Partners, LLC, including exhibits, is attached hereto as **Exhibit "A"**.

Dated: July 29, 2015
     New York, New York

                                        /s/ Ray C. Schrock, P.C.
                                        Ray C. Schrock, P.C.
                                        Garrett A. Fail
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        *Proposed Attorneys for Debtors*
                                        *and Debtors in Possession*

# Exhibit A

# Liquidation Consulting Agreement

# GOB SERVICES AGREEMENT

This GOB SERVICES AGREEMENT (this "Agreement") is made as of July 23, 2015 (the "Effective Date") by and between THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation, having an address at 2 Paragon Drive, Montvale, NJ 07645, on behalf of itself and certain of its affiliates (collectively, the "Company") and Gordon Brothers Retail Partners, LLC, a Delaware limited liability company having an address at 800 Boylston Street, 27th Floor, Boston, MA 02199 (the "Consultant").

## RECITALS

WHEREAS, Company operates certain supermarkets and liquor stores in six Northeastern states (the "Stores");

WHEREAS, Company is entering into this Agreement after a voluntary filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, in furtherance of its strategic business plan and under the auspices of the Bankruptcy Court, Company intends to initially close and liquidate the 25 stores attached hereto as **Exhibit A** (each an "Initial Closing Store" and collectively, "Initial Closing Stores") as well as subsequently identify additional stores during the Company's bankruptcy case to close and liquidate (the "Additional Closing Stores" and, together with the Initial Closing Stores, the "Closing Stores"); and

WHEREAS, Company desires to retain Consultant to provide certain "going out of business", "store closing", or similar theme sale and liquidation services for the Closing Stores, under the terms and conditions contained herein, and Consultant is willing to provide such services.

NOW, THEREFORE, in consideration of the facts set forth in the Recitals above, the mutual covenants and conditions below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Term of Agreement. This Agreement shall commence on the first day following, and the parties' obligations hereunder shall be subject to, the entry of the Approval Order, and this Agreement shall remain in full force and effect until the closing of the Company's bankruptcy case or on the date that is thirty (30) days from written notice issued by Company to Consultant terminating the Agreement for cause (the "Term"); provided however, that Consultant shall have the right to earlier termination of this Agreement if all Services at all of the Initial Closing Stores (and at any Additional Closing Stores that became subject to this Agreement) have been satisfactorily completed and finally reconciled. Termination for "cause" shall mean any termination as a result of Consultant's completion of Services or failure to diligently perform the Services or any fraud, material misrepresentation, gross negligence, willful misconduct or material breach by Consultant of the terms of this Agreement.

   a. Effect of Termination. Upon termination of this Agreement by Company, Consultant shall: (i) immediately discontinue all Services; and (ii) deliver to Company all information, reports, papers, and other materials prepared or obtained by Consultant in performing the Services, whether completed or in process. Upon termination, the Company shall be liable only for payment of accrued and unpaid amounts provided for under this Agreement as of the effective date of the termination and no compensation shall be due to Consultant unless such fees have been earned by Consultant as of the effective date of termination in accordance with Section 2(b) or 3(b) below (unless the

Bankruptcy Court determines that there was actually no "cause" to justify the Company's termination of this Agreement, in which case the parties will mutually agree upon (or the Bankruptcy Court will determine) appropriate compensation due from the Company to the Consultant.

2. <u>Inventory Liquidation</u>.

(a) <u>Services</u>. "Inventory" means all food products, general merchandise and other inventory that is customarily sold to the public at the Closing Stores, but shall not include the following: postal stamps, lottery tickets, tobacco, prescription drugs and medication and devices designed to be used primarily in connection with prescription drugs/medications, in-store services (such as Western Union, video rentals, Coin-Star, ATM, bottle redemption, banking services, vending machines, Rug Dr., and film development), prescription related lists (aka scripts) and any liquor or other licenses used in the operation of the Closing Stores. Consultant shall develop and implement a program for the orderly and efficient sale and liquidation of the Inventory at each closing store (the "Inventory Project"). The Inventory Project shall include, without limitation, the following services:

(i) Consultant shall recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Inventory during the Term and shall directly market and advertise the Inventory Project to the public using a "store closing" handle, including, without limitation, the use of circulars, in-store signs and banners, exterior signs and banners, mailings, sign walkers, and print, radio, and other media, provided, that the content all of advertising shall be subject to the reasonable approval of the Company. All advertising shall reflect that sales are "final sales" and the Inventory is being sold in its "as is" condition;

