ISRAEL GOLDOWITZ
Chief Counsel
CHARLES L. FINKE
Deputy Chief Counsel
LORI A. BUTLER
Assistant Chief Counsel
THEA D. DAVIS
DAMARR M. BUTLER
Attorneys
PENSION BENEFIT GUARANTY
  CORPORATION
Office of the Chief Counsel
1200 K Street, N.W.
Washington, D.C. 20005
Tel.: (202) 326-4020, ext. 3166
Fax: (202) 326-4112
Emails: davis.thea@pbgc.gov *and*
        efile@pbgc.gov

*Attorneys for Pension Benefit Guaranty Corporation*

**Hearing Date: August 10, 2015 at 10:00 am (ET)**
**Objection Deadline: August 5, 2015[1] at 4:00 pm (ET)**
**Dkt. Ref. 26**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE GREAT ATLANTIC &<br>PACIFIC TEA COMPANY, INC., *et al.*[2],<br><br>Debtors. | Chapter 11<br><br>Case No. 15-23007(RDD)<br><br>(Jointly Administered) |

---

[1] The Debtors agreed to an extension of time to respond for the Unsecured Creditors' Committee and its members.

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corp (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); Shopwell, Inc. (3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

**OBJECTION OF THE PENSION BENEFIT GUARANTY CORPORATION
TO MOTION OF DEBTORS PURSUANT TO 11 U.S.C §§ 105, 363, 365 AND 503 AND
FED. R. BANKR. P. 2002, 6004 AND 6006 FOR APPROVAL OF: (I) (A) GLOBAL
BIDDING PROCEDURES, (B) BID PROTECTIONS, (C) FORM AND MANNER OF
NOTICE OF SALE TRANSACTIONS AND SALE HEARING, AND (D) ASSUMPTION
AND ASSIGNMENT PROCEDURES; AND (II) (A) PURCHASE AGREEMENTS (B)
SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES, AND (C) ASSUMPTION AND
<u>ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES</u>**

The Pension Benefit Guaranty Corporation ("<u>PBGC</u>"), a creditor in the above-captioned proceedings, hereby files this objection to the Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365, and 503 and Fed. R. Bankr. P. 2002, 6004 and 6006 for Approval of: (I) (A) Global Bidding Procedures, (B) Bid Protections, (C) Form and Manner of Notice of Sale Transactions and Sale Hearing, and (D) Assumption and Assignment Procedures; and (II) (A) Purchase Agreements (B) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, and (C) Assumption and Assignment of Certain Executory Contracts and Leases ("<u>Motion</u>") filed on July 20, 2015.[3]

PBGC objects to the Motion because the Global Bidding Procedures proposed by the Debtors[4] fail to take into account the possibility that a Qualified Bidder may wish to assume all or some portion of one or more of the defined benefit pension plans sponsored by the Debtors. Similarly, the Global Bidding Procedures fail to expressly provide that the Debtors will credit the value of any pension liabilities assumed when determining the highest and best bid.

PBGC also objects to the timelines presented in the Global Bidding Procedures. The proposed schedule is simply too tight to accommodate a vigorous auction process. The unreasonable deadlines will have a chilling effect on, if not prevent altogether, prospective

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[4] The Global Bidding Procedures are attached to the Motion as Exhibit 1.

bidders and will thus decrease competition at auction. The Court should not approve the proposed bid procedures without first requiring the Debtors to make certain modifications described herein.

PBGC will communicate its concerns with the Global Bidding Procedures to the Debtors and will provide the Debtors with proposed language that will resolve its objections. PBGC hopes that a consensual resolution is possible. Because such resolution may not be reached before the August 5, 2015 filing deadline, PBGC files this objection.

## I.    BACKGROUND

### A.  PBGC and ERISA

PBGC is a wholly owned United States government corporation, and an agency of the United States, that administers and enforces the defined benefit pension plan termination insurance program under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. §§ 1301-1461 (2012, Supp. I 2013). PBGC guarantees the payment of certain pension benefits upon the termination of a single-employer pension plan covered by Title IV of ERISA. When an underfunded plan terminates, PBGC generally becomes trustee of the plan and supplements any assets remaining in the plan with its insurance funds to pay to the retired employees their pension benefits, subject to statutory limits. *See* 29 U.S.C. §§ 1321-1322, 1342, 1361. PBGC's insurance funds are made up of, among other things, (i) the agency's recoveries of terminated pension plan's underfunding and (ii) premiums paid by pension plan sponsors.

