WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Salvatore A. Romanello
Garrett A. Fail
Lawrence J. Baer

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** : | |
| **COMPANY, INC.,** *et al.*, : | **Case No. 15-23007 (RDD)** |
| : | |
| **Debtors.**[1] : | **(Jointly Administered)** |
| : | |

------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION OF
## DEBTORS PURSUANT TO 11 U.S.C. § 1113(e) FOR INTERIM
## AUTHORITY TO MODIFY COLLECTIVE BARGAINING AGREEMENTS

      **PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**")

of The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),

pursuant to section 1113(e) of title 11 of the United States Code (the "**Bankruptcy Code**"), for

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

an order authorizing interim modifications to the obligations set forth in their collective bargaining agreements, has been requested on **August 17, 2015 at 10:00 a.m. (Eastern Time)** (the "**Hearing**") before the Honorable Robert D. Drain, United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York, 10601 (the "**Bankruptcy Court**").[2]

PLEASE TAKE FURTHER NOTICE that any responses or objections ("**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted pro hac vice, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with General Order M-399 and *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m) and 9007 Implementing Certain Notice and Case Management Procedures*, dated July 20, 2015 (ECF No. 62), so as to be so filed and received no later than **August 14, 2015 at 12:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that any reply of the Debtors ("**Reply**") to Objections to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court by attorneys practicing in the Bankruptcy Court electronically in accordance

---

[2] Contemporaneously herewith, the Debtors have filed the Motion to Schedule Expedited Hearing and Shorten Notice for the Motion of Debtors' Pursuant to 11 U.S.C. § 1113(e) for Interim Authority to Modify Collective Bargaining Agreements.

with General Order M-399 (which can be found at www.nysb.uscourts.gov), so as to be so filed

no later than **August 17, 2015 at 8:00 a.m. (Eastern Time)** (the "**Reply Deadline**"), and copies

of the Reply shall be made available by the Debtors at the Hearing.

        **PLEASE TAKE FURTHER NOTICE** that if an Objection to the Motion is not

received by the Objection Deadline, the Bankruptcy Court may enter an order granting the relief

sought without further notice.

        **PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon

default.

Dated: August 11, 2015
      New York, New York

                                /s/ Ray C. Schrock, P.C.
                                WEIL, GOTSHAL & MANGES LLP
                                767 Fifth Avenue
                                New York, New York  10153
                                Telephone:  (212) 310-8000
                                Facsimile:  (212) 310-8007
                                Ray C. Schrock, P.C.
                                David J. Lender
                                Salvatore A. Romanello
                                Garrett A. Fail
                                Lawrence J. Baer

                                *Attorneys for Debtors*
                                *and Debtors in Possession*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Salvatore A. Romanello
Garrett A. Fail
Lawrence J. Baer

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** : | |
| **COMPANY, INC.,** *et al.*, : | **Case No. 15-23007 (RDD)** |
| : | |
| **Debtors.**[1] : | **(Jointly Administered)** |
| : | |

-------------------------------------------------------------x

### MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 1113(e) FOR INTERIM AUTHORITY TO MODIFY COLLECTIVE BARGAINING AGREEMENTS

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as

debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"**Debtors**"), respectfully represent:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

**Preliminary Statement**

1.      Through these chapter 11 cases, the Debtors seek to preserve jobs – both in the short term and in the long term – for as many of their 28,500 employees as possible.  The chapter 11 sale process developed and being implemented by the Debtors provides the best – and only – chance to do so, while simultaneously ensuring the maximum value of all of the Debtors' assets for the benefit of all of the Debtors' many creditors.  The viability of the sale process and distribution of proceeds pursuant to a chapter 11 plan depends on execution of the Court-approved competitive auction and sale process to sell large blocks of stores as going concerns, the Court-approved, fast and nimble process to sell stores as going concerns on an ad hoc basis, and the Court-approved process to close stores where, for example, no going-concern sales can be achieved, in order to stem losses and fund ongoing operations of other stores that may be sold.

2.      The Debtors' efforts to implement the chapter 11 strategy are well underway.  The Debtors obtained approval of debtor-in-possession financing on favorable terms.  They obtained traditional first-day relief and have stabilized and preserved ongoing operations, employment, and long-standing relationships as customers to their many vendors.  They entered into agreements with stalking horse bidders to sell approximately 118 stores as going concerns for nearly $566 million.  They have solicited and received additional indications of interest for certain of the Debtors' other stores.  They have sought to reject leases for eight "dark" store locations and begun to wind down twenty-five other stores with negative profitability and for which no buyer has emerged.  The Debtors' have made some progress, though the savings from these later measures are not enough to reverse the Company's ongoing losses.  The gap between its assets and liabilities continues to widen, and nothing will be gained by delay.

3.      If execution of the Debtors' strategy fails, the Debtors' businesses face an almost-certain risk of collapsing in a chapter 7 liquidation – a scenario in which the estates, their

creditors and constituents are all harmed irreparably.  As described in the declarations filed in support of this motion, time is of essence.  The Debtors' economic position is precarious.  Every day and every dollar spent in chapter 11 is an additional economic hurdle to confirming a chapter 11 plan.

4.     Prior to and throughout these cases, the Debtors have worked with, and provided extensive information regarding Debtors' finances, the chapter 11, and the sale process to their employees' unions (collectively, the "**Unions**") and the Unions' financial and legal advisors.  As explained to the Unions and in greater detail herein, in order to achieve a successful chapter 11 process, the Debtors must obtain limited, tailored, interim modifications to their 35 separate collective bargaining agreements ("**CBAs**").  Certain of the required modifications are required by the stalking horse agreements and are necessary to consummate transactions that will provide for ongoing employment of approximately 12,500 of the Debtors' current employees.  As described below, all of the requested modifications are required to practically implement the sale process under the circumstances of these cases and to avoid a potential administrative insolvency that would preclude the maximization of asset values and going concern sales.  The impact on the Unions from certain of the modifications will be neutralized by the inclusion of Union representation on the Official Committee of Unsecured Creditors and as notice and consultation parties in the Court-approved sale process.

5.     Recognizing the Unions' importance in the chapter 11 process, the Debtors have already initiated negotiations with the Unions regarding the interim and permanent relief the Debtors' businesses will require.  The Debtors believe that they will have the best chance of confirming a chapter 11 plan by achieving consensus with the Unions, whose interests are, in many respects, aligned with the Debtors' interests.  In furtherance of this goal, the Debtors

developed and presented the Unions with a formal proposal, met on multiple occasions with Unions and their advisors (separately and together) to discuss and negotiate the terms of the proposal, and provided access to a data room with backup and information responding to Union requests.  Negotiations to achieve a permanent resolution will be complicated and will no doubt take time.  Unfortunately, the Debtors cannot afford the financial, practical, or operational cost of delay in the interim.

6.    Accordingly, the Debtors have made a concerted effort to consensually obtain the limited interim relief required to carry forth their Sale Strategy (as defined in the McGarry Declaration).    These efforts have included measures above and beyond the requirements for interim relief under section 1113(e) of the Bankruptcy Code, including numerous meetings to discuss and negotiate over the Debtors' interim proposals.  Moreover, the Debtors have gone to great lengths to reach an agreement, including by refining their proposed modifications in response to the concerns and guidance voiced by their Unions' leaders.  The Debtors did this even though the Unions did not give one counter-offer to the Debtors' proposals. Ultimately, in nearly every case, the Debtors have chosen to act consistent with this guidance and, as a result, have achieved practical but effective resolutions of the hurdles their CBAs created for near-term implementation of the Sale Strategy.   Court intervention is now only required with respect to two critical, interim measures as the Debtors and their Unions continue to negotiate over permanent modifications to the CBAs (for the remainder, the Debtors do not seek relief unless their intentions and understanding, as stated in this Motion, are disputed).[2]

---

[2] As the Debtors have explained to their Union partners, it is likely that the Debtors will file a motion for permanent relief pursuant to 1113(c) of the Bankruptcy Code absent the Unions agreement to the Debtors' proposals.  This relief will be necessary so that the Debtors may effectuate the sales that will be consummated pursuant to the Court-approved sale procedures. The definitive timing of filing a motion for permanent relief remains under discussion; however, the Debtors likely would file such a motion in late August 2015 so that the motion could be heard by the time of the Debtors' sale hearings, which will take place in late September or not later than October 7, 2015.

7.      First, the Debtors require relief from bumping provisions contained in virtually all of the Debtors CBAs, which allow senior employees at stores that are closed to take the jobs of junior employees elsewhere (who in turn are fired or, if senior, able to bump someone else and take their job).  These bumping provisions only make sense where an employer closes a store and there are other stores owned by the employer into which senior employees can transfer. In the context of these cases, not only do the bumping provisions create a monumental administrative burden, they would be virtually impossible to implement given that the Debtors are administering an orderly liquidation process including sales of hundreds of stores to third parties.  There simply are no stores that the Debtors will own on a go-forward basis to which senior employees can be transferred.  Moreover, failure to obtain relief from the bumping provisions will trigger protective covenants that would threaten to disrupt the stalking horse bids. Moreover, the stalking horse asset purchase agreement contain prohibitions on allowing bumping of employees into the stores contemplated to be purchased, and thus absent the relief requested bumping could give rise to a breach under such asset purchase agreements.

8.      In addition, the Debtors require authority to implement a compromise proposal with respect to severance obligations created by their CBAs.  Severance obligations go hand-in-hand with bumping, as such obligations are, generally and under ordinary circumstances, triggered when employees are terminated upon store closures (with an exception where employees are offered a job from a purchaser).  The Debtors may dispute the priority of claims for severance, and maintain that at least some portion of the severance payments provided in their CBAs are prepetition claims.  Regardless of their priority, however, the Bankruptcy Code's distributional and priority scheme does not require the Debtors to make any payments *at all* on account of severance during the midst of this proceeding.  The Debtors believe that by paying a

portion of severance on a current basis (with the remainder deferred with a claim to be satisfied in accordance with the Bankruptcy Code's priority and distributional requirements) they can achieve a fair resolution that recognizes the inherent difficultly employees share upon termination, but require relief pursuant to section 1113(e) to do so to the extent the Court finds it necessary to avoid paying severance obligations on a super-priority basis before their status has been litigated and the Debtors' ability to pay has been established.

9.      As further detailed below, the Debtors have satisfied the standards for the relief they are seeking with respect to bumping and severance and, to the extent that any of the other compromises they intend to implement pursuant to the Unions' guidance are challenged, would satisfy the standards to obtain relief in those instances as well.  Accordingly, the Debtors respectfully request that the Court grant this Motion.

## Background

10.      On July 19, 2015 (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

11.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

12.      On July 24, 2015, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors.

6

13.     Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to and filed on the Commencement Date (ECF No. 4) (the "**McGarry 1007 Declaration**").

## Jurisdiction

14.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

## Factual Section Relating to Relief

15.     The declarations of Christopher W. McGarry (the "**McGarry Declaration**"), Tim McDonagh (the "**McDonagh Declaration**"), and Ali Rizvi (the "**Rizvi Declaration**") in support of this motion are attached hereto as **Exhibit "C"**, **Exhibit "D"**, and **Exhibit "E"** respectively.

16.     The McGarry Declaration includes (1) general information about the Debtors' business; (2) an overview of the Sale Strategy[3] (including its development and the need for swift execution); (3) the APAs; (4) the DIP Facility; (5) the Debtors' proposals to their Unions, and also their extensive communications, information sharing, and negotiations with their Unions; and (6) information pertinent to the specific relief requested on an interim basis.

17.     The McDonagh Declaration includes (1) information about the Debtors' assets and the claims against them; (2) the Debtors' postpetition cash burn and liquidity needs; (3) the financial impact if the Debtors were forced to liquidate the stores currently subject to

---

[3] Capitalized terms that are not defined in this Motion shall have the meanings ascribed in the McGarry Declaration.

stalking horse bids; (4) analysis of the potential costs of certain potential obligations, including for severance, paid-time off payable upon termination, lump-sum retirement bonuses, and pension contributions; and (5) information regarding data room prepared for the Unions and their advisors.

18.     The Rizvi Declaration includes (1) a detailed description of the operation of "bumping" provisions; (2) an in-depth analysis of the hypothetical bumping that would occur from closing just one of the Initial Closing Stores, including the projected bumps in each "wave" and the number of displaced employees; (3) information concerning the detrimental operational effects from bumping; (4) information regarding the significant administrative burden from implementing bumping and the Debtors' limited human resources personnel; (5) an analysis of the financial impact from bumping and its effects on the Debtors' sale processes.

**The Debtors Are Negotiating With Their Unions, But Require Limited, Interim Relief**

19.     The Debtors recognize that successful implementation of the Sale Strategy requires relief from certain of the Debtors' CBA provisions, and that the consequences of not obtaining such relief in a timely fashion could be catastrophic.  *See* McGarry Decl. ¶ 14. Accordingly, as described in considerable detail in the McGarry Declaration, the Debtors shared a proposal containing CBA modifications with their Unions (the "**Initial Proposal**") and have subsequently prepared a revised proposal (the "**Revised Proposal**") in response to ongoing negotiations with the Unions.  *See id*. Exhs. 2, 3.

20.     Subsequently, at a meeting held on August 5, 2015 (the "**August 5th Meeting**"), the Debtors met with UFCW international and local leaders, including the international head of collective bargaining, as well as their advisors, to discuss certain interim relief that the Debtors require in order to prevent irreparable harm to the estate and to maximize the value obtained in their asset sales.  The Debtors reaffirmed the exigent circumstances of their

8

cases, including their intention to sell as many of their stores as possible and to wind-down those that remained. The Debtors then proceeded through the interim relief included in the Revised Proposal, taking time to explain their rationale for each particular request, to answer any questions, and to listen to concerns raised by Union leaders. Afterwards, following over two hours of caucus by the Union leaders, the Debtors were provided with specific guidance and recommendations to move the process forward. In response to such guidance and subsequent deliberations, the Debtors orally presented a revised proposal (the "**Second Revised Proposal**") at the August 5th Meeting. *See id.* ¶ 15.

21.     At the request of the Unions, the Debtors memorialized their Second Revised Proposal, in writing, which was delivered to the Unions at a follow-up meeting between the Unions and the Debtors held on August 11, 2015 (the "**August 11th Meeting**"). *See id.* ¶ 15. A copy of the Second Revised Proposal is attached as Exhibit 5 to the McGarry Declaration. During the August 11 Meeting, the Unions confirmed that the Debtors' written Second Revised Proposal accurately reflected the guidance received from the Unions during the August 5th Meeting**,** but sought certain further written clarifications of Debtors' Second Revised Proposal. Subsequent to the August 11 Meeting, the Unions' counsel delivered the Unions' further requested written clarifications to the Debtors. *See id.* A copy of the Second Revised Proposal containing the further clarifications sought by the Unions, and acceptable to the Debtors, is attached as Exhibit 6 to the McGarry Declaration.

22.     The Debtors are committed to pursuing consensual resolutions with their Unions and, accordingly, accepted the Unions' guidance wherever possible. The Debtors made certain concessions with the intention of taking issues off the table and enabling the parties to focus on the limited remaining interim issues (*i.e.*, severance and bumping), as well as an

9

eventual, permanent, across-the-board resolution.  As a result, the Debtors have significantly cut back the interim relief they request from the Court (as compared to their initial proposals).

23.    In light of their and their Unions' progress, the Debtors remain hopeful that a consensual agreement can be reached – but believe such an agreement may not be immediately possible on certain sticking points of bumping and severance.[4]  Indeed, certain Union leaders have expressed the position that they do not intend to make *any* concessions to the Debtors, or have taken initial steps to enforce CBA provisions that the Debtors have indicated could be fatal to the Sale Strategy.  *See* McGarry Decl. ¶ 17 Exh. 8 (message from the UFCW Local 342 president to its members indicating that "[s]o all the membership understands:  it is the intention, and position, of our Union that we will not be agreeing to any concessions or give-backs"); *id.*  Exhs. 9, 10 (letters in which the UFCW Local 1776 president identified certain CBA provisions that the Debtors have proposed modifying and requested information and a meeting concerning these rights).

24.    In light of the foregoing, as well as Debtors pressing and immediate need for relief from certain CBA provisions, as set forth in the McGarry Declaration, McDonagh Declaration, and Rizvi Declaration and described in more detail herein, the Debtors are compelled to file this Motion to obtain interim relief pursuant to section 1113(e) of the Bankruptcy Code.  The Debtors intend such relief as a temporary measure to permit implementation of the Sale Strategy as negotiations continue.  Without such relief, the Debtors' chances of successfully concluding the Sale Strategy and confirming a chapter 11 plan will

---

[4] The Debtors have continued to negotiate since the August 5th Meeting, including by meeting with the international and local leaders of the UFCW on the date hereof to discuss the Second Revised Proposal in hopes of reaching a settlement but, unable to reach an agreement, proceeded to file this Motion.  At this last meeting, the Debtors made clear that although they are compelled to file this motion for relief, they are ready and willing to meet with the Unions to the extent such discussions would be productive. The Unions made clear at such meeting that they would not agree to any modification on bumping or severance, and indeed the Unions have not presented a single counter proposal to the Debtors since the Debtors began negotiating with the Unions.

greatly decrease and, instead, they will face a greater likelihood of being forced into a chaotic and costly chapter 7 liquidation. The irreparable harm inherent in that scenario must be avoided and, accordingly, the Debtors respectfully submit that this Motion should be granted.

### Relief Requested

25.    Pursuant to section 1113(e) of the Bankruptcy Code, the Debtors request authority to temporarily modify their collective bargaining agreements in two limited respects. First, the Debtors seek relief from complying with any and all "bumping" provisions. Second, the Debtors seek relief to the extent necessary to implement their severance proposal, which is to pay 25% of a Union employee's valid claim for severance due to postpetition termination of employment in cash on a timely basis, subject to an aggregate cap of $10 million applicable to all severance paid to both Union and Non-Union employees, and to defer payment of and satisfy any allowed claim for the remainder of any such severance obligation in accordance with the Bankruptcy Code.

26.    The foregoing requested relief is *not* the only relief the Debtors require from their CBAs. However, as described in detail herein, and based upon guidance provided from their Unions and representations from Union leadership, the Debtors believe that agreement on the remaining relief has been reached consensually, and that they will be able to continue on their intended course of action (as set forth in this Motion) without at this time seeking additional relief from this Court. To the extent that any Union now objects or seeks to reserve an argument that such action would constitute a violation of section 1113(f) of the Bankruptcy Code, the Debtors seek interim relief to carry out those intentions, as well.

27.    The Debtors request that, to the extent that interim relief requested in this Motion (conditionally or otherwise) is granted, that it be granted, with respect to each of the Debtors' CBAs, until the earlier of (i) the rejection of such CBA, either by consensual agreement

with an authorized representative or pursuant to section 1113(c), or (ii) three (3) months from the date of entry of an order granting such interim relief.

28.    A proposed form of order granting the relief requested is attached hereto as **Exhibit "A"** (the "**Proposed Order**").   A chart generally describing the CBA provisions implicated by this Motion is attached hereto as **Exhibit "B"**.

<u>Argument</u>

A.    **Section 1113(e) of the Bankruptcy Code Permits the Requested Relief**

29.    Section 1113(e) of the Bankruptcy Code authorizes this Court to grant the relief requested.  Section 1113(e) is intended as a flexible remedy that allows courts to provide a debtor with relief needed to carry out the objectives of chapter 11 of the Bankruptcy Code, which include preserving its ongoing operations in order to maximize the value of its estate and improve its prospects for confirming a chapter 11 plan. *See In re United Press Int'l, Inc.*, 134 B.R. 507, 513 (Bankr. S.D.N.Y. 1991) (noting that the purpose of section 1113(e) "is to allow a Court sufficient flexibility to provide the debtor in possession temporary economic relief in order to carry out the objective of Chapter 11; that is, to preserve the business, if possible, for the benefit of all").  As provided by the statute, this Court may authorize the Debtor to implement interim changes to its CBAs where such changes are either (a) "essential to the continuation of the debtor's business" or (b) "in order to avoid irreparable damage to the estate." 11 U.S.C. § 1113(e); *see In re United Press Int'l,* Inc., 134 B.R. 507, 514 (Bankr.  S.D.N.Y. 1991) ("There is a difference between the continuation of the debtor's business and irreparable damage to the estate. . . . [A] debtor need only meet one of the statutory standards without having met the other."); *cf. In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 526 (Bankr. S.D.N.Y. 1991) (holding that relief was appropriate under section 1114(h) in order to avoid immediate liquidation and to

preserve the value of the estate).  Here, the Debtors seek the requested 1113(e) relief in order to avoid irreparable damage to the estate.

30.     Section 1113(e) relief is available any time after a debtor files its bankruptcy petition.  *See Beckley Coal Mining Co. v.  United Mine Workers of Am.*, 98 B.R. 690, 694 (D. Del. 1988) ("A debtor may request interim relief at any time after it commences a chapter 11 case.").  The only procedural requirements for granting relief under section 1113(e) are notice and a hearing.  *See United Food & Commercial Workers Union, Local 328, AFL-CIO v. Almac's Inc.*, 90 F.3d 1, 6 (1st Cir. 1996) ("Only the basic procedural safeguards, 'notice and a hearing,' are required."); *cf. In re United Press Int'l, Inc.*, 134 B.R. 507, 513 (Bankr. S.D.N.Y. 1991) (finding that a debtor could "seek interim relief without first seeking permanent relief in the form of CBA rejection, because the only requirement in the statute is that the application be made 'during a period when the collective bargaining agreement continues in effect'") (quoting 11 U.S.C. § 1113(e)).[5]

31.     Courts have found that interim relief was warranted under sections 1113(e) and 1114(h) (the analogous provision concerning interim relief from retiree obligations)[6] in circumstances similar to the Debtors', *i.e.*, where it would reduce the risk of conversion to a chapter 7 liquidation and the attendant loss of value to a debtor's estate.  Thus, in *Hostess*, the

---

[5] Although there is clear authority that a debtor does not need to seek relief under section 1113(c) before seeking relief pursuant to section 1113(e), the Debtors have a motion pursuant to section 1113(c) ready and, to the extent that any Unions or other parties in interest raise an objection that such a motion is required in the circumstances of this case, are Debtors are prepared to file it.

[6] Section 1114(h) of the Bankruptcy Code requires a debtor seeking to modify an obligation to provide retiree benefits to satisfy requirements that are virtually identical to those of section 1113(e).  *See In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 520 (Bankr. S.D.N.Y. 1991) ("[C]ompliance with § 1114 is substantively and procedurally the same as compliance with § 1113").  The same authorities that support a motion for interim relief from the provisions of collective bargaining agreements under section 1113 are applicable to a motion for interim relief from retiree benefit obligations under Section 1114, and cases addressing one are generally applicable to the other.  *See In re Horsehead Indus., Inc.*, 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003) (indicating that its discussion of section 1113 and cases that interpret it would apply to section 1114); *United Food & Comm'l Workers Union, Local 211 v. Family Snacks, Inc. (In re Family Snacks, Inc.),* 257 B.R. 884, 896 (B.A.P. 8th Cir.2001) (relying on Section 1113 cases in interpreting Section 1114).

court granted a debtor on the verge of administrative insolvency interim CBA relief to facilitate a

sale and wind-down process because that process was found to be "absolutely necessary to avoid

imminent and irreparable harm to the estate" that would occur if the case were converted to a

chapter 7 liquidation. *See* Hr'g Tr. at 147, 157-58, *In re Hostess Brands, Inc.*, No. 12-22052

(Bankr. S.D.N.Y. Nov. 21, 2012), attached hereto as **Exhibit "F"**. Similarly, in *Ionosphere*, the

court granted a chapter 11 debtor interim relief from its retiree benefit obligations because of

"the danger of a precipitous conversion of the case to Chapter 7" in which case "the ultimate

value of the estate would be severely compromised to the detriment of all parties in interest,

retirees and others alike." *See* Hr'g Tr. at 14, *In re Ionosphere Clubs, Inc.*, No. 89-10449

(Bankr. S.D.N.Y. May 22, 1991), attached hereto as **Exhibit "G"**.

**B.      The Debtors Are Entitled to Interim Relief from the Collective Bargaining
         Agreements Pursuant to Section 1113(e) of the Bankruptcy Code**

          32.      Similar to *Hostess* and *Ionosphere*, here interim relief from certain CBA

provisions is essential in order to avoid irreparable damage to the Debtors' estates. The interim

relief requested by the Debtors is limited, in reliance on the guidance the Debtors received at the

August 5th Meeting, to relief from bumping and severance provisions.

          33.      ***Bumping Provisions.***  Nearly all of the Debtors' CBAs include bumping

provisions, which allow a senior employee at a store that is closing to displace a more junior

employee at a store that is not closing. Bumping not only results in the junior employee losing

his or her job, but also triggers a domino effect in which the junior employee can displace an

even-more-junior third employee in any of the stores governed by the relevant CBA. Indeed,

one bump by a full-time employee on average impacts as many as four employees at other stores.

*See* Rizvi Decl. ¶ 8. Although bumping rights vary by CBA (for example, in how seniority is

calculated or in what geographical area bumping is permitted), they generally have the same

effect:  the most senior employees are protected from any layoff.  *See id.* (describing example where layoff of grocery store manager who bumps ultimately results in a part-time cashier at another store losing his or her job).

34.    The Debtors require immediate, interim relief from bumping provisions so that they may proceed to wind-down stores where appropriate, beginning with prompt closure of the Initial Closing Stores (which, alone, will cost the Debtors approximately $9.8 million to operate over a 16-week period).  *See* McDonagh Decl. ¶ 8.  As discussed in further detail in the Rizvi Declaration, applying bumping provisions to employees working at just one of the Initial Closing Stores would result in hundreds of employees replacing more junior employees in other stores.   For example, assuming all employees accept their bumping right, closure of the Pathmark in Linden, New Jersey would result in the transfer of 76 employees impacting 110 positions in 30 different stores.  *See* Rizvi Decl. ¶ 7.  If the Debtors were to close not just one, but all 25 of the Initial Closing Stores at the same time, the results become staggering – 2,509 employees would have the right to bump into the Debtors' remaining 270 stores (if they are the same bargaining unit).  *See id.*  Of these 2,509 employees, approximately 1,100 would have the right to bump into the 118 stores subject to the Stalking Horse Bids.  *See id.*

35.    Administering and implementing bumping would create substantial and untenable delays, and would create an enormous burden on the Debtors' limited human resources employees.  *See id.* ¶¶ 12-13 (noting that the seven Human Resources managers employees trained and experienced in administering bumping are already stretched thin responding to issues including changes to benefits, severance, FSA money, and vacation, as well as working with the various buyers, participating in due diligence efforts, and working on WARN Act notices).  Based on past experience, this process would require analyzing the seniority of affected

bargaining unit employees, negotiating over potential bumps and ancillary issues, and then reaching out to individual employees to determine whether they are willing to bump, and typically takes four weeks to complete for just a single store closing. *See id.* It would take many months to administer the projected bumping from closing all 25 of the Initial Closing Stores, which would mean that the Debtors would still be working through the transfers long after the Global Bidding Procedures process would need to conclude. *See id.* ¶ 14.

36.    Moreover, even if bumping were possible from an operational perspective, allowing bumping would clearly trigger pre-closing covenants in the Court-approved APAs that prohibit employee transfers, threatening the Debtors' ability to close on those transactions.[7] If the Debtors do not receive relief from the bumping provisions and the Stalking Horse Bids did not go forward as a result of the failure to receive that relief, the estate could lose as much as $213 million in proceeds,– a certain deathblow to the hopes of an orderly chapter 11 liquidation. *See* McDonagh Decl. ¶ 9.[8]

37.    As the foregoing makes clear, the Debtors require relief from bumping provisions in order to avoid irreparable harm to their estates.

38.    ***Severance Provisions (if necessary).*** The Debtors' CBAs generally require the Debtors to provide benefits described as "severance" to employees upon their

---

[7] *See* McGarry Decl. ¶ 20 (quoting section 5.3(b) of the APAs, labeled "Conduct of the Business Pending Each Closing," which provides that "neither seller shall, solely as it relates to the Business: (i) . . . (z) . . . permit to be transferred to any Store any employee of the Sellers or any other affiliate of the Sellers, other than any hiring or transfer in replacement of an employee terminated for cause, or who otherwise resigned . . . .").

[8] Even if the Stalking Horse Bidders agreed to allow bumped employees to transfer into their stores, the increased labor costs would undoubtedly result in lower values for the sold stores. Bumping employees from the Initial Closing Stores alone would be expected to increase costs at remaining stores by as much as $14 million. *See* Rizvi Decl. ¶ 16. The threat of such bumping would likely drive down the price of bids, as potential purchasers would not know with any certainty what they would be buying or whom they would employ. *See id.* ¶ 15.

termination.  The UPTS[9] provision, for example, provides that wages continue being paid post-termination for periods ranging from one to eighteen weeks.  *See* UPTS § 5(b).  The Debtors' projected aggregate severance liability is substantial – as high as $90 million ($54 million if stores subject to Stalking Horse Bids are excluded).  *See* McDonagh Decl. ¶ 10.  It is the Debtors' position that such severance claims would be, at least in part, on account of prepetition obligations, *see Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98 (2d Cir. 1986) (noting that "it appears to be the general rule that when severance pay, like vacation pay, represents compensation for the employee's past services it is not an administrative expense entitled to priority"), and the Debtors will dispute the treatment of such claims at the appropriate time.  In the interim, the Debtors intend (and, to the extent necessary, request relief) to pay 25% of any Union employees' allowed claim for severance in cash on a timely basis (up to an aggregate cap of $10 million, applicable to severance paid to both Union and Non-Union employees), defer payment of the remainder, and satisfy any resulting claims in accordance with the Bankruptcy Code.

39.    The Debtors maintain that they can implement the foregoing severance proposal without relief from section 1113(e) and without running afoul of the requirements of section 1113(f) of the Bankruptcy Code.  While section 1113(f) prohibits a debtor from unilaterally modifying the provisions of its CBAs, that section is not implicated when a debtor adheres to the Bankruptcy Code's provisions regarding the timing of payment of claims arising from a CBA.  *See In re Ionosphere Clubs, Inc.*, 22 F.3d 403, 407 (2d Cir. 1994) (noting that applying the Bankruptcy Code priority scheme to claims arising from a CBA does not constitute a "unilateral alteration" because a debtor's "obligation to satisfy in full the [CBA] claims

---

[9] The "**UPTS**" is the Union Protections in Term Sheets, a global term sheet with provisions that were incorporated into most of the Company's CBAs in connection with a settlement in the 2010 Cases.  *See* McGarry Decl. Exh. 1.

remains unchanged.  [The Bankruptcy Code] . . . only establishes the priority of those claims, it does not affect the underlying obligation."); *In re A.C.E. Elevator Co., Inc.*, 347 B.R. 473, 483 (Bankr. S.D.N.Y. 2006) (noting that a debtor's failure to pay amounts when due under a CBA did not violate Section 1113(f) because a debtor's "adherence to the Bankruptcy Code's requirements of when, and when not, to pay claims in full does not equate to [its] unilateral alteration of the CBA in derogation of section 1113(f)").

40.    The lack of any unencumbered assets provides an additional reason why the Debtors are not compelled to make severance payments on a cash-up-front basis.  Indeed, even in the more-exacting context of section 1114 – which, unlike section 1113, expressly requires debtors to make "timely" payments of retiree obligations during a chapter 11 case – courts have held that payments cannot be required on a current basis when a debtor lacks unencumbered assets to pay them.  *In re Jones & Lamson Mach. Co., Inc.*, 102 B.R. 12, 16-17 (Bankr. D. Conn. 1989) (holding that section 1114 does not grant retirees priority over secured creditors and that a debtor is only required to pay retiree benefits if there is unencumbered property available to make such payments); *see also In re A.C.E. Elevator Co., Inc.*, 347 B.R. 473, 488 (Bankr. S.D.N.Y. 2006) (requiring a debtor to provide information regarding its unencumbered assets and administrative solvency to determine whether it would be required to pay unpaid retiree benefits on a current basis) (citing *In re GF Corp.*, 115 B.R. 579, 586 (Bankr. N.D. Ohio)); *cf. In re Kitty Hawk, Inc.*, 255 B.R. 428 (Bankr. N.D. Tex. 2000) (noting that if Congress had intended to mandate "timely" payment of benefits to union employees that had administrative priority status, that it would have done so expressly in section 1113(f) as it had done in section 1114(e)(1) and (2), which require a debtor to "timely pay . . . retiree benefits").

Here, all of the Debtors' assets have been pledged to secured creditors and, for that additional reason, the Debtors are not required to pay severance in full on a timely basis.

41.     To avoid distractions during their ongoing attempts to negotiate a permanent settlement with their Unions in good faith, the Debtors seek confirmation that they are not required to pay severance payments in full on a current basis or, to the extent necessary, request interim relief from CBA provisions that require the Debtors to do so.  Although not technically required, section 1113(e) relief from the CBAs' severance provisions is available. *See, e.g.*, *In re United Press Int'l, Inc.*, 134 B.R. at 514 (Bankr. S.D.N.Y. 1991) (debtor sought interim relief from a CBAs severance provisions so that it could conduct needed layoffs without triggering severance obligations, which relief was granted).[10]

42.     Such relief is appropriate in these cases, where every dollar and every payment possible should contribute to confirmation of a chapter 11 plan, and every dollar diverted increases the risk of administrative insolvency.[11]  Because the priority status of severance claims arising from the Debtors' CBAs has not been established, it is uncertain whether they must be paid as a prerequisite to confirmation.  *See In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007) ("The burden of proving entitlement to priority payment as an administrative expense . . . rests with the party requesting it.").  The Debtors intend to dispute

---

[10] Notably, *United Press International* was decided before the Second Circuit held that section 1113(f) does not give CBA creditors super-priority claims.  *In re Ionosphere Clubs, Inc.*, 22 F.3d 403, 407 (2d Cir. 1994).  Before the law in the Second Circuit was established by *Ionosphere*, some courts had adopted the contrary view that section 1113(f) *did* create super-priority claims.  *See In re Golden Distributors, Ltd.*, 134 B.R. 760, 765 (Bankr. S.D.N.Y. 1991) *aff'd*, 152 B.R. 35 (S.D.N.Y. 1992) ("[C]laims arising out of a collective bargaining agreement may be granted priority status regardless of whether they meet the requirements of 11 U.S.C. §§ 503(b) and 507(a). Thus, 11 U.S.C. § 1113(f) creates a super-priority for all pre-petition as well as post-petition payments due under a collective bargaining agreement which, in effect, trumps 11 U.S.C. § 507.").

[11] The Debtors' recognize that their severance proposal is more generous than would be required by the law. Although, technically, the Bankruptcy Code does not require the Debtors to pay *any* severance on a current basis, the Debtors' have determined that the estates would greatly benefit if a consensual resolution were reached with their Unions and believe that a settlement consistent with the proposal would provide a net benefit to the estates.

any assertion that such claims are entitled to priority status, in light of the narrow construction of provisions granting administrative priority and the Debtors' determination that, to at least some extent, such claims represent prepetition obligations. *See Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed."); *A.C.E. Elevator Co. v. Local No. 1, Int'l Union of Elevator Constructors (In re A.C.E. Elevator Co., Inc.)*, 2009 WL 3255381, Adv. Pro. No. 05-1158 (RDD) at *7 (Bankr. S.D.N.Y. Oct. 7, 2009) at *7 (holding that under *Ionosphere*, a debtor "was not required, and was in fact prohibited, by the Bankruptcy Code from paying its prepetition obligations in full in cash absent Court approval."). Requiring payment on account of claims for severance payments in full when due would effectively, and improperly, elevate such claims to super-priority status before their priority status, or the Debtors' ability to satisfy them, had been determined. Interim relief to implement the severance proposal, to the extent it is even necessary, is justified to prevent a certain fortunate few employees from siphoning assets that otherwise would contribute to confirmation of a chapter 11 plan and be distributed ratably.

43.      In addition, to the extent that the Debtors are obligated to pay CBA severance payments on a current basis until a permanent resolution is negotiated, represented employees terminated prior to such resolution could potentially  receive better treatment than similarly situated employees who are terminated at a later date. The Debtors have begun and remain in the midst of negotiating with their Unions with respect to the amount of severance payable to terminated employees. *See* McGarry Decl. ¶ 15 (describing the Debtors' proposals and revised proposals, which address severance claims). Temporary relief from any obligation to make such payments in full will ensure that Union-represented employees receive their fair

share of what assets are available to satisfy their claims and maximize the chances that the Debtors are able to satisfy the payment thresholds necessary to confirm a chapter 11 plan. Moreover, it is necessary to preserve the Debtors' ability to later argue that permanent modifications to their CBA severance provisions are fair and equitable as required for section 1113(c) relief.

**C.    The Debtors Intend to Act Consistent With Union Guidance,
        Are Entitled to Interim Relief to the Extent Such Intentions Are Disputed.**

44.    As previously mentioned, the Debtors require relief from far more than just the bumping and severance provisions of their CBAs in order to implement their Sale Strategy and avoid irreparable harm to the estate, believe – based upon guidance provided by Union leaders at the August 5th Meeting and confirmed at the August 11th Meeting – that additional court intervention will not be necessary.

45.    Instead, the Debtors understand that if they continue on their intended course of action consistent with the Unions' guidance – including by taking actions inconsistent with the written provisions of the CBAs – the Unions *will not* later argue that the Debtors should have first obtained interim relief or that the Debtors have "unilaterally" altered their CBAs in violation of section 1113(f).  The Debtors intentions with respect to the relief discussed with their Unions and for which guidance was provided are described below.  To the extent that any Union now objects (or seeks to reserve an argument that such action would constitute a violation of section 1113(f) of the Bankruptcy Code), the Debtors seek interim relief to carry out those intentions.  Such relief should be granted if required, as the limited, compromise relief described below is truly the minimum necessary to carry out the Sale Strategy in the near-term and to prevent irreparable damage to the Debtors' estates.

21

46. ***Successor Clauses (in certain circumstances).*** Many of the Debtors' CBAs include "successor clauses," which could prevent the Debtors from selling any stores unless the purchaser first agrees to assume the affected CBA without modifications. For example, the UPTS provision (which most CBAs incorporate) provides that a sale of stores shall not take place without the Company obtaining a written agreement by the successor to assume the affected CBAs and offer employment to substantially all of the covered employees at the store being sold. *See* UPTS § 6(b).[12]

47. At the August 5th and 11th Meetings, the Union leaders advised the Debtors that they were concerned with the Debtors' request for blanket interim relief from any successor clause. However, where needed to close an asset sale in the near term, the Unions suggested that they would be amenable to going to court on an expedited basis on a motion for section 1113(e) relief from a successor clause. *See* McGarry Decl. ¶ 22. Based on this guidance, the Debtors will not seek immediate relief from the CBAs successor clauses. The Debtors do so with the following specific understanding: the Debtors may seek Bankruptcy Court approval for modification of any applicable successorship provisions on not less than 5 days' notice to the extent necessary to consummate an asset sale that is scheduled to close on or before October 7, 2015, and the Unions will not object to having such matter heard on such expedited notice. The Debtors believe that, although this represents a substantial concession from their initial proposals, the expedited, case-by-case process contemplated by the Unions' guidance will provide an effective interim resolution of issues concerning successorship clauses.

---

[12] The UPTS successor provision is only "binding on grocery store sales in batches of either; (1) 25 or more stores, regardless of the location or jurisdiction of such stores, within a 30 day period; or (2) 5 or more stores employing members of any single Local Union, to one or more operators that take place between the effective date of a plan of reorganization and the end of the Term, provided, however, that if a single Local Union represents employees at less than 50 of the Company's stores, this successorship provision (if added) would apply to sales of any store(s)." *See* UPTS § 6(b).

48.     To the extent that any Unions object to this interim resolution, the Debtors request section 1113(e) relief necessary for its implementation.  Such relief would be warranted under the circumstances.  For various reasons, few if any buyers will be willing to accept the Debtors' CBAs without modification.  Certain potential buyers have pre-existing CBAs with many of their Unions and may want to roll new employees into these prior agreements, while others do not have a unionized work force.  Yet others may simply require better terms with their Unions than those provided in the CBAs.  *See id.*  The Debtors' experiences at the outset of the Global Bidding Procedures process are telling.  During the course of negotiating the terms of the APAs, the Debtors provided the bidders with an "auction draft" APA (the "**Auction Draft**").  *See id.* ¶ 13.  The Auction Draft contemplated that the bidders would either assume the CBAs governing the stores contained therein, enter into a mutually acceptable modified labor agreement, or negotiate in good faith with each affected labor union in an effort to do so.  And while each bidder has agreed to undertake good faith negotiations with the Unions (and each bidder has, as of the date hereof, already engaged with the Unions for that purpose), they have made it clear that they will *not* assume certain legacy obligations arising under the Debtors' CBAs – most notably, bumping and pension liabilities.  *See id.*[13]

49.     The Debtors recognize that section 1113(c) provides a means for the Debtors or purchasers to obtain relief from successor clauses in order to implement a free and clear sale.  But that option is not a practical solution for every sale, and particularly sales conducted pursuant to the Discrete Sale and Lease Rationalization Procedures (especially in the near term).[14]  Indeed, it is difficult to imagine a more wasteful approach to these cases than for

---

[13] Notwithstanding, given the bidders' pre-existing relationships with the UFCW, the Debtors expect the bidders will reach consensual agreements with the Unions.

[14] With respect to the Stalking Horse Bids, the Debtors are hopeful that a consensual resolution will be reached and that such relief will not be necessary(if not, then the Debtors have every intention of pursuing section 1113(c) relief)

the Debtors to repeatedly comply with the cumbersome and formal section 1113(c) process to obtain relief, and then to come before the Court time and time again to make a case for substantially the same relief for substantially the same reasons for each and every different potential sale and purchaser.  The cost and burden of undertaking would likely be prohibitive for the anticipated buyers, and certainly would change the value proposition of the stores in a way that would chill bidding and diminish purchase prices (and, by increasing the Debtors' own costs, further diminish the value of the estate).  In this case, a process-wide loss in value would result in significant harm.  For obvious reasons, the Debtors require a permanent resolution regarding their Unions' successor clauses, which they intend to reach by negotiation or court order.  However, in the near term, the expedited section 1113(e) process that the Unions proposed will preserve the Debtors' ability to move quickly to obtain relief that, in the aggregate, will be critical to maximizing the value of the estates and minimizing the risk of administrative insolvency and irreparable damage.

50.    ***Certain Notice Requirements***.  The Debtors' CBAs include a variety of notice requirements, information sharing obligations, and procedures in connection with potential sales and store-closures.  For example, the UPTS requires the Debtors to consult with any affected Unions regarding "confidentiality agreements, information packages, process letters, management presentations, due diligence room links, sales procedures, and data information requests, before they are provided to any prospective purchasers."  UPTS § 6(b).

51.    At the August 5th Meeting, the Debtors' explained their concerns with being bound to requirements in the UPTS, which were not drafted in contemplation of the present circumstances, created an impediment to efficient implementation of the Sale Strategy, and could lead to a foot-fault, and also noted that they had made significant efforts to share

24

information with their Unions through calls, meetings, and the data room, and were committed to remaining engaged with the Unions and establishing a process for sharing information on an ongoing basis.  Based upon guidance from the Unions provided in response to the foregoing, the Debtors will not seek immediate relief from their CBAs' information sharing provisions, and instead will continue to work cooperatively with their Unions on this issue to develop a solution that suited to the circumstances of these cases.  *See* McGarry Decl. ¶ 24.  The Debtors do so on the understanding that the Unions will otherwise act according to the Global Bidding Procedures and the Discrete Asset Sale and Lease Rationalization Procedures, and will not later attempt to insist on future adherence to the information sharing requirements or to use them as a basis to hold up asset sales conducted pursuant to the procedures approved by the Court.

52.    To the extent that any Unions dispute the foregoing, the Debtors request relief from such information sharing provisions pursuant to section 1113(e).  Such relief is warranted under the circumstances.  Requiring the Debtors to consult with each affected Union before providing any potential purchaser a confidentiality agreement, information package, due diligence room link, or other covered communication, as required by the UPTS, would create a significant and real impediment to the Debtors' ability to quickly and nimbly implement the Sale Strategy.  The Debtors have proposed procedures in the various motions filed to implement the Sale Strategy that would provide fair and adequate notice to the Unions in light of the circumstances, which render the CBA requirements unnecessary.  *See id.*  Indeed, Unions are notice and consultation parties under the court-approved sale procedures.  Continuing obligations to adhere to the particular notice and store closing requirements of the Debtors' 35 CBAs will only serve to create pitfalls, delays, and administrative burdens for the Debtors, undermining the Sale Strategy.  Moreover, to the extent that the Debtors inadvertently fail to honor the letter of

such requirements, their ability to later obtain permanent relief from their CBAs (if such relief is later determined to be necessary) could be jeopardized.  *See* 11 U.S.C. § 1113(f) (prohibiting unilateral alterations to a collective bargaining agreement).

53.    ***Right of First Refusal (in certain circumstances).***    Certain of the Debtors' CBAs provide Unions with a right of first refusal to purchase approximately twenty-five stores.  At the August 5th and 11th Meetings, the Debtors expressed concerns that, among other things, such provisions would disrupt the ability to sell bundled stores and view that Court-approved sale procedures would preserve the Unions' rights to acquire such assets.  *See* McGarry Decl. ¶ 25.  Based upon guidance from the Unions provided in response, the Debtors will not seek immediate relief from such provisions and, instead, will continue to work together with their Unions (and, in particular, a subcommittee headed by the Unions' financial advisor) to reach a consensual resolution.  The Debtors understand that the Unions intend to act in accordance with the approved Global Bidding Procedures and Discrete Sale and Lease Rationalization Procedures (to which they did not object) and will not later claim that section 1113(e) from the rights of first refusal necessary.

54.    To the extent that any Unions dispute to the foregoing, the Debtors request 1113(e) relief from any CBA provision providing a right of first refusal to the limited extent that it would apply to stores committed to the Stalking Horse Bidders or could be exercised to interfere with a bundled sale of stores.  Such relief is warranted under the circumstances.  Giving a select-few Unions the ability to upset other bids on such stores without regard to the approved procedures would chill bidding, destroy value, and otherwise complicate the Debtors' sale processes to the detriment of the estates.  *See id.*  In these cases, such process-wide disruption, and the corresponding impact on value, imperils the Debtors' chances of confirming a plan and

increase the risk of irreparable harm to the estate. Moreover, the procedures established by the Debtors do not prejudice the Unions. The procedures permit any party to make a higher and better offer and ensure that the Unions will have an opportunity to bid and to compete in an auction for as many rounds as they choose to. Moreover, Unions that signed NDAs have been given access to a data room that all bidders have access to, plus additional Union-specific information not available to other bidders. *See* McDonagh Decl. ¶ 15 (describing information provided to Unions in a union-specific data room).

55.     *Job Guarantees*. Certain of the Debtors' CBAs include provisions that guarantee jobs to employees that are hired as of a given date. *See, e.g.*, McGarry Decl. ¶ 26 (quoting EDP 9002 § 8.6(a) ("No employee on payroll as of March 5, 1986 with three (3) years of seniority as of that date shall be laid off from employment during the term of this Agreement provided the employee is qualified and continuously able to perform the work.")); *id.* (quoting EDP 3218 § 13(O) (prohibiting layoff of full-time employees on payroll as of October 31, 1995)).

56.     At the August 5th Meeting, the Debtors explained their request for interim relief from job guarantees based on the circumstances of these cases, including the need to promptly implement their strategy by closing stores and closing on sales to third parties who may not hire all of the employees at a store. In response, the Unions indicated that the Debtors should resolve this issue by permitting an aggrieved employee to file a claim. Based on the foregoing guidance, the Debtors intend where necessary to terminate employment of any employee, notwithstanding any job guarantee provided for in a CBA, with the proviso that a terminated employee will be entitled to assert a claim on account of their job guarantee to be satisfied in accordance with the Bankruptcy Code. The Debtors will take this action based upon the

understanding that the Union will not claim that the Debtors should have first sought interim relief from job guarantee provisions. *See id.*

57.    To the extent that any Unions object to the Debtor resolving job guarantees with a claim in this manner without first obtaining interim relief, the Debtors request 1113(e) relief to the extent necessary to effectuate the foregoing. Such relief is warranted under the circumstances of these cases and the need to implement the Sale Strategy without delay, as job guarantee provisions stand in its way by preventing the Debtors from laying off certain employees when stores are closed and preventing stores from being sold free and clear of liabilities. *See id.*

58.    ***Certain Work Rules (in certain circumstances and with certain exception)***. The Debtors' CBAs create various work rules that control what tasks represented employees can be called upon to do ("usual roles" rules), what stores or bargaining units such employees can be called upon to work at ("transfer restrictions"), and whether outside help can be brought in to assist with the operations of a store or to perform a particular function ("exclusive work" or "non-bargaining unit members doing bargaining unit work" rules). *See* McGarry Decl. ¶ 27 (quoting EDP 2403 § 2.4 ("It is agreed upon that only meat employees covered by this Agreement shall handle meats, poultry, fish or delicatessen products, whether fresh, frozen or smoked.")); *id.* (quoting EDP 9002 § 16.3 ("No member of the Union shall be required to perform work which is beyond his usual line of duty")).

59.    At the August 5th Meeting, the Debtors indicated that they require relief from the foregoing work rules and, in response, the Union leaders informed them of certain concerns and proposed modifications to and exceptions from the requested relief. Based upon this guidance, the Debtors will not seek immediate relief from such work rules and transfer

restrictions with the understanding that: (1) they will not adhere to work rules related to "exclusive work," "non-bargaining unit members doing bargaining unit work," and "usual roles", or to transfer restrictions (including transfer between bargaining units), at stores designated for going-out-of-business sales (except as otherwise would result in an imminent safety risk to an employee) and (2) they will not use the limited elimination of the foregoing rules and restrictions to cause layoffs or a reduction in an employee's hours prior to a date on which either would have otherwise occurred. *See id.*

60.    To the extent that any Unions dispute the foregoing understanding and consensual resolution, the Debtors request 1113(e) relief from work rules and transfer restrictions consistent with the foregoing in order to carry out the wind-down of certain stores and preserve going-concern operations in the interim. Such relief is required with respect to stores that are being closed, as the Debtors anticipate that their existing employees will be required to carry out a number of unusual tasks and odd jobs, including in connection with efforts to liquidate assets and inventory. In addition, it is also anticipated that, in certain circumstances, it will be necessary to retain temporary outside help to assist the Debtors' existing labor force, which will require relief from "exclusive work" and "non-bargaining unit members doing bargaining unit work." Finally, the Debtors anticipate increased attrition in light of the Debtors' current, well-publicized circumstances, as well as potential store-closing and other notices (including notice pursuant to the Worker Adjustment and Retraining Notification Act, 28 U.S.C. § 2101 et seq., and its state-law equivalents). In order to maintain operations at closing stores in the event of such attrition, the Debtors require relief for transfer restrictions so that they may transfer employees at closing stores between closing stores and their bargaining units at their discretion when necessary. Such relief (subject to the exceptions in the Debtors' current

understanding) is essential to ensure the Debtors' continuing compliance with pre-closing covenants in their APAs regarding ordinary course operations, and to minimize disruption as stores are closed and liquidated (thus reducing the risk of irreparable harm from the Debtors being unable to confirm a chapter 11 plan).  Without such relief, wind-down efforts would face significant additional costs and untenable delays.

61.    ***Conditional No-Strike Provisions (to require prior notice)***.  Certain CBAs include conditional no-strike clauses, which could potentially permit represented employees to strike if the Debtors did not make a particular Pension Contribution.  *See* McGarry Decl. ¶ 28 (noting that EDP 9004 § 19 provides that the CBA's no-strike clause is inoperative where the employer is delinquent in making contributions to various funds in accordance with the applicable trust agreements and the CBA).

62.    At the August 5th Meeting, after the Debtors expressed their particular concern with these provisions in light of their decision to stop payment of prepetition pension contributions (as discussed below), Union leaders indicated that the Debtors would receive prior notice of such a strike and would have an opportunity to seek relief.  Per this guidance, the Debtors do not seek interim relief to eliminate the conditional no-strike clauses, with the specific understanding that the Unions will always give the Debtors at least five days' prior written notice before they intend to strike pursuant to this provision and that the Unions will not object to going to court on an expedited basis, within the five day notice period, on a motion for section 1113(e) relief from these conditional no-strike provisions.

63.    To the extent that any Unions dispute this understanding and assert an unfettered right to strike as a result of unpaid pension contributions, the Debtors request 1113(e) relief from the conditional no-strike clauses.  A strike could trigger a materially adverse change

in respect of the APAs and disrupt the Debtors' operations and ability to maintain revenues, in either case to catastrophic effect, and relief is therefore required.   McDonagh Decl. ¶ 14. Moreover, the Debtors are required to pay approximately $724,000 per month on pension contributions for these CBAs, *see id.* ¶ 13, and maintain that relief from such provisions is also consistent with the prohibition on using a strike to coerce a debtor to pay prepetition obligations. *See A.C.E. Elevator Co. v. Local No. 1, Int'l Union of Elevator Constructors (In re A.C.E. Elevator Co., Inc.)*, 2009 WL 3255381, Adv. Pro. No. 05-1158 (RDD) at *7 (Bankr. S.D.N.Y. Oct. 7, 2009) (holding that an attempt by a union, through a strike, to enforce cash payment of a prepetition obligation was in derogation of the Bankruptcy Code's priority scheme was precluded by the Bankruptcy Code and improper, including under section 1113(f)).   The limited relief requested (if necessary) merely establishes a procedural precursor to the affected employees' right to strike, which will not impair such right but will serve to prevent irreparable harm to the estate.

      64.   ***Mandatory Payment Provisions***.   Certain CBA provisions are similar to severance in so far as they require the Debtors to make payments during the implementation of the Sale Strategy (such payments, "**Mandatory Payments**"), which the Debtors are not required to pay and, in any event, are not entitled to priority.   These include:

- ***Paid-Time Off***.   The Debtors' CBAs generally require the Debtors to make a lump-sum payment to employees upon termination for unused paid-time off that accrued as a result of employees' pre-termination work, which could give rise to aggregate potential claims of as much as $28 million ($17 million if stores covered by Stalking Horse Bids are excluded).   *See* McDonagh Decl. ¶ 10.

- ***Retirement Bonus Payments***.   Certain CBAs require payment of a lump sum retirement bonus when active employees retire (including certain Local 342 CBAs require the Debtors to pay former represented employees a lump-sum payment upon retirement).   The Debtors anticipate that they

31

may become obligated to pay as much as approximately $6.9 million on account of such benefits.  *See* McDonagh Decl. ¶ 11.

- *Prepetition Pension Contributions*.  Most of the Debtors' CBAs require contributions to pension plans, debtors annual pension contributions are approximately $13 million.  *See* McDonagh Decl. ¶ 12.[15]

65.    The Debtors have stopped – or intend to stop – paying these obligations on a current basis, and will satisfy any resulting claims pursuant to the priority and distributional requirements of the Bankruptcy Code.  At the August 5th Meeting, the Debtors informed the Union leaders of this intention and proposed corresponding relief.  In light of Union guidance provided in response, the Debtors are not seeking immediate relief with the understanding that the Union will not insist that the Debtors should have sought interim relief from the Bankruptcy Court.

66.    To the extent that any Union disputes the foregoing, the Debtors will maintain that, consistent with the case law discussed in connection with severance (which is equally applicable to Mandatory Payments), the Debtors do not require interim relief to wait and satisfy claims arising from these provisions pursuant to the distributional requirements of the Bankruptcy Code. *See supra* ¶¶ 37-42.  Moreover, the Debtors cannot be compelled to pay Mandatory Payments on a current basis given the lack of unencumbered assets.  *See id.*

67.    To the extent that the Court determines that section 1113(e) relief is necessary and that failure to pay Mandatory Payments when required by the CBAs would constitute a unilateral alteration of the CBAs pursuant to section 1113(f), the Debtors request such relief be granted.  It is warranted in the present circumstances to protect the Debtors' estates from unnecessary dissipation due to paying non-priority, prepetition payment obligations, which

---

[15] The Debtors' CBAs also require them to pay certain post-termination health and welfare benefits, which in the aggregate could cost the Debtors as much as $22 million.  *See* McDonagh Decl. ¶ 10.  Consistent with the Unions' guidance, the Debtors do not intend to stop paying such amounts on a current basis.

could threaten the Debtors' ability to satisfy the requirements to confirm a chapter 11 plan (including satisfaction of priority claims).

## Conclusion

68.    The Debtors have satisfied the standards for the limited section 1113(e) relief they are seeking (including with respect to conditional modifications) and respectfully request that the Court grant this Motion.  The relief requested represents the bare minimum needed to obtain to carry out the Sale Strategy and limit the risk of conversion to a chapter 7 liquidation – a conclusion supported by careful consideration and analysis by the Debtors and their advisors for each aspect of the relief requested.  The relief is not intended to supplant the negotiations the Debtors are conducting concerning their Proposal for permanent modifications to the CBAs.

## Reservation of Rights

69.    Nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption under section 1113, section 1114, or any other section of the Bankruptcy Code of, or a postpetition re-affirmation of, any of the CBAs, any other agreement with the Unions or any of their locals or affiliates, or the any retiree obligations.  Any payment made by the Debtors pursuant to an order granting the relief requested herein is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

70.    Notice of this Motion has been provided in accordance with the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m) and 9007 Implementing*

*Certain Notice and Case Management Procedures*, dated July 20, 2015 (ECF No. 62).   The

Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other

or further notice need be provided.

71.   No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the proposed interim

order granting the relief requested herein and such other and further relief as is just.

Dated: August 11, 2015
        New York, New York

                                 /s/ Ray C. Schrock, P.C.
                                 WEIL, GOTSHAL & MANGES LLP
                                 767 Fifth Avenue
                                 New York, New York  10153
                                 Telephone:  (212) 310-8000
                                 Facsimile:  (212) 310-8007
                                 Ray C. Schrock, P.C.
                                 David J. Lender
                                 Salvatore A. Romanello
                                 Garrett A. Fail
                                 Lawrence J. Baer

                                 *Attorneys for Debtors*
                                 *and Debtors in Possession*

## Exhibit A

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

In re                                                      :
                                                           :    **Chapter 11**
**THE GREAT ATLANTIC & PACIFIC TEA**                       :
**COMPANY, INC.,** *et al.,*                               :    **Case No. 15-23007 (RDD)**
                                                           :
          **Debtors.**[1]                                  :    **(Jointly Administered)**

--------------------------------------------------------------x

## INTERIM ORDER PURSUANT TO 11 U.S.C. § 1113(e) AUTHORIZING DEBTORS TO MODIFY COLLECTIVE BARGAINING AGREEMENTS

Upon the motion (the "**Motion**")[2] of The Great Atlantic & Pacific Tea Company,

Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), pursuant to section 1113(e) of title 11 of the

United States Code (the "**Bankruptcy Code**"), for an order authorizing the Debtors to modify

the obligations set forth in their collective bargaining agreements (the "**CBAs**") until, with

respect to each of the CBAs, the earlier of (i) the rejection of such CBA, either by consensual

agreement or by order of this Court, or (ii) three (3) months from the date of entry of this Order,

all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28. U.S.C. §§ 157 and 1334 and the Amended

Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corp. (7132); APW Supermarkets, Inc. (9509); Borman's Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided in accordance with the *Order*

*Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m) and 9007 Implementing*

*Certain Notice and Case Management Procedures*, dated July 20, 2015 (ECF No. 62), and such

notice having been adequate and appropriate under the circumstances; and it appearing that no

other or further notice need be provided; and a hearing having been held on August 17, 2015 to

consider the relief requested in the Motion (the "**Hearing**"); and upon the Declaration of

Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

Southern District of New York filed on the Commencement Date, and the Declaration of

Christopher W. McGarry in Support of Motion of Debtors Pursuant to 11 U.S.C. 1113(e) for

Interim Authority to Modify Collective Bargaining Agreements, the Declaration of Tim

McDonagh in Support of Motion of Debtors Pursuant to 11 U.S.C. 1113(e) for Interim Authority

to Modify Collective Bargaining Agreements, and the Declaration of Ali Rizvi in Support of

Motion of Debtors Pursuant to 11 U.S.C. 1113(e) for Interim Authority to Modify Collective

Bargaining Agreements, all annexed to the Motion, and the record of the Hearing and all of the

proceedings had before the Court; and the Court having found and determined that the relief

sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties

in interest, and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis as provided herein; and

it is further

ORDERED that the Debtors are authorized, pursuant to section 1113(e) of the

Bankruptcy Code, to modify the obligations set forth in the CBAs as requested in the Motion

until, with respect to each of the CBAs, the earlier of (i) the rejection of such CBA, either by

consensual agreement with an authorized representative or pursuant to section 1113(c) relief, or

(ii) three (3) months from the date of entry of this Order, to the extent requested in the Motion;

and it is further,

ORDERED that nothing contained in the Motion or this Interim Order or any

payment made pursuant to the authority granted by this Interim Order is intended to be or shall

be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver

of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an

assumption under section 1113 or any other section of the Bankruptcy Code of, or a postpetition

re-affirmation of, any of the CBAs or any other agreement with the Debtors' Unions or any of

their locals or affiliates; and it is further

ORDERED that notwithstanding entry of this Interim Order, nothing herein shall

create, nor is intended to create, any rights in favor of or enhance the status of any claim held by,

any party; and it is further

ORDERED that the Debtors are authorized to take all steps necessary to carry out

this Interim Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement of this

Interim Order.

Dated: _____, 2015
           White Plains, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Chart Identifying CBA Provisions Implicated by Motion**

| Requested Relief (with Motion pincites) | Relevant Collective Bargaining Agreement Provisions |
|---|---|
| Bumping (¶¶ 32-36) | • Nearly all agreements include provisions relating to "bumping." |
| Severance (¶¶ 37-42) | • Paragraph 5 of the UPTS outlines the severance provisions for most agreements with Local Unions under the UFCW.<br><br>• Local 342 did not opt into the severance provisions of the UPTS, and therefore retains the severance provisions of the individual agreements.  The relevant provisions are:<br><br>   o Section 16 of EDP 1006;<br><br>   o Section 14(U) of EDP 3201;<br><br>   o Section 15 of EDP 3218;<br><br>   o Section 7(b) of EDP 8001;<br><br>   o Section 19 of EDP 9003; and<br><br>   o Section 7(B) of EDP 9004.<br><br>• Section 10(B) of EDP 9008 with SEIU Local 1199. |
| Successorship (¶¶ 45-48) | • Paragraph 6(c) of the Union Protections in Term Sheets ("UPTS") (attached as Exhibit A of this Declaration) outlines the successorship provisions for most agreements with Local Unions under the United Food and Commercial Workers International Union ("UFCW").<br><br>• Sections 1 and 17 of EDP 9008, the agreement with Local 1199 of the Service Employees International Union ("SEIU").<br><br>• Sections 26.1 of both EDP 2325 and 2325G with UFCW Local 1776. |
| Notice and Information Sharing Requirements (¶¶ 49-51) | • Paragraphs 2(a), 4(b) and 6(b) of the UPTS outline the various notice requirements that apply to most agreements with Local Unions under the UFCW. |

| Requested Relief (with Motion pincites) | Relevant Collective Bargaining Agreement Provisions |
|---|---|
| Right of First Refusal (¶¶ 52-53) | • Addendum 4 to EDP 2325 with Local 1776.<br><br>• Addendum to EDP 2329 with Local 152 (found on page 40 of the Agreement). |
| Job Guarantees (¶¶ 54-56) | • Agreements with UFCW Local 342:<br>  ○ Section 13(O) of EDP 3218 (as amended);<br>  ○ Section 7(a) of EDP 8001; and<br>  ○ Section 7(A) of EDP 9004.<br>• Section 8.6 of EDP 9002 with Local 152.<br>• Addendum 1 of EDP 2325 with Local 1776. |
| Certain Work Rules (¶¶ 57-59) | • Nearly all agreements include provisions relating to restrictions on the work that can or must be performed by bargaining unit members, or can or must be performed by only certain employees. |
| Conditional No-Strike Provisions (¶¶ 60-62) | • Agreements with Retail, Wholesale and Department Store Union (RWDSU) Local 338:<br>  ○ Section 25(f) of EDP 1004;<br>  ○ Section 24(F) of EDP 1020;<br>  ○ Section 25(f) of EDP 3261;<br>  ○ Section 25(f) of EDP 8004; and<br>  ○ Section 24(g) of EDP 8020.<br>• Agreements with UFCW Local 342<br>  ○ Section 10(D) of EDP 1006;<br>  ○ Section 16 of EDP 3201;<br>  ○ Section 16 of EDP 3218;<br>  ○ Section 18 of EDP 8001;<br>  ○ Section 13(D)(1) of EDP 9003; and<br>  ○ Section 19 of EDP 9004. |

| Requested Relief (with Motion pincites) | Relevant Collective Bargaining Agreement Provisions |
|---|---|
| Paid Time Off (¶ 63) | • Nearly all agreements include provisions requiring lump sum payment of accrued but unused paid time off at termination. |
| Retirement Bonus Payments (¶ 63) | • Agreements with UFCW Local 342<br><br>   o Section 7 of the Memorandum of Agreement modifying EDP 1006;<br><br>   o Section 19(C) and related provisions of later Memoranda of Agreement modifying EDP 3201;<br><br>   o Section 21(D) of EDP 3218 and related provisions of later Memoranda of Agreement modifying EDP 3218;<br><br>   o Sections 15(c) and 15(e) of EDP 8001 and related provisions of later Memoranda of Agreement modifying EDP 8001;<br><br>   o Section 8 of the Memorandum of Agreement modifying EDP 9003; and<br><br>   o Sections 16(G) and 16(C) of EDP 9004 and related provisions of later Memoranda of Agreement modifying EDP 9004. |
| Prepetition Pension Contributions (¶ 63) | • Nearly all agreements include provisions requiring contributions to pension plans for work performed prepetition. |

**Exhibit C**

**Declaration of Christopher W. McGarry in Support of Motion of Debtors Pursuant to 11 U.S.C. § 1113(e) for Interim Authority to Modify Collective Bargaining Agreements**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Salvatore A. Romanello
Garrett A. Fail
Lawrence J. Baer

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** : | |
| **COMPANY, INC.,** *et al.*, : | **Case No. 15-23007 (RDD)** |
| : | |
| **Debtors.**[1] : | **(Jointly Administered)** |
| : | |

------------------------------------------------------------x

### DECLARATION OF CHRISTOPHER W. MCGARRY IN
### SUPPORT OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 1113(e) FOR
### INTERIM AUTHORITY TO MODIFY COLLECTIVE BARGAINING AGREEMENTS

I, Christopher W. McGarry, make this declaration under 28 U.S.C. § 1746:

1.      I am the Chief Restructuring Officer ("**CRO**") of The Great Atlantic &

Pacific Tea Company, Inc. and its affiliated debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**" or "**A&P**"). I was appointed as the CRO

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

on July 19, 2015.  As CRO, I report and provide strategic business advice to A&P's Board of Directors and Chief Executive Officer in connection with the Debtors' chapter 11 cases, and am responsible for carrying out the Debtors' chapter 11 strategy and objectives described herein.

2.    On July 19, 2015 (the "**Commencement Date**"), the Debtors each commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases (the "**Chapter 11 Cases**").  I have been an A&P executive since 2006.  I was a member of A&P's management team during its prior chapter 11 case filed on December 12, 2010 (the "**2010 Cases**").

3.    I make this Declaration in support of the Motion of Debtors Pursuant to 11 U.S.C. § 1113(e) for Interim Authority to Modify Collective Bargaining Agreements (the "**Motion**") and hereby incorporate the Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York [ECF No. 4] (the "**McGarry 1007 Declaration**").  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the supermarket industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

### Nature of A&P's Business

4.    The Debtors are one of the nation's oldest leading supermarket and food retailers, operating approximately 300 stores across six Northeastern states.  The Debtors' primary retail operations consist of supermarkets operated under a variety of well-known trade

names, or "banners," including A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, The

Food Emporium, Best Cellars, and A&P Liquors. The Debtors currently employ approximately

28,500 employees, over 90% of whom are members of one of four international and twelve local

unions (the "**Unions**") whose members are employed by the Debtors under the authority of 35

separate collective bargaining agreements (collectively, the "**CBAs**"). As of February 28, 2015,

the Debtors reported total assets of approximately $1.6 billion and total liabilities of

approximately $2.3 billion.

## The Sale Strategy

5.      Although by the end of its 2014 fiscal year the Debtors had sufficient cash

and liquidity for their immediate future, continuing sales decline and deteriorating cash flow

from operations suggested that the Debtors' businesses as then constituted were not sustainable

in the long term. As a result, in March of 2015 the Debtors initiated a process to review various

strategic alternatives intended to address the long term future of its business.

6.      Specifically, the Debtors hired Evercore Partners, L.L.C. ("**Evercore**"), to

originate and evaluate potential strategic options for the Company ranging from asset sales to

acquisitions of the Company by new financial sponsors. Evercore created informational

materials and in April commenced a marketing process targeting a relatively narrow group of 25

substantive strategic buyers and financial sponsors, with special focus on those buyers who have

existing relationships with the International United Food and Commercial Workers Union (the

"**UFCW**").

7.      In the ensuing 90 days, the Debtors engaged in rigorous diligence,

engagement, and negotiation with the potential buyers that yielded 8 formal bids. However, no

bids contemplated the assumption of any legacy costs (workers compensation liabilities, supply

chain costs, pension obligations, etc.), and the Debtors' quickly realized that there was no viable path that did not contemplate an in-court process.

8.      The Debtors' have determined that their businesses are not sustainable over the long term under the current cost structure and, in the exercise of their business judgment and as fiduciaries for all of the Debtors' stakeholders, and taking account of the results of a 4-month pre-petition strategic review process, have concluded that the best and only viable path to maximize the value of their business and preserve thousands of jobs is to sell as many of their stores as possible as going concerns, and to liquidate any remaining stores in an orderly and controlled process and pursuant to a liquidating chapter 11 plan.

9.      In light of the foregoing, the Debtors have determined to execute upon their sales strategy (the "**Sale Strategy**") as a foundation of these Chapter 11 Cases, as it is critical to maximizing recoveries for all creditors and preserving thousands of jobs.  As described in more detail in the McGarry 1007 Declaration, the Sale Strategy consists of: (i) the sale of core stores on a going concern basis through an auction and sale process pursuant to section 363 of the Bankruptcy Code led by the Stalking Horse Bids (subject to higher or better offers) (the "**Global Bidding Procedures**"), (ii) the going concern sale or rationalization of other stores and non-core assets on an ad hoc basis (the "**Discrete Sale and Lease Rationalization Procedures**"), and (iii) the orderly wind-down of certain stores that a potential strategic buyer has not expressed interest in acquiring (the "**Closing Stores**"), including the immediate closure of approximately 25 stores that have negative profitability and negative lease value (the "**Initial Closing Stores**").

10.      The Sale Strategy must be implemented quickly and efficiently to maximize value.  It is the Debtors' judgment that if the Debtors cannot implement the Sale

Strategy in a timely manner, the Debtors will not be able to confirm a liquidating chapter 11 plan and will be left with no choice but to liquidate their business in a fire sale and piecemeal fashion.

**The Asset Purchase Agreements**

11.      As stated above, by the time of the Commencement Date, the Debtors had already devoted substantial time and resources in planning for an initiating the Sale Strategy, which early efforts have resulted in the successful completion of three stalking horse asset purchase agreements (collectively, the "**APAs**").  The stalking horse bids are with buyers who have existing relationships with the UFCW, provide for the going concern sale of 118 stores that employ approximately 12,500 employees, and command an aggregate purchase price of almost $568 million, inclusive of accounts receivable (the "**Stalking Horse Bids**").  The Stalking Horse Bids are each subject to higher or better offers, and the Debtors are continuing to engage with other interested parties as part of the sale process with the expectation of selling additional stores on a going concern basis during these Chapter 11 Cases (under substantially the same terms and conditions as those set forth in the APAs).

12.      The APAs include certain pre-closing covenants, including a requirement that the Debtors continue to operate the subject stores in the ordinary course of business and that employees from other stores do not transfer into stores covered by the bids (except in certain specified circumstances).  It is my understanding that the Unions ultimately did not object to the bidding procedures order or the Court's approval of the stalking horse bids.  In addition, depending on the circumstances, the APAs include provisions that may excuse the stalking horse bidders from their obligation to close the contemplated transactions if events subsequent to execution result in the occurrence of a material adverse effect.

5

13.     During the course of negotiating the terms of the APAs, the Debtors

provided the bidders with an "auction draft" APA (the "**Auction Draft**").  The Auction Draft

contemplated that the bidders would either assume the CBAs governing the stores contained

therein, enter into a mutually acceptable modified labor agreement, or negotiate in good faith

with each affected labor union in an effort to do so.  And while each bidder has agreed to

undertake good faith negotiations with the Unions (and each bidder has, as of the date hereof,

already engaged with the Unions for that purpose), they have made it clear that they will *not*

assume certain legacy obligations arising under the Debtors' CBAs – most notably, bumping and

pension liabilities.  Notwithstanding, given the bidders' pre-existing relationships with the

UFCW, the Debtors expect the bidders will reach consensual agreements with the Unions.

### Modifying and Rejecting the CBAs

14.     The successful implementation of the Sale Strategy requires relief from

CBA provisions that would preclude or put at risk an expeditious and orderly sale and wind-

down of the Debtors' operations.  If the CBAs are not modified, either consensually or by Court

order in a timely fashion, the consequences could be catastrophic.  Accordingly, with careful

planning, the Debtors developed a proposal for CBA modifications that is specifically aligned

with the Sale Strategy and the Debtors' overall reorganization and liquidation process.  The

Debtors continue to refine their proposal in consultation with their advisors, as a result of

ongoing negotiations with the Unions, and in light of the best available information.

15.     The Debtors are committed to engaging in direct and comprehensive

negotiations with their Unions with respect to proposed modifications, and hope to achieve the

necessary relief in a consensual outcome.  To achieve this, it is imperative that the Debtors and

their Unions cooperate with one another and that negotiations to resolve any disputes be

conducted as expeditiously as possible. Accordingly, the Debtors have engaged (or, in some cases, attempted to engage) in negotiations and open communications with their Unions' representatives, both prior to and after delivering a proposal. The communications, disclosures, and meetings include the following (in addition to numerous other calls and meetings between the parties' respective professionals):

- **_Continuous Information Updates._** Since March, 2012, the Debtors have provided the UFCW International with quarterly financial and operating information about the company in accordance with term sheet modifications agreed to in a global settlement in the 2010 Cases (the "**Union Protections in Term Sheets**" or "**UPTS**"), which is annexed hereto as **Exhibit "1"**.

- **_March 26 Phone Calls._** Sheryl Schermer (Vice President of the Debtors' Human Resources and Labor Relations Department), Michael Fredericks (Senior Director of the Debtors' Human Resources and Labor Relations Department), and I made calls to the presidents of all Union Locals to advise them that the Debtors had commenced a strategic review process. On these calls we confirmed that the Debtors had engaged Evercore and discussed the scope of the engagement and focus of the process. We also committed to provide periodic updates as appropriate and to comply with the requirements of the UPTS.

- **_April, May and June Phone Calls._** During the months of April, May, and June, 2015, Sheryl Schermer, Michael Fredericks, and I participated in numerous conference calls and meetings providing the Unions with regular updates on the strategic review process.

- **_May Non-Disclosure Agreements._** In accordance with the Union Protections in Term Sheets, the Debtors sent form NDAs to the Union Locals as a prerequisite for sharing information associated with the strategic process. In good faith, and in advance of receiving signed NDAs, the Debtors provided the Union Locals the teaser/marketing materials and process letter utilized by Evercore in connection with the M&A process. The Debtors also advised of the imminently anticipated receipt of bids and expressions of interest from prospective buyers, and the need for the NDAs to be executed before the Debtors could share such information with the Union Locals. Notwithstanding this advice, only 50% of the Union Locals executed an NDA.

- **_June 30 Meeting with UFCW International_**. On June 24, 2015, the UFCW International requested a meeting with the Debtors' management. On June 30, 2015, Greg Mays (the Chairman of the Debtors' Board of Directors), and Ray Schrock and Lawrence Baer, attorneys from Weil, Gotshal & Manges LLP ("**Weil**"), and I attended a 2-hour meeting with five representatives and

advisors of the UFCW International including Kevin Williamson, the head of collective bargaining; Michael Glanzer, their financial advisor; and Richard Seltzer, their outside counsel. At the meeting, we discussed the Debtors' M&A process, and also disclosed that the Debtors were planning to support the process with a strategic bankruptcy filing. The meeting was followed by a 1-hour breakout session in which we developed a joint statement for use by the UFCW Locals.

- ***July 2 Response to Information Request.*** On July 2, 2015, the Debtors provided the UFCW International with information responding to a request dated June 9, 2015, as well as copies of the Debtors' two most recent years' audited financial statements.

- ***July 9 Meeting.*** On July 9, 2015, Greg Mays and Ray Schrock, other attorneys from Weil, and I met with six representatives and advisors from the UFCW International including Kevin Williamson, Michael Glanzer, and Richard Seltzer. The meeting lasted over two hours. At this meeting the Union representatives were given an overview of the Debtors' situation, the Sale Strategy, the expectation that the Debtors would petition for chapter 11 relief, and also their likely need to obtain debtor-in-possession financing. We also shared a copy of the Auction Draft and pointed out its provisions concerning CBAs.

- ***July 16 Meeting.*** On July 16, 2015, the foregoing group met again, along with additional representatives from the UFCW International, and also Stephen Goldstein of Evercore. The meeting lasted approximately one and a half hours. At this meeting, Mr. Goldstein provided additional information about the status of the Global Bidding Procedures process, and also indicated that the anticipated chapter 11 filing would occur as soon as the APAs were executed, and could be within days. I also provided information about the current bidders and the pertinent details of their bids. We also answered questions concerning how an 1113 process would work in connection with the stalking horse bidders, including who would file and pay for an 1113 motion. We reiterated that the thrust of the Sale Strategy was to sell as many stores as possible as going concerns. The UFCW raised concerns that the Discrete Sale and Lease Rationalization Procedures would only involve real estate transactions, but I assured them that we intended to use that process to sell stores as going concerns to smaller buyers where sensible. We also described the need to close the Initial Closing Stores on a short time frame after petitioning for chapter 11 relief.

- ***July 20 Call.*** On the morning of July 20, 2015, I participated on a call with the foregoing group. We advised the UFCW that we had signed APAs with three stalking horse bidders, and that soon after we had filed petitions for chapter 11 relief and certain motions to preserve ordinary course operations. Among other things, we also described the committed debtor-in-possession and its related motion, a motion to establish going out of business procedures

8

and to close the Initial Closing Stores, and a proposed bidding procedures. I answered questions concerning the obligations of the stalking horse bidders to negotiate terms with the Unions. We also discussed the anticipated need for interim relief from certain CBA provisions to implement the Sale Strategy, including bumping and other items. The UFCW representatives indicated that there was no way that they would allow the Debtors "off the hook" from the Union Protections in Term Sheets. We discussed how to coordinate meetings with the stalking horse bidders, and the process for connecting potential interested purchasers to the appropriate professionals. In response to questions, we also reiterated that the Discrete Sale and Lease Rationalization Procedures were not simply a real estate play, and was expected to include selling stores as going concerns.

- *July 23 Information Response.* On July 17, 2015, the UFCW International served a 20-item, multi-part information request upon the Debtors. The Debtors fully responded to this request on July 23, 2015.

- *July 23 Meeting.* On July 23, 2015, Greg Mays, Sheryl Schermer, certain attorneys from Weil, and I attended a meeting with representatives of the UFCW Locals at the offices of UFCW Local 464 in Little Falls, New Jersey. At this meeting, we advised the Union representatives of the progress of the Chapter 11 Cases to date, the APAs had been executed and the buyers' desires to meet with the Unions to negotiate modified CBAs, and the plans for future marketing and sales efforts. The Unions requested that we present to them the Debtors' proposals for modification of the current CBAs. We advised the Union representatives that the Debtors' proposals were not yet completed, but that we would be prepared to present them to the UFCW the following morning at 8:00 a.m. In addition, we reminded the Union representatives that, among other things, and as had been previously previewed with them, the Debtors would be seeking in its proposals relief from bumping provisions in order to effectuate the Sale Strategy.

- *July 24 Proposal and Call.* On July 24, 2015, Lawrence Baer, an attorney at Weil, provided union representatives and professionals Mr. Williamson, Mr. Seltzer, and Mr. Glanzer attaching the Debtors' initial written proposal (the "**Initial Proposal**"). A copy of the Initial Proposal is annexed hereto as **Exhibit "2"**. Later that day, Greg Mays, and certain attorneys from Weil, and I participated in a call with representatives from the UFCW to discuss the Proposal and negotiations going forward. Among other things, we clarified that the Proposal reflected both interim and permanent relief that would be necessary to carry out the Sale Strategy, but that a final decision on what was required on an interim basis had not been made. We also discussed each aspect of the Proposal, explained why it was needed, and answered questions posed to us. We also indicated that we would provide access to a data room and would provide additional information in response to any follow up requests where we were able to do so.

9

▪ ***July 28 Proposal.*** Subsequent to the July 24, 2015 meeting, pursuant to a request by Union counsel, we refined the Proposal in order to segregate from one another the Company's proposals for which immediate relief was requested, final relief was requested and proposals that did not require modification of any current CBA. In addition to reordering the proposals, in the interest of clarity, we provided a brief, non-exhaustive explanation of the rationale underlying some of the Company's proposals. On July 28, 2015, Mr. Baer provided Mr. Williamson, Mr. Seltzer, and Mr. Glanzer a revised Proposal (the "**Revised Proposal**") and requested a date for another meeting. A copy of the Revised Proposal is annexed hereto as **Exhibit "3"**.

▪ ***July 29 Meeting – Cancelled.*** The Debtors scheduled a meeting with the UFCW International and Locals for the entire day of July 29, 2015, which the UFCW cancelled.

▪ ***August 3 Diligence Response.*** On July 29, 2015, Richard Seltzer sent an email to Ray Schrock and Lawrence Baer requesting additional information in connection with the Revised Proposal, which the Unions contended was necessary for their analysis and evaluation of the proposal and a meaningful discussion. The request sought, among other things, additional explanation regarding what relief was requested, diligence and analysis, communications with prospective purchasers, and legal precedent. The Debtors and their advisors disputed the characterization of the adequacy of the information provided, as the Unions had been offered unfettered access to a data room. Nonetheless the Debtors immediately began preparing a response. On August 3, 2015, Lawrence Baer sent a letter response to Richard Seltzer, which is annexed hereto as **Exhibit "4"**, and also provided online access to additional documents.

▪ ***August 5 Meeting with UFCW International and Locals and Second Revised Proposal.*** On August 5, 2015, Greg Mays, Sheryl Schermer, Ray Schrock, Lawrence Baer, Garrett Fail, and I met with international and local leaders from the UFCW, including the international head of collective bargaining, as well as their advisors at the offices of UFCW Local 464 in Little Falls, New Jersey. At this meeting, which lasted approximately 7 hours, the Debtors explained the exigent circumstances of their cases, including their intention to sell as many of their stores as possible and to wind-down those that remained, and provided an update on the status of their cases and their position on certain matters, including workers' compensation, pension and other fund contributions, a committee to represent retirees, and the ongoing sale process. The Debtors also described each aspect of the interim relief requested in Revised Proposal, taking time to explain their rationale for each particular request, to respond to questions, and to listen to concerns raised by Union leaders. After a caucus lasting over two hours, the Union leadership and its advisors provided comments and "guidance" to the Debtors to move the process forward (but, it was specified, not a "counterproposal"), discussed more specifically below in the context of the relief now sought by the Debtors.

After further deliberations, the Debtors' orally presented a revised proposal based upon the guidance provided to the Debtors by the Unions.[2] At the request of the Unions, the Debtors memorialized their revised proposal in writing (the "**Second Revised Proposal**"), which is annexed hereto as **Exhibit "5"**.

- *August 11 Meeting with UFCW International and Locals and Union Clarifications.* On August 11, 2015, Greg Mays, Sheryl Schermer, Ali Rizvi, Ray Schrock, Lawrence Baer, Garrett Fail, and I again met with international and local leaders from the UFCW, including the international head of collective bargaining, as well as their advisors at the offices of UFCW Local 464 in Little Falls, New Jersey. Prior to this meeting, the Debtors delivered the memorialized Second Revised Proposal to counsel for the Unions. During the meeting, the Unions confirmed that the Debtors' written Second Revised Proposal accurately reflected the guidance received from the Unions during the August 5th Meeting, but sought certain further written clarifications of Debtors' Second Revised Proposal. Subsequent to the meeting, the Unions' counsel delivered the Unions' further requested written clarifications to the Debtors. A copy of the Second Revised Proposal containing the further clarifications sought by the Unions, and acceptable to the Debtors, is annexed hereto as **Exhibit "6"**.

16.    As mentioned, the Debtors have created a data room with information supporting their proposals. *See Declaration of Tim McDonagh in Support of Motion of Debtors Pursuant to 11 U.S.C. 1113(e) for Interim Authority to Modify Collective Bargaining Agreements*, filed contemporaneously herewith (the "**McDonagh Declaration**") ¶ 15. The data room has been made available to their Unions on the condition that they provide the Debtors with an executed non-disclosure agreement. I believe that the information provided in the data room, and otherwise, to date has been sufficient for the Unions to understand the basis for and necessity of the Debtors' proposals, including the need to maximize value through the Sale

---

[2] In addition to the foregoing, on August 7, 2015, Lawrence Baer sent an email with a proposal attached (the "**SEIU Proposal**") to counsel for the Service Employees International Union Local 1199. The SEIU Proposal, annexed hereto as **Exhibit "7"**, was substantially similar to the Second Revised Proposal, though less inclusive. On that same day, Sheryl Schermer, Mr. Baer, and other attorneys from Weil participated on a call with the president of the SEIU 1199 and her counsel to discuss the SEIU Proposal. A follow up discussion was scheduled for Sunday, August 16th.

Strategy and to minimize the risk of not being able to satisfy claims in full or confirm a chapter 11 plan.

17.     While the Debtors are committed to pursuing consensual resolutions with their Unions where possible, and believe that a consensual resolution would provide the best outcome and the greatest value to the Debtors' estates, the Debtors must remain mindful of and compliant with the deadlines imposed by the APAs.   As of the date hereof, consensual resolutions concerning the Debtors' proposal have not been achieved.   The Debtors remain optimistic in light of current progress; however, it is unclear whether, and when, any such resolution would be possible.  For example, I have read a message from Richard Abondolo, the president of UFCW Local 342, which was dated July 25, 2015 and which addressed the membership of the local.   A copy of the message is annexed hereto as **Exhibit "8"**.   In this message, Mr. Abondolo stated that "[s]o all the membership understands:  it is the intention, and position, of our Union that we will not be agreeing to any concessions or give-backs" with the Debtors.  In addition, the message describes the relief the Debtors may seek under the section 1113 of the Bankruptcy Code, notes that "[s]ection 1113 means the company asks the bankruptcy judge to throw out the contracts because employees refuse to give back more," and states that "the day the A&P decides to file the Section 1113 is the day we empty the stores."  In addition, on July 29, 2015, Wendell Young, president of UFCW Local 1776, sent two letters to the Debtors, which are annexed hereto as **Exhibits "9"** and **"10"**.  In these letters, Mr. Wendell identified certain CBA provisions that the Initial Proposal had requested modifications to, including successor clauses, bumping provisions, and a right of first refusal, and requests information and a meeting concerning these rights.

18.    In light of the foregoing, and consistent with my statements in the McGarry 1007 Declaration, the Debtors are now compelled to file the Motion and commence proceedings under section 1113(e) of the Bankruptcy Code to seek authority to implement temporary modifications to the CBAs on a unilateral basis.  If a consensual agreement for permanent modifications is not reached in a timely manner, then, with respect to such CBAs or retiree obligations, Debtors will also have to commence proceedings pursuant to sections 1113(c) and 1114 to obtain permanent relief.  The Debtors anticipate that, within three months, they will have either reached an agreement with their Unions or will have obtained necessary relief under section 1113(c) of the Bankruptcy Code.

### Interim Relief Is Essential to Avoid Irreparable Harm

19.    For reasons that include those discussed in the McDonagh Declaration and the *Declaration of Ali Rizvi in Support of Motion of Debtors Pursuant to 11 U.S.C. 1113(e) for Interim Authority to Modify Collective Bargaining Agreements*, filed contemporaneously herewith (the "**Rizvi Declaration**"), the limited interim relief requested in the Motion and otherwise obtained consistent with the Unions' guidance is essential in order to avoid irreparable damage to the Debtors' estates.  Without such relief there is a significant risk that the Debtors will be unable to confirm a chapter 11 plan and will be forced into an uncontrolled, fire-sale liquidation.  The harm to the Debtors' estates in that scenario is difficult to quantify, but it would be severe.  It is almost certain that, in the event of an uncontrolled liquidation, that the Debtors would not be able to generate sufficient value to satisfy the claims of their secured creditors.

20.    ***Bumping***.    The Debtors require interim relief from all "bumping" provisions, which are found in nearly all of the Debtors' CBAs.  Such provisions require the Debtors to conduct layoffs by seniority, *i.e.*, by terminating junior union-represented employees

13

before more senior employees.  As further described in the Rizvi Declaration, the operational and financial impact of bumping as a result of closing the Initial Closings Stores, and any additional Closing Stores, would be extreme.  Without relief from bumping, existing stalking horse bids may not close, and, in light of the consequences from bumping, the Debtors would not be able to close the Initial Closing Stores (and other Closing Stores) and prevent further depletion of the estates.

21.    ***Severance***.  The Debtors' CBAs generally require the Debtors to provide benefits described as "severance" to employees upon their termination.  The UPTS provision, for example, provides that wages continue being paid post-termination for periods ranging from one to eighteen weeks.  *See* UPTS § 5(b).  The Debtors intend (and, if necessary, request relief) to pay 25% of any Union employees' claim for severance in cash on a timely basis (up to an aggregate cap of $10 million, applicable to severance paid to both Union and Non-Union employees), defer payment of the remainder, and satisfy any resulting claims in accordance with the Bankruptcy Code.

22.    ***Successor Clauses***.  Many of the Debtors' CBAs include "successor clauses," which could prevent the Debtors from selling any stores unless the purchaser first agrees to assume affected CBA without modifications.  For example, the UPTS provision (which most CBAs incorporate) provides that a sale of stores shall not take place without the Company obtaining a written agreement by the successor to assume the affected CBAs and offer employment to substantially all of the covered employees at the store being sold.  *See* UPTS § 6(b).[3]  At the August 5th and 11th Meetings, the Union leaders advised the Debtors that they

---

[3] The UPTS successor provision is only "binding on grocery store sales in batches of either; (1) 25 or more stores, regardless of the location or jurisdiction of such stores, within a 30 day period; or (2) 5 or more stores employing members of any single Local Union, to one or more operators that take place between the effective date of a plan of reorganization and the end of the Term, provided, however, that if a single Local Union represents employees at less

were concerned with the Debtors' request for blanket interim relief from any successor clause. However, where needed to close an asset sale in the near term, the Unions suggested that they would be amenable to going to court on an expedited basis on a motion for section 1113(e) relief from a successor clause.  Based on this guidance, the Debtors will not seek immediate relief from the CBAs successor clauses.  The Debtors do so with the following specific understanding:  the Debtors may seek Bankruptcy Court approval for modification of any applicable successorship provisions on not less than 5 days' notice to the extent necessary to consummate an asset sale that is scheduled to close on or before October 7, 2015, and the Unions will not object to having such matter heard on such expedited notice.  The Debtors believe that, although this represents a substantial concession from their initial proposals, the expedited, case-by-case process contemplated by the Unions' guidance will provide an effective interim resolution of issues concerning successorship clauses.

23.    For various reasons, few if any buyers will be willing to accept the Debtors' CBAs without modification.  Certain potential buyers have pre-existing CBAs with many of their Unions and may want to roll new employees into these prior agreements, while others do not have a unionized work force.  Yet others may simply require better terms with their Unions than those provided in the CBAs.  Notwithstanding, given the bidders' pre-existing relationships with the UFCW, the Debtors expect the bidders will reach consensual agreements with the Unions.  In this case, process-wide procedural delays would result in significant harm and loss of value.  For obvious reasons, the Debtors require a permanent resolution regarding their Unions' successor clauses, which they intend to resolve by negotiation or court order.

---

than 50 of the Company's stores, this successorship provision (if added) would apply to sales of any store(s)."  *See* UPTS § 6(b).

However, in the near term, the Debtors only require interim relief to obtain relief from successor clauses on an expedited basis, consistent with the guidance provided by the Unions.

24.    ***Certain Notice Requirements***.  Interim relief from certain CBA provisions related to information sharing with respect to future mergers, acquisitions, store openings and store closures and post-confirmation store sales is required.  For example, the UPTS requires the Debtors to consult with any affected Unions regarding "confidentiality agreements, information packages, process letters, management presentations, due diligence room links, sales procedures, and data information requests, before they are provided to any prospective purchasers."  UPTS § 6(b).  At the August 5th Meeting, the Debtors explained their concerns with being bound to requirements in the UPTS, which were not drafted in contemplation of the present circumstances, created an impediment to efficient implementation of the Sale Strategy, and could lead to a foot-fault, and also noted that they had made significant efforts to share information with their Unions through calls, meetings, and the data room, and were committed to remaining engaged with the Unions and establishing a process for sharing information on an ongoing basis. Based upon guidance from the Unions provided in response to the foregoing, the Debtors will not seek immediate relief from their CBAs' information sharing provisions, and instead will continue to work cooperatively with their Unions on this issue to develop a solution that suited to the circumstances of these cases.  The Debtors have taken steps to comply with the multitude of CBA reporting and notification requirements.  But continuing to require the Debtors to consult with each affected Union before providing any potential purchaser a confidentiality agreement, information package, due diligence room link, or other covered communication, as required by the UPTS, would create a significant and real impediment to the Debtors' ability to quickly and

nimbly implement the Sale Strategy.   The Debtors have proposed procedures in the various motions filed to implement the Sale Strategy, which render the CBA requirements unnecessary.

25.   ***Right of First Refusal***.   Certain of the Debtors' CBAs provide the Union with a right of first refusal to purchase stores, which implicate approximately 25 separate stores. At the August 5th and 11th Meetings, the Debtors expressed concerns that, among other things, such provisions would disrupt the ability to sell bundled stores and view that Court-approved sale procedures would preserve the Unions' rights to acquire such assets.   Based upon guidance from the Unions provided in response, the Debtors will not seek immediate relief from such provisions and, instead, will continue to work together with their Unions (and, in particular, a subcommittee headed by the Unions' financial advisor) to reach a consensual resolution.   The Debtors understand that the Unions intend to act in accordance with the approved Global Bidding Procedures and Discrete Sale and Lease Rationalization Procedures (to which they did not object) and will not later claim that section 1113(e) from the rights of first refusal necessary. The procedures proposed by the Debtors would permit any party to bid on sales, including Unions.   The Unions would not be prejudiced because, as described in further detail in the McDonagh Declaration, unions that signed NDAs have been given access to the data room that all bidders have access to, plus additional information.   *See* McDonagh Decl. ¶ 15 (describing information provided to Unions in a union-specific data room).   Moreover, due to their experience with the Debtors likely would have better knowledge of the Debtors' assets than any other party.   On the other hand, giving a select-few Unions the ability to upset other bids without regard to such procedures would chill bidding, destroy value, and otherwise complicate the Debtors' sale processes.   In these cases, such disruption and the attendant loss in value would increase the risk that the Debtors are unable to confirm a chapter 11 plan.

26.     ***Job Guarantees***.  Certain of the Debtors' CBAs include provisions that guarantee jobs to employees that are hired as of a given date.  For example, section 8.6(a) of a UFCW Local 152 CBA (identified as EDP 9002) provides that "[n]o employee on payroll as of March 5, 1986 with three (3) years of seniority as of that date shall be laid off from employment during the term of this Agreement provided the employee is qualified and continuously able to perform the work."  Similarly, section 13(O) of a UFCW Local 342 CBA (identified as EDP 3218) prohibits layoffs of full-time employees on payroll as of October 31, 1995.  The Debtors require relief from these and other job guarantee provisions, as they could prevent them from laying off certain employees when stores are closed and could prevent stores from being sold free and clear of liabilities.  At the August 5th Meeting, the Debtors explained their request for interim relief from job guarantees based on the circumstances of these cases, including the need to promptly implement their strategy by closing stores and closing on sales to third parties who may not hire all of the employees at a store.  In response, the Unions indicated that the Debtors should resolve this issue by permitting an aggrieved employee to file a claim.  Based on the foregoing guidance, the Debtors intend where necessary to terminate employment of any employee, notwithstanding any job guarantee provided for in a CBA, with the proviso that a terminated employee will be entitled to assert a claim on account of their job guarantee to be satisfied in accordance with the Bankruptcy Code.  The Debtors will take this action based upon the understanding that the Union will not claim that the Debtors should have first sought interim relief from job guarantee provisions.

27.     ***Certain Work Rules (in certain circumstances and with certain exception)***.  The Debtors' CBAs create various work rules that control what tasks represented employees can be called upon to do ("usual roles" rules).  For example, section 1.63 in a UFCW

Local 152 CBA (identified as EDP 9002) provides that "[n]o member of the Union shall be required to perform work which is beyond his usual line of duty." In addition, other work rules control what stores or bargaining units such employees can be called upon to work at ("transfer restrictions") and whether outside help can be brought in to assist with the operations of a store or to perform a particular function ("exclusive work" or "non-bargaining unit members doing bargaining unit work" rules). For example, section 2.4 in a UFCW Local 27 CBA (identified as EDP 2403) provides that "[i]t is agreed upon that only meat employees covered by this Agreement shall handle meats, poultry, fish or delicatessen products, whether fresh, frozen or smoked." Relief from such work rules is necessary as they will interfere with the Debtors' ability to carry out the Sales Strategy using Union employees, and increase the need for a flexible, outside labor force. With respect to stores that are being closed, the Debtors anticipate that their existing employees will be required to carry out a number of unusual tasks and odd jobs, including in connection with efforts to liquidate assets and inventory. In addition, it is also anticipated that, in certain circumstances, it will be necessary to retain temporary outside help to assist the Debtors' existing labor force, which will require relief from "transfer restrictions", "exclusive work", and "non-bargaining unit members doing bargaining unit work" provisions. Finally, the Debtors anticipate increased attrition in light of the Debtors' current, well-publicized circumstances, as well as potential store-closing and other notices (including notice pursuant to the Worker Adjustment and Retraining Notification Act, 28 U.S.C. § 2101 et seq., and its state-law equivalents). In order to maintain operations at closing stores in the event of such attrition, the Debtors require relief for transfer restrictions so that they may transfer employees at closing stores between stores and bargaining units at their discretion when necessary. Such relief would help ensure that the Debtors continue to comply with the pre-closing covenants in their APAs

regarding ordinary course operations, and would also serve to minimize disruption as stores are closed and liquidated (thus reducing the risk of irreparable harm from Debtors being unable to confirm a chapter 11 plan).  At the August 5th Meeting, the Debtors indicated that they require relief from the foregoing work rules and, in response, the Union leaders informed them of certain concerns and proposed modifications to and exceptions from the requested relief.  Based upon this guidance, the Debtors will not seek immediate relief from such work rules and transfer restrictions with the understanding that:  (1) they will not adhere to work rules related to "exclusive work,"  "non-bargaining unit members doing bargaining unit work," and "usual roles", or to transfer restrictions (including transfer between bargaining units), at stores designated for going-out-of-business sales (except as otherwise would result in an imminent safety risk to an employee) and (2) they will not use the limited elimination of the foregoing rules and restrictions to cause layoffs or a reduction in an employee's hours prior to a date on which either would have otherwise occurred.

28.  ***Conditional No-Strike Provisions (to require prior notice)***.  Certain CBAs include conditional no-strike clauses, which could potentially permit represented employees to strike if the Debtors did not make a particular Pension Contribution.  For example, section 19 of a UFCW Local 342 CBA (identified as EDP 9004) provides that the CBA's no-strike clause is inoperative where the employer is delinquent in making contributions to various funds in accordance with the applicable trust agreements and the CBA.  The Debtors have, postpetition, stopped paying prepetition pension contributions and, accordingly, the Debtors face a risk that represented employees could strike.  Such a strike could trigger a materially adverse change in respect of the APAs and disrupt the Debtors' operations and ability to maintain revenues, among other things, and relief is therefore required.  At the August 5th Meeting, after

20

the Debtors expressed their particular concern with these provisions in light of their decision to
stop payment of prepetition pension contributions (as discussed below), Union leaders indicated
that the Debtors would receive prior notice of such a strike and would have an opportunity to
seek relief.  Per this guidance, the Debtors do not seek interim relief to eliminate the conditional
no-strike clauses, with the specific understanding that the Unions will always give the Debtors at
least five days' prior written notice before they intend to strike pursuant to this provision and that
the Unions will not object to going to court on an expedited basis, within the five day notice
period, on a motion for section 1113(e) relief from these conditional no-strike provisions.

### Mandatory Payment Provisions.

29.      The Debtors' CBAs include provisions that require the Debtors to make
certain payments during the implementation of the Sale Strategy, including paid-time-off payable
upon termination, lump-sum retirement supplements, and prepetition pension contributions (such
payments, "**Mandatory Payments**").  Each of the Mandatory Payments is on account of claims
that the Debtors believe may not be entitled to priority (and thus need not be satisfied in order to
confirm a chapter 11 plan).  The Debtors intend to dispute any assertion that claims on account
of such payments are entitled to priority status under the Bankruptcy Code.  Given the Debtors'
financial condition, any unnecessary payments on account of prepetition general unsecured
claims would increase the likelihood that the Debtors are unable to confirm a chapter 11 plan,
and instead are forced into an uncontrolled liquidation.  For this reason, among others, interim
relief from the foregoing obligations is necessary and critical to preserving and maximizing the
value of the Debtors' estates.

30.      The Debtors have already stopped – or intend to stop – paying Mandatory
Payments in full on a current basis, and will satisfy any resulting claims pursuant to the priority

and distributional requirements of the Bankruptcy Code (or otherwise as is consistent with the Second Revised Proposal). At the August 5th Meeting, the Debtors informed the Union leaders of this intention and proposed corresponding relief. In light of Union guidance provided in response, the Debtors are not seeking immediate relief with the understanding that the Union will not insist that the Debtors should have sought interim relief from the Bankruptcy Court.

31. ***Paid-Time Off***. The Debtors' CBAs generally require the Debtors to make a lump-sum payment for unused paid-time off ("**PTO**") that accrued as a result of employees' pre-termination work. For example, the UPTS provision provides that upon termination, an employee is entitled to payment on account of accrued but unused vacation time, personal days, and sick entitlements. UPTS § 5(b). The Debtors intend (and, if necessary, request relief) to defer payment on account of prepetition PTO triggered upon termination of employment and satisfy any resulting claims in accordance with the Bankruptcy Code.

32. ***Retirement Bonus Payments***. Certain CBAs require payment of a lump sum retirement bonus when active employees retire (including certain UFCW Local 342 CBAs require the Debtors to pay former represented employees a lump-sum payment upon retirement). The Debtors intend (and, if necessary, request relief) to defer payment of any lump sum bonus payments triggered upon retirement, and instead satisfy any resulting claims in accordance with the Bankruptcy Code.

33. ***Prepetition Pension Contributions***. Most of the Debtors' CBAs require contributions to pension plans. The Debtors intend (and, if necessary, request relief) to defer such payments to the extent they are on account of prepetition services rendered, and to satisfy any claims in accordance with the Bankruptcy Code.

34.     The Debtors intend the foregoing relief to be a temporary solution that enables them to proceed with the Sale Strategy according to the required timelines.    As discussed, the Debtors have also proposed permanent modifications to the CBAs with respect to which the Debtors have been and will continue to negotiate with the Unions.

## Conclusion

35.     This declaration illustrates the factors that have precipitated the filing of the Motion and the critical need for the Debtors to receive temporary relief from certain of their CBA provisions to implement the Sale Strategy.

36.     I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 11th day of August, 2015

/s/ Christopher W. McGarry
Christopher W. McGarry
Chief Restructuring Officer,
The Great Atlantic & Pacific
Company, Inc.

## **Exhibit 1**

**Union Protections in Term Sheets**

15-23007-rdd   Doc 527   Filed 02/17/15   Entered 02/17/15 23:21:16   Main Document
Pg 71 of 294

## A&P/UFCW/LOCAL UNIONS

## UNION PROTECTIONS IN TERM SHEETS

The parties, United Food and Commercial Workers International Union ("UFCW"), its affiliated local unions 27, 100R, 152, 338, 342, 371, 464A, 1034, 1245, 1262, 1360, 1500, and 1776 (each individually a "Local Union" and collectively the "Local Unions"), along with The Great Atlantic and Pacific Tea Company, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Company" and collectively with UFCW and the Local Unions the "Parties"), agree that these provisions will accompany and be incorporated into the term sheets for all modifications of collective bargaining agreements between the Company and the Local Unions, contingent on agreements between the Company and the Local Unions that are acceptable to the Company and each Local Union.

### 1.      Conditions to Effectiveness of Modified Collective Bargaining Agreements

(a)      ***Effective Date***.  The Effective Date of the revised agreements (the "Effective Date") shall be two business days following the later of: (i) ratification of all modified collective bargaining agreements ("modified CBAs") by the Local Unions, as appropriate; and (ii) approval of the Bankruptcy Court of the modified CBAs between the Company and each Local Union.  If the Bankruptcy Court's order approving the modified CBAs is appealed, the modifications shall remain in place until and unless the order approving the modified CBAs is reversed, in which case the parties shall revert to the positions that they were in prior to the Effective Date.  In the event that the Bankruptcy Court's order approving the modified CBAs is reversed on appeal, the Local Unions on behalf of the employees represented by the Local Unions will be entitled to a stipulated, approved, and allowed administrative claim for all savings provided during the period between the Effective Date and any reversal, subject to the cap described in Paragraph 2(b) below.  If the actual cash savings provided to the Company under the amended CBAs between the Effective Date and reversal exceeds the amounts of the caps described in Paragraph 2(b) below, any excess savings shall be treated as a stipulated, approved, and allowed administrative claim that is subordinated in priority and (to the extent relevant) payment timing to any other administrative expense claims allowed in the Company's Chapter 11 cases.

(b)      ***Term***.  Each of the modified CBAs shall be in effect for a period of 5 years beginning on the Effective Date (the "Term").

(c)      ***Bankruptcy Court Approval***.  The Company will immediately and without condition seek Bankruptcy Court approval of the amended CBAs.  The Company will give UFCW counsel advance notice of and an opportunity to comment on all pleadings filed in connection with such approval and will consider in good faith all such comments. The Company will support approval of the modified CBAs without condition and will use its best efforts to obtain the support of the Official Committee of Unsecured Creditors and other key constituencies in the Company's Chapter 11 cases of the amended CBAs.

(d)        *Conditions on Any Further Requests for Concessions During Chapter 11 Cases*.  The Parties all agree that the modifications to each of the CBAs (the "CBA Modifications") were agreed to by UFCW and each of its affiliated Local Unions in furtherance of the Company's efforts to successfully reorganize under Chapter 11 of the United States Bankruptcy Code.  The modified CBAs will be binding on any Chapter 11 trustee appointed in these cases, or any other entity operating with the equivalent authority to a chapter 11 trustee.  The Parties further agree that:

(i)        The CBA Modifications: (1) are based on the most complete and reliable information available to the Company; (2) permit the Company to avoid irreparable harm and provide for necessary modifications to the CBAs that are necessary, fair, and equitable in order to permit the successful reorganization of the Company; (3) the balance of equities favors the Company entering into the CBA Modifications and subject to Section 1(d)(iii) below, adhering to the CBA Modifications.

(ii)        The Company agrees that neither the Company nor any Company affiliate will file or support any motion pursuant to 11 U.S.C. Sections 1113 or 1113(e), seeking rejection or modification of, or relief or interim relief from, the CBAs and CBA Modifications, during the course of its Chapter 11 cases, and the Company and its affiliates specifically waive the right to file or support such a Motion, except that the Company reserves the right to file or support such a motion if it can demonstrate that there has been a material and substantial change in the Company's business situation such that the Company cannot continue as a going concern without each of the additional concessions requested by the Company.

(iii)        Should the Company file or support a motion invoking the exception provided in Section 1(d)(ii) above, all requirements and provisions of 11 U.S.C. § 1113 shall remain applicable to the motion and, in addition, if the Company attempts to invoke Section 1(d)(ii) above within the first 60 days following Bankruptcy Court approval of the CBA modifications, the Company agrees that it will have to demonstrate that the additional concessions requested are essential to the continuation of the Company's business, or in order to avoid irreparable damage to the Company's estates.  The UFCW and the Local Unions reserve the right to object to any such motion and nothing in this Agreement shall be a construed as an agreement by the UFCW or any Local Union to such motion or modifications or relief.

(e)        This agreement and the modified CBAs are contingent on the Company's securing savings from Local 1199 (SEIU) which, in the Company's good faith discretion, are approximately equivalent, taking into account the relative size of the groups represented by Local 1199 on the one hand, and the Local Unions on the other hand, as they relate to the Company.

2

### 2.    Further Union Protections During (And In Some Cases After) The Company's Chapter 11 Cases

(a)    *Information Sharing*.  The Company agrees that, beginning on the effective date of the modified CBAs and extending throughout the term of the modified collective bargaining agreements, subject to appropriate confidentiality agreements, it will make reasonable and appropriate information on the projected and actual performance of its business available to UFCW international officers and their legal and financial advisors, and to the officers and legal and financial advisors of its affiliated Local Unions, at reasonable intervals.  The information shared between the Company and the UFCW/individual Local Unions, subject to appropriate confidentiality restrictions, shall include the following:

(i)    *Sharing of Business Information*.  The Company will share with officers for UFCW international: (1) a copy of its business plan/cash flow forecasts and, if modifications are made to the business plan, any such modifications to the business plan/cash flow forecasts, within a reasonable time after any revised plans are complete; (2) a copy of any overall and/or store-by-store capital expenditure plan for the Company within a reasonable time after such capital expenditure plan is complete (including but not limited to the McKinsey study, within a reasonable time period of its completion); (3) a copy of any bankruptcy-related exit financing proposals received from third parties, subject to the consent of the party or parties providing the proposal(s); and (4) information on the EBITDA performance of the Company, as a whole, and on a store-by-store basis, on a quarterly basis, within forty-five (45) days of the conclusion of each quarter.

(ii)    *Sharing Of Information With Respect To Future Mergers, Acquisitions, Store Openings, Store Closures*.  Subject to entry into a confidentiality agreement acceptable to the Company, the Company will provide the earliest practicable and reasonable advance notice to officers of UFCW and the presidents of the Local Unions of any upcoming mergers, acquisitions, store openings, or store closures.  This information shall be provided on a confidential basis and UFCW and the Local Union presidents shall not share the information with anyone other than their own financial and legal advisors.

(b)    *Savings During Chapter 11 Cases Due To Modifications*.  The Local Unions on behalf of the employees represented by the Local Unions shall accrue and shall be entitled to a stipulated, approved, and allowed administrative claim in the amount of the actual cash savings provided to the Company under the amended CBAs from the effective date of the CBA Modifications through the confirmation of a plan of reorganization.  The Local Unions and UFCW agree that any administrative expense claim provided under this paragraph will be capped at a maximum of $18 million based on cash savings provided in the fourth quarter of calendar 2011 and $7 million based on cash savings provided in the first quarter of calendar 2012, it being understood that if the cash savings during the fourth quarter of calendar 2011 are less than $18 million, any excess will be added to the $7 million cap for the first quarter of 2012.  If the actual cash

3

savings provided to the Company under the amended CBAs between the Effective Date and confirmation exceeds the amounts of the caps described above, any excess savings shall be treated as a stipulated, approved, and allowed administrative claim that is subordinated in priority and (to the extent relevant) payment timing to any other administrative expense claims allowed in the Company's Chapter 11 cases. In any event, any administrative claim shall be waived, extinguished, and forever discharged upon confirmation of any plan of reorganization in the Company's Chapter 11 cases which contemplates the continued operation of a chain of grocery stores, by either the Company or a buyer through a plan-related sale that is otherwise consistent with this agreement.

(c)      ***Events of Default***. The UFCW shall have the option to declare the CBA Modifications in default and terminated within 10 days of:

(i)      The entry of an unstayed order authorizing the sale of substantially all of the Debtors' assets pursuant to 11 U.S.C. § 363—provided however, it shall not be an event of default if the successful buyer of the company purchases the company through a credit bid and assumes the modified CBAs;

(ii)      The DIP loan being accelerated;

(iii)      Appointment of a Chapter 11 trustee for the Company's estates; or

(iv)      Conversion of the Company's cases to Chapter 7.

(d)      ***Negotiation of the Company's Proposed Plan of Reorganization and Disclosure Statement***.

(i)      ***Consistency With Local Union Agreements.*** The Company will not propose a plan of reorganization that is in any material way inconsistent with the terms of the modified CBAs, inclusive of the provisions described herein. The Company's proposed plan of reorganization will incorporate, in full, the agreements between UFCW, its Local Unions, and the Company reflected in these term sheets and the modified CBAs.

(ii)      ***Information Sharing***. The Company agrees to provide legal counsel to UFCW and the Local Unions with an advance draft of, and an opportunity to comment upon, any plan of reorganization that the Company may propose, and the disclosure statement that would be sent along with any such plan of reorganization. The Company will provide its drafts of the proposed plan of reorganization and disclosure statement to counsel for the UFCW as promptly as possible prior to its filing.

(iii)      ***Most Favored Constituent Status in Plan Discussions***. The Company agrees to consider in good faith any comments to any proposed plan of reorganization and/or disclosure statement made by UFCW and the Local Unions, including its proposed capital structure, board structure, by-laws and financing, and to consider the UFCW's views on these topics as thoroughly as they will consider the views of any other constituency in these Chapter 11 cases, including

4

but not limited to a proposed plan sponsor or equity investor, the Official
Committee of Unsecured Creditors, holders of the Company's Second Lien debt,
holders of the Company's convertible bonds, or any other constituency.

**3.      Plan Terms**

The Company, the UFCW, and the Local Unions agree that in addition to the obligations
in Paragraph 2(d)(1) above, any plan of reorganization proposed in the Company's Chapter 11
cases (inclusive of the disclosure statement and other plan-related documents), or otherwise
supported by the Company, will contain at least the following terms:

(a)    ***Assumption of Modified Agreements***.  The modified CBAs will be
assumed pursuant to 11 U.S.C.  § 365 under a plan of reorganization.[1]

(b)    ***Capital Infusion***.  Any plan of reorganization proposed by the Company
will include an appropriate capital infusion sufficient, when combined with the cash flow
in the business plan that is reflected in and related to the final disclosure statement
approved by the Bankruptcy Court (the "Business Plan"), to enable the Company to make
the capital investments in its stores that are envisioned by the Business Plan.

(c)    ***Minimum Liquidity***.  Any plan of reorganization proposed by the
Company will provide that upon emergence from chapter 11, the Company shall have at
least $200 million in total combined cash, cash equivalents, and borrowing availability
under any credit facility, it being understood that any undrawn revolver capacity is
considered to be available and part of the $200 million in liquidity.

(d)    ***Release and Exculpation***.  Any plan of reorganization will include
customary release and exculpation clauses that will be at least as comprehensive for
UFCW, the Local Unions, and each of their current or former members, officers,
committee members, employees, advisors, attorneys, accountants, actuaries, investment
bankers, consultants, agents and other representatives (the "UFCW Exculpated Parties"),
as it is for the Company and its officers, directors, and advisors.  The Company will
propose in its plan of reorganization that the UFCW Exculpated Parties be released and
exculpated from any and all claims related to the Company's bankruptcy cases; the
formulation, preparation, negotiation, dissemination, implementation, administration,
confirmation or consummation of the modified CBAs, the disclosure statement
concerning the plan of reorganization or the plan itself, or any other agreement of
document created, modified, amended, terminated or entered into in connection with
either the plan of reorganization or any agreement between the Company, the UFCW, or
the Local Unions.  Upon request of the UFCW or a Local Union, the Company will
appear and intervene, or, if intervention is not authorized, file an amicus brief (if
permitted to do so), asserting and defending the application of these exculpation
provisions in any relevant proceeding relating to the application of these exculpation
provisions to the UFCW or a Local Union.

---

[1]    For the sake of clarity, this does ***not*** include the assumption of any withdrawal liabilities associated with any
defined benefit multi-employer pension plan.

(e)    ***Professional Fee and Expense Recovery***.  If the Effective Date takes place and the CBA Modifications are still in place as of confirmation of a plan of reorganization, the Company will pay the reasonable fees and expenses charged to UFCW by Cohen, Weiss & Simon LLP ("CWS") and Glanzer & Co ("Glanzer"), as specified below in connection with the review, design, negotiation, approval, and ratification of each amended CBA, as well as any other aspects of the Company's Chapter 11 cases in which the UFCW and the Company's positions were not adverse.  The amount and payment dates are as follows:

***Effective date of POR***

CWS                    up to $750,000

Glanzer                $2,000,000

These fees and expenses shall constitute a stipulated, approved, and allowed administrative expense paid on the effective date of the plan.  These fees and expenses are not subject to the limitations of Paragraph 2(b) above.

(f)    ***Board Seat***.  The Company shall propose as part of its Plan that the Board of Directors of the reorganized company shall, for the Term, include one member designated by the UFCW.  The mechanism for the UFCW's designation of a director shall be agreed to by the UFCW and the Company.

(g)    ***UFCW/Local Union Support***.  So long as the Company's proposed plan of reorganization is materially consistent with the terms of the modified CBAs (inclusive of the provisions herein), the UFCW and each Local Union agree that they will support any request by the Company to extend the exclusivity period provided in the Bankruptcy Code made by the Company, as well as the Company's proposed plan of reorganization, by arguing in support of such motions, including by filing a written pleading articulating their support for such motions; provided, however, that: (1) this paragraph shall not obligate the UFCW or any Local Union to support any liquidating plan; and (2) this paragraph does not affect the UFCW's fiduciary obligations as a member of the Official Committee of Unsecured Creditors ("OCUC") when acting in its capacity as a member of the OCUC.

**4.    Pre-Confirmation Sale Processes (If Any).**  In the event that prior to the confirmation of a plan of reorganization or pursuant to a plan of reorganization (and, in the case of Subsection (a) below, during any bankruptcy or other judicially-supervised sale process during the Term), the Company initiates a marketing process to sell stores to a third party, the Company agrees that it will do so in compliance with the provisions below:

(a)    ***Procedural Protections—All Sales.***  If the Company elects or is required to sell any stores to third parties between the Effective Date and the confirmation of a plan of reorganization (or pursuant to a plan of reorganization), the Company agrees that:

(i)    while the bidding procedures and processes used by the Company may be different for future sales, they will be no less favorable to the UFCW and

6

Local Unions as the bidding procedures approved by the Bankruptcy Court in connection with the sale of the Southern Stores, taking into consideration any differences between the assets being sold;

       (ii)     the Company will consult with the UFCW and affected Local Unions regarding the bidding procedures before proposing them, and will consult with the UFCW and affected Local Unions regarding the following materials before they are provided to potential third-party purchasers:  confidentiality agreements, information packages, process letters, preliminary bidding instructions, management presentations, due diligence room links, rules and procedures, data information requests, and final bidding procedures;

       (iii)    at the request of the UFCW and affected Local Unions, the Company will facilitate an introduction of any specific prospective bidder identified by the UFCW and/or affected Local Unions; and

       (iv)    while the Company believes that it must accept the highest and best bid in any sales context, it understands that the UFCW and the Local Unions believes that any buyer must accept and assume the modified CBAs as part of any purchase, and the Company agrees to take the positions of the UFCW and the Local Unions, and potential buyers' willingness to assume the modified CBAs as part of any purchase, into account in determining what bid represents the highest and best offer.  For the avoidance of doubt, the Parties agree that the Company can take non-economic factors into account in determining which bid is the higher and better bid.

     (b)     ***Additional Procedural Protections—Sales Of 75+ Grocery Stores***.  If the Company files a motion for authority to sell more than 75 stores at any one time, or sells stores during the Term (other than liquor stores) in lots of less than 75 which  collectively amount to 75 prior to or as part of a plan of reorganization, the Company agrees that:

       (i)     the Company will promptly advise the UFCW in writing of its election and will grant the UFCW the right to organize a transaction to bid for such stores (by itself or with a third-party partner or partners) and, to the extent practicable, shall provide the UFCW with at least 30 days to organize and present a bid prior to choosing a buyer or stalking horse;

       (ii)    the Company will provide the UFCW, subject to appropriate confidentiality restrictions, with information reasonably necessary for due diligence purposes so that the UFCW may determine whether it wishes to pursue a transaction, and the UFCW may share this information with a third-party partner or partners subject to confidentiality restrictions set by the Company;

       (iii)    the Company shall promptly notify the UFCW of the schedule and/or timetable for consideration by the Company of any possible transaction and shall provide the UFCW with the same time provided by the schedule and/or timetable given to other interested parties to submit an offer for the stores;

7

(iv)    the Company will give the UFCW (alone or in combination with a third-party partner or partners) the opportunity to bid for a position as the stalking horse in any such sale/marketing process, it being understood that such opportunity is not exclusive to the UFCW (with or without a third party partner or partners), but that (with the exception of paragraph 4(b)(i) above, the UFCW shall be treated comparably to any other potential stalking horses; and

(v)    the Company agrees to grant the UFCW seven (7) days to advise the Company whether or not it intends to pursue the rights set forth in Paragraph 4(b)(i)-(iv) above and, during this time period, will not enter into any stalking horse agreement or other contract regarding the stores that are subject to the bidding process with another party.

(c)    ***Substantive Protections for Sales of 75+ Stores (If Any)***.  In any sale process initiated by the Company between the effective date of the modifications in this Agreement and the Company's emergence from Chapter 11 protection, or as part of a plan of reorganization, the Company agrees to provide the UFCW with the following substantive protections:

(i)    ***Stalking Horse Option—If UFCW Bids***.  In the event that the UFCW submits an offer pursuant to Section 4(b) above, the Company shall not be under any obligation to accept such offer; provided, however, that, the Company may not enter into an agreement with regard to the stores covered by the bidding procedures with an entity other than UFCW unless that transaction is higher and better than the UFCW bid.  The Company may only deem a proposed transaction superior to the UFCW bid if its Board of Directors determines in its sole discretion that such transaction is more favorable to the Company and its stakeholders.  If the UFCW-led bid is, in pure economic terms, higher than an alternative bid, there will be a rebuttable presumption that the UFCW-led bid is the higher and better bid, and the burden will be on the Company to demonstrate that its chosen bid is in fact the higher and better bid.  For the avoidance of doubt, the Parties agree that the Company can take non-economic factors into account in determining which bid is the higher and better bid.

(ii)    ***Status of Modifications In Any Future Sales Of 75+ Stores***.  The Company agrees that if it sells more than seventy-five (75) stores to a single buyer between the effective date of the modifications to this agreement and the Company's emergence from Chapter 11 protection, as part of a Section 363 sale or a plan of reorganization, the UFCW and its affected Local Unions may, at their option, elect to terminate the modifications to their collective bargaining agreements described in this Agreement in their entirety.  The Company agrees to inform any potential buyer of more than seventy-five (75) stores of this provision and to involve the UFCW and the affected Local Unions in any such transaction that may cause the provision to be invoked.  The UFCW and its affected Local Unions must inform the Company within seven (7) days of receiving notice of the Company's intent to sell 75+ stores if it will elect to terminate the modifications described in this Agreement.  If the UFCW and the affected Local Unions elect to

8

invoke the provisions of this paragraph, the Company may immediately or at any time thereafter invoke its rights under 11 U.S.C. § 1113 and section 1(d) of this agreement shall be null and void.

(d)     Neither the provisions of Paragraph 4 nor any other portion of this Agreement (except, if applicable, the severance provision in Paragraph 5 below) shall apply to store closures.

5.     **Severance.**  At the option of each Local Union this severance provision will be included in the modified CBA with respect to any store closures that occur during the Term.  If a Local Union elects within 10 days of the Effective Date to opt-in to this paid Severance Program (the "Severance Program"), it will consist of the following terms:

(a)     *Definitions*.  For purposes of Section 5, these definitions shall apply:

(i)     "Eligible Full-Time Associate" shall mean an associate who; (a) is a member a Local Union, (b) is classified as full-time by the Company on or about the date of the store closure; (c) is laid off, or forfeits a contractual right to bump to another store, as a result of store closings and (d) is no longer employed by the Company due to a store closing.

(ii)    "Eligible Part-Time Associate" shall mean an associate who (a) is a member of a Local Union, (b) was classified as part-time by the Company and (c) is no longer employed by the Company due to a store closing.

(b)     *Severance Terms*.  In the event of a store closing during the term of the CBA Modifications:

(i)     Each Eligible Full-Time Associate shall receive; (a) a severance benefit in the amount of one (1) week of base pay for each two (2) full years of service (from his or her most recent hire date), up to a maximum of four (4) weeks base pay (the "Severance Cap"); and (b) three (3) months of continued Health & Welfare contributions by the Company at the current rate as of the date of the store closing.  The Severance Cap described above shall be extended to a maximum of 18 weeks pay for Eligible Full-Time Associates with more than 25 years of continuous service to the Company, and a maximum of 9 weeks pay for Eligible Full-Time Associates with between 15 and 25 years of continuous service to the Company.

(ii)    Each Eligible Part-Time Associate shall receive; (a) a severance benefit in the amount of one (1) week of base pay (based on his or her average hours worked in the prior year) for each four (4) full years of service (from his or her most recent hire date), up to a maximum of four (4) weeks base pay, and (b) two (2) months of continued health & welfare contributions by the Company at the current rate as of the date of the store closing.

9

   (iii)  All severance payments will be made in weekly installments on the Company's regular pay dates, and will be subject to applicable state/federal tax withholding and union dues.

   (iv)  Each Eligible Full-Time Associate and Eligible Part-Time Associate  shall receive a payment for accrued but unused vacation time, personal days, and sick entitlements  for the calendar year in which the severance takes place, if such a payment is required by the particular collective bargaining agreement between the Company and the Local Union of which the associate is a member, or is otherwise required by applicable state law.

   (v)  The severance benefits and continued health & welfare contributions outlined in Section 5(b)(i), (ii), and (iv) (if any) above are conditioned upon and subject to the Company's receipt of a Confidential Employment Separation and Release Agreement ("Release Agreement") fully executed (and notarized) by the Eligible Associate in a form that is satisfactory to the Company and the applicable Local Union.  By executing the Release Agreement, the Eligible Associate forfeits any and all recall rights.

   (vi)  The Company will not contest any application for unemployment benefits filed by any Eligible Full-Time Associate or any Eligible Part-Time Associate.

   (vii)  The Company agrees to provide positive reference to severed associates in their attempts to obtain new employment upon request of the associate or a potential future employer.  If the Company in good faith does not feel it can provide a positive reference, it shall provide a neutral reference that provides no more information than the employee's dates of employment.

(c)  ***Certain Limitations on Severance Program***

   (i)  The Severance Program described in this Section 5 shall not apply to any associate who, upon a sale of the store in which he or she works to a third party, obtains a job with the buyer.

   (ii)  The Parties agree that the Severance Program is the entirety of effects bargaining of any layoff or store closing with respect to any issue that is covered directly or indirectly by this Agreement.

**6.**  **Post-Emergence Protections**

(a)  ***Capital Expenditures***.  The Company shall spend a minimum of $100 million on an average annual basis on capital improvements for its stores in calendar years 2012-2015.  If the Company does not spend at least $100 million in any specific year beginning in 2012, the UFCW shall be entitled to request, and the Company shall provide, a specific, reasonable plan by which the Company will meet the average annual spending commitment.  Provided, however, that the Company shall in all circumstances

spend a minimum of $45 million on capital improvements for its stores in any calendar year.

(b)    ***Store Sales***.  The Company agrees that for any store sales during the Term, even those occurring after the effective date of a plan of reorganization, it will:

(i)    consult with the UFCW and the affected Local Unions regarding any confidentiality agreements, information packages, process letters, management presentations, due diligence room links, sales procedures, and data information requests, before they are provided to any prospective purchasers;

(ii)    identify to the UFCW and the affected Local Unions any *bona fide* prospective buyers and facilitate an introduction of UFCW to any specific prospective buyer identified by the UFCW; and

(iii)    in the event that the Company initiates a marketing process to sell stores during the Term, or receives an offer to buy stores during the Term, the Company will involve the UFCW and affected Local Unions in any such process and give the UFCW (alone or in combination with a third party bidder) the opportunity to bid on the stores that the Company puts up for sale.

(c)    ***Successorship***.  At the option of each Local Union, the Company agrees that the following successorship provisions will be added to the applicable modified CBA, and would be binding on grocery store sales in batches of either; (1) 25 or more stores, regardless of the location or jurisdiction of such stores, within a 30 day period; or (2) 5 or more stores employing members of any single Local Union, to one or more operators that take place between the effective date of a plan of reorganization and the end of the Term, provided, however, that if a single Local Union represents employees at less than 50 of the Company's stores, this successorship provision (if added) would apply to sales of any store(s):

(i)    This Agreement shall be binding on all signatories thereto, and their successors and assigns, whether such status is created by sale, lease, assignment, merger, joint venture or any other type of transfer, in whole or in part, of the store(s) covered by this Agreement during the term thereof.

(ii)    Any such sales shall not take place without the Company securing the written agreement of a successor to: (1) assume the applicable collective bargaining agreement(s) covering bargaining unit employees at the stores to be sold, inclusive of the CBA Modifications; and (2) offer comparable employment opportunities subject to the terms of the applicable collective bargaining agreement(s) (including the CBA Modifications) to substantially all of the Company's then-current employees working at the respective stores to be sold, recognizing their accrued seniority for all relevant purposes *vis a vis* other employees of the Company.

(iii)    At least 7 days prior to the closing of any such transaction, the Company agrees to provide the UFCW and the president of any affected Local

11

Union, subject to entry into a confidentiality agreement acceptable to the
Company, with: (1) the successor or assignee's name; (2) the date and location of
the closing; and (3) proof of the buyer's agreement to assume the applicable
collective bargaining agreements, inclusive of the CBA Modifications and other
obligations referred to above.

(d)      ***Change in Control***.  The Parties agree that if during the Term there is a
merger, share exchange, consolidation, or sale or disposition of all or substantially all of
the assets of the Company (a "Change in Control"), such a Change in Control will trigger
a partial reopener of this agreement and the modified CBAs with respect to working
conditions.

(e)      ***Potential Partial Reopener***.  The Parties may each reopen the modified
CBAs in 2014, but solely to address the impact of the Patient Protection and Affordable
care Act ("PACA") and any directly related successor legislation, regulations, or any
amendments thereto (if any).

**7.**      **Success Sharing.**  The Company will create and implement a profit-sharing plan
to share the "upside" of its reorganization with its associates.  Specifically, on an annual basis
during the Term, the Company will create a pool of 5% of any EBITDA generated that is over
and above that projected in the Business Plan, if there is any EBITDA generated that is over and
above that projected in the Business Plan, for sharing with its UFCW and SEIU partners.  The
Company, the UFCW, and the Local Unions will negotiate in good faith the terms of the sharing
and the distribution of any payments among associates affiliated with the Local Unions.

**8.**      **Buyout**.  The UFCW, Local Unions, and the Company will meet and confer over
the terms of an employee buy-out.

9.      **Enforcement.**  During the pendency of the Company's bankruptcy cases, the
Parties agree that notwithstanding the arbitration provisions of the applicable collective
bargaining agreements, the provisions of this agreement, with the exception of Paragraph 5
hereof, may be enforced by the Bankruptcy Court solely.  After the effective date of a plan of
reorganization, the Parties agree that any disputes arising under the provisions of the CBA
Modifications will be governed pursuant to the grievance and arbitration provisions of each
CBA**.**

12

## **<u>Exhibit 2</u>**

**Initial Proposal, dated July 24, 2015**

**PROPOSAL FOR CBA MODIFICATIONS NECESSARY TO PERMIT MAXIMUM OPPORTUNITY FOR SALE OF DEBTORS' ASSETS AS A GOING CONCERN AND ORDERLY WIND-DOWN OF DEBTORS' UNSOLD ASSETS:**

1. **Repeal of any and all successorship provisions.**

2. **Repeal of "bumping" provisions under CBAs.**

3. **Relief from right of first refusal to purchase stores in CBA's with Locals 56, 1357, and 1776 (EDP 2329, pg. 32; EDP 2325, pg. 40)).**

4. **Suspension of right to strike as a result of failure to make contributions.**

5. **Repeal provisions of UPTS related to information sharing with respect to future mergers, acquisitions, store openings and store closures and post-confirmation store sales. Replace repealed provisions with obligations to provide access to unions and their advisors to the data room made available to prospective purchasers, subject to entry into NDA's . In addition, the Company shall have the further obligation to identify stalking horse and qualified bidders participating in Bankruptcy Court supervised auction process and facilitate good faith negotiations between the unions and bidders.**

6. **Elimination of job guarantees in EDP 9002 and EDP 3218 (Local 342).**

7. **Elimination of work rules related to "exclusive work," "non-bargaining unit members doing bargaining unit work," "usual roles" and transfer restrictions (including transfer between bargaining units).**

8. **Relief from any and all notices obligations contained in CBA's exceeding obligations under applicable federal and state plant closing laws.**

9. **Unions shall cooperate to encourage orderly wind down and liquidation of store operations in any store that remains unsold.**

10. **Existing CBA's shall terminate when Company no longer employs associates in relevant bargaining unit.**

11. **Unions shall meet and confer in good faith with stalking horse and qualified bidders in effort to reach agreement on prospective terms and conditions of employment for represented associates.**

12. **Deferral of severance immediately payable upon termination of employment as a result of store closing or sale (in the event associate is not hired by Purchaser). We are continuing to analyze our specific request in terms of number of weeks payable upon termination and**

number of weeks deferred, but the request will be consistent with severance benefits ultimately offered to the Company's non-unionized work force.

13.   Elimination of obligation to cash-out accrued, but unused PTO upon termination. Accrued but unused PTO to be paid in accordance with formula established in relevant CBA,  in accordance with the priority scheme set forth in the Bankruptcy Code.

14.   Elimination of Lump Sum Retirement Supplement Contained in Local 342 CBA's

15. Termination of post-employment retiree medical and other insurance programs.

16. All disputes arising out of this Term Sheet and the sale and wind down of Company assets shall be resolved by the Bankruptcy Court under its exclusive jurisdiction.

17. The foregoing arrangements shall satisfy the Company's effects bargaining obligations.

WEIL:\95411418\1\50480.0003

## **Exhibit 3**

**Revised Proposal, dated July 28, 2015**

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND ALL STATE LAW EQUIVALENTS
7/28/2015
(FURTHER REFINEMENT OF EXISTING PROPOSAL PROPOSED AT UFCW'S
REQUEST)

**PROPOSAL FOR CBA MODIFICATIONS NECESSARY TO PERMIT MAXIMUM OPPORTUNITY FOR SALE OF DEBTORS' ASSETS AS A GOING CONCERN AND ORDERLY WIND-DOWN OF THE DEBTORS' REMAINING OPERATIONS. REQUESTS ARE APPLICABLE TO ALL COLLECTIVE BARGAINING AGREEMENTS UNLESS OTHERWISE SPECIFIED BELOW.**

**<u>Immediate relief and modifications</u>:**

1.  Repeal of any and all successorship provisions.  (Immediately necessary to the extent of any Tier 2 sales that occur in the near-term.  Assets are contemplated to be sold free and clear of all liens and claims in chapter 11 process.)

2.  Repeal of "bumping" provisions under all collective bargaining agreements (CBAs).  Necessary for a multitude of reasons, including because it is operationally impossible and economically infeasible to implement bumping in an expedited sale process where all other operations will be wound down to the extent they are not sold.)

3.  Elimination of job guarantees in EDP 9002 and EDP 3218 (Local 342).  (Assets sales are contemplated to take place free and clear of all liens and claims.)

4. Deferral of severance immediately payable upon termination of employment as a result of store closing or sale (in the event associate is not hired by Purchaser).  Any severance that is deferred will be paid subject to the Bankruptcy Code's priority scheme.  A&P is requesting that any severance immediately payable (i.e., severance not deferred) to employees subject to CBAs will be commensurate to what A&P is offering to non-unionized employees; i.e., if non-unionized employees are offered two weeks of severance, unionized employees will be paid two weeks of severance and the remainder of any severance benefit to unionized employees will be deferred and paid subject to the Bankruptcy Code's priority scheme.)

5.  Elimination of obligation to cash-out accrued, but unused paid time off (PTO) upon termination.   Accrued but unused PTO to be paid in accordance with (a) formula established in relevant CBA, and subject to (b) the priority scheme set forth in the Bankruptcy Code.

6.  Elimination of Lump Sum Retirement Supplement Contained in Local 342 CBAs.

7. Relief from right of first refusal to purchase stores in CBA's with Locals 56, 1357, and 1776 (EDP 2329, pg. 32; EDP 2325, pg. 40)) to the extent it interferes with any store committed to a stalking horse bidder or is exercised to interfere with any bundled sale of stores. (The Court will approve procedures for selling stores, we cannot have this right interfere with the Court's procedures.)

8.  Suspension of obligation to make pension plan contributions and right to strike as a result of failure to do so.  (The Company currently is not making further pension contributions on account

prepetition work in accordance with applicable law. The Company will make pension contributions allocable to postpetition work. Making this change is simply making the CBAs consistent with applicable federal Bankruptcy law.)

9. Repeal provisions of UPTS related to information sharing with respect to future mergers, acquisitions, store openings and store closures and post-confirmation store sales.

Replace repealed provisions with obligations to provide access to unions and their advisors to the data room made available to prospective purchasers, subject to entry into NDA's . In addition, the Company shall have the further obligation to identify stalking horse and qualified bidders participating in Bankruptcy Court supervised auction process and facilitate good faith negotiations between the unions and bidders.

A&P will continue work with the unions in good faith.

10. Elimination of work rules related to "exclusive work," "non-bargaining unit members doing bargaining unit work," "usual roles" and transfer restrictions (including transfer between bargaining units).
This is necessary to implement going out of business and wind down of stores in an orderly fashion.


**Permanent Relief and Modifications:**

11. Make permanent items requested above for immediate relief.

12. Relief from any and all notices obligations contained in CBA's exceeding obligations under applicable federal and state plant closing laws.

13. Existing CBA's shall terminate when Company no longer employs associates in relevant bargaining unit.

14. Termination of post-employment retiree medical and other insurance programs.
The Company will be working with the Unions, the Court and other parties to form an official statutory committee to represent retirees' interests consistent with section 1114 of the Bankruptcy Code. A&P expects to file this motion in the very near term.


**Other Proposals Not Modifying an existing CBA, But Accommodations A&P Requests on an Immediate Basis:**

15. Unions shall meet and confer in good faith with stalking horse and qualified bidders in effort to reach agreement on prospective terms and conditions of employment for represented associates.

16. All disputes arising out of this Term Sheet and the sale and wind down of Company assets shall be resolved by the Bankruptcy Court under its exclusive jurisdiction.

17. The foregoing arrangements shall satisfy the Company's effects bargaining obligations.

WEIL:\95417741\1\99910.B572

**<u>Exhibit 4</u>**

**Diligence Response, dated August 3, 2015**

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

Lawrence J. Baer
+1 (212) 310-8334
lawrence.baer@weil.com

August 3, 2015

**VIA ELECTRONIC MAIL**

Richard M. Seltzer
Cohen, Weiss and Simon LLP
33 West 42nd Street
New York, NY 10036

Re:  Response to UFCW July 29, 2015 Information Request

Dear Richard:

This responds to the UFCW's information request contained in your email to Ray Schrock and me, dated July 29, 2015, 6:00 p.m.

We disagree with your characterization of the explanations and information provided to the UFCW by the Debtors in support of their proposals.  As you know, we provided a lengthy explanation of our proposals during our conference call on Friday, July 24 and again, during our follow-up telephone conversation today. We certainly were prepared to discuss and explain those proposals in greater detail at the meeting that had been scheduled for the entire day of July 29, which the UFCW cancelled. We have also provided the UFCW and its advisors unfettered access  the Company's data room, including the separate labor folder (9.6, entitled "Information Related to Union Proposal") which, as I will describe below in response to your specific questions (reproduced here in bold), contains much of the data requested by the UFCW underlying Debtors' proposals.

**UFCW Information Requests:**

1. **Successorship provisions – Identify any and all requests made by prospective buyers for waiver of successorship provisions, whether in connection with Tier I or II sales.  Provide any documents concerning or related to such requests.**

   **DEBTORS' RESPONSE**:

   As we advised the UFCW most recently, during our July 23 meeting and our July 24 call, no prospective purchaser has been willing to assume any current CBA, notwithstanding the

Richard M. Seltzer                                              **Weil, Gotshal & Manges LLP**
August 3, 2015
Page 2

Company's requests that they do so. We are producing to you, on a rolling basis, drafts of Asset Purchase Agreements ("APA's") exchanged between the Debtors and prospective buyers and correspondence related thereto demonstrating that fact. The documents responsive to this request contain commercially sensitive information that, if shared, could negatively impact the Debtors' bargaining position with other potential bidders. For that reason, the documents are being produced on a "FOR ATTORNEYS' EYES ONLY" basis and loaded into a separate secure SFTP data site, outside the general data room established by the Debtors. Instructions for accessing the SFTP data site will follow in a separate communication. Further, certain of the documents responsive to this request are subject to confidentiality restrictions based upon agreements between Debtors and prospective purchasers, Albertsons and Ahold. Debtors are presently seeking consent from to produce the responsive documents subject to such restrictions.

2.  **Bumping provisions** – **Identify any and all requests made by prospective buyers for waiver of bumping provisions. Provide any documents concerning or related to such requests. Also, please provide any analysis by the Company or its advisors of the cost that the Company believes the bumping provisions will impose, including but not limited to your advisors' estimate of almost $14.8 million in annual costs from the closing of the initial closing stores (*see* ¶48 of the 7/20/15 McGarry declaration), and how that figure relates to the cost during the few months of the Company's projected further operations. In addition, for each of the approximately 25 stores currently scheduled to close, provide the number of employees who would be eligible for bumping; the number of such eligible employees that are full-time and the number that are part-time; and the current hourly wage and other compensation costs of each such employee.**

**DEBTORS' RESPONSE:**

Each of the stalking horse APA's entered into by the Company with a prospective purchaser contains restrictions on the Debtors' ability to transfer employees into the stores included in the sales. While we note that the executed APA's have been previously furnished to the UFCW, set forth below is the text of the relevant APA provisions:

**Albertsons and Ahold: §5.2(b).** Conduct of the Business Pending Each Closing. "[N]either seller shall, solely as it relates to the Business: (i) . . . (z) . . . permit to be transferred to any Store any employee of the Sellers or any other affiliate of the Sellers, other than any hiring or transfer in replacement of an employee terminated for cause, or who otherwise resigned (which replacement employee will not be hired at a base salary or bonus amount greater than the terminated or resigned employee)

Richard M. Seltzer                                                    **Weil, Gotshal & Manges LLP**
August 3, 2015
Page 3

**Key Food:  §5.2(b).**  Conduct of the Business Pending Each Closing.  "[N]either seller shall, solely as it relates to the Business: (i) . . . (z) . . . permit to be transferred to any Store any employee of the Sellers or any other affiliate of the Sellers, other than any hiring or transfer in replacement of an employee terminated for cause, or who otherwise resigned (which replacement employee will not be hired at a base salary or bonus amount greater than the terminated or resigned employee or be represented by a union or collective bargaining agreement other than the Affected Union)

Other prospective purchasers, including Wakefern Food Corporation, were unwilling to make any specific commitment to hire any of the Company's existing employees.

The analysis underlying the Debtors' advisors' estimate of almost $14.8 million in annual costs from the closing of the initial closing stores referred to in ¶48 of the 7/20/15 McGarry declaration, and the further detail you request with respect to each affected employee is contained in the data room in folder 9.6.5, entitled "Bumping Back-up."  Information pertaining to those employees who may be eligible to bump is contained in data room folder 9.6.4.8, entitled "Draft Union Employee List for Calcs."

Because the prospective buyers' offers are contingent upon obtaining relief from bumping provisions, failure to obtain such relief could lead to liquidation of all stores, thereby costing the Debtors hundreds of millions of dollars in going concern value.  Moreover, the aforementioned costs do not take into account the operational impact and practical impossibility of the Debtors implementing bumping into going concern stores given the Debtors' sale strategy.  Debtors, compliance with existing bumping provisions will result in the many months' of delay attendant to the bumping process.  That delay will make it practically impossible to conclude any going concern sale before the Debtors are forced to liquidate.

Further, it is beyond dispute that additional store closures will occur in this process despite everyone's best efforts.  As you know, dozens of the Debtors' stores produce negative four-wall EBITDA.  The Debtors have a precious few weeks to solicit bids on the stores.  Thus, if bids are not received for stores on a going concern basis, for example, the Debtors will have to prepare the store for closure.  Thus, bumping employees from the 25 stores set for immediate closure into stores that are likely to close on a not-too-distant future date would be a futile effort and a waste of time and resources of the Debtors' estates.  This process of store closures and forced bumping will be occurring over the next several weeks on a real-time basis.  We believe it is impossible to move through this process in an orderly fashion with bumping.  Carried to its logical conclusion, thousands of employees could potentially be bumped, and bumped yet again, over the near-term.  Simply put, without this relief, running the sale and wind down process for this enterprise would be operationally impossible.  The economic effect on the process in total may be somewhat incalculable beyond the Debtors' informed business judgment this provision

Richard M. Seltzer                                                    **Weil, Gotshal & Manges LLP**
August 3, 2015
Page 4

jeopardizes any meaningful opportunity to move through this process without catastrophic risk and results to the Debtors' stakeholders and employees.

We are producing to you, on a rolling basis, drafts of Asset Purchase Agreements ("APA's") exchanged between the Debtors and prospective buyers and correspondence related thereto. The documents responsive to this request contain commercially sensitive information that, if shared, could negatively impact the Debtors' bargaining position with other potential bidders. For that reason, the documents are being produced on a "FOR ATTORNEYS' EYES ONLY" basis and loaded into a separate secure SFTP data site, outside the general data room established by the Debtors. Instructions for accessing the SFTP data site will follow in a separate communication. Further, certain of the documents responsive to this request are subject to confidentiality restrictions based upon agreements between Debtors and prospective purchasers, Albertsons and Ahold. Debtors are presently seeking consent to produce the responsive documents subject to such restrictions.

3. **Elimination of job guarantees in Local 342 CBA's – Identify by name, hiring date and full-time vs. part-time status all the employees subject to these guarantees. In addition, identify any and all requests made by prospective buyers for elimination of these guarantees and provide any documents reflecting communications with prospective buyers over these guarantees.**

**DEBTORS' RESPONSE**:

Debtors are still compiling the information responsive to this request. Responsive information will be uploaded to a subfolder in data room folder 9.6. when such compilation is completed. No buyer has expressly requested elimination of job guarantees.

4. **Deferral of severance payments – Indicate the Company's position on whether severance would be due to employees hired by the buyer. Provide the Company's estimate of severance that will be owed to the employees of the approximately 25 stores scheduled to close, and any documents showing the basis for this estimate. What is the Company's specific proposal on how much of this severance would be immediately payable? Explain the Company's reasoning for why severance immediately payable to bargaining unit employees must or should be commensurate with severance it intends to immediately pay to non-bargaining unit employees. Provide any documents relating to any program or policy to provide severance to non-bargaining unit employees.**

**DEBTORS' RESPONSE**:

Richard M. Seltzer                                                        **Weil, Gotshal & Manges LLP**
August 3, 2015
Page 5


**DEBTORS' RESPONSE**:

No severance would be due to any employee hired by a buyer. Section 5(c)(i) of the A&P/UFCW/Local Unions Union Protections in Term Sheets ("UPTS") provides that "[t]he Severance Program described in this Section 5 shall not apply to any associate who, upon a sale of the store in which he or she works to a third party, obtains a job with the buyer." Local 342 did not opt in to the Severance Provisions of UPTS. Certain of Local 342's CBA's provide that no severance due will be due if the severed employee continues to be employed.

The severance calculations for the 25 stores scheduled to close are contained in data room folder 9.6.4, entitled "Severance & PTO Calculations."

The Debtors have not yet determined the amount of severance that would be immediately payable, but will be prepared to discuss the matter with the UFCW during our meeting on August 5.

The Debtors believe that all represented and non- represented employees should be treated in a similar manner with respect to severance payments immediately payable upon termination. The Company's Severance Policy applicable to non-represented personnel is contained in data room folder 9.2.2, entitled, "Severance Policy."

5. **Obligation to cash out accrued, unused PTO – Please give any examples of cases where a debtor sought and/or obtained as part of Section 1113 relief a contract modification to reflect bankruptcy claim priorities, as requested here.**


**DEBTORS' RESPONSE**:

The question set forth above seeks attorney work product that can be obtained by the UFCW from publicly available sources and attempts to improperly shift the burden of performing legal research in support of the UFCW's potential legal arguments from the UFCW to the Debtors.

6. **Lump Sum Retirement Supplement in Local 342 CBAs – Identify by name, hiring date and full time vs. part-time status all the employees currently eligible for these lump sum payments and any estimate by the Company or its advisors regarding the cost to the Company of lump sum payments for such employees. Provide any written analysis of such estimate.**

**DEBTORS' RESPONSE**:

Please see data room folder 9.6.4.9, entitled "Potential Current Employees Eligible for 342 Retirement Benefit."

Richard M. Seltzer
August 3, 2015
Page 6

**Weil, Gotshal & Manges LLP**

7.  <u>Right of first refusal in certain CBAs</u> – **Identify any and all requests made by prospective buyers for the elimination of these rights and provide any documents reflecting communications with prospective buyers over these right-of-first-refusal provisions.**

<u>DEBTORS' RESPONSE</u>:

No prospective buyer has made such a request. The rights of first refusal provisions will interfere with the bundled sales of stores as going concerns, thereby diminishing the value of the Debtors' estates and the potential to maximize employment opportunities for employees represented by the UFCW.

8.  <u>Obligation to make pension contributions and right to strike</u> – **Please give any examples of cases where a debtor sought and/or obtained as part of Section 1113 relief a contract modification of the right to strike.**

<u>DEBTORS' RESPONSE</u>:

The question set forth above seeks attorney work product that can be obtained by the UFCW from publicly available sources and attempts to improperly shift the burden of performing legal research in support of the UFCW's potential legal arguments from the UFCW to the Debtors.

9.  <u>Repeal of UPTS information sharing provisions</u> – **Explain with specificity why repeal of each provision is essential to continuation of the debtors' business or to avoid irreparable harm. Provide examples that support your explanation. Also, please provide any documents reflecting communications with prospective buyers over repeal of these information sharing provisions.**

<u>DEBTORS' RESPONSE</u>:

The Debtors propose to repeal only those information sharing provisions contained in the UPTS that pertain to future mergers, acquisitions, store openings, store closures and post-confirmation store sales. If the Debtors are unable to sell stores as going concerns, as quickly as possible, the Debtors will be forced to liquidate its assets under "fire sale" conditions, thereby severely diminishing the value of the Debtors' estates and the Debtors' ability to preserve employment opportunities for its employees. Among the UPTS provisions the Debtors' seek to repeal are provisions requiring advance consultation among the UFCW, the affected Local Unions and the Debtors "regarding any confidentiality agreements, information packages, process letters, management presentations, due diligence room links, sales procedures, and data information requests, before they are provided to any prospective purchasers." Further, the provisions require the Debtors to "involve the UFCW and affected Local Unions in any such

Richard M. Seltzer                                         **Weil, Gotshal & Manges LLP**
August 3, 2015
Page 7

process and give the UFCW (alone or in combination with a third party bidder) the opportunity to bid on stores that the Company puts up for sale " (*see* UPTS Section 6 (b)). Such provisions will result in a severely burdened sales process, delay and potential liquidation. Moreover, the Bankruptcy Court supervised sales process provides significant transparency and opportunity for the UFCW to be heard and influence the outcome of such sales. There are no documents responsive to this request.

10. **Work rules re protection of bargaining unit work** – **Explain with specificity why repeal of each provision is essential to continuation of the debtors' business or to avoid irreparable harm. Provide examples that support your explanation. Also explain whether the Company intends to utilize these changes to lay off or limit the hours of bargaining unit employees earlier than would be the case absent such contract modifications. Also, indicate when the Company would want such contract modifications to go into effect  -  immediately or when a final decision has been made to close the store?**

**DEBTORS' RESPONSE**:

The requested modifications would go into effect only after a store has been designated for closure. The requested changes are not intended to enable lay-offs or limit hours of bargaining unit employees. They are merely intended to permit the operational flexibility required under the usual circumstances of a going-out-of-business sale, particularly in light of anticipated attrition at the stores designated for closure.

11. **Plant closing notice provisions** – **Specify which provisions in which CBAs your proposal seeks to repeal. Explain why the debtors believe they cannot comply with the requirements in these provisions. Please provide copies of any WARN notices that have been sent since the filing, identify proposed store closings for which WARN Notices have not been filed, and if the Company has made a determination concerning which store future closings would or would not require a WARN notice please provide that information.**

**DEBTORS' RESPONSE**:

Debtors seek repeal of the following provisions:

**Local 342**
**EDP 8001** - Section 13 of Memorandum Agreement - 30 days' notice prior to store closing
**EDP 9004** - Article 21 - 1-2 weeks' notice prior to permanent layoff; 2 weeks in advance of actual closing of a store; Section 15 of Memorandum Agreement - 30 days' notice prior to store closing

Richard M. Seltzer                                    **Weil, Gotshal & Manges LLP**
August 3, 2015
Page 8


**Local 338**
**EDP 8004** - Article 4(f) - one (1) week written notice to union and employees for layoff; if possible, two (2) weeks' notice to union for store closing
**EDP 8020RX** - Article 4(f) - one (1) week written notice to union and employees for layoff; if possible, two (2) weeks' notice to union for store closing

**Local 1034**
**EDP 9007** - Article 7(7) – Employer shall give 1 week's notice of intended layoff to Union and shop steward


**Local 1245**
**EDP 9009 -** Article 21 (C) – Employees that have worked for 6 months or more must be given 3 days' advance written notice before layoff, or forty hours straight time pay

**Local 1262**
**EDP 9010 -** Article 13(g) – employees must be given written notice (5 days for FT, 1 week for PT) or pay in lieu of notice in reduction of hours or layoff; for store closing or major layoff, Employer shall notify Union and meet two weeks prior to layoff to resolve bumping rights of all affected employees

**Local 1500**
**EDP 9013 -** Article 8(C) – in event Employer closes store(s), must give 2 weeks' written notice to the union, if possible, along with seniority list so that Union can determine bumping rights


The Debtors have not asserted that they cannot comply with the CBA store closing notice provisions. Rather, Debtors believe that the combined effect of the public nature of the Debtors' bankruptcy proceedings, the Debtor's announced intentions to promptly liquidate stores not sold as going concerns and state and federal WARN Act requirements serve to provide actual notice to all affected employees of the potential for store closings. Moreover, the various CBA store closing notice provisions, providing between 3-30 days' advance notice of a store closing, provide little additional benefit under the circumstances and are outweighed by the burden placed on the Debtors in complying with such provisions, at a time in which corporate resources are severely strained.

Copies of WARN notices sent since the filing are presently being uploaded to the data room in a subfolder to data room folder 9.6, entitled "WARN Act Notices."

WARN notices have not been issued for the following ten (10) stores scheduled for closure:

Richard M. Seltzer                                    **Weil, Gotshal & Manges LLP**
August 3, 2015
Page 9

Store # 2314 – Superfresh in Center Square, PA
Store # 2723 – Pathmark in Philadelphia, PA
Store # 3825 – A&P in Cliffwood/Matawan, NJ
Store # 5244 – Superfresh in Kennett Square, PA
Store # 5248 – Pathmark in Berwyn/Devon, PA
Store # 5363 – Pathmark in Walnutport, PA
Store # 5562 – Superfresh in Claymont, DE
Store # 6185 – Pathmark in Clifton, NJ
Store # 6567 – Pathmark in Folsom, PA
Store # 6583 – Pathmark in Wilmington, DE

The Debtors have not yet made a determination concerning which store future closings would or would not require a WARN notice.

12. **Post-employment retiree medical and insurance** – **Provide any analysis by you or your advisors, with any supporting documentation, regarding the amount of the Company's OPEB obligation.  Provide this amount broken out separately for each CBA and/or Local.**

**DEBTORS' RESPONSE**:

Please see data room folder 9.6.4.5, entitled "Retiree Company Provided Benefits."

13. **Union meet & confer with stalking horse and qualified bidders** – **Explain the basis or rationale for this proposal.  Also, identify any and all requests made by prospective buyers for the changes requested and please provide any documents reflecting correspondence with stalking horse bidders concerning meetings or potential meetings with the Union.**

**DEBTORS' RESPONSE**:

Based upon all bidders unwillingness to assume any current Debtor CBA, it will be necessary for the UFCW to meet and confer with prospective purchasers to establish terms and conditions of employment for the Debtors' current employees hired by any prospective purchaser.  One of the goals of the Debtors' sales strategy is for as many of the Debtors employees as possible to continue to be employed at the stores that are sold to purchasers.  We are producing to you, on a rolling basis, drafts of Asset Purchase Agreements ("APA's") exchanged between the Debtors and prospective buyers and correspondence related thereto.  The documents responsive to this request contain commercially sensitive information that, if shared, could negatively impact the Debtors' bargaining position with other potential bidders.  For that reason, the documents are being produced on a "FOR ATTORNEYS' EYES ONLY" basis and loaded into a separate

Richard M. Seltzer                                                  **Weil, Gotshal & Manges LLP**
August 3, 2015
Page 10

secure SFTP data site, outside the general data room established by the Debtors. Instructions for accessing the SFTP data site will follow in a separate communication. Further, certain of the documents responsive to this request are subject to confidentiality restrictions based upon agreements between the Debtors and the prospective purchasers, Albertsons and Ahold. Debtors are presently seeking consent to produce the responsive documents subject to such restrictions.

14. **<u>Exclusive Bankruptcy Court jurisdiction over disputes</u> – Explain what disputes are contemplated by the reference to "disputes arising out of this Term Sheet and the sale and wind down of Company assets." Also, indicate whether this proposal is intended to preclude any and all grievance/arbitration proceedings concerning or relating to the sale and wind down of the Company or its assets.**

### <u>DEBTORS' RESPONSE</u>:

The Debtors contemplate that all disputes arising out of any final Term Sheet and the sale and wind down of Company assets would be resolved by the Bankruptcy Court in lieu of any grievance and arbitration procedures.

The Debtors reserve their rights to supplement their responses to the UFCW's requests for information as it may become necessary or appropriate to do so.

We look forward to our meeting scheduled for the day of August 5 at our offices.

Sincerely,

Lawrence J. Baer

WEIL:\95423855\1\50482.0004

**<u>Exhibit 5</u>**

**Memorialized Second Revised Proposal, dated August 11, 2015**

PRIVILEGED AND CONFIDENTIAL
8/10/2015
(REVISED PROPOSAL IN RESPONSE TO UFCW'S GUIDANCE)

**PROPOSAL FOR CBA MODIFICATIONS NECESSARY TO PERMIT MAXIMUM OPPORTUNITY FOR SALE OF DEBTORS' ASSETS AS A GOING CONCERN AND ORDERLY WIND-DOWN OF THE DEBTORS' REMAINING OPERATIONS. REQUESTS ARE APPLICABLE TO ALL COLLECTIVE BARGAINING AGREEMENTS UNLESS OTHERWISE SPECIFIED BELOW.**

**<u>Immediate relief and modifications</u>:**

1. Repeal of any and all successorship provisions related to any asset sale that will close prior to October 7, 2015.

Global Bidding Procedure sales.

Based upon guidance from the Union, the Debtors will not seek immediate relief from such provisions with the understanding that Union will advise Debtors, in writing, of objection to any proposed asset sale that is scheduled to close on or before October 7, 2015, based upon successorship grounds not later than 5 days following written notice of such sale. Debtors may seek Bankruptcy Court approval for modification of UPTS and/or relevant CBA successorship provisions, on not less than 5 days' notice, to the extent necessary to consummate such asset sale, and the Union will not object to having such matter heard on expedited five days' notice.

2. Repeal of "bumping" provisions under all collective bargaining agreements (CBAs). Necessary for a multitude of reasons, including because it is operationally impossible and economically infeasible to implement bumping in an expedited sale process where all other operations will be wound down to the extent they are not sold.)

3. Elimination of job guarantees in EDP 9004 and EDP 3218 (Local 342), EDP 9002, (Local 152), EDP 8001 (Local 342), EDP 2325 (Local 1776). (Assets sales are contemplated to take place free and clear of all liens and claims.) Based upon guidance from the Union, the Debtors intend to treat any claim for a job guarantee as a prepetition claim and not seek immediate relief. The Debtors are taking this action based upon the understanding that the Union will not claim that the Debtors should have sought immediate relief from CBA provisions to effectuate this relief.

4. Deferral of severance immediately payable upon termination of employment as a result of store closing or sale (in the event associate is not hired by Purchaser). Any severance that is deferred will be paid subject to the Bankruptcy Code's priority scheme. A&P is requesting that any severance immediately payable (i.e., severance not deferred) to employees subject to CBAs will be commensurate to what A&P is offering to non-unionized employees. If not hired by a buyer, 25% of severance entitlement immediately payable (subject to an appropriate reserve to ensure that all employees receive fair and equitable treatment on such distribution) following termination, subject to an aggregate all employee cap of $10 million, with the remainder to be treated as a claim in accordance with the Bankruptcy Code's priority scheme. Health & Welfare contributions to continue following an employee's termination in accordance with UPTS Section 5.

5.  Elimination of obligation to cash-out accrued, but unused paid time off (PTO) upon termination.   Accrued but unused PTO to be paid in accordance with (a) formula established in relevant CBA, and to be treated as a pre-petition claim in accordance with the Bankruptcy Code's priority scheme.  The Debtors, accordingly, are not seeking immediate relief with the understanding that the Union will not insist that the Debtors should have sought immediate relief from the Bankruptcy Court.

6   Elimination of Lump Sum Retirement Supplement Contained in Local 342 CBAs. To be treated as a pre-petition claim in accordance with the Bankruptcy Code's priority scheme.  The Debtors, accordingly, are not seeking immediate relief with the understanding that the Union will not insist that the Debtors should have sought immediate relief from the Bankruptcy Court.

7. Relief from right of first refusal to purchase stores in CBA's with Locals 56, 1357, and 1776 (EDP 2329, pg. 32; EDP 2325, pg. 40)) to the extent it interferes with any store committed to a stalking horse bidder or is exercised to interfere with any bundled sale of stores.  (The Court will approve procedures for selling stores, we cannot have this right interfere with the Court's procedures.)  In accordance with guidance received from the Union, the Debtors will not be seeking immediate relief on this issue and instead will continue to work cooperatively with the Union, including what the Union referred to as the "Glanzer subcommittee" on this issue and otherwise in accordance with the Global Bidding Procedures and Discrete Asset Sale Procedures approved by the Bankruptcy Court.

8.  Suspension of obligation to make pension plan contributions allocable to pre-petition service and right to strike as a result of failure to do so.  (The Company currently is not making further pension contributions on account prepetition work in accordance with applicable law.  The Company will make pension contributions allocable to post-petition work.  Making this change is simply making the CBAs consistent with applicable federal Bankruptcy law.) (Provisions are limited to Local 338 and Local 342 CBAs.)  Per the guidance received from the Union, the Debtors do not intend to seek immediate relief under the affected CBAs with the understanding that the Union will always give the Debtors at least five days' prior written notice before it intends to strike pursuant to this provision and that the Union will not object to having such matter heard on an expedited basis, within the five day notice period.

9. Repeal provisions of UPTS related to information sharing with respect to future mergers, acquisitions, store openings and store closures and post-confirmation store sales.  In accordance with guidance received from the Union, the Debtors will not be seeking immediate relief on this issue and instead will continue to work cooperatively with the Union, including what the Union referred to as the "Glanzer subcommittee" on this issue and otherwise in accordance with the Global Bidding Procedures and Discrete Asset Sale Procedures approved by the Bankruptcy Court.

10.   Except as otherwise would result in an imminent safety risk to an employee, elimination of

2

work rules related to "exclusive work," "non-bargaining unit members doing bargaining unit work," "usual roles" and transfer restrictions (including transfer between bargaining units). Per guidance received from the Union, the Debtors will not seek immediate relief related to this provision with the understanding that the Debtors will only be implemented in stores designated for GOB sales and shall not result in layoffs or reduction in an employee's hours prior to a date on which such layoffs or reduction in hours would have otherwise occurred.  The Debtors are not seeking immediate relief to implement this change and that the Union will otherwise direct that affected employees should endeavor to cooperate with the Debtors' request on this issue.

This is necessary to implement going out of business and wind down of stores in an orderly fashion and address issues related to expected attrition.

**Permanent relief and modifications that the Debtors expect to be implemented on or before October 7, 2015 (the date of the final sale hearing) or such earlier date as is necessary to close a sale subject to the Global Bidding Procedures approved by the Bankruptcy Court:**

11. Make permanent items requested above for immediate relief.

12.  Relief from any and all notices obligations contained in CBA's exceeding obligations under applicable federal and state plant closing laws.

13.  Existing CBA's shall terminate when Company no longer employs associates in relevant bargaining unit.

14. Termination of post-employment retiree medical and other insurance programs.

The Company will be working with the Unions, the Court and other parties to form an official statutory committee to represent retirees' interests consistent with section 1114 of the Bankruptcy Code.  A&P expects to file this motion in the very near term.

**Other proposals not modifying an existing CBA, but accommodations A&P requests on an immediate basis (The Debtors are not requesting immediate relief from the Bankruptcy Court on these issues with the understanding that the parties agree to continue working in good faith with one another on the issues listed below.):**

15. Unions shall meet and confer in good faith with stalking horse and qualified bidders in effort to reach agreement on prospective terms and conditions of employment for represented associates.

16. All disputes arising out of this Term Sheet and the sale and wind down of Company assets shall be resolved by the Bankruptcy Court under its exclusive jurisdiction.

17. The foregoing arrangements shall satisfy the Company's effects bargaining obligations.

WEIL:\95430036\4\50482.0004

## **Exhibit 6**

**Second Revised Proposal Containing Further Clarifications Sought by the Unions**

.

PRIVILEGED AND CONFIDENTIAL
8/10/2015
(REVISED PROPOSAL IN RESPONSE TO UFCW'S GUIDANCE)

**PROPOSAL FOR CBA MODIFICATIONS NECESSARY TO PERMIT MAXIMUM OPPORTUNITY FOR SALE OF DEBTORS' ASSETS AS A GOING CONCERN AND ORDERLY WIND-DOWN OF THE DEBTORS' REMAINING OPERATIONS. REQUESTS ARE APPLICABLE TO ALL COLLECTIVE BARGAINING AGREEMENTS UNLESS OTHERWISE SPECIFIED BELOW.**

**Immediate relief and modifications:**

1. Repeal of any and all successorship provisions related to any asset sale that will close prior to October 7, 2015.

Global Bidding Procedure sales.

Based upon guidance from the Union, the Debtors will not seek immediate relief from such provisions with the understanding that Union will advise Debtors, in writing, of objection to any proposed asset sale that is scheduled to close on or before October 7, 2015, based upon successorship grounds not later than 5 days following written notice of such sale. Debtors may seek Bankruptcy Court approval for modification of UPTS and/or relevant CBA successorship provisions, on not less than 5 days' notice, to the extent necessary to consummate such asset sale, and the Union will not object to having such matter heard on expedited five days' notice.

2. Repeal of "bumping" provisions under all collective bargaining agreements (CBAs). Necessary for a multitude of reasons, including because it is operationally impossible and economically infeasible to implement bumping in an expedited sale process where all other operations will be wound down to the extent they are not sold.)

3. Elimination of job guarantees in EDP 9004 and EDP 3218 (Local 342), EDP 9002, (Local 152), EDP 8001 (Local 342), EDP 2325 (Local 1776). (Assets sales are contemplated to take place free and clear of all liens and claims.) Based upon guidance from the Union, the Debtors intend to treat any claim for a job guarantee as a prepetition claim and not seek immediate relief. The Debtors are taking this action based upon the understanding that the Union will not claim that the Debtors should have sought immediate relief from CBA provisions to effectuate this relief.

4. Deferral of severance immediately payable upon termination of employment as a result of store closing or sale (in the event associate is not hired by Purchaser). Any severance that is deferred will be paid subject to the Bankruptcy Code's priority scheme. A&P is requesting that any severance immediately payable (i.e., severance not deferred) to employees subject to CBAs will be commensurate to what A&P is offering to non-unionized employees. If not hired by a buyer, 25% of severance entitlement immediately payable (subject to an appropriate reserve to ensure that all employees receive fair and equitable treatment on such distribution) following termination, subject to an aggregate all employee cap of $10 million, with the remainder to be treated as a claim in accordance with the Bankruptcy Code's priority scheme. Health & Welfare contributions to continue following an employee's termination in accordance with UPTS Section 5.

Field Code Changed

5. ~~Elimination of O~~Oobligation to cash-out ~~accrued, but~~ unused paid time off (PTO) upon termination treated consistent with Bankruptcy Code .  PTO a~~A~~ccrued prepetition but unused ~~PTO~~ to be paid in accordance with (a) formula established in relevant CBA, and to be treated as a pre-petition claim in accordance with the Bankruptcy Code's priority scheme.  The Debtors, accordingly, are not seeking immediate relief with the understanding that the Union will not insist that the Debtors should have sought immediate relief from the Bankruptcy Court.

6   Elimination of Lump Sum Retirement Supplement Contained in Local 342 CBAs. To be treated as a pre-petition claim in accordance with the Bankruptcy Code's priority scheme.  The Debtors, accordingly, are not seeking immediate relief with the understanding that the Union will not insist that the Debtors should have sought immediate relief from the Bankruptcy Court.

7. Relief from right of first refusal to purchase stores in CBA's with Locals 56, 1357, and 1776 (EDP 2329, pg. 32; EDP 2325, pg. 40)) to the extent it interferes with any store committed to a stalking horse bidder or is exercised to interfere with any bundled sale of stores.  (The Court will approve procedures for selling stores, we cannot have this right interfere with the Court's procedures.)  In accordance with guidance received from the Union, the Debtors will not be seeking immediate relief on this issue and instead will continue to work cooperatively with the Union, including what the Union referred to as the "Glanzer subcommittee" on this issue and otherwise in accordance with the Global Bidding Procedures and Discrete Asset Sale Procedures approved by the Bankruptcy Court.

8.  Suspension of obligation to make pension plan contributions allocable to pre-petition service and right to strike as a result of failure to do so.  (The Company currently is not making further pension contributions on account prepetition work in accordance with applicable law.  The Company will make pension contributions allocable to post-petition work.  Making this change is simply making the CBAs consistent with applicable federal Bankruptcy law.) (Provisions are limited to Local 338 and Local 342 CBAs.)  Per the guidance received from the Union, the Debtors do not intend to seek immediate relief under the affected CBAs with the understanding that the Union will always give the Debtors at least five days' prior written notice before it intends to strike pursuant to this provision and that the Union will not object to having such matter heard on an expedited basis, within the five day notice period.

9. Repeal provisions of UPTS related to information sharing with respect to future mergers, acquisitions, store openings and store closures and post-confirmation store sales.  In accordance with guidance received from the Union, the Debtors will not be seeking immediate relief on this issue and instead will continue to work cooperatively with the Union, including what the Union referred to as the "Glanzer subcommittee" on this issue and otherwise in accordance with the Global Bidding Procedures and Discrete Asset Sale Procedures approved by the Bankruptcy Court.

10.   Except as otherwise would result in an imminent safety risk to an employee, elimination of

2

work rules related to "exclusive work," "non-bargaining unit members doing bargaining unit work," "usual roles" and transfer restrictions (including transfer between bargaining units). Per guidance received from the Union, the Debtors will not seek immediate relief related to this provision with the understanding that the Debtors will only be implemented in stores designated for GOB sales and shall not result in layoffs or reduction in an employee's hours prior to a date on which such layoffs or reduction in hours would have otherwise occurred.  The Debtors are not seeking immediate relief to implement this change and that the Union will otherwise direct that affected employees should endeavor to cooperate with the Debtors' request on this issue.

> This is necessary to implement going out of business and wind down of stores in an orderly fashion and address issues related to expected attrition.

**Permanent relief and modifications that the Debtors expect to be implemented on or before October 7, 2015 (the date of the final sale hearing) or such earlier date as is necessary to close a sale subject to the Global Bidding Procedures approved by the Bankruptcy Court:**

11. Make permanent items requested above for immediate relief.

12.  Relief from any and all notices obligations contained in CBA's exceeding obligations under applicable federal and state plant closing laws.

13.  Existing CBA's shall terminate when Company no longer employs associates in relevant bargaining unit.

14. Termination of post-employment retiree medical and other insurance programs.

> The Company will be working with the Unions, the Court and other parties to form an official statutory committee to represent retirees' interests consistent with section 1114 of the Bankruptcy Code.  A&P expects to file this motion in the very near term.

**Other proposals not modifying an existing CBA, but accommodations A&P requests on an immediate basis (The Debtors are not requesting immediate relief from the Bankruptcy Court on these issues with the understanding that the parties agree to continue working in good faith with one another on the issues listed below.):**

15. Unions shall meet and confer in good faith with stalking horse and qualified bidders in effort to reach agreement on prospective terms and conditions of employment for represented associates.

16. All disputes arising out of this Term Sheet and the sale and wind down of Company assets shall be resolved by the Bankruptcy Court under its exclusive jurisdiction.

17. The foregoing arrangements shall satisfy the Company's effects bargaining obligations.

3

## **Exhibit 7**

**SEIU Proposal, dated August 7, 2015**

CONFIDENTIAL
8/7/15

**PROPOSAL FOR 1199 SEIU CBA MODIFICATIONS NECESSARY TO PERMIT MAXIMUM OPPORTUNITY FOR SALE OF DEBTORS' ASSETS AS A GOING CONCERN AND ORDERLY WIND-DOWN OF THE DEBTORS' REMAINING OPERATIONS.**

**Immediate relief and modifications:**

1. Repeal of successorship provisions. (Art. 17). (Immediately necessary for completion of sales in the near-term.  Assets are contemplated to be sold free and clear of all liens and claims in chapter 11 process.)

2. Repeal of "bumping" provisions. (Art. 10 (F)).  Necessary for a multitude of reasons, including because it is operationally impossible and economically infeasible to implement bumping in an expedited sale process where all other operations will be wound down to the extent they are not sold.)

3. Elimination of job guarantees. (Art. 19.)  (Assets sales are contemplated to take place free and clear of all liens and claims.)

4. Deferral of severance immediately payable upon termination of employment as a result of store closing or sale (in the event associate is not hired by Purchaser).  Any severance that is deferred will be paid subject to the Bankruptcy Code's priority scheme.  A&P is requesting that any severance immediately payable (i.e., severance not deferred) to employees subject to CBAs will be commensurate to what A&P is offering to non-unionized employees.  If not hired by a buyer, 25% of severance entitlement immediately payable following termination, subject to an aggregate all employee cap of $10 million, remainder to be treated as a claim in accordance with the Bankruptcy Code's priority scheme.

5. Elimination of work rules related to transfer restrictions. (Art. 25).  This is necessary to implement going out of business and wind down of stores in an orderly fashion.

**Permanent Relief and Modifications:**

6. Make permanent items requested above for immediate relief.

7. Existing CBA shall terminate when Company no longer employs associates in relevant bargaining unit.

**Other Proposals Not Modifying existing CBA, But Accommodations A&P Requests on an Immediate Basis:**

8. Unions shall meet and confer in good faith with stalking horse and qualified bidders in effort to reach agreement on prospective terms and conditions of employment for represented associates.

9. All disputes arising out of this Term Sheet and the sale and wind down of Company assets shall be resolved by the Bankruptcy Court under its exclusive jurisdiction.

10. The foregoing arrangements shall satisfy the Company's effects bargaining obligations.

WEIL:\95428387\1\50482.0004

## **Exhibit 8**

**Abondolo Message, dated July 25, 2015**

Redacted

Saturday, July 25, 2015 -
A Message from President Abondolo on the A&P Bankruptcy to All Local 342 Members:

This is the second time in four years our members who work in the Pathmark, Food Emporium, and Waldbaum's stores are being put through a disgusting process by the A&P executive management. For the last four years, A&P executives have operated the stores in a way leading up to where we are now. This is not a new story for any member who has been working at A&P, which is a company that has been badly managed for the last 25 years or more. And this is the third bankruptcy that the senior Pathmark members are experiencing, since Pathmark when bankrupt years ago after the investment bankers at Merrill Lynch saddled Pathmark with debt that Pathmark could never get out from under.

In the past fifteen years, another investment banker, Christian Haub of the Tengleman Group, bought the A&P, Waldbaum's and the Food Emporium. This past owner of what once was a great company was voted by business people in the supermarket industry as absolutely the worst supermarket operator in America. Christian Haub used the company and the lives of the employees like a toy, making bad decisions, appointing CEO after CEO who did not know what they were doing. No company can survive year after year with such bad management, and that is especially true when the company is in the hands of investment bankers. Bankers are about money, period. They do not care about working people and their families, and the communities and lives they destroy.

This time the current owners of A&P, again investment bankers, have filed what is called a Pre-Packaged bankruptcy, meaning they borrowed more money based upon commitments to get stores sold. As you read in the papers, Ahold, which owns Stop & Shop, Key Food, and Albertsons made offers to buy approximately 120 of the stores up for sale. Although it is likely the companies will end up owning the stores they bid on, the sales are not final yet. Some of the Shop Rite owners and other people in the supermarket business have put in bids for stores, and the outcome of those bids is not known yet. Additionally, we have been working along with other UFCW Local Union Presidents to try to get owners in our area to buy the stores A&P closed. We don't know yet if these efforts will be successful, but it makes

1

sense to work on keeping stores open so that our members have jobs. The Union is assisting to get some of the buyers in this process to get preferential treatment for their bids, based on commitments to take the contracts and the members.

Additionally, all the UFCW Local Union Presidents, along with the International Union, have been policing the A&P executives to prevent them from trying to sell stores to non-union operators, or owners who don't want the members and the contracts. This has been going on all week, ever since the company got caught in their attempts to do just that after they filed for bankruptcy this past Monday. The UFCW Union Presidents and the International Union representatives had A&P come to a meeting last Thursday. The A&P came to the meeting completely unprepared to answer any of the Local Union's concerns, like information requests and job security of our members. The meeting did not turn out very well for the A&P lawyers and executives, as the Union told them they were not going to accept non-union buyers.

In our opinion, the reason A&P has proposed to all the Local Unions to give more concessions is the A&P is actually trying to bargain for non-union bidders, and possibly some buyers who have already put in bids for stores over the last 2 months. So all the membership understands: it is the intention, and position, of our Union that we will not be agreeing to any concessions or give-backs. We have a contract in effect, and we expect that to be lived up to. The A&P executives are interested in one thing only: how much money, if any, can they get for themselves. And there is no reason whatsoever to allow the executives and the investment bankers and their lawyers to make more money off the employees they already robbed. It is the UFCW members that made investment after investment in the A&P, and were lied to. This is very personal to every member who works at A&P, and it is very personal to me and the rest of the Local 342 staff.

So the process at this point in the bankruptcy is to meet with the companies that have put bids in to buy stores and to make sure to secure our members jobs. Although the bankruptcy process requires the Unions by law to meet with A&P, we will do that later, after we have talked with potential buyers. The membership should be well aware that the leadership has no intention of recommending or proposing anything other than the current agreements in effect. Also our membership should know there will be no decisions made without the vote of the membership.

At this point our contracts are still in effect. For as long as A&P operates they must pay you, and provide you with health insurance and the other benefits. Everyone already vested and eligible to collect a pension will remain eligible to receive a pension. For members covered by the A&P company pension fund, you will also retain your right to collect a pension when you retire. The last report we received from A&P was that the pension fund was operating and was funded to provide full pension credits. For those members who are eligible for a pension supplement when they retire, it is, and will always be our position that our contract protects and guarantees us our entitlement to the pension supplement, whether it is A&P or new employers.

A&P's biggest threat to the Unions is telling us they will file what is called a Section 1113 in bankruptcy court if the members do not agree to further concessions. The Union's biggest threat, and most powerful, is your unity. The Section 1113 means the company asks the bankruptcy judge to throw out the contracts because employees refuse to give back more. The unity of the membership means the members control the business, customer relationships, and you are the ones who make the money to keep it all going, up to and including feeding the communities in our area.

Things change every couple of hours, but Union Representatives have been working 24 hours a day attempting to call as many members as possible, and we will continue to give everyone constant updates. We will make decisions together with the members.

For those of you with all good intent, who may be planning to show up at the bankruptcy court on Monday, please know this: it is your right to do that if you feel the need to. But keep in mind if showing up at the court in White Plains was a remedy for what is taking place now, then we would have emptied all the stores and bused people to the courthouse already. The good intention of going to the court could actually work in the reverse, by making the judge feel challenged.

But the day the A&P decides to file the Section 1113 is the day we empty the stores.

2

We need to do this together. Don't think for one minute that I wouldn't love to take every one of the A&P executives and investment bankers to all the stores to face you personally to see what they have caused.

Stewards will be updated on Monday night, and anything else significant will be reported to the membership. Thank you

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, and destroy the original message. Thank you

**<u>Exhibit 9</u>**

**Young Letter 1, dated July 29, 2015**



**FOUNDED IN 1937**

July 29, 2015

WENDELL W. YOUNG, IV
President

MICHELE L. KESSLER
Secretary-Treasurer

BARBARA JOHNSON
Recorder

Ms. Sheryl Schermer
VP, Human Resources & Labor Relations
The Great Atlantic & Pacific Tea Company
2 Paragon Drive
Montvale, NJ 07645

Dear Ms. Schermer:

As a result of A & P's recent bankruptcy filing, the Local is aware that at least five of the Company's stores within Local 1776's jurisdiction (Store Nos. 0248, 0314, 0363, 0723, and 0726) will be closing in the near future.   As you should be aware, Addendum 1 (Promotion and Layoffs) of our collective bargaining agreement ("CBA") sets forth a process whereby employees affected by these closures have the right to move to other stores covered by the CBA.

Local 1776 would like to begin the Addendum 1 process promptly.   Please let me know as soon as possible when the Company is available to meet for this purpose.

Thank you for your attention.

Sincerely,

Wendell W. Young, IV
President

WY/cd
Cc:  Edward C. Chew, III
       Laurence M. Goodman
       Rafael X. Zahralddin-Aravena



MAIN OFFICE: Walton Campus • 3031A Walton Road, Suite 201 • Plymouth Meeting, Pennsylvania 19462-2344
Phone: (610) 940-1776 • 1-800-822-3737 • 1-866-329-1776     Fax: (610) 941-9525     Internet: www.ufcw1776.org

CENTRAL PA DIVISION (Gettysburg/Harrisburg)
3161 Chambersburg Road • Biglerville, PA 17307-9405 • (717) 334-0064 or 1-800-332-9421 • Fax (717) 334-4150
150 S. 43rd Street, Suite 214 • Harrisburg, PA 17111 • (717) 558-3510 • Fax (717) 558-3512

N.E. PA DIVISION (Wilkes Barre) • 2007 Highway 315, Suite 100 • Pittston, PA 18640-6105
(570) 655-6886 or 1-800-635-6994          Fax (570) 655-6864

Affiliated with the United Food and Commercial Workers International Union

## **Exhibit 10**

**Young Letter 2, dated July 29, 2015**



**FOUNDED IN 1937**

July 29, 2015

WENDELL W. YOUNG, IV
President

MICHELE L. KESSLER
Secretary-Treasurer

BARBARA JOHNSON
Recorder

Ms. Sheryl Schermer
VP, Human Resources & Labor Relations
The Great Atlantic & Pacific Tea Company
2 Paragon Drive
Montvale, NJ 07645

Dear Ms. Schermer:

As a result of A & P's recent bankruptcy filing, the Local is aware that, of the Company's eighteen (18) stores within Local 1776's jurisdiction covered by the parties' collective bargaining agreement ("CBA"), nine (9) stores have a potential buyer; five (5) stores are being closed; and the disposition of the remaining four (4) stores is undetermined at this time.

This is to remind the Company of its obligations under Article 26.1 (Store Closing) to ensure that any successor entity to which the Company's store(s) are sold or transferred must become a signatory to the CBA, and that such successor entity must be provided advance notice of this obligation.   To the extent that the Company has entered into such sale or transfer agreements with a third party, please provide Local 1776 with copies of such documents so that the Local can verify that the Company is in compliance with Article 26.1

Further, Addendum 4 to the CBA (as interpreted and enforced in the Brogan Award) provides Local 1776 with the right of first refusal as to certain of the Company's stores.   This is to request that you provide Local 1776 with immediate notice if the Company intends to close any of those stores and transfer them to a third party, so that the Local may have the opportunity to invoke its rights under Addendum 4.

Please provide the above requested information as soon as possible.

Sincerely,

Wendell W. Young, IV
President

WY/cd
Cc:  Edward C. Chew, III
     Laurence M. Goodman
     Rafael X. Zahralddin-Aravena



**MAIN OFFICE:** Walton Campus • 3031A Walton Road, Suite 201 • Plymouth Meeting, Pennsylvania 19462-2344
Phone: (610) 940-1776 • 1-800-822-3737 • 1-866-329-1776     Fax: (610) 941-9525     Internet: www.ufcw1776.org

**CENTRAL PA DIVISION** (Gettysburg/Harrisburg)
3161 Chambersburg Road • Biglerville, PA 17307-9405 • (717) 334-0064 or 1-800-332-9421 • Fax (717) 334-4150
150 S. 43rd Street, Suite 214 • Harrisburg, PA 17111 • (717) 558-3510 • Fax (717) 558-3512

**N.E. PA DIVISION** (Wilkes Barre) • 2007 Highway 315, Suite 100 • Pittston, PA 18640-6105
(570) 655-6886 or 1-800-635-6994          Fax (570) 655-6864

Affiliated with the United Food and Commercial Workers International Union

**Exhibit D**

**Declaration of Tim McDonagh in Support of Motion of Debtors Pursuant to
11 U.S.C. § 1113(e) for Interim Authority to Modify Collective Bargaining Agreements**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Salvatore A. Romanello
Garrett A. Fail
Lawrence J. Baer

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | |
| **COMPANY, INC.,** *et al.*, | : | **Case No. 15-23007 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------x

## DECLARATION OF TIM MCDONAGH IN
## SUPPORT OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 1113(e) FOR
## INTERIM AUTHORITY TO MODIFY COLLECTIVE BARGAINING AGREEMENTS

I, Tim McDonagh, make this declaration under 28 U.S.C. § 1746:

1.      I am a Managing Director in the Corporate Finance Group at FTI

Consulting, Inc. ("**FTI**"), which currently serves as financial advisor to The Great Atlantic &

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

Pacific Tea Company, Inc. and certain of its affiliates, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**").

2.     I have over 10 years of financial consulting experience, with a focus on liquidity and working capital management, identification of reorganization alternatives, and managing processes to sell businesses or underperforming assets and secure financing. My industry experience includes retail, automotive, media, utilities, financial services and manufacturing. I have significant experience assisting distressed companies with day to day management activities, including development of business plans, cash flow management, and implementation of liquidity and cost saving strategies.

3.     In January 2015, FTI was retained to serve as financial advisor for the Debtors. During this engagement, I have overseen a team of individuals that has assisted the Debtors' management team with, among other things, managing and forecasting the Debtors' liquidity position, preparing for and managing the Debtors' chapter 11 filing, and other financial analysis and planning. Accordingly, I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, cash flow needs and projections, and books and records.

4.     I submit this declaration ("**Declaration**") in support of the Motion of Debtors Pursuant to 11 U.S.C. § 1113(e) for Interim Authority to Modify Collective Bargaining Agreements (the "**Motion**"). Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees or other FTI employees working with the Debtors, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and the grocery and food retail industries. If called upon to testify, I would

2

testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

### The Debtors' Assets and Claims

5.    As of February 28, 2015, the Debtors reported total assets of approximately $1.6 billion and total liabilities of approximately $2.3 billion.  FTI has prepared analysis of the Debtors' capital structure, including the Debtors' secured claims.  As of the Commencement Date, the Debtors had outstanding funded debt obligations consisting of (i) approximately $198 million in senior lien secured borrowings under the Debtors' ABL Facility, (ii) approximately $262.5 million in principal amount of senior secured borrowings under the Debtors' Term Loan Facility; (ii) a face amount of $215 million of secured PIK Toggle Notes, and (iii) a face amount of $250 million of secured Convertible Notes.  In original principal amount, this represents an aggregate secured claim pool of approximately $925.5 million.  If prepetition PIK interest is included in this total, then the aggregate pool is even greater.  In addition to the foregoing, the Debtors are expected to have additional administrative and priority unsecured claims.

### The Sale Strategy and APAs

6.    As set forth in further detail in the McGarry Declaration, the Debtors have petitioned for chapter 11 to implement a Sale Strategy that they have determined will maximize recoveries for all creditors and preserve thousands of jobs.  In accordance therewith, and pursuant to an organized prepetition bidding process (the "**Global Bidding Procedures**"), the Debtors have currently entered three asset purchase agreements ("**APAs**") to sell a total of 118 stores as going concerns worth approximately $566 million (inclusive of accounts receivable and cash, and subject to adjustment).  The Debtors are continuing to engage with other interested

parties as part of the Global Bidding Procedures, and also engaging in a process with buyers that are interested in stores that not sold pursuant to the Global Bidding Procedures (the "**Discrete Sale and Rationalization Procedures**").  Pursuant to the Global Bidding Procedures and the Discrete Sale and Rationalization Procedures, the Debtors expect to enter into many additional transactions for the sale of stores on a going concern basis during these chapter 11 cases.  In addition, the Debtor have sought to close certain underperforming stores that are not or will not be sold during the Global Bidding Procedures or the Discrete Sale and Rationalization Procedures (the "**Closing Stores**"), including 25 stores that the Debtors have identified for closing as soon as practicable (the "**Initial Closing Stores**").

7.      The Debtors' normalized, postpetition burn rate is approximately $4.5 million per week (inclusive of interest and professional fees), with the consequence that the gap between the Debtors' assets and liabilities is widening.  The Debtors have taken certain measures to decrease expenditures, including by seeking to reject leases for eight "dark" store locations and beginning to wind down the twenty-five Initial Closing Stores.  These measures not sufficient to reverse the ongoing losses the Debtors are facing.

8.      I prepared an analysis of the net cost of maintaining operations at the Initial Closing Stores (in terms of 4-Wall EBITDA).  On the basis of this analysis, FTI concluded that, over the course of a 16 week period, the stores would generate losses of $9.8 million.

9.      If the Debtors cannot complete their Sale Strategy within the time periods prescribed by the APAs, the Debtors would face increased risk of having to liquidate their business.  A liquidation would be disastrous, as illustrated by an analysis that I, along with FTI employees working under my supervision, prepared comparing the going concern value versus the liquidation value of stores subject to the APAs, which is annexed hereto as **Exhibit "1"**.  In

the event that the APAs are not consummated and the Debtors were forced to liquidate these 118 stores, our analysis projects that the stores would generate liquidation proceeds of approximately $353 million (inclusive of accounts receivable), which would be $213 million less than the proceeds currently contemplated under the APAs. The foregoing analysis assumes an orderly liquidation of such stores – in a true fire sale liquidation, the proceeds would likely be much lower. I believe that the Debtors would face a greater risk of not being able to confirm chapter 11 plan, if the stores were liquidated as opposed to sold as going concerns.

### Termination Payments

10.     The Debtors have massive potential payment obligations triggered by the termination of union-represented employees, which include severance payments and lump-sum payments for accrued paid time-off ("**PTO**"), and temporary continuation of health and welfare benefits. FTI has prepared an analysis of the cost of these potential termination payments, which is annexed hereto as **Exhibit "2"**. This analysis indicates that, when considering employees at all stores in the aggregate, including stores subject to a Stalking Horse Bid (as defined in the Motion), such payments would amount to approximately $140 million. This figure is comprised of projected severance costs of $90 million, projected PTO payments of $28 million, and projected health and welfare benefit costs of $22 million. Excluding termination payments for employees at stores subject to a stalking horse bid, such payments would amount to approximately $84 million, including projected severance costs of $54 million, projected PTO costs of $17 million, and projected health and welfare costs of $13 million. Termination payments at the Initial Closing Stores alone amount to approximately $13 million.

**Retirement Bonus Payments**

11.    Certain of the Debtors' CBAs with UFCW Local 342 may require the Debtors to pay a lump sum retirement benefit.  I conducted an analysis of this benefit and the potential retirees who may be eligible, which is annexed hereto as **Exhibit "3"**.  This analysis indicates that the Debtors may become obligated to pay approximately $6.9 million on account of such benefits (inclusive of employees at stores subject to stalking horse bids).

**Pension Contributions**

12.    The Debtors pay approximately $13 million in annual contributions to pension plans, including approximately $4 million for multi-employer pension plans and approximately $9 million for single-employer pension plans (plus an annual assessment).

13.    As described in the McGarry Declaration, certain CBAs include no-strike clauses that are conditioned on the Debtors making pension plan contributions.  I prepared an analysis of the cost of pension plan contributions for bargaining units that the Debtors informed us have a conditional no-strike clause, which is annexed hereto as **Exhibit "4"**.  As determined by this analysis, the pension contributions for these CBAs amount to approximately $724,000 per month.

14.    The APAs include material adverse change clauses that could prevent a sale from closing if triggered by a disruption in Debtors' business or store operations.  If the respective union employees orchestrated a strike as a result of nonpayment of pension contributions, that event would severely disrupt the Debtors' operations, could trigger material adverse change clauses in the APAs, and may chill future bidding on the Debtors' stores as going concerns.

6

## **Data Room**

15.    On July 28, 2015, FTI employees working under my supervision prepared materials to share with the Debtors' Unions in an online data room that had been made available to prospective asset purchasers, which included information and analysis relating to the Global Bidding Procedures, the Discrete Sale and Rationalization Procedures, the APAs, the Debtors' debtor-in-possession financing, and the Debtors' capital structure and liabilities.  In addition, FTI provided information for a Union-specific data room that included certain of the analyses described in this Declaration, such as analysis of severance, PTO, bumping, lump-sum retirement benefits, and pension contribution costs.  The union-specific data room has also been supplemented with information provided in response to information requests from the International United Food and Commercial Workers Union.  A redacted list of files contained in this union-specific data room is annexed hereto as **Exhibit "5"**.

16.      Based on the foregoing, I submit that the Court should grant the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct.

Dated:      August 11, 2015
New York, New York

                    Tim McDonagh
                    Managing Director
                    FTI Consulting, Inc.

## <u>Exhibit 1</u>

**Analysis of Going Concern Versus Liquidation Value of Stores Subject to APAs**

Project Phoenix
Liquidation vs Going Concern
($ in Millions)

| | # of Stores | APA | Variance | Liquidation |
|---|---|---|---|---|
| **Estimated Proceeds** | | | | |
| **Stores Under Stalking Horse APAs** | | | | |
| **i. Bids for Boxes** | | | | |
| Albertsons | 76 Stores | $ 255.7 | $ (123.3) | $ 132.4 |
| Ahold | 25 Stores | 146.3 | (79.2) | 67.1 |
| Key Foods | 17 Stores | 22.3 | (3.7) | 18.6 |
| Subtotal | 118 Stores | 424.3 | (206.2) | 218.1 |
| ii. Inventory | 118 Stores | 115.4 | (34.8) | 80.7 |
| iii. Accounts Receivable | 118 Stores | 18.5 | - | 18.5 |
| iv. Scripts | 118 Stores | - | 23.1 | 23.1 |
| v. Store FF&E | 118 Stores | - | 3.2 | 3.2 |
| vi. Store Cash | | 7.3 | 1.9 | 9.2 |
| **Subtotal Stalking Horse Bids** | | $ 565.5 | $ (212.8) | $ 352.8 |

 Note - APA includes value for assets in the stores not purchased that will otherwise be realized
 Note - Gross proceeds shown does not include all costs needed to achieve such proceeds
 Note - Liquidation value for leases based on appraised value for borrowing base
 Note - Inventory for sale assumed at 95% of cost, for liquidation is assumed at NOLV per the borrowing base
 Note - Accounts Receivable assumed at 95% of cost for both sale and liquidation
 Note - Store FF&E in liquidation scenario based on proposals for FF&E in closing stores
 Note - Scripts included in box value under sale scenario; shown at appraised value per borrowing base value in liquidation scenario
 Note - Store cash includes cash in transit, and is allocated to stores
 Note - Accounts receivable is based on the projections in the DIP budget and is allocated to stores
 Note - Inventory is based on the projections in the DIP budget and is allocated to stores

**<u>Exhibit 2</u>**

**Analysis of Termination Payments**

**Project Phoenix**
**Union Termination Payments**
**($ in 000's)**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Current Agreements** | | | | | | | | |
| | **Severance** | **H&W** | **Subtotal Sev./H&W** | **Vacation** | **Personal** | **Sick** | **Subtotal PTO** | **Total** | |
| **Union Employees Only** | | | | | | | | | |
| **I. Tier 1** | | | | | | | | | |
| Albertsons | $ 19,691 | $ 6,268 | $ 25,959 | $ 4,248 | $ 364 | $ 817 | $ 5,429 | $ 31,388 | |
| Ahold | 11,646 | 2,399 | 14,045 | 3,108 | 322 | 871 | 4,300 | 18,345 | |
| Key Foods | 4,428 | 653 | 5,081 | 1,069 | 101 | 377 | 1,547 | 6,628 | |
| **Subtotal APA Stores** | **35,764** | **9,320** | **45,084** | **8,424** | **787** | **2,065** | **11,276** | **56,360** | |
| **II. Tier 2** | | | | | | | | | |
| Triple Negative | 8,418 | 2,330 | 10,749 | 2,075 | 181 | 347 | 2,603 | 13,351 | |
| Other Stores | 44,911 | 10,092 | 55,004 | 10,713 | 1,089 | 2,616 | 14,418 | 69,421 | |
| Warehouse/Field | 622 | 152 | 774 | 158 | 27 | 43 | 228 | 1,001 | |
| **Subtotal Non-APA** | **53,952** | **12,574** | **66,526** | **12,946** | **1,297** | **3,006** | **17,248** | **83,774** | |
| **Grand Total** | $ 89,716 | $ 21,894 | $ 111,610 | $ 21,370 | $ 2,084 | $ 5,070 | $ 28,525 | $ 140,135 | |

Note - Vacation based on forecasted balances as of September 30, 2015
Note - Based on May 2015 headcount

Prepared by FTI Consulting
Prepared at the Request of Counsel

Privileged and Confidential

## **Exhibit 3**

**Analysis of UFCW Local 342 Retirement Bonus Payment Obligations**

**Project Phoenix**
**342 Retirement Benefit**
**($ in 000's)**

| | CBA | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | 1006 | 3201 | 3218 | 8001 | 9003 | 9004 | Total |
| Potential Eligible Employees | 8 | 7 | 25 | 39 | 10 | 43 | 132 |
| Retirement Supplement | $ 50 | $ 40 | $ 40 | $ 50 | $ 50 | $ 50 | N/A |
| **Product** | **400** | **280** | **1,000** | **1,950** | **500** | **2,150** | **6,280** |
| Estimated Total Accrued Int. | N/A | N/A | 111 | 219 | 58 | 240 | 628 |
| **Total Benefit** | **$ 400** | **$ 280** | **$ 1,111** | **$ 2,169** | **$ 558** | **$ 2,390** | **$ 6,908** |

Note - Based on May 2015 headcount
Note - For purposes of this analysis a cut-off of 61.7 years of age as of the May 2015 personnel file was used
Note - Accrued interest benefit is estimated

**<u>Exhibit 4</u>**

**Cost of Pension Contributions for CBAs with Conditional No-Strike Clause**

**Project Phoenix**
**MEPPA Average Monthly Disbursement**
**CBAs with Conditional No-Strike Clauses**
**($ in 000's)**

| CBA | Avg. Monthly MEPPA Pension Contribution |
|-----|------------------------------------------|
| 3261 | $6 |
| 3218 | 27 |
| 1004 | 120 |
| 8001 | 38 |
| 9004 | 68 |
| 8004 | 440 |
| 8020RX | 15 |
| 1020 | 5 |
| 3201 | 7 |
| **Total** | **$724** |

## **Exhibit 5**

**List of Files in Union-Specific Data Room**

**Project Phoenix**
**Virtual Data Room Index**
**Folder 9.6: Information Related to Union Proposal**

| Index | Title | Page Count |
|-------|-------|-----------|
| 9.6.1.1 | A&P - DIP Budget - 7 22 2015 | 24 |
| 9.6.1.2 | DIP - Credit Agreement (Final Executed) | 363 |
| 9.6.2.1 | Bid Procedures Motion with APA | 283 |
| 9.6.3.1 | 01 AP - ABL Credit Agreement Fully compiled | 431 |
| 9.6.3.2 | 02 Amended and Restated Senior Secured Term Credit Agreement - Fully Exe… | 345 |
| 9.6.3.3 | 03.01 (x) PIK Toggle Indenture_(22031314_1) (2) | 182 |
| 9.6.3.4 | 04.01 (x) Convertible Indenture_(22031313_1) | 188 |
| 9.6.3.5 | Draft Estimated Trade Motion Data 2015_7_27 (2) | 1 |
| 9.6.4.1 | A&P - Sev_PTO_Store_union_07272015 | 24 |
| 9.6.4.5 | Retiree Company Provided Benefits 0615 | 1 |
| 9.6.4.6 | Vacation_payout_rules | 1 |
| 9.6.4.8 | Draft Union Employee List for Calcs 2015_7_27 UPDATED | 343 |
| 9.6.4.9 | Potential Current Employees Eligible for 342 Retirement Benefit 2015_7_31 v2 | 3 |
| 9.6.5.1 | A&P - Bumping Data | 8 |
| 9.6.6.1 | A&P - MEPPA Pension | 11 |
| 9.6.7.1 | 2014 Leasehold Valuation | 29 |
| 9.6.7.2 | 2014 Leasehold Valuation_Non Operating | 21 |
| 9.6.8.2 | Store Listing | 5 |
| 9.6.9.1 | 1-XXXX Union Letter | 4 |
| 9.6.9.2 | 2-XXXX Union Letter | 3 |
| 9.6.9.3 | 3-Mayor XXXX Letter (revised) | 6 |
| 9.6.9.4 | 4 -XXXX Letter | 6 |
| 9.6.9.5 | 5- XXXX Union Letter | 47 |
| 9.6.9.6 | 6- XXXX Union (NJ) | 39 |
| 9.6.9.7 | 6- XXXX Union (NY) | 4 |
| 9.6.9.8 | 7- Local XXXX Union Letter | 48 |
| 9.6.9.9 | 8- XXXX Union Letter | 39 |
| 9.6.9.10 | 9-XXXX Letter | 11 |
| 9.6.9.11 | 10-XXXX Letter | 47 |
| 9.6.9.12 | 11-Mayor XXXX Letter (revised) | 11 |
| 9.6.9.13 | 12 -XXXX Letter (revised) | 10 |
| 9.6.9.14 | 13-Mayor XXXX Letter (revised) | 11 |

**Project Phoenix**
**Virtual Data Room Index**
**Folder 9.6: Information Related to Union Proposal**

| Index | Title | Page Count |
|---|---|---|
| 9.6.9.15 | 14-XXXX Letter | 11 |
| 9.6.9.16 | 15- XXXX Union Letter | 7 |
| 9.6.9.17 | 15-Mayor XXXX Letter (revised) | 11 |
| 9.6.9.18 | 16- XXXX | 21 |
| 9.6.9.19 | 17-Mayor XXXX Letter (revised) | 10 |
| 9.6.9.20 | 18-Mayor XXXX Letter (revised) | 10 |
| 9.6.9.21 | 19 - XXXX Union Letter | 4 |
| 9.6.9.22 | 20-Mayor XXXX Letter (revised) | 11 |
| 9.6.9.23 | 21-XXXX Letter (revised) | 11 |
| 9.6.9.24 | 22-Mayor XXXX Letter (revised) | 11 |
| 9.6.9.25 | 23 - XXXX Union Letter | 6 |
| 9.6.9.26 | 24- XXXX Union Letter | 4 |
| 9.6.9.27 | 26-XXXX Letter (revised) v2 | 6 |
| 9.6.9.28 | 27-XXXX (revised) | 8 |
| 9.6.9.29 | 29 - XXXX Investment Board | 14 |
| 9.6.9.30 | 30-XXXX Letter (revised) v2 | 6 |
| 9.6.9.31 | 31 - XXXX Letter (revised) v2 | 6 |
| 9.6.9.32 | 32 - XXXX Investment Board | 14 |
| 9.6.9.33 | 33- XXXX Union (NY) | 9 |
| 9.6.9.34 | 34-XXXX Letter (revised) v2 | 5 |
| 9.6.9.35 | 35-XXXX Letter (revised) v2 | 5 |
| 9.6.9.36 | 36 - XXXX Investment Board | 11 |
| 9.6.9.37 | 37 - XXXX Letter | 8 |
| 9.6.9.38 | 38 - XXXX Letter | 8 |
| 9.6.9.39 | Additional Employee Notices | 26 |
| 9.6.9.40 | AP - NJ WARN - Store XXXX Supplement | 4 |
| 9.6.9.41 | AP - NJ WARN - Store XXXX Supplement | 5 |
| 9.6.9.42 | AP - NJ WARN - Store XXXX Supplement | 5 |
| 9.6.9.43 | AP - NJ WARN - Store XXXX Supplement | 5 |
| 9.6.9.44 | AP - NJ WARN - Store XXXX Supplement | 5 |
| 9.6.9.45 | AP - NJ WARN - Store XXXX Supplement | 5 |
| 9.6.9.46 | AP - NJ WARN - Store XXXX Supplement | 5 |

**Project Phoenix**
**Virtual Data Room Index**
**Folder 9.6: Information Related to Union Proposal**

| Index | Title | Page Count |
|---|---|---|
| 9.6.9.47 | New York non union | 36 |
| 9.6.9.48 | NJ non Union employee Store No. XXXX | 50 |
| 9.6.9.49 | NJ non Union employee Store No. XXXX | 100 |
| 9.6.9.50 | NJ non Union employee Store No. XXXX | 140 |
| 9.6.9.51 | NJ non Union employee Store No. XXXX | 70 |
| 9.6.9.52 | NJ non Union employee Store No. XXXX | 60 |
| 9.6.9.53 | NJ non Union employee Store No. XXXX | 50 |
| 9.6.9.54 | NJ non Union employee Store No. XXXX | 60 |
| 9.6.9.55 | NJ non Union employee Store No. XXXX | 120 |
| 9.6.9.56 | NJ union employee Store No. XXXX | 1,030 |
| 9.6.9.57 | NJ union employee Store No. XXXX | 1,030 |
| 9.6.9.58 | NJ union employee Store No. XXXX | 1,110 |
| 9.6.9.59 | NJ union employee Store No. XXXX | 1,130 |
| 9.6.9.60 | NJ union employee Store No. XXXX | 950 |
| 9.6.9.61 | NJ union employee Store No. XXXX | 1,000 |
| 9.6.9.62 | NJ union employee Store No. XXXX | 890 |
| 9.6.9.63 | NJ union employee Store No. XXXX | 1,090 |
| 9.6.9.64 | NY union employee | 2,052 |
| 9.6.9.65 | PA Store No. XXXX | 16 |
| 9.6.9.66 | PA Store No. XXXX | 16 |
| 9.6.9.67 | AP - NJ WARN - Store XXXX Supplement | 5 |

Prepared by FTI Consulting
Prepared at the Request of Counsel

DRAFT - Subject to Material Change
Privileged and Confidential

8/10/2015 1:13 PM
Page 3 of 3

**Exhibit E**

**Declaration of Ali Rizvi in Support of Motion of Debtors Pursuant to
11 U.S.C. § 1113(e) for Interim Authority to Modify Collective Bargaining Agreements**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Salvatore A. Romanello
Garrett A. Fail
Lawrence J. Baer

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** : | |
| **COMPANY, INC.,** *et al.*, : | **Case No. 15-23007 (RDD)** |
| : | |
| Debtors.[1] : | **(Jointly Administered)** |
| : | |

------------------------------------------------------------------x

### DECLARATION OF ALI RIZVI IN
### SUPPORT OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 1113(e) FOR
### INTERIM AUTHORITY TO MODIFY COLLECTIVE BARGAINING AGREEMENTS

I, Ali Rizvi, make this declaration under 28 U.S.C. § 1746:

1.      I am a self-employed labor metrics consultant and currently serve as an

independent contractor for The Great Atlantic & Pacific Tea Company, Inc. ("**Great Atlantic**"

or the "**Company**") and its affiliated debtors and debtors in possession in the above-captioned

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

chapter 11 cases (collectively, the "**Debtors**" or "**A&P**").  In my consultant capacity, I have

worked for A&P since March 2015 and have at all times reported to Sheryl Schermer, Great

Atlantic's Vice President of Human Resources and Labor Relations.  I was previously employed

by Great Atlantic from March 2007 to March 2012 in various labor and financial analytics and

planning roles.  I was the primary in-house labor analytical support for the Company during its

prior restructuring.

2.      On July 19, 2015 (the "**Commencement Date**"), the Debtors each

commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with the

Debtors' day-to-day operations, business and financial affairs, books and records, and A&P's 35

collective bargaining agreements (collectively, the "**CBAs**").  I also have extensive experience

negotiating labor analytics for the CBAs.

3.      I submit this declaration ("**Declaration**") in support of the Motion of

Debtors Pursuant to 11 U.S.C. § 1113(e) for Interim Authority to Modify Collective Bargaining

Agreements (the "**Motion**").  Except as otherwise indicated herein, the facts set forth in this

Declaration are based upon my personal knowledge, my review of relevant documents,

information provided to me by employees working under my supervision, or my opinion based

upon my experience, knowledge, and information concerning the Debtors' operations and the

supermarket industry.  If called upon to testify, I would testify competently to the facts set forth

in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

### The Immediate Need for Relief from Bumping Provisions

4.      The Debtors currently employ approximately 28,500 employees, over 90%

of whom are members of one of twelve local unions whose members are employed by the

Debtors under the authority of 35 separate CBAs.  Nearly all of the Debtors' CBAs include

"bumping" provisions that allow a senior employee at a store that is closing to displace a more

junior employee at a store that is not closing.  This results in not only the junior employee losing

his or her job, but also triggers a domino effect in which the junior employee can displace an

even more junior third employee in any of the stores governed by the relevant CBA.

5.     The Debtors are currently engaged in negotiations with the unions and the

unions have indicated that they seek to enforce the cumbersome bumping provisions in the

CBAs.  For the reasons set forth herein, the Debtors need relief from the operational and

financial disruptions caused by the bumping provisions in order to successfully complete an

orderly wind-down process and implement a comprehensive asset sale strategy.

**A.     Bumping Will Cause Significant Operational Difficulties for the Debtors**

6.     Bumping will cause significant operational difficulties for the Debtors,

given the Company's sale strategy of selling stores to multiple purchasers.  When implemented,

the bumping provisions will create a domino effect, as when a more senior union employee

displaces a more junior employee at another store, the junior employee will likely in turn bump a

more junior employee at yet another store.  This cascading of employees through multiple stores

over a compressed period of time is disruptive to operations as the staff at any given store is

constantly changing, and is exacerbated under the current circumstances where twenty-five

stores are closing at once, there are multiple purchasers for approximately 118 stores owned by

the Debtors, and the fate of an additional 150 plus stores is unknown at this time.

7.     The cascade or domino effect caused by bumping can be illustrated by

assuming that the Pathmark in Linden, New Jersey (the "**Linden Pathmark**") closes.  Pursuant

to the CBAs governing the Linden Pathmark, employees first bump by job classification within a

defined geographic area.  In the first wave of bumps, there are 113 potential moves within Local

1262,[2] impacting 30 stores.[3]  Assuming each employee accepts their bump, 76 associates within this bargaining unit would be laid off and 22 full-time employees would be reduced to part-time employment.[4]  Under the terms of the CBAs governing the employees at the Linden Pathmark, employees next bump within the bargaining unit but a larger geographic zone.  This second wave of bumps impacts an additional 16 stores.[5]  In total, assuming each employee from the Linden Pathmark exercises their right to bump, and each employee at an existing store exercises their right to bump after being displaced by a bump caused by the closure of the Linden Pathmark, 271 employees will be affected across 30 stores.

8.     On average, 1 bump by a full-time employee from the Linden Pathmark impacts 4 associates at other stores.  For example, the grocery manager at the Linden Pathmark holds the highest level of seniority within his bargaining unit.   When the Linden Pathmark closes, that manager has the right to bump the grocery manager at the East Brunswick, New Jersey store because the East Brunswick employee is the least senior grocery manager within the bargaining unit and geographic zone.  The East Brunswick grocery manager in turn has the right to bump into a Newark, New Jersey store and displace the night stock clerk at that location.  The night stock clerk, a full-time employee, has the right to bump the part-time cashier in the Edison, New Jersey store.  If each of the aforementioned employees accepts their bump, the cashier will be laid off.

---

[2] These are "potential moves" because an employee can choose to decline a bump.  Based on past practice, approximately 90% of full-time employees typically accept their bump.  Part-time employees bump at a lower rate, normally 40-50%, because they have less of a financial incentive to travel to a new store location.  Should an employee not accept their bump, the bumping analysis has to be revised to take into account the seniority of the second most senior associate.

[3] The Linden Pathmark bumping analysis is depicted on a spreadsheet attached hereto as **Exhibit 1**.

[4] Under some CBAs, a full-time associate reduced to part-time will retain their full-time rate for a period of one year following the bump.  This modification will further increase the labor costs associated with the going concern stores.

[5] Other factors could further magnify the bumping effect.  For example, associates on leave of absence or workman's compensation that have seniority will trigger a second bumping process when they return to work.

9.      The Linden Pathmark model provides an example of the impact bumping would have on the Debtors' workforce based on one store closing.  The Debtors intend to close 25 stores that are cash flow negative and have no real estate value (the "**Initial Closing Stores**"). The magnitude and operational impact of bumping would be exponential if the above model was based on the simultaneous closure of all 25 Initial Closing Stores.[6]  If the Debtors were to close these 25 stores at the same time, approximately 2,509 employees would have the right to bump into the remaining 188 stores, which are in the same bargaining unit.  Those 2,509 employees will bump 2,509 other employees, many of whom will also have the right to bump employees at other stores.  Approximately 1,100 employees will have the right to bump into 89 of the 118 stores which have stalking horse bids on them (the "**Stalking Horse Bids**").  The impact could be even greater given that some of the going concern stores, which are not presently subject to a stalking horse bid, may never receive a bid and will ultimately be closed.  Any such closures would generate yet another wave of bumps.

10.     The domino effect caused by bumping would severely disrupt Debtors' operations.  During the course of Debtors' wind-down process, union employees will not know where they will bump or if they will even have a job at the end of the bumping process.  This uncertainty causes great anxiety and concern amongst workers, which in turn, reduces employee productivity.

11.     Moreover, bumping reduces productivity because employees who bump can be placed in new positions, with which they are unfamiliar.  There will be transition period, in which the senior employee who displaced the more junior worker must learn new job skills.

---

[6] Due to the complexity of the bumping process and the limited amount of time Debtors have to seek relief from the CBAs, it is not feasible for the Debtors to conduct the full bumping analysis based on the 25 Initial Closing Stores. The Linden Pathmark model provides a realistic, yet much smaller scale, view of just how disruptive bumping would be to the Debtors' orderly wind-down process.

For example, a dairy clerk who displaces a cashier must be trained to perform as a cashier. Training takes time and comes at a cost. Relatedly, even employees who keep their same role will be dealing with new managers. These factors can reduce store efficiency at a time when the Debtors need to maximize productivity and the value of their assets.

### B.    Administering Bumping Rights Will Drain the Debtors' Limited Resources

12.    Executing the bumping process will also drain A&P's limited time and personnel resources. The process of administering a bump is complicated and time-consuming. When a store is first closed, the Debtors must rank all employees in the bargaining unit by seniority in order to figure out who can exercise their right to bump into another store. Next, the Debtors are required to discuss the potential bump with the unions. Negotiations with the unions can be extremely protracted due to ambiguous language contained in the CBAs and the history of past practices in applying such provisions. Moreover, the Debtors and unions must negotiate issues such as deployment of displaced associates into open positions, roll-off of temporary assignments, inter-local matters, and other issues that are unique to each CBA. Once the Debtors and the union identify the senior individual and the bump, a human resources ("**HR**") representative, together with a union representative, contacts each senior employee individually to ascertain whether they are willing to accept the bump.[7] This process is further complicated by the fact that presently the Debtors do not know which stores will remain open for employees to bump into.

13.    Based on past experience, the bumping process normally takes four weeks to complete based on a single store closing. Even if the Debtors were continuing as a going concern, it would take many months to work through the bumping process for the 25 Initial

---

[7] Some workers will not accept the bump because they want to retire or their new position is too far away from their home and they do not want to travel. If a senior employee declines the bump, this will alter the existing seniority ranking and A&P will need to re-do the bumping analysis.

Closing Stores and the 2,509 employees impacted by the bumping provisions.  Moreover, given

that the Debtors are in the process of an orderly wind-down, the Debtors do not have appropriate

HR staff to effectively administer such a tremendous operational undertaking.  There are only

seven human resources representatives who are capable of administering the bumping process

and they are already burdened with the many extraordinary tasks associated with the bankruptcy.

For example, the HR team has been fielding questions from employees regarding, among other

issues, benefits, severance, FSA money, and vacation, working with the various buyers,

participating in due diligence efforts, and working on the Worker Adjustment and Retraining

Notification Act (the "**WARN Act**") notices.  The staff is already stretched too thin and would

need to hire and train many more employees to complete the bumping process by the end of the

year for the 25 Initial Closing Stores.

### C.    Bumping Will Negatively Impact the Debtors' Sale Strategy

14.    The Initial Closing Stores are set to close between September 19, 2015

and October 19, 2015.[8]  The Debtors cannot start the bumping process until those stores are

closed.  The Debtors have executed three asset purchase agreements (the "**APAs**") with third-

party bidders (the "**Stalking Horse Bidders**").  These sales are set to close at various dates

between October 30, 2015 and December 31, 2015.  Given administering the bumping process

will take many months and the Debtors have less than two months between the initial stores

closures and the mandated sale closing dates, bumping will certainly disrupt the third-party sale

process.

15.    The Debtors need relief from bumping because bumping will negatively

impact the Debtors' sale strategy.  With bumping and all the attendant variables, potential buyers

---

[8] 10 of the Initial Closing Stores are set to close on September 5, 2015.

will be unable to accurately assess the labor costs associated with and the state of the stores they are interested in purchasing.  Their labor costs will depend on how many stores are ultimately closed and how much employees bump into the store that they are interested in buying. Moreover, an interested buyer will not know to whom he is making offers of employment.  The potential buyer may have seen good employees or a well-functioning department on his or her walk-through of a store facility, but these employees may be gone by the time the deal closes because of bumping.  Alternatively, buyers may visit a store facility that is suffering from employee uncertainty and a lack of productivity due to the aforementioned fears of being bumped and conclude that the location is not worth the trouble, when in fact the store may have been extremely productive before the store closure process began.  The Debtors need relief from bumping in order to facilitate the sale of as many going concern stores as possible.

### D.    The Financial Impact of Bumping is Substantial and Costly

16.    Without relief from the various bumping provisions in the CBAs, the projected bumping cost associated with the closure of the 25 Initial Closing Stores is approximately $14 million in EBITDA.[9]  This number represents the increased labor cost which would result from senior workers employed at the Initial Closing Stores bumping into the going concern stores, *i.e.* it captures the pay differential between the senior employees who bump and the junior employees who are displaced by the bumping provision.  This negative impact on EBITDA is likely understated because it does not take into account more costly benefits, vacation, and paid time off owed to senior employees, nor does it include travel pay that may be

---

[9] The bumping cost is calculated based on the most senior employee in the closing store bumping the least senior in the bargaining unit.  It does not take into account the intermediate steps of bumping within classification and/or geography.  464 full-time employees will convert to part-time employees and will keep their full-time rate for only one year.  Hence, the bumping cost will be reduced slightly in year two.

owed to senior associates who bump into stores outside their geographic zone,[10] both factors which would further increase the overall cost of bumping. Without relief from bumping, these increased labor costs would result in lower sale values of stores sold to third-party bidders, thereby negatively impacting the Debtors' existing sale strategy. Moreover, if bumping is not avoided, the Debtors can expect a re-trade on value from the Stalking Horse Bidders with existing APAs.

17.     I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 11th day of August, 2015

/s/ Ali Rizvi
Ali Rizvi
Labor Metrics Consultant and
Independent Contractor for The
Great Atlantic & Pacific
Company, Inc.

---

[10] Oftentimes senior employees are bumped to stores quite far from their original store of employment. Some CBAs require the Debtors to compensate the transferred employee for their increased travel expenses.

# EXHIBIT 1

## 9010 Bumps

| Oracle | Last Name | Dis | Loc | GEO AREA | Department | Job | Location | Hiredate | FT/PT | FT Date | Union | EDP | Status | Job Date | Shift | Pay Rate | Closing Store? | Classified | Bump # | Bump Position | PT | Layoff | Reduced to Clerk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 784712 | | 9 | 512 | A | Store Front End | Asst Customer Service Manager | 6512 Linden NJ | 2/10/1990 | F | 11/13/2005 | 1262 | 9010 | A | 11/13/2005 | D | | Yes | Yes | 1 | A | | | |
| 773643 | | 10 | 112 | A | Store Front End | Asst Customer Service Manager | 6112 Jersey City NJ | 5/1/1989 | F | 2/04/2004 | 1262 | 9010 | A | 8/4/2008 | D | | | Yes | 1 | B | | | |
| 773377 | | 9 | 190 | B | Store Front End | Asst Customer Service Manager | 6190 Edgewater NJ | 12/6/2003 | F | 2/24/2014 | 1262 | 9010 | A | 2/24/2014 | D | | | Yes | 1 | BB | Yes | | Yes |
| 872464 | | 9 | 181 | B | Store Front End | Cashier/Checker | 6181 Elmwood Park NJ | 7/6/2015 | P | NULL | 1262 | 9010 | A | 7/6/2015 | D | | | | 1 | EE | Yes | Yes | |
| 782798 | | 9 | 512 | A | Store Front End | Bookkeeper-Head Cashier | 6512 Linden NJ | 5/29/1990 | F | 4/29/1996 | 1262 | 9010 | A | 10/10/2014 | D | | Yes | Yes | 2 | A | | | |
| 770411 | | 10 | 198 | A | Front-End/Customer Service Clerk 2nd Shi | 6224 Irvington NJ | 12/6/1969 | F | 1/5/1998 | 1262 | 9010 | A | 8/5/2012 | D | | | | 2 | C | | | |
| 768799 | | 9 | 198 | B | Store Front End | Cashier/Checker | 6/6/1988 | F | 10/31/1998 | | 1262 | 9010 | A | 10/18/2011 | D | | | | 2 | CC | Yes | | |
| 858306 | | 9 | 198 | B | Store Front End | Cashier/Checker | 6198 Fair Lawn NJ | 7/5/2015 | P | NULL | 1262 | 9010 | A | 7/5/2015 | D | | | | 2 | EE | Yes | Yes | |
| 773423 | | 9 | 512 | A | Store Grocery | Dairy Manager | 6512 Linden NJ | 7/25/1988 | F | 11/12/1995 | 1262 | 9010 | A | 12/11/1998 | D | | Yes | Yes | 3 | A | | | |
| 785030 | | 10 | 223 | A | Store Grocery | Dairy Manager | 6223 Newark NJ | 11/3/1997 | F | 7/4/1999 | 1262 | 9010 | A | 2/14/2014 | D | | | Yes | 3 | B | | | |
| 539255 | | 9 | 261 | B | Store Grocery | Dairy Clerk Night Crew | 6261 Landing NJ | 12/23/2007 | F | 1/17/1977 | 1262 | 9010 | A | 3/31/2014 | D | | | Yes | 3 | BB | | Yes | |
| 633698 | | 9 | 299 | B | Store Grocery | Grocery Clerk | 6299 Ramsey NJ | 11/26/2000 | F | 9/29/2014 | 1262 | 9010 | L | 9/29/2014 | D | | | | 3 | CC | Yes | | |
| 872520 | | 9 | 282 | B | Store Front End | Cashier/Checker | 6282 Parsippany NJ | 7/2/2015 | P | NULL | 1262 | 9010 | A | 7/2/2015 | D | | | | 3 | EE | Yes | Yes | |
| 773088 | | 9 | 512 | A | Store Produce | First Clerk/Lead Clerk | 6512 Linden NJ | 11/1/1968 | F | 10/9/1989 | 1262 | 9010 | A | 2/9/1991 | D | | Yes | Yes | 4 | A | | | |
| 771535 | | 10 | 436 | A | Store Produce | First Clerk/Lead Clerk | 6436 Middlesex NJ | 9/6/1977 | F | 5/15/1978 | 1262 | 9010 | A | 3/31/2013 | D | | | Yes | 4 | B | | | Yes |
| 780003 | | 10 | 112 | A | Store Produce | Produce Clerk 2nd Shift | 6112 Jersey City NJ | 4/29/1996 | F | 11/21/1999 | 1262 | 9010 | A | 1/8/2012 | D | | | | 4 | C | Yes | | |
| 872515 | | 10 | 288 | B | Store Front End | Cashier/Checker | 6288 Elizabeth NJ | 7/7/2015 | P | NULL | 1262 | 9010 | A | 7/7/2015 | D | | | | 4 | E | Yes | Yes | |
| 770608 | | 9 | 512 | A | Store HBC | Gen Merchandise Mgr/Dir | 6512 Linden NJ | 11/7/1979 | F | 9/21/1981 | 1262 | 9010 | A | 2/20/2004 | D | | Yes | Yes | 5 | A | | | |
| 778011 | | 10 | 112 | A | Store Grocery | Dairy Clerk Night Crew | 6112 Jersey City NJ | 7/17/1995 | F | 3/7/1999 | 1262 | 9010 | A | 1/3/2012 | D | | | Yes | 5 | C | Yes | | |
| 872532 | | 3 | 527 | A | Store Front End | Night Stock/Packout Clerk | 6527 Hopelawn NJ | 7/6/2015 | P | NULL | 1262 | 9010 | A | 7/6/2015 | D | | | | 5 | E | Yes | Yes | |
| 779010 | | 9 | 512 | A | Store Grocery | Grocery Manager | 6512 Linden NJ | 4/24/1978 | F | 4/24/1978 | 1262 | 9010 | P | 4/24/1978 | D | | Yes | Yes | 6 | A | | | |
| 777203 | | 3 | 538 | A | Store Grocery | Grocery Manager | 6538 East Brunswick NJ | 5/23/1988 | F | 4/3/1994 | 1262 | 9010 | A | 6/1/2012 | D | | | Yes | 6 | B | | | |
| 781325 | | 10 | 128 | B | Store Grocery | Grocery Manager | 6128 Belleville NJ | 3/10/1990 | F | 11/17/1997 | 1262 | 9010 | A | 4/26/2015 | D | | | Yes | 6 | BB | | | Yes |
| 770163 | | 9 | 299 | B | Store Grocery | Night Stock/Packout Clerk | 6299 Ramsey NJ | 9/27/1994 | F | 4/23/2000 | 1262 | 9010 | N | 3/7/2010 | N | | | | 6 | CC | Yes | | |
| 841789 | | 10 | 153 | B | Store Front End | Cashier/Checker | 6153 Hackensack NJ | 7/2/2015 | P | NULL | 1262 | 9010 | A | 7/2/2015 | D | | | | 6 | EE | Yes | Yes | |
| 779349 | | 9 | 512 | A | Store Grocery | Lead Frozen Grocery | 6512 Linden NJ | 11/22/1976 | F | 8/20/1979 | 1262 | 9010 | A | 8/20/1979 | D | | Yes | Yes | 7 | A | | | |
| 773600 | | 10 | 580 | A | Store Grocery | Lead Frozen Food Clerk | 6580 Avenel NJ | 2/4/1982 | F | 9/26/1985 | 1262 | 9010 | A | 7/1/2012 | D | | | Yes | 7 | B | | | |
| 768296 | | 10 | 186 | A | Store Grocery | Dairy Clerk Night Crew | 6186 Newark NJ | 3/18/1996 | F | 1/24/1999 | 1262 | 9010 | A | 7/3/2011 | D | | | | 7 | C | Yes | | |
| 872460 | | 10 | 112 | A | Store Front End | Cashier/Checker | 6112 Jersey City NJ | 7/6/2015 | P | NULL | 1262 | 9010 | A | 7/6/2015 | D | | | | 7 | E | Yes | Yes | |
| 773314 | | 9 | 512 | A | Store HBC | Lead HBC Clerk | 6513 Linden NJ | 10/13/1971 | F | 6/16/1974 | 1262 | 9010 | A | 6/16/1974 | D | | Yes | Yes | 8 | A | | | |
| 771228 | | 10 | 112 | A | Store Grocery | Night Stock/Packout Clerk | 6112 Jersey City NJ | 11/1/1976 | F | 11/3/1995 | 1262 | 9010 | A | 3/17/2013 | D | | | Yes | 8 | B | | | |
| 784746 | | 10 | 224 | A | Store Front End | Front-End/Customer Service Clerk 2nd Shi | 6224 Irvington NJ | 6/9/2012 | F | 2/16/2014 | 1262 | 9010 | A | 2/16/2014 | E | | | | 8 | C | Yes | | |
| 872349 | | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 7/1/2015 | P | NULL | 1262 | 9010 | A | 7/1/2015 | D | | | | 8 | E | Yes | Yes | |
| 785434 | REDACTED | 9 | 512 | A | Store Grocery | Lead Scanning Admin/Coordinator | 6512 Linden NJ | 8/27/1991 | F | 12/24/2000 | 1262 | 9010 | A | 6/5/2001 | D | REDACTED | Yes | Yes | 9 | A | | | |
| 774180 | | 10 | 114 | A | Store Grocery | Lead Scanning Admin/Coordinator | 6114 Jersey City NJ | 12/11/2000 | F | 10/20/2013 | 1262 | 9010 | A | 10/20/2013 | D | | | Yes | 9 | B | Yes | | Yes |
| 872326 | | 3 | 538 | A | Store Front End | Cashier/Checker | 6538 East Brunswick NJ | 6/30/2015 | P | NULL | 1262 | 9010 | A | 6/30/2015 | D | | | | 9 | E | Yes | Yes | |
| 779560 | | 9 | 512 | A | Store Front End | Lead Service Center Clerk | 8/8/1977 | F | 11/17/1986 | | 1262 | 9010 | A | 11/17/1986 | D | | Yes | Yes | 10 | A | | | |
| 786309 | | 10 | 270 | A | Store Front End | Lead Service Center Clerk | 6270 South Orange NJ | 5/9/1981 | F | 4/1/1984 | 1262 | 9010 | A | 12/30/2014 | D | | | Yes | 10 | B | | | Yes |
| 770560 | | 10 | 223 | A | Store Front End | Night Stock/Packout Clerk | 6223 Newark NJ | 3/24/1997 | F | 1/25/1999 | 1262 | 9010 | A | 9/13/2004 | D | | | | 10 | C | Yes | | |
| 872424 | | 3 | 535 | A | Store Front End | Cashier/Checker | 6535 Edison NJ | 6/29/2015 | P | NULL | 1262 | 9010 | A | 6/29/2015 | D | | | | 10 | E | Yes | Yes | |
| 781244 | | 9 | 512 | A | Store Front End | Manager Customer Service | 6512 Linden NJ | 11/14/1983 | F | 7/24/2011 | 1262 | 9010 | A | 8/5/2012 | D | | Yes | Yes | 11 | A | | | |
| 773400 | | 9 | 286 | B | Store Front End | Manager Customer Service | 6286 Woodport NJ | 10/25/1973 | F | 7/3/1985 | 1262 | 9010 | A | 9/29/2014 | D | | | Yes | 11 | BB | | | Yes |
| 780665 | | 10 | 175 | B | Store Grocery | Dairy Clerk Night Crew | 6175 Clifton NJ | 6/19/1989 | F | 6/5/2011 | 1262 | 9010 | A | 6/5/2011 | D | | | | 11 | CC | Yes | | |
| 872366 | | 9 | 198 | B | Store Front End | Cashier/Checker | 6198 Fair Lawn NJ | 7/1/2015 | P | NULL | 1262 | 9010 | A | 7/1/2015 | D | | | | 11 | E | Yes | Yes | |
| 779479 | | 9 | 512 | A | Store Grocery | Night Crew Chief/Captain | 6512 Linden NJ | 2/18/1982 | F | 10/18/1984 | 1262 | 9010 | A | 10/18/1987 | D | | Yes | Yes | 12 | A | | | |
| 777961 | | 10 | 112 | A | Store Grocery | Night Crew Chief/Captain | 6112 Jersey City NJ | 9/18/1997 | F | 6/2/1996 | 1262 | 9010 | A | 2/19/2015 | N | | | Yes | 12 | B | | | |
| 781688 | | 10 | 270 | A | Store Produce | Night Stock/Packout Clerk | 6270 South Orange NJ | 9/18/1997 | F | 11/17/1997 | 1262 | 9010 | A | 5/22/2011 | D | | | | 12 | C | Yes | | |
| 768319 | | 9 | 190 | B | Store Front End | Front-End/Customer Service Clerk 2nd Shi | 6190 Edgewater NJ | 6/26/1993 | F | 9/13/1998 | 1262 | 9010 | A | 5/22/2011 | D | | | | 12 | CC | Yes | | |
| 865180 | | 9 | 292 | B | Store Front End | Cashier/Checker | 6292 Nanuet NY | 6/29/2015 | P | NULL | 1262 | 9010 | A | 6/29/2015 | D | | | | 12 | EE | Yes | Yes | |
| 776430 | | 9 | 512 | A | Store Produce | Produce Manager | 6512 Linden NJ | 2/16/1980 | F | 11/8/1983 | 1262 | 9010 | A | 2/3/2000 | D | | Yes | Yes | 13 | A | | | |
| 775073 | | 3 | 538 | A | Store Produce | Produce Manager | 6538 East Brunswick NJ | 6/10/1985 | F | 3/28/1988 | 1262 | 9010 | A | 2/16/2015 | D | | | Yes | 13 | B | | | |
| 771968 | | 9 | 178 | B | Store Produce | Produce Manager | 6178 Weehawken NJ | 9/19/1995 | F | 4/17/2000 | 1262 | 9010 | A | 4/2/2015 | D | | | Yes | 13 | BB | Yes | | Yes |
| 842032 | | 9 | 292 | B | Store Front End | Cashier/Checker | 6292 Nanuet NY | 6/27/2015 | P | NULL | 1262 | 9010 | A | 6/27/2015 | D | | | | 13 | EE | Yes | Yes | |
| 767103 | | 9 | 512 | A | Store Front End | Cashier/Checker | 4/8/1977 | F | 8/30/1980 | | 1262 | 9010 | A | 1/28/1995 | D | | Yes | | 14 | A | | | |
| 767665 | | 10 | 580 | A | Store Grocery | Night Stock/Packout Clerk | 6580 Avenel NJ | 3/2/1989 | F | 7/11/1999 | 1262 | 9010 | A | 2/9/1991 | D | | | Yes | 14 | B | | | |
| 872277 | | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 6/28/2015 | P | NULL | 1262 | 9010 | A | 6/28/2015 | D | | | | 14 | E | Yes | Yes | |
| 780507 | | 9 | 512 | A | Store Grocery | Night Stock/Packout Clerk | 6512 Linden NJ | 1/31/1980 | F | 5/31/1981 | 1262 | 9010 | A | 6/26/2001 | D | | Yes | | 15 | A | | | |
| 783801 | | 3 | 582 | A | Store Grocery | Dairy Clerk Night Crew | 6582 Toms River NJ | 9/13/1991 | F | 4/24/1994 | 1262 | 9010 | A | 1/14/2012 | D | | | Yes | 15 | B | | | |
| 872204 | | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 6/27/2015 | P | NULL | 1262 | 9010 | A | 6/27/2015 | D | | | | 15 | E | Yes | Yes | |
| 778233 | | 9 | 512 | A | Store Grocery | Dairy Clerk | 6512 Linden NJ | 1/27/1984 | F | 10/28/1985 | 1262 | 9010 | A | 8/18/2013 | D | | Yes | | 16 | A | | | |
| 773971 | | 3 | 578 | A | Store Grocery | Night Stock/Packout Clerk | 6578 Brick NJ | 2/2/1996 | F | 12/7/1998 | 1262 | 9010 | A | 7/20/1997 | D | | | Yes | 16 | C | Yes | | |
| 872283 | | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 6/27/2015 | P | NULL | 1262 | 9010 | A | 6/27/2015 | D | | | | 16 | E | Yes | Yes | |
| 779550 | | 9 | 512 | A | Store Front End | Cashier/Checker Night Crew | 6512 Linden NJ | 1/10/1977 | F | 11/1/1987 | 1262 | 9010 | A | NULL | D | | Yes | | 17 | A | | | |
| 768982 | | 10 | 114 | A | Store Grocery | Night Stock/Packout Clerk | 6114 Jersey City NJ | 8/17/1994 | F | 10/10/1996 | 1262 | 9010 | A | 4/26/2015 | D | | | Yes | 17 | C | Yes | | |
| 872333 | | 3 | 538 | A | Store Produce | Produce Clerk | 6538 East Brunswick NJ | 6/27/2015 | P | NULL | 1262 | 9010 | A | 6/27/2015 | D | | | | 17 | E | Yes | Yes | |
| 779398 | | 9 | 512 | A | Store Front End | Cashier/Checker | 10/2/1972 | F | 4/18/1988 | | 1262 | 9010 | A | NULL | D | | Yes | | 18 | A | | | |
| 771300 | | 3 | 538 | A | Store Grocery | Night Stock/Packout Clerk | 6538 East Brunswick NJ | 9/11/1989 | F | 4/26/1998 | 1262 | 9010 | A | 9/5/2009 | N | | | Yes | 18 | B | | | |
| 783374 | | 9 | 194 | B | Store Grocery | Night Stock/Packout Clerk | 6194 Bergenfield NJ | 1/10/1983 | F | 12/12/1999 | 1262 | 9010 | A | 3/13/2011 | D | | | Yes | 18 | C | Yes | | |
| 872278 | | 9 | 181 | B | Store Front End | Cashier/Checker | 6181 Elmwood Park NJ | 6/26/2015 | P | NULL | 1262 | 9010 | A | 6/26/2015 | D | | | | 18 | EE | Yes | Yes | |

| Oracle | Last Name | Dis | Loc | GEO AREA | Department | Job | Location | Hiredate | FT/PT | FT Date | Union | EDP | Status | Job Date | Shift | Pay Rate | Closing Store? | Classified | Bump # | Bump Position | PT | Layoff | Reduced to Clerk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 780011 | | 9 | 512 | A | Store Grocery | Night Stock/Packout Clerk | 6512 Linden NJ | 4/5/1989 | F | 3/4/1990 | 1262 | 9010 | A | NULL | D | | Yes | | 19 | B | | | |
| 781810 | | 3 | 538 | A | Store Grocery | Night Stock/Packout Clerk | 6538 East Brunswick NJ | 8/3/1992 | F | 3/16/1998 | 1262 | 9010 | A | 10/29/2011 | N | | | | 19 | C | | | |
| 768370 | | 9 | 299 | B | Store Grocery | Night Stock/Packout Clerk | 6299 Ramsey NJ | 9/4/1995 | F | 11/14/1999 | 1262 | 9010 | A | 9/4/1995 | D | | | | 19 | CC | Yes | | |
| 852620 | | 10 | 128 | B | Store Front End | Cashier/Checker | 6128 Belleville NJ | 6/26/2015 | P | NULL | 1262 | 9010 | A | 6/26/2015 | D | | | | 19 | EE | | Yes | |
| 776141 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 10/12/1988 | F | 12/5/1994 | 1262 | 9010 | A | 7/5/2009 | D | | Yes | | 20 | B | | | |
| 774667 | | 10 | 270 | A | Store Grocery | Night Stock/Packout Clerk | 6270 South Orange NJ | 10/3/1994 | F | 3/8/1998 | 1262 | 9010 | A | 2/13/2011 | D | | | | 20 | C | | | |
| 776997 | | 9 | 198 | B | Store Grocery | Night Stock/Packout Clerk | 6198 Fair Lawn NJ | 3/27/1995 | F | 6/7/1999 | 1262 | 9010 | A | NULL | D | | | | 20 | CC | Yes | | |
| 872070 | | 10 | 128 | B | Store Front End | Cashier/Checker | 6128 Belleville NJ | 6/25/2015 | P | NULL | 1262 | 9010 | A | 6/25/2015 | D | | | | 20 | EE | | Yes | |
| 784964 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 7/2/1981 | F | 10/30/1995 | 1262 | 9010 | A | 9/3/2013 | D | | Yes | | 21 | B | | | |
| 771425 | | 3 | 582 | A | Store Grocery | Night Stock/Packout Clerk | 6582 Toms River NJ | 6/17/1992 | F | 2/16/1998 | 1262 | 9010 | A | NULL | D | | | | 21 | C | | | |
| 776025 | | 9 | 181 | A | Store Grocery | Night Stock/Packout Clerk | 6181 Elmwood Park NJ | 3/1/1997 | F | 5/2/1999 | 1262 | 9010 | A | 1/19/1998 | D | | | | 21 | CC | Yes | | |
| 872124 | | 10 | 128 | B | Store Front End | Cashier/Checker | 6128 Belleville NJ | 6/23/2015 | P | NULL | 1262 | 9010 | A | 6/23/2015 | D | | | | 21 | EE | | Yes | |
| 780412 | | 9 | 512 | A | Store Grocery | Night Stock/Packout Clerk | 6512 Linden NJ | 11/6/1986 | F | 9/20/1999 | 1262 | 9010 | A | 4/26/2002 | D | | Yes | | 22 | B | Yes | | |
| 872288 | | 3 | 527 | A | Store Front End | Cashier/Checker | 6527 Hopelawn NJ | 6/26/2015 | P | NULL | 1262 | 9010 | A | 6/26/2015 | D | | | | 22 | C | | Yes | |
| 779421 | | 9 | 512 | A | Store Pharmacy | Pharmacy Tech | 6512 Linden NJ | 10/19/1975 | F | NULL | 1262 | 9010 | A | 9/19/2000 | D | | Yes | | 23 | D | | | |
| 872461 | | 10 | 288 | A | Store Grocery | Pharmacy Clerk | 6288 Elizabeth NJ | 6/26/2015 | P | NULL | 1262 | 9010 | A | 6/26/2015 | D | | | | 23 | E | | Yes | |
| 780260 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 11/5/1975 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 24 | D | | | |
| 872315 | | 10 | 270 | A | Store Grocery | Cashier/Checker | 6270 South Orange NJ | 6/23/2015 | P | NULL | 1262 | 9010 | A | 6/23/2015 | D | | | | 24 | E | | Yes | |
| 780768 | | 9 | 512 | A | Store Front End | Front-End/Customer Service Clerk | 6512 Linden NJ | 5/2/1977 | P | NULL | 1262 | 9010 | A | 2/9/1991 | D | | Yes | | 25 | D | | | |
| 872244 | | 10 | 270 | A | Store Front End | Cashier/Checker | 6270 South Orange NJ | 6/22/2015 | P | NULL | 1262 | 9010 | A | 6/22/2015 | D | | | | 25 | E | | Yes | |
| 780604 | | 9 | 512 | A | Store Front End | Clerk Podium | 6512 Linden NJ | 5/28/1978 | F | 9/28/1982 | 1262 | 9010 | A | 1/29/1995 | D | | Yes | | 26 | D | | | |
| 872205 | | 10 | 270 | A | Store Front End | Cashier/Checker | 6270 South Orange NJ | 6/22/2015 | P | NULL | 1262 | 9010 | A | 6/22/2015 | D | | | | 26 | E | | Yes | |
| 778574 | | 9 | 512 | A | Store Pharmacy | Pharmacy Tech | 6512 Linden NJ | 11/13/1978 | F | NULL | 1262 | 9010 | A | 9/19/2000 | D | | Yes | | 27 | D | | | |
| 872059 | | 10 | 112 | A | Store Front End | Cashier/Checker | 6112 Jersey City NJ | 6/22/2015 | P | NULL | 1262 | 9010 | A | 6/22/2015 | D | | | | 27 | E | | Yes | |
| 778367 | | 9 | 512 | A | Store Grocery | Grocery Clerk 2nd Shift | 6512 Linden NJ | 7/27/1981 | F | NULL | 1262 | 9010 | A | 6/17/2011 | D | | Yes | | 28 | D | | | |
| 872049 | | 10 | 112 | A | Store Front End | Cashier/Checker | 6112 Jersey City NJ | 6/22/2015 | P | NULL | 1262 | 9010 | A | 6/22/2015 | D | | | | 28 | E | | Yes | |
| 780391 | | 9 | 512 | A | Store Grocery | Dairy Clerk | 6512 Linden NJ | 10/26/1981 | F | 11/5/2000 | 1262 | 9010 | A | 2/9/1991 | D | | Yes | | 29 | D | | | |
| 872031 | | 3 | 581 | A | Store Front End | Cashier/Checker | 6581 Old Bridge NJ | 6/22/2015 | P | NULL | 1262 | 9010 | A | 6/22/2015 | D | | | | 29 | E | | Yes | |
| 779582 | | 9 | 512 | A | Store Front End | Clerk Podium | 6512 Linden NJ | 2/27/1989 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 30 | D | | | |
| 871995 | | 3 | 581 | A | Store Front End | Cashier/Checker | 6581 Old Bridge NJ | 6/21/2015 | P | NULL | 1262 | 9010 | A | 6/21/2015 | D | | | | 30 | E | | Yes | |
| 772421 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 3/18/1989 | P | NULL | 1262 | 9010 | A | 2/9/1991 | D | | Yes | | 31 | D | | | |
| 871976 | | 9 | 450 | A | Store Grocery | Grocery Clerk | 6450 Garwood NJ | 6/20/2015 | P | NULL | 1262 | 9010 | A | 6/20/2015 | D | | | | 31 | E | | Yes | |
| 779223 | | 9 | 512 | A | Store Front End | Front-End/Customer Service Clerk | 6512 Linden NJ | 7/9/1990 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 32 | D | | | |
| 872113 | | 9 | 450 | A | Store Front End | Cashier/Checker | 6450 Garwood NJ | 6/18/2015 | P | NULL | 1262 | 9010 | A | 6/18/2015 | D | | | | 32 | E | | Yes | |
| 779609 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 8/27/1991 | P | NULL | 1262 | 9010 | A | 11/15/2009 | D | | Yes | | 33 | D | | | |
| 830691 | REDACTED | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 6/16/2015 | P | NULL | 1262 | 9010 | A | 6/16/2015 | D | REDACTED | | | 33 | E | | Yes | |
| 780195 | | 9 | 512 | A | Store Grocery | Grocery Clerk | 6512 Linden NJ | 10/26/1991 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 34 | D | | | |
| 871677 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 6/16/2015 | P | NULL | 1262 | 9010 | A | 6/26/2015 | D | | Yes | | 34 | E | | Yes | |
| 778974 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 11/29/1993 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 35 | D | | | |
| 871959 | | 9 | 450 | A | Store Front End | Cashier/Checker | 6450 Garwood NJ | 6/15/2015 | P | NULL | 1262 | 9010 | A | 6/15/2015 | D | | | | 35 | E | | Yes | |
| 780542 | | 9 | 512 | A | Store Front End | Front-End/Customer Service Clerk | 6512 Linden NJ | 5/19/1997 | P | NULL | 1262 | 9010 | A | 5/19/1997 | D | | Yes | | 36 | D | | | |
| 871672 | | 3 | 581 | A | Store Front End | Cashier/Checker | 6581 Old Bridge NJ | 6/15/2015 | P | NULL | 1262 | 9010 | A | 6/15/2015 | D | | | | 36 | E | | Yes | |
| 772226 | | 9 | 512 | A | Store Produce | Produce Clerk | 6512 Linden NJ | 3/28/1998 | P | 7/18/2004 | 1262 | 9010 | A | 6/21/2011 | D | | Yes | | 37 | D | | | |
| 871657 | | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 6/13/2015 | P | NULL | 1262 | 9010 | A | 6/13/2015 | D | | | | 37 | E | | Yes | |
| 773459 | | 9 | 512 | A | Store Pharmacy | Pharmacy Tech | 6512 Linden NJ | 8/24/1998 | P | NULL | 1262 | 9010 | A | 9/19/2000 | D | | Yes | | 38 | D | | | |
| 871743 | | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 6/12/2015 | P | NULL | 1262 | 9010 | A | 6/12/2015 | D | | | | 38 | E | | Yes | |
| 780614 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 10/28/1998 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 39 | D | | | |
| 871642 | | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 6/12/2015 | P | NULL | 1262 | 9010 | A | 6/12/2015 | D | | | | 39 | E | | Yes | |
| 779410 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 9/27/1999 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 40 | D | | | |
| 871788 | | 10 | 112 | A | Store Front End | Cashier/Checker | 6112 Jersey City NJ | 6/12/2015 | P | NULL | 1262 | 9010 | A | 6/12/2015 | D | | | | 40 | E | | Yes | |
| 779699 | | 9 | 512 | A | Store Front End | Front-End/Customer Service Clerk | 6512 Linden NJ | 12/7/1999 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 41 | D | | | |
| 833612 | | 3 | 535 | A | Store Front End | Cashier/Checker | 6535 Edison NJ | 6/11/2015 | P | NULL | 1262 | 9010 | A | 6/11/2015 | D | | | | 41 | E | | Yes | |
| 780668 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 1/19/2001 | P | NULL | 1262 | 9010 | A | 8/21/2001 | D | | Yes | | 42 | D | | | |
| 871587 | | 3 | 581 | A | Store Front End | Cashier/Checker | 6581 Old Bridge NJ | 6/11/2015 | P | NULL | 1262 | 9010 | A | 6/11/2015 | D | | | | 42 | E | | Yes | |
| 780359 | | 9 | 512 | A | Store Front End | Clerk Podium | 6512 Linden NJ | 6/2/2001 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 43 | D | | | |
| 871597 | | 3 | 535 | A | Store Front End | Cashier/Checker | 6535 Edison NJ | 6/9/2015 | P | NULL | 1262 | 9010 | A | 6/9/2015 | D | | | | 43 | E | | Yes | |
| 778996 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 7/11/2001 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 44 | D | | | |
| 871941 | | 9 | 450 | A | Store Front End | Cashier/Checker | 6450 Garwood NJ | 6/9/2015 | P | NULL | 1262 | 9010 | A | 6/9/2015 | D | | | | 44 | E | | Yes | |
| 780712 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 8/22/2001 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 45 | D | | | |
| 779936 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 10/23/2002 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 46 | D | | | |
| 870648 | | 3 | 581 | A | Store Front End | Cashier/Checker | 6581 Old Bridge NJ | 6/9/2015 | P | NULL | 1262 | 9010 | A | 6/7/2015 | D | | | | 46 | E | | Yes | |
| 780530 | | 9 | 512 | A | Store HBC | Gen Mdse/Non-Food/HBA Clerk | 6512 Linden NJ | 4/9/2003 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 47 | D | | | |
| 871223 | | 3 | 581 | A | Store Front End | Cashier/Checker | 6581 Old Bridge NJ | 6/7/2015 | P | NULL | 1262 | 9010 | A | 6/7/2015 | D | | | | 47 | E | | Yes | |
| 779620 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 5/7/2003 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 48 | D | | | |
| 844336 | | 10 | 270 | A | Store Front End | Cashier/Checker | 6270 South Orange NJ | 6/6/2015 | P | NULL | 1262 | 9010 | A | 6/6/2015 | D | | | | 48 | E | | Yes | |
| 783555 | | 9 | 512 | A | Store Front End | Cashier 2nd Shift | 6512 Linden NJ | 3/6/2004 | P | NULL | 1262 | 9010 | A | 1/16/2011 | D | | Yes | | 49 | D | | | |
| 871407 | | 10 | 224 | A | Store Front End | Cashier/Checker | 6224 Irvington NJ | 6/6/2015 | P | NULL | 1262 | 9010 | A | 6/6/2015 | D | | | | 49 | E | | Yes | |
| 779572 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 6/19/2004 | P | NULL | 1262 | 9010 | A | 12/17/2007 | D | | Yes | | 50 | D | | | |
| 871427 | | 10 | 224 | A | Store Front End | Cashier/Checker | 6224 Irvington NJ | 6/6/2015 | P | NULL | 1262 | 9010 | A | 6/6/2015 | D | | | | 50 | E | | Yes | |
| 779783 | | 9 | 512 | A | Store Produce | Produce Clerk | 6512 Linden NJ | 7/3/2004 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 51 | D | | | |
| 871648 | | 3 | 578 | A | Store Front End | Cashier/Checker | 6578 Brick NJ | 6/5/2015 | P | NULL | 1262 | 9010 | A | 6/5/2015 | D | | | | 51 | E | | Yes | |

| Oracle | Last Name | Dis | Loc | GEO AREA | Department | Job | Location | Hiredate | FT/PT | FT Date | Union | EDP | Status | Job Date | Shift | Pay Rate | Closing Store? | Classified | Bump # | Bump Position | PT | Layoff | Reduced to Clerk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 780309 | | 9 | 512 | A | Store Front End | Front-End/Customer Service Clerk | 6512 Linden NJ | 9/3/2005 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 52 | D | | | |
| 871504 | | 3 | 578 | A | Store Front End | Cashier/Checker | 6578 Brick NJ | 6/5/2015 | P | NULL | 1262 | 9010 | A | 6/5/2015 | D | | | | 52 | E | | Yes | |
| 779360 | | 9 | 512 | A | Store Front End | Cashier 2nd Shift | 6512 Linden NJ | 3/4/2006 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 53 | D | | | |
| 871164 | | 10 | 112 | A | Store Front End | Cashier/Checker | 6112 Jersey City NJ | 6/2/2015 | P | NULL | 1262 | 9010 | A | 6/2/2015 | D | | | | 53 | E | | Yes | |
| 779769 | | 9 | 512 | A | Store Produce | Produce Clerk | 6512 Linden NJ | 7/1/2006 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 54 | D | | | |
| 831121 | | 10 | 436 | A | Store Produce | Produce Clerk | 6436 Middlesex NJ | 6/2/2015 | P | NULL | 1262 | 9010 | A | 6/2/2015 | D | | | | 54 | E | | Yes | |
| 780290 | | 9 | 512 | A | Store Produce | Produce Clerk | 6512 Linden NJ | 1/6/2007 | P | NULL | 1262 | 9010 | A | 7/13/2013 | D | | Yes | | 55 | D | | | |
| 871152 | | 10 | 186 | A | Store Front End | Cashier/Checker | 6186 Newark NJ | 6/1/2015 | P | NULL | 1262 | 9010 | A | 6/1/2015 | D | | | | 55 | E | | Yes | |
| 780433 | | 9 | 512 | A | Store Produce | Produce Clerk 2nd Shift | 6512 Linden NJ | 5/25/2007 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 56 | D | | | |
| 871033 | | 10 | 580 | A | Store Front End | Cashier/Checker | 6580 Avenel NJ | 6/1/2015 | P | NULL | 1262 | 9010 | A | 6/1/2015 | D | | | | 56 | E | | Yes | |
| 779957 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 5/28/2007 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 57 | D | | | |
| 871076 | | 10 | 580 | A | Store Front End | Cashier/Checker | 6580 Avenel NJ | 6/1/2015 | P | NULL | 1262 | 9010 | A | 6/1/2015 | D | | | | 57 | E | | Yes | |
| 779023 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 11/3/2007 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 58 | D | | | |
| 848806 | | 3 | 535 | A | Store Front End | Cashier/Checker | 6535 Edison NJ | 5/31/2015 | P | NULL | 1262 | 9010 | A | 5/31/2015 | D | | | | 58 | E | | Yes | |
| 786700 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 12/8/2007 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 59 | D | | | |
| 871024 | | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 5/31/2015 | P | NULL | 1262 | 9010 | A | 5/31/2015 | D | | | | 59 | E | | Yes | |
| 796308 | | 9 | 512 | A | Store Grocery | Frozen Food Clerk | 6512 Linden NJ | 6/6/2008 | P | NULL | 1262 | 9010 | A | 5/26/2014 | D | | Yes | | 60 | D | | | |
| 835317 | | 10 | 580 | A | Store Front End | Cashier/Checker | 6580 Avenel NJ | 5/31/2015 | P | NULL | 1262 | 9010 | A | 5/31/2015 | D | | | | 60 | E | | Yes | |
| 801828 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 8/30/2008 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 61 | D | | | |
| 870980 | | 10 | 223 | A | Store Front End | Cashier/Checker | 6223 Newark NJ | 5/30/2015 | P | NULL | 1262 | 9010 | A | 5/30/2015 | D | | | | 61 | E | | Yes | |
| 820579 | | 9 | 512 | A | Store Produce | Produce Clerk | 6512 Linden NJ | 11/21/2009 | P | NULL | 1262 | 9010 | A | NULL | D | | Yes | | 62 | D | | | |
| 871284 | | 3 | 578 | A | Store Front End | Cashier/Checker | 6578 Brick NJ | 5/29/2015 | P | NULL | 1262 | 9010 | A | 5/29/2015 | D | | | | 62 | E | | Yes | |
| 839146 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 4/27/2012 | P | NULL | 1262 | 9010 | A | 4/27/2012 | D | | Yes | | 63 | D | | | |
| 815144 | REDACTED | 10 | 186 | A | Store Front End | Cashier/Checker | 6186 Newark NJ | 5/28/2015 | P | NULL | 1262 | 9010 | A | 5/28/2015 | D | REDACTED | | | 63 | E | | Yes | |
| 843909 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 9/18/2012 | P | NULL | 1262 | 9010 | A | 9/18/2012 | D | | Yes | | 64 | D | | | |
| 871120 | | 9 | 450 | A | Store Front End | Cashier/Checker | 6450 Garwood NJ | 5/27/2015 | P | NULL | 1262 | 9010 | A | 5/27/2015 | D | | | | 64 | E | | Yes | |
| 844952 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 10/1/2012 | P | NULL | 1262 | 9010 | A | 10/1/2012 | D | | Yes | | 65 | D | | | |
| 870919 | | 3 | 582 | A | Store Front End | Cashier/Checker | 6582 Toms River NJ | 5/27/2015 | P | NULL | 1262 | 9010 | A | 5/27/2015 | D | | | | 65 | E | | Yes | |
| 854304 | | 9 | 512 | A | Store Grocery | Night Stock/Packout Clerk | 6512 Linden NJ | 8/27/2013 | P | NULL | 1262 | 9010 | A | 8/27/2013 | D | | Yes | | 66 | D | | | |
| 870914 | | 3 | 582 | A | Store Produce | Produce Clerk | 6582 Toms River NJ | 5/27/2015 | P | NULL | 1262 | 9010 | A | 5/27/2015 | D | | | | 66 | E | | Yes | |
| 863028 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 6/9/2014 | P | NULL | 1262 | 9010 | A | 7/21/2014 | D | | Yes | | 67 | D | | | |
| 871423 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 5/27/2015 | P | NULL | 1262 | 9010 | A | 6/15/2015 | D | | Yes | | 67 | E | | Yes | |
| 862596 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 6/18/2014 | P | NULL | 1262 | 9010 | A | 7/14/2014 | D | | Yes | | 68 | D | | | |
| 871213 | | 10 | 270 | A | Store Front End | Cashier/Checker | 6270 South Orange NJ | 5/26/2015 | P | NULL | 1262 | 9010 | A | 5/26/2015 | D | | | | 68 | E | | Yes | |
| 866702 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 9/18/2014 | P | NULL | 1262 | 9010 | A | 11/3/2014 | D | | Yes | | 69 | D | | | |
| 870815 | | 10 | 112 | A | Store Front End | Cashier/Checker | 6112 Jersey City NJ | 5/25/2015 | P | NULL | 1262 | 9010 | A | 5/25/2015 | D | | | | 69 | E | | Yes | |
| 865831 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 9/18/2014 | P | NULL | 1262 | 9010 | A | 10/10/2014 | D | | Yes | | 70 | D | | | |
| 870939 | | 10 | 436 | A | Store Front End | Cashier/Checker | 6436 Middlesex NJ | 5/24/2015 | P | NULL | 1262 | 9010 | A | 5/24/2015 | D | | | | 70 | E | | Yes | |
| 865830 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 9/18/2014 | P | NULL | 1262 | 9010 | A | 10/10/2014 | D | | Yes | | 71 | D | | | |
| 870923 | | 10 | 436 | A | Store Front End | Cashier/Checker | 6436 Middlesex NJ | 5/24/2015 | P | NULL | 1262 | 9010 | A | 5/24/2015 | D | | | | 71 | E | | Yes | |
| 867098 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 10/29/2014 | P | NULL | 1262 | 9010 | A | 11/10/2014 | D | | Yes | | 72 | D | | | |
| 870941 | | 10 | 436 | A | Store Front End | Cashier/Checker | 6436 Middlesex NJ | 5/24/2015 | P | NULL | 1262 | 9010 | A | 5/24/2015 | D | | | | 72 | E | | Yes | |
| 870411 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 5/5/2015 | P | NULL | 1262 | 9010 | A | 6/1/2015 | D | | Yes | | 73 | D | | | |
| 853156 | | 3 | 573 | A | Store Front End | Front-End/Customer Service Clerk | 6573 Hazlet NJ | 5/24/2015 | P | NULL | 1262 | 9010 | A | 5/24/2015 | D | | | | 73 | E | | Yes | |
| 870401 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 5/7/2015 | P | NULL | 1262 | 9010 | A | 5/16/2015 | D | | Yes | | 74 | D | | | |
| 870808 | | 10 | 224 | A | Store Grocery | Grocery Clerk | 6224 Irvington NJ | 5/23/2015 | P | NULL | 1262 | 9010 | A | 5/23/2015 | D | | | | 74 | E | | Yes | |
| 870743 | | 9 | 512 | A | Store Grocery | Grocery Clerk | 6512 Linden NJ | 5/21/2015 | P | NULL | 1262 | 9010 | A | 6/1/2015 | D | | Yes | | 75 | D | | | |
| 870769 | | 10 | 270 | A | Store Front End | Cashier/Checker | 6270 South Orange NJ | 5/22/2015 | P | NULL | 1262 | 9010 | A | 5/22/2015 | D | | | | 75 | E | | Yes | |
| 870783 | | 9 | 512 | A | Store Front End | Cashier/Checker | 6512 Linden NJ | 5/22/2015 | P | NULL | 1262 | 9010 | A | 5/26/2015 | D | | Yes | | 76 | D | | | |
| 870839 | | 10 | 270 | A | Store Front End | Cashier/Checker | 6270 South Orange NJ | 5/22/2015 | P | NULL | 1262 | 9010 | A | 5/22/2015 | D | | | | 76 | E | | Yes | |

9010 Bumps

## 9005 Bumps

| Oracle | Last Name | Dis | Loc | GEO AREA | Department | Job | Location | Hiredate | FT/PT | FT Date | Union | EDP | Status | Job Date | Shift | Pay Rate | Closing Store? | Classified | Bump # | Bump Position | PT | Layoff | Reduced to Clerk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 779042 | | 9 | 512 | A | Store Seafood | Seafood Manager/Dept Head | 6512 Linden NJ | 8/20/1990 | F | 8/20/1990 | 464 | 9005 | A | 3/5/2000 | D | | Yes | Yes | 1 | A | | | |
| 772069 | | 10 | 224 | A | Store Seafood | Seafood Manager/Dept Head | 6224 Irvington NJ | 1/30/2012 | F | 3/31/2014 | 464 | 9005 | A | 3/31/2014 | D | | | Yes | 1 | E | Yes | | Yes |
| 871791 | | 10 | 270 | A | Store Deli | Seafood Clerk | 6270 South Orange NJ | 6/16/2015 | P | NULL | 464 | 9005 | A | 6/16/2015 | D | | | | 1 | E | | Yes | |
| 779664 | | 9 | 512 | A | Store Deli | Deli Manager | 6512 Linden NJ | 3/29/1986 | F | 8/24/1987 | 464 | 9005 | A | 1/29/1994 | D | | Yes | Yes | 2 | A | | | |
| 774956 | | 3 | 581 | A | Store Deli | Deli Manager | 6581 Old Bridge NJ | 11/30/1998 | F | 3/5/2000 | 464 | 9005 | A | 5/3/2015 | D | | | Yes | 2 | B | | Yes | |
| 769572 | | 10 | 270 | A | Store Deli | Deli Clerk | 6270 South Orange NJ | 10/24/2003 | F | 2/9/2015 | 464 | 9005 | A | 2/9/2015 | D | | | | 2 | C | Yes | | |
| 870392 | | 9 | 450 | A | Store Deli | Deli Clerk | 6450 Garwood NJ | 5/9/2015 | P | NULL | 464 | 9005 | A | 5/9/2015 | D | | | | 2 | E | | Yes | |
| 774902 | | 9 | 512 | A | Store Meat | 1st Cutter/2nd Person | 6512 Linden NJ | 3/23/1981 | F | 7/17/1982 | 464 | 9005 | A | NULL | D | | Yes | | 3 | B | | Yes | |
| 772322 | | 10 | 114 | A | Store Meat | Journeyman Meat Cutter | 6114 Jersey City NJ | 8/27/2012 | F | 4/22/2013 | 464 | 9005 | A | 4/22/2013 | D | | | | 3 | C | Yes | | |
| 872212 | | 3 | 573 | A | Store Meat | Apprentice Meat Cutter | 6573 Hazlet NJ | 6/26/2015 | P | NULL | 464 | 9005 | A | 6/26/2015 | D | | | | 3 | E | | Yes | |
| 618211 | | 9 | 512 | A | Store Meat | Journeyman Meat Cutter | 6512 Linden NJ | 3/5/2005 | F | 3/5/2005 | 464 | 9005 | A | 10/14/2014 | D | | Yes | | 4 | B | | Yes | |
| 775201 | | 10 | 112 | A | Store Meat | Journeyman B 2nd Shift | 6112 Jersey City NJ | 5/16/2005 | F | 3/3/2013 | 464 | 9005 | L | 3/3/2013 | D | | | | 4 | C | Yes | | |
| 870796 | | 10 | 270 | A | Store Meat | Journeyman Meat Cutter | 6270 South Orange NJ | 5/27/2015 | P | NULL | 464 | 9005 | A | 5/27/2015 | D | | | | 4 | E | | Yes | |
| 842823 | | 9 | 512 | A | Store Meat | Journeyman B | 6512 Linden NJ | 8/12/2012 | F | 3/4/2013 | 464 | 9005 | A | 3/4/2013 | D | | Yes | | 5 | B | Yes | | |
| 776748 | | 10 | 112 | A | Store Meat | Journeyman Meat Cutter | 6112 Jersey City NJ | 11/5/2014 | P | NULL | 464 | 9005 | A | 11/5/2014 | D | | | | 5 | E | | Yes | |
| 772553 | | 9 | 512 | A | Store Deli | Deli Clerk 2nd Shift | 6512 Linden NJ | 9/12/2001 | F | 7/10/2005 | 464 | 9005 | A | NULL | D | | Yes | | 6 | B | | Yes | |
| 771303 | | 10 | 114 | A | Store Deli | Deli Clerk | 6114 Jersey City NJ | 11/10/2005 | F | 8/24/2014 | 464 | 9005 | A | 8/24/2014 | D | | | | 6 | C | Yes | | |
| 871712 | | 10 | 224 | A | Store Deli | Deli Clerk | 6224 Irvington NJ | 6/6/2015 | P | NULL | 464 | 9005 | A | 6/6/2015 | D | | | | 6 | E | | Yes | |
| 768019 | | 9 | 512 | A | Store Seafood | Lead Seafood Clerk | 6512 Linden NJ | 2/8/1982 | F | 11/28/2004 | 464 | 9005 | A | NULL | D | | Yes | | 7 | B | | Yes | |
| 778313 | | 10 | 224 | A | Store Deli | Deli Clerk | 6224 Irvington NJ | 6/26/1999 | F | 6/23/2014 | 464 | 9005 | A | 6/23/2014 | D | | | | 7 | C | Yes | | |
| 860287 | | 3 | 573 | A | Store Deli | Deli Clerk | 6573 Hazlet NJ | 6/26/2015 | P | NULL | 464 | 9005 | A | 6/26/2015 | D | | | | 7 | E | | Yes | |
| 779053 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 7/22/1991 | F | 1/12/2004 | 464 | 9005 | A | 1/12/2004 | D | | Yes | | 8 | B | | Yes | |
| 872370 | | 10 | 580 | A | Store Deli | Deli Clerk | 6580 Avenel NJ | 7/3/2015 | P | NULL | 464 | 9005 | A | 7/3/2015 | D | | | | 8 | E | | Yes | |
| 780233 | | 9 | 512 | A | Store Meat | Meat Weigher/Wrapper | 6512 Linden NJ | 1/17/1994 | F | NULL | 464 | 9005 | A | 4/5/2009 | D | | Yes | | 9 | D | | | |
| 871994 | | 10 | 224 | A | Store Deli | Deli Clerk | 6224 Irvington NJ | 6/20/2015 | P | NULL | 464 | 9005 | A | 7/5/2015 | D | | | | 9 | E | | Yes | |
| 779190 | REDACTED | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 1/27/1997 | F | NULL | 464 | 9005 | A | NULL | D | REDACTED | Yes | | 10 | D | | | |
| 871893 | | 9 | 450 | A | Store Seafood | Seafood Clerk | 6450 Garwood NJ | 6/15/2015 | P | NULL | 464 | 9005 | A | 6/15/2015 | D | | | | 10 | E | | Yes | |
| 779901 | | 9 | 512 | A | Store Seafood | Deli Clerk | 6512 Linden NJ | 3/19/2003 | F | NULL | 464 | 9005 | A | NULL | D | | Yes | | 10 | E | | | |
| 871425 | | 10 | 224 | A | Store Seafood | Seafood Clerk | 6224 Irvington NJ | 6/6/2015 | P | NULL | 464 | 9005 | A | 6/21/2015 | D | | | | 11 | E | | Yes | |
| 837195 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 1/12/2012 | P | NULL | 464 | 9005 | A | 1/12/2012 | E | | Yes | | 12 | D | | | |
| 754727 | | 3 | 578 | A | Store Deli | Deli Clerk | 6578 Brick NJ | 6/5/2015 | P | NULL | 464 | 9005 | A | 6/5/2015 | D | | | | 12 | E | | Yes | |
| 838779 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 4/23/2012 | P | NULL | 464 | 9005 | A | 12/31/2012 | D | | Yes | | 13 | D | | | |
| 870793 | | 3 | 535 | A | Store Deli | Deli Clerk | 6535 Edison NJ | 5/20/2015 | P | NULL | 464 | 9005 | A | 5/20/2015 | D | | | | 13 | E | | Yes | |
| 780656 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 9/18/2012 | P | NULL | 464 | 9005 | A | 9/18/2012 | D | | Yes | | 14 | D | | | |
| 870541 | | 10 | 224 | A | Store Seafood | Seafood Clerk | 6112 Jersey City NJ | 5/18/2015 | P | NULL | 464 | 9005 | A | 5/18/2015 | D | | | | 14 | E | | Yes | |
| 854221 | | 9 | 512 | A | Store Seafood | Seafood Clerk | 6512 Linden NJ | 9/7/2013 | P | NULL | 464 | 9005 | A | 9/23/2013 | D | | Yes | | 15 | D | | | |
| 870505 | | 3 | 581 | A | Store Deli | Deli Clerk | 6581 Old Bridge NJ | 5/17/2015 | P | NULL | 464 | 9005 | A | 5/17/2015 | D | | | | 15 | E | | Yes | |
| 858609 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 1/15/2014 | P | NULL | 464 | 9005 | A | 1/15/2014 | D | | Yes | | 16 | D | | | |
| 870446 | | 10 | 114 | A | Store Deli | Deli Clerk | 6114 Jersey City NJ | 5/15/2015 | P | NULL | 464 | 9005 | A | 5/15/2015 | D | | | | 16 | E | | Yes | |
| 858606 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 1/27/2014 | P | NULL | 464 | 9005 | A | 1/27/2014 | D | | Yes | | 17 | D | | | |
| 870436 | | 10 | 114 | A | Store Deli | Deli Clerk | 6114 Jersey City NJ | 5/15/2015 | P | NULL | 464 | 9005 | A | 5/15/2015 | D | | | | 17 | E | | Yes | |
| 865269 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 9/2/2014 | P | NULL | 464 | 9005 | A | 9/2/2014 | D | | Yes | | 18 | D | | | |
| 856365 | | 3 | 578 | A | Store Deli | Deli Clerk | 6578 Brick NJ | 5/12/2015 | P | NULL | 464 | 9005 | A | 5/12/2015 | D | | | | 18 | E | | Yes | |
| 747538 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 9/15/2014 | P | NULL | 464 | 9005 | A | 9/15/2014 | D | | Yes | | 19 | D | | Yes | |
| 870341 | | 10 | 224 | A | Store Deli | Deli Clerk | 6224 Irvington NJ | 5/9/2015 | P | NULL | 464 | 9005 | A | 5/9/2015 | D | | | | 19 | E | | Yes | |
| 870412 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 5/7/2015 | P | NULL | 464 | 9005 | A | 5/7/2015 | D | | Yes | | 20 | D | | Yes | |
| 871680 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 5/15/2015 | P | NULL | 464 | 9005 | A | 5/15/2015 | D | | Yes | | 21 | D | | Yes | |
| 870585 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 5/18/2015 | P | NULL | 464 | 9005 | A | 5/18/2015 | D | | Yes | | 22 | D | | Yes | |
| 872242 | | 9 | 512 | A | Store Deli | Deli Clerk | 6512 Linden NJ | 6/22/2015 | P | NULL | 464 | 9005 | A | 6/22/2015 | D | | Yes | | 23 | D | | Yes | |
| 783668 | | 9 | 512 | A | Store Meat | Market Manager/Meat Dept Head | 6512 Linden NJ | 6/18/2001 | F | 6/18/2001 | 464 | 9005 | A | 10/14/2014 | D | | Yes | Yes | 24 | A | | | |
| 772345 | | 10 | 114 | A | Store Meat | Market Manager/Meat Dept Head | 6114 Jersey City NJ | 10/3/1996 | F | 4/27/1998 | 464 | 9005 | A | 4/17/2015 | D | | | Yes | 24 | B | | | Yes |
| 776464 | | 10 | 224 | A | Store Meat | 1st Cutter/2nd Person | 6224 Irvington NJ | 5/11/2012 | F | 3/3/2013 | 464 | 9005 | A | 6/30/2014 | D | | | | 24 | C | Yes | | |
| 864680 | | 3 | 581 | A | Store Meat | Journeyman Meat Cutter | 6581 Old Bridge NJ | 8/13/2014 | P | NULL | 464 | 9005 | A | 8/13/2014 | D | | | | 24 | E | | Yes | |

9005 Bumps

## 9009J Bumps

| Oracle | Last Name | Dis | Loc | GEO AREA | Department | Job | Location | Hiredate | FT/PT | FT Date | Union | EDP | Status | Job Date | Shift | Pay Rate | Closing Store? | Classified | Bump # | Bump Position | PT | Layoff | Reduced to Clerk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 777275 | | 9 | 512 | A | Store Bakery | Bakery Manager/Dir/Dept Head | 6512 Linden NJ | 8/29/1985 | F | 9/30/1985 | 1245 | 9009J | A | 7/14/1997 | D | | Yes | Yes | 1 | A | | | |
| 796781 | | 3 | 573 | A | Store Bakery | Bakery Manager/Dir/Dept Head | 6573 Hazlet NJ | 6/22/2008 | F | 8/10/2014 | 1245 | 9009J | A | 8/10/2014 | D | | | Yes | 1 | B | Yes | | Yes |
| 872054 | | 10 | 112 | A | Store Bakery | Bakery Clerk | 6112 Jersey City NJ | 6/24/2015 | P | NULL | 1245 | 9009J | A | 6/24/2015 | D | | | | 1 | E | | Yes | |
| 773915 | | 9 | 512 | A | Store Bakery | Bakery Clerk Night Crew | 6512 Linden NJ | 3/20/1978 | F | 3/20/1978 | 1245 | 9009J | A | NULL | D | | Yes | | 2 | B | | | |
| 771275 | | 3 | 535 | A | Store Bakery | Cake Decorator | 6535 Edison NJ | 9/15/1997 | F | 12/4/2005 | 1245 | 9009J | A | NULL | D | | | | 2 | C | Yes | | |
| 872441 | | 10 | 270 | A | Store Bakery | Bakery Clerk | 6270 South Orange NJ | 7/6/2015 | P | NULL | 1245 | 9009J | A | 7/6/2015 | D | | | | 2 | E | | Yes | |
| 780169 | | 9 | 512 | A | Store Bakery | Bakery Clerk | 6512 Linden NJ | 1/12/1998 | P | NULL | 1245 | 9009J | A | NULL | D | | Yes | | 3 | D | | | |
| 870439 | | 9 | 450 | A | Store Bakery | Bakery Clerk | 6450 Garwood NJ | 5/12/2015 | P | NULL | 1245 | 9009J | A | 5/12/2015 | D | | | | 3 | E | | Yes | |
| 780356 | REDACTED | 9 | 512 | A | Store Bakery | Cake Decorator | 6512 Linden NJ | 7/29/1998 | P | NULL | 1245 | 9009J | A | NULL | D | REDACTED | Yes | | 4 | D | | | |
| 864905 | | 3 | 573 | A | Store Bakery | Bakery Clerk | 6573 Hazlet NJ | 4/4/2015 | P | NULL | 1245 | 9009J | A | 4/4/2015 | D | | | | 4 | E | | Yes | |
| 777117 | | 9 | 512 | A | Store Bakery | Bakery Clerk | 6512 Linden NJ | 3/10/2003 | P | NULL | 1245 | 9009J | A | NULL | D | | Yes | | 5 | D | | | |
| 868814 | | 10 | 223 | A | Store Bakery | Cake Decorator | 6223 Newark NJ | 2/17/2015 | P | NULL | 1245 | 9009J | A | 2/17/2015 | D | | | | 5 | E | | Yes | |
| 770463 | | 9 | 512 | A | Store Bakery | Bakery Clerk | 6512 Linden NJ | 5/24/2004 | P | NULL | 1245 | 9009J | A | 10/1/2001 | D | | Yes | | 6 | D | | | |
| 868751 | | 9 | 450 | A | Store Bakery | Bakery Clerk | 6450 Garwood NJ | 2/9/2015 | P | NULL | 1245 | 9009J | A | 2/9/2015 | D | | | | 6 | E | | Yes | |
| 844926 | | 9 | 512 | A | Store Bakery | Cake Decorator | 6512 Linden NJ | 10/27/2012 | P | NULL | 1245 | 9009J | A | 10/27/2012 | D | | Yes | | 7 | D | | | |
| 868710 | | 10 | 270 | A | Store Bakery | Bakery Clerk | 6270 South Orange NJ | 2/6/2015 | P | NULL | 1245 | 9009J | A | 2/6/2015 | D | | | | 7 | E | | Yes | |
| 840193 | | 9 | 512 | A | Store Bakery | Bakery Clerk | 6512 Linden NJ | 11/3/2014 | P | NULL | 1245 | 9009J | A | 11/3/2014 | D | | Yes | | 8 | D | | | |
| 867761 | | 10 | 270 | A | Store Bakery | Bakery Clerk | 6270 South Orange NJ | 12/26/2014 | P | NULL | 1245 | 9009J | A | 12/26/2014 | D | | | | 8 | E | | Yes | |

## 9014

| Oracle | Last Name | Dis | Loc | GEO AREA | Department | Job | Location | Hiredate | FT/PT | FT Date | Union | EDP | Status | Job Date | Shift | Pay Rate | Closing Store? | Bump # | Bump Position | PT | Layoff |
|--------|-----------|-----|-----|----------|------------|-----|----------|----------|-------|---------|-------|-----|--------|----------|-------|----------|----------------|--------|---------------|-----|--------|
| 772329 |  | 9 | 512 | A | Store Pharmacy | Pharmacy Manager | 6512 Linden NJ | 7/2/1984 | F | 7/2/1984 | 100 | 9014 | A | 4/29/2012 | D |  | Yes | 1 | A |  |  |
| 770124 |  | 10 | 270 | A | Store Pharmacy | Pharmacy Manager | 6270 South Orange NJ | 3/11/2000 | F | 1/4/2015 | 100 | 9014 | A | 1/4/2015 | D |  |  | 1 | B |  |  |
| 870031 |  | 3 | 581 | A | Store Pharmacy | Pharmacist | 6581 Old Bridge NJ | 5/3/2015 | F | 5/3/2015 | 100 | 9014 | A | 5/3/2015 | D |  |  | 1 | C | Yes |  |
| 785906 | REDACTED | 10 | 224 | A | Store Pharmacy | Per Diem Pharmacist | 6224 Irvington NJ | 4/18/2005 | P | NULL | 100 | 9014 | P | 5/4/2014 | D |  |  | 1 | E |  | Yes |
| 769993 |  | 9 | 512 | A | Store Pharmacy | Pharmacist | 6512 Linden NJ | 7/17/1989 | F | 12/1/1997 | 100 | 9014 | A | 3/13/2011 | D | REDACTED | Yes | 2 | B | Yes |  |
| 846978 |  | 10 | 223 | A | Store Pharmacy | Pharmacist | 6223 Newark NJ | 3/25/2013 | F | 3/25/2013 | 100 | 9014 | A | 9/8/2013 | D |  |  | 2 | C | Yes |  |
| 767803 |  | 3 | 538 | A | Store Pharmacy | Per Diem Pharmacist | 6538 East Brunswick NJ | 5/16/2007 | P | NULL | 100 | 9014 | A | 9/20/2009 | D |  |  | 2 | E |  | Yes |
| 867107 |  | 9 | 512 | A | Store Pharmacy | Pharmacist | 6512 Linden NJ | 11/4/2014 | P | NULL | 100 | 9014 | A | 11/4/2014 | D |  | Yes | 3 | D |  | Yes |
| 765101 |  | 3 | 538 | A | Store Pharmacy | Per Diem Pharmacist | 6538 East Brunswick NJ | 2/23/2005 | P | NULL | 100 | 9014 | A | 11/13/2011 | D |  |  | 3 | E |  | Yes |

# GEO AREA

## 1245 Geographical Area

| STORE | LOCALS | DIV |
|-------|--------|-----|
| 112 | 1262 – 464 | A |
| 114 | 1262 – 464 | A |
| 186 | 1262 – 464 | A |
| 223 | 1262 – 464 | A |
| 224 | 1262 – 464 | A |
| 270 | 1262 – 464 | A |
| 288 | 1262 – 464 | A |
| 436 | 1262 – 464 | A |
| 450 | 1262 – 464 | A |
| 512 | 1262 – 464 | A |
| 527 | 1262 – 464 | A |
| 535 | 1262 – 464 | A |
| 538 | 1262 – 464 | A |
| 573 | 1262 – 464 | A |
| 576 | 1262 – 464 | A |
| 578 | 1262 – 464 | A |
| 580 | 1262 – 464 | A |
| 581 | 1262 – 464 | A |
| 582 | 1262 – 464 | A |
| 128 | 1262 – 464 | B |
| 153 | 1262 – 464 | B |
| 175 | 1262 – 464 | B |
| 178 | 1262 – 464 | B |
| 181 | 1262 – 464 | B |
| 185 | 1262 – 464 | B |
| 190 | 1262 – 464 | B |
| 194 | 1262 – 464 | B |
| 198 | 1262 – 464 | B |
| 261 | 1262 – 464 | B |
| 280 | 1262 – 464 | B |
| 282 | 1262 – 464 | B |
| 284 | 1262 – 464 | B |
| 286 | 1262 – 464 | B |
| 292 | 1262 – 464 | B |
| 299 | 1262 – 464 | B |

GEO AREA

# <u>Key</u>

| | |
|---|---|
| A | Department Manager Bump |
| B | FT Bump |
| C | FT Bump |
| D | FT-PT |
| E | PT clerk Laid off |
| BB | Department Manager Bump in GEO AREA B |
| CC | FT Bump in GEO AREA B |
| EE | PT Bump in GEO AREA B |

**<u>Exhibit F</u>**

**Hearing Transcript, *In re Hostess Brands, Inc.***
**Case No. 12-22052 (Bankr. S.D.N.Y. Nov. 21, 2012)**

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 12-22052-rdd

 4   - - - - - - - - - - - - - - - - x

 5   In the Matter of:

 6

 7   HOSTESS BRANDS, INC.

 8

 9             Debtors.

10   - - - - - - - - - - - - - - - - x

11

12                    U.S. Bankruptcy Court

13                    300 Quarropas Street

14                    White Plains, NY

15

16                    November 21, 2012

17                    11:55 AM

18

19   B E F O R E :

20   HON. ROBERT D. DRAIN

21   U.S. BANKRUPTCY JUDGE

22

23

24

25   ECRO:  Willie Rodriguez
```

1    HEARING re Motion to Authorize/Emergency Motion of Debtors

2    and Debtors In Possession for Interim and Final Orders,

3    Pursuant to Sections 105, 363, 365 and 503(c) of the

4    Bankruptcy Code (A) Approving (I) A Plan to Wind Down the

5    Debtors' Businesses, (II) The Sale of Certain Assets,

6    (III) Going Out of Business Sales at the Debtors Retail

7    Stores, (IV) The Debtors Non-Consensual Use of Cash

8    Collateral and Modifications to Final DIP Order, (V) An

9    Employee Retention Plan, (VI) A Management Incentive Plan,

10   (VII) Protections for Certain Employees Implementing the

11   Wind Down of the Debtors Businesses, (VIII) The use of

12   Certain Third Party Contractors and (IX) Procedures for the

13   Expedited Rejection of Contracts and Leases; and (B)

14   Authorizing the Debtors to Take Any and All Actions

15   Necessary to Implement the Wind Down

16

17   HEARING re Motion to Authorize/Emergency Motion and

18   Memorandum of Law of Debtors and Debtors in Possession

19   Pursuant to 1113(e) of the Bankruptcy Code (related

20   document(s) 1710)

21

22   HEARING re Continuance of Matters Previously Heard on

23   November 19, 2012 at 2 p.m. EST (related document(s) 1710,

24   1711)

25   Transcribed by:  Sheila Orms

15-23007-rdd   Doc 2539   Filed 02/17/15   Entered 02/25/15 11:51:46   Main Document
Pg 3 of 423

Page 3

 1   A P P E A R A N C E S :

 2

 3   KRAMER LEVIN NAFATALIS & FRANKEL, LLP

 4        Attorneys for the Committee of Unsecured Creditors

 5        1177 Avenue of the Americas

 6        New York, NY  10038

 7

 8   BY:  JOSHUA K. BRODY, ESQ.

 9        THOMAS MOERS MAYER, ESQ.

10

11   JONES DAY

12        Attorneys for Debtors

13        222 East 41st Street

14        New York, NY  10017

15

16   BY:  ROBERT HAMILTON, ESQ.

17        HEATHER LENNOX, ESQ.

18        MICHAEL SILBERFARB, ESQ.

19

20   LOWENSTEIN SANDLER

21        Attorneys for IAM

22        1251 Avenue of the Americas

23        New York, NY  10020

24

25   BY:  SHARON LEVINE, ESQ.

Page 4

```
 1 | MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
 2 |      Attorneys for Unknown
 3 |      1350 Broadway
 4 |      New York, NY  10018
 5 |
 6 | BY:  HANAN B. KOLKO, ESQ.
 7 |
 8 | MACEY SWANSON AND ALLMAN
 9 |      Attorneys for UAW
10 |      445 N. Pennsylvania Street
11 |      Suite 401
12 |      Indianapolis, IN  46204
13 |
14 | BY:  RICHARD J. SWANSON, ESQ.
15 |
16 | COHEN, WEISS & SIMON LLP
17 |      Attorneys for Teamsters
18 |      330 West 42nd Street
19 |      New York, NY  10036
20 |
21 | BY:  RICHARD M. SELTZER, ESQ.
22 |
23 |
24 |
25 |
```

Page 5

```
 1    CONNOLLY ROVE LODGE & HUTZ LLP

 2         Attorneys for Cigna Behavioral Health and

 3         Connecticut General Life Insurance Company

 4         The Nemours Building

 5         1007 North Orange Street

 6         Wilmington, DE  19899

 7

 8    BY:  JEFFREY C. WISLER, ESQ.

 9

10    FULBRIGHT & JAWORSKI, LLP

11         Attorneys for Bakery & Confectionery Union and

12         Industry International Pension Fund

13         666 Fifth Avenue

14         New York, NY  10103

15

16    BY:  ANCELA NASTASI, ESQ.

17

18    PAUL HASTINGS

19         Attorneys for General Electric Capital Corporation

20         1170 Peachtree Street, N.E.

21         Suite 100

22         Atlanta, GA  30309

23

24    BY:  JESSE H. AUSTIN, III, ESQ

25
```

Page 6

 1   U.S. DEPARTMENT OF JUSTICE

 2        Attorneys for the Office of the United States Trustee

 3        33 Whitehall Street

 4        21st Floor

 5        New York, NY  10004

 6

 7   BY:  SUSAN D. GOLDEN, ESQ.

 8        LINDA RIFFKIN, ESQ.

 9

10   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP

11        Attorneys for Diane Meyers and Kelly Caions

12        1265 Avenue of the Americas

13        New York, NY  10019

14

15   BY:  BRIAN S. HERMANN, ESQ.

16        DIANE MAYER, ESQ.

17

18   ULMER & BERNE LLP

19        Attorneys for Accenture

20        1660 West 2nd Street

21        Suite 1100

22        Cleveland, OH  44113

23

24   BY:  JEFFREY BADDELEY, ESQ. (TELEPHONICALLY)

25

Page 7

1    WEINBERG, ROGER & ROSENFELD

2         Attorneys for IUOE

3         1001 Marino Village Parkway

4         Suite 200

5         Alameda, CA  94501

6

7    BY:  JORDAN D. MAZUR, ESQ.  (TELEPHONICALLY)

8

9    KLEHR, HARRISON, HARVEY & BRANZBURG

10        Attorneys for Mark Popovich

11        457 Haddonfield Road

12        Suite 450

13        Cherry Hill, NJ  08002

14

15   BY:  CHARLES A. ERCOLE, ESQ. (TELEPHONICALLY)

16

17   UNKNOWN FIRM

18        Attorneys for RWDSU and Industry Pension Fund

19        (Unknown address)

20

21   BY:  WILLIAM WOLF, ESQ.

22

23

24

25

```
 1    VIRGINIA & AMBINDER LLP

 2         Attorneys for MidAtlantic Regional Council of

 3              Carpenters Annuity Fund and the Bakery Drivers,

 4              Local 33 Pension Fund

 5         Trinity Centre

 6         111 Broadway

 7         Suite 1403

 8         New York, NY  10006

 9

10    BY:  MARC TENENBAUM, ESQ. (TELEPHONICALLY)

11

12    LOCKE, LORD, BISSELL & LIDDELL LLP

13         Attorneys for Blommer Chocolate Company

14         111 South Wacker Drive

15         Chicago, IL  60606

16

17    BY:  COURTNEY BARR, ESQ. (TELEPHONICALLY)

18

19    CORNFIELD AND FELDMAN

20         Attorneys for Retail Wholesale & Department Store Union

21         25 East Washington Street

22         Suite 1400

23         Chicago, IL  60602

24

25    BY:  ROBERT A. SELTZER, ESQ. (TELEPHONICALLY)
```

Page 9

```
 1    BREDHOFF & KAISER, PLLC

 2         Attorneys for Bakery and Confectionery Union

 3         805 15th Street, Northwest

 4         Washington, D.C.  20005

 5

 6    BY:  JEFFREY R. FREUND, ESQ. (TELEPONICALLY)

 7

 8    FORD & ASSOCIATES, P.A.

 9         Attorneys for Olesya Gats

10         (Unknown Address)

11         Atlanta, GA

12

13    BY:  EDMOND J. FORD, ESQ. (TELEPHONICALLY)

14

15    TELEPHONIC APPEARANCES:

16

17    SCOTT AUGUST, SIERRA LIQUIDITY FUND

18    JEFFREY BADDELEY, ULMER & BERNE

19    WALTER BENZJIA, HALPERIN, BATTACLIA REICHT, LLP, CENTRAL

20         PENSION FUND

21    CASSIE C. COPPAGE, PAUL HASTINGS LLP, GENERAL ELECTRIC

22         CAPITAL CORP.

23    TERRY CUPPS, FOULSTON SIEFKIN, CEREAL FOOD PROCESSORS, INC.

24    COSTA DARCAS, MORGAN STANELY, NEW YORK

25    ZOLTAN DONOVAN, WINSTON, STRAWN LLP, PRO SE
```

1    TELEPHONIC APPEARANCES, CONTD:

2

3    KURT DUERSELDT, WELLS FARGO BANK

4    JEFF FORTIZZI, SILVER POINT CAPITAL

5    CHAIM FORTGANG, SILVER POINT CAPITAL

6    JOSHUA FRIEDMAN, KRAMER LEVIN NAFTALIS & FRANKEL, LLP,

7         UNSECRURED CREDITOR'S COMMITTEE

8    KIMBERLY B. GIANIS, CONTRARIAN CAPITAL MANAGEMENT

9    DREW HILL, UBS SECURITIES, LLC

10   WOJOIECH F. JUNG, LOWENSTEIN SANDLER P.C., INTERNATIONAL

11        ASSOCIATION OF MACHINISTS

12   MICHAEL J. KELLY, MONARCH ALTERNATIVE CAPITAL, LP

13   CONNIE A. LAHN, FAFINSKI MARK & JOHNSON, GENERAL MILLS

14   DAVID LAMPL, LEECH TISHMAN FUSCALDO & LAMPL

15   TIM LAVELLE, SILVERPOINT CAPITAL, LP

16   KRISTIN LAWSON, LEECH TISHMAN FUSCALDO & LAMPL

17   KYLE G. MAPES, TALAMOD ASSET MANAGEMENT, LLC

18   DAWN MCCARTY, BLOOMBERG LP

19   ROBERT MCNABB

20   PHIL MILFORD, BLOOMBERG, LP

21   MICHAEL C. MILLER, THE PENSION BENEFIT GUARANTY CORP.

22   PETER MONTORI, GENERAL ELECTRIC

23   HENRA OZA, DEBTWIRE

24   JACQUELINE C. PALANK, DOW JONES

25   BEN POCKEN, NBCNEWS.COM

Page 11

1    TELEPHONIC APPEARANCES, CONTD.:

2

3    JOHN RAPAPORT, CYRUS CAPITAL PARTNERS, LP

4    DAVID REGANATO, SILVER POINT CAPITAL

5    KATIE REICHEL, PAUL HASTINGS LLP

6    IAN E. ROBERTS, BAKER BOTTS, LLP

7    PAUL M. ROSENBLAN, KILPATRICK, TOWNSEND & STOCKTON LLP

8    MICHAEL S. RUDNICK, PAUL WEISS RIFKIND WHARTON & GARRISON,

9         SILVER POINT FINANCE, LLC

10    PETER SAKON

11    RAVI SARAWGI, JPMORGAN CHAE & CO.

12    OMNIK SARMA

13    BRENDAN M. SCOTT, KLESTADT & WICKERS, LLP

14    JOLYN SEBREE, HOSTESS BRANDS, INC.

15    WENDY SIMKULAK, DUANE MORRIS, LLP, ACE INSURANCE COMPANIES

16    KEVIN J. STARKE, CRT CAPITAL GROUP, LLC

17    JON STEMPEL, REUTERS

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Okay.  I realize almost everyone here
 3       was here for Hostess I'd adjourned Hostess to as early as I
 4       thought I'd be free today.  So I'm prepared to go ahead with
 5       the Hostess matters, although it's possible the parties want
 6       a chambers conference.  Is that possible?
 7              UNIDENTIFIED:  That ball's been bouncing, Your
 8       Honor.  If you'd give me a second --
 9              THE COURT:  Okay.
10              UNIDENTIFIED:  -- if it stopped bouncing.
11              THE COURT:  Okay.
12              (Pause)
13              THE COURT:  Okay.  So we're back on the record in
14       Hostess.  Ms. Lennox.
15              MS. LENNOX:  Good morning, Judge.  It might make
16       sense just to level set a little bit after yesterday's
17       events and take maybe five minutes just to have -- just to
18       tell the Court where we are in a chambers conference, if
19       Your Honor wouldn't mind.
20              THE COURT:  So you're requesting a chambers
21       conference?
22              MS. LENNOX:  Yes, Your Honor.
23              THE COURT:  Okay.  That's fine.
24              THE CLERK:  State your name.
25              MS. LENNOX:  Heather Lennox of Jones Day on behalf
```

1    of the debtors.

2                THE COURT:  Okay.  So I'm happy to have a chambers

3    conference.  As you know, my chambers are fairly small, so

4    I'm not suggesting that we have a cast of thousands.  But --

5                MS. LENNOX:  Perhaps the mediation parties and

6    Mr. --

7                THE COURT:  And the committee?

8                MS. LENNOX:  -- Mayer.

9                THE COURT:  That's fine.  All right.  I'll do

10   that.  If anyone who is here wishes to speak today, should

11   use this time to give your appearance to the ECRO operator,

12   and maybe if you have a colleague here that's stuck in the

13   conference, you can give your appearance also for your

14   colleague.

15               So I'll be back in about five or ten minutes.

16               (Pause)

17               THE COURT:  Please be seated.  Okay.  In Re

18   Hostess Brand.  Good morning.  All of you probably know, but

19   let me just confirm.  Sadly the parties were not able to

20   reach an agreement in yesterday's mediation.  I'm sure that

21   many people who were not present at that mediation would

22   like to know what happened; however, as I think you'll

23   understand, mediations cannot be hope to be effective unless

24   the parties are free to discuss the issues candidly.  And

25   the only way they can really do that is if it's done

1    confidentially.

2           So with this mediation, as with all the mediations

3    I conduct, I made it clear to all of the parties, and the

4    parties understood and agreed that the details of the

5    mediation would remain confidential.  And that the only

6    thing that we would be -- be made public unless someone

7    negotiated in bad faith or not in good faith was whether

8    mediation succeeded or failed.

9           It's clear to me from my conduct of the mediation

10   that all of the parties yesterday participated in good

11   faith.  And the fact that they were not able to reach

12   agreement does not indicate anything to the contrary, and

13   thank God, it's a free country, and so people are free not

14   to agree.  I cannot impose a result on them.

15          So I am not going to be able to disclose to you,

16   nor will anyone else who participated in the mediation any

17   details of the mediation.  But unfortunately, we're faced

18   now with the matters that were originally scheduled for

19   Monday and that we adjourned to today to deal with the

20   issues facing the debtor in their need to preserve and to

21   the extent possible maintain their value in a liquidation

22   sale.

23          MS. LENNOX:  Thank you, Your Honor.  For the

24   record, Heather Lennox of Jones Day on behalf of the

25   debtors.

 1              I think with Your Honor's introduction, I think we

 2     can proceed to move directly to the motions, and I do want

 3     to update the Court and the parties on some negotiations

 4     that have taken place within the last 24 to 48 hours that

 5     have resolved some significant objections, and have moved

 6     the parties closer on others.

 7              Perhaps we might want to start, I know the

 8     committee wanted to make a short statement to the Court

 9     about where the committee is, and a resolution the committee

10     has reached.

11              MR. MAYER:  Good morning, Your Honor.  Thomas

12     Moers Mayer of Kramer Levin Neftalis and Frankel LLP for the

13     Official Committee of Unsecured Creditors.

14              THE COURT:  Good morning.

15              MR. MAYER:  Your Honor, the committee has

16     negotiated an agreement with the debtors and with the

17     secured creditors represented by Paul Weiss, I don't think

18     anything here implicates the asset based lenders, on certain

19     outstanding issues.  And I would like to put that agreement

20     on the record at the beginning of this hearing.

21              THE COURT:  Okay.

22              MR. MAYER:  It is our intent to finally document

23     those in a stipulation and order that would be binding on

24     both the estate and on a Chapter 7 trustee if this case ends

25     up in a Chapter 7.

1           First, the parties have agreed that no preference

2    or other Chapter 5 actions will be brought against unsecured

3    creditors.  Those actions will be waived.

4           Second, the secured creditors have agreed to allow

5    an additional $1 million to be distributed in the form of

6    one day's extra pay to all Hostess employees whether or not

7    they went out on strike, it applies to everybody.

8           THE COURT:  You mean current employees?

9           MR. MAYER:  Current employees.  Third, the

10   expenses of investigating the secured creditors' collateral

11   and causes of action against the secured creditors, the

12   secured creditors have agreed to release their liens to

13   allow those expenses to be paid in exact dollar amounts that

14   we provided to them, and would provide to the Court, subject

15   of course, to the U.S. Trustee's power to review those

16   expenditures for appropriateness, and this Court's authority

17   to allow or disallow them as they see fit.

18          This is an agreement relating to the release of

19   collateral to pay these fees.  It's not an agreement that

20   they will be allowed, although I understand the secured

21   creditors have signed off on the --

22          THE COURT:  And that effort is done?  You've

23   already --

24          MR. MAYER:  Yes.

25          THE COURT:  The investigation is complete?

Page 17

```
 1              MR. MAYER:  I didn't get a chance to finish the

 2      other side of this.

 3              THE COURT:  Okay.

 4              MR. MAYER:  The committee has agreed to

 5      discontinue the investigation.  I don't know whether it's

 6      appropriate to discontinue an investigation with prejudice,

 7      but the committee is prepared to announce and it does

 8      announce today that it has found no action that it wishes to

 9      pursue against the secured creditors, either with respect to

10      the perfection of their interest in collateral, or with

11      respect to any actions they may have taken that could

12      conceivably exposed anybody to liability or disallowance.

13      We are done.  The investigation is over.

14              And in consideration of this deal, we would not be

15      bringing any claims, nor would we recommend that other

16      people bring them.

17              THE COURT:  I'm sorry, you -- I'm just trying to

18      recall the cash collateral stipulation.  I think at this

19      point, the way it's worded, it was really limited to the

20      committee.

21              MR. MAYER:  I believe that's correct, yes.

22              THE COURT:  Okay.  But you've completed your

23      investigation.

24              MR. MAYER:  We completed our investigation.  I

25      mean, to put a little color on the picture, and the
```

Page 18

```
 1    investigation's done primarily by conflicts counsel.  It's

 2    not done by my office.  Basically without getting into the

 3    weeds, conflict counsel looked at some detail of the acts of

 4    the secured creditors and their representatives on the board

 5    over the probably 18-month period prior to the commencement

 6    of this case was -- obtained substantial discovery and spent

 7    a fair amount of time on analysis, made the report that it

 8    did, and the committee came out where it did.

 9            In connection with perfection issues, and I say

10    this because I've gotten some questions from people, there

11    are, of course, bits and pieces of collateral as to which

12    there are perfection issues.  That being said, there are

13    adequate protection liens and claims that would apply to any

14    bits and pieces of collateral that are not subject to

15    prepetition liens.  And the committee made a determination,

16    given the facts of this case, it would profit no creditor to

17    assert that any of the secured creditor's liens were

18    unperfected on this truck or that truck prior to the

19    bankruptcy.

20            THE COURT:  Okay.

21            MR. MAYER:  I think the fourth item is that there

22    is a lien item for the creditor's committee's professionals

23    in the budget going forward, and to give them credit, it

24    does not include money for Blackstone and Blackstone will be

25    continuing to advise the committee, even though it
```

Page 19

1   understands that it is unlikely to be paid additional monies

2   for its services.  They confirmed that yesterday.  And we

3   are appreciative of this.

4         That relates to the fifth item which is the wind

5   down program.  The committee asked for a view as to how the

6   assets would be sold, and we were given a confidential sort

7   of outline as to how the debtors wished to proceed.  Now,

8   that outline doesn't have defaults in it, it doesn't have

9   mandatory deadlines.  The debtors said they would keep the

10  committee informed, and we will stay informed, but on a much

11  reduced basis.

12        Basically, the committee will function on a much

13  -- it has been functioning on a low basis prior to this

14  hearing, and will continue to diminish and (indiscernible)

15  accordingly.  And I've asked Mr. Herman or Ms. Lennox to

16  indicate whether I misstated or failed to state any part of

17  our agreement.

18        MR. HERMAN:  Good afternoon, Your Honor, Brian

19  Herman from Paul Weis for Silverpoint as agent for the

20  prepetition secured lenders and the DIP lenders.  That is an

21  accurate description of our stipulation.

22        THE COURT:  Okay.

23        MS. LENNOX:  The debtor concurs, Your Honor.

24        THE COURT:  Okay.  So there are aspects of this

25  stipulation that obviously need notice and approval, for

15-23007-rdd   Doc 539   Filed 02/17/15   Entered 02/25/15 11:51:46   Main Document
Pg 200 of 213

Page 20

 1    example, the waiver of certain preference claims.  So it's

 2    your contemplation that you would draft this promptly and

 3    then make a motion for its approval?

 4              MR. MAYER:  I believe Mr. Herman's office is

 5    already in the process of doing that, yes, Your Honor.

 6              THE COURT:  Okay.  All right.

 7              MR. HERMAN:  Thank you, Your Honor.

 8              THE COURT:  Thanks.

 9              MS. LENNOX:  That, Your Honor, is not the only

10    resolution that we have reached.  Very significantly, just

11    this morning we have reached an agreement with out ABL

12    secured lenders regarding their objection, and I believe it

13    resolves their objection.  We will have to modify and we are

14    in the process of marking it up right now, the proposed

15    order that will reflect this, but I would like to read it

16    into the record.

17              The ABL lenders will be given a pay down of $10

18    million on Tuesday.  In week four of the budget, if the

19    debtors have not signed a purchase agreement or an agency

20    agreement greater than or equal to the debt outstanding

21    under the ABL loan, and if we have not filed a motion within

22    five business days thereafter, the ABL lenders will get

23    another $10 million pay down.

24              In the current DIP budget, or in the current

25    liquidation budget that was attached as an exhibit to the

15-23007-rdd   Doc 539   Filed 02/17/15   Entered 02/25/15 11:51:46   Main Document
Pg 210 of 283

Page 21

1    motion, we contemplated a pay down of two and a half million

2    in week eight.  That will stay.

3            We have also agreed to pay downs in week five,

4    which is December 20th, the week of December 20th; in week

5    nine, which is January 17th, and in week thirteen, which is

6    February 14th, that we would do a pay down of the greater of

7    $2 million or the permanent budget variance in excess of our

8    projected collections.  So the concept is if we're doing

9    better than we've forecast, and that's greater than two

10   million, they would be paid down that up side.

11           In addition, as additional adequate protection,

12   the lenders -- the ABL lenders will get what we have

13   proposed in our motion, which is a first lien on all assets

14   to the diminution of value.  And what that means, Your

15   Honor, is that when we do asset sales, then the proceeds of

16   all those asset sales, other than bulk inventory because

17   we're in the process of doing that now, but all other sales

18   will come directly to the ABL lenders to be paid down.

19           And they will -- in the wind down order, we have

20   some approval rights for the DIP lenders, the ABL lenders

21   will be getting those same approval rights.

22           And with that, I would ask either Ms. Plaskett or

23   Mr. Austin to -- and Mr. Herman to confirm that what I've

24   said is accurate.

25           THE COURT:  Okay.

1          MR. AUSTIN:  For the record, Jess Austin on behalf

2    of General Electric Cooperation as the prepetition ABL

3    lender agent.  What was stated is accurate, Your Honor.  I

4    think it is most important to -- for the ABL lenders that --

5    to allow the use of continued cash collateral as projected

6    in the liquidation budgets.  Obviously, there's a lot of

7    cash projected be collected and used to get the replacement

8    lien as offered and especially the net proceeds for if and

9    when those asset sales occur.  It was certainly a

10   contributing factor to reach an agreement.

11         THE COURT:  Okay.  Thanks.

12         MR. HERMAN:  Brian Herman from Paul Weiss for

13   Silver Point, we agree that accurately describes the

14   stipulation.  Thank you, Your Honor.

15         THE COURT:  Okay.

16         MS. LENNOX:  So that resolves a very significant

17   hurdle we had today, Your Honor.  We have also reached

18   agreements on some smaller objections, and is basically with

19   language that's proposed to the order.  But every -- we have

20   three utility company objections.  That is resolved for the

21   interim order by adding some language to the order that

22   basically leads -- reads,

23         "Notwithstanding the above, prior to the entry of

24   a final order with respect to the motion, the debtors shall

25   continue to timely pay the undisputed invoices of entities

Page 23

1   that are utilities within the meaning of Section 366 of the

2   Bankruptcy Code, defined utilities, in the ordinary course

3   of business for charges incurred both prior to and

4   subsequent to the filing of the motion, and the debtor shall

5   not send a payment grace period notice to utilities prior to

6   the entry of a final order, with respect to the motion."

7            That's a lot of words, Your Honor, to just say

8   they're in the budget and they'll be paid.

9            THE COURT:  Okay.  And that resolves all the

10  utility objections?

11           MS. LENNOX:  All of the utility objections, Your

12  Honor.

13           THE COURT:  Okay.

14           MS. LENNOX:  And we have also reached an agreement

15  with CIGNA Connecticut General Life with respect to its

16  objection.  There was some concern that there wasn't money

17  -- line items in the budget to pay employee healthcare,

18  there is.  And so CIGNA has agreed that they have no

19  objection to the entry of the interim order, and we will

20  discuss and make sure that we have appropriate numbers in

21  the liquidation budget for this.

22           THE COURT:  Okay.  So you're in essence confirming

23  that they're in the budget, too?

24           MS. LENNOX:  Correct.

25           THE COURT:  Okay.

 1          MS. LENNOX:  And then the final thing to report,

 2    Your Honor, and it's not -- oh, I'm sorry, counsel for

 3    CIGNA, would you like to confirm that?

 4          MR. WISLER:  Good morning, Your Honor, Jeff Wisler

 5    on behalf of Connecticut General Life Insurance Company and

 6    CIGNA Behavioral Health.

 7          The other piece of that resolution was that the

 8    debtors have modified the order so that counsel for parties

 9    to reject the contracts will get notice in the same manner

10    as the parties with -- if counsel is of record, and

11    otherwise, the description of our interim resolution pending

12    a final hearing is correct.

13          THE COURT:  So counsel who have appeared of record

14    will get the notice?

15          MR. WISLER:  Correct.

16          THE COURT:  They can't send notice to somebody

17    they don't know, who's appeared, but --

18          MR. WISLER:  Correct.

19          MS. LENNOX:  Yes, and my apologies for omitting

20    that.  That is correct, Your Honor.

21          THE COURT:  Okay.

22          MS. LENNOX:  And then finally again, with respect

23    to the second motion that we have, which is our companion

24    motion to the wind down motion, and that is seeking some

25    additional 1113(e) emergency temporary relief from our

Page 25

 1    unions, we have made great progress on that, and I believe

 2    that counsel for the unions are here and can discuss this.

 3           The wind down -- union participation in the wind

 4    down will largely be completed after about four months.  And

 5    half the employees that we're keeping, we'd like to remain

 6    with us, are union employees.  So we have a short window of

 7    time to do a fast bargaining under the National Labor

 8    Relations Act, and we will be doing that.  Proposals are

 9    being prepared to be made.  But in the interim, there are

10    just some small issues, and we've narrowed the original

11    relief request down to three items.

12           In fact, Your Honor, we have a -- perhaps the

13    easiest way for Your Honor to follow this is a proposed

14    black line of the order, which shows the relief that we're

15    keeping and the relief that we would omit from this.  It's

16    purely, I'm not suggesting that Your Honor would enter that,

17    but just to show you as a demonstrative.

18           THE COURT:  Sure, that's fine.

19           MS. LENNOX:  If I may approach.

20           THE COURT:  And this is a black line to the

21    interim order?  Or was there not an interim order on 1113?

22           MS. LENNOX:  There was not an interim order on the

23    Section 1113 here, Your Honor.

24           THE COURT:  Okay.

25           MS. LENNOX:  May I approach?

         1              THE COURT:  Yes.  Thanks.

         2              (Pause)

         3              MS. LENNOX:  Okay.  This black line was done late

         4      last night, Your Honor, and there have been a few more

         5      additions, but the original relief that we had asked for,

         6      Your Honor, are in the bullet points that start on page 2 of

         7      this black line and continue on page 3.

         8              We had asked for several forms of relief.  We had

         9      narrowed them down to three, and they have -- they are the

        10      three bullets on page three.  The first one which is the

        11      first full bullet on the top of page 3 is that the debtors

        12      may offer work to remaining employees without being subject

        13      to work rules or job classifications.

        14              The second, Your Honor, is that the bullet below

        15      that, that we may hire temporary employees of third party

        16      contractors if we can't get our -- if our employees aren't

        17      otherwise available to do the work.

        18              And the final one is the second bullet below that,

        19      Your Honor, which is that we may retain remaining employees

        20      without regard to seniority.  These are all -- we've also

        21      agreed to add language that these are all only as necessary

        22      to effect the wind down plan.  We have also agreed that we

        23      will only seek this interim relief for a period of two

        24      months, which will allow the parties to do their next

        25      bargaining.

Page 27

```
 1              I think the unions can certainly -- like I said,

 2     we don't have any formal agreement.  We have gotten very

 3     positive responses to this.

 4              THE COURT:  But you've agreed to limit this relief

 5     whether they agree or not?

 6              MS. LENNOX:  Whether they agree or not, this will

 7     be the relief in the order.

 8              THE COURT:  So you're not at this point trying to

 9     specify what claims are in place, or are not in place or the

10     like.

11              MS. LENNOX:  Correct.

12              THE COURT:  It's really just --

13              MS. LENNOX:  It is really --

14              THE COURT:  -- authority as necessary to direct

15     people to do work.

16              MS. LENNOX:  Correct.

17              THE COURT:  And it's limited by two months.

18              MS. LENNOX:  Correct.

19              THE COURT:  Or the shorter if there's

20     bargaining --

21              MS. LENNOX:  Correct.

22              THE COURT:  -- that's concluded successfully.

23              MS. LENNOX:  That's right.

24              THE COURT:  Okay.

25              MS. LENNOX:  Three of our unions have agreed to
```

```
 1    this.  We have an agreement from the IBFO, the UAW, and the

 2    Mill Wrights.  We also -- we only had less than five USW

 3    employees, and this agreement wouldn't apply to the USW

 4    anyway.

 5              And so with respect to the other unions we are

 6    still in discussions with them.  But we have received a

 7    favorable reaction with respect to this.

 8              THE COURT:  Okay.

 9              MS. LENNOX:  We do have objections remaining, Your

10    Honor.  So I would like to very briefly go through the wind

11    down motion, because I think there's been some

12    misunderstanding by some of the objecting parties about what

13    exactly we're asking for, and what we are not asking for.

14              And if it might help Your Honor I have a

15    demonstrative that might help Your Honor understand what

16    we're asking for.

17              THE COURT:  Okay.

18              MS. LENNOX:  May I approach, Your Honor?

19              THE COURT:  Sure.  Thanks.

20              MS. LENNOX:  So I'm going to -- this is a summary

21    sheet, and then I'll go through kind of the descriptions of

22    some explanation that I think reading some of the objections

23    people might not have understood.

24              First, we are seeking approval for a comprehensive

25    operational plan to clean, preserve and prepare our assets
```

1    for sale, to secure our assets, to sell our inventory, and

2    to collect our accounts receivable, and that plan is

3    basically described at paragraphs 25 to 41 of the motion in

4    Exhibit A to the motion.

5            It is the result of months of contingency planning

6    by management and their advisors.  The efforts to wind down

7    the company and to sell the assets are expected to take at

8    least a year, but the majority of the labor intensive

9    activity is going to take place in the first three to four

10   months.  And so, Your Honor, we have asked initially about

11   3,200 of our own employees to remain with the company for

12   various periods of time to help out.  And with rare

13   exception, they have accepted.

14           We are planning to use third party contractors to

15   supplement only where we need it, or for a non-union

16   position where we need it, and we don't otherwise have

17   employee help.

18           Nevertheless, the wind down plan does contemplate

19   that the head count for remaining employees will decrease by

20   approximately 94 percent within the first 16 weeks of the

21   wind down, as the majority of activity necessary to sell our

22   perishable goods and inventory and to clean and secure and

23   prepare our various plans and depots in retail stores for

24   sale will be completed within that time frame.

25           The desired outcome of our wind down plan is the

1    sale of groups of assets that can be operated on a going

2    concern basis, which would result in the buyer assuming

3    claims and preserving jobs.

4          I believe that every major creditor group in this

5    case shares this goal, and thinks that Chapter 11 is the

6    best venue in which this may happen, with respect to

7    maximizing value and selling plants where employees can be

8    employed.

9          I also want to make something clear about the

10   asset sales, because I think there's been a little bit of

11   confusion.  Other than as expressly requested in our motion

12   with respect to the GOB sales of finished goods and

13   inventory, we are not asking for sales of assets.  We're out

14   in the market, and when we have sales of big assets, we'll

15   bring them to the Court.

16         As the Court knows, our investment banker is

17   Perella Weinberg have been marketing the assets, and we

18   already have indications of interest for several of our

19   brands.  And since we filed the motion, Your Honor, we have

20   received a flood of inquiries, and we therefore think that

21   there can be very healthy competition for our brands, and

22   for our other assets.

23         Because so much work, spade work had been done

24   before, we think we can start signing up stalking horses in

25   a few weeks, with auctions a few weeks thereafter.  And for

1    those brands that don't sell, we would tee up an open

2    auction, and for that -- and for whatever is left, PP&E and

3    real estate, be it plants, depots or stores, we would likely

4    contract with firms that specialize in selling those kinds

5    of portfolios.  But to be clear, that's not part of the

6    motion today.

7            I also want to alert the Court that we have begun

8    to implement some of the items discussed in the wind down

9    plan, in order to preserve our equipment.  For example,

10   we've processed through remaining equipment, we've started

11   cleaning and dry packing our boilers, we've started

12   aggregating our fleet into various locations.  So we have

13   started some of the activities already, Your Honor.

14           And that basically is the wind down plan.  We are

15   asking for interim approval of that plan today, pending a

16   final hearing.

17           Second, the motion seeks approval for the funding

18   and the financing of the wind down, and that basically is

19   the liquidation budget.  Again, we are asking for that on an

20   interim basis, pending a final hearing.  We had been asking

21   for approval of nonconsensual use of cash collateral, but as

22   of an hour ago, we don't have to do that anymore, Your

23   Honor.

24           Related to the funding, there are some technical

25   modifications to the DIP credit agreement, and amendments to

1    the final DIP order, and those were reflected in the form of

2    order that was filed with the motion, Your Honor.

3           The seventh amendment to the DIP agreement was

4    also attached as an exhibit to the wind down motion.  As I

5    mentioned, we are seeking the sale of our excess

6    ingredients, inventory, and some GOB sales.  Again, on an

7    interim basis until final.

8           Third, the motion seeks protections -- oh, one

9    thing I do want to mention, Your Honor, in relation to the

10   budget, there is a procedure that we're asking for, because

11   we don't know how much our -- we don't know how many

12   proceeds are going to be generated in the first few weeks of

13   the case.  And it may very well be that our expenses,

14   especially our employee wages and benefits expenses will

15   exceed our in flow.  And so we are asking if we need it, and

16   only if we need it, for a 90-day grace period.

17          I want to be clear that we currently do not

18   anticipate having to use it.  This is purely protective on

19   the theory that you can't get blood from a turnip, but we

20   are currently not expecting to have to use it.  I also want

21   to be very clear, that we will not defer payment of current

22   wages and benefits.  That is not subject to this grace

23   period.

24          So we will have a better sense of where things are

25   going, in terms of the asset sales after the next few weeks,

1    and we acknowledge that it's possible that these estates may

2    be administratively insolvent.  It's also equally possible

3    that they will not be, and I think there will be a little

4    bit of testimony on that today.  But we won't know for sure

5    until the asset sales are completed.

6             The third group of relief that we're asking for

7    are some protections and relief for employees that we

8    believe are necessary to implement the wind down plan.  We

9    have proposed two plans, an employee retention plan and a

10   senior management incentive plan.  We are not asking for

11   relief for the senior management incentive plan today.  That

12   will only be taken up at the final hearing.

13            With respect to the employee retention plan, it is

14   a true retention plan.  No insiders or officers or directors

15   are a part of it.  It applies to all employees we are asking

16   to remain with us, other than senior management.  It also

17   applies to union and non-union employees equally.  Forty-

18   nine percent of the participants in this plan if it is

19   approved are union employees.

20            The basis of the plan, Your Honor, is to pay them

21   25 percent of their pay earned during the time they work for

22   us implementing the wind down plan.  On an interim basis, we

23   are asking for interim approval for the amounts that would

24   accrue between now and the final hearing.  We will ask for

25   final approval of all amounts at the final hearing.

 1          We are also asking for an exculpation and a

 2   related injunction and the funding of a trust for actions to

 3   be taken by the people who are going to be running this

 4   process if Your Honor approves it, and only pursuant to the

 5   Court order.

 6          I also want to be very clear, this is not a

 7   blanket release for our management for anything they've

 8   done, there is no release for prepetition claims, this is

 9   not a blanket release for post petition claims.  All this is

10   is an exculpation to protect them for talking actions that

11   would be approved by the Court in implementing the wind down

12   of this company.  And we can have argument about that later,

13   but that's the plan.

14          Again, what we are asking for today is only for

15   approval for actions to be taken pending the final hearing.

16   And we will ask for final approval at the final hearing.

17   But we do need -- we're going to ask people to do stuff, we

18   think we need to offer them some protection in the interim.

19          And then fourth, we are asking for some procedural

20   relief, approval of expedited contract rejection procedures,

21   and waiver of state and local requirements to the extent

22   that they would conflict with the relief that we're asking

23   for.  I want to be clear, we believe that we have complied

24   with our federal and state Warren obligations.  We have

25   given those notices, we have repeatedly communicated with

15-22097-rdd   Doc 539   Filed 02/17/15   Entered 02/25/15 11:52:46   Main Document
Pg 195 of 429

Page 35

```
 1   people.  So we're not asking for that kind of relief.  But

 2   if there's a local statute that says, you know, I have to

 3   notify the tax collector 90 days before we close the plant,

 4   that's the kind of stuff we're asking for relief for.

 5            So that is the relief, and I have gone through,

 6   Your Honor, the relief they're asking for, as modified under

 7   Section 1113(e) motion.  So I would think at this point,

 8   Your Honor, given that we have some objections pending, we

 9   might want to move to evidence, which we believe we can put

10   on very expeditiously.

11            THE COURT:  Okay.

12            MR. HAMILTON:  Your Honor, the first witness the

13   debtors would call would be Josh Scherer.

14            THE COURT:  Is there a mic?

15            MR. HAMILTON:  No one's put a mic on the witness

16   stand, Your Honor.

17            THE COURT:  Yeah, we need a microphone there.

18            MR. HAMILTON:  I can --

19            THE COURT:  Maybe you can take it from this table.

20            MR. HAMILTON:  I can talk loudly, Your Honor.  Oh,

21   we have one right here, we have one right here.

22            THE COURT:  Would you raise your right hand,

23   please?

24                JOSHUA SCHERER, WITNESS, SWORN

25            THE COURT:  And can you spell your name for the
```

1    record?

2            THE WITNESS:  Sure.  It's Joshua Scherer, J-o-s-h-

3    u-a, last name is S-c-h-e-r-e-r.

4                    DIRECT EXAMINATION

5    BY MR. HAMILTON:

6    Q    Good afternoon, Mr. Scherer.  With whom are you

7    employed?

8    A    Perella Weinberg Partners.

9    Q    And at what point did you become involved in the

10   Hostess Brands matter?

11   A    We were retained in either June or July of 2011.

12   Q    And for what purpose were you retained at that time?

13   A    We were retained as the company's investment banker and

14   restructuring advisor, which covers a number of areas,

15   including assisting the debtors in their negotiations with

16   the lenders, and the unions, assisting with financing.  We

17   helped raise interim financing that bridged the negotiations

18   prior to the filing in January.  We assisted with the debtor

19   in possession financing and we've also been running the

20   debtor's sale processes.  There's been two large ones, the

21   full company sale process which we ran at the beginning of

22   this year, and then also the individual brand going concern

23   sale process which has been more recent.

24   Q    So has Perella been working on this matter continually

25   since last summer?

1    A    Yes, we have.

2    Q    And have you previously been working on this matter

3    since last summer?

4    A    I have, yes.

5    Q    Can you -- you mentioned what the various categories or

6    stages were of the sales processes that you have pursued

7    during this engagement since last summer.  Could you

8    describe in a little bit more detail what happened with

9    respect to the potential sale processes back in the summer,

10   what happened after the filing of the petition in January,

11   and what has happened since roughly July this year.

12   A    Sure.  So going back to the prepetition period, there

13   was no active or organized sales process.  The organized

14   sales process for the whole company began soon after the

15   debtors filed their Chapter 11 in January.

16   Q    Can you describe what that process was that began soon

17   after we filed the petition in January?

18   A    Sure.  It was a very broad process where we reached out

19   to well over 40 parties, including some of our financial

20   parties and strategic parties, both domestic and

21   international.  We ran a, like I said, a very broad process.

22   We got input from the creditor's committee and other parties

23   in the case who wanted us to have conversations with

24   specific parties which we did through a process where we

25   received indications of interest, we narrowed, we ultimately

Page 38

1  received six bids for the company, none of which were

2  actionable.

3  Q    All right.  And just can you generally describe what

4  was the nature of the transactions that you were exploring

5  at that stage in the process?  Were they to sell particular

6  assets or were they particular investments in the entire

7  company or a sales to sell the entire company or some

8  combination?

9  A    No.  That process was specifically for the whole

10  company.

11  Q    And what were some of the obstacles that you

12  encountered in trying to market the whole company at that

13  stage?

14  A    They included the company's participation in the multi-

15  employer pension plans, that was a very significant hurdle,

16  which ultimately none of the investors were able to

17  overcome.  And the level of leverage that would have been --

18  that the existing lenders would have wanted to have left on

19  the company.

20  Q    Was -- how did the process change in the summer of this

21  year, in terms of exploring potential transactions?

22  A    Right.  So the more recent process that as you

23  indicated started during the summer was one to determine

24  whether or not we could sell individual brands as going

25  concern sales, in part to assist in the funding of the exit

1    from Chapter 11.  And again, that was a very broad process.

2    Some of the parties that we reached out to were the same as

3    the parties we'd reached out to for the whole company, but

4    it was a more -- it was a broader process.  Many of the

5    smaller brands are interesting for regional bakeries,

6    parties that couldn't have bought the whole company.

7    Q    All right.  In front of you, sir, on the witness stand

8    there is a document, it is a document that has been filed in

9    this matter.  It is the objection of the Untied States

10   Trustee to the debtor's request to take any and all actions

11   to implement a wind down plan, and it is Docket No. 1744,

12   which was filed on November 19th of 2012.

13        Do you see that document, sir?

14   A    Yes, I do.

15   Q    Okay.  If you look at on the very first page of the

16   document under the heading of "introduction," you will see

17   the first sentence says, "the debtors are administratively

18   insolvent and have determined to liquidate their business."

19        Do you see that sentence, sir?

20   A    I do, yes.

21   Q    Do you believe that that is a fair statement?

22   A    I do not.

23   Q    Why not?

24   A    Because I think it is way too early to know whether

25   that is factual or not.

```
 1   Q    Have you done, and has Perella done analyses to

 2   determine expected ranges or possible ranges of recovery

 3   with respect to the monetization of the estate's assets at

 4   this point?

 5   A    We have.  I think the way we look at this is very

 6   simple, which is this company has revenues of -- between 2.3

 7   and $2.4 billion, which frankly I think is fairly surprising

 8   given that these brands have been under invested in for at

 9   least a decade for a variety of reasons.

10       Typically, when a company in this industry is sold, a

11   company in this industry and of this size, a typical

12   transaction multiple would be one times sales.  So --

13   Q    So what does that mean here?

14   A    That would mean a value between 2.3 and $2.4 billion.

15   Now, that's typical for a going concern sale.  I would

16   expect a discount here, given that the facilities have been

17   shutdown.  But fundamentally, having these brands unshackled

18   from the legacy liabilities, I expect we can generate very

19   significant values.

20   Q    All right.  Let's try and put some context around that

21   $2 billion number with that substantial discount.  Do you

22   have a back of the envelope ballpark of what would need to

23   be realized from the monetization of the estate's assets in

24   order for these estates to be administratively solvent?

25   A    I haven't done the specific math on that, but I believe
```

1     it's approaching a billion dollars.

2    Q    Could you break that down just generally?

3    A    Again, this is general.  I haven't done the specific

4    math, but there's approximately 900 million of secured debt,

5    and I would guess between 100 and 150 million of

6    administrative claims.

7    Q    And so if you have -- did you say 2.2 billion in sales?

8    A    Yes, 2.3 to 2.4.

9    Q    So what multiple of sales would you need to generate in

10    the selling of these assets to cover the admin claims in

11    this case?

12    A    It would be a half a turn, so 50 percent discount.

13    Q    In your judgment, is it a reasonable scenario to expect

14    that you may be able to obtain that level of a monetization

15    of the assets to achieve administrative solvency in this

16    case?

17    A    Absolutely, yes.

18    Q    Are there certain unique factors about the sale of

19    assets in this case that gave you -- that add to your

20    confidence that the possibility of obtaining such

21    recoveries?

22    A    Yes.

23    Q    What are they?

24    A    Well, I think we're all seeing it in the press.  These

25    are iconic brands that people love.  And the number of in

1   bound calls, I think Ms. Lennox referred to it as a flood of

2   calls has been surprising on a number of fronts, not just

3   the number of the calls, but the nature of the calls.

4        We're getting calls from parties that are competitors.

5   I don't think that would surprise anyone.  So these are

6   regional bakers, these are national competitors, but we're

7   also getting calls from other parties, like our customers

8   who are interested in the brands.

9   Q    Is there something unique about this opportunity for

10  other potential buyers to purchase these brands?

11  A    I'm sorry, can you repeat that?

12  Q    A once in a lifetime type of opportunity?

13  A    Yeah.  Listen, I think -- first of all, maybe just

14  elaborating a little bit.  We've had over two dozen in bound

15  calls, so these are unsolicited calls.

16  Q    Over what period of time, sir?

17  A    Over the last two or three days, okay, and these are

18  name brand companies that everyone in this courtroom would

19  know and recognize.  We already, from our prior sales

20  processes have over 50 parties that are signed up to NDAs

21  and/or are active in the data room.

22       Further, we have a buyer's list for over 160 strategic

23  parties that we plan to go out to, and discuss this

24  opportunity with.  And I've put them into four buckets.  We

25  have regional bakers who we've already been having active

1    dialogue with.  We have our national competitors, who many

2    of whom we've already been in active dialogue with.  The

3    third bucket are customers, okay, so the --

4    Q     Who are your customers?

5    A     These are the supermarkets, and I'm going to mention

6    some names, but I'm mentioning them as customers, not

7    necessarily as potential buyers, Wal-Mart, Kroger, Giant

8    Eagle, as an example, also the convenience stores would fall

9    into that bucket.

10         A fourth bucket, which is also very interesting is a

11   catch all of other potential buyers.  It's the large

12   consumer product companies that we're all familiar with.

13   And again, I'm not going to mention names, but they're

14   cereal producers, you name it, international buyers.  We've

15   had very significant interest from international parties.

16   These are parties that haven't to date had a real

17   opportunity to break into the United States baking industry.

18         And then in that third bucket, I would put all the

19   financial parties as well, and we have about 140 of them

20   that we would be approaching.  And I think you've seen the

21   press.  Many of them have been reaching out to us already.

22   Q     With respect to the category that you mentioned of the

23   customers, and I'm not saying that any particular

24   supermarket chain is within the category of those that

25   expressed interest, but as a general matter, what is it

 1   about the nature of the business of the customers that make

 2   them interested in potentially being involved in the process

 3   of potentially purchasing some of these brands.

 4   A    Well, I think it's not just the customers, but also our

 5   major competitors.  This situation is very unique, and I

 6   think there's a real opportunity to generate significant

 7   value for two reasons.

 8        One, this is a once in a lifetime opportunity for our

 9   competitors, whether it be the national competitors, or

10   regional bakeries to get iconic brands separated from the

11   legacy liabilities.  There is not going to be another

12   opportunity to do this, and I can see and I'm already seeing

13   it, very intense competition between those parties for the

14   brands.

15        The next element, as you mentioned, is our customers.

16   And like I said, they've been reaching out to us as well.

17   Why?  I think in part they have the shelf space for the

18   product, they have the distribution.  I think another

19   element, though, is they want to ensure that there continues

20   to be robust competition in the baking industry.

21   Q    Why?

22   A    I -- if you're a named national supermarket, you want

23   to be calling the shots in terms of what's on your shelf and

24   how much you're paying for it, you don't want the bakeries

25   doing that.

1    Q    As a result of these factors, can you -- you've already

2    touched on it a little bit, can you give the Court an idea

3    of what Perella has been doing over the past four or five

4    days, and how it compares to what happened back in the sales

5    process that you were looking at last January, February,

6    March?

7    A    Well, for a start, we've broadened our calling effort.

8    It made no sense for us to, as an example, call our

9    customers or potential customers during the prior sales

10   process.  That would be one example.

11        I think there's also an element of we are now getting

12   calls and actively reaching out to parties that had

13   previously been a very short conversation.  They said

14   absolutely no way, union involvement, multi-employer pension

15   plans, we cannot under any circumstance, we're not just

16   going to look at it.

17   Q    These are the people that you talked to back in

18   February and March in this process?

19   A    Some of them, and these are unsolicited in bounds that

20   we haven't spoken to, but yes, some of them are parties

21   we've spoken to previously, and they -- it was a very short

22   conversation then.  And now they are actively seeking us

23   out.

24   Q    Over the last four or five days?

25   A    This is over the last four or five days, yes.

1    Q    With respect to the activity that has been going on in

2    the last four or five days, have you seen potential

3    opportunities to pursue asset sales that would, if we can

4    consummate them quickly, preserve employment opportunities

5    for current Hostess employees?

6    A    Absolutely.

7    Q    Describe those for the Judge.

8    A    I can, so I'll just take one specific opportunity.  We

9    have a cake brand known as Drakes.  We've been in active

10   dialogue with several parties.  There's one potentially

11   interested buyer, actually very interested buyer who toured

12   the facility yesterday, and one question they had to the

13   plant manager was, are we going to have the opportunity to

14   rehire the employees that worked here.  That's just one

15   example.

16   Q    Okay.  Are there other areas where they may be

17   opportunities for the debtors to sell some of their assets

18   or their brands that would also involve preserving jobs for

19   current Hostess employees?

20   A    Absolutely.

21   Q    Are there any others that you can name for the Court,

22   or don't want to for strategic purposes?

23   A    I mean, I think it's pretty broad.  I -- you know, I

24   think there's been some mention throughout the case of the

25   Marita brand, it's a big southern bread brand, definitely

1    opportunities there, and I see opportunities with many of

2    the other brands as well.  Ultimately it'll depend on who

3    the buyer is, of course.

4    Q    Okay.  What would the impact be of delay in the sales

5    process in the -- with respect to the opportunity to sell an

6    asset and also preserve the employment opportunities of

7    current Hostess employees in connection with that sale?

8    A    So I think it's a two part question, which is how does

9    delay affect value, and how does that affect employment

10   opportunities.  I think with respect to value, it can be

11   very detrimental to value for two reasons.  We have very

12   significant momentum right now, with all of the, I'd

13   characterize from a selling perspective, positive press.

14   And in any sales process, it's critical to maintain momentum

15   and a competitive dynamic, and we have that right now.

16        The other element is that every day our product is off

17   the shelf, it's diminishing in value.  Our customers get

18   used to generating revenues and selling goods without our

19   brands, and the end user, individuals, learn to live without

20   Twinkies and Wonder Bread.

21        And so very specifically, I've had buyers tell me,

22   Josh, the longer it takes me to get into the plant, do my

23   diligence, the less value I'm going to be able to pay you

24   because it's going to be worth less to me.  So it's critical

25   that we're moving forward on an expedited basis.

```
 1        And I think with respect to the employment

 2    opportunities the same holds.  It's critical to move very

 3    quickly.

 4    Q    How important is it for the company to retain key

 5    members of its middle and senior management in connection

 6    with this sale process of its hard assets and brands and

 7    why?

 8    A    Well, listen, from my perspective, it's absolutely

 9    critical.  And again, I think the best way to explain that

10    is a specific situation.  The party that went into the

11    Drake's plant yesterday, they called us up on Friday, they

12    said, Josh, we understand you want us to move quickly, we

13    want to move quickly, we want to get into the facility.

14    Q    This it the Drake's plant?

15    A    This is the buyer.

16    Q    The Drake plant in New Jersey?

17    A    Yes.

18    Q    Okay.

19    A    I have to turn to the management team at that point.  I

20    have no ability.  I don't know who the plant manager is, I'm

21    sure I could find the facility, but there's just a whole

22    infrastructure there that facilitated a three hour tour.

23    Q    When did that tour -- not like a three hour tour like

24    -- well, never mind.

25        When did that three hour tour occur?
```

Page 49

1    A    I believe it was yesterday morning.  But they were

2    asking a lot of questions of the management teams that I'm

3    simply not in a position to answer.  And all of that goes

4    directly to how much that buyer is going to be willing to

5    pay on two fronts.  One is speed of access to the facility,

6    perception of a very organized process, okay, and

7    information.

8         The fundamental fact is this management team has

9    information that in their heads that I never will, and I'll

10   never be able to get.

11   Q    In your experience, how critical is that historical

12   information to potential buyers in doing their due

13   diligence?

14   A    It's critical.

15   Q    What would be the affect of the monetization of the

16   estate's assets if the management members that have that

17   information leave the company during this sale process?

18   A    I think it would be very detrimental to not only the

19   value of the estate, but our ability to have any of the

20   employees rehired.

21   Q    In your judgment, what would the impact be on this sale

22   process if it was delayed as a result of the appointment of

23   a Chapter 7 trustee if the case was converted to Chapter 7?

24   A    If you're speaking specifically just to delay, it would

25   be everything that I just said.  I think it's very

1    detrimental to value and to employment opportunities.

2            MR. HAMILTON:  No further questions for this

3    witness, Your Honor.

4            THE COURT:  Okay.  Does anyone want to cross-

5    examine Mr. Scherer?

6            MS. GOLDEN:  Yes, Your Honor.

7            THE COURT:  Okay.

8                    CROSS-EXAMINATION

9    BY MS. GOLDEN:

10   Q    Good afternoon, Mr. Scherer.

11   A    Good afternoon.

12   Q    My name is Susan Golden, and I'm an attorney with the

13   Office of the United States Trustee, which is component of

14   the Department of Justice which oversees bankruptcy cases,

15   and I only have a few questions for you this afternoon.

16       First, are you familiar with the debtor's emergency

17   motion for the approval of the wind down plan?

18   A    I am.

19   Q    Okay.  I would like to direct your attention to

20   paragraph 46 of the motion.  I don't know if you have it in

21   front of you, or I could read it.

22           MR. HAMILTON:  Yeah, it's there.

23           THE WITNESS:  What page is it?

24           MS. GOLDEN:  It's on page 20.  I'll also read it

25   to make it a little bit --

Page 51

```
1              THE WITNESS:  I have it.

2    BY MS. GOLDEN:

3    Q    You have it, okay.

4         I would like to draw your attention to the third

5    sentence beginning with the word "further."  It says,

6    "Further, while certain administrative claims will be paid

7    under the liquidation budget, the liquidation budget does

8    not include a provision for payment of all of the

9    administrative claims that have accrued against the debtor's

10   estates to date."

11        Is this a true and correct statement?

12   A    I'm not in a position to say.

13   Q    The next sentence says, "The DIP agent and certain of

14   the debtor's prepetition secured lenders have advised that

15   they cannot at this time commit to the payment of all

16   accrued administrative expense claims."  Is this a true and

17   correct statement?

18   A    Again, I'm not in a position to say.

19              MS. GOLDEN:  Okay.  Thank you, that's it.

20              MR. HAMILTON:  Redirect, Your Honor?

21              THE COURT:  Sure.

22                        REDIRECT EXAMINATION

23   BY MR. HAMILTON:

24   Q    Turn to Tab F of that notebook, Mr. Scherer.

25   A    Okay.
```

Page 52

1    Q     That's the liquidation budget that was referred to in

2    paragraph 46 that counsel just quoted to you.  Do you see

3    that?

4    A     Yes.

5    Q     Can you tell the Court over what period of time that

6    liquidation budget covers?

7    A     I believe it's a 13-week budget.

8    Q     From November 23rd through February 15th of next year,

9    correct?

10   A     Correct.

11   Q     So if we go back to paragraph 46, the sentence that

12   counsel quoted to you, "while certain administrative claims

13   will be paid under the liquidation budget, the liquidation

14   budget does not include a provision for payment of all of

15   the administrative claims that have accrued against the

16   debtor's estates to date."  Do you see that, sir?

17   A     Yes.

18   Q     That statement then indicates that the liquidation

19   budget, which only provides for payments through February

20   15th next year doesn't provide for the payment of all admin

21   claims in this case, correct?

22   A     Correct.

23   Q     This budget doesn't purport to reflect what admin

24   claims will be paid in this case after February 15th of next

25   year; is that correct?

Page 53

```
 1    A    That's correct.

 2    Q    It is your judgment that there is a reasonable

 3    possibility in this case that asset sales will produce

 4    enough money for the estates to be able to pay all of its

 5    administrative claims at some point in this case; is that

 6    correct?

 7    A    That is correct.

 8              MR. HAMILTON:  No further questions, Your Honor.

 9              THE COURT:  Okay.  Anyone else like to cross-

10    examine, Mr. Scherer?

11              (No response)

12              THE COURT:  Okay.  You can step down, sir.

13              THE WITNESS:  Thanks.

14              MR. HAMILTON:  Debtors call their CEO, Mr. Greg

15    Rayburn to the stand, Your Honor.

16              THE COURT:  Okay.  Would you raise your right

17    hand, please?

18                   GREG RAYBURN, WITNESS, SWORN

19              THE COURT:  And it's R-a-y-b-u-r-n?

20              THE WITNESS:  Yes, sir.

21              THE COURT:  Okay.

22              THE CLERK:  What was his name?

23              THE COURT:  Greg Rayburn.

24                   DIRECT EXAMINATION

25    BY MR. HAMILTON:
```

Page 54

```
 1    Q    Mr. Rayburn, there are two notebooks in front of you on

 2    the witness stand.

 3              MR. HAMILTON:  Do we have copies for the Court?

 4    Have we handed those up?  Okay.

 5    Q    The first is it's got the big long caption that says In

 6    Re: Hostess Brand, Emergency Motion of Debtors in Possession

 7    for Interim and Final Orders.

 8    A    Yes.

 9    Q    If I can ask you to turn to Tab E of that particular

10    notebook.

11    A    Okay.

12    Q    What is this document?

13    A    It's my declaration in support of the wind down motion.

14    Q    Did you sign this document?

15    A    I did.

16    Q    At the time you signed it, were the statements that

17    were set forth in this document true and accurate to your

18    best knowledge and belief?

19    A    Yes.

20              MR. HAMILTON:  I would introduce that declaration

21    into evidence, Your Honor.

22              THE COURT:  Okay.  Any objection to that?

23              (No response)

24              THE COURT:  Okay.  I'll admit it.

25    (Declaration of Greg Rayburn received)
```

Page 55

1  BY MR. HAMILTON:

2  Q    And if I could ask you to turn to the other notebook,

3  Mr. Rayburn, the emergency motion and memorandum of law of

4  debtors and debtors in possession, pursuant to Section

5  1113(e) of the Code, and ask you to turn to Tab A of that

6  particular notebook.

7  A    I have it.

8  Q    Can you tell the Court what that document is?

9  A    It's my declaration in support of that motion.

10  Q    Did you sign this document?

11  A    I did.

12  Q    At the time you signed it, were the statements in here

13  true and accurate to the best of your knowledge and belief?

14  A    Yes.

15          MR. HAMILTON:  I would introduce that declaration,

16  Your Honor, into evidence.

17          THE COURT:  Okay.  Does anyone object to that?

18          (No response)

19          THE COURT:  All right.  It's admitted also.

20  (Declaration of Greg Rayburn in support of the motion above

21  noted received)

22          MR. HAMILTON:  Thank you.

23  BY MR. HAMILTON:

24  Q    Mr. Rayburn, before we get to the meat of the

25  testimony, I'd like to confirm a couple of things with you

1   just for the record, and in connection with some of the

2   objections that are filed.  Can you state for the Court

3   approximately what percentage of the employees that would be

4   eligible for retention payments under our proposed employee

5   retention plan are union employees versus non-union

6   employees?

7   A    I believe it's 49 percent are union employees.

8   Q    And then the -- there is in the last best final offer

9   as to the unions, there was a proposed 8 percent wage

10  reduction that has been authorized by the Court, was that

11  your understanding?

12  A    And implemented, yes.

13  Q    Okay.  Is there a similar 8 percent reduction to the

14  salaries and wages of non-union employees including

15  management?

16  A    Yes.

17  Q    And is that going to be continued in the wind down?

18  A    Yes.

19  Q    So everybody's got the 8 percent cut?

20  A    That's correct.

21  Q    Now, with respect to Warren notices, have the debtors

22  undertaken the process of complying with its obligations

23  under the federal Warren Act?

24  A    Yes, I think we have.  I think --

25  Q    When did that start?

Page 57

1    A    I couldn't tell you the month.  I think we've sent

2    about a million of them.  I mean, we've sent them every

3    period that -- when they would expire, we had to resend.  I

4    couldn't tell you how many, you know, in honesty how many

5    we've actually sent.  But I think we've complied with

6    federal and state laws throughout that process.

7    Q    All right.  I want to ask you about you're aware that

8    in connection with the relief that the debtors are seeking

9    with respect to its wind down motion, we are asking the

10   Court to approve certain exculpation provisions and a

11   related injunction and trust fund for defense costs in

12   connection with actions that senior management takes in

13   implementing the wind down, if it is, in fact, approved by

14   the Court; is that right?

15   A    That's right.

16   Q    Why are the exculpation provisions and related

17   injunction and trust that's requested in the motion, why are

18   those important to the current members of senior management

19   of the company?

20   A    Well, I mean I think the easiest way to state it, Your

21   Honor, is they are going to have to do some things that are

22   going to be difficult, and they don't want to do anything

23   that's going to open them up to any liability.  And I'll

24   give you the first example of that, is that, you know, when

25   we closed on Friday, we sent people home.

Page 58

1       We did not terminate people.  All right.  This

2    afternoon, I need to terminate about 15,000 people.

3    Q    Why do you terminate?

4    A    Because they can't get unemployment if I don't.  So

5    right now, I've got, you know, thousands of employees who

6    have tried to apply for unemployment, and the unemployment

7    office will tell them, you know, if you're not terminated by

8    Hostess, you can't get unemployment.  So that's a problem,

9    right, so I need, you know, from this point forward, and I

10    know this might be a little off your question, but from this

11    point forward I need two things to happen.  I need to

12    maximize the value of the estate, but I also need to do the

13    best we can do for those employees.  And the best we can do

14    now is to terminate them, so they're eligible for

15    unemployment.

16    Q    And can you explain again why is management hesitant or

17    unwilling to terminate those employees without the

18    protection of the exculpation clause and related injunction

19    and trust --

20    A    They don't want to be sued, and they don't want to have

21    any actions coming at them for having to do the things that

22    the Court approves within the wind down motion.

23    Q    Why does management think they might get sued?

24    A    You know, we've had lawsuits threatened.  I mean, one

25    of our unions threatened in writing a lawsuit if we imposed

Page 59

1   under your order.  So, you know, it's a litigious society.

2   Q    Can I ask you, sir, to go to the notebook that has the

3   long caption.

4   A    Okay.

5   Q    It's the wind down motion.  And if I could ask you,

6   sir, to turn to tab 3.

7   A    Okay.

8   Q    And, sir, as you see on the caption, this was a

9   document entry that was filed in this case, Document 1278.

10  The caption says it's the IUOE Stationary Engineers, Local

11  39 and Local -- and Stationary Engineers Local 39 Pension

12  Trust Fund and others objection to our emergency motion.  Do

13  you see that?

14  A    Yes.

15  Q    And IUOE is one of your other unions; is that correct?

16  A    Yes.

17  Q    And if I could ask you, sir, to turn to page 5.  And if

18  I can ask you, sir, to focus in particular on paragraph 14

19  of that objection.  Is that paragraph an example of the

20  threats that management is concerned about and why they

21  believe they need the exculpation provision and related

22  injunction?

23  A    Absolutely.

24  Q    And if you look at paragraph 15, is that paragraph, out

25  of this objection, part of the reason that current

1    management believes it needs the exculpation and protections

2    of the related injunction?

3    A    Yes.

4    Q    If I could ask you, sir, to turn to tab 4 of this

5    notebook.  If you take a moment, there's four documents in

6    this tab.  There's an e-mail and then a series of three

7    letters, correspondence.  If you look at that and tell the

8    Court if you recognize this exchange.

9    A    I do.

10    Q    Just briefly, generally, without getting into the

11    details, just describe for the Court what this exchange is

12    all about.

13    A    You know, I think the way to summarize it is basically

14    what I said before, they were threatening to litigate with

15    us if we imposed under the Judge's order the wage

16    reductions.

17    Q    So in the recent past, your other unions have

18    threatened to sue you or file charges against you for taking

19    actions that were expressly authorized by this Court; is

20    that correct?

21    A    Correct.

22    Q    After they were authorized by this Court?

23    A    Correct.

24    Q    Do you, sir, as the CEO of the company have an

25    understanding as to what is likely to happen with respect to

1   your senior management if the Court does not approve today

2   on an interim basis, the exculpation clause that we've

3   requested and a related injunction and trust?

4   A    Sure.  The most critical people will leave.

5   Q    Which -- who are some of these critical people that

6   might leave?  Not names, but what are their positions?

7   A    CFO, COO, you know, the very top levels of my

8   management team.

9   Q    And what is the basis for your belief in that regard?

10  A    They've told me.

11  Q    What would the impact be of their departure on the

12  efforts of the estate to monetize its assets?

13  A    Well, you're going to have a couple of things you have

14  to deal with.  I'll go back to the termination of the

15  employees, and no one's going to be there to do that.  So

16  under that scenario, if the case were to convert, right, to

17  a 7, and you appoint a trustee in 20 days or 30 days, you're

18  going to incur a million dollars a day of payroll until

19  someone terminates them.  That could be 20 or $30 million of

20  a hit to the recovery of the estate.  That's one piece.

21       And then the second piece is I think goes back to Mr.

22  Scherer's testimony, and it would be my view as well that

23  the longer you're off the shelf, the less value you're going

24  to get.  And so speed is critical to get that value, to get

25  maximum value.

1    Q    And again, if nobody terminates the Hostess employees

2    within the next few weeks, can those Hostess employees get

3    unemployment benefits?

4    A    No.

5    Q    Nothing?

6    A    Nothing.

7    Q    What would be the impact in your judgment, Mr. Rayburn,

8    on the estate if this case is converted in the next few days

9    to a Chapter 7?

10   A    I think there would be a sizeable reduction in the

11   value received from the sale of the brands, specifically the

12   brands, I don't know what the impact would be on plants or

13   hard assets, because I don't know that the timing is -- you

14   know, it's critical to those if they are tied to brands.  So

15   it's certainly critical relative to trying to preserve jobs.

16   So I think you're going to take hits to value, hits to job

17   preservation, and I don't think there's any question about

18   that.  I can't tell you how much, but I think it would be

19   material in terms of the reduction.

20   Q    Is there any doubt in your mind that it is in the best

21   interests of the estates and all of the stakeholders with

22   respect to the estates, keep this liquidation in a Chapter

23   11?

24   A    I -- yes.  I think for the people who have the economic

25   risk and for the employees, that's in their best interests.

1    Q    To keep it in the 11?

2    A    Yes.

3              MR. HAMILTON:  I have no further questions for

4    this witness, Your Honor.

5              THE COURT:  Okay.  Does anyone want to cross-

6    examine Mr. Rayburn?

7              MR. BADDELEY:  Your Honor, this is Jeffrey

8    Baddeley on behalf of Accenture.  I'd like to ask a couple

9    of questions of Mr. Rayburn.

10             THE COURT:  Sure.

11                        CROSS-EXAMINATION

12   BY MR. BADDELEY:

13   Q    Mr. Rayburn, you filed a declaration in this case, and

14   I hope can locate it fairly quickly.  I apologize but I'm on

15   the phone and not able to help you.  But your declaration, I

16   believe, was Tab E of the notebook that counsel just had you

17   walk through.  Can you find that declaration, please?

18   A    Hold on just a second.  I have it.

19   Q    Would you take a look, please, at page 11, paragraph 29

20   of that declaration?

21   A    Yes.

22   Q    You mention in that paragraph "significant attrition

23   among the senior management employees," and among others,

24   you point to the resignation in September of this year, the

25   resignation by Steven Bergfeld (ph), Senior Vice-President

 1    and Chief Information Officer, as well as Martha Roth (ph),

 2    Senior Vice-President of Controller and Corporate Audit.  Do

 3    you see those references?

 4    A    I do.

 5    Q    And you also say in that same paragraph that the

 6    responsibilities has been performed by existing Hostess

 7    employees or third party consultants since their respective

 8    resignation.  Do you see that reference?

 9    A    I do.

10    Q    In fact, has Accenture been performing many of the

11    duties of the information technology officer?

12    A    I believe that's correct.

13    Q    And, in fact, has Accenture been preforming many of the

14    duties of Martha Roth, Senior Vice-President, Controller and

15    Corporate Audit?

16    A    Not at all.

17    Q    No?

18    A    No.

19    Q    So what role does Accenture play with regard to finance

20    and accounting for Hostess?

21    A    I'm not aware of what that role is.  We replaced the

22    controller with an employee from FTI.

23    Q    I understand.  But with regard to information

24    technology, that role of the chief information officer has

25    been assumed by Accenture?

Page 65

1    A    I don't know if it was formally titled that way, but it

2    has been assumed by Accenture.

3              MR. BADDELEY:  Thank you.  No further questions,

4    Your Honor.

5              THE COURT:  Okay.  Anyone else want to cross-

6    examine the witness?

7              MR. MAZUR:  Your Honor, Jordan Mazur for the IUOE

8    also on the telephone with Weinberg Roger & Rosenfeld.  I

9    just have a few quick questions for Mr. Rayburn.

10             THE COURT:  Okay.

11                      CROSS-EXAMINATION

12   BY MR. MAZUR:

13   Q    Mr. Rayburn, describing the company as having

14   difficulty terminating employees, do you mean to suggest

15   that presently the unionized work force has not been

16   terminated?

17   A    That's exactly what I said.

18   Q    So are the unionized workers still accruing payroll

19   wages now?

20   A    No, because they are hourly and work when paid.  Our

21   normal payroll is about $2 million a day.  Our payroll run

22   rate right now is about $1 million a day.

23   Q    You described in connection with the IUOE's objection

24   some of the threats of litigation as a basis for the need

25   for exculpation, and you stated that senior management might

1    leave if they didn't get exculpation; is that correct?

2    A    I said they would.

3    Q    Okay.  So is it correct that no Hostess employee would

4    be willing to terminate the unionized employee without the

5    protection from prosecution?

6    A    My belief is that no one on the senior management team

7    would undertake to do that, and I doubt anybody else would

8    want to create any liability for themselves to take that on.

9    Q    So do you believe that it would create liability then

10   if someone were to terminate?

11   A    I don't know if it will or it won't, but we're not

12   going to do it without the protection.

13            MR. MAZUR:  Thank you.  Those are the only

14   questions I have.

15            THE COURT:  Okay.  Mr. Rayburn, on this same

16   subject of the importance of so-called exculpation provision

17   and injunction, I think I heard you correctly when you said

18   that the main concern you have is that you and your

19   management team don't want to be sued for taking actions

20   that are expressly authorized by the Court.

21            THE WITNESS:  Correct.

22            THE COURT:  I have to balance that legitimate

23   concern with the interest that third parties who potentially

24   have claims against the debtors, and be it derivatively or

25   directly against management and preserving those claims or

1    asserting them.  And the way I read this provision, which is

2    in paragraph 20 of the proposed order, as well as paragraph

3    62 of the motion which declines third party actions, and

4    it's defined pretty broadly as saying that among other

5    things, making threats, or seeking to obtain leverage by

6    initiative third party actions against one or more of the

7    protected persons, and it's defined collectively the third

8    party action.  And then there's a complete exculpation as

9    well as an injunction of that.

10            The way I could read that would be that it would

11   cover anything, including things that were not authorized by

12   the Court.  So for example, if outside of the wind down

13   plan, we did something out of the ordinary course, this

14   could be read I think as covering that.  Was that intended?

15            THE WITNESS:  No, sir.  It was -- obviously I

16   didn't draft that, but what's intended is not a release for

17   any causes of action that someone may have.  It's protection

18   for things that we do under the wind down, that you approve.

19            THE COURT:  That are authorized.

20            THE WITNESS:  That you've authorized.

21            THE COURT:  And I guess the second question I

22   have, and I think this is a harder question for you to

23   answer, but once you appreciate my concern about the notion

24   of enjoining this -- these types of claims, which we've now

25   defined apparently permanently is it would seem to me to

Page 68

1    balance those two concerns more appropriate to channel such

2    claims to this court, because among other things, the way

3    it's worded now, the injunction is kind of in the eye of the

4    beholder, and if you all say well, it's covered and someone

5    else says, no, it's not, they're precluded from doing that.

6                There's a well recognized, although nuanced

7    doctrine in bankruptcy law that protects fiduciaries, called

8    the Barton Doctrine, which in essence does that, and the

9    Courts have worked that out to balance the concern of

10   fiduciaries not being subjected to being sued all over the

11   country, arguably for strike suits, but maybe not, with the

12   notion that maybe they're not strike suits, and so

13   therefore, if the Court that authorized the action of a

14   fiduciary hears the suit, then it's channeled to that court

15   properly.

16               So I guess my question is, and I know you haven't

17   -- maybe you haven't specifically discussed this with your

18   team, but it would seem to me that if the injunction were

19   modified in that respect, it should give them sufficient

20   comfort without completely cutting off people who have

21   legitimate rights to have a complaint.

22               So what would the effect of your view of that

23   change to the proposed objection have on your --

24               THE WITNESS:  I would need to talk to them.  I

25   think, you know, I understand what you're looking to

1    balance.  I only want to point one thing out that I'm sure

2    you're already aware of, but this is a very hostile

3    situation.  There is -- you know, and in some respects,

4    rightfully so.  And there's a lot of bad history here that

5    we really tried hard to overcome.

6            So the management team is on high alert, and is

7    talking to their families about, you know, do I stick this

8    out.  And there's -- they are going to be concerned.  If

9    there's any window that they think is going to drag them

10   into something, just because they're carrying out your

11   order, it's going to be tough because there's a lot of bad

12   history.

13           THE COURT:  Okay.  Let me ask you this, and I

14   don't know whether you looked at this or not, and maybe it's

15   a more appropriate question for the debtor's counsel.  Is

16   there a D&O insurance that would cover the litigation costs

17   of this?  If you don't know, you can say that, I mean, I can

18   ask someone else.

19           THE WITNESS:  I'm sorry, off hand, I think there's

20   probably D&O, but I have no idea what the extent of that is.

21           THE COURT:  Okay.  Any questions on that exchange?

22           MR. HAMILTON:  Just a second, Your Honor.

23           (Pause)

24           MR. HAMILTON:  No, Your Honor.

25           THE COURT:  All right.  You can step down.

15-22097-rdd    Doc 526    Filed 02/17/15    Entered 02/17/15 23:21:16    Main Document
Pg 230 of 429

Page 70

1          MR. SILBERFARB:  Your Honor, Michael Silberfarb of

2     Jones Day on behalf of the debtors.  We'd like to call

3     Charles Carroll.

4          THE COURT:  Okay.

5          Could you raise your right hand, please?

6              CHARLES CARROLL, WITNESS, SWORN

7          THE COURT:  And could you spell your name for the

8     record?

9          THE WITNESS:  Sure.  It's Charles W. Carroll, C-a-

10    r-r-o-l-l.

11         THE COURT:  Okay.  Go ahead.

12                   DIRECT EXAMINATION

13    BY MR. SILBERFARB:

14    Q    Mr. Carroll, there are two binders in front of you.

15    Could you turn to the one with the shorter title --

16    A    Sure.

17    Q    -- and turn to Tab B in that binder?

18    A    I've got it.

19    Q    And what's behind Tab B your declaration in support of

20    the debtor's Section 1113(e) motion?

21    A    Yes, it is.

22    Q    And did you sign that declaration?

23    A    Yes, I have.

24    Q    And when you signed it, was everything in it true and

25    correct to the best of your knowledge?

Page 71

1    A    Yes, it was.

2            MR. SILBERFARB:  Your Honor, we'd like to offer

3    that declaration into evidence.

4            THE COURT:  Okay.  Any objection to that?

5            (No response)

6            THE COURT:  All right.  It's admitted.

7    (Declaration of Charles Carroll in support of the debtor's

8    Section 1113(e) motion received)

9    BY MR. SILBERFARB:

10   Q    And then in the other binder with the longer title, can

11   you turn to Tab B, as in boy?

12   A    Yes, I have that.

13   Q    And is what's behind Tab B your declaration in support

14   of what we're calling the wind down motion?

15   A    Yes, it is.

16   Q    Okay.  And did you sign that declaration?

17   A    Yes, I did.

18   Q    And when you signed that declaration, was everything in

19   it true and correct to the best of your knowledge?

20   A    Yes.

21   Q    Okay.  From reading your declaration, Mr. Carroll, it's

22   my understanding and correct me if I'm wrong, but it seems

23   like you and your team led the development of the wind down

24   plan; is that correct?

25   A    That is correct.

1    Q    Okay.  Can you briefly describe that process?

2    A    Sure.  The wind down process was a culmination of

3    several months worth of work.  We worked with every major

4    officer of the company, every departmental head, to come up

5    with a comprehensive wind down plan, that encompassed both

6    the human capital, so in terms of the employees that were

7    needed to wind down the process; how long each of those

8    employees would be necessary and the steps that needed to be

9    taken to prepare all of the assets for sale, be it plants,

10   depot stores, et cetera, while complying with environmental

11   safety and other sanitation issues that needed to happen,

12   and you know, mothballing the various assets.

13   Q    Okay.  And you worked with people at the debtor's to do

14   this?

15   A    Sure.  This would encompass everybody from Ken Barker

16   (ph) who heads up the real estate, Rich Hobbs, who's SVP of

17   plant operations, all of the logistics folks, such as Mary

18   West, and then of course, the senior officers, such as John

19   Stewart, who's a CFO and Rich Steven, who's the Chief

20   Operating Officer and Chief Marketing Officer.

21   Q    And how long have you been developing this, the wind

22   down plan?

23   A    Several months.  In fact, we've had a -- actually,

24   multiple months.  It's further got refined as the process

25   went along, and as we knew there was potential crossroads,

Page 73

1    you know, even more intensive efforts.

2    Q    And you did that as a contingency in case the debtors

3    weren't able to reorganize; is that correct?

4    A    That's correct.  We were moving down a parallel path,

5    so we were heavily involved in the turnaround plan, all of

6    the financial modeling and the assumptions of that, while at

7    the same time, had the team working on the contingency plan.

8    Q    Okay.  Now, in light of your experience with the

9    process you just described, do you have an opinion as to

10   what would happen to the value of the debtor's assets if the

11   debtors were forced to convert to a Chapter 7 in the next

12   few days?

13   A    Yes, I do.

14   Q    And can you briefly go through that opinion?

15   A    I think it's be catastrophic.  You know, I think

16   there's three kind of major points from my perspective.  One

17   would be the Chapter 7 trustee in getting up to speed.  The

18   second thing would be the loss of the senior management, and

19   all the institutional knowledge that's embedded in those

20   folks.  And then three would be diminution of value on the

21   perishable collateral that we've got out there, so we've got

22   the issues with that as well.

23   Q    Okay.  Let's go through those one at a time.  First,

24   you say getting the Chapter 7 trustee up to speed.  Can you

25   briefly describe that one?

Page 74

 1    A    Sure.  As anybody familiar with the case, this company

 2    has a significant asset footprint.  It's over 9 million

 3    square feet of real estate spread throughout the United

 4    States, that's plants, that's depots, that's stores.  You

 5    know, as Mr. Scherer had indicated earlier, numerous brands,

 6    some of those produced in certain plants from around the

 7    country, some of those brands such as Drake's, only in one

 8    plant, Wayne, New Jersey, and that -- there's a getting up

 9    to speed factor that happens in any case, but in a company

10    of this size with the employee base that it had, the asset

11    base and the brands, that's a considerable undertaking.

12        I know just from our experience when we got involved

13    with the company over a year ago, it took a while for us and

14    we were inside the company dealing with all the various

15    departmental managers, et cetera.  It takes a long time.

16    Q    And the second one you talked about was institutional

17    knowledge.  Can you briefly describe that?

18    A    Sure.  If the goal at the end of the day is to try and

19    get some of these sold as ongoing businesses, get some of

20    these employees back in, have some plants back up and

21    running again, there's no better brand ambassador than

22    somebody like Rick Steven who's the chief marketing officer

23    that's been with the company for years and years, has all

24    the relationships with the customers, knows what these

25    brands -- what the impact of these brands are, knows what

1    the potential up side is.

2        From a real estate perspective Ken Barker, who has been

3    around for years and years, knows the 265 pieces of real

4    estate we've got around the country that are 9 million

5    square feet.  And from a plant perspective, nobody knows the

6    plants better than Rich Hobbs, because the guy's been here

7    53 years.  So he knows the in's and out's.  He can tell you

8    all of the -- you know, what plants have hydraulic lifts,

9    what don't, all of -- you know what CapX has been spent

10   where, all of that goes away if those individuals leave.

11   Q    So the importance of that is, it's kind of what Mr.

12   Scherer was talking about earlier, that if someone wants to

13   know about a plant or a brand, this institutional knowledge

14   will be critical to explain it to them quickly, move the

15   sale process along quickly.

16   A    Absolutely.  As Josh had indicated, you have to strike

17   when the iron's hot.  And so we've got a significant amount

18   of interest right now.  The faster we can get potential

19   parties in there, and have folks like Rich Hobbs walking

20   them through the plants, and have Rich Steven walking them

21   through the value of the brands and so forth, the better.

22   Q    Okay.  And just quickly, the third topic you talked

23   about was divesting the perishable goods.

24   A    Sure.  The bread and the cake products have a very

25   finite shelf life.  And we're in the process now with

Page 76

1    talking to some major retailers and some wholesalers out

2    there, in terms of off loading this product at fairly good

3    recovery from our perspective, all things considered.

4         If we have to wait for somebody else to come in and

5    make the decision in that regard, that's millions and

6    millions of dollars that at that point in time it'll be

7    stale and nobody's going to buy it.

8              MR. SILBERFARB:  Okay.  I have no further

9    questions at this time.

10             THE COURT:  Okay.  Does anyone want to cross-

11   examine, Mr. Carroll?

12             MR. BADDELEY:  Your Honor, this is Jeff Baddeley

13   again.

14                       CROSS-EXAMINATION

15   BY MR. BADDELEY:

16   Q    Mr. Carroll, would you please refer to paragraph 26 of

17   your declaration?  This is the declaration filed on the 16th

18   of November.

19   A    Sure, I've got two, the declaration in support of the

20   wind down or the 1113.

21   Q    I apologize.  It's the one in connection with the wind

22   down plan.

23   A    Sure.  And which paragraph, sir?

24   Q    Paragraph 26.

25   A    I'm there.

1    Q    In that paragraph you say that the wind down plan

2    contemplates retention of various third parties to complete

3    the winding up of their affairs.  Do you see that?

4    A    Yes, sir.

5    Q    That would include the retention of Accenture which

6    currently provide information tech and finance and

7    accounting services?

8    A    Yes, that is correct.

9    Q    Do you have any idea whether there's been a provision

10   made to pay Accenture in full?

11   A    That I don't know the specifics in terms of the

12   Accenture payments.  I do know we're retaining Accenture, or

13   the plan for that, and that'll be for a multi period of

14   time.  But in terms of payment, and how that's been modeled

15   out, I do not know.

16   Q    Okay.  Do you know that the plan is to retain

17   Accenture, but you don't know whether there is a provision

18   for payment in full?

19   A    That is correct.

20   Q    Do I understand your testimony correctly?

21   A    Yes, that is correct.

22            MR. BADDELEY:  Okay.  No further questions, Your

23   Honor.

24            THE COURT:  Okay.  You can step down, sir.  Unless

25   you -- I'm sorry, unless you have any redirect.

1          MR. SILBERFARB:  Well, Your Honor, just to be --

2     to make sure I've got all my ducks in a row.

3          THE COURT:  All right.

4          MR. SILBERFARB:  I'm not sure I --

5          THE COURT:  I spoke too soon.  You should sit

6     down.

7          MR. SILBERFARB:  Well, no, I'm not sure I offered

8     the second declaration, the declaration in support of the

9     wind down motion into evidence.  He already stated that

10    everything is true and correct.

11         THE COURT:  Okay.  Does anyone object to the

12    second declaration, the one in support of the 1113(e) motion

13    being admitted?

14         (No response)

15         THE COURT:  All right.  It's admitted.

16    (Declaration of Charles Carroll in support of the 1113(e)

17    motion received)

18         THE WITNESS:  Thank you.

19         MR. HAMILTON:  Your Honor, we also -- I don't

20    think we need to call these people to the stand.  I don't

21    anticipate any cross, but Exhibit C and D to the wind down

22    motion are the -- Imhoff (ph) declaration and the Rush

23    declaration, we would introduce those into evidence.  We can

24    bring them to the stand if anybody wants to cross, but I

25    don't think anybody does.

1           THE COURT:  Okay.  Well, let's deal with Mr.

2   Imhoff's first.  Does anyone object to the admission of his

3   declaration, which is in support of the wind down motion?

4           (No response)

5           THE COURT:  All right.  It'll be admitted.

6   (Imhoff's declaration in support of wind down motion

7   received)

8           THE COURT:  Does anyone want to cross-examine Mr.

9   Imhoff?

10          (No response)

11          THE COURT:  Okay.  I have no questions of him.

12          And then does anyone object to the admission of

13  David Rush's declaration, also in support of the wind down

14  motion?

15          (No response)

16          THE COURT:  All right.  It's admitted.

17  (David Rush's declaration in support of wind down motion

18  received)

19          THE COURT:  All right.  Does anyone want to cross-

20  examine Mr. Rush?

21          (No response)

22          THE COURT:  Okay.  I have no questions of him

23  either.  I think the debtor's counsel can answer my

24  questions relating to the budget.  If not I may want to hear

25  from him.

1          MR. HAMILTON:  I think that -- with that, Your

2     Honor, we will rest on our evidentiary presentation.

3          THE COURT:  Okay.  Does anyone else have evidence

4     to submit either in support or in opposition to the debtor's

5     two motions?

6          (No response)

7          THE COURT:  All right.  So I'll close the

8     evidentiary portion of the hearing, although I do have a

9     couple of questions of the debtors.  I think counsel can

10    answer them, but maybe not.

11         As far as the administrative claims number that

12    Mr. Scherer eluded to --

13         MS. LENNOX:  Uh-huh.

14         THE COURT:  -- I'm assuming he didn't develop that

15    number since administrative claims are largely a legal

16    issue.  Is it fair to assume that the debtor's counsel has

17    reached some conclusion about what the existing

18    administrative claims are?

19         MS. LENNOX:  I think, Your Honor, it's ball park,

20    and it's sort of hard to know what's going on, but I think

21    that that is certainly a fair ball park from what we

22    understand.

23         THE COURT:  Okay.  And do you include in that the

24    accrued post petition pension contribution claims that I

25    ruled on earlier?

15-23007-rdd   Doc 2539   Filed 02/17/15   Entered 02/25/15 11:31:46   Main Document
Pg 241 of 429

Page 81

```
 1              MS. LENNOX:  We do.

 2              THE COURT:  Even though that's on appeal,

 3    obviously.

 4              MS. LENNOX:  We do.

 5              THE COURT:  Okay.  And then turning to the D&O

 6    issue.

 7              MS. LENNOX:  Yes.

 8              THE COURT:  Can you shed anymore light on the D&O

 9    coverage that the current management have, as far as both

10    defense costs and liability costs?

11              MS. LENNOX:  They do have -- there are D&O

12    policies in place.  There are deductibles for those

13    policies.  The policies that we have have exclusions, which

14    may not cover everything for these directors and officers,

15    so there is some concern.

16              THE COURT:  Right.  But I'm assuming that the

17    exclusion would not exclude acts that were specifically

18    authorized by a Court.

19              MS. LENNOX:  No, it -- well, it doesn't -- to my

20    knowledge, there's no specific exclusion for that, but there

21    may be --

22              THE COURT:  No, but what I'm saying is that that

23    would protect them, if the Court -- if the normal

24    exclusion --

25              MS. LENNOX:  You know, Your Honor --
```

```
 1              THE COURT:  -- is for things done improperly.

 2              MS. LENNOX:  I would beg to differ on that.

 3              THE COURT:  Okay.

 4              MS. LENNOX:  Because I will tell you after having

 5    litigated and seen my partners litigate coverage cases with

 6    insurers, if they can find any way not to insure somebody,

 7    they will, and there are exclusions in the policies for

 8    certain acts, and frankly, you know, that's the only reason

 9    we're asking for the extra protection that we're asking for.

10    Because as Mr. Rayburn indicated, this is a volatile

11    environment, and we cannot assure the folks that, you know,

12    they can tap D&O for everything.

13              THE COURT:  Well, turning to that last point, part

14    of the protection you're offering here for the officers is

15    this $5 million trust.

16              MS. LENNOX:  Uh-huh.

17              THE COURT:  Is it fair to say that that's in

18    essence coming out of the secured creditors?

19              MS. LENNOX:  Absolutely, Your Honor.

20              THE COURT:  It's basically a carve out, right?

21              MS. LENNOX:  That's right, Your Honor.

22              THE COURT:  It's their money.

23              MS. LENNOX:  It's their money, it's coming out of

24    their collateral.

25              THE COURT:  It's not reducing what administrative
```

15-23007-rdd   Doc 526   Filed 09/17/15   Entered 09/25/15 23:21:16   Main Document
Pg 243 of 429
15-22092-rdd   Doc 2539   Filed 09/17/15   Entered 09/25/15 11:51:46   Main Document
Pg 243 of 428

Page 83

1    creditors would otherwise get.

2              MS. LENNOX:  Well, the money is being paid from

3    the estate, it's not being paid directly from the lenders,

4    but it is coming out of their collateral.

5              THE COURT:  But they're permitting it to come it

6    out of collateral.

7              MS. LENNOX:  They are permitting it to come,

8    correct.

9              THE COURT:  Okay.  Oh, one other question.  It's

10   an odd sort of change, but I think it's maybe required.  Is

11   part of the relief you're seeking under 1113(e) to permit

12   the retained employees who are union members to get the

13   benefit of the plan?

14             MS. LENNOX:  The retention plan?

15             THE COURT:  Right.

16             MS. LENNOX:  Yeah, I -- yes.  We want -- we just

17   want -- we did that for clarity.  We wanted to be clear

18   about that.

19             THE COURT:  No.  But is that something that would

20   be part of 1113(e) relief because it would alter the terms

21   of the employment under the -- I mean, it's to the better,

22   but.

23             MS. LENNOX:  It's to the better, I'm not sure it's

24   necessary, we just wanted it to be very clear.

25             THE COURT:  Okay.

15-23007-rdd   Doc 539   Filed 02/17/15   Entered 02/25/15 11:51:46   Main Document
Pg 34 of 103

Page 84

1          MS. LENNOX:  So we do have still several

2    objections, Your Honor.  I don't know how you would like to

3    handle that or proceed to argument.

4          THE COURT:  Well, I guess I'd like to hear the

5    objectors.

6          MS. GOLDEN:  Good afternoon, Your Honor, Susan

7    Golden for the United States Trustee.

8          First, the U.S. Trustee has asked me to express

9    her sadness that the case is in the posture that it is in.

10   She wants you and all parties in interest to know that she

11   has considered all alternatives, keeping in mind the best

12   interests of the estate, and of the employees.

13         I will do my best to be brief, because the U.S.

14   Trustee's position is articulated in her objection to the

15   wind down motion.

16         Under both the law and the equities, this case

17   should be converted to Chapter 7.  In short, the debtor is

18   not able to meet the statutory standards to be able to

19   remain in Chapter 11, nor has the debtor met the standards

20   to pay the executive bonuses, which per Mr. Rayburn's

21   testimony appear retentive.  Nor have they met --

22         THE COURT:  They're not seeking those today.

23         MS. GOLDEN:  Okay.  Nor have --

24         THE COURT:  Right?  I just want to make sure.

25         MR. HAMILTON:  That's correct.

1          MS. LENNOX:  That's correct, Your Honor.

2          MS. GOLDEN:  Okay.  Nor have they met the

3    standards for such a broad exculpation.  The case is

4    currently administratively insolvent.  Any other

5    interpretation is speculative.  The debtor cannot pay its

6    administrative creditors in full, and the proposed budget

7    demonstrates this.

8          Instead, as evidenced by paragraph 46 of the wind

9    down plan and memorandum in support, the debtors and the DIP

10   agent propose to be allowed to cherry pick which claims will

11   get paid and which will not.

12         THE COURT:  Well, can I stop you on that?

13         MS. GOLDEN:  Sure.

14         THE COURT:  It appears to me from the testimony

15   that the only way to ensure a reasonable likelihood that

16   administrative creditors will get paid in full is at least

17   in the interim not to convert the case, because the debtors

18   basically need a seamless transition to liquidation.

19         So as far as the relief that's being sought before

20   me today, I'm having a hard time seeing a specific provision

21   of Section 1112 that would require conversion.  I understand

22   that there's some risk, because Mr. Scherer wasn't giving

23   any guarantee that administrative expenses won't be paid by

24   everyone, but it seems to me that the risk is much greater

25   if it's converted.

1          MS. GOLDEN:  Well, the U.S. Trustee understands

2     that, but the U.S. Trustee believes that anything going

3     forward right now is truly speculative, and she certainly

4     understands the issues that you're raising, and also that

5     debtor's counsel and the gentleman who testified also said.

6     But she believes that the bifurcation here violates the

7     absolute priority rule, and really does allow for unfair

8     discrimination.  Because today, the debtor is

9     administratively insolvent.

10          THE COURT:  Well, Congress does recognize in

11     506(c) that the costs of preserving and protecting

12     collateral get deducted and get paid.  It's kind of ironic

13     that the costs of preserving and protecting the value for

14     the priority creditors wouldn't get paid.  I mean, I would

15     understand the trustee's argument completely if the wind

16     down budget was not limited to paying the necessary costs of

17     winding down, and include in it, instead, you know, favored

18     admin creditors.  That to me would be a real problem.  But I

19     don't think that's the case.

20          Is there any evidence that those types of payments

21     are in there as opposed to, you know, what's absolutely

22     necessary to get from point A to point B?

23          MS. GOLDEN:  No, Your Honor.

24          THE COURT:  Okay.

25          MS. GOLDEN:  I mean, in effect, it really seems

Page 87

1    that ultimately the debtors are seeking to run a virtual

2    Chapter 7 case within the Chapter 11 context.

3              THE COURT:  At least for now.

4              MS. GOLDEN:  For now.  You know, and the U.S.

5    Trustee is certainly troubled that down the road, that

6    management is still proposing to pay millions of dollars in

7    bonuses while firing so many people.  The U.S. Trustee also

8    believes that there is nothing here that a Chapter 7 trustee

9    cannot do.  And we realize the complexity of these cases,

10   from orchestrating the closing of the plants to selling the

11   assets.  Moreover --

12             THE COURT:  Well, to me that's a timing issue,

13   isn't it?

14             MS. GOLDEN:  Sure.

15             THE COURT:  I mean, I can't imagine even the most

16   experienced third party coming in today and being able to

17   pick up the reins.  I mean, I think the only way he or she

18   would do that, if she'd be prepared literally to hire these

19   same people to do the same work.  It would seem to me that

20   perhaps if the Code required it in the long run, a trustee

21   in waiting, I suppose, or you know, a trustee or a potential

22   trustee since you have a list of your panel trustees, could

23   come up to speed with some real due diligence eventually.

24   Although even then, he or she may well decide I just need to

25   hire these same people.  But you know, they're a fiduciary,

15-23007-rdd   Doc 526   Filed 02/17/15   Entered 02/25/15 23:21:16   Main Document
Pg 248 of 429

1   they have to make that decision.

2         MS. GOLDEN:  Absolutely, Your Honor.

3         THE COURT:  I mean, it just seems to me that the

4   gap here, as all the testimony has said, would be through no

5   fault of the trustee's, you know, a loss of real value, and

6   jobs, and again, the payment of admin claims.

7         So I understand the U.S. Trustee's position in the

8   abstract, and I also understand it if the evidence were

9   different.  It just seems to me that given this record, if

10  there's a need for a trustee, that person before actually

11  assuming duties of a fiduciary would have to do some real

12  due diligence.

13        And I know from prior situations that is possible.

14  But anyway --

15        MS. GOLDEN:  I --

16        THE COURT:  -- I don't want to go off track,

17  but --

18        MS. GOLDEN:  No, I understand.

19        THE COURT:  -- I was just responding to your

20  point.

21        MS. GOLDEN:  I understand.  I only have a few more

22  points.

23        THE COURT:  Okay.

24        MS. GOLDEN:  The debtor does state that in the

25  Chapter 11, they will be able to save approximately I think

1    3,200 jobs at least, you know, for some time into the

2    future.

3              THE COURT:  Right.

4              MS. GOLDEN:  And the U.S. Trustee does not believe

5    that this would change if the case were converted, since any

6    trustee would still need these employees for the same

7    purposes.

8              The bottom line is that the proposed wind down

9    plan does not comply with the Code, and she believes that it

10   calls out for an independent disinterested and qualified

11   fiduciary.

12             The U.S. Trustee also wanted me to let the Court

13   know that while she is in Manhattan in another urgent matter

14   before another judge, Assistant United States Trustee, Linda

15   Riffkin is here and in contact with her, and Ms. Davis is

16   ready to act immediately should the Court either convert the

17   case or direct any other action that she should undertake.

18             THE COURT:  Okay.  Thank you.  Well, I mean, I

19   think I've been pretty clear.  I think that -- and I

20   appreciate Ms. Davis' focus on this, the U.S. Trustee's

21   focus on it, for those of you who don't know who she is.  I

22   would just say, and again, this is coming from the Judge,

23   it's not coming from the Justice Department who is her boss,

24   that in my view, the best thing she could be doing is

25   identifying someone or a list of people who could do the due

1    diligence, so that if in fact, on a longer term basis there

2    was a good reason under 1112 or even under 1104 to have a

3    trustee, that person could do as much as possible a seamless

4    transition.

5          MS. GOLDEN:  We will certainly let her know, Your

6    Honor.

7          THE COURT:  Okay.  And I know she's done this in

8    the past in other cases where -- well, I mean, in the Revco

9    case, hundreds of millions of dollars of value were

10    preserved for creditors because the trustee acted like a

11    real true public servant in preparing the ground for what

12    needed to be done there.

13          Okay.  Anyone else?

14          MR. BADDELEY:  Your Honor, this is Jeffrey

15    Baddeley on behalf of Accenture LLP.

16          As we noted for the Court in our filing, Accenture

17    LLP has a contract with the debtors to provide a variety of

18    services.  Those services include information technology,

19    finance and accounting services, as well as operating the

20    data center and storing the debtor's data.

21          Your Honor, that contract has been in place since

22    February 2004, called a master out sourcing agreement.  The

23    debtor's motion does not commit to pay -- and, Your Honor,

24    we invoiced the debtors at the first of the month, and are

25    paid on the last date of the month for services rendered

1    during that month.

2           So right now, in invoices outstanding payable to

3    Accenture for services it expects to render during November,

4    and that is payable on the 28th of November, and the amount

5    of that invoice is $1,827,000.

6           The debtors do not commit and have not committed

7    to pay that invoice, even though the services are being

8    rendered.  The debtors have not provided a budget consistent

9    with the payment of that invoice, although it's hard to tell

10   how much is set aside.  They have not given us the assurance

11   that there is sufficient funds to pay that outstanding

12   invoice.

13          And most troubling, we do not have an agreement as

14   to the level of staffing or timing of payment or appropriate

15   provisions to terminate the agreement post petition and post

16   wind down.  We have been advised by personnel of the debtor

17   that they believe that the contract terms have been modified

18   to go forward as of November 16th, and that we will not be

19   paid the full amount of the agreed contract.

20          The wind down motion puts Accenture at risk.  It

21   is obvious that the debtor requires the services, and you've

22   heard the testimony of at least one of the witnesses I

23   cross-examined.  They have used the services to date, but

24   they have put forth a budget that adjusts the agreed upon

25   rate after Accenture has rendered those services.  No other

1   similarly situated, and I'll use the term professional

2   loosely, no other similarly situated provider of service has

3   been placed in this position.

4          The debtor was asked whether these payments were

5   coming out of the secured lender's collateral, and there's

6   no doubt the payments for the trust were coming out of the

7   secured party's collateral.  There's no doubt that those

8   secured parties have agreed to set this money aside.  But my

9   question to the Court is, whether if some portion were set

10  aside to provide the assurance to Accenture and to other

11  administrative claimants that they would be paid in a timely

12  fashion, we don't have an answer to whether that's even been

13  (indiscernible).

14         And we are at risk for several months of payments

15  and of services rendered.  We're confident that we can reach

16  a deal with the debtor but if Your Honor puts in place this

17  order, even on an interim basis, we are subject to being at

18  risk, not only for what we believe we are owed under the

19  November contract, but for contracts going forward.

20         Your Honor asked whether there was any evidence of

21  favoritism among administrative creditors, and I submit that

22  the timing of payment is critical in determining whether, in

23  fact, there is favoritism.  We are being asked to wait

24  perhaps up to 90 days to accommodate the debtor's cash

25  needs.  No other creditor, no other administrative creditor

 1    is being asked to do that.

 2            THE COURT:  Has your contract been assumed?

 3            MR. BADDELEY:  No, Your Honor, has not.

 4            THE COURT:  And when is the expiration date of the

 5    contract?

 6            MR. BADDELEY:  The contract doesn't expire until

 7    2014.

 8            THE COURT:  Okay.

 9            MR. BADDELEY:  There were obviously provisions for

10    termination prior to that time, but they are consistent with

11    the long history between these companies fairly lengthy.

12    They involve two or three levels of review within each of

13    the debtor and Accenture, and could take as long as 60 to 90

14    days to terminate.

15            THE COURT:  Okay.

16            MR. BADDELEY:  So, Your Honor, because we are

17    being asked to extend services without assurance of payment,

18    and without any guarantee that there will be enough money in

19    the budget, we would object to the terms of the proposed

20    wind down order insofar as it puts payments of Accenture at

21    risk, and that (indiscernible) basically we are paid between

22    a million and $2 million a month under these contracts that

23    we're being asked to --

24            THE COURT:  Right.  I mean, generally speaking, a

25    party to an executory contract that's neither been assumed,

1    or if it hasn't been assumed, it hasn't been rejected, is

2    not entitled to a guarantee.  Congress gave the debtor that

3    level of optionality.  Now, you have the right I guess to

4    seek to terminate the agreement --

5              MR. BADDELEY:  Well, Your Honor, actually under

6    the proposed motion we wouldn't have that right for 90 days.

7    We would be asked to extend credit for 90 days under the

8    provision of the payment grace period program.

9              THE COURT:  Right, right.  If they give you the

10   Exhibit G notice.

11             MR. BADDELEY:  That's right.  We get an Exhibit G

12   notice tomorrow, and we have to wait 90 days.

13             THE COURT:  Okay.  So I'm asking the debtors now,

14   what is in the budget and what is not in the budget for

15   Accenture?

16             MS. LENNOX:  So what we have in the budget for

17   Accenture, Your Honor, is full payment for everything up to

18   November 16th.  And what we are talking -- because -- and

19   payment's not due until later, but we budgeted everything.

20   And there's full payment budgeted going forward.

21             What's happening now is the parties are in

22   negotiations about, as Mr. Rayburn testified, we're not

23   using them for everything.  So we're in negotiations about

24   modifying about what they do and the payment rates going

25   forward.

 1               So, you know, I understand --

 2               THE COURT:  Well, when you say you have them in

 3    the budget for full payment going forward, that's full

 4    payment under their current agreement, or under as proposed?

 5               MS. LENNOX:  It's full payment through their run

 6    rate through November 16th, because they've been doing

 7    everything then.  And what we've been doing is negotiating

 8    with them since then, what are they going to be doing going

 9    forward, and we'll figure out what we need to pay them for

10    that, and we'll pay them for that.

11               THE COURT:  But is that in the budget?

12               MS. LENNOX:  Yes.

13               THE COURT:  But -- including the full amount or

14    the amount that you want to negotiate with them?

15               MS. LENNOX:  The full amount's not, it's the

16    reduced amount that we'd like to negotiate for them because

17    they're simply not providing -- they're only providing IT

18    services.  They're not even performing services for other

19    functions, so they probably couldn't get paid for that

20    anyway.

21               THE COURT:  Okay.

22               MS. LENNOX:  And as I mentioned at the beginning,

23    this --

24               THE COURT:  How are you measuring the amount?

25    Based on just what they're doing?  I'm just trying to figure

1    out whether you're really trying to jam there, and saying we

2    think your services are worth $5.  I mean, what's the basis

3    for --

4              MS. LENNOX:  We're still negotiating, Your Honor.

5    Right now it's an estimate.  Based on everything we've done,

6    we think it's a fair estimate for what we're asking them to

7    do going forward.

8              THE COURT:  Is it based on, you know, basically

9    what it would cost to replace them?

10             MS. LENNOX:  No.

11             THE COURT:  I'm just trying to figure out --

12             MS. LENNOX:  No.

13             THE COURT:  -- what it's based on.

14             MS. LENNOX:  It's based on contract rate.

15             THE COURT:  For the people who are still -- is it

16   for the people that are still there?

17             MS. LENNOX:  Perhaps Mr. Rush can explain --

18             THE COURT:  Okay.  That's fine.

19             MS. LENNOX:  -- since he knows the facts.  He's in

20   the middle of negotiations.

21             THE COURT:  Okay.

22             MR. RUSH:  So our controller is in the process of

23   negotiating this agreement.

24             THE CLERK:  State your name, please?

25             MR. RUSH:  David Rush.  In the process of

Page 97

1    negotiating the step down services, obviously we're scaling

2    down quickly.  There are a number of services such as IT

3    implementation, processing that it's not going to be

4    necessary in a company that's scaling down this fast.

5            THE COURT:  Right.

6            MR. RUSH:  So we did get estimates from the prior

7    chief information officer based on what he thought would be

8    the critical services in a step down manner, and that's what

9    we've got in the budget.

10           THE COURT:  Does the contract, as it currently

11   exists, break out the different types of services Accenture

12   provides and puts a dollar amount on each one so, you know,

13   anything like that?

14           MR. RUSH:  You know, I'm not too familiar with the

15   contract and the pricing mechanism.

16           THE COURT:  Well, let me ask Accenture's counsel.

17   Does it -- is it like -- I would find it hard to believe,

18   but maybe it's the case, that there's one unitary contract

19   price that doesn't have any, you know, components to it, but

20   are there components to the price that can be --

21           MR. BADDELEY:  Your Honor, every month as I

22   understand it, and I apologize that I probably don't have

23   the kind of familiarity with the contract that Your Honor

24   may be seeking.  Every month we give to the debtors an

25   estimate of the people that will be required to perform the

Page 98

1    function that month, and the debtors agree.  That happened

2    on November 1st.  And the debtors use these employees of

3    Accenture and is using them today.

4         THE COURT:  That's not the issue.  They're paying

5    you through today.  The issue is they are proposing, and

6    they have in the budget, to pay you just for what they need

7    going forward, which frankly is the law.

8         MR. BADDELEY:  Your Honor --

9         THE COURT:  They don't have to pay you anymore.  I

10   hope you didn't have to suffer through this morning's

11   hearing on A&P, but I gave about a 20-minute ruling on that.

12        MR. BADDELEY:  I understand, Your Honor.

13        THE COURT:  Okay.

14        MR. BADDELEY:  But what actually has happened is

15   as of today, the number of employees performing the variety

16   of functions we've discussed are in the offices of the

17   debtor working, at the debtor's request and upon their

18   agreement.  And as of today, retroactively, we've been

19   advised that some step down rate is what we are entitled to

20   be paid because that's what the Bankruptcy Code does permit.

21        I recognize that risk.  But we contracted with

22   these debtors for something very different.

23        THE COURT:  Well, that's too bad.  You know,

24   that's just too bad.  That isn't the law, and I'm not going

25   to spend more time on this.  I will give you the flexibility

 1   to make a motion to reject your agreement, and the debtors

 2   will have all the claims they have including in respect of

 3   their SAP systems, which I heard a lot about -- well, I

 4   won't tell you when I heard it.

 5            MR. BADDELEY:  Okay.

 6            THE COURT:  So in that respect, your objection is

 7   granted.  You are free during the 90 days or whenever they

 8   may send you a notice to seek to reject the agreement.

 9            MR. BADDELEY:  Your Honor?

10            THE COURT:  Yes.

11            MR. BADDELEY:  So that I understand your ruling,

12   is your ruling that you will permit the debtor to implement

13   the budget and thus reduce the payments due under the

14   contract --

15            THE COURT:  I think they're doing what they're

16   supposed to do under the Bankruptcy Code.  If it turns out

17   that they're jerking you around, I will listen quite

18   favorably to a motion to either compel them to pay the

19   administrative expense, because they're jerking you around,

20   or alternatively to move because to the extent you're

21   entitled to under the Bankruptcy Code because you're not

22   suitably protected, notwithstanding your limited rights as a

23   party to a non-assumed executory contract, to have the

24   contract rejected.

25            MR. BADDELEY:  Thank you, Your Honor.

```
 1              THE COURT:  Okay.

 2              MR. ERCOLE:  Your Honor, Charles Ercole on behalf

 3    of employee Mark Popovich and other similarly situated --

 4              THE COURT:  Yes, good afternoon.

 5              MR. ERCOLE:  Good afternoon.  We join in the

 6    trustee's objection to the exculpation language in paragraph

 7    20, not to reiterate too much, but we agree that with the

 8    litigation trust budget, the D&O policies, and authority of

 9    the Court, ratification of these actions, these officers are

10    certainly protected and do not need this language.

11              Moving on to the Warren Act issue, our concern

12    with paragraph 14, and the waiver from state, local

13    statutes, rules and ordinances, regulations, our concern is

14    that first of all we think it's premature.  They're asking

15    for the Court to exercise its preemptory powers based on and

16    their motion says in paragraph 82, "in light of the debtor's

17    compliance with federal statutes."  We don't think it's

18    crystal clear that they have complied with the federal

19    Warren Act, so even the premise for which they're asking the

20    Court to exercise this preemption and waive these

21    obligations --

22              THE COURT:  And I'm sorry, which paragraph of the

23    proposed order are you focusing on here?  14?

24              MR. ERCOLE:  Paragraph 14, yes.

25              THE COURT:  All right.
```

Page 101

```
 1              MR. ERCOLE:  They're asking the Court to --

 2              THE COURT:  I guess -- well, I want to hear the

 3    debtors more on this.  I'm not sure that they are looking to

 4    get out from under monetary obligations.  What they're

 5    looking to get out from under is something that would enjoin

 6    them from doing the sale.

 7              MS. LENNOX:  That's exactly correct, Your Honor.

 8    We are not trying to initiate the claims if there are any.

 9    We don't think we have any because we think we've complied,

10    but we are seeking to initiate claims.  It is exactly that,

11    it's a time issue.

12              THE COURT:  So for example if your clients -- let

13    me just make sure we're all clear on this.  If someone has a

14    Warren Act claim, if they think that the company did not

15    comply with the Warren Act, they would be able to assert

16    that claim in the bankruptcy case and have it be determined.

17              MS. LENNOX:  Correct.

18              MR. ERCOLE:  And just so I'm clear, Your Honor, is

19    -- are the debtors conceding that that could be brought

20    under not only the federal Warren, but any state and local

21    Warren Act that might be applicable?

22              THE COURT:  I'm assuming that's the case, right?

23              MS. LENNOX:  If somebody thinks that there's a

24    claim, they can certainly assert it in this court, and be

25    dealt with and adjudicated in this court.
```

```
 1              MR. ERCOLE:  Okay.

 2              THE COURT:  Okay.

 3              MR. ERCOLE:  If that's the case, then we would

 4    withdraw the objection.

 5              THE COURT:  Okay.  Thank you.

 6              MR. ERCOLE:  Thank you.

 7              THE COURT:  I appreciate this case on short notice

 8    for people, and I don't fault anyone for filing an objection

 9    and then later having it be clarified.

10              MR. SELTZER:  I guess I got to the podium in time

11    this time.

12              THE COURT:  Well, I think you made it this time.

13              MR. SELTZER:  Richard Seltzer of Cohen, Weiss and

14    Simon for the IBCNNC which is the Teamster's National

15    Negotiating Committee.  And I just have a couple of comments

16    in the 1113(e) and just take one minute I think to just

17    acknowledge as we stated in our objection, that there is a

18    tragedy that is taking place here.

19              We appreciate all the Court's efforts in this

20    case, and we appreciate the Court's efforts yesterday to

21    serve as the mediator.  Sometimes things are beyond the

22    power of the Court.  The Teamsters have been fully engaged

23    in this case, as the Court knows, for the entire case, to

24    try to avoid the very outcome that we're faced with today.

25    And some things are out of our control as well.
```

1           But I think we do -- sometimes attention needs to

2    be paid and sometimes acknowledgement has to be made that

3    long after we finish today, long after the wind down, long

4    after the last exculpation if there is any dispute is heard

5    by the Court, there are thousands of employees who are going

6    to be dealing with the consequences of what's happened for

7    the rest of their lives.

8           In terms of the 1113(e) largely because I think of

9    the lack of time, and the fact that this is all being done

10   in a very expedited emergency basis, there have been no

11   negotiations or no proposals as such.  And therefore, there

12   really isn't an agreement, and the Teamster Negotiating

13   Committee stands on its objection because it really hasn't

14   been a negotiation as such.

15          But I can say that there have been some very

16   helpful discussions between counsel up to last night and

17   this morning.  We do acknowledge that there's been moving in

18   many areas by the debtor from the original request for

19   relief.  Some of that in response to specific points that

20   were raised in our objection, and in the discussions.

21   Primarily the term is now limited to two months, that the

22   areas of relief are limited to three areas of relief, and

23   that in those particular areas, and this was a particular

24   concern of ours, that if this -- if the debtors are stating

25   this is required to deal with the particular wind down

1    situation that it not be a blanket authority to use people

2    out of seniority order, just because somebody wants to do

3    that, but because it's necessary for the wind down budget.

4          THE COURT:  Right, and that's in addition to the

5    black line.

6          MR. SELTZER:  And that is an addition to the black

7    line actually, and we just request that some time today, we

8    be able to see an ultimate black line so we know the

9    language that's ultimately going to the Court.

10          And so while we stand on our objection, we do

11    recognize there have been a lot of changes that deal with

12    some of our concerns.  I think the only other thing I want

13    to say is that in relation to the U.S. Trustee's position

14    which we understand, and understand their concerns, it is

15    our position that this case would be better administered and

16    the outcome for all parties would be improved by continuing

17    in Chapter 11.  If it can't get to Chapter 11 long term, we

18    do think that there is an advantage to all the parties to

19    continuing at least for an interim period in Chapter 11.

20    Thank you.

21          THE COURT:  Well, I agree with -- I actually agree

22    with everything you said.  But in particular, I agree with

23    the fact that the debtor's revisions to the relief that

24    they've sought under 1113(e) have, to my mind at least, I'm

25    not going to put words in your mouth on this, but to my

Page 105

1    mind, have really dealt with what I have found to be the

2    problematic aspects of that motion in particular, putting a

3    -- I think as is appropriate, a time limit on the relief

4    that would roughly track what I believe should be the out of

5    bankruptcy court bargaining process.  And also limiting the

6    relief to the three areas that were discussed.

7              Any other objectors?

8              MR. TENENBAUM:  Your Honor, this is Mark

9    Tenenbaum.  I represent the MidAtlantic Regional Council of

10   Carpenters Annuity Fund and the Bakery Driver's Local 33

11   Pension Fund.

12             THE COURT:  Yes.

13             MR. TENENBAUM:  The annuity -- neither of these

14   funds have received any payment of their allowed

15   administrative expenses in this case.  The annuity fund has

16   an allowed claim of $27,520 for the period January through

17   March of this year, and that amount has now grown to roughly

18   $100,000.  The debtors did not appeal Your Honor's ruling

19   allowing that administrative expense, and they've paid no

20   payment towards that.  And as far as we know, it's not

21   included in the budget.

22             The Bakery Drivers Local 33 Pension Fund have a

23   total claim of somewhere in the neighborhood of $700,000

24   that has not been paid, the debtors have appealed that.  But

25   it's our view that the debtors are discriminating against

Page 106

1   disfavored creditors by not paying these claims.  They are

2   paying other claims that were incurred prior to the -- prior

3   to today, and it's our view that even though this case is

4   apparently not going to be converted to Chapter 7, that it

5   should nevertheless be administered in accordance with the

6   priorities specified in Chapter 7.  So that administrative

7   claims incurred during the liquidation are paid first, and

8   then there's a pro rata payment of all claims incurred

9   between the petition date and today, basically.

10          And what the debtors are proposing to do is to

11   cherry pick which claims incurred between January and

12   November they're going to pay and which they're not going to

13   pay unless it turns out at the end of the day that there's

14   enough to pay everyone and we think that's improper.

15          THE COURT:  All right.  Well, what claims that

16   were incurred in January are being paid under the

17   liquidation budget?

18          MS. LENNOX:  I would think that claims that were

19   incurred in January have been paid already.

20          MR. TENENBAUM:  I don't know what -- I don't know,

21   Your Honor, but the liquidation budget does specify that

22   there will be (indiscernible) liquidation expenses.

23          MS. LENNOX:  What?

24          THE COURT:  I'm sorry, I missed the word before

25   liquidation expenses.

1           MR. TENENBAUM:  The budget that the debtors

2    proposed have a line for other preliquidation expenses.  So

3    that is, I guess, expenses incurred prior to November 16th

4    or November -- or November 19th or 20th.  They have paid --

5    they have not made any payments to the annuity fund for

6    January through November.

7           THE COURT:  Okay.  What is that line, that

8    preliquidation expenses line?  What's in there?

9           MS. LENNOX:  So let's just explain the budget a

10   little bit further, and that will answer Your Honor's

11   question.  Your Honor hit the nail exactly on the head.

12   What this budget is, is essentially, it's a consensual

13   surcharge.  And so what is in the budget are the items that

14   are -- that the debtors believe and our lenders agree are

15   needed to preserve, protect, and sell their collateral, all

16   the collateral and try to maximize value of the estates.

17           So utilities, wages, things that we need to do to

18   marshal it, sell it, all that stuff, some of that stuff

19   would've been accrued claims from before the time we filed

20   the motion.  For example, we had a lot of product on trucks

21   the day we shut this down.  If we're going to -- they have

22   shipper's lanes.  They can pull the trucks over to the side

23   of the road, and some of them did, and said, I'm not

24   delivering this $2 million worth of goods to your depot or

25   to your retail store unless you pay me.  That was necessary

1  to pay that claim to get the product to market so we could

2  sell it.  It was those kinds of claims.

3           In addition, we are talking about paying down our

4  ABL lenders.  Those are all prepetition claims.  So those

5  are the kinds of things that would fall into kind of a

6  consensual surcharge.  This whole budget, at least for the

7  13 weeks that we've predicted.  There's like -- there's a

8  hundred million dollars of administrative claims going out,

9  most of it in wages and salaries.

10          THE COURT:  So -- but just to amplify then again,

11  what is in that one category?

12          MS. LENNOX:  The pre --

13          THE COURT:  The preliquidation.

14          MS. LENNOX:  The preliquidation claims are -- may

15  I consult with Mr. Rush very briefly?

16          THE COURT:  Sure, yes.

17          (Pause)

18          MS. LENNOX:  So, Your Honor, it really is things

19  to -- it's maintenance repair obligations in that line item,

20  and if I'm looking at the budget, I think this is a pretty

21  small line item.  Rent and CAM charges that are accrued.

22  It's that kind of stuff.

23          THE COURT:  Okay.

24          MS. LENNOX:  And this is a very small line item,

25  Your Honor.

```
 1              THE COURT:  What's the total?

 2              MS. LENNOX:  Over 13 weeks, it's 2.6 million.

 3              MR. TENENBAUM:  Well, but that's -- Your Honor,

 4       that's just the line that says other preliquidation

 5       expenses.  There are -- I believe that there are

 6       preliquidation expenses included in some of the other line

 7       items, and it's not broken out, so there's no way that any

 8       of us can really tell for sure.  But obviously, they have a

 9       line for professional services.  I assume they are going to

10       be paying professionals for work performed in October that

11       has not been paid yet.

12              And probably some other lines as well.  And those

13       administrative claims should be treated on a par with the

14       pension funds and the annuity funds claims.

15              MS. LENNOX:  Your Honor, virtually every line item

16       has accrued payments in it.  Payroll being the biggest one,

17       and benefits being the biggest one, utilities, fuel costs,

18       those all have carryover.  The issue for the budget is are

19       these necessary expenses to pay so we can do all the

20       activities that we just described to Your Honor and was

21       described in testimony to move this process forward

22       expeditiously and try to maximize value.

23              Again, this is a 13-week budget.  You know, Mr.

24       Scherer said, and we have always said that we're not going

25       to -- there are some things that we can pay right now, and
```

1    there are some things that we have to figure out later.  We

2    acknowledge these estates might be administratively

3    insolvent, we also acknowledge that there's a very good

4    chance that they won't be.  But right now, especially

5    because we're not producing, and we don't have a constant

6    stream of money coming in until we do these asset sales, we

7    are paying the necessary expenses to get through this

8    process and figure it out.

9              This is again, the legal basis for this is a

10   consensual surcharge under 506(c).  This is permitted within

11   the Bankruptcy Code.  It has also been permitted, and

12   frankly under a surcharge, creditors don't have the right to

13   demand payment under that legal theory.

14             Finally, you know, there are many cases that are

15   like this.  I mean, this is not an uncommon phenomenon,

16   particularly in this environment.  And there are cases where

17   debtors should be able to continue as we've argued today to

18   operate in Chapter 11 to conduct sale processes even if

19   they're potentially administratively insolvent.

20             You know, Judge Lifland did it in Blockbuster

21   recently, Judge Gerber did it -- well, that's -- there are

22   other cases around the country where this happens.  And

23   there is a sound legal basis routed in the Bankruptcy Code

24   upon which to do this.

25             THE COURT:  Okay.

 1              MR. TENENBAUM:  Well, Your Honor, the problem is

 2     that the debtors have done everything in their power to

 3     avoid paying contributions to the multi-employer pension

 4     plans, including the annuity fund which is a defined

 5     contribution fund, and their failure to make those payments

 6     despite it being an allowed claim that they did not appeal,

 7     their failure to make those payments has resulted in

 8     individuals who have performed work post petition, not

 9     having money deposited into their accounts.

10              And they really should not be permitted to

11     discriminate among administrative claimants.

12              THE COURT:  What happens to your client's claim if

13     this case is converted to Chapter 7?

14              MR. TENENBAUM:  Your Honor, I don't know if --

15              THE COURT:  You do know, don't you, based on the

16     evidence you've heard?

17              MR. TENENBAUM:  Your Honor, I don't know if --

18              THE COURT:  You really don't know?

19              MR. TENENBAUM:  -- (indiscernible) we'll come

20     through or not.  I did not -- Your Honor, I --

21              THE COURT:  You think it's more likely that your

22     clients' claim will be paid if it's converted to Chapter 7?

23              MR. TENENBAUM:  No, I do not, Your Honor, however,

24     and I'm not really advocating that it be converted to

25     Chapter 7, I'm just advocating that the -- I understand the

1   debtor may be able to realize more value if they -- if the

2   current management is allowed to stay in place, and is

3   allowed to conduct these asset sales.  I understand that.

4           However, I believe that the proceeds of those

5   sales still need to be distributed as if it were a Chapter

6   7, and that means not discriminate and not paying

7   preliquidation creditors and not paying other preliquidation

8   creditors.  It's a different issue.

9           THE COURT:  Well, I don't think this motion

10  provides that that will occur except in respect of the cost

11  to get from here to there.  I understand that you -- I mean,

12  I have them, too, questions about the make-up of the budget,

13  but I think they've been answered.

14          MR. TENENBAUM:  Right.

15          THE COURT:  Okay.  Thank you.

16          MR. TENENBAUM:  Thank you, Your Honor.

17          MS. BARR:  Your Honor, if I may, my name is

18  Courtney Barr.  I represent the Blommer Chocolate Company.

19          THE COURT:  Yes.

20          MS. BARR:  Blommer filed a limited objection to

21  the interim relief sought, and just to give you some brief

22  background.  Blommer is a top supplier to the debtors and is

23  an essential supplier to the debtors, and that they are

24  party to a post petition essential supplier agreement with

25  the debtors.

1         My objection relates to two paragraphs in the

2    interim order, paragraph 10 and paragraph 16.  With regard

3    to paragraph 10, it's really just a matter of clarification.

4    I just want to confirm with debtor's counsel that the

5    debtors will reach out to a supplier to return excess

6    ingredients before they seek to sell them.  In other words,

7    that they will give the supplier effectively the right of

8    first refusal, or a chance to, you know, arrange for the

9    return of the ingredients before they sell them in the open

10   market to somebody else.

11         MS. LENNOX:  Your Honor, the -- if we've had

12   excess ingredients hanging around, sometimes we've reached

13   out to return to suppliers, sometimes we've tried to sell

14   and monetize.  I think there's a mixed bag there.  If

15   there's a specific request, I would suggest that Ms.

16   Blommer's (sic) client contact her business contact at the

17   debtors to discuss those.

18         THE COURT:  Okay.  What --

19         MS. BARR:  What is it in the motion itself that

20   actually says that only upon a refusal by the supplier to

21   the return of the goods will the debtors seek to sell the

22   goods, and that really didn't get translated into the order.

23         MS. LENNOX:  I'm sorry, Counsel, this process is

24   going on right now.  It's a real time process, so it's

25   probably best dealt with on a business basis.

```
 1                 THE COURT:  Has your client made a request?

 2                 MS. BARR:  They haven't really had any

 3       communications with the debtor --

 4                 THE COURT:  Okay.

 5                 MS. BARR:  -- in terms of what the status of the

 6       excess ingredients are.

 7                 THE COURT:  What would be the legal basis to

 8       compel the return of the excess ingredients?

 9                 MS. BARR:  Well, I guess to mitigate the event of

10       our admin claim if there's a risk that the --

11                 THE COURT:  If the debtors can sell them for twice

12       that amount.  I mean, I do think as a practical matter this

13       will be worked out if your clients contact the debtors and

14       say we want the chocolate back or whatever it is that, you

15       know, goes into --

16                 MS. BARR:  Right.  And that's fine.

17                 THE COURT:  -- Drake's cakes, but I think as a

18       practical matter, I mean I would be reluctant to inscribe

19       some sort of right of first refusal generally because at

20       least I can conceive of situations where that would just

21       cost the company.  But as a practical matter, most

22       situations it would be more cost efficient to have the goods

23       returned.  So I think it'll get worked out as a business

24       matter.

25                 MS. BARR:  And that's fine, that was really the
```

1   point, the clarification that I can bring it up with the

2   business people.

3           THE COURT:  Okay.  Well, I'm sorry, before --

4   someone else wanted to speak on this particular point who's

5   here.

6           MR. AUSTIN:  Yes, Your Honor, for the record Jess

7   Austin, rising on behalf of General Electric Capital

8   Corporation, the agent under the prepetition ABL agreement.

9   Where the primary collateral of the ABL lenders are the

10  inventory, which would include I believe the raw material

11  that's being discussed.  So I want to make sure that

12  whatever happens --

13          THE COURT:  It's subject to your client's rights.

14          MR. AUSTIN:  It's subject to our security

15  interests, that's correct, Your Honor.

16          THE COURT:  That's fair.  Although I don't think

17  GE particularly wants a bunch of chocolate.

18          MR. AUSTIN:  I never know what my client wants

19  these days, Your Honor.

20          UNIDNETIFIED:  Never do we.

21          THE COURT:  I'm sure the debtors would be happy to

22  deliver it to -- okay.  All right.

23          MS. BARR:  Your Honor, I guess that takes me to I

24  guess the two basis for my actual objection.  Specifically

25  to paragraph 16 of the interim order, I guess Blommer

```
 1    Chocolate just doesn't see a basis to enjoin a party from

 2    pursuing their rights to file a motion for the payment of

 3    their --

 4              THE COURT:  Can I interrupt --

 5              MS. BARR:  -- administrative claims.

 6              THE COURT:  Can I interrupt you on this one?  As I

 7    understand it, you actually have a critical vendor

 8    agreement --

 9              MS. BARR:  Yes.

10              THE COURT:  -- that was entered into as I

11    authorized it.  I think you may be in a different situation

12    than people normally because of that.

13              MS. BARR:  Yes.

14              THE COURT:  I think the debtors have like an

15    additional burden to break that deal.  And so I don't know

16    whether the debtors -- again, I don't know whether your

17    client has talked with them about this, but it would seem to

18    me it may be different here.  And again, you know, it's kind

19    of a contradiction in terms, they say they're only going to

20    do this if it's absolutely necessary.  If your client is a

21    necessary vendor pursuant to one of those preauthorized

22    agreements, I'm not sure it would ever be absolutely

23    necessary, because you're a necessary vendor.

24              MS. BARR:  Correct.  I mean, if the effect of

25    paragraph 16 is that it modifies the terms of our essential
```

1    supplier agreement, to our detriment actually.

2              MS. LENNOX:  Your Honor, we --

3              MS. BARR:  And I'm happy to take that up with the

4    debtors, to have a conversation about that, it's just, you

5    know, given the expedited time frame --

6              THE COURT:  Right.

7              MS. BARR:  -- I guess I just want to ensure

8    that --

9              THE COURT:  What I suggest is that with respect to

10   your client, this isn't going to come up over the next week,

11   and so it's something you all should discuss.  And you

12   haven't reached an amicable resolution of it, I can hear it

13   on the 29th when we're back here on the final approval.

14             MS. BARR:  That's fine, Your Honor.  We're happy

15   to carry out objection over to the 29th.

16             THE COURT:  On this point.

17             MS. BARR:  On this point.

18             THE COURT:  Okay.

19             MS. BARR:  And that's all I have.

20             THE COURT:  Okay.  Thank you.

21             MR. KOLKO:  Thank you, Judge, Hanan Kolko from

22   Meyer, Suozzi, English & Klein here on behalf of the

23   Steelworkers and Local 12 of the OPEIU.

24             Very quickly, for the steelworkers, my

25   understanding, and I just want confirmation from debtor's

Page 118

1    counsel, is that debtors are not seeking 1113(e) relief as

2    to the steelworkers because they won't be employing any

3    steelworkers during the wind down period.  If that's

4    correct, then our -- then the steelworker's objection is

5    obviously mooted.

6            MS. LENNOX:  That's correct, Your Honor.

7            THE COURT:  Okay.

8            MR. KOLKO:  And as to Local 12, we a) appreciate

9    the movement that debtors have made because of the tight

10   time frames, we haven't been able to reach an agreement, and

11   so we stand on our objections, but do appreciate that.

12   Thank you, Judge.

13           THE COURT:  Thank you.

14           MR. SELTZER:  This is Robert Seltzer on behalf of

15   the Retail and Wholesale Department Store Union and the

16   United Food and Commercial Workers Union.

17           THE COURT:  Yes, good afternoon.

18           MR. SELTZER:  I'll be brief.  We've objected to

19   the 1113(e) motion, and we also appreciate the fact that the

20   debtor has now restricted that motion to three items.

21           In our case, we also still believe that the

22   modifications are unnecessary.  We've been advised that the

23   debtor intends to employ, hopes to employ 104 UFCW members,

24   all of whom work in stores, and 75 RWDSU members of whom 50

25   will be employed in stores, 23 in the Birmingham bakery

1     plant, and two in Depot.

2              I just want to address the stores.  In the wind

3     down motion, debtors state that the primary wind down

4     activities be undertaken at the retail stores are facility

5     cleaning and the sale and disposition of finished product

6     inventory, which is precisely what our bargaining unit

7     members do anyway, that's the nature of their job.  There's

8     absolutely no special skill sets or knowledge based involved

9     in doing that.  And for that reason, there's no reason to

10    override seniority or work rules in order to carry out those

11    tasks.

12             THE COURT:  But I -- can I interrupt for a second?

13    I thought maybe I missed this, I thought there was an

14    additional agreement that this only would be done if it was

15    necessary.  So, you know, I agree with what you say it's

16    unlikely that it would ever be necessary, but I suppose

17    that, you know, someone with seniority may be, you know, on

18    vacation that week, and it would need to get done, or you

19    know, broke his leg and couldn't come into the office, so.

20             But it's expressly limited.  It was set forth on

21    the record today, it wasn't in the black line that you may

22    have seen earlier, but it was stated on the record, that

23    this is only where it is necessary.

24             MR. SELTZER:  Your Honor, I understand and

25    appreciate that point.  And certainly if someone's not

1    available, the employer has the right to employ someone

2    else.  I mean, that's true whether they have a modification

3    or not.

4              THE COURT:  All right.  Well, I take great comfort

5    in the reproduction of the word of the statute necessary.  I

6    think it's -- you know, if they screw up, and they don't

7    like the older guy and they want to have the younger guy,

8    then that older guy will have a beef.

9              MR. SELTZER:  I understand.  Let me just also

10   point out at the Birmingham bakery, we're also concerned

11   about the seniority there.  Two reasons.  One is that under

12   the current seniority system at all our bargaining units,

13   employees have to be, you know, able and qualified to do the

14   work.  We don't feel that the provisions of the contract

15   would prevent that from occurring.

16             Secondly, in Alabama, this is a right to work

17   state.  We have in our bargaining unit, members of the union

18   and people who are not in the union.  We do not want a

19   situation in which the employer is picking non-union people

20   over union people, and going by seniority (indiscernible)

21   seniority would, you know, prevent any appearance of that

22   occurring.  Which is in the interest of our members, and

23   frankly is also in the interest of the debtor.

24             So for those reasons, we do not believe that

25   overriding seniority or work rules is necessary to actually

```
 1    accomplish what the debtor wants to accomplish during the

 2    wind down period.

 3              THE COURT:  I'm not sure I followed the last point

 4    about the right to work and the --

 5              MR. SELTZER:  Well, we have a bargaining unit

 6    which has union members and non-union members within it.

 7              THE COURT:  Right.

 8              MR. SELTZER:  I mean, right now, they still have

 9    to comply with seniority and how they allocate, you know,

10    who does which work.  If seniority can be overridden, there

11    is a danger that the employer could pick people that it

12    wants to pick, and it would pick the non-union people as

13    opposed to the union people.  Obviously, that would be a

14    violation of the labor law and --

15              THE COURT:  But again, it's only where it's

16    necessary.

17              MR. SELTZER:  I understand.

18              THE COURT:  It's not just to save, you know, $5 an

19    hour, right?

20              MS. LENNOX:  That's my understanding, Your Honor.

21              THE COURT:  Okay.

22              MR. SELTZER:  Well, it's also -- you know, we

23    don't want them picking -- you know, management's friends,

24    that sort of thing.  That's why we --

25              THE COURT:  Well, it wouldn't be necessary then.
```

1   That would be based on friendship which is not a necessity

2   unfortunately, you know, it just isn't.  I mean, look, I

3   guess --

4           MR. SELTZER:  Your Honor, I understand your point

5   about necessity.

6           THE COURT:  Okay.

7           MR. SELTZER:  We have many decades of experience

8   with management discretion when it comes to allocating work,

9   and that's why we have our seniority (indiscernible).

10          THE COURT:  Right.

11          MR. SELTZER:  That's our concern.

12          THE COURT:  Okay.  Well, I'm assuming that

13  management here, given the situation the company's in, will

14  take the word as it is written and do it only if necessary.

15  And I'm assuming there will be some instructions to them

16  from counsel and from their senior management, that this

17  isn't an excuse to prefer people who you like better or

18  think are, you know, are non-union in Alabama, are non-union

19  people, but only vary the terms of the agreement as to

20  seniority truly as necessary, where the senior person really

21  doesn't have the ability to do the job.

22          MR. SELTZER:  Well, I would hope that would be

23  true.  Thank you.

24          THE COURT:  Okay.  Thanks.

25          MS. LEVINE:  Good afternoon, Your Honor, Sharon

1    Levine, Lowenstein Sandler for the International Association

2    of Machinists.

3              Your Honor, we actually filed a response to the

4    wind down motion, and then an objection to the 1113(e).

5    With regard to the response to the wind down motion, we'd

6    like to carry that to the final hearing date, subject to

7    seeing the documentation with regard to the agreement that's

8    been put on the record today.  We appreciate all the effort

9    made by all the parties, and are hopeful that the language

10   is appropriate and that we can then join on.

11             THE COURT:  This is on the 1113?

12             MS. LEVINE:  No, this is on the wind down motion.

13             THE COURT:  Well, I mean, there's certain aspects

14   of the wind down motion I'm being asked to approve today.  I

15   mean, I don't know how it can really be carried.

16             MS. LEVINE:  Your Honor, we're not -- we're -- the

17   response is simply subject to documentation if an issue

18   arises with regard to the documentation.

19             THE COURT:  Okay.  All right.

20             MS. LEVINE:  We're reserving the right to --

21             THE COURT:  I'm sorry, I understand now.

22             MS. LEVINE:  Your Honor, with regard to the

23   1113(e), we actually share counsel's concern, and you heard

24   Mr. Rayburn testify that this has been a hostile situation.

25   And so again, while we very much appreciate the efforts that

1    everybody's made, and we hope we've been constructive in

2    that process as well, and we appreciate the progress that

3    the debtors have made with regard to even the 1113 relief to

4    reach the point that we've reached today, and with regard to

5    the accommodations, including the accommodations to the

6    employees in the wind down payment.  And we appreciate the

7    million dollars that's been added with regard to the

8    employees.

9            The bottom line is, the collective bargaining

10   agreements, particularly with regard to the provisions that

11   do not allow for subjective decision-making are very, very

12   important to the employees.  And we respectfully submit that

13   even though we understand Your Honor's reliance on the word

14   necessary and the reliance on the good faith that you're

15   seeing in this courtroom, that out at the locations in a

16   very tense situation, having an objective, as opposed to a

17   subjective standard is the appropriate way to handle this

18   particular situation.

19           And the fact that the lenders may get a little bit

20   more in the recovery if they don't have to follow seniority

21   or some of those other provisions, we would respectfully

22   submit is an inappropriate use of 1113(e) particularly in

23   this kind of a situation, but we're not looking at a

24   reorganization, but just reallocating the value from the

25   liquidation.

Page 125

```
 1            THE COURT:  Okay.  Well, I don't think it's value

 2    here, but what types of jobs do your --

 3            MS. LEVINE:  The mechanics?

 4            THE COURT:  -- members have?  Yeah.

 5            MS. LEVINE:  We fix the trucks.

 6            THE COURT:  All right.  So it seems to me that the

 7    only time you'd use this necessary exception is literally if

 8    the senior guy is not there to fix the engine that needs to

 9    deliver the otherwise rotting -- well, I'd have to pick a

10    product that rots, you know, whatever it is, you know.

11            MS. LEVINE:  Your Honor, but that's already

12    accounted for in the collective bargaining agreement.  I

13    mean, even when you're not, you know, under ordinary terms,

14    people get sick, people are on vacation, people are

15    unavailable, and they move to -- and they're able to move to

16    the next person.

17            THE COURT:  All right.

18            MS. LEVINE:  What this language does, especially

19    coupled with the exculpation provisions that are going to

20    appear to be incorporated into the wind down provision, it

21    takes away the added protection of just having a strictly

22    objective standard.  And while the collective bargaining

23    agreement allows for the product to get out and the work to

24    get done, it does it in an objective way.

25            THE COURT:  All right.  I guess -- I mean, to me
```

Page 126

1    necessary is the objective standard, too, and I just -- you

2    know, there's no place in this company for someone to be

3    creating new issues, you know, frankly if a manager is doing

4    that, he should be fired by not doing what's actually

5    necessary.

6            On the exculpation, I want to talk to the debtors

7    some more about that.  I understand that point.

8            MS. LEVINE:  Thank you, Your Honor.

9            MR. SWANSON:  Your Honor, very briefly, Richard

10   Swanson for the UAW and its Local 2828.  We filed an

11   objection to the 1113(e).  We reached an agreement, so we

12   withdraw that objection.  We filed an objection on three

13   grounds to the limited motion, the explanations of counsel

14   satisfy two of them, and the third one, which has to do with

15   the senior management incentive program, I understand it's

16   for next week.

17           THE COURT:  That's for next week.

18           MR. SWANSON:  So we have nothing else for today.

19   Thank you.

20           MS. NASTASI:  Good afternoon, Your Honor, Ancela

21   Nastasi on behalf of the BNC Fund.  We filed a limited

22   objection simply seeking to have transparency in the sale

23   process.  I was very heartened to hear Mr. Scherer and Mr.

24   Rayburn testify that they believe that an expeditious

25   process was going to result in the most number of jobs

```
 1    preserved and the greatest amount of value for these

 2    estates.  But we simply would like to have a more open sale

 3    process, such that the wind down which is part of it, has to

 4    go hand in hand with the ultimate sale process, and we have

 5    not been given sufficient information to really know where

 6    the sale is headed at this point.

 7              THE COURT:  Well, that would be notice for

 8    approval.

 9              MS. NASTASI:  I know and we just would like to

10    sort of be kept in the loop and know what's going on with

11    it.  It's kind of a big question mark at this point.  I

12    mean, the wind down without the sale is kind of like the

13    cart without the horse.  I mean, it's -- and I know that I'm

14    sure this has to do with the stalking horse and obtaining

15    the right sale parameters, we'd just simply like to be kept

16    in the loop.  We don't see a wind down in the absence of a

17    sale or a sale in the absence of a wind down in this

18    particular --

19              THE COURT:  Well, the whole point of this is to do

20    the sale efficiently as possible.

21              MS. NASTASI:  Yes, I understand that.

22              THE COURT:  In my view, generally speaking,

23    fiduciaries should be involved in a sale process if they're

24    fiduciaries for like an official committee, and secured

25    creditors whose collateral is being sold, should be part of
```

1   the sale process because they have a right under 363(f) to

2   object, it's unique.  But I think it's really in the

3   debtor's discretion on how much they want to open up the

4   process, as opposed to their obligation to file a motion on

5   appropriate notice for the sale itself.

6          So, you know, it may be in the exercise of their

7   business judgment they think it's important for some group

8   to be involved because it's a good thing for the sale

9   process to have it involved, but I don't think I can mandate

10   that.

11          MS. NASTASI:  I hear you.  Okay.  Thank you.

12          MR. WOLF:  Your Honor, William Wolf for the

13   trustees of the RWDSU and Industry Pension Fund.

14          Your Honor, we filed an objection based for the

15   most part on concerns about possible discriminatory

16   treatment of administrative claims.  They've been addressed

17   throughout and we're willing to wait and see how that works

18   out, based upon comments by the Court, by counsel for the

19   debtors, and the arguments previously made.

20          THE COURT:  All right.  Again I don't fault any of

21   the pension plans for making their objection.  I think you

22   needed to see the record, and I needed to see the record,

23   and it's a fluid situation.

24          MR. WOLF:  Thank you, Your Honor.

25          THE COURT:  Okay.  Any other objectors?

 1              MR. FREUND:  Your Honor, Jeffrey Freund for the

 2    Bakery Workers.

 3              THE COURT:  Okay.

 4              MR. FREUND:  I want to begin by thanking you for

 5    your efforts yesterday.  I agree that everyone entered those

 6    negotiations and ended those negotiations in good faith, and

 7    made their best efforts under the circumstances to resolve

 8    the difficult situation.

 9              With respect to the objection of the wind down

10    motion, we had simply joined in the bakery -- in the

11    (indiscernible) Fund motion, and our concern is the same,

12    that is with respect to transparency of the sale process.

13              On the 1113 motion, I have to say I'm a little

14    confused isn't the right word, but that's the best one I can

15    think of.  We've had, I think, productive discussions with

16    the debtor with respect to that, and I was -- I thought I

17    was of the understanding that those discussions would

18    continue, and that perhaps the motion wouldn't be brought up

19    for final resolution today.

20              THE COURT:  They're shaking their head.

21              MR. FREUND:  Which way?

22              THE COURT:  Well, they're not just nodding,

23    they're disagreeing with you, that they were willing to make

24    the changes that they've agreed to, but they wanted to go

25    ahead with the motion as modified.

1           MR. FREUND:  I see.  Well, I think they understand

2    my position and we really have nothing more to add than the

3    other unions have already addressed.

4           THE COURT:  Okay.

5           MS. LENNOX:  I just want to clarify for Mr.

6    Freund, however, that we still understand that we need to

7    make proposals and go through normal effects bargaining and

8    we absolutely intend to do that.  And I imagine these things

9    could get rolled up in there as well.

10          MR. FREUND:  Very likely.

11          THE COURT:  Okay.  Thank you.

12          MR. FREUND:  Thank you.

13          MR. MAZUR:  Your Honor, Jordan Mazur for the IUOE,

14   both the union and the fund, and we filed objection to

15   1113(e), we appreciate the movement from the debtors as

16   well.  But like other objectors, we have just a

17   (indiscernible) on that objection.

18          THE COURT:  Right.

19          MR. MAZUR:  As to the wind down, I think that

20   others have covered each of the points that we make in our

21   objection, and we have nothing to add on any of those

22   issues.

23          THE COURT:  Okay.  Thank you.

24          MR. FORD:  Your Honor, Edmond Ford on behalf of

25   Olesya Gats.

         1              THE COURT:  I'm sorry, on behalf of whom?

         2              MR. FORD:  Olesya Gats.

         3              THE COURT:  Oh, yes.

         4              MR. FORD:  First (indiscernible) plaintiff.

         5              THE COURT:  Right.

         6              MR. FORD:  And, Your Honor, I would ask the Court

         7    to consider carefully the presentation by the United States

         8    Trustee on the benefits of Chapter 7, and while I know

         9    that's not teed up for hearing today, I think that should

        10    weigh into the interim order.  And I would add one twist to

        11    the U.S. Trustee's observation, which is that the

        12    appointment of a Chapter 7 trustee in the conversion of the

        13    case has the benefit of permitting somebody to promise with

        14    some certainty to the burial expenses that they will not

        15    have to share with the administrative claimants who already

        16    (indiscernible).

        17              THE COURT:  I'm sorry, you were fading out.  I

        18    didn't hear the last sentence.  That promise some certainty

        19    with regard to what?

        20              MR. FORD:  When the Chapter 7 trustee is

        21    appointed, the Chapter 7 expenses take priority over the

        22    Chapter 11 administrative expenses.  That means that the

        23    Chapter 7 trustee can promise with certainty that to the

        24    vendors that are partaking in the liquidation, that they

        25    will be paid, and they will not have to share with the prior

1    Chapter 11 expenses.

2           What we have today is a situation in which the --

3    everybody acknowledges that there's a significant risk of

4    administrative insolvency.  That means that administrative

5    claims won't be paid all -- you know, a hundred cents on the

6    dollar, and there is no statutory basis for preferring an

7    administrative claimant that came into the Chapter 11 case

8    in June, or no, excuse me, preferring one who came into the

9    Chapter 11 case in December, over the one who came into the

10   Chapter 11 case in June.  The only way you get that

11   preference is by converting.

12          THE COURT:  All right.  You do not represent an

13   administrative expense claimant.

14          MR. FORD:  No, I do not, Your Honor.

15          THE COURT:  Okay.  All right.  Thank you.

16          MR. FORD:  Thank you.

17          THE COURT:  Okay.  Anyone else?

18          (No response)

19          THE COURT:  All right.  I know you probably want

20   to respond to these objections, maybe I'm wrong on that, but

21   I had a couple of issues that really haven't been addressed

22   a lot.  One of them you can probably tell from my

23   questioning of Mr. Rayburn.  I have a hard time approving a

24   blanket exculpation and a permanent injunction of claims

25   related to anything that I've approved.  I am comfortable

Page 133

```
 1   channeling such claims to this court, and I'm frankly

 2   comfortable in specifically incorporating the Barton

 3   Doctrine as part of that relief.

 4              But I think that to use an example Ms. Levine

 5   raised, I mean, if in fact, someone is bumped, not because

 6   it's necessary but because someone in management just liked

 7   someone else better, that person should have some redress

 8   somewhere, and I think, you know, it's appropriate to

 9   channel them here, but I think they need to have some

10   redress.  So --

11              MS. LENNOX:  So, and it's my understanding, Your

12   Honor, with -- I have two practical issues with respect to

13   that.  It's my understanding that if the exculpation is

14   granted for what -- for the activities that are required to

15   go into the wind down, and for example, to use Ms. Levine's

16   standard, we have a standard for that.

17              If it is found -- I mean, one of the defenses

18   could be, if this action were to be channeled and come

19   before your court is well, we were exculpated for that

20   because we complied with the standard.

21              THE COURT:  Well, except there's an injunction

22   preventing them from doing that.

23              MS. LENNOX:  Well, if Your Honor were to modify as

24   Your Honor is suggesting.

25              THE COURT:  Okay.
```

```
 1                MS. LENNOX:  I mean, part of the issue with the

 2       Barton Doctrine that we're concerned about is look, we have

 3       brought this whole program, there's a reason we brought this

 4       program before the Court.

 5                THE COURT:  Right.

 6                MS. LENNOX:  Because it is comprehensive, it is

 7       massive, it is in some ways unprecedented and it's out of

 8       the ordinary course.  And so we brought it to Your Honor to

 9       approve.  And we're asking some folks to be in charge of

10       doing that.

11                THE COURT:  Right.

12                MS. LENNOX:  And, you know, in -- if they haven't

13       done it now, they can certainly have time to do it before

14       the final hearing.  But if somebody's got a problem with it,

15       we need to know what it is now.  I mean, we can't have

16       people waiting in the weeds to say, well, I'm not going to

17       object to this, but I'm just going to wait and then a year

18       down the road, sue somebody for doing what the Court said

19       they could do.

20                So if they have -- if there are issues out there

21       that we are unaware of that people have problems with and

22       they want to file objections to, they ought to be raising

23       them now.  Which is why we really looked at this injunction

24       purely as in aid of your order, not for people to prevent

25       them from filing warrant claims or what have you.
```

 1              THE COURT:  Okay.  Well, wouldn't my providing

 2     that they would have the full benefit of the same relief

 3     that would be applicable in the Barton Doctrine do that?

 4              MS. LENNOX:  I'm sorry, Your Honor?

 5              THE COURT:  If the order provided that they would

 6     have the full benefit of the panoply of rights as if they

 7     were covered by the Barton Doctrine, wouldn't that do that?

 8              MS. LENNOX:  I think that would be helpful, Your

 9     Honor.

10              THE COURT:  Okay.

11              MS. LENNOX:  Excuse me, Your Honor.

12              (Pause)

13              MS. LENNOX:  Sorry, Your Honor.  I think that

14     would help, Your Honor.  I mean, look, what we're trying to

15     provide is certainty to the folks, you know, the guys on the

16     line, the senior guys on the line that are doing this.

17              THE COURT:  Right.

18              MS. LENNOX:  Mr. Hobbs and Mr. Steven, that look,

19     if you're going to continue to do this, and it's a massive

20     task, and you know, you have some protection for doing it

21     because the Court has authorized it.  I mean, look, if

22     somebody -- you know, if one of the guys were to decide that

23     well, you know, I'm going to take some of this inventory for

24     myself, this isn't going to -- this doesn't cover it.  It's

25     what is -- what we're asking to do, we're asking to is, you

Page 136

```
 1    know, Mr. Rayburn said, we're going down to 3,200 employees,

 2    we're going to clean --

 3              THE COURT:  No, I understand all that.  I just --

 4              MS. LENNOX:  So --

 5              THE COURT:  -- you know, the way it's drafted,

 6    it's very, very broad.  You could read it as not even

 7    limited to complying with this relief.

 8              MS. LENNOX:  Uh-huh.

 9              THE COURT:  And I think we've cleared up that.

10              MS. LENNOX:  I mean, the reason we're asking for

11    it, Your Honor, is frankly, as Mr. Rayburn testified --

12              THE COURT:  No, I understand why they're asking.

13              MS. LENNOX:  Okay.

14              THE COURT:  And it's a legitimate concern.  I just

15    think there needs to be a safety valve.  And it's related to

16    another concern I have that was raised in a couple of the

17    objections, but the people that normally raise this issue

18    have not raised it, and perhaps that's because they haven't

19    gotten notice, which is the GOB sale aspect of this.

20              MS. LENNOX:  Uh-huh.

21              THE COURT:  And paragraph 14 that's related to

22    that.

23              MS. LENNOX:  Uh-huh.

24              THE COURT:  There's kind of gotten to be a fairly

25    standard order in this area, and I had one I think in
```

1     Fortune Off.

2              MS. LENNOX:  Right.

3              THE COURT:  And there are a couple that are

4     attached to the pleadings that you all submitted.  And I

5     would like you all to follow the form of that order, as

6     opposed --

7              MS. LENNOX:  Okay.

8              THE COURT:  -- to just having a blanket waiver.

9              MS. LENNOX:  Okay.

10             THE COURT:  I mean, that form of order really

11    differentiates between health and safety laws, and sets up a

12    whole procedure for the government agencies to come in.

13    Most of the time they never come in.  They only object to

14    these things because they want to preserve the right to come

15    in --

16             MS. LENNOX:  Understood.

17             THE COURT:  -- and so they've been satisfied with

18    these types of orders like in the Betsy --

19             MS. LENNOX:  Betsy Johnson.

20             THE COURT:  -- Johnson that you've attached or the

21    Fortune Off one, and as long as you track that procedure I'm

22    okay with it.

23             MS. LENNOX:  Okay.  We're happy to do that.

24             THE COURT:  I think the way it's written it's too

25    broad because we'd be going backwards on what we've

Page 138

```
 1    achieved, which is, you know, the State of New York AG and

 2    the State of New Jersey AG doesn't feel like they have to

 3    come in and object every sale, because they're afraid that

 4    you're going to be violating the --

 5              MS. LENNOX:  Which is certainly not the intent.

 6              THE COURT:  Yeah.  And I think when you're -- you

 7    know, you're engaging in sales at bakery shops, so I doubt

 8    you're going to have the type of shopping center concerns

 9    you have.

10              MS. LENNOX:  Correct.

11              THE COURT:  But there are health and safety issues

12    of selling donuts that might have been expired.  So I want

13    to preserve their ability to come in and say that shouldn't

14    happen.

15              MS. LENNOX:  We'll conform that, Your Honor.

16              THE COURT:  Okay.  All right.  I guess those were

17    my concerns on this relief after having heard everyone and

18    heard the evidence.

19              MS. LENNOX:  Okay.  Did you -- do you have further

20    questions about other issues, Your Honor?

21              THE COURT:  Huh-uh.

22              MS. LENNOX:  Okay.  I do not propose to go through

23    and we've had the discussion about the budget, we've had the

24    discussion about the exculpation.  I don't feel the need to

25    go through the objections, sort of seriatim.  I would just
```

 1   make a couple of clarifications and points.  And I would

 2   have a whole exposition for the folks that rested on their

 3   pleadings on 1113(e) about why I think the relief is proper,

 4   but given today's colloquy, I'm not sure I need to go

 5   through all that unless Your Honor has some specific

 6   questions for me with respect to that.

 7           THE COURT:  No, I don't.

 8           MS. LENNOX:  But I would like to make clear

 9   because I think there's been some confusion about seniority

10   and all that sort of thing.

11           There are some people, we think, at least the guys

12   on the line think, that may be more familiar with and have

13   special skills that may help us in the liquidation rather

14   than in a running of the business.  And if that person, for

15   example, familiarity with how to clean an oven and if --

16           THE COURT:  I'm sorry, familiarity with?

17           MS. LENNOX:  How to clean an oven.

18           THE COURT:  Right.

19           MS. LENNOX:  Okay.  And so if that person is a

20   junior person and maybe has better familiarity and more

21   precise skill sets that we need for shutting it down, then

22   somebody who would have better skill sets for operating the

23   business, and that person is a junior person, we would view

24   that as necessary.

25           So it's not that we don't have any senior workers

1   available to do it necessarily, it's we may not have a more

2   senior person that has as good of understanding about how to

3   clean the oven and shut it down than the junior guy does.

4   So I just want to be very clear about that, so there's no

5   misunderstanding going forward.

6           THE COURT:  Okay.  I mean, that's fine.  I think

7   as a practical matter, your managers may want to put the

8   senior guy to the test, to see whether he or she really does

9   know what they're doing.

10          MS. LENNOX:  We'll spread the word, Your Honor.

11          THE COURT:  You know, the proof's in the pudding

12  literally.

13          MS. LENNOX:  Understood.  And also understanding

14  we're trying to get this done quickly, but I --

15          THE COURT:  Understand.  But, you know, if someone

16  knows how to do something with machinery, you can figure out

17  that pretty quickly.

18          MS. LENNOX:  Right.  I understand.  I understand

19  the guidance, Your Honor.  So I think that's the only thing

20  that I wanted to mention on the 1113.  I'm just looking

21  quickly.

22          Oh, as to Ms. Nastasi's and Mr. Freund's concerns

23  about transparency on the sale process, they are members of

24  the committee, and so I think they'll be seeing what the

25  committee sees.

15-23007-rdd   Doc 539   Filed 02/17/13   Entered 02/25/15 23:32:46   Main Document
Pg 941 of 423

Page 141

```
 1              THE COURT:  I guess.  I don't know what your

 2    confidentiality agreements provide, but subject to that,

 3    you're right.

 4              MR. UNIDENTIFIED:  Your Honor, I don't think we've

 5    had too many instances recently excluding any member of the

 6    committee on what the committee gets on sale processes --

 7              THE COURT:  Right.

 8              MR. UNIDENTIFIED:  -- but I can't (indiscernible)

 9    month anyway.

10              THE COURT:  Okay.

11              MS. LENNOX:  All right.  As to other specific

12    objections, I'm just looking through quickly.  I think we've

13    addressed the Accenture objection that I wanted to say

14    something on.  As you pointed out, Ms. Gats and Mr. Ford

15    representing Ms. Gats, that's not only a prepetition claim,

16    it's an insured claim.  So I think Chapter 7 or Chapter 11

17    doesn't matter with respect to that claim.

18              And I believe that is all of the specifics on the

19    objections that I would have otherwise covered.

20              So, Your Honor, I think we would conclude by

21    saying that we echo Mr. Seltzer's sentiments.  This is a

22    tragedy, and we're well aware of it.  And I know a lot of

23    discussion in this courtroom today has been about preserving

24    value and maximizing value which is absolutely our fiduciary

25    duty.  But we are trying to do that, being as sensitive as
```

1    we can possibly be under the circumstances to the human

2    costs to this.  And I want the Court to be aware of that.

3           Nevertheless, we are where we are.  And I do think

4    that all of the parties with an economic interest in this

5    case do believe that proceeding as we've set forth, we

6    proposed to do, will be the best path to try to preserve as

7    many jobs in the future, not only now but going forward, and

8    to sell the assets for the highest possible value, and

9    potentially avoid an administratively insolvent case.

10          And we would respectfully ask this Court to grant

11   the motions as we've modified them on the record today.

12          THE COURT:  Okay.  All right.  Anything else?

13          (No response)

14          THE COURT:  All right.  I have two motions before

15   me by the debtors.  The first seeks approval, first and

16   foremost of a wind down plan or approach for winding down

17   the debtor's businesses with a budget that has been

18   specifically negotiated for a little over three months time,

19   although the wind down is projected to occur over a longer

20   period.  And that budget has been negotiated with the

21   debtor's secured lenders.  And now as set forth on the

22   record, reflects an agreement as to a modification of the

23   debtor in possession/cash collateral or with the ABL

24   lenders.

25          The motion as part of the wind down contemplates

```
 1    and seeks approval of going out of business sales at the

 2    debtor's retail stores, and employee retention plan, that is

 3    for non-insider employees, both union and non-union, a

 4    management incentive plan for insiders, and certain

 5    protections for management in implementing the wind down

 6    plan.

 7            The wind down plan contemplates the use of certain

 8    third party contractors, and also procedures for the

 9    rejection of executory contracts and leases, which is

10    appropriate here given the fact that the debtors are now

11    unfortunately in a liquidation process.

12            The motion seeks final approval of certain aspects

13    of the foregoing relief, including approval of the wind down

14    plan -- I'm sorry, including approval of the amendment to

15    the DIP credit agreement and order, the sale of excess

16    ingredients and packaging, the GOB sales approval, the

17    employment of third party contractors, the approval for

18    expedited contract rejection procedures, and approval of the

19    funding from the collateral of $5 million in trust to

20    support indemnification rights of the managers, and for

21    payments made under the employee retention plan, and the

22    proposed exculpation and injunction for the period up to the

23    final approval that's being sought.

24            The debtors are not seeking in any way the

25    approval of the senior management incentive plan that's on
```

1    for hearing next week, as is on a final basis approval of

2    the wind down plan, the liquidation budget, and originally

3    the nonconsensual use of cash collateral, but now that is

4    agreed.

5            So an interim basis, the wind down plan and

6    liquidation budget's being sought to be approved today, but

7    that'll be on for a final basis on the 29th.  In addition,

8    the debtors have sought temporary relief under Section

9    1113(e) of the Bankruptcy Code, with respect to certain

10   modifications to the collective bargaining agreements to

11   help them implement the wind down plan.

12           As originally sought, that relief was far broader

13   under Section 1113(e) that is now being sought.  At this

14   time, the debtors are seeking under 1113(e) that relief only

15   as set forth on the record on a truly interim basis for the

16   shorter of two months or the time that they parties are able

17   to bargain in the non-bankruptcy setting.

18           And that, in addition, to offer work to remaining

19   employees without being subject to work rule under a job

20   classification restrictions contained in the reorganization

21   last best and final offers, and to select which remaining

22   employees may perform wind down tasks without being

23   restricted by the same types of restrictions, and to hire

24   temporary employees and/or third party contractors, again

25   without being subject to the last best and final offer

Page 145

1    restrictions.

2           All of those rights, however, are subject to or

3    will be subject to an express requirement of necessity,

4    which will be added to the proposed order, and circulated to

5    the counsel for the various unions, so they can confirm that

6    that's the case.

7           A debtor under the Bankruptcy Code has flexibility

8    to remain in Chapter 11 even if it determines during the

9    course of a Chapter 11 case that rather than reorganizing

10   through a Chapter 11 plan, it intends to sell all of

11   substantially all of its assets, either on a going concern

12   basis or on a partial going concern basis, and a partial

13   liquidation sale basis.  That's confirmed by the Supreme

14   Court in Toy v Radcliff (ph) as well as by Section 1123 of

15   the Bankruptcy Code.

16          It is the case also notwithstanding the

17   requirements of 1129 of the Bankruptcy Code that substantial

18   debtors have, in fact, confirmed Chapter 11 plans,

19   notwithstanding their ability to pay all administrative

20   creditors in full.  There was a case, for example, in the

21   United States Lyons' case, where Mr. Mayer's partner

22   represented the administrative lease creditors, who

23   consented to such a plan.

24          So the debtor is not required under the Bankruptcy

25   Code to convert its case to a case under Chapter 7 when it

Page 146

1    goes into liquidation mode, which the debtors unfortunately

2    have had to do here.  Instead, Congress gave debtors subject

3    to Section 1112 of the Bankruptcy Code, which specifies

4    mandatory requirements for conversion, the flexibility in

5    light of their fiduciary duties to stay in Chapter 11.

6            These two motions raised the issue of whether, in

7    fact, it's a proper exercise of the debtor's business

8    judgment and fiduciary duties to pursue the proposed wind

9    down and related relief in Chapter 11, as opposed to

10   converting their case to Chapter 7.  And I will note, there

11   have been no motions to, in fact, convert the case.

12           In addition, having heard the evidence as well as

13   read the declarations that have been admitted into evidence,

14   I find and conclude that it would not be in the best

15   interests of the debtor's estates or creditors, including

16   administrative creditors if at this time the debtors,

17   instead of pursuing the wind down plan that's been set forth

18   in this -- in these two motions, in fact, instead converted

19   their case at this time.

20           It appears to me in particular, based upon the

21   testimony that leaving the case in Chapter 11 would, in

22   fact, avoid the diminution of the estate that would actually

23   occur in a Chapter 7 case.

24           As far as the mandatory requirements for a

25   conversion of concerned as set forth in Section 1112(b)(4),

1    the only section that I would find potentially applicable

2    here is (b)(4)(A), which says that the Court -- that cause

3    includes, and of course, if there's cause, then the Court

4    shall convert the case under Section 1112(b), it includes a

5    substantial or continuing loss to or diminution of the

6    estate, in the absence of a reasonable likelihood of

7    rehabilitation.  It's a conjunctive provision even in the

8    absence of a reasonable likelihood of rehabilitation, there

9    has to be substantial or continuing loss to or a diminution

10   of the estate.

11          Obviously, as the evidence shows, this estate will

12   suffer substantial diminution if the wind down plan is not

13   promptly implemented.  But I believe that there would be a

14   serious risk that that diminution would, in fact, be far

15   greater if the case were converted today to Chapter 7, and I

16   did not approve the wind down plan substantially as sought.

17          It has been stated that the debtor may need a

18   qualified disinterested fiduciary to represent it.  I have

19   presided over this since its inception.  I've heard the

20   debtor's management testify frequently during the case, and

21   it appears to me that there is no issue as to whether the

22   current management, and I emphasize the word current has

23   conducted themselves in any way other than as a true

24   fiduciary.

25          It's probably worth mentioning because this came

1     up in the -- in some of the pleadings.  There was a serious

2     issue raised in this case I think first aired by the

3     creditor's committee as to bonuses that were given to

4     management pre-bankruptcy.  But I think it's important to

5     set forth on the record that Mr. Rayburn and his team were

6     not those people.  And I think Mr. Rayburn has quite

7     appropriately dealt with swiftly the fact that he was handed

8     of those bonuses.

9            So again, I don't believe that there is a need for

10    a new fiduciary here, and that, in fact, the current

11    fiduciaries are needed to conduct in a seamless way the wind

12    down plan that has been laid out and developed.  It may be

13    that for other reasons not having to do with fiduciary duty

14    issues at some point in this case, it should be converted.

15    That's an open question.  But clearly at this point, that

16    would be as testified to by Mr. Scherer, Mr. Carroll, and

17    Mr. Rayburn a disaster for all concerned, that given the

18    loss in value no new fiduciary could be expected to come up

19    to speed in this case which is quite complicated, as far as

20    the assets are concerned, and requires very nimble and quick

21    movement, as far as the sales are concerned without a

22    destructive delay, and that's not to degenerate the ability

23    of whoever the U.S. Trustee would appoint as a Chapter 7

24    trustee, but just to point out I think the obvious, which is

25    that unless he or she were to immediately hire the people

1    that are implementing the wind down, which would be a

2    difficult task without doing any analysis on his or her

3    part, the resulting delay would seriously affect the sale

4    value and greatly diminish the likelihood of there being a

5    recovery here for at least the administrative creditors in

6    full.

7              As well as, and I take this seriously, the ability

8    at least in some instances beyond the 3,200 or so people who

9    will be working on the wind down plan, to be rehired by a

10   prospective buyer, which I hope will occur as often as

11   possible.

12             So on a general level, it appears to me that the

13   debtors have taken the right course in seeking to implement

14   the wind down plan as promptly as practical in this Chapter

15   11 context.

16             Of course, there's nothing that would prevent a

17   Chapter 7 trustee from hiring all of the people that in

18   essence I'm saying should be running the wind down, but he

19   or she would have to at least do some due diligence to make

20   sure that was the right course of action, of course, they

21   would have the benefit of this record to help them with that

22   due diligence.

23             In addition, there have been individual objections

24   to the wind down motion.  I've ruled on one already, which

25   is the Accenture objection.  It appears to me that

Page 150

1    consistent with the rights limited as they are of parties to

2    executory contracts that have not been assumed, most of

3    Accenture's exception is not well taken.  However, I will

4    permit them to make a motion to compel assumption or

5    rejection of the Accenture agreement if it appears that the

6    debtor is not appropriately providing for payment to them on

7    an ongoing basis for the work that they're doing of the

8    amount that equates to the benefit that they're providing to

9    the estate.

10            But frankly, those types of motions are guided by

11   the particular facts, and should be decided at that time

12   rather than now, as an objection to this wind down motion.

13            Certain of the multi-employer and I think also

14   defined benefit funds have objected to the motion because

15   their accrued administrative claims are not included in the

16   wind down budget that's been submitted, which again is a

17   budget for only 13 weeks.  The remaining weeks of the budget

18   being subject to further negotiation with the DIP lenders

19   and secured lenders, including the ABL lenders.

20            If I were of the belief that the debtors were

21   truly administratively insolvent, I might well have

22   converted the case and let a Chapter 7 trustee do the best

23   that she could do with the result.  However, I found Mr.

24   Scherer to be credible with regard to the reasonable

25   likelihood of the projected proceeds of combined asset sales

1    that the debtors and Perella Weinberg will be pursuing in

2    the near future.

3             I also find credible the debtor's primarily

4    through their counsel's estimate of likely allowed

5    administrative expense claims.  Therefore, I accept Mr.

6    Scherer's testimony that there is a reasonable likelihood,

7    if in fact, the wind down plan is pursued, that

8    administrative claims will be paid.

9             I also believe that based on Mr. Scherer's

10   testimony, Mr. Carroll's testimony, Mr. Rayburn's testimony

11   there is not a reasonable likelihood that administrative

12   expense claims will be paid in full if the wind down plan is

13   not implemented, and if for example, the case is promptly

14   converted to Chapter 7.

15            Therefore, while I understand the position of the

16   pension fund trustees that as a legal matter their

17   administrative expense claims are entitled to be paid on a

18   par with all other administrative expense claims, the only

19   way I believe there is a reasonable prospect of them being

20   paid in full is if those doing the work to implement the

21   wind down plan are, in fact, paid on a going forward basis.

22            As I noted, Congress has recognized the scenario

23   with regard to secured creditors, enabling their collateral

24   to be charged under 506(c).  It stands to reason that the

25   Court should not be required to convert a case if the same

1    logic would apply to those holding administrative expense

2    claims; i.e., their clear best chance of being paid in full

3    will be only if those doing the work to get them paid in

4    full actually get paid first.

5           It appears to me based on the record of this

6    hearing, including my questioning of the debtors, that the

7    interim budget for the 13 weeks does, in fact, only pay the

8    creditors who in fact will be doing the work to achieve the

9    results of the wind down plan.  There's certainly a

10   dovetailing of the standard, given the fact that the secured

11   creditors have agreed to it and they're not likely to agree

12   to anything other than that which improves the value of the

13   collateral, which is essentially a lien on all the assets.

14          I don't find that there have been any additions to

15   the budget that show favoritism to a particular

16   administrative expense creditor.  To the contrary, it

17   appears to me that the budget truly sticks to the principle

18   that the debtor is paying only those expenses that need to

19   be paid to implement the wind down plan, to generate the

20   proceeds to pay the administrative claims as a whole.

21          So I will overrule the objections of the pension

22   funds, obviously without prejudice, however, to their

23   general rights as administrative creditors to be paid in

24   full, either if a Chapter 11 plan is ever confirmed, or in a

25   Chapter 7 priority scheme basis.

1            The motion seeks the ability to delay payment of

2     administrative claims when absolutely necessary for 90 days,

3     given the inability to predict in a liquidation scenario the

4     debtor's cash flow.  Again, given Mr. Scherer's testimony,

5     it appears to me that this is a reasonable provision.  The

6     Bankruptcy Code does not require in and of itself, although

7     employment agreements, and collective bargaining agreements

8     may so require, the current payment of administrative

9     expenses.  And under the circumstances, the 90-day provision

10    as clarified on the record by Ms. Lennox, is consistent with

11    the parties, the administrative creditor's rights.

12            And consistent with that representation, and

13    consistent with the debtor's obligations, separate and apart

14    from the Bankruptcy Code, the 90-day provision as confirmed

15    by Ms. Lennox will not apply to current wages and benefits.

16            I conclude that the employee retention plan, which

17    is clearly not prohibited by Section 503 of the Bankruptcy

18    Code, since it applies to non-insiders only and applies

19    across the board, is reasonable and a reasonable exercise of

20    the debtor's business judgment under the circumstances.

21            Clearly, based on the testimony, it's necessary

22    recognizing the additional work these people will be doing

23    and their importance to the wind down plan, that they be

24    properly compensated and incentivized to stay to complete

25    the wind down, which clearly is not something that they

1    signed up to do originally when they were hired.

2            So it appears to me appropriate that they be paid

3    as they're proposed to be paid, and I will note that there

4    have been no objections to the metrics upon which that

5    payment was derived.

6            Similarly, it's necessary for the debtors to

7    employ third party contractors where they don't have

8    employees to do the necessary work, and so that merits

9    approval, and frankly, there have been no objections to that

10   relief.

11           There were objections to three aspects of the

12   relief, however, that I need to address in some more detail.

13   First to the exculpation and injunction relief sought,

14   second to the $5 million trust sought -- well, I'm sorry,

15   the injunction was the second element that was objected to,

16   and the third was the trust.

17           As far as the trust is concerned, although the

18   debtors have D&O insurance, there is a deductible, and it

19   appears to me that setting up the trust in light of that

20   deductible, and in light of the hard decisions that senior

21   management has to make in implementing the wind down, is a

22   prudent exercise of the debtor's business judgment.

23           The trust is funded out of the secured creditor's

24   collateral.  Clearly they believe that it is necessary to

25   preserve the value of their collateral.  And consequently, I

 1    will approve it.

 2         I understand the general principal particularly as

 3    clarified on the record, both by Mr. Rayburn and by Ms.

 4    Lennox of the exculpation provision.  As drafted, it was

 5    clearly too broad.  It should apply to actions taken as

 6    approved by the Court when it approved the wind down plan,

 7    which includes, I recognize, actions taken in furtherance of

 8    that plan as sought by the motion.  I think that is

 9    different than what was in the proposed order, so the order

10    should be modified to make that clear.

11         I would also add from actions taken in good faith

12    and the prudent exercise of their business judgment to that

13    language.  Which in large measure, if not entirely,

14    dovetails with their protection anyway.

15         The main concern that Mr. Rayburn expressed and I

16    found his testimony credible, is in fact, less with the

17    protections that management has and the exercise and good

18    faith of their business judgment as fiduciaries, but more

19    from being dragged into lawsuits around the country, many of

20    which might be strike suits and would eventually be

21    dismissed because there would be no basis to bring such

22    action given their obtaining advance approval of that very

23    action from this Court on notice to everyone, as

24    contemplated by Congress in Section 363(b) of the Bankruptcy

25    Code.

1           However, I do not believe that a permanent

2    injunction of such actions, such litigation would be

3    appropriate.  Instead, I believe there should be a

4    channeling injunction that any such litigation or claim

5    should be brought in this court.

6           To my mind, given the fiduciary duties that

7    management has here and the Board have, what I have is very

8    much consistent with the Barton Doctrine that applies to

9    trustees, and I have no problem with incorporating that into

10   this order, as well as the channeling injunction.

11          I've also stated my concern about the blanket

12   injunction with respect to regulatory objections to GOB

13   sales, but I think we're all on the same page on that point

14   here, as long as the order tracks any one of the three

15   orders that I've mentioned, the Betsy Johnson, Ben and

16   Jerry's, or Fortune Off Orders, all of which I think are

17   pretty much state of the art as to what gets blanket

18   approval as far as the sale is concerned, and what has a

19   window to come back to the Court on short notice on, with

20   regard to health and safety concerns is in the final order,

21   I will approve that, as far as GOB sales are concerned.

22          I think the only other objection that I have not

23   dealt with on the wind down motion is a passing objection in

24   the expedited contract rejection procedures.  I think the

25   debtors have already taken care of this anyway, but to the

1    extent that the notice is not going to a counsel who has

2    made a notice of appearance in the case, they should get

3    notice of the motion to approve contract rejection.

4         If they just filed a proof of claim or if they

5    just filed a pleading that was not enough, but if they

6    appeared in the case and requested notice under Rule 2002,

7    then they should get notice.

8         Turning to the 1113(e) motion, as originally

9    sought, the relief requested by the debtors raised serious

10   issues as to whether 1113(e) would apply, particularly given

11   the open-ended nature of the relief that was sought.

12        I find and conclude that as modified, including as

13   modified on the record, and there was quite a bit of

14   discussion about that as far as the what necessary means,

15   the debtors are entitled to the relief that they've -- they

16   are now seeking today under 1113(e).

17        I think it probably is the case that there needs

18   to be a possibility of a Chapter 11 plan for 1113(e) to

19   apply, but I'm not ruling that out here, given that there is

20   not an insurmountable obstacle to a Chapter 11 plan, which

21   clearly contemplates not only sales but simply the

22   distribution of sale proceeds.

23        It also appears to me again based on the testimony

24   which I found credible, that it is absolutely necessary to

25   avoid imminent and irreparable loss of value to the estate,

1    that the wind down plan be implemented which includes using

2    employees, including union employees on hand, where

3    necessary out of seniority to take the steps necessary for

4    the wind down plan.

5            Similarly, if workers, union workers are not

6    available, it's necessary to hire third parties in this

7    situation, the debtor is not going to be hiring new union

8    workers at this point.  And again, without using third

9    parties, under those circumstances, the debtor's estate

10   would be irreparably harmed.

11           So as sought today, as modified, I will grant the

12   Section 1113(e) motion.  It appears to me that given the

13   employee retention plan, as well as the debtor's

14   undertaking, which is subject to Court approval to pay one

15   day's extra pay to current employees, you may need to add

16   that to the 1113(e) relief.  I don't think anyone would

17   oppose it, because it's a benefit to the employees, but I

18   think it would arguably modify the collective bargaining

19   agreements, at least you should consult with your leading

20   unions to see if that's the case.  If it is, I'm authorizing

21   that under 1113(e) as well.

22           I hope I haven't missed anything.  But in sum, I

23   will grant the 1113(e) motion as modified and the wind down

24   motion except as I've expressly ordered that it be modified.

25           I'm not going to ask you to settle that order, and

15-23007-rdd   Doc 2539   Filed 02/07/13   Entered 02/15/13 23:21:16   Main Document
Pg 319 of 423

Page 159

1    in fact, the debtors knowing the need for speed can operate

2    a reliance on my bench decision.  It may take a while,

3    particularly given that tomorrow is Thanksgiving to get the

4    order entered, but I am going to ask you, although I'm not

5    going to have to you settle it on formal notice to parties,

6    I am going to ask you to circulate it to the objecting

7    parties, so they can see that it's consistent with my

8    ruling.

9             I'm not really going to wait a long time for them

10   to raise any objections, because I'm pretty sure I know what

11   I ruled, and I'll review it, but they will have a chance if

12   they get to it quickly to let me know if I left out -- if

13   you left out something or that there's something should be

14   in there that I ruled on.

15            So is there anything I missed?

16            MS. LENNOX:  I don't think so, Your Honor.

17            THE COURT:  No?  Okay.  All right.  Let me say, I

18   have complimented management, current management in this

19   case, who clearly was thrust into on very short notice a

20   very difficult situation, and I think have done their very

21   best to make it work.

22            I also want to compliment the employees of this

23   company, both union and non-union, and say that I think

24   they've done a good job, too.

25   (Proceedings concluded at 3:29 PM)

Page 160

         1                    I N D E X

         2

         3                  W I T N E S S E S

         4    WITNESS              BY                     PAGE

         5    JOSHUA SCHERER       MR. HAMILTON            36

         6                         MS. GOLDEN             50

         7                         MR. HAMILTON           51

         8    GREG RAYBURN         MR. HAMILTON           53

         9                         MR. BADDELEY           63

        10                         MR. MAZUR              65

        11    CHARLES CARROLL      MR. SILBERFARB         70

        12                         MR. BADDELEY           76

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

15-23007-rdd   Doc 539   Filed 02/07/13   Entered 02/25/15 23:32:46   Main Document
Pg 321 of 429

Page 161

```
 1                E X H I B I T   I N D E X

 2    NO.              DESCRIPTION                       PAGE

 3    Debtor's:

 4    --       Declaration of Greg Rayburn               54

 5    --       Declaration of Greg Rayburn               55

 6    --       Declaration of Charles Carroll in         71

 7             support of the 1113(e) motion

 8    --       Declaration of Charles Carroll in         78

 9             support of the 1113(e) motion

10    --       Imhoff's declaration in support of        79

11             wind down motion

12    --       David Rush's declaration in support       79

13             of wind down motion

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 162

1                    R U L I N G S

2   DESCRIPTION                                        PAGE

3   Motion to Authorize/Emergency Motion of            142

4   Debtors and Debtors In Possession for

5   Interim and Final Orders

6

7   Motion to Authorize/Emergency Motion and           142

8   Memorandum of Law of Debtors and Debtors in

9   Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

     I, Sheila G. Orms, certify that the foregoing is a correct

3    transcript from the official electronic sound recording of

4    the proceedings in the above-entitled matter.

5

6    Dated:  November 27, 2012

7

8

9     Signature of Approved Transcriber

10

11

     Veritext

12

     200 Old Country Road

13

     Suite 580

14

     Mineola, NY 11501

15

16

17

18

19

20

21

22

23

24

25

**Exhibit G**

**Hearing Transcript, *In re Ionosphere Clubs, Inc.***
**Case No. 89-10449 (Bankr. S.D.N.Y. May 22, 1991)**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

In the Matter                     Case No.
of                          89 B 10448/49

IONOSPHERE/EASTERN AIR LINES, INC.,

                    Debtors.

----------------------------------------x

May 22, 1991

United States Custom House
One Bowling Green
New York, New York 10004

Mtn by Trustee for relief from retiree benefits
pursuant to Section 1114(g) of bankruptcy.

B E F O R E :

            HON. BURTON R. LIFLAND,

                    Bankruptcy Judge.



```
 1              IONOSPHERE/EASTERN AIR LINES, INC.            2

 2      A P P E A R A N C E S :

 3

 4            WEIL, GOTSHAL & MANGES, ESQS.

 5                    Attorneys for Trustee

 6                    767 Fifth Avenue

 7                    New York, New York 10153

 8

 9            BY:    BRUCE R. ZIRINSKY, ESQ., of Counsel

10                         - and -

11            BY:    MATTHEW CANTOR, ESQ., of Counsel

12

13            O'MELVENY & MYERS, ESQS.

14                    Attorneys for Creditors Committee

15                    153 East 53rd Street

16                    New York, New York 10022

17

18            BY:    ADAM C. HARRIS, ESQ., of Counsel

19                         - and -

20            BY:    WENDY Y. HILL, ESQ., of Counsel

21

22

23

24

25
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.            3

 2

 3      A P P E A R A N C E S  (Continued):

 4

 5

 6            GUERRIERI, EDMOND & JAMES, P.C.

 7                    Attorneys for International Association

 8                    of Machinists

 9                    1331 F Street, N.W.

10                    Washington, D.C. 20004

11

12            BY:    ROBERT S. CLAYMAN, ESQ., of Counsel

13                        - and -

14            BY:    NANCY E. SEGAL, ESQ., of Counsel

15

16

17            O'DONNELL & SCHWARTZ, ESQS.

18                    Attorneys for TWU

19                    Lincoln Building

20                    60 East 42nd Street

21                    New York, New York 10165

22

23            BY:    MALCOLM A. GOLDSTEIN, ESQ., of Counsel

24

25
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.              4

 2

 3     A P P E A R A N C E S   (Continued):

 4

 5

 6         O'DONNELL, SCHWARTZ & ANDERSON, ESQS.

 7                 Attorneys for TWU

 8                 Suite 200

 9                 1300 L Street, N.W.

10                 Washington, D.C. 20009

11

12         BY:   PENNY A. PILZER, ESQ., of Counsel

13

14

15         DICKSTEIN, SHAPIRO & MORIN, ESQS.

16                 Attorneys for David I. Shapiro, Special

17                 Advisor to Trustee

18                 2101 L Street, N.W.

19                 Washington, D.C. 20037

20

21         BY:   R. BRUCE HOLCOMB, ESQ., of Counsel

22

23

24

25
```

1              IONOSPHERE/EASTERN AIR LINES, INC.                    5

2

3    A P P E A R A N C E S   (Continued):

4

5         WILLIAM G. BELL, ESQ.

6                   Attorney for Pilot Retirees and

7                   Noncontract Retirees

8                   5200 Blue Lagoon Drive, Suite 700

9                   Miami, Florida 33126

10

11   ALSO PRESENT:

12

13                  DAVID I. SHAPIRO, ESQ., Special Adviser
                                           to Trustee

14

15

16                  P R O C E E D I N G S

17

18                  THE COURT:  I am pleased to advise,

19   after long and arduous negotiations, there is at

20   least a partial resolution and settlement agreed

21   upon.

22                  Mr. Zirinsky.

23                  MR. ZIRINSKY:  Thank you, Your Honor.

24                  Your Honor, if I may I would like to

25   announce for the record and read into the record the

1          IONOSPHERE/EASTERN AIR LINES, INC.                6

2     terms of a settlement, an interim agreement, which

3     has been reached by the Trustee and the Committee of

4     Retirees, which represents all of Eastern's retirees

5     other than the IAM and TWU represented retirees, who

6     are represented by the unions, so that would include

7     all of the noncontract retirees, as well as the

8     retirees formerly represented by ALPA, the Air Line

9     Pilots Association.

10                On a rough a approximation basis, Your

11    Honor, that represents approximately sixty percent of

12    the total retiree body of approximately 10,000

13    individuals under age sixty-five.

14                Your Honor, if I may, I would like to

15    read into the record the terms of the interim

16    agreement.  And Mr. Bell, who is here on behalf of

17    the committee, I would ask at the end of my reading

18    into the record, if he would affirm if that is the

19    agreement and if I misspeak, Mr. Bell, feel free to

20    correct me.

21                Current benefits, Your Honor, would be

22    paid to this group at current levels through June 30,

23    1991.  As of July 1, 1991, benefits would be reduced,

24    as set forth in Exhibit B to the Trustee's motion for

25    relief under Section 1114 subject to certain

1                IONOSPHERE/EASTERN AIR LINES, INC.                7

2       modifications that I will read into the record.

3                          These benefits will run through

4       December 31, 1991, the end of the year.  The cost to

5       Eastern for these benefits, what Eastern will pay,

6       would be equal to $145 per month times a number of

7       retirees represented by this group.  This amount

8       represents an approximate cost to Eastern of

9       approximately $1.45 million per month times sixty

10      percent.  I haven't done the math, but that would be

11      the approximate cost to Eastern.

12                          And this is premised upon the

13      individuals making personal monthly contributions of

14      $75 per individual.

15                          To the extent there are cost overruns

16      in providing the benefits set forth on the exhibit at

17      the cost of $75, Eastern would increase its payments

18      up to a maximum of $170 per month per individual.  To

19      the extent that any cost overruns, which we don't

20      anticipate might exceed that amount when taken in

21      conjunction with the $75 per month contribution by

22      the individuals, then either the individual

23      contributions will have to be increased for the

24      benefits slightly modified under the plan to cover

25      that.

1          IONOSPHERE/EASTERN AIR LINES, INC.          8

2                    But the bottom line is that above $170

3     per month per individual the cost would be for the

4     account of the retirees.

5                    Eastern would pay the current claims

6     incurred through June 30, 1991, but not paid at that

7     time, that's what we call the pipeline, and all

8     claims incurred through December 31, 1991, but not

9     paid.  So that to the extent there is any runoff

10    either on the existing benefits or any runoff on

11    benefits under the interim agreement, Eastern will

12    pick up those expenses.

13                   The Trustee and the Retiree Committee

14    agree to cooperate on litigation and, to the extent

15    necessary or appropriate, expedite appeal of the

16    various outstanding legal issues that have been

17    presented by the Trustee's motion under Section 1114

18    and the responses of the committee and various other

19    parties, which includes, among other issues, Your

20    Honor, whether or not the claims which might result

21    from a modification of retiree benefits would

22    constitute expenses of administration of the Chapter

23    11 case or whether or not they will constitute

24    general unsecured claims or whether, in fact, there

25    might be defenses to any claims whatsoever.

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.           9

 2                       There are other issues involved,

 3      including whether or not Section 1114 applies to a

 4      case of liquidation under Chapter 11 as opposed to

 5      reorganization, and the parties obviously reserve the

 6      right to litigate those issues as well.

 7                       This is not an exercise just for the

 8      purpose of engaging in litigation, Your Honor.  Just

 9      to note for the record there have been very

10      substantial efforts, I believe in good faith, made on

11      both sides to reach agreement on a permanent

12      agreement.  But there are some novel issues, some

13      complex legal issues raised by these proceedings, and

14      I think both sides agree that to the extent the Court

15      can provide some clarification of some of these legal

16      issues between now and the end of the year, that

17      clarification as well as additional facts which may

18      come to bear in terms of Eastern's financial

19      condition will likely enhance the prospects of

20      reaching an agreement on permanent resolution of the

21      retiree claim situation and benefit situation.

22                       Consistent with this approach, both the

23      Trustee and the committee will cooperate with each

24      other in the production of information and other

25      matters or evidence which might be relevant to future
```

```
 1            IONOSPHERE/EASTERN AIR LINES, INC.        10

 2   determination of issues or negotiation of

 3   settlements.

 4              The Trustee and the Unsecured Creditors

 5   Committee would agree to withdraw any objections to

 6   the Retiree Committee's application to retain special

 7   counsel for the purposes of any of this litigation

 8   and, obviously, such compensation of any such counsel

 9   would be subject to application and allowance by this

10   Court.

11              The parties would reach agreement as to

12   a trial date for the issues on the priority of the

13   claims as well as the other issues, as well as

14   expedited appeal, subject to this Court's calendar

15   and this Court's approval.

16              The Trustee and the Unsecured Creditors

17   Committee would agree not to convert Eastern's

18   Chapter 11 case to a case under Chapter 7 solely

19   because of the need to pay retiree benefits under the

20   agreement with the committee prior to December 31,

21   1991.  And we would ask the Court in this regard,

22   since we feel, and obviously the Retiree Committee

23   feels it is very important to bring as much certainty

24   to this process as we possibly can, that if even for

25   other reasons the case were converted to Chapter 7,
```

1            IONOSPHERE/EASTERN AIR LINES, INC.           11

2    that the agreement that we have reached here today on

3    an interim basis, that that agreement would be

4    binding upon any Chapter 7 Trustee, and that even if

5    the case were converted to a Chapter 7, that a

6    Chapter 7 Trustee would honor the obligations being

7    undertaken by the Chapter 11 Trustee with respect to

8    this interim agreement.

9              Obviously, consistent with this

10   agreement, the Trustee would not unilaterally seek to

11   change the level of benefits under this interim

12   agreement for any period prior to December 31, 1991.

13              The committee and the Trustee would

14   agree to set a hearing date for permanent

15   modifications under 1114 to be scheduled for December

16   15, 1991 or some other date close thereto as the

17   Court's calendar would permit, and that we'll be

18   entering into this interim agreement in settlement of

19   the Trustee's current motion, obviously without

20   prejudice to the right of the Trustee to bring an

21   additional motion and without prejudice to any rights

22   or claims or defenses to such a motion that might be

23   asserted by the Retiree Committee later.

24              It obviously being the intent and

25   desire of both sides to try to work out a settlement

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.        12

 2    without the need for litigation, but obviously, if we

 3    can't, we need to come back to this Court and all

 4    sides are preserving all of their rights with respect

 5    thereto.

 6                   The relief requested at that time, if

 7    any, will be based upon the facts and circumstances

 8    existing at that time and this agreement, as I

 9    already stated, would be without prejudice to the

10    rights of the parties in respect of any subsequent

11    consideration of any motions under Section 1114.

12                   Exclusive of amounts paid for the

13    runoffs here, any payments by Eastern for the retiree

14    benefits under this agreement would be credited

15    against any distribution on retiree claims,

16    administrative or otherwise, or any permanent relief

17    which might be subsequently established by agreement

18    or by Order of the Court pursuant to Section 1114.

19                   Other than the express provisions of

20    this agreement, the parties reserve all of their

21    other rights under the Bankruptcy Code or otherwise.

22                   I just would like to correct for the

23    record, Your Honor, the terms of the benefits are

24    attached as Exhibit B to the reply of the Trustee

25    filed in connection with this motion, not the actual
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.        13

 2   motion itself.  This reply was filed on Monday of

 3   this week.

 4                    That is the interim agreement, Your

 5   Honor, as the Trustee understands it.

 6                    Mr. Bell.

 7                    MR. BELL:  I just want to make one

 8   inquiry.

 9                    The cost to Eastern, you state, comes

10   to $1.45 million per month times sixty percent.

11   Sixty percent of that figure.  Yet there is an

12   agreement for Eastern to pick up certain additional

13   amounts pursuant to some formula with a cap.  That,

14   as I understand it, then, has a potential of going up

15   to approximately $1.7 million per month.

16                    MR. ZIRINSKY:  Times sixty percent.

17                    THE COURT:  Times sixty percent, is

18   that correct?

19                    MR. ZIRINSKY:  That is correct, Your

20   Honor.  We agreed that is the understanding reached

21   between the parties, Your Honor.

22                    Your Honor, if I may move on.  We have

23   also, just by way of update, Your Honor, we have made

24   the same proposal to the IAM and the TWU, the

25   authorized representatives of the retirees, formerly
```

```
 1          IONOSPHERE/EASTERN AIR LINES, INC.          14

 2    represented by those unions, and the proposal has

 3    been rejected.

 4              We have also been engaged in

 5    negotiations with the IAM and the TWU with a view

 6    towards reaching agreement on permanent modification.

 7    Unfortunately, Your Honor, the parties are miles and

 8    miles apart, and there is no prospect at this time in

 9    the Trustee's judgment of reaching agreement on a

10    permanent basis.

11              We have two choices to date, Your

12    Honor.  One choice is to proceed with the evidence on

13    the Trustee's proposed permanent modifications, or

14    alternatively, Your Honor, to proceed under the basis

15    of Section 1114(h), which is a somewhat more

16    abbreviated proceeding in which we would ask the

17    Court to impose upon the IAM and TWU the same

18    provisions that are set forth in the interim

19    agreement with the committee.

20              We believe, Your Honor, that that is a

21    fair and equitable disposition, at least on an

22    interim basis, of this matter.  We believe it will

23    continue to provide the retirees, represented by

24    these two unions, with adequate level of coverage,

25    with certainty of coverage, at least through the end
```

1                    IONOSPHERE/EASTERN AIR LINES, INC.        15

2     of the year, and will afford not only to the parties

3     but to the Court the same illumination of fact and

4     resolution of somewhat unknown legal terrain in terms

5     of establishing, perhaps, a better framework of

6     understanding as to what the alternatives to an

7     agreement are under 1114.

8                    We frankly believe that that is a far

9     more productive course to follow at this time than a

10    protracted hearing on permanent modifications.  And I

11    am really looking to the Court for some guidance on

12    this issue.

13                   We are prepared to go either way.  It

14    just seems to me that given the state of Eastern's

15    liquidation, the fact that there are still very

16    substantial assets which remain unsold, and which are

17    going to have to be sold, that there is still

18    numerous contingencies which can affect the financial

19    condition of this estate as the liquidation

20    progresses, both on the asset side and on the

21    litigation side.

22                   Given the fact that the parties seem to

23    have, at least in certain cases, almost diametrically

24    opposed views of the law in this area and that over

25    the same period of time we perhaps could achieve

1          IONOSPHERE/EASTERN AIR LINES, INC.          16

2     greater certainty through this Court's determination

3     and, if necessary, through determination in the

4     District Court or Court of Appeals of certain of

5     these issues that we would be in a far better

6     position, both in terms of knowledge of facts,

7     certainty and knowledge of the legal parameters come

8     sometime in late November or early December to be

9     dealing with these issues rather than to be dealing

10    with the issues today in what is at best a somewhat

11    unknown area, particularly in the context of the

12    actual financial condition of the estate.

13              We believe, Your Honor, that absent

14    relief now, whether it be in the form or permanent

15    relief or in the form of interim relief, the estate

16    will be irreparably injured.  We simply cannot afford

17    to continue to pay benefits at the levels presently

18    in effect, which is approximately $3.6 million a

19    month.

20              I would note for the Court and the

21    evidence will show, and I frankly don't think this is

22    a designated fact, based upon the Trustee's best

23    present estimates, and these are obviously subject to

24    change inasmuch as these estimates make a lot of

25    assumptions about asset sales, which haven't occurred

IONOSPHERE/EASTERN AIR LINES, INC.                    17

1
2   or where there aren't even agreement to asset sales

3   to occur, but the Trustee's best estimate at this

4   time is assuming he hits a home run on his

5   projections and does everything exactly the way it's

6   projected, that at the end of the day, after

7   consideration of all administrative expenses, and

8   after consideration of all priority employee and tax

9   claims, there will be a net amount available for

10  distribution to creditors of only approximately $66

11  million.  That's assuming a home run.  And even Babe

12  Ruth didn't hit a home run every time he went up to

13  the plate.  Sometimes he struck out.

14              Here, Your Honor, I want to point out

15  this assumption of $66 million reflects an assumption

16  that all retiree benefits come to an end or payments

17  on retiree benefits come to an end on June 15th.

18              So if you were to do the simple

19  calculation of $3.6 million per month over the next

20  six months, that in itself, Your Honor, would

21  constitute a very substantial erosion in that $66

22  million.

23              There are almost $400 million of

24  anticipated asset sales that remain to be done that

25  we have no agreements for assets, that the Trustee is

1             IONOSPHERE/EASTERN AIR LINES, INC.          18

2       holding without agreements that are going to have to

3       be sold in order to achieve that $66 million number.

4                   If the Trustee were to miss those

5       numbers by a mere ten percent and were required to

6       continue to pay retiree benefits at the current rate,

7       and it's certainly not unheard of to miss projections

8       by ten percent, this estate by the end of the year,

9       Your Honor, would be unable to confirm a liquidating

10      plan under the statute and it would be the Trustee's

11      statutory obligation to recommend to the Court a

12      conversion to Chapter 7.

13                  A conversion to Chapter 7 would not

14      only have a negative impact on the asset values of

15      the estate, but also would hurt most of the people

16      whose interests are presently before the Court, the

17      retirees.  There is no 1114 in Chapter 7.  And while

18      perhaps others might take issue with this, I think

19      it's quite clear that in a Chapter 7, Your Honor,

20      absent some special provision such as we reached

21      today with the Retiree Committee, all retiree

22      benefits would come to a halt almost immediately,

23      that a Chapter 7 Trustee would not have the ability

24      to continue to make those payments under those

25      benefits.  So that therefore the very people whose

IONOSPHERE/EASTERN AIR LINES, INC.                    19

1

2    interests are before the Court today that we are

3    trying to protect, albeit in some modified form,

4    would be hurt the most.

5                    And moreover, Your Honor, the thousands

6    of creditors who hold billions of dollars of claims

7    against this estate, who today at best can anticipate

8    a relatively de minimis return on their claims, and

9    these aren't all large corporations, Your Honor,

10   almost half of the unsecured claims against Eastern

11   are either held by employees or are employee related.

12                   We are talking about claims for wages,

13   for severance, for accrued vacation, for pension

14   benefits.  There are bondholder claims.  We received

15   letters, the Creditors Committee has received letters

16   from retirees who are wondering if they are ever

17   going to receive a return on their claims, the bonds

18   that they bought and expected to get a fixed payment

19   every quarter in terms of an interest payment, those

20   payments have obviously all come to a halt.

21                   So the fact of the matter is, Your

22   Honor, that unless we get some relief, whether we

23   call it interim relief or we go forward and get

24   permanent relief, this estate will be

25   administratively insolvent, incapable of reaching a

IONOSPHERE/EASTERN AIR LINES, INC.                    20

1    liquidation plan under the statute, a confirming

2    liquidation plan under the statute and would

3    therefore be irreparably harmed.

4              We would therefore submit, Your Honor,

5    whether the Court indicates a preference to go

6    forward today on permanent relief or only on interim

7    relief, that we must get some relief and that we must

8    get some relief very promptly.

9              Thank you, Your Honor.

10             MR. BELL:  Your Honor, before Mr.

11   Clayman responds, can I be heard briefly?

12             THE COURT:  Sure.

13             MR. BELL:  Your Honor, there are

14   certain factual distinctions between the employees

15   that I represent and the employees that Mr. Clayman

16   and Miss Pilzer represent and so that has resulted in

17   the two different approaches being taken.

18             But I would like to make it clear that

19   I would not think it fair to use the position I have

20   chosen in behalf of my employees because of the

21   peculiar position that they happen to be in against

22   Mr. Clayman as some indication of the position he has

23   taken, because there are factual distinctions and

24   that has created the difference in approaches and not

25

1          IONOSPHERE/EASTERN AIR LINES, INC.                21

2     some arbitrary decision on the part of the two

3     parties to split off.

4              So I would ask the Court not to take

5     the position we took as some indication that Mr.

6     Clayman and Miss Pilzer should have taken that

7     position as far as their employees go.

8              Thank you.

9              MR. CLAYMAN:  Your Honor, Robert

10    Clayman, I represent --

11             THE COURT:  I understand, Mr. Bell,

12    that you take the position based upon the mandate

13    that you have and your constituencies that you

14    represent and, indeed, the IAM and the TWU do have

15    their interests disagree with you in that regard.

16    But I also want to point out there are many similar

17    attributes in respect to your constituency.  There

18    are, for example, in your group a substantial number

19    of noncontract employees that you are representing,

20    in addition to the ALPA group.

21             MR. CLAYMAN:  Your Honor, we are here

22    today upon notice of the Trustee for permanent

23    relief, permanent modification of the retiree health

24    benefits.  And with regard to Section 1114 I think

25    that what has been missed here is really what the

IONOSPHERE/EASTERN AIR LINES, INC.        22

principal purpose of 1114 is.  That it is intended to
prevent the summary termination of retiree health
benefits and to provide retirees with some sense of
security, that they know going forward what level of
benefits they will have for an extended period of
time.

What Mr. Zirinsky is proposing today is
simply a roll of the dice: you have benefits for six
months and in six months, upon his own analysis, they
may be off by ten percent there is nothing left and
maybe you get something and maybe you don't.

The time has come, the issue has been
joined, time has come for a decision to be made on
where we stand and where retirees stand with regard
to essential medical treatment and how they are going
to pay for that.

Now, with regard to the proposal that
has been made and accepted by Mr. Bell on behalf of
his constituency, I appreciate his acknowledgment
that there are, we believe, considerable factual
distinctions between the two groups that in and of
itself required us to reject that proposal.

Second of all and most importantly, we
believe that that proposal is fraught with risks,

1          IONOSPHERE/EASTERN AIR LINES, INC.          23

2     risks that the retirees cannot bear.

3                    Now, they have gone through, I will

4     say, nothing less than hell upon a notice that was

5     sent out by the Trustee telling them that their

6     benefits are going to be terminated within a matter

7     of days.  Now they are being told they are going to

8     relive that experience sometime in December, that

9     again the issue will be out there, and again, may be

10    subject to summary termination.

11                   Now, where can we reasonably expect the

12    estate to be at the end of the day is really the the

13    question here?  Right now their own professionals,

14    their own Chief Financial Officer is predicting a

15    cushion of $125 million, of which $66 million will be

16    set aside or be made available for general unsecured

17    creditors.  That comes out to less than a three cent

18    recovery for unsecured creditors.

19                   Right now they can pay that money.

20    That's their own prediction.  Our concern is that

21    every prediction that this estate has ever made since

22    the case was first commenced back in March of 1989

23    has missed the mark.

24                   We started off with a one hundred cent

25    plan, and that was promised for the first twelve

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.        24

 2     months of the case.  We were down to a fifty cents

 3     plan after thirteen months.  That then became a

 4     thirty cent plan, and today we are at a less than

 5     three cent plan.

 6                  Your Honor, this is the same Trustee

 7     that made an application to increase his compensation

 8     from $35,000 to $50,000 on December 20th was touting

 9     that this was an estate that was going to be cash

10     neutral in the first quarter of 1991, whereupon three

11     weeks later he commenced a liquidation of the estate.

12                  We have no faith in their predictions.

13     We have no faith in the future of this estate and we

14     are not willing to risk the future of the retirees

15     upon their predictions.  They need to know today what

16     they are going to get.

17                  Now in regard to the particulars of

18     that proposal that was made for interim relief, the

19     threat of Chapter 7 is there, as much as Mr. Zirinsky

20     may say today, "I will make every effort that claim

21     of Mr. Bell's is preserved in Chapter 7," it seems to

22     me in the same breath he also said if it goes into

23     Chapter 7, 1114 doesn't even apply.

24                  So what happens to the second piece of

25     Mr. Zirinsky's proposal if it goes into Chapter 7?
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          25
 2                    MR. ZIRINSKY:  Excuse me, Your Honor, I
 3      would like to state for the record --
 4                    MR. CLAYMAN:  If I can continue.
 5                    MR. ZIRINSKY:  I don't like to be
 6      misrepresented.
 7                    It was my assumption if the agreement
 8      is satisfactory, the Court would so order that
 9      provision and the Order would hold.
10                    MR. CLAYMAN:  That's the first time,
11      Your Honor, that I heard that that 1114 provision and
12      by the Code itself under 103 does not apply in
13      Chapter 7 will now be made applicable in a Chapter 7.
14      I think that remains to be seen.
15                    The fact of the matter is that this
16      case can be converted into a Chapter 7 for any reason
17      other than paying Mr. Bell his retiree health
18      benefits.
19                    Mr. Zirinsky has also indicated the
20      great risk that this estate bears or may bear with
21      regard to any of the numerous contingencies, either
22      with regard to assets or with regard to litigation.
23      We are not willing to take that risk.
24                    Second of all, he is going to be making
25      the argument, assuming it's not in a 7, that 1114
```

IONOSPHERE/EASTERN AIR LINES, INC.                26

2   does not even apply in a liquidating 11.  So at the

3   end of the day, we may have absolutely nothing

4   because based upon that legal theory there is

5   absolutely no reason why the Court has to apply the

6   criteria of 1114 to a liquidating 11, if they should

7   prevail on that argument.  We are not willing to take

8   that risk.

9             With regard to the cap on the

10  contributions that have to be made, first of all, our

11  people cannot afford $75 a month.  That's per person.

12  That is $150 a month for most people, for most of our

13  retirees who are on fixed incomes, which they cannot

14  afford.  That according to their own actuarial

15  analysis they have said that the cost of that

16  insurance per month is $280.

17            What they have told us is that the

18  retirees will pay 75 and that they're willing to go

19  up to 170, that's 245, that leaves a spread of $35,

20  according to their own actuarial analysis, that will

21  be borne by the retirees.  Potentially, the retirees

22  under this proposal would be paying as much as $110

23  per person per month.  We cannot afford that.  We are

24  not willing to take that risk.

25            Now, 1114 again was intended to provide

IONOSPHERE/EASTERN AIR LINES, INC.                27

1    security for people to know where they stand so they

2    can plan for their futures.  We have made proposals

3    that take into account the conditions of the estate.

4    We understand that we are in a liquidating 11.  Our

5    proposals recognize that.  And our final proposal

6    that was on the table, what we asked for, was a two

7    year guarantee of benefits in accordance with

8    Schedule B, so that these people, some of whom in two

9    years may be able to qualify for Social Security

10   disability, will know where they stand today and a

11   third year would be made available for payment of

12   benefits, if the estate at some point in the future,

13   basically probably in a year, the analysis would be

14   made and if the estate at that time had the $66

15   million available for general unsecured creditors,

16   then the retirees would get a third year.

17             We are willing to take into account the

18   condition of the estate.  Our proposal for the first

19   two years only would require the estate to pay $18

20   million.  Right now, according to their own analysis,

21   there is $125 million.  We want the money paid up

22   front.  If there is any group that Congress intended

23   to have money paid first it is to the retirees.  The

24   legislative history is replete with references that

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.        28
 2    says retirees stand at the head of the creditor line.
 3                  MR. ZIRINSKY:  Cite me to that section.
 4                  MR. CLAYMAN:  I said the legislative
 5    history.
 6                  In any event, the other factor here,
 7    the other factor that must be considered, and it is
 8    the overriding factor, it is not a matter of money,
 9    it is not a simple monetary equation, and you will
10    hear, I am sure, some evidence that's all that is
11    involved here, and the basic premise of that analysis
12    is that we should be lumped with all other general
13    unsecured creditors.
14                  That is not the intent of 1114.  1114
15    is infused with equitable considerations.  And as
16    you, Your Honor, have said in a case dealing with the
17    closure of a hospital, you said that equity has to be
18    tempered by mercy.  And that's what 1114 is about.
19    And it's not fair to the people out there and the
20    other 10,000 people out there to tell them that they
21    may have all of their benefits pulled at the end of
22    the day.  They deserve to know today where they
23    stand.
24                  Now, what are the equities?  First,
25    what we are talking about is preserving a three
```

1        IONOSPHERE/EASTERN AIR LINES, INC.        29

2   percent recovery, a three cent recovery for unsecured

3   creditors on claims that are more than two years old.

4   They have had adequate time to absorb that loss and

5   to adjust to it.

6            In fact, Congress stated -- excuse me,

7   Senator Metzenbaum, a principal architect of 1114

8   stated, "Courts should not lose sight of the fact

9   that retirees differ radically from other creditors

10  in their ability to absorb and cover their financial

11  losses."

12           The most effective use of that money, in

13  fact, the only effective use of that money is to at

14  least set aside today the amount of money that it

15  will take, $18 million for two years of coverage.

16           Now, I heard some reference to

17  bondholders are complaining.  They have reason to

18  complain.  They thought they were going to get one

19  hundred cents.  They thought they were going to get

20  fifty cents.  Then it was thirty cents; now they are

21  looking at less than three cents.

22           I dare say that I cannot believe, and I

23  am sure it's true of Boeing and United Technologies

24  and Rolls Royce and all the other major manufacturers

25  and trade creditors that they are not, they are not

IONOSPHERE/EASTERN AIR LINES, INC.                30

1    knocking down the door of the Creditors Committee or

2    Mr. Shugrue saying we want our three cents, the

3    retirees be damned.

4              I am sure that's not what they are

5    hearing in any of those letters that they have

6    received.  Because, by and large, people understand

7    what 1114 does.  They understand the purpose.  They

8    understand the precarious situation that retirees are

9    in.  And all our proposal does it gives them what

10   they deserve, which is just two years, with a

11   possibility for a third.

12             Now, in terms of equitable

13   considerations, Your Honor, I think you need to take

14   that into account in terms of what is being proposed

15   here today.  What are the equities?  Are the equities

16   that Mr. Shugrue is getting paid $50,000 a month so

17   that he can pay for his health insurance?  Is that

18   one of the equities?  Is one of the equities that Mr.

19   Gibson has a pending application for early

20   disbursement of his severance package and at the same

21   time two of them stand here today, or sit, urging you

22   to basically say you get five months and boom, you

23   may be out of luck at the end of the day?

24             Are the equities with the professional

25

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.        31
 2    fees being disbursed at a far greater rate than what
 3    we are asking for for retiree health benefits?  Are
 4    those the equities?
 5              I don't think so.  Are the equities
 6    that this case has been manned by two major law
 7    firms, are those the equities?  I don't think so,
 8    Your Honor.
 9              I think that what 1114 intended to do
10    is exactly what we are asking you to do today.  And
11    it is to provide them relief.  To give them the
12    security they deserve.
13              Now, I don't understand what the
14    purpose of their proposal is considering the risks
15    that would be endured by the people who deserve not
16    to endure any risks.  I would imagine it's greed.
17              We are only talking about three cents.
18    And I can't believe it's being vindictive in that
19    because other people have taken a ninety-seven cents
20    hit on each dollar that they are owed, and now it's
21    time come for retirees to suffer similarly.  But they
22    won't suffer similarly.  You cannot compare the harm
23    that was endured by other creditors to the harm that
24    will be endured by these retirees.
25              Your Honor, in the final analysis I
```

```
 1            IONOSPHERE/EASTERN AIR LINES, INC.           32

 2     think what is being asked of you today by the Trustee

 3     is that this is simply a matter of money.  It is not,

 4     Your Honor.  It is a matter of common decency.

 5                 MS. PILZER:  This is Penny Pilzer for

 6     the Transport Workers Union.

 7                 Your Honor, I come here knowing

 8     bankruptcy is about the process of breaking promises.

 9     Certainly, there have been a lot of promises broken

10     here.  But many of the creditors, most of the

11     creditors, even the bondholders knew that they were

12     taking a risk when they accepted a promise from

13     Eastern Air Lines.  The retirees did not.  This was a

14     company they worked all their lives for and when this

15     company came to them and said, "You give your life to

16     me and I am going to help you with your health

17     insurance when you need it, when you are older," they

18     didn't know that was a contingent promise.  They

19     didn't know that meant if I have the money; they

20     accepted it at face value.  Congress recognized this

21     special aspect of the retiree promise when it enacted

22     1114.

23                 Eastern came to us with a proposal for

24     permanent relief and then about ten minutes ago that

25     was all we had was a proposal for permanent relief.
```

IONOSPHERE/EASTERN AIR LINES, INC.                    33

1

2    We agree.  Permanent relief is what is called for

3    here.  One set sum that we can work with, to try to

4    get the best benefits we can to as many people as

5    possible for as long as we can.

6                    We have asked for an amount which will

7    not require the estate to go into Chapter 7.  We have

8    asked for an amount which is a tiny fraction of the

9    unsecured claim, if that is what we had.  We are

10   asking that that be paid to us as an administrative

11   claim, as 1114 calls for.  There is no risk to

12   Eastern.  They give us the money.  We will try to do

13   for our people as much as we can.

14                   We are accepting this with heavy hearts

15   after a lot of soul searching because what was

16   promised to these people was a lifetime of benefits,

17   not two lousy years.  We don't see we have any choice

18   in this circumstance.  What we are asking for is

19   fair.  What we are asking for is equitable.  What we

20   are asking for is to give these people whose security

21   has been badly shaken so that they can rely on for a

22   little while while they put their lives together and

23   make their plans.

24                   Thank you.

25                   MR. ZIRINSKY:  Your Honor, I would just

1

2    like to make one statement here because I think it's

3    important to put all of this in context.

4                     You know, this application is not

5    something that the Trustee relishes having to make.

6    As the Court is aware and as our friends here from

7    the IAM and the TWU are aware, the Trustee did this

8    as a last resort.  This case has been pending since

9    March of 1989.  Not one dollar, not one penny of

10   retiree benefit payments has been missed over that

11   entire period of time.

12                    Notwithstanding that over 30,000

13   Eastern employees have lost their jobs,

14   notwithstanding that Eastern has lost almost $2

15   billion in attempting to reorganize, and that

16   creditors of this estate have watched their

17   prospective returns go from one hundred cents plus

18   interest down to pennies.  Many of these creditors

19   are former Eastern employees of this company.

20                    Moreover, Your Honor, it's nice to be

21   able to come into Court and try to take the high

22   moral ground in a case like this.  Believe me, Your

23   Honor, neither I nor anyone else sitting at counsel

24   table with me relishes the thought of a single penny

25   of retiree benefits being lost.  But for her to say

1          IONOSPHERE/EASTERN AIR LINES, INC.          35

2     that they were promised and guaranteed this for life,

3     they had no expectation, and to completely misstate

4     the facts, it just can't go unanswered.

5               Your Honor, the benefit plans that we

6     are talking about here, including the ones for the

7     IAM and the ones for the flight attendants

8     represented by the TWU, have an expressed statement

9     in the plan.

10              I will quote:  "Because future

11    conditions affecting Eastern cannot be foreseen,

12    Eastern necessarily reserves the right to require

13    contributions to maintain coverage under the program

14    to change the benefits it provides and to otherwise

15    amend, suspend or discontinue the program subject to

16    the limitations of any of the applicable collective

17    bargaining agreements as permitted under the Railway

18    Labor Act or as otherwise permitted by the law."

19              MR. CLAYMAN:  Read the date of that

20    document.

21              MR. ZIRINSKY:  12/89.

22              MR. CLAYMAN:  Thank you, Bruce.

23              MR. ZIRINSKY:  Your Honor, this is not

24    something, this is not something where anyone's

25    legitimate arguments are going to be furthered by

IONOSPHERE/EASTERN AIR LINES, INC.                36

attempting to claim that they are better or more
moral or have higher values or have more social
compassion than the other side.

          The Trustee is a fiduciary.  The
Trustee is a fiduciary for many constituencies,
including the creditor body.  The Trustee has to
administer this estate, preserve the value of the
assets of the estate and distribute the assets in
accordance with the statute.  The Trustee is an
officer of this Court.  The Trustee is the one who
has to make the tough decisions.  The Trustee is the
one who has to look at the financial projections and
determine that if he continues to pay $3.6 million
per month in retiree benefits, Eastern's estate will
run out of cash, and will run out of ability to pay
other administrative expenses.  And that as a
consequence of that the Trustee will be forced, not
discretionarily, but forced under the statute to
recommend conversion to Chapter 7, because he won't
be able to satisfy the expenses of continuing the
Chapter 11 case, and at that point in time, not only
will other creditors suffer and lose whatever de
minimis return they may have of a potential of
receiving today, but the retirees, they may

```
 1          IONOSPHERE/EASTERN AIR LINES, INC.          37

 2    themselves will lose the wherewithal to receive any

 3    continued benefits.

 4                  For Mr. Clayman to come in here and

 5    suggest that we are going to scare people in December

 6    is just a blatant misrepresentation, Your Honor.  We

 7    have come here because we have a problem.  We have

 8    come here as Section 1114 says we must come here.

 9                  Section 1114 says that retiree benefits

10    are the subject of consideration by the Court based

11    upon the equities.  The equities are not just the

12    equities with respect to one particular constituency,

13    but to all of the constituencies.  And that is the

14    hard choice that has to be made.

15                  The fact is we have a Hobson's choice

16    here.  The Hobson's choice is if we continue as is or

17    if we accede to the proposals made by the two unions,

18    this will be axiomatic the estate will end up in

19    Chapter 7.  That is what their proposals bring with

20    them.

21                  The Trustee as a matter of law cannot

22    agree to those proposals.  It's not because the

23    Trustee doesn't desire to continue to pay retiree

24    benefits.  Mr. Shugrue has a long standing career in

25    this industry as one who has -- Your Honor, I would
```

IONOSPHERE/EASTERN AIR LINES, INC.                    38

1    ask the Court to admonish people in the audience from

2    laughter.

3

4                    Mr. Shugrue is here to do the best he

5    possibly can.  Whether it's Mr. Shugrue or anybody

6    else who is a representative, as an officer of this

7    Court, somebody has to make the hard choices, make

8    the hard decisions and has to make the

9    recommendations to this Court.  That's what this

10   hearing is about.

11                   It's a hearing about living within the

12   confines of a statute and doing what is equitable

13   within the confines of the statute.  And that's why

14   we are here.  And I resent, and I think the Court

15   should admonish parties in this case from attempting

16   to take unfair advantage of the arguments here and to

17   try to make themselves out to be better than the

18   other side, because that's not what this hearing is

19   all about.  What this hearing is about, Your Honor,

20   is a tough problem, which requires a tough decision

21   and that's what we are here for.

22                   Thank you.

23                   MR. CLAYMAN:  Your Honor --

24                   THE COURT:  Mr. Clayman, I am going to

25   let other people have their say and then we are going

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          39
 2     to go forward with the hearing.
 3                    MR. HARRIS:  Your Honor, just briefly,
 4     Adam Harris on behalf of the Creditors Committee.
 5                    Your Honor, in the first instance the
 6     committee fully supports the agreement that's been
 7     reached between the Trustee and Mr. Bell on behalf of
 8     the retired Eastern pilots and the noncontract
 9     retirees which is going to provide the estate with
10     interim relief while continuing retiree benefits at a
11     reduced level through December 31st of this year.
12                    During the period we hope to resolve
13     what are some very complex legal issues and to know
14     much better where this estate is going to be and in
15     full recognition of the fact that retirees, for
16     better or worse, rely on the financial condition of
17     the estate to make the payments.
18                    The financial condition of this estate,
19     Your Honor, as you are well aware, is not good.  In
20     fact it's pretty bad.  And for us to carve out of
21     what remains for a small group of creditors, as
22     entitled as Mr. Clayman may say they are, to give
23     them what is essentially twenty-seven percent of what
24     may be available distribution to unsecured creditors,
25     when they hold approximately seven percent of the
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.        40
 2    claims is inequitable.  It's inequitable to other
 3    people, maybe not the Airbuses or the Boeings or the
 4    Rolls Royces of the world, who by the way in this
 5    case because of their contractual subordination
 6    provisions, will get nothing, maybe not to the
 7    bondholders who also will get nothing in this case,
 8    but there are hundreds, probably thousands of other
 9    creditors out there, the employees, the PBGC, to the
10    extent of over $500 million, who is in this case and
11    is obligated to pay pensions to people formerly
12    employed by Eastern, and for every dollar that they
13    don't get out there it's coming out of the pocket of
14    everybody sitting in this room through increased
15    taxes.  Not that that is going to concern Mr. Clayman
16    today, Your Honor.
17              But the fact of the matter is the
18    equities are not all on his side today.  The fact of
19    the matter is that there is a very valid legal
20    argument, we believe, that Congress never intended
21    for Section 1114 to apply to liquidating Chapter 11
22    Debtors at all, and that there is no continuing
23    obligation of this estate to pay one more nickel of
24    retiree benefit payments.
25              The committees as has supported the
```

1           IONOSPHERE/EASTERN AIR LINES, INC.          41

2     Trustee in making a proposal to the IAM and TWU

3     retirees, which will have provided them with one year

4     of guaranteed benefits, twelve full months from now,

5     with an additional two years based on what happens to

6     this estate in the future.

7                    We guaranteed them twelve months, Your

8     Honor.  But that wasn't enough for them.  They said,

9     "We want more.  We want more than every other

10    creditor is going to get in this case.  We wanted

11    more than our percentages would otherwise entitle us

12    to.  We believe we have all the equities."  I submit,

13    Your Honor, they don't have all the equities.

14                    This case has been going on now for

15    well over two years.  Creditors who have gotten

16    nothing in this case since the day it filed have been

17    waiting for payment, and Mr. Clayman can't stand up

18    here today and say the people who lost their jobs are

19    on unemployment and have claims against this estate

20    aren't going to care about getting their three cents.

21                    I at one point suggested to Mr. Clayman

22    if he wanted to move all the money over to the

23    retirees he should file a plan that allowed him to do

24    that and put it out to a creditors' vote.  He hasn't

25    chosen to do that, Your Honor.  He has chosen to come

IONOSPHERE/EASTERN AIR LINES, INC.                    42

1

2   into this forum and ask Your Honor to say, "Other

3   creditors, your three cent recovery doesn't mean

4   anything to you, instead you should get a penny.  My

5   Guys are entitled to more."

6                   Your Honor, that's not fair and

7   equitable.  That's not what the statute contemplates.

8   If it applies at all in this case, and I propose to

9   make argument on that as a preliminary matter for

10  Your Honor's consideration today, because I think it

11  may actually resolve the issue that is before us, in

12  which case we would never get to the equities.

13                  I submit for Mr. Clayman that there is

14  specific legislative history which says, "We are not

15  here," this is Representative Fish saying, "We are

16  not here protecting retirees in liquidations, we are

17  only providing protection for retirees in

18  reorganization cases," Your Honor.  This is not a

19  reorganization.  By any stretch of the imagination it

20  is not not a reorganization.

21                  In fact, Mr. Clayman makes the best

22  argument of all as to why 1114 should not apply to

23  liquidating Debtors.  He says you can never get

24  relief under 1114 if you are a liquidating Debtor

25  because you can't meet the standard, you can't meet

```
 1            IONOSPHERE/EASTERN AIR LINES, INC.            43
 2    the standard that says it is necessary to permit the
 3    reorganization of the Debtor.
 4                 If you can never meet the standard, you
 5    can never get the relief and you are thrown into the
 6    black hole of conversion.  That's not what Congress
 7    intends, Your Honor.  And based on that I think this
 8    hearing should go forward and I am prepared to make
 9    argument on the issue of whether 1114 was ever
10    intended by Congress to apply to a situation that is
11    now before the Court.
12                 Thank you.
13                 THE COURT:  Anyone else?
14                 MR. SHAPIRO:  Yes, Your Honor.
15                 THE COURT:  All right.
16                 MR. SHAPIRO:  People have been talking
17    about the legislative history says this, the
18    legislative history says that.  Nobody has spoken yet
19    about what the statute specifically provides, and I
20    would like to call Your Honor's attention to 1114(h),
21    which I will try to read in the small print despite
22    the fact I don't have my glasses.
23                 It says, and I quote, "(h)(1).  Prior
24    to a Court issuing a Final Order under Subsection (g)
25    of this section," that's the one for permanent
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.        44
 2    relief, "if essential to the continuation of the
 3    Debtor's business or in order to avoid irreparable
 4    damage to the estate the Court after notice and a
 5    hearing may authorize the Trustee to implement
 6    interim modifications in retiree benefits.
 7                   "(2).  Any hearing under this
 8    subsection shall be scheduled in accordance with the
 9    needs of the Trustee."
10                   And finally "(3). The implementation of
11    such interim changes does not render the motion for
12    modification moot."
13                   That subsection is the issue that the
14    Trustee has put squarely before the Court.  And if
15    there is anything that can be read out of this
16    language, it is clear that for all practical purposes
17    it's not really the Trustee's decision or the
18    arguments on behalf of the unions or Mr. Bell's
19    agreement, it's you, the buck, Your Honor, actually
20    stops with you, as it almost always does in cases of
21    this kind.
22                   Under this statute what I read here is
23    that you have got to balance the needs of the estate
24    as against a lifeline, a lifeline to these retirees.
25                   It doesn't help you any in making that
```

1              IONOSPHERE/EASTERN AIR LINES, INC.              45

2     balance to have an argument that says they, the

3     retirees, need to know today.  That doesn't help you

4     in how you make that balance.  And it doesn't help

5     you in terms of making that balance to hear a legal

6     argument on the question of about whether or not 1114

7     even applies in a liquidating reorganization.

8                   What you have before you is a difficult

9     balancing act.  And basically, that's what this

10    hearing should be directed to.  You have to balance

11    the equities, sure.

12                  The only point I want to make about the

13    question of interim relief, it wasn't raised for the

14    first time until ten minutes ago.  The whole question

15    of interim relief was put on the table a long, long

16    time ago, it's been discussed off and on for months

17    and it was squarely on the table, clearly, Monday

18    morning.

19                  So the suggestion that it's a brand new

20    notion or nobody has ever thought about it before or

21    it just come in out of the blue is clearly incorrect.

22                  THE COURT:  I am not going to hear any

23    more position statements.  It's very clear I didn't

24    interrupt anybody here, even though it's obvious that

25    many of the statements that are made here are made in

1      IONOSPHERE/EASTERN AIR LINES, INC.          46

2      justification of positions taken by the parties in

3      connection with attempting to negotiate some kind of

4      resolution.  And I don't denigrate those arguments,

5      but they are position arguments, they are valid, they

6      have merit and it is unfortunate that with respect to

7      approximately forty percent of the retirees that are

8      at issue that there has not been any kind of an

9      agreement on a temporary basis.

10                  I understand Mr. Clayman's argument

11     that there is a high desirability to come to a lump

12     sum settlement at a particular amount.  He may be

13     correct.  There are other parties who don't

14     necessarily disagree, but have equally valid

15     arguments as to why the particular sum that's being

16     requested is inappropriate.

17                  We are here essentially under 1114(h),

18     which does indeed require a balancing of needs as

19     against lifeline that has to be thrown out with an

20     understanding that nothing precludes the parties from

21     reaching an agreement during this interim period.

22                  It is clear that the Court is not in a

23     position, given both the state of the law, the issues

24     that are before me that have not been construed to

25     any great degree by any other Courts, this is a new

1        IONOSPHERE/EASTERN AIR LINES, INC.        47

2    section, that there is against this backdrop the

3    specter of a potential of a Chapter 7 conversion,

4    which is, to one degree or another, a shadow.

5             There are limited funds and competing

6    interests to those funds.  There has been

7    unfortunately with respect to one portion of the

8    retiree group an inability to reach a compromise on a

9    temporary basis or on a permanent basis.  This matter

10   is not ripe for a permanent 1114 solution.

11            In fact, the issues of law and in fact

12   will be played out in connection with the anticipated

13   litigation with Mr. Bell's committee.  The Debtor

14   has, to the extent that it can commit, indicated that

15   it will not be party to a motion to convert to

16   Chapter 7 based upon the need to pay retirees; that

17   would apply no matter what I would do under 1114(h).

18            I don't think you need be concerned,

19   Mr. Clayman, that if there is any interim relief

20   accorded that your constituency would be treated any

21   differently than Mr. Bell's constituency in that

22   regard.

23            This Court will, whatever the outcome,

24   impose what amounts to, perhaps even under 105 what

25   amounts to a, perhaps, recognition of an

```
 1            IONOSPHERE/EASTERN AIR LINES, INC.        48

 2    administration claim based upon the outcome of an

 3    1114(h) motion.

 4              Under the circumstances and since your

 5    group or that grouping has not been able to reach an

 6    accommodation with respect to a lump sum or permanent

 7    solution at this point in time, I urge, because I am

 8    going forward under 1114(h), that in the interim

 9    period that negotiations continue to see if there can

10    be some accommodation reached among all of the

11    competing interests here in that regard.

12              But I do recognize there are retirees

13    in dire straits that need a lifeline, at least as of

14    today.  Since I do not see the possibility of a

15    permanent solution today, we will go forward under

16    1114(h).

17              MR. HARRIS:  Your Honor, I would just

18    like to note for the record in light of the change,

19    procedural posture of the hearing today, and it's not

20    one for permanent relief, the committee would like to

21    reserve its ability to argue at the hearing for

22    permanent relief that 1114 is not applicable and was

23    never intended by Congress to be applicable to

24    liquidating Chapter 11 cases.

25              THE COURT:  I don't think the committee
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          49

 2   has to continuely restate the position that everybody

 3   is taking here, that there are divergent views as to

 4   applicability of 1114, and that even if this Court

 5   goes forward under 1114(h), it is going forward

 6   because a motion under 1114 has been placed on the

 7   Court's plate.  And I haven't made any determination,

 8   one way or the other, as to the applicability of

 9   1114.  That's one of the risks that Mr. Bell, for

10   example, is taking.  All parties' rights are

11   preserved in that regard.

12              MR. ZIRINSKY:  Your Honor, I will call

13   Martin Shugrue to the stand at this time.

14              THE COURT:  Would you approach the

15   bench, gentlemen.

16              (Discussion off the record.)

17              THE COURT:  We will take a thirty

18   minute recess.

19              (Whereupon, at this point in the

20         proceedings there was a recess, after which

21         the proceedings continued as follows:)

22

23

24

25
```

```
 1            IONOSPHERE/EASTERN AIR LINES, INC.          50

 2

 3    M A R T I N    R.   S H U G R U E,   JR.,    called

 4            as a witness, having been first duly sworn by

 5            the Notary Public, was examined and testified

 6            as follows:

 7

 8    EXAMINATION BY THE COURT:

 9

10            Q.    What is you name?

11            A.    Martin R. Shugrue, Jr.

12

13    DIRECT EXAMINATION BY MR. ZIRINSKY:

14

15            Q.    Mr. Shugrue, would you state your

16    address, please.

17            A.    Eastern Air Lines, Miami International

18    Airport, Miami, Florida.

19            Q.    Mr. Shugrue, you are the Trustee of

20    Eastern Air Lines; is that correct?

21            A.    Yes, I am.

22            Q.    Do you recall when you were appointed

23    as Trustee for Eastern?

24            A.    April 19th of last year.

25            Q.    What is the current status of Eastern's
```

1            IONOSPHERE/EASTERN AIR LINES, INC.          51

2       operations?

3            A.       Eastern is -- has shut down its

4       operations and is liquidating its estate.

5            Q.       Did that shutdown occur on or about

6       January 19th of this year?

7            A.       Yes, it did.

8            Q.       Mr. Shugrue, at what stage is the

9       liquidation of Eastern's assets at this time?

10           A.       We are in the process of liquidating

11      the estate and selling assets.  We are about, in

12      percentage terms, about sixty percent through the

13      process.

14           Q.       In terms of estimated values to be

15      received from assets that are yet unsold, what is the

16      approximate amount of that?

17           A.       Approximately $380 million.

18           Q.       Mr. Shugrue, have you or have people at

19      Eastern, under your supervision, prepared any

20      estimates as to what the ultimate net proceeds from

21      the liquidation will be after recovery of all

22      administrative expenses and all priority claims under

23      the bankruptcy --

24           A.       Yes, we have.

25           Q.       What is that amount?

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          52

 2         A.       About $66.5 million.

 3         Q.       When was that estimate prepared?

 4         A.       That estimate is current as at 31 March

 5    this year.

 6         Q.       Mr. Shugrue, did that estimate make any

 7    assumptions as to when retiree benefits payable by

 8    Eastern Air Lines would cease to be made?

 9         A.       That estimate assumed that the $3.6

10    million per month payout to cover retiree health care

11    stop in June.

12         Q.       On or about June 15th?

13         A.       On or about June 15th.

14         Q.       You said that's about $3.6 million a

15    month?

16         A.       That's correct.

17         Q.       If Eastern were required to continue to

18    pay $3.6 million a month through the end of the year,

19    what effect would that have, if any, on the

20    approximate $66 million of net recovery?

21         A.       It would reduce it by almost half.

22         Q.       Maybe you could go through the

23    computation of 3.6 for seven months.

24         A.       Seven times time three --

25                  MR. CLAYMAN:  I object to the question.
```

IONOSPHERE/EASTERN AIR LINES, INC.            53

The standard here is irreparable harm.  The standard

is not whether or not it is going to potentially

reduce the recovery to unsecured creditors, Your

Honor.  Under 1114(h) there is no relevance to this

question.  The issue here is not what unsecured

creditors are going to get at the end of the day.

It's immediate irreparable harm to the estate.

                    THE COURT:  Erosion of assets and

buildup of liabilities is a component of irreparable

harm.  If that is an objection, overruled.

        A.      If my mental math is correct, it is

$22.5 million.

        Q.      That would be the $3.6 million a month

for another seven months?

        A.      Yes.

        Q.      What would that do to the $66 million?

        A.      That would come right off the top of

the $66.5 million that we have estimated would be

available to pay general unsecured creditors.

        Q.      If that were the case, it would be

approximately $40 million of net value?

        A.      Approximately 40 million left, yes.

        Q.      Mr. Shugrue, what would happen to that

$40 million if Eastern were to miss its projections

IONOSPHERE/EASTERN AIR LINES, INC.                54

2   of asset sales by ten percent?

3          A.      It would be zero.

4          Q.      Mr. Shugrue, do you believe there is

5   any risk that Eastern will not achieve the full

6   amount of its projected asset sales?

7          A.      Yes, there is some risk of that.

8          Q.      Could you explain that, please.

9          A.      Well, that $66.5 million estimate or

10  projection results from a series of projections;

11  contained in the projections are rational assumptions

12  having to do with what we can sell assets for --

13         Q.      Let me be a little bit more specific.

14  What is the current state of the marketplace for

15  airline assets today as compared to say a year ago?

16         A.      The current market today for airline

17  assets is very marginal.  The industry is in turmoil

18  and we are in a recession.

19         Q.      Is it fair to say that Eastern has thus

20  far not sold assets as quickly as it had originally

21  projected back in January that it would?

22                 MR. CLAYMAN:  Objection.

23                 I understand your first ruling.  I want

24  to make it clear I have a continuing objection to

25  this line of questioning.

1            IONOSPHERE/EASTERN AIR LINES, INC.            55

2                    THE COURT:  It is understood.

3                    THE WITNESS:  Repeat the question.

4                    MR. ZIRINSKY:  Please read back the

5      question.

6                    (The question requested was read back

7            by the reporter.)

8            A.     Yes, it is.

9            Q.     In addition to asset sales or projected

10     asset sales, Mr. Shugrue, does the estimate as to the

11     net result of $66 million make certain assumptions

12     about what the administrative liabilities of the

13     estate would be?

14           A.     Yes, it does.

15           Q.     Are all of those liabilities fixed or

16     were you required to make certain estimates with

17     respect to any of those administrative expenses?

18           A.     Some are fixed and a number of them are

19     estimates of what they are going to be.

20           Q.     Could you describe certain of the

21     amounts that you had to estimate?

22           A.     Such as various litigation against the

23     estate.  In particular, we have two pieces of labor

24     litigation against Eastern having to do with --

25     brought by ALPA, the Air Line Pilots Association,

14

1        IONOSPHERE/EASTERN AIR LINES, INC.        56

2    having to do with pay parity dispute, and another

3    major litigation brought by the same union having to

4    do with displacement workers' rights.

5            Q.    What estimates have you made as to the

6    potential liability of those amounts in the $66

7    million analysis?

8            A.    We have estimated the liability on

9    those two suits to be a little over $20 million.

10           Q.    How much is actually claimed in those

11   suits by ALPA?

12           A.    $90 million.

13           Q.    So it's a $70 million difference right

14   there?

15           A.    That's correct.

16           Q.    Mr. Shugrue, if you were required to

17   continue to pay retiree benefits at the current rate

18   and if you are half wrong in your estimate on ALPA's

19   liability, what would the result be to the estate?

20           A.    You would be insolvent.  You would be

21   forced into Chapter 7.

22           Q.    Mr. Shugrue, in addition to

23   administrative expenses or estimated administrative

24   expenses of the estate, there are also certain other

25   priority claims such as taxes and employee type

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.            57
 2      claims; is that correct?
 3              A.      That is correct.
 4              Q.      What is the amount, approximately, of
 5      those claims?
 6              A.      That's about -- around $53.5 million
 7      dollars.
 8              Q.      Is it your understanding, Mr. Shugrue,
 9      under any plan of liquidation those priority claims
10      would have to be paid in full?
11              A.      Yes, they have to be paid in full.
12              Q.      In order to confirm a plan?
13              A.      That's correct.
14              Q.      Mr. Shugrue, do you have any
15      understanding as to what your obligations are in the
16      event you were to determine that you would be unable
17      to confirm a liquidating plan under Chapter 11?
18              A.      I would be obligated as a fiduciary to
19      acknowledge that and take the appropriate action.  In
20      this case is to convert the case to Chapter 7.
21              Q.      Mr. Shugrue, in the event the case were
22      converted to Chapter 7, do you have any information
23      or views as to what impact that would have on the
24      asset valuation of Eastern's estate?
25                      MR. CLAYMAN:  I object to the question.
```

1        IONOSPHERE/EASTERN AIR LINES, INC.        58

2   There is no foundation laid as to his experience in a

3   Chapter 7 proceeding, Your Honor.  He has never been

4   a Trustee in a Chapter 7 proceeding, as far as we

5   know he has never been involved in a Chapter 7

6   proceeding.  I don't think any foundation has been

7   laid as to his expertise with regard to that kind of

8   procedure.

9            THE COURT:  To the extent there are

10  similarities in the liquidating 11 to a liquidating

11  Chapter 7 he would be competent to testify in those

12  areas.

13        A.     Asset values would deteriorate as a

14  result of a Chapter 7 filing, in my judgment.

15        Q.     Do you think it would be more difficult

16  to sell assets under those circumstances?

17        A.     It would be more difficult to sell

18  assets under those circumstances.

19        Q.     Do you believe there would be more of a

20  time constraint, more time pressure to sell assets

21  more quickly?

22        A.     Yes.

23        Q.     Would that have a depressing effect on

24  the price?

25        A.     Yes.

1           IONOSPHERE/EASTERN AIR LINES, INC.           59

2           Q.     Mr. Shugrue, do you have any

3   understanding as to what additional expenses might be

4   attendant to a Chapter 7 liquidation?

5           A.     My understanding --

6                  MR. CLAYMAN:  My continuing objection

7   to this line of questioning as well.

8           A.     My understanding is that there are

9   additional expenses incurred with a Chapter 7 filing,

10  and on an administrative claim basis the appointment

11  of a liquidating Trustee, liquidating Trustee's

12  professionals, accountants, et cetera.

13          Q.     Mr. Shugrue, does Eastern presently

14  have pending for approval by the Department of

15  Transportation sales of foreign routes to other

16  carriers?

17          A.     Yes, we do.

18          Q.     Do you have any understanding as to

19  what impact the conversion of this case to Chapter 7

20  might have on the ability to obtain such approval?

21          A.     I think it would have a negative impact

22  on our ability to obtain such approval.

23          Q.     Do you have any information to that

24  effect?

25          A.     We have had informal conversations with

IONOSPHERE/EASTERN AIR LINES, INC.                    60

various people in the Department of Transportation
and among ourselves as to the effect of a Chapter 7
liquidation status would have on our ability to sell
what we call perishable assets, in this case a route
is a perishable asset, and we have concluded upon
information and advice that our ability to sell that
asset and realize money for it would be jeopardized.

        Q.     What is the projected amount of cash to
be received, assuming those sales are approved and go
forth?

        A.     That's approximately $25 million.

        Q.     Mr. Shugrue, does Eastern presently
retain certain certificates or approvals from the FAA
or other governmental agencies concerning its ability
to conduct engine repair and maintenance operations?

        A.     Yes.

        Q.     And other similar type operations?

        A.     Yes, we do.

        Q.     Has Eastern been in fact conducting
such operations since the shutdown in January?

        A.     Yes, we have.  We continue to overhaul
engines and continue to do airframe work on airplanes
on behalf of lease holders, for which we are being
paid, as well as ferry aircraft to various locations

IONOSPHERE/EASTERN AIR LINES, INC.                61

around the country or where a purchaser would like to

see them arrive.

Q.      Are those continual operations

providing any net benefit to Eastern's estate?

A.      Yes, there are significant net benefits

to the estate.

Q.      Do you have an understanding as to

whether or not Eastern would be permitted to continue

those types of services and continue to have the

necessary permits and approvals in the event the case

were converted to a Chapter 7?

A.      Again, upon information and belief, as

a result of our own studies and conversations with

respect to those matters, we think a Chapter 7

conversion would jeopardize those certificates.

Q.      Approximately how many employees are

currently working at Eastern Air Lines?

A.      Approximately 1,600 at the moment.

Q.      How many are involved in the engine

repair and maintenance operation?

A.      About half that number.  A little more

than half that number.

Q.      Does that include machinists?

A.      Yes.

1

2       Q.      Mr. Shugrue, if Eastern were converted

3    to a Chapter 7, if the case were converted to a

4    Chapter 7, do you have any understanding as to how

5    many of the approximate 1,600 remaining employees

6    would lose their jobs?

7       A.      At least half would join the

8    unemployment rolls.

9       Q.      Immediately?

10       A.      Immediately.

11              MR. CLAYMAN:   There has been no

12    foundation laid as to that point.  There has been one

13    opinion after another as to consequences in a 7, and

14    no foundation is laid as to why in a 7 there would

15    have to be accelerated sales, why in a 7 there would

16    be a loss of jobs.  This is all pure conjecture on

17    Mr. Shugrue's part, and I would object to the

18    questions and that the answers have no foundation at

19    all.

20              MR. ZIRINSKY:   Your Honor, I think Mr.

21    Shugrue is testifying as someone who has been the

22    Trustee for this estate over a year and been involved

23    in the liquidation process since January and been

24    involved in the necessary arrangements with various

25    governmental agencies.

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          63

 2                    I think he is perfectly competent to

 3       testify.

 4                    MR. CLAYMAN:  Your Honor, he is not a

 5       bankruptcy mavin.

 6                    THE COURT:  He is a hands on

 7       liquidating expert in the context of liquidating this

 8       airline.  He does have that degree of expertise to be

 9       able to testify.  There is sufficient foundation.

10                    He is in a better position to know what

11       employees would be necessary to keep on and what

12       employees would have to be discharged in the event of

13       a Chapter 7.  Your objection is overruled.

14            Q.     By the way, Mr. Shugrue, how many years

15       have you been involved in the airline industry?

16            A.     Twenty-three.

17            Q.     In what capacities?

18            A.     As Trustee, as President of essentially

19       domestic airlines, as Vice Chairman and Chief

20       Operating Officer of an essentially international

21       airline, as --

22            Q.     That would be Pan Am?

23            A.     Pan Am.  The prior one would be

24       Continental.  As Senior VP of marketing of Pan Am,

25       Vice President of labor relations of Pan Am, Senior
```

IONOSPHERE/EASTERN AIR LINES, INC.                64

1  
2   Vice President of administration of Pan Am, which

3   included responsibilities for property and

4   facilities, corporate real estate, security, as well

5   as personnel and labor relations.

6          Q.     Over the course of your years of

7   experience in the airline industry, have you had

8   occasion prior to your appointment as Trustee here,

9   have you had occasion to be involved in the purchase

10  and sale or the negotiation for the purchase and sale

11  of airline assets?

12         A.     Yes, I have.

13         Q.     Mr. Shugrue, the interim agreement that

14  was reached earlier today with Mr. Bell's group, that

15  calls for payments of up to $1.7 million or sixty

16  percent of that amount, approximately, between now

17  and the end of the year; is that correct?

18         A.     That's correct.

19         Q.     Mr. Shugrue, if that same formulation

20  were made applicable to the other retiree groups

21  represented by the IAM and TWU, have you made an

22  estimate as to what the total cash outlay to Eastern

23  would be?

24         A.     It would be approximately $13 million,

25  if I do my mental arithmetic correct again.  Capped

```
1              IONOSPHERE/EASTERN AIR LINES, INC.          65

2    at $1.7 million per month for six months, with June

3    being at full rates, so it's $1.7 million times six

4    plus 3.6.

5              Q.     Would it would be approximately, give

6    or take, about half of what your current requirements

7    are; is that correct?

8              A.     Just about, yes.

9              Q.     Mr. Shugrue, based upon those cash

10   outlays and based upon your current estimates of

11   Eastern's financial condition, do you believe that

12   Eastern can afford to make those payments without

13   being in substantial jeopardy of having to convert

14   the case to Chapter 7?

15             A.     Yes, I do.

16             Q.     Do you believe, Mr. Shugrue, that the

17   reduction that you are proposing is absolutely

18   essential to avoid the necessity for possibly

19   converting this case to a Chapter 7 before the end of

20   the year?

21             A.     Yes, I do.

22             MR. CLAYMAN:   I object to the question.

23   Again, these are incredibly leading questions.   I

24   think they are calling for yes or no responses when

25   this is the heart of the matter and Mr. Shugrue does
```

1
2    have to answer.

3                Obviously, these are conclusionary

4    questions or basically calling for legal conclusions,

5    and again there is absolutely no foundation laid as

6    to why he believes that this amount of money is going

7    to lead to administative insolvency or a Chapter 7.

16

8                It's purely opinion without any

9    foundation and they are leading questions.  I have a

10   multiple objection on those questions.

11               MR. ZIRINSKY:  I simply disagree.  We

12   asked the Trustee to express his best judgment to the

13   Court.

14               THE COURT:  It's clear that Mr. Shugrue

15   is uniquely posited to testify with respect to the

16   condition of the estate, the impact of the variables

17   that he is dealing with at this point in time, and to

18   the degree that you challenge his expertise in this

19   regard or ability to testify as an expert, he

20   certainly qualifies under 701, but he also qualifies

21   under 702.

22               I think that you might make that

23   objection more forcefully if the Trustee were perhaps

24   a lawyer or an accountant or some functionary that

25   gets appointed in some of these cases who has had

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          67

 2    absolutely no background or experience in the matters

 3    that are at issue here.  Your objection is overruled.

 4              MR. ZIRINSKY:  I have no further --

 5         Q.    I believe you answered?

 6         A.    I answered yes.

 7              MR. ZIRINSKY:  I have no further

 8    questions at this time.

 9

10    CROSS-EXAMINATION BY MR. HARRIS:

11

12         Q.    Mr. Shugrue, I believe your counsel

13    stated earlier in opening statements that you

14    recognized that you are a fiduciary for not only the

15    retirees but also the creditors and all other parties

16    in interest in this case?

17         A.    That is correct.

18         Q.    You recognize that you in fact are a

19    fiduciary for all those parties?

20         A.    Yes, I do.

21         Q.    Mr. Shugrue, at any time prior to

22    today's hearing, have you ever had conversations with

23    members of the Creditors Committee or their

24    representatives regarding retiree benefits?

25         A.    Yes, I have.
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          68
 2         Q.      And the continuing payment of those
 3    benefits?
 4         A.      Yes, I have.
 5         Q.      At the established levels as they exist
 6    today?
 7         A.      Yes, I have.
 8         Q.      Mr. Shugrue, isn't it a fact that the
 9    Creditors Committee advised you earlier on that in
10    the event retiree benefits were not modified that
11    they would seek to convert this case to a Chapter 7?
12         A.      Yes, the Creditors Committee has
13    advised me forcefully of that.
14         Q.      Isn't it a fact that the Creditors
15    Committee said to you that in the event of the
16    continued payment of retiree benefits at these levels
17    they considered it to constitute irreparable injury
18    to the estate?
19         A.      Yes, I have.
20              MR. HARRIS:  No further questions.
21
22    CROSS-EXAMINATION BY MR. CLAYMAN:
23
24         Q.      Mr. Shugrue, I take it that this
25    projection of $125 million being available for
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          69
 2     distribution to priority unsecured creditors and
 3     general unsecured creditors is your present best
 4     estimate of what will be available at the end of the
 5     day?
 6              A.      Yes, it is.
 7              Q.      It could go down?
 8              A.      Yes.
 9              Q.      And it could go up?
10              A.      Yes, it could.
11              Q.      In fact, it may go up considerably,
12     isn't that true?
13              A.      It's possible.
14              Q.      In fact, it may go up in one felled
15     swoop if you are able to get rid of one past
16     liability of $110 million?
17              A.      That's an assumption one can make.
18              Q.      As you can make an assumption you may
19     lose money, you may gain money by the time this
20     process ends?
21              A.      That's correct.
22              Q.      How long do you anticipate this process
23     to last?
24              A.      We stated earlier we would like to
25     bring this case to closure in its present form at the
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          70

 2    end of the year.

 3              Q.    At the end of the year?

 4              A.    Yes.

 5              Q.    You are not, in the course of your

 6    fiduciary duties you are not controlled in any way by

 7    the Creditors Committee?

 8              A.    You may have learned I am not

 9    controlled by anybody.

10              Q.    I would agree with that.

11                    You have your own fiduciary

12    responsibilities under the Bankruptcy Code which you

13    have to satisfy independent of what you are told by

14    anyone else?

15              A.    That is correct.

16              Q.    What are your present cash balances,

17    Mr. Shugrue?

18              A.    Approximate cash balances in the total

19    estate at the moment is approximately $220 million.

20              Q.    You have $220 million available for

21    distribution or is it in an escrow, if you know?

22              A.    It's both in escrow funds and certain

23    amount of working capital is within the company.

24              Q.    So you are not allowed to touch that

25    money unless you have a Court Order that enables you
```

IONOSPHERE/EASTERN AIR LINES, INC.                    71

2    to make a withdrawal from that fund; is that correct?

3          A.      That is correct.

4          Q.      Isn't it true that you have more than

5    sufficient funds to meet the estate's obligations

6    during the liquidation process?

7          A.      At the moment, yes, if our relief is

8    granted we do.

9          Q.      You are saying that the difference

10   between having more than sufficient funds and having

11   insufficient funds is through the liquidation

12   process, which is now you have described it as six

13   months, is a total of approximately $1.9 million per

14   month; is that what you are telling the Court?

15         A.      I am telling the Court that absent

16   relief and running the risk of either having

17   administrative expenses coming in higher than

18   projected or realizing assets of asset sales lower

19   than projected, would render this estate

20   adminstratively insolvent.

21         Q.      I understand that in the long term that

22   is a projection which may go up and may go down?

23         A.      That is correct.

24         Q.      For the immediate present here that you

25   are looking at on a month by month basis, looking at

1          IONOSPHERE/EASTERN AIR LINES, INC.          72

2    that with regard to the irreparable harm that you

3    testified would exist, you have more than sufficient

4    funds to get through the liquidation process, the

5    interim relief that you have requested would save the

6    estate how much on a monthly basis, if it were

7    applied to everyone?

8          A.     It would save the estate -- let's see.

9    Approximately $1.9 million per month would be saved.

10         Q.     $1.9 million per month.  That is the

11   margin between irreparable harm and not irreparable

12   harm on an ongoing basis?

13         A.     When you are looking at a possible

14   distribution to general unsecured creditors at $66.5

15   million, that is a substantial amount of money.  And

16   I might add that that is the cushion between us, the

17   estate, and administrative insolvency.

18         Q.     What is the cushion?

19         A.     $66.5 million.

20         Q.     I understand.

21         A.     And you want to erode the cushion by a

22   third or so.  I don't think that's prudent.

23         Q.     Not a third.

24         A.     Or so.

25         Q.     We are talking about the difference

```
 1            IONOSPHERE/EASTERN AIR LINES, INC.          73
 2    over that six-month period at $1.9 million a month is
 3    approximately $12 million.
 4            A.      Okay.
 5            Q.      So you are saying it would erode it by
 6    about $2 million.
 7            A.      To erode that rather limited cushion in
 8    my judgment is not prudent.
 9            Q.      You have taken every measure to cut
10    corners and to save the estate every last dollar so
11    that you can avoid administrative insolvency, avoid
12    Chapter 7 and maintain as great a recovery as
13    possible for unsecured creditors; is that correct?
14            A.      That's correct.
15            Q.      Isn't it true, Mr. Shugrue, that you
16    made an application to this Court, which you
17    personally signed, asking to increase your
18    compensation from $35,000 a month to $50,000 a month
19    retroactive to your date of appointment; is that not
20    true?
21            A.      It's a matter of record.
22            Q.      And you then got, I take it, a lump sum
23    payment somewhere in the neighborhood of about
24    $115,000?
25            A.      I will take your math.
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.        74
 2         Q.      Part of that application, in fact, the
 3    principal components of that application was how good
 4    a job you had done and how good a job you would be
 5    doing in the future; is that not true?
 6              MR. ZIRINSKY:  Objection.  The
 7    application speaks for itself.
 8              THE COURT:  I will let him answer.
 9         A.      Would you repeat the question?
10         Q.      That application was based upon your
11    job performance and what you anticipated would happen
12    with regard to the estate?
13         A.      Yes.
14         Q.      You anticipated at that point in time,
15    on December 20th when the application was filed, was
16    that by the end of the first quarter you would be
17    cash neutral; is that correct?
18         A.      That is correct.
19         Q.      Instead three weeks later you commenced
20    liquidation of the estate?
21         A.      That's correct.
22         Q.      I take it, Mr. Shugrue, you have not
23    come back to this Court, having failed in your main
24    mission of reorganization, to seek a modification
25    back to the level of $35,000 a month, have you?
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.            75

 2         A.     No, I have not.

 3         Q.     Now, Mr. Shugrue, as part of your

 4   liquidation analysis in arriving at this cushion of

 5   what you call $66 million could go up, as part of

 6   that analysis do you also take into account the

 7   amount of money that may be disbursed under 326(a)

 8   for your final compensation?

 9         A.     No.

10         Q.     That is not rolled in there?

11         A.     No.

12         Q.     So you have not made an application for

13   that at all?

14         A.     No, not an application.

15         Q.     You have not made a projection as to

16   what you would be entitled to at the end of the day?

17         A.     No, I have not.

18         Q.     Do you anticipate making an application

19   under 326(a)?

20         A.     I am required to at some point.

21         Q.     You can ask up to three percent; is

22   that correct?

23         A.     That's what the statute allows.

24                It's a legal conclusion but you know

25   that's what the statute allows.  But that's not in
```

IONOSPHERE/EASTERN AIR LINES, INC.                    76

1    the forecast, counsel.  It's not in the forecast, and

2    you know it's not in the forecast.

3              MR. ZIRINSKY:  I will object to any

4    further questioning along this line.

5              As a matter of law, a Chapter 7 Trustee

6    would also be entitled to compensation.  Any

7    compensation that Mr. Shugrue receives, whether it be

8    interim or final, is ultimately subject to this

9    Court's approval as to its reasonableness, and I

10   really don't think this line of questioning is

11   relevant or productive.

12             MR. CLAYMAN:  Can I be heard?

13             MR. ZIRINSKY:  I frankly think it is

14   intentionally designed to harass the witness.

15             MR. CLAYMAN:  Absolutely not.  We are

16   talking about what is now a very fine margin

17   between --

18             THE COURT:  The witness already

19   responded that it's not within his contemplation with

20   respect to these numbers.

21        Q.    Mr. Shugrue, what do you anticipate to

22   be the amount of money that the estate will expend on

23   professional fees, including of course attorneys,

24   from now through the end of the liquidation process?

IONOSPHERE/EASTERN AIR LINES, INC.                    77

1
2          A.       From now through the end.  I would have
3     to estimate, since I don't have a budget document
4     available to me.  I really can't answer the question.
5     I don't have that in my memory bank and I don't have
6     a document in front of me.
7                   MR. CLAYMAN:  Can I approach the bench,
8     Your Honor?
9                   THE COURT:  I am going to react to the
10    line of questioning on the basis that it is what we
11    come down to everything is speculative.
12                   As a matter of fact, attorneys' fees
13    and the need for attorneys' fees are based upon the
14    size of the engine of litigation that's going to
15    drive this case, and we already seen that since the
16    parties haven't gotten together on very many issues,
17    the engine of litigation is going to be a very heavy
18    here.
19                   The issues under 1114 are separately
20    carved out for a new arena of litigation.  There is
21    already existing litigation.  So that to some extent,
22    to a very large extent, neither the Court, Mr.
23    Shugrue or parties to all of these litigations are
24    exactly in control of that, except to the extent this
25    shows a high degree of sensitivity and prudence and

IONOSPHERE/EASTERN AIR LINES, INC.                    78

1   avoids unnecessary litigation.  That's what I would
2   like to see happen as a result of this motion and why
3   I have tried to get the parties to sit down and come
4   to appropriate accommodation without developing a
5   litigation stance.
6               It's unfortunate that can't be
7   accomplished, and I am not blaming anybody, but
8   nevertheless, this one area, the cost of litigation
9   is something that everybody sitting at counsel table
10  has some control over.
11          Q.    Mr. Shugrue, I take it that in order to
12  accomplish the liquidation or to begin the
13  liquidation process, as you did on January 19th of
14  1991 --
15          A.    That's correct.
16          Q.    (Continuing) -- that entailed a
17  tremendous amount of preparation to ensure that it
18  was done in an orderly fashion and not to create
19  chaos within the traveling public?
20          A.    That's correct.
21          Q.    I take it that there was a lot of
22  activity in preparation of that day that took place
23  immediately before January 19th?
24          A.    There was a lot of activity prior to

```
 1            IONOSPHERE/EASTERN AIR LINES, INC.          79

 2    the shutdown, yes.

 3           Q.    When in point of fact did you actually

 4    make the decision to shut down the airline?

 5           A.    On the 19th of this January.

 6           Q.    Mr. Shugrue, you have to be serious

 7    about this.  You obviously did not make

 8    contemporaneous --

 9                 THE COURT:  I sustain the objection.

10                 MR. CLAYMAN:  If I can be heard?

11                 THE COURT:  No, it has nothing to do

12    with the question.  It is the preface to the question

13    which was inappropriate.

14                 MR. CLAYMAN:  I am sorry.  I withdraw

15    it.

16                 THE COURT:  I assume that everybody

17    here is serious.

18                 MR. CLAYMAN:  Let me rephrase the

19    question, if I may.

20           Q.    Mr. Shugrue, in order to get the

21    liquidation done so that there was not panic within

22    your travelers, your passengers, I am sure that you

23    sat down with people prior to the 19th and discussed

24    that liquidation was a very real possibility.

25                 MR. ZIRINSKY:  Objection.  That's not a
```

1           IONOSPHERE/EASTERN AIR LINES, INC.          80

2    question.  Mr. Clayman has just stated his belief.

3    He did he did not ask the witness a question.

4           Q.    Is that not true, you sat down with

5    certain of your top officials to discuss the

6    possibility of the liquidation?

7           A.    Very shortly after my arrival at

8    Eastern in April of '90 I directed the Chief

9    Operating Officer of the company, Mr. Leonard, in

10   order to prepare a shutdown plan and to get it on the

11   shelf so that were we required to shut down we would

12   have a plan that we could shut down in accordance

13   with to avoid the very thing you described.  That was

14   done months before the shutdown actually occurred.

15          Q.    In large part, the decision to shut

16   down on the 19th, I take it, was based upon the fact

17   that your cash reserves had been depleted to a very

18   low point; is that not true?

19          A.    That's part of the criteria, yes.

20          Q.    In point of fact had you not depleted

21   all of your cash reserves by the beginning of January

22   1991?

23          A.    No.  No, we had not.  We had -- I don't

24   recall the exact figures.  But the year-end cash was

25   at satisfactory or acceptable levels.

1       IONOSPHERE/EASTERN AIR LINES, INC.          81

2                    It certainly was not robust, but it was

3       acceptable to us at that time.

4              Q.     Are you testifying that at the end of

5       the year everything was okay with regard to cash

6       reserves and then it got depleted between January 1st

7       and January 19th?

8                    MR. ZIRINSKY:  Your Honor, I object to

9       this line of questioning.

10                    The witness testified about the current

11      financial condition of the estate and projections of

12      that financial condition going forth.  What happened

13      last year or in January before the shutdown, I think

14      is entirely irrelevant to the matter presently before

15      the Court.

16                    MR. CLAYMAN:  If I could connect that

17      to other questions.

18                    Mr. Shugrue filed an application

19      talking about how well he was doing at the end of

20      December, the Order was signed December 27th,

21      liquidation then followed three weeks later.

22                    I think that sequence of events raises

23      serious issues of credibility, and I would like to

24      probe further into how Mr. Shugrue could reconcile

25      liquidating the airline three weeks after informing

1          IONOSPHERE/EASTERN AIR LINES, INC.          82

2     this Court that he was going to be cash neutral at

3     the end of the first quarter.

4               MR. ZIRINSKY:  Your Honor, the same

5     objection.  It's not relevant.  I don't think it goes

6     to the witness' credibility at all.  I don't think it

7     goes to the matter before the Court today.

8               THE COURT:  I agree.  I don't think

9     it's relevant, nor do I think it goes to credibility,

10    because I think the world is very well aware of the

11    conditions in the airline industry, the conditions in

12    the world, the price of fuel, the impact of the war,

13    the scarcity of passengers.  But I will allow you to

14    have an answer to the question, Mr. Clayman, and get

15    on to another area.

16               You may answer the question.

17               THE WITNESS:  Could I have the question

18    read back, please.

19               (The question requested was read back

20        by the reporter.)

21        A.       I testified that the year-end cash

22    balances at the end of December were acceptable.  I

23    didn't say it was okay and I didn't say it was

24    robust, it was acceptable.

25               We were in the throes of an

```
1              IONOSPHERE/EASTERN AIR LINES, INC.         83

2     unprecedented marketplace for the airline business in

3     the winter of last year.  And you have to know that

4     simply by reading the newspaper, and we were

5     struggling with sorting through the impact of the

6     war, the reality of the direction of fuel costs

7     which, in fact, were coming down, but traffic was

8     falling faster and that was a developing process

9     marked somewhat by heavy year-end travel, which is

10    normal in the business, and followed by a precipitous

11    decline in travel right after New Year's for all air

12    carriers, not just Eastern.

13            Q.     So in order to announce a liquidation

14    on January 19th, when was that date selected in order

15    to get all the necessary ducks in a row to accomplish

16    the announcement on January 19th?

17            A.     As I said, there was an existing plan

18    in existence for months, which was updated on a

19    regular basis so that it was current.

20                  Any prudent management such as a

21    situation in which Eastern was would have available

22    to them an orderly shutdown plan, and we had

23    available to us an orderly shutdown plan, and on the

24    19th of January we made the decision in the late

25    afternoon to implement it and we did and it worked
```

IONOSPHERE/EASTERN AIR LINES, INC.                84

1   very well.

2   Q.      So it's your testimony that you had no

3   conversations prior to the 19th, for example, with

4   the counsel to the Creditors Committee that the

5   airline was going to be liquidated?

6               MR. ZIRINSKY:  Objection, Your Honor.

7   That was not what he testified to.

8               Q.      Excuse me.  Liquidating on January

9   19th.

10              MR. ZIRINSKY:  Again, it's the same

11  objection.  The witness hasn't said he didn't have

12  any conversations about the shutdown.

13              Q.      Did you indicate to anyone prior to the

14  19th that the company was intending to liquidate the

15  airline starting January 19th?

16              A.      No, I did not.

17              MR. CLAYMAN:  If I can just have a

18  moment, Your Honor.

19              THE COURT:  Sure.

20              (Whereupon, at this point in the

21              proceedings there was a recess, after which

22              the proceedings continued as follows:)

23              MR. CLAYMAN:  I have no further

24  questions at this time, Your Honor.

1              IONOSPHERE/EASTERN AIR LINES, INC.          85

2                    THE COURT:   Does anyone else want to

3      make inquiry?

4                    (No response.)

5                    MR. ZIRINSKY:   I have one question,

6      Your Honor.

7

8      REDIRECT EXAMINATION BY MR. ZIRINSKY:

9

10            Q.     Mr. Shugrue, Mr. Clayman asked you

11     whether or not it was possible that the estimate of

12     $66 million could go up, at the end of the day you

13     could have more than $66 million; is that correct?

14            A.     That is correct.

15            Q.     Mr. Shugrue, what you are proposing

16     today is interim relief under Section 1114; is that

17     correct?

18            A.     That is correct.

19            Q.     Mr. Shugrue, if you were afforded

20     additional time and if events were to turn out over

21     the period of this interim relief between now and the

22     end of the year that Eastern had more assets

23     available, is it not true that you might believe that

24     you could provide additional benefits to the

25     retirees?

IONOSPHERE/EASTERN AIR LINES, INC.                86

1

2          A.      Absolutely, that's why I want interim

3    relief.  We will know more then than now, if we are

4    moving north instead of south, we will have an

5    opportunity to provide continued benefits for a

6    longer period of time, at perhaps a different level,

7    at perhaps a different level of contribution, perhaps

8    a different level of benefit.

9              We just today don't know, and it is

10   imprudent in the extreme to commit today to expend

11   huge sums of money from the cash coffers of the

12   estate when we don't know what the environment is

13   going to be.

14              MR. ZIRINSKY:  Thank you.

15              THE COURT:  Any further questions?

16              (No response.)

17              THE COURT:  Thank you, Mr. Shugrue.

18              MR. ZIRINSKY:  We have no further

19   witnesses, Your Honor.

20              THE COURT:  Does anybody else want to

21   be heard?

22              MR. CLAYMAN:  Your Honor, on the

23   specific issue, I think, that has to be addressed

24   under 1114(h), which is irreparable harm, rather than

25   the equities which are enumerated under 1114(g), we

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.        87
 2    have no witnesses on the issue of irreparable harm,
 3    having first been informed about this procedure, that
 4    there was going to be an application under 1114(h)
 5    for today.
 6              But in any event, I take this without
 7    prejudice to whatever rights at the time of the 1114
 8    hearing to proceed on the issue of equities.
 9              MR. ZIRINSKY:  Your Honor, I believe we
10    have satisfied our obligations and burdens under
11    1114(h).
12              MR. CLAYMAN:  Can I be heard?
13              THE COURT:  Sure.
14              MR. CLAYMAN:  Your Honor, what you have
15    heard does not even come close to satisfying what is
16    a very specific, narrow standard for interim relief.
17    That is, there has to be a showing of present
18    irreparable harm.
19              What Mr. Shugrue has testified to is
20    pure speculation, that right now there is a cushion
21    of $66 million, it may go up as much as it may go
22    down, but based upon that speculation he needs to
23    acquire interim relief today.
24              He has testified that there are more,
25    more than sufficient funds to cover the costs of
```

1          IONOSPHERE/EASTERN AIR LINES, INC.          88

2     liquidation.

3               I am hard pressed to believe, Your

4     Honor, that the difference between more than

5     sufficient and irreparable harm is $1.9 million a

6     month.  Because that's what he has to demonstrate

7     under 1114(h).  And there has been absolutely no

8     testimony that this estate is that close to the

9     margin of irreparable harm.  That there is more than

10    sufficient funds is so close that all it consists of

11    is $1.9 million, and deprived of that on a monthly

12    basis they all of a sudden are in a state of

13    suffering irreparable harm.  They made no showing of

14    that at all, Your Honor.

15              It seems to me that if we are talking

16    about, if they are that close to the margin, Your

17    Honor, if they are truly that close to irreparable

18    harm, then it would seem to me it was encumbent upon

19    Mr. Shugrue to lessen that margin by coming back into

20    this Court and asking for a decrease in his

21    compensation.

22              On the one hand, he is begging this

23    Court to deprive retirees of a standard that they

24    have enjoyed for all the years that they have been in

25    retirement, benefit level that they have enjoyed

IONOSPHERE/EASTERN AIR LINES, INC.                    89

based upon some, I think, notion of irreparable harm.

            But at the same time there he sits
receiving his $50,000 a month, having never made
application to reduce that to the level of a mere
$35,000 a month.  If this estate is truly suffering
or would suffer from irreparable harm because of
paying $3.6 million a month instead of $1.7 million,
I dare say it was encumbent upon Mr. Shugrue to truly
evidence that belief by coming to you and saying,
"It's time, Your Honor.  We are very close.  If we
don't do it, we are really that close I will take
$35,000 a month."  He didn't do that.

            And moreover, he has made no showing
that there is any connection between $1.7 million or
$3.6 million on a monthly basis and irreparable harm.
All he has testified to is that that is connected to
some interest in preserving a recovery to unsecured
creditors.  That raises a host of equitable issues
under 1114(g) that were not addressed and were not
intended to be addressed under 1114(h).

            This is not an issue of preserving
assets or preserving recoveries.  It's an issue of
whether or not this estate can accomplish in an
orderly way, without suffering irreparable harm, a

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.          90
 2    liquidation.  He has not testified that on a monthly
 3    basis this estate would suffer irreparable harm
 4    because it's paying $1.9 million more each month.
 5              I think that under the standard that is
 6    set forth under 1114(h), they have failed abysmally
 7    in demonstrating that they satisfied that standard,
 8    and for that reason the relief that's requested here
 9    today should be denied.
10              MS. PILZER:  Your Honor, of course, it
11    is the position of the TWU that under 1114 these are
12    benefits that must be paid as administrative expenses
13    so long as they can be paid by the estate, that is
14    what 1114(h) is talking about when it talks about
15    irreparable harm.  And there has been no showing
16    today that this estate will not continue to be able
17    to pay that $1.9 million, that is the difference
18    between the parties here, for the time period that is
19    in question.
20              However, because I know you will be
21    considering our position as opposed to the interim
22    proposal that Eastern has put forward, I want you to
23    be aware that there are some very serious pitfalls in
24    that interim proposal that make it very unfair to the
25    retirees, particularly the retirees we represent, as
```

1                    IONOSPHERE/EASTERN AIR LINES, INC.              91

2     it is stated.

3                    The first is that employees under that

4     proposal will pay at least $75 or $150 per couple and

5     quite possibly more.  Our bargaining unit members,

6     many but not all of whom are not in as good shape

7     financially, were never as well compensated as the

8     other group will find that much less easy to pay.

9                    In addition, Eastern has placed the cap

10    not on the employee contribution only or not on the

11    the employee contribution, but on its contribution.

12    That means that any health care inflation that is

13    unexpected, claim fluctation that is unexpected is

14    going to be borne on the backs of the employees, and

15    we would submit that that is not fair, that their

16    benefits under that interim proposal would already

17    have been significantly altered and in some cases

18    slashed considerably.

19                    Thirdly, we don't think that the

20    proposal as written would even be workable.  It would

21    require us to go -- there is no provision of which we

22    are aware to find out whether on a monthly basis

23    Eastern has overshot its $1.7 million total

24    liability.

25                    We would have to audit the claims, we

IONOSPHERE/EASTERN AIR LINES, INC.          92

1    would have to have fights about incurred claims, we

2    would have to have fights about how much is incurred

3    claims into the future, what our liabilities are

4    going to be on an actuarial basis for those people

5    who have not filed claims.

6            There is a whole raft of problems with

7    the proposal as it is written and it is totally

8    unworkable from the employers' side of this equation

9    to have the cap and the employees' side of the

10   equation to fluctuate by the month or however they

11   think they are going to do it.  So we just want the

12   Court to be aware of those problems with the interim

13   proposals.

14           However, we also believe that as

15   written there is just simply an inadequate

16   reservation of rights in Chapter 7.  This is not

17   specifically called, for example, a superpriority

18   claim.  There are problems.

19           At any rate, TWU's position is that

20   this administrative expense should be paid as an

21   administrative expense until it cannot, cannot be

22   paid any longer.  However, I did want to bring to

23   your attention those problems with the interim

24   proposals.

IONOSPHERE/EASTERN AIR LINES, INC.                  93

1

2            Thank you.

3            MR. CLAYMAN:  Your Honor, we concur in

4    those statements about the defects in the interim

5    proposal.  In the alternative, obviously, our

6    principal argument is they haven't satisfied the

7    standard under 1114(h).

8            MR. HARRIS:  Your Honor, I think the

9    focus of where we need to start in determining

10   whether there is irreparable harm is by defining what

11   is the estate.

12            The estate here is a fixed pool of

13   assets against which there are substantial

14   liabilities far, far in excess of any reasonable

15   valuation of those assets.  To the extent any money

16   is paid out it depletes the aggregate value of the

17   estate and in this instance it is gone and it cannot

18   be recovered.  The estate diminishes in value.

19            And in fact, in a similar situation the

20   Court in GF Corp. said that continued depletion of

21   the fixed assets of the estate was sufficient to

22   constitute continuing loss to or diminution of the

23   estate sufficient to convert it to a 7.  And cuts off

24   the benefits entirely.

25            Your Honor, there is irreparable harm

| | |
|---|---|
| 1 | IONOSPHERE/EASTERN AIR LINES, INC.      94 |
| 2 | here every time a nickel goes out the door on |
| 3 | something where a nickel could be saved. |
| 4 | Your Honor, $1.9 million a month under |
| 5 | their proposal continues to go out.  It is gone.  The |
| 6 | estate suffers to that extent. |
| 7 | Your Honor, the only other thing I |
| 8 | would like to say and I find it sort of hard to |
| 9 | believe to sit here and listen to TWU's counsel is |
| 10 | them saying that the proposal and the schedule of |
| 11 | benefits and the cost of those benefits is unworkable |
| 12 | when their benefits' consultant put it together. |
| 13 | MS. PILZER:  I am sorry, that is not |
| 14 | true.  That is just not true, Adam. |
| 15 | MR. HARRIS:  Your Honor, we asked Mr. |
| 16 | Levy from Martin Segal & Company -- |
| 17 | MR. CLAYMAN:  Your Honor, there has |
| 18 | been no testimony as to who put together the |
| 19 | proposal.  Right now we are getting into Mr. Harris |
| 20 | testifying about evidence that is not before you.  I |
| 21 | think it's improper. |
| 22 | MR. ZIRINSKY:  Your Honor, both Mr. |
| 23 | Clayman and his colleague made comments about the |
| 24 | defects in the plan; they haven't put any evidence in |
| 25 | either.  I think Mr. Harris' comments are well taken. |

```
1        IONOSPHERE/EASTERN AIR LINES, INC.        95

2                THE COURT:  Given the nature of the

3    hearing the Court is prepared to have enough latitude

4    to hear a lot of ad hominem commentary.  As a matter

5    of fact, I expect it, I expect everybody has the

6    position that they want to articulate and I am not

7    going to clamp down on that.

8                MR. ZIRINSKY:  That was my point, Your

9    Honor.

10               MR. HARRIS:  Your Honor, just to make

11   the record clear.  Attached to the Trustee's reply

12   brief is a copy of the response of the retiree

13   representatives to Eastern's initial proposal.  At

14   meetings we had over the course of a long period of

15   time there was represented to Eastern and to the

16   Trustee and to the committee that the average cost on

17   a monthly basis for providing the benefits in their

18   schedule was $220 a month per person eligible

19   retirees.  That came to $2.2 millio, n and that was

20   the number that we had been working off for the whole

21   series of negotiations.  If they are going to tell us

22   now the number is not right, then that's a bigger

23   problem than we had throughout these negotiations.

24               That being the case, Your Honor, we

25   think that there has been irreparable harm shown
```

IONOSPHERE/EASTERN AIR LINES, INC.                96

1

2      here.    The value of this estate to the extent of $1.9

3      million a month would continue and would be depleted,

4      and that the rationale Mr. Clayman is using and Miss

5      Pilzer is using for the TWU that somehow you can

6      continue to pay it and it doesn't affect the estate,

7      just simply isn't true.

8                        The defined pool of assets here will be

9      less, and that constitutes irreparable harm.

10                       MR. SHAPIRO:  Your Honor, I am out of

11     law school a long time.  I think it's since June

12     1949, and one of the things I learned early on was

13     that an owner was always an expert as to his own

14     business and can testify as an expert with regard to

15     his own business.  Mr. Shugrue clearly stands in the

16     place of the owner.  He is clearly an expert, and

17     what his testimony said was, "Look, if we continue --

18     "

19                       THE COURT:  There are four or five

20     cases entitled United States of America against a

21     particular parcel of land.

22                       MR. SHAPIRO:  All over the place.

23                       What he testified to was that there is

24     a substantial risk here:  "If my projections are

25     wrong, if something we don't know about or can't

1             IONOSPHERE/EASTERN AIR LINES, INC.            97

2       forecast happens we are running a substantial risk of

3       administrative insolvency."

4                   I think by very definition you are

5       talking about at least in terms of this statute,

6       irreparable damage.

7                   He testified also that he was

8       confronted with the real serious possibility, not

9       only in terms of what might happen if a projection

10      was off here and there, but if these particular

11      benefits were not reduced, he was confronted with the

12      threat by the Creditors Committee that they would

13      move for conversion under Chapter 7.  And that too by

14      very definition would be irreparable harm.  I think

15      the statute is to determine irreparable damage.

16                  But not only would the estate be

17      irreparably harmed in that context, but, as I

18      understand the law, the lifeline that Section (h)

19      calls for in the balancing of the needs of the estate

20      and the lifelines of the employees would be

21      completely cut, because what would happen if you have

22      a conversion to 7 is that the lifeline is cut and

23      instead of getting some kind of help during this

24      period of time they get cut off with nothing.  And

25      that is not merely irreparable harm to the estate,

1         IONOSPHERE/EASTERN AIR LINES, INC.          98

2    it's irreparable harm to all these people sitting out

3    here in the audience and countless more, and that

4    should not be permitted to happen.

5              Now, the only argument I heard here

6    that touched me was the notion that they said their

7    people can't afford to pay what the other people are

8    paying.  They in effect asked for a $50 cap, but Your

9    Honor gave them the opportunity to go out during the

10   recess and to propose precisely that kind of thing.

11   And as a matter of fact, the Court's adviser urged

12   him to do that.  And they rejected the opportunity.

13             To come in here now and say there is

14   something wrong with the plan, when the issue is and

15   the one before you is balancing the needs of the

16   estate against the lifeline, I think it's a little

17   too late to make that kind of objection.

18             Your Honor, of course, has all the

19   evidence before him.  You heard everything from all

20   the parties.  You know what the positions of the

21   parties are.  I think we have got to leave it in your

22   hands.

23             THE COURT:  I too sympathize with the

24   position of all of the parties.  I especially

25   sympathize with the representatives of the IAM and

```
 1          IONOSPHERE/EASTERN AIR LINES, INC.          99
 2   the TWU who cover forty percent of the people that
 3   are affected here in that their position, intractable
 4   as it is, is for a lump sum payment now rather than
 5   some interim relief, and it is possible that in a
 6   period of time when we get to or before we get to
 7   1114(g), if we ever do get to that, some appropriate
 8   agreement can be forged that is fair and equitable to
 9   all parties.
10               But I must deal with the lifeline
11   issues right now and do the best that we can with
12   respect to this limited fund and deal with it under
13   1114(h).
14               I will give you my ruling in about five
15   minutes.
16               (Whereupon, at this point in the
17          proceedings there was a recess, after which
18          the proceedings continued as follows:)
19               THE COURT:  It is some consolation up
20   to this point the Eastern Air Lines retirees have not
21   been called upon to share the principal burdens
22   associated with Eastern's failed attempt to
23   reorganize.
24               Since the date of the petition, Eastern
25   has made retiree benefit payments every month
```

3

1                    IONOSPHERE/EASTERN AIR LINES, INC.        100

2      amounting to approximately $101 million.  From this

3      record it is clear that these payments totaling

4      approximately $3.6 million per month must now be

5      reduced given the dire condition of the estate.

6                    Representatives of the retirees which

7      were appointed under Bankruptcy Code Section 1114,

8      the Trustee, the Creditors Committee and the Special

9      Adviser have been involved in negotiations concerning

10     modifications to Eastern's retiree health and life

11     benefits for the last month and have engaged in

12     extended negotiations over the past three days.

13                    Although all of the parties have not

14     been able to reach a consensual resolution, the ALPA

15     and noncontract retirees and the Trustee have reached

16     an interim settlement, which was set forth on the

17     record earlier.

18                    Various legal issues have been raised

19     by the parties which have not been previously

20     litigated in this or other forums.  The issues raised

21     include the applicability of Code Section 1114 to

22     this liquidating case, the priority and status of

23     retiree claims and the effects of a possible

24     conversion of this case to Chapter 7.

25                    In addition, the factual issue of

1                IONOSPHERE/EASTERN AIR LINES, INC.        101

2    whether the procedural requirements of Code Section

3    1114 have been complied with is in dispute.  The

4    Creditors Committee has submitted papers which argue

5    that the Code Section 1114 does not apply in this

6    liquidating case.  The committee asserts that the

7    language of the statute and the legislative history

8    coupled with the policy rationale behind the

9    section's enactment supports a finding that Code

10   Section 1114 only applies to Debtors which are

11   reorganizing, not in liquidation, as is the present

12   case.

13                Section 1114 is a relatively new

14   section of the Code, with very little case law

15   developed.

16                If Code Section 1114 does not apply,

17   then issues of other applicable law would have to be

18   considered.  If this Court should ultimately find

19   that Code Section 1114 is applicable to a liquidating

20   Chapter 11 case, this Court would then have to decide

21   under 1114(g) whether the statutory requirements had

22   been satisfied, and if so the priority and status of

23   retiree claims.

24                Further, the specter of a motion to

25   convert the case to Chapter 7 and the effects thereof

1          IONOSPHERE/EASTERN AIR LINES, INC.          102

2    would continue to lurk in the background of

3    presenting a significant measure of uncertainty with

4    respect to the various parties' rights to the limited

5    fund which is in the process of being created.

6                Given a limited fund and competing

7    interests the task at this point is to reach a

8    reasonable compromise on how to best provide a

9    lifeline to those retirees most in need.

10               Although the parties have tried to

11   reach that compromise and succeeded with the sixty

12   percent element of the retirement committee, it has

13   not yet happened with respect to the IAM and TWU

14   retirees.

15               The Court has been apprised of the

16   progress of the negotiations among the parties at

17   settlement conferences during the past several days.

18   This afternoon, prior to the hearing, the

19   representative for ALPA and noncontract retirees and

20   the Trustee informed the Court of the interim

21   settlement, which was spread on the record

22   previously.

23               On the other hand, the representatives

24   of the IAM and TWU retirees have made alternative

25   proposals.  Their position seemed intractable on the

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.         103
 2    point of obtaining a lump sum settlement today and
 3    did not accommodate any interim agreement.
 4                  However, given the current posture of
 5    the estate, the danger of a precipitous conversion of
 6    the case to Chapter 7, all of the retirees and others
 7    are put at such risk that the irreparable harm is
 8    clear.
 9                  Beside the legal issue involved with a
10    conversion of the case to Chapter 7 it is clear that
11    the ultimate value of the estate would be severely
12    compromised to the detriment of all parties in
13    interest, retirees and others alike.
14                  The overriding concern of this Court is
15    to protect the retirees in a way consistent with both
16    the statute and the interests of the estate.
17                  The most severely impacted retirees
18    must be given a lifeline to protect those with
19    serious illnesses and a netting for the other
20    retirees.
21                  I find that the requirements of Section
22    1114(h) have been met, that without the interim
23    modifications there will be irreparable damage to the
24    estate.
25                  The grant of the interim relief request
```

```
 1              IONOSPHERE/EASTERN AIR LINES, INC.           104

 2    will allow the parties time to alternatively litigate

 3    the issues which have been raised or come to a

 4    consensual resolution.

 5              I strongly urge that the parties

 6    continue and redouble their efforts to reach a more

 7    permanent agreement during this interim relief period

 8    and, accordingly, I do grant the application to

 9    modify the obligations to make the retiree benefits

10    in accordance with the request of the Trustee.

11              Submit an Order.

12              Thank you all for your patience, ladies

13    and gentlemen.

14              MR. ZIRINSKY:  Thank you, Your Honor.

15

16

17

18

19

20

21

22

23

24

25
```

105

C E R T I F I C A T E

I, ROBERT PAYENSON, a Shorthand Reporter
and Notary Public of the State of New York, do hereby
certify:

That I reported the proceedings
hereinbefore set forth and that the foregoing is a
true record of the proceedings herein.

I further certify that I am not related to
any of the parties to this action by blood or
marriage; and that I am in no way interested in the
outcome of this matter.

_____