**Deadline to Object to Bid Protections Only: September 25, 2015 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re                                                       :
                                                            :    **Chapter 11**
**THE GREAT ATLANTIC & PACIFIC TEA**        :
**COMPANY, INC.,** *et al.***,**                              :    **Case No. 15-23007 (RDD)**
                                                            :
                        **Debtors.**[1]                         :    **(Jointly Administered)**
                                                            :
-----------------------------------------------------------------x

## SUPPLEMENTAL NOTICE OF AUCTION PURSUANT TO
## DISCRETE SALE AND LEASE RATIONALIZATION PROCEDURES

**PLEASE TAKE NOTICE** that:

1.       On July 19, 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

2.       On August 11, 2015, the Bankruptcy Court entered the *Order Approving Discrete Sale and Lease Rationalization Procedures* [Docket No. 496] (the "**Discrete**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc. (3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

Procedures Order"). A copy of the Discrete Procedures Order may be found at: http://cases.primeclerk.com/aptea.

3. Pursuant to Section III.A of the Discrete Sale and Lease Rationalization Procedures attached to the Discrete Procedures Order as Exhibit 1 (the "**Discrete Procedures**"), on September 18, 2015, the Debtors filed a *Notice of Auction Pursuant to Discrete Sale and Lease Rationalization Procedures* [Docket No. 1025] (the "**Auction Notice**"), indicating that the Debtors had determined to hold an auction (the "**Auction**") with respect to the following Additional Stores[2] (the "**Applicable Stores**"):

|    | Store | Banner | City | Address | State |
|----|-------|--------|------|---------|-------|
| 38 | 36711 | Food Emporium | New York | 1331 1st Avenue | NY |
| 40 | 36732 | Food Emporium | New York | 810 8th Avenue | NY |
| 43 | 36742 | Food Emporium | New York | 1066 3rd Avenue | NY |

4. As set forth in the Auction Notice, pursuant to the Global Bidding Procedures, a Global Auction has been scheduled for **October 1 and 2, 2015 at 9:30 a.m.** at the offices of Weil, Gotshal & Manges LLP, located at 767 Fifth Avenue, New York 10153 (the "**Global Auction**"). The Auction for the Applicable Stores will take place as part of the Global Auction and will be governed by the Bidding Procedures attached as Exhibit A to the Auction Notice.

5. The Auction Notice indicated that the Debtors had designated a bidder as a Stalking Horse with respect to the Applicable Stores, subject in all respects to the Debtors agreeing to definitive documentation.

6. On September 21, 2015, The Great Atlantic & Pacific Tea Company, Inc., Shopwell, Inc. and A&P Real Property, LLC, three of the Debtors, entered into an asset purchase agreement for the Applicable Stores with R.B.G. Management Corp. d/b/a Morton Williams Supermarkets ("**Morton Williams**"). A copy of the agreement is attached hereto as **Exhibit A** (the "**Morton Williams Agreement**").

7. Pursuant to Section III.C of the Discrete Procedures and the Morton Williams Agreement, the Debtors have designated Morton Williams as a Stalking Horse with respect to the Applicable Stores and related assets, as more particularly described in the Morton Williams Agreement.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Auction Notice.

WEIL:\95473413\2\50482.0005

8.      The material terms and conditions of the Bid Protections offered to Morton Williams (the "**Bid Protections**") remain as disclosed in the Auction Notice and as follows:

|    | Store | Purchase Price | Breakup Fee | % of Purchase Price |
|----|-------|----------------|-------------|---------------------|
| 38 | 36711 | $10,500,000.00 | $315,000.00 | 3% |
| 40 | 36732 | $7,000,000.00  | $210,000.00 | 3% |
| 43 | 36742 | $4,750,000.00  | $142,500.00 | 3% |

As set forth in greater detail in the Bidding Procedures, the Bid Protections apply individually as to each Applicable Store.

9.      As set forth in the Auction Notice, any objection to the Bid Protections (an "**Objection**") must:  (i) be in writing; (ii) state with specificity the nature of the Objection; and (iii) be filed with the Bankruptcy Court and served on (a) The Great Atlantic and Pacific Tea Company, Inc., 2 Paragon Drive, Montvale, New Jersey 07645 (Attn: Christopher W. McGarry and Matthew Bennett); (b) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. and Garrett A. Fail, Esq.); (c) Hilco, 5 Revere Dr. Suite 320, Northbrook, IL 60062 (Attn: Gregory S. Apter) (collectively, the "**Debtor Notice Parties**") and (d) the attorneys for the Creditors' Committee, Pachulski Stang Ziehl & Jones, LLP, 780 Third Avenue, 34th Floor, New York, NY 10017 (Attn:  Robert J. Feinstein, Esquire, and Bradford J. Sandler, Esquire), so that it is actually received by the Debtor Notice Parties and the Creditors' Committee on or before **September 25, 2015 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

10.      If any Objections are timely filed and served by the Objection Deadline, a hearing (the "**Hearing**") on the Bid Protections will be scheduled before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601.

11.      Objecting parties are required to attend the Hearing and failure to appear may result in relief being granted or denied upon default.

3

12.     If no Objections are timely filed and served by the Objection Deadline, the Bid Protections shall be deemed fully and finally authorized by the Bankruptcy Court under the terms of the Discrete Procedures Order and no further notice or Bankruptcy Court approval shall be required or necessary.

Dated: September 24, 2015
          New York, New York

/s/ Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

4

## Exhibit A

**Morton Williams Agreement**

EXECUTION VERSION

---

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,**

**SHOPWELL, INC.,**

**A&P REAL PROPERTY, LLC**

**AND**

**R.B.G. MANAGEMENT CORP. D/B/A MORTON WILLIAMS SUPERMARKETS**

**September 21, 2015**

---

Table of Contents

Page

ARTICLE I          DEFINITIONS.................................................................................1
    Section 1.1      Definitions..................................................................................1
    Section 1.2      Interpretations ........................................................................11

ARTICLE II         PURCHASE AND SALE.............................................................12
    Section 2.1      Purchase and Sale of Assets...................................................12
    Section 2.2      Assumed Liabilities ................................................................12
    Section 2.3      Consideration; Deposit; Escrow Amount ..............................12
    Section 2.4      Break Up Fee ..........................................................................13
    Section 2.5      Closing .....................................................................................13
    Section 2.6      Closing Payments and Deliveries ..........................................14
    Section 2.7      Inventory..................................................................................14
    Section 2.8      Allocation.................................................................................15
    Section 2.9      Proration...................................................................................15
    Section 2.10     Removal of Excluded Assets .................................................17

ARTICLE III        SELLERS' REPRESENTATIONS AND WARRANTIES ..................17
    Section 3.1      Organization of Sellers; Good Standing ................................17
    Section 3.2      Authorization of Transaction .................................................17
    Section 3.3      Noncontravention; Government Filings ..................................17
    Section 3.4      Title to Assets .........................................................................18
    Section 3.5      Real Property ...........................................................................18
    Section 3.6      Litigation; Decrees..................................................................18
    Section 3.7      Labor Relations .......................................................................19
    Section 3.8      Brokers' Fees ..........................................................................19
    Section 3.9      Taxes ........................................................................................19
    Section 3.10     Compliance with Laws; Permits ............................................19
    Section 3.11     Disclaimer of Other Representations and Warranties..............19

ARTICLE IV         BUYER'S REPRESENTATIONS AND WARRANTIES ......................20
    Section 4.1      Organization of Buyer; Good Standing ..................................20
    Section 4.2      Authorization of Transaction .................................................20
    Section 4.3      Noncontravention.....................................................................20
    Section 4.4      Litigation; Decrees..................................................................21
    Section 4.5      Brokers' Fees ..........................................................................21
    Section 4.6      Sufficient Funds ......................................................................21
    Section 4.7      Adequate Assurances ..............................................................22

ARTICLE V          PRE-CLOSING COVENANTS ......................................................22
    Section 5.1      Efforts; Cooperation.................................................................22
    Section 5.2      Conduct of the Business Pending the Closing .........................23
    Section 5.3      Regulatory Approvals..............................................................24
    Section 5.4      Bankruptcy Court Matters.......................................................25
    Section 5.5      Notice of Developments .........................................................26
    Section 5.6      Access; No Contact..................................................................26
    Section 5.7      Bulk Transfer Laws.................................................................26

