**Objection Deadline: October 1, 2015 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objection Filed): TBD**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
In re                                        :
                                             :      Chapter 11
THE GREAT ATLANTIC & PACIFIC TEA             :
COMPANY, INC., et al.,                       :      Case No. 15-23007 (RDD)
                                             :
          Debtors.¹                          :      (Jointly Administered)
                                             :
-------------------------------------------------------x
```

**NOTICE OF AUCTION PURSUANT TO DISCRETE
SALE AND LEASE RATIONALIZATION PROCEDURES**

**PLEASE TAKE NOTICE** that:

1.      On July 19, 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

2.      On August 11, 2015, the Bankruptcy Court entered the *Order Approving Discrete Sale and Lease Rationalization Procedures* [Docket No. 496] (the "**Discrete**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc. (3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

Procedures Order"").    A copy of the Discrete Procedures Order may be found at: http://cases.primeclerk.com/aptea.

3.        Pursuant to Section III.A of the Discrete Sale and Lease Rationalization Procedures attached to the Discrete Procedures Order as Exhibit 1 (the "**Discrete Procedures**"), the Debtors have determined to hold an auction (the "**Auction**") with respect to the Additional Stores[2] included in the Wakefern Package (defined below) only in the event the Debtors receive a Qualified Bid from a bidder other than Wakefern Food Corp. ("**Wakefern**").

4.        The Auction, if any, will take place on **October 8, 2015 at 9:30 a.m.** at the offices of Weil, Gotshal & Manges LLP, located at 767 Fifth Avenue, New York 10153.

5.        On August 11, 2015, the Bankruptcy Court approved the Global Bidding Procedures attached as Exhibit 1 to the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, if Necessary, and Sale Hearings* [Docket No. 495] (the "**Global Procedures**").

6.        In consultation with the Consultation Parties, the Debtors have determined that the auction rules and bidding procedures set forth in the Global Procedures, as modified to the extent set forth on **Exhibit A** hereto (the "**Bidding Procedures**"), are appropriate to promote a spirited and robust auction, if any, for the Wakefern Package.

7.        Pursuant to Section III.C of the Discrete Procedures, A&P Live Better, LLC and A&P Real Property, LLC, two of the Debtors, have entered into a lease sale agreement with Wakefern (the "**Wakefern Agreement**"), a copy of which is attached hereto as **Exhibit B**, pursuant to which the Debtors have designated Wakefern as a Stalking Horse with respect to the following Additional Stores, including related assets, as more particularly described in the Wakefern Agreement (the "**Wakefern Package**"):

| | Store | Banner | City | Address | State |
|---|---|---|---|---|---|
| 3 | 70074 | A&P | Danbury | 1 Padanaram Road | CT |
| 17 | 72653 | Pathmark | Bethpage | 3901 Hempstead Turnpike | NY |
| 18 | 72649 | Pathmark | New Hyde Park | 2335 New Hyde Park Road | NY |
| 34 | 70699 | Waldbaums | Deer Park | 1960 Deer Park Avenue | NY |
| 52 | 72558 | Pathmark | Brookhaven | 5005 Edgemont Avenue | PA |
| 53 | 72569 | Pathmark | Glenolden | 140 North MacDade Boulevard | PA |
| 54 | 72552 | Pathmark | Philadelphia | 330 Oregon Avenue | PA |
| 56 | 72522 | Pathmark | Philadelphia | 3399 Aramingo Avenue | PA |

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Discrete Procedures or the Bidding Procedures, as applicable.

2

| | Store | Banner | City | Address | State |
|---|---|---|---|---|---|
| 122 | 70003 | A&P | Lagrangeville | 1643 Route 82 | NY |
| 141 | 72528 | Pathmark | Wyncote | 1000 Easton Road | PA |
| 147 | 72556 | Pathmark | Philadelphia | 4160 Monument Avenue | PA |
| 151 | 72568 | Pathmark | Upper Darby | 421 S. 69th Street | PA |

8.    The material terms and conditions of the Bid Protections offered to Wakefern (the "**Bid Protections**") are as follows:

| Stores | Purchase Price | Breakup Fee | % of Purchase Price |
|---|---|---|---|
| Wakefern Package | $40,000,000.00 | $1,200,000.00 | 3% |

As set forth in greater detail in the Bidding Procedures and the Wakefern Agreement, the Bid Protections apply to the entire Wakefern Package on a group basis.

9.    Any objection to the Bid Protections (an "**Objection**"), must:  (i) be in writing; (ii) state with specificity the nature of the objection; and (iii) be filed with the Bankruptcy Court and served on (a) The Great Atlantic and Pacific Tea Company, Inc., 2 Paragon Drive, Montvale, New Jersey 07645 (Attn: Christopher W. McGarry and Matthew Bennett); (b) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. and Garrett A. Fail, Esq.); (c) Hilco, 5 Revere Dr. Suite 320, Northbrook, IL 60062 (Attn: Gregory S. Apter) (collectively, the "**Debtor Notice Parties**"); (d) the attorneys for the Creditors' Committee, Pachulski Stang Ziehl & Jones, LLP, 780 Third Avenue, 34th Floor, New York, NY 10017 (Attn: Robert J. Feinstein, Esq., and Bradford J. Sandler, Esq.); and (e) the attorneys for Wakefern, Greenberg Traurig, LLP, MetLife Building, 200 Park Avenue, New York, NY  10166 (Attn:  Dennis J. Block, Esq.) and Cole Schotz P.A., 900 Third Avenue, 16th Floor, New York, NY  10022  (Attn:  Ilana Volkov, Esq.) so that it is actually received by the Debtor Notice Parties, the Creditors' Committee and Wakefern on or before **October 1, 2015 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

10.    If any Objections are timely filed and served by the Objection Deadline, a hearing (the "**Hearing**") on the Bid Protections will be scheduled before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601.

11.    Objecting parties are required to attend the Hearing and failure to appear may result in relief being granted or denied upon default.

3

12.     If no Objections are timely filed and served by the Objection Deadline, Wakefern and the Wakefern Agreement shall be approved as the Stalking Horse and the Stalking Horse Bid, respectively, and the Bid Protections shall be deemed fully and finally authorized by the Bankruptcy Court under the terms of the Discrete Procedures Order and no further notice or Bankruptcy Court approval shall be required or necessary.

Dated: September 24, 2015
     New York, New York

          /s/ Garrett A. Fail
          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York  10153
          Telephone:  (212) 310-8000
          Facsimile:  (212) 310-8007
          Ray C. Schrock, P.C.
          Garrett A. Fail

          *Attorneys for Debtors*
          *and Debtors in Possession*

**<u>Exhibit A</u>**

**Bidding Procedures**

WEIL:\95468547\5\50482.0005

## BIDDING PROCEDURES

### Overview

On July 19, 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On August 11, 2015, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (the "**Discrete Procedures Order**"),[3] approving the Discrete Sale and Lease Rationalization Procedures attached to the Discrete Procedures Order as Exhibit 1 (the "**Discrete Procedures**") which, among other things, authorized the Debtors to (i) hold an auction in connection with the sale of one or more of the Additional Stores[4], (ii) establish any rules for such auction that the Debtors determine, in consultation with the Consultation Parties, are appropriate to promote a spirited and robust auction, and (iii) designate a Stalking Horse and offer Bid Protections; *provided* that the Bid Protections shall not exceed 3% of the cash portion of the Stalking Horse's Bid.

On September 24, 2015, the Debtors filed a *Notice of Auction Pursuant to Discrete Sale and Lease Rationalization Procedures* (the "**Auction Notice**") designating Wakefern Food Corp. ("**Wakefern**") as a stalking horse bidder with respect to the following Additional Stores and related assets, as more particularly set forth in the Wakefern Agreement (as defined below) (collectively, the "**Wakefern Package**"):

| | Store | Banner | City | Address | State |
|---|---|---|---|---|---|
| 3 | 70074 | A&P | Danbury | 1 Padanaram Road | CT |
| 17 | 72653 | Pathmark | Bethpage | 3901 Hempstead Turnpike | NY |
| 18 | 72649 | Pathmark | New Hyde Park | 2335 New Hyde Park Road | NY |
| 34 | 70699 | Waldbaums | Deer Park | 1960 Deer Park Avenue | NY |
| 52 | 72558 | Pathmark | Brookhaven | 5005 Edgemont Avenue | PA |
| 53 | 72569 | Pathmark | Glenolden | 140 North MacDade Boulevard | PA |
| 54 | 72552 | Pathmark | Philadelphia | 330 Oregon Avenue | PA |
| 56 | 72522 | Pathmark | Philadelphia | 3399 Aramingo Avenue | PA |
| 122 | 70003 | A&P | Lagrangeville | 1643 Route 82 | NY |
| 141 | 72528 | Pathmark | Wyncote | 1000 Easton Road | PA |

---

[3] A copy of the *Order Approving Discrete Sale and Lease Rationalization Procedures* [Docket No. 496] may be found at: http://cases.primeclerk.com/aptea.

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Discrete Procedures, the Global Procedures (defined below) or the Wakefern Agreement (defined below) as applicable.

| | Store | Banner | City | Address | State |
|---|---|---|---|---|---|
| 147 | 72556 | Pathmark | Philadelphia | 4160 Monument Avenue | PA |
| 151 | 72568 | Pathmark | Upper Darby | 421 S. 69th Street | PA |

The Wakefern Package is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures. These Bidding Procedures describe, among other things: (A) the procedures for Qualified Bidders (defined below) to submit bids for one or more of the Additional Stores in the Wakefern Package; (B) the conduct of the auction with respect to the Wakefern Package (the "**Auction**"), if any; and (C) the ultimate selection of the Successful Bidder(s) (as defined below) and Bankruptcy Court approval thereof.

On August 11, 2015, the Bankruptcy Court approved the Global Procedures attached as Exhibit 1 to the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, if Necessary, and Sale Hearings* [Docket No. 495] (the "**Global Procedures**")). The Additional Stores in the Wakefern Package have been extensively marketed in accordance with the Global Procedures. **Any party who timely submitted a bid on any of the Additional Stores in the Wakefern Package pursuant to the Global Procedures does not need to resubmit a bid. The submitted bid, to the extent it remains a binding bid under the Global Procedures, will be deemed a bid submitted for purposes of the Wakefern Package.**

### Summary of Important Dates

| | |
|---|---|
| **September 29, 2015** | • Debtors to File and Serve Sale Motion and Cure Notice<br>• Debtors to Serve Wakefern Adequate Assurance Information |
| **October 1, 2015 at 4:00 p.m.** | • Deadline to Object to Wakefern Bid Protections |
| **TBD** | • Hearing on Wakefern Bid Protections (*If Objections Filed*) |
| **October 6, 2015 at 5:00 p.m.** | • Bid Deadline for Stores in Wakefern Package |
| **October 7, 2015 at 5:00 p.m.** | • Debtors to File Notice (1) Cancelling Auction If No Other Qualified Bid Received or (2) of Baseline Bids and Qualified Bidders for Auction |
| **October 8, 2015 at 9:30 a.m.** | • Auction to be conducted at the offices of Weil, Gotshal & Manges LLP; 767 Fifth Avenue, New York, New York 10153 |

WEIL:\95468547\5\50482.0005

| October 9, 2015 | • Debtors to File and Serve Notice of Successful Bidder(s) |
|---|---|
| **October 9, 2015 at 4:00 p.m.** | • Deadline to Object to Sale of Wakefern Package, Including Assumption and Assignment of Leases and Subleases, to Wakefern and/or a Designated Member and Proposed Cure Amounts |
| **October 12, 2015** | • Debtors to Serve Adequate Assurance Information for Successful Bidder(s) (*If Not Wakefern*) |
| **October 16, 2015, at 10:00 a.m.** | • Sale Hearing (*If No Auction Conducted or Wakefern is the Successful Bidder*) |
| **October 22, 2015 at 4:00 p.m.** | • Deadline to Object to Sale of Stores in Wakefern Package, Including Assumption and Assignment of Leases and Subleases, to Successful Bidder(s) (*If Not Wakefern*) |
| **TBD** | • Sale Hearing (*If Auction Conducted and Wakefern is not the Successful Bidder*) |

Access to Diligence

        To participate in the diligence process and receive access to due diligence information with respect to any of the Additional Stores in the Wakefern Package, a party must submit to the Debtors or their advisors:

(A)     an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder(s); and

(B)     sufficient information, as reasonably determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to reasonably determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure reasonably acceptable to the Debtors in their discretion).

        An interested party shall be a "**Potential Bidder**" if the Debtors determine in their reasonable discretion, after consultation with the Consultation Parties, that an interested party has satisfied the above requirements.  As soon as practicable, the Debtors will deliver to such Potential Bidder:  (A) an information package containing information and financial data with respect to the Additional Stores in the Wakefern Package in which such Potential Bidder has expressed an interest; and (B) access to the Debtors' confidential electronic data room concerning the Stores (the "**Data Room**").

        Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

4

Due Diligence

Until the Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be initially directed to:

(A)    Paul Billyard and Will Jurist of Evercore (Billyard@Evercore.com and William.Jurist@Evercore.com) if you are interested in purchasing any of the Stores as a going concern; and

(C)    Gregory Apter of Hilco (gapter@hilcoglobal.com) if you are interested in purchasing any of the Stores as a going concern or any of the Stores' leases or designation rights associated with such leases; or

(B)    Weil at APDiligence@weil.com.

The Debtors will simultaneously distribute via the Data Room in written form any additional diligence materials not previously provided to Wakefern or any other Potential Bidder to all Potential Bidders for the Stores to which such diligence materials relate (including, if applicable, Wakefern) and the Consultation Parties.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (A) the Potential Bidder does not become a Qualified Bidder (as defined below) or (B) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Additional Stores in the Wakefern Package to any person or entity who is not a Potential Bidder or a Consultation Party or who does not comply with the participation requirements set forth above.

**Auction Qualification Procedures**

Bid Deadline

A Potential Bidder that desires to make a bid on one or more of the Stores in the Wakefern Package shall deliver written and electronic copies of its bid in both PDF and MS-WORD format to the Debtor Notice Parties so as to be received no later than **October 6, 2015 at 5:00 p.m. (Eastern Time)** (the "**Bid Deadline**").

**Any party that does not submit a bid by the Bid Deadline will not be allowed to (A) submit any offer after the Bid Deadline, or (B) participate in the Auction; provided, that if a Potential Bidder has already submitted a bid for one of the Stores in the Wakefern Package pursuant to the Global Procedures, such Potential Bidder does not need to resubmit such bid in order for the Debtors to consider such bid in connection with determining whether any Bids, including any Partial Bids (defined below) together, may qualify as a Qualified Bid (defined below) for the Wakefern Package.**

WEIL:\95468547\5\50482.0005

<u>Form and Content of Qualified Bid</u>

        A bid is a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a sale transaction), and any other party that will be participating in connection with the bid or the sale transaction, and includes, at a minimum, the following information (each, a "**Bid**"):

    A.    <u>Proposed Stores and Valuation</u>.  Each Bid must clearly identify and list the particular Additional Stores in the Wakefern Package, additional assets (such as inventory or furniture, fixtures and equipment ("**FF&E**")) and liabilities that the Potential Bidder seeks to acquire.  The Bid must identify, on a per Store basis, the valuations, in U.S. dollars, that the Potential Bidder associates with each of those Stores, and a description of any significant assumptions on which such valuations are based.  To the extent the Bid proposes to purchase additional assets associated with the Stores, such as inventory or FF&E, the Bid shall clearly identify the value, in U.S. dollars, associated with such assets.

    B.    <u>Marked Agreement</u>.  Each Bid must include a copy of an asset purchase agreement or lease sale agreement, as applicable, reflecting the terms and conditions of its Bid, which agreement must be marked to show any proposed amendments and modifications to the form of (i) going-concern asset purchase agreement provided by the Debtors in the Data Room or (ii) the lease sale agreement executed by Wakefern (the "**Wakefern Agreement**"), as applicable (the "**Marked Agreement**").

    C.    <u>Unconditional Offer</u>.  A statement that the Bid is formal, binding and unconditional (except for those conditions expressly set forth in the applicable Marked Agreement) and is not subject to any due diligence or financing contingency and is irrevocable until the first business day following the closing of the proposed sale transaction, except as otherwise provided in these Bidding Procedures.

    D.    <u>Form of Consideration</u>.  Unless the Bid includes a credit bid (as described below), a statement confirming that the Bid is based on an all-cash offer, including, sufficient cash consideration to pay the applicable $1,200,000.00 breakup fee to Wakefern (the "**Breakup Fee**"); <u>provided</u> that any Bid that includes a credit bid shall also include a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee and shall comply with that certain Intercreditor Agreement, dated as of March 13, 2012 (as amended and supplemented, including pursuant to that certain Supplemental Senior Lien Intercreditor Agreement as amended) (the "**Intercreditor Agreement**"), including Section 5.06 thereof.

WEIL:\95468547\5\50482.0005

E.      Purchase Price; Minimum Bid.

1.  Wakefern Package.  Each Bid submitted in connection with the Wakefern Package must (i) be a Bid for all of the Stores in the Wakefern Package, (ii) propose an alternative transaction that provides substantially similar or better terms than Wakefern's Stalking Horse Bid and (iii) (a) exceed the applicable cash purchase price by the Minimum Overbid Amount (as defined below) and the Breakup Fee; or (b) propose to purchase all the assets in the Wakefern Package for cash, and assume the corresponding liabilities on similar or better terms as Wakefern's Stalking Horse Bid.

2.  Bids for Individual Stores or Combination of Stores.  Bidders may also submit Bids for individual Stores or combinations of Stores in the Wakefern Package (each a "**Partial Bid**").  The Debtors will determine, after consultation with the Consultation Parties, whether such Bids qualify as Qualified Bids.  If a Bid includes one or more Stores currently included in the Wakefern Package, but is not for all of the Stores included in the Wakefern Package, such Bid will not be considered to be a "Qualified Bid" unless the Debtors receive one or more Bids for the remaining Stores in the Wakefern Package that, in combination with one or more other Bids, constitute a higher or better bid than Wakefern's Stalking Horse Bid.

F.      Employee and Labor Terms.  Except as set forth in the Wakefern Agreement, if the Bid contemplates a going concern sale of a Store in the Wakefern Package, a statement of proposed terms for unionized and non-unionized employees, which shall include, alternatively:  (i) a statement that the Potential Bidder will assume the collective bargaining agreements (the "**Affected Labor Agreement**") covering any of the employees of the Debtors at the Closing (as defined in the Wakefern Agreement) whose duties relate primarily to the operation of such Store, including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing (the "**Covered Employees**") without modification; or (ii) if the Potential Bidder will not assume the Affected Labor Agreements without modification, a statement that the Potential Bidder will enter into good faith negotiations with each of the unions representing any of the Covered Employees (the "**Affected Unions**") to enter into modified collective bargaining agreements, including a term sheet, which shall be attached to the Marked Agreement, proposing post-closing work rules and conditions to be offered to unionized employees.  Such statement shall also include an acknowledgment of the requirements of sections 1113 and 1114 of the Bankruptcy Code and an agreement to use good faith reasonable best efforts to cooperate with the Debtors in ensuring compliance with any applicable provisions thereof in the event that mutually satisfactory modified collective bargaining agreements have not been entered into between the Potential Bidder and the Affected Unions to the closing of a sale contemplated by these Bidding Procedures.

WEIL:\95468547\5\50482.0005

G.  <u>Pension Plans</u>.  Each Bid must state whether or not the Potential Bidder intends to assume (i) sponsorship of all or any part of or (ii) any of the potential liabilities associated with The Great Atlantic & Pacific Tea Company Pension Plan, New York-New Jersey Amalgamated Pension Plan for A&P Employees, Delaware County Dairies, Inc. Hourly Employees Pension Plan, and Pathmark Stores, Inc. Pension Plan (collectively, the "Pension Plans").  If the Potential Bidder does not intend to assume sponsorship or liabilities of the Pension Plans in full, each Bid must state whether the Potential Bidder intends to assume the assets and liabilities of the Pension Plan(s) relating to plan participants associated with the stores in the Bid.

H.  <u>Required Approvals</u>.  If applicable, a statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the business and stores included in its Bid from and after closing the sale transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals. A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Marked Agreement.

I.  <u>No Entitlement to Expense Reimbursement or Other Amounts</u>.  Except as provided with respect to Wakefern, a statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Wakefern Package.

J.  <u>Adequate Assurance Information</u>.  Information supporting the Potential Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Potential Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to the Potential Bidders.

Notwithstanding the foregoing, if a Bid for a Store is submitted by the landlord under the real property lease for such Store (a "**Landlord Lease Bid**"), such landlord need not satisfy the requirements set forth in subsections F, G, H, and J above; <u>provided</u> that such landlord must satisfy the requirements set forth in subsection F and G above if its Landlord Lease Bid contemplates a going concern purchase of the Store.  For the avoidance of doubt, a Landlord Lease Bid will not be considered a "Qualified Bid" unless the requirements for a "Qualified Bid" set forth in subsection E.2 above are satisfied.

WEIL:\95468547\5\50482.0005

A Potential Bidder must also accompany its Bid with: (A) a Deposit (as defined below); (B) the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Potential Bidder; (C) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the applicable Marked Agreement) and such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement, as acceptable in the Debtors' business judgment, in consultation with the Consultation Parties, including a description of each investor and any additional party or parties investing in the transaction included in the applicable bid and such party's financial position; (D) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Marked Agreement; (E) a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; (F) if the value of the Bid relative to Wakefern Agreement includes additional non-cash components (such as fewer contingencies than are in the Wakefern Agreement), a detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value; and (G) if the Bid includes an asset purchase agreement that is not executed, a signed statement that such Bid is irrevocable until the first business day following the closing or closings of the applicable sale transaction.

**The submission of a Bid by the Bid Deadline shall constitute a binding and irrevocable offer to acquire the Stores or other assets reflected in such Bid.**

Deposit

To qualify as a Qualified Bid (as defined below), each Bid must be accompanied by a good faith cash deposit in the amount of five percent (5%) of the proposed purchase price, to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "**Escrow Agent**") pursuant to the escrow agreement to be provided by the Debtors to the Potential Bidders (the "**Escrow Agreement**"); provided that with respect to a Landlord Lease Bid, the landlord may deduct from its Deposit the amount of any undisputed monetary obligations that constitute the Cure Costs for the applicable real property lease.

To the extent the Stores included in a Qualified Bid are modified at or prior to the Auction, the Qualified Bidder must adjust its Deposit so that it equals five percent (5%) of the proposed purchase price to be paid for each Store.

Review of Bids

The Debtors will deliver, within one (1) business day after receipt thereof, copies of all Bids to the Consultation Parties and, if such Bids include the assumption of any liabilities associated with the Pension Plans, the Pension Benefit Guaranty Corporation, 1200 K Street, N.W., Washington, D.C. 20005 (Attn: Thea Davis, davis.thea@pbgc.gov).

WEIL:\95468547\5\50482.0005

The Debtors will evaluate timely submitted bids, in consultation with the Consultation Parties, and may engage in negotiations with Potential Bidders who submitted Bids complying with the preceding paragraphs as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid.  In evaluating the bids, the Debtors may take into consideration the following non-binding factors:

1. the amount of the Bid and the Stores and number of Stores and other assets proposed to be acquired;

2. the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates after the payment of the Breakup Fee;

3. any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities through a credit bid;

4. any benefit to the Debtors' bankruptcy estates from any other assumption of liabilities, including any liabilities under the Pension Plans, the assumption of the sponsorship of all, any, or a portion of the Pension Plans;

5. the value to be provided to the Debtors under the Bid for the Stores included therein (individually and in the aggregate);

6. the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals;

7. the impact on employees, employee claims against the Debtors, Affected Labor Agreements, and whether the Potential Bidder has reached an agreement with the Affected Unions;

8. the impact on trade creditors and landlords; and

9. any other factors the Debtors may reasonably deem relevant.

<u>Designation of Qualified Bidders</u>

A bid will be considered a "**Qualified Bid**," and each Potential Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**," if the Debtors determine, after consultation with the Consultation Parties, that such Bid meets the requirements set forth in these Bidding Procedures.  For the avoidance of doubt, a Bid will not be deemed a Qualified Bid unless (i) the Bid is for all of the Acquired Assets in the Wakefern Package or (ii) if the Debtors receive Partial Bids that, in combination, constitute a higher or better Bid than Wakefern's Stalking Horse Bid.

The Debtors reserve the right to work with any Bidder in advance of the Auctions to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid.  The

Debtors may accept a single Bid or multiple Bids for non-overlapping Stores such that, if taken together, would otherwise meet the standards for a single Qualified Bid as to the Wakefern Package (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the applicable Auction).  If a Bid is received and, in the Debtors' judgment, after consultation with the Consultation Parties, it is not clear whether the Bid is a Qualified Bid, the Debtors may consult with the Potential Bidder and seek additional information in an effort to establish whether or not the Bid is a Qualified Bid.

The Debtors, after consultation with the Consultation Parties, will have the right to determine that a Bid is not a Qualified Bid if any of the following conditions are satisfied:

(A)    A Potential Bidder has failed to comply with reasonable requests for additional information from the Debtors;

(B)    If the Bid includes a credit bid, such Bid does not (i) include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment), (ii) comply with the terms of the Intercreditor Agreement or (iii) pay cash in the amount of any assets on which such bidder seeks to purchase, but does not have a valid, perfected and unavoidable lien; <u>provided</u> that any Bid that does not include a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee shall not be a Qualified Bid; or

(C)    The terms of the Bid are burdensome or conditional in view of the proposed purchase price or are materially more burdensome or conditional than the terms of the Wakefern Agreement, and are not offset by a material increase in purchase price, which determination (as made by the Debtors in consultation with the Consultation Parties) may take into consideration, among other things:

(i)    whether the Bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including, the Breakup Fee);

(ii)    whether the Bid includes a non-cash instrument or similar consideration that is not freely marketable.

Wakefern is a Qualified Bidder and Wakefern's Stalking Horse Bid is a Qualified Bid as to the Wakefern Package.  Should it decide to credit bid, each of (A) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014, (B) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014, (C) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured PIK Toggle Notes due 2017, dated as of March 13, 2012, or the majority holder of the Senior Secured PIK Toggle Notes due 2017, (D) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured Convertible Notes due 2018, dated as of March 13, 2012, or the majority

11

holder of the Senior Secured Convertible Notes due 2018, and (E) the DIP Lenders is a Qualified Bidder and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline, complies with the above requirements set forth under the heading "Designation of Qualified Bidders," complies with section 363(k) of the Bankruptcy Code, complies with the requirements for a credit bid, complies with section 5.06(d) of the Intercreditor Agreement and includes a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee, and all obligations secured by senior liens on the applicable assets to be purchased.

### **Pre-Auction Procedures**

Determination and Announcement of Baseline Bids

    In the event Qualified Bids other than the Wakefern Stalking Horse Bid are submitted by the Bid Deadline, in consultation with the Consultation Parties, the Debtors shall make a determination regarding:

    (A)  the highest or best Qualified Bid (or collection of Qualified Bids) for the Wakefern Package (each, a "**Baseline Bid**" and such bidder or group of bidders, a "**Baseline Bidder**") to serve as the starting point at the Auction for the Wakefern Package; and

    (B)  which Bids have been determined to be Qualified Bids.

    On **October 7, 2015, at 5:00 p.m. (Eastern Time)** (the "**Designation Deadline**"), the Debtors shall file notice of the foregoing on the Court's docket and publish such notice on the website of their claims and noticing agent and in the Data Room.  As soon as practicable but no later than one (1) day prior to the Auction, the Debtors will provide copies of each Baseline Bid to the Consultation Parties and Wakefern.

    Between the date hereof and the Auction, the Debtors may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for the Debtors, during the period that such Qualified Bid remains binding as specified herein; provided that any Qualified Bid may be improved at the Auction, as set forth in the Bidding Procedures.

    Except as provided in the Wakefern Agreement, the Debtors are under no obligation to (A) select any Baseline Bid, (B) consummate or pursue any transaction with respect to one or more of the Stores in the Wakefern Package, or (C) conduct the Auction, whether before or after selecting a Baseline Bid.  Notwithstanding anything to the contrary contained herein, the Debtors may elect, in their reasonable discretion, and after consultation with the Consultation Parties, to consummate the sale transactions contemplated in the Wakefern Agreement to Wakefern without holding the Auction.

<u>Failure to Receive Two or More Qualified Bids</u>

        If no Qualified Bid other than the one submitted by Wakefern is received by the Bid Deadline, the Debtors will not conduct the Auction for the Wakefern Package, and shall file and serve, **by October 7, 2015 at 5:00 p.m. (Eastern Time)**, a notice indicating that the Auction has been cancelled with respect to the Wakefern Package, that Wakefern is the Successful Bidder as to the Wakefern Package and that the Sale Hearing as to the Wakefern Package will be conducted on the date set forth in the Sale Motion (defined below).

## The Sale Motion and Sale Order

        In accordance with the Discrete Procedures, the Debtors will file a motion (the "**Sale Motion**") seeking entry of order(s) authorizing and approving, *inter alia*, the applicable sale transaction(s) to the Successful Bidder(s) with respect to the Stores in the Wakefern Package (each, a "**Sale Order**"). Each Sale Order shall authorize and approve the applicable sale transaction to the Successful Bidder (defined below) for each of the Stores in the Wakefern Package. The form of Sale Order with respect to the Wakefern Stalking Horse Bid is attached as an exhibit to the Wakefern Agreement. In the event no Qualified Bid is received by the Bid Deadline as set forth herein, the Debtors shall seek entry of the Sale Order at the Sale Hearing.

## Auction Procedures

        If a Qualified Bid is received from a Qualified Bidder other than Wakefern by the Bid Deadline, the Debtors will conduct the Auction on **October 8, 2015, beginning at 9:30 a.m. (Eastern Time) each day, at the offices of Weil, Gotshal & Manges LLP; 767 Fifth Avenue, New York, New York 10153**. Only Qualified Bidder(s) will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith. Professionals and/or other representatives of the Consultation Parties will be permitted to attend and observe the Auction.

        At the Auction, Qualified Bidders (including Wakefern) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the purchase price and terms proposed in the applicable Baseline Bid, and will proceed thereafter in increments of at least 2% of the applicable Baseline Bid (a "**Minimum Overbid Amount**"). If Wakefern bids at the Auction for an Applicable Store, Wakefern will be entitled to a "credit" in the amount of the Breakup Fee to be counted towards its bid such that the cash and other consideration proposed by Bidder plus the Breakup Fee "credit" must exceed the most recent bid by at least the Minimum Overbid Amount.

        The Debtors may adopt rules, after consultation with the Consultation Parties, for the Auction at any time that the Debtors reasonably determine to be appropriate to promote a spirited and robust auction pursuant to the Discrete Procedures and are not inconsistent with these Bidding Procedures. At the start of the Auction, the Debtors shall describe the terms of the applicable Baseline Bid. Any rules adopted by the Debtors will not unilaterally modify any of the terms of the Wakefern Agreement (as may be consensually modified at any Auction) without the consent of Wakefern. Any rules developed by the Debtors will provide that all bids in a particular Auction will be made and received in one room, on an open basis, and all other bidders

participating in that Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders participating in that Auction and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be fully disclosed to all other bidders throughout the entire Auction. Each Qualified Bidder will be permitted what the Debtors reasonably determine to be an appropriate amount of time to respond to the previous bid at the Auction.

Except as otherwise set forth in the Wakefern Agreement, the Debtors reserve the right to and may, after consultation with the Consultation Parties, reject at any time before entry of the relevant Sale Order any bid that, in the Debtors' judgment, is: (A) inadequate or insufficient; (B) not in conformity with the requirements of the Bankruptcy Code, the Discrete Procedures, these Bidding Procedures or the terms and conditions of the applicable sale transaction; or (C) contrary to the best interests of the Debtors and their estates.

Prior to the conclusion of the Auction, except as otherwise set forth in the Wakefern Agreement, the Debtors, after consultation with the Consultation Parties, will: (A) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating a sale transaction; (B) determine the highest or best offer for each Applicable Store (each, a "**Successful Bid**"); (C) determine which Qualified Bid is the next highest or best bid for each Applicable Store (each, the "**Back-Up Bid**"); and (D) notify all Qualified Bidders participating in the Auction, prior to its conclusion, the successful bidder for each Applicable Store (the "**Successful Bidder**"), the amount and other material terms of the Successful Bid and the identity of the party that submitted the Back-Up Bid for such Applicable Store (the "**Back-Up Bidder**").

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding or the Auction.

## Post-Auction Process

A Successful Bidder shall, within one (1) business day after the close of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid. Promptly following the submission of such documentation, the Debtors shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder. Except as set forth in the Wakefern Agreement, the Successful Bid may not be assigned to any party without the consent of the Debtors after consultation with the Consultation Parties.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (A) ninety (90) days after the completion of the Auction, but in no event later than January 31, 2016 (B) the consummation of the transaction with the Successful Bidder, or (C) the release of such bid by the Debtors (such date, the "**Back-Up Bid Expiration Date**"). If the transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

14

At a Sale Hearing, the Debtors will present a Successful Bid to the Bankruptcy Court for approval.

Unless otherwise required pursuant to the Debtors' fiduciary duties, the Debtors shall not consider any bids submitted after the conclusion of the Auction.

## Treatment and Return of Deposits

Potential Bidders

Within three (3) business days after the Designation Deadline, the Escrow Agent shall return to each Potential Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Potential Bidder's Deposit, plus any interest accrued thereon. Upon the authorized return of such Potential Bidder's Deposit, the bid of such Potential Bidder shall be deemed revoked and no longer enforceable.

Qualified Bidders

The Deposit of a Qualified Bidder will be forfeited to the Debtors if (A) the applicable Qualified Bidder attempts to modify, amend or withdraw its Qualified Bid, except as permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures, or (B) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the transaction according to these Bidding Procedures and the terms of the applicable transaction documents with respect to the Successful Bid.  The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by the Debtors two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of the Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

With the exception of the Deposit of a Successful Bidder and a Back-Up Bidder, the Escrow Agent shall return to any other Qualified Bidder any Deposit, plus any interest accrued thereon, three (3) business days after the execution by the Successful Bidder and the Debtors of the documentation memorializing the Successful Bid, but in no event later than seven (7) business days after the conclusion of the Sale Hearing.

Notwithstanding anything to the contrary herein, the good faith deposit provided by Wakefern pursuant to the Wakefern Agreement (including any required return of such deposit) shall be governed by the terms and conditions of the Wakefern Agreement.

Back-Up Bidder

The Escrow Agent shall return a Back-Up Bidder's Deposit, plus any interest accrued thereon, within three (3) business days after the occurrence of the applicable Back-Up Bid Expiration Date.

WEIL:\95468547\5\50482.0005

<u>The Successful Bidder</u>

The Deposit of a Successful Bidder shall be applied against the cash portion of the Purchase Price of such Successful Bidder upon the consummation of the transaction proposed in the applicable Successful Bid.

<u>Joint Notice to Escrow Agent</u>

The Debtors and, as applicable, the Potential Bidder, Qualified Bidder, and/or Back-Up Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit, to the extent such return is required by these Bidding Procedures.  If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

<u>Consultation Parties</u>

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by the Discrete Procedures or these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

In the event that any Consultation Party or any member of the Creditors' Committee or an affiliate of any of the foregoing, submits a bid that is a Qualified Bid, any obligation of the Debtors to consult with the bidding party established under the Discrete Procedures or these Bidding Procedures will be waived, discharged and released without further action; <u>provided</u> that the bidding party will have the same rights as any other Potential Bidder set forth above, and will retain any rights it has under existing orders regarding debtor in possession financing and/or use of cash collateral (to the extent applicable).

If a member of the Creditors' Committee submits a Qualified Bid, the Creditors' Committee will continue to have Consultation Rights; <u>provided</u> that the Creditors' Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any confidential information regarding the sale of the Assets to such member.

## **<u>Consent to Jurisdiction and Authority as Condition to Bidding</u>**

All bidders that participate in the Auction (including Wakefern) shall be deemed to have (A) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, (B) waived any right to a jury trial in connection with any disputes relating to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, and (C) consented to the entry of a final order or judgment in any way related to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction if it is

16

determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## **<u>Reservation of Rights</u>**

The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties and Wakefern, to alter or terminate these Bidding Procedures, to waive terms and conditions set forth herein with respect to all potential bidders, alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers or investors (except for Wakefern) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Discrete Procedures Order; provided further that the Debtors' exercise of their discretion in evaluating bids and administering the bidding and auction process described herein does not permit, and shall not be construed as permitting, the Debtors to materially deviate from the procedures, terms, conditions and protections set forth in these Bidding Procedures and/or the Discrete Procedures Order.

WEIL:\95468547\5\50482.0005

**<u>Exhibit B</u>**

**Wakefern Agreement**

EXECUTION VERSION
CONFIDENTIAL

12 Stalking Horse Stores – Bulk Bid Package

## <u>LEASE SALE AGREEMENT</u>

THIS LEASE SALE AGREEMENT (this "**Agreement**") is made as of September 24, 2015 by and between A&P Live Better, LLC, a Delaware limited liability company and A&P Real Property, LLC, a Delaware limited liability company ("**Sellers**" or "**Tenants**"), and Wakefern Food Corp., a New Jersey corporation ("**Buyer**", and collectively with Sellers, the "**Parties**").

W I T N E S S E T H :

WHEREAS, Sellers are tenants under those certain leases more specifically described on Exhibit A attached hereto and made a part hereof (together with any amendments, modifications, extensions and renewals, collectively, the "**Leases**" and, individually, a "**Lease**"), with respect to all or a portion of certain real property (the "**Leased Premises**"), which real property is more particularly described on Exhibit B attached hereto and made a part hereof;

WHEREAS, Sellers and certain of their Affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, pursuant to the Order *Approving Discrete Sale and Lease Rationalization Procedures* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 496] (the "**Discrete Procedures Order**"), and subject to any approval of the Bankruptcy Court required by the Discrete Procedures Order, Sellers desire to sell, assign, convey and transfer all of their rights, title and interests as tenants under the Leases, together with all of their rights, title and interests as sublessor under those certain sublease agreements more particularly described on Exhibit C attached hereto, including any security deposits paid to Tenants (each, a "**Sublease**" and, collectively, the "**Subleases**"), if any, and

## [CHECK AND INITIAL WHERE INDICATED IF APPLICABLE]

✓   All trade fixtures, leasehold improvements, machinery, shopping carts, aisle markers, store models, shelving, display cases and racks, cash registers and refrigeration equipment and other furnishings and equipment and other tangible personal property owned by the Sellers and located at the Leased Premises or otherwise primarily used in the operation of the Leased Premises by the Sellers but not located at the Leased Premises ("**FF&E**").

*INITIAL* [_____]

WHEREAS, Buyer desires to purchase and accept such assignment and assume all rights, title, interests and obligations of Tenants under the Leases, and any Subleases and FF&E to the extent set forth herein, subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Sellers and Buyer agree as follows:

1.      <u>Procedures</u>.  This Agreement is made subject to, and in accordance with, the Discrete Procedures Order.  Capitalized terms used but not otherwise defined herein (including on <u>Schedule I</u> attached hereto) shall have the meanings ascribed to them in the Discrete Procedures Order, as applicable.  In the event of a contradiction between this Agreement and the Discrete Procedures Order, as applicable, the Discrete Procedures Order, as applicable, shall control.

2.      <u>Consideration</u>.  The consideration for the assignment of the Leases and any security deposits held by the respective landlords in connection therewith, together with the Subleases and FF&E to the extent set forth herein (the foregoing, as applicable, collectively, the "**Acquired Assets**"), shall be equal to Forty Million Dollars ($40,000,000) (the "**Purchase Price**"), which shall be comprised of:

a.      Twenty Nine Million Eight Hundred Thirty Five Thousand Two Hundred Sixty Dollars ($29,835,260) as consideration for the Leases, plus

b.      Ten Million One Hundred Sixty Four Thousand Seven Hundred Forty Dollars ($10,164,740) as consideration for the FF&E, allocated as indicated on <u>Exhibit L</u>.

Buyer's submission of an executed copy of this Agreement along with the Deposit (as defined below) shall be deemed an irrevocable offer subject only to the rights of termination provided herein.

3.      <u>Payment of Purchase Price</u>.  The Purchase Price shall be paid to Sellers by Buyer as follows:

a.      <u>Deposit</u>.  Buyer has previously deposited with TitleVest Services, LLC, a New York limited liability company ("**Escrowee**"), by a bank wire transfer of immediately available federal funds to an account designated by Escrowee the sum of Two Million Dollars ($2,000,000) (together with all interest thereon, the "**Deposit**"), which Deposit shall be held by Escrowee and delivered to either Buyer or Sellers in accordance with the provisions of the escrow agreement (the "**Escrow Agreement**") attached hereto as <u>Exhibit D</u> and hereby made a part hereof.  Notwithstanding anything to the contrary set forth in this Agreement or in the Escrow Agreement, (i) all charges of Escrowee, if any, attendant to holding and/or disbursing the Deposit shall be paid by Buyer and (ii) all interest accrued in connection with the Deposit hereunder shall accrue for the sole benefit of the Party to whom the Deposit is paid; provided, that if such accrued interest is paid to Sellers the Purchase Price shall be reduced dollar for dollar by the amount of such accrued interest.  The Parties agree that any payments made to Sellers pursuant to this <u>Section 3.a</u> in respect of accrued interest shall be deemed to be an adjustment to the Purchase Price for Tax purposes to the extent permitted by applicable Law.

2

b.      Closing Payment.  On the Closing Date (as defined below) the Purchase Price, less the Deposit, shall be paid by Buyer by wire transfer of immediately available federal funds to the account designated on Exhibit E hereto or as otherwise designated in writing by Sellers.

4.      Allocation.  Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "**Allocation Principles**"). No later than sixty (60) days after the Closing Date, Buyer shall deliver to Sellers an allocation of the Purchase Price (and all other relevant items) as of the Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "**Purchase Price Allocation**") for Sellers' review.   Sellers shall have an opportunity to review the proposed Purchase Price Allocation for a period of sixty (60) days after receipt of the proposed Purchase Price Allocation.  If Sellers disagree with any aspect of the proposed Purchase Price Allocation, Sellers shall notify Buyer in writing prior to the end of such sixty (60)-day period (an "**Allocation Objection Notice**"), setting forth Sellers' proposed Purchase Price Allocation and specifying, in reasonable detail, any good faith dispute as to Buyer's proposed Purchase Price Allocation.   If prior to the conclusion of such sixty (60)-day period, Sellers notify Buyer in writing that they will not provide any Allocation Objection Notice or if Sellers do not deliver an Allocation Objection Notice within such sixty (60)-day period, then the proposed Purchase Price Allocation shall be deemed final, conclusive and binding on each of the Parties.   Buyer and Sellers shall use commercially reasonable efforts to resolve any objection by Sellers to the proposed Purchase Price Allocation.  If, within ten (10) days after Buyer receives an Allocation Objection Notice, the Parties have not resolved all objections and agreed upon a final Purchase Price Allocation, the Parties shall engage an independent accounting firm mutually acceptable to Buyer and Sellers to resolve any outstanding disputes, and such resolution shall be final, conclusive and binding on each of the Parties.   The fees and disbursements of such independent accounting firm shall be shared equally by Buyer, on the one hand, and Sellers, on the other hand.  Buyer and Sellers shall make appropriate adjustments to the Purchase Price Allocation to reflect any adjustments to the Purchase Price.  Buyer and Sellers agree (and agree to cause their respective subsidiaries and Affiliates) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the final Purchase Price Allocation.  None of the Parties will take any position inconsistent with the final Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, in each case unless otherwise required by Law or a final determination by a Governmental Authority.   For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the Parties do not agree with respect to such determination, such matter shall be resolved in accordance with the process outlined in this Section 4, provided further, that such Tax Return shall be amended if the Purchase Price Allocation is subsequently adjusted pursuant to the procedures described above. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 4 shall survive the Closing (as defined below) without limitation.

WEIL:\95473301\3\50482.0005

NY 245397079v18

5.      Payment of Cure Amounts.  The Purchase Price includes consideration for the proposed cure amount of the Leases and Subleases (the "**Cure Amount**"), which Cure Amount shall be the total amount payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, assignment to Buyer of all Leases and Subleases being assigned hereunder. For the avoidance of doubt, Buyer shall not be liable for, nor have any obligation to pay or cause to be paid, any Cure Amounts.

6.      Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York, such other location in the state where the Leased Premises are located as may be selected by Sellers, or such other location as shall be mutually agreed upon by Sellers and Buyer commencing at 10:00 a.m. local time on a date (the "**Closing Date**") that is the fifth (5th) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyers to consummate the transactions contemplated hereby set forth in Section 14 (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.  Sellers shall have a one-time right to adjourn the Closing for up to thirty (30) days on written notice delivered no less than three (3) Business Days' prior to the then scheduled Closing Date; provided, however, that Sellers shall not be permitted to adjourn the Closing to a date later than the Outside Date.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective at 12:01 a.m., New York City time, on the Closing Date.

7.      Assignment.  As of the Closing Date, pursuant to the Sale Order, Tenants shall grant, transfer and assign to Buyer, without, except as otherwise expressly provided herein, representation or warranty of any kind, all of its right, title, and interest in and to the Leases, the Subleases, if any, and the FF&E and any warranties associated therewith.

8.      Assumption.  On and after the Closing Date, except as otherwise provided herein, Buyer shall assume all of the covenants, agreements, and obligations of Tenants as tenants under the Leases and as sublessor under the Subleases, if any, which accrue on or after the Closing Date.  For the avoidance of doubt, any personal injury, property damage or other claims or Liabilities that exist, accrued or arose before the Closing Date shall not be assumed.  In further consideration of the above assignment, Buyer hereby agrees that, except as otherwise provided herein, it shall, from and after the Closing Date, perform all of the covenants, conditions and agreements, which accrue on or after the Closing Date, of (a) the Leases (including making all payments) as if Buyer were the original tenant under the Leases and (b) the Subleases, if any, as if Buyer were the original sublessor under each of such Subleases.  As of the Closing Date, except as otherwise provided herein, Sellers shall have no Liabilities or obligations with respect to the obligations accruing under the Leases from and after the Closing Date, including, but not limited to, obligations related to rents, utilities, Taxes, insurance and common area maintenance, nor any of the Subleases, if any (accruing from and after the Closing Date), and Sellers shall be released from all such obligations and Buyer shall fully indemnify and hold harmless Sellers

4

with respect to any obligations thereunder which accrue on or after the Closing Date. No Person, other than Buyer, shall be deemed a beneficiary of the provisions of this Section 8.

9.    Prorations/Adjustments.

(a)    On the Closing Date all monthly payments for the month in which the Closing occurs (including base rent, common area maintenance fees, utility charges, and other items of additional rent, if any) under the Leases transferred at the Closing (the "Prorated Charges") shall be apportioned and prorated between Sellers and Buyer as of the Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges under the applicable Lease and the denominator being the total number of days in the lease month in which the Closing occurs, times (B) the number of days in such lease month following the day that immediately precedes the Closing Date and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the Closing, (ii) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers); (iii) Buyer being entitled to Buyer's proportionate share of rents paid and payable by subtenants under Subleases that shall be equal to the product obtained by multiplying (C) a fraction, the numerator being the amount of rents paid under the applicable Sublease for the applicable month and the denominator being the total number of days in the lease month in which the Closing occurs, times (D) the number of days in such month following the day that immediately precedes the Closing Date and paying such amount to Buyer to the extent payment for such rent has been made by or on behalf of any subtenant prior to the Closing and (iv) all cash security deposits under the Subleases held by Sellers at the time of Closing shall be credited to Buyer on the Closing Date and Buyer shall assume Sellers' obligations related to such security deposits. Sellers will get a credit for all security deposits given by Sellers in connection with any Leases (excluding any security deposits that have been applied by the landlord on or before the Closing Date). The net amount of all Prorated Charges owed to Buyer and Sellers under this Section 9 shall be referred to as the "**Buyer Proration Amount**" if owed to Buyer or the "**Seller Proration Amount**" if owed to Sellers. For purposes hereof, all Sublease rent and Sublease security deposits to be credited to Buyer shall be included in the Buyer Proration Amount. Except as set forth in this Section 9 and Section 12, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyer.

(b)    As to all non-monthly real estate related payments (including, real estate Taxes, water rates and charges, sewer Taxes and rents, common area maintenance fees, permit fees, and fuel), the same shall be apportioned between Sellers and Buyer as of 12:01 a.m. on the Closing Date. If any amounts are payable in installments, all installments due through the Closing together with the accrued but unpaid portion of any other installments not yet due as of the Closing shall be prorated based on the periods of time covered by such installments occurring before and after the Closing Date. Fuel

5

payments, if any, shall be apportioned at the cost per gallon most recently charged to Sellers, based on the supplier's measurements thereof, plus sales Taxes thereon, which measurements shall be taken by the supplier or any other mutually agreeable, professionally qualified third party as close to the Closing Date as is reasonably practicable, and which, absent manifest error, shall be conclusive and binding on Sellers and Buyer.

(c)    As to real estate and personal property Taxes and assessments, if the Closing shall occur before a new real estate or personal property Tax rate is fixed for the applicable property, the apportionment of Taxes for such property at the Closing shall be upon the basis of the old Tax rate for the preceding fiscal year applied to the latest assessed valuation.  Promptly after the new Tax rate is fixed, the apportionment of Taxes shall be recomputed and any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at the Closing shall be promptly corrected and the proper Party reimbursed.

(d)    If on the Closing Date, any subtenant is in arrears in the payment of rent or has not paid the rent payable by it and which is attributable to the month in which the Closing occurs (whether or not it is in arrears for such month on the Closing Date), any rent received by Buyer or Sellers after the Closing shall be applied to amounts due and payable by such tenant in the following order of priority: first, to rent attributable to the month in which the Closing occurred, and, thereafter, to the months subsequent to the month in which the Closing occurred through the then current month, and third, to the months preceding the month in which the Closing occurred; provided, however, that rent received after the Closing shall only be applied in respects of rent attributable to the months preceding the Closing to the extent that such pre-Closing rents due have been identified in a writing delivered by Sellers to Buyer prior to the Closing Date.  If rent or any portion thereof received by Sellers or Buyer after the Closing is due and payable to the other party by reason of the foregoing allocation, the appropriate sum shall be promptly paid to such other party.

(e)    For the six (6) month period following the Closing Date, in the course of its collection of rents, Buyer agrees that, in respect of those Sublease tenants identified on Exhibit C, it will reasonably cooperate with Sellers (at no cost to Buyer) to collect rent of any such tenant owed to Sellers allocable to the period up to and including the Closing Date; provided, that Buyer will have no liability for the failure to collect such rent and Buyer will not be required to take any actions beyond, in the collection of its rents, requesting that such tenants pay any rents owed to Sellers and forwarding to Sellers any such rents actually collected by Buyer.

(f)    If any of the items subject to apportionment under the foregoing provisions cannot be apportioned at the Closing because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the Closing are discovered subsequent to the Closing, then such item shall be reapportioned and such errors and omissions corrected as soon as

6

practicable after the Closing Date and the proper Party reimbursed but in no event later than six (6) months year after Closing.

(g)     Except as provided in Sections 9 and 12, there will be no prorations between Sellers and Buyer on the Closing Date, and no post-assignment reconciliations or adjustments of any kind shall occur.  The provisions of this Section 9 shall survive Closing.

10.     Free and Clear of All Liens.  Pursuant to the Discrete Procedures Order and the Sale Order entered by the Bankruptcy Court, Sellers shall convey their rights and interests under the Leases and the other Acquired Assets to Buyer free and clear of all Liabilities and Liens to the maximum extent permitted under the Bankruptcy Code, if any, with any such Liabilities and Liens attaching to the proceeds paid to Sellers.  Except as otherwise agreed to by Buyer, Sellers shall use their commercially reasonable efforts to terminate any License in accordance with its terms without costs to the Sellers and/or to reject such Licenses under the Bankruptcy Code.

11.     Closing Deliverables.  On the Closing Date:

a.     Sellers shall deliver to Buyer (i) a duly executed copy of: (A) an Assignment and Assumption of Leases in the form attached hereto as Exhibit F ("**Assignment and Assumption of Leases**"); (B) a FIRPTA Certificate; (C) if applicable, Transfer Tax forms or certifications provided by Buyer as more specifically described in subsection (b) below; (D) if applicable, a Quitclaim Bill of Sale in the form attached hereto as Exhibit G (the "**Quitclaim Bill of Sale**"); (E) a landlord notice and a subtenant notice (if applicable), each in the form attached hereto as Exhibit H; (F) if applicable, an assignment and assumption with respect to the each of the Subleases, to the extent such Subleases are in effect on the Closing Date, in the form attached hereto as Exhibit I ("**Assignment of Subleases**" and, together with the Assignment and Assumption of Leases,  collectively referred to herein as the "**Related Agreements**"); (G) the counterpart of the joint Closing instructions to the Escrowee (the "**Closing Escrow Instructions**"), (H) a certificate from an authorized officer of each Seller to the effect that each of the conditions specified in Section 14.a is satisfied, (ii) the originals, or if for any reason Sellers do not have an original in their possession, copies of all Leases and Subleases, (iii) to the extent in the possession or control of Sellers, the originals (or copies, if originals are not available) of all (A) plans, (B) warranties and (C) certificates of occupancy for the stores located on the Leased Premises; (iv) the Lease file maintained by Sellers for each of the Leased Premises to the extent not already furnished to Buyer; (v) to the extent in the possession or control of Sellers, keys to the Leased Premises; (vi) alarm and access codes to the Leased Premises; and (vii) physical possession of the Leased Premises in broom clean condition, free of (A) all occupants and Persons except for persons permitted under the Subleases and (B) all fixtures, furnishings, equipment and other personal property not being acquired by Buyer or otherwise required under this Agreement (the "**Excluded Property**"), which Excluded Property shall be removed and properly disposed of offsite (i.e., outside of the applicable Leased Premises) at no cost or expense to Buyer.

WEIL:\95473301\3\50482.0005

NY 245397079v18

b.    Buyer shall deliver to Sellers: (i) a duly executed counterpart of the Assignment and Assumption of Leases, (ii) an executed copy of all Transfer Tax forms or certifications as may be required by each state, county or municipality to record the Assignment and Assumption of Leases and effectuate the transactions contemplated herein, (iii) a duly executed counterpart of the Assignment of Subleases, (iv) Closing Escrow Instructions duly executed by Buyer and (v) a duly executed certificate from an authorized officer of Buyer to the effect that each of the conditions specified in <u>Section 14.b</u> is satisfied.

12.    <u>Transfer Taxes</u>.

a.    Any Transfer Tax imposed under applicable Law in connection with the transactions contemplated hereby shall be split 50/50 among Buyer, on the one hand, and Sellers, on the other hand.  Accordingly, if either of Buyer, on the one hand, or Sellers, on the other hand, is required by Law to pay any such Transfer Taxes, the non-paying Party shall promptly reimburse the paying Party for 50% of the amount of such Transfer Taxes actually paid by such paying Party.  The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns; provided, that, the other Parties shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by the non-paying Party, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to the paying Party's approval, which shall not be unreasonably withheld, delayed, or conditioned.  The Parties hereto shall cooperate to permit the filing Party to prepare and timely file any such Tax Returns.

b.    <u>Tax Adjustments</u>.  Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes, personal property Taxes and similar Taxes, other than those Taxes subsumed in Section 9(b)) for the Tax period in which the Closing occurs (the "**Proration Period**") will be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes.  If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period.  When the actual amounts become known, such proration shall be recalculated by Buyer and Sellers, and Buyer or Sellers, as the case may be, promptly (but not later than ten (10) days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment or refund so that the correct prorated amount is paid by each of Buyer and Sellers.  Nothing in this <u>Section 12 </u>shall be interpreted to include Taxes based, in whole or in part, on income, sales or receipts.

c.    The provisions of this <u>Section 12</u> shall survive Closing.

8

13.    <u>Closing Costs</u>.  Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

14.    <u>Conditions to Closing.</u>

a.    <u>Conditions to Buyer's Obligations</u>.  Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)    the representations and warranties set forth in <u>Section 23.a</u> (without giving effect to any limitation as to "material" or "material adverse effect" set forth therein) shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct has not had and would not reasonably be expected to have a material adverse effect on the condition of Acquired Assets as a whole or on the ability of the Sellers to consummate the transactions contemplated herein;

(ii)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(iii)    the Sale Order shall have been entered and the transactions contemplated by this Agreement shall have been authorized by the Bankruptcy Court, and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(iv)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement or imposes material conditions on such consummation not otherwise provided for herein;

(v)    each delivery contemplated by <u>Section 11.a</u> to be delivered to Buyer shall have been delivered;

(vi)    Sellers shall deliver the Leased Premises in vacant, broom clean condition with all FF&E; and

(vii)    Buyer shall not have an obligation to consummate the transactions contemplated hereby in respect of a particular Lease if the Leased Premises associated with such Lease has suffered a Material Event (as defined below) or a Condemnation (as defined below) or the Lease associated with such Leased Premises is terminated; provided, however, the Buyer's obligation to acquire the Acquired Assets that are not affected by the foregoing shall remain in full force and effect.

9

b.    <u>Conditions to Sellers' Obligations</u>.  Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(i)    the representations and warranties set forth in <u>Section 23(b)</u>(without giving effect to any limitation as to "material" or "material adverse effect" set forth therein) shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct has not had and would not reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the transactions contemplated herein;

(ii)    Buyer shall have performed and complied with all of its covenants and agreements hereunder through the Closing in all material respects;

(iii)    the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Sale Order, and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(iv)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement or imposes material conditions on such consummation not otherwise provided for herein; and

(v)    each payment contemplated by <u>Sections 3, 4 and 13</u> to be made to Sellers shall have been made, and each delivery contemplated by <u>Section 11.b</u> to be delivered to Sellers shall have been delivered.

c.    <u>No Frustration of Closing Conditions</u>.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in <u>Section 14.a</u> or <u>Section 14.b</u>, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliate's failure to use its reasonable best efforts (or commercially reasonably efforts with respect to those matters contemplated by <u>Section 17</u>, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach by such Party or its Affiliates hereunder.  The Parties agree that neither the failure to obtain a court order nor any action with respect to a Competing Bid (as defined below), to the extent permitted hereunder, shall be deemed to be a failure to use the efforts required to satisfy the conditions to consummation of the transactions contemplated hereunder nor a breach hereunder.

15.    <u>No Other Contingencies</u>.  Buyer expressly agrees and acknowledges that Buyer's obligations hereunder are not in any way conditioned upon or qualified by Buyer's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt, financing or equity investment or otherwise) nor upon Buyer's ability to obtain title insurance.

10

16.    <u>Termination of Agreement</u>.

a.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(i)    by the mutual written consent of the Parties;

(ii)    by any Party by giving written notice to the other Party if:

(A)    any court of competent jurisdiction shall have enacted or issued a Law or Decree permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; or

(B)    the Closing shall not have occurred on or prior to the sixtieth (60th) day from the date hereof (the "**Outside Date**"); <u>provided</u> that if the Closing shall not have occurred on or before the Outside Date due to a material breach of this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 16.a(ii)(B)</u>.

(iii)    if (i)(x) Sellers enter into a definitive agreement with respect to a higher or better competing bid for all of the Leases and all of the other Acquired Assets in accordance with the bidding procedures attached hereto as <u>Exhibit J</u> (the "**Bidding Procedures**") for all of the Leases and all of the other Acquired Assets in bulk ("**Competing Bid**"); provided, however, that a bid shall not be deemed a Competing Bid unless the economic value of such bid allocable to all of the Leases and all of the other Acquired Assets as determined by the Sellers exceeds the economic value of the transactions contemplated hereby on the terms and conditions set forth in this Agreement, (y) the Bankruptcy Court enters an order approving a Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

b.    Sellers may terminate this Agreement at any time prior to Closing if Buyer fails to satisfy the requirement set forth under <u>Section 14.b(v)</u> , including delivery of the Deposit required hereunder.  In such case, the Agreement shall be rendered null and void, Sellers shall be entitled to retain any and all consideration already paid to Sellers, including, but not limited to, the Deposit.

c.    <u>Effect of Termination</u>.  If any Party terminates this Agreement pursuant to <u>Sections 16.a</u> or <u>b</u>, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that <u>Section 13</u>, this <u>Section 16</u>, <u>Sections 25 through 44</u>, and <u>Schedule I</u> shall survive any such termination) and no Party shall have any Liability to the other Party hereunder; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 16</u> shall relieve Sellers from their obligation to pay the Termination Payment (as defined below) to Buyer as set forth in <u>Section 17</u> hereof to the extent triggered; <u>provided</u>, <u>further</u>, that nothing in this <u>Section 16</u> shall relieve any Party from Liability for any breach occurring prior to any such

11

termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, that other than in the case of fraud or willful misconduct, (i) the maximum Liability of Sellers under this Agreement shall not exceed the reasonable out of pocket expenses incurred by Buyer and (ii) the maximum Liability of Buyer under this Agreement shall not exceed the Deposit and Buyer and Sellers acknowledge and agree that each of the out-of-pocket expenses incurred by Buyer and the Deposit, if paid in accordance with the terms hereof, constitutes liquidated damages and not a penalty.

17.    Bankruptcy Court Matters.

a.    Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court in accordance with the Discrete Procedures Order, the consideration by Sellers of a Competing Bid in accordance with the Bidding Procedures and, in the event Sellers receive a Competing Bid, an auction (the "**Auction**") to be conducted in accordance with the Bidding Procedures.

b.    Termination Payment.  To induce Buyer to enter into this Agreement, to maximize value of the Sellers' estates and in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers grant Buyer, subject to compliance with the Discrete Procedures Order, a break-up fee in an amount equal to three percent (3%) of the Purchase Price (the "**Termination Payment**").  Sellers further agree that the Termination Payment constitutes an allowed administrative expense claim against their estates pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code.  In the event an Auction is conducted in connection with the sale of the Leases because of the timely submission of a Competing Bid, Buyer shall be entitled to credit bid all or any portion of the Termination Payment at the Auction.  In the event a Competing Bid is consummated, the Termination Payment shall be paid on the first Business Day following the date of consummation of the Competing Bid from the proceeds thereof if no material breach by Buyer of this Agreement has occurred.  Upon payment of the Termination Payment to Buyer in accordance with this Section 17.b, Sellers and their respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Sellers, their Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to the Leases or any applicable Law, including for reimbursement of expenses.

c.    Solicitation.  From the date hereof and until the earlier of (i) when the Buyer is declared the winning bidder for the Leases and Acquired Assets or (ii) the Closing Date, Sellers are permitted to, and are permitted to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by or from any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, and  Sellers shall be permitted and shall have the authority to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of

12

the Acquired Assets, including supplying information relating to the assets of Sellers to prospective buyers.  Without limiting the foregoing, Sellers shall be permitted to perform all of the foregoing activities with respect to all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Sale Order, Discrete Procedures Order or other applicable Law.

       d.     <u>Bankruptcy Court Filings</u>.  As soon as reasonably practicable following the execution of this Agreement and by no later than the deadlines imposed by the Discrete Procedures Order, Sellers shall file and serve any necessary notice or pleadings required in connection therewith (including to all taxing or other Governmental Authorities as reasonably requested by Buyer). Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the transactions contemplated by this Agreement pursuant to the Discrete Procedures Order, including a finding of adequate assurance of future performance by Buyer or any Designated Member, including furnishing affidavits or other documents or information for providing the adequate assurance information as required by the Discrete Sale Order, and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the approval of the transactions contemplated by this Agreement shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

       e.     <u>Sale Order</u>.  Provided Buyer is selected as the winning bidder in respect of the Acquired Assets at the auction, Sellers shall seek entry of the Sale Order and any other necessary orders of the Bankruptcy Court to close the sale of the Acquired Assets as soon as reasonably practicable following the closing of the auction in accordance with the terms and conditions hereof and Sellers shall provide notice of the Sale Order in accordance with the Discrete Procedures Order.  Buyer and Sellers understand and agree that the transaction contemplated herein is subject to approval by the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and other necessary orders of the Bankruptcy Court to close the sale of the Acquired Assets.  In the event the entry of the Sale Order shall be appealed, Sellers and Buyer shall use commercially reasonable efforts to defend such appeal.

       f.     <u>Back-up Bidder</u>. Buyer agrees that, in the event that Buyer is not the winning bidder at the Auction, if and only if (i) the terms of this Agreement (without regard to any increased or modified bid the Buyer may submit at the Auction) constitute the second highest or best bid, and (ii) Sellers give written notice to Buyer on or before the Back-up Termination Date, stating that Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyer shall, promptly consummate the transactions contemplated by this Agreement (without regard to any increased or modified bid the Buyer may submit at the Auction) upon the terms and conditions as set forth herein.

     18.     <u>Intentionally Omitted</u>

13

19.    <u>Delivery; "AS IS" Transaction</u>.

a.    Buyer acknowledges that it has fully inspected or waived the right to inspect the Leased Premises prior to the execution of this Agreement and does hereby assume all of the risks, including, but not limited to, latent defects in the Leased Premises.  Sellers shall not be obligated to do any work or alter, restore, repair or develop the Leased Premises, but Sellers shall deliver the Leased Premises in vacant, broom clean condition, and, if applicable, with all furnishings, fixtures, equipment, inventory, racks, aisle displays, refrigeration equipment and personal property removed from the Leased Premises.  Any work (including demolition) which may be necessary to adapt the Leased Premises for Buyer's occupancy or for the operation of Buyer's business therein shall be the sole responsibility of Buyer and shall be performed by Buyer at its sole cost and expense, in accordance with the terms of the Lease.

b.    BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE LEASES OR THE LEASED PREMISES (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE LEASED PREMISES; THE PHYSICAL CONDITION OF THE LEASED PREMISES; THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE LEASED PREMISES OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE LEASED PREMISES; THE ZONING OF THE LEASED PREMISES; THE POSSIBILITY OF DEVELOPING OR USING THE LEASED PREMISES IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE LEASES OR THE LEASED PREMISES; THE FITNESS OF THE LEASED PREMISES, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE LEASED PREMISES (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE LEASES OR THE LEASED PREMISES).  BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLERS.  BUYER ALSO ACKNOWLEDGES THAT BUYER HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND ENVIRONMENTAL CONDITIONS OF THE LEASED PREMISES AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE LEASED PREMISES AND/OR THE LEASES, AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IS ACQUIRING THE LEASES AND THE LEASED PREMISES, BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT, AND BUYER IS NOT RELYING UPON ANY

14

REPRESENTATIONS OF SELLERS OR SELLERS' AGENTS.  ACCORDINGLY, BUYER HEREBY ACCEPTS THE LEASED PREMISES IN THEIR "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS.

20.    <u>Store Closed</u>.  The Parties acknowledge and agree that Sellers have ceased (or will cease as of the Closing Date) operations at the Leased Premises.

21.    <u>Release; Indemnity</u>.  Pursuant to section 365(k) of the Bankruptcy Code, on and after the Closing Date, Buyer agrees to defend and indemnify Sellers against, and hold Sellers harmless from, any and all claims, actions, proceedings, suits, costs, Liabilities, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and disbursements) that accrue after the Closing Date, whether foreseen or unforeseen, in connection with the Leases, the Leased Premises (including, without limitation, the performance or observance or the failure or refusal to perform or observe any agreement or obligation of the Tenants under the Leases or any term or provision thereof required to be performed by the Tenants under the Leases) and each Sublease.  For the avoidance of doubt, Sellers are not released from, and Buyer does not indemnify Sellers in respect of, any personal injury, property damage or other claims or Liabilities that exist, accrued or arose before the Closing Date.

22.    <u>Casualty and Condemnation</u>.

a.    If, after the date of this Agreement and before Closing or termination of this Agreement, any Leased Premises, any store on a Leased Premises or any portion of any Leased Premises or store is (i) damaged by fire or other casualty or (ii) shall have been, be in the process of or threatened to be taken by (A) eminent domain or (B) a deed in lieu of condemnation (each of (ii)(A) or (B), a "**Condemnation**" and each of (i) and (ii) a "**Casualty/Condemnation Event**"), Sellers shall give prompt notice thereof to Buyer and within ten (10) Business Days after such fire or casualty or knowledge of such Condemnation, give notice to Buyer (the "**Sellers' Casualty/Condemnation Notice**") as to whether a Material Event has occurred, which notice shall include, among other things, a reasonably detailed estimated scope and cost of repair for the damaged property prepared by a licensed architect or engineer. "**Material Event**" means that (i) the restoration of such Leased Premises or store(s) to substantially the same condition prior to such casualty/Condemnation would take six (6) months or longer, (ii) in the case of a fire or other casualty, a fire or other casualty that results in damage to any Leased Premises in excess of $500,000 (on a per location basis) or the applicable landlord having the right to terminate the Lease as a result of such casualty or (iii) a Condemnation.

b.    In the case of a Material Event, Buyer may terminate this Agreement with respect to the affected Lease(s) only upon written notice given to Sellers within five (5) Business Days after receipt of Sellers' Casualty/Condemnation Notice.  If Buyer terminates the Agreement in respect of a particular Lease, the provisions of <u>Section 16.c</u> and <u>Section 22.f</u> shall apply in respect of such termination, and in all other respects, the Agreement will survive *mutatis mutandis*.  For the avoidance of doubt, in the event that Buyer terminates this Agreement in respect of any Lease that has experienced a Material Event, Buyer shall remain obligated to purchase all other Leases.  In the event that in response to a Material Event, Buyer does not

15

terminate this Agreement in respect of an affected Lease or a fire or other casualty does not constitute a Material Event, Buyer shall receive at Closing (i) an abatement of the Purchase Price in an amount equal to the total of (a) the insurance proceeds or Condemnation awards ("**Proceeds**") received by Sellers through the Closing Date and (b) an amount equal to Sellers' insurance deductible (but not more than the amount by which the cost, as of the Closing Date, to repair the damage is greater than the amount of insurance proceeds assigned to Buyer), and (ii) an assignment of the Proceeds payable after Closing.

c.    Other than Casualty/Condemnation Events that are Material Events as set forth above, this Agreement shall stay in full force and effect, with respect to such store.  Sellers may elect to restore such store but shall have no obligation to do so.  Sellers shall, at the Closing, assign to Buyer all Proceeds.  In connection with such assignment, Sellers shall credit Buyer with an amount equal to the applicable deductible amount under Sellers' insurance (but not more than the amount by which the cost, as of the Closing Date, to repair the damage is greater than the amount of insurance proceeds assigned to Buyer).

d.    Any assignment of proceeds or awards under this Section 22 shall not include any Proceeds to the extent attributable to lost rents or similar costs applicable to any period prior to the Closing and shall be reduced by (i) the amount of all costs incurred by Sellers in connection with any repair of such damage or destruction, collection costs of Sellers respecting any Proceeds, and (ii) any amounts required to be paid to landlord under the applicable Lease or to any lender pursuant to any financing, as applicable, to the extent that Sellers actually have paid such amounts to the applicable landlord or lender(s) and any amounts otherwise expended or obligated to be expended towards repair/restoration of the affected assets by any lender or landlord.

e.    In all cases, if the cost of repairing the affected Leased Premises exceeds $500,000 (on a per location basis), then Sellers shall not adjust or settle any insurance claims or enter into any contract for the restoration of such Leased Premises or store without Buyer's prior written consent, which shall not be unreasonably withheld or delayed.

f.    If, after the date of this Agreement and before Closing or termination of this Agreement, any Lease or Leases are terminated or either Seller receives notice of any termination or termination proceeding in respect of any Lease or Leases, Seller shall give prompt written notice thereof to Buyer.  If Seller has not contested such termination within a reasonable period following notice from landlord, or if contested, there has been a final, non-appealable judgment in favor of the landlord with respect to the termination before the Closing or the termination of this Agreement or Buyer terminates this Agreement with respect to (an) affected Lease(s) in accordance with Section 22.b, Buyer shall receive an automatic abatement of the Purchase Price equal to the amount that Buyer bid for such Lease(s) and the FF&E associated with the applicable Leased Premises as reflected on Exhibit L.  If Buyer does not terminate this Agreement with respect to such Lease(s), Sellers shall assign to Buyer at Closing all rights of Sellers (if any) against the landlord(s) for such Lease(s) and any other claims Sellers may have in connection with such Lease(s).

16

23.     Representations and Warranties.

        a.      Each Seller represents and warrants to the Buyer that the statements contained in this Section 23.a are true and correct as of the date of this Agreement and as of the Closing Date:

                (i)     Organization of Sellers; Good Standing.   Each Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of its incorporation and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

                (ii)    Authorization of Transaction.   Subject to the Bankruptcy Court's entry of the Sale Order, and any other necessary order to close the sale of the Acquired Assets, each Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.   The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.   This Agreement has been duly executed and delivered by each Seller and upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

                (iii)   Condemnation Proceedings.   To Sellers' knowledge, there are no pending or threatened in writing Condemnation proceedings against any of the Leased Premises.

                (iv)    Assessments.   To Sellers' knowledge, there is no pending or proposed special assessment affecting or which may affect the Leases.

        b.      Buyer represents and warrants to each Seller that the statements contained in this Section 23.b are true and correct as of the date of this Agreement and as of the Closing Date:

                (i)     Organization of Buyer; Good Standing.   Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of New Jersey and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

                (ii)    Authorization of Transaction.   Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.   The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party have been

17

WEIL:\95473301\3\50482.0005

NY 245397079v18

duly authorized by Buyer.  This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

(iii)    <u>Sufficient Funds; Adequate Assurances</u>. Upon the Closing Buyer will have immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Acquired Assets.

(iv)    <u>Noncontravention</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Section 11</u>) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (b) violate any Law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyer.  Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

24.    <u>Conduct of the Business Pending the Closing</u>.  Prior to the Closing and except as permitted by this Agreement or with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), Sellers shall:

a.    not reject any of the Leases or seek or obtain an order approving such rejection;

b.    not renew or amend or modify any Lease or Sublease;

c.    notify Buyer promptly upon receipt by Sellers (or any of them) prior to Closing of written notice of the institution or pendency of any action, suit, or proceeding against or affecting the Leased Premises, or relating to or arising out of the ownership of such Leased Premises;

d.    not consent to or enter into any easements, mortgages or other encumbrances upon the Leased Premises, nor shall Seller grant, create or suffer any rights in any third parties affecting the Leased Premises or any part thereof; and

18

        e.     not knowingly use or authorize any party to knowingly use any portion of the Leased Premises (including the surface and subsurface thereof) for the dumping, emission, Release or storage of any Hazardous Materials in violation of any Environmental Law.

       25.    <u>Brokers' Fees</u>.  Each Seller and Buyer represents to the other that other than the fees and expenses payable to Evercore Group L.L.C. or Hilco Real Estate Group LLC in connection with the transactions contemplated hereby, which shall be borne by Sellers, neither Party has entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.  Sellers shall indemnify and hold Buyer harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or Liabilities, including reasonable attorneys' fees and disbursements, which Buyer, or any of its Affiliates may sustain, incur or be exposed to, by reason of any claim or claims by any broker, finder or other Person or entity retained by Sellers for fees, commissions or other compensation arising out of the transactions contemplated herein.  Buyer shall indemnify and hold Sellers harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or Liabilities, including reasonable attorneys' fees and disbursements, which Seller, or any of its Affiliates may sustain, incur or be exposed to, by reason of any claim or claims against Buyer by any broker, finder or other Person or entity retained by Buyer for fees, commissions or other compensation arising out of the transactions contemplated herein if such claim or claims are based in whole or in part on dealings or agreements with the Buyer.  Any broker retained by or providing services to Buyer in connection with the transaction evidenced by this Agreement shall be compensated solely by Buyer without contribution from Sellers.  This <u>Section 25</u> shall survive the Closing.

       26.    <u>Survival</u>.  Except as specifically set forth herein or in any certificate delivered pursuant to <u>Section 11.a</u> or <u>Section 11.a</u>, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to <u>Section 11.a</u> or <u>Section 11.a</u> shall survive, and each of the same shall terminate and be of no further force or effect as of the Closing.

       27.    <u>Covered Employees</u>.

         a.     After the Closing, Buyer shall use commercially reasonable efforts to interview qualified Covered Employees who apply for employment at the stores associated with the Leased Premises. Buyer shall have no obligation to (i) hire any such Covered Employees, (ii) compensate any such Covered Employees during any period when the relevant stores are closed for capital improvements, (iii) establish, maintain or otherwise participate in any Employee Benefits Plans or (iv) give any such Covered Employee credit for his or her service with the Sellers.  To the extent that Buyer interviews and, in its sole discretion, extends offers of employment to any Covered Employee, Buyer, in its sole discretion, will determine the initial terms and conditions of hire and employment. Buyer anticipates that, to the extent the relevant Designated Member has existing collective bargaining agreements within a similar geographic area as the relevant store, any such offers of employment will be on substantially similar terms as are reflected in such existing collective bargaining agreements.

19

b.      Notwithstanding the foregoing, Buyer is under no obligation to make an offer of employment to any Covered Employees employed by Sellers or its respective subsidiaries and the Parties agree that nothing in this Section 27, whether express or implied, is intended to create any third party beneficiary rights in any Covered Employee.  Sellers shall terminate the employment of all Covered Employees prior to the transactions contemplated by this Agreement. Sellers shall pay and be solely responsible for all applicable wages, severance pay, benefits, multiemployer pension plan withdrawal liabilities and other Liabilities owing to all Covered Employees.

c.      To the extent that after the Closing any applicable union may establish that it represents a majority of employees in a Store associated with a Leased Premises which is an appropriate unit for collective bargaining purposes or with respect to an appropriate bargaining unit at such a Store, then promptly thereafter, Buyer agrees to negotiate with the appropriate local union representing such employees in good faith with a view to integrating such represented employees into Buyer's existing collective bargaining units.

28.      Entire Agreement.  This Agreement, any documents delivered at Closing pursuant hereto, and any confidentiality agreement entered into by Sellers and Buyer in connection with this transaction, constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

29.      Further Assurances.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request; provided, however, the transfer of any utilities relating to the Leased Premises to the Buyer shall be done promptly by Sellers at no cost to Buyer or Seller.

30.      Incorporation of Exhibits and Schedules.  The Exhibits and Schedule(s) to this Agreement are incorporated herein by reference and made a part hereof.

31.      Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach.  No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 31 except as expressly provided herein.

20

Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

       32.   <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any subsequently appointed chapter 11 or chapter 7 trustee for any of the Sellers.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of each other Party.

       33.   <u>Notices</u>.   All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Sellers:

         The Great Atlantic & Pacific Tea Company, Inc.
         2 Paragon Drive
         Montvale, New Jersey 07645
         Attention: Christopher W. McGarry and Matthew Bennett
         E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Sellers) to:

         Weil, Gotshal & Manges LLP
         767 Fifth Avenue
         New York, New York 10153
         Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
         E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

If to Buyer:

         Wakefern Food Corp.
         5000 Riverside Drive
         Keasbey, NJ 08832
         Attention: Allison M. Berger, Group Vice President, General Counsel
         Facsimile: 732.512.6385
         E-mail: Allison.Berger@Wakefern.com

With a copy (which shall not constitute notice to Buyer) to:

         Greenberg Traurig, LLP

21

> MetLife Building
> 200 Park Avenue
> New York, NY 10166
> Attention: Dennis J. Block
> Facsimile: (212) 805-5555
> E-mail: blockd@gtlaw.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 33.

     34.    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

     35.    Submission to Jurisdiction; Service of Process.  Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 33; provided, however, that nothing in this Section 35 shall affect the right of any Party to serve legal process in any other manner permitted by Law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by Law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

     36.    Waiver of Jury Trial.   EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

     37.    Specific Performance.  Each of the Parties acknowledges and agrees that the other Party, and in the case of the Sellers, their respective estates would be damaged irreparably in the

22

event such Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that such other Party may have under Law or equity, such other Party shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

38.    Severability.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

39.    No Third Party Beneficiaries.    This Agreement shall not confer any rights or remedies upon any Person other than Buyer, Sellers, and their respective successors and permitted assigns, except as expressly set forth in this Agreement.

40.    Non-Recourse.    All claims or causes of action (whether in contract or in tort, in Law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.   No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or Representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any Liability (whether in contract or in tort, in Law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or Affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at Law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.

23

The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this <u>Section 40</u>.

41.    <u>Mutual Drafting</u>.    The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

42.    <u>Headings</u>.    The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.

43.    <u>Counterparts; Facsimile and Electronic Signatures</u>.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

44.    <u>Prevailing Party</u>.    If any action is brought by either of the Parties against the other, then the prevailing Party shall be entitled to recover from the other Party court costs and reasonable attorneys' fees and costs actually incurred.

45.    <u>Designated Member</u>.    Simultaneously at Closing, Buyer may elect to sublease each of the premises subject to the Leases and assign the Subleases, in accordance with the terms and procedures set forth in the Sale Order, to a Designated Member; provided that (i) any such Designated Member shall be identified to the applicable non-Debtor counterparty to the Lease or Sublease in or before the filing of the motion to approve this Agreement (i) no such designation shall relieve Buyer of its obligations under this Agreement, and (ii) if the Sale Order is modified to exclude references to Designated Members, Buyer shall not be relieved of its obligations to pay the Purchase Price and consummate the transactions contemplated by this Agreement in accordance with its terms.

[<b><u>SIGNATURE PAGE FOLLOWS</u></b>]

24

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


A&P LIVE BETTER, LLC

By: _____

Name: Christopher McGarry

Title: CRO


A&P REAL PROPERTY, LLC

By: _____

Name: Christopher McGarry

Title: CRO


WAKEFERN FOOD CORP.

By: _____

Name: Joseph R. Sheridan

Title: President & COO

## LIST OF SCHEDULE AND EXHIBITS

| SCHEDULE | DESCRIPTION |
| --- | --- |
| Schedule I | Definitions |

| EXHIBIT | DESCRIPTION |
| --- | --- |
| Exhibit A | Leases |
| Exhibit B | Leased Premises |
| Exhibit C | Subleases |
| Exhibit D | Escrow Agreement |
| Exhibit E | Wire Instructions |
| Exhibit F | Form of Assignment and Assumption of Leases |
| Exhibit G | Form of Quitclaim Bill of Sale |
| Exhibit H | Form of Landlord Notice and Form of Subtenant Notice |
| Exhibit I | Form of Assignment of Subleases |
| Exhibit J | Bidding Procedures |
| Exhibit K | Sale Order |
| Exhibit L | Allocation of Purchase Price (per store basis) |

## Schedule I

## Definitions

(i)    "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

(ii)    "Back-up Termination Date" shall mean the earlier to occur of (A) ninety (90) days after completion of the Auction, but in no event later than January 31, 2016, (b) the consummation of the transaction with a Successful Bidder (as defined in the Bidding Procedures), or (C) the release of Buyer's obligations under this Agreement by Sellers.

(iii)    "Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(iv)    "Code" means the Internal Revenue Code of 1986, as amended.

(v)    "Covered Employee" means, at the Closing, an employee of Sellers who both is represented by a labor union and whose duties relate primarily to the operation of any of the Leased Premises or the other Acquired Assets, excluding such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

(vi)    "Decree" means any judgment, decree, ruling, injunction or any other order of any Governmental Authority.

(vii)    "Designated Member" mean a designated stockholder and cooperative member of Buyer or a wholly-owned subsidiary of Buyer.

(viii)    "Employee Benefit Plans" means all "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers and their subsidiaries with respect to Covered Employees.

(ix)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(x)    "Environmental Law" shall mean any federal, state or local statute, regulation or ordinance or any judicial or administrative decree or decision, whether now existing or hereinafter enacted, promulgated or issued, with respect to any Hazardous Materials, drinking water, groundwater, wetlands, landfills, open dumps, storage tanks, underground storage tanks,

solid waste, waste water, storm water runoff, waste emissions or wells, including, without limiting the generality of the foregoing, the following statutes, and regulations, orders, decrees, permits, licenses and deed restrictions now or hereafter promulgated thereunder, and amendments and successors to such statutes and regulations as may be enacted and promulgated from time to time: Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §9601 et seq., as amended by the Superfund Amendments and Reauthorization Act; , the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq. the Hazardous Material Transportation Act, 42 U.S.C. §1801 et seq., the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq., the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Occupational Safety and Health Act, 29 U.S.C. §651 et seq., the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §11001 et seq., the Clean Air Act, 42 U.S.C. §7401 et seq., the Uranium Mill Tailings Radiation Control Act (42 U.S.C. §7901 et seq.); the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §136 et seq.); the Noise Control Act (42 U.S.C. §4901 et seq.); the Safe Drinking Water Act (21 U.S.C. §349, 42 U.S.C. §201 and §300f et seq.); and the National Environmental Policy Act (42 U.S.C. § 4321 et seq.)

(xi)      "FIRPTA Certificate" means a certificate from Tenants in compliance with applicable Treasury Regulations setting forth Tenants (or, if applicable, their regarded owners') names, addresses and federal tax identification numbers and stating that Tenants (or, if applicable, their regarded owners) are not "foreign persons" within the meaning of section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to section 1445 of the Code.

(xii)     "Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

(xiii)    "Hazardous Materials" means each and every element, compound, chemical mixture, contaminant, pollutant, material, waste or other substance which is defined, determined or identified as hazardous or toxic under any Environmental Law.

(xiv)     "Law" means any constitution applicable to, and any law, statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

(xv)      "Legal Requirements" means all federal, state, county, municipal, and other governmental statutes, ordinances, laws, rules, regulations and requirements, including all Environmental Laws, laws relating to architectural barriers affecting the disabled, and all rules, regulations, ordinances, statutes and guidelines promulgated by any applicable Governmental Authorities having jurisdiction.

(xvi)     "Liability" means any debt, liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising and including all costs and expenses relating thereto.

(xvii)    "<u>License</u>" means all licenses, concessions, options and all other agreements (written or oral), and any amendments or supplements to the foregoing pursuant to which any Seller has granted any third parties a license to use or occupy any portion of its Leased Premises.

(xviii)    "<u>Lien</u>" means any mortgage, pledge, lien, charge, deed of trust, hypothecation, assignment, deposit, arrangement, assessment, adverse claim, levy, preemptive right, preference or priority, security interest, option, right of first refusal or first offer, or security agreement (whether voluntary or involuntary, whether affirmative or negative, whether imposed or created by operation of Law or otherwise).

(xix)    "<u>Litigation</u>" means any action, cause of action, suit, claim, charge, investigation, audit, demand, examination, hearing, mediation or proceeding, whether civil, criminal, administrative, or arbitral, whether at Law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority or private.

(xx)    "<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

(xxi)    "<u>Release</u>" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, storing, escaping, leaching, dumping, discarding, burying, abandoning, or disposing of Hazardous Materials into the environment.

(xxii)    "<u>Representative</u>" means, when used with respect to a Person, the Person's controlled Affiliates (including subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

(xxiii)    "<u>Sale Order</u>" shall mean an order of the Bankruptcy Court substantially in the form attached hereto as <u>Exhibit K</u> with such changes as are reasonable acceptable to the Parties.

(xxiv)    "<u>Tax</u>" or "<u>Taxes</u>" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

(xxv)    "<u>Tax Return</u>" means any return, declaration, report, and claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(xxvi)    "Transfer Tax" means any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated by this Agreement.

(xxvii)    "Treasury Regulations" mean the Treasury regulations promulgated under the Code.

## EXHIBIT A

### Leases

| STORE# (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTION OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|
| 075-6522 | 3399 ARAMINGO AVE. | PHILADELPHIA | PA | INDENTURE OF LEASE DATED OCTOBER 21, 1977 BETWEEN 909 GROUP, L.P., AS LANDLORD, AND A&P LIVE BETTER, LLC (SUCCESSOR IN INTEREST TO ACME MARKETS, INC.), AS TENANT, WHICH LEASE WAS DATED ON OCTOBER 21, 1977 AND RECORDED ON OCTOBER 27, 1977 IN THE OFFICE OF THE RECORDER OF DEEDS OF PHILADEPHIA COUNTY IN DEED BOOK 1510 PAGE 196; AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION OF LEASE DATED APRIL 22, 2005, AS AMENDED BY AMENDMENT TO LEASE DATED OCTOBER 18, 1994, LETTER AGREEMENT DATED MAY 26, 2005, AND BY LETTER AGREEMENT DATED MARCH 15, 2011; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED DECEMBER 23, 2011; AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012; AND SUBJECT TO GUARANTY DATED MARCH 13, 2012.  AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.6.28 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 072-6653 | 3901 HEMPSTEAD TURNPIKE | BETHPAGE | NY | LEASE DATED MARCH 28, 2002 BETWEEN MANARCO REALTY CO., AS LANDLORD, AND A&P REAL PROPERTY, LLC (SUCCESSOR TO PATHMARK STORES INC.), AS TENANT; AS EVIDENCED BY MEMORANDUM OF LEASE DATED MARCH 28, 2003; AS AMENDED BY FIRST AMENDMENT DATED JUNE 3, 2002, AND BY LETTER AGREEMENT DATED MARCH 23, 2005; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011; AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012; AND SUBJECT TO GUARANTY DATED MARCH 13, 2012.  AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.5.9 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT |

| STORE# (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTION OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|
| | | | | AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 072-6558 | 5005 EDGEMONT AVE. | BROOKHAVEN | PA | LEASE BETWEEN BROOKHAVEN MZL LP (AS SUCCESSOR IN INTEREST TO BROOKHAVEN ASSOCIATES), AS LANDLORD, AND A&P REAL PROPERTY LLC (AS SUCCESSOR IN INTEREST TO PATHMARK STORES, INC. (FORMERLY KNOWN AS SUPERMARKETS GENERAL CORPORATION)), AS TENANT, DATED DECEMBER 16, 1968; AS EVIDENCED BY SHORT FORM LEASE DATED DECEMBER 16, 1968 AND RECORDED ON MAY 16, 1969 IN DELAWARE COUNTY IN DEED BOOK 2339, PAGE 185; AS AMENDED OR MODIFIED BY AGREEMENT DATED JULY 30, 1969, AND BY LETTER AGREEMENT DATED JUNE 15, 1970, AND BY LETTER AGREEMENT DATED OCTOBER 15, 1970, AND BY CONFIRMATION OF LEASE TERM AGREEMENT DATED JULY 14, 1971, AND BY CONSENT LETTER DATED MARCH 17, 1972, AND BY LETTER AGREEMENT DATED MAY 16, 1972, AND BY LEASE MODIFICATION AGREEMENT DATED JUNE 30, 1981, AND BY AMENDMENT OF LEASE DATED OCTOBER 9, 1995, AND BY ADDENDUM TO OCTOBER 9, 1995 AMENDMENT OF LEASE, AND BY LETTER AGREEMENT DATED NOVEMBER 19, 1998, AND BY NOTICE OF RENEWAL DATED AUGUST 27, 2010; AND AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011; AND AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012; AND AS SUBJECT TO GUARANTY DATED MARCH 13, 2012.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.6.2 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 074-3074 | 1 PADANARAM ROAD | DANBURY | CT | LEASE ORIGINALLY DATED OCTOBER 16, 1995 BETWEEN DANPAR ASSOCIATES, AS LANDLORD, AND THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., AS TENANT; AS EVIDENCED BY THAT MEMORANDUM OF LEASE DATED OCTOBER 16, 1995 AND RECORDED IN BOOK 1131 PAGE 0844; AS AMENDED BY LETTER AGREEMENT DATED JULY 8, 1997; AND CONFIRMATION OF LEASE TERM AGREEMENT DATED JUNE 9, 1998 |

| STORE# (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTION OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|
| | | | | RECORDED IN VOLUME 1222 PAGE 0354;AND LETTER AGREEMENT DATED NOVEMBER 16, 2001; AND LETTER AGREEMENT DATED JULY 13, 2004 (WHICH AMENDS LETTER AGREEMENT DATED JULY 8, 2004); AND LETTER AGREEMENT DATED APRIL 17, 2006 (WHICH AMENDS LETTER AGREEMENT DATED APRIL 5, 2006); AND LETTER AGREEMENT DATED SEPTEMBER 11, 2008,  SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED DECEMBER 23, 2011.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.1.2 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 072-6569 | 140 NORTH MACDADE BLVD. | GLENOLDEN | PA | LEASE BY AND BETWEEN MCB GLENOLDEN, LP, AS LANDLORD AND A&P REAL PROPERTY, LLC, AS TENANT DATED OCTOBER 15, 2013; AS SUBJECT TO UNCONDITIONAL GUARANTY BY THE GREAT ATLANTIC & PACIFIC TEA COMPANY DATED OCTOBER 15, 2013.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.6.9 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 070-3003 | 1643 ROUTE 82, SUITE 1 & ARTHURSBURG | LAGRANGEVILLE | NY | LEASE DATED NOVEMBER 2, 1990 BETWEEN ANTHONY ASSOCIATES, LP (SUCCESSOR TO LAGRANGE PLAZA ASSOCIATES), AS LANDLORD, AND A&P REAL PROPERTY, LLC (SUCCESSOR TO THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.), AS TENANT; AS EVIDENCED BY MEMORANDUM OF LEASE FOR RECORDATION (NOTICE OF LEASE) DATED AS OF NOVEMBER 2, 1990 AND RECORDED ON FEBRUARY 5, 1991 IN BOOK 1885 PAGE 296; AS AMENDED BY AMENDMENT TO LEASE DATED AUGUST 22, 1995, AND BY SECOND AMENDMENT TO LEASE DATED MAY 13, 1996, AND BY THIRD AMENDMENT TO LEASE DATED AUGUST 1, 2010, AND BY FOURTH AMENDMENT TO LEASE DATED JUNE 20, 2011 AND A CONFIRMATION OF LEASE TERM AGREEMENT DATED MAY 3, 1999; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW |

| STORE# (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTION OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|
| | | | | YORK DATED NOVEMBER 16, 2011; AS ASSIGNED PURSUANT TO THAT ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012 AND ASSIGNMENT OF LEASES (AS TO LANDLORD'S INTEREST) DATED DECEMBER 20, 1995; AND SUBJECT TO GUARANTY DATED MARCH 13, 2012.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.5.66 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 072-6556 | 4160 MONUMENT AVE. | PHILADELPHIA | PA | LEASE DATED NOVEMBER 1, 1980 BETWEEN GATOR MONUMENT PARTNERS, LLP (SUCCESSOR-IN-INTEREST TO NEWKIRK SUPERLINE L.P. (SUCCESSOR-BY-MERGER TO SUPERLINE ASSOCIATES LIMITED PARTNERSHIP)), AS LANDLORD, AND A&P REAL PROPERTY LLC (AS SUCCESSOR IN INTEREST TO PATHMARK STORES, INC. (FORMERLY KNOWN AS SUPERMARKETS GENERAL CORPORATION)), AS TENANT; AS EVIDENCED BY MEMORANDUM OF LEASE AGREEMENT DATED AS OF NOVEMBER 1, 1980; AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT BETWEEN NEWKIRK SUPERLINE L.P. AND GATOR MONUMENT PARTNERS, LLP, DATED MARCH 26, 2008; AS SUBJECT TO THAT CERTAIN ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED DECEMBER 23, 2011; AS AFFIRMED BY THAT CERTAIN SUMMARY ORDER OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT DATED JUNE 19, 2013; AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012, AS EXTENDED BY THAT EXTENSION LETTER DATED AUGUST 18, 2014; AND AS SUBJECT TO THAT GUARANTY DATED MARCH 13, 2012 (NOT SIGNED BY GATOR MONUMENT PARTNERS, LLP AS BENEFICIARY).<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.6.25 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS |

| STORE# (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTION OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|
| | | | | IDENTIFIED ABOVE. |
| 072-6649 | 2335 NEW HYDE PARK ROAD | NEW HYDE PARK | NY | LEASE DATED AS OF JANUARY 13, 1995, BETWEEN AMERICAN MILLWORK, LLC, AS LANDLORD, AND PATHMARK STORES, INC., AS TENANT; TOGETHER WITH MEMORANDUM OF LEASE DATED FEBRUARY 16, 1995 (NOT RECORDED) AND MEMORANDUM OF LEASE DATED FEBRUARY 20, 1998 (NOT RECORDED); AS AMENDED BY FIRST AMENDMENT OF LEASE DATED OCTOBER 16, 1996, AS AMENDED BY LETTER AGREEMENT DATED FEBRUARY 14, 1997, AS AMENDED BY SECOND AMENDMENT TO LEASE AGREEMENT DATED DECEMBER 29, 2011 BETWEEN ALECTA REAL ESTATE USA, LLC AND PATHMARK STORES, INC.; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011; AS ASSIGNED BY PATHMARK STORES, INC. TO A&P REAL PROPERTY, LLC PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT DATED AS OF MARCH 13, 2012; AND SUBJECT TO THAT GUARANTY DATED MARCH 13, 2012.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.5.81 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 072-6552 | 330 OREGON AVE. WHITMAN PLAZA SHOPPING CENTER | PHILADELPHIA | PA | LEASE DATED MAY 30, 1979 BETWEEN SOUTH-WHIT SHOPPING CENTER, INC., AS LANDLORD, AND SUPERMARKETS GENERAL CORPORATION, AS TENANT, AS AMENDED BY THAT LETTER AGREEMENT DATED MAY 30, 1979 AND BY THAT FIRST AMENDMENT OF LEASE DATED MAY 15, 1980, AS FURTHER AMENDED BY LETTER AGREEMENTS DATED MARCH 31, 1981 AND MAY 26 1983, TOGETHER WITH COMMENCEMENT AGREEMENT DATED APRIL 7, 1982AND THAT SECOND AMENDMENT OF LEASE DATED OCTOBER 7, 1986 BETWEEN SOUTH-WHIT SHOPPING CENTER ASSOCIATES (F/K/A SOUTH-WHIT SHOPPING CENTER, INC.) AND TENANT, AND BY LETTER AGREEMENTS DATED OCTOBER 17, 1986, AUGUST 28, 1989, JANUARY 27, 1995, OCTOBER 7, 1996, AND FEBRUARY 25, 2002, AS RENEWED BY RENEWAL NOTICES DATED NOVEMBER 17, 2004, NOVEMBER 10, 2009, AND JANUARY 29, |

| STORE# (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTION OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|
| | | | | 2015; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED AUGUST 31, 2011; AS ASSIGNED BY PATHMARK STORES, INC. (SUCCESSOR-IN-INTEREST TO SUPERMARKETS GENERAL CORPORATION) TO A&P REAL PROPERTY, LLC PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT DATED AS OF MARCH 13, 2012.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.6.23 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 072-6568 | 421 SOUTH 69TH BLVD. | UPPER DARBY | PA | LEASE BY AND BETWEEN REALTY INCOME UPPER DARBY 69TH, LLC (AS SUCCESSOR IN INTEREST TO WE APP UPPER DARBY LLC), AS LANDLORD AND A&P REAL PROPERTY, LLC (AS SUCCESSOR IN INTEREST TO PATHMARK STORES, INC.), AS TENANT, DATED NOVEMBER 8, 2010; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED OCTOBER 3, 2011; AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012; AND SUBJECT TO GUARANTY DATED NOVEMBER 8, 2010 AND MARCH 13, 2012, AS APPROVED BY LANDLORD ON SEPTEMBER 6, 2012; WHICH LEASE WAS ASSIGNED BY ORIGINAL LANDLORD ON SEPTEMBER 13, 2012 BY THAT ASSIGNMENT AND ASSUMPTION OF LEASES AND BY THAT PURCHASED INTEREST ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MAY 9, 2014 TO REALTY INCOME UPPER DARBY 69TH, LLC.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.6.33 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 072-6528 | 1000 EASTON ROAD. | WYNCOTE | PA | LEASE DATED SEPTEMBER 27, 1994  BY AND BETWEEN CEDARBROOK PLAZA INC., AS LANDLORD AND PATHMARK STORES, INC., AS TENANT; AS EVIDENCED BY MEMORANDUM OF LEASE DATED SEPTEMBER 27, 1994; AS |

| STORE# (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTION OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|
| | | | | AMENDED BY FIRST AMENDMENT OF LEASE DATED NOVEMBER 29, 1995, AND BY AMENDMENT TO LEASE DATED FEBRUARY 1, 1996, AND BY COMMENCEMENT AGREEMENT DATED MARCH 27, 1996, AS EVIDENCED BY MEMORANDUM OF LEASE AS AMENDED DATED DECEMBER 29, 1997; AND AS FURTHER AMENDED BY THAT THIRD AMENDMENT OF LEASE DATED JANUARY 17, 2003; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011; AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012; AND SUBJECT TO GUARANTY DATED MARCH 13, 2012.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.6.35 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
| 027-7699 | 1960 DEER PARK AVENUE | DEER PARK | NY | STORE – 070-7699 (027-7699) – 1960  DEER PARK AVE., DEER PARK, NY, 11729.<br><br>AMENDED AND RESTATED LEASE DATED JANUARY 9, 2009 ORIGINALLY BY AND BETWEEN PARK PLAZA PROPERTIES – MAVCO, LLC, AS LANDLORD AND APW SUPERMARKETS, INC., AS TENANT; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011AND THAT CURE LETTER DATED JULY 15, 2011; AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT TO A&P REAL PROPERTY LLC,  DATED MARCH 13, 2012, RECORDED ON APRIL 30, 2013 IN LIBER 12778 Cp 77; AND SUBJECT TO GUARANTY DATED MARCH 13, 2012.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.5.37 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |

## EXHIBIT B

### Leased Premises

| | |
|---|---|
| 075-6522 | 3399 ARAMINGO AVE., PHILADELPHIA, PA |
| 072-6653 | 3901 HEMPSTEAD TURNPIKE, BETHPAGE, NY |
| 072-6558 | 5005 EDGEMONT AVE., BROOKHAVEN, PA |
| 074-3074 | 1 PADANARAM ROAD, DANBURY, CT |
| 072-6569 | 140 NORTH MACDADE BLVD., GLENOLDEN, PA |
| 070-3003 | 1643 ROUTE 82, SUITE 1 & ARTHURSBURG, LAGRANGEVILLE, NY |
| 072-6556 | 4160 MONUMENT AVE., PHILADELPHIA, PA |
| 072-6649 | 2335 NEW HYDE PARK ROAD, NEW HYDE PARK, NY |
| 072-6552 | 330 OREGON AVE. WHITMAN PLAZA SHOPPING CENTER, PHILADELPHIA, PA |
| 072-6568 | 421 SOUTH 69TH BLVD., UPPER DARBY, PA |
| 072-6528 | 1000 EASTON ROAD, WYNCOTE, PA |
| 070-7699 | 1960 DEER PARK AVENUE, DEER PARK, NY |

## EXHIBIT C

### Subleases

| # | STORE [LEGACY] | ST | CITY | ADDRESS | SUBLEASE(S) DESCRIPTION TO BE INSERTED INTO CONTRACT ESCROW |
|---|---|---|---|---|---|
| | 70-074 | CT | Danbury | PADANARUM ROAD | • SUBLEASE(S), AS AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED, WITH RESPECT TO THE FOLLOWING SUBTENANT(S): <br><br> i. **JP MORGAN CHASE BANK ---** LEASE, DATED APRIL 13, 1998 ORIGINALLY BETWEEN THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., AS LANDLORD, AND THE CHASE MANHATTAN BANK, AS TENANT, AS AMENDED BY THAT CERTAIN AMENDMENT TO LEASE DATED AUGUST 13, 2002 AND THAT SECOND AMENDMENT TO LEASE DATED JUNE 5, 2013, WHICH EXTENDED THE LEASE TERM TO MAY 31, 2018. <br><br> AND ALL OTHER DOCUMENTS WITH RESPECT TO SUCH SUBLEASE(S) LOCATED IN DATAROOM FOLDER 1.1.2. |
| | 72-556 | PA | PHILADELPHIA | 4160 MONUMENT AVE | • SUBLEASE(S), AS AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED, WITH RESPECT TO THE FOLLOWING SUBTENANT(S): <br><br> i. **ALLEGRO PIZZA OF CITY LINE INC. ---** LEASE, DATED APRIL 9, 1985 ORIGINALLY BETWEEN SUPERMARKET'S GENERAL CORPORATION, AS LANDLORD, AND MONUMENT ROAD RESTAURANT, INC., AS TENANT, AS AMENDED BY A LETTER AGREEMENT DATED AUGUST 5, 1987; AS AMENDED BY A SECOND AMENDMENT OF LEASE DATED FEBRUARY 22, 2000 BETWEEN PATHMARK STORES, INC. (F/K/A SUPERMARKETS GENERAL CORPORATION) AND TENANT, AS FURTHER AMENDED BY THAT THIRD AMENDMENT OF LEASE DATED JUNE 24, 2005, AND AS EXTENDED BY THAT RENEWAL NOTICE LETTER DATED AUGUST 8, 2010. **\*TENANT SUBJECT OF EVICTION PROCEEDINGS.** <br><br> ii. **DUNKIN DONUTS ---** LEASE, DATED AUGUST 19, 2009 ORIGINALLY BETWEEN PATHMARK |

|  |  |  |  |  | STORES, INC., AS LANDLORD, AND CBP ENTERPRISES, AS TENANT, AS AMENDED BY FIRST AMENDMENT TO LEASE DATED AUGUST 26, 2013.<br><br>iii. **JES HAIR GALLERY, INC.** --- SUBLEASE, DATED MARCH 2015 ORIGINALLY BETWEEN A&P REAL PROPERTY, LLC AS LANDLORD, AND JES HAIR GALLERY, INC., AS TENANT.<br><br>v. **JIE CHEN (CHINESE RESTAURANT)** --- SUBLEASE, DATED SEPTEMBER 1, 2014 ORIGINALLY BETWEEN A&P REAL PROPERTY, LLC AS LANDLORD, AND JIE CHEN, INDIVIDUALLY, AND RI HONG RISING SUN INC., AS TENANT; AND SUBJECT TO GUARANTY DATED SEPTEMBER 1, 2014 BY JI CHEN, AS GUARANTOR.<br><br>vi. **SHUQING LIU D/B/A MONUMENT CHECK CASHING** --- LEASE, DATED DECEMBER 1, 1998 ORIGINALLY BETWEEN PATHMARK STORES, INC., AS LANDLORD, AND ASHOT NERISIAN AND SHUQING LIU, JOINTLY AND SEVERALLY, AS TENANT, AS AMENDED BY FIRST AMENDMENT TO LEASE DATED JUNE 28, 2013.<br><br>vii. **MY PHAM, AN INDIVIDUAL D/B/A "PRETTY NAIL"** --- LEASE, DATED APRIL 28, 1995 ORIGINALLY BETWEEN PATHMARK STORE, INC., AS LANDLORD, AND MY PHAM, AN INDIVIDUAL D/B/A "PRETTY NAIL" AS TENANT AS AMENDED BY FIRST AMENDMENT TO LEASE DATED MAY 30, 2001.<br><br>AND ALL OTHER DOCUMENTS WITH RESPECT TO SUCH SUBLEASE(S) LOCATED IN DATAROOM FOLDER 1.6.25 |
|---|---|---|---|---|---|

# **EXHIBIT D**

## **Escrow Agreement**

(Attached hereto)

EXECUTION VERSION

**Bidder ID No. 104**

**Site No(s). 6522;6653;6558;3074;6569;3003;6556;6649;6552;6568;6528;7699;6642;7611;6679**

## ESCROW RIDER TO LEASE SALE AGREEMENT

This Escrow Agreement dated this 17th day of September, 2015 (this "Escrow Agreement"), is entered into by and among A&P Live Better, LLC, a Delaware limited liability company, and A&P Real Property, LLC, a Delaware limited liability company (individually and collectively, the "Seller"), and Wakefern Food Corp., a New Jersey corporation ("Bidder," and together with Seller, the "Parties," and individually, a "Party"), and TitleVest Services, LLC, a New York limited liability company, as escrow agent ("Escrow Agent"). Any capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Agreement (as defined below).

## W I T N E S S E T H

WHEREAS, the Bidder has executed that certain Lease Sale Agreement (the "Sale Agreement") as part of a bid for the acquisition of certain assets pursuant to the Sale Agreement more particularly described on Exhibit A (the "Acquired Assets");

WHEREAS, as part of the bid process, Bidder is required to wire to Escrow Agent a Deposit in the amount of Two Million Three Hundred Twenty Eight Thousand Six Hundred Dollars ($2,328,600) (the "Escrow Funds"); and

WHEREAS, Bidder desires that Escrow Agent hold the Escrow Funds in escrow pursuant to the terms of this Escrow Agreement; and

WHEREAS, Escrow Agent is willing to hold the Escrow Funds, on the terms and conditions hereinafter set forth; and

NOW THEREFORE, in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid, the receipt and sufficiency of which are hereby mutually acknowledged, the Parties and the Escrow Agent agree as follows:

I.    **ESCROW FUNDS**

A.    <u>Delivery of Escrow Funds; Authorization of Escrow Agent</u>.  Concurrently with execution and delivery of this Escrow Agreement, Bidder shall deliver the Escrow Funds along with a nonrefundable Escrow Fee of $500 ("Initial Escrow Fee"; together with all other nonrefundable escrow fees set forth on Exhibit C, the "Nonrefundable Escrow Fees") to Escrow Agent via wire transfer.  Upon receipt, the Escrow Funds shall be held by Escrow Agent in Escrow Agent's client escrow account at Citibank and shall not be invested in any securities.  The Escrow Funds shall at all times remain available for distribution.  Upon receipt, the Escrow Agent shall acknowledge to Bidder in writing that the Initial Escrow Fee has been delivered to the Escrow Agent. The Parties hereby appoint Escrow Agent to serve as escrow agent with respect to the

Escrow Funds, and Escrow Agent hereby accepts such appointment and agrees to act in accordance with the terms and subject to the conditions of this Escrow Agreement.  Escrow Agent shall have the right to disburse the Escrow Funds, in whole or in part, solely in accordance with the terms of this Escrow Agreement.  Escrow Agent shall not, under any circumstances, pledge or hypothecate any portion of the Escrow Funds and shall act only as directed in accordance with the terms of this Escrow Agreement.

B.    UNTIL RELEASED AND DISBURSED IN ACCORDANCE WITH THE TERMS OF THIS ESCROW AGREEMENT, ALL ESCROW FUNDS SHALL (i) REMAIN THE PROPERTY OF BIDDER, (ii) NOT BE OR BECOME THE PROPERTY OR ASSETS OF SELLER OR ESCROW AGENT, AND (iii) NOT BE SUBJECT TO ANY LIEN OR ANY JUDGMENT OR CREDITORS' CLAIMS AGAINST SELLER, BIDDER OR ESCROW AGENT.  IN NO EVENT SHALL ANY OF THE ESCROW FUNDS BE COMMINGLED WITH DEPOSIT ACCOUNTS OF ESCROW AGENT OR OTHERWISE TREATED AS A DEPOSIT ACCOUNT OF ESCROW AGENT OR REFLECTED ON THE FINANCIAL STATEMENTS OF ESCROW AGENT.

## II.    <u>RELEASE OF ESCROW FUNDS</u>

A.    <u>Potential Bidder</u>.  If Bidder is determined by Seller not to meet the requirements for qualifying as a bidder in any auction for the Acquired Assets (the "<u>Auction</u>"), as confirmed by the debtors, within three (3) Business Days after the deadline for Seller to make a determination regarding which bids have been determined to be qualified bids for such auction (the "<u>Designation Deadline</u>") ("<u>Unqualified Bidder</u>"), the Escrow Agent shall, upon joint notice from Seller and Bidder, return to Bidder the Escrow Funds as soon as practicable, but, in any event within 5 Business Days after the Designation Deadline.

B.    <u>Qualified Bidder</u>.  The Escrow Funds will be forfeited to Seller if Bidder is determined by Seller to meet the requirements for qualifying as a bidder at the Auction ("<u>Qualified Bidder</u>") and (A) Bidder attempts to modify, amend or withdraw its qualified bid, except as may permitted by the governing procedures or the Sale Agreement, during the time the qualified bid remains binding and irrevocable under the applicable procedures and the Sale Agreement or (B) the Bidder is selected as the Successful Bidder (as defined below) and fails to enter into definitive documentation as required under the Sale Agreement executed by Seller and Bidder or to consummate the transaction according to the applicable procedures, and the terms of the applicable transaction documents (as contemplated by the Sale Agreement) with respect to the successful bid.  The Escrow Agent shall release the Escrow Funds by wire transfer of immediately available funds to an account designated by Seller two (2) business days after the receipt by the Escrow Agent of a joint written notice by Seller and Bidder requesting the release of the Escrow Funds to Seller.  Seller agrees that if it provides to the Escrow Agent the notice specified in the immediately preceding sentence, it will simultaneously provide a copy of such notice to the Bidder in accordance with the notice procedures of <u>Section V.B</u>.

C.    <u>Successful Bidder</u>.  If Bidder is the successful bidder for the Acquired Assets ("<u>Successful Bidder</u>"), Seller or its agent shall notify Escrow Agent, and Escrow Agent shall retain the Escrow Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement and such Escrow Funds shall be applied to reduce dollar for dollar the Purchase Price to be paid in respect of the Premises.

D.      Backup Bidder.  If the Bidder is selected as the next highest or next best bid for purchase of the Acquired Assets ("Backup Bidder"), Seller or its agent shall notify the Escrow Agent, and the Escrow Funds will continue to be held by the Escrow Agent until the acquisition of the Acquired Assets by the Successful Bidder, at which time the Escrow Funds will be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as Exhibit B, less any applicable Nonrefundable Escrow Fees (and Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated); provided that if the Successful Bidder does not consummate the purchase of the Acquired Assets, then the Escrow Agent shall retain the Escrow Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement.

E.      Neither Successful Nor Backup Bidder.  If Bidder is determined by Seller to be neither the Successful Bidder nor the Backup Bidder, then, within three (3) business days of execution by the Successful Bidder and Seller of the documentation memorializing the successful bid, the Escrow Funds shall, upon joint written notice from Seller and Bidder, be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as Exhibit B, less any applicable Nonrefundable Escrow Fees.  Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated.  In the case of Subsections (C) and (D) of this Section II, Escrow Agent shall release the funds no later than the Outside Date except to the extent the Sale Agreement is executed by Seller with respect to a Backup Bidder prior to the Outside Date.

F.      Disbursements.  Seller and Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Escrow Funds. If either party fails to execute such written notice, the Escrow Funds may be released by an order of the Bankruptcy Court (as defined below).

## III.   DUTIES OF THE ESCROW AGENT

A.      Scope of Responsibility. Notwithstanding any provision to the contrary, Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstances will Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement.  Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to Escrow Agent; and Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document.  References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and Escrow Agent has no duties or obligations with respect thereto.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

B.      Attorneys and Agents. Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by Escrow Agent in accordance with the advice of its counsel or other professionals retained or consulted by Escrow Agent.  Escrow Agent shall be

reimbursed for any and all compensation (reasonable and documented fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

C.    <u>Reliance</u>.  Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors and/or assigns.  Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person's or persons' authority.  Concurrently herewith, the Bidder shall deliver to the Escrow Agent <u>Exhibit D</u> hereto, which contains authorized party designations.

D.    <u>Right Not Duty Undertaken</u>.  The permissive rights of Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

E.    <u>No Financial Obligation</u>.  No provision of this Escrow Agreement shall require Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.  Escrow Agent shall not be liable for the insolvency of any bank in which the Escrow Funds are deposited.

## IV.    <u>PROVISIONS CONCERNING ESCROW AGENT</u>

A.    <u>Indemnification</u>.

1.    Seller, on the one hand, and Bidder, on the other hand, each agree to severally (but not jointly) indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, reasonable and documented attorneys' fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating to (a) the Escrow Agent's execution and performance of this Escrow Agreement, except to the extent that such loss, liability or expense shall have been finally adjudicated to have directly resulted from the gross negligence, fraud or willful misconduct of the Escrow Agent (or any person through which its duties are performed, as provided in <u>Section III(C)</u>) or (b) the Escrow Agent's following any instructions or other directions from the Bidder or Seller, except to the extent that its following any such instruction or direction is expressly forbidden by the terms of this Escrow Agreement. The provisions of this <u>Section IV(A)(1)</u> shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

2.    In the event that litigation is brought against the Escrow Agent in respect of which indemnity may be sought hereunder, the Escrow Agent shall give prompt written notice of that litigation to each of Seller and Bidder and Seller and Bidder, shall, upon receipt of that notice, have the obligation and the right to assume the defense of such litigation, provided, that the failure of the Escrow Agent to give that notice shall not relieve either Seller or Bidder from any of their respective obligations under this <u>Section</u>

IV(A)(2)  unless that failure prejudices the defense of such litigation by Seller or Bidder. The Escrow Agent may employ separate counsel and participate in the defense.  Seller shall not be liable for any settlement entered into without the Seller's consent and Bidder shall not be liable for any settlement entered into without Bidder's consent.

B.      Limitation of Liability. ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM ESCROW AGENT'S GROSS NEGLIGENCE, FRAUD  OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

C.      Resignation or Removal.  Escrow Agent may resign by furnishing at least fifteen (15) Business Days' written notice of its resignation to the Parties, and Seller may remove Escrow Agent by furnishing to Escrow Agent a written notice of Escrow Agent's removal along with payment of all reasonable and documented fees and expenses to which it is entitled through the date of termination or removal.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Funds and to deliver the same to a successor escrow agent as shall be appointed by Seller , as evidenced by a written notice filed with Escrow Agent or in accordance with a court order.  Upon such removal or their receipt of notice of resignation from the Escrow Agent, Seller shall use reasonable efforts to designate a successor escrow agent.  If Seller fails to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all Parties hereto.  Any such successor escrow agent shall deliver to Seller and Bidder a written instrument accepting such appointment, and thereupon it shall succeed to all the rights and duties of the escrow agent hereunder and shall be entitled to receive possession of the Escrow Funds.  Upon receipt of the identity of the successor escrow agent, the Escrow Agent shall deliver the Escrow Funds then held hereunder, less any reasonable and documented fees and expenses then due and owing to the Escrow Agent, to the successor escrow agent.  In the event of the resignation or removal of the Escrow Agent, the resigning or removed Escrow Agent shall be absolved from any further duties as the Escrow Agent hereunder; provided, however, that the Escrow Agent or any successor escrow agent shall continue to act as the Escrow Agent until a successor is appointed and qualified to act as the Escrow Agent.

D.      Compensation.  Escrow Agent shall be entitled to fees and expenses incurred in administering and disbursing the Escrow Funds, and compensation for its services which shall be paid by Bidder as set forth on Exhibit C.  The fees agreed upon in Exhibit C are intended as full compensation for the Escrow Agent services as contemplated by this Escrow Agreement. If any material controversy arises hereunder, or Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then, subject to Section IV(A)(2), Escrow Agent shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable and documented attorneys' fees and expenses,

occasioned by any such delay, controversy, litigation or event and such additional compensation shall be split 50/50 by Seller and Bidder.  If any amount due to Escrow Agent hereunder is not paid within thirty (30) days of the date due, Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.

E.    Disagreements.  If any conflict, disagreement or dispute arises between, among, or involving any of the Parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or Escrow Agent is in doubt as to the action to be taken hereunder, Escrow Agent is authorized to retain the Escrow Funds until Escrow Agent (i) receives a final, non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Funds, (ii) receives a written agreement executed by each of the Parties involved in such disagreement or dispute directing delivery of the Escrow Funds, in which event Escrow Agent shall be authorized to disburse the Escrow Funds in accordance with such final court order, arbitration decision, or agreement, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, Escrow Agent shall be relieved of all liability as to the Escrow Funds which it delivers to such court and shall be entitled to recover reasonable and documented attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

F.    Attachment of Escrow Funds; Compliance with Legal Orders.  In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting Escrow Funds, Escrow Agent is hereby expressly authorized, in its reasonable discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction.  In the event that Escrow Agent obeys or complies with any such writ, order or decree, it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

## V.    MISCELLANEOUS

A.    Successors and Assigns.  This Escrow Agreement shall be binding on and inure to the benefit of the Parties and Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement.  No assignment of the interest of the Parties shall be binding unless and until written notice of such assignment shall be delivered to other Party and Escrow Agent and shall require the prior written consent of such other Party and Escrow Agent (such consent not to be unreasonably withheld).

B.    Notices.  All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (a) personally, (b) by facsimile transmission with written confirmation of receipt, (c) on the day of transmission if sent by electronic mail ("e-mail") to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of transmission, (d) by overnight delivery with a reputable national overnight delivery service, or (e) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is mailed, it shall be

deemed given five (5) Business Days after the date such notice is deposited in the United States mail.  If notice is given to a party, it shall be given at the address for such party set forth below.  It shall be the responsibility of each party hereto to notify the Escrow Agent and the other Party in writing of any name or address changes.

If to Seller:

The Great Atlantic and Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention:  Christopher W. McGarry; Matthew Bennett
E-mail:  mcgarryc@aptea.com; bennettm@aptea.com

with a copy (which shall not constitute notice to Seller) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
Facsimile: (212) 310-8007
E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

Notices to Bidder:

Wakefern Food Corp.
5000 Riverside Drive
Keasbey, NJ 08832
Attention: Allison M. Berger, Group Vice President, General Counsel
Facsimile: (732) 512-6385
E-mail: Allison.Berger@Wakefern.com

With a copy (which shall not constitute notice to Bidder) to:

Greenberg Traurig, LLP
MetLife Building
200 Park Avenue
New York, NY 10166
Attention: Dennis J. Block
Facsimile: (212) 805-5555
E-mail: blockd@gtlaw.com


Notices to Escrow Agent:

TitleVest Services, LLC
44 Wall Street – 10th Floor
New York, NY 10005
Attention:  Sara Murray
E-Mail:  APBid@TitleVest.com

With a copy to:

Titlevest Agency, Inc.
44 Wall Street – 10th Floor
New York, NY 10005
Attention: Glen Chernick
Facsimile: (212) 757-0466
E-mail: Glen.Chernick@titlevest.com

C.      Governing Law; Jurisdiction.   This Escrow Agreement shall be governed by and
construed in accordance with the laws of the State of New York (without giving effect to the
principles of conflict of laws thereof), except to the extent that the laws of such state are
superseded by chapter 11 of title 11 of the United States Code ("Chapter 11").  Without limiting
any Party's right to appeal any order of the United States Bankruptcy Court for the Southern
District of New York (the "Bankruptcy Court"), (a) the Bankruptcy Court shall retain exclusive
jurisdiction to enforce the terms of this Escrow Agreement and to decide any claims (including
with respect to Section V) or disputes which may arise or result from, or be connected with, this
Escrow Agreement, any breach or default hereunder, and (b) any and all proceedings related to
the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto
hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall
receive notices at such locations as indicated herein; provided, however, that if the contemplated
Chapter 11 cases of Seller and certain of its affiliates has closed, the parties hereto agree to
unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts
of the State of New York, located in New York County for the resolution of any such claim or
dispute.  Each party hereto (i) expressly and irrevocably consents and submits to the jurisdiction
of each such court; (ii) agrees that each such court shall be deemed to be a convenient forum; (iii)
agrees that service of process in any such proceeding may be made by giving notice pursuant to
Section V(B); and (iv) agrees not to assert, by way of motion, as a defense or otherwise, in any
such proceeding commenced in any such court, any claim that such party is not subject personally
to the jurisdiction of such court, that such proceeding has been brought in an inconvenient forum,
that the venue of such proceeding is improper or that this Escrow Agreement or the subject matter
of this Escrow Agreement may not be enforced by such court.

D.      Entire Agreement. This Escrow Agreement and the exhibits hereto set forth the entire
agreement and understanding of the Parties and Escrow Agent related to the Escrow Funds.

E.      Amendment. This Escrow Agreement may be amended, modified, superseded, rescinded,
or canceled only by a written instrument executed by all of the Parties and Escrow Agent.

F.      Waivers. The failure of any Party to this Escrow Agreement at any time or times to
require performance of any provision under this Escrow Agreement shall in no manner affect the
right at a later time to enforce the same performance.  A waiver by any Party to this Escrow

Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

G.      Headings.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

H.      Counterparts.  This Escrow Agreement and any notices or communications may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

I.      Conflicts.  In the event of any conflict between this Escrow Agreement and the Sale Agreement or any order of the Bankruptcy Court, the terms of the Sale Agreement and/or the order of the Bankruptcy Court shall govern, but only as between the Parties.

J.      Publication; disclosure.  By executing this Escrow Agreement, the Parties and the Escrow Agent acknowledge that this Escrow Agreement (including related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement(other than to the directors, officers, agents, auditors or advisors of the applicable Party hereto or its subsidiaries who agree, or are otherwise bound, not to disclose such information except as contemplated herein, or in connection with any disclosure required by the Bankruptcy Court).  Each Party hereto further agrees to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement, or, in the alternative, publishing a conformed copy of this Escrow Agreement.  If any Party hereto must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as any judicial, or administrative order, subpoena or discovery request, it shall notify in writing the other Party and the Escrow Agent at the time of execution of this Escrow Agreement of the legal requirement to do so.  If any Party hereto becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that such Party shall promptly notify in writing the other Parties and the Escrow Agent and shall be liable for any unauthorized release or disclosure.  Notwithstanding the foregoing, this Section V(J) shall not apply with respect to the filing, publication, disclosure or dissemination of this Escrow Agreement as may be requested or required by the Bankruptcy Court pursuant to a Chapter 11 bankruptcy process.

K.      Expenses.  Except as otherwise provided herein, each Party shall be responsible for its own costs and expenses with respect to matters involving this Escrow Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.


**A&P REAL PROPERTY, LLC**

By:

Name: Christopher McGarry

Title: CRO


**A&P LIVE BETTER, LLC**

By:

Name: Christopher McGarry

Title: CRO

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

**A&P LIVE BETTER, LLC**

By:     _____
Name:
Title:

**A&P REAL PROPERTY, LLC**

By:     _____
Name:
Title:

**WAKEFERN FOOD CORP.**

By _____
Name:     _Douglas W. Wilk_
Title:     _CFO_

**TITLEVEST SERVICES, LLC**

By:_____
Name:
Title:

**TITLEVEST SERVICES, LLC**

By: _____

Name:   Sara Murray

Title:    Escrow Supervisor

**EXHIBIT A**
Acquired Assets

| Ban. | Store # | Store Name |
|------|---------|------------|
| PM | 6522 | Aramingo Ave |
| PM | 6653 | Bethpage |
| PM | 6558 | Brookhaven |
| PM | 6642 | Brooklyn (12th Street) |
| AP | 3074 | Danbury |
| PM | 6569 | Glenolden |
| AP | 3003 | Lagrangeville |
| PM | 6556 | Monument Ave |
| PM | 6649 | New Hyde Park |
| PM | 6552 | Oregon Avenue |
| WB | 7611 | Rocky Point |
| PM | 6679 | Staten Island (Amboy) |
| PM | 6568 | Upper Darby |
| PM | 6528 | Wyncote |
| WB | 7699 | Deer Park |

## EXHIBIT B

Wire Instructions

Direct to: Wire Routing Transit Number ABA# 121000248

Bank name: Wells Fargo Bank, N.A.

Bank address, city, state: 420 Montgomery Street, San Francisco, CA 94104

Beneficiary Account number: 2016300003715

Beneficiary account name: Wakefern Food Corp.

**EXHIBIT C**

FEES OF ESCROW AGENT

<u>Preclosing</u>

- **Administration Fee:  $500.00**
  The administration fee is payable with the bid submission.

- **Escrow Agreement Negotiation Fee: $200**
  For negotiation of this Escrow Agreement or review and negotiation of an alternative
  form of escrow agreement.  Payable with bid submission.

<u>Closing</u>
- **Escrow Closing Fee:** $750 for attendance at Closing.  Payable at Closing.
- **Preparation of Transfer Tax Forms**: $150/set per property.  Payable at Closing.


<u>General</u>

**Out of Pocket Expenses**: Actual Cost.  Escrow Agent will charge for out-of-pocket expenses in
response to specific tasks assigned by the client or provided for in the escrow agreement.
Possible expenses would be, but are not limited to, express mail, Federal Express or other over-
night carrier, messenger charges, wiring fees and travel fees and expenses to attend closing or
other meetings.   There are no charges for indirect out-of- pocket expenses.  Payable at closing.

**EXHIBIT D**

BIDDER AUTHORIZED PARTY

Telephone Numbers and Authorized Signatures for
Person(s) Designated to Execute the Escrow Agreement, Give Joint Instruction and Confirm
Funds Transfer Instructions

For Buyer:

| Name | Business Telephone Numbers | Signature |
|---|---|---|
| 1. Doug Wille | 732-512-6374 | |
| 2. | | |
| 3. | | |

To the extent required herein, all instructions to be delivered by Bidder, including but not limited to funds transfer instructions, whether transmitted by facsimile or otherwise, must include the signature of the authorized representative authorizing said funds transfer on behalf of Bidder.

**<u>EXHIBIT E</u>**

<u>TitleVest Wire Instructions</u>

**Citibank**, 111 Wall Street, New York, NY 10005, Account No. **4985568554**, Account Name **TitleVest Services LLC Escrow Control**, ABA **021000089**

**EXHIBIT E**

**Wire Instructions**[1]

---

[1] NTD: TO BE INCLUDED AT A LATER DATE.

## EXHIBIT F

**Form of Assignment and Assumption of Leases**

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS **ASSIGNMENT AND ASSUMPTION OF LEASE** (this "**Assignment**") is entered into and effective as of September __, 2015, by and between by and between [ _____, _____, whose address is _____ ] ("**Seller**"), and **[**WAKEFERN FOOD CORP., a New Jersey corporation, whose address is 5000 Riverside Drive, Keasbey, New Jersey 08832 **[**or insert name and address of applicable Wakefern member**]** ("**Buyer**"). Seller and Buyer are referred to collectively herein as the "**Parties**."

WHEREAS, [the Parties] [the Seller and WAKEFERN FOOD CORP., a New Jersey corporation, whose address is 5000 Riverside Drive, Keasbey, New Jersey 08832 ("Wakefern") ] are parties to that certain Lease Sale Agreement, dated [●], 2015 (the "**Purchase Agreement**") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement);

WHEREAS, the execution and delivery of this Assignment is contemplated by the Purchase Agreement[, and Buyer has been designated by Wakefern as the assignee of the "Lease" identified below]; and

WHEREAS, Seller desires to assign, transfer, convey, and deliver to Buyer the Lease described in **Exhibit A** attached hereto including all amendments, modifications, and supplements thereto (collectively, the "**Lease**"), and Buyer desires to accept an assignment of the Lease together with all right, title, and interest of Seller thereunder.  The Lease encumbers all or a portion of certain property (the "**Leased Premises**") which property is more specifically described on **Exhibit B** attached hereto (the "**Premises**").

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1) <u>Assignment and Assumption of Lease</u>.  Effective as of the Closing, Seller hereby assigns, transfers, conveys, and delivers to Buyer all of Seller's estate, right, title and interest as tenant of the leasehold estate described under the Lease, and Buyer hereby accepts the assignment, transfer, conveyance, and delivery of Seller's estate, rights, title and interest in, to and under such leasehold estate, and assumes and agrees to pay, discharge, and perform when due all of Seller's obligations as tenant accruing from and after the date hereof under the Lease.

2) <u>Conflict</u>.  The assignment and assumption of the Lease (and the obligations thereunder) made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference.  In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.  Notwithstanding anything to the contrary in this Assignment,

nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the Purchase Agreement.

3)  <u>Notices</u>.  Any notice, request, or other document to be given hereunder to any Party shall be given in the manner specified in <u>Section 33</u> of the Purchase Agreement**[**, except that any notices to Buyer shall be given to the following address:

> Name of Buyer
> Street Address
> City, State, Zip Code
> Attention: Contact
> E-mail: E-mail address

With a copy (which shall not constitute notice to Buyer) to:

> Firm
> Street Address
> City, State, Zip Code
> Attention: Contact
> E-mail: E-mail address**]**

4)  <u>Severability</u>.  Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Assignment is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Assignment.

5)  <u>Amendments</u>.  This Assignment may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Seller.

6)  <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Assignment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

7)  <u>Governing Law</u>.  This Assignment shall be governed by the Laws of the state in which the Leased Premises are located, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

8)  <u>Third Party Beneficiaries and Obligations</u>.  This Assignment shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Assignment, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Assignment.

9)  <u>Recordation</u>.    Seller makes no representation regarding the recordability of this Assignment, nor the Lease or related documents. Seller shall bear no liability for the failure of the Lease or related documents to be recorded.

10)  <u>Further Assurances</u>.  Each of the Parties, without additional consideration, shall execute and deliver all such further documents and do such other things as the other Party may reasonably request to give full effect to this Assignment, including, without limitation, any other form of assignment agreement required in order to record this Assignment in the appropriate public records of the county in which the Leased Premises is located.

11)  <u>Entire Agreement</u>.  This Assignment, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior agreements, understandings, representations and statements, oral or written,  between the Parties on the subject matter hereof, which such prior agreements, understandings, representations and statements, oral or written, shall be of no further force or effect.

* * * * *

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.


**SELLER:**


[ _____,
a _____ ]


By:      _____
Name:  _____
Title:   _____

[ACKNOWLEDGMENTS]

**BUYER**:

[WAKEFERN FOOD CORP.,
a New Jersey corporation

By: _____
Name: _____
Title: _____]

**or**

[NAME OF BUYER ENTITY,
STATE AND TYPE OF BUYER ENTITY]

By: _____
Name: _____
Title: _____]

[ACKNOWLEDGMENTS]

## **EXHIBIT A**

### **Lease**

[List Lease in the following form:

Lease dated [●] originally between [●], as Landlord, and [●], as Tenant.]

# **EXHIBIT B**

## **Premises**

# **EXHIBIT G**

**Form of Quitclaim Bill of Sale**

*NY 245411399v4*

## QUITCLAIM BILL OF SALE

THIS **QUITCLAIM BILL OF SALE** (this "Bill of Sale") is entered into and effective as of [●], 2015, by and among [SELLER], a [●] ("Seller"), [●], a [●] (together with A&P, "Sellers") and WAKEFERN FOOD CORP., a New Jersey corporation ("Buyer"). Seller and Buyer are referred to collectively herein as the "Parties."

WHEREAS, the Parties are parties to that certain Lease Sale Agreement, dated [●], 2015 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1.    Sale and Acceptance of Acquired Assets. For true and lawful consideration paid by Buyer, the sufficiency of which is hereby acknowledged, effective  as of the date hereof, (a) Seller hereby sells, assigns, transfers, conveys, grants and  delivers to Buyer all of its right, title and interest in and to the Acquired Assets and (b) Buyer hereby accepts the foregoing sale and assignment.

2.    Conflict. The sale, assignment, transfer, conveyance, and delivery of the Acquired Assets made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein).  In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.   Notwithstanding anything to the contrary in this Bill of Sale, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants, and obligations of the Parties contained in the Purchase Agreement or the survival thereof.

3.    Notices. Any notice, request, or other document to be given hereunder to any Party shall be given in the manner specified in Section 33 of the Purchase Agreement.

4.    No Representation. This Bill of Sale is made without any covenant, warranty or representation by, or recourse against, Seller or any of Seller's Affiliates of any kind whatsoever.

5.    Severability. Whenever possible, each provision of this Bill of Sale shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Bill of Sale is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Bill of Sale.

6.  <u>Amendments</u>. This Bill of Sale may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Sellers.

7.  <u>Further Assurances</u>. Each of the Parties shall execute and deliver all such further documents and do such other things as the other Party may reasonably request to give full effect to this Agreement.

8.  <u>Counterparts; Facsimile and Electronic Signatures</u>. This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

9.  <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

10.  <u>Third Party Beneficiaries and Obligations</u>. This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Bill of Sale, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Bill of Sale.

11.  <u>Entire Agreement</u>. This Bill of Sale, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof, which such prior agreements, understandings, representations and statements, oral or written, shall be of no further force or effect.

* * * * *

IN WITNESS WHEREOF, the Parties have executed this Bill of Sale as of the date first above written.


[SELLER]


By: _____
Name:
Title:



WAKEFERN FOOD CORP.


By: _____
Name:
Title:


[Signature Page to Bill of Sale]

## **EXHIBIT H**

**Form of Landlord Notice**
**Form of Subtenant Notice**

## NOTICE TO LANDLORD

[ _____ ], 2015

**<u>Via Federal Express</u>**

[Name and Address of Landlord]

    Re:  Notice of assignment of lease at [ _____ ] (the "Lease")

Ladies and Gentlemen:

Please be advised that on July 19, 2015, [ _____ ], the tenant under the Lease ("Tenant"), and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.

Effective as of [ _____ ], Tenant's interest in the Lease has been assigned to [WAKEFERN FOOD CORP. ] [or insert name and address of applicable Wakefern member] ("Assignee"), and, pursuant to the terms and conditions of the Assignment and Assumption of Lease attached hereto as <u>Exhibit A</u>, Assignee has assumed all of the tenant's obligations under the Lease.

Any future inquiries regarding your Lease should be directed to the address below:

[Wakefern Food Corp.
5000 Riverside Drive
Keasbey, NJ 08832
Attention: Allison M. Berger, Group Vice President, General Counsel
Facsimile: 732.512.6385
E-mail: Allison.Berger@Wakefern.com]

**or**

[Name of Assignee
Street Address
City, State, Zip Code
Attention: Contact
E-mail: E-mail address]

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Very truly yours,

[ _____ ]


By:      _____
         Name:
         Title:

**NOTICE TO SUBTENANTS**

[ _____ ], 2015

<u>**Via Federal Express**</u>

[Name and Address of Subtenant]

     Re:     Notice of assignment of sublease at [ _____ ] (the "Sublease")

Ladies and Gentlemen:

Please be advised that on July 19, 2015, [ _____ ], the sublessor under the Sublease ("Sublessor"), and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.

Effective as of [ _____ ], Sublessor's interest in the Sublease has been assigned to **[WAKEFERN FOOD CORP. ]** [or insert name and address of applicable Wakefern member], and Assignee has assumed all of the sublessor's obligations under the Sublease, pursuant to the terms and conditions of the Assignment and Assumption of Sublease attached hereto as <u>Exhibit A</u>, Assignee has assumed all of the tenant's obligations under the Sublease.

 Any future inquiries regarding your Sublease should be directed to the address below:

**[**Wakefern Food Corp.
5000 Riverside Drive
Keasbey, NJ 08832
Attention: Allison M. Berger, Group Vice President, General Counsel
Facsimile: 732.512.6385
E-mail: Allison.Berger@Wakefern.com**]**

              **or**

**[**Name of Assignee
Street Address
City, State, Zip Code
Attention: Contact
E-mail: E-mail address**]**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Very truly yours,

[ _____ ]


By:    _____
       Name:
       Title:

# **EXHIBIT I**

**Form of Assignment of Subleases**

## ASSIGNMENT AND ASSUMPTION OF SUBLEASE

This **ASSIGNMENT AND ASSUMPTION OF SUBLEASE** (this "Assignment") is entered into and effective as of [_____ ___], 2015, by and between [ _____ ], a [_____] [_____] having an address at [ _____ ] ("Assignor"), and [WAKEFERN FOOD CORP., a New Jersey corporation, whose address is 5000 Riverside Drive, Keasbey, New Jersey 08832] [or insert name and address of applicable Wakefern member] ("Assignee"). Assignor and Assignee are referred to collectively herein as the "Parties".

WHEREAS Assignor, as tenant, entered into a lease agreement with respect to certain premises more specifically described on Exhibit B attached hereto (the "Premises").

WHEREAS Assignor entered into that certain sublease dated [ _____ ] as more particularly described on Exhibit A (together with all amendments, modification, and renewals thereto, the "Sublease") with respect to all or a portion of the Premises; and

WHEREAS, Assignor desires to assign, transfer, convey and deliver to Assignee all of its right, title and interest in and to the Sublease, and Assignee desires to accept an assignment of the Sublease together with all right, title and interest of Assignor thereunder.

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1. Assignment by Assignor.  Assignor hereby assigns, transfers, conveys and delivers to Assignee all of Assignor's right, title, interest and obligations in, to and under the Sublease.

2. Assumption by Assignee.  Assignee hereby expressly and unconditionally accepts the foregoing assignment and assumes and agrees to perform fully and faithfully each and every term, covenant and condition and every obligation accruing from and after the date hereof of Assignor under the Sublease and to meet Assignor's obligations accruing from and after the date hereof under the Sublease.

3. Notices.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Assignor:

[Assignor]
[Street Address]
[City, State, Zip Code]

Attention: [Contact]
E-mail: [E-mail address]

With a copy (which shall not constitute notice to Assignor) to:

[Firm]
[Street Address]
[City, State, Zip Code]
Attention: [Contact]
E-mail: [E-mail address]


If to Assignee:

[Wakefern Food Corp.
5000 Riverside Drive
Keasbey, NJ 08832
Attention: Allison M. Berger, Group Vice President, General Counsel
Facsimile: 732.512.6385
E-mail: Allison.Berger@Wakefern.com

With a copy (which shall not constitute notice to Assignee) to:

Greenberg Traurig, LLP
MetLife Building
200 Park Avenue
New York, NY 10166
Attention: Dennis J. Block
Facsimile: (212) 805-5555
E-mail: blockd@gtlaw.com]

**or**

[Name of Assignee
Street Address
City, State, Zip Code
Attention: Contact
E-mail: E-mail address

With a copy (which shall not constitute notice to Assignee) to:

Firm
Street Address
City, State, Zip Code
Attention: Contact
E-mail: E-mail address]

Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other party notice in the manner set forth in this Section 3.

4. Severability.  Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Assignment is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Assignment.

5. Amendments. This Assignment may not be amended or modified except by an instrument in writing signed by all of the parties hereto.

6. Counterparts; Facsimile and Electronic Signatures.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.   This Assignment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

7. Governing Law.  This Assignment shall be governed by and construed in accordance with the laws of the state in which the Premises are located (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such state are superseded by the United States Bankruptcy Code.

8. Third Party Beneficiaries and Obligations.  This Assignment shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Assignment, express or implied, is intended to or shall confer upon any person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Assignment.

9. Recordation.  Subject to the following two sentences, this Assignment may be recorded in the appropriate public records of the county in which the Premises is located. Assignor makes no representation regarding the recordability of this Assignment, nor the Sublease or related documents. Assignor shall bear no liability for the failure of the Sublease or related documents to be recorded.

10. Entire Agreement.  This Assignment, together with the Exhibits attached hereto, contains the entire understanding between the Parties with respect to the transaction contemplated hereby and supersedes all prior agreements, understandings, representations, and statements, oral or written, between the Parties on the subject matter hereof, which such prior agreements, understandings, representations, and statements, oral or written, shall be of no further force or effect.

11. <u>Further Assurances</u>.  Each of the Parties, without additional consideration, shall execute and deliver all such further documents and do such other things as the other Party may reasonably request to give full effect to this Assignment.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.

**ASSIGNOR:**

**[●], a [●]**

| | |
|---|---|
| _____ | By: _____ |
| Witness Signature | Name: _____ |
| | Title: _____ |
| _____ | |
| Printed Witness Name | |
| _____ | |
| Witness Signature | |
| _____ | |
| Printed Witness Name | |

**[ACKNOWLEDGMENT]**

**ASSIGNEE:**

**[WAKEFERN FOOD CORP.**, a New
Jersey corporation]

|  |  |
|---|---|
| By: | _____ |
| Name: | _____ |
| Title: | _____ |

_____
Witness Signature

_____
Printed Witness Name

_____
Witness Signature

_____
Printed Witness Name]

**OR**

**[NAME OF BUYER ENTITY,
STATE AND TYPE OF BUYER
ENTITY]**

|  |  |
|---|---|
| By: | _____ |
| Name: | _____ |
| Title: | _____ |

_____
Witness Signature

_____
Printed Witness Name

_____
Witness Signature

_____
Printed Witness Name]

**[ACKNOWLEDGMENT]**

**EXHIBIT A**

**Sublease**

**EXHIBIT B**

**Premises**

# **EXHIBIT J**

**Bidding Procedures**

## BIDDING PROCEDURES

### Overview

On July 19, 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On August 11, 2015, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (the "**Discrete Procedures Order**"),[1] approving the Discrete Sale and Lease Rationalization Procedures attached to the Discrete Procedures Order as Exhibit 1 (the "**Discrete Procedures**") which, among other things, authorized the Debtors to (i) hold an auction in connection with the sale of one or more of the Additional Stores[2], (ii) establish any rules for such auction that the Debtors determine, in consultation with the Consultation Parties, are appropriate to promote a spirited and robust auction, and (iii) designate a Stalking Horse and offer Bid Protections; provided that the Bid Protections shall not exceed 3% of the cash portion of the Stalking Horse's Bid.

On September 24, 2015, the Debtors filed a *Notice of Auction Pursuant to Discrete Sale and Lease Rationalization Procedures* (the "**Auction Notice**") designating Wakefern Food Corp. ("**Wakefern**") as a stalking horse bidder with respect to the following Additional Stores and related assets, as more particularly set forth in the Wakefern Agreement (as defined below) (collectively, the "**Wakefern Package**"):

|  | Store | Banner | City | Address | State |
|---|---|---|---|---|---|
| 3 | 70074 | A&P | Danbury | 1 Padanaram Road | CT |
| 17 | 72653 | Pathmark | Bethpage | 3901 Hempstead Turnpike | NY |
| 18 | 72649 | Pathmark | New Hyde Park | 2335 New Hyde Park Road | NY |
| 34 | 70699 | Waldbaums | Deer Park | 1960 Deer Park Avenue | NY |
| 52 | 72558 | Pathmark | Brookhaven | 5005 Edgemont Avenue | PA |
| 53 | 72569 | Pathmark | Glenolden | 140 North MacDade Boulevard | PA |
| 54 | 72552 | Pathmark | Philadelphia | 330 Oregon Avenue | PA |
| 56 | 72522 | Pathmark | Philadelphia | 3399 Aramingo Avenue | PA |
| 122 | 70003 | A&P | Lagrangeville | 1643 Route 82 | NY |
| 141 | 72528 | Pathmark | Wyncote | 1000 Easton Road | PA |

---

[1] A copy of the *Order Approving Discrete Sale and Lease Rationalization Procedures* [Docket No. 496] may be found at:  http://cases.primeclerk.com/aptea.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Discrete Procedures, the Global Procedures (defined below) or the Wakefern Agreement (defined below) as applicable.

| | Store | Banner | City | Address | State |
|---|---|---|---|---|---|
| 147 | 72556 | Pathmark | Philadelphia | 4160 Monument Avenue | PA |
| 151 | 72568 | Pathmark | Upper Darby | 421 S. 69th Street | PA |

The Wakefern Package is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.  These Bidding Procedures describe, among other things:  (A) the procedures for Qualified Bidders (defined below) to submit bids for one or more of the Additional Stores in the Wakefern Package; (B) the conduct of the auction with respect to the Wakefern Package (the "**Auction**"), if any; and (C) the ultimate selection of the Successful Bidder(s) (as defined below) and Bankruptcy Court approval thereof.

On August 11, 2015, the Bankruptcy Court approved the Global Procedures attached as Exhibit 1 to the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, if Necessary, and Sale Hearings* [Docket No. 495] (the "**Global Procedures**")).  The Additional Stores in the Wakefern Package have been extensively marketed in accordance with the Global Procedures.  **Any party who timely submitted a bid on any of the Additional Stores in the Wakefern Package pursuant to the Global Procedures does not need to resubmit a bid.  The submitted bid, to the extent it remains a binding bid under the Global Procedures, will be deemed a bid submitted for purposes of the Wakefern Package.**

<u>**Summary of Important Dates**</u>

| **September 29, 2015** | • Debtors to File and Serve Sale Motion and Cure Notice<br>• Debtors to Serve Wakefern Adequate Assurance Information |
|---|---|
| **October 1, 2015 at 4:00 p.m.** | • Deadline to Object to Wakefern Bid Protections |
| **TBD** | • Hearing on Wakefern Bid Protections (*If Objections Filed*) |
| **October 6, 2015 at 5:00 p.m.** | • Bid Deadline for Stores in Wakefern Package |
| **October 7, 2015 at 5:00 p.m.** | • Debtors to File Notice (1) Cancelling Auction If No Other Qualified Bid Received or (2) of Baseline Bids and Qualified Bidders for Auction |
| **October 8, 2015 at 9:30 a.m.** | • Auction to be conducted at the offices of Weil, Gotshal & Manges LLP; 767 Fifth Avenue, New York, New York 10153 |

| **October 9, 2015** | • Debtors to File and Serve Notice of Successful Bidder(s) |
|---|---|
| **October 9, 2015 at 4:00 p.m.** | • Deadline to Object to Sale of Wakefern Package, Including Assumption and Assignment of Leases and Subleases, to Wakefern and/or a Designated Member and Proposed Cure Amounts |
| **October 12, 2015** | • Debtors to Serve Adequate Assurance Information for Successful Bidder(s) (*If Not Wakefern*) |
| **October 16, 2015, at 10:00 a.m.** | • Sale Hearing (*If No Auction Conducted or Wakefern is the Successful Bidder*) |
| **October 22, 2015 at 4:00 p.m.** | • Deadline to Object to Sale of Stores in Wakefern Package, Including Assumption and Assignment of Leases and Subleases, to Successful Bidder(s) (*If Not Wakefern*) |
| **TBD** | • Sale Hearing (*If Auction Conducted and Wakefern is not the Successful Bidder*) |

<u>Access to Diligence</u>

To participate in the diligence process and receive access to due diligence information with respect to any of the Additional Stores in the Wakefern Package, a party must submit to the Debtors or their advisors:

(A)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder(s); and

(B)    sufficient information, as reasonably determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to reasonably determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure reasonably acceptable to the Debtors in their discretion).

An interested party shall be a "**Potential Bidder**" if the Debtors determine in their reasonable discretion, after consultation with the Consultation Parties, that an interested party has satisfied the above requirements.  As soon as practicable, the Debtors will deliver to such Potential Bidder:  (A) an information package containing information and financial data with respect to the Additional Stores in the Wakefern Package in which such Potential Bidder has expressed an interest; and (B) access to the Debtors' confidential electronic data room concerning the Stores (the "**Data Room**").

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

Due Diligence

Until the Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be initially directed to:

(A)    Paul Billyard and Will Jurist of Evercore (Billyard@Evercore.com and William.Jurist@Evercore.com) if you are interested in purchasing any of the Stores as a going concern; and

(C)    Gregory Apter of Hilco (gapter@hilcoglobal.com) if you are interested in purchasing any of the Stores as a going concern or any of the Stores' leases or designation rights associated with such leases; or

(B)    Weil at APDiligence@weil.com.

The Debtors will simultaneously distribute via the Data Room in written form any additional diligence materials not previously provided to Wakefern or any other Potential Bidder to all Potential Bidders for the Stores to which such diligence materials relate (including, if applicable, Wakefern) and the Consultation Parties.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (A) the Potential Bidder does not become a Qualified Bidder (as defined below) or (B) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Additional Stores in the Wakefern Package to any person or entity who is not a Potential Bidder or a Consultation Party or who does not comply with the participation requirements set forth above.

## **Auction Qualification Procedures**

Bid Deadline

A Potential Bidder that desires to make a bid on one or more of the Stores in the Wakefern Package shall deliver written and electronic copies of its bid in both PDF and MS-WORD format to the Debtor Notice Parties so as to be received no later than **October 6, 2015 at 5:00 p.m. (Eastern Time)** (the "**Bid Deadline**").

**Any party that does not submit a bid by the Bid Deadline will not be allowed to (A) submit any offer after the Bid Deadline, or (B) participate in the Auction; provided, that if a Potential Bidder has already submitted a bid for one of the Stores in the Wakefern Package pursuant to the Global Procedures, such Potential Bidder does not need to**

**resubmit such bid in order for the Debtors to consider such bid in connection with determining whether any Bids, including any Partial Bids (defined below) together, may qualify as a Qualified Bid (defined below) for the Wakefern Package.**

Form and Content of Qualified Bid

        A bid is a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a sale transaction), and any other party that will be participating in connection with the bid or the sale transaction, and includes, at a minimum, the following information (each, a "**Bid**"):

    A.    <u>Proposed Stores and Valuation</u>.  Each Bid must clearly identify and list the particular Additional Stores in the Wakefern Package, additional assets (such as inventory or furniture, fixtures and equipment ("**FF&E**")) and liabilities that the Potential Bidder seeks to acquire.  The Bid must identify, on a per Store basis, the valuations, in U.S. dollars, that the Potential Bidder associates with each of those Stores, and a description of any significant assumptions on which such valuations are based.  To the extent the Bid proposes to purchase additional assets associated with the Stores, such as inventory or FF&E, the Bid shall clearly identify the value, in U.S. dollars, associated with such assets.

    B.    <u>Marked Agreement</u>.  Each Bid must include a copy of an asset purchase agreement or lease sale agreement, as applicable, reflecting the terms and conditions of its Bid, which agreement must be marked to show any proposed amendments and modifications to the form of (i) going-concern asset purchase agreement provided by the Debtors in the Data Room or (ii) the lease sale agreement executed by Wakefern (the "**Wakefern Agreement**"), as applicable (the "**Marked Agreement**").

    C.    <u>Unconditional Offer</u>.  A statement that the Bid is formal, binding and unconditional (except for those conditions expressly set forth in the applicable Marked Agreement) and is not subject to any due diligence or financing contingency and is irrevocable until the first business day following the closing of the proposed sale transaction, except as otherwise provided in these Bidding Procedures.

    D.    <u>Form of Consideration</u>.  Unless the Bid includes a credit bid (as described below), a statement confirming that the Bid is based on an all-cash offer, including, sufficient cash consideration to pay the applicable $1,200,000.00 breakup fee to Wakefern (the "**Breakup Fee**"); <u>provided</u> that any Bid that includes a credit bid shall also include a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee and shall comply with that certain Intercreditor Agreement, dated as of March 13, 2012 (as amended and supplemented, including pursuant to that certain Supplemental

Senior Lien Intercreditor Agreement as amended) (the "**Intercreditor
Agreement**"), including Section 5.06 thereof.

E.  Purchase Price; Minimum Bid.

1.  Wakefern Package.  Each Bid submitted in connection with the Wakefern
Package must (i) be a Bid for all of the Stores in the Wakefern Package,
(ii) propose an alternative transaction that provides substantially similar or
better terms than Wakefern's Stalking Horse Bid and (iii) (a) exceed the
applicable cash purchase price by the Minimum Overbid Amount (as
defined below) and the Breakup Fee; or (b) propose to purchase all the
assets in the Wakefern Package for cash, and assume the corresponding
liabilities on similar or better terms as Wakefern's Stalking Horse Bid.

2.  Bids for Individual Stores or Combination of Stores.  Bidders may also
submit Bids for individual Stores or combinations of Stores in the
Wakefern Package (each a "**Partial Bid**").  The Debtors will determine,
after consultation with the Consultation Parties, whether such Bids qualify
as Qualified Bids.  If a Bid includes one or more Stores currently included
in the Wakefern Package, but is not for all of the Stores included in the
Wakefern Package, such Bid will not be considered to be a "Qualified
Bid" unless the Debtors receive one or more Bids for the remaining Stores
in the Wakefern Package that, in combination with one or more other
Bids, constitute a higher or better bid than Wakefern's Stalking Horse Bid.

F.  Employee and Labor Terms.  Except as set forth in the Wakefern Agreement,
if the Bid contemplates a going concern sale of a Store in the Wakefern
Package, a statement of proposed terms for unionized and non-unionized
employees, which shall include, alternatively:  (i) a statement that the
Potential Bidder will assume the collective bargaining agreements (the
"**Affected Labor Agreement**") covering any of the employees of the
Debtors at the Closing (as defined in the Wakefern Agreement) whose duties
relate primarily to the operation of such Store, including such employees who
are on short-term disability, long-term disability or any other approved leave
of absence as of the Closing (the "**Covered Employees**") without
modification; or (ii) if the Potential Bidder will not assume the Affected
Labor Agreements without modification, a statement that the Potential
Bidder will enter into good faith negotiations with each of the unions
representing any of the Covered Employees (the "**Affected Unions**") to enter
into modified collective bargaining agreements, including a term sheet,
which shall be attached to the Marked Agreement, proposing post-closing
work rules and conditions to be offered to unionized employees.  Such
statement shall also include an acknowledgment of the requirements of
sections 1113 and 1114 of the Bankruptcy Code and an agreement to use
good faith reasonable best efforts to cooperate with the Debtors in ensuring
compliance with any applicable provisions thereof in the event that mutually
satisfactory modified collective bargaining agreements have not been entered

into between the Potential Bidder and the Affected Unions to the closing of a sale contemplated by these Bidding Procedures.

G.   <u>Pension Plans</u>.  Each Bid must state whether or not the Potential Bidder intends to assume (i) sponsorship of all or any part of or (ii) any of the potential liabilities associated with The Great Atlantic & Pacific Tea Company Pension Plan, New York-New Jersey Amalgamated Pension Plan for A&P Employees, Delaware County Dairies, Inc. Hourly Employees Pension Plan, and Pathmark Stores, Inc. Pension Plan (collectively, the "Pension Plans").  If the Potential Bidder does not intend to assume sponsorship or liabilities of the Pension Plans in full, each Bid must state whether the Potential Bidder intends to assume the assets and liabilities of the Pension Plan(s) relating to plan participants associated with the stores in the Bid.

H.   <u>Required Approvals</u>.  If applicable, a statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the business and stores included in its Bid from and after closing the sale transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals. A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Marked Agreement.

I.   <u>No Entitlement to Expense Reimbursement or Other Amounts</u>.  Except as provided with respect to Wakefern, a statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Wakefern Package.

J.   <u>Adequate Assurance Information</u>.  Information supporting the Potential Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Potential Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to the Potential Bidders.

Notwithstanding the foregoing, if a Bid for a Store is submitted by the landlord under the real property lease for such Store (a "**Landlord Lease Bid**"), such landlord need not satisfy the requirements set forth in subsections F, G, H, and J above; <u>provided</u> that such landlord must satisfy the requirements set forth in subsection F and G above if its Landlord Lease Bid

contemplates a going concern purchase of the Store.  For the avoidance of doubt, a Landlord Lease Bid will not be considered a "Qualified Bid" unless the requirements for a "Qualified Bid" set forth in subsection E.2 above are satisfied.

A Potential Bidder must also accompany its Bid with: (A) a Deposit (as defined below); (B) the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Potential Bidder; (C) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the applicable Marked Agreement) and such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement, as acceptable in the Debtors' business judgment, in consultation with the Consultation Parties, including a description of each investor and any additional party or parties investing in the transaction included in the applicable bid and such party's financial position; (D) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Marked Agreement; (E) a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; (F) if the value of the Bid relative to Wakefern Agreement includes additional non-cash components (such as fewer contingencies than are in the Wakefern Agreement), a detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value; and (G) if the Bid includes an asset purchase agreement that is not executed, a signed statement that such Bid is irrevocable until the first business day following the closing or closings of the applicable sale transaction.

**The submission of a Bid by the Bid Deadline shall constitute a binding and irrevocable offer to acquire the Stores or other assets reflected in such Bid.**

Deposit

To qualify as a Qualified Bid (as defined below), each Bid must be accompanied by a good faith cash deposit in the amount of five percent (5%) of the proposed purchase price, to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "**Escrow Agent**") pursuant to the escrow agreement to be provided by the Debtors to the Potential Bidders (the "**Escrow Agreement**"); provided that with respect to a Landlord Lease Bid, the landlord may deduct from its Deposit the amount of any undisputed monetary obligations that constitute the Cure Costs for the applicable real property lease.

To the extent the Stores included in a Qualified Bid are modified at or prior to the Auction, the Qualified Bidder must adjust its Deposit so that it equals five percent (5%) of the proposed purchase price to be paid for each Store.

Review of Bids

The Debtors will deliver, within one (1) business day after receipt thereof, copies of all Bids to the Consultation Parties and, if such Bids include the assumption of any

liabilities associated with the Pension Plans, the Pension Benefit Guaranty Corporation, 1200 K Street, N.W., Washington, D.C. 20005 (Attn: Thea Davis, davis.thea@pbgc.gov).

The Debtors will evaluate timely submitted bids, in consultation with the Consultation Parties, and may engage in negotiations with Potential Bidders who submitted Bids complying with the preceding paragraphs as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid. In evaluating the bids, the Debtors may take into consideration the following non-binding factors:

1. the amount of the Bid and the Stores and number of Stores and other assets proposed to be acquired;

2. the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates after the payment of the Breakup Fee;

3. any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities through a credit bid;

4. any benefit to the Debtors' bankruptcy estates from any other assumption of liabilities, including any liabilities under the Pension Plans, the assumption of the sponsorship of all, any, or a portion of the Pension Plans;

5. the value to be provided to the Debtors under the Bid for the Stores included therein (individually and in the aggregate);

6. the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals;

7. the impact on employees, employee claims against the Debtors, Affected Labor Agreements, and whether the Potential Bidder has reached an agreement with the Affected Unions;

8. the impact on trade creditors and landlords; and

9. any other factors the Debtors may reasonably deem relevant.

Designation of Qualified Bidders

A bid will be considered a "**Qualified Bid**," and each Potential Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**," if the Debtors determine, after consultation with the Consultation Parties, that such Bid meets the requirements set forth in these Bidding Procedures. For the avoidance of doubt, a Bid will not be deemed a Qualified Bid unless (i) the Bid is for all of the Acquired Assets in the Wakefern Package or (ii) if the Debtors receive Partial Bids that, in combination, constitute a higher or better Bid than Wakefern's Stalking Horse Bid.

The Debtors reserve the right to work with any Bidder in advance of the Auctions to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid. The Debtors may accept a single Bid or multiple Bids for non-overlapping Stores such that, if taken together, would otherwise meet the standards for a single Qualified Bid as to the Wakefern Package (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the applicable Auction). If a Bid is received and, in the Debtors' judgment, after consultation with the Consultation Parties, it is not clear whether the Bid is a Qualified Bid, the Debtors may consult with the Potential Bidder and seek additional information in an effort to establish whether or not the Bid is a Qualified Bid.

The Debtors, after consultation with the Consultation Parties, will have the right to determine that a Bid is not a Qualified Bid if any of the following conditions are satisfied:

(A)     A Potential Bidder has failed to comply with reasonable requests for additional information from the Debtors;

(B)     If the Bid includes a credit bid, such Bid does not (i) include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment), (ii) comply with the terms of the Intercreditor Agreement or (iii) pay cash in the amount of any assets on which such bidder seeks to purchase, but does not have a valid, perfected and unavoidable lien; provided that any Bid that does not include a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee shall not be a Qualified Bid; or

(C)     The terms of the Bid are burdensome or conditional in view of the proposed purchase price or are materially more burdensome or conditional than the terms of the Wakefern Agreement, and are not offset by a material increase in purchase price, which determination (as made by the Debtors in consultation with the Consultation Parties) may take into consideration, among other things:

(i)      whether the Bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including, the Breakup Fee);

(ii)     whether the Bid includes a non-cash instrument or similar consideration that is not freely marketable.

Wakefern is a Qualified Bidder and Wakefern's Stalking Horse Bid is a Qualified Bid as to the Wakefern Package. Should it decide to credit bid, each of (A) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014, (B) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014, (C) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured PIK Toggle Notes due 2017, dated as of March 13, 2012, or the majority holder of the Senior Secured PIK Toggle

Notes due 2017, (D) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured Convertible Notes due 2018, dated as of March 13, 2012, or the majority holder of the Senior Secured Convertible Notes due 2018, and (E) the DIP Lenders is a Qualified Bidder and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline, complies with the above requirements set forth under the heading "Designation of Qualified Bidders," complies with section 363(k) of the Bankruptcy Code, complies with the requirements for a credit bid, complies with section 5.06(d) of the Intercreditor Agreement and includes a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee, and all obligations secured by senior liens on the applicable assets to be purchased.

## **Pre-Auction Procedures**

Determination and Announcement of Baseline Bids

In the event Qualified Bids other than the Wakefern Stalking Horse Bid are submitted by the Bid Deadline, in consultation with the Consultation Parties, the Debtors shall make a determination regarding:

(A)    the highest or best Qualified Bid (or collection of Qualified Bids) for the Wakefern Package (each, a "**Baseline Bid**" and such bidder or group of bidders, a "**Baseline Bidder**") to serve as the starting point at the Auction for the Wakefern Package; and

(B)    which Bids have been determined to be Qualified Bids.

On **October 7, 2015, at 5:00 p.m. (Eastern Time)** (the "**Designation Deadline**"), the Debtors shall file notice of the foregoing on the Court's docket and publish such notice on the website of their claims and noticing agent and in the Data Room.  As soon as practicable but no later than one (1) day prior to the Auction, the Debtors will provide copies of each Baseline Bid to the Consultation Parties and Wakefern.

Between the date hereof and the Auction, the Debtors may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for the Debtors, during the period that such Qualified Bid remains binding as specified herein; provided that any Qualified Bid may be improved at the Auction, as set forth in the Bidding Procedures.

Except as provided in the Wakefern Agreement, the Debtors are under no obligation to (A) select any Baseline Bid, (B) consummate or pursue any transaction with respect to one or more of the Stores in the Wakefern Package, or (C) conduct the Auction, whether before or after selecting a Baseline Bid.  Notwithstanding anything to the contrary contained herein, the Debtors may elect, in their reasonable discretion, and after consultation with the Consultation Parties, to consummate the sale transactions contemplated in the Wakefern Agreement to Wakefern without holding the Auction.

<u>Failure to Receive Two or More Qualified Bids</u>

        If no Qualified Bid other than the one submitted by Wakefern is received by the Bid Deadline, the Debtors will not conduct the Auction for the Wakefern Package, and shall file and serve, **by October 7, 2015 at 5:00 p.m. (Eastern Time)**, a notice indicating that the Auction has been cancelled with respect to the Wakefern Package, that Wakefern is the Successful Bidder as to the Wakefern Package and that the Sale Hearing as to the Wakefern Package will be conducted on the date set forth in the Sale Motion (defined below).

## **The Sale Motion and Sale Order**

        In accordance with the Discrete Procedures, the Debtors will file a motion (the "**Sale Motion**") seeking entry of order(s) authorizing and approving, inter alia, the applicable sale transaction(s) to the Successful Bidder(s) with respect to the Stores in the Wakefern Package (each, a "**Sale Order**"). Each Sale Order shall authorize and approve the applicable sale transaction to the Successful Bidder (defined below) for each of the Stores in the Wakefern Package. The form of Sale Order with respect to the Wakefern Stalking Horse Bid is attached as an exhibit to the Wakefern Agreement. In the event no Qualified Bid is received by the Bid Deadline as set forth herein, the Debtors shall seek entry of the Sale Order at the Sale Hearing.

## **Auction Procedures**

        If a Qualified Bid is received from a Qualified Bidder other than Wakefern by the Bid Deadline, the Debtors will conduct the Auction on **October 8, 2015, beginning at 9:30 a.m. (Eastern Time) each day, at the offices of Weil, Gotshal & Manges LLP; 767 Fifth Avenue, New York, New York 10153**. Only Qualified Bidder(s) will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith. Professionals and/or other representatives of the Consultation Parties will be permitted to attend and observe the Auction.

        At the Auction, Qualified Bidders (including Wakefern) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the purchase price and terms proposed in the applicable Baseline Bid, and will proceed thereafter in increments of at least 2% of the applicable Baseline Bid (a "**Minimum Overbid Amount**"). If Wakefern bids at the Auction for an Applicable Store, Wakefern will be entitled to a "credit" in the amount of the Breakup Fee to be counted towards its bid such that the cash and other consideration proposed by Bidder plus the Breakup Fee "credit" must exceed the most recent bid by at least the Minimum Overbid Amount.

        The Debtors may adopt rules, after consultation with the Consultation Parties, for the Auction at any time that the Debtors reasonably determine to be appropriate to promote a spirited and robust auction pursuant to the Discrete Procedures and are not inconsistent with these Bidding Procedures. At the start of the Auction, the Debtors shall describe the terms of the applicable Baseline Bid. Any rules adopted by the Debtors will not unilaterally modify any of the terms of the Wakefern Agreement (as may be consensually modified at any Auction) without the consent of Wakefern. Any rules developed by the Debtors will provide that all bids in a particular Auction will be made and received in one room, on an open basis, and all other bidders

participating in that Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders participating in that Auction and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be fully disclosed to all other bidders throughout the entire Auction.  Each Qualified Bidder will be permitted what the Debtors reasonably determine to be an appropriate amount of time to respond to the previous bid at the Auction.

Except as otherwise set forth in the Wakefern Agreement, the Debtors reserve the right to and may, after consultation with the Consultation Parties, reject at any time before entry of the relevant Sale Order any bid that, in the Debtors' judgment, is: (A) inadequate or insufficient; (B) not in conformity with the requirements of the Bankruptcy Code, the Discrete Procedures, these Bidding Procedures or the terms and conditions of the applicable sale transaction; or (C) contrary to the best interests of the Debtors and their estates.

Prior to the conclusion of the Auction, except as otherwise set forth in the Wakefern Agreement, the Debtors, after consultation with the Consultation Parties, will: (A) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating a sale transaction; (B) determine the highest or best offer for each Applicable Store (each, a "**Successful Bid**"); (C) determine which Qualified Bid is the next highest or best bid for each Applicable Store (each, the "**Back-Up Bid**"); and (D) notify all Qualified Bidders participating in the Auction, prior to its conclusion, the successful bidder for each Applicable Store (the "**Successful Bidder**"), the amount and other material terms of the Successful Bid and the identity of the party that submitted the Back-Up Bid for such Applicable Store (the "**Back-Up Bidder**").

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding or the Auction.

## Post-Auction Process

A Successful Bidder shall, within one (1) business day after the close of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid.  Promptly following the submission of such documentation, the Debtors shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.  Except as set forth in the Wakefern Agreement, the Successful Bid may not be assigned to any party without the consent of the Debtors after consultation with the Consultation Parties.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (A) ninety (90) days after the completion of the Auction, but in no event later than January 31, 2016 (B) the consummation of the transaction with the Successful Bidder, or (C) the release of such bid by the Debtors (such date, the "**Back-Up Bid Expiration Date**").  If the transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

At a Sale Hearing, the Debtors will present a Successful Bid to the Bankruptcy Court for approval.

Unless otherwise required pursuant to the Debtors' fiduciary duties, the Debtors shall not consider any bids submitted after the conclusion of the Auction.

## Treatment and Return of Deposits

Potential Bidders

Within three (3) business days after the Designation Deadline, the Escrow Agent shall return to each Potential Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Potential Bidder's Deposit, plus any interest accrued thereon. Upon the authorized return of such Potential Bidder's Deposit, the bid of such Potential Bidder shall be deemed revoked and no longer enforceable.

Qualified Bidders

The Deposit of a Qualified Bidder will be forfeited to the Debtors if (A) the applicable Qualified Bidder attempts to modify, amend or withdraw its Qualified Bid, except as permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures, or (B) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the transaction according to these Bidding Procedures and the terms of the applicable transaction documents with respect to the Successful Bid.  The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by the Debtors two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of the Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

With the exception of the Deposit of a Successful Bidder and a Back-Up Bidder, the Escrow Agent shall return to any other Qualified Bidder any Deposit, plus any interest accrued thereon, three (3) business days after the execution by the Successful Bidder and the Debtors of the documentation memorializing the Successful Bid, but in no event later than seven (7) business days after the conclusion of the Sale Hearing.

Notwithstanding anything to the contrary herein, the good faith deposit provided by Wakefern pursuant to the Wakefern Agreement (including any required return of such deposit) shall be governed by the terms and conditions of the Wakefern Agreement.

Back-Up Bidder

The Escrow Agent shall return a Back-Up Bidder's Deposit, plus any interest accrued thereon, within three (3) business days after the occurrence of the applicable Back-Up Bid Expiration Date.

<u>The Successful Bidder</u>

The Deposit of a Successful Bidder shall be applied against the cash portion of the Purchase Price of such Successful Bidder upon the consummation of the transaction proposed in the applicable Successful Bid.

<u>Joint Notice to Escrow Agent</u>

The Debtors and, as applicable, the Potential Bidder, Qualified Bidder, and/or Back-Up Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit, to the extent such return is required by these Bidding Procedures.  If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

<u>Consultation Parties</u>

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by the Discrete Procedures or these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

In the event that any Consultation Party or any member of the Creditors' Committee or an affiliate of any of the foregoing, submits a bid that is a Qualified Bid, any obligation of the Debtors to consult with the bidding party established under the Discrete Procedures or these Bidding Procedures will be waived, discharged and released without further action; <u>provided</u> that the bidding party will have the same rights as any other Potential Bidder set forth above, and will retain any rights it has under existing orders regarding debtor in possession financing and/or use of cash collateral (to the extent applicable).

If a member of the Creditors' Committee submits a Qualified Bid, the Creditors' Committee will continue to have Consultation Rights; <u>provided</u> that the Creditors' Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any confidential information regarding the sale of the Assets to such member.

<b><u>Consent to Jurisdiction and Authority as Condition to Bidding</u></b>

All bidders that participate in the Auction (including Wakefern) shall be deemed to have (A) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, (B) waived any right to a jury trial in connection with any disputes relating to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, and (C) consented to the entry of a final order or judgment in any way related to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction if it is

determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

### **Reservation of Rights**

The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties and Wakefern, to alter or terminate these Bidding Procedures, to waive terms and conditions set forth herein with respect to all potential bidders, alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers or investors (except for Wakefern) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Discrete Procedures Order; provided further that the Debtors' exercise of their discretion in evaluating bids and administering the bidding and auction process described herein does not permit, and shall not be construed as permitting, the Debtors to materially deviate from the procedures, terms, conditions and protections set forth in these Bidding Procedures and/or the Discrete Procedures Order.

**<u>EXHIBIT K</u>**

**Sale Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | **Case No. 15-23007 (RDD)** |
| **COMPANY, INC.,** *et al.*, | : | |
| | : | **(Jointly Administered)** |
| Debtors.[1] | : | |

-------------------------------------------------------------x

### ORDER (I) APPROVING THE LEASE SALE AGREEMENT BETWEEN SELLERS AND WAKEFERN FOOD CORP. AND THE TRANSACTIONS CONTEMPLATED THEREIN, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED REAL PROPERTY LEASES AND SUBLEASES IN CONNECTION THEREWITH (III) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (IV) APPROVING REJECTION OF CERTAIN LICENSE AGREEMENTS, AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated [ ], 2015 (Docket No. [ ]) (the "Sale Motion")[2], filed by

the above-captioned debtors and debtors in possession (the "Debtors") seeking, among other

things, the entry of an order, pursuant to sections 105, 363 and 365 of the United States

Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, and

6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 6004-1

and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the

Southern District of New York (the "Local Bankruptcy Rules"), authorizing and approving (i)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms used herein but not otherwise defined have the meanings given to them in the Lease Sale Agreement (as defined below) or, if not defined in the Lease Sale Agreement, the meanings given to them in the Sale Motion.

the lease sale agreement between A&P Live Better, LLC and A&P Real Property, LLC (the

"Sellers") and Wakefern Food Corp. (the "Buyer") and the transactions contemplated therein; (ii)

authorizing the Sellers' assumption and assignment to Buyer of certain unexpired real property

leases (the "Leases") and subleases (the "Subleases"); (iii) authorizing the sale of certain of the

Sellers' assets free and clear of liens, claims, interests, and encumbrances; (iv) approving the

Sellers' rejection of certain license agreements identified on Schedule 1 hereto (collectively, the

"License Agreements"); and (v) granting related relief; and the Court having taken into

consideration this Court's prior order, dated August 11, 2015 (Docket No. 496) (the "Discrete

Procedures Order"), approving procedures for the sale or disposition of certain of the Debtors'

operating stores, including certain executory contracts, unexpired leases and assets related

thereto (the "Discrete Procedures"); and the Court having taken into consideration the bidding

procedures for the Acquired Assets (the "Bidding Procedures") attached as Exhibit 1 to the

notice of auction filed on September [ ], 2015 (Docket No. [    ]); and the Buyer having submitted

a bid for the Acquired Assets, which was declared by the Debtors as the successful bid for the

Acquired Assets, at an auction held on October ___, 2015, if any (the "Auction"); and the Court

having conducted a hearing on the Sale Motion on October ___, 2015 (the "Sale Hearing"), at

which time all interested parties were offered an opportunity to be heard with respect to the Sale

Motion and the relief granted herein; and the Court having reviewed and considered (i) the Sale

Motion and the exhibits thereto, (ii) the Lease Sale Agreement, dated as of [ ], 2105 (the "Lease

Sale Agreement"), a copy of which is attached hereto as Exhibit A, by and between Sellers and

Buyer, whereby the Sellers have agreed, among other things, to assume and assign the Leases

and Subleases and to sell all the other Acquired Assets to Buyer or a Designated Member (as

defined below) on the terms and conditions set forth in the Lease Sale Agreement (the "Sale

Transaction"), and (iii) the arguments of counsel made, and the evidence proffered or adduced, at

the Sale Hearing; and it appearing that due notice of the Sale Motion and the form of this order

having been provided in accordance with the Discrete Procedures Order; and all objections to the

Sale Motion having been withdrawn, resolved or overruled as provided in this Order; and it

appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their

estates and creditors and all parties in interest in these chapter 11 cases; and upon the record of

the Sale Hearing and these chapter 11 cases; and after due deliberation thereon; and good cause

appearing therefor, it is hereby

### FOUND AND DETERMINED THAT:

A.    **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute

the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made

applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the

following findings of fact constitute conclusions of law, they are adopted as such. To the extent

any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Sale Motion and

Sale Transaction pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding

pursuant to 28 U. S.C. § 157.  Venue of these chapter 11 cases and the Sale Motion in this

District is proper under 28 U.S.C. §§ 1408 and 1409.

C.    **Statutory and Rule Predicates**.  The statutory and other legal predicates for the

relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code,

Bankruptcy Rules 2002, 6004, and 6006, Local Bankruptcy Rules 6004-1 and 6006-1, and the

Amended Guidelines for the Conduct of Asset Sales, Approved by Administrative Order

Number 383 in the United States Bankruptcy Court for the Southern District of New York.

D.    **Opportunity to Object**.  A fair and reasonable opportunity to object to and to be

heard with respect to the relief requested in the Sale Motion, the Sale Transaction and the relief

granted herein has been given, as required by the Bankruptcy Code and the Bankruptcy Rules, to

all Persons entitled to notice pursuant to the Discrete Procedures Order, including, but not

limited to, the following: (i) all non-Debtor parties to the Leases and Subleases; (ii) all non-

Debtor parties to the License Agreements; (iii) all known holders of security interests in and

liens on the Acquired Assets; (iv) all applicable governmental authorities; and (v) all other

parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

E.    **Final Order**.  This Order constitutes a final order within the meaning of 28

U.S.C. § 158(a).

F.    **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and

sound business purposes and justifications for approval of the Sale Motion, the Lease Sale

Agreement, and the Sale Transaction, entry into the Lease Sale Agreement and related Bill of

Sale, Assignment and Assumption Agreement and Assignment of Subleases (the "Related

Agreements") and rejection of the License Agreementss.   The Debtors entry into and

performance under the Lease Sale Agreement and Related Agreements (i) constitute a sound and

reasonable exercise of the Debtors' business judgment, (ii) provide value to and are beneficial to

the Debtors' estates, and are in the best interests of the Debtors and their stakeholders, and

(iii) are reasonable and appropriate under the circumstances.  Business justifications for the Sale

Transaction include, but are not limited to, the following: (i) the Lease Sale Agreement

constitutes the highest and best offer received for the Acquired Assets; (ii) the Lease Sale

Agreement presents the best opportunity to maximize the value of the Acquired Assets and avoid

decline and devaluation of the Acquired Assets; (iii) unless the Sale Transaction and all of the

other transactions contemplated by the Lease Sale Agreement are concluded expeditiously, as

provided for pursuant to the Lease Sale Agreement, recoveries to creditors may be diminished;

and (iv) the value of the Debtors' estates will be maximized through the sale of the Acquired

Assets pursuant to the Lease Sale  Agreement.

G.    **Compliance with Discrete Procedures**.  The Debtors and Buyer complied with

the Discrete Procedures and Bidding Procedures in all respects.  Buyer was the successful bidder

for the Acquired Assets in accordance with the Bidding Procedures.

H.    **Highest and Best Value**.  (i) The Debtors and their advisors, including Evercore

Group LLC and Hilco Real Estate LLC, engaged in a robust and extensive marketing and sale

process, both prior to the commencement of these chapter 11 cases and through the postpetition

sale process pursuant to the Discrete Procedures Order, (ii) the Debtors conducted a fair and

open sale process, (iii) the sale process, the Bidding Procedures and the Auction were non-

collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to

make an offer to purchase the Acquired Assets, and (iv) the process conducted by the Debtors

pursuant to the Discrete Procedures and the Bidding Procedures obtained the highest and best

value for the Acquired Assets for the Debtors and their estates, and any other transaction would

not have yielded as favorable an economic result.

I.    **Fair Consideration**.  The monetary and non-monetary consideration to be paid

by Buyer under the Lease Sale Agreement constitutes fair and reasonable consideration for the

Acquired Assets.

J.    **No Successor or Other Derivative Liability**.  Neither Buyer nor any Designated

Member is, nor will be, a mere continuation, and is not holding itself out as a mere continuation,

of any of the Debtors or their respective estates and there is no continuity between Buyer or any

Designated Member and the Sellers or any other Debtors.  The Sale Transaction does not amount

to a consolidation, merger or *de facto* merger of Buyer or any Designated Member and any of the

Debtors.

   K.  **Good Faith**.  The Lease Sale Agreement and each of the transactions

contemplated therein were negotiated, proposed and entered into by the Sellers and the other

Debtors and Buyer (including each Designated Member) in good faith, without collusion and

from arm's-length bargaining positions.  Buyer and each Designated Member is a "good faith

purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is

entitled to all the protections afforded thereby.  Neither the Debtors nor Buyer nor any

Designated Member have engaged in any conduct that would cause or permit the Lease Sale

Agreement to be avoided or costs and damages to be imposed under section 363(n) of the

Bankruptcy Code.  Neither Buyer nor any Designated Member is an "insider" of any of the

Debtors, as that term is defined in section 101 of the Bankruptcy Code, and no common identity

of incorporators, directors, or controlling stockholders existed between Buyer and a Designated

Member and the Debtors.

   L.  **Notice**.  As evidenced by the certificates of service filed with the Court:

(i) proper, timely, adequate and sufficient notice of the Sale Motion, the bidding process

(including the deadline for submitting bids and the Auction), the Sale Hearing, the Sale

Transaction and the entry of this Order was provided by the Debtors; (ii) such notice was good,

sufficient and appropriate under the particular circumstances and complied with the Discrete

Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction,

the Bidding Procedures, the Sale Hearing or the entry of this  Order is required.

M.    **Cure Notice**.  As evidenced by the certificates of service filed with the Court, and in accordance with the provisions of the Discrete Procedures Order, the Debtors have served, prior to the Sale Hearing, notice (the "Cure Notice") of the Debtors' intent to assume and assign the Leases and the Subleases and of the related proposed cure amount (the "Cure Amount") upon each non-debtor counterparty to the Leases and the Subleases.  The service of the Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Amount for the assumption and assignment of the Leases and the Subleases.  All non-debtor parties to the Leases and the Subleases have had a reasonable opportunity to object both to the Cure Amounts listed on the applicable Cure Notice and to the assumption and assignment of the Leases and Subleases to Buyer and Buyer's immediate and simultaneous sublease of each of the premises subject to the Leases (the "Leased Premises") and the Subleases to a designated stockholder and cooperative member of Buyer or a wholly-owned subsidiary of Buyer (each, a "Designated Member").

N.    **Satisfaction of Section 363(f) Standards**.  The Sellers  may assign, sell and transfer the Acquired Assets free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever against the Sellers, the other Debtors or the Acquired Assets, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against the Debtors, and any derivative, vicarious, transferee or successor liability claims, rights or causes of action (whether in law or in equity,

under any law, statute, rule or regulation of the United States, any state, territory, or possession

thereof or the District of Columbia), whether arising prior to or subsequent to the

commencement of these chapter 11 cases, whether known or unknown, and whether imposed by

agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or

in any way related to the Debtors, the Sellers or other Debtors' interests in the Acquired Assets,

the operation of the Debtors' businesses before the Closing, or the transfer of the Sellers or other

Debtors' interests in the Acquired Assets to Buyer (collectively, excluding any liabilities

expressly assumed under the Lease Sale  Agreement, the "Claims"), because, in each case, one

or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been

satisfied.  Without limiting the generality of the foregoing, "Claims" shall include any and all

liabilities or obligations whatsoever arising under or out of, in connection with, or in any way

relating to: (1) any of the employee benefit plans, including any Claims related to unpaid

contributions or current or potential withdrawal or termination liability; (2) any of the Debtors'

collective bargaining agreements; (3) the Worker Adjustment and Retraining Notification Act of

1988; or (4) any of the Debtors' current and former employees.  Those holders of Claims who

did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the

Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

Those holders of Claims who did object that have an interest in the Acquired Assets fall within

one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore

adequately protected by having their Claims that constitute interests in the Acquired Assets, if

any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property

in which they have an interest, in the same order of priority and with the same validity, force and

effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors.

All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired

Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting

such Claims against Buyer and any Designated Member, any of their  respective assets, property,

Affiliates, successors, and assigns, or the Acquired Assets.

       O.      Buyer would not have entered into the Lease Sale  Agreement and would not

consummate the transactions contemplated thereby, thus adversely affecting the Debtors and

their estates and their creditors, if the sale of the Acquired Assets was not free and clear of all

Claims, or if Buyer would, or in the future could, be liable for any such Claims, including, as

applicable, certain liabilities related to the operation of stores by the Debtors that will not be

assumed by Buyer, as described in the Lease Sale Agreement.

       P.      The total consideration to be provided under the Lease Sale Agreement reflects

Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the

Bankruptcy Code, with title to and possession of the Acquired Assets free and clear of all Claims

(including, without limitation, any potential derivative, vicarious, transferee or successor liability

claims).

       Q.    **Assumption and Assignment of Leases and Subleases**.  The assumption and

assignment of the Leases and Subleases are integral to the Lease Sale Agreement, are in the best

interests of the Debtors and their estates, and represent the reasonable exercise of the Debtors'

sound business judgment.  Specifically, the assumption and assignment of the Leases and

Subleases (i) is necessary to sell the Acquired Assets to Buyer, (ii) limit the losses suffered by

counterparties to the Leases and Subleases, and (iii) maximize the recoveries to other creditors of

the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the

rejection of the Leases and Subleases.

R.    With respect to each of the Leases and Subleases, the Debtors have met all

applicable requirements of section 365(b) of the Bankruptcy Code.  Further, Buyer and any

Designated Member have provided adequate assurance of future performance under the Leases

and Subleases, in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code, to the extent

that any such assurance is required and not waived by the counterparties to such Leases and

Subleases.  Accordingly, the Leases may be assumed by the Debtors and assigned to Buyer or a

Designated Member as provided for in the Lease Sale Agreement and/or herein.

S.    **Validity of the Transfer**.  As of the Closing, the assignment, sale and transfer of

the Acquired Assets to Buyer or a Designated Member will be a legal, valid and effective

transfer of the Acquired Assets, and will vest Buyer or a Designated Member, as the case may

be, with all right, title and interest of the Debtors in and to the Acquired Assets, free and clear of

all Claims.

T.    The Debtors (i) have full corporate or limited liability company (as applicable)

power and authority to execute the Lease Sale Agreement and all other documents contemplated

thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate

action of the Debtors, (ii) have all of the corporate or limited liability company (as applicable)

power and authority necessary to consummate the transactions contemplated by the Lease Sale

Agreement, and (iii) upon entry of this Order, need no consent or approval from any other Person

to consummate the Sale Transaction.

U.    The Acquired Assets constitute property of the Debtors' estates and good title is

vested in the Debtors' estate within the meaning of section 541(a) of the Bankruptcy Code.  The

Sellers are the sole and rightful owners of the Acquired Assets, and no other Person has any

ownership right, title, or interests therein.

V.      The Lease Sale Agreement is a valid and binding contract between the Sellers and

Buyer and shall be enforceable pursuant to its terms.  The Lease Sale Agreement and the Sale

Transaction itself, and the consummation thereof shall be specifically enforceable against and

binding upon (without posting any bond) the Debtors, any chapter 7 or chapter 11 trustee

appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the

foregoing parties or any other Person.

W.      **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Acquired

Assets must be approved and consummated promptly in order to preserve the value of the

Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and

the Debtors and Buyer intend to close the Sale Transaction as soon as reasonably practicable.

The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound

business purpose and justification for the immediate approval and consummation of the Sale

Transaction as contemplated by the Lease Sale Agreement.  Accordingly, there is cause to lift the

stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the transactions

contemplated by this Order.

X.      **Personally Identifiable Information**.  As may be contemplated in the Lease Sale

Agreement, and subject to the terms of this Order, the sale to Buyer under the Lease Sale

Agreement of personally identifiable information (as such term is defined in section 101(41A) of

the Bankruptcy Code) about individuals is either consistent with the privacy policy of the

Debtors in effect on the date of commencement of these chapter 11 cases or consistent with the

recommendations of the consumer privacy ombudsman appointed in these chapter 11 cases.

Y.      **Legal and Factual Bases**.  The legal and factual bases set forth in the Sale

Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS ORDERED THAT**:

1.      **Sale Motion is Granted**.  The Sale Motion and the relief requested therein is

granted and approved.

2.      **Objections Overruled**.  All objections (except for objections to Cure Amounts

identified on Schedule *[ ]* hereto that are adjourned in accordance with the Discrete Procedures

Order (the "Adjourned Cure Objections")), if any, to the Sale Motion or the relief requested

therein that have not been withdrawn, waived or settled as announced to the Court at the Sale

Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are

hereby overruled on the merits.  If an objection was not timely filed and served, then with respect

to the assumption and assignment of any Leases and Subleases to which no objection was filed,

(i) the Debtors' proposed cure amount shall be binding upon each non-Debtor party to such

Lease and Sublease for all purposes in the Debtors' chapter 11 cases and will constitute a final

determination of the assumption and no additional cure amounts shall be due; (ii) each non-

Debtor party to such Lease or Sublease will be deemed to have received adequate assurance of

future performance; (iii) the effective date of such assumption and assignment will be the

Closing Date; (iv) any provisions in such Lease or Sublease that prohibits, restricts or conditions

assignment or sublet thereof (including, but not limited to, the conditioning of such assignment

or subleases on consent of the non-debtor counterparty) or, as a result of such assignment or

sublet, allows the parties thereto to terminate, recapture, impose any penalty or fee, place a

condition on renewal or extension, or modify any term or condition upon the assignment thereof,

constitute unenforceable anti-assignment provisions that are void and of no force and effect; (v)

Buyer shall be deemed to be substituted for the Sellers, and shall be fully and irrevocably vested

with all rights, title, and interest of the Sellers thereunder, and such Lease and Sublease shall be in full force and effect and enforceable in accordance with its respective terms.

3.      **Notice.**  Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

4.      **Fair Purchase Price**.  The consideration provided by Buyer under the Lease Sale Agreement is fair and reasonable.

5.      **Approval of the Lease Sale Agreement**.  The Lease Sale Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved.  The failure specifically to include any particular provision of the Lease Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Lease Sale Agreement be authorized and approved in its entirety.

6.      **Consummation of Sale Transaction**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to execute, deliver and perform their obligations under and comply with the terms of the Lease Sale Agreement and to consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions of the Lease Sale Agreement and this Order.

7.      The Debtors, their Affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Lease Sale Agreement and to take all further actions as may be (a) reasonably requested by Buyer for the purpose of assigning, transferring, granting, conveying and conferring to Buyer or a Designated Member, or reducing to possession, the Acquired Assets

or (b) necessary or appropriate to the performance of the obligations contemplated by the Lease

Sale Agreement, all without further order of the Court.

8.        All Persons that are currently in possession of some or all of the Acquired Assets

are hereby directed to surrender possession of such Acquired Assets to Buyer or a Designated

Member as of the Closing.

9.        Each and every any federal, state, local, or foreign government or governmental

or regulatory authority, agency, board, bureau, commission, court, department, or other

governmental entity is hereby directed to accept any and all documents and instruments

necessary and appropriate to consummate the transactions contemplated by the Lease Sale

Agreement.

10.        **Transfer of Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f)

and 365 of the Bankruptcy Code, the Sellers are authorized to transfer the Acquired Assets in

accordance with the terms of the Lease Sale Agreement.  The Acquired Assets shall be

transferred to Buyer or a Designated Member, as the case may be, and upon the Closing, such

transfer shall: (a) be valid, legal, binding and effective; (b) vest Buyer or a Designated Member,

as the case may be, with all right, title and interest of the Sellers in the Acquired Assets; and (c)

be free and clear of all Claims in accordance with section 363(f) of the Bankruptcy Code, with

all Claims that represent interests in property to attach to the net proceeds of the Sale

Transaction, in the same order of their priority and with the same validity, force and effect which

they now have against the Acquired Assets, subject to any claims and defenses the Debtors may

possess with respect thereto.

11.        Except as otherwise provided in the Lease Sale Agreement, all Persons (and their

respective successors and assigns) including, without limitation, all debt security holders, equity

security holders, governmental, tax and regulatory authorities, lenders, employees, former

employees, pension plans, multiemployer pension plans, labor unions, trade creditors and any

other creditors holding Claims against the Debtors or the Acquired Assets, are hereby forever

barred, estopped and permanently enjoined from asserting or pursuing such Claims against

Buyer and any Designated Member, their respective Affiliates, successors or assigns, and

property, or the Acquired Assets, including, without limitation, taking any of the following

actions with respect to a Claim (other than an Assumed Liability): (a) commencing or continuing

in any manner any action or other proceeding against Buyer and any Designated Member, or

their respective Affiliates, successors or assigns, assets or properties (including the Acquired

Assets); (b) enforcing, attaching, collecting or recovering in any manner any judgment, award,

decree, or order against Buyer and any Designated Member, or their respective Affiliates,

successors or assigns, assets, or properties (including the Acquired Assets); (c) creating,

perfecting, or enforcing any Claims against Buyer and any Designated Member, or their

respective successors or assigns, assets or properties (including the Acquired Assets); (d)

asserting a Claim as a setoff, right of subrogation or recoupment of any kind against any

obligation due Buyer and any Designated Member, or their respective Affiliates successors or

assigns; or (e) commencing or continuing any action in any manner or place that does not

comply, or is inconsistent, with the provisions of this Order or the agreements or actions

contemplated or taken in respect thereof.  No such Persons shall assert or pursue against Buyer

and any Designated Member or their respective Affiliates, successors or assigns, assets or

properties (including the Acquired Assets) any such Claim.

   12.  This Order (a) shall be effective as a determination that, as of the Closing, all

Claims, have been unconditionally released, discharged and terminated as to Buyer, any

Designated Member and the Acquired Assets, and that the conveyances and transfers described

herein have been effected, and (b) is and shall be binding upon and govern the acts of all

Persons, including all filing agents, filing officers, title agents, title companies, recorders of

mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental

departments, secretaries of state, federal and local officials and all other Persons who may be

required by operation of law, the duties of their office, or contract, to accept, file, register or

otherwise record or release any documents or instruments, or who may be required to report or

insure any title or state of title in or to any lease; and each of the foregoing Persons is hereby

directed to accept for filing any and all of the documents and instruments necessary and

appropriate to consummate the transactions contemplated by the Lease Sale Agreement.

13.     Following the Closing of the Sale Transaction, no holder of any Claim shall

interfere with Buyer's or any Designated Member's title to or use and enjoyment of the Acquired

Assets based on or related to any such Claim or based on any actions the Debtors may take in

these chapter 11 cases.

14.     Except as may be expressly set forth in the Lease Sale Agreement, neither Buyer

nor any Designated Member nor any of their respective Affiliates, successors and assigns shall

have any liability for any Claim, whether known or unknown as of the Closing Date, now

existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a

transferee or successor or otherwise, of any kind, nature or character whatsoever, including

Claims arising under, without limitation: (a) any employment or labor agreements or the

termination thereof; (b) any pension, welfare, compensation or other employee benefit plans,

agreements, practices and programs, including, without limitation, any pension plan of or related

to any of the Debtors or any Debtor's Affiliates or predecessors or any current or former

employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtors'

business operations or the cessation thereof; (d) any litigation involving one or more of the

Debtors; and (e) any employee, workers' compensation, occupational disease or unemployment

or temporary disability related law, including, without limitation, claims that might otherwise

arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as

amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv)

the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker

Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee

Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with

Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x)

the Multiemployer Pension Plan Amendments Act of 1980,(xi) state and local discrimination

laws, (xii) state and local unemployment compensation laws or any other similar state and local

laws, (xiii) state workers' compensation laws or (xiv) any other state, local or federal employee

benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating

to, wages, benefits, employment or termination of employment with any or all Debtors or any

predecessors; (xv) any antitrust laws; (xvi) any product liability or similar laws, whether state or

federal or otherwise; (xvii) any environmental laws, rules, or regulations, including, without

limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act,

42 U.S.C. §§ 9601, et seq., or similar state statutes; (xviii) any bulk sales or similar laws; (xix)

any federal, state or local tax statutes, regulations or ordinances, including, without limitation,

the Internal Revenue Code of 1986, as amended; and (xx) any common law doctrine of *de facto*

merger or successor or transferee liability, successor-in-interest liability theory or any other

theory of or related to successor liability.

15.      If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the Person has with respect to the Debtors or the Acquired Assets or otherwise, then with regard to the Acquired Assets that are purchased by Buyer pursuant to the Lease Sale Agreement and this Order (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the Person with respect to the Acquired Assets and (b) Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

16.      **No Successor or Other Derivative Liability**.  By virtue of the Sale Transaction, neither Buyer nor any Designated Member nor any of their respective Affiliates, successors or assigns shall be deemed to: (a) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (b) have, *de facto* or otherwise, merged with or into any or all Debtors; or (c) be a mere continuation or substantial continuation of any or all Debtors or the enterprise or operations of any or all Debtors.

17.      **Assumption and Assignment of Leases and Subleases**.  The Sellers are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Leases and Subleases to Buyer free and clear of all Claims, and to execute and deliver

to Buyer such documents or other instruments as may be necessary to assign and transfer the

Leases and Subleases to Buyer as provided in the Lease Sale Agreement.  The Sellers'

assumption and assignment of the Leases and Subleases to Buyer and the Buyers' simultaneous

sublease of the applicable Leased Premises and Subleases to a Designated Member are hereby

approved notwithstanding any other terms of provisions of the Leases to the contrary.  Upon the

Closing, (a) Buyer shall be fully and irrevocably vested with all right, title and interest of the

Sellers and shall be deemed to be substituted for the Sellers under the Leases and Subleases, and

the Leases and Subleases shall be in full force and effect and enforceable according to their terms

and, (b) pursuant to section 365(k) of the Bankruptcy Code, the Sellers shall be relieved from

any further liability with respect to the Leases and Subleases, except as otherwise set forth in

sections 8 and 21 of the Lease Sale Agreement.  Notwithstanding any term of the Leases or

Subleases to the contrary, any current or future extension, renewal or purchase options or other

rights contained in the Leases that purport to be personal only to the Sellers (or other Debtors) or

to a named entity in the Leases or to be exercisable only by the Sellers (or other Debtors) or by a

named entity or an entity operating under a specific trade name may be freely exercisable to their

full extent by Buyer or any Designated Member.

18.    All Cure Amounts shall be determined and paid in accordance with the Discrete

Procedures Order.  Payment of the Cure Amounts shall be in full satisfaction and cure of any and

all defaults under the Leases and Subleases, whether monetary or non-monetary.  Each non-

debtor party to a Lease and Sublease is forever barred, estopped and permanently enjoined from

asserting against the Debtors, Buyer any Designated Member, and their respective Affiliates,

successors or assigns or the property of any of them, any default existing as of the date of the

Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

19.     An Adjourned Cure Objection may be resolved after the Closing Date.  Upon

resolution of such Adjourned Cure Objection and the payment of the applicable Cure Amount

pursuant to the Discrete Procedures Order, if any, the applicable Lease or Sublease that was the

subject of such Adjourned Cure Objection shall be deemed assumed and assigned to Buyer (and,

as set forth herein, simultaneously subleased to a Designated Member) as of the Closing Date

without further order of the Court.

20.     **Ipso Facto Clauses Ineffective**.  The Leases and Subleases shall be transferred

to, and remain in full force and effect for the benefit of, Buyer and any Designated Member in

accordance with their respective terms, including all obligations of Buyer as the assignee of, and

any Designated Member as the further sublessee of, the Leases and Subleases, notwithstanding

any provision in any such Leases and Subleases (including, without limitation, those of the type

described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or

conditions such assignment or transfer.  Specifically, but not without limitation, no sections or

provisions of the Leases that purport to (i) prohibit, restrict, or condition the Sellers' assignment

of the Leases, including, but not limited to, the conditioning of such assignment on the consent

of the non-debtor party to the Leases; (ii) provide for the cancellation, or modification of the

terms of the Leases based on the filing of a bankruptcy case, the financial condition of the

Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called "profit"

sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-

debtor third parties to the Leases upon assignment or subletting thereof; or (iv) provide for any

rights of first refusal, or any recapture or termination rights, in favor of the non-debtor third

parties to the Leases, or any right of the non-debtor third parties to the Leases to take an

assignment or sublease from a tenant, shall have any force or effect with respect to the

assignment of Leases by the Sellers to the Buyer and/or further sublease thereof to any

Designated Member as authorized by this Order.  Notwithstanding any provision of the

applicable Lease or Sublease to the contrary, Buyer and any Designated Member hereby are

authorized to: (i) use and operate the applicable Leased Premises under the ShopRite banner, (ii)

perform non-structural interior alterations and remodeling of the applicable Leased Premises

without further consent of any Person or party to the extent necessary to cause the layout to

conform to Buyer's or any Designated Member's use; (iii) erect Buyer's or any Designated

Member's customary and typical building façade signs and insert customary and typical signage

on the shopping center's multi-panel pylon, if any, in place of any such pylon panel sign of

Sellers (it being understood that the size of the space on the pylon for such sign shall be equal to

the size of the space allocated to Sellers' current signs), and (iv) remain "dark" with respect to

the applicable Leased Premises, for the later of 120 days after the Closing Date or as may

otherwise be provided in the applicable Lease, to complete any alterations and remodeling

without triggering any default, recapture right and/or any right to increase the rent under the

underlying Lease or Sublease(s).

   21.  Upon the Sellers' assignment of Leases and Subleases to Buyer or any Designated

Member as set forth herein, pursuant to  the provisions of this Order, no default shall exist under

any Leases or Subleases, and no counterparty to any Leases or Subleases shall be permitted to

declare a default by any Debtor or Buyer or Designated Member or otherwise to take action

against Buyer or any Designated Member as a result of any Debtor's financial condition,

bankruptcy or failure to perform any of its obligations under the Leases or Subleases.  Any

provision in any of the Leases or Subleases that prohibits or conditions the assignment or

sublease of such Lease or Sublease (including without limitation, the granting of a lien therein)

or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on

renewal or extension, or modify any term or condition upon such assignment or sublease,

constitutes an unenforceable anti-assignment provision that is void and of no force and effect.

The failure of the Debtors or Buyer or any Designated Member to enforce at any time one or

more terms or conditions of any of the Leases or Subleases shall not be a waiver of such terms or

conditions, or of the Debtors' and Buyer's (and any Designated Member's) rights to enforce

every term and condition of the Leases and Subleases.

22.    **Rejection of License Agreements**.  The Debtors are hereby authorized to reject

the License Agreements and the Debtors' rejection of the License Agreements is hereby

approved pursuant to Section 365(a) of the Bankruptcy Code effective as of the Closing Date.

As a result, as of the Closing Date, the Leased Premises shall be delivered to the Buyer free and

clear of any License Agreements and any third parties claiming any rights under the License

Agreements.

23.    **Remaining Property**.  Buyer and any Designated Member are hereby authorized

to dispose of any property that is present on the Leased Premises as of the Closing Date without

any Liability to any party.

24.    **Statutory Mootness**.  The transactions contemplated by the Lease Sale

Agreement are undertaken by Buyer and each Designated Member in good faith, as that term is

used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on

appeal of the authorization provided herein of the Sale Transaction shall neither affect the

validity of the Sale Transaction nor the assumption and assignment of the Leases and Subleases

nor the transfer of the other Acquired Assets to Buyer or any Designated Member, free and clear

of Claims, unless such authorization is duly stayed before the Closing pending such appeal.

25.    **No Avoidance of Lease Sale Agreement**.  Neither the Debtors nor Buyer nor any

Designated Member has engaged in any conduct that would cause or permit the Lease Sale

Agreement to be avoided or costs and damages to be imposed under section 363(n) of the

Bankruptcy Code.

26.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  Notwithstanding the

provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local

Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable

immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h)

and 6006(d) is hereby expressly waived and shall not apply.  Any party objecting to this Order

must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by

law and prior to the Closing, or risk its appeal will be foreclosed as moot.

27.    **Personally Identifiable Information**.  After appointment of the consumer

privacy ombudsman in these chapter 11 cases, in accordance with section 332 of the Bankruptcy

Code, and after giving due consideration to the facts, circumstances and conditions of the Lease

Sale Agreement, as well as any report of the consumer privacy ombudsman filed with the Court,

no showing was made that the sale of any personally identifiable information contemplated in the

Lease Sale Agreement, subject to the terms of this Order, would violate applicable

nonbankruptcy law.

28.    **Binding Effect of this Order**.  The terms and provisions of the Lease Sale

Agreement and this Order shall be binding in all respects upon, or shall inure to the benefit of,

the Debtors, their estates and their creditors, Buyer, the Designated Members, and their

respective Affiliates, successors and assigns, and any affected third parties, including all Persons

asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner or

receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and

terms shall likewise be binding on such trustee, examiner or receiver and shall not be subject to

rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or

receiver.

29.    **Conflicts; Precedence**.  In the event that there is a direct conflict between the

terms of this Order and the terms of (a) the Lease Sale Agreement, or (b) any other order of this

Court, the terms of this Order shall control.  Nothing contained in any chapter 11 plan hereinafter

confirmed in these chapter 11 cases, or any order confirming such plan, shall conflict with or

derogate from the provisions of the Lease Sale Agreement or the terms of this Order.

30.    **Modification of Lease Sale Agreement**.  The Lease Sale Agreement, and any

related agreements, documents or other instruments, may be modified, amended or supplemented

by the parties thereto, in a writing signed by each party, and in accordance with the terms

thereof, without further order of the Court; provided that any such modification, amendment or

supplement does not materially change the terms of the Lease Sale Agreement or any related

agreements, documents or other instruments.

31.    **Bulk Sales**.  No bulk sales law, or similar law of any state or other jurisdiction

shall apply in any way to the transactions contemplated by the Lease Sale Agreement, the Sale

Motion or this Order.

32.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to,

among other things, interpret, enforce and implement the terms and provisions of this Order and

the Lease Sale Agreement, all amendments thereto, any waivers and consents thereunder (and of

each of the agreements executed in connection therewith), to adjudicate disputes related to this

Order, the Lease Sale Agreement (and such other related agreements, documents or other

instruments) and the Adjourned Cure Objections, and to enforce the injunctions set forth herein.

Dated: **[ ]**, 2015
     White Plains, New York

                                     _____

                                     UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT L

**Allocation of Purchase Price (per store basis)**

**WAKEFERN FOOD CORP.**
**PHOENIX - ALLOCATION OF BIDS**

| | | | Lease Value | F&E | Total |
|---|---|---|---|---|---|
| PM | 6522 | Aramingo Ave | 5,323,113 | - | 5,323,113 |
| PM | 6653 | Bethpage | 1,596,934 | - | 1,596,934 |
| PM | 6558 | Brookhaven | 2,235,707 | - | 2,235,707 |
| AP | 3074 | Danbury | 3,400,000 | 2,455,424 | 5,855,424 |
| WB | 7699 | Deer Park | 500,000 | 2,480,944 | 2,980,944 |
| PM | 6569 | Glenolden | 3,193,868 | - | 3,193,868 |
| AP | 3003 | Lagrangeville | 2,800,000 | 340,637 | 3,140,637 |
| PM | 6556 | Monument Ave | 4,258,490 | - | 4,258,490 |
| PM | 6649 | New Hyde Park | 1,500,000 | 629,245 | 2,129,245 |
| PM | 6552 | Oregon Avenue | 3,726,179 | - | 3,726,179 |
| PM | 6568 | Upper Darby | - | 4,258,490 | 4,258,490 |
| PM | 6528 | Wyncote | 1,300,969 | - | 1,300,969 |
| | | | **29,835,260** | **10,164,740** | **40,000,000** |