WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------x
In re                                    :
                                         :        Chapter 11
THE GREAT ATLANTIC & PACIFIC TEA         :
COMPANY, INC., et al.,                   :        Case No. 15-23007 (RDD)
                                         :
            Debtors.¹                    :        (Jointly Administered)
---------------------------------------------------------------x
```

## NOTICE OF DEBTORS' APPLICATION PURSUANT TO 11 U.S.C. §§ 327 AND 328 AND FED. R. BANKR. P. 2014 AND 2016 FOR AUTHORITY TO RETAIN HILCO IP SERVICES, LLC AS INTELLECTUAL PROPERTY ADVISORS TO THE DEBTORS

PLEASE TAKE NOTICE that a hearing on the annexed application (the

"**Application**") of The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates,

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"**Debtors**"), for authority, pursuant to sections 327 and 328 of the Bankruptcy Code, Federal

Rules of Bankruptcy Procedure 2014(a) and 2016, and Local Bankruptcy Rules 2014-1 and

2016-1, to retain and employ Hilco IP Services, LLC d/b/a Hilco Streambank as intellectual

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

property sale advisors to the Debtors will be held before the Honorable Robert D. Drain, United

States Bankruptcy Court, 300 Quarropas Street, White Plains, New York, 10601 (the

"**Bankruptcy Court**"), on **October 16, 2015 at 10:00 a.m. (Eastern Time)** (the "**Hearing**").

PLEASE TAKE FURTHER NOTICE that any responses or objections

("**Objections**") to the Application shall be in writing, shall conform to the Federal Rules of

Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York,

shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court,

including attorneys admitted *pro hac vice*, electronically in accordance with General Order

M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest,

on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered

directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and

General Order M-399, to the extent applicable, and shall be served in accordance with General

Order M-399 and the Order Pursuant to 11 U.S.C. § 105(a) and Fed. Bankr. P. 1015(c) and 9007

Implementing Certain Notice and Case Management Procedures, dated July 20, 2015 (ECF

No. 62), so as to be so filed and received no later than **October 2, 2015 at 4:00 p.m. (Eastern

Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if an Objection to the Application is

not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

WEIL:\95463851\4\50482.0005

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon

default.

Dated: September 25, 2015
       New York, New York

/s/ Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors and
Debtors in Possession*

3

**HEARING DATE AND TIME: October 16, 2015 at 10:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE: October 2, 2015 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
In re                                             :
                                                  :      Chapter 11
THE GREAT ATLANTIC & PACIFIC TEA                  :
COMPANY, INC., et al.,                            :      Case No. 15-23007 (RDD)
                                                  :
          Debtors.¹                               :      (Jointly Administered)
-----------------------------------------------------------------x
```

**DEBTORS' APPLICATION PURSUANT TO 11 U.S.C. §§ 327 AND 328 AND
FED. R. BANKR. P. 2014 AND 2016 FOR AUTHORITY TO RETAIN HILCO IP
SERVICES, LLC AS INTELLECTUAL PROPERTY ADVISORS TO THE DEBTORS**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as

debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter

11 cases (these "**Cases**"), respectfully represent as follows in support of this application (this

"**Application**"):

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

## Background

1.      On July 19, 2015 (the "**Commencement Date**"), each of the Debtors

commenced with this Court a voluntary Case under chapter 11 of the Bankruptcy Code.  The

Debtors are authorized to continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee

or examiner has been appointed in these Cases.

2.      These Cases are being jointly administered for procedural purposes only

pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

3.      On July 24, 2015, the U.S. Trustee appointed the Official Committee of

Unsecured Creditors.

4.      Information on the Debtors' business, capital structure, and the

circumstances leading to the commencement of these Cases is set forth in the *Declaration of*

*Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the*

*Southern District of New York* (ECF No. 4) (the "**McGarry 1007 Declaration**").

## Jurisdiction

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

6.      The Debtors request authority to retain and employ Hilco IP Services,

LLC d/b/a Hilco Streambank ("**Hilco Streambank**") as their intellectual property sale advisor in

accordance with the terms and conditions set forth in that certain Letter Agreement dated

September 25, 2015 (the "**Engagement Agreement**"), a copy of which is attached as Exhibit 1

to the proposed form of order granting the relief requested herein and attached hereto as Exhibit

WEIL:\95463851\4\50482.0005

A (the "**Proposed Order**").[2]  In support of the relief requested herein, the Debtors submit the

Declaration of David Peress, the Executive Vice President of Hilco Streambank (the "**Peress**

**Declaration**"), filed concurrently herewith.

### Hilco Streambank's Qualifications

7.       As part of a proactive process to explore strategic alternatives, the

Debtors' board and management, with the assistance of the Debtors' advisors, engaged in a

comprehensive review of the Debtors' store portfolio, with the objective of determining each

store's current and projected profitability, as well as each store's potential for rehabilitation.  As

a result of this review, the Debtors determined that the best way to maximize value for

distribution to creditors is to sell their stores through the asset sales strategy that is the foundation

of these Cases (the "**Sale Strategy**").  The Debtors seek to retain Hilco Streambank to assist with

implementing the Sale Strategy by providing certain intellectual property advisory services.

8.       Hilco Streambank is an expert in managing the sale of assets such as

brands and trademarks, domain names, customer data, copyrights, recipes, patents, proprietary

software, license agreements, IP addresses and the like, as well as physical archival material that

supports such intellectual property (collectively, the "**IP Assets**").  Hilco Streambank is often

engaged by companies seeking to sell assets in a bankruptcy case because of its familiarity with

the 363 sale process, and its relationships with buyers of intellectual property assets domestically

and abroad.  Hilco Streambank is also one of the leading providers of intellectual property

valuations to lenders and other investors and has meaningful experience valuing consumer

related brands in almost every channel and category.

---

[2] The terms of the Engagement Agreement are incorporated herein by reference.

9.      In addition, in connection with this engagement, Hilco Streambank has contracted with Peter Thom to assist it in the valuation and marketing of the Debtors' intellectual property.  Mr. Thom is an investment banker who focuses exclusively on the grocery industry, and will supplement Hilco Streambank's knowledge about grocery brands and nameplates and potential buyers of these assets.

10.      Hilco Streambank has served as intellectual property advisor in a similar capacity as that contemplated here in many complex bankruptcy cases.  *See, e.g.*, *In re RadioShack Corp.*, Ch. 11 Case No. 15-10197 (BLS) (Bankr. D. Del. 2015); *In re Borders Group, Inc.*, Ch. 11 Case No. 11-10614 (MG) (Bankr. S.D.N.Y. 2011); *In re Hostess Brands, Inc.,* Ch. 11 Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. 2013); *In re Ritz Camera & Image LLC,* Ch. 11 Case No. 12-11868 (KG) (Bankr. D. Del. 2012); *In re Circuit City Stores, Inc.*, Ch. 11 Case No. 08-35653 (KRH) (Bankr. E.D. Va. 2009).  In these cases, Hilco Streambank worked with the debtors and their professionals, and other key case constituents such as creditors committees, secured lenders, and consumer privacy ombudsmen to structure and execute intellectual property sale processes that satisfied the requirements of the Bankruptcy Code and generated maximum recoveries for the debtors' estates.

11.      The Debtors selected Hilco Streambank through a competitive process.  Specifically, the Debtors considered ten candidate firms to sell IP Assets.  Based on those ten candidates, the Debtors sent requests for proposal to five firms.  They ultimately compared the responses submitted by the top two candidates and determined that both such candidates were likely to be capable of producing successful sale results.  The Debtors also determined that they would incur approximately the same costs by retaining either Hilco Streambank or the other top candidate firm (though it was possible that Hilco Streambank could cost slightly more).  But

7

several factors ultimately caused the Debtors to select Hilco Streambank as intellectual property

advisor:

(a)    Hilco Streambank had a greater depth of retail—and particularly grocery—asset sale experience.

(b)    Hilco Streambank greater capability to provide a complete IP Asset sale solution.

(c)    Hilco Streambank was likely capable of completing the sales of IP Assets faster than the other top candidate firm.

(d)    Hilco Streambank was determined to have better market-making capabilities and a better overall sales approach and associated expertise.

Accordingly, the Debtors determined that Hilco Streambank was the most appropriate firm to

retain to advise the Debtors on their sales of IP Assets.

### Scope of Services

12.    Subject to further order of this Court and consistent with the Engagement

Agreement, the Debtors request the employment and retention of Hilco Streambank to render the

following consulting and advisory services:[3]

(a)    <u>Audit Services</u>: Hilco Streambank will advise the Debtors in collecting and securing all of the available information concerning the IP Assets.

(b)    <u>Valuation Services</u>: Hilco Streambank will develop a sales and marketing program which will include the development of marketing materials designed to inform potential purchasers of the availability of the IP Assets for sale, assignment, license, or other disposition.  This program will be designed to maximize the value of the IP Assets.  Hilco Streambank will also develop a sale and auction timeline, respond to requests for due diligence information, and create bid forms and distribute them to potential bidders.

(c)    <u>Sale Services</u>: Hilco Streambank will review offers from bidders to acquire assets and will promptly notify the Debtors and their restructuring counsel of all such offers.  Hilco Streambank will advise the Debtors in qualifying bidders and managing one or more auctions for the IP Assets.  Hilco

---

[3] To the extent that there are any discrepancies between the summary provided herein and the Engagement Agreement, the terms and conditions of the Engagement Agreement shall govern in all respects.

8

Streambank will not have authority to enter into any contract to sell IP Assets on behalf of the Debtors.

(d)     Closing and Transfer Services: Hilco Streambank will advise the Debtors in connection with transferring the IP Assets to the acquirer(s) that offer the highest or otherwise best cash consideration for the IP Assets.

The Engagement Agreement vests the Debtors with complete discretion to reject any transaction proposed by Hilco Streambank.

## No Duplication of Services

13.     The Debtors intend that the services of Hilco Streambank will complement, and not duplicate, the services being rendered by other professionals retained in these Cases.  Hilco Streambank understands that the Debtors have retained and may retain additional professionals during the term of the Engagement Agreement and will work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

14.     In particular, Hilco Streambank is an affiliate of Hilco Real Estate, LLC ("**Hilco RE**"), which has been retained by the Debtors pursuant to a separate order of the Court (ECF No. 926).  The IP Assets, however, are generally excluded from the sale procedure on which Hilco RE is advising the Debtors (the "**Global Bidding Process**").  Moreover, the Engagement Agreement provides that the Debtors will direct Hilco Streambank regarding the assets subject to their advisory services and that the Debtors can withdraw any asset from such direction at any time.  The Debtors will closely coordinate the sale of IP Assets with the Global Bidding Process to ensure that there is no overlap in services between Hilco RE and Hilco Streambank.

WEIL:\95463851\4\50482.0005

## Hilco Streambank's Disinterestedness

15.     To the best of the Debtors' knowledge and as disclosed herein and in the

Peress Declaration: (a) Hilco Streambank is a "disinterested person" within the meaning of

section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code,

and does not hold or represent an interest adverse to the Debtors' estates; and (b) Hilco

Streambank has no connection to the Debtors, their creditors, or their related parties except as

disclosed in the Peress Declaration.

16.     Hilco Streambank will review its files periodically during the pendency of

these Cases to ensure that no conflicts of interest or other disqualifying circumstances exist or

arise.  If any new relevant facts or relationships are discovered or arise, Hilco Streambank will

use reasonable efforts to identify such further developments and will file promptly a

supplemental declaration, as required by Federal Rule of Bankruptcy Procedure 2014(a).

## Professional Compensation

17.     In exchange for Hilco Streambank's services, the Engagement Agreement

contemplates the payment by the Debtors of Hilco Streambank's fees and the reimbursement by

the Debtors of Hilco Streambank's reasonable and verified out-of-pocket expenses as set forth

below (the "**Fee Structure**"):[4]

18.     <u>Audit Fee</u>.  The Debtors have agreed to pay Hilco Streambank a flat fee of

$100,000 upon the Court's approval of Hilco Streambank's retention for the audit services

described in paragraph 10 above.

---

[4] The following summary of the Fee Structure is provided solely for the convenience of the Bankruptcy Court and
parties in interest.  To the extent that there are any discrepancies between the summary provided herein and the
Engagement Agreement, the terms and conditions of the Engagement Agreement shall govern in all respects.  Also,
capitalized terms used to describe Hilco Streambak's compensation but otherwise not defined herein shall have the
meanings ascribed to them in the Engagement Agreement.

WEIL:\95463851\4\50482.0005

19.     <u>Valuation Fee</u>.  The Debtors have agreed to pay Hilco Streambank a flat fee of $50,000 upon Hilco Streambank's presentation of an IP Asset valuation report to the Debtors.

20.     <u>Sale Commission</u>.  The Debtors have agreed to pay Hilco Streambank a commission for sale services on the following terms:

(a)     5% of the amount of aggregate cash proceeds from the sales of IP Assets; plus

(b)     10% of the amount by which such aggregate cash proceeds exceed $5,500,000 up to $10,000,000; plus

(c)     12.5% of the amount by which such aggregate cash proceeds exceed $10,000,000.

The Engagement Agreement contemplates the payment of such sale commissions to Hilco Streambank from cash proceeds of a sale, assignment, license, or other disposition of IP Assets immediately upon the successful consummation of such transaction, notwithstanding any liens, claims, or other encumbrances on such IP Assets or the cash proceeds generated by such transaction.

21.     <u>Expenses</u>.  The Debtors have agreed to reimburse Hilco Streambank's reasonable and verified out-of-pocket expenses incurred in connection with this engagement up to an aggregate of $50,000.

22.     <u>Mutual Indemnity</u>.  The Engagement Agreement provides for mutual indemnification among the parties.  Specifically, the Debtors have agreed to indemnify Hilco Streambank and hold it harmless against any and all losses, claims, damages, liabilities and expenses incurred by Hilco Streambank, including without limitation, reasonable legal expenses, arising from, related to, or in any way connected with the negotiation, execution and/or rendering of services by Hilco Streambank under the terms of the Engagement Agreement, unless such losses, claims, damages, liabilities and expenses resulted from the fraud, misrepresentation, gross

11

negligence, willful misconduct or material breach of any of the terms of such agreement by Hilco Streambank.  Hilco Streambank has agreed to the same indemnification of the Debtors.

23.    The Fee Structure is consistent with and typical of arrangements entered into by Hilco Streambank and other intellectual property consultants when rendering similar services to clients such as the Debtors.  Hilco Streambank and the Debtors believe that the foregoing compensation arrangement is both reasonable and market-based.  In determining the level of compensation to be paid to Hilco Streambank and the reasonableness of such compensation, the Debtors compared Hilco Streambank's fee proposal to other proposals received by the Debtors in the intellectual property consultant selection process and considered the unique requirements of the Sale Strategy.

24.    Because of the transactional nature of the services that Hilco Streambank provides, Hilco Streambank's professionals do not bill clients on an hourly basis while performing such services.  Hilco Streambank's intellectual property valuation expertise and ability to maximize value by executing sales of IP Assets quickly were important factors in determining the Fee Structure, and the Debtors believe that the ultimate benefit to their estates resulting from Hilco Streambanks's services under the Engagement Agreement could not be measured by reference to the number of hours to be expended by Hilco Streambank's professionals in the performance of such services.

25.    The Debtors respectfully submit that the Fee Structure has been agreed upon by the parties on an arms' length basis in anticipation that a substantial commitment of professional time and effort will be required of Hilco Streambank and its professionals hereunder and in light of the facts that (a) such commitment may foreclose other opportunities for Hilco Streambank and (b) the actual time and commitment required of Hilco Streambank and its

12

professionals to perform its services under the Engagement Agreement may vary substantially from week to week and month to month.

26.     Based on the foregoing, the Debtors seek relief from having Hilco Streambank maintain time records or file interim fee applications, *provided* that Hilco Streambank will file a final fee application with a summary of fees earned and expenses incurred along with a summary of what fees have been paid and expenses have been reimbursed.  In addition, Hilco Streambank will submit invoices to the Debtors, the Office of the United States Trustee for Region 2, the Creditors' Committee, the attorneys for the holders of a majority of the Prepetition PIK Notes, and the attorneys for the holders of a majority of the Prepetition Convertible Notes (collectively, the "**Notice Parties**") for the payment of compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases in accordance with the terms of the Engagement Agreement when such compensation becomes due and owing and such expenses are incurred.  The Notice Parties shall have fifteen days to review and dispute any such invoice submitted by Hilco Streambank, and if no such disputes are received, without any further order of the Court, the Debtors shall be authorized to pay such Hilco Streambank's invoices.  If an objection is received, the Debtors shall withhold the payment of the portion of the payment that is objected to and promptly pay the remainder.  All objections that are not resolved shall be preserved and presented to the Court for determination.

## Basis for Relief

27.     Section 327(a) of the Bankruptcy Code allows the Debtors to employ and retain Hilco as a "professional person" to represent the Debtors in carrying out their duties under the Bankruptcy Code.  *See* 11 U.S.C. § 327(a).

13

28.    The Debtors seek approval of the Fee Structure pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors, "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis."  11 U.S.C. § 328(a).  Accordingly, section 328 of the Bankruptcy Code permits the compensation of professionals, including real estate consultants, on more flexible terms that reflect the nature of their services and market conditions, which is a significant departure from prior bankruptcy practices relating to the compensation of professionals.  As the United States Court of Appeals for the Fifth Circuit recognized in *In re Nat'l Gypsum Co.*, 123 F.3d 861, 862 (5th Cir. 1997) (citations omitted):

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done.  That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc.  Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

*Id.*

29.    Courts have also approved similar compensation arrangements, including with Hilco Streambank's affiliates, that contain comparable terms and conditions under section 328 of the Bankruptcy Code.  *See, e.g.*, *In re Neff Corp.*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 9, 2010) [Docket No. 131]; *In re Lenox Sales, Inc.*, No. 08-14679 (ALG) (Bankr. S.D.N.Y. March 11, 2009) [Docket No. 397]; *In re Bally Total Fitness of Greater N.Y.*, No. 08-14818 (BRL) (Bankr. S.D.N.Y Jan. 14, 2009) [Docket No. 424]; *see also In re The Oceanaire Tex. Rest. Co., L.P.*, No. 09-34262 (BJH) (Bankr. N.D. Tex. Nov. 17, 2009) [Docket No. 289]; *In re Bashas' Inc.*, No. 09-16050 (JMM) (Bankr. D. Ariz. Aug. 26, 2009) [Docket No. 485]; *In re*

WEIL:\95463851\4\50482.0005

15-23007-rdd    Doc 1087    Filed 09/25/15    Entered 09/25/15 18:56:52    Main Document
Pg 15 of 30

*RCC Liquidating Corp.*, No. 09-10617 (MFW) (Bankr. D. Del. May 19, 2009) [Docket No. 583];

*In re Everything But Water, LLC*, No. 09-10649 (MFW) (Bankr. D. Del. Apr. 16, 2009) [Docket

No. 215]; *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Sept. 26, 2008)

[Docket No. 540]; *In re BSCV, Inc.*, No. 08-11637 (KG) (Bankr. D. Del. Sept. 15, 2008) [Docket

No. 286]. Most recently, this Court authorized the Debtors to retain Hilco RE under a similar

(but significantly more complex) structure. (*See* ECF No. 926).

30.     Moreover, in light of the reasons set forth in the "Professional

Compensation" section of this Application and given the numerous issues that Hilco Streambank

may be required to address in the performance of its services hereunder, Hilco Streambank's

commitment to the variable level of time and effort necessary to address all such issues as they

arise and the market prices for Hilco Streambank's services for engagements of this nature both

out-of-court and in a chapter 11 context, the Debtors believe that the Fee Structure is fair and

reasonable and market-based under the standards set forth in section 328(a) of the Bankruptcy

Code.

31.     Furthermore, under the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005, Pub. L. 109–8, § 417, 119 Stat. 23, 108 (2005), section 328(a) of the

Bankruptcy Code was specifically amended to include the underlined text set forth below:

> The trustee, or a committee appointed under section 1102 of this title, with the
> court's approval, may employ or authorize the employment of a professional
> person under section 327 or 1103 of this title, as the case may be, on any
> reasonable terms and conditions of employment, including on a retainer, on an
> hourly basis, *on a fixed or percentage fee basis*, or on a contingent fee basis.

*Id.*

32.     This amendment makes clear the ability of the Debtors to retain, with

Court approval, a professional on a fixed or percentage fee basis such as the Fee Structure with

Hilco Streambank in these Cases. The Debtors believe that invoices and a final application

WEIL:\95463851\4\50482.0005

submitted in the manner set forth above will provide the Court and other parties in interest with sufficient information to monitor the amount and types of services rendered to the Debtors by Hilco Streambank.  It is also the Debtors' understanding that, except for the agreement with Mr. Thom disclosed herein and in the Engagement Agreement, Hilco Streambank has no agreement with any other entity to share any compensation received, nor will any be made, except as permitted under section 504(b)(1) of the Bankruptcy Code.

33.    In sum, the Debtors believe that the Fee Structure and other terms and conditions in the Engagement Agreement are reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code.  The Fee Structure appropriately reflects (a) the nature and scope of the services to be provided by Hilco Streambank in these Cases and (b) the fee structures typically utilized by Hilco Streambank.

## Notice

34.    Notice of this Application has been provided in accordance with the Order Pursuant to 11 U.S.C. § 105(a) and Fed. Bankr. P. 1015(c), and 9007 Implementing Certain Notice and Case Management Procedures dated July 20, 2015 (ECF No. 62).  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

WEIL:\95463851\4\50482.0005

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: September 25, 2015
      New York, New York

                                        Respectfully submitted,

                                        The Great Atlantic & Pacific Tea Company, Inc.
                                        (for itself and on behalf of its affiliates as Debtors
                                        and Debtors in Possession)

                                        /s/ Christopher W. McGarry
                                        Name: Christopher W. McGarry
                                        Title: Chief Restructuring Officer

WEIL:\95463851\4\50482.0005

## Exhibit A

Proposed Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re                                             :
                                                  :        **Chapter 11**
**THE GREAT ATLANTIC & PACIFIC TEA**              :
**COMPANY, INC., et al.,**                        :        **Case No. 15-23007 (RDD)**
                                                  :
        **Debtors.**[1]                           :        **(Jointly Administered)**
-----------------------------------------------------------------x

## ORDER AUTHORIZING THE DEBTORS TO RETAIN HILCO IP SERVICES, LLC AS INTELLECTUAL PROPERTY ADVISORS TO THE DEBTORS

Upon the application (the "**Application**")[2] of The Great Atlantic & Pacific Tea

Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**" or "**A&P**") for entry of an order

authorizing the Debtors to retain Hilco IP Services, LLC d/b/a Hilco Streambank ("**Hilco**

**Streambank**") as their intellectual property advisors; and the Court having jurisdiction to decide

the Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157(a)–(b) and

1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska,

C.J.); and consideration of the Application and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided

in accordance with the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. Bankr. P. 1015(c), and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Application.

*9007 Implementing Certain Notice and Case Management Procedures*, dated July 20, 2015 (ECF

No. 62), and such notice having been adequate and appropriate under the circumstances; and it

appearing that no other or further notice need be provided; and upon the record of the hearing

held by the Court on the Application on October [1], 2015 (the "**Hearing**"); and upon the

Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules

for the Southern District of New York filed on the Commencement Date, the Declaration of

David Peress, and all of the proceedings had before the Court; and the Court having found and

determined that the relief sought in the Application and granted herein is in the best interests of

the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases

set forth in the Application and at the Hearing establish just cause for the relief granted herein;

and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Application is granted to the extent provided herein; and it is

further

ORDERED that pursuant to sections 327(a) and 328(a) of the Bankruptcy Code,

Federal Rules of Bankruptcy Procedure 2014(a) and 2016, and Local Bankruptcy Rules 2014-1

and 2016-1, the Debtors are authorized to retain and employ Hilco Streambank as their

consultant and intellectual property advisor in accordance with the terms and conditions set forth

in the Engagement Agreement attached hereto as Exhibit 1; and it is further

ORDERED that Hilco Streambank is not required to maintain time records or file

interim fee applications, *provided* that Hilco Streambank shall (a) file a final fee application with

a summary of fees earned and expenses incurred along with a summary of what fees and

expenses have been paid, and (b) submit invoices to the Debtors, the Office of the United States

Trustee for Region 2, the Creditors' Committee, the attorneys for the holders of a majority of the

2

Prepetition PIK Notes and the attorneys for the holders of a majority of the Prepetition

Convertible Notes (collectively, the "**Notice Parties**") for the payment of compensation for

professional services rendered and reimbursement of expenses incurred in connection with these

chapter 11 cases in accordance with the terms of the Engagement Agreement when such

compensation becomes due and owing and such expenses are incurred; and it is further

        ORDERED that each of the Notice Parties shall have fifteen (15) days to review

and dispute any such invoice submitted by Hilco Streambank, and if no such disputes are

received, without any further order of the Court, the Debtors shall be authorized to pay such

Hilco Streambank invoices in accordance with the terms of the Engagement Letter; and it is

further

        ORDERED that, if an objection is received, the Debtors shall withhold the

payment of the portion of the payment that is objected to and promptly pay the remainder and all

objections that are not resolved shall be preserved and presented to the Court for determination;

and it is further

        ORDERED that the fees payable to Hilco Streambank pursuant to the

Engagement Agreement shall be subject to review only pursuant to the standards set forth in

section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth

in section 330 of the Bankruptcy Code; and it is further

        ORDERED that, to the extent that the Engagement Agreement is inconsistent

with this Order, the terms of this Order shall govern; and it is further

        ORDERED that the Debtors are authorized to take all actions necessary to

effectuate the relief granted pursuant to this Order in accordance with the Application; and it is

further

WEIL:\95463851\4\50482.0005

ORDERED that the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement of this

Order.

Dated: October ___, 2015
      White Plains, New York

                                          _____
                                          UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

Engagement Agreement



EXECUTION VERSION

September 25, 2015

Mr. Christopher McGarry
The Great Atlantic & Pacific Tea Co., Inc.
2 Paragon Drive
Montvale, New Jersey  07645

Via E-mail – mcgarryc@APTEA.com

Re: A&P Intangible Asset Valuation, Marketing and Sale

Dear Mr. McGarry:

This letter agreement (this "**Letter Agreement**") sets forth the terms of the agreement between Hilco IP Services, LLC d/b/a Hilco Streambank ("**Hilco Streambank**") and Great Atlantic and Pacific Tea Company, Inc. and its affiliates (collectively, "**A&P**" or the "**Company**") with respect to the marketing and sale of the intellectual property and certain related assets of the Company.  For purposes of this engagement, the intellectual property includes the Company's interests in its brands and trademarks, domain names, customer data, copyrights, recipes, patents, proprietary software, license agreements, IP addresses and the like (the "**Intellectual Property**"), as well as physical archival material ("**Related Tangible Assets**"; collectively with the Intellectual Property, the "**Assets**") that supports the Intellectual Property.  Hilco Streambank and the Company agree that the Assets specifically include only those assets for which Hilco Streambank has received a direction from the Company or Weil, Gotshal & Manges LLP, as counsel to the Company ("**Weil**"), to provide services pursuant to this Letter Agreement (a "**Direction**") and such Direction has not been rescinded. The Company (or Weil on behalf of the Company) may rescind any Direction at any time and for any reason or no reason at all, including that an asset may be sold as part of an auction process under the Debtors' Global Bidding Procedures or Discrete Sale Procedures; *provided* that the sale or other disposition of any asset for which the Company has rescinded a Direction shall be subject to Section 6 of this Letter Agreement unless such asset is sold or otherwise disposed of by an affiliate of Hilco Streambank, in which case Section 6 of this Letter Agreement shall not apply.  We understand that the Company is currently a debtor in possession under Chapter 11 of the United States Bankruptcy Code, with its case pending in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

Hilco Streambank is an expert in managing the sale of assets such as the Assets and has provided similar services in many bankruptcy cases.  Hilco Streambank is prepared to immediately commence working with the Company to assist it with respect to the monetization of the Assets subject to the following scope of work and terms and conditions:

1. Engagement and Exclusivity. Hilco Streambank shall be engaged to work exclusively with the Company to audit, value and sell, assign, or license the Assets.

2. Scope of Services.  For reference, please see our August 11, 2015 response to the Company's RFP provided August 3, 2015 in which the Company seeks a detailed scope of work and understanding of the staffing and timeline required to complete the project described in this Letter Agreement.  A Project Workflow Spreadsheet is attached hereto as Exhibit A and incorporated by reference herein.

WEIL:\95457484\3\50482.0005
WEIL:\95457484\6\50482.0005

a. <u>Staffing</u>: The lead Hilco Streambank principal on this project will be David Peress. He will be assisted by Matthew Helming (Project Manager), Dmitry Chemlin (Marketing Manager), and Peter Thom (Consultant).

b. <u>Audit</u>: Hilco Streambank shall work with the Company to collect and secure all of the available information and data concerning the Assets. An Information Request Checklist has been previously provided to you and a copy is attached hereto.

c. <u>Valuation</u>: Hilco Streambank shall provide a report ("**Valuation Report**") to the Company in which it provides a range of gross and net recovery values for the sale of the Company's various Assets identified in the Audit.

d. <u>Marketing</u>: Hilco Streambank shall develop a sales and marketing program which shall include the development of marketing materials designed to inform potential purchasers of the availability of the Assets for sale, assignment, license, or other disposition and shall structure and execute the Assets sales and marketing program with a view toward completing one or more sales, assignments, licenses, or other dispositions of the Assets for the highest possible value. Working with you and your legal and restructuring professionals, Hilco Streambank will develop a sale and auction timeline with appropriate benchmarks, respond to requests for due diligence information, and create bid forms and distribute them to potential bidders.

e. <u>Sale</u>: Hilco Streambank will review offers from bidders to acquire assets, and working with the Company and its bankruptcy professionals, qualify bidders and structure and manage one or more auctions for the Assets.

f. <u>Closing and Transfer</u>: Hilco Streambank shall assist the Company in connection with the transfer of the Assets to the acquirer(s) who offer the highest or otherwise best consideration for the Assets.

g. <u>Authority</u>:

(i) Hilco Streambank shall promptly advise the Company and Weil of all offers made with respect to the Assets. Hilco Streambank is authorized on the behalf of the Company only to negotiate the terms of sales, assignments, or other dispositions of the Assets but not to commit the Company to any such agreement or arrangement or to sign any instrument on behalf of the Company.

(ii) Notwithstanding anything in this Letter Agreement to the contrary, the entry into and the terms and conditions of each and every transaction relating to one or more of the Assets shall be subject to written approval by the Company, which approval may be withheld in the sole discretion of the Company for any reason or no reason. Except as provided in Section 6 below, no Sale Commission will be earned or paid to Hilco Streambank pursuant to this Letter Agreement unless the Company shall have approved or executed the applicable transaction.

3. <u>Compensation to Hilco Streambank</u>. For its services hereunder, Hilco Streambank shall be paid per the following structure:

a. <u>Audit Fee</u>: Hilco Streambank shall be paid a one-time audit fee of $100,000 upon the Bankruptcy Court's entry of an order approving the Company's entry into the Letter

WEIL:\95457484\3\50482.0005
WEIL:\95457484\6\50482.0005

Agreement (the "**Effective Date**") for the work performed pursuant to Section 2(b) above (the "**Audit Fee**").

b. <u>Valuation Fee</u>: Hilco Streambank shall be paid a one-time valuation fee of $50,000 upon presentation of its Valuation Report to the Company (the "**Valuation Fee**").

c. As used below, "**Consideration**" means all cash received by the Company in consideration of the sale, license or other assignment of the Assets.

d. <u>Sale Commission</u>: In addition to the Audit Fee and Valuation Fee, Hilco Streambank shall be paid a commission based on a percentage of the aggregate Consideration generated from the sale, assignment, license, or other dispositions of the Assets (the "**Sale Commission**") as follows:

   (i)    5% of the amount of aggregate Consideration up to $5,500,000; plus

   (ii)   10% of the amount by which the aggregate Consideration exceeds $5,500,000 up to $10 million; plus

   (iii)  12.5% of the amount by which aggregate Consideration exceeds $10 million.

e. Any commissions due Hilco Streambank hereunder shall be paid in full immediately only upon the successful consummation of any transaction or transactions involving the sale, assignment, license, or other disposition of the Assets from the Consideration generated from such transaction(s) notwithstanding any liens, claims, or other encumbrances on the Assets or the Consideration generated from the disposition thereof.

4. <u>Expenses</u>. Hilco Streambank shall be entitled to reimbursement from the Company for all reasonable and customary Reimbursable Expenses (as defined below) in connection with the performance of the services proposed. "**Reimbursable Expenses**" means all reasonable and verified out-of-pocket costs and expenses incurred by Hilco Streambank in connection with performance of the contemplated services, including, without limitation: reasonable expenses of marketing, advertising, data room expenses, travel and transportation, postage and courier/overnight express fees along with fees owed to third party consultants; *provided* that the Reimbursable Expenses shall not exceed $50,000 in the aggregate, unless otherwise agreed to in writing by the Company. The Company shall reimburse Hilco Streambank within five (5) business of receipt of an invoice for such Reimbursable Expenses, *provided* the Reimbursable Expenses (i) do not in the aggregate exceed $50,000, or (ii) were otherwise pre-approved by the Company.

5. <u>Termination</u>. The term of this Letter Agreement shall commence upon the Effective Date and shall terminate on the earlier of (i) the date that all of the Assets has been sold, licensed or otherwise assigned and (ii) the date that is one year from the Effective Date unless extended by a written agreement between the Company and Hilco Streambank; *provided*, that the Company may terminate this Letter Agreement at any time for cause by providing five (5) business days' prior written notice to Hilco Streambank. Termination for "cause" shall mean any termination as a result of Hilco Streambank's failure to diligently perform the services described herein or any fraud, misrepresentation, gross negligence, willful misconduct or material breach by Hilco Streambank of any of the terms of this Letter Agreement.

WEIL:\95457484\3\50482.0005
WEIL:\95457484\6\50482.0005

6. <u>Survival</u>.  Within fifteen (15) calendar days after termination of this Letter Agreement, Hilco Streambank shall provide the Company with a list of all third parties (each, a "**Prospect**") that Hilco Streambank has engaged in documented oral (summarized in writing) or written negotiations with respect to the Assets.  If within one hundred and fifty (150) days after the termination of this Letter Agreement or such longer period as may be agreed to in writing by the Company and Hilco Streambank, the Company and any Prospect should close a transaction regarding any Asset that incorporates economic terms that are identical or reasonably similar to terms that were negotiated by Hilco Streambank in connection with such Asset, Hilco Streambank shall be entitled to a Sale Commission with respect to such Asset calculated in accordance with Section 3 of this Letter Agreement.

7. <u>No Guaranty</u>.  Hilco Streambank is not guarantying any specific result on the sale, assignment, or other disposition of the Assets.

8. <u>Nature of Services</u>.  With the exception of preparation, deposition, and expert testimony, the services to be provided by Hilco Streambank in respect of the Assets are, in general, transactional in nature, and Hilco Streambank will not be billing the Company by the hour or maintaining time records.

9. <u>Hilco Streambank and Company Covenants</u>.  In consideration of this Letter Agreement, Hilco Streambank agrees to use commercially reasonable efforts and diligence to achieve the purpose of this Letter Agreement.  Hilco Streambank shall conduct all negotiations on behalf of the Company in a professional and businesslike manner and in accordance with the reasonable instructions of Weil, the Company, and the Company's officers, representatives and counsel. The Company agrees to cooperate reasonably with Hilco Streambank and to make available to Hilco Streambank such information as Hilco Streambank reasonably requests, including true and correct copies of documentation relating to the Assets.

10. <u>Entire Agreement/Amendment</u>.  This letter sets forth the proposed terms of an agreement between Hilco Streambank and the Company. This Letter Agreement shall not be modified or amended in any respect except by a written instrument executed by or on behalf of the parties to this Letter Agreement.

11. <u>Governing Law</u>.  This Letter Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to its conflicts-of-laws principles.  Hilco Streambank and the Company agree that the Bankruptcy Court overseeing the Company's chapter 11 cases shall have exclusive jurisdiction over all matters arising out of, in connection with, and/or pertaining to this Letter Agreement, and hereby consent to the exclusive jurisdiction of the Bankruptcy Court over any action or proceeding arising out of or relating to this Letter Agreement.  The parties further waive any objection to venue in the Bankruptcy Court and any objection to any action or proceeding in such state on the basis of *forum non conveniens*.

12. <u>WAIVER OF JURY TRIAL</u>.  EACH OF HILCO STREAMBANK AND THE COMPANY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS LETTER AGREEMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

13. <u>Limitation of Liability</u>.  Hilco Streambank's maximum liability to the Company, in the aggregate, arising for any reason out of or relating to this Letter Agreement, whether a claim in tort, contract, or otherwise, shall be limited to the amount of fees paid to Hilco Streambank under this Letter Agreement for these services, except to the extent such liability is finally determined to have been caused by gross negligence or willful misconduct of Hilco Streambank or its personnel.

14. <u>Indemnification</u>.

    a.  The Company shall indemnify Hilco Streambank and hold it harmless against any and all losses, claims, damages, liabilities and expenses incurred by Hilco Streambank, including without limitation, reasonable legal expenses, arising from, related to, or in any way connected with the negotiation, execution and/or rendering of services by Hilco Streambank hereunder, unless such losses, claims, damages, liabilities and expenses resulted from the fraud, negligence or willful misconduct of Hilco Streambank in breach of this Letter Agreement.

    b.  Hilco Streambank shall indemnify the Company and hold it harmless against any and all losses, claims, damages, liabilities and expenses arising from, related to, or in any way connected with the negotiation, execution and/or rendering of services by Hilco Streambank hereunder, unless such losses, claims, damages, liabilities and expenses resulted from the fraud, misrepresentation, gross negligence, willful misconduct or material breach of any of the terms of this Letter Agreement by the Company.

15. <u>Further Assurances</u>. Hilco Streambank and the Company shall take all such further actions as are necessary or appropriate to carry out the terms and conditions of this Letter Agreement, including (without limitation) with respect to the approval of this Letter Agreement by Bankruptcy Court.

16. <u>Execution in Counterparts</u>.  This Letter Agreement may be executed in separate counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument.  Delivery of an executed signature page to this Letter Agreement by facsimile, PDF, or other electronic transmission (including the use of e-mail communication for which receipt is acknowledged by Hilco Streambank and the Company) shall be as effective as delivery of a manually signed counterpart of this Agreement.

17. <u>Bankruptcy Court Approval</u>.  Weil, as counsel to and on behalf of the Company, shall file an application requesting entry of an order pursuant to sections 327 and 328 of the Bankruptcy Code, in form and substance reasonably acceptable to Hilco Streambank, authorizing Hilco Streambank to serve as the Company's advisor with respect to the services described in this Letter Agreement, which the Company agrees to use reasonable efforts to obtain (the "**Retention Order**").  The Company will use its reasonable efforts to ensure that the Retention Order specifically provides that: (i) Hilco Streambank is being retained pursuant to sections 327 and 328 of the Bankruptcy Code by the Company; (ii) the payment of all fees and reimbursement of expenses hereunder to Hilco is approved under section 328(a) of the Bankruptcy Code and shall be free and clear of all liens, claims, and encumbrances; (iii) all such payments of fees and reimbursement of Reimbursable Expenses shall be made without further order of the Bankruptcy Court and in accordance with this Letter Agreement; (iv) Hilco Streambank is not required to maintain time records or file interim or fee applications, *provided* that Hilco will file a final fee application with a summary of the fees earned and Reimbursable Expenses incurred; and (v) Hilco Streambank is authorized to perform all services described in this Letter Agreement on behalf of the Company without regard to state or local real estate or auctioneer licensing or advertising or signage statutes, ordinances, laws, or regulations.  Hilco Streambank acknowledges and agrees that this Letter Agreement, as well as the compensation and transactions contemplated

WEIL:\95457484\3\50482.0005
WEIL:\95457484\6\50482.0005

herein, will require approval of the Bankruptcy Court.  As such, notwithstanding anything in this Letter Agreement to the contrary, the terms and conditions of a proposed transaction and the payment of compensation to Hilco Streambank as contemplated hereby will be subject to the prior approval of the Bankruptcy Court.

18. Notwithstanding anything to the contrary in this Letter Agreement, Hilco Streambank and the Company each acknowledge and agree that Weil shall not be responsible for any fees, expenses, indemnification rights, or other amounts or payments that may be due and payable directly or indirectly hereunder to Hilco Streambank by the Company.

We are prepared to commence work on behalf of the Company immediately. Please let me know if the foregoing terms are acceptable by executing a copy of this Letter Agreement on the space indicated below. If you have any questions concerning this letter, or the proposed scope of this project, please give the undersigned a call at (781) 444-4940.

Sincerely,                                            Agreed/Accepted:
Hilco IP Services LLC d/b/a Hilco Streambank          Great Atlantic & Pacific Tea Company (A&P)

By:                                                  By:

Gabe Fried                                           Name: Christopher McGarry
Chief Executive Officer                              Title: Chief Restructuring Officer

                                                     Date: September 25, 2015

WEIL:\95457484\3\50482.0005
WEIL:\95457484\6\50482.0005

herein, will require approval of the Bankruptcy Court.  As such, notwithstanding anything in this Letter Agreement to the contrary, the terms and conditions of a proposed transaction and the payment of compensation to Hilco Streambank as contemplated hereby will be subject to the prior approval of the Bankruptcy Court.

18. Notwithstanding anything to the contrary in this Letter Agreement, Hilco Streambank and the Company each acknowledge and agree that Weil shall not be responsible for any fees, expenses, indemnification rights, or other amounts or payments that may be due and payable directly or indirectly hereunder to Hilco Streambank by the Company.

We are prepared to commence work on behalf of the Company immediately. Please let me know if the foregoing terms are acceptable by executing a copy of this Letter Agreement on the space indicated below. If you have any questions concerning this letter, or the proposed scope of this project, please give the undersigned a call at (781) 444-4940.

Sincerely,
Hilco IP Services LLC d/b/a Hilco Streambank

By:

Gabe Fried
Chief Executive Officer

Agreed/Accepted:
Great Atlantic & Pacific Tea Company (A&P)

By:

Name: Christopher McGarry
Title: Chief Restructuring Officer

Date: September 25, 2015