**Objection Deadline: October 2, 2015 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objection Filed): October 7, 2015 at 10:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : |
| **COMPANY, INC.,** *et al.*, | :    **Case No. 15-23007 (RDD)** |
| | : |
| **Debtors.**[1] | :    **(Jointly Administered)** |
| | : |

---------------------------------------------------------------x

## NOTICE OF AUCTION PURSUANT TO DISCRETE
## SALE AND LEASE RATIONALIZATION PROCEDURES

**PLEASE TAKE NOTICE** that:

      1.     On July 19, 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

      2.     On August 11, 2015, the Bankruptcy Court entered the *Order Approving Discrete Sale and Lease Rationalization Procedures* [Docket No. 496] (the "**Discrete**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc. (3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

Procedures Order"").    A copy of the Discrete Procedures Order may be found at:
http://cases.primeclerk.com/aptea.

       3.    Pursuant Section III.A of the Discrete Sale and Lease Rationalization Procedures attached to the Discrete Procedures Order as Exhibit 1 (the "**Discrete Procedures**"), the Debtors have determined to hold an auction (the "**Auction**") with respect to the Federal Realty Stores (defined below) only in the event the Debtors receive a Qualified Bid from a bidder other Federal Realty Investment Trust ("**Federal Realty**") with respect to at least one of the Federal Realty Stores.

       4.    The Auction will take place on **October 8, 2015 at 9:30 a.m.** at the offices of Weil, Gotshal & Manges LLP, located at 767 Fifth Avenue, New York 10153.[2]

       5.    On August 11, 2015, the Bankruptcy Court approved the Global Bidding Procedures attached as Exhibit 1 to the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, if Necessary, and Sale Hearings* [Docket No. 495] (the "**Global Procedures**").

       6.    In consultation with the Consultation Parties, the Debtors have determined that the auction rules and bidding procedures set forth in the Global Procedures, as modified to the extent set forth on **Exhibit A** hereto (the "**Bidding Procedures**"), are appropriate to promote a spirited and robust auction, if any, for the Federal Realty Stores.

       7.    Pursuant to Section III.C of the Discrete Procedures, A&P Real Property, LLC, one of the Debtors, has entered into three lease sale agreements with Federal Realty (the "**Federal Realty Agreements**"), final forms of which are attached hereto as **Exhibit B**, pursuant to which the Debtors have designated Federal Realty as a Stalking Horse with respect to the following Additional Stores (the "**Federal Realty Stores**"):

| Store | | Banner | City | Address | State |
|---|---|---|---|---|---|
| 21 | 70298 | Waldbaums | Melville | 890 Walt Whitman Road | NY |
| 71 | 70802 | A&P | Bricktown | 64 Brick Plaza | NJ |
| 95 | 72282 | Pathmark | Parsippany | 1157 Route 46 East | NJ |

---

[2] The Debtors have scheduled the Auction one day earlier than provided for in the Discrete Procedures to coincide with another auction scheduled for that date. *See* [Docket No. 1081]. Adequate notice of the Debtors' proposed sale of the Federal Realty Stores has been provided and, pursuant to the Discrete Procedures, the Debtors will seek approval of the transactions contemplated by the Federal Realty Agreements in accordance with the Discrete Procedures Order.

WEIL:\95469915\3\50482.0005

8.    The material terms and conditions of the Bid Protections offered to Federal Realty (the "**Bid Protections**") are as follows:

| Stores | Purchase Price | Breakup Fee | % of Purchase Price |
|--------|----------------|-------------|---------------------|
| 70298 | $700,000.00 | $21,000.00 | 3% |
| 70802 | $1,400,000.00 | $42,000.00 | 3% |
| 72282 | $4,250,000.00 | $127,500.00 | 3% |

As set forth in greater detail in the Bidding Procedures, the Bid Protections apply to each Federal Realty Store on an individual Store basis.

9.    Any objection to the Bid Protections (an "**Objection**"), must:  (i) be in writing; (ii) state with specificity the nature of the objection; and (iii) be filed with the Bankruptcy Court and served on (a) The Great Atlantic and Pacific Tea Company, Inc., 2 Paragon Drive, Montvale, New Jersey 07645 (Attn: Christopher W. McGarry and Matthew Bennett); (b) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. and Garrett A. Fail, Esq.); (c) Hilco, 5 Revere Dr. Suite 320, Northbrook, IL 60062 (Attn: Gregory S. Apter) (collectively, the "**Debtor Notice Parties**"); (d) the attorneys for the Creditors' Committee, Pachulski Stang Ziehl & Jones, LLP, 780 Third Avenue, 34th Floor, New York, NY 10017 (Attn:  Robert J. Feinstein, Esq., and Bradford J. Sandler, Esq.); and (e) the attorneys for Federal Realty, Katten Muchin Rosenman LLP, 2029 Century Park East, Suite 2600, Los Angeles, CA 90067-3012 (Attn: Dustin P. Branch), so that it is actually received by the Debtor Notice Parties, the Creditors' Committee and Federal Realty on or before **October 2, 2015 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

10.    If any Objections are timely filed and served by the Objection Deadline, a hearing (the "**Hearing**") on the Bid Protections will be scheduled before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601.

11.    Objecting parties are required to attend the Hearing and failure to appear may result in relief being granted or denied upon default.

3

12.     If no Objections are timely filed and served by the Objection Deadline, Federal Realty and the Federal Realty Agreements shall be approved as the Stalking Horse and the Stalking Horse Bids, respectively, and the Bid Protections shall be deemed fully and finally authorized by the Bankruptcy Court under the terms of the Discrete Procedures Order and no further notice or Bankruptcy Court approval shall be required or necessary.

Dated: September 25, 2015
      New York, New York

/s/ Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

4

**<u>Exhibit A</u>**

**Bidding Procedures**

WEIL:\95469915\3\50482.0005

## BIDDING PROCEDURES

### Overview

On July 19, 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On August 11, 2015, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (the "**Discrete Procedures Order**"),[3] approving the Discrete Sale and Lease Rationalization Procedures attached to the Discrete Procedures Order as Exhibit 1 (the "**Discrete Procedures**") which, among other things, authorized the Debtors to (i) hold an auction in connection with the sale of one or more of the Additional Stores[4], (ii) establish any rules for such auction that the Debtors determine, in consultation with the Consultation Parties, are appropriate to promote a spirited and robust auction, and (iii) designate a stalking horse and offer Bid Protections; <u>provided</u> that the Bid Protections shall not exceed 3% of the cash portion of the stalking horse's bid.

On September 25, 2015, the Debtors filed a *Notice of Auction Pursuant to Discrete Sale and Lease Rationalization Procedures* (the "**Auction Notice**") designating Federal Realty Investment Trust as a stalking horse bidder (the "**Stalking Horse**") with respect to the following Additional Stores, as more particularly described in the Stalking Horse Agreements (defined below) (collectively, the "**Stalking Horse Stores**"):

|    | Store | Banner    | City      | Address              | State |
|----|-------|-----------|-----------|----------------------|-------|
| 21 | 70298 | Waldbaums | Melville  | 890 Walt Whitman Road | NY    |
| 71 | 70802 | A&P       | Bricktown | 64 Brick Plaza        | NJ    |
| 95 | 72282 | Pathmark  | Parsippany | 1157 Route 46 East   | NJ    |

The Stalking Horse Stores are subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures. These Bidding Procedures describe, among other things: (A) the procedures for Qualified Bidders (defined below) to submit bids for one or more of the Stalking Horse Stores; (B) the conduct of the auction with respect to the Stalking Horse Stores (the "**Auction**"), if any; and (C) the ultimate selection of the Successful Bidder(s) (as defined below) and Bankruptcy Court approval thereof.

On August 11, 2015, the Bankruptcy Court approved the Global Procedures attached as Exhibit 1 to the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice*

---

[3] A copy of the *Order Approving Discrete Sale and Lease Rationalization Procedures* [Docket No. 496] may be found at: http://cases.primeclerk.com/aptea.

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Discrete Procedures or the Global Procedures (defined below) as applicable.

*of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, if Necessary, and Sale Hearings* [Docket No. 495] (the "**Global Procedures**")).  The Stalking Horse Stores have been extensively marketed in accordance with the Global Procedures.  **Any party who timely submitted a bid on any of the Stalking Horse Stores pursuant to the Global Procedures does not need to resubmit a bid. The submitted bid, to the extent it remains a binding bid under the Global Procedures, will be deemed a bid submitted for purposes of the Auction.**

The Debtors reserve the right to extend any of the bidding deadlines or other dates set forth in these Bidding Procedures without further order of the Bankruptcy Court, subject to providing any notice required by the Discrete Procedures; provided that nothing herein shall authorize the Debtors to unilaterally extend any date or deadline set forth in the Stalking Horse Agreements.

## Summary of Important Dates

| | |
|---|---|
| **September 29, 2015** | • Debtors to File and Serve Sale Motion and Cure Notice<br><br>• Debtors to Serve Stalking Horse Adequate Assurance Information |
| **October 2, 2015 at 4:00 p.m.** | • Deadline to Object to Stalking Horse Bid Protections |
| **October 6, 2015 at 5:00 p.m.** | • Bid Deadline for Stores in Stalking Horse Package |
| **October 7, 2015 at 10:00 a.m.** | • Hearing on Stalking Horse Bid Protections (*If Objections Filed*) |
| **October 7, 2015 at 5:00 p.m.** | • Debtors to File Notice (1) Cancelling Auction If No Other Qualified Bid Received or (2) of Baseline Bids and Qualified Bidders for Auction |
| **October 8, 2015 at 9:30 a.m.** | • Auction to be conducted at the offices of Weil, Gotshal & Manges LLP; 767 Fifth Avenue, New York, New York 10153 |
| **October 9, 2015** | • Debtors to File and Serve Notice of Successful Bidder(s) |
| **October 9, 2015 at 4:00 p.m.** | • Deadline to Object to Sale of Stalking Horse Stores, Including Assumption and Assignment of Leases and Subleases, to Stalking Horse and Proposed Cure Amounts |
| **October 12, 2015** | • Debtors to Serve Adequate Assurance Information for Successful Bidder(s) (*If Not Stalking Horse*) |
| **October 16, 2015, at 10:00 a.m.** | • Sale Hearing (*If No Auction Conducted*) |
| **October 22, 2015 at 4:00 p.m.** | • Deadline to Object to Sale of Stores in Stalking Horse Package, Including Assumption and Assignment of Leases and Subleases, to Successful Bidder(s) (*If Not Stalking Horse*) |

WEIL:\95469915\3\50482.0005

| TBD | • Sale Hearing (*If Auction Conducted*) |
|---|---|

Access to Diligence

       To participate in the diligence process and receive access to due diligence information with respect to any of the Stalking Horse Stores, a party must submit to the Debtors or their advisors:

   (A)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder(s); and

   (B)    sufficient information, as reasonably determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to reasonably determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure reasonably acceptable to the Debtors in their discretion).

       An interested party shall be a "**Potential Bidder**" if the Debtors determine in their reasonable discretion, after consultation with the Consultation Parties, that an interested party has satisfied the above requirements. As soon as practicable, the Debtors will deliver to such Potential Bidder: (A) an information package containing information and financial data with respect to the Stalking Horse Stores in which such Potential Bidder has expressed an interest; and (B) access to the Debtors' confidential electronic data room concerning the Stores (the "**Data Room**").

       Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

Due Diligence

       Until the Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be initially directed to:

   (A)    Paul Billyard and Will Jurist of Evercore (Billyard@Evercore.com and William.Jurist@Evercore.com) if you are interested in purchasing any of the Stores as a going concern; and

   (C)    Gregory Apter of Hilco (gapter@hilcoglobal.com) if you are interested in purchasing any of the Stores as a going concern or any of the Stores' leases or designation rights associated with such leases; or

   (B)    Weil at APDiligence@weil.com.

3

The Debtors will simultaneously distribute via the Data Room in written form any additional diligence materials not previously provided to Stalking Horse or any other Potential Bidder to all Potential Bidders for the Stores to which such diligence materials relate (including, if applicable, Stalking Horse) and the Consultation Parties.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (A) the Potential Bidder does not become a Qualified Bidder (as defined below) or (B) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Stalking Horse Stores to any person or entity who is not a Potential Bidder or a Consultation Party or who does not comply with the participation requirements set forth above.

## Auction Qualification Procedures

Bid Deadline

A Potential Bidder that desires to make a bid on one or more of the Stalking Horse Stores shall deliver written and electronic copies of its bid in both PDF and MS-WORD format to the Debtor Notice Parties so as to be received no later than **October 6, 2015 at 5:00 p.m. (Eastern Time)** (the "**Bid Deadline**"); provided that the Debtors may extend the Bid Deadline without further Order of the Bankruptcy Court, subject to providing notice to all Potential Bidders and the Consultation Parties.

**Any party that does not submit a bid by the Bid Deadline will not be allowed to (A) submit any offer after the Bid Deadline, or (B) participate in the Auction; provided, that if a Potential Bidder has already submitted a bid for one of the Stalking Horse Stores pursuant to the Global Procedures, such Potential Bidder does not need to resubmit such bid in order for the Debtors to consider whether such bid may qualify as a Qualified Bid (defined below) for purposes of the Auction.**

Form and Content of Qualified Bid

A bid is a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a sale transaction), and any other party that will be participating in connection with the bid or the sale transaction, and includes, at a minimum, the following information (each, a "**Bid**"):

A.    Proposed Stores and Valuation. Each Bid must clearly identify and list the particular Stalking Horse Stores, additional assets (such as inventory or prescriptions) and liabilities that the Potential Bidder seeks to acquire. The Bid must identify, on a per Store basis, the valuations, in U.S. dollars, that the Potential Bidder associates with each of those Stores, and a description of any significant assumptions on which such valuations are based. To the extent the Bid proposes to purchase additional assets associated with the

4

Stores, such as inventory or prescriptions, the Bid shall clearly identify the value, in U.S. dollars, associated with such assets.

B.   <u>Marked Agreement</u>.  Each Bid must include a copy of an asset purchase agreement or lease sale agreement, as applicable, reflecting the terms and conditions of its Bid, which agreement must be marked to show any proposed amendments and modifications to the form of (i) going-concern asset purchase agreement provided by the Debtors in the Data Room or (ii) the lease sale agreements executed by Stalking Horse (the "**Stalking Horse Agreements**"), as applicable (the "**Marked Agreement**").

C.   <u>Unconditional Offer</u>.  A statement that the Bid is formal, binding and unconditional (except for those conditions expressly set forth in the applicable Marked Agreement) and is not subject to any due diligence or financing contingency and is irrevocable until the first business day following the closing of the proposed sale transaction, except as otherwise provided in these Bidding Procedures.

D.   <u>Form of Consideration</u>.  Unless the Bid includes a credit bid (as described below), a statement confirming that the Bid is based on an all-cash offer, including, sufficient cash consideration to pay the applicable breakup fee to Stalking Horse (the "**Breakup Fee**"); <u>provided</u> that any Bid that includes a credit bid shall also include a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee and shall comply with that certain Intercreditor Agreement, dated as of March 13, 2012 (as amended and supplemented, including pursuant to that certain Supplemental Senior Lien Intercreditor Agreement as amended) (the "**Intercreditor Agreement**"), including Section 5.06 thereof.

E.   <u>Purchase Price; Minimum Bid</u>.  With respect to each Stalking Horse Store, each Bid submitted must (i) propose an alternative transaction that provides substantially similar or better terms than Stalking Horse's Bid for such Store and (ii) (a) exceed the applicable cash purchase price for such Store by the Minimum Overbid Amount (as defined below) and the Breakup Fee; or (b) propose to purchase such Store for cash, and assume the corresponding liabilities on similar or better terms as Stalking Horse's Bid.

F.   <u>Employee and Labor Terms</u>.  If the Bid contemplates a going concern sale of a Stalking Horse Store, a statement of proposed terms for unionized and non-unionized employees, which shall include, alternatively:  (i) a statement that the Potential Bidder will assume the collective bargaining agreements (the "**Affected Labor Agreement**") covering any of the employees of the Debtors at the Closing (as defined in the Stalking Horse Agreements) whose duties relate primarily to the operation of such Store, including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing (the "**Covered Employees**") without modification; or (ii) if the Potential Bidder will not assume the

WEIL:\95469915\3\50482.0005

Affected Labor Agreements without modification, a statement that the Potential Bidder will enter into good faith negotiations with each of the unions representing any of the Covered Employees (the "**Affected Unions**") to enter into modified collective bargaining agreements, including a term sheet, which shall be attached to the Marked Agreement, proposing post-closing work rules and conditions to be offered to unionized employees.  Such statement shall also include an acknowledgment of the requirements of sections 1113 and 1114 of the Bankruptcy Code and an agreement to use good faith reasonable best efforts to cooperate with the Debtors in ensuring compliance with any applicable provisions thereof in the event that mutually satisfactory modified collective bargaining agreements have not been entered into between the Potential Bidder and the Affected Unions to the closing of a sale contemplated by these Bidding Procedures.

G.      <u>Pension Plans</u>.  Each Bid must state whether or not the Potential Bidder intends to assume (i) sponsorship of all or any part of or (ii) any of the potential liabilities associated with The Great Atlantic & Pacific Tea Company Pension Plan, New York-New Jersey Amalgamated Pension Plan for A&P Employees, Delaware County Dairies, Inc. Hourly Employees Pension Plan, and Pathmark Stores, Inc. Pension Plan (collectively, the "Pension Plans").  If the Potential Bidder does not intend to assume sponsorship or liabilities of the Pension Plans in full, each Bid must state whether the Potential Bidder intends to assume the assets and liabilities of the Pension Plan(s) relating to plan participants associated with the stores in the Bid.

H.      <u>Required Approvals</u>.  If applicable, a statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the business and stores included in its Bid from and after closing the sale transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals. A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Marked Agreement.

I.      <u>No Entitlement to Expense Reimbursement or Other Amounts</u>.  Except as provided with respect to Stalking Horse, a statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Stalking Horse Stores.

J.      Adequate Assurance Information.  Information supporting the Potential
Bidder's ability to comply with the requirements of adequate assurance of
future performance under section 365(f)(2)(B) and, if applicable, section
365(b)(3) of the Bankruptcy Code, including the Potential Bidder's financial
wherewithal and willingness to perform under any contracts that are assumed
and assigned to the Potential Bidders.

Notwithstanding the foregoing, if a Bid for a Store is submitted by the landlord
under the real property lease for such Store (a "**Landlord Lease Bid**"), such landlord need not
satisfy the requirements set forth in subsections F, G, H, and J above; provided that such landlord
must satisfy the requirements set forth in subsection F and G above if its Landlord Lease Bid
contemplates a going concern purchase of the Store.

A Potential Bidder must also accompany its Bid with: (A) a Deposit (as defined
below); (B) the contact information of the specific person(s) whom the Debtors or their advisors
should contact in the event that the Debtors have any questions or wish to discuss the bid
submitted by the Potential Bidder; (C) written evidence of available cash, a commitment for
financing (not subject to any conditions other than those expressly set forth in the applicable
Marked Agreement) and such other evidence of ability to consummate the transaction
contemplated by the applicable Marked Agreement, as acceptable in the Debtors' business
judgment, in consultation with the Consultation Parties, including a description of each investor
and any additional party or parties investing in the transaction included in the applicable bid and
such party's financial position; (D) a copy of a board resolution or similar document
demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the
terms proposed and to consummate the transaction contemplated by the Marked Agreement;
(E) a covenant to cooperate with the Debtors to provide pertinent factual information regarding
the bidder's operations reasonably required to analyze issues arising with respect to any
applicable antitrust laws and other applicable regulatory requirements; (F) if the value of the Bid
relative to the relevant Stalking Horse Agreement includes additional non-cash components
(such as fewer contingencies than are in the relevant Stalking Horse Agreement), a detailed
analysis of the value of any additional non-cash component of the Bid and back-up
documentation to support such value; and (G) if the Bid includes an asset purchase agreement
that is not executed, a signed statement that such Bid is irrevocable until the first business day
following the closing or closings of the applicable sale transaction.

**The submission of a Bid by the Bid Deadline shall constitute a binding and
irrevocable offer to acquire the Store(s) or other assets reflected in such Bid.**

Deposit

To qualify as a Qualified Bid (as defined below), each Bid must be accompanied
by a good faith cash deposit in the amount of five percent (5%) of the proposed purchase price,
to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the
"**Escrow Agent**") pursuant to the escrow agreement to be provided by the Debtors to the
Potential Bidders (the "**Escrow Agreement**"); provided that with respect to a Landlord Lease
Bid, the landlord may deduct from its Deposit the amount of any undisputed monetary
obligations that constitute the Cure Costs for the applicable real property lease.

WEIL:\95469915\3\50482.0005

To the extent the Stores included in a Qualified Bid are modified at or prior to the Auction, the Qualified Bidder must adjust its Deposit so that it equals five percent (5%) of the proposed purchase price to be paid for each Store.

Review of Bids

The Debtors will deliver, within one (1) business day after receipt thereof, copies of all Bids to the Consultation Parties and, if such Bids include the assumption of any liabilities associated with the Pension Plans, the Pension Benefit Guaranty Corporation, 1200 K Street, N.W., Washington, D.C. 20005 (Attn: Thea Davis, davis.thea@pbgc.gov).

The Debtors will evaluate timely submitted bids, in consultation with the Consultation Parties, and may engage in negotiations with Potential Bidders who submitted Bids complying with the preceding paragraphs as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid. In evaluating the bids, the Debtors may take into consideration the following non-binding factors:

1. the amount of the Bid and the Stores and number of Stores and other assets proposed to be acquired;

2. the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates after the payment of the Breakup Fee;

3. any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities through a credit bid;

4. any benefit to the Debtors' bankruptcy estates from any other assumption of liabilities, including any liabilities under the Pension Plans, the assumption of the sponsorship of all, any, or a portion of the Pension Plans;

5. the value to be provided to the Debtors under the Bid for the Stores included therein (individually and in the aggregate);

6. the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals;

7. the impact on employees, employee claims against the Debtors, Affected Labor Agreements, and whether the Potential Bidder has reached an agreement with the Affected Unions;

8. the impact on trade creditors and landlords; and

9. any other factors the Debtors may reasonably deem relevant.

WEIL:\95469915\3\50482.0005

Designation of Qualified Bidders

A bid will be considered a "**Qualified Bid**," and each Potential Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**," if the Debtors determine, after consultation with the Consultation Parties, that such Bid meets the requirements set forth in these Bidding Procedures.

The Debtors reserve the right to work with any Bidder in advance of the Auctions to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid.  If a Bid is received and, in the Debtors' judgment, after consultation with the Consultation Parties, it is not clear whether the Bid is a Qualified Bid, the Debtors may consult with the Potential Bidder and seek additional information in an effort to establish whether or not the Bid is a Qualified Bid.

The Debtors, after consultation with the Consultation Parties, will have the right to determine that a Bid is not a Qualified Bid if any of the following conditions are satisfied:

(A)    A Potential Bidder has failed to comply with reasonable requests for additional information from the Debtors;

(B)    If the Bid includes a credit bid, such Bid does not (i) include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment), (ii) comply with the terms of the Intercreditor Agreement or (iii) pay cash in the amount of any assets on which such bidder seeks to purchase, but does not have a valid, perfected and unavoidable lien; provided that any Bid that does not include a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee shall not be a Qualified Bid; or

(C)    The terms of the Bid are burdensome or conditional in view of the proposed purchase price or are materially more burdensome or conditional than the terms of the relevant Stalking Horse Agreement, and are not offset by a material increase in purchase price, which determination (as made by the Debtors in consultation with the Consultation Parties) may take into consideration, among other things:

(i)    whether the Bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including, the Breakup Fee);

(ii)    whether the Bid includes a non-cash instrument or similar consideration that is not freely marketable.

Stalking Horse is a Qualified Bidder and Stalking Horse's Bid is a Qualified Bid as to the Stalking Horse Stores.  Should it decide to credit bid, each of (A) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014, (B) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior

WEIL:\95469915\3\50482.0005

Secured Term Credit Agreement, dated as of September 17, 2014, (C) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured PIK Toggle Notes due 2017, dated as of March 13, 2012, or the majority holder of the Senior Secured PIK Toggle Notes due 2017, (D) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured Convertible Notes due 2018, dated as of March 13, 2012, or the majority holder of the Senior Secured Convertible Notes due 2018, and (E) the DIP Lenders is a Qualified Bidder and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline, complies with the above requirements set forth under the heading "Designation of Qualified Bidders," complies with section 363(k) of the Bankruptcy Code, complies with the requirements for a credit bid, complies with section 5.06(d) of the Intercreditor Agreement and includes a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee, and all obligations secured by senior liens on the applicable assets to be purchased.

## Pre-Auction Procedures

Determination and Announcement of Baseline Bids

In consultation with the Consultation Parties, the Debtors shall make a determination regarding:

(A)    the highest or best Qualified Bid for each of the Stalking Horse Stores (each, a "**Baseline Bid**" and such bidder or group of bidders, a "**Baseline Bidder**") to serve as the starting point at the Auction for the Stalking Horse Stores; and

(B)    which Bids have been determined to be Qualified Bids.

On **October 7, 2015, at 5:00 p.m. (Eastern Time)** (the "**Designation Deadline**"), the Debtors shall file notice of the foregoing on the Court's docket and publish such notice on the website of their claims and noticing agent and in the Data Room. As soon as practicable but no later than one (1) day prior to the Auction, the Debtors will provide copies of each Baseline Bid to the Consultation Parties and Stalking Horse.

Between the date hereof and the Auction, the Debtors may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of the Debtors, a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for the Debtors, during the period that such Qualified Bid remains binding as specified herein; provided that any Qualified Bid may be improved at the Auction, as set forth in the Bidding Procedures.

Except as provided in the Stalking Horse Agreements, the Debtors are under no obligation to (A) select any Baseline Bid, (B) consummate or pursue any transaction with respect to one or more of the Stalking Horse Stores, or (C) conduct the Auction, whether before or after selecting a Baseline Bid. Notwithstanding anything to the contrary contained herein, the Debtors may elect, in their reasonable discretion, and after consultation with the Consultation Parties, to adjourn the Auction and/or to consummate a sale transaction with Stalking Horse with respect to

10

one or more of the Stalking Horse Stores without holding the Auction.

<u>Failure to Receive Two or More Qualified Bids</u>

With respect to each Stalking Horse Store, if no Qualified Bid other than the one submitted by Stalking Horse is received by the Bid Deadline, the Debtors will not conduct the Auction for that Stalking Horse Store, and shall file and serve, **by October 7, 2015 at 5:00 p.m. (Eastern Time)**, a notice indicating that the Auction has been cancelled with respect to such Stalking Horse Store, that Stalking Horse is the Successful Bidder as to such Stalking Horse Store and that the Sale Hearing as to the sale of such Stalking Horse Store to Stalking Horse will be conducted on the date set forth in the Sale Motion (defined below).

### The Sale Motion and Sale Order

In accordance with the Discrete Procedures, the Debtors will file a notice or motion (the "**Sale Motion**") seeking entry of order(s) authorizing and approving, inter alia, the applicable sale transaction(s) to the Successful Bidder(s) with respect to the Stalking Horse Stores (each, a "**Sale Order**"). Each Sale Order shall authorize and approve the applicable sale transaction to the Successful Bidder (defined below) for each of the Stalking Horse Stores.

The Sale Motion shall set forth the date of the hearing(s) before the Bankruptcy Court to consider entry of the Sale Order(s). In the Debtors' reasonable discretion (after consultation with the Successful Bidder(s)), any Sale Hearing may be adjourned or rescheduled without notice or with limited and shortened notice to parties, including by (A) an announcement of such adjournment at the Sale Hearing or at the Auction or (B) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Sale Hearing; <u>provided</u> that nothing herein shall authorize the Debtors to unilaterally extend any date or deadline set forth in the Stalking Horse Agreements.

### Auction Procedures

With respect to each Stalking Horse Store, if a Qualified Bid is received from a Qualified Bidder other than Stalking Horse, the Debtors will conduct the Auction with respect to such Stalking Horse Store on **October 8, 2015, beginning at 9:30 a.m. (Eastern Time), at the offices of Weil, Gotshal & Manges LLP; 767 Fifth Avenue, New York, New York 10153**. Only Qualified Bidder(s) will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith. Professionals and/or other representatives of the Consultation Parties will be permitted to attend and observe the Auction.

At the Auction, Qualified Bidders (including Stalking Horse) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the purchase price and terms proposed in the applicable Baseline Bid, and will proceed thereafter in increments of 2% of the applicable Baseline Bid (a "**Minimum Overbid Amount**"). If Stalking Horse bids at the Auction, Stalking Horse will be entitled to a "credit" in the amount of the Breakup Fee to be counted towards its bid such that the cash and other consideration proposed by Bidder plus the Breakup Fee "credit" must exceed the most recent bid by at least the Minimum Overbid Amount.

11

The Debtors may adopt rules, after consultation with the Consultation Parties, for the Auction at any time that the Debtors reasonably determine to be appropriate to promote a spirited and robust auction pursuant to the Discrete Procedures and are not inconsistent with these Bidding Procedures.  At the start of the Auction, the Debtors shall describe the terms of the applicable Baseline Bid.  Any rules adopted by the Debtors will not unilaterally modify any of the terms of the Stalking Horse Agreements (as may be consensually modified at the Auction) without the consent of Stalking Horse.  Any rules developed by the Debtors will provide that all bids in a particular Auction will be made and received in one room, on an open basis, and all other bidders participating in that Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders participating in that Auction and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be fully disclosed to all other bidders throughout the entire Auction.  Each Qualified Bidder will be permitted what the Debtors reasonably determine to be an appropriate amount of time to respond to the previous bid at the Auction.

Except as otherwise set forth in the Stalking Horse Agreements, the Debtors reserve the right to and may, after consultation with the Consultation Parties, reject at any time before entry of the relevant Sale Order any bid that, in the Debtors' judgment, is: (A) inadequate or insufficient; (B) not in conformity with the requirements of the Bankruptcy Code, the Discrete Procedures, these Bidding Procedures or the terms and conditions of the applicable sale transaction; or (C) contrary to the best interests of the Debtors and their estates.

Prior to the conclusion of the Auction, the Debtors, after consultation with the Consultation Parties, will: (A) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating a sale transaction; (B) determine the highest or best offer for each Stalking Horse Store (each, a "**Successful Bid**"); (C) determine which Qualified Bid is the next highest or best bid for each Stalking Horse Store (each, the "**Back-Up Bid**"); and (D) notify all Qualified Bidders participating in the Auction, prior to its conclusion, the successful bidder for each Stalking Horse Store (the "**Successful Bidder**"), the amount and other material terms of the Successful Bid and the identity of the party that submitted the Back-Up Bid for such Stalking Horse Store (the "**Back-Up Bidder**").

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding or the Auction.

## Post-Auction Process

A Successful Bidder shall, within one (1) business day after the close of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid.  Promptly following the submission of such documentation, the Debtors shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.  The Successful Bid may not be assigned to any party without the consent of the Debtors after consultation with the Consultation Parties.

WEIL:\95469915\3\50482.0005

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (A) ninety (90) days after the completion of the Auction, but in no event later than January 31, 2016 (B) the consummation of the transaction with the Successful Bidder, or (C) the release of such bid by the Debtors (such date, the "**Back-Up Bid Expiration Date**").  If the transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

At a Sale Hearing, the Debtors will present a Successful Bid to the Bankruptcy Court for approval.

Unless otherwise required pursuant to the Debtors' fiduciary duties, the Debtors shall not consider any bids submitted after the conclusion of the Auction.

## Treatment and Return of Deposits

Potential Bidders

Within three (3) business days after the Designation Deadline, the Escrow Agent shall return to each Potential Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Potential Bidder's Deposit, plus any interest accrued thereon. Upon the authorized return of such Potential Bidder's Deposit, the bid of such Potential Bidder shall be deemed revoked and no longer enforceable.

Qualified Bidders

The Deposit of a Qualified Bidder will be forfeited to the Debtors if (A) the applicable Qualified Bidder attempts to modify, amend or withdraw its Qualified Bid, except as permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures, or (B) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the transaction according to these Bidding Procedures and the terms of the applicable transaction documents with respect to the Successful Bid.  The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by the Debtors two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of the Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

With the exception of the Deposit of a Successful Bidder and a Back-Up Bidder, the Escrow Agent shall return to any other Qualified Bidder any Deposit, plus any interest accrued thereon, three (3) business days after the execution by the Successful Bidder and the Debtors of the documentation memorializing the Successful Bid, but in no event later than seven (7) business days after the conclusion of a Sale Hearing.

Notwithstanding anything to the contrary herein, the good faith deposits provided by Stalking Horse pursuant to the Stalking Horse Agreements (including any required return of such deposit) shall be governed by the terms and conditions of the Stalking Horse Agreements.

13

Back-Up Bidder

   The Escrow Agent shall return a Back-Up Bidder's Deposit, plus any interest accrued thereon, within three (3) business days after the occurrence of the applicable Back-Up Bid Expiration Date.

The Successful Bidder

   The Deposit of a Successful Bidder shall be applied against the cash portion of the Purchase Price of such Successful Bidder upon the consummation of the transaction proposed in the applicable Successful Bid.

Joint Notice to Escrow Agent

   The Debtors and, as applicable, the Potential Bidder, Qualified Bidder, and/or Back-Up Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit, to the extent such return is required by these Bidding Procedures. If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

Consultation Parties

   For the avoidance of doubt, any consultation rights provided to the Consultation Parties by the Discrete Procedures or these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

   In the event that any Consultation Party or any member of the Creditors' Committee or an affiliate of any of the foregoing, submits a bid that is a Qualified Bid, any obligation of the Debtors to consult with the bidding party established under the Discrete Procedures or these Bidding Procedures will be waived, discharged and released without further action; provided that the bidding party will have the same rights as any other Potential Bidder set forth above, and will retain any rights it has under existing orders regarding debtor in possession financing and/or use of cash collateral (to the extent applicable).

   If a member of the Creditors' Committee submits a Qualified Bid, the Creditors' Committee will continue to have Consultation Rights; provided that the Creditors' Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any confidential information regarding the sale of the Assets to such member.

## **Consent to Jurisdiction and Authority as Condition to Bidding**

   All bidders that participate in the Auction (including Stalking Horse) shall be deemed to have (A) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, (B) waived any right to a jury trial in

WEIL:\95469915\3\50482.0005

connection with any disputes relating to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, and (C) consented to the entry of a final order or judgment in any way related to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## **Reservation of Rights**

The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties, to alter or terminate these Bidding Procedures, to waive terms and conditions set forth herein with respect to all potential bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers or investors (except for Stalking Horse) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Discrete Procedures Order; provided further that the Debtors' exercise of their discretion in evaluating bids and administering the bidding and auction process described herein does not permit, and shall not be construed as permitting, the Debtors to materially deviate from the procedures, terms, conditions and protections set forth in these Bidding Procedures and/or the Discrete Procedures Order.

WEIL:\95469915\3\50482.0005

**<u>Exhibit B</u>**

**Federal Realty Agreements**

CONFIDENTIAL

STORE NO:  70298 (MELVILLE MALL)
890 WALT WHITMAN ROAD, MELVILLE, NEW YORK

### LEASE SALE AGREEMENT

THIS LEASE SALE AGREEMENT (this "**Agreement**") is made as of September 11, 2015 by and between A&P Real Property, LLC, a Delaware limited liability company ("**Tenant**") and APW Supermarkets, Inc. a New York corporation ("**Guarantor**," and together with Tenant, the or "**Seller**"),and Federal Realty Investment Trust, a Maryland real estate investment trust ("**Buyer**", and collectively with Seller, the "**Parties**").

W I T N E S S E T H :

WHEREAS, Tenant is the tenant under that certain lease more specifically described on Exhibit A attached hereto and made a part hereof (together with any amendments, modifications, extensions and renewals, the "**Lease**"), with respect to all or a portion of certain real property (the "**Leased Premises**"), which real property is more particularly described in Exhibit B attached hereto and made a part hereof (the "**Premises**");

WHEREAS, Seller and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, pursuant to the Order *Approving Discrete Sale and Lease Rationalization Procedures* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 496] (the "**Discrete Procedures Order**"), and subject to any approval of the Bankruptcy Court required by the Discrete Procedures Order, Seller desires to sell, assign, convey and transfer all of its rights, title and interests as tenant under the Lease, together with all of its rights, title and interests as sublessor under those certain sublease agreements and/or license agreements more particularly described on Exhibit C attached hereto (each, a "**Sublease**" and, collectively, the "**Subleases**"), if any, and

WHEREAS, Buyer desires to terminate all rights, title, interests and obligations of Tenant under the Lease and Subleases, if any, to the extent set forth herein, subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Seller and Buyer agree as follows:

1.    Procedures.  This Agreement is made subject to, and in accordance with the Discrete Procedures Order.  Capitalized terms used but not otherwise defined herein (including on Schedule I attached hereto) shall have the meanings ascribed to them in the Discrete Procedures Order, as applicable.  In the event of a contradiction between this Agreement and the Discrete Procedures Order, as applicable, the Discrete Procedures Order, as applicable, shall control.

2.    Lease Consideration.  The consideration for the sale of Seller's interest in, and the simultaneous termination of the Lease together with the Subleases to the extent set forth herein (the foregoing, as applicable, collectively, the "**Acquired Assets**"), shall be equal to Seven Hundred Thousand and No Dollars ($700,000.00) (the "**Purchase Price**") which shall be comprised of:

a.    Seven Hundred Thousand and No Dollars ($700,000.00), less application of the Deposit and Cure Amount (as defined below) as consideration for the Lease, plus

b.    **NONE** Dollars ($) as consideration for the FF&E.

Buyer's submission of an executed copy of this Agreement along with the Deposit shall be deemed an irrevocable offer subject only to the rights of termination provided herein.

3.    Payment of Purchase Price.  The Purchase Price shall be paid to Seller by Buyer as follows:

a.    Deposit.  Buyer has deposited with TITLEVEST SERVICES, LLC ("**Escrowee**") by a bank wire transfer of immediately available federal funds to an account designated by Escrowee the sum of Twenty Four Thousand Twenty Six and 25/100 Dollars ($24,026.25) (together with all interest thereon, the "**Deposit**"), which Deposit shall be held by Escrowee pursuant to the escrow agreement (the "**Escrow Agreement**") attached hereto as Exhibit D and hereby made a part hereof.  Notwithstanding anything to the contrary set forth in this Agreement or in the Escrow Agreement, (i) all charges of Escrowee, if any, attendant to holding and/or disbursing the Deposit shall be paid by Buyer and (ii) all interest accrued in connection with the Deposit hereunder shall accrue for the sole benefit of the party to whom the Deposit is paid.  The Parties agree that any payments made pursuant to this Section 3(a) in respect of accrued interest shall be deemed to be an adjustment to the Purchase Price for tax purposes to the extent permitted by applicable Law.

b.    Closing Payment.  On the Closing Date, as defined below, the Purchase Price, as adjusted by the application of the Deposit in the amount of Twenty Four Thousand Twenty Six and 25/100 Dollars ($24,026.25), and the application of the Cure Amount in the amount of Two Hundred Nineteen Thousand Four Hundred Seventy Five and 01/100 Dollars ($219,475.01), subject to Seller's rights set forth below, shall be paid by Buyer by wire transfer of immediately available federal funds to the account designated on Exhibit E hereto or as otherwise designated in writing by Seller. The balance of the Purchase Price due on the Closing Date shall be Four Hundred Fifty Six Thousand Four Hundred Ninety Eight and 74/100 Dollars ($456,498.74).

4.    Payment of Cure Amount.  The Purchase Price includes a credit to the Buyer for the cure amount owing under the Lease in the amount of Two Hundred Nineteen Thousand Four Hundred Seventy Five and 01/100 Dollars ($219,475.01) (the "**Cure Amount**"), which Cure Amount shall be the total amount payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the termination by Buyer of all contracts related to the Lease, and which shall be subject to approval by the Bankruptcy Court.  Nothing herein shall prejudice the Seller's right

2

to object to the amount of the Cure Amount set forth herein prior to the Closing. In the event the Cure Amount is reduced by the agreement of the Parties or further order of the Bankruptcy Court, Buyer shall be responsible to pay to Seller the amount of such reduction of the Cure Amount.

5.    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York, such other location in the state where the Leased Premises are located as may be selected by Seller, or such other location as shall be mutually agreed upon by Seller and Buyer commencing at 10:00 a.m. local time on a date (the "**Closing Date**") that is the thirtieth (30th) Business Day following the date hereof, or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto.  Seller shall have a one-time right to adjourn the Closing for up to thirty (30) days on notice provided no later than the Closing Date.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective at 12:01 a.m., New York City time, on the Closing Date.

6.    Termination.  As of the Closing Date, pursuant to sections 363 and 365 of the Bankruptcy Code and in accordance with the Sale Order, Tenant and Buyer shall reject and terminate the Lease and Subleases, if any.

7.    Prorations/Adjustments.  As set forth above, Seller shall be solely responsible to pay the Cure Amount to the landlord, and the Remaining Lease Obligations (as defined below). There will be no prorations between Seller and Buyer on the Closing Date, and no post-assignment reconciliations or adjustments of any kind shall occur.

8.    Termination of Lease.  As of the Closing Date, Seller surrenders the Premises to Buyer and shall give, grant and surrender unto Buyer all of Seller's right, title and interest in and to the Premises, including, without limitation, all of the Seller's right, title and interest in, to and under the Lease, and any Subleases, and Buyer hereby accepts such surrender.  Each of the parties hereto acknowledges performance of all obligations of the other party under the Lease or otherwise in connection with the Premises through and including the date of this Closing Date, and agree that, from and after the Closing Date, the Lease, any Subleases, and any guaranties by Seller entities, and all rights and obligations of the parties thereunder, shall be deemed to have expired and terminated as fully and completely and with the same force and effect as if such date were the expiry date set forth in the Lease, and that the Lease, and any guaranties by Seller entities are hereby agreed to be null and void and of no further force and effect as of that date.  Except as set forth herein, any and all rights and obligations of the parties which may have arisen in connection with the Premises shall be deemed to have expired and terminated as of the Closing Date.

9.    Remaining Lease Obligations.  From the date of this Agreement through the Closing Date, Seller agrees that it (i) will continue to perform all of its covenants and obligations, including to pay all rent and related lease charges, under the Lease; (ii) will remain current on its obligations under the Lease with respect to maintenance of insurance and payment of utilities; and (iii) shall not cause any material damage to the Premises in connection with the conduct of the store closing sale or removal of Seller's trade fixtures (collectively, the "**Remaining Lease Obligations**").  On the Closing Date, Seller shall: (a) deliver the Premises in broom clean condition, with it being agreed that any furniture, fixtures, equipment or other personal property that remains in or on the Premises following the Closing Date shall be deemed abandoned by Seller

3

in accordance with the procedures set forth in the *Amended Final Order Pursuant to 11 U.S.C. §§ 105, 363, 365 and 554 Approving (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer, or Abandonment or De Minimus Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry Into a Liquidation Consulting Agreement* [Docket No. 546] (the "De Minimus Asset Order"), and that the Buyer may dispose of such remaining property without notice or liability to the Seller or the Debtors, or any party claiming by, through or under the Seller or the Debtors in accordance with the De Minimus Asset Order; and (b) reasonably cooperate with Buyer to transfer utilities into the name of Buyer.

10.    Free and Clear of All Liens. Pursuant to the Discrete Procedures Order and the Sale Order entered by the Bankruptcy Court, Seller shall convey its rights and interests under the Lease to Buyer free and clear of all liens, claims, interests, or encumbrances (collectively, "Liens") to the maximum extent permitted under the Bankruptcy Code, if any, with any such Liens attaching to the proceeds paid to Seller.

11.    Closing Deliverables. On the Closing Date:

a.    Seller shall deliver to Buyer a duly executed copy of: (i) a FIRPTA Certificate; and (ii) if applicable, Transfer Tax forms or certifications provided by Buyer as more specifically described in subsection (b) below.

b.    Buyer shall deliver to Seller: (i) an executed copy of all Transfer Tax forms or certifications as may be required by each state, county or municipality to record the termination and effectuate the transactions contemplated herein; and (ii) such other documents as may be reasonably required to complete the transactions provided for in this Agreement. All documents executed and delivered by Buyer pursuant to this Section shall be in form and substance reasonably satisfactory to Seller.

12.    Transfer Tax Forms. Buyer shall be responsible for the preparation, delivery and recordation of any and all real estate Transfer Tax forms or certifications required by any Governmental Authority (unless Seller notifies Buyer that it will do so), with Buyer being responsible for any payment required therewith as provided in Section 14. The Party that is required by applicable law to file or record any other Transfer Tax forms or certifications shall prepare and timely file and record such forms or certifications, with Buyer being responsible for any payment required therewith with respect to the Sale Assets as provided in Section 14. The Parties hereto shall cooperate in making, in a timely manner, all such tax returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any such Transfer Taxes. At Seller's request, all Transfer Tax forms and certifications, along with payment therefor, shall be delivered by Buyer to Seller for recordation and payment with the appropriate Governmental Authority. To the extent required by applicable Law, Seller shall execute any Transfer Tax forms or certifications.

13.    Closing Costs.

4

a.      Seller and Buyer shall each pay their own attorneys' fees and expenses. Buyer shall pay (i) all state, county and local Transfer Taxes required to be paid in connection with the assignment and assumption of the Lease and any and all Subleases, and the consummation of the transactions contemplated herein, all of which amounts shall be paid, if applicable, to the proper Governmental Authority on or prior to the Closing Date, and (ii) all title and escrow charges.

b.      Except as otherwise provided in this Agreement, all other costs and expenses of the transaction contemplated by this Agreement shall be borne by Buyer.

c.      Buyer agrees to fully indemnify and hold Seller harmless for, from and against any loss, cost, claim, damage or expense incurred, directly or indirectly, by Seller as a result of Buyer's failure to pay any Taxes or costs pursuant to clauses (a) and (b) above. Buyer's obligations in this Section shall survive the Closing Date.

14.    Conditions to Closing.

a.      Conditions to Buyer's Obligations. Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)      the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or the Sale Order entered by the Bankruptcy Court, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(ii)      no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(iii)      each delivery contemplated by Section 12(a) to be delivered to Buyer shall have been delivered.

b.      Conditions to Seller's Obligations. Seller's obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(i)      Buyer shall have performed and complied with all of its covenants and agreements hereunder through the Closing in all material respects;

(ii)      the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or the Sale Order entered by the Bankruptcy Court, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(iii)      no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

5

(iv)    each payment contemplated by Sections 3, 4 and 14 to be made to Seller shall have been made, and each delivery contemplated by Section 12(b) to be delivered to Seller shall have been delivered.

c.    No Frustration of Closing Conditions.  Neither Buyer nor Seller may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Subsection 15(a) or Subsection 15(b), as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliate's failure to use its reasonable best efforts (or commercially reasonable efforts, with respect to those matters contemplated by Section 18, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach hereunder.  The Parties agree that neither the failure to obtain a court order nor any action with respect to a Competing Bid (as defined below), to the extent permitted hereunder, shall be deemed to be a failure to use the efforts required to satisfy the conditions to consummation of the transactions contemplated hereunder nor a breach hereunder.

15.    No Other Contingencies.  Buyer expressly agrees and acknowledges that Buyer's obligations hereunder are not in any way conditioned upon or qualified by Buyer's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt, financing or equity investment or otherwise) nor upon Buyer's ability to obtain title insurance.

16.    Termination of Agreement.

a.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(i)    by the mutual written consent of the Parties;

(ii)    by any Party by giving written notice to the other Party if:

(A)    any court of competent jurisdiction shall have enacted or issued a Law permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this agreement and such Law or Decree or other action shall have become final and non-appealable; or

(B)    the Closing shall not have occurred prior to the sixtieth (60) day from the date hereof ("**Outside Date**"); provided that if the Closing shall not have occurred on or before the Outside Date due to a material breach of this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this Section 17(a)(ii)(B).

(iii)    if (i)(x) with respect to a Lease, Seller enters into a definitive agreement with respect to a higher or better competing bid in accordance with the bidding procedures attached hereto as Exhibit G (the "**Bidding Procedures**") for such Lease, including any related Acquired Assets  ("**Competing Bid**"), (y) the Bankruptcy Court enters an order approving a Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

6

b.       Seller may terminate this Agreement at any time prior to Closing if Buyer fails to satisfy any requirement set forth under Section 15(b)(iv), including delivery of the Deposit required hereunder. In such case, the Agreement shall be rendered null and void, Seller shall be entitled to retain any and all consideration already paid to Seller, including, but not limited to, the Deposit.

c.       Effect of Termination. If any Party terminates this Agreement pursuant to Section 17(a) or (b), all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Section 14, this Section 17, Sections 24 through 43, and Schedule I shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 17(b) and Section 18) to the other Party hereunder (except as may be provided in Section 4 and Subsection 17(b)); provided, however, that nothing in this Section 17 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, subject to Section 17(d) below, that other than in the case of fraud or willful misconduct, (a) the maximum Liability of Seller under this Agreement shall not exceed the reasonably out of pocket expenses incurred by Buyer and (b) subject to subsection (d) below, the maximum liability of Buyer under this Agreement shall not exceed the Deposit.

17.     Bankruptcy Court Matters.

a.       Competing Transaction. This Agreement is subject to approval by the Bankruptcy Court in accordance with the Discrete Procedures Order, and the consideration by Seller of a Competing Bid in accordance with the Bidding Procedures and, in the event Seller receives a Competing Bid, an auction to be conducted in accordance with the Bidding Procedures. From the date hereof and until the transactions contemplated hereby are consummated, Seller is permitted to, and is permitted to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by or from any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, and Seller shall be permitted and shall have the authority to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, including supplying information relating to the assets of Seller to prospective buyers. Without limiting the foregoing, Seller shall be permitted to perform all of the foregoing activities with respect to all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Discrete Procedures Order, the Bidding Procedures, or other applicable Law.

b.       Termination Payment. To induce Buyer to enter into this Agreement, to maximize value of the Seller's estates and in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller grants Buyer, subject to compliance with the Discrete Procedures Order, a break-up fee in an amount equal to three percent (3%) of the Purchase Price (the "**Termination Payment**"). Seller further agrees that the Termination Payment constitutes an allowed administrative expense claim against their estates pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code. In the event an auction is conducted in connection with the sale of the Leases because of the timely submission of a Competing Bid, Buyer

WEIL:\95469808\2\50482.0005

shall be entitled to credit bid all or any portion of the Termination Payment at the auction. In the event a Competing Bid is consummated, the Termination Payment shall be paid on the first Business Day following the date of consummation of the Competing Bid from the proceeds thereof if no material breach by Buyer of this Agreement has occurred. Upon payment of the Termination Payment to Buyer in accordance with this Section 18.b, Seller and its respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Seller, its Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to the Lease or any applicable Law, including for reimbursement of expenses.

      c.     <u>Bankruptcy Court Filings</u>.

      (i)     As soon as reasonably practicable following the execution of this Agreement, and by no later than the deadlines imposed by the Discrete Procedures Order, Seller shall file any necessary notice or pleadings required in connection therewith. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the transactions contemplated by this Agreement pursuant to the Discrete Procedures Order, including a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for providing the Adequate Assurance Information to the Cure Notice Parties and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event the approval of the transactions contemplated by this Agreement shall be appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

     18.     <u>Delivery; "AS IS" Transaction</u>.

      a.     Buyer acknowledges that it has fully inspected or waived the right to inspect the Leased Premises prior to the execution of this Agreement and does hereby assume all of the risks, including, but not limited to, latent defects in the Leased Premises. Seller shall not be obligated to do any work or alter, restore, repair or develop the Leased Premises, but Seller shall deliver the Leased Premises in vacant, broom clean condition, and, if applicable, with all furnishings, fixtures, equipment, inventory, racks, aisle displays, refrigeration equipment and personal property removed from the Leased Premises. Any work (including demolition) which may be necessary to adapt the Leased Premises for Buyer's occupancy or for the operation of Buyer's business therein shall be the sole responsibility of Buyer and shall be performed by Buyer at its sole cost and expense, in accordance with the terms of the Lease.

      b.     BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE LEASE OR THE LEASED PREMISES (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE LEASED PREMISES; THE PHYSICAL CONDITION OF THE LEASED PREMISES; THE

8

PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE LEASED PREMISES OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE LEASED PREMISES; THE ZONING OF THE LEASED PREMISES; THE POSSIBILITY OF DEVELOPING OR USING THE LEASED PREMISES IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE LEASE OR THE LEASED PREMISES; THE FITNESS OF THE LEASED PREMISES, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE LEASED PREMISES (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE LEASE OR THE LEASED PREMISES).   BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLER.   BUYER ALSO ACKNOWLEDGES THAT BUYER HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE LEASED PREMISES AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE LEASED PREMISES AND/OR THE LEASE, AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IS ACQUIRING THE LEASE AND THE LEASED PREMISES, BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT, AND BUYER IS NOT RELYING UPON ANY REPRESENTATIONS OF SELLER OR SELLER'S AGENTS.   ACCORDINGLY, BUYER HEREBY ACCEPTS THE LEASED PREMISES IN ITS "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS, SUBJECT TO BUYER'S RIGHTS UNDER THE LEASE AS LANDLORD.

19.   Store Closed.  The Parties acknowledge and agree that Seller has ceased (or will cease as of the Closing Date) operations at the Leased Premises.

20.   Release; Indemnity.  On and after the Closing Date, Buyer agrees to release Seller from any and all claims (including claims for rejection damages under Bankruptcy Code Section 502(b)(6), actions, proceedings, suits, costs, liabilities, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and disbursements), whether foreseen or unforeseen, in connection with the Lease, the Leased Premises (including, without limitation, the performance or observance or the failure or refusal to perform or observe any agreement or obligation of the tenant under the Leases or any term or provision thereof required to be performed by the tenant under the Lease), each Sublease, and this Agreement. Notwithstanding the above, Buyer does not waive or release Seller from the following:  (i) any obligations arising under this Agreement; and (ii) any indemnification obligations arising from third party claims asserted with respect to or arising from Seller's use and occupancy of the Leased Premises prior to the Closing Date for which Seller had a duty to indemnify Buyer pursuant to the Lease, and which expressly survive the expiration or termination of the Lease (but only to the extent that

9

such claims are covered by Seller's insurance policies and on the condition that Buyer only seeks recovery from the insurer and only up to the insured amount).

21.    <u>Release of Buyer</u>.  Except as set forth herein, as of the Closing Date, Tenant, the Seller and Seller's bankruptcy estates, and anyone eligible to make a claim by or through the Tenant, the Seller and their bankruptcy estates, including the Committee, hereby releases and discharges Buyer and its affiliates, agents, directors, officers, representatives, attorneys, advisors, employees, successors and assigns, of and from all manner of actions, causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, claims and demands whatsoever, and any rights to request relief from termination or from forfeiture, in law or in equity, which Seller or the bankruptcy estates ever had, now has or hereafter can, shall or may have against Buyer or its successors or assigns for, upon or by reason of any matter, cause or thing whatsoever, including the pursuit of any avoidance actions under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code against the Buyer, solely relating to or arising out of the Lease or the Leased Premises.  Notwithstanding the above, Seller, the bankruptcy estates, and anyone eligible to make a claim by or through the Seller and bankruptcy estates, including the Committee, does not waive or release Buyer from the following:  (i) any obligations arising under this Agreement; and (ii) any indemnifications obligations arising from third party claims asserted with respect to or arising from Buyer's obligations prior to the Closing Date for which Buyer had a duty to indemnify Seller pursuant to the Lease, and which expressly survive the expiration or termination of the Lease (but only to the extent that such claims are covered by Buyer's insurance policies and on the condition that Seller only seeks recovery from the insurer and only up to the insured amount).

22.    <u>Casualty and Condemnation</u>.

a.    Seller agrees to give Buyer prompt written notice of any fire, flood or similar casualty affecting any portion of the Leased Premises or of any actual or threatened (to the extent that Seller has current knowledge thereof) taking or condemnation of all or any portion of any Leased Premises.

b.    If prior to Closing there shall occur:  (i) damage to any Leased Premises caused by fire or other casualty; or (ii) the taking or condemnation of all or any portion of the Leased Premises; then, in each case, the Closing Date shall occur as provided in this Agreement, and Buyer shall be assigned at the Closing Date (A) all interest of Seller in and to any insurance proceeds (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date), subject to all applicable deductible amounts or (B) condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding.

c.    The Parties hereby waive the provisions of the Uniform Vendor and Purchaser Risk Act (to the extent the same is applicable to the Leased Premises) and of any other Law to the same or similar effect, and agree that the same shall not apply to this Agreement.

WEIL:\95469808\2\50482.0005

23.     Brokers' Fees. Other than the fees and expenses payable to Evercore Group L.L.C. or Hilco Real Estate Group LLC in connection with the transactions contemplated hereby, which shall be borne by Seller, neither Party has entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay. Buyer shall indemnify and hold Seller harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or liabilities, including reasonable attorneys' fees and disbursements, which Buyer, or any of its affiliates may sustain, incur or be exposed to, by reason of any claim or claims by any broker, finder or other person or entity for fees, commissions or other compensation arising out of the transactions contemplated herein. Any broker retained by or providing services to Buyer in connection with the transaction evidenced by this Agreement shall be compensated solely by Buyer without contribution from Seller.

24.     Survival. Except as specifically set forth herein, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 12(a) or Section 12(b) shall survive, and each of the same shall terminate and be of no further force or effect as of the Closing.

25.     Expenses. Except as otherwise expressly set forth herein, including but not limited to Section 12, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants. For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

26.     Entire Agreement. This Agreement and any documents delivered at Closing pursuant hereto constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

27.     Incorporation of Exhibits and Schedules. The Exhibits and Schedule(s) to this Agreement are incorporated herein by reference and made a part hereof.

28.     Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach. No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 29 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

11

29.    _Succession and Assignment_.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including the Committee and/or a trustee, if any, subsequently appointed under Chapter 7 or 11 of the Bankruptcy Code.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of each other Party.

30.    _Notices_.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

> The Great Atlantic & Pacific Tea Company, Inc.
> 2 Paragon Drive
> Montvale, New Jersey 07645
> Attention: Christopher W. McGarry and Matthew Bennett
> E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Seller) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
> E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

If to Buyer:

> Federal Realty Investment Trust and
>
> FLV Greenlawn Plaza, LP c/o Federal Realty Investment Trust
> 1626 East Jefferson Street
> Rockville, MD  20852
> Attention: Chris Weilminster and Darlene Hough
> E-mail: cweilminster@federalrealty.com; dhough@federalrealty.com

With a copy (which shall not constitute notice to Buyer) to:

> Katten Muchin Rosenman LLP
> 2029 Century Park East, Suite 2600
> Los Angeles, CA 90067-3012
> Attention: Dustin P. Branch

WEIL:\95469808\2\50482.0005

E-mail: dustin.branch@kattenlaw.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 31.

31.    Governing Law. This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

32.    Submission to Jurisdiction; Service of Process. Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 31; provided, however, that nothing in this Section shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

33.    Waiver of Jury Trial.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

34.    Specific Performance. Buyer acknowledges and agrees that Seller and its estate would be damaged irreparably in the event Buyer does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Seller may have under law or equity, Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

35.    Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the

13

event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

36.    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than Buyer, Seller, and their respective successors and permitted assigns, except as expressly set forth in this Agreement.

37.    Non-Recourse.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.  No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 38.

38.    Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

39.    Headings; Table of Contents.  The section headings and the table of contents contained in this Agreement and the Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

14

40.    Counterparts; Facsimile and Electronic Signatures.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

41.    Limitations Under Applicable Law. Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to limitations under applicable Law, including, without limitation, sections 1113 and 1114 of the Bankruptcy Code.

42.    Prevailing Party.  If any action is brought by either of the Parties against the other, then the prevailing Party shall be entitled to recover from the other Party court costs and reasonable attorneys' fees and costs actually incurred.

### [**SIGNATURE PAGE FOLLOWS**]

WEIL:\95469808\2\50482.0005

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

A&P REAL PROPERTY, LLC

By: _____

Name:

Title:

APW SUPERMARKETS, INC.

By: _____

Name:

Title:

FEDERAL REALTY INVESTMENT TRUST

By: _____

Name:   Dawn M. Becker

Title:   Executive Vice President-Managing
         Director Mixed-Use Operations

## LIST OF SCHEDULE AND EXHIBITS

| SCHEDULE | DESCRIPTION |
| --- | --- |
| Schedule I | Definitions |

| EXHIBIT | DESCRIPTION |
| --- | --- |
| Exhibit A | The Lease |
| Exhibit B | Premises |
| Exhibit C | Sublease(s) |
| Exhibit D | Escrow Agreement |
| Exhibit E | Wire Instructions |
| Exhibit F | Intentionally Omitted |
| Exhibit G | Bidding Procedures |
| Exhibit H | Sale Order |

## Schedule I

## Definitions

(i)    "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

(ii)    "Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(iii)    "Code" means the Internal Revenue Code of 1986, as amended.

(iv)    "Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

(v)    "Decree" means any judgment, decree, ruling, injunction or any other order of any Governmental Authority.

(vi)    "FIRPTA Certificate" means a certificate from Tenant in compliance with applicable Treasury Regulations setting forth Tenant's (or, if applicable, its regarded owner's) name, address and federal tax identification number and stating that Tenant (or, if applicable, its regarded owner) is not a "foreign person" within the meaning of section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to section 1445 of the Code.

(vii)    "Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

(viii)    "Law" means any constitution applicable to, and any law, statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

(ix)    "Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

(x)    "Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

(xi)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

(xii)    "Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

(xiii)    "Sale Order" shall mean an order of the Bankruptcy Court substantially in the form attached hereto as Exhibit G authorizing, among other things, a rejection of the Lease pursuant to section 365(b) of the Bankruptcy Code.

(xiv)    "Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

(xv)    "Transfer Tax" means any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated by this Agreement.

(xvi)    "Treasury Regulations" mean the Treasury regulations promulgated under the Code

## EXHIBIT A

### The Lease

| | STORE # (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTON OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|---|
| 201 | 027-7298 | 890 WALT WHITMAN ROAD | MELVILLE | NY | STORE 027-7298 – 890 WALT WHITMAN ROAD, MELVILLE, NY<br><br>LEASE DATED MAY 14, 1973 ORIGINALLY BETWEEN WHITE AT MELVILLE, INC., AS LANDLORD, AND THE GREAT ATLANTIC & PACIFIC TEA COMPANY INC., AS TENANT.<br><br>• INDENTURE DATED MAY 14, 1973 [RECORDED]<br>• AMENDMENT TO LEASE DATED OCTOBER 16, 1973<br>• AGREEMENT DATED NOVEMBER 9, 1973<br>• COMMENCEMENT DATE AGREEMENT DATED APRIL 4, 1974<br>• LETTER AGREEMENT DATED OCTOBER 14, 1977<br>• LETTER AGREEMENT DATED OCTOBER 21, 1977<br>• LETTER AGREEMENT DATED DECEMBER 5, 1984<br>• RENEWAL LETTER DATED APRIL 20, 1992<br>• CONSENT LETTER DATED NOVEMBER 1, 1993<br>• ENLARGEMENT AGREEMENT DATED NOVEMBER 1, 1993<br>• GROUND LESSOR CONSENT AGREEMENT DATED NOVEMBER 1, 1993<br>• MEMORANDUM OF AMENDMENT TO LEASE FOR RECORDATION (NOTICE OF LEASE) DATED NOVEMBER 1, 1993 [NOT RECORDED]<br>• LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT DATED FEBRUARY 26, 2010<br>• ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011<br>• GUARANTY DATED MARCH 13, 2012<br>• RENEWAL LETTER DATED FEBRUARY 26, 2013<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.5.75 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |

## EXHIBIT B

**Leased Premises**

STORE NO:  70298 (MELVILLE MALL)
890 WALT WHITMAN ROAD, MELVILLE, NEW YORK

**EXHIBIT C**

**Sublease(s)**

None.

## EXHIBIT D

### Escrow Agreement

(Attached hereto)

EXHIBIT E

Wire Instructions[1]

---

[1] NTD: WEIL TO INCLUDE AT A LATER DATE.

**<u>EXHIBIT F</u>**

**Intentionally deleted**

EXHIBIT G

**Bidding Procedures**

**EXHIBIT H**

**Sale Order**

CONFIDENTIAL

STORE NO: 70802 (BRICK PLAZA)
10 CHAMBERS BRIDGE ROAD, BRICKTOWN, NEW JERSEY

## LEASE SALE AGREEMENT

THIS LEASE SALE AGREEMENT (this "**Agreement**") is made as of September 11, 2015 by and between A&P Real Property, LLC, a Delaware limited liability company ("**Tenant**") and The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation ("**Guarantor**," and together with Tenant, the or "**Seller**"), and Federal Realty Investment Trust, a Maryland real estate investment trust ("**Buyer**", and collectively with Seller, the "**Parties**").

WITNESSETH:

WHEREAS, Tenant is the tenant under that certain lease more specifically described on Exhibit A attached hereto and made a part hereof (together with any amendments, modifications, extensions and renewals, the "**Lease**"), with respect to all or a portion of certain real property (the "**Leased Premises**"), which real property is more particularly described in Exhibit B attached hereto and made a part hereof (the "**Premises**");

WHEREAS, Seller and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, pursuant to the Order *Approving Discrete Sale and Lease Rationalization Procedures* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 496] (the "**Discrete Procedures Order**"), and subject to any approval of the Bankruptcy Court required by the Discrete Procedures Order, Seller desires to sell, assign, convey and transfer all of its rights, title and interests as tenant under the Lease, together with all of its rights, title and interests as sublessor under those certain sublease agreements and/or license agreements more particularly described on Exhibit C attached hereto (each, a "**Sublease**" and, collectively, the "**Subleases**"), if any, and

WHEREAS, Buyer desires to terminate all rights, title, interests and obligations of Tenant under the Lease and Subleases, if any, to the extent set forth herein, subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Seller and Buyer agree as follows:

1.    Procedures. This Agreement is made subject to, and in accordance with the Discrete Procedures Order. Capitalized terms used but not otherwise defined herein (including on Schedule I attached hereto) shall have the meanings ascribed to them in the Discrete Procedures Order, as applicable. In the event of a contradiction between this Agreement and the Discrete Procedures Order, as applicable, the Discrete Procedures Order, as applicable, shall control.

2.    <u>Lease Consideration</u>. The consideration for the sale of Seller's interest in, and the simultaneous termination of the Lease together with the Subleases to the extent set forth herein (the foregoing, as applicable, collectively, the "**Acquired Assets**"), shall be equal to One Million Four Hundred Thousand and No Dollars ($1,400,000.00) (the "**Purchase Price**") which shall be comprised of:

a.    One Million Four Hundred Thousand and No Dollars ($ 1,400,000.00), less application of the Deposit and Cure Amount (as defined below) as consideration for the Lease, plus

b.    **NONE** Dollars ($) as consideration for the FF&E.

Buyer's submission of an executed copy of this Agreement along with the Deposit shall be deemed an irrevocable offer subject only to the rights of termination provided herein.

3.    <u>Payment of Purchase Price</u>. The Purchase Price shall be paid to Seller by Buyer as follows:

a.    <u>Deposit</u>.    Buyer has deposited with TITLEVEST SERVICES, LLC ("**Escrowee**") by a bank wire transfer of immediately available federal funds to an account designated by Escrowee the sum of Fifty Six Thousand Four Hundred Fifty Nine and 49/100 Dollars ($56,459.49) (together with all interest thereon, the "**Deposit**"), which Deposit shall be held by Escrowee pursuant to the escrow agreement (the "**Escrow Agreement**") attached hereto as <u>Exhibit D</u> and hereby made a part hereof. Notwithstanding anything to the contrary set forth in this Agreement or in the Escrow Agreement, (i) all charges of Escrowee, if any, attendant to holding and/or disbursing the Deposit shall be paid by Buyer and (ii) all interest accrued in connection with the Deposit hereunder shall accrue for the sole benefit of the party to whom the Deposit is paid. The Parties agree that any payments made pursuant to this <u>Section 3(a)</u> in respect of accrued interest shall be deemed to be an adjustment to the Purchase Price for tax purposes to the extent permitted by applicable Law.

b.    <u>Closing Payment</u>. On the Closing Date, as defined below, the Purchase Price, as adjusted by the application of the Deposit in the amount of Fifty Six Thousand Four Hundred Fifty Nine and 49/100 Dollars ($56,459.49), and the Cure Amount in the amount of Two Hundred Seventy Thousand Eight Hundred Ten and 27/100 Dollars ($270,810.27), subject to Seller's rights set forth below, shall be paid by Buyer by wire transfer of immediately available federal funds to the account designated on <u>Exhibit E</u> hereto or as otherwise designated in writing by Seller. The balance of the Purchase Price due on the Closing Date shall be One Million Seventy Two Thousand Seven Hundred Thirty and 24/100 Dollars ($1,072,730.24).

4.    <u>Payment of Cure Amount</u>. The Purchase Price includes a credit to the Buyer for the cure amount owing under the Lease in the amount of Two Hundred Seventy Thousand Eight Hundred Ten and 27/100 Dollars ($270,810.27) (the "**Cure Amount**"), which Cure Amount shall be the total amount payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the termination by Buyer of all contracts related to the Lease, and which shall be subject to approval by the Bankruptcy Court. Nothing herein shall prejudice the Seller's right to object to

2

the amount of the Cure Amount set forth herein prior to the Closing. In the event the Cure Amount is reduced by the agreement of the Parties or further order of the Bankruptcy Court, Buyer shall be responsible to pay to Seller the amount of such reduction of the Cure Amount.

5.      Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York, such other location in the state where the Leased Premises are located as may be selected by Seller, or such other location as shall be mutually agreed upon by Seller and Buyer commencing at 10:00 a.m. local time on a date (the "**Closing Date**") that is the thirtieth (30th) Business Day following the date hereof, or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto.  Seller shall have a one-time right to adjourn the Closing for up to thirty (30) days on notice provided no later than the Closing Date.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective at 12:01 a.m., New York City time, on the Closing Date.

6.      Termination.  As of the Closing Date, pursuant to sections 363 and 365 of the Bankruptcy Code and in accordance with the Sale Order, Tenant and Buyer shall reject and terminate the Lease and the Subleases, if any.

7.      Prorations/Adjustments.  As set forth above, Sellers shall be solely responsible to pay the Cure Amount to the landlord, and the Remaining Lease Obligations (as defined below).  There will be no prorations between Seller and Buyer on the Closing Date, and no post-assignment reconciliations or adjustments of any kind shall occur.

8.      Termination of Lease.  As of the Closing Date, Seller surrenders the Premises to Buyer and shall give, grant and surrender unto Buyer all of Seller's right, title and interest in and to the Premises, including, without limitation, all of the Seller's right, title and interest in, to and under the Lease and any Subleases, and Buyer hereby accepts such surrender.  Each of the parties hereto acknowledges performance of all obligations of the other party under the Lease or otherwise in connection with the Premises through and including the date of this Closing Date, and agree that, from and after the Closing Date, the Lease, any Subleases, and any guaranties by Seller entities, and all rights and obligations of the parties thereunder, shall be deemed to have expired and terminated as fully and completely and with the same force and effect as if such date were the expiry date set forth in the Lease, and that the Lease, and any guaranties by Seller entities are hereby agreed to be null and void and of no further force and effect as of that date.  Except as set forth herein, any and all rights and obligations of the parties which may have arisen in connection with the Premises shall be deemed to have expired and terminated as of the Closing Date.

9.      Remaining Lease Obligations.  From the date of this Agreement through the Closing Date, Seller agrees that it (i) will continue to perform all of its covenants and obligations, including to pay all rent and related lease charges, under the Lease; (ii) will remain current on its obligations under the Lease with respect to maintenance of insurance and payment of utilities; and (iii) shall not cause any material damage to the Premises in connection with the conduct of the store closing sale or removal of Seller's trade fixtures (collectively, the "**Remaining Lease Obligations**").  On the Closing Date, Seller shall: (a) deliver the Premises in broom clean condition, with it being agreed that any furniture, fixtures, equipment or other personal property that remains in or on the Premises following the Closing Date shall be deemed abandoned by Seller

3

in accordance with the procedures set forth in the *Amended Final Order Pursuant to 11 U.S.C. §§ 105, 363, 365 and 554 Approving (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer, or Abandonment or De Minimus Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry Into a Liquidation Consulting Agreement* [Docket No. 546] (the "De Minimus Asset Order"), and that the Buyer may dispose of such remaining property without notice or liability to the Seller or the Debtors, or any party claiming by, through or under the Seller or the Debtors in accordance with the De Minimus Asset Order; and (b) reasonably cooperate with Buyer to transfer utilities into the name of Buyer.

10.     Free and Clear of All Liens.  Pursuant to the Discrete Procedures Order and the Sale Order entered by the Bankruptcy Court, Seller shall convey its rights and interests under the Lease to Buyer free and clear of all liens, claims, interests, or encumbrances (collectively, "**Liens**") to the maximum extent permitted under the Bankruptcy Code, if any, with any such Liens attaching to the proceeds paid to Seller.

11.     Closing Deliverables.  On the Closing Date:

a.     Seller shall deliver to Buyer a duly executed copy of: (i) a FIRPTA Certificate; and (ii) if applicable, Transfer Tax forms or certifications provided by Buyer as more specifically described in subsection (b) below.

b.     Buyer shall deliver to Seller: (i) an executed copy of all Transfer Tax forms or certifications as may be required by each state, county or municipality to record the termination and effectuate the transactions contemplated herein; and (ii) such other documents as may be reasonably required to complete the transactions provided for in this Agreement. All documents executed and delivered by Buyer pursuant to this Section shall be in form and substance reasonably satisfactory to Seller.

12.     Transfer Tax Forms. Buyer shall be responsible for the preparation, delivery and recordation of any and all real estate Transfer Tax forms or certifications required by any Governmental Authority (unless Seller notifies Buyer that it will do so), with Buyer being responsible for any payment required therewith as provided in Section 14.  The Party that is required by applicable law to file or record any other Transfer Tax forms or certifications shall prepare and timely file and record such forms or certifications, with Buyer being responsible for any payment required therewith with respect to the Sale Assets as provided in Section 14.  The Parties hereto shall cooperate in making, in a timely manner, all such tax returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any such Transfer Taxes. At Seller's request, all Transfer Tax forms and certifications, along with payment therefor, shall be delivered by Buyer to Seller for recordation and payment with the appropriate Governmental Authority. To the extent required by applicable Law, Seller shall execute any Transfer Tax forms or certifications.

13.     Closing Costs.

WEIL:\95469807\2\50482.0005

a.      Seller and Buyer shall each pay their own attorneys' fees and expenses. Buyer shall pay (i) all state, county and local Transfer Taxes required to be paid in connection with the assignment and assumption of the Lease and any and all Subleases, and the consummation of the transactions contemplated herein, all of which amounts shall be paid, if applicable, to the proper Governmental Authority on or prior to the Closing Date, and (ii) all title and escrow charges.

b.      Except as otherwise provided in this Agreement, all other costs and expenses of the transaction contemplated by this Agreement shall be borne by Buyer.

c.      Buyer agrees to fully indemnify and hold Seller harmless for, from and against any loss, cost, claim, damage or expense incurred, directly or indirectly, by Seller as a result of Buyer's failure to pay any Taxes or costs pursuant to clauses (a) and (b) above.  Buyer's obligations in this Section shall survive the Closing Date.

14.    Conditions to Closing.

a.      Conditions to Buyer's Obligations.  Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)      the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or the Sale Order entered by the Bankruptcy Court, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(ii)      no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(iii)      each delivery contemplated by Section 12(a) to be delivered to Buyer shall have been delivered.

b.      Conditions to Seller's Obligations.  Seller's obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(i)      Buyer shall have performed and complied with all of its covenants and agreements hereunder through the Closing in all material respects;

(ii)      the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or the Sale Order entered by the Bankruptcy Court, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(iii)      no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(iv)    each payment contemplated by Sections 3, 4 and 14 to be made to Seller shall have been made, and each delivery contemplated by Section 12(b) to be delivered to Seller shall have been delivered.

c.    No Frustration of Closing Conditions.  Neither Buyer nor Seller may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Subsection 15(a) or Subsection 15(b), as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliate's failure to use its reasonable best efforts (or commercially reasonable efforts, with respect to those matters contemplated by Section 18, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach hereunder.  The Parties agree that neither the failure to obtain a court order nor any action with respect to a Competing Bid (as defined below), to the extent permitted hereunder, shall be deemed to be a failure to use the efforts required to satisfy the conditions to consummation of the transactions contemplated hereunder nor a breach hereunder.

15.    No Other Contingencies.  Buyer expressly agrees and acknowledges that Buyer's obligations hereunder are not in any way conditioned upon or qualified by Buyer's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt, financing or equity investment or otherwise) nor upon Buyer's ability to obtain title insurance.

16.    Termination of Agreement.

a.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(i)    by the mutual written consent of the Parties;

(ii)    by any Party by giving written notice to the other Party if:

(A)    any court of competent jurisdiction shall have enacted or issued a Law permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this agreement and such Law or Decree or other action shall have become final and non-appealable; or

(B)    the Closing shall not have occurred prior to the sixtieth (60) day from the date hereof ("**Outside Date**"); provided that if the Closing shall not have occurred on or before the Outside Date due to a material breach of this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this Section 17(a)(ii)(B).

(iii)    if (i)(x) with respect to a Lease, Seller enters into a definitive agreement with respect to a higher or better competing bid in accordance with the bidding procedures attached hereto as Exhibit G (the "**Bidding Procedures**") for such Lease, including any related Acquired Assets  ("**Competing Bid**"), (y) the Bankruptcy Court enters an order approving a Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

6

b.        Seller may terminate this Agreement at any time prior to Closing if Buyer fails to satisfy any requirement set forth under Section 15(b)(iv), including delivery of the Deposit required hereunder. In such case, the Agreement shall be rendered null and void, Seller shall be entitled to retain any and all consideration already paid to Seller, including, but not limited to, the Deposit.

c.        Effect of Termination. If any Party terminates this Agreement pursuant to Section 17(a) or (b), all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Section 14, this Section 17, Sections 24 through 43, and Schedule I shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 17(b) and Section 18) to the other Party hereunder (except as may be provided in Section 4 and Subsection 17(b)); provided, however, that nothing in this Section 17 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, subject to Section 17(d) below, that other than in the case of fraud or willful misconduct, (a) the maximum Liability of Seller under this Agreement shall not exceed the reasonably out of pocket expenses incurred by Buyer and (b) subject to subsection (d) below, the maximum liability of Buyer under this Agreement shall not exceed the Deposit.

17.      Bankruptcy Court Matters.

a.        Competing Transaction. This Agreement is subject to approval by the Bankruptcy Court in accordance with the Discrete Procedures Order, and the consideration by Seller of a Competing Bid in accordance with the Bidding Procedures and, in the event Seller receives a Competing Bid, an auction to be conducted in accordance with the Bidding Procedures. From the date hereof and until the transactions contemplated hereby are consummated, Seller is permitted to, and is permitted to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by or from any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, and Seller shall be permitted and shall have the authority to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, including supplying information relating to the assets of Seller to prospective buyers. Without limiting the foregoing, Seller shall be permitted to perform all of the foregoing activities with respect to all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Discrete Procedures Order, the Bidding Procedures, or other applicable Law.

b.        Termination Payment. To induce Buyer to enter into this Agreement, to maximize value of the Seller's estates and in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller grants Buyer, subject to compliance with the Discrete Procedures Order, a break-up fee in an amount equal to three percent (3%) of the Purchase Price (the "**Termination Payment**"). Seller further agrees that the Termination Payment constitutes an allowed administrative expense claim against their estates pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code. In the event an auction is conducted in connection with the sale of the Lease because of the timely submission of a Competing Bid, Buyer

7

shall be entitled to credit bid all or any portion of the Termination Payment at the auction.  In the event a Competing Bid is consummated, the Termination Payment shall be paid on the first Business Day following the date of consummation of the Competing Bid from the proceeds thereof if no material breach by Buyer of this Agreement has occurred.  Upon payment of the Termination Payment to Buyer in accordance with this Section 18.b, Seller and its respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Seller, its Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to the Lease or any applicable Law, including for reimbursement of expenses.

     c.     Bankruptcy Court Filings.

     (i)     As soon as reasonably practicable following the execution of this Agreement, and by no later than the deadlines imposed by the Discrete Procedures Order, Seller shall file any necessary notice or pleadings required in connection therewith. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the transactions contemplated by this Agreement pursuant to the Discrete Procedures Order, including a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for providing the Adequate Assurance Information to the Cure Notice Parties and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the approval of the transactions contemplated by this Agreement shall be appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

     18.     Delivery; "AS IS" Transaction.

     a.     Buyer acknowledges that it has fully inspected or waived the right to inspect the Leased Premises prior to the execution of this Agreement and does hereby assume all of the risks, including, but not limited to, latent defects in the Leased Premises.  Seller shall not be obligated to do any work or alter, restore, repair or develop the Leased Premises, but Seller shall deliver the Leased Premises in vacant, broom clean condition, and, if applicable, with all furnishings, fixtures, equipment, inventory, racks, aisle displays, refrigeration equipment and personal property removed from the Leased Premises.  Any work (including demolition) which may be necessary to adapt the Leased Premises for Buyer's occupancy or for the operation of Buyer's business therein shall be the sole responsibility of Buyer and shall be performed by Buyer at its sole cost and expense, in accordance with the terms of the Lease.

     b.     BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE LEASE OR THE LEASED PREMISES (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE LEASED PREMISES; THE PHYSICAL CONDITION OF THE LEASED PREMISES; THE

8

PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE LEASED PREMISES OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE LEASED PREMISES; THE ZONING OF THE LEASED PREMISES; THE POSSIBILITY OF DEVELOPING OR USING THE LEASED PREMISES IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE LEASE OR THE LEASED PREMISES; THE FITNESS OF THE LEASED PREMISES, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE LEASED PREMISES (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE LEASE OR THE LEASED PREMISES).   BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLER.   BUYER ALSO ACKNOWLEDGES THAT BUYER HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE LEASED PREMISES AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE LEASED PREMISES AND/OR THE LEASE, AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IS ACQUIRING THE LEASE AND THE LEASED PREMISES, BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT, AND BUYER IS NOT RELYING UPON ANY REPRESENTATIONS OF SELLER OR SELLER'S AGENTS.  ACCORDINGLY, BUYER HEREBY ACCEPTS THE LEASED PREMISES IN ITS "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS, SUBJECT TO BUYER'S RIGHTS UNDER THE LEASE AS LANDLORD.

19.   Store Closed.  The Parties acknowledge and agree that Seller has ceased (or will cease as of the Closing Date) operations at the Leased Premises.

20.   Release; Indemnity.  On and after the Closing Date, Buyer agrees to release Seller from any and all claims (including claims for rejection damages under Bankruptcy Code Section 502(b)(6), actions, proceedings, suits, costs, liabilities, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and disbursements), whether foreseen or unforeseen, in connection with the Lease, the Leased Premises (including, without limitation, the performance or observance or the failure or refusal to perform or observe any agreement or obligation of the tenant under the Lease or any term or provision thereof required to be performed by the tenant under the Lease), each Sublease, and this Agreement. Notwithstanding the above, Buyer does not waive or release Seller from the following: (i) any obligations arising under this Agreement that expressly survive the Closing Date; and (ii) any indemnification obligations arising from third party claims asserted with respect to or arising from Seller's use and occupancy of the Leased Premises prior to the Closing Date for which Seller had a duty to indemnify Buyer pursuant to the Lease, and which expressly survive the expiration or

9

termination of the Lease (but only to the extent that such claims are covered by Seller's insurance policies and on the condition that Buyer only seeks recovery from the insurer and only up to the insured amount).

      21.   <u>Release of Buyer</u>. Except as set forth herein, as of the Closing Date, Tenant, the Seller and Seller's bankruptcy estates, and anyone eligible to make a claim by or through the Tenant, the Seller and their bankruptcy estates, including the Committee, hereby releases and discharges Buyer and its affiliates, agents, directors, officers, representatives, attorneys, advisors, employees, successors and assigns, of and from all manner of actions, causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, claims and demands whatsoever, and any rights to request relief from termination or from forfeiture, in law or in equity, which Seller or the bankruptcy estates ever had, now has or hereafter can, shall or may have against Buyer or its successors or assigns for, upon or by reason of any matter, cause or thing whatsoever, including the pursuit of any avoidance actions under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code against the Buyer, solely relating to or arising out of the Lease or the Leased Premises. Notwithstanding the above, Seller, the bankruptcy estates, and anyone eligible to make a claim by or through the Seller and bankruptcy estates, including the Committee, does not waive or release Buyer from the following: (i) any obligations arising under this Agreement; and (ii) any indemnifications obligations arising from third party claims asserted with respect to or arising from Buyer's obligations prior to the Closing Date for which Buyer had a duty to indemnify Seller pursuant to the Lease, and which expressly survive the expiration or termination of the Lease (but only to the extent that such claims are covered by Buyer's insurance policies and on the condition that Seller only seeks recovery from the insurer and only up to the insured amount).

      22.   <u>Casualty and Condemnation</u>.

      a.   Seller agrees to give Buyer prompt written notice of any fire, flood or similar casualty affecting any portion of the Leased Premises or of any actual or threatened (to the extent that Seller has current knowledge thereof) taking or condemnation of all or any portion of any Leased Premises.

      b.   If prior to Closing there shall occur: (i) damage to any Leased Premises caused by fire or other casualty; or (ii) the taking or condemnation of all or any portion of the Leased Premises; then, in each case, the Closing Date shall occur as provided in this Agreement, and Buyer shall be assigned at the Closing Date (A) all interest of Seller in and to any insurance proceeds (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date), subject to all applicable deductible amounts or (B) condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding.

      c.   The Parties hereby waive the provisions of the Uniform Vendor and Purchaser Risk Act (to the extent the same is applicable to the Leased Premises) and of any other Law to the same or similar effect, and agree that the same shall not apply to this Agreement.

WEIL:\95469807\2\50482.0005

23.    Brokers' Fees.  Other than the fees and expenses payable to Evercore Group L.L.C. or Hilco Real Estate Group LLC in connection with the transactions contemplated hereby, which shall be borne by Seller, neither Party has entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.  Buyer shall indemnify and hold Seller harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or liabilities, including reasonable attorneys' fees and disbursements, which Buyer, or any of its affiliates may sustain, incur or be exposed to, by reason of any claim or claims by any broker, finder or other person or entity for fees, commissions or other compensation arising out of the transactions contemplated herein.  Any broker retained by or providing services to Buyer in connection with the transaction evidenced by this Agreement shall be compensated solely by Buyer without contribution from Seller.

24.    Survival.  Except as specifically set forth herein, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 12(a) or Section 12(b) shall survive, and each of the same shall terminate and be of no further force or effect as of the Closing.

25.    Expenses.  Except as otherwise expressly set forth herein, including but not limited to Section 12, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

26.    Entire Agreement.  This Agreement and any documents delivered at Closing pursuant hereto, and any confidentiality agreement entered into by Seller and NONE in connection with this transaction, constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

27.    Incorporation of Exhibits and Schedules.  The Exhibits and Schedule(s) to this Agreement are incorporated herein by reference and made a part hereof.

28.    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach.  No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 29 except as expressly provided herein.  Except where a specific

11

period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

29.    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including the Committee and/or a trustee, if any, subsequently appointed under Chapter 7 or 11 of the Bankruptcy Code.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of each other Party.

30.    Notices.   All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

> The Great Atlantic & Pacific Tea Company, Inc.
> 2 Paragon Drive
> Montvale, New Jersey 07645
> Attention: Christopher W. McGarry and Matthew Bennett
> E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Seller) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
> E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

If to Buyer:

> Federal Realty Investment Trust and
>
> FLV Greenlawn Plaza, LP c/o Federal Realty Investment Trust
> 1626 East Jefferson Street
> Rockville, MD  20852
> Attention: Chris Weilminster and Darlene Hough
> E-mail: cweilminster@federalrealty.com; dhough@federalrealty.com

With a copy (which shall not constitute notice to Buyer) to:

> Katten Muchin Rosenman LLP

12

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Attention: Dustin P. Branch
E-mail: dustin.branch@kattenlaw.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 31.

31.    Governing Law. This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

32.    Submission to Jurisdiction; Service of Process. Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 31; provided, however, that nothing in this Section shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

33.    Waiver of Jury Trial. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

34.    Specific Performance. Buyer acknowledges and agrees that Seller and its estate would be damaged irreparably in the event Buyer does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Seller may have under law or equity, Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

13

WEIL:\95469807\2\50482.0005

35.    <u>Severability</u>. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

36.    <u>No Third Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any Person other than Buyer, Seller, and their respective successors and permitted assigns, except as expressly set forth in this Agreement.

37.    <u>Non-Recourse</u>. All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**"). In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this <u>Section 38</u>.

38.    <u>Mutual Drafting</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

14

39.   <u>Headings; Table of Contents</u>.   The section headings and the table of contents contained in this Agreement and the Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

40.   <u>Counterparts; Facsimile and Electronic Signatures</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

41.   <u>Limitations Under Applicable Law</u>.  Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to limitations under applicable Law, including, without limitation, sections 1113 and 1114 of the Bankruptcy Code.

42.   <u>Prevailing Party</u>.  If any action is brought by either of the Parties against the other, then the prevailing Party shall be entitled to recover from the other Party court costs and reasonable attorneys' fees and costs actually incurred.

## [SIGNATURE PAGE FOLLOWS]

WEIL:\95469807\2\50482.0005

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

A&P REAL PROPERTY, LLC

By: _____
Name:
Title:

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.

By: _____
Name:
Title:

FEDERAL REALTY INVESTMENT TRUST

By: _____
Name: Dawn M. Becker
Title:  Executive Vice President-Managing
        Director Mixed-Use Operations

## LIST OF SCHEDULE AND EXHIBITS

| SCHEDULE | DESCRIPTION |
| --- | --- |
| Schedule I | Definitions |

| EXHIBIT | DESCRIPTION |
| --- | --- |
| Exhibit A | The Lease |
| Exhibit B | Premises |
| Exhibit C | Sublease(s) |
| Exhibit D | Escrow Agreement |
| Exhibit E | Wire Instructions |
| Exhibit F | Intentionally Omitted |
| Exhibit G | Bidding Procedures |
| Exhibit H | Sale Order |

## Schedule I

## Definitions

(i)      "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

(ii)      "Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(iii)      "Code" means the Internal Revenue Code of 1986, as amended.

(iv)      "Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

(v)      "Decree" means any judgment, decree, ruling, injunction or any other order of any Governmental Authority.

(vi)      "FIRPTA Certificate" means a certificate from Tenant in compliance with applicable Treasury Regulations setting forth Tenant's (or, if applicable, its regarded owner's) name, address and federal tax identification number and stating that Tenant (or, if applicable, its regarded owner) is not a "foreign person" within the meaning of section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to section 1445 of the Code.

(vii)      "Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

(viii)      "Law" means any constitution applicable to, and any law, statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

(ix)      "Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

(x)      "Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

(xi)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

(xii)   "Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

(xiii)  "Sale Order" shall mean an order of the Bankruptcy Court substantially in the form attached hereto as Exhibit G authorizing, among other things, a rejection of the Lease pursuant to section 365(b) of the Bankruptcy Code.

(xiv)   "Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

(xv)    "Transfer Tax" means any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated by this Agreement.

(xvi)   "Treasury Regulations" mean the Treasury regulations promulgated under the Code

## EXHIBIT A

### The Lease

| | STORE # (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTON OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|---|
| 37 | 070-3880 70-802 | 10 CHAMBERS BRIDGE RD | BRICKTOWN (BRICK) | NJ | STORE 070-3880 – 10 CHAMBERS BRIDGE RD, BRICKTOWN, NJ LEASE, DATED DECEMBER 23, 1994 ORIGINALLY BETWEEN FEDERAL REALTY INVESTMENT TRUST, AS LANDLORD, AND THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., AS TENANT. <ul><li>GROUND LESSOR CONSENT AGREEMENT DATED DECEMBER 23, 1994</li><li>MEMORANDUM OF LEASE FOR RECORDATION [NOTICE OF LEASE] DATED DECEMBER 23, 1994 [RECORDED]</li><li>LETTER AGREEMENT DATED SEPTEMBER 12, 1995</li><li>CONFIRMATION OF LEASE TERM AGREEMENT DATED MARCH 27, 1998</li><li>ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011</li><li>ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012</li><li>GUARANTY DATED MARCH 13, 2012</li><li>LEASE MODIFICATION AGREEMENT DATED AUGUST 14, 2013</li><li>LETTER AGREEMENT DATED DECEMBER 12, 2014</li><li>RENEWAL LETTER DATED APRIL 7, 2015</li></ul> AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.4.12 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |

<u>EXHIBIT B</u>

**Leased Premises**

STORE NO: 70802 (BRICK PLAZA)
10 CHAMBERS BRIDGE ROAD, BRICKTOWN, NEW JERSEY

## EXHIBIT C

**Sublease(s)**

None.

WEIL:\95469807\2\50482.0005

**EXHIBIT D**

**Escrow Agreement**

(Attached hereto)

## EXHIBIT E

### Wire Instructions[1]

---

[1] NTD: WEIL TO ATTACH AT A LATER DATE.

**EXHIBIT F**

Intentionally Omitted

## EXHIBIT G

**Bidding Procedures**

**EXHIBIT H**

**Sale Order**

CONFIDENTIAL

STORE NO:  72282 (TROY HILLS)
1157 ROUTE 46 EAST, PARSIPPANY, NEW JERSEY

### LEASE SALE AGREEMENT

THIS LEASE SALE AGREEMENT (this "**Agreement**") is made as of September 11, 2015 by and between A&P Real Property, LLC, a Delaware limited liability company ("**Tenant**") and Pathmark Stores, Inc., a Delaware corporation ("**Guarantor**," and together with Tenant, the or "**Seller**"),and Federal Realty Investment Trust, a Maryland real estate investment trust ("**Buyer**", and collectively with Seller, the "**Parties**").

W I T N E S S E T H:

WHEREAS, Tenant is the tenant under that certain lease more specifically described on Exhibit A attached hereto and made a part hereof (together with any amendments, modifications, extensions and renewals, the "**Lease**"), with respect to all or a portion of certain real property (the "**Leased Premises**"), which real property is more particularly described in Exhibit B attached hereto and made a part hereof (the "**Premises**");

WHEREAS, Seller and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, pursuant to the Order *Approving Discrete Sale and Lease Rationalization Procedures* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 496] (the "**Discrete Procedures Order**"), and subject to any approval of the Bankruptcy Court required by the Discrete Procedures Order, Seller desires to sell, assign, convey and transfer all of its rights, title and interests as tenant under the Lease, together with all of its rights, title and interests as sublessor under those certain sublease agreements and/or license agreements more particularly described on Exhibit C attached hereto (each, a "**Sublease**" and, collectively, the "**Subleases**"), if any, and

WHEREAS, Buyer desires to terminate all rights, title, interests and obligations of Tenant under the Lease and Subleases, if any, to the extent set forth herein, subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Seller and Buyer agree as follows:

1.    Procedures.  This Agreement is made subject to, and in accordance with the Discrete Procedures Order.  Capitalized terms used but not otherwise defined herein (including on Schedule I attached hereto) shall have the meanings ascribed to them in the Discrete Procedures Order, as applicable.  In the event of a contradiction between this Agreement and the Discrete Procedures Order, as applicable, the Discrete Procedures Order, as applicable, shall control.

2.    Lease Consideration.  The consideration for the sale of Seller's interest in, and the simultaneous termination of the Lease together with the Subleases to the extent set forth herein (the foregoing, as applicable, collectively, the "**Acquired Assets**"), shall be equal to Four Million Two Hundred Fifty Thousand and No Dollars ($4,250,000.00) (the "**Purchase Price**") which shall be comprised of:

a.    Four Million Two Hundred Fifty Thousand and No Dollars ($4,250,000.00)as consideration for the Lease, plus

b.    **NONE** Dollars ($) as consideration for the FF&E, if any.

Buyer's submission of an executed copy of this Agreement along with the Deposit shall be deemed an irrevocable offer subject only to the rights of termination provided herein.

3.    Payment of Purchase Price.  The Purchase Price shall be paid to Seller by Buyer as follows:

a.    Deposit.    Buyer has deposited with TITLEVEST SERVICES, LLC ("**Escrowee**") by a bank wire transfer of immediately available federal funds to an account designated by Escrowee the sum of Two Hundred Thousand Six Hundred Eighty and 40/100 Dollars ($200,680.40) (together with all interest thereon, the "**Deposit**"), which Deposit shall be held by Escrowee pursuant to the escrow agreement (the "**Escrow Agreement**") attached hereto as Exhibit D and hereby made a part hereof.  Notwithstanding anything to the contrary set forth in this Agreement or in the Escrow Agreement, (i) all charges of Escrowee, if any, attendant to holding and/or disbursing the Deposit shall be paid by Buyer and (ii) all interest accrued in connection with the Deposit hereunder shall accrue for the sole benefit of the party to whom the Deposit is paid.  The Parties agree that any payments made pursuant to this Section 3(a) in respect of accrued interest shall be deemed to be an adjustment to the Purchase Price for tax purposes to the extent permitted by applicable Law.

b.    Closing Payment.  On the Closing Date, as defined below, the Purchase Price, as adjusted by the application of the Deposit in the amount of Two Hundred Thousand Six Hundred Eighty and 40/100 Dollars ($200,680.40), and the application of the Cure Amount in the amount of Two Hundred Forty Three Thousand Sixty Three and 39/100 Dollars ($243,063.39), subject to Seller's rights set forth below, shall be paid by Buyer by wire transfer of immediately available federal funds to the account designated on Exhibit E hereto or as otherwise designated in writing by Seller. The balance of the Purchase Price due on the Closing Date shall be Three Million Eight Hundred Six Thousand Two Hundred Fifty Six and 21/100 Dollars ($3,806,256.21).

4.    Payment of Cure Amount.  The Purchase Price includes a credit to the Buyer for the cure amount owing under the Lease in the amount of Two Hundred Forty Three Thousand Sixty Three and 39/100 Dollars ($243,063.39) (the "**Cure Amount**"), which Cure Amount shall be the total amount payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the termination by Buyer of all contracts related to the Lease, and which shall be subject to approval by the Bankruptcy Court.  Nothing herein shall prejudice the Seller's right to object to the amount of the Cure Amount set forth herein prior to the Closing. In the event the Cure Amount

2

is reduced by the agreement of the Parties or further order of the Bankruptcy Court, Buyer shall be responsible to pay to Seller the amount of such reduction of the Cure Amount.

5.    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York, such other location in the state where the Leased Premises are located as may be selected by Seller, or such other location as shall be mutually agreed upon by Seller and Buyer commencing at 10:00 a.m. local time on a date (the "**Closing Date**") that is the thirtieth (30th) Business Day following the date hereof, or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto.  Seller shall have a one-time right to adjourn the Closing for up to thirty (30) days on notice provided no later than the Closing Date.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective at 12:01 a.m., New York City time, on the Closing Date.

6.    Termination.  As of the Closing Date, pursuant to sections 363 and 365 of the Bankruptcy Code and in accordance with the Sale Order, Tenant and Buyer shall reject and terminate the Lease and the Subleases, if any.

7.    Prorations/Adjustments.  As set forth above, Sellers shall be solely responsible to pay the Cure Amount to the landlord, and the Remaining Lease Obligations (as defined below).  There will be no prorations between Sellers and Buyer on the Closing Date, and no post-assignment reconciliations or adjustments of any kind shall occur.

8.    Termination of Lease.  As of the Closing Date, Seller surrenders the Premises to Buyer and shall give, grant and surrender unto Buyer all of Seller's right, title and interest in and to the Premises, including, without limitation, all of the Seller's right, title and interest in, to and under the Lease, and any Subleases, and Buyer hereby accepts such surrender.  Each of the parties hereto acknowledges performance of all obligations of the other party under the Lease or otherwise in connection with the Premises through and including the date of this Closing Date, and agree that, from and after the Closing Date, the Lease, any Subleases, and any guaranties by Seller entities, and all rights and obligations of the parties thereunder, shall be deemed to have expired and terminated as fully and completely and with the same force and effect as if such date were the expiry date set forth in the Lease, and that the Lease, and any guaranties by Seller entities are hereby agreed to be null and void and of no further force and effect as of that date.  Except as set forth herein, any and all rights and obligations of the parties which may have arisen in connection with the Premises shall be deemed to have expired and terminated as of the Closing Date.

9.    Remaining Lease Obligations.  From the date of this Agreement through the Closing Date, Seller agrees that it (i) will continue to perform all of its covenants and obligations, including to pay all rent and related lease charges, under the Lease; (ii) will remain current on its obligations under the Lease with respect to maintenance of insurance and payment of utilities; and (iii) shall not cause any material damage to the Premises in connection with the conduct of the store closing sale or removal of Seller's trade fixtures (collectively, the "**Remaining Lease Obligations**").  On the Closing Date, Seller shall: (a) deliver the Premises in broom clean condition, with it being agreed that any furniture, fixtures, equipment or other personal property that remains in or on the Premises following the Closing Date shall be deemed abandoned by Seller in accordance with the procedures set forth in the *Amended Final Order Pursuant to 11 U.S.C. §§ 105,*

*363, 365 and 554 Approving (I) Global Procedures for (A) Store Closings, (B) the Expedited Sale, Transfer, or Abandonment or De Minimus Assets, and (C) Rejecting Unexpired Nonresidential Real Property Leases, and (II) Entry Into a Liquidation Consulting Agreement* [Docket No. 546] (the "De Minimus Asset Order"), and that the Buyer may dispose of such remaining property without notice or liability to the Seller or the Debtors, or any party claiming by, through or under the Seller or the Debtors in accordance with the De Minimus Asset Order; and (b) reasonably cooperate with Buyer to transfer utilities into the name of Buyer.

10.    Free and Clear of All Liens.    Pursuant to the Discrete Procedures Order and the Sale Order entered by the Bankruptcy Court, Seller shall convey its rights and interests under the Lease to Buyer free and clear of all liens, claims, interests, or encumbrances (collectively, "**Liens**") to the maximum extent permitted under the Bankruptcy Code, if any, with any such Liens attaching to the proceeds paid to Seller.

11.    Closing Deliverables.    On the Closing Date:

a.    Seller shall deliver to Buyer a duly executed copy of: (i) a FIRPTA Certificate; and (ii) if applicable, Transfer Tax forms or certifications provided by Buyer as more specifically described in subsection (b) below.

b.    Buyer shall deliver to Seller: (i) an executed copy of all Transfer Tax forms or certifications as may be required by each state, county or municipality to record the termination and effectuate the transactions contemplated herein; and (ii) such other documents as may be reasonably required to complete the transactions provided for in this Agreement. All documents executed and delivered by Buyer pursuant to this Section shall be in form and substance reasonably satisfactory to Seller.

12.    Transfer Tax Forms. Buyer shall be responsible for the preparation, delivery and recordation of any and all real estate Transfer Tax forms or certifications required by any Governmental Authority (unless Seller notifies Buyer that it will do so), with Buyer being responsible for any payment required therewith as provided in Section 14. The Party that is required by applicable law to file or record any other Transfer Tax forms or certifications shall prepare and timely file and record such forms or certifications, with Buyer being responsible for any payment required therewith with respect to the Sale Assets as provided in Section 14. The Parties hereto shall cooperate in making, in a timely manner, all such tax returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any such Transfer Taxes. At Seller's request, all Transfer Tax forms and certifications, along with payment therefor, shall be delivered by Buyer to Seller for recordation and payment with the appropriate Governmental Authority. To the extent required by applicable Law, Seller shall execute any Transfer Tax forms or certifications.

13.    Closing Costs.

WEIL:\95469809\2\50482.0005

a.      Seller and Buyer shall each pay their own attorneys' fees and expenses. Buyer shall pay (i) all state, county and local Transfer Taxes required to be paid in connection with the assignment and assumption of the Lease and any and all Subleases, and the consummation of the transactions contemplated herein, all of which amounts shall be paid, if applicable, to the proper Governmental Authority on or prior to the Closing Date, and (ii) all title and escrow charges.

b.      Except as otherwise provided in this Agreement, all other costs and expenses of the transaction contemplated by this Agreement shall be borne by Buyer.

c.      Buyer agrees to fully indemnify and hold Seller harmless for, from and against any loss, cost, claim, damage or expense incurred, directly or indirectly, by Seller as a result of Buyer's failure to pay any Taxes or costs pursuant to clauses (a) and (b) above. Buyer's obligations in this Section shall survive the Closing Date.

14.    Conditions to Closing.

a.      Conditions to Buyer's Obligations. Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)      the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or the Sale Order entered by the Bankruptcy Court, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(ii)     no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(iii)    each delivery contemplated by Section 12(a) to be delivered to Buyer shall have been delivered.

b.      Conditions to Seller's Obligations. Seller's obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(i)      Buyer shall have performed and complied with all of its covenants and agreements hereunder through the Closing in all material respects;

(ii)     the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or the Sale Order entered by the Bankruptcy Court, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(iii)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

WEIL:\95469809\2\50482.0005

5

(iv)    each payment contemplated by <u>Sections 3, 4 and 14</u> to be made to Seller shall have been made, and each delivery contemplated by <u>Section 12(b)</u> to be delivered to Seller shall have been delivered.

c.    <u>No Frustration of Closing Conditions</u>.  Neither Buyer nor Seller may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in <u>Subsection 15(a)</u> or <u>Subsection 15(b)</u>, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliate's failure to use its reasonable best efforts (or commercially reasonable efforts, with respect to those matters contemplated by <u>Section 18</u>, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach hereunder.  The Parties agree that neither the failure to obtain a court order nor any action with respect to a Competing Bid (as defined below), to the extent permitted hereunder, shall be deemed to be a failure to use the efforts required to satisfy the conditions to consummation of the transactions contemplated hereunder nor a breach hereunder.

15.    <u>No Other Contingencies</u>.  Buyer expressly agrees and acknowledges that Buyer's obligations hereunder are not in any way conditioned upon or qualified by Buyer's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt, financing or equity investment or otherwise) nor upon Buyer's ability to obtain title insurance.

16.    <u>Termination of Agreement</u>.

a.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(i)    by the mutual written consent of the Parties;

(ii)    by any Party by giving written notice to the other Party if:

(A)    any court of competent jurisdiction shall have enacted or issued a Law permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this agreement and such Law or Decree or other action shall have become final and non-appealable; or

(B)    the Closing shall not have occurred prior to the sixtieth (60) day from the date hereof ("**Outside Date**"); <u>provided</u> that if the Closing shall not have occurred on or before the Outside Date due to a material breach of this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 17(a)(ii)(B)</u>.

(iii)    if (i)(x) with respect to a Lease, Seller enters into a definitive agreement with respect to a higher or better competing bid in accordance with the bidding procedures attached hereto as <u>Exhibit G</u> (the "**Bidding Procedures**") for such Lease, including any related Acquired Assets  ("**Competing Bid**"), (y) the Bankruptcy Court enters an order approving a Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

WEIL:\95469809\2\50482.0005

b.        Seller may terminate this Agreement at any time prior to Closing if Buyer fails to satisfy any requirement set forth under Section 15(b)(iv), including delivery of the Deposit required hereunder.  In such case, the Agreement shall be rendered null and void, Seller shall be entitled to retain any and all consideration already paid to Seller, including, but not limited to, the Deposit.

c.        Effect of Termination.  If any Party terminates this Agreement pursuant to Section 17(a) or (b), all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Section 14, this Section 17, Sections 24 through 43, and Schedule I shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 17(b) and Section 18) to the other Party hereunder (except as may be provided in Section 4 and Subsection 17(b)); provided, however, that nothing in this Section 17 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, subject to Section 17(d) below, that other than in the case of fraud or willful misconduct, (a) the maximum Liability of Seller under this Agreement shall not exceed the reasonably out of pocket expenses incurred by Buyer and (b) subject to subsection (d) below, the maximum liability of Buyer under this Agreement shall not exceed the Deposit.

17.    Bankruptcy Court Matters.

a.        Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court in accordance with the Discrete Procedures Order, and the consideration by Seller of a Competing Bid in accordance with the Bidding Procedures and, in the event Seller receives a Competing Bid, an auction to be conducted in accordance with the Bidding Procedures. From the date hereof and until the transactions contemplated hereby are consummated, Seller is permitted to, and is  permitted to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by or from any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, and Seller shall be permitted and shall have the authority to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, including supplying information relating to the assets of Seller to prospective buyers.  Without limiting the foregoing, Seller shall be permitted to perform all of the foregoing activities with respect to all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Discrete Procedures Order, the Bidding Procedures, or other applicable Law.

b.        Termination Payment.  To induce Buyer to enter into this Agreement, to maximize value of the Seller's estates and in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller grants Buyer, subject to compliance with the Discrete Procedures Order, a break-up fee in an amount equal to three percent (3%) of the Purchase Price (the "**Termination Payment**").  Seller further agrees that the Termination Payment constitutes an allowed administrative expense claim against their estates pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code.  In the event an auction is conducted in connection with the sale of the Lease because of the timely submission of a Competing Bid, Buyer

WEIL:\95469809\2\50482.0005

shall be entitled to credit bid all or any portion of the Termination Payment at the auction. In the event a Competing Bid is consummated, the Termination Payment shall be paid on the first Business Day following the date of consummation of the Competing Bid from the proceeds thereof if no material breach by Buyer of this Agreement has occurred. Upon payment of the Termination Payment to Buyer in accordance with this Section 18.b, Seller and its respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Seller, its Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to the Lease or any applicable Law, including for reimbursement of expenses.

      c.    Bankruptcy Court Filings.

      (i)    As soon as reasonably practicable following the execution of this Agreement, and by no later than the deadlines imposed by the Discrete Procedures Order, Seller shall file any necessary notice or pleadings required in connection therewith. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the transactions contemplated by this Agreement pursuant to the Discrete Procedures Order, including a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for providing the Adequate Assurance Information to the Cure Notice Parties and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event the approval of the transactions contemplated by this Agreement shall be appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

    18.    Delivery; "AS IS" Transaction.

      a.    Buyer acknowledges that it has fully inspected or waived the right to inspect the Leased Premises prior to the execution of this Agreement and does hereby assume all of the risks, including, but not limited to, latent defects in the Leased Premises. Seller shall not be obligated to do any work or alter, restore, repair or develop the Leased Premises, but Seller shall deliver the Leased Premises in vacant, broom clean condition, and, if applicable, with all furnishings, fixtures, equipment, inventory, racks, aisle displays, refrigeration equipment and personal property removed from the Leased Premises. Any work (including demolition) which may be necessary to adapt the Leased Premises for Buyer's occupancy or for the operation of Buyer's business therein shall be the sole responsibility of Buyer and shall be performed by Buyer at its sole cost and expense, in accordance with the terms of the Lease.

      b.    BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE LEASE OR THE LEASED PREMISES (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE LEASED PREMISES; THE PHYSICAL CONDITION OF THE LEASED PREMISES; THE

WEIL:\95469809\2\50482.0005

PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE LEASED PREMISES OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE LEASED PREMISES; THE ZONING OF THE LEASED PREMISES; THE POSSIBILITY OF DEVELOPING OR USING THE LEASED PREMISES IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE LEASE OR THE LEASED PREMISES; THE FITNESS OF THE LEASED PREMISES, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE LEASED PREMISES (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE LEASE OR THE LEASED PREMISES).    BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLER.    BUYER ALSO ACKNOWLEDGES THAT BUYER HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE LEASED PREMISES AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE LEASED PREMISES AND/OR THE LEASES, AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IS ACQUIRING THE LEASE AND THE LEASED PREMISES, BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT, AND BUYER IS NOT RELYING UPON ANY REPRESENTATIONS OF SELLER OR SELLER'S AGENTS.    ACCORDINGLY, BUYER HEREBY ACCEPTS THE LEASED PREMISES IN ITS "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS, SUBJECT TO BUYER'S RIGHTS UNDER THE LEASE AS LANDLORD.

19.    Store Closed.  The Parties acknowledge and agree that Seller has ceased (or will cease as of the Closing Date) operations at the Leased Premises.

20.    Release; Indemnity.  On and after the Closing Date, Buyer agrees to release Seller from any and all claims (including claims for rejection damages under Bankruptcy Code Section 502(b)(6), actions, proceedings, suits, costs, liabilities, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and disbursements), whether foreseen or unforeseen, in connection with the Lease, the Leased Premises (including, without limitation, the performance or observance or the failure or refusal to perform or observe any agreement or obligation of the tenant under the Lease or any term or provision thereof required to be performed by the tenant under the Lease), each Sublease, and this Agreement. Notwithstanding the above, Buyer does not waive or release Seller from the following: (i) any obligations arising under this Agreement; and (iii) any indemnification obligations arising from third party claims asserted with respect to or arising from Seller's use and occupancy of the Leased Premises prior to the Closing Date for which Seller had a duty to indemnify Buyer pursuant to the Lease, and which expressly survive the expiration or termination of the Lease (but only to the extent that

9

such claims are covered by Seller's insurance policies and on the condition that Buyer only seeks recovery from the insurer and only up to the insured amount).

21.    Release of Buyer. Except as set forth herein, as of the Closing Date, Tenant, the Seller and Seller's bankruptcy estates, and anyone eligible to make a claim by or through the Tenant, the Seller and their bankruptcy estates, including the Committee, hereby releases and discharges Buyer and its affiliates, agents, directors, officers, representatives, attorneys, advisors, employees, successors and assigns, of and from all manner of actions, causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, claims and demands whatsoever, and any rights to request relief from termination or from forfeiture, in law or in equity, which Seller or the bankruptcy estates ever had, now has or hereafter can, shall or may have against Buyer or its successors or assigns for, upon or by reason of any matter, cause or thing whatsoever, including the pursuit of any avoidance actions under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code against the Buyer, solely relating to or arising out of the Lease or the Leased Premises. Notwithstanding the above, Seller, the bankruptcy estates, and anyone eligible to make a claim by or through the Seller and bankruptcy estates, including the Committee, does not waive or release Buyer from the following:  (i) any obligations arising under this Agreement; and (ii) any indemnifications obligations arising from third party claims asserted with respect to or arising from Buyer's obligations prior to the Closing Date for which Buyer had a duty to indemnify Seller pursuant to the Lease, and which expressly survive the expiration or termination of the Lease (but only to the extent that such claims are covered by Buyer's insurance policies and on the condition that Seller only seeks recovery from the insurer and only up to the insured amount).

22.    Casualty and Condemnation.

a.    Seller agrees to give Buyer prompt written notice of any fire, flood or similar casualty affecting any portion of the Leased Premises or of any actual or threatened (to the extent that Seller has current knowledge thereof) taking or condemnation of all or any portion of any Leased Premises.

b.    If prior to Closing there shall occur:  (i) damage to any Leased Premises caused by fire or other casualty; or (ii) the taking or condemnation of all or any portion of the Leased Premises; then, in each case, the Closing Date shall occur as provided in this Agreement, and Buyer shall be assigned at the Closing Date (A) all interest of Seller in and to any insurance proceeds (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date), subject to all applicable deductible amounts or (B) condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding.

c.    The Parties hereby waive the provisions of the Uniform Vendor and Purchaser Risk Act (to the extent the same is applicable to the Leased Premises) and of any other Law to the same or similar effect, and agree that the same shall not apply to this Agreement.

WEIL:\95469809\2\50482.0005

23.    <u>Brokers' Fees</u>. Other than the fees and expenses payable to Evercore Group L.L.C. or Hilco Real Estate Group LLC in connection with the transactions contemplated hereby, which shall be borne by Seller, neither Party has entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.  Buyer shall indemnify and hold Seller harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or liabilities, including reasonable attorneys' fees and disbursements, which Buyer, or any of its affiliates may sustain, incur or be exposed to, by reason of any claim or claims by any broker, finder or other person or entity for fees, commissions or other compensation arising out of the transactions contemplated herein.  Any broker retained by or providing services to Buyer in connection with the transaction evidenced by this Agreement shall be compensated solely by Buyer without contribution from Seller.

24.    <u>Survival</u>.  Except as specifically set forth herein, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to <u>Section 12(a)</u> or <u>Section 12(b)</u> shall survive, and each of the same shall terminate and be of no further force or effect as of the Closing.

25.    <u>Expenses</u>.  Except as otherwise expressly set forth herein, including but not limited to <u>Section 12</u>, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

26.    <u>Entire Agreement</u>.  This Agreement and any documents delivered at Closing pursuant hereto constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

27.    <u>Incorporation of Exhibits and Schedules</u>.  The Exhibits and Schedule(s) to this Agreement are incorporated herein by reference and made a part hereof.

28.    <u>Amendments and Waivers</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach.  No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 29</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

WEIL:\95469809\2\50482.0005

29.    <u>Succession and Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including the Committee and/or a trustee, if any, subsequently appointed under Chapter 7 or 11 of the Bankruptcy Code. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of each other Party.

30.    <u>Notices</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

> The Great Atlantic & Pacific Tea Company, Inc.
> 2 Paragon Drive
> Montvale, New Jersey 07645
> Attention: Christopher W. McGarry and Matthew Bennett
> E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Seller) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
> E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

If to Buyer:

> Federal Realty Investment Trust and
>
> FLV Greenlawn Plaza, LP c/o Federal Realty Investment Trust
> 1626 East Jefferson Street
> Rockville, MD  20852
> Attention: Chris Weilminster and Darlene Hough
> E-mail: cweilminster@federalrealty.com; dhough@federalrealty.com

With a copy (which shall not constitute notice to Buyer) to:

> Katten Muchin Rosenman LLP
> 2029 Century Park East, Suite 2600
> Los Angeles, CA 90067-3012

12

Attention: Dustin P. Branch
E-mail: dustin.branch@kattenlaw.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 31.

31.    Governing Law. This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

32.    Submission to Jurisdiction; Service of Process. Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 31; provided, however, that nothing in this Section shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

33.    Waiver of Jury Trial. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

34.    Specific Performance. Buyer acknowledges and agrees that Seller and its estate would be damaged irreparably in the event Buyer does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Seller may have under law or equity, Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

13

35.    Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

36.    No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than Buyer, Seller, and their respective successors and permitted assigns, except as expressly set forth in this Agreement.

37.    Non-Recourse. All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**"). In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 38.

38.    Mutual Drafting. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

WEIL:\95469809\2\50482.0005

39.    Headings; Table of Contents.  The section headings and the table of contents contained in this Agreement and the Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

40.    Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

41.    Limitations Under Applicable Law.  Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to limitations under applicable Law, including, without limitation, sections 1113 and 1114 of the Bankruptcy Code.

42.    Prevailing Party.  If any action is brought by either of the Parties against the other, then the prevailing Party shall be entitled to recover from the other Party court costs and reasonable attorneys' fees and costs actually incurred.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

A&P REAL PROPERTY, LLC

By: _____

Name: _____

Title: _____

PATHMARK STORES, INC.

By: _____

Name: _____

Title: _____

FEDERAL REALTY INVESTMENT TRUST

By: _____

Name:  Dawn M. Becker

Title:  Executive Vice President-Managing
        Director Mixed-Use Operations

## LIST OF SCHEDULE AND EXHIBITS

| SCHEDULE | DESCRIPTION |
| --- | --- |
| Schedule I | Definitions |

| EXHIBIT | DESCRIPTION |
| --- | --- |
| Exhibit A | The Lease |
| Exhibit B | Premises |
| Exhibit C | Sublease(s) |
| Exhibit D | Escrow Agreement |
| Exhibit E | Wire Instructions |
| Exhibit F | Intentionally Omitted |
| Exhibit G | Bidding Procedures |
| Exhibit H | Sale Order |

**Schedule I**

**Definitions**

(i)      "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

(ii)      "Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(iii)      "Code" means the Internal Revenue Code of 1986, as amended.

(iv)      "Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

(v)      "Decree" means any judgment, decree, ruling, injunction or any other order of any Governmental Authority.

(vi)      "FIRPTA Certificate" means a certificate from Tenant in compliance with applicable Treasury Regulations setting forth Tenant's (or, if applicable, its regarded owner's) name, address and federal tax identification number and stating that Tenant (or, if applicable, its regarded owner) is not a "foreign person" within the meaning of section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to section 1445 of the Code.

(vii)      "Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

(viii)      "Law" means any constitution applicable to, and any law, statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

(ix)      "Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

(x)      "Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

(xi)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

(xii)    "Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

(xiii)    "Sale Order" shall mean an order of the Bankruptcy Court substantially in the form attached hereto as Exhibit G authorizing, among other things, a rejection of the Lease pursuant to section 365(b) of the Bankruptcy Code.

(xiv)    "Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

(xv)    "Transfer Tax" means any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated by this Agreement.

(xvi)    "Treasury Regulations" mean the Treasury regulations promulgated under the Code

# EXHIBIT A

## The Lease

| | STORE # (ORACLE) [LEGACY] | STREET ADDRESS (ALTERNATE ADDRESS) | CITY | ST | THIS IS THE DESCRIPTON OF THE LEASE TO BE INCLUDED IN THE CONTRACT |
|---|---|---|---|---|---|
| 100 | 072-6282 | 1157 ROUTE 46 EAST | PARSIPPANY | NJ | LEASE DATED JANUARY 17, 1978 BETWEEN PARSIPPANY PLAZA, INC., AS LANDLORD, AND A&P REAL PROPERTY LLC, (SUCCESSOR IN INTEREST TO PATHMARK STORES, INC. (FORMERLY KNOWN AS SUPERMARKETS GENERAL CORPORATION)), AS TENANT; AS EVIDENCED BY SHORT FORM LEASE DATED JANUARY 17, 1978; AS AMENDED BY FIRST AMENDMENT TO LEASE DATED JANUARY 15, 1982, AND BY SECOND AMENDMENT TO LEASE DATED OCTOBER 26, 1993, AND BY THIRD AMENDMENT TO LEASE DATED SEPTEMBER 6, 2005, AND BY FOURTH AMENDMENT TO LEASE DATED AUGUST 22, 206, AND BY FIFTH LEASE MODIFICATION AGREEMENT DATED AUGUST 14, 2013; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED DECEMBER 23, 2011; AS ASSIGNED PURSUANT TO ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012; AND SUBJECT TO GUARANTY DATED MARCH 13, 2012.<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.4.84 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |

## EXHIBIT B

### Leased Premises

STORE NO:  72282 (TROY HILLS)
1157 ROUTE 46 EAST, PARSIPPANY, NEW JERSEY

# EXHIBIT C

## Sublease(s)

| # | STORE (LEGACY) | ST | CITY | ADDRESS | SUBLEASE(S) DESCRIPTION TO BE INSERTED INTO CONTRACT ESCROW |
|---|---|---|---|---|---|
| 100 | 72-282 | NJ | PARSIPPANY | 1157 ROUTE 46 | SUBLEASE(S)/LICENSE(S), AS AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED, WITH RESPECT TO THE FOLLOWING SUBTENANT(S)/LICENSEE(S): <br><br>i.  **INDUS AMERICAN BANK ---** LEASE, DATED AUGUST 30, 2006 ORIGINALLY BETWEEN PATHMARK STORES, INC., AS LANDLORD, AND INDUS AMERICAN BANK, AS TENANT. **EXPIRED 9/30/2009; MONTH TO MONTH** <br><br>AND ALL OTHER DOCUMENTS WITH RESPECT TO SUCH SUBLEASE(S)/LICENSE(S) LOCATED IN DATAROOM FOLDER 1.4.84. |

**EXHIBIT D**

**Escrow Agreement**

(Attached hereto)

**EXHIBIT E**

**Wire Instructions[1]**

---

[1] NTD: WEIL TO INCLUDE AT A LATER DATE.

**<u>EXHIBIT F</u>**

Intentionally Omitted

WEIL:\95469809\2\50482.0005

## EXHIBIT G

**Bidding Procedures**

## EXHIBIT H

Sale Order