(ii) Consultant shall establish discounting for the Inventory and modify the discounting during the course of the Inventory Project in an effort to maximize return on the Inventory;

(iii) Consultant shall establish and provide oversight of accounting functions for the Inventory Project, including evaluation of sales of inventory by category, sales reporting and expense monitoring;

(iv) Consultant shall provide adequate supervisory staffing at each Closing Store to oversee the Inventory Project, and such staff member shall have industry-specific experience conducting "store closing", "bankruptcy liquidation", or similarly themed sales and shall act in a professional manner, provided, that unless the Company otherwise consents (which consent shall not unreasonably be withheld or delayed) Consultant shall assign at least one full time, on-site supervisor level staff person for every two (2) Closing Stores; and provided further that if the Company is dissatisfied with any specific supervisor then the Consultant will use reasonable efforts to promptly replace such supervisor with an alternate/acceptable supervisor (it being understood that the reason for the Company's dissatisfaction must not be discriminatory or otherwise unlawful).

(v) Consultant shall coordinate the Inventory Project with the Company at both the store and corporate level to insure that the Inventory Project is conducted in an orderly and efficient manner, provided however, that the Company shall have the ultimate control of store personnel and shall handle the cash, debit, and charge card payments for all Inventory sold in accordance with Company's customary cash management procedures; and provided further that the Company shall be solely responsible for the computing, collecting, holding, reporting, and paying all sales taxes associated with the sale of Inventory in the Inventory Project (and Consultant shall have absolutely no responsibilities or liabilities therefor);

(vi) Consultant shall make recommendations to the Company on appropriate staffing levels for the Closing Stores during the course of the Inventory Project;

(vii) Consultant shall advise the company on loss prevention and stock loss initiatives;

(viii) Consultant shall provide written reports to Company during the Inventory Project in such frequency as reasonably determined by Company;

(ix) Consultant shall ensure each Closing Store is vacated in a "broom clean" condition (subject to Consultant's right to abandon unsold FF&E and Excluded FF&E as provided in Section 3 below);

(x) Consultant shall, as necessary, coordinate with the landlords and any other tenants or other subtenants on the property in which the Closing Stores are located to minimize any possible disruptions caused by the Inventory Project;

(xi) To the extent that there is any unsold Inventory remaining after the Inventory Project, Consultant shall remove and dispose of same off-site; provided, that any income resulting from the disposal shall belong to Company but shall be part of Gross Sales (defined below); and provided further that the costs and expenses of such removal/disposal shall be the responsibility of the Company in accordance with a mutually agreed upon and reasonable budget determined at such later time; and

(xii) Consultant and Company shall comply with the respective provisions applicable to them in the Approval Order (as defined in Section 6 below).

(xiii) Consultant shall fix a term of the Inventory Project in respect of the Initial Closing Stores ("Initial Inventory Project"), and if applicable a term of the Inventory Project in respect of one or more sets of Additional Closing Stores, if applicable; provided however that in each case Consultant shall have the right to earlier terminate any such fixed term at any one or more Closing Stores/Additional Closing Stores with the consent of the Company (which consent shall not unreasonably be withheld or delayed). The parties agree that the term of the Initial Inventory Project shall commence on the first day following entry of the Approval Order and shall end five (5) weeks thereafter.

(b) Compensation.
(i) As used in this Agreement:

(A) The term "Retail Value" with respect to each item of Inventory shall be determined using the "Gross Rings Methodology" using file retail prices established the day prior to the commencement of the Inventory Project with respect to each Store.

(B) The term "Gross Sales" shall mean the gross proceeds of the sale of the Inventory during the Inventory Project at and with respect to the Initial Closing Stores (and independently at the conclusion of the Inventory Project at and with respect to each one or more sets of Additional Closing Stores, if applicable), in each case net only of sales taxes, including without limitation, liquor and similar taxes.

(C) The "Cost Value" with respect to each item of Inventory shall be determined with reference to the cost value reflected by the Company on its books and records maintained in the ordinary course consistent with historic practices and periods, and consistent with the information provided by the Company to the Consultant in connection with the due diligence process leading up to the execution of this Agreement.

(D) The term "Recovery Percentage" shall mean the Gross Sales divided by the Cost Value.

(ii) At the conclusion of the Inventory Project at and with respect to the Initial Closing Stores (and, unless otherwise agreed upon, independently at the conclusion of the Inventory Project at and with respect to each one or more sets of Additional Closing Stores, if applicable), the Company shall pay the Consultant a percentage of the Gross Sales based upon the following Recovery Percentage Schedule (on a "back-to-first-dollar" rather than "incremental" basis):

| Recovery Percentage | Gross Sales Percentage Fee |
| --- | --- |
| 100% or greater | 1.00% |
| Less than 100% | 0% |

Provided however, that for purposes of calculating the compensation contemplated by this Section 2(b), perishable items of Inventory brought into the Stores after the commencement of the Inventory Project at a Closing Store (which the Company agrees it will do in consultation with the Consultant) shall not be taken into account for purposes of calculation of the compensation.

For example, assuming the Cost Value of the Inventory of the Initial Closing Stores is $24,000,000, and the Gross Sales at the end of the Initial Inventory Project is $25,000,000, then the Recovery Percentage is 104.17%, and the fee for the Initial Inventory Project will be $250,000 ($25,000,000 x 1.00%).

(iii) The compensation contemplated hereby shall be determined and paid no later than the first Monthly Reconciliation following the completion of the Inventory during the Inventory Project at and with respect to the Initial Closing Stores (and independently at the conclusion of the Inventory Project at and with respect to each one or more sets of Additional Closing Stores, if applicable).

(iv) The parties agree that the Recovery Percentage hurdles and the Gross Sales Percentage Fee formulations have been established based upon the Consultant's understanding from the Company that: (a) the Cost Value-to-Retail Value relationship of the Inventory included in the Initial Inventory Project (and, unless otherwise agreed upon, the Cost Value-to-Retail Value relationship of the Inventory included in one or more sets of Additional Closing Stores, if applicable), shall be not greater than 62.4%; and (b) the Company has not since the date hereof (and will not without the Consultant's approval, not to be unreasonably withheld or delayed with reference to the establishment of such hurdles/formulations) transfer Inventory into or out of the Initial Stores outside of the ordinary course of business consistent with historic periods and practices; and (c) any Company circular sales, POS discounts, and/or similar promotions covering the Closing Stores will cease applying to sales made at such Closing Stores on the Thursday immediately preceding the start of the respective Inventory Project at such Closing Stores.

3. FF&E Liquidation.

(a) "FF&E" means all of the furniture, fixtures, equipment, supplies and other tangible personal property located at the Closing Stores as of the Sale Commencement Date, but shall not include (i) any intangible property, such as liquor or other licenses used in the operation of the Closing Store or (ii) any "Excluded FF&E" (as defined below). Consultant shall develop and implement a program for the orderly and efficient sale and liquidation of any and all FF&E (the "FF&E Project", and together with the Inventory Project, the "Services"). The FF&E Project shall include, without limitation, the following services:

(i) Consultant shall directly conduct the sale of any and all FF&E;

(ii) Consultant shall remove and dispose off-site all rubbish so that all of the Closing Stores are restored to a "broom clean condition" no later than the close of business on the day following the conclusion of the Initial Inventory Project (and the close of business on the day following the conclusion of any subsequent one or more sets of Inventory Projects with respect to Additional Closing Stores, if applicable);

(iii) Consultant shall properly cap/fill/repair (as applicable) any exposed electrical, plumbing, HVAC and roofing connections resulting from the removal of the FF&E Project, all in compliance with local building codes;

(iv) Consultant shall obtain any and all permits, licenses, or other governmental approvals required to perform the FF&E Project;

(v) Consultant shall provide adequate security and otherwise properly maintain and secure the Closing Stores until the conclusion of the FF&E Project, provided, that Consultant shall not be liable for any loss or theft unless resulting from Consultant's gross negligence;

(vi) Consultant shall, as necessary and subject to the terms of the Approval Order, coordinate with the landlords and any other tenants or other subtenants on the property in which the Closing Stores are located to minimize any possible disruptions caused by the FF&E Project;

(vii) Consultant shall provide written reports to Company during the FF&E Project in such frequency as reasonably determined by Company;

(viii) On or before the third day following the commencement of the Initial Inventory Project (and the third day following the commencement of any subsequent one or more sets of Inventory Projects with respect to Additional Closing Stores, if applicable), Company and Consultant shall conduct a joint walk-through of the Closing Stores and prepare written sign-offs to confirm that Consultant has performed all of the services outlined in this Section 3(a);

(ix) For the avoidance of doubt, coolers, freezers and walk-in storage boxes shall be included as FF&E (e.g. such items shall not be Excluded FF&E); and

(x) Notwithstanding any other provision of this Agreement to the contrary: (1) Consultant shall have the right to abandon (in favor of the Company, and not in favor of any landlord or other third party) all unsold FF&E; (2) Consultant shall have no responsibility for removing or disposing of any unsold FF&E or any Excluded FF&E; and (3) Consultant shall have no responsibility for removing, disposing of, or otherwise handling any hazardous materials (including without limitation Freon) in connection with its Services relating to FF&E (the full responsibility of which shall remain with the Company whether or not FF&E containing such hazardous materials is or is not sold).

(b) <u>Compensation.</u> The Company shall pay the Consultant a commission equal to ten percent (10%) of the gross sales of all FF&E (net only of sales taxes), monthly on account of sales of FF&E made during the prior month as part of each Monthly Reconciliation (as defined in Section 4(b) below).

(c) As used herein, "Excluded FF&E" shall mean those items of furniture, fixtures, equipment, supplies and other tangible personal property located at Stores as of the Sale Commencement Date that the Company (i) wishes to exclude from the FF&E Project in its sole discretion and (ii) does not own or otherwise does the have the right to authorize Consultant to sell. "Excluded FF&E" also shall

mean all wall systems. The Company shall provide the Consultant with a list of Excluded FF&E no later than the fifth (5th) day following the Sale Commencement Date. The Consultant shall have no responsibility for the sale, removal, handling, disposal, or cleanup of any Excluded FF&E.  Until the Inventory Project at a particular Closing Store has concluded, the Company may not remove any Excluded FF&E from such Closing Store without the Consultant's prior consent.

(d)     Notwithstanding the foregoing provisions of this Section 3, the Consultant shall promptly following the commencement of the Initial Inventory Project (and, promptly following the commencement of the Inventory Project at one or more sets of Additional Closing Stores, if applicable), solicit dealer bids (estimated or firm) for the FF&E at each Closing Store (which dealer bids may serve as a valuation floor), and communicate those respective bids (and whether they are estimates or firm bids) to the Company.  In consultation with one another, the Company and the Consultant shall jointly (acting reasonably and promptly) determine (on a Closing Store-by-Closing Store basis) whether to accept such dealer bids, to accept such dealer bids on a "stalking horse" basis, or to treat the FF&E at the Closing Store in question as Excluded FF&E.

4.     Reimbursable Expenses.

(a)     Consultant shall deliver to Company a budget relating to the Services (including both the Inventory and FF&E related Services)  that describes in reasonable detail certain projected expenses (the "Budget") and which shall be subject to the Company's prior written consent in all respects, which consent shall not be unreasonably withheld.  Subject to the Budget (which may be updated from time to time with the mutual consent of the Company and the Consultant; and which must be updated in connection with the inclusion of any Additional Closing Stores with the mutual consent of the Company and the Consultant), all Expenses (defined below) shall be borne by the Company, and Consultant shall be entitled to reimbursement from Company for all Expenses as part of each Monthly Reconciliation. "Expenses" mean all reasonable, documented (through receipts or invoices) out-of-pocket expenses incurred by Company in connection with its performance of its Services hereunder, including, without limitation: supervision, FF&E-related sale expenses, reasonable expenses of advertising, marketing, coach travel and transportation, including, the cost of out-of-town travel and postage and courier/overnight express fees and other mutually agreed upon expenses incurred in connection with performing the Services.

(b)     The parties will meet no less frequently than monthly ("Monthly Reconciliations") during the Term to review any  matters reasonably requested by either party; and all amounts reimbursable to Consultant for the prior month (or the partial month in the case of the first and last months) shall be reconciled and paid immediately thereafter.  From time to time upon request, each party shall prepare and deliver to the other party such other reports as either party may reasonably request.  Each party to this Agreement shall, at all times during the Term and during the one (1) year period thereafter, provide the other with access to all information, books and records relating to the Services and to this Agreement.  All records and reports shall be made available to Consultant and Company during regular business hours upon reasonable notice.

5.     Intentionally Left Blank.

6.     Bankruptcy Court Approval.  Consultant acknowledges and agrees that the Company has filed for bankruptcy, and the parties respective obligations under this Agreement (including without limitation the Company's compensation and reimbursement obligations, and the Consultant's Services obligations, contemplated herein) will be subject to the prior approval of the Bankruptcy Court (the "Approval Order").   Notwithstanding anything in this Agreement to the contrary, the effectiveness of this Agreement, the Consultant's obligations to provide services, the terms and conditions of the liquidation of

the Closing Stores, and the payment of the compensation contemplated herein, shall be subject to entry of the Approval Order.

7. Scope of Agreement.

(a) Company Cooperation. Company shall make all relevant documentation relating to the Closing Stores available to the Consultant. If documentation is available electronically, Company shall send it to the Consultant. If documentation is only available in paper form, Consultant shall be provided access to review and copy documentation at Company's headquarters. During the Term of the Agreement, Company shall assist and cooperate with Consultant whenever reasonably necessary by making Company personnel available to Consultant for consultation, and providing other information and data reasonably necessary for the performance of the Services.

(b) Meetings and Written Reports. Consultant shall deliver written status reports to the Company Representative regarding the status of all activities, marketing efforts, prospective assignees, negotiations and other transactions on a regular basis, at least weekly. If requested by Company, Consultant shall meet with or participate in telephone conferences with the Company Representative regarding such status of activities.

(c) Consultant Cooperation with Bankruptcy Process. Consultant acknowledges and agrees that it is being retained by Company because of its expertise in assisting debtors in liquidation matters during the course of a bankruptcy proceeding. Consultant, at no charge to Company, shall reasonably cooperate and work with all interested parties in connection with the Company's bankruptcy case, including without limitation, any postpetition debtor-in-possession financing lenders, statutory committee of creditors appointed in the Company's bankruptcy case, the prepetition secured parties that comprise the Company's capital structure, the Company's other advisors, and if requested Company, Consultant shall, at no charge to Company, provide written reports, meet with or participate in telephone conferences with such parties, and provide oral testimony or written affidavits for the Bankruptcy Court regarding its activities under this Agreement; provided, that Consultant shall not communicate with any such parties or their advisors regarding this Agreement without the prior written instruction of the Company. The Company acknowledges that the Consultant and/or its affiliates may have, or may have had, certain relationships with such interested parties that may need to be disclosed to the Bankruptcy Court as part of the retention by the Company of the Consultant, and the parties will work cooperatively to make all such required disclosures.

(d) Consultant's Business Conduct. Consultant shall use commercially reasonable efforts, diligence and good business judgement to achieve the purpose of this Agreement; provided however that the Company acknowledges that the Consultant is not guaranteeing any results under this Agreement.

(e) Consultant's Affiliates. Consultant shall not disclose to its affiliates or its joint venture partners the specific nature of the Services provided under this Agreement, but may generically disclose the fact that it is providing store closing services to Company.

8. Company's Representative. Nirup Krishnamurthy shall be Company's representative ("Company's Representative") in dealing with Consultant, duly and fully authorized by Company to act for it with respect to the performance hereof. Company reserves the right, at any time and from time to time, upon written notice to Consultant, to designate a successor representative and to limit the authority of the representative in any respect. Consultant shall report regularly to the Company's Representative in order to keep him/her fully advised of Consultant's obligations. Consultant shall be solely responsible for all matters relating to payment of Consultant's personnel, including, but not limited to, compliance with

workers' compensation, unemployment, disability insurance, social security, withholding and all other federal, state and local laws, rules and regulations governing such matters.

9.  Independent Contractor.  This agreement does not establish an employer-employee relationship between Company and Consultant. Consultant's personnel are not employees or agents of Company, and Consultant retains the right to exercise full control and supervision over the performance, employment, direction, compensation and discharge of any and all of Consultant's personnel assisting in the performance of Consultant's obligations.

10. Default.  If either party fails to perform its obligations in accordance with the terms hereof, and does not cure such failure within three (3) days following written notice of such default, the other party shall have the right to terminate this Agreement by notice of termination to the non-performing party.

11. Assignment.  This Agreement relates to personal services to be performed by Consultant, and Consultant shall not have the right to assign this Agreement, or subcontract the Services, without Company's written consent, which may be withheld in Company's sole discretion.

12. Notices.  All notices, requests, consents, approvals, payments in connection with this Agreement, or communications which either party desires or is required or permitted to give or make to the other party under this Agreement shall be deemed to have been given, made and delivered, only when made or given in writing and personally served, upon delivery by reputable overnight courier (e.g., UPS or Federal Express), or three days after having been deposited in the United States mail, certified or registered mail, postage prepaid, and addressed to the parties as follows:

> To Company:
>
> The Great Atlantic & Pacific Tea Company, Inc.
> 2 Paragon Drive
> Montvale, NJ 07645
> Attn: Nirup Krishnamurthy
> Email: NirupK@aptea.com
>
> With a copy to the attention of General Counsel, at the same address.
>
> To Consultant:
>
> Gordon Brothers Retail Partners, LLC
> 800 Boylston Street, 27th Floor
> Boston, MA 02199
> Attention: Michael Chartock, General Counsel
> Email: mchartock@gordonbrothers.com
>
> With a copy to:
> Steven Fox
> Riemer & Braunstein, LLP
> 7 Times Square, Suite 2506
> New York, NY 10036
> Email: sfox@riemerlaw.com

13. Compliance with Laws.  Subject to the terms of the Approval Order, Consultant shall comply with all applicable federal, state and local laws, regulations, and codes in the performance of the Services. Without limiting the generality of the foregoing, to the extent that the sale, discounting or advertising of certain Inventory is regulated by law, such as may be in the case of liquor sales, the Consultant shall comply with any Company directives regarding such regulations (provided that the Company shall inform

the Consultant of any such applicable laws, with specificity, at least 5 days prior to the start of the Inventory Project at any Closing Store where such laws apply).

14.  Insurance.

   a.  Each of the Company and the Consultant shall maintain its own commercial general liability insurance policy (including where applicable umbrella coverage) having a coverage limit of not less than Two Million Dollars ($2,000,000.00) per occurrence for bodily injury, personal injury and property damage (the "General Liability Insurance Policy"), and no such policy may have a self-insured retention in excess of $750,000 per occurrence in the case of the Company, and $100,000 per occurrence in the case of the Consultant. Each such General Liability Insurance Policy shall name the other party as an additional insured, and each respective policy shall be primary to any coverage maintained by the additional insureds to the extent of each respective party's gross negligence (or the negligence of each respective party' officers, directors, employees, contractors, and other representatives). Consultant and Company shall each maintain any and all required workers' compensation insurance in accordance law. All policies are to be written by an insurer reasonably acceptable to the other party, and both parties shall attempt to have such insurance policies contain a statement indicating that such insurance policy cannot be canceled by the insurer unless the insurer provides the other party with not less than ten (10) days written notice of its intention to cancel. Upon or prior to execution of this Agreement Consultant shall furnish to the Company Representative, and Company shall furnish to Consultant Representative, a certificate of insurance demonstrating that the foregoing insurance coverage is in effect, and at least fifteen (15) days prior to the expiration of any such insurance policy, Consultant shall provide Company and Company shall provide Consultant (as the case may be) an acceptable renewal certificate.

   b.  Any sub-contractor engaged by Consultant, and any FF&E buyer identified by Consultant, in each case in connection with the transactions contemplated by this Agreement, shall either: (i) be covered by Consultant's commercial general liability insurance contemplated in subsection (a) above; or (ii) have its own commercial general liability insurance with at least the same coverage amounts as Consultant is required to have pursuant to subsection (a) above (in which case Consultant shall be responsible for using a reasonable method to verify the existence of such coverage).

15.  Waivers and Amendments.  Waiver by either party of any default by the other party shall not be deemed a waiver of any other default. No provision of this Agreement shall be deemed waived, amended, or modified by either party, unless it is in writing and signed by both parties. Notwithstanding the foregoing, Company may add additional Closing Stores to Exhibit A by email to Consultant; provided however, that all such additions shall require the parties' mutual agreement of a reasonable increase to the Budget reflecting such additions.

16.  Confidentiality.  Consultant acknowledges that in doing business with the Company it may be provided or exposed to or have access to, learn of and/or obtain non-public and confidential financial, proprietary and/or trade secret information of the Company (collectively, "Confidential Information"). Consultant agrees that it and its Representatives (as defined below) will hold, transmit and treat all Confidential Information in all forms (including, but not limited to, electronic forms) in a confidential manner and will not, without prior written consent of the Company, use such Confidential Information for any purpose other than in connection with its performance of the Services. Consultant will only reveal Confidential Information in connection with performing the Services in accordance with the advance authorization of the Company or to Consultant's directors, officers, partners, members or employees (each, a "Representative") who are informed by Consultant of the confidential nature of the Confidential Information and who agree to be bound by this confidential covenant, and will take appropriate steps to ensure that any Representative to whom Confidential Information is disclosed abides by the provisions herein. In the event Consultant receives a request or demand to disclose all or any part of the Confidential

Information, including under the terms of a subpoena or order issued by a court of competent jurisdiction, the Consultant agrees to promptly notify the Company and use its reasonable good faith efforts to assist the Company in obtaining a protective order or other remedy the Company deems desirable. The obligations contained in this paragraph shall survive termination of this Agreement for a period of one (1) year. Consultant further agrees that upon request of the Company, it will promptly return or destroy all Confidential Information furnished to it or in the possession of Consultant or its Representatives.

17. <u>Indemnification</u>. Consultant agrees to indemnify, save, hold harmless and defend the Company, its directors, officers, employees, agents and other representatives (each a "Company Representative"), including reasonable attorney fees and expenses, from and against an and all claims, loss or liability arising in any manner from or in connection with any grossly negligent, willful, or unlawful acts or omissions by Consultant, other than claims resulting from the bad faith, fraud, criminal conduct, self-dealing, breach of fiduciary duty, to the extent one is found to exist, gross negligence or willful misconduct on the part of such Company Representative. Company agrees to indemnify, save, hold harmless and defend Consultant, its directors, officers, employees, agents and other representatives (each a "Consultant Representative"), including reasonable attorney fees and expenses, from and against any and all claims, loss or liability arising in any manner from or in connection with any grossly negligent, willful, or unlawful acts or omissions by Company, other than claims resulting from the bad faith, fraud, criminal conduct, self-dealing, breach of fiduciary duty, to the extent one is found to exist, gross negligence or willful misconduct on the part of such Consultant Representative.

18. <u>Intentionally Left Blank</u>.

19. <u>Severability</u>. Each provision hereof shall be interpreted in such a manner as to be effective and valid under applicable law. If any provision or application thereof is held invalid or unenforceable, then it shall, to that extent alone, be ineffective only to the extent of such prohibition or invalidity without affecting the validity of the remaining provisions or the application of such provision to other circumstances.

20. <u>Survival</u>. The terms, conditions, indemnities and warranties contained in this Agreement that are intended to survive the expiration or termination of this Agreement shall survive.

21. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof. All prior agreements, representations, statements, negotiations, understandings, and undertakings are superseded by this Agreement.

22. <u>Execution</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which together shall constitute one document. A facsimile, email, pdf or electronic signature shall be deemed an original signature. Each party represents that the persons signing this Agreement on its behalf have the requisite corporate authority to enter into this Agreement and thereby can bind the Company and the Consultant, as applicable.

23. <u>Governing Law/Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the federal bankruptcy laws and the laws of the State of New Jersey. Any disputes arising out of this Agreement shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

24. <u>Exculpation</u>. Consultant shall look solely to the Company for the satisfaction of each and every remedy of Consultant in the event of any breach by the Company of any of the terms and conditions of this Agreement to be performed by the Company, and there shall be absolutely no personal liability on the part of the officers, employees or agents of the Company who are natural persons with respect to any of the terms and conditions of this Agreement; such exculpation of personal liability to be absolute and

without any exception whatsoever. Company shall look solely to the Consultant for the satisfaction of and every remedy of Company in the event of any breach by the Consultant of any of the terms and conditions of this Agreement to be performed by the Consultant, and there should be absolutely no personal liability on the part of the officers, employees or agents of the Consultant who are natural persons with respect to any of the terms and conditions of this Agreement; such exculpation of personal liability to be absolute and without any exception whatsoever.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives.

COMPANY:
THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation, on behalf of itself and certain of its affiliates

By: _____
Print Name and Title: NIRUP KRISHNAMURTHY, CSO

CONSULTANT
GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Print Name and Title:
Richard Edwards
Co-President - Retail

# A&P Stores
## Exhibit A
## Store List

| Store No. | Store | Address | City | State | Zip Code | Total Sq Ft | Sales Sq Ft | Banner |
|---|---|---|---|---|---|---|---|---|
| 3656 | Holmdel | 2101 Rt 35 | Holmdel | NJ | 07733 | 56,633 | 40,499 | AP |
| 3825 | Matawan | 325 Highway 35 South | Matawan | NJ | 07721 | 56,914 | 41,987 | AP |
| 2726 | Philadelphia | 1851 S. Columbus Blvd | Philadelphia | PA | 19148 | 60,566 | 43,144 | SF |
| 5244 | Kennett Square | 863 East Baltimore Pike | Kennett Square | PA | 19348 | 43,613 | 31,184 | SF |
| 5562 | Claymont | 2105 Philadelphia Turnpike | Claymont | DE | 19703 | 51,051 | 36,690 | SF |
| 2314 | Center Square | 1301 Skippack Pike | Center Square | PA | 19422 | 48,500 | 36,375 | SF |
| 7213 | Oceanside | 3620 Long Beach Rd. | Oceanside | NY | 11572 | 49,538 | 33,946 | WB |
| 7610 | Carle Place | 2 Westbury Ave | Carle Place | NY | 11514 | 50,436 | 39,174 | WB |
| 6567 | Folsom | 420 Mcdade Boulevard | Folsom | PA | 19033 | 48,739 | 34,156 | PM |
| 6589 | Wilmington | 3901 Lancaster Avenue | Wilmington | DE | 19805 | 48,616 | 36,034 | PM |
| 2723 | Philadelphia | 85 Franklin Mills | Philadelphia | PA | 19154 | 56,508 | 41,389 | PM |
| 5248 | Berwyn | 450 W. Swedesford Rd | Berwyn | PA | 19312 | 54,617 | 39,624 | PM |
| 6564 | Philadelphia | 840 Cottman Ave | Philadelphia | PA | 19111 | 57,452 | 42,573 | PM |
| 6128 | Belleville | 115 Belmont Avenue | Belleville | NJ | 07109 | 52,582 | 37,978 | PM |
| 5363 | Walnutport | 300 S. Best Ave | Walnutport | PA | 18088 | 57,139 | 42,064 | PM |
| 6175 | Clifton | 85 Ackerman Avenue | Clifton | NJ | 07011 | 57,120 | 44,499 | PM |
| 6185 | Clifton | 895 Paulison Avenue | Clifton | NJ | 07011 | 33,981 | 27,215 | PM |
| 6512 | Linden | 651 North Stiles Street | Linden | NJ | 07036 | 58,820 | 43,281 | PM |
| 6535 | Edison | 561 Route 1 | Edison | NJ | 08817 | 58,290 | 40,576 | PM |
| 6538 | East Brunswick | 50 Racetrack Road & Route 18 | East Brunswick | NJ | 08816 | 55,715 | 41,161 | PM |
| 6581 | Old Bridge | 1043 Route 9 North | Old Bridge | NJ | 08859 | 59,214 | 43,048 | PM |
| 6582 | Toms River | 1256 Indian Head Road | Toms River | NJ | 08755 | 58,375 | 43,385 | PM |
| 6623 | Baldwin | 1764 Grand Avenue | Baldwin | NY | 11510 | 51,687 | 39,326 | PM |
| 7212 | Riverhead | 1510 Old Country Road | Riverhead | NY | 11901 | 59,051 | 45,295 | WB |
| 6663 | Centereach | 2150 Middle Country Road | Centereach | NY | 11720 | 63,465 | 48,895 | PM |
| 25 | | | | | | 53,945 | 39,740 | |

# The Great Atlantic & Pacific Tea Company, Inc.
## GBRP Expense Budget

|  | $ |
|---|---|
| Estimated Supervision | 333,000 |
| Estimated Advertising & Misc | 317,000 |
| **Expenses Above** | **650,000** |
| **Expenses per Store (before FF&E)** | **26,000** |
| FF&E Expenses | 150,000 |
| **Grand Total Expenses** | **800,000** |