ERISA provides the exclusive means for a plan sponsor to terminate a pension plan — a standard termination or a distress termination. *See* 29 U.S.C. § 1341(a)(1); *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999). A standard termination requires sufficient

3

assets to pay all of the pension plan's promised benefits. *See* 29 U.S.C. § 1341(b)(1)(D). A distress termination requires a showing, among other things, that the plan sponsor and each controlled group member satisfy one of the three financial distress criteria: (i) liquidation in bankruptcy; (ii) inability to reorganize in bankruptcy unless the pension plan terminates; or (iii) inability to pay debts when due and continue in business unless the pension plan terminates. *See* 29 U.S.C. § 1341(c)(2)(B). Separate from a standard or distress termination, PBGC can initiate termination of a pension plan pursuant to section 4042 of ERISA when certain statutory criteria are satisfied ("PBGC-initiated termination"). *See* 29 U.S.C. § 1342.

Upon a distress termination or a PBGC-initiated termination, the contributing sponsor and its controlled group members are subject to certain liabilities with regard to the terminated pension plan, for which they are jointly and severally liable to PBGC: (i) the unfunded benefit liabilities of the pension plan, 29 U.S.C. § 1362(a), (b); (ii) any unpaid flat-rate and variable-rate premiums, 29 U.S.C. § 1307; and (iii) termination premiums at the rate of $1,250.00 per plan participant per year for three years, 29 U.S.C. § 1306(a)(7). If the plan termination occurs while the plan sponsor and any controlled group members are attempting to reorganize in Chapter 11, and they ultimately obtain confirmation of a Chapter 11 plan of reorganization, their obligation to PBGC for termination premiums does not arise until after the Chapter 11 plan is confirmed and the Debtor exits bankruptcy. 29 U.S.C. § 1306(a)(7)(B). Thus, under those circumstances, termination premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5), 1141.

Finally, because PBGC typically becomes the statutory trustee of the terminated pension plan, it has authority to collect all amounts owed to the pension plan, including any unpaid

minimum funding contributions for which the plan sponsor and controlled group members are jointly and severally liable. 29 U.S.C. §§ 1082(b)(2), 1342(d), 1362(c); 26 U.S.C. § 412(b)(2).

### B. The Debtors' Pension Plans

The Debtors sponsor three single-employer and one multiple-employer defined benefit pension plans covered under Title IV of ERISA, i.e., The Great Atlantic & Pacific Tea Company Pension Plan ("A&P Plan"), New York-New Jersey Amalgamated Pension Plan for A&P Employees ("Amalgamated Plan"), Delaware County Dairies, Inc. Hourly Employees Pension Plan ("Delaware Plan"), and Pathmark Stores, Inc. Pension Plan ("Pathmark Plan") (collectively, the "Pension Plans"). The Pension Plans cover an estimated 25,815 of the Debtors' current and former employees and are underfunded by an estimated $302,539,373.00. PBGC's investigation into the status and funding levels of the Pension Plans is ongoing.

Because the Debtors filed their Chapter 11 petitions with this Court only two weeks ago, PBGC has not yet filed claims against the Debtors for their statutory obligations to the Pension Plans and PBGC. The PBGC anticipates filing claims against each of the Debtors for the following statutory liabilities, as explained above: (i) the unfunded benefit liabilities of the Pension Plans; (ii) due and unpaid minimum funding contributions owed to the Pension Plans; and (iii) statutory premiums owed to PBGC. PBGC's claim for the unfunded benefit liabilities of the Pension Plans will be contingent upon termination of the Pension Plans. Termination, however, is not the preferred outcome for the Pension Plans, nor should it be treated as a *fait accompli*.

### C. The Debtors' Bankruptcy Proceedings

On July 19, 2015, the Debtors filed voluntary Chapter 11 petitions with this Court, along with their First-Day Motions, including this Motion. A hearing on certain relief sought in the Motion – specifically the approval of the Global Bidding Procedures and the buyer protections asserted therein – is scheduled for August 10, 2015.

## II.    ARGUMENT

When selling estate assets, a debtor has a duty to obtain the highest price or greatest overall benefit possible for the estate. *See In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (citing *In re Atlanta Packaging Prods., Inc.,* 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)); *see also In re Reading Broad, Inc.*, 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008) (noting that "the purpose of a bankruptcy sale is to obtain the highest and best price for the estate and thus for its creditors and equity holders").

To that end, "it is the overarching objective of sales in bankruptcy to maximize value to the estate." *In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009). Accordingly, bid procedures should be designed to facilitate an open and fair sale process. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Dura Auto. Sys.*, No. 06-11202 (KJC), 2007 Bankr. Lexis 2764, at *253 (Bankr. D. Del. Aug. 15, 2007).

### A. The Global Bidding Procedures Must Be Modified To Encourage Assumption of All or Part of the Pension Plans

The Global Bidding Procedures and Stalking Horse Agreements do not provide for the assumption of the Pension Plans by the potential bidders or stalking horse purchasers. It is premature to foreclose the possibility that a potential bidder may wish to assume all or part of any of the Pension Plans' liabilities as part of a Qualified Bid.

When employees are transferred to a new employer, they wish to keep their benefits intact. Assumption of a Pension Plan (or of its liabilities associated with the seller's current and former employees) will enhance employee satisfaction because that benefit is maintained. Moreover, employers may receive tax benefits for contributions to the Pension Plan. It is in the interest of the Debtors' estates and their creditors to attract bidders willing to assume Pension Plan liabilities. PBGC is by far one of the largest creditors of the Debtors. Assumption of any liabilities relating to the Pension Plans would effectively eliminate or reduce PBGC's claims against each of the Debtors, thereby providing value to the Debtors' respective estates and increasing recoveries for other creditors.

In order to encourage Qualified Bidders to assume the Pension Plans, the Debtors should make a few modifications to the Global Bidding Procedures. First, the Global Bidding Procedures should require all bidders to expressly state their intention with respect to the Pension Plans. They should state whether it intends to assume any of the Pension Plans in their entirety, and if not the bidder should state whether it intends to assume liabilities and assets of the Pension Plan(s) relating to plan participants associated with the stores.

Second, the Global Bidding Procedures should provide that, in determining the Successful Bid, the Debtors will give credit for the value of the Pension Plans' liabilities a Qualified Bidder agrees to assume. The highest and best bid for the Debtors' assets should be the one that provides the greatest total amount of consideration to the Debtors, including any pension liabilities transferred to the Successful Bidder.[5]

---

[5] These modifications are neither burdensome nor unprecedented. PBGC routinely requests this language in bankruptcy cases involving an ongoing pension plan and a sale of substantially all of the assets of the plan sponsor and members of its controlled group. *See In re Journal Register Company,* Case No. 12-13774 (SMB) (Bankr. S.D.N.Y. Dec. 21, 2012) (Docket No. 294); *In re Vertis Holdings, Inc.,* Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (Docket No. 206).

7

Additionally, PBGC requests that the Court direct the Debtors to timely provide PBGC with copies of all Qualified Bids that propose to assume all or any portion of the Pension Plans' liabilities. PBGC further requests that the Court direct any Successful Bidder who proposes to assume all or any portion of the Pension Plans' liabilities to timely provide PBGC with sufficient information in advance of the Sale Hearing so that the PBGC may confirm the Successful Bidder's financial ability to maintain the assumed Pension Plans (or any portion thereof) on an ongoing basis.

### B. The Proposed Timing of the Sale Process Does Not Facilitate a Competitive Auction Process that Maximizes Value to the Debtors' Estates

The Debtors' rushed schedule for bidding and approval of the sales greatly concerns PBGC. "The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also Four B. Corp v. Food Barns Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 564-65 (8th Cir. 1997); *In re Reading Broad, Inc*., 386 B.R. 562, 575 (Bank. E.D. Pa. 2008). Indeed, the Debtors have a fiduciary duty to establish bidding procedures and a sale process which will "maximize value to the estate." *In re Metaldyne Corp*., 409 B.R. at 668. With a hearing date on this Motion on August 10, 2015, and a proposed Bidding Deadline of September 11, 2015, the truncated schedule is far from conducive to a vigorous and open auction and it may have a chilling effect on the auction process. Such a short period does not allow potential bidders the opportunity to investigate the financial condition and business prospects of the Debtors, prepare a bid, and obtain financing. The bidding procedures anticipate the sales of a collection of stores. Prospective bidders need time to investigate the business on a store by store basis, a difficult and timely process. Absent an expansion of the times for the bidding

8

procedures, this will not be a competitive sale process that maximizes value to the estate, which in turn, could benefit creditors.

### C. Avoidance Actions Should be Preserved for Unsecured Creditors

Avoidance actions are a distinct creature of bankruptcy law designed to facilitate equality of distribution among a debtor's unsecured creditors, and are not truly property of a debtor's estate. Instead, avoidance actions are statutory rights that the estates hold in trust for the benefit of creditors.[6] As an important potential source of recovery for PBGC and other unsecured creditors, these assets should remain free of any encumbrance.[7]

Each of the Stalking Horse Agreements includes a definition of Acquired Assets that includes "causes of action" relating to the Acquired Assets.[8] To the extent "causes of action" includes avoidance actions, PBGC objects because these are unencumbered assets of the estates that should be retained for the benefit of unsecured creditors. Alternatively, if the Acquired

---

[6] *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 567 (3d Cir. 2000) (explaining how the underlying intent of the avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate); *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 786-87 (Bankr. S.D.N.Y. 2008) ("Avoidance actions . . . never belonged to the Debtor, but rather were creditor claims that could only be brought by a trustee or debtor in possession . . . ."); *In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985) ("The avoiding powers are not 'property' but a statutorily created power to recover property."), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989); *In re Sapolin Paints, Inc.*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (reciting "the well-settled principle that neither a trustee . . . nor a debtor-in-possession, can assign, sell, ***or otherwise transfer*** the right to maintain a suit to avoid preference" (emphasis added)).

[7] *See, e.g.*, *In re Excel Maritime Carriers, Ltd.*, Case No. 13-23060-RDD, ECF No. 133 at p. 14 & p. 16 (Bankr. S.D.N.Y. Aug. 6, 2013) (excluding avoidance actions and proceeds thereof from property that could be used to pay superpriority claims under section 507(b) and similarly excluding avoidance actions and proceeds from the scope of adequate protection liens); *In re Hostess Brands, Inc.*, Case No. 12-22052-RDD, ECF No. 254 at p. 17, p. 20 & pp. 28-29 (Bankr. S.D.N.Y. Feb. 3, 2012) (same).

[8] *See* Acme Markets Inc. Stalking Horse Agreement, Section 1.1, para. (n) (any causes of action arising out of or relating to Acquired Assets); Stop & Shop Supermarket Company, LLC, Stalking Horse Agreement, Section 1.1, para. (i) (all causes of action relating to the Acquired Assets or Assumed Liabilities); Key Food Stores Co-Operative, Inc., Stalking Horse Agreement, Section 1.1, para. (k) (all of Sellers' causes of action arising out of the operations of the Business).

9

Assets are held to include avoidance actions, then a value should be attributed to the purchase of the avoidance actions and those sale proceeds should be segregated for the benefit of unsecured creditors.

### D. The Debtors Must Provide Substantive Involvement by PBGC on a Real Time Basis with Potential Bidders

PBGC is by far one of the Debtors' largest unsecured creditors and, as such, has an enormous stake in the outcome of the sales. Therefore, PBGC, on its own and as a part of the unsecured creditors' committee, should be fully involved in the bidding process and the auction. Specifically, the Court should order that,

1. PBGC promptly receive copies of all bids and required documents submitted by each Potential Bidder;

2. The Debtor promptly inform PBGC whether a Potential Bidder is determined by the Debtor to be a Qualified Bidder, and, if not, the basis for that determination; and

3. PBGC be consulted regarding which Qualified Bid constitutes the highest and best offer.

PBGC's meaningful role in the sale of the Debtors' assets will ensure a competitive bidding process, which will maximize the value of the Debtors' estates to their unsecured creditors, including, in large part, PBGC.

### E. Reservation of Rights

If circumstances warrant that any of the Pension Plans terminate in the future, PBGC reserves its rights to request the Debtors, the Stalking Horse Bidder(s), or any Successful Bidder(s) to timely provide to PBGC employees, agents and representatives copies of and access to all pension documents, personnel records, employee files, and any related documents or information for all participants in the Pension Plans. PBGC further reserves its rights to seek appropriate related relief from this Court if necessary.

10

PBGC files this objection as a reservation of rights for PBGC and the Pension Plans.

PBGC reserves all rights with respect to this Motion, including its rights to file further pleadings.

### III. CONCLUSION

For the foregoing reasons, PBGC requests that the Global Bidding Procedures and Stalking Horse Agreements not be approved unless modified as described above.

DATED: August 5, 2015
Washington, D.C.

Respectfully submitted,

By: /s/ Thea D. Davis
ISRAEL GOLDOWITZ
Chief Counsel
CHARLES L. FINKE
Deputy Chief Counsel
LORI A. BUTLER
Assistant Chief Counsel
THEA D. DAVIS
DAMARR M. BUTLER
Attorneys
Office of the Chief Counsel
**PENSION BENEFIT GUARANTY CORPORATION**
1200 K Street, N.W.
Washington, D.C.  20005
Tel.: (202) 326-4020, ext. 3166
Fax: (202) 326-4112
Emails: davis.thea@pbgc.gov *and*
         efile@pbgc.gov

*Attorneys for Pension Benefit Guaranty Corporation*