Table of Contents
(continued)

Page

Section 5.8      Replacement Bonding Requirements.................................................26
Section 5.9      Financing...........................................................................................27

ARTICLE VI      OTHER COVENANTS ....................................................................28
Section 6.1      Further Assurances............................................................................28
Section 6.2      Access; Enforcement; Record Retention ..........................................28
Section 6.3      Treatment of Affected Labor Agreements.........................................28
Section 6.4      Covered Employees ..........................................................................28
Section 6.5      Certain Tax Matters ..........................................................................29
Section 6.6      Insurance Matters..............................................................................30
Section 6.7      Acknowledgements............................................................................30
Section 6.8      Press Releases and Public Announcements .......................................31
Section 6.9      Seller Marks.......................................................................................31
Section 6.10     Licenses..............................................................................................31

ARTICLE VII     CONDITIONS TO OBLIGATION TO CLOSE ...................................32
Section 7.1      Conditions to Buyer's Obligations....................................................32
Section 7.2      Conditions to Sellers' Obligations.....................................................32
Section 7.3      No Frustration of Closing Conditions................................................33

ARTICLE VIII    TERMINATION.................................................................................33
Section 8.1      Termination of Agreement.................................................................33
Section 8.2      Effect of Termination........................................................................34
Section 8.3      Lease Indemnity.................................................................................34

ARTICLE IX      MISCELLANEOUS ..........................................................................34
Section 9.1      Survival..............................................................................................34
Section 9.2      Expenses............................................................................................35
Section 9.3      Entire Agreement...............................................................................35
Section 9.4      Incorporation of Exhibits and Disclosure Schedule..........................35
Section 9.5      Amendments and Waivers.................................................................35
Section 9.6      Succession and Assignment...............................................................35
Section 9.7      Notices...............................................................................................35
Section 9.8      Governing Law ..................................................................................36
Section 9.9      Submission to Jurisdiction; Service of Process ................................36
Section 9.10     Waiver of Jury Trial...........................................................................37
Section 9.11     Specific Performance.........................................................................37
Section 9.12     Severability........................................................................................37
Section 9.13     No Third Party Beneficiaries .............................................................37
Section 9.14     Non-Recourse ...................................................................................37
Section 9.15     Mutual Drafting.................................................................................38
Section 9.16     Disclosure Schedule..........................................................................38
Section 9.17     Headings; Table of Contents..............................................................39
Section 9.18     Counterparts; Facsimile and Electronic Signatures ..........................39
Section 9.19     Limitations Under Applicable Law ...................................................39

Table of Contents
(continued)

Exhibit A – Escrow Agreement
Exhibit B – Form of Bill of Sale
Exhibit C – Form of Assignment and Assumption Agreement
Exhibit D – Form of Sale Order
Exhibit E – Bidding Procedures

WEIL:\95462444\9\50482.0004

<u>ASSET PURCHASE AGREEMENT</u>

This Asset Purchase Agreement (this "<u>Agreement</u>") is entered into as of September 21, 2015 by and among The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation ("<u>A&P</u>"), Shopwell, Inc., a New York corporation, and A&P Real Property, LLC, a Delaware limited liability company (each, a wholly-owned Subsidiary of A&P and, together with A&P, "<u>Sellers</u>"), and R.B.G. Management Corp. d/b/a Morton Williams Supermarkets, a New York corporation ("<u>Buyer</u>").  Sellers and Buyer are referred to collectively herein as the "<u>Parties</u>".

WITNESSETH

WHEREAS, Sellers and certain of their affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, Sellers operate the three (3) supermarkets at the locations set forth in <u>Section 3.5</u> of the Disclosure Schedule (as defined below) under the name "Food Emporium" (each a "<u>Store</u>" and, collectively, the "<u>Stores</u>"); and

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets (as defined below) and Assumed Liabilities (as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1     <u>Definitions</u>.  For purposes of this Agreement:

"<u>A&P</u>" has the meaning set forth in the preamble.

"<u>Acquired Assets</u>" means all of Sellers' right, title, and interest in and to all of the following assets of Sellers used or held for use exclusively in the operation of the Stores and (to the extent applicable) located at the Stores on the Closing Date:

(a)     the Inventory (other than Excluded Inventory);

(b)     the Furnishings and Equipment owned by Sellers (other than Excluded Furnishings and Equipment);

(c)     to the maximum extent permitted by the Bankruptcy Code and in accordance with the terms herein, the Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments,

appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Leases;

(d)    to the maximum extent permitted by the Bankruptcy Code and in accordance with the terms herein, all rights under those Contracts set forth on Schedule 1.1(a), other than those Contracts that expire or that are terminated prior to the Closing (such Contracts, together with the Leases (the "Transferred Contracts");

(e)    all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases and, to the extent transferable, other deposits by Sellers relating to the Stores under any of the Transferred Contracts (collectively, the "Prepaid Expenses").    For each Lease, the Prepaid Expenses as of the date hereof are listed on Schedule 1.1(b), which Schedule shall be updated three (3) Business Days prior to the Closing Date;

(f)    all goodwill of Sellers arising, directly or indirectly, primarily out of the operation or conduct of the Business; and

(g)    to the extent transferable, all warranties related to any of the foregoing;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Affected Labor Agreements" means the collective bargaining agreements covering any of the Covered Employees, each of which is listed on Schedule 1.1(c).

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Principles" has the meaning set forth in Section 2.8.

"Antitrust Law" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other laws and orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.6(b).

"Assumed Liabilities" means all liabilities of each of the Sellers incurred exclusively in the operation of the Stores as of the Closing, including:

(a)       all Liabilities under the Transferred Contracts (exclusive of Cure Costs);

(b)       all amounts allocated to Buyer under <u>Section 2.8</u> and <u>Section 6.5</u>, other than Transfer Taxes allocated to Sellers pursuant to <u>Section 6.5</u>; and

(c)       all Liabilities relating to or arising out of the ownership or operation of the Stores or any Acquired Asset from and after the Closing Date;

<u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"<u>Auction</u>" has the meaning set forth in <u>Section 5.4(a)</u>.

"<u>Bankruptcy Cases</u>" means the Chapter 11 cases of Sellers and certain of their Affiliates.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bidding Procedures</u>" has the meaning set forth in <u>Section 5.4(a)</u>.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Bonding Requirements</u>" means standby letters of credit, guarantees, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets.

"<u>Business</u>" means the operation of the Stores by Sellers.

"<u>Business Day</u>" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Buyer Proration Amount</u>" has the meaning set forth in <u>Section 2.9(a)</u>.

"<u>Cash Equivalents</u>" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"<u>Cash Purchase Price</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Competing Bid</u>" has the meaning set forth in <u>Section 5.4(a)</u>.

WEIL:\95462444\9\50482.0004

"Confidentiality Agreement" means the confidentiality agreement, dated as of June 2, 2015, by and between A&P and Buyer.

"Contract" means any agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby, other than the Leases.

"Contracting Parties" has the meaning set forth in Section 9.14.

"Covered Employee" means an employee of A&P or any of its Subsidiaries at the Closing whose duties relate primarily to the operation of any of the Stores, including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Buyer of the Transferred Contracts.

"Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

"Debt Commitment Letter" has the meaning set forth in Section 4.6.

"Debt Financing" means the debt financing incurred or intended to be incurred pursuant to the Debt Commitment Letter, as amended, supplement or replaced in compliance with this Agreement.

"Debt Financing Commitment" has the meaning set forth in Section 4.6.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Disclosure Schedule" has the meaning set forth in Article III.

"Discrete Procedures Order" means the *Order Approving Discrete Sale and Lease Rationalization Procedures* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 496].

"Employee Benefit Plan" means all "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers and their Subsidiaries with respect to Covered Employees.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means TitleVest Services, LLC.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Buyer, and the Escrow Agent, a copy of which is attached hereto as Exhibit A.

"Escrow Amount" has the meaning set forth in Section 2.3(b).

"Excluded Assets" means all assets of Sellers as of the Closing that are not expressly included in the Acquired Assets, including:

(a)    any asset of Sellers that is (i) not located in the Stores and used or held for use exclusively in the operation of the Stores or (ii) inseparable from any other business of Sellers or any of their Affiliates (other than the operation of the Stores), in each case, including (A) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (B) books and records related to (1) Taxes paid or payable by Sellers or (2) any claims, obligations or liabilities not included in Assumed Liabilities; (C) any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to either of the Sellers; and (D) any assets not customarily based or located at the Stores;

(b)    capital stock of any of A&P's Subsidiaries;

(c)    all Cash Equivalents and accounts receivable;

(d)    all Permits;

(e)    all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(f)    all of Sellers' rights under this Agreement or any Related Agreement;

(g)    all of Sellers' rights under any Contracts primarily related to any Excluded Asset;

(h)    any and all automobiles, trucks, tractors, and trailers;

(i)    except as otherwise provided in this Agreement, any other payment, reimbursement, rebate or refund arising from the operation of the Stores prior to the Closing;

(j)    all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the names "A&P Liquors," "A&P," "Waldbaums," "Superfresh," "Food Emporium," "Food Basics," "Best Cellars," "Pathmark," "Foodmart" and all other marks set forth on Schedule 1.1(d), any name or trademark, service mark, trade name, logo, trade dress, Internet domain name or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, all rights and goodwill associated therewith and any name or trademark, service mark, trade name, logo, Internet domain name, or other indicia of origin that is confusingly similar thereto or derived therefrom (collectively, the "Seller Marks");

(k)    all leased equipment located at or used in the Stores and all in-store processors, direct access storage devices, and electronic funds transfer devices, except any equipment leased pursuant to a Transferred Contract;

(l)    the Furnishings and Equipment described on Schedule 1.1(e) (the "Excluded Furnishings and Equipment");

(m)    all Contracts and Leases other than the Transferred Contracts;

(n)    all Excluded Inventory;

(o)    all customer data and information derived from branded loyalty promotion or co-branded credit card programs and other similar information related to customer purchases at the Stores;

(p)    all other assets bearing any of the Seller Marks; and

(q)    those items set forth on Schedule 1.1(f).

"Excluded Furnishings and Equipment" has the meaning set forth in the definition of Excluded Assets.

"Excluded Inventory" has the meaning set forth in Section 2.7(a).

"Excluded Liabilities" means the following Liabilities of Sellers:

(a)    any Liability not relating to or arising out of the operation of the Stores or the Acquired Assets, including any Liability exclusively relating to or exclusively arising out of the Excluded Assets;

(b)    any Liability of Sellers for Taxes (except as provided for in Section 2.8 and Section 6.5);

(c)    all accounts payable;

(d)    all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(e)    all Liabilities of Sellers relating to or arising out of the Stores or Acquired Assets prior to the Closing Date not specifically assumed by Buyer hereunder or by operation of law; and

(f)    all Liabilities of Sellers or any of their respective Subsidiaries or any ERISA Affiliate with respect to any Employee Benefit Plan or any other compensation or benefit plan, program, policy, agreement or arrangement of any such Seller, Subsidiary thereof, or any ERISA Affiliate, including, for the avoidance of doubt, any Liability of Sellers or any of their respective Subsidiaries or any ERISA Affiliate under Title IV of ERISA with respect to any single-employer plan (within the meaning of Section 4001(a)(15) of ERISA) or any multiemployer plan (within the meaning of Section 4001(a)(3) of ERISA).

"Fee Letter" has the meaning set forth in Section 4.6.

"Furnishings and Equipment" means all trade fixtures, store models, shelving, and refrigeration equipment owned by Sellers and located at the Stores, including those items listed on Schedule 1.1(g).

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Intellectual Property" means (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrights, together with all registrations and applications for registration therefor and renewals in connection therewith; (d) all trade secrets, know-how, technology, improvements, and inventions; and (e) all computer software (including data and databases).

"Inventory" means all food, beverages and other merchandise and products (including general merchandise items described in Schedule 1.1(h) but excluding greeting cards, alcohol and Pharmaceutical Inventory) offered for sale to customers at the Stores.

"Inventory Date" has the meaning set forth in Section 2.7(a).

"Inventory Purchase Price" has the meaning set forth in Section 2.7(a).

"Inventory Taker" has the meaning set forth in Section 2.7(a).

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Knowledge" of Sellers (and other words of similar import) means the actual knowledge of persons holding a position of senior vice president or senior thereto at Sellers.  "Knowledge" of Buyer (and other words of similar import) means the actual knowledge of persons holding a position of senior vice president or senior thereto at Buyer.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"Leases" means all leases, subleases, licenses, concessions, options (including lease renewal options), contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights of use and occupancy of any Store.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, absolute or contingent, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Lien" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

"Material Adverse Effect" means any effect or change that has a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects or changes arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail grocery generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather

event; (f) changes in Law or accounting rules; (g) the taking of any action contemplated by this Agreement or any Related Agreement or taken with the consent of the other Party; (h) any effects or changes as a result of the announcement or pendency of this Agreement; (i) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (j) the sale of any other assets or stores to any third parties by any Seller or any of its Affiliates; (k) any effects or changes arising from or related to the breach of the Agreement by Buyer; (l) the failure of Sellers to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; (m) any strike or labor dispute, (n) any items set forth in the Disclosure Schedule; (o) any effect resulting from the filing of the Bankruptcy Cases; or (p) any matter of which Buyer is aware on the date hereof.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business, that in each case have been bonded over or otherwise secured in a manner acceptable to Buyer in Buyer's reasonable discretion; (c) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto; (d) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not reasonably be expected to have a Material Adverse Effect; (f) matters that would be disclosed on an accurate survey of the real property; (g) any liens shown in any title commitment, report or policy, or otherwise of record; (h) any other Liens that Buyer has expressly stated are acceptable to Buyer in a writing delivered to Sellers; and (i) other than any of the Liens set forth in the foregoing clauses (a) through (h) and other than any Lien that is required to be removed or cured by the applicable tenant under the applicable Lease or was created by such tenant, any Liens on the fee property underlying any Lease that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect or impose any material adverse obligations on Buyer following the applicable Closing.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Pharmaceutical Inventory" means prescription pharmaceuticals and prescription products.

"Pre-Closing Period" has the meaning set forth in Section 6.5(c).

"Prepaid Expenses" has the meaning set forth in the definition of Acquired Assets.

"Prorated Charges" has the meaning set forth in Section 2.9(a).

"Proration Period" has the meaning set forth in Section 6.5(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.8.

"Related Agreements" means the Bill of Sale and the Assignment and Assumption Agreement.

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Sale Order" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit D (a) approving (i) this Agreement and the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Acquired Assets to Buyer free and clear of all Liens, other than any Permitted Liens or any Assumed Liabilities; (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein; and (iv) the assumption and assignment to Buyer of the Transferred Contracts on the terms set forth herein; (b) determining that Buyer is a good faith purchaser; and (c) providing that the Closing will occur in accordance with the terms and conditions hereof.

"Seller Marks" has the meaning set forth in the definition of Excluded Assets.

"Seller Proration Amount" has the meaning set forth in Section 2.9(a).

"Sellers" has the meaning set forth in the preamble.

"Stores" has the meaning set forth in the recitals.

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such

Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Payment" has the meaning set forth in Section 2.4.

"Transfer Tax" has the meaning set forth in Section 6.5(a).

"Transferred Contracts" has the meaning set forth in the definition of Acquired Assets and, without limiting the preceding, shall include the Leases.

Section 1.2     Interpretations.  Unless otherwise indicated herein to the contrary:

(a)     When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)     The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)     The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)     The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)     The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)    References herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)    Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)    References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers or provided to Buyer or its Representatives in response to requests for materials or information.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, Buyer will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer at the Closing all of the Acquired Assets.

Section 2.2    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, Buyer will assume and become responsible for the Assumed Liabilities at the Closing.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof.

Section 2.3    Consideration; Deposit; Escrow Amount.

(a)    The consideration for the Acquired Assets at and including the Stores shall be (i) an aggregate Dollar amount equal to the sum of (A) $22,250,000 (the "Cash Purchase Price," which shall be allocated as follows: (1) $7,000,000 to Store number 732, (2) $4,750,000 to Store number 742 and (3) $10,500,000 to Store number 711), *plus* (B) the amount of the Inventory Purchase Price, *plus* (C) the amount of the Prepaid Expenses,

*plus* (D) the Seller Proration Amount, if any, *minus* (E) the Buyer Proration Amount, if any (such calculation, the "Purchase Price") and (ii) Buyer's assumption of the Assumed Liabilities.

(b)    Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Buyer shall immediately deposit with the Escrow Agent the sum of $1,112,500 by wire transfer of immediately available funds (the "Escrow Amount"), to be released by the Escrow Agent and delivered to either Buyer or Sellers, in accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows:

(i)    if the Closing shall occur, the Escrow Amount shall be paid to Sellers and applied towards the Purchase Price payable by Buyer to Sellers under Section 2.3(a), and all accrued investment income thereon, if any, shall be delivered to Buyer at the Closing;

(ii)    if this Agreement is terminated by Sellers pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers; or

(iii)    if this Agreement is terminated for any reason other than by any Seller pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, shall in each case be returned to Buyer.

Section 2.4    Break Up Fee.    In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay Buyer, in accordance with the terms hereof (including Article VIII) and the Discrete Procedures Order, upon consummation of a Competing Bid with respect to any Store, a break-up fee in an amount equal to three percent (3%) of the Cash Purchase Price allocated above to such Store (the "Termination Payment"). The Termination Payment shall be due and owing and payable on the first Business Day following the date of consummation of a Competing Bid from the proceeds of such Competing Bid, if no material breach by Buyer of this Agreement has occurred. Subject to the payment of the Termination Payment, Sellers may terminate this Agreement with respect to the applicable Store(s) (and the Acquired Assets related thereto) in the event of consummation of a Competing Bid with respect to such Store(s).

Section 2.5    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m. local time on a date (the "Closing Date") that is the third (3rd) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. For

purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.

Section 2.6    Closing Payments and Deliveries.

(a)    On the Closing Date, Buyer shall pay the Purchase Price (less the Escrow Amount, which shall be released to Sellers by the Escrow Agent) to Sellers, which shall be paid by wire transfer of immediately available funds into an account designated by Sellers.

(b)    At the Closing, Sellers will deliver to Buyer (i) a duly executed Bill of Sale substantially in the form of Exhibit B (the "Bill of Sale"); (ii) a duly executed Assignment and Assumption Agreement substantially in the form of Exhibit C (the "Assignment and Assumption Agreement"); and (iii) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) is satisfied.

(c)    At the Closing, Buyer will deliver to Sellers (i) the Bill of Sale duly executed by Buyer; (ii) the Assignment and Assumption Agreement duly executed by Buyer; and (iii) a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) are satisfied; and (iv) the executed originals of each of the Leases to the extent in Sellers' possession.

Section 2.7    Inventory.

(a)    A physical count of the Inventory, and calculation of the value thereof, at each of the Stores shall be made by Retail Grocery Inventory Services (the "Inventory Taker") two (2) days prior to the anticipated Closing Date, or on such other date as the Parties may mutually agree (the date of such inventory being the "Inventory Date").  The Inventory Taker will conduct the physical inventory in accordance with instructions set forth in Schedule 2.7(a) and otherwise in accordance with the terms and conditions of this Section 2.7.  Each Party shall be entitled to have a Representative present during the inventory and the fees and expenses of the Inventory Taker shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers.  The physical inventory (and the Inventory Purchase Price to be paid by Buyer for the Inventory) shall not include Inventory that is (i) A&P branded (including any of Sellers' Affiliates' branded) or other private label inventory; (ii) damaged, spoiled, perishable, outdated (any merchandise that has a manufacturer's date by which it must be sold that is less than fourteen (14) days after the Inventory Date being deemed outdated for this purpose), obsolete, or otherwise unsaleable at normal retail price in the Ordinary Course of Business at the Stores; or (iii) not transferable to Buyer under applicable Law (collectively, the "Excluded Inventory").  The Inventory Taker shall value all Inventory carried in the Stores on the Inventory Date, excluding the Excluded Inventory (but including any portion or all of the Excluded Inventory described in clause (ii) or (iii) above that Buyer deems Inventory), at the percentages of the segment retail price set forth in Schedule 2.7(a) (such value, the "Inventory Purchase Price").

(b)      The complete inventory prepared by the Inventory Taker shall be prepared in accordance with the usual and customary practices of the industry and shall show the total cost of the Inventory for each Store determined in the manner provided above.  In the event that the Parties do not agree on the value of the Inventory for any Store because the Parties disagree as to whether certain items should be counted as Excluded Inventory or as to Sellers' cost of Inventory, the opinion of the Inventory Taker shall be final and binding.

Section 2.8      Allocation.  Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles").  No later than sixty (60) days after the Closing Date, Sellers shall deliver to Buyer an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Buyer's review and comment. Any reasonable comments provided by Buyer to the Sellers under this Section 2.8 shall be considered by the Sellers in good faith.  The Purchase Price Allocation (inclusive of any reasonable comments accepted by the Sellers) shall be conclusive and binding on the parties, and Buyer and Sellers agree (and agree to cause their respective subsidiaries and Affiliate) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the Purchase Price Allocation.  None of the Parties will take any position inconsistent with the Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority. For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the Parties do not agree with respect to such determination, such matter shall be resolved in accordance with the process outlined in this Section 2.8, provided further, that such Tax Return shall be amended if the Purchase Price Allocation is subsequently adjusted pursuant to the procedures described above.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.8 shall survive the Closing without limitation.

Section 2.9      Proration.

(a)      On the Closing Date all monthly payments for the month in which the Closing occurs (including base rent, common area maintenance fees, and utility charges) under the Leases transferred at the Closing (the "Prorated Charges") shall be apportioned and prorated between Sellers and Buyer as of the Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges under the applicable Lease and the denominator being the total number of days in the lease month in which the Closing occurs, times (B) the number of days in such lease month following the day that immediately precedes the Closing Date and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the Closing, and (ii) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers).  The net amount of

all Prorated Charges owed to Buyer and Sellers under this shall be referred to as the "Buyer Proration Amount" if owed to Buyer or the "Seller Proration Amount" if owed to Sellers.  Except as set forth in this Section 2.9 and in Section 6.5, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyer.  Notwithstanding the foregoing there shall be no apportionment nor reduction in Purchase Price for percentage rents, if any.

(b)      Real estate taxes and assessments and water and sewer charges shall be adjusted in the manner set forth in Section 6.5.

(c)      As to all non-monthly real estate related payments, the same shall be apportioned between Sellers and Buyer as of 12:01 a.m. on the Closing Date.  If any amounts are payable in installments, all installments due through the Closing together with the accrued but unpaid portion of any other installments not yet due as of the Closing shall be prorated based on the periods of time covered by such installments occurring before and after the Closing Date.

(d)      If on the Closing Date any subtenant or licensee is in arrears in the payment of rent or has not paid the rent payable by it and which is attributable to the month in which the Closing occurs (whether or not it is in arrears for such month on the Closing Date), any rent received by Buyer or Sellers after the Closing shall be applied to amounts due and payable by such tenant in the following order of priority: first, to rent attributable to the month in which the Closing occurred, and, thereafter, ratably, between rent attributable to the months following the month in which the Closing occurred and rent attributable to the months preceding the month in which the Closing occurred.  If rent or any portion thereof received by Sellers or Buyer after the Closing is due and payable to the other party by reason of the foregoing allocation, the appropriate sum shall be promptly paid to such other party.

(e)      Following the Closing Date, at no cost to Sellers, Buyer shall use commercially reasonable efforts to collect rent owed to Seller by any tenant allocable to the period up to and including the Closing Date.  Buyer agrees to reasonably cooperate with Sellers at no cost to Buyer in connection with all efforts by Sellers to collect such rent.

(f)      Subtenant security deposits shall not be assigned and an amount equal to such security deposits shall be a credit to the Buyer.

(g)      If any of the items subject to apportionment under the foregoing provisions cannot be apportioned at the Closing because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the Closing are discovered subsequent to the Closing, then such item shall be reapportioned and such errors and omissions corrected as soon as practicable after the Closing Date and the proper party reimbursed, provided, however, that such apportionment must occur within sixty (60) days from and after the Closing Date.

Section 2.10    <u>Removal of Excluded Assets</u>.    As promptly as practicable following the Closing Date (and in any event within fifteen (15) Business Days), Buyer shall allow Sellers to remove at Sellers' sole cost and expense all Excluded Assets that are located at the Stores and, if requested by Sellers, Buyer shall arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' sole cost and expense.

# ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this <u>Article III</u> are true and correct as of the date of this Agreement, except as (i) set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>") or (ii) disclosed in any forms, statements, or other documents filed with the Bankruptcy Court.

Section 3.1    <u>Organization of Sellers; Good Standing</u>.    Each Seller is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of the state of its formation.  Each Seller has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized, existing, or in good standing or have such power and authority would not reasonably be expected to have a Material Adverse Effect.

Section 3.2    <u>Authorization of Transaction</u>.    Subject to the Bankruptcy Court's entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, each Seller has full power and authority (including full corporate or other organizational power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.  Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3    <u>Noncontravention; Government Filings</u>.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of any Seller, (b) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, materially violate any law or Decree to which any Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, result in a material breach of, constitute a material default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which any Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflicts,

violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Other than as required or pursuant to the Bankruptcy Code, the Sale Order and any other necessary order to close the sale of the Acquired Assets, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay any Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4    Title to Assets.    At the Closing, subject to any Permitted Liens, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets except to the extent the failure to have such title or right to use would not be expected to have a Material Adverse Effect. Pursuant to the Sale Order, Sellers will convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens).

Section 3.5    Real Property.    Section 3.5 of the Disclosure Schedule sets forth the location of each Store, each of which is leased to a Seller by a third party, and a list of all Store lease agreements and related amendments.  Sellers have made available to Buyer a true and complete copy of each Lease to the extent in their possession.  With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in material breach or material default under such Lease, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect.  To Sellers' Knowledge, there are no subleases at the Stores to which any Seller is sublessor.

Section 3.6    Litigation; Decrees.    Except as set forth in Section 3.6 of the Disclosure Schedule and other than the Bankruptcy Case, there is no Litigation pending or, to the Knowledge of Sellers, threatened, that (a) would reasonably be expected to have a Material Adverse Effect or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Other than the Bankruptcy Case, no Seller is subject to any outstanding Decree that would (a) reasonably be expected to have a Material Adverse Effect or (b) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.7    Labor Relations.    Except as set forth in Section 3.7 of the Disclosure Schedule, no Seller is a party to or bound by any collective bargaining agreement covering the Covered Employees.

Section 3.8    Brokers' Fees.    Other than the fees and expenses payable to Evercore Group L.L.C. in connection with the transactions contemplated hereby, which shall be borne by Sellers, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.9    Taxes.

(a)    In each case with respect to the Acquired Assets and the Business and except for matters that would not be reasonably expected to result in a Material Adverse Effect, (i) Sellers have timely filed all Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers); and (ii) all Taxes shown as due on such Tax Returns have been paid (except as prohibited by the Bankruptcy Code).

(b)    Sellers are not foreign persons within the meaning of section 1445 of the IRC.

Section 3.10    Compliance with Laws; Permits.

(a)    Sellers are in compliance with all Laws applicable to the Business, except where the failure to be in compliance would not be reasonably expected to result in a Material Adverse Effect.  Sellers have not received any written notice of or been charged with the violation of any Laws, except where such violation would not be reasonably expected to result in a Material Adverse Effect.

(b)    Sellers have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not be reasonably expected to result in a Material Adverse Effect.  Sellers are not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which they are parties, except where such default or violation would not be reasonably expected to result in a Material Adverse Effect.

Section 3.11    Disclaimer of Other Representations and Warranties.    Except for the representations and warranties contained in this Article III (as modified by the Disclosure Schedule) or expressly contained in any Related Agreement, neither Sellers nor any other Person shall be deemed to have made any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding Sellers, any Acquired Assets, any Assumed Liabilities or any other matter.  Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, SELLERS MAKE NO OTHER (AND HEREBY DISCLAIM EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE

VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  BUYER ACKNOWLEDGES THAT, SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS).  Sellers disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Sellers or any of their Affiliates).

**ARTICLE IV**
**BUYER'S REPRESENTATIONS AND WARRANTIES**

Buyer represents and warrants to each Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date of this Agreement.

Section 4.1     <u>Organization of Buyer; Good Standing</u>.  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of New York and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2     <u>Authorization of Transaction</u>.  Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer.  This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3     <u>Noncontravention</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (b) violate any law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyer.  Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions

contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

    Section 4.4  <u>Litigation; Decrees</u>.  There is no Litigation pending or, to Buyer's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Neither Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

    Section 4.5  <u>Brokers' Fees</u>.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

    Section 4.6  <u>Sufficient Funds</u>.  Buyer has, and upon the Closing will have, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. Buyer will cooperate with Sellers in attempting to satisfy the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities but shall not be liable to the Sellers if those conditions cannot be satisfied. As of the date of this Agreement, Buyer has received an executed debt commitment letter ("the "<u>Debt Commitment Letter</u>") for such financing from Wells Fargo Bank, N.A., a true, complete and correct copy of which has been furnished to Sellers, pursuant to which Wells Fargo Bank, N.A. has committed, subject to the terms and conditions set forth therein (the "<u>Debt Financing Commitment</u>") to provide to Buyer Debt Financing in cash in the aggregate amount set forth in the Debt Commitment Letter, in each case, the proceeds of which are available to fund the Purchase Price and to pay related fees and expenses.  A true, complete and correct copy of any fee letter related to the Debt Commitment Letter as in effect on has been provided to Sellers (the "<u>Fee Letter</u>"), except that the numerical fees, pricing caps, "flex" provisions and other commercially sensitive information specified therein may have been redacted.  Buyer has fully paid any and all commitment or other fees required by the Debt Commitment Letter to be paid on or before the date hereof.  As of the date hereof, the Debt Commitment Letter is valid and in full force and effect and represents the legal, valid and binding obligations of the parties thereto, enforceable against Buyer, and, to the Knowledge of Buyer, each other party thereto in accordance with their terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and to general principles of equity.  As of the date hereof, there are no conditions precedent or other contingencies related to the Debt Financing as contemplated by the Debt Commitment Letter other than as expressly set forth in the Debt Commitment Letter.  There are no side letters or other agreements, contracts or arrangements in effect or contemplated (except for the Fee Letter) to which Buyer or any of its Affiliates is a party that could adversely affect the availability of the Debt Financing or the timing of Closing other than as expressly set forth in or contemplated by the Debt Commitment Letter.  The Debt Commitment Letter has not been nor

will be amended or modified, except as consistent with Section 5.9, and the commitments contained in the Debt Commitment Letter have not been withdrawn or rescinded in any respect as of the date hereof.  As of the date of this Agreement, no event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of Buyer nor, to the Knowledge of Buyer, any other party thereto, under the Debt Commitment Letter, in each case, that would adversely affect or delay the availability of the Debt Financing on the Closing Date.  Assuming the satisfaction of the conditions set forth in Section 7.1 and the accuracy of Sellers' representations and warranties such that the closing conditions set forth in Section 7.1 would not fail to be satisfied, the aggregate proceeds contemplated by the Debt Commitment Letter, together with available cash of Buyer, will be sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by Buyer in connection with the transactions contemplated hereby.  Assuming the satisfaction of the conditions set forth in Section 7.1, as of the date hereof, Buyer has no reason to believe that any of the conditions to the Debt Financing will not be satisfied or that the Debt Financing will not be available to Buyer on the Closing Date.

Section 4.7    Adequate Assurances.  Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use (except as otherwise set forth in Section 5.3) its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby (including by giving, or causing to be given, any notices to, making any filings  with, and using commercially reasonable efforts to obtain any consents of Governmental Authorities, as applicable, as are necessary and appropriate to consummate the    transactions contemplated hereby).  Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within its control or influence to be satisfied or fulfilled, (ii) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled, and (iii) in the event the Bankruptcy Court requires a consumer privacy ombudsman to be appointed in connection with the transactions contemplated by this Agreement, Buyer shall provide any cooperation reasonably required by such ombudsman and shall use commercially

reasonable efforts to take all reasonable actions recommended by such ombudsman in any report provided to the Bankruptcy Court.

(b)      Without limiting the generality of Section 5.1(a), neither Party shall take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any Party to consummate, or materially delay any Party's ability to consummate, the transactions contemplated hereby, including any action that is intended or would reasonably be expected to result in any of the conditions to any Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

Section 5.2      Conduct of the Business Pending the Closing.

(a)      Prior to the Closing, except (i) as set forth on Section 5.2(a) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), each Seller shall (A) conduct the Business only in the Ordinary Course of Business and (B) use its commercially reasonable efforts to (1) preserve the present business operations, organization and goodwill of the Business, and (2) preserve the present relationships with material vendors and suppliers of the Business.

(b)      Except (i) as set forth on Section 5.2(b) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), no Seller shall, solely as it relates to the Business:

(i)      other than in the Ordinary Course of Business or as required by any applicable collective bargaining agreement or Law or pursuant to any Contract or policy in effect as of the date of this Agreement, (A) materially increase the annual level of compensation of any Covered Employee or (B) materially increase the coverage or benefits available under any (or create any new) Employee Benefit Plan;

(ii)      subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral;

(iii)      other than in the Ordinary Course of Business, sell, transfer, assign, license, sub-license, or otherwise dispose of any Acquired Asset;

(iv)      other than in the Ordinary Course of Business, remove any tangible Acquired Asset from the Stores; or

(v)      agree to do anything prohibited by this Section 5.2.

Section 5.3    Regulatory Approvals.

(a)    To the extent required, each of the Parties hereto shall make its respective filing under the HSR Act with respect to the transactions contemplated hereby within five (5) Business Days of the date of this Agreement, unless otherwise extended by mutual agreement between the Parties.  In addition, the Parties shall mutually agree to make any and all other filings required pursuant to other Antitrust Laws as promptly as reasonably practicable following the date of this Agreement.

(b)    Buyer shall use its best efforts to resolve as soon as reasonably practicable any inquiry or investigation by any Governmental Authority relating to the transactions contemplated by this Agreement under any Antitrust Law, including under the HSR Act. In connection with any such inquiry or investigation, Buyer further agrees to: (i) supply as promptly as reasonably practicable any additional information and documentary material that may be requested or required pursuant to any Antitrust Law; and (ii) keep Sellers reasonably informed of any material communication to or from any Governmental Authority with respect to any inquiry or investigation under any Antitrust Law.

(c)    Sellers shall have the right not to sell any and all Stores to Buyer if, and only if, any Governmental Authority with jurisdiction over the enforcement of an Antitrust Law, including the Federal Trade Commission, including its staff, or any state attorney general or its staff: (i) indicates orally or in writing that it has concerns that the acquisition of any such Store(s) may violate any Antitrust Law; or (ii) threatens or initiates litigation challenging the acquisition of any such Store(s) as violative of any Antitrust Law.  In the event that, subject to the limitations set forth herein, Sellers choose to exercise their right not to sell any Store(s) to Buyer, Buyer shall have no further right to acquire such Store(s), and the Purchase Price shall be reduced by the amount of the Purchase Price allocated to such Store(s) as set forth in Section 5.3(c) of the Disclosure Schedule ("Allocated Amount").

(d)    Notwithstanding any other provision in this Agreement, Buyer shall, and shall cause its Affiliates to, promptly take and diligently pursue any or all actions to the extent necessary to eliminate each and every impediment under any Antitrust Law that may be asserted by any Governmental Authority or any other Person in opposition to the consummation of any transaction contemplated hereby, so as to enable the Parties to consummate the transactions contemplated by this Agreement as soon as reasonably practicable, but in any event not later than the Outside Date.  In furtherance of this obligation, and without limitation, Buyer agrees to: (i) offer, negotiate, effect, and agree to, by consent decree, hold separate order or otherwise, any sale, divestiture, license, or other disposition of or restriction on, any of the Acquired Assets or Buyer's assets; provided, however, that any such sale, divestiture, license, disposition, restriction on, holding separate, or other similar arrangement or action is conditioned on the occurrence of, and shall become effective only from and after, the Closing Date; and (ii) to take any and all actions to avoid and, if necessary, defend any threatened or initiated litigation under any Antitrust Law that would prevent or delay consummation of the transactions contemplated by this Agreement.

(e)      Actions or agreements required of Buyer pursuant to this Section 5.3 shall under no circumstances be considered a Material Adverse Effect.

Section 5.4      Bankruptcy Court Matters.

(a)      Discrete Procedures Order.  This Agreement is subject to approval by the Bankruptcy Court in accordance with the Discrete Procedures Order and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Acquired Assets in accordance with the bidding procedures attached hereto as Exhibit E (the "Bidding Procedures") (whether in combination with other assets of the Sellers or their Affiliates or otherwise) (each a "Competing Bid") and an auction to be conducted in accordance with the Bidding Procedures (the "Auction").  From the date hereof (and any prior time) and until the transactions contemplated hereby are consummated, Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, including, to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, (including supplying information relating to the Business and the assets of Sellers to prospective purchasers).

(b)      Sale Order.  Provided Buyer is selected as the winning bidder in respect of the Acquired Assets at the Auction, or if no Competing Bid is submitted with respect to the Acquired Assets, Sellers shall seek entry of the Sale Order and any other necessary orders of the Bankruptcy Court to close the sale of the Acquired Assets in accordance with the terms and conditions of the Discrete Procedures Order.  Buyer and Sellers understand and agree that the consummation of the transactions contemplated by this Agreement is subject to approval by the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for providing the adequate assurance information as required by the Discrete Procedures Order, and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder.  In the event the entry of the Sale Order is appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(i)      Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude Sellers from filing such motions, including upon commencement of the Bankruptcy Cases, to reject any Contracts that are not Transferred Contracts.

(c)    Back-up Bidder.  Buyer agrees that, in the event that Buyer is not the winning bidder at the Auction, if and only if Buyer is notified that its bid at the Auction or the terms of this Agreement constitute the next highest or best bid for the applicable Acquired Assets (for the avoidance of doubt, on a Store by Store basis), Buyer shall be the Back-Up Bidder (as defined in the Bidding Procedures) and shall comply with the obligations of a Back-Up Bidder set forth in the Bidding Procedures.

Section 5.5    Notice of Developments.  Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII  not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.5 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.6    Access; No Contact.  Upon the reasonable request of Buyer, and to the extent not otherwise prohibited by applicable Law, Sellers will permit Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, books and records and Transferred Contracts included in the Acquired Assets during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of any Seller; provided, however, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto.  Prior to the Closing, Buyer shall not, and shall cause its Representatives not to, contact any employees, vendors, suppliers, landlords, or licensors of any Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller; provided, however, that so long as the applicable landlord for the applicable Store(s) is not a potential bidder at the Auction, Buyer may contact the landlords for the Stores beginning one (1) day following the bid deadline for the Auction.

Section 5.7    Bulk Transfer Laws.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.8    Replacement Bonding Requirements.  On or prior to the Closing Date, Buyer shall provide replacement guarantees, standby letters of credit or other assurances of payment with respect to all Bonding Requirements, in form and substance satisfactory to Sellers and any banks or other counterparty thereto, and, both prior to and following the Closing Date, Buyer and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Buyer and Sellers with respect to all Bonding Requirements.  To the extent Buyer is unable to make such arrangements with respect to any Bonding Requirements prior to the Closing, with Sellers' consent in lieu thereof, Buyer shall deliver to Sellers an irrevocable,

unconditional standby letter of credit in favor of Sellers in an amount equal to the amount of such Bonding Requirements, issued by a bank rated "A" or better by Standard and Poor's, in form and substance reasonably satisfactory to Sellers.  To Sellers' Knowledge there are no Bonding Requirements with respect to the Transferred Contracts.

   Section 5.9  <u>Financing</u>.  Buyer shall, and shall cause its Affiliates to, use its reasonable best efforts to obtain the Debt Financing at Closing on the terms and conditions described in the Debt Commitment Letter (<u>provided</u> that each Buyer may (a) amend the Debt Commitment Letter to add lenders, lead arrangers, bookrunners, syndication agents or similar entities who had not executed the Debt Commitment Letter as of the date of this Agreement, (b) amend the Debt Commitment Letter or the Fee Letter, as applicable, to implement any flex provisions applicable thereto or (c) otherwise replace or amend, or agree to any waivers in respect of, the Debt Commitment Letter or the Fee Letter so long as, in each case, such action would not reasonably be expected to delay or prevent the Closing or impair the availability of the Debt Financing and the terms are not less beneficial to Buyer, with respect to conditionality or enforcement, than those in the Debt Commitment Letter as in effect on the date of this Agreement), including using, and causing its Affiliates to use, reasonable best efforts to (i) take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary, proper or advisable in connection therewith, (ii) maintain in effect the Debt Financing Commitment for as long as the transactions contemplated by this Agreement are required to be consummated, (iii) satisfy on a timely basis all conditions applicable to the Buyer in the Debt Commitment Letter and otherwise comply in all material respects with their obligations thereunder, (iv) negotiate definitive agreements with respect thereto on the terms and conditions (including, to the extent the same are exercised, the flex provisions) contemplated by the Debt Commitment Letter or the Fee Letter, as applicable, or on other terms acceptable to the Buyer that would not (x) reduce the aggregate amount of the Debt Financing or (y) impose new or additional conditions precedent to the receipt of the Debt Financing and (v) if all of the conditions to the Buyer's obligations under <u>Section 7.1</u> (other than those conditions that, by their terms, will be satisfied on the Closing Date) have been satisfied or waived, consummate the Debt Financing at Closing.  Without limiting the generality of the foregoing, the Buyer shall give the Company prompt notice:  (A) of any material breach or default by any party to either Debt Commitment Letter or Fee Letter and (B) of the receipt of any written notice or other written communication from any person with respect to any: (x) breach, default, termination or repudiation by any party to either Debt Commitment Letter or Fee Letter or (y) material dispute between or among any parties to either Debt Commitment Letter or Fee Letter.  If any portion of the Debt Financing becomes unavailable on the terms and conditions (including the flex provisions) contemplated in the Debt Commitment Letter or the Fee Letter, the Buyer shall use their reasonable best efforts to obtain alternative financing from alternative sources in an amount sufficient to consummate the transactions contemplated by this Agreement as promptly as practicable following the occurrence of such event; it being understood that the Buyer shall have no obligation to accept terms that are materially less favorable, taken as a whole (after taking into account any flex provisions), to the Buyer than those included in the Debt Commitment Letter or the Fee Letter, as applicable, as of the date hereof.  The Buyer shall keep Seller informed on a reasonably current basis in reasonable detail of the status of its efforts to arrange the Debt Financing (subject to any applicable restrictions in the Debt Commitment Letter).

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.    In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

Section 6.2    Access; Enforcement; Record Retention.    From and after the Closing, upon request by any Seller, Buyer will permit Sellers and their Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Buyer, to all premises, properties, personnel, books and records, and Contracts of or related to the Acquired Assets or the Assumed Liabilities for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations of any Seller under this Agreement or any of the Related Agreements, or (c) complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable law, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations. Buyer agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing.

Section 6.3    Treatment of Affected Labor Agreements.    With respect to Covered Employees under an Affected Labor Agreement, Buyer shall not be obligated to assume any obligation of Sellers under such Affected Labor Agreements.    Notwithstanding the foregoing, Buyer acknowledges the requirements of sections 1113 and 1114 of the Bankruptcy Code and agrees to use good faith reasonable best efforts to cooperate with Sellers in ensuring compliance with any applicable provisions thereof.

Section 6.4    Covered Employees.

(a)    Offer of Employment.    At least five (5) days prior to the Closing Date, Buyer shall make an offer of employment, effective as of the Closing Date and contingent upon the Closing, to substantially all of Sellers' active employees at the Stores to employ such employees on a probationary basis, it being the intent of Buyer that such employees will be covered under Buyer's existing labor agreements with Locals 338 and 342, as appropriate, and on such terms as are acceptable to Buyer and such Locals.  If Buyer is unable to reach agreement with such Locals, Buyer's offer of employment will include compensation and employee benefits that are in the aggregate substantially comparable to the compensation and employee benefits provided by Buyer to employees

similarly situated to such active employees immediately prior to the Closing, under substantially similar terms and conditions of employment.  At least five (5) days prior to the Closing Date, Buyer may make an offer of employment  to Sellers' active employees who are not union represented, and such offers shall be on such terms and conditions as Buyer determines in its sole discretion.

(b)    No Third Party Beneficiary Rights.  The Parties agree that nothing in this Section 6.4, whether express or implied, is intended to create any third party beneficiary rights in any Covered Employee.

(c)    Cooperation.  After the Closing Date, Buyer shall, and shall cause its Affiliates to, cooperate with Sellers to provide such current information regarding the Covered Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Covered Employees under any applicable employee benefit that continues to be maintained by A&P or its Affiliates. Buyer shall, and shall cause its Affiliates to, permit Covered Employees to provide such assistance to A&P as may be required in respect of claims against A&P or its Affiliates, whether asserted or threatened, to the extent that, in A&P's opinion, (i) a Covered Employee has knowledge of relevant facts or issues, or (ii) a Covered Employee's assistance is reasonably necessary in respect of any such claim.

Section 6.5    Certain Tax Matters.

(a)    Transfer Taxes.  Buyer, on the one hand, and Sellers, on the other hand, shall pay two-thirds (2/3) and one-third (1/3), respectively, of any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee or governmental charge imposed under applicable Law in connection with the transactions contemplated hereby (a "Transfer Tax").  Accordingly, if either Seller is required by Law to pay any such Transfer Taxes, Buyer shall promptly reimburse such Seller for Buyer's portion of the amount of such Transfer Taxes actually paid by such Seller.  The party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall, subject to Section 2.8, prepare and timely file such Tax Returns. Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by the applicable Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned.  Buyer and Sellers shall cooperate in making, in a timely manner, all Tax Returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such Laws, the amount of any such Transfer Taxes.

(b)    Tax Adjustments.  Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes (other than those subsumed in Section 2.8), personal property Taxes and similar Taxes) for the Tax period in which the Closing occurs (the "Proration Period") will be apportioned and

prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes.  If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period.  When the actual amounts become known, such proration shall be recalculated by Buyer and Sellers, and Buyer or Sellers, as the case may be, promptly (but not later than ten (10) days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment or refund so that the correct prorated amount is paid by each of Buyer and Sellers.

(c)    Tax Refunds.  In furtherance of Sellers' right to retain those assets described in section (a)(C) of the definition of Excluded Assets, Sellers shall be entitled to receive from Buyer all refunds (or credits for overpayments) of Taxes, including any interest paid thereon, by a Governmental Authority, attributable to any tax period ending on or prior to the Closing Date (a "Pre-Closing Period") or the portion of any Proration Period ending on and including the Closing Date, net of any costs, fees, expenses or Taxes incurred in obtaining such refunds (or credits). Buyer and Sellers shall execute all documents, take reasonable additional actions and otherwise reasonably cooperate as may be necessary to obtain the Tax refunds (or credits) contemplated by this Section 6.5(c). Buyer shall pay any such Tax refund (or the amount of any such credit) to the Sellers within five (5) calendar days after Buyer receives such Tax refund from a Governmental Authority or files a Tax Return claiming such credit.

Section 6.6    Insurance Matters.  Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers, the Stores, or the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer, the Stores, or the Acquired Assets and no further coverage shall be available to Buyer, the Stores, or the Acquired Assets under any such policies.

Section 6.7    Acknowledgements.

(a)    Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics.  Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; and (iii) neither Buyer nor any other Person shall have any claim against any Seller or any of its respective directors, officers, Affiliates, agents, or other Representatives with respect thereto.  Accordingly,

without limiting the generality of <u>Section 3.11</u> or <u>Section 9.1</u>, Buyer acknowledges that neither Sellers nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information.

(b)    Buyer acknowledges that, except for the representations and warranties expressly set forth in <u>Article III</u> (which representations and warranties shall terminate and be of no further force or effect as of the Closing), and without limiting the generality of <u>Section 3.11</u>, neither Sellers nor any other Person makes any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding any Seller, the Stores, any Acquired Assets, any Assumed Liabilities or any other matter, and neither Sellers nor any other Person will be subject to any Liability to Buyer or any other Person resulting from such matters or the distribution to Buyer, or the use of, any such information.  Buyer acknowledges that, should the Closing occur, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities in an "as is" condition and on a "where is" basis, without any representation or warranty of any kind, express or implied (including any with respect to environmental, health or safety matters).  Further, without limiting any representation, warranty, or covenant of any Seller expressly set forth herein, Buyer acknowledges that it has waived and hereby waives as a condition to the Closing any further due diligence reviews, inspections, or examinations with respect to any Seller, the Stores, the Acquired Assets, the Assumed Liabilities, or any other matter, including with respect to engineering, environmental, title, survey, financial, operational, regulatory, and legal compliance matters.

Section 6.8    <u>Press Releases and Public Announcements</u>.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court.  If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure.  The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.9    <u>Seller Marks</u>.  The Seller Marks may appear on some of the Acquired Assets, including on signage.  Buyer acknowledges and agrees that it does not have and, upon consummation of the transactions contemplated by this Agreement, will not have, any right, title, interest, license, or other right to use the Seller Marks.  Buyer shall within thirty (30) days after the Closing Date remove the Seller Marks from, or cover or conceal the Seller Marks on, any Acquired Assets, or otherwise refrain from the use and display of the Acquired Assets on which the Seller Marks are affixed.

Section 6.10    <u>Licenses</u>.  With respect to any license to which any Seller is a party to related to any part of the space covered by the Leases, such Seller shall use commercially reasonable efforts to either terminate such license and/or reject such license under the Bankruptcy Code, excluding for the avoidance of doubt, any unexpired leases of real property under which a Seller is the lessor that is governed by section 365(h)(1)(A) of the Bankruptcy Code.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    Conditions to Buyer's Obligations.    Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article III shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier specific date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    in accordance with the Discrete Procedures Order, the Bankruptcy Court shall have entered (i) the Sale Order and (ii) any other order necessary to close the sale of the Acquired Assets, and no order staying, reversing, modifying, or amending such orders shall be in effect on the Closing Date;

(d)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(e)    each delivery contemplated by Section 2.6(b) to be delivered to Buyer shall have been delivered.

Section 7.2    Conditions to Sellers' Obligations.    Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article IV shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered (i) the Sale Order and (ii) any other order necessary to close the sale of the Acquired Assets, and no order staying, reversing, modifying, or amending such orders shall be in effect on the Closing Date;

(d)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(e)    each payment contemplated by Section 2.6(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.6(c) to be delivered to Sellers shall have been delivered.

Section 7.3    No Frustration of Closing Conditions.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or commercially reasonable efforts, with respect to those matters contemplated by Section 5.3, respectively, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination of Agreement.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)    by the mutual written consent of the Parties;

(b)    by any Party by giving written notice to the other Parties if:

(i)    any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to Buyer if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of Buyer to have fulfilled any of its obligations under this Agreement; or

(ii)    the Closing shall not have occurred prior to December 31, 2015 (the "Outside Date"); provided that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(b)(ii).

(c)    by Buyer by giving written notice to each Seller if there has been a material breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) ten (10) days after receipt of Buyer's notice of intent to terminate or (B) the Outside Date;

(d)      by any Seller by giving written notice to Buyer and the other Seller if there has been a material breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (A) ten (10) days after receipt of such Seller's notice of intent to terminate or (B) the Outside Date;

(e)      by Sellers or Buyer with respect to any of the Stores (and the Acquired Assets related thereto), if (x) Sellers enter into a definitive agreement with respect to a Competing Bid with respect to the applicable Store(s), (y) the Bankruptcy Court enters an order approving a Competing Bid with respect to such Store(s) and (z) the Person making such Competing Bid consummates such Competing Bid, subject to Buyer's right to payment of the Termination Payment, if applicable, in accordance with the provisions of Section 2.4; or

(f)      by Sellers or Buyer, if the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

Section 8.2      Effect of Termination.   If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 3.11, Section 6.7, Section 8.3, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 8.3) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, that other than in the case of fraud or willful misconduct, that (a) the maximum Liability of Sellers under this Agreement shall not exceed Buyer's reasonable and documented out-of-pocket expenses up to an aggregate amount of $45,000 and (b) the maximum liability of Buyer under this Agreement shall not exceed the Escrow Amount.

Section 8.3      Lease Indemnity.   If this Agreement is terminated pursuant to Section 8.1(b) or Section 8.1(d), Buyer shall indemnify Sellers for all Liabilities and Damages arising out of any Lease assumed by Sellers pursuant to section 365(k) of the Bankruptcy Code.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1      Survival.   Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.6(b) or Section 2.6(c) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 9.2    Expenses.  Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.  This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    Incorporation of Exhibits and Disclosure Schedule.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.  Notwithstanding the preceding, prior to Closing and only upon the advance written notice to Sellers, Buyer may assign its rights under this Agreement with respect to the Stores and Leases to one or more Affiliates of Buyer; provided, that any such assignment pursuant to this Section 9.6 shall not relieve Buyer of any Liability or any of its obligations hereunder.

Section 9.7    Notices.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e)

three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

|  |  |
|---|---|
| If to either Seller: | The Great Atlantic & Pacific Tea Company, Inc.<br>2 Paragon Drive<br>Montvale, New Jersey 07645<br>Attention:  Christopher W. McGarry<br>                      Matthew Bennett<br>E-mail: mcgarryc@aptea.com; bennettm@aptea.com |
|  | With a copy (which shall not constitute notice to Sellers) to: |
|  | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention: Ray C. Schrock, P.C. and Gavin Westerman<br>Facsimile: (212) 310-8007<br>E-mail: ray.schrock@weil.com; gavin.westerman@weil.com |
| If to Buyer: | R.B.G. Management Corp. d/b/a Morton Williams Supermarkets<br>15 E. Kingsbridge Road<br>Bronx, New York 104689<br>Attention: Avi Kaner<br>Facsimile: 718 364-7664<br>E-mail: AviKaner@mortonwilliams.com |
|  | With a copy (which shall not constitute notice to Buyer) to: |
|  | Rich Michaelson Magaliff Moser LLP<br>335 Madison Avenue<br>New York, New York 10017<br>Attention: Jeffrey N. Rich<br>Facsimile: 212 913 9641<br>E-mail: Jrich@r3mlaw.com |

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 9.7.

Section 9.8    Governing Law.   This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    Submission to Jurisdiction; Service of Process.  Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the

transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 9.7</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 9.9</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    <u>Waiver of Jury Trial</u>. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    <u>Specific Performance</u>. Buyer acknowledges and agrees that Sellers and their respective estates would be damaged irreparably in the event Buyer does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Sellers may have under law or equity, each Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

Section 9.12    <u>Severability</u>. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13    <u>No Third Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

Section 9.14    <u>Non-Recourse</u>. All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are

expressly identified as parties hereto or thereto (the "Contracting Parties"). In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 9.14.

Section 9.15    Mutual Drafting.    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16    Disclosure Schedule.    All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure for all purposes of this Agreement and all other sections of the Disclosure Schedule to which such matter relates. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced.

The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.17    Headings; Table of Contents.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18    Counterparts; Facsimile and Electronic Signatures.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

Section 9.19    Limitations Under Applicable Law.  Notwithstanding anything to the contrary contained in this Agreement, Sellers' obligations hereunder shall be subject to limitations under applicable Law, including, without limitation, Sections 1113 and 1114 of the Bankruptcy Code.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.

By: _____
    Name: Christopher W. McGarry
    Title: Executive Vice President and Chief Administrative Officer

SHOPWELL, INC.

By: _____
    Name: Christopher W. McGarry
    Title: Vice President & Secretary

A&P REAL PROPERTY, LLC

By: _____
    Name: Christopher W. McGarry
    Title: Vice President & Secretary

R.B.G. MANAGEMENT CORP. D/B/A MORTON WILLIAMS SUPERMARKETS

By: _____
    Name: Abraham Avi Kaner
    Title: Vice President

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.


By: _____
　　　Name: Christopher W. McGarry
　　　Title: Executive Vice President and Chief Administrative Officer


SHOPWELL, INC.


By: _____
　　　Name: Christopher W. McGarry
　　　Title: Vice President & Secretary


A&P REAL PROPERTY, LLC


By: _____
　　　Name: Christopher W. McGarry
　　　Title: Vice President & Secretary


R.B.G. MANAGEMENT CORP. D/B/A MORTON WILLIAMS SUPERMARKETS


By: _____
　　　Name: Abraham Avi Kaner
　　　Title: Vice President


[Signature Page to Asset Purchase Agreement]