**Objection Deadline: October 2, 2015 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objection Filed): October 7, 2015 at 10:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
In re                                              :
                                                   :        **Chapter 11**
**THE GREAT ATLANTIC & PACIFIC TEA**               :
**COMPANY, INC.,** *et al.*,                       :        **Case No. 15-23007 (RDD)**
                                                   :
         **Debtors.**[1]                            :        **(Jointly Administered)**
                                                   :
-------------------------------------------------------------x

## NOTICE OF AUCTION PURSUANT TO DISCRETE SALE AND LEASE RATIONALIZATION PROCEDURES

**PLEASE TAKE NOTICE** that:

1.      On July 19, 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

2.      On August 11, 2015, the Bankruptcy Court entered the *Order Approving Discrete Sale and Lease Rationalization Procedures* [Docket No. 496] (the "**Discrete**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc. (3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

Procedures Order").    A copy of the Discrete Procedures Order may be found at:
http://cases.primeclerk.com/aptea.

3.      Pursuant Section III.A of the Discrete Sale and Lease Rationalization
Procedures attached to the Discrete Procedures Order as Exhibit 1 (the "**Discrete Procedures**"),
the Debtors have determined to hold an auction (the "**Auction**") with respect to the Food Bazaar
Stores (defined below) only in the event the Debtors receive a Qualified Bid from a bidder other
Bogopa Service Corp. d/b/a Food Bazaar ("**Food Bazaar**") with respect to at least one of the
Food Bazaar Stores.

4.      The Auction will take place on **October 8, 2015 at 9:30 a.m.** at the
offices of Weil, Gotshal & Manges LLP, located at 767 Fifth Avenue, New York 10153.[2]

5.      On August 11, 2015, the Bankruptcy Court approved the Global Bidding
Procedures attached as Exhibit 1 to the *Order Approving (A) Global Bidding Procedures, (B) Bid
Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice
of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment
Procedures, and (E) the Date for Auctions, if Necessary, and Sale Hearings* [Docket No. 495]
(the "**Global Procedures**").

6.      In consultation with the Consultation Parties, the Debtors have determined
that the auction rules and bidding procedures set forth in the Global Procedures, as modified to
the extent set forth on **Exhibit A** hereto (the "**Bidding Procedures**"), are appropriate to promote
a spirited and robust auction, if any, for the Food Bazaar Stores.

7.      Pursuant to Section III.C of the Discrete Procedures, A&P Real Property,
LLC, one of the Debtors, has entered into four lease sale agreements with Food Bazaar (the
"**Food Bazaar Agreements**"), copies of which attached hereto as **Exhibit B**, pursuant to which
the Debtors have designated Food Bazaar as a Stalking Horse with respect to the following
Additional Stores (the "**Food Bazaar Stores**"):

|    | Store | Banner | City | Address | State |
|----|-------|--------|------|---------|-------|
| 27 | 72634 | Pathmark | Brooklyn | 111-10 Flatlands Avenue | NY |
| 74 | 72288 | Pathmark | Elizabeth | 211 Elmora Avenue | NJ |
| 75 | 70618 | A&P | Fairview | 425 Anderson Avenue | NJ |
| 91 | 59512 | Food Basics | North Bergen | 1425 Kennedy Blvd. | NJ |

---

[2] The Debtors have scheduled the Auction one day earlier than provided for in the Discrete Procedures to coincide
with another auction scheduled for that date. *See* [Docket No. 1081].  Adequate notice of the Debtors' proposed sale
of the Food Bazaar Stores has been provided and, pursuant to the Discrete Procedures, the Debtors will seek
approval of the transactions contemplated by the Food Bazaar Agreements in accordance with the Discrete
Procedures Order.

2

8.    The material terms and conditions of the Bid Protections offered to Food Bazaar (the "**Bid Protections**") are as follows:

| Store | Purchase Price | Breakup Fee | % of Purchase Price |
|-------|----------------|-------------|---------------------|
| 72634 | $3,550,000.00 | $106,500.00 | 3% |
| 72288 | $3,000,000.00 | $90,000.00 | 3% |
| 70618 | $2,275,000.00 | $68,250.00 | 3% |
| 59512 | $2,925,000.00 | $87,750.00 | 3% |

As set forth in greater detail in the Bidding Procedures, the Bid Protections apply to each Food Bazaar Store on an individual Store basis.

9.    Any objection to the Bid Protections (an "**Objection**"), must:  (i) be in writing; (ii) state with specificity the nature of the objection; and (iii) be filed with the Bankruptcy Court and served on (a) The Great Atlantic and Pacific Tea Company, Inc., 2 Paragon Drive, Montvale, New Jersey 07645 (Attn: Christopher W. McGarry and Matthew Bennett); (b) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. and Garrett A. Fail, Esq.); (c) Hilco, 5 Revere Dr. Suite 320, Northbrook, IL 60062 (Attn: Gregory S. Apter) (collectively, the "**Debtor Notice Parties**"); (d) the attorneys for the Creditors' Committee, Pachulski Stang Ziehl & Jones, LLP, 780 Third Avenue, 34th Floor, New York, NY 10017 (Attn:  Robert J. Feinstein, Esq., and Bradford J. Sandler, Esq.); and (e) the attorneys for Food Bazaar, Harfenist Kraut & Perlstein, LLP, 3000 Marcus Avenue, Suite 2E1, Lake Success, New York 11042 (Attn: Allen Perlstein) and Klestadt Winters Jureller Southard & Stevens, LLP, 570 Seventh Avenue, 17th floor, New York, NY 10018 (Attn: Tracy Klestadt, Esq.), so that it is actually received by the Debtor Notice Parties, the Creditors' Committee and Food Bazaar on or before **October 2, 2015 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

10.    If any Objections are timely filed and served by the Objection Deadline, a hearing (the "**Hearing**") on the Bid Protections will be scheduled before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601.

11.    Objecting parties are required to attend the Hearing and failure to appear may result in relief being granted or denied upon default.

12.    If no Objections are timely filed and served by the Objection Deadline, Food Bazaar and the Food Bazaar Agreements shall be approved as the Stalking Horse and the Stalking Horse Bids, respectively, and the Bid Protections shall be deemed fully and finally authorized by the Bankruptcy Court under the terms of the Discrete Procedures Order and no further notice or Bankruptcy Court approval shall be required or necessary.

WEIL:\95469954\4\50482.0005

Dated: September 25, 2015
      New York, New York

      /s/ Garrett A. Fail
      WEIL, GOTSHAL & MANGES LLP
      767 Fifth Avenue
      New York, New York  10153
      Telephone:  (212) 310-8000
      Facsimile:  (212) 310-8007
      Ray C. Schrock, P.C.
      Garrett A. Fail

      *Attorneys for Debtors*
      *and Debtors in Possession*

WEIL:\95469954\4\50482.0005

## Exhibit A

**Bidding Procedures**

## BIDDING PROCEDURES

### Overview

On July 19, 2015, The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On August 11, 2015, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (the "**Discrete Procedures Order**"),[3] approving the Discrete Sale and Lease Rationalization Procedures attached to the Discrete Procedures Order as Exhibit 1 (the "**Discrete Procedures**") which, among other things, authorized the Debtors to (i) hold an auction in connection with the sale of one or more of the Additional Stores[4], (ii) establish any rules for such auction that the Debtors determine, in consultation with the Consultation Parties, are appropriate to promote a spirited and robust auction, and (iii) designate a stalking horse and offer Bid Protections; provided that the Bid Protections shall not exceed 3% of the cash portion of the stalking horse's bid.

On September 25, 2015, the Debtors filed a *Notice of Auction Pursuant to Discrete Sale and Lease Rationalization Procedures* (the "**Auction Notice**") designating Bogopa Service Corp. d/b/a Food Bazaar as a stalking horse bidder (the "**Stalking Horse**") with respect to the following Additional Stores, as more particularly described in the Stalking Horse Agreements (defined below) (collectively, the "**Stalking Horse Stores**"):

|    | Store | Banner | City | Address | State |
|----|-------|--------|------|---------|-------|
| 27 | 72634 | Pathmark | Brooklyn | 111-10 Flatlands Avenue | NY |
| 74 | 72288 | Pathmark | Elizabeth | 211 Elmora Avenue | NJ |
| 75 | 70618 | A&P | Fairview | 425 Anderson Avenue | NJ |
| 91 | 59512 | Food Basics | North Bergen | 1425 Kennedy Blvd. | NJ |

The Stalking Horse Stores are subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures. These Bidding Procedures describe, among other things: (A) the procedures for Qualified Bidders (defined below) to submit bids for one or more of the Stalking Horse Stores; (B) the conduct of the auction with respect to the Stalking Horse Stores (the "**Auction**"), if any; and (C) the ultimate selection of the Successful Bidder(s) (as defined below) and Bankruptcy Court approval thereof.

On August 11, 2015, the Bankruptcy Court approved the Global Procedures attached as Exhibit 1 to the *Order Approving (A) Global Bidding Procedures, (B) Bid*

---

[3] A copy of the *Order Approving Discrete Sale and Lease Rationalization Procedures* [Docket No. 496] may be found at: http://cases.primeclerk.com/aptea.

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Discrete Procedures or the Global Procedures (defined below) as applicable.

*Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, if Necessary, and Sale Hearings* [Docket No. 495] (the "**Global Procedures**")).  The Stalking Horse Stores have been extensively marketed in accordance with the Global Procedures.  **Any party who timely submitted a bid on any of the Stalking Horse Stores pursuant to the Global Procedures does not need to resubmit a bid. The submitted bid, to the extent it remains a binding bid under the Global Procedures, will be deemed a bid submitted for purposes of the Auctio**n; provided that nothing herein shall authorize the Debtors to unilaterally extend any date or deadline set forth in the Stalking Horse Agreements.

The Debtors reserve the right to extend any of the bidding deadlines or other dates set forth in these Bidding Procedures without further order of the Bankruptcy Court, subject to providing any notice required by the Discrete Procedures.

## Summary of Important Dates

| | |
|---|---|
| **September 29, 2015** | • Debtors to File and Serve Sale Motion and Cure Notice<br>• Debtors to Serve Stalking Horse Adequate Assurance Information |
| **October 2, 2015 at 4:00 p.m.** | • Deadline to Object to Stalking Horse Bid Protections |
| **October 6, 2015 at 5:00 p.m.** | • Bid Deadline for Stores in Stalking Horse Package |
| **October 7, 2015 at 10:00 a.m.** | • Hearing on Stalking Horse Bid Protections (*If Objections Filed*) |
| **October 7, 2015 at 5:00 p.m.** | • Debtors to File Notice (1) Cancelling Auction If No Other Qualified Bid Received or (2) of Baseline Bids and Qualified Bidders for Auction |
| **October 8, 2015 at 9:30 a.m.** | • Auction to be conducted at the offices of Weil, Gotshal & Manges LLP; 767 Fifth Avenue, New York, New York 10153 |
| **October 9, 2015** | • Debtors to File and Serve Notice of Successful Bidder(s) |
| **October 9, 2015 at 4:00 p.m.** | • Deadline to Object to Sale of Stalking Horse Stores, Including Assumption and Assignment of Leases and Subleases, to Stalking Horse and Proposed Cure Amounts |
| **October 12, 2015** | • Debtors to Serve Adequate Assurance Information for Successful Bidder(s) (*If Not Stalking Horse*) |
| **October 16, 2015, at 10:00 a.m.** | • Sale Hearing (*If No Auction Conducted*) |
| **October 22, 2015 at 4:00 p.m.** | • Deadline to Object to Sale of Stores in Stalking Horse Package, Including Assumption and Assignment of Leases and Subleases, |

| | |
|---|---|
| | to Successful Bidder(s) (*If Not Stalking Horse*) |
| **TBD** | • Sale Hearing (*If Auction Conducted*) |

Access to Diligence

> To participate in the diligence process and receive access to due diligence information with respect to any of the Stalking Horse Stores, a party must submit to the Debtors or their advisors:

> (A)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder(s); and

> (B)    sufficient information, as reasonably determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to reasonably determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure reasonably acceptable to the Debtors in their discretion).

> An interested party shall be a "**Potential Bidder**" if the Debtors determine in their reasonable discretion, after consultation with the Consultation Parties, that an interested party has satisfied the above requirements.  As soon as practicable, the Debtors will deliver to such Potential Bidder:  (A) an information package containing information and financial data with respect to the Stalking Horse Stores in which such Potential Bidder has expressed an interest; and (B) access to the Debtors' confidential electronic data room concerning the Stores (the "**Data Room**").

> Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

Due Diligence

> Until the Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be initially directed to:

> (A)    Paul Billyard and Will Jurist of Evercore (Billyard@Evercore.com and William.Jurist@Evercore.com) if you are interested in purchasing any of the Stores as a going concern; and

3

(C)    Gregory Apter of Hilco (gapter@hilcoglobal.com) if you are interested in purchasing any of the Stores as a going concern or any of the Stores' leases or designation rights associated with such leases; or

(B)    Weil at APDiligence@weil.com.

The Debtors will simultaneously distribute via the Data Room in written form any additional diligence materials not previously provided to Stalking Horse or any other Potential Bidder to all Potential Bidders for the Stores to which such diligence materials relate (including, if applicable, Stalking Horse) and the Consultation Parties.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (A) the Potential Bidder does not become a Qualified Bidder (as defined below) or (B) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Stalking Horse Stores to any person or entity who is not a Potential Bidder or a Consultation Party or who does not comply with the participation requirements set forth above.

### Auction Qualification Procedures

Bid Deadline

A Potential Bidder that desires to make a bid on one or more of the Stalking Horse Stores shall deliver written and electronic copies of its bid in both PDF and MS-WORD format to the Debtor Notice Parties so as to be received no later than **October 6, 2015 at 5:00 p.m. (Eastern Time)** (the "***Bid Deadline***"); provided that the Debtors may extend the Bid Deadline without further Order of the Bankruptcy Court, subject to providing notice to all Potential Bidders and the Consultation Parties.

**Any party that does not submit a bid by the Bid Deadline will not be allowed to (A) submit any offer after the Bid Deadline, or (B) participate in the Auction; provided, that if a Potential Bidder has already submitted a bid for one of the Stalking Horse Stores pursuant to the Global Procedures, such Potential Bidder does not need to resubmit such bid in order for the Debtors to consider whether such bid may qualify as a Qualified Bid (defined below) for purposes of the Auction.**

Form and Content of Qualified Bid

A bid is a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a sale transaction), and any other party that will be participating in connection with the bid or the sale transaction, and includes, at a minimum, the following information (each, a "**Bid**"):

A.  <u>Proposed Stores and Valuation</u>.  Each Bid must clearly identify and list the particular Stalking Horse Stores, additional assets (such as inventory or prescriptions) and liabilities that the Potential Bidder seeks to acquire.  The Bid must identify, on a per Store basis, the valuations, in U.S. dollars, that the Potential Bidder associates with each of those Stores, and a description of any significant assumptions on which such valuations are based.  To the extent the Bid proposes to purchase additional assets associated with the Stores, such as inventory or prescriptions, the Bid shall clearly identify the value, in U.S. dollars, associated with such assets.

B.  <u>Marked Agreement</u>.  Each Bid must include a copy of an asset purchase agreement or lease sale agreement, as applicable, reflecting the terms and conditions of its Bid, which agreement must be marked to show any proposed amendments and modifications to the form of (i) going-concern asset purchase agreement provided by the Debtors in the Data Room or (ii) the lease sale agreements executed by Stalking Horse (the "**Stalking Horse Agreements**"), as applicable (the "**Marked Agreement**").

C.  <u>Unconditional Offer</u>.  A statement that the Bid is formal, binding and unconditional (except for those conditions expressly set forth in the applicable Marked Agreement) and is not subject to any due diligence or financing contingency and is irrevocable until the first business day following the closing of the proposed sale transaction, except as otherwise provided in these Bidding Procedures.

D.  <u>Form of Consideration</u>.  Unless the Bid includes a credit bid (as described below), a statement confirming that the Bid is based on an all-cash offer, including, sufficient cash consideration to pay the applicable breakup fee to Stalking Horse (the "**Breakup Fee**"); <u>provided</u> that any Bid that includes a credit bid shall also include a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee and shall comply with that certain Intercreditor Agreement, dated as of March 13, 2012 (as amended and supplemented, including pursuant to that certain Supplemental Senior Lien Intercreditor Agreement as amended) (the "**Intercreditor Agreement**"), including Section 5.06 thereof.

E.  <u>Purchase Price; Minimum Bid</u>.  With respect to each Stalking Horse Store, each Bid submitted must (i) propose an alternative transaction that provides substantially similar or better terms than Stalking Horse's Bid for such Store and (ii) (a) exceed the applicable cash purchase price for such Store by the Minimum Overbid Amount and the Breakup Fee; or (b) propose to purchase such Store for cash, and assume the corresponding liabilities on similar or better terms as Stalking Horse's Bid.

F.  <u>Employee and Labor Terms</u>.  If the Bid contemplates a going concern sale of a Stalking Horse Store, a statement of proposed terms for unionized and non-unionized employees, which shall include, alternatively:  (i) a statement that

WEIL:\95469954\4\50482.0005

the Potential Bidder will assume the collective bargaining agreements (the "**Affected Labor Agreement**") covering any of the employees of the Debtors at the Closing (as defined in the Stalking Horse Agreements) whose duties relate primarily to the operation of such Store, including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing (the "**Covered Employees**") without modification; or (ii) if the Potential Bidder will not assume the Affected Labor Agreements without modification, a statement that the Potential Bidder will enter into good faith negotiations with each of the unions representing any of the Covered Employees (the "**Affected Unions**") to enter into modified collective bargaining agreements, including a term sheet, which shall be attached to the Marked Agreement, proposing post-closing work rules and conditions to be offered to unionized employees.  Such statement shall also include an acknowledgment of the requirements of sections 1113 and 1114 of the Bankruptcy Code and an agreement to use good faith reasonable best efforts to cooperate with the Debtors in ensuring compliance with any applicable provisions thereof in the event that mutually satisfactory modified collective bargaining agreements have not been entered into between the Potential Bidder and the Affected Unions to the closing of a sale contemplated by these Bidding Procedures.

G.    <u>Pension Plans</u>.  Each Bid must state whether or not the Potential Bidder intends to assume (i) sponsorship of all or any part of or (ii) any of the potential liabilities associated with The Great Atlantic & Pacific Tea Company Pension Plan, New York-New Jersey Amalgamated Pension Plan for A&P Employees, Delaware County Dairies, Inc. Hourly Employees Pension Plan, and Pathmark Stores, Inc. Pension Plan (collectively, the "Pension Plans").  If the Potential Bidder does not intend to assume sponsorship or liabilities of the Pension Plans in full, each Bid must state whether the Potential Bidder intends to assume the assets and liabilities of the Pension Plan(s) relating to plan participants associated with the stores in the Bid.

H.    <u>Required Approvals</u>.  If applicable, a statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the business and stores included in its Bid from and after closing the sale transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals. A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Marked Agreement.

WEIL:\95469954\4\50482.0005

I.  <u>No Entitlement to Expense Reimbursement or Other Amounts</u>.  Except as provided with respect to Stalking Horse, a statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Stalking Horse Stores.

J.  <u>Adequate Assurance Information</u>.  Information supporting the Potential Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Potential Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to the Potential Bidders.

Notwithstanding the foregoing, if a Bid for a Store is submitted by the landlord under the real property lease for such Store (a "**Landlord Lease Bid**"), such landlord need not satisfy the requirements set forth in subsections F, G, H, and J above; <u>provided</u> that such landlord must satisfy the requirements set forth in subsection F and G above if its Landlord Lease Bid contemplates a going concern purchase of the Store.

A Potential Bidder must also accompany its Bid with: (A) a Deposit (as defined below); (B) the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Potential Bidder; (C) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the applicable Marked Agreement) and such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement, as acceptable in the Debtors' business judgment, in consultation with the Consultation Parties, including a description of each investor and any additional party or parties investing in the transaction included in the applicable bid and such party's financial position; (D) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Marked Agreement; (E) a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; (F) if the value of the Bid relative to the relevant Stalking Horse Agreement includes additional non-cash components (such as fewer contingencies than are in the relevant Stalking Horse Agreement), a detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value; and (G) if the Bid includes an asset purchase agreement that is not executed, a signed statement that such Bid is irrevocable until the first business day following the closing or closings of the applicable sale transaction.

**The submission of a Bid by the Bid Deadline shall constitute a binding and irrevocable offer to acquire the Store(s) or other assets reflected in such Bid.**

7

Deposit

        To qualify as a Qualified Bid (as defined below), each Bid must be accompanied by a good faith cash deposit in the amount of five percent (5%) of the proposed purchase price, to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "**Escrow Agent**") pursuant to the escrow agreement to be provided by the Debtors to the Potential Bidders (the "**Escrow Agreement**"); provided that with respect to a Landlord Lease Bid, the landlord may deduct from its Deposit the amount of any undisputed monetary obligations that constitute the Cure Costs for the applicable real property lease.

        To the extent the Stores included in a Qualified Bid are modified at or prior to the Auction, the Qualified Bidder must adjust its Deposit so that it equals five percent (5%) of the proposed purchase price to be paid for each Store.

Review of Bids

        The Debtors will deliver, within one (1) business day after receipt thereof, copies of all Bids to the Consultation Parties and, if such Bids include the assumption of any liabilities associated with the Pension Plans, the Pension Benefit Guaranty Corporation, 1200 K Street, N.W., Washington, D.C. 20005 (Attn: Thea Davis, davis.thea@pbgc.gov).

        The Debtors will evaluate timely submitted bids, in consultation with the Consultation Parties, and may engage in negotiations with Potential Bidders who submitted Bids complying with the preceding paragraphs as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid.  In evaluating the bids, the Debtors may take into consideration the following non-binding factors:

1.  the amount of the Bid and the Stores and number of Stores and other assets proposed to be acquired;

2.  the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates after the payment of the Breakup Fee;

3.  any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities through a credit bid;

4.  any benefit to the Debtors' bankruptcy estates from any other assumption of liabilities, including any liabilities under the Pension Plans, the assumption of the sponsorship of all, any, or a portion of the Pension Plans;

5.  the value to be provided to the Debtors under the Bid for the Stores included therein (individually and in the aggregate);

6.  the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals;

8

7.  the impact on employees, employee claims against the Debtors, Affected Labor Agreements, and whether the Potential Bidder has reached an agreement with the Affected Unions;

8.  the impact on trade creditors and landlords; and

9.  any other factors the Debtors may reasonably deem relevant.

Designation of Qualified Bidders

A bid will be considered a "**_Qualified Bid_**," and each Potential Bidder that submits a Qualified Bid will be considered a "**_Qualified Bidder_**," if the Debtors determine, after consultation with the Consultation Parties, that such Bid meets the requirements set forth in these Bidding Procedures.

The Debtors reserve the right to work with any Bidder in advance of the Auctions to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid.  If a Bid is received and, in the Debtors' judgment, after consultation with the Consultation Parties, it is not clear whether the Bid is a Qualified Bid, the Debtors may consult with the Potential Bidder and seek additional information in an effort to establish whether or not the Bid is a Qualified Bid.

The Debtors, after consultation with the Consultation Parties, will have the right to determine that a Bid is not a Qualified Bid if any of the following conditions are satisfied:

(A)  A Potential Bidder has failed to comply with reasonable requests for additional information from the Debtors;

(B)  If the Bid includes a credit bid, such Bid does not (i) include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment), (ii) comply with the terms of the Intercreditor Agreement or (iii) pay cash in the amount of any assets on which such bidder seeks to purchase, but does not have a valid, perfected and unavoidable lien; provided that any Bid that does not include a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee shall not be a Qualified Bid; or

(C)  The terms of the Bid are burdensome or conditional in view of the proposed purchase price or are materially more burdensome or conditional than the terms of the relevant Stalking Horse Agreement, and are not offset by a material increase in purchase price, which determination (as made by the Debtors in consultation with the Consultation Parties) may take into consideration, among other things:

(i)  whether the Bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including, the Breakup Fee);

9

(ii)    whether the Bid includes a non-cash instrument or similar consideration that is not freely marketable.

Stalking Horse is a Qualified Bidder and Stalking Horse's Bid is a Qualified Bid as to the Stalking Horse Stores.  Should it decide to credit bid, each of (A) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Revolving Credit Agreement, dated as of September 17, 2014, (B) Wells Fargo Bank, National Association, as agent under that certain Amended and Restated Senior Secured Term Credit Agreement, dated as of September 17, 2014, (C) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured PIK Toggle Notes due 2017, dated as of March 13, 2012, or the majority holder of the Senior Secured PIK Toggle Notes due 2017, (D) U.S. Bank National Association, as trustee under that certain Indenture for Senior Secured Convertible Notes due 2018, dated as of March 13, 2012, or the majority holder of the Senior Secured Convertible Notes due 2018, and (E) the DIP Lenders is a Qualified Bidder and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline, complies with the above requirements set forth under the heading "Designation of Qualified Bidders," complies with section 363(k) of the Bankruptcy Code, complies with the requirements for a credit bid, complies with section 5.06(d) of the Intercreditor Agreement and includes a cash component sufficient to pay, and earmarked exclusively for payment of, the Breakup Fee, and all obligations secured by senior liens on the applicable assets to be purchased.

## **Pre-Auction Procedures**

Determination and Announcement of Baseline Bids

In consultation with the Consultation Parties, the Debtors shall make a determination regarding:

(A)    the highest or best Qualified Bid for each of the Stalking Horse Stores (each, a "**Baseline Bid**" and such bidder or group of bidders, a "**Baseline Bidder**") to serve as the starting point at the Auction for the Stalking Horse Stores; and

(B)    which Bids have been determined to be Qualified Bids.

On **October 7, 2015, at 5:00 p.m. (Eastern Time)** (the "**Designation Deadline**"), the Debtors shall file notice of the foregoing on the Court's docket and publish such notice on the website of their claims and noticing agent and in the Data Room.  As soon as practicable but no later than one (1) day prior to the Auction, the Debtors will provide copies of each Baseline Bid to the Consultation Parties and Stalking Horse.

Between the date hereof and the Auction, the Debtors may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for the Debtors, during the period that such Qualified Bid remains binding as specified herein; provided that any Qualified Bid may be improved at the Auction, as set forth in

10

the Bidding Procedures.

Except as provided in the Stalking Horse Agreements, the Debtors are under no obligation to (A) select any Baseline Bid, (B) consummate or pursue any transaction with respect to one or more of the Stalking Horse Stores, or (C) conduct the Auction, whether before or after selecting a Baseline Bid.  Notwithstanding anything to the contrary contained herein, the Debtors may elect, in their reasonable discretion, and after consultation with the Consultation Parties, to adjourn the Auction and/or to consummate a sale transaction with Stalking Horse with respect to one or more of the Stalking Horse Stores without holding the Auction.

<u>Failure to Receive Two or More Qualified Bids</u>

With respect to each Stalking Horse Store, if no Qualified Bid other than the one submitted by Stalking Horse is received by the Bid Deadline, the Debtors will not conduct the Auction for that Stalking Horse Store, and shall file and serve, **by October 7, 2015 at 5:00 p.m. (Eastern Time)**, a notice indicating that the Auction has been cancelled with respect to such Stalking Horse Store, that Stalking Horse is the Successful Bidder as to such Stalking Horse Store and that the Sale Hearing as to the sale of such Stalking Horse Store to Stalking Horse will be conducted on the date set forth in the Sale Motion (defined below).

## The Sale Motion and Sale Order

In accordance with the Discrete Procedures, the Debtors will file a notice or motion (the "**Sale Motion**") seeking entry of order(s) authorizing and approving, *inter alia*, the applicable sale transaction(s) to the Successful Bidder(s) with respect to the Stalking Horse Stores (each, a "***Sale Order***").  Each Sale Order shall authorize and approve the applicable sale transaction to the Successful Bidder (defined below) for each of the Stalking Horse Stores.

The Sale Motion shall set forth the date of the hearing(s) before the Bankruptcy Court to consider entry of the Sale Order(s).  In the Debtors' reasonable discretion (after consultation with the Successful Bidder(s)), any Sale Hearing may be adjourned or rescheduled without notice or with limited and shortened notice to parties, including by (A) an announcement of such adjournment at the Sale Hearing or at the Auction or (B) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Sale Hearing; <u>provided</u> that nothing herein shall authorize the Debtors to unilaterally extend any date or deadline set forth in the Stalking Horse Agreements.

## Auction Procedures

With respect to each Stalking Horse Store, if a Qualified Bid is received from a Qualified Bidder other than Stalking Horse, the Debtors will conduct the Auction with respect to such Stalking Horse Store on **October 8, 2015, beginning at 9:30 a.m. (Eastern Time), at the offices of Weil, Gotshal & Manges LLP; 767 Fifth Avenue, New York, New York 10153**. Only Qualified Bidder(s) will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith.  Professionals and/or other representatives of the Consultation Parties will be permitted to attend and observe the Auction.

WEIL:\95469954\4\50482.0005

At the Auction, Qualified Bidders (including Stalking Horse) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the purchase price and terms proposed in the applicable Baseline Bid, and will proceed thereafter in increments of 2% of the applicable Baseline Bid (a "**Minimum Overbid Amount**"). If Stalking Horse bids at the Auction, Stalking Horse will be entitled to a "credit" in the amount of the Breakup Fee to be counted towards its bid such that the cash and other consideration proposed by Bidder plus the Breakup Fee "credit" must exceed the most recent bid by at least the Minimum Overbid Amount.

The Debtors may adopt rules, after consultation with the Consultation Parties, for the Auction at any time that the Debtors reasonably determine to be appropriate to promote a spirited and robust auction pursuant to the Discrete Procedures and are not inconsistent with these Bidding Procedures. At the start of the Auction, the Debtors shall describe the terms of the applicable Baseline Bid. Any rules adopted by the Debtors will not unilaterally modify any of the terms of the Stalking Horse Agreements (as may be consensually modified at the Auction) without the consent of Stalking Horse. Any rules developed by the Debtors will provide that all bids in a particular Auction will be made and received in one room, on an open basis, and all other bidders participating in that Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders participating in that Auction and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be fully disclosed to all other bidders throughout the entire Auction. Each Qualified Bidder will be permitted what the Debtors reasonably determine to be an appropriate amount of time to respond to the previous bid at the Auction.

Except as otherwise set forth in the Stalking Horse Agreements, the Debtors reserve the right to and may, after consultation with the Consultation Parties, reject at any time before entry of the relevant Sale Order any bid that, in the Debtors' judgment, is: (A) inadequate or insufficient; (B) not in conformity with the requirements of the Bankruptcy Code, the Discrete Procedures, these Bidding Procedures or the terms and conditions of the applicable sale transaction; or (C) contrary to the best interests of the Debtors and their estates.

Prior to the conclusion of the Auction, the Debtors, after consultation with the Consultation Parties, will: (A) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating a sale transaction; (B) determine the highest or best offer for each Stalking Horse Store (each, a "***Successful Bid***"); (C) determine which Qualified Bid is the next highest or best bid for each Stalking Horse Store (each, the "***Back-Up Bid***"); and (D) notify all Qualified Bidders participating in the Auction, prior to its conclusion, the successful bidder for each Stalking Horse Store (the "***Successful Bidder***"), the amount and other material terms of the Successful Bid and the identity of the party that submitted the Back-Up Bid for such Stalking Horse Store (the "***Back-Up Bidder***").

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding or the Auction.

WEIL:\95469954\4\50482.0005

**Post-Auction Process**

A Successful Bidder shall, within one (1) business day after the close of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid. Promptly following the submission of such documentation, the Debtors shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder. The Successful Bid may not be assigned to any party without the consent of the Debtors after consultation with the Consultation Parties.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (A) ninety (90) days after the completion of the Auction, but in no event later than January 31, 2016 (B) the consummation of the transaction with the Successful Bidder, or (C) the release of such bid by the Debtors (such date, the "**Back-Up Bid Expiration Date**"). If the transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

At a Sale Hearing, the Debtors will present a Successful Bid to the Bankruptcy Court for approval.

Unless otherwise required pursuant to the Debtors' fiduciary duties, the Debtors shall not consider any bids submitted after the conclusion of the Auction.

**Treatment and Return of Deposits**

Potential Bidders

Within three (3) business days after the Designation Deadline, the Escrow Agent shall return to each Potential Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Potential Bidder's Deposit, plus any interest accrued thereon. Upon the authorized return of such Potential Bidder's Deposit, the bid of such Potential Bidder shall be deemed revoked and no longer enforceable.

Qualified Bidders

The Deposit of a Qualified Bidder will be forfeited to the Debtors if (A) the applicable Qualified Bidder attempts to modify, amend or withdraw its Qualified Bid, except as permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures, or (B) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the transaction according to these Bidding Procedures and the terms of the applicable transaction documents with respect to the Successful Bid. The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by the Debtors two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of the Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

With the exception of the Deposit of a Successful Bidder and a Back-Up Bidder,

the Escrow Agent shall return to any other Qualified Bidder any Deposit, plus any interest accrued thereon, three (3) business days after the execution by the Successful Bidder and the Debtors of the documentation memorializing the Successful Bid, but in no event later than seven (7) business days after the conclusion of a Sale Hearing.

Notwithstanding anything to the contrary herein, the good faith deposits provided by Stalking Horse pursuant to the Stalking Horse Agreements (including any required return of such deposit) shall be governed by the terms and conditions of the Stalking Horse Agreements.

Back-Up Bidder

The Escrow Agent shall return a Back-Up Bidder's Deposit, plus any interest accrued thereon, within three (3) business days after the occurrence of the applicable Back-Up Bid Expiration Date.

The Successful Bidder

The Deposit of a Successful Bidder shall be applied against the cash portion of the Purchase Price of such Successful Bidder upon the consummation of the transaction proposed in the applicable Successful Bid.

Joint Notice to Escrow Agent

The Debtors and, as applicable, the Potential Bidder, Qualified Bidder, and/or Back-Up Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit, to the extent such return is required by these Bidding Procedures.  If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

Consultation Parties

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by the Discrete Procedures or these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

In the event that any Consultation Party or any member of the Creditors' Committee or an affiliate of any of the foregoing, submits a bid that is a Qualified Bid, any obligation of the Debtors to consult with the bidding party established under the Discrete Procedures or these Bidding Procedures will be waived, discharged and released without further action; provided that the bidding party will have the same rights as any other Potential Bidder set forth above, and will retain any rights it has under existing orders regarding debtor in possession financing and/or use of cash collateral (to the extent applicable).

If a member of the Creditors' Committee submits a Qualified Bid, the Creditors' Committee will continue to have Consultation Rights; provided that the Creditors' Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets

WEIL:\95469954\4\50482.0005

and shall not provide any confidential information regarding the sale of the Assets to such member.

## <u>Consent to Jurisdiction and Authority as Condition to Bidding</u>

All bidders that participate in the Auction (including Stalking Horse) shall be deemed to have (A) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, (B) waived any right to a jury trial in connection with any disputes relating to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, and (C) consented to the entry of a final order or judgment in any way related to the Discrete Procedures, these Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## <u>Reservation of Rights</u>

The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties, to alter or terminate these Bidding Procedures, to waive terms and conditions set forth herein with respect to all potential bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers or investors (except for Stalking Horse) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Discrete Procedures Order; provided further that the Debtors' exercise of their discretion in evaluating bids and administering the bidding and auction process described herein does not permit, and shall not be construed as permitting, the Debtors to materially deviate from the procedures, terms, conditions and protections set forth in these Bidding Procedures and/or the Discrete Procedures Order.

15

**Exhibit B**

**Food Bazaar Agreements**

CONFIDENTIAL

STORE NO: **072-6634**
111-10 FLATLANDS AVENUE
BROOKLYN, NEW YORK

## LEASE SALE AGREEMENT

THIS LEASE SALE AGREEMENT (this "**Agreement**") is made as of September __, 2015 by and between A&P REAL PROPERTY, LLC, a Delaware limited liability company ("**Tenant**" or "**Seller**"), and BOGOPA SERVICE CORP., a New York corporation ("**Buyer**", and collectively with Seller, the "**Parties**").

W I T N E S S E T H :

WHEREAS, Tenant is the tenant under that certain lease more specifically described on Exhibit A attached hereto and made a part hereof (together with any amendments, modifications, extensions and renewals, the "**Lease**"), with respect to all or a portion of certain real property (the "**Leased Premises**"), which real property is more particularly described in Exhibit B attached hereto and made a part hereof (the "**Premises**");

WHEREAS, Seller and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, pursuant to the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, If Necessary, and Sale Hearings* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 495] (the "**Global Bidding Procedures Order**") or the Order *Approving Discrete Sale and Lease Rationalization Procedures* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 496] (the "**Discrete Procedures Order**"), as applicable, and subject to any approval of the Bankruptcy Court required by the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, Seller desires to sell, assign, convey and transfer all of its rights, title and interests as tenant under the Lease, together with all of its rights, title and interests as sublessor under those certain sublease agreements and/or license agreements more particularly described on Exhibit C attached hereto (each, a "**Sublease**" and, collectively, the "**Subleases**"), if any, and

**[CHECK AND INITIAL WHERE INDICATED IF APPLICABLE]**

☒   all trade fixtures, shopping carts, aisle markers, store models, shelving, display racks and refrigeration equipment and other furnishings and equipment owned by Seller located at the Leased Premises ("**FF&E**");

*INITIAL* [_____]

WHEREAS, Buyer desires to purchase and accept such assignment and assume all rights, title, interests and obligations of Tenant under the Lease, and any Subleases and FF&E to the extent set forth herein, subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Seller and Buyer agree as follows:

1.    Procedures.  This Agreement is made subject to, and in accordance with, the Global Bidding Procedures Order or the Discrete Procedures Order.  Capitalized terms used but not otherwise defined herein (including on Schedule I attached hereto) shall have the meanings ascribed to them in the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable.  In the event of a contradiction between this Agreement and the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, shall control.

2.    Lease Consideration.  The consideration for the assignment of the Lease, together with the Subleases and FF&E to the extent set forth herein (the foregoing, as applicable, collectively, the "**Acquired Assets**"), shall be equal to THREE MILLION FIVE HUNDRED FIFTY THOUSAND ($3,550,000.00) DOLLARS (the "**Purchase Price**") which shall be comprised of:

a.    Three Million Five Hundred Fifty Thousand Dollars ($3,550,000.00) as consideration for the Lease, plus

b.    **NONE.**[1]

Buyer's submission of an executed copy of this Agreement along with the Deposit shall be deemed an irrevocable offer subject only to the rights of termination provided herein.

3.    Payment of Purchase Price.  The Purchase Price shall be paid to Seller by Buyer as follows:

a.    Deposit.  Concurrently herewith, Buyer shall deposit with TITLEVEST SERVICES, LLC, a New York limited liability company ("**Escrowee**") by a bank wire transfer of immediately available federal funds to an account designated by Escrowee the sum of ONE HUNDRED SEVENTY SEVEN THOUSAND FIVE HUNDRED ($177,500.00) DOLLARS (together with all interest thereon, the "**Deposit**"), which Deposit shall be held by Escrowee pursuant to the escrow agreement (the "**Escrow Agreement**") attached hereto as Exhibit D and hereby made a part hereof.  Notwithstanding anything to the contrary set forth in this Agreement or in the Escrow Agreement, (i) all charges of Escrowee, if any, attendant to holding and/or disbursing the Deposit shall be paid by Buyer and (ii) all interest accrued in connection with the Deposit hereunder shall accrue for the sole benefit of the party to whom the Deposit is paid.  The Parties agree that any payments made pursuant to this Section 3(a) in respect of accrued interest

---

[1] NTD: We have required that bidders separately list the consideration for the leases, FF&E and inventory to facilitate the expedient calculation and timely payment of transfer taxes and sales taxes.

WEIL:\95469023\4\50482.0005

shall be deemed to be an adjustment to the Purchase Price for tax purposes to the extent permitted by applicable Law.

b.    Closing Payment.  On the Closing Date, as defined below, the Purchase Price, as adjusted by the application of the Deposit, shall be paid by Buyer by wire transfer of immediately available federal funds to the account designated on Exhibit E hereto or as otherwise designated in writing by Seller.

4.    Allocation.  If, at least three (3) Business Days prior to Closing, either Seller or Buyer requests a further allocation of the Purchase Price (and all other relevant items) among the Acquired Assets, the Parties mutually agree to determine in good faith an appropriate allocation to be reflected in writing no later than the Closing (the "**Allocation Schedule**").  The Allocation Schedule shall be conclusive and binding on the Parties, and Seller and Buyer agree to (and agree to cause their respective subsidiaries and Affiliates to) prepare, execute, and file all Tax Returns on a basis consistent with the Allocation Schedule (including any update thereto).  None of the Parties will take any position inconsistent with the Allocation Schedule (including any update thereto) on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority.  The Allocation Schedule may be updated from time to time by mutual agreement of the Parties and as necessary to reflect any adjustment to the Purchase Price for applicable Tax purposes or as required by applicable Law.

5.    Payment of Cure Amount.  The Purchase Price includes consideration for the proposed cure amount of the Lease (the "**Cure Amount**"), which Cure Amount shall be the total amount payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Buyer and assignment to Buyer of all contracts being assigned hereunder, and which shall be subject to approval by the Bankruptcy Court.

6.    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York, such other location in the state where the Leased Premises are located as may be selected by Seller, or such other location as shall be mutually agreed upon by Seller and Buyer commencing at 10:00 a.m. local time on a date (the "**Closing Date**") that is the thirtieth (30th) Business Day following the date hereof, or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto.  Seller shall have a one time right to adjourn the Closing for up to thirty (30) days on notice provided no later than the Closing Date.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective at 12:01 a.m., New York City time, on the Closing Date.

7.    Assignment.  As of the Closing Date, pursuant to sections 363 and 365 of the Bankruptcy Code and in accordance with the Discrete Procedures or a sale order entered pursuant to the Global Bidding Procedures Order, Tenant shall grant, transfer and assign to Buyer, without representation or warranty of any kind, all of its right, title, and interest in and to the Lease, the Subleases, if any, and, to the extent provided herein, FF&E.

8.    Assumption.  On and after the Closing Date, Buyer shall assume all of the covenants, agreements, and obligations of Tenant as tenant under the Lease and as sublessor

under the Subleases, if any.  In further consideration of the above assignment, Buyer hereby agrees that it shall, as of the Closing Date: (a) perform all of the covenants, conditions and agreements of (i) the Lease (including making all payments) as if Buyer were the original tenant under the Lease and (ii) the Subleases, if any, as if Buyer were the original sublessor under each of such Subleases, and (b) that the Lease and each of the Subleases, if any, shall remain in full force and effect.  As of the Closing Date, Seller shall have no further liabilities or obligations with respect to the Lease, including, but not limited to, obligations related to rents, utilities, Taxes, insurance and common area maintenance, regardless of when due and payable, nor any of the Subleases, if any, and Seller shall be released from all such obligations and Buyer shall fully indemnify and hold harmless Seller with respect thereto.  No Person, other than Buyer, shall be deemed a beneficiary of the provisions of this Section 8.

9.    Prorations/Adjustments.  As set forth above, Seller shall be solely responsible to pay the Cure Amount to the landlord.  There will be no prorations between Seller and Buyer on the Closing Date, and no post-assignment reconciliations or adjustments of any kind shall occur.  Buyer shall receive the benefits and burdens for all adjustments under the Lease that occur after the Closing Date (regardless of the period in question that is subject to the adjustment), including year-end adjustments for Taxes, fees, any common area maintenance charges, and percentage rent for calendar year 2015 and thereafter and Buyer shall fully indemnify and hold harmless Seller with respect thereto.  Seller shall retain all security deposits under any Subleases and there shall be no offset or reduction in the Purchase Price in connection with the same.  Buyer shall replace all such security deposits as of the Closing Date and maintain the same in accordance with applicable Laws and each Sublease, as applicable.

10.    Free and Clear of All Liens.  Pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, Seller shall convey its rights and interests under the Lease to Buyer free and clear of all liens, claims, interests, or encumbrances (collectively, "**Liens**"), if any, with any such Liens attaching to the proceeds paid to Seller.

11.    Closing Deliverables.  On the Closing Date:

a.    Seller shall deliver to Buyer a duly executed copy of: (i) an Assignment and Assumption of Lease in the form attached hereto as Exhibit F ("**Assignment and Assumption**"); (ii) a FIRPTA Certificate; (iii) if applicable, Transfer Tax forms or certifications provided by Buyer as more specifically described in subsection (b) below; (iv) if applicable, a Quitclaim Bill of Sale in the form attached hereto as Exhibit G; (v) a landlord notice and a subtenant notice (if applicable), each in the form attached hereto as Exhibit H; and (vi) if applicable, an assignment and assumption with respect to the Subleases, to the extent such Subleases are assignable and are in effect on the Closing Date, in the form attached hereto as Exhibit I ("**Assignment of Subleases**").

b.    Buyer shall deliver to Seller: (i) a fully executed counterpart of the Assignment and Assumption, (ii) an executed copy of all Transfer Tax forms or certifications as may be required by each state, county or municipality to record the Assignment and Assumption and effectuate the transactions contemplated herein; (iii) a fully executed counterpart of the Assignment of Subleases; (iv) such other documents as may be reasonably required to complete

the transactions provided for in this Agreement. All documents executed and delivered by Buyer pursuant to this Section shall be in form and substance reasonably satisfactory to Seller.

12.    Transfer Tax Forms. Buyer shall be responsible for the preparation, delivery and recordation of any and all real estate Transfer Tax forms or certifications required by any Governmental Authority (unless Seller notifies Buyer that they will do so), with Buyer being responsible for any payment required therewith as provided in Section 13. The Party that is required by applicable law to file or record any other Transfer Tax forms or certifications shall prepare and timely file and record such forms or certifications, with Buyer being responsible for any payment required therewith with respect to the Acquired Assets as provided in Section 13. The Parties hereto shall cooperate in making, in a timely manner, all such tax returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any such Transfer Taxes. At Seller's request, all Transfer Tax forms and certifications, along with payment therefor, shall be delivered by Buyer to Seller for recordation and payment with the appropriate Governmental Authority. To the extent required by applicable Law, Seller shall execute any Transfer Tax forms or certifications.

13.    Closing Costs.

a.    Seller and Buyer shall each pay their own attorneys' fees and expenses. Buyer shall pay (i) all state, county and local Transfer Taxes required to be paid in connection with the assignment and assumption of the Lease and any and all Subleases, and the consummation of the transactions contemplated herein, all of which amounts shall be paid, if applicable, to the proper Governmental Authority on or prior to the Closing Date and (ii) all title and escrow charges.

b.    Except as otherwise provided in this Agreement, all other costs and expenses of the transaction contemplated by this Agreement shall be borne by Buyer.

c.    Buyer agrees to fully indemnify and hold Seller harmless for, from and against any loss, cost, claim, damage or expense incurred, directly or indirectly, by Seller as a result of Buyer's failure to pay any Taxes or costs pursuant to clauses (a) and (b) above. Buyer's obligations in this Section shall survive the Closing Date.

14.    Conditions to Closing.

a.    Conditions to Buyer's Obligations. Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)    the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

AP/D226551/FCORP399

WEIL:\95469023\4\50482.0005

(ii)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(iii)    each delivery contemplated by Section 11(a) to be delivered to Buyer shall have been delivered.

b.    Conditions to Seller's Obligations.    Seller's obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(i)    Buyer shall have performed and complied with all of its covenants and agreements hereunder through the Closing in all material respects;

(ii)    the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(iii)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(iv)    each payment contemplated by Sections 3, 4 and 13 to be made to Seller or any landlord shall have been made, and each delivery contemplated by Section 11(b) to be delivered to Seller shall have been delivered.

c.    No Frustration of Closing Conditions.    Neither Buyer nor Seller may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Subsection 14(a) or Subsection 14(b), as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliate's failure to use its reasonable best efforts (or commercially reasonable efforts, with respect to those matters contemplated by Section 17, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach hereunder.    The Parties agree that neither the failure to obtain a court order nor any action with respect to a Competing Bid (as defined below), to the extent permitted hereunder, shall be deemed to be a failure to use the efforts required to satisfy the conditions to consummation of the transactions contemplated hereunder nor a breach hereunder.

15.    No Other Contingencies.    Buyer expressly agrees and acknowledges that Buyer's obligations hereunder are not in any way conditioned upon or qualified by Buyer's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt, financing or equity investment or otherwise) nor upon Buyer's ability to obtain title insurance.

16.    Termination of Agreement.

a.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(i)        by the mutual written consent of the Parties;

(ii)       by any Party by giving written notice to the other Party if:

(A)       any court of competent jurisdiction shall have enacted or issued a Law permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this agreement and such Law or Decree or other action shall have become final and non-appealable; or

(B)       the Closing shall not have occurred prior to the sixtieth (60) day from the date hereof ("**Outside Date**"); provided that if the Closing shall not have occurred on or before the Outside Date due to a material breach of this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this Section 16(a)(ii)(B).

(iii)      if (i)(x) Seller enters into a definitive agreement with respect to a higher or better competing bid in accordance with the bidding procedures attached hereto as Exhibit J (the "**Bidding Procedures**") in respect of the Lease (a "**Competing Bid**"), (y) the Bankruptcy Court enters an order approving the Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

b.        Seller may terminate this Agreement at any time prior to Closing if Buyer fails to satisfy any requirement set forth under Section 14(b)(v), including delivery of the Deposit required hereunder. In such case, the Agreement shall be rendered null and void, Seller shall be entitled to retain any and all consideration already paid to Seller, including, but not limited to, the Deposit.

c.        Effect of Termination.  If any Party terminates this Agreement pursuant to Section 16(a) or (b), all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Section 13, this Section 16, Sections 23 through 43, and Schedule I shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 16(b) and Section 17) to the other Party hereunder (except as may be provided in Section 4 and Subsection 16(b)); provided, however, that nothing in this Section 16 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, subject to Section 16(d) below, that other than in the case of fraud or willful misconduct, (a) the maximum Liability of Seller under this Agreement shall not exceed the reasonable out of pocket expenses incurred by Buyer and (b) subject to subsection (d) below, the maximum liability of Buyer under this Agreement shall not exceed the Deposit.

d.        Lease Indemnity.  Notwithstanding anything contained herein to the contrary, if this Agreement is terminated pursuant to Section 16(a) or (b), Buyer shall indemnify Seller for all Liabilities and Damages arising out of any Lease assumed by Seller pursuant to section 365(k) of the Bankruptcy Code. This indemnity shall survive such early termination.

17.      Bankruptcy Court Matters.

AP/D226551/FCORP399

WEIL:\95469023\4\50482.0005

a.    <u>Competing Transaction</u>.  This Agreement is subject to approval by the Bankruptcy Court in accordance with the Discrete Procedures Order, and the consideration by Seller of a Competing Bid in accordance with the Discrete Procedures Order and, in the event Sellers receive a Competing Bid, an auction to be conducted in accordance with the Bidding Procedures.

b.    <u>Break Up Fee</u>.  In consideration for Buyer having expended considerable time, effort and expense in connection with this Agreement, Sellers grant Buyer, subject to compliance with the Discrete Procedures Order, a break-up fee in an amount equal to 3% of the Purchase Price (the "**Break Up Fee**").  Seller further agrees that the Break Up Fee constitutes an allowed administrative expense claim against Seller's estate pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code.  In the event a Competing Bid is consummated, if no material breach by Buyer of this Agreement has occurred, Seller shall cause the (1) refund of the Deposit to Buyer in accordance with the Bidding Procedures and (2) payment to Buyer of the Break Up Fee on the first Business Day following the date of consummation of the Competing Bid.

c.    From the date hereof and until the transactions contemplated hereby are consummated, Seller is permitted to, and is  permitted to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by or from any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, and  Seller shall be permitted and shall have the authority to (and to cause its Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, including supplying information relating to the assets of Seller to prospective buyers.  Without limiting the foregoing, Seller shall be permitted to perform all of the foregoing activities with respect to all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Global Bidding Procedures Order, Discrete Procedures Order or other applicable Law.

d.    <u>Bankruptcy Court Filings</u>.

(i)    If the Buyer is the successful bidder (to the extent an auction is conducted), as soon as reasonably practicable following the execution of this Agreement, Seller shall seek approval of the Agreement in accordance with the Global Bidding Procedures Order or the Discrete Procedures Order and file any necessary notice or pleadings required in connection therewith. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the transactions contemplated by this Agreement pursuant to the Global Bidding Procedures Order or the Discrete Procedures Order, including a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for providing the Adequate Assurance Information to the Cure Notice Parties and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  Buyer shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder.  In the event the approval of the transactions contemplated by this

Agreement shall be appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

18.     <u>Intentionally Omitted</u>

19.     <u>Delivery; "AS IS" Transaction.</u>

    a.     Buyer acknowledges that it has fully inspected or waived the right to inspect the Leased Premises prior to the execution of this Agreement and does hereby assume all of the risks, including, but not limited to, latent defects in the Leased Premises. Seller shall not be obligated to do any work or alter, restore, repair or develop the Leased Premises, but Seller shall deliver the Leased Premises in vacant, broom clean condition, and, if applicable, with all furnishings, fixtures, equipment, inventory, racks, aisle displays, refrigeration equipment and personal property removed from the Leased Premises. Any work (including demolition) which may be necessary to adapt the Leased Premises for Buyer's occupancy or for the operation of Buyer's business therein shall be the sole responsibility of Buyer and shall be performed by Buyer at its sole cost and expense, in accordance with the terms of the Lease.

    b.     BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE LEASE OR THE LEASED PREMISES (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE LEASED PREMISES; THE PHYSICAL CONDITION OF THE LEASED PREMISES; THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE LEASED PREMISES OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE LEASED PREMISES; THE ZONING OF THE LEASED PREMISES; THE POSSIBILITY OF DEVELOPING OR USING THE LEASED PREMISES IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE LEASE OR THE LEASED PREMISES; THE FITNESS OF THE LEASED PREMISES, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE LEASED PREMISES (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE LEASE OR THE LEASED PREMISES). BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLER. BUYER ALSO ACKNOWLEDGES THAT BUYER HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE LEASED PREMISES AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE LEASED PREMISES AND/OR THE LEASE, AS BUYER DEEMED NECESSARY OR APPROPRIATE AND

BUYER IS ACQUIRING THE LEASE AND THE LEASED PREMISES, BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT, AND BUYER IS NOT RELYING UPON ANY REPRESENTATIONS OF SELLER OR SELLER'S AGENTS. ACCORDINGLY, BUYER HEREBY ACCEPTS THE LEASED PREMISES IN ITS "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS.

20.    Store Closed. The Parties acknowledge and agree that Seller has ceased (or will cease as of the Closing Date) operations at the Leased Premises and the Leased Premises will be delivered in broom clean condition.

21.    Release; Indemnity. Pursuant to section 365(k) of the Bankruptcy Code, on and after the Closing Date, Buyer agrees to defend and indemnify Seller against, and hold Seller harmless from, any and all claims, actions, proceedings, suits, costs, liabilities, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and disbursements), whether foreseen or unforeseen, in connection with the Lease, the Leased Premises (including, without limitation, the performance or observance or the failure or refusal to perform or observe any agreement or obligation of the tenant under the Lease or any term or provision thereof required to be performed by the tenant under the Lease), each Sublease, and this Agreement.

22.    Casualty and Condemnation.

a.    Seller agrees to give Buyer prompt written notice of any fire, flood or similar casualty affecting any portion of the Leased Premises or of any actual or threatened (to the extent that Seller has current knowledge thereof) taking or condemnation of all or any portion of any Leased Premises.

b.    If prior to Closing there shall occur:  (i) damage to any Leased Premises caused by fire or other casualty; or (ii) the taking or condemnation of all or any portion of the Leased Premises; then, in each case, the Closing Date shall occur as provided in this Agreement, and Buyer shall be assigned at the Closing Date (A) all interest of Seller in and to any insurance proceeds (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date), subject to all applicable deductible amounts or (B) condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding.

c.    The Parties hereby waive the provisions of the Uniform Vendor and Purchaser Risk Act (to the extent the same is applicable to the Leased Premises) and of any other Law to the same or similar effect, and agree that the same shall not apply to this Agreement.

23.    Brokers' Fees. Other than the fees and expenses payable to Evercore Group L.L.C. or Hilco Real Estate Group LLC in connection with the transactions contemplated hereby, which shall be borne by Seller, neither Party has entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay. Buyer shall indemnify and hold Seller

harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or liabilities, including reasonable attorneys' fees and disbursements, which Seller, or any of its affiliates may sustain, incur or be exposed to, by reason of any claim or claims against Buyer by any broker, finder or other person or entity for fees, commissions or other compensation arising out of the transactions contemplated herein if such claim or claims are based in whole or in part on dealings or agreements with the Buyer. Any broker retained by or providing services to Buyer in connection with the transaction evidenced by this Agreement shall be compensated solely by Buyer without contribution from Seller.

24. <u>Survival</u>. Except as specifically set forth herein, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to <u>Section 11(a)</u> or <u>Section 11(b)</u> shall survive, and each of the same shall terminate and be of no further force or effect as of the Closing.

25. <u>Expenses</u>. Except as otherwise expressly set forth herein, including but not limited to <u>Section 11</u>, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants. For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

26. <u>Entire Agreement</u>. This Agreement, any documents delivered at Closing pursuant hereto, and any confidentiality agreement entered into by Seller and Buyer in connection with this transaction, constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

27. <u>Incorporation of Exhibits and Schedules</u>. The Exhibits and Schedule(s) to this Agreement are incorporated herein by reference and made a part hereof.

28. <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach. No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 28</u> except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

29. <u>Succession and Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may

assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of each other Party.

30.    Notices.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

The Great Atlantic & Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention: Christopher W. McGarry and Matthew Bennett
E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Seller) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

If to Buyer:

Bogopa Service Corp.
650 FountainAvenue
Brooklyn, New York 11208
Attention:  Edward Suh, Esq.
E-mail: edward.suh@bogopausa.com

With a copy (which shall not constitute notice to Buyer) to:

Harfenist Kraut & Perlstein, LLP
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
Attention: Allen Perlstein
E-mail: aperlstein@hkplaw.com

With a copy (which shall not constitute notice to Buyer) to:

Klestadt Winters Jureller Southard & Stevens, LLP

570 Seventh Avenue
17th floor
New York, NY 10018
Attention: Tracy Klestadt, Esq.
E-mail: TKlestadt@Klestadt.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 30.

31. Governing Law. This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

32. Submission to Jurisdiction; Service of Process. Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 30; provided, however, that nothing in this Section shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

33. Waiver of Jury Trial. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

34. Specific Performance. Buyer acknowledges and agrees that Seller and its estate would be damaged irreparably in the event Buyer does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Seller may have under law or equity, Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any

AP/D226551/FCORP399

13

breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

35.    <u>Severability</u>.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

36.    <u>No Third Party Beneficiaries</u>.    This Agreement shall not confer any rights or remedies upon any Person other than Buyer, Seller, and their respective successors and permitted assigns, except as expressly set forth in this Agreement.

37.    <u>Non-Recourse</u>.    All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**"). In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this <u>Section 37</u>.

38.    <u>Mutual Drafting</u>.    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption

or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

39.    Headings.    The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

40.    Counterparts; Facsimile and Electronic Signatures.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

41.    Limitations Under Applicable Law.    Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to limitations under applicable Law, including, without limitation, Sections 1113 and 1114 of the Bankruptcy Code.

42.    Assignment of Lease.    The acceptance of the Assignment and Assumption by Seller shall be deemed to be a full performance of Seller and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement.

43.    Prevailing Party.    If any action is brought by either of the Parties against the other, then the prevailing Party shall be entitled to recover from the other Party court costs and reasonable attorneys' fees and costs actually incurred.

44.    Assignment.    Buyer shall have the right to assign this Agreement to an Affiliate simultaneously with the Closing, provided that such assignment shall not release Buyer from its obligations hereunder.

45.    Covered Employees.    For those store employees represented by a labor union, Buyer will negotiate with the appropriate local union representing such Covered Employees, in good faith, to (a) assume the applicable collective bargaining agreement; (b) reach a mutually acceptable collective bargaining agreement; or (c) enter into an agreement with such local union integrating such represented Covered Employees into Buyer's existing collective bargaining units. For all purposes of this Section 45, Buyer acknowledges the requirements of sections 1113 and 1114 of the Bankruptcy Code and agrees to use good faith reasonable best efforts to cooperate with Seller in ensuring compliance with any applicable provisions thereof. Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to applicable law, including, without limitation, sections 1113 and 1114 of the Bankruptcy Code and any applicable federal labor law.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

A&P REAL PROPERTY, LLC,
a Delaware limited liability company

By:_____
Name:
Title:


BOGOPA SERVICE CORP.,
a New York corporation


By:_____
Name: Edward Suh
Title: Vice President and Secretary

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


A&P REAL PROPERTY, LLC,
a Delaware limited liability company


By: _____
Name:
Title:



BOGOPA SERVICE CORP.,
a New York corporation


By: _____
Name: ___ ALLEN POLISTER
Title: ___ ASST. SECRETARY

## LIST OF SCHEDULE AND EXHIBITS

| SCHEDULE | DESCRIPTION |
|----------|-------------|
| Schedule I | Definitions |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Exhibit A | The Lease |
| Exhibit B | Premises |
| Exhibit C | Sublease(s) |
| Exhibit D | Escrow Agreement |
| Exhibit E | Wire Instructions |
| Exhibit F | Form of Assignment and Assumption of Lease |
| Exhibit G | Form of Quitclaim Bill of Sale |
| Exhibit H | Form of Landlord Notice and Form of Subtenant Notice |
| Exhibit I | Form of Assignment and Assumption of Subleases |
| Exhibit J | Bidding Procedures |

## Schedule I

## Definitions

(v)     "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

(vi)    "Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(vii)    "Code" means the Internal Revenue Code of 1986, as amended.

(viii)    "Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

(ix)    "Decree" means any judgment, decree, ruling, injunction or any other order of any Governmental Authority.

(x)     "FIRPTA Certificate" means a certificate from Tenant in compliance with applicable Treasury Regulations setting forth Tenant's (or, if applicable, its regarded owner's) name, address and federal tax identification number and stating that Tenant (or, if applicable, its regarded owner) is not a "foreign person" within the meaning of section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to section 1445 of the Code.

(xi)    "Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

(xii)    "Law" means any constitution applicable to, and any law, statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

(xiii)    "Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

(xiv)    "Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

(xv)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

(xvi)    "Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

(xvii)    "Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

(xviii)    "Transfer Tax" means any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated by this Agreement.

(xix)    "Treasury Regulations" mean the Treasury regulations promulgated under the Code

## EXHIBIT A

### The Lease

| 153 | 072-6634 | 111-10 FLATLANDS AVENUE | BROOKLYN | NY | STORE 072-6634 – 11110 FLATLANDS AVENUE, BROOKLYN, NY<br><br>LEASE DATED FEBRUARY 15, 1979, ORIGINALLY BETWEEN SHERADEL REALTY CORP., AS LANDLORD, AND SUPERMARKETS GENERAL CORPORATION, AS TENANT, AS THE SAME  MAY HAVE BEEN AMENDED.<br><ul><li>FIRST AMENDMENT OF LEASE DATED FEBRUARY 1, 1980</li><li>SECOND AMENDMENT OF LEASE DATED MAY 28, 1980</li><li>THIRD AMENDMENT OF LEASE DATED DECEMBER 1, 1980</li><li>MEMORANDUM OF LEASE AS AMENDED DATED DECEMBER 1, 1980 [RECORDED]</li><li>COMMENCEMENT AGREEMENT DATED APRIL 22, 1981</li><li>FOURTH AMENDMENT OF LEASE DATED SEPTEMBER 3, 1981</li><li>FIFTH AMENDMENT OF LEASE DATED DECEMBER 3, 1990</li><li>LETTER AGREEMENT DATED DECEMBER 24, 2003</li><li>LETTER AGREEMENT DATED DECEMBER 24, 2003</li><li>RENEWAL LETTER DATED JULY 19, 2005</li><li>LETTER AGREEMENT DATED APRIL 23, 2009</li><li>RENEWAL LETTER DATED JULY 22, 2010</li><li>ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED DECEMBER 23, 2011</li><li>SUBORDINATION, RECOGNITION AND NON DISTURBANCE AGREEMENT DATED JANUARY 6, 2012</li><li>ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012</li><li>GUARANTY DATED MARCH 13, 2012</li></ul>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.5.26 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |

## EXHIBIT B

**Leased Premises**

**111-10 Flatlands Avenue, Brooklyn, New York**

## EXHIBIT C

Sublease(s)

License Agreement dated December 23, 1997 by and between Pathmark Stores, Inc., as

Licensor, and Columbia Federal Savings Bank, as Licensee.

## EXHIBIT D

### Escrow Agreement

**Bidder ID No. 109**

**Site No(s). 072-6634, 072-6288, 038-3512, 038-3504**

### ESCROW RIDER TO LEASE SALE AGREEMENT

This Escrow Agreement dated this 10TH day of September 2015 (this "Escrow Agreement"), is entered into by and among THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., ("Seller"), BOGOPA SERVICE CORP. ("Bidder"), and TITLEVEST SERVICES, LLC, a New York limited liability company, as escrow agent ("Escrow Agent"). Seller and Bidder are known herein, individually or collectively as the context may require as a "Party" or the "Parties". Any capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Agreement (as defined below).

### W I T N E S S E T H

WHEREAS, the Bidder has executed that certain Lease Sale Agreement (the "Sale Agreement") as part of a bid for the acquisition of certain real property more particularly described on Exhibit A (the "Premises");

WHEREAS, as part of the bid process, Bidder is required to wire to Escrow Agent a Deposit in the amount of $587,500.00 (the "Escrow Funds"); and

WHEREAS, Bidder desires that Escrow Agent hold the Escrow Funds in escrow pursuant to the terms of this Escrow Agreement; and

WHEREAS, Escrow Agent is willing to hold the Escrow Funds, on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid, the receipt and sufficiency of which are hereby mutually acknowledged, the Parties and the Escrow Agent agree as follows:

**I.    ESCROW DEPOSIT**

A.    Delivery of Escrow Funds; Authorization of Escrow Agent. Concurrently with execution and delivery of this Escrow Agreement, Bidder shall deliver the Escrow Funds along with a nonrefundable Escrow Fee of $500 ("Initial Escrow Fee"; together with all other nonrefundable escrow fees set forth on Exhibit C, the "Nonrefundable Escrow Fees") to Escrow Agent via wire transfer. Upon receipt, the Escrow Funds shall be held by Escrow Agent in Escrow Agent's client escrow account at Citibank. The Parties hereby appoint Escrow Agent to serve as escrow agent with respect to the Escrow Funds, and Escrow Agent hereby accepts such appointment and agrees to act in accordance with the terms and subject to the conditions of this Escrow Agreement. Escrow Agent shall have the right to disburse the Escrow Funds, in whole or in part,

solely in accordance with the terms of this Escrow Agreement. Escrow Agent shall not, under any circumstances, pledge or hypothecate any portion of the Escrow Funds and shall act only as directed in accordance with the terms of this Escrow Agreement.

B.     UNTIL RELEASED AND DISBURSED IN ACCORDANCE WITH THE TERMS OF THIS ESCROW AGREEMENT, ALL ESCROW FUNDS SHALL (i) REMAIN THE PROPERTY OF BIDDER, (ii) NOT BE OR BECOME THE PROPERTY OR ASSETS OF SELLER OR ESCROW AGENT, AND (iii) NOT BE SUBJECT TO ANY LIEN OR ANY JUDGMENT OR CREDITORS' CLAIMS AGAINST SELLER, BIDDER OR ESCROW AGENT. IN NO EVENT SHALL ANY OF THE ESCROW FUNDS BE COMMINGLED WITH DEPOSIT ACCOUNTS OF ESCROW AGENT OR OTHERWISE TREATED AS A DEPOSIT ACCOUNT OF ESCROW AGENT OR REFLECTED ON THE FINANCIAL STATEMENTS OF ESCROW AGENT.

## II.    RELEASE OF ESCROW FUNDS

A.     Potential Bidder. If Bidder is determined by Seller not to meet the requirements for qualifying as a bidder in any auction for the Premises (the "Auction"), as confirmed by the Debtors, within three (3) business days after the deadline for Seller to make a determination regarding which bids have been determined to be qualified bids for such auction (the "Designation Deadline") ("Unqualified Bidder"), the Escrow Agent shall return to Bidder the Deposit.

B.     Qualified Bidder. The Deposit will be forfeited to Seller if Bidder is determined by Seller to meet the requirements for qualifying as a bidder at the Auction ("Qualified Bidder") and (A) Bidder attempts to modify, amend or withdraw its qualified bid, except as may permitted by the governing procedures or the Sale Agreement, during the time the qualified bid remains binding and irrevocable under the applicable procedures and the Sale Agreement or (B) the Bidder is selected as the Successful Bidder (defined below) and fails to enter into the required definitive documentation or to consummate the transaction according to the applicable procedures, and the terms of the applicable transaction documents with respect to the successful bid. The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by Seller two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of Seller stating that Bidder has breached or failed to satisfy its obligations or undertakings.

C.     Successful Bidder. If Bidder is the successful bidder for the Premises ("Successful Bidder"), Seller or its agent shall notify Escrow Agent, and Escrow Agent shall retain the Escrow Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement.

D.     Backup Bidder. If the Bidder is selected as the next highest or next best bid for purchase of the Premises ("Backup Bidder"), Seller or its agent shall notify the Escrow Agent, and the Escrow Funds will continue to be held by the Escrow Agent until the acquisition of the Premises by the Successful Bidder, at which time the Escrow Funds will be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as Exhibit B, less any applicable Nonrefundable Escrow Fees (and Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated); provided that if the Successful Bidder does not consummate the purchase of the Premises, then the Escrow Agent shall retain the Escrow Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement.

E.  Neither Successful Nor Backup Bidder.  If Bidder is determined by Sellers to be neither the Successful Bidder nor the Backup Bidder, then, within three (3) business days of execution by the Successful Bidder and Seller of the documentation memorializing the successful bid, the Escrow Funds will be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as Exhibit B, less any applicable Nonrefundable Escrow Fees. Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated.  In the case of Subsections (C) and (D) of this Section II, Escrow Agent shall release the funds no later than the Outside Date except to the extent the Sale Agreement is executed by Seller with respect to a Backup Bidder prior to the Outside Date.

F.  Disbursements.  The Debtors and Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit. If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

G.  Reliance.  Escrow Agent shall rely on all information provided to it by attorneys at Weil, Gotshal & Manges LLP regarding (i) the Successful Bidder, the Backup Bidder, an Unqualified Bidder and a Qualified Bidder (ii) the closing with the Successful Bidder, and (iii) any default by the Successful Bidder or acceptance of the Backup Bidder.  Bidder acknowledges that Escrow Agent is entitled to rely on said information in disbursing the Escrow Funds.

III.  **DUTIES OF THE ESCROW AGENT**

A.  Scope of Responsibility. Notwithstanding any provision to the contrary, Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstances will Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement.  Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to Escrow Agent; and Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document.  References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and Escrow Agent has no duties or obligations with respect thereto.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

B.  Attorneys and Agents. Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by Escrow Agent.  Escrow Agent shall be reimbursed for any and all compensation (reasonable and documented fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

C.  Reliance.  Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors and/or assigns.  Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent

by the proper person or persons, without further inquiry into the person's or persons' authority. Concurrently herewith, the Bidder shall deliver Exhibit D hereto, which contains authorized party designations.

D.      Right Not Duty Undertaken.  The permissive rights of Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

E.      No Financial Obligation.  No provision of this Escrow Agreement shall require Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.  Escrow Agent shall not be liable for the insolvency of any bank in which the Escrow Funds are deposited.

## IV.  PROVISIONS CONCERNING ESCROW AGENT

A.      Indemnification.  The Parties, jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, reasonable and documented attorneys' fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating to (a) the Escrow Agent's execution and performance of this Escrow Agreement, except to the extent that such loss, liability or expense shall have been finally adjudicated to have directly resulted from the gross negligence or willful misconduct of the Escrow Agent (or any person through which its duties are performed, as provided in Section 3(C)) or (b) the Escrow Agent's following any instructions or other directions from the Bidder or Sellers, except to the extent that its following any such instruction or direction is expressly forbidden by the terms of this Escrow Agreement. The provisions of this Section 4(A) shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

B.      Limitation of Liability. ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

C.      Resignation or Removal.  Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and Seller may remove Escrow Agent by furnishing to Escrow Agent a written notice of Escrow Agent's removal along with payment of all reasonable and documented fees and expenses to which it is entitled through the date of termination or removal.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Funds and to deliver the same to a successor escrow agent as shall be appointed by the Seller, as evidenced by a written notice filed with Escrow Agent or in accordance with a court order.  If the Seller fails to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting

appointment shall be binding upon the Parties. Any such successor escrow agent shall deliver to Seller and Bidder a written instrument accepting such appointment, and thereupon it shall succeed to all the rights and duties of the escrow agent hereunder and shall be entitled to receive possession of the Escrow Funds. Upon receipt of the identity of the successor escrow agent, the Escrow Agent shall deliver the Escrow Funds then held hereunder, less any reasonable and documented fees and expenses then due and owing to the Escrow Agent, to the successor escrow agent. In the event of the resignation or removal of the Escrow Agent, the resigning or removed Escrow Agent shall be absolved from any further duties as the Escrow Agent hereunder; provided, however, that the Escrow Agent or any successor escrow agent shall continue to act as the Escrow Agent until a successor is appointed and qualified to act as the Escrow Agent.

D.    Compensation. Escrow Agent shall be entitled to fees and expenses incurred in administering and disbursing the Escrow Funds, and compensation for its services which shall be paid by Bidder as set forth on Exhibit C. If any material controversy arises hereunder, or Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then Escrow Agent shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable and documented attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event. If any amount due to Escrow Agent hereunder is not paid within thirty (30) days of the date due, Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.

E.    Disagreements. If any conflict, disagreement or dispute arises between, among, or involving the Parties concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or Escrow Agent is in doubt as to the action to be taken hereunder, Escrow Agent is authorized to retain the Escrow Funds until Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Funds, (ii) receives a written agreement executed by the Parties directing delivery of the Escrow Funds, in which event Escrow Agent shall be authorized to disburse the Escrow Funds in accordance with such agreement, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, Escrow Agent shall be relieved of all liability as to the Escrow Funds which it delivers to such court and shall be entitled to recover reasonable and documented attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

F.    Attachment of Escrow Funds; Compliance with Legal Orders. In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting Escrow Funds, Escrow Agent is hereby expressly authorized, in its reasonable discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that Escrow Agent obeys or complies with any such writ, order or decree, it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

V.    **MISCELLANEOUS**

A.    Successors and Assigns. This Escrow Agreement shall be binding on and inure to the benefit of the Parties and Escrow Agent and their respective successors and permitted assigns.

No other persons shall have any rights under this Escrow Agreement.  No assignment of the interest of the Parties shall be binding unless and until written notice of such assignment shall be delivered to other Party and Escrow Agent and shall require the prior written consent of such other Party and Escrow Agent (such consent not to be unreasonably withheld).

B.      Notices.  All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (a) personally, (b) by facsimile transmission with written confirmation of receipt, (c) on the day of transmission if sent by electronic mail ("e-mail") to the e-mail address given below, (d) by overnight delivery with a reputable national overnight delivery service, or (e) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited in the United States mail.  If notice is given to a party, it shall be given at the address for such party set forth below.  It shall be the responsibility of each party hereto to notify the Escrow Agent and the other Party in writing of any name or address changes.

If to Sellers:

The Great Atlantic and Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention:  Christopher W. McGarry; Matthew Bennett
E-mail:  mcgarryc@aptea.com; bennettm@aptea.com

with a copy (which shall not constitute notice to Sellers) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
Facsimile: (212) 310-8007
E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

Notices to Bidder:

Bogopa Service Corp.
650 FountainAvenue
Brooklyn, New York 11208
Attention:  Edward Suh, Esq.
E-mail: edward.suh@bogopausa.com

With a copy to:

Harfenist Kraut & Perlstein, LLP
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
Attention: Allen Perlstein
E-mail: aperlstein@hkplaw.com


And with a copy to:

Klestadt Winters Jureller Southard & Stevens, LLP
570 Seventh Avenue
17th floor
New York, NY  10018
Attention: Tracy Klestadt, Esq.
E-mail: TKlestadt@Klestadt.com

Notices to Escrow Agent:

TitleVest Services, LLC
44 Wall Street – 10th Floor
New York, NY 10005
Attn:  Sara Murray
E-Mail:  APBid@TitleVest.com


C.    <u>Governing Law; Jurisdiction</u>.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the laws of such state are superseded by chapter 11 of title 11 of the United States Code ("<u>Chapter 11</u>").  Without limiting any Party's right to appeal any order of the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Escrow Agreement and to decide any claims (including with respect to <u>Section</u>) or disputes which may arise or result from, or be connected with, this Escrow Agreement, any breach or default hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated herein; <u>provided</u>, <u>however</u>, that if the contemplated Chapter 11 cases of Seller and certain of its affiliates has closed, the parties hereto agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts of the State of New York, located in New York County for the resolution of any such claim or dispute.  Each party hereto (i) expressly and irrevocably consents and submits to the jurisdiction of each such court; (ii) agrees that each such court shall be deemed to be a convenient forum; (iii) agrees that service of process in any such proceeding may be made by giving notice pursuant to <u>Section V(B)</u>; and (iv) agrees not to assert, by way of motion, as a defense or otherwise, in any such proceeding commenced in any such court, any claim that such party is not subject personally to the jurisdiction of such court, that such proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this Escrow Agreement or the subject matter of this Escrow Agreement may not be enforced by such court.

D.    Entire Agreement. This Escrow Agreement sets forth the entire agreement and understanding of the Parties and Escrow Agent related to the Escrow Funds.

E.    Amendment. This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by all of the Parties and Escrow Agent.

F.    Waivers. The failure of any Party at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance. A waiver by any Party of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

G.    Headings. Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

H.    Counterparts. This Escrow Agreement and any notices or communications may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

I.    Conflicts. In the event of any conflict between this Escrow Agreement and the Sale Agreement or any order of the Bankruptcy Court, the terms of the Sale Agreement and/or the order of the Bankruptcy Court shall govern, but only as between the Parties.

J.    Publication; disclosure. By executing this Escrow Agreement, the Parties and the Escrow Agent acknowledge that this Escrow Agreement (including related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement. The Parties further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement, or, in the alternative, publishing a conformed copy of this Escrow Agreement. If a Party must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as any judicial, or administrative order, subpoena or discovery request, it shall notify in writing the other Party and the Escrow Agent at the time of execution of this Escrow Agreement of the legal requirement to do so. If any Party becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that Party shall promptly notify in writing the other Parties and the Escrow Agent and shall be liable for any unauthorized release or disclosure.

[Signature Page Follows]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

**THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.**

By: _____
Name:
Title:


**PATHMARK STORES, INC.**

By: _____
Name:
Title:

**BOGOPA SERVICE CORP.**

By_____
Name:   ALLEN PERLSTEIN
Title:   ASST SECRETARY


**TITLEVEST SERVICES, LLC**

By:_____
Name:
Title:

**EXHIBIT A to Escrow Agreement**
The Premises

| No. | Store No. | Address |
|-----|-----------|---------|
| 153 | 072-6634 | 111-10 Flatlands Avenue, Brooklyn, New York |
| 53 | 038-3524 | 289 Bergen Boulevard, Fairview, New Jersey |
| 91 | 038-3512 | 1425 Kennedy Boulevard, North Bergen, New Jersey |
| 50 | 072-6288 | 211 Elmora Avenue, Elizabeth, New Jersey |

**EXHIBIT B to Escrow Agreement**

Wire Instructions

**EXHIBIT C to Escrow Agreement**

FEES OF ESCROW AGENT

<u>Preclosing</u>

- **<u>Adminstration Fee</u>: $500.00**
  The Administration Fee is payable with the bid submission.

- **<u>Escrow Agreement Negotiation Fee</u>: $200**
  For negotiation of this Escrow Agreement or review and negotiation of an alternative form of escrow agreement.  Payable with bid submission.

<u>Closing</u>
- **<u>Escrow Closing Fee</u>:** $750 for attendance at Closing.  Payable at Closing.
- **<u>Preparation of Transfer Tax Forms</u>**: $150/set per property.  Payable at Closing.

<u>General</u>

**<u>Out of Pocket Expenses</u>**: Actual Cost.  Escrow Agent will charge for out-of-pocket expenses in response to specific tasks assigned by the client or provided for in the escrow agreement. Possible expenses would be, but are not limited to, express mail, Federal Express or other over-night carrier, messenger charges, wiring fees and travel fees and expenses to attend closing or other meetings.   There are no charges for indirect out-of- pocket expenses.  Payable at closing.

2

**EXHIBIT D to Escrow Agreement**

BIDDER AUTHORIZED PARTY

Telephone Numbers and Authorized Signatures for
Person(s) Designated to Execute the Escrow Agreement, Give Joint Instruction and Confirm
Funds Transfer Instructions

For Buyer:

| Name | Business Telephone Numbers | Signature |
|------|---------------------------|-----------|
| 1.Edward Suh | 718-346-6500 | |
| 2. | | |
| 3. | | |

To the extent required herein, all instructions to be delivered by Bidder, including but not limited to funds transfer instructions, whether transmitted by facsimile or otherwise, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of Bidder.

3

## EXHIBIT E

### Wire Instructions

### See attached

WEIL:\95469023\4\50482.0005

## EXHIBIT F

### Form of Assignment and Assumption of Lease

### ASSIGNMENT AND ASSUMPTION OF LEASE

THIS **ASSIGNMENT AND ASSUMPTION OF LEASE** (this "**Assignment**") is entered into and effective as of [ _____ ], 2015, by and between A&P REAL PROPERTY, LLC, a Delaware limited liability company, whose address is 2 Paragon Drive, Montvale, New Jersey 07645 ("**Seller**"), and BOGOPA SERVICE CORP., a New York corporation, whose address is 650 Fountain Avenue, Brooklyn, New York 11208 ("**Buyer**"). Seller and Buyer are referred to collectively herein as the "**Parties**."

WHEREAS, the Parties are parties to that certain Lease Sale Agreement, dated September 10, 2015 (the "**Purchase Agreement**") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement);

WHEREAS, the execution and delivery of this Assignment is contemplated by the Purchase Agreement; and

WHEREAS, Seller desires to assign, transfer, convey, and deliver to Buyer the Lease described in **Exhibit A** attached hereto including all amendments, modifications, and supplements thereto (collectively, the "**Lease**"), and Buyer desires to accept an assignment of the Lease together with all right, title, and interest of Seller thereunder. The Lease encumbers all or a portion of certain property (the "**Leased Premises**") which property is more specifically described on **Exhibit B** attached hereto (the "**Premises**").

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1)     **Assignment and Assumption of Lease. Effective as of the Closing, Seller hereby assigns, transfers, conveys, and delivers to Buyer all of Seller's estate, right, title and interest as tenant of the leasehold estate described under the Lease, and Buyer hereby accepts the assignment, transfer, conveyance, and delivery of Seller's estate, rights, title and interest in, to and under such leasehold estate, and assumes and agrees to pay, discharge, and perform when due all of Seller's obligations as tenant under the Lease.**

2)     **Conflict. The assignment and assumption of the Lease (and the obligations thereunder) made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail. Notwithstanding anything to the contrary in this Assignment, nothing herein is**

WEIL:\95469023\4\50482.0005

intended to, nor shall it, extend, amplify, or otherwise alter the Purchase Agreement.

3)   Severability.   Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Assignment is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Assignment.

4)   Amendments.   This Assignment may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Seller.

5)   Counterparts; Facsimile and Electronic Signatures.   This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

6)   Governing Law.   This Assignment shall be governed by the Laws of the state in which the Leased Premises are located, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

7)   Third Party Beneficiaries and Obligations.   This Assignment shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Nothing in this Assignment, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Assignment.

8)   Recordation.   Seller makes no representation regarding the recordability of this Assignment, nor the Lease or related documents. Seller shall bear no liability for the failure of the Lease or related documents to be recorded.

9)   Further Assurances.   Each of the Parties, without additional consideration, shall execute and deliver all such further documents and do such other things as the other Party may reasonably request to give full effect to this Assignment, including, without limitation, any other form of assignment agreement required in order to record this Assignment in the appropriate public records of the county in which the Leased Premises is located.

* * * * *

WEIL:\95469023\4\50482.0005

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.


**SELLER:**

A&P REAL PROPERTY, LLC,
a Delaware limited liability company


By: _____
Name: _____
Title: _____


[ACKNOWLEDGMENTS]

[Seller Signature Page to Assignment and Assumption of Lease –
Brooklyn, New York(Store #072-6634)

**BUYER**:

BOGOPA SERVICE CORP.
a New York corporation

By: _____
Name: Edward Suh
Title: Vice President and Secretary

STATE OF NEW YORK    )
                   ) ss.:
COUNTY OF_____   )

    On the ___ day of ____ in the year 2015, before me, the undersigned, personally appeared Edward Suh personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
            Notary Public

[Buyer Signature Page to Assignment and Assumption of Lease –
Brooklyn, New York(Store #072-6634)]

## EXHIBIT A

### Lease

### The Lease

| 153 | 072-6634 | 111-10 FLATLANDS AVENUE | BROOKLYN | NY | STORE 072-6634 – 11110 FLATLANDS AVENUE, BROOKLYN, NY

LEASE DATED FEBRUARY 15, 1979, ORIGINALLY BETWEEN SHERADEL REALTY CORP., AS LANDLORD, AND SUPERMARKETS GENERAL CORPORATION, AS TENANT, AS THE SAME MAY HAVE BEEN AMENDED.
- FIRST AMENDMENT OF LEASE DATED FEBRUARY 1, 1980
- SECOND AMENDMENT OF LEASE DATED MAY 28, 1980
- THIRD AMENDMENT OF LEASE DATED DECEMBER 1, 1980
- MEMORANDUM OF LEASE AS AMENDED DATED DECEMBER 1, 1980 [RECORDED]
- COMMENCEMENT AGREEMENT DATED APRIL 22, 1981
- FOURTH AMENDMENT OF LEASE DATED SEPTEMBER 3, 1981
- FIFTH AMENDMENT OF LEASE DATED DECEMBER 3, 1990
- LETTER AGREEMENT DATED DECEMBER 24, 2003
- LETTER AGREEMENT DATED DECEMBER 24, 2003
- RENEWAL LETTER DATED JULY 19, 2005
- LETTER AGREEMENT DATED APRIL 23, 2009
- RENEWAL LETTER DATED JULY 22, 2010
- ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED DECEMBER 23, 2011
- SUBORDINATION, RECOGNITION AND NON DISTURBANCE AGREEMENT DATED JANUARY 6, 2012
- ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012
- GUARANTY DATED MARCH 13, 2012

AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.5.26 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
|---|---|---|---|---|---|

## EXHIBIT G

### Form of Quitclaim Bill of Sale

### QUITCLAIM BILL OF SALE

THIS **QUITCLAIM BILL OF SALE** (this "Bill of Sale") is entered into and effective as of _____, 2015, by and among A&P REAL PROPERTY, LLC, a Delaware limited liability company ("Seller") and BOGOPA SERVICE CORP., a New York corporation ("Buyer"). Seller and Buyer are referred to collectively herein as the "Parties."

WHEREAS, the Parties are parties to that certain Lease Sale Agreement, dated September 10, 2015 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1.    Sale and Acceptance of Acquired Assets. For true and lawful consideration paid by Buyer, the sufficiency of which is hereby acknowledged, effective as of the date hereof, (a) Seller hereby sells, assigns, transfers, conveys, grants and delivers to Buyer all of its right, title and interest in and to the Acquired Assets, and (b) Buyer hereby accepts the foregoing sale and assignment.

2.    Conflict. In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.

3.    No Representation. This Bill of Sale is made without any covenant, warranty or representation by, or recourse against, Seller or any of Seller's Affiliates of any kind whatsoever.

4.    Severability. Whenever possible, each provision of this Bill of Sale shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Bill of Sale is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Bill of Sale.

5.    Amendments. This Bill of Sale may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Seller.

6.    Counterparts; Facsimile and Electronic Signatures. This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by

portable document format (.pdf), each of which shall be deemed an original.

       7.    <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

       8.    <u>Third Party Beneficiaries and Obligations</u>. This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Bill of Sale, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Bill of Sale.

       9.    <u>Entire Agreement</u>. This Bill of Sale, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof, which such prior agreements, understandings, representations and statements, oral or written, shall be of no further force or effect.

* * * * *

IN WITNESS WHEREOF, the Parties have executed this Bill of Sale as of the date first above written.


A&P REAL PROPERTY, LLC,
a Delaware limited liability company

By: _____
Name:
Title:



BOGOPA SERVICE CORP.


By: _____
Name: Edward Suh
Title:   Vice President and Secretary










[Signature Page to Bill of Sale]

## EXHIBIT H

### Form of Subtenant Notice

### NOTICE TO SUBTENANTS

[ _____ ], 2015

**Via Federal Express**

[Name and Address of Subtenant]

Re:    Notice of assignment of sublease at 110-10 Flatlands Avenue, Brooklyn, New York (the
"Sublease")

Ladies and Gentlemen:

Please be advised that on July 19, 2015, [ _____ ], the sublessor under the Sublease
("Sublessor"), and certain of its affiliates filed voluntary petitions for relief under chapter 11 of
title 11 of the United States Code in the United States Bankruptcy Court for the Southern District
of New York.

Effective as of [ _____ ], Sublessor's interest in the Sublease has been assigned to [
_____ ] ("Assignee"), and Assignee has assumed all of the sublessor's obligations under
the Sublease.

Any future inquiries regarding your Sublease should be directed to the address below:

[Assignee's Notice Name]
c/o Bogopa Service Corp.
650 Fountain Avenue
Brooklyn, New York 11208

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WEIL:\95469023\4\50482.0005

Very truly yours,

[ _____ ]


By:    _____
        Name: Edward Suh
        Title:   Secretary

Brooklyn, New York (Store #072-6634)
WEIL:\95469023\4\50482.0005

## Exhibit I

**Form of Assignment and Assumption of Subleases**

### ASSIGNMENT AND ASSUMPTION OF SUBLEASE

This **ASSIGNMENT AND ASSUMPTION OF SUBLEASE** (this "Assignment") is entered into and effective as of [_____ ___], 2015, by and between A&P REAL PROPERTY, LLC, a Delaware limited liability company, having an address at 2 Paragon Drive, Montvale, New Jersey 076545 ("Assignor"), and [_____], a [_____] [_____] having an address at [ _____ ] ("Assignee"). Assignor and Assignee are referred to collectively herein as the "Parties".

WHEREAS Assignor, as tenant, entered into a lease agreement with respect to certain premises more specifically described on Exhibit B attached hereto (the "Premises").

WHEREAS Assignor entered into that certain license agreement dated December 23, 1997 as more particularly described on Exhibit A (together with all amendments, modification, and renewals thereto, the "Sublease") with respect to all or a portion of the Premises; and

WHEREAS, Assignor desires to assign, transfer, convey and deliver to Assignee all of its right, title and interest in and to the Sublease, and Assignee desires to accept an assignment of the Sublease together with all right, title and interest of Assignor thereunder.

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1. Assignment by Assignor.  Assignor hereby assigns to Assignee all of Assignor's right, title, interest and obligations in, to and under the Sublease.

2. Assumption by Assignee.  Assignee hereby expressly and unconditionally accepts the foregoing assignment and assumes and agrees to perform fully and faithfully each and every term, covenant, condition and obligation of Assignor under the Sublease and to meet Assignor's obligations under the Sublease.

3. Severability.  Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Assignment is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Assignment.

4. Amendments. This Assignment may not be amended or modified except by an instrument in writing signed by all of the parties hereto.

5. Counterparts; Facsimile and Electronic Signatures.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which

WEIL:\95469023\4\50482.0005

together will constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

6. <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the state in which the Premises are located, except to the extent that the laws of such state are superseded by the Bankruptcy Code.

7. <u>Third Party Beneficiaries and Obligations</u>. This Assignment shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Assignment, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Assignment.

8. <u>Recordation</u>. Subject to the following two sentences, this Assignment may be recorded in the appropriate public records of the county in which the Premises is located. Assignor makes no representation regarding the recordability of this Assignment, nor the Sublease or related documents. Assignor shall bear no liability for the failure of the Sublease or related documents to be recorded.

9. <u>Entire Agreement</u>. This Assignment, together with the Exhibits attached hereto, supersedes all prior agreements, understandings, representations, and statements, oral or written, between the Parties on the subject matter hereof, which such prior agreements, understandings, representations, and statements, oral or written, shall be of no further force or effect.

10. <u>Further Assurances</u>. Each of the Parties, without additional consideration, shall execute and deliver all such further documents and do such other things as the other Party may reasonably request to give full effect to this Assignment.


*[Remainder of Page Intentionally Left Blank]*

WEIL:\95469023\4\50482.0005

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.

**ASSIGNOR:**

A&P REAL PROPERTY, LLC,
a Delaware limited liability company

_____
Witness Signature

By: _____
Name: _____
Title: _____

_____
Printed Witness Name

_____
Witness Signature

_____
Printed Witness Name

**[ACKNOWLEDGMENT]**

*Assignor Signature Page to Assignment and Assumption of Sublease –*
*Brooklyn, New York (Store #072-6634)*

WEIL:\95469023\4\50482.0005

**ASSIGNEE:**

[_____],
a New York corporation

_____        By: _____
Witness Signature                Name: Edward Suh
                                 Title:   Secretary

_____
Printed Witness Name

_____
Witness Signature

_____
Printed Witness Name

**[ACKNOWLEDGMENT]**

Assignee Signature Page to Assignment and Assumption of Sublease -
Brooklyn, New York (Store #072-6634)

WEIL:\95469023\4\50482.0005

## EXHIBIT A

Sublease

License Agreement dated December 23, 1997 by and between Pathmark Stores, Inc., as

Licensor, and Columbia Federal Savings Bank, as Licensee.

# EXHIBIT B

## Premises

111-10 Flatlands Avenue, Brooklyn, New York

WEIL:\95469023\4\50482.0005

## Exhibit J

**Bidding Procedures**

CONFIDENTIAL

STORE NO: 072-6288
211 ELMORA AVENUE
ELIZABETH, NEW JERSEY

## LEASE SALE AGREEMENT

THIS LEASE SALE AGREEMENT (this "**Agreement**") is made as of September __, 2015 by and between A&P REAL PROPERTY, LLC, a Delaware limited liability company ("**Tenant**" or "**Seller**"), and BOGOPA SERVICE CORP., a New York corporation ("**Buyer**", and collectively with Seller, the "**Parties**");

W I T N E S S E T H :

WHEREAS, Tenant is the tenant under that certain lease more specifically described on Exhibit A attached hereto and made a part hereof (together with any amendments, modifications, extensions and renewals, the "**Lease**"), with respect to all or a portion of certain real property (the "**Leased Premises**"), which real property is more particularly described in Exhibit B attached hereto and made a part hereof (the "**Premises**");

WHEREAS, Seller and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, pursuant to the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, If Necessary, and Sale Hearings* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 495] (the "**Global Bidding Procedures Order**") or the Order *Approving Discrete Sale and Lease Rationalization Procedures* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 496] (the "**Discrete Procedures Order**"), as applicable, and subject to any approval of the Bankruptcy Court required by the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, Seller desires to sell, assign, convey and transfer all of its rights, title and interests as tenant under the Lease, together with all of its rights, title and interests as sublessor under those certain sublease agreements and/or license agreements more particularly described on Exhibit C attached hereto (each, a "**Sublease**" and, collectively, the "**Subleases**"), if any, and

**[CHECK AND INITIAL WHERE INDICATED IF APPLICABLE]**

☒    all trade fixtures, shopping carts, aisle markers, store models, shelving, display racks and refrigeration equipment and other furnishings and equipment owned by Seller located at the Leased Premises ("**FF&E**");

*INITIAL* [_____]

WHEREAS, Buyer desires to purchase and accept such assignment and assume all rights, title, interests and obligations of Tenant under the Lease, and any Subleases and FF&E to the extent set forth herein, subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Seller and Buyer agree as follows:

1.    Procedures.  This Agreement is made subject to, and in accordance with, the Global Bidding Procedures Order or the Discrete Procedures Order.  Capitalized terms used but not otherwise defined herein (including on Schedule I attached hereto) shall have the meanings ascribed to them in the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable.  In the event of a contradiction between this Agreement and the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, shall control.

2.    Lease Consideration.  The consideration for the assignment of the Lease, together with the Subleases and FF&E to the extent set forth herein (the foregoing, as applicable, collectively, the "**Acquired Assets**"), shall be equal to THREE MILLION DOLLARS ($3,000,000.00) (the "**Purchase Price**") which shall be comprised of:

a.    Three Million Dollars ($3,000,000.00) as consideration for the Lease, plus

b.    **NONE.**[1]

Buyer's submission of an executed copy of this Agreement along with the Deposit shall be deemed an irrevocable offer subject only to the rights of termination provided herein.

3.    Payment of Purchase Price.  The Purchase Price shall be paid to Seller by Buyer as follows:

a.    Deposit.  Concurrently herewith, Buyer shall deposit with TITLEVEST SERVICES, LLC, a New York limited liability company ("**Escrowee**") by a bank wire transfer of immediately available federal funds to an account designated by Escrowee the sum of ONE HUNDRED FIFTY THOUSAND ($150,000.00) DOLLARS (together with all interest thereon, the "**Deposit**"), which Deposit shall be held by Escrowee pursuant to the escrow agreement (the "**Escrow Agreement**") attached hereto as Exhibit D and hereby made a part hereof. Notwithstanding anything to the contrary set forth in this Agreement or in the Escrow Agreement, (i) all charges of Escrowee, if any, attendant to holding and/or disbursing the Deposit shall be paid by Buyer and (ii) all interest accrued in connection with the Deposit

---

[1] NTD: We have required that bidders separately list the consideration for the leases, FF&E and inventory to facilitate the expedient calculation and timely payment of transfer taxes and sales taxes.

hereunder shall accrue for the sole benefit of the party to whom the Deposit is paid.  The Parties agree that any payments made pursuant to this Section 3(a) in respect of accrued interest shall be deemed to be an adjustment to the Purchase Price for tax purposes to the extent permitted by applicable Law.

b.      Closing Payment.  On the Closing Date, as defined below, the Purchase Price, as adjusted by the application of the Deposit, shall be paid by Buyer by wire transfer of immediately available federal funds to the account designated on Exhibit E hereto or as otherwise designated in writing by Seller.

4.      Allocation.  If, at least three (3) Business Days prior to Closing, either Seller or Buyer requests a further allocation of the Purchase Price (and all other relevant items) among the Acquired Assets, the Parties mutually agree to determine in good faith an appropriate allocation to be reflected in writing no later than the Closing (the "**Allocation Schedule**").  The Allocation Schedule shall be conclusive and binding on the Parties, and Seller and Buyer agree to (and agree to cause their respective subsidiaries and Affiliates to) prepare, execute, and file all Tax Returns on a basis consistent with the Allocation Schedule (including any update thereto).  None of the Parties will take any position inconsistent with the Allocation Schedule (including any update thereto) on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority.  The Allocation Schedule may be updated from time to time by mutual agreement of the Parties and as necessary to reflect any adjustment to the Purchase Price for applicable Tax purposes or as required by applicable Law.

5.      Payment of Cure Amount.  The Purchase Price includes consideration for the proposed cure amount of the Lease (the "**Cure Amount**"), which Cure Amount shall be the total amount payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Buyer and assignment to Buyer of all contracts being assigned hereunder, and which shall be subject to approval by the Bankruptcy Court.

6.      Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York, such other location in the state where the Leased Premises are located as may be selected by Seller, or such other location as shall be mutually agreed upon by Seller and Buyer commencing at 10:00 a.m. local time on a date (the "**Closing Date**") that is the thirtieth (30th) Business Day following the date hereof, or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto.  Seller shall have a one time right to adjourn the Closing for up to thirty (30) days on notice provided no later than the Closing Date.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective at 12:01 a.m., New York City time, on the Closing Date.

7.      Assignment.  As of the Closing Date, pursuant to sections 363 and 365 of the Bankruptcy Code and in accordance with the Discrete Procedures or a sale order entered pursuant to the Global Bidding Procedures Order, Tenant shall grant, transfer and assign to Buyer, without representation or warranty of any kind, all of its right, title, and interest in and to the Lease, the Subleases, if any, and, to the extent provided herein, FF&E.

AP/D226551/FCORP399

3

WEIL:\95469018\5\50482.0005

8.    Assumption.  On and after the Closing Date, Buyer shall assume all of the covenants, agreements, and obligations of Tenant as tenant under the Lease and as sublessor under the Subleases, if any.  In further consideration of the above assignment, Buyer hereby agrees that it shall, as of the Closing Date: (a) perform all of the covenants, conditions and agreements of (i) the Lease (including making all payments) as if Buyer were the original tenant under the Lease and (ii) the Subleases, if any, as if Buyer were the original sublessor under each of such Subleases, and (b) that the Lease and each of the Subleases, if any, shall remain in full force and effect.  As of the Closing Date, Seller shall have no further liabilities or obligations with respect to the Lease, including, but not limited to, obligations related to rents, utilities, Taxes, insurance and common area maintenance, regardless of when due and payable, nor any of the Subleases, if any, and Seller shall be released from all such obligations and Buyer shall fully indemnify and hold harmless Seller with respect thereto.  No Person, other than Buyer, shall be deemed a beneficiary of the provisions of this Section 8.

9.    Prorations/Adjustments.  As set forth above, Seller shall be solely responsible to pay the Cure Amount to the landlord.  There will be no prorations between Seller and Buyer on the Closing Date, and no post-assignment reconciliations or adjustments of any kind shall occur.  Buyer shall receive the benefits and burdens for all adjustments under the Lease that occur after the Closing Date (regardless of the period in question that is subject to the adjustment), including year-end adjustments for Taxes, fees, any common area maintenance charges, and percentage rent for calendar year 2015 and thereafter and Buyer shall fully indemnify and hold harmless Seller with respect thereto.  Seller shall retain all security deposits under any Subleases and there shall be no offset or reduction in the Purchase Price in connection with the same.  Buyer shall replace all such security deposits as of the Closing Date and maintain the same in accordance with applicable Laws and each Sublease, as applicable.

10.    Free and Clear of All Liens.  Pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, Seller shall convey its rights and interests under the Lease to Buyer free and clear of all liens, claims, interests, or encumbrances (collectively, "**Liens**"), if any, with any such Liens attaching to the proceeds paid to Seller.

11.    Closing Deliverables.  On the Closing Date:

a.    Seller shall deliver to Buyer a duly executed copy of: (i) an Assignment and Assumption of Lease in the form attached hereto as Exhibit F ("**Assignment and Assumption**"); (ii) a FIRPTA Certificate; (iii) if applicable, Transfer Tax forms or certifications provided by Buyer as more specifically described in subsection (b) below; (iv) if applicable, a Quitclaim Bill of Sale in the form attached hereto as Exhibit G; (v) a landlord notice and a subtenant notice (if applicable), each in the form attached hereto as Exhibit H; and (vi) if applicable, an assignment and assumption with respect to the Subleases, to the extent such Subleases are assignable and are in effect on the Closing Date, in the form attached hereto as Exhibit I ("**Assignment of Subleases**").

b.    Buyer shall deliver to Seller: (i) a fully executed counterpart of the Assignment and Assumption, (ii) an executed copy of all Transfer Tax forms or certifications as may be required by each state, county or municipality to record the Assignment and Assumption

and effectuate the transactions contemplated herein; (iii) a fully executed counterpart of the Assignment of Subleases; (iv) such other documents as may be reasonably required to complete the transactions provided for in this Agreement. All documents executed and delivered by Buyer pursuant to this Section shall be in form and substance reasonably satisfactory to Seller.

12.    Transfer Tax Forms.  Buyer shall be responsible for the preparation, delivery and recordation of any and all real estate Transfer Tax forms or certifications required by any Governmental Authority (unless Seller notifies Buyer that they will do so), with Buyer being responsible for any payment required therewith as provided in Section 13.  The Party that is required by applicable law to file or record any other Transfer Tax forms or certifications shall prepare and timely file and record such forms or certifications, with Buyer being responsible for any payment required therewith with respect to the Acquired Assets as provided in Section 13.  The Parties hereto shall cooperate in making, in a timely manner, all such tax returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any such Transfer Taxes.  At Seller's request, all Transfer Tax forms and certifications, along with payment therefor, shall be delivered by Buyer to Seller for recordation and payment with the appropriate Governmental Authority.  To the extent required by applicable Law, Seller shall execute any Transfer Tax forms or certifications.

13.    Closing Costs.

a.    Seller and Buyer shall each pay their own attorneys' fees and expenses. Buyer shall pay (i) all state, county and local Transfer Taxes required to be paid in connection with the assignment and assumption of the Lease and any and all Subleases, and the consummation of the transactions contemplated herein, all of which amounts shall be paid, if applicable, to the proper Governmental Authority on or prior to the Closing Date and (ii) all title and escrow charges.

b.    Except as otherwise provided in this Agreement, all other costs and expenses of the transaction contemplated by this Agreement shall be borne by Buyer.

c.    Buyer agrees to fully indemnify and hold Seller harmless for, from and against any loss, cost, claim, damage or expense incurred, directly or indirectly, by Seller as a result of Buyer's failure to pay any Taxes or costs pursuant to clauses (a) and (b) above.  Buyer's obligations in this Section shall survive the Closing Date.

14.    Conditions to Closing.

a.    Conditions to Buyer's Obligations.  Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)    the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, and

no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(ii)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(iii)    each delivery contemplated by Section 11(a) to be delivered to Buyer shall have been delivered.

b.    <u>Conditions to Seller's Obligations</u>.  Seller's obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(i)    Buyer shall have performed and complied with all of its covenants and agreements hereunder through the Closing in all material respects;

(ii)    the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(iii)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(iv)    each payment contemplated by Sections 3, 4 and 13 to be made to Seller or any landlord shall have been made, and each delivery contemplated by Section 11(b) to be delivered to Seller shall have been delivered.

c.    <u>No Frustration of Closing Conditions</u>.  Neither Buyer nor Seller may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Subsection 14(a) or Subsection 14(b), as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliate's failure to use its reasonable best efforts (or commercially reasonable efforts, with respect to those matters contemplated by Section 17, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach hereunder.  The Parties agree that neither the failure to obtain a court order nor any action with respect to a Competing Bid (as defined below), to the extent permitted hereunder, shall be deemed to be a failure to use the efforts required to satisfy the conditions to consummation of the transactions contemplated hereunder nor a breach hereunder.

15.    <u>No Other Contingencies</u>.  Buyer expressly agrees and acknowledges that Buyer's obligations hereunder are not in any way conditioned upon or qualified by Buyer's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt, financing or equity investment or otherwise) nor upon Buyer's ability to obtain title insurance.

16.     Termination of Agreement.

      a.     The Parties may terminate this Agreement at any time prior to the Closing as provided below:

      (i)     by the mutual written consent of the Parties;

      (ii)     by any Party by giving written notice to the other Party if:

      (A)     any court of competent jurisdiction shall have enacted or issued a Law permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this agreement and such Law or Decree or other action shall have become final and non-appealable; or

      (B)     the Closing shall not have occurred prior to the sixtieth (60) day from the date hereof ("**Outside Date**"); provided that if the Closing shall not have occurred on or before the Outside Date due to a material breach of this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this Section 16(a)(ii)(B).

      (iii)     if (i)(x) Seller enters into a definitive agreement with respect to a higher or better competing bid in accordance with the bidding procedures attached hereto as Exhibit J (the "**Bidding Procedures**") in respect of the Lease (a "**Competing Bid**"), (y) the Bankruptcy Court enters an order approving the Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

      b.     Seller may terminate this Agreement at any time prior to Closing if Buyer fails to satisfy any requirement set forth under Section 14(b)(v), including delivery of the Deposit required hereunder. In such case, the Agreement shall be rendered null and void, Seller shall be entitled to retain any and all consideration already paid to Seller, including, but not limited to, the Deposit.

      c.     Effect of Termination. If any Party terminates this Agreement pursuant to Section 16(a) or (b), all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Section 13, this Section 16, Sections 23 through 43, and Schedule I shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 16(b) and Section 17) to the other Party hereunder (except as may be provided in Section 4 and Subsection 16(b)); provided, however, that nothing in this Section 16 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, subject to Section 16(d) below, that other than in the case of fraud or willful misconduct, (a) the maximum Liability of Seller under this Agreement shall not exceed the reasonable out of pocket expenses incurred by Buyer and (b) subject to subsection (d) below, the maximum liability of Buyer under this Agreement shall not exceed the Deposit.

d.    <u>Lease Indemnity</u>.    Notwithstanding anything contained herein to the contrary, if this Agreement is terminated pursuant to <u>Section 16(a) or (b)</u>, Buyer shall indemnify Seller for all Liabilities and Damages arising out of any Lease assumed by Seller pursuant to section 365(k) of the Bankruptcy Code.  This indemnity shall survive such early termination.

17.    <u>Bankruptcy Court Matters</u>.

a.    <u>Competing Transaction</u>.    This Agreement is subject to approval by the Bankruptcy Court in accordance with the Discrete Procedures Order, and the consideration by Seller of a Competing Bid in accordance with the Discrete Procedures Order and, in the event Sellers receive a Competing Bid, an auction to be conducted in accordance with the Bidding Procedures.

b.    <u>Break Up Fee</u>.  In consideration for Buyer having expended considerable time, effort and expense in connection with this Agreement, Sellers grant Buyer, subject to compliance with the Discrete Procedures Order, a break-up fee in an amount equal to 3% of the Purchase Price (the "**Break Up Fee**").  Seller further agrees that the Break Up Fee constitutes an allowed administrative expense claim against Seller's estate pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code.  In the event a Competing Bid is consummated, if no material breach by Buyer of this Agreement has occurred, Seller shall cause the (1) refund of the Deposit to Buyer in accordance with the Bidding Procedures and (2) payment to Buyer of the Break Up Fee on the first Business Day following the date of consummation of the Competing Bid.

c.    From the date hereof and until the transactions contemplated hereby are consummated, Seller is permitted to, and is  permitted to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by or from any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, and  Seller shall be permitted and shall have the authority to (and to cause its Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, including supplying information relating to the assets of Seller to prospective buyers.  Without limiting the foregoing, Seller shall be permitted to perform all of the foregoing activities with respect to all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Global Bidding Procedures Order, Discrete Procedures Order or other applicable Law.

d.    <u>Bankruptcy Court Filings</u>.

(i)    If the Buyer is the successful bidder (to the extent an auction is conducted), as soon as reasonably practicable following the execution of this Agreement, Seller shall seek approval of the Agreement in accordance with the Global Bidding Procedures Order or the Discrete Procedures Order and file any necessary notice or pleadings required in connection therewith. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the transactions contemplated by this Agreement pursuant to the Global Bidding Procedures Order or the Discrete Procedures Order, including a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for providing the Adequate Assurance Information

to the Cure Notice Parties and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder. In the event the approval of the transactions contemplated by this Agreement shall be appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

18.    <u>Intentionally Omitted</u>

19.    <u>Delivery; "AS IS" Transaction</u>.

a.    Buyer acknowledges that it has fully inspected or waived the right to inspect the Leased Premises prior to the execution of this Agreement and does hereby assume all of the risks, including, but not limited to, latent defects in the Leased Premises. Seller shall not be obligated to do any work or alter, restore, repair or develop the Leased Premises, but Seller shall deliver the Leased Premises in vacant, broom clean condition, and, if applicable, with all furnishings, fixtures, equipment, inventory, racks, aisle displays, refrigeration equipment and personal property removed from the Leased Premises. Any work (including demolition) which may be necessary to adapt the Leased Premises for Buyer's occupancy or for the operation of Buyer's business therein shall be the sole responsibility of Buyer and shall be performed by Buyer at its sole cost and expense, in accordance with the terms of the Lease.

b.    BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE LEASE OR THE LEASED PREMISES (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE LEASED PREMISES; THE PHYSICAL CONDITION OF THE LEASED PREMISES; THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE LEASED PREMISES OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE LEASED PREMISES; THE ZONING OF THE LEASED PREMISES; THE POSSIBILITY OF DEVELOPING OR USING THE LEASED PREMISES IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE LEASE OR THE LEASED PREMISES; THE FITNESS OF THE LEASED PREMISES, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE LEASED PREMISES (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE LEASE OR THE LEASED PREMISES). BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE

BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLER.  BUYER ALSO ACKNOWLEDGES THAT BUYER HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE LEASED PREMISES AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE LEASED PREMISES AND/OR THE LEASE, AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IS ACQUIRING THE LEASE AND THE LEASED PREMISES, BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT, AND BUYER IS NOT RELYING UPON ANY REPRESENTATIONS OF SELLER OR SELLER'S AGENTS.  ACCORDINGLY, BUYER HEREBY ACCEPTS THE LEASED PREMISES IN ITS "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS.

20.    Store Closed.  The Parties acknowledge and agree that Seller has ceased (or will cease as of the Closing Date) operations at the Leased Premises and the Leased Premises will be delivered in broom clean condition.

21.    Release; Indemnity.  Pursuant to section 365(k) of the Bankruptcy Code, on and after the Closing Date, Buyer agrees to defend and indemnify Seller against, and hold Seller harmless from, any and all claims, actions, proceedings, suits, costs, liabilities, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and disbursements), whether foreseen or unforeseen, in connection with the Lease, the Leased Premises (including, without limitation, the performance or observance or the failure or refusal to perform or observe any agreement or obligation of the tenant under the Lease or any term or provision thereof required to be performed by the tenant under the Lease), each Sublease, and this Agreement.

22.    Casualty and Condemnation.

a.    Seller agrees to give Buyer prompt written notice of any fire, flood or similar casualty affecting any portion of the Leased Premises or of any actual or threatened (to the extent that Seller has current knowledge thereof) taking or condemnation of all or any portion of any Leased Premises.

b.    If prior to Closing there shall occur:  (i) damage to any Leased Premises caused by fire or other casualty; or (ii) the taking or condemnation of all or any portion of the Leased Premises; then, in each case, the Closing Date shall occur as provided in this Agreement, and Buyer shall be assigned at the Closing Date (A) all interest of Seller in and to any insurance proceeds (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date), subject to all applicable deductible amounts or (B) condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding.

c.    The Parties hereby waive the provisions of the Uniform Vendor and Purchaser Risk Act (to the extent the same is applicable to the Leased Premises) and of any other Law to the same or similar effect, and agree that the same shall not apply to this Agreement.

23.    <u>Brokers' Fees</u>.  Other than the fees and expenses payable to Evercore Group L.L.C. or Hilco Real Estate Group LLC in connection with the transactions contemplated hereby, which shall be borne by Seller, neither Party has entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.  Buyer shall indemnify and hold Seller harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or liabilities, including reasonable attorneys' fees and disbursements, which Seller, or any of its affiliates may sustain, incur or be exposed to, by reason of any claim or claims against Buyer by any broker, finder or other person or entity for fees, commissions or other compensation arising out of the transactions contemplated herein if such claim or claims are based in whole or in part on dealings or agreements with the Buyer.  Any broker retained by or providing services to Buyer in connection with the transaction evidenced by this Agreement shall be compensated solely by Buyer without contribution from Seller.

24.    <u>Survival</u>.  Except as specifically set forth herein, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to <u>Section 11(a)</u> or <u>Section 11(b)</u> shall survive, and each of the same shall terminate and be of no further force or effect as of the Closing.

25.    <u>Expenses</u>.  Except as otherwise expressly set forth herein, including but not limited to <u>Section 11</u>, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

26.    <u>Entire Agreement</u>.  This Agreement, any documents delivered at Closing pursuant hereto, and any confidentiality agreement entered into by Seller and Buyer in connection with this transaction, constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

27.    <u>Incorporation of Exhibits and Schedules</u>.  The Exhibits and Schedule(s) to this Agreement are incorporated herein by reference and made a part hereof.

28.    <u>Amendments and Waivers</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach.  No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 28</u> except as expressly provided herein.

Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

29.    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of each other Party.

30.    <u>Notices</u>.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

> The Great Atlantic & Pacific Tea Company, Inc.
> 2 Paragon Drive
> Montvale, New Jersey 07645
> Attention: Christopher W. McGarry and Matthew Bennett
> E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Seller) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
> E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

If to Buyer:

> Bogopa Service Corp.
> 650 FountainAvenue
> Brooklyn, New York 11208
> Attention:  Edward Suh, Esq.
> E-mail: edward.suh@bogopausa.com

With a copy (which shall not constitute notice to Buyer) to:

> Harfenist Kraut & Perlstein, LLP
> 3000 Marcus Avenue, Suite 2E1
> Lake Success, New York 11042
> Attention: Allen Perlstein

AP/D226551/FCORP399

12

E-mail: aperlstein@hkplaw.com

With a copy (which shall not constitute notice to Buyer) to:

Klestadt Winters Jureller Southard & Stevens, LLP
570 Seventh Avenue
17th floor
New York, NY 10018
Attention: Tracy Klestadt, Esq.
E-mail: TKlestadt@Klestadt.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 30.

31.    Governing Law.    This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

32.    Submission to Jurisdiction; Service of Process.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.    Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.    Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.    Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 30; provided, however, that nothing in this Section shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.    Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.    The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

33.    Waiver of Jury Trial.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

AP/D226551/FCORP399

13

WEIL:\95469018\5\50482.0005

34.   <u>Specific Performance</u>.  Buyer acknowledges and agrees that Seller and its estate would be damaged irreparably in the event Buyer does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Seller may have under law or equity, Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

35.   <u>Severability</u>.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

36.   <u>No Third Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than Buyer, Seller, and their respective successors and permitted assigns, except as expressly set forth in this Agreement.

37.   <u>Non-Recourse</u>.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.   No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this <u>Section 37</u>.

38.   <u>Mutual Drafting</u>.   The Parties have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

39.   <u>Headings</u>.   The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

40.   <u>Counterparts; Facsimile and Electronic Signatures</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.   This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

41.   <u>Limitations Under Applicable Law</u>.   Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to limitations under applicable Law, including, without limitation, Sections 1113 and 1114 of the Bankruptcy Code.

42.   <u>Assignment of Lease</u>.   The acceptance of the Assignment and Assumption by Seller shall be deemed to be a full performance of Seller and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement.

43.   <u>Prevailing Party</u>.   If any action is brought by either of the Parties against the other, then the prevailing Party shall be entitled to recover from the other Party court costs and reasonable attorneys' fees and costs actually incurred.

44.   <u>Assignment</u>.   Buyer shall have the right to assign this Agreement to an Affiliate simultaneously with the Closing, provided that such assignment shall not release Buyer from its obligations hereunder.

45.   <u>Covered Employees</u>.   For those store employees represented by a labor union, Buyer will negotiate with the appropriate local union representing such Covered Employees, in good faith, to (a) assume the applicable collective bargaining agreement; (b) reach a mutually acceptable collective bargaining agreement; or (c) enter into an agreement with such local union integrating such represented Covered Employees into Buyer's existing collective bargaining units.   For all purposes of this <u>Section 45</u>, Buyer acknowledges the requirements of sections 1113 and 1114 of the Bankruptcy Code and agrees to use good faith reasonable best efforts to cooperate with Seller in ensuring compliance with any applicable provisions thereof.   Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to applicable law, including, without limitation, sections 1113 and 1114 of the Bankruptcy Code and any applicable federal labor law.

[<b>SIGNATURE PAGE FOLLOWS</b>]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


A&P REAL PROPERTY, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


A&P REAL PROPERTY, LLC,
a Delaware limited liability company


By:_____
Name:
Title:


BOGOPA SERVICE CORP.,
a New York corporation


By:_____
Name:  ALLEN PERLSTEIN
Title:  ASST. SECRETARY

## LIST OF SCHEDULE AND EXHIBITS

| SCHEDULE | DESCRIPTION |
|---|---|
| Schedule I | Definitions |

| EXHIBIT | DESCRIPTION |
|---|---|
| Exhibit A | The Lease |
| Exhibit B | Premises |
| Exhibit C | Sublease(s) |
| Exhibit D | Escrow Agreement |
| Exhibit E | Wire Instructions |
| Exhibit F | Form of Assignment and Assumption of Lease |
| Exhibit G | Form of Quitclaim Bill of Sale |
| Exhibit H | Form of Landlord Notice and Form of Subtenant Notice |
| Exhibit I | Form of Assignment and Assumption of Subleases |
| Exhibit J | Bidding Procedures |

## Schedule I

## Definitions

(i)      "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

(ii)      "Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(iii)      "Code" means the Internal Revenue Code of 1986, as amended.

(iv)      "Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

(v)      "Decree" means any judgment, decree, ruling, injunction or any other order of any Governmental Authority.

(vi)      "FIRPTA Certificate" means a certificate from Tenant in compliance with applicable Treasury Regulations setting forth Tenant's (or, if applicable, its regarded owner's) name, address and federal tax identification number and stating that Tenant (or, if applicable, its regarded owner) is not a "foreign person" within the meaning of section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to section 1445 of the Code.

(vii)      "Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

(viii)      "Law" means any constitution applicable to, and any law, statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

(ix)      "Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

(x)      "Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

(xi)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

(xii)    "Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

(xiii)    "Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

(xiv)    "Transfer Tax" means any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated by this Agreement.

(xv)    "Treasury Regulations" mean the Treasury regulations promulgated under the Code

## EXHIBIT A

### The Lease

| 50 | 072-6288 | 211 ELMORA AVE. | ELIZABETH | NJ | AGREEMENT DATED APRIL 29, 1966 BETWEEN VESTAL DEVELOPMENT CO., L.L.C. (SUCCESSOR IN INTEREST TO HILLSIDE DEVELOPMENT CO., INC.), AS LANDLORD, AND PATHMARK STORES, INC., AS TENANT; AS EVIDENCED BY MEMORANDUM OF LEASE DATED JUNE 5, 2012; AS AMENDED BY FIRST SUPPLEMENT OF LEASE DATED APRIL 12, 1971, AND BY LETTER AGREEMENT DATED MAY 29, 1980, AND BY THIRD SUPPLEMENT OF LEASE DATED OCTOBER 1, 1996; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011; AND SUBJECT TO GUARANTY DATED MARCH 13, 2012, AS THE SAME MAY HAVE BEEN AMENDED. <br><br> AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.4.29 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
|---|---|---|---|---|---|

<u>**EXHIBIT B**</u>

**Leased Premises**

**211 Elmora Avenue, Elizabeth, New Jersey**

## EXHIBIT C

### Sublease(s)

Lease dated September 7, 1999 by and between Pathmark Stores, Inc., as landlord, and

Laundry Warehouse of Elizabeth, L.L.C., as Tenant.

# EXHIBIT D

## Escrow Agreement

**Bidder ID No. 109**

**Site No(s). 072-6634, 072-6288, 038-3512, 038-3504**

### ESCROW RIDER TO LEASE SALE AGREEMENT

This Escrow Agreement dated this 10^TH^ day of September 2015 (this "Escrow Agreement"), is entered into by and among THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., ("Seller"), BOGOPA SERVICE CORP. ("Bidder"), and TITLEVEST SERVICES, LLC, a New York limited liability company, as escrow agent ("Escrow Agent"). Seller and Bidder are known herein, individually or collectively as the context may require as a "Party" or the "Parties". Any capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Agreement (as defined below).

### W I T N E S S E T H

WHEREAS, the Bidder has executed that certain Lease Sale Agreement (the "Sale Agreement") as part of a bid for the acquisition of certain real property more particularly described on Exhibit A (the "Premises");

WHEREAS, as part of the bid process, Bidder is required to wire to Escrow Agent a Deposit in the amount of $587,500.00 (the "Escrow Funds"); and

WHEREAS, Bidder desires that Escrow Agent hold the Escrow Funds in escrow pursuant to the terms of this Escrow Agreement; and

WHEREAS, Escrow Agent is willing to hold the Escrow Funds, on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid, the receipt and sufficiency of which are hereby mutually acknowledged, the Parties and the Escrow Agent agree as follows:

## I.    ESCROW DEPOSIT

A.    Delivery of Escrow Funds; Authorization of Escrow Agent. Concurrently with execution and delivery of this Escrow Agreement, Bidder shall deliver the Escrow Funds along with a nonrefundable Escrow Fee of $500 ("Initial Escrow Fee"; together with all other nonrefundable escrow fees set forth on Exhibit C, the "Nonrefundable Escrow Fees") to Escrow Agent via wire transfer. Upon receipt, the Escrow Funds shall be held by Escrow Agent in Escrow Agent's client escrow account at Citibank. The Parties hereby appoint Escrow Agent to serve as escrow agent with respect to the Escrow Funds, and Escrow Agent hereby accepts such appointment and agrees to act in accordance with the terms and subject to the conditions of this Escrow Agreement. Escrow Agent shall have the right to disburse the Escrow Funds, in whole or in part,

solely in accordance with the terms of this Escrow Agreement. Escrow Agent shall not, under any circumstances, pledge or hypothecate any portion of the Escrow Funds and shall act only as directed in accordance with the terms of this Escrow Agreement.

B.    UNTIL RELEASED AND DISBURSED IN ACCORDANCE WITH THE TERMS OF THIS ESCROW AGREEMENT, ALL ESCROW FUNDS SHALL (i) REMAIN THE PROPERTY OF BIDDER, (ii) NOT BE OR BECOME THE PROPERTY OR ASSETS OF SELLER OR ESCROW AGENT, AND (iii) NOT BE SUBJECT TO ANY LIEN OR ANY JUDGMENT OR CREDITORS' CLAIMS AGAINST SELLER, BIDDER OR ESCROW AGENT. IN NO EVENT SHALL ANY OF THE ESCROW FUNDS BE COMMINGLED WITH DEPOSIT ACCOUNTS OF ESCROW AGENT OR OTHERWISE TREATED AS A DEPOSIT ACCOUNT OF ESCROW AGENT OR REFLECTED ON THE FINANCIAL STATEMENTS OF ESCROW AGENT.

## II.    RELEASE OF ESCROW FUNDS

A.    Potential Bidder. If Bidder is determined by Seller not to meet the requirements for qualifying as a bidder in any auction for the Premises (the "Auction"), as confirmed by the Debtors, within three (3) business days after the deadline for Seller to make a determination regarding which bids have been determined to be qualified bids for such auction (the "Designation Deadline") ("Unqualified Bidder"), the Escrow Agent shall return to Bidder the Deposit.

B.    Qualified Bidder. The Deposit will be forfeited to Seller if Bidder is determined by Seller to meet the requirements for qualifying as a bidder at the Auction ("Qualified Bidder") and (A) Bidder attempts to modify, amend or withdraw its qualified bid, except as may permitted by the governing procedures or the Sale Agreement, during the time the qualified bid remains binding and irrevocable under the applicable procedures and the Sale Agreement or (B) the Bidder is selected as the Successful Bidder (defined below) and fails to enter into the required definitive documentation or to consummate the transaction according to the applicable procedures, and the terms of the applicable transaction documents with respect to the successful bid. The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by Seller two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of Seller stating that Bidder has breached or failed to satisfy its obligations or undertakings.

C.    Successful Bidder. If Bidder is the successful bidder for the Premises ("Successful Bidder"), Seller or its agent shall notify Escrow Agent, and Escrow Agent shall retain the Escrow Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement.

D.    Backup Bidder. If the Bidder is selected as the next highest or next best bid for purchase of the Premises ("Backup Bidder"), Seller or its agent shall notify the Escrow Agent, and the Escrow Funds will continue to be held by the Escrow Agent until the acquisition of the Premises by the Successful Bidder, at which time the Escrow Funds will be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as Exhibit B, less any applicable Nonrefundable Escrow Fees (and Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated); provided that if the Successful Bidder does not consummate the purchase of the Premises, then the Escrow Agent shall retain the Escrow Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement.

E.      Neither Successful Nor Backup Bidder.  If Bidder is determined by Sellers to be neither the Successful Bidder nor the Backup Bidder, then, within three (3) business days of execution by the Successful Bidder and Seller of the documentation memorializing the successful bid, the Escrow Funds will be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as Exhibit B, less any applicable Nonrefundable Escrow Fees. Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated.  In the case of Subsections (C) and (D) of this Section II, Escrow Agent shall release the funds no later than the Outside Date except to the extent the Sale Agreement is executed by Seller with respect to a Backup Bidder prior to the Outside Date.

F.      Disbursements.  The Debtors and Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit. If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

G.      Reliance.  Escrow Agent shall rely on all information provided to it by attorneys at Weil, Gotshal & Manges LLP regarding (i) the Successful Bidder, the Backup Bidder, an Unqualified Bidder and a Qualified Bidder (ii) the closing with the Successful Bidder, and (iii) any default by the Successful Bidder or acceptance of the Backup Bidder.  Bidder acknowledges that Escrow Agent is entitled to rely on said information in disbursing the Escrow Funds.

## III.    DUTIES OF THE ESCROW AGENT

A.      Scope of Responsibility. Notwithstanding any provision to the contrary, Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstances will Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement.  Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to Escrow Agent; and Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document. References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and Escrow Agent has no duties or obligations with respect thereto.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

B.      Attorneys and Agents. Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by Escrow Agent.  Escrow Agent shall be reimbursed for any and all compensation (reasonable and documented fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

C.      Reliance.  Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors and/or assigns.  Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent

by the proper person or persons, without further inquiry into the person's or persons' authority. Concurrently herewith, the Bidder shall deliver <u>Exhibit D</u> hereto, which contains authorized party designations.

D.        <u>Right Not Duty Undertaken</u>.  The permissive rights of Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

E.        <u>No Financial Obligation</u>.  No provision of this Escrow Agreement shall require Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.  Escrow Agent shall not be liable for the insolvency of any bank in which the Escrow Funds are deposited.

## IV.    PROVISIONS CONCERNING ESCROW AGENT

A.        <u>Indemnification</u>.  The Parties, jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, reasonable and documented attorneys' fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating to (a) the Escrow Agent's execution and performance of this Escrow Agreement, except to the extent that such loss, liability or expense shall have been finally adjudicated to have directly resulted from the gross negligence or willful misconduct of the Escrow Agent (or any person through which its duties are performed, as provided in <u>Section 3(C)</u>) or (b) the Escrow Agent's following any instructions or other directions from the Bidder or Sellers, except to the extent that its following any such instruction or direction is expressly forbidden by the terms of this Escrow Agreement. The provisions of this <u>Section 4(A)</u> shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

B.        <u>Limitation of Liability</u>. ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

C.        <u>Resignation or Removal</u>.  Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and Seller may remove Escrow Agent by furnishing to Escrow Agent a written notice of Escrow Agent's removal along with payment of all reasonable and documented fees and expenses to which it is entitled through the date of termination or removal.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Funds and to deliver the same to a successor escrow agent as shall be appointed by the Seller, as evidenced by a written notice filed with Escrow Agent or in accordance with a court order.  If the Seller fails to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting

appointment shall be binding upon the Parties.  Any such successor escrow agent shall deliver to Seller and Bidder a written instrument accepting such appointment, and thereupon it shall succeed to all the rights and duties of the escrow agent hereunder and shall be entitled to receive possession of the Escrow Funds.  Upon receipt of the identity of the successor escrow agent, the Escrow Agent shall deliver the Escrow Funds then held hereunder, less any reasonable and documented fees and expenses then due and owing to the Escrow Agent, to the successor escrow agent.  In the event of the resignation or removal of the Escrow Agent, the resigning or removed Escrow Agent shall be absolved from any further duties as the Escrow Agent hereunder; provided, however, that the Escrow Agent or any successor escrow agent shall continue to act as the Escrow Agent until a successor is appointed and qualified to act as the Escrow Agent.

D.    <u>Compensation</u>.  Escrow Agent shall be entitled to fees and expenses incurred in administering and disbursing the Escrow Funds, and compensation for its services which shall be paid by Bidder as set forth on <u>Exhibit C</u>.  If any material controversy arises hereunder, or Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then Escrow Agent shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable and documented attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event.  If any amount due to Escrow Agent hereunder is not paid within thirty (30) days of the date due, Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.

E.    <u>Disagreements</u>.  If any conflict, disagreement or dispute arises between, among, or involving the Parties concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or Escrow Agent is in doubt as to the action to be taken hereunder, Escrow Agent is authorized to retain the Escrow Funds until Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Funds, (ii) receives a written agreement executed by the Parties directing delivery of the Escrow Funds, in which event Escrow Agent shall be authorized to disburse the Escrow Funds in accordance with such agreement, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, Escrow Agent shall be relieved of all liability as to the Escrow Funds which it delivers to such court and shall be entitled to recover reasonable and documented attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

F.    <u>Attachment of Escrow Funds; Compliance with Legal Orders</u>.  In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting Escrow Funds, Escrow Agent is hereby expressly authorized, in its reasonable discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction.  In the event that Escrow Agent obeys or complies with any such writ, order or decree, it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

## V.    <u>MISCELLANEOUS</u>

A.    <u>Successors and Assigns</u>.  This Escrow Agreement shall be binding on and inure to the benefit of the Parties and Escrow Agent and their respective successors and permitted assigns.

No other persons shall have any rights under this Escrow Agreement.  No assignment of the interest of the Parties shall be binding unless and until written notice of such assignment shall be delivered to other Party and Escrow Agent and shall require the prior written consent of such other Party and Escrow Agent (such consent not to be unreasonably withheld).

B.    Notices.  All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (a) personally, (b) by facsimile transmission with written confirmation of receipt, (c) on the day of transmission if sent by electronic mail ("e-mail") to the e-mail address given below, (d) by overnight delivery with a reputable national overnight delivery service, or (e) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited in the United States mail.  If notice is given to a party, it shall be given at the address for such party set forth below.  It shall be the responsibility of each party hereto to notify the Escrow Agent and the other Party in writing of any name or address changes.

If to Sellers:

The Great Atlantic and Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention:  Christopher W. McGarry; Matthew Bennett
E-mail:  mcgarryc@aptea.com; bennettm@aptea.com

with a copy (which shall not constitute notice to Sellers) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
Facsimile: (212) 310-8007
E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

Notices to Bidder:

Bogopa Service Corp.
650 FountainAvenue
Brooklyn, New York 11208
Attention:  Edward Suh, Esq.
E-mail: edward.suh@bogopausa.com

With a copy to:

Harfenist Kraut & Perlstein, LLP
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
Attention: Allen Perlstein
E-mail: aperlstein@hkplaw.com

And with a copy to:

Klestadt Winters Jureller Southard & Stevens, LLP
570 Seventh Avenue
17th floor
New York, NY  10018
Attention: Tracy Klestadt, Esq.
E-mail: TKlestadt@Klestadt.com

Notices to Escrow Agent:

TitleVest Services, LLC
44 Wall Street – 10th Floor
New York, NY 10005
Attn:  Sara Murray
E-Mail:  APBid@TitleVest.com

C.     Governing Law; Jurisdiction.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the laws of such state are superseded by chapter 11 of title 11 of the United States Code ("Chapter 11").  Without limiting any Party's right to appeal any order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Escrow Agreement and to decide any claims (including with respect to Section) or disputes which may arise or result from, or be connected with, this Escrow Agreement, any breach or default hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated herein; provided, however, that if the contemplated Chapter 11 cases of Seller and certain of its affiliates has closed, the parties hereto agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts of the State of New York, located in New York County for the resolution of any such claim or dispute.  Each party hereto (i) expressly and irrevocably consents and submits to the jurisdiction of each such court; (ii) agrees that each such court shall be deemed to be a convenient forum; (iii) agrees that service of process in any such proceeding may be made by giving notice pursuant to Section V(B); and (iv) agrees not to assert, by way of motion, as a defense or otherwise, in any such proceeding commenced in any such court, any claim that such party is not subject personally to the jurisdiction of such court, that such proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this Escrow Agreement or the subject matter of this Escrow Agreement may not be enforced by such court.

D.     Entire Agreement. This Escrow Agreement sets forth the entire agreement and understanding of the Parties and Escrow Agent related to the Escrow Funds.

E.     Amendment. This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by all of the Parties and Escrow Agent.

F.      Waivers. The failure of any Party at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance. A waiver by any Party of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

G.      Headings. Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

H.      Counterparts. This Escrow Agreement and any notices or communications may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

I.      Conflicts. In the event of any conflict between this Escrow Agreement and the Sale Agreement or any order of the Bankruptcy Court, the terms of the Sale Agreement and/or the order of the Bankruptcy Court shall govern, but only as between the Parties.

J.      Publication; disclosure. By executing this Escrow Agreement, the Parties and the Escrow Agent acknowledge that this Escrow Agreement (including related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement. The Parties further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement, or, in the alternative, publishing a conformed copy of this Escrow Agreement. If a Party must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as any judicial, or administrative order, subpoena or discovery request, it shall notify in writing the other Party and the Escrow Agent at the time of execution of this Escrow Agreement of the legal requirement to do so. If any Party becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that Party shall promptly notify in writing the other Parties and the Escrow Agent and shall be liable for any unauthorized release or disclosure.

[Signature Page Follows]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

**THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.**

By: _____
Name:
Title:

**PATHMARK STORES, INC.**

By: _____
Name:
Title:

**BOGOPA SERVICE CORP.**

By___ _____
Name: ALLEN PERLSTON
Title: ASST SEC

**TITLEVEST SERVICES, LLC**

By:_____
Name:
Title:

**EXHIBIT A to Escrow Agreement**
The Premises

| No. | Store No. | Address |
|-----|-----------|---------|
| 153 | 072-6634 | 111-10 Flatlands Avenue, Brooklyn, New York |
| 53 | 038-3524 | 289 Bergen Boulevard, Fairview, New Jersey |
| 91 | 038-3512 | 1425 Kennedy Boulevard, North Bergen, New Jersey |
| 50 | 072-6288 | 211 Elmora Avenue, Elizabeth, New Jersey |

**EXHIBIT B to Escrow Agreement**

Wire Instructions

**EXHIBIT C to Escrow Agreement**

FEES OF ESCROW AGENT

Preclosing

- **Adminstration Fee:** **$500.00**
  The Administration Fee is payable with the bid submission.

- **Escrow Agreement Negotiation Fee: $200**
  For negotiation of this Escrow Agreement or review and negotiation of an alternative form of escrow agreement.  Payable with bid submission.

Closing
- **Escrow Closing Fee:** $750 for attendance at Closing.  Payable at Closing.
- **Preparation of Transfer Tax Forms**: $150/set per property.  Payable at Closing.

General

**Out of Pocket Expenses**: Actual Cost.  Escrow Agent will charge for out-of-pocket expenses in response to specific tasks assigned by the client or provided for in the escrow agreement.  Possible expenses would be, but are not limited to, express mail, Federal Express or other over-night carrier, messenger charges, wiring fees and travel fees and expenses to attend closing or other meetings.   There are no charges for indirect out-of- pocket expenses.  Payable at closing.

**EXHIBIT D to Escrow Agreement**

BIDDER AUTHORIZED PARTY

<u>Telephone Numbers and Authorized Signatures for
Person(s) Designated to Execute the Escrow Agreement, Give Joint Instruction and Confirm
Funds Transfer Instructions</u>

For Buyer:

| Name | Business Telephone Numbers | Signature |
|---|---|---|
| 1.Edward Suh | 718-346-6500 | |
| 2. | | |
| 3. | | |

To the extent required herein, all instructions to be delivered by Bidder, including but not limited to funds transfer instructions, whether transmitted by facsimile or otherwise, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of Bidder.

## EXHIBIT E

### Wire Instructions

### See attached

**EXHIBIT F**

Form of Assignment and Assumption of Lease

ASSIGNMENT AND ASSUMPTION OF LEASE

THIS **ASSIGNMENT AND ASSUMPTION OF LEASE** (this "**Assignment**") is entered into and effective as of [ _____ ], 2015, by and between A&P REAL PROPERTY LLC, LLC, a Delaware limited liability company, whose address is 2 Paragon Drive, Montvale, New Jersey 07645 ("**Seller**"), and BOGOPA SERVICE CORP., a New York corporation, whose address is 650 Fountain Avenue, Brooklyn, New York 11208 ("**Buyer**"). Seller and Buyer are referred to collectively herein as the "**Parties**."

WHEREAS, the Parties are parties to that certain Lease Sale Agreement, dated September 10, 2015 (the "**Purchase Agreement**") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement);

WHEREAS, the execution and delivery of this Assignment is contemplated by the Purchase Agreement; and

WHEREAS, Seller desires to assign, transfer, convey, and deliver to Buyer the Lease described in **Exhibit A** attached hereto including all amendments, modifications, and supplements thereto (collectively, the "**Lease**"), and Buyer desires to accept an assignment of the Lease together with all right, title, and interest of Seller thereunder. The Lease encumbers all or a portion of certain property (the "**Leased Premises**") which property is more specifically described on **Exhibit B** attached hereto (the "**Premises**").

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1)  Assignment and Assumption of Lease.  Effective as of the Closing, Seller hereby assigns, transfers, conveys, and delivers to Buyer all of Seller's estate, right, title and interest as tenant of the leasehold estate described under the Lease, and Buyer hereby accepts the assignment, transfer, conveyance, and delivery of Seller's estate, rights, title and interest in, to and under such leasehold estate, and assumes and agrees to pay, discharge, and perform when due all of Seller's obligations as tenant under the Lease.

2)  Conflict.  The assignment and assumption of the Lease (and the obligations thereunder) made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference.  In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.  Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the Purchase Agreement.

3) <u>Severability</u>.  Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Assignment is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Assignment.

4) <u>Amendments</u>.  This Assignment may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Seller.

5) <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

6) <u>Governing Law</u>.  This Assignment shall be governed by the Laws of the state in which the Leased Premises are located, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

7) <u>Third Party Beneficiaries and Obligations</u>.  This Assignment shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Assignment, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Assignment.

8) <u>Recordation</u>.  Seller makes no representation regarding the recordability of this Assignment, nor the Lease or related documents. Seller shall bear no liability for the failure of the Lease or related documents to be recorded.

9) <u>Further Assurances</u>.  Each of the Parties, without additional consideration, shall execute and deliver all such further documents and do such other things as the other Party may reasonably request to give full effect to this Assignment, including, without limitation, any other form of assignment agreement required in order to record this Assignment in the appropriate public records of the county in which the Leased Premises is located.

* * * * *

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.


**SELLER:**

A&P REAL PROPERTY, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: _____


[ACKNOWLEDGMENTS]


[Seller Signature Page to Assignment and Assumption of Lease –
Elizabeth New Jersey (Store 072-6288)]

**BUYER**:

BOGOPA SERVICE CORP.
a New York corporation

By: _____
Name:  Edward Suh
Title:  Vice President and Secretary

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NASSAU)

On the 10TH day of September in the year 2015, before me, the undersigned, personally appeared Edward Suh personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

[Buyer Signature Page to Assignment and Assumption of Lease –
Elizabeth New Jersey (Store 072-6288)]

## EXHIBIT A

### Lease

| 50 | 072-6288 | 211 ELMORA AVE. | ELIZABETH | NJ | AGREEMENT DATED APRIL 29, 1966 BETWEEN VESTAL DEVELOPMENT CO., L.L.C. (SUCCESSOR IN INTEREST TO HILLSIDE DEVELOPMENT CO., INC.), AS LANDLORD, AND PATHMARK STORES, INC., AS TENANT; AS EVIDENCED BY MEMORANDUM OF LEASE DATED JUNE 5, 2012; AS AMENDED BY FIRST SUPPLEMENT OF LEASE DATED APRIL 12, 1971, AND BY LETTER AGREEMENT DATED MAY 29, 1980, AND BY THIRD SUPPLEMENT OF LEASE DATED OCTOBER 1, 1996; AS SUBJECT TO ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011; AND SUBJECT TO GUARANTY DATED MARCH 13, 2012, AS THE SAME MAY HAVE BEEN AMENDED. |
|---|---|---|---|---|---|
|  |  |  |  |  | AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.4.29 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |

## EXHIBIT G

### Form of Quitclaim Bill of Sale

### QUITCLAIM BILL OF SALE

THIS **QUITCLAIM BILL OF SALE** (this "Bill of Sale") is entered into and effective as of _____, 2015, by and among A&P REAL PROPERTY, LLC, a Delaware limited liability company ("Seller") and BOGOPA SERVICE CORP., a New York corporation ("Buyer"). Seller and Buyer are referred to collectively herein as the "Parties."

WHEREAS, the Parties are parties to that certain Lease Sale Agreement, dated September 10, 2015 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1.      Sale and Acceptance of Acquired Assets. For true and lawful consideration paid by Buyer, the sufficiency of which is hereby acknowledged, effective as of the date hereof, (a) Seller hereby sells, assigns, transfers, conveys, grants and delivers to Buyer all of its right, title and interest in and to the Acquired Assets, and (b) Buyer hereby accepts the foregoing sale and assignment.

2.      Conflict. In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.

3.      No Representation. This Bill of Sale is made without any covenant, warranty or representation by, or recourse against, Seller or any of Seller's Affiliates of any kind whatsoever.

4.      Severability. Whenever possible, each provision of this Bill of Sale shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Bill of Sale is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Bill of Sale.

5.      Amendments. This Bill of Sale may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Seller.

6.      Counterparts; Facsimile and Electronic Signatures. This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

7.    <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

8.    <u>Third Party Beneficiaries and Obligations</u>. This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Bill of Sale, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Bill of Sale.

9.    <u>Entire Agreement</u>. This Bill of Sale, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof, which such prior agreements, understandings, representations and statements, oral or written, shall be of no further force or effect.

* * * * *

IN WITNESS WHEREOF, the Parties have executed this Bill of Sale as of the date first above written.


A&P REAL PROPERTY, LLC,
a Delaware limited liability company

By: _____
Name:
Title:



BOGOPA SERVICE CORP.



By: _____
Name: Edward Suh
Title:   Vice President and Secretary








[Signature Page to Bill of Sale]

## EXHIBIT H

### Form of Landlord Notice

### NOTICE TO LANDLORD

[ _____ ], 2015

**Via Federal Express**

[Name and Address of Landlord]

    Re:    Notice of assignment of lease at 211 Elmora Avenue, Elizabeth, New Jersey  (the "Lease")

Ladies and Gentlemen:

Please be advised that on July 19, 2015, [ _____ ], the tenant under the Lease ("Tenant"), and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.

Effective as of [ _____ ], Tenant's interest in the Lease has been assigned to [ _____ ] ("Assignee"), and Assignee has assumed all of the tenant's obligations under the Lease.

Any future inquiries regarding your Lease should be directed to the address below:

[Assignee's Name]
c/o Bogopa Service Corp.
650 Fountain Avenue
Brooklyn, New York 11208

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WEIL:\95469018\5\50482.0005

Very truly yours,

[ _____ ]


By: _____
       Name: Edward Suh
       Title:  Secretary

## Exhibit I

**Form of Assignment and Assumption of Subleases[2]**

---

[2] NTD: THERE IS A SUBLEASE AT THIS SITE.   PLEASE USE ASSIGNMENT OF SUBLEASE FORM POSTED TO MERRILL DATASITE.

Elizabeth New Jersey (Store 072-6288)

## Exhibit J

**Bidding Procedures**

CONFIDENTIAL

STORE NO: **070-3618**
425 Anderson Avenue & Edgewater Rd.
Fairview, New Jersey

## LEASE SALE AGREEMENT

THIS LEASE SALE AGREEMENT (this "**Agreement**") is made as of September __, 2015 by and between A&P REAL PROPERTY, LLC, a Delaware limited liability company ("**Tenant**" or "**Seller**"), and BOGOPA SERVICE CORP., a New York corporation ("**Buyer**", and collectively with Seller, the "**Parties**").

W I T N E S S E T H:

WHEREAS, Tenant is the tenant under that certain lease more specifically described on Exhibit A attached hereto and made a part hereof (together with any amendments, modifications, extensions and renewals, the "**Lease**"), with respect to all or a portion of certain real property (the "**Leased Premises**"), which real property is more particularly described in Exhibit B attached hereto and made a part hereof (the "**Premises**");

WHEREAS, Seller and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, pursuant to the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, If Necessary, and Sale Hearings* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 495] (the "**Global Bidding Procedures Order**") or the Order *Approving Discrete Sale and Lease Rationalization Procedures* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 496] (the "**Discrete Procedures Order**"), as applicable, and subject to any approval of the Bankruptcy Court required by the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, Seller desires to sell, assign, convey and transfer all of its rights, title and interests as tenant under the Lease, together with all of its rights, title and interests as sublessor under those certain sublease agreements and/or license agreements more particularly described on Exhibit C attached hereto (each, a "**Sublease**" and, collectively, the "**Subleases**"), if any, and

**[CHECK AND INITIAL WHERE INDICATED IF APPLICABLE]**

☒    all trade fixtures, shopping carts, aisle markers, store models, shelving, display racks and refrigeration equipment and other furnishings and equipment owned by Seller located at the Leased Premises ("**FF&E**");

*INITIAL* [_____]

WHEREAS, Buyer desires to purchase and accept such assignment and assume all rights, title, interests and obligations of Tenant under the Lease, and any Subleases and FF&E to the extent set forth herein, subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Seller and Buyer agree as follows:

     1.    <u>Procedures</u>.  This Agreement is made subject to, and in accordance with, the Global Bidding Procedures Order or the Discrete Procedures Order.  Capitalized terms used but not otherwise defined herein (including on <u>Schedule I</u> attached hereto) shall have the meanings ascribed to them in the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable.  In the event of a contradiction between this Agreement and the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, shall control.

     2.    <u>Lease Consideration</u>.  The consideration for the assignment of the Lease, together with the Subleases and FF&E to the extent set forth herein (the foregoing, as applicable, collectively, the "**Acquired Assets**"), shall be equal to TWO MILLION TWO HUNDRED SEVENTY FIVE THOUSAND ($2,275,000.00) DOLLARS (the "**Purchase Price**") which shall be comprised of:

     a.    Two Million Two Hundred Seventy Five Thousand Dollars ($2,275,000.00) as consideration for, plus

     b.    **NONE.**[1]

Buyer's submission of an executed copy of this Agreement along with the Deposit shall be deemed an irrevocable offer subject only to the rights of termination provided herein.

     3.    <u>Payment of Purchase Price</u>.  The Purchase Price shall be paid to Seller by Buyer as follows:

     a.    <u>Deposit</u>.  Concurrently herewith, Buyer shall deposit with TITLEVEST SERVICES, LLC, a New York limited liability company ("**Escrowee**") by a bank wire transfer of immediately available federal funds to an account designated by Escrowee the sum of ONE HUNDRED THIRTEEN THOUSAND SEVEN HUNDRED FIFTY ($113,750.00) DOLLARS (together with all interest thereon, the "**Deposit**"), which Deposit shall be held by Escrowee pursuant to the escrow agreement (the "**Escrow Agreement**") attached hereto as <u>Exhibit D</u> and hereby made a part hereof.  Notwithstanding anything to the contrary set forth in this Agreement or in the Escrow Agreement, (i) all charges of Escrowee, if any, attendant to holding and/or disbursing the Deposit shall be paid by Buyer and (ii) all interest accrued in connection with the

---

[1] NTD: We have required that bidders separately list the consideration for the leases, FF&E and inventory to facilitate the expedient calculation and timely payment of transfer taxes and sales taxes.

Deposit hereunder shall accrue for the sole benefit of the party to whom the Deposit is paid.  The Parties agree that any payments made pursuant to this Section 3(a) in respect of accrued interest shall be deemed to be an adjustment to the Purchase Price for tax purposes to the extent permitted by applicable Law.

        b.     Closing Payment.  On the Closing Date, as defined below, the Purchase Price, as adjusted by the application of the Deposit, shall be paid by Buyer by wire transfer of immediately available federal funds to the account designated on Exhibit E hereto or as otherwise designated in writing by Seller.

4.     Allocation.  If, at least three (3) Business Days prior to Closing, either Seller or Buyer requests a further allocation of the Purchase Price (and all other relevant items) among the Acquired Assets, the Parties mutually agree to determine in good faith an appropriate allocation to be reflected in writing no later than the Closing (the "**Allocation Schedule**").  The Allocation Schedule shall be conclusive and binding on the Parties, and Seller and Buyer agree to (and agree to cause their respective subsidiaries and Affiliates to) prepare, execute, and file all Tax Returns on a basis consistent with the Allocation Schedule (including any update thereto).  None of the Parties will take any position inconsistent with the Allocation Schedule (including any update thereto) on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority.  The Allocation Schedule may be updated from time to time by mutual agreement of the Parties and as necessary to reflect any adjustment to the Purchase Price for applicable Tax purposes or as required by applicable Law.

5.     Payment of Cure Amount.  The Purchase Price includes consideration for the proposed cure amount of the Lease (the "**Cure Amount**"), which Cure Amount shall be the total amount payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Buyer and assignment to Buyer of all contracts being assigned hereunder, and which shall be subject to approval by the Bankruptcy Court.

6.     Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York, such other location in the state where the Leased Premises are located as may be selected by Seller, or such other location as shall be mutually agreed upon by Seller and Buyer commencing at 10:00 a.m. local time on a date (the "**Closing Date**") that is the thirtieth (30th) Business Day following the date hereof, or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto.  Seller shall have a one time right to adjourn the Closing for up to thirty (30) days on notice provided no later than the Closing Date.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective at 12:01 a.m., New York City time, on the Closing Date.

7.     Assignment.  As of the Closing Date, pursuant to sections 363 and 365 of the Bankruptcy Code and in accordance with the Discrete Procedures or a sale order entered pursuant to the Global Bidding Procedures Order, Tenant shall grant, transfer and assign to Buyer, without representation or warranty of any kind, all of its right, title, and interest in and to the Lease, the Subleases, if any, and, to the extent provided herein, FF&E.

8.    <u>Assumption</u>.  On and after the Closing Date, Buyer shall assume all of the covenants, agreements, and obligations of Tenant as tenant under the Lease and as sublessor under the Subleases, if any.  In further consideration of the above assignment, Buyer hereby agrees that it shall, as of the Closing Date: (a) perform all of the covenants, conditions and agreements of (i) the Lease (including making all payments) as if Buyer were the original tenant under the Lease and (ii) the Subleases, if any, as if Buyer were the original sublessor under each of such Subleases, and (b) that the Lease and each of the Subleases, if any, shall remain in full force and effect.  As of the Closing Date, Seller shall have no further liabilities or obligations with respect to the Lease, including, but not limited to, obligations related to rents, utilities, Taxes, insurance and common area maintenance, regardless of when due and payable, nor any of the Subleases, if any, and Seller shall be released from all such obligations and Buyer shall fully indemnify and hold harmless Seller with respect thereto.  No Person, other than Buyer, shall be deemed a beneficiary of the provisions of this <u>Section 8</u>.

9.    <u>Prorations/Adjustments</u>.  As set forth above, Seller shall be solely responsible to pay the Cure Amount to the landlord.  There will be no prorations between Seller and Buyer on the Closing Date, and no post-assignment reconciliations or adjustments of any kind shall occur.  Buyer shall receive the benefits and burdens for all adjustments under the Lease that occur after the Closing Date (regardless of the period in question that is subject to the adjustment), including year-end adjustments for Taxes, fees, any common area maintenance charges, and percentage rent for calendar year 2015 and thereafter and Buyer shall fully indemnify and hold harmless Seller with respect thereto.  Seller shall retain all security deposits under any Subleases and there shall be no offset or reduction in the Purchase Price in connection with the same.  Buyer shall replace all such security deposits as of the Closing Date and maintain the same in accordance with applicable Laws and each Sublease, as applicable.

10.    <u>Free and Clear of All Liens</u>.  Pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, Seller shall convey its rights and interests under the Lease to Buyer free and clear of all liens, claims, interests, or encumbrances (collectively, "**Liens**"), if any, with any such Liens attaching to the proceeds paid to Seller.

11.    <u>Closing Deliverables</u>.  On the Closing Date:

a.    Seller shall deliver to Buyer a duly executed copy of: (i) an Assignment and Assumption of Lease in the form attached hereto as <u>Exhibit F</u> ("**Assignment and Assumption**"); (ii) a FIRPTA Certificate; (iii) if applicable, Transfer Tax forms or certifications provided by Buyer as more specifically described in subsection (b) below; (iv) if applicable, a Quitclaim Bill of Sale in the form attached hereto as <u>Exhibit G</u>; (v) a landlord notice and a subtenant notice (if applicable), each in the form attached hereto as <u>Exhibit H</u>; and (vi) if applicable, an assignment and assumption with respect to the Subleases, to the extent such Subleases are assignable and are in effect on the Closing Date, in the form attached hereto as <u>Exhibit I</u> ("**Assignment of Subleases**").

b.    Buyer shall deliver to Seller: (i) a fully executed counterpart of the Assignment and Assumption, (ii) an executed copy of all Transfer Tax forms or certifications as may be required by each state, county or municipality to record the Assignment and Assumption

and effectuate the transactions contemplated herein; (iii) a fully executed counterpart of the Assignment of Subleases; (iv) such other documents as may be reasonably required to complete the transactions provided for in this Agreement. All documents executed and delivered by Buyer pursuant to this Section shall be in form and substance reasonably satisfactory to Seller.

12.    <u>Transfer Tax </u>Forms.  Buyer shall be responsible for the preparation, delivery and recordation of any and all real estate Transfer Tax forms or certifications required by any Governmental Authority (unless Seller notifies Buyer that they will do so), with Buyer being responsible for any payment required therewith as provided in Section 13.  The Party that is required by applicable law to file or record any other Transfer Tax forms or certifications shall prepare and timely file and record such forms or certifications, with Buyer being responsible for any payment required therewith with respect to the Acquired Assets as provided in Section 13.  The Parties hereto shall cooperate in making, in a timely manner, all such tax returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any such Transfer Taxes.  At Seller's request, all Transfer Tax forms and certifications, along with payment therefor, shall be delivered by Buyer to Seller for recordation and payment with the appropriate Governmental Authority.  To the extent required by applicable Law, Seller shall execute any Transfer Tax forms or certifications.

13.    <u>Closing Costs</u>.

a.    Seller and Buyer shall each pay their own attorneys' fees and expenses. Buyer shall pay (i) all state, county and local Transfer Taxes required to be paid in connection with the assignment and assumption of the Lease and any and all Subleases, and the consummation of the transactions contemplated herein, all of which amounts shall be paid, if applicable, to the proper Governmental Authority on or prior to the Closing Date and (ii) all title and escrow charges.

b.    Except as otherwise provided in this Agreement, all other costs and expenses of the transaction contemplated by this Agreement shall be borne by Buyer.

c.    Buyer agrees to fully indemnify and hold Seller harmless for, from and against any loss, cost, claim, damage or expense incurred, directly or indirectly, by Seller as a result of Buyer's failure to pay any Taxes or costs pursuant to clauses (a) and (b) above.  Buyer's obligations in this Section shall survive the Closing Date.

14.    <u>Conditions to Closing.</u>

a.    <u>Conditions to Buyer's Obligations</u>.  Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)    the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, and

no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

      (ii)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

      (iii)    each delivery contemplated by <u>Section 11(a)</u> to be delivered to Buyer shall have been delivered.

      b.    <u>Conditions to Seller's Obligations</u>.  Seller's obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

      (i)    Buyer shall have performed and complied with all of its covenants and agreements hereunder through the Closing in all material respects;

      (ii)    the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

      (iii)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

      (iv)    each payment contemplated by <u>Sections 3, 4 and 13</u> to be made to Seller or any landlord shall have been made, and each delivery contemplated by <u>Section 11(b)</u> to be delivered to Seller shall have been delivered.

      c.    <u>No Frustration of Closing Conditions</u>.  Neither Buyer nor Seller may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in <u>Subsection 14(a)</u> or <u>Subsection 14(b)</u>, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliate's failure to use its reasonable best efforts (or commercially reasonable efforts, with respect to those matters contemplated by <u>Section 17</u>, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach hereunder.  The Parties agree that neither the failure to obtain a court order nor any action with respect to a Competing Bid (as defined below), to the extent permitted hereunder, shall be deemed to be a failure to use the efforts required to satisfy the conditions to consummation of the transactions contemplated hereunder nor a breach hereunder.

      15.    <u>No Other Contingencies</u>.  Buyer expressly agrees and acknowledges that Buyer's obligations hereunder are not in any way conditioned upon or qualified by Buyer's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt, financing or equity investment or otherwise) nor upon Buyer's ability to obtain title insurance.

16.    <u>Termination of Agreement</u>.

a.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(i)    by the mutual written consent of the Parties;

(ii)    by any Party by giving written notice to the other Party if:

(A)    any court of competent jurisdiction shall have enacted or issued a Law permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this agreement and such Law or Decree or other action shall have become final and non-appealable; or

(B)    the Closing shall not have occurred prior to the sixtieth (60) day from the date hereof ("**Outside Date**"); <u>provided</u> that if the Closing shall not have occurred on or before the Outside Date due to a material breach of this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 16(a)(ii)(B)</u>.

(iii)    if (i)(x) Seller enters into a definitive agreement with respect to a higher or better competing bid in accordance with the bidding procedures attached hereto as <u>Exhibit J</u> (the "**Bidding Procedures**") in respect of the Lease (a "**Competing Bid**"), (y) the Bankruptcy Court enters an order approving the Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

b.    Seller may terminate this Agreement at any time prior to Closing if Buyer fails to satisfy any requirement set forth under <u>Section 14(b)(v)</u>, including delivery of the Deposit required hereunder. In such case, the Agreement shall be rendered null and void, Seller shall be entitled to retain any and all consideration already paid to Seller, including, but not limited to, the Deposit.

c.    <u>Effect of Termination</u>. If any Party terminates this Agreement pursuant to <u>Section 16(a) or (b)</u>, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that <u>Section 13</u>, this <u>Section 16</u>, <u>Sections 23 through 43</u>, and <u>Schedule I</u> shall survive any such termination) and no Party shall have any Liability (except as set forth in <u>Section 16(b) and Section 17</u>) to the other Party hereunder (except as may be provided in <u>Section 4</u> and <u>Subsection 16(b)</u>); <u>provided</u>, <u>however</u>, that nothing in this <u>Section 16</u> shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; <u>provided</u>, <u>further</u>, subject to <u>Section 16(d)</u> below, that other than in the case of fraud or willful misconduct, (a) the maximum Liability of Seller under this Agreement shall not exceed the reasonable out of pocket expenses incurred by Buyer and (b) subject to subsection (d) below, the maximum liability of Buyer under this Agreement shall not exceed the Deposit.

d.    <u>Lease Indemnity</u>.    Notwithstanding anything contained herein to the contrary, if this Agreement is terminated pursuant to <u>Section 16(a) or (b)</u>, Buyer shall indemnify Seller for all Liabilities and Damages arising out of any Lease assumed by Seller pursuant to section 365(k) of the Bankruptcy Code.  This indemnity shall survive such early termination.

17.    <u>Bankruptcy Court Matters</u>.

a.    <u>Competing Transaction</u>.    This Agreement is subject to approval by the Bankruptcy Court in accordance with the Discrete Procedures Order, and the consideration by Seller of a Competing Bid in accordance with the Discrete Procedures Order and, in the event Sellers receive a Competing Bid, an auction to be conducted in accordance with the Bidding Procedures.

b.    <u>Break Up Fee</u>.    In consideration for Buyer having expended considerable time, effort and expense in connection with this Agreement, Sellers grant Buyer, subject to compliance with the Discrete Procedures Order, a break-up fee in an amount equal to 3% of the Purchase Price (the "**Break Up Fee**").  Seller further agrees that the Break Up Fee constitutes an allowed administrative expense claim against Seller's estate pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code.  In the event a Competing Bid is consummated, if no material breach by Buyer of this Agreement has occurred, Seller shall cause the (1) refund of the Deposit to Buyer in accordance with the Bidding Procedures and (2) payment to Buyer of the Break Up Fee on the first Business Day following the date of consummation of the Competing Bid.

c.    From the date hereof and until the transactions contemplated hereby are consummated, Seller is permitted to, and is  permitted to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by or from any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, and  Seller shall be permitted and shall have the authority to (and to cause its Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, including supplying information relating to the assets of Seller to prospective buyers.  Without limiting the foregoing, Seller shall be permitted to perform all of the foregoing activities with respect to all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Global Bidding Procedures Order, Discrete Procedures Order or other applicable Law.

d.    <u>Bankruptcy Court Filings</u>.

(i)    If the Buyer is the successful bidder (to the extent an auction is conducted), as soon as reasonably practicable following the execution of this Agreement, Seller shall seek approval of the Agreement in accordance with the Global Bidding Procedures Order or the Discrete Procedures Order and file any necessary notice or pleadings required in connection therewith. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the transactions contemplated by this Agreement pursuant to the Global Bidding Procedures Order or the Discrete Procedures Order, including a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for providing the Adequate Assurance Information

to the Cure Notice Parties and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder. In the event the approval of the transactions contemplated by this Agreement shall be appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

18.     <u>Intentionally Omitted</u>

19.     <u>Delivery; "AS IS" Transaction</u>.

a.     Buyer acknowledges that it has fully inspected or waived the right to inspect the Leased Premises prior to the execution of this Agreement and does hereby assume all of the risks, including, but not limited to, latent defects in the Leased Premises. Seller shall not be obligated to do any work or alter, restore, repair or develop the Leased Premises, but Seller shall deliver the Leased Premises in vacant, broom clean condition, and, if applicable, with all furnishings, fixtures, equipment, inventory, racks, aisle displays, refrigeration equipment and personal property removed from the Leased Premises. Any work (including demolition) which may be necessary to adapt the Leased Premises for Buyer's occupancy or for the operation of Buyer's business therein shall be the sole responsibility of Buyer and shall be performed by Buyer at its sole cost and expense, in accordance with the terms of the Lease.

b.     BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE LEASE OR THE LEASED PREMISES (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE LEASED PREMISES; THE PHYSICAL CONDITION OF THE LEASED PREMISES; THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE LEASED PREMISES OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE LEASED PREMISES; THE ZONING OF THE LEASED PREMISES; THE POSSIBILITY OF DEVELOPING OR USING THE LEASED PREMISES IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE LEASE OR THE LEASED PREMISES; THE FITNESS OF THE LEASED PREMISES, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE LEASED PREMISES (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE LEASE OR THE LEASED PREMISES). BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE

BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLER.  BUYER ALSO ACKNOWLEDGES THAT BUYER HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE LEASED PREMISES AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE LEASED PREMISES AND/OR THE LEASE, AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IS ACQUIRING THE LEASE AND THE LEASED PREMISES, BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT, AND BUYER IS NOT RELYING UPON ANY REPRESENTATIONS OF SELLER OR SELLER'S AGENTS.  ACCORDINGLY, BUYER HEREBY ACCEPTS THE LEASED PREMISES IN ITS "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS.

20.    Store Closed.  The Parties acknowledge and agree that Seller has ceased (or will cease as of the Closing Date) operations at the Leased Premises and the Leased Premises will be delivered in broom clean condition.

21.    Release; Indemnity.  Pursuant to section 365(k) of the Bankruptcy Code, on and after the Closing Date, Buyer agrees to defend and indemnify Seller against, and hold Seller harmless from, any and all claims, actions, proceedings, suits, costs, liabilities, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and disbursements), whether foreseen or unforeseen, in connection with the Lease, the Leased Premises (including, without limitation, the performance or observance or the failure or refusal to perform or observe any agreement or obligation of the tenant under the Lease or any term or provision thereof required to be performed by the tenant under the Lease), each Sublease, and this Agreement.

22.    Casualty and Condemnation.

a.    Seller agrees to give Buyer prompt written notice of any fire, flood or similar casualty affecting any portion of the Leased Premises or of any actual or threatened (to the extent that Seller has current knowledge thereof) taking or condemnation of all or any portion of any Leased Premises.

b.    If prior to Closing there shall occur:  (i) damage to any Leased Premises caused by fire or other casualty; or (ii) the taking or condemnation of all or any portion of the Leased Premises; then, in each case, the Closing Date shall occur as provided in this Agreement, and Buyer shall be assigned at the Closing Date (A) all interest of Seller in and to any insurance proceeds (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date), subject to all applicable deductible amounts or (B) condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding.

c.    The Parties hereby waive the provisions of the Uniform Vendor and Purchaser Risk Act (to the extent the same is applicable to the Leased Premises) and of any other Law to the same or similar effect, and agree that the same shall not apply to this Agreement.

23.    <u>Brokers' Fees</u>.  Other than the fees and expenses payable to Evercore Group L.L.C. or Hilco Real Estate Group LLC in connection with the transactions contemplated hereby, which shall be borne by Seller, neither Party has entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.  Buyer shall indemnify and hold Seller harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or liabilities, including reasonable attorneys' fees and disbursements, which Seller, or any of its affiliates may sustain, incur or be exposed to, by reason of any claim or claims against Buyer by any broker, finder or other person or entity for fees, commissions or other compensation arising out of the transactions contemplated herein if such claim or claims are based in whole or in part on dealings or agreements with the Buyer.  Any broker retained by or providing services to Buyer in connection with the transaction evidenced by this Agreement shall be compensated solely by Buyer without contribution from Seller.

24.    <u>Survival</u>.  Except as specifically set forth herein, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to <u>Section 11(a)</u> or <u>Section 11(b)</u> shall survive, and each of the same shall terminate and be of no further force or effect as of the Closing.

25.    <u>Expenses</u>.  Except as otherwise expressly set forth herein, including but not limited to <u>Section 11</u>, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

26.    <u>Entire Agreement</u>.  This Agreement, any documents delivered at Closing pursuant hereto, and any confidentiality agreement entered into by Seller and Buyer in connection with this transaction, constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

27.    <u>Incorporation of Exhibits and Schedules</u>.  The Exhibits and Schedule(s) to this Agreement are incorporated herein by reference and made a part hereof.

28.    <u>Amendments and Waivers</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach.  No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 28</u> except as expressly provided herein.

Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

29.    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of each other Party.

30.    <u>Notices</u>.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

> The Great Atlantic & Pacific Tea Company, Inc.
> 2 Paragon Drive
> Montvale, New Jersey 07645
> Attention: Christopher W. McGarry and Matthew Bennett
> E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Seller) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
> E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

If to Buyer:

> Bogopa Service Corp.
> 650 FountainAvenue
> Brooklyn, New York 11208
> Attention:  Edward Suh, Esq.
> E-mail: edward.suh@bogopausa.com

With a copy (which shall not constitute notice to Buyer) to:

> Harfenist Kraut & Perlstein, LLP
> 3000 Marcus Avenue, Suite 2E1
> Lake Success, New York 11042
> Attention: Allen Perlstein

E-mail: aperlstein@hkplaw.com

With a copy (which shall not constitute notice to Buyer) to:

Klestadt Winters Jureller Southard & Stevens, LLP
570 Seventh Avenue
17th floor
New York, NY 10018
Attention: Tracy Klestadt, Esq.
E-mail: TKlestadt@Klestadt.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 30.

31.     Governing Law.   This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

32.     Submission to Jurisdiction; Service of Process.   Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.   Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.   Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.   Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 30; provided, however, that nothing in this Section shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.   Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.   The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

33.     Waiver of Jury Trial.   EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

AP/D226551/FCORP399

WEIL:\95469021\4\50482.0005

34. <u>Specific Performance</u>. Buyer acknowledges and agrees that Seller and its estate would be damaged irreparably in the event Buyer does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Seller may have under law or equity, Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

35. <u>Severability</u>. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

36. <u>No Third Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any Person other than Buyer, Seller, and their respective successors and permitted assigns, except as expressly set forth in this Agreement.

37. <u>Non-Recourse</u>. All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**"). In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this <u>Section 37</u>.

AP/D226551/FCORP399

14

WEIL:\95469021\4\50482.0005

38.    Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

39.    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

40.    Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

41.    Limitations Under Applicable Law.  Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to limitations under applicable Law, including, without limitation, Sections 1113 and 1114 of the Bankruptcy Code.

42.    Assignment of Lease.  The acceptance of the Assignment and Assumption by Seller shall be deemed to be a full performance of Seller and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement.

43.    Prevailing Party.  If any action is brought by either of the Parties against the other, then the prevailing Party shall be entitled to recover from the other Party court costs and reasonable attorneys' fees and costs actually incurred.

44.    Assignment.  Buyer shall have the right to assign this Agreement to an Affiliate simultaneously with the Closing, provided that such assignment shall not release Buyer from its obligations hereunder.

45.    Covered Employees.   For those store employees represented by a labor union, Buyer will negotiate with the appropriate local union representing such Covered Employees, in good faith, to (a) assume the applicable collective bargaining agreement; (b) reach a mutually acceptable collective bargaining agreement; or (c) enter into an agreement with such local union integrating such represented Covered Employees into Buyer's existing collective bargaining units.  For all purposes of this Section 45, Buyer acknowledges the requirements of sections 1113 and 1114 of the Bankruptcy Code and agrees to use good faith reasonable best efforts to cooperate with Seller in ensuring compliance with any applicable provisions thereof.  Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to applicable law, including, without limitation, sections 1113 and 1114 of the Bankruptcy Code and any applicable federal labor law.

## [SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

A&P REAL PROPERTY, LLC,
a Delaware limited liability company

By:_____
Name:
Title:

BOGOPA SERVICE CORP.,
a New York corporation

By:_____
Name: Edward Suh
Title: Vice President and Secretary

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


A&P REAL PROPERTY, LLC,
a Delaware limited liability company


By:_____
Name:
Title:




BOGOPA SERVICE CORP.,
a New York corporation

By:_____
Name: ALLEN PELISTON
Title: ASST. SEC

## LIST OF SCHEDULE AND EXHIBITS

| SCHEDULE | DESCRIPTION |
|---|---|
| Schedule I | Definitions |

| EXHIBIT | DESCRIPTION |
|---|---|
| Exhibit A | The Lease |
| Exhibit B | Premises |
| Exhibit C | Sublease(s) |
| Exhibit D | Escrow Agreement |
| Exhibit E | Wire Instructions |
| Exhibit F | Form of Assignment and Assumption of Lease |
| Exhibit G | Form of Quitclaim Bill of Sale |
| Exhibit H | Form of Landlord Notice and Form of Subtenant Notice |
| Exhibit I | Form of Assignment and Assumption of Subleases |
| Exhibit J | Bidding Procedures |

## Schedule I

## Definitions

(v)    "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

(vi)    "Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(vii)    "Code" means the Internal Revenue Code of 1986, as amended.

(viii)    "Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

(ix)    "Decree" means any judgment, decree, ruling, injunction or any other order of any Governmental Authority.

(x)    "FIRPTA Certificate" means a certificate from Tenant in compliance with applicable Treasury Regulations setting forth Tenant's (or, if applicable, its regarded owner's) name, address and federal tax identification number and stating that Tenant (or, if applicable, its regarded owner) is not a "foreign person" within the meaning of section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to section 1445 of the Code.

(xi)    "Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

(xii)    "Law" means any constitution applicable to, and any law, statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

(xiii)    "Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

(xiv)    "Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

(xv)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

(xvi)    "Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

(xvii)    "Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

(xviii)    "Transfer Tax" means any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated by this Agreement.

(xix)    "Treasury Regulations" mean the Treasury regulations promulgated under the Code

## EXHIBIT A

### The Lease

STORE 070-3618 – 425 ANDERSON AVENUE, FAIRVIEW, NJ

LEASE DATED FEBRUARY 21, 1992 ORIGINALLY BETWEEN FAIRVIEW 91
ASSOCIATES, AS LANDLORD, AND THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., AS TENANT.

- MEMORANDUM OF LEASE FOR RECORDATION (NOTICE OF LEASE) DATED APRIL 2, 1992 [RECORDED]
- FIRST AMENDMENT TO LEASE DATED MAY 11, 1992
- LETTER AGREEMENT DATED FEBRUARY 23, 1993
- CONFIRMATION OF LEASE TERM AGREEMENT DATED MARCH 19, 1993 [RECORDED]
- ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011
- ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012
- GUARANTY DATED MARCH 13, 2012
- SECOND AMENDMENT TO LEASE DATED NOVEMBER 14, 2013

AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.4.33 AS OF THE
BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT
AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE.

## EXHIBIT B

**Leased Premises**

**425 ANDERSON AVENUE, FAIRVIEW, NEW JERSEY 07022**

## EXHIBIT C

### Sublease(s)

**None.**

# EXHIBIT D

## Escrow Agreement

**Bidder ID No. 109**

**Site No(s). 072-6634, 072-6288, 038-3512, 038-3504**

### ESCROW RIDER TO LEASE SALE AGREEMENT

This Escrow Agreement dated this 10TH day of September 2015 (this "Escrow Agreement"), is entered into by and among THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., ("Seller"), BOGOPA SERVICE CORP. ("Bidder"), and TITLEVEST SERVICES, LLC, a New York limited liability company, as escrow agent ("Escrow Agent"). Seller and Bidder are known herein, individually or collectively as the context may require as a "Party" or the "Parties". Any capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Agreement (as defined below).

### W I T N E S S E T H

WHEREAS, the Bidder has executed that certain Lease Sale Agreement (the "Sale Agreement") as part of a bid for the acquisition of certain real property more particularly described on Exhibit A (the "Premises");

WHEREAS, as part of the bid process, Bidder is required to wire to Escrow Agent a Deposit in the amount of $587,500.00 (the "Escrow Funds"); and

WHEREAS, Bidder desires that Escrow Agent hold the Escrow Funds in escrow pursuant to the terms of this Escrow Agreement; and

WHEREAS, Escrow Agent is willing to hold the Escrow Funds, on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid, the receipt and sufficiency of which are hereby mutually acknowledged, the Parties and the Escrow Agent agree as follows:

**I.    ESCROW DEPOSIT**

A.    Delivery of Escrow Funds; Authorization of Escrow Agent. Concurrently with execution and delivery of this Escrow Agreement, Bidder shall deliver the Escrow Funds along with a nonrefundable Escrow Fee of $500 ("Initial Escrow Fee"; together with all other nonrefundable escrow fees set forth on Exhibit C, the "Nonrefundable Escrow Fees") to Escrow Agent via wire transfer. Upon receipt, the Escrow Funds shall be held by Escrow Agent in Escrow Agent's client escrow account at Citibank. The Parties hereby appoint Escrow Agent to serve as escrow agent with respect to the Escrow Funds, and Escrow Agent hereby accepts such appointment and agrees to act in accordance with the terms and subject to the conditions of this Escrow Agreement. Escrow Agent shall have the right to disburse the Escrow Funds, in whole or in part,

solely in accordance with the terms of this Escrow Agreement.  Escrow Agent shall not, under any circumstances, pledge or hypothecate any portion of the Escrow Funds and shall act only as directed in accordance with the terms of this Escrow Agreement.

B.      UNTIL RELEASED AND DISBURSED IN ACCORDANCE WITH THE TERMS OF THIS ESCROW AGREEMENT, ALL ESCROW FUNDS SHALL (i) REMAIN THE PROPERTY OF BIDDER, (ii) NOT BE OR BECOME THE PROPERTY OR ASSETS OF SELLER OR ESCROW AGENT, AND (iii) NOT BE SUBJECT TO ANY LIEN OR ANY JUDGMENT OR CREDITORS' CLAIMS AGAINST SELLER, BIDDER OR ESCROW AGENT.  IN NO EVENT SHALL ANY OF THE ESCROW FUNDS BE COMMINGLED WITH DEPOSIT ACCOUNTS OF ESCROW AGENT OR OTHERWISE TREATED AS A DEPOSIT ACCOUNT OF ESCROW AGENT OR REFLECTED ON THE FINANCIAL STATEMENTS OF ESCROW AGENT.

## II.    **RELEASE OF ESCROW FUNDS**

A.      Potential Bidder.  If Bidder is determined by Seller not to meet the requirements for qualifying as a bidder in any auction for the Premises (the "Auction"), as confirmed by the Debtors, within three (3) business days after the deadline for Seller to make a determination regarding which bids have been determined to be qualified bids for such auction (the "Designation Deadline") ("Unqualified Bidder"), the Escrow Agent shall return to Bidder the Deposit.

B.      Qualified Bidder.  The Deposit will be forfeited to Seller if Bidder is determined by Seller to meet the requirements for qualifying as a bidder at the Auction ("Qualified Bidder") and (A) Bidder attempts to modify, amend or withdraw its qualified bid, except as may permitted by the governing procedures or the Sale Agreement, during the time the qualified bid remains binding and irrevocable under the applicable procedures and the Sale Agreement or (B) the Bidder is selected as the Successful Bidder (defined below) and fails to enter into the required definitive documentation or to consummate the transaction according to the applicable procedures, and the terms of the applicable transaction documents with respect to the successful bid.  The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by Seller two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of Seller stating that Bidder has breached or failed to satisfy its obligations or undertakings.

C.      Successful Bidder.  If Bidder is the successful bidder for the Premises ("Successful Bidder"), Seller or its agent shall notify Escrow Agent, and Escrow Agent shall retain the Escrow Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement.

D.      Backup Bidder.  If the Bidder is selected as the next highest or next best bid for purchase of the Premises ("Backup Bidder"), Seller or its agent shall notify the Escrow Agent, and the Escrow Funds will continue to be held by the Escrow Agent until the acquisition of the Premises by the Successful Bidder, at which time the Escrow Funds will be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as Exhibit B, less any applicable Nonrefundable Escrow Fees (and Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated); provided that if the Successful Bidder does not consummate the purchase of the Premises, then the Escrow Agent shall retain the Escrow Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement.

E.      Neither Successful Nor Backup Bidder.  If Bidder is determined by Seller to be neither the Successful Bidder nor the Backup Bidder, then, within three (3) business days of execution by the Successful Bidder and Seller of the documentation memorializing the successful bid, the Escrow Funds will be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as Exhibit B, less any applicable Nonrefundable Escrow Fees. Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated.  In the case of Subsections (C) and (D) of this Section II, Escrow Agent shall release the funds no later than the Outside Date except to the extent the Sale Agreement is executed by Seller with respect to a Backup Bidder prior to the Outside Date.

F.      Disbursements.  The Debtors and Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit. If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

G.      Reliance.  Escrow Agent shall rely on all information provided to it by attorneys at Weil, Gotshal & Manges LLP regarding (i) the Successful Bidder, the Backup Bidder, an Unqualified Bidder and a Qualified Bidder (ii) the closing with the Successful Bidder, and (iii) any default by the Successful Bidder or acceptance of the Backup Bidder.  Bidder acknowledges that Escrow Agent is entitled to rely on said information in disbursing the Escrow Funds.

III.    **DUTIES OF THE ESCROW AGENT**

A.      Scope of Responsibility. Notwithstanding any provision to the contrary, Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstances will Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement.  Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to Escrow Agent; and Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document. References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and Escrow Agent has no duties or obligations with respect thereto.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

B.      Attorneys and Agents. Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by Escrow Agent.  Escrow Agent shall be reimbursed for any and all compensation (reasonable and documented fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

C.      Reliance.  Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors and/or assigns.  Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent

by the proper person or persons, without further inquiry into the person's or persons' authority. Concurrently herewith, the Bidder shall deliver <u>Exhibit D</u> hereto, which contains authorized party designations.

D.     <u>Right Not Duty Undertaken</u>.  The permissive rights of Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

E.     <u>No Financial Obligation</u>.  No provision of this Escrow Agreement shall require Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.  Escrow Agent shall not be liable for the insolvency of any bank in which the Escrow Funds are deposited.

## IV.     **PROVISIONS CONCERNING ESCROW AGENT**

A.     <u>Indemnification</u>.  The Parties, jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, reasonable and documented attorneys' fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating to (a) the Escrow Agent's execution and performance of this Escrow Agreement, except to the extent that such loss, liability or expense shall have been finally adjudicated to have directly resulted from the gross negligence or willful misconduct of the Escrow Agent (or any person through which its duties are performed, as provided in <u>Section 3(C)</u>) or (b) the Escrow Agent's following any instructions or other directions from the Bidder or Seller, except to the extent that its following any such instruction or direction is expressly forbidden by the terms of this Escrow Agreement. The provisions of this <u>Section 4(A)</u> shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

B.     <u>Limitation of Liability</u>. ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

C.     <u>Resignation or Removal</u>.  Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and Seller may remove Escrow Agent by furnishing to Escrow Agent a written notice of Escrow Agent's removal along with payment of all reasonable and documented fees and expenses to which it is entitled through the date of termination or removal.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Funds and to deliver the same to a successor escrow agent as shall be appointed by the Seller, as evidenced by a written notice filed with Escrow Agent or in accordance with a court order.  If the Seller fails to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting

appointment shall be binding upon the Parties. Any such successor escrow agent shall deliver to Seller and Bidder a written instrument accepting such appointment, and thereupon it shall succeed to all the rights and duties of the escrow agent hereunder and shall be entitled to receive possession of the Escrow Funds. Upon receipt of the identity of the successor escrow agent, the Escrow Agent shall deliver the Escrow Funds then held hereunder, less any reasonable and documented fees and expenses then due and owing to the Escrow Agent, to the successor escrow agent. In the event of the resignation or removal of the Escrow Agent, the resigning or removed Escrow Agent shall be absolved from any further duties as the Escrow Agent hereunder; provided, however, that the Escrow Agent or any successor escrow agent shall continue to act as the Escrow Agent until a successor is appointed and qualified to act as the Escrow Agent.

D.    Compensation. Escrow Agent shall be entitled to fees and expenses incurred in administering and disbursing the Escrow Funds, and compensation for its services which shall be paid by Bidder as set forth on Exhibit C. If any material controversy arises hereunder, or Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then Escrow Agent shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable and documented attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event. If any amount due to Escrow Agent hereunder is not paid within thirty (30) days of the date due, Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.

E.    Disagreements. If any conflict, disagreement or dispute arises between, among, or involving the Parties concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or Escrow Agent is in doubt as to the action to be taken hereunder, Escrow Agent is authorized to retain the Escrow Funds until Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Funds, (ii) receives a written agreement executed by the Parties directing delivery of the Escrow Funds, in which event Escrow Agent shall be authorized to disburse the Escrow Funds in accordance with such agreement, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, Escrow Agent shall be relieved of all liability as to the Escrow Funds which it delivers to such court and shall be entitled to recover reasonable and documented attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

F.    Attachment of Escrow Funds; Compliance with Legal Orders. In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting Escrow Funds, Escrow Agent is hereby expressly authorized, in its reasonable discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that Escrow Agent obeys or complies with any such writ, order or decree, it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

V.    **MISCELLANEOUS**

A.    Successors and Assigns. This Escrow Agreement shall be binding on and inure to the benefit of the Parties and Escrow Agent and their respective successors and permitted assigns.

No other persons shall have any rights under this Escrow Agreement.  No assignment of the interest of the Parties shall be binding unless and until written notice of such assignment shall be delivered to other Party and Escrow Agent and shall require the prior written consent of such other Party and Escrow Agent (such consent not to be unreasonably withheld).

B.      Notices.  All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (a) personally, (b) by facsimile transmission with written confirmation of receipt, (c) on the day of transmission if sent by electronic mail ("e-mail") to the e-mail address given below, (d) by overnight delivery with a reputable national overnight delivery service, or (e) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited in the United States mail.  If notice is given to a party, it shall be given at the address for such party set forth below.  It shall be the responsibility of each party hereto to notify the Escrow Agent and the other Party in writing of any name or address changes.

If to Seller:

The Great Atlantic and Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention:  Christopher W. McGarry; Matthew Bennett
E-mail:  mcgarryc@aptea.com; bennettm@aptea.com

with a copy (which shall not constitute notice to Seller) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
Facsimile: (212) 310-8007
E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

Notices to Bidder:

Bogopa Service Corp.
650 FountainAvenue
Brooklyn, New York 11208
Attention:  Edward Suh, Esq.
E-mail: edward.suh@bogopausa.com


With a copy to:

Harfenist Kraut & Perlstein, LLP
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
Attention: Allen Perlstein
E-mail: aperlstein@hkplaw.com

AP/D226556/FCORP399

WEIL:\95469021\4\50482.0005

And with a copy to:

Klestadt Winters Jureller Southard & Stevens, LLP
570 Seventh Avenue
17th floor
New York, NY  10018
Attention: Tracy Klestadt, Esq.
E-mail: TKlestadt@Klestadt.com

Notices to Escrow Agent:

TitleVest Services, LLC
44 Wall Street – 10th Floor
New York, NY 10005
Attn:  Sara Murray
E-Mail: APBid@TitleVest.com

C.    Governing Law; Jurisdiction.  This Escrow Agreement shall be governed by and
construed in accordance with the laws of the State of New York (without giving effect to the
principles of conflict of laws thereof), except to the extent that the laws of such state are
superseded by chapter 11 of title 11 of the United States Code ("Chapter 11").  Without limiting
any Party's right to appeal any order of the United States Bankruptcy Court for the Southern
District of New York (the "Bankruptcy Court"), (a) the Bankruptcy Court shall retain exclusive
jurisdiction to enforce the terms of this Escrow Agreement and to decide any claims (including
with respect to Section) or disputes which may arise or result from, or be connected with, this
Escrow Agreement, any breach or default hereunder, and (b) any and all proceedings related to
the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto
hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall
receive notices at such locations as indicated herein; provided, however, that if the contemplated
Chapter 11 cases of Seller and certain of its affiliates has closed, the parties hereto agree to
unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts
of the State of New York, located in New York County for the resolution of any such claim or
dispute.  Each party hereto (i) expressly and irrevocably consents and submits to the jurisdiction
of each such court; (ii) agrees that each such court shall be deemed to be a convenient forum; (iii)
agrees that service of process in any such proceeding may be made by giving notice pursuant to
Section V(B); and (iv) agrees not to assert, by way of motion, as a defense or otherwise, in any
such proceeding commenced in any such court, any claim that such party is not subject personally
to the jurisdiction of such court, that such proceeding has been brought in an inconvenient forum,
that the venue of such proceeding is improper or that this Escrow Agreement or the subject matter
of this Escrow Agreement may not be enforced by such court.

D.    Entire Agreement. This Escrow Agreement sets forth the entire agreement and
understanding of the Parties and Escrow Agent related to the Escrow Funds.

E.    Amendment. This Escrow Agreement may be amended, modified, superseded, rescinded,
or canceled only by a written instrument executed by all of the Parties and Escrow Agent.

AP/D226556/FCORP399

WEIL:\95469021\4\50482.0005

F.      Waivers. The failure of any Party at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any Party of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

G.      Headings.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

H.      Counterparts.  This Escrow Agreement and any notices or communications may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

I.      Conflicts.  In the event of any conflict between this Escrow Agreement and the Sale Agreement or any order of the Bankruptcy Court, the terms of the Sale Agreement and/or the order of the Bankruptcy Court shall govern, but only as between the Parties.

J.      Publication; disclosure.  By executing this Escrow Agreement, the Parties and the Escrow Agent acknowledge that this Escrow Agreement (including related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement.  The Parties further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement, or, in the alternative, publishing a conformed copy of this Escrow Agreement.  If a Party must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as any judicial, or administrative order, subpoena or discovery request, it shall notify in writing the other Party and the Escrow Agent at the time of execution of this Escrow Agreement of the legal requirement to do so.  If any Party becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that Party shall promptly notify in writing the other Parties and the Escrow Agent and shall be liable for any unauthorized release or disclosure.

[Signature Page Follows]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

**THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.**

By: _____
Name:
Title:


**PATHMARK STORES, INC.**

By: _____
Name:
Title:


**BOGOPA SERVICE CORP.**

By _____
Name: E: *Allen Polisu*
Title: *Asst Sec*


**TITLEVEST SERVICES, LLC**

By:_____
Name:
Title:

**EXHIBIT A to Escrow Agreement**
The Premises

| No. | Store No. | Address |
|-----|-----------|---------|
| 153 | 072-6634 | 111-10 Flatlands Avenue, Brooklyn, New York |
| 53 | 038-3524 | 289 Bergen Boulevard, Fairview, New Jersey |
| 91 | 038-3512 | 1425 Kennedy Boulevard, North Bergen, New Jersey |
| 50 | 072-6288 | 211 Elmora Avenue, Elizabeth, New Jersey |

**EXHIBIT B to Escrow Agreement**

Wire Instructions

**EXHIBIT C to Escrow Agreement**

FEES OF ESCROW AGENT

Preclosing

- **Adminstration Fee**:  **$500.00**
  The Administration Fee is payable with the bid submission.

- **Escrow Agreement Negotiation Fee**: **$200**
  For negotiation of this Escrow Agreement or review and negotiation of an alternative
  form of escrow agreement.  Payable with bid submission.

Closing
- **Escrow Closing Fee:** $750 for attendance at Closing.  Payable at Closing.
- **Preparation of Transfer Tax Forms**: $150/set per property.  Payable at Closing.

General

**Out of Pocket Expenses**: Actual Cost.  Escrow Agent will charge for out-of-pocket expenses in
response to specific tasks assigned by the client or provided for in the escrow agreement.
Possible expenses would be, but are not limited to, express mail, Federal Express or other over-
night carrier, messenger charges, wiring fees and travel fees and expenses to attend closing or
other meetings.   There are no charges for indirect out-of- pocket expenses.  Payable at closing.

2

**EXHIBIT D to Escrow Agreement**

BIDDER AUTHORIZED PARTY

Telephone Numbers and Authorized Signatures for
Person(s) Designated to Execute the Escrow Agreement, Give Joint Instruction and Confirm
Funds Transfer Instructions

For Buyer:

| Name | Business Telephone Numbers | Signature |
|---|---|---|
| 1.Edward Suh | 718-346-6500 | |
| 2. | | |
| 3. | | |

To the extent required herein, all instructions to be delivered by Bidder, including but not limited to funds transfer instructions, whether transmitted by facsimile or otherwise, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of Bidder.

3

## EXHIBIT E

### Wire Instructions

**See attached**

WEIL:\95469021\4\50482.0005

## EXHIBIT F

### Form of Assignment and Assumption of Lease

### ASSIGNMENT AND ASSUMPTION OF LEASE

THIS **ASSIGNMENT AND ASSUMPTION OF LEASE** (this "**Assignment**") is entered into and effective as of [ _____ ], 2015, by and between A&P REAL PROPERTY, LLC, a Delaware limited liability company,  whose address is 2 Paragon Drive, Montvale, New Jersey 07645 ("**Seller**"), and BOGOPA SERVICE CORP., a New York corporation, whose address is 650 Fountain Avenue, Brooklyn, New York 11208 ("**Buyer**"). Seller and Buyer are referred to collectively herein as the "**Parties**."

WHEREAS, the Parties are parties to that certain Lease Sale Agreement, dated September 10, 2015 (the "**Purchase Agreement**") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement);

WHEREAS, the execution and delivery of this Assignment is contemplated by the Purchase Agreement; and

WHEREAS, Seller desires to assign, transfer, convey, and deliver to Buyer the Lease described in **Exhibit A** attached hereto including all amendments, modifications, and supplements thereto (collectively, the "**Lease**"), and Buyer desires to accept an assignment of the Lease together with all right, title, and interest of Seller thereunder.  The Lease encumbers all or a portion of certain property (the "**Leased Premises**") which property is more specifically described on **Exhibit B** attached hereto (the "**Premises**").

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1) **Assignment and Assumption of Lease.  Effective as of the Closing, Seller hereby assigns, transfers, conveys, and delivers to Buyer all of Seller's estate, right, title and interest as tenant of the leasehold estate described under the Lease, and Buyer hereby accepts the assignment, transfer, conveyance, and delivery of Seller's estate, rights, title and interest in, to and under such leasehold estate, and assumes and agrees to pay, discharge, and perform when due all of Seller's obligations as tenant under the Lease.**

2) **Conflict.  The assignment and assumption of the Lease (and the obligations thereunder) made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference.  In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail. Notwithstanding anything to the contrary in this Assignment, nothing herein is**

WEIL:\95469021\4\50482.0005

intended to, nor shall it, extend, amplify, or otherwise alter the Purchase Agreement.

3)  <u>Severability</u>.  Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Assignment is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Assignment.

4)  <u>Amendments</u>.  This Assignment may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Seller.

5)  <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

6)  <u>Governing Law</u>.  This Assignment shall be governed by the Laws of the state in which the Leased Premises are located, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

7)  <u>Third Party Beneficiaries and Obligations</u>.  This Assignment shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Nothing in this Assignment, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Assignment.

8)  <u>Recordation</u>.  Seller makes no representation regarding the recordability of this Assignment, nor the Lease or related documents. Seller shall bear no liability for the failure of the Lease or related documents to be recorded.

9)  <u>Further Assurances</u>.  Each of the Parties, without additional consideration, shall execute and deliver all such further documents and do such other things as the other Party may reasonably request to give full effect to this Assignment, including, without limitation, any other form of assignment agreement required in order to record this Assignment in the appropriate public records of the county in which the Leased Premises is located.

* * * * *

WEIL:\95469021\4\50482.0005

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.


**SELLER:**

A&P REAL PROPERTY, LLC,
a Delaware limited liability company


By: _____
Name: _____
Title: _____


[ACKNOWLEDGMENTS]

[Seller Signature Page to Assignment and Assumption of Lease –
Fairview, New Jersey (Store #38-3524)

WEIL:\95469021\4\50482.0005

**BUYER**:

BOGOPA SERVICE CORP.
a New York corporation

By: _____
Name:  Edward Suh
Title:  Vice President and Secretary

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF_____      )

On the ___ day of ____ in the year 2015, before me, the undersigned, personally appeared Edward Suh personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

[Buyer Signature Page to Assignment and Assumption of Lease –
Fairview, New Jersey (Store #38-3524)

## EXHIBIT A

### Lease

STORE 070-3618 – 425 ANDERSON AVENUE, FAIRVIEW, NJ

LEASE DATED FEBRUARY 21, 1992 ORIGINALLY BETWEEN FAIRVIEW 91
ASSOCIATES, AS LANDLORD, AND THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., AS TENANT.

- MEMORANDUM OF LEASE FOR RECORDATION (NOTICE OF LEASE) DATED APRIL 2, 1992 [RECORDED]
- FIRST AMENDMENT TO LEASE DATED MAY 11, 1992
- LETTER AGREEMENT DATED FEBRUARY 23, 1993
- CONFIRMATION OF LEASE TERM AGREEMENT DATED MARCH 19, 1993 [RECORDED]
- ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED JULY 8, 2011
- ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012
- GUARANTY DATED MARCH 13, 2012
- SECOND AMENDMENT TO LEASE DATED NOVEMBER 14, 2013

AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.4.33 AS OF THE
BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT
AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE.

## EXHIBIT G

### Form of Quitclaim Bill of Sale

### QUITCLAIM BILL OF SALE

THIS **QUITCLAIM BILL OF SALE** (this "Bill of Sale") is entered into and effective as of _____, 2015, by and among A&P REAL PROPERTY, LLC, a Delaware limited liability company ("Seller") and BOGOPA SERVICE CORP., a New York corporation ("Buyer"). Seller and Buyer are referred to collectively herein as the "Parties."

WHEREAS, the Parties are parties to that certain Lease Sale Agreement, dated September 10, 2015 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1.      Sale and Acceptance of Acquired Assets. For true and lawful consideration paid by Buyer, the sufficiency of which is hereby acknowledged, effective as of the date hereof, (a) Seller hereby sells, assigns, transfers, conveys, grants and delivers to Buyer all of its right, title and interest in and to the Acquired Assets, and (b) Buyer hereby accepts the foregoing sale and assignment.

2.      Conflict. In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.

3.      No Representation. This Bill of Sale is made without any covenant, warranty or representation by, or recourse against, Seller or any of Seller's Affiliates of any kind whatsoever.

4.      Severability. Whenever possible, each provision of this Bill of Sale shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Bill of Sale is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Bill of Sale.

5.      Amendments. This Bill of Sale may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Seller.

6.      Counterparts; Facsimile and Electronic Signatures. This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

7.      <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

8.      <u>Third Party Beneficiaries and Obligations</u>. This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Bill of Sale, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Bill of Sale.

9.      <u>Entire Agreement</u>. This Bill of Sale, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof, which such prior agreements, understandings, representations and statements, oral or written, shall be of no further force or effect.

* * * * *

IN WITNESS WHEREOF, the Parties have executed this Bill of Sale as of the date first above written.


A&P REAL PROPERTY, LLC,
a Delaware limited liability company


By: _____
Name:
Title:


BOGOPA SERVICE CORP.


By: _____
Name: Edward Suh
Title:   Vice President and Secretary


[Signature Page to Bill of Sale]

## EXHIBIT H

### Form of Landlord Notice

### NOTICE TO LANDLORD

[ _____ ], 2015

**Via Federal Express**

[Name and Address of Landlord]

Re:   Notice of assignment of lease at 289 Bergen Boulevard, Fairview, New Jersey   (the "Lease")

Ladies and Gentlemen:

Please be advised that on July 19, 2015, [ _____ ], the tenant under the Lease ("Tenant"), and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.

Effective as of [ _____ ], Tenant's interest in the Lease has been assigned to [ _____ ] ("Assignee"), and Assignee has assumed all of the tenant's obligations under the Lease.

Any future inquiries regarding your Lease should be directed to the address below:

[Assignee's Name]
c/o Bogopa Service Corp.

650 Fountain Avenue

Brooklyn, New York 11208

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WEIL:\95469021\4\50482.0005

Very truly yours,

[ _____ ]


By:      _____
         Name: Edward Suh
         Title:   Secretary

## Exhibit I

### Form of Assignment and Assumption of Subleases

**Not applicable**

WEIL:\95469021\4\50482.0005

## Exhibit J

**Bidding Procedures**

CONFIDENTIAL

STORE NO 038-3512
1425 KENNEDY BLVD.
NORTH BERGEN, NEW JERSEY

## LEASE SALE AGREEMENT

THIS LEASE SALE AGREEMENT (this "**Agreement**") is made as of September __, 2015 by and between A&P REAL PROPERTY, LLC, a Delaware limited liability company ("**Tenant**" or "**Seller**"), and BOGOPA SERVICE CORP., a New York corporation ("**Buyer**", and collectively with Seller, the "**Parties**").

W I T N E S S E T H :

WHEREAS, Tenant is the tenant under that certain lease more specifically described on Exhibit A attached hereto and made a part hereof (together with any amendments, modifications, extensions and renewals, the "**Lease**"), with respect to all or a portion of certain real property (the "**Leased Premises**"), which real property is more particularly described in Exhibit B attached hereto and made a part hereof (the "**Premises**");

WHEREAS, Seller and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 19, 2015 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, pursuant to the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, If Necessary, and Sale Hearings* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 495] (the "**Global Bidding Procedures Order**") or the Order *Approving Discrete Sale and Lease Rationalization Procedures* entered by the Bankruptcy Court on August 11, 2015 [Docket No. 496] (the "**Discrete Procedures Order**"), as applicable, and subject to any approval of the Bankruptcy Court required by the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, Seller desires to sell, assign, convey and transfer all of its rights, title and interests as tenant under the Lease, together with all of its rights, title and interests as sublessor under those certain sublease agreements and/or license agreements more particularly described on Exhibit C attached hereto (each, a "**Sublease**" and, collectively, the "**Subleases**"), if any, and

## [CHECK AND INITIAL WHERE INDICATED IF APPLICABLE]

☒    all trade fixtures, shopping carts, aisle markers, store models, shelving, display racks and refrigeration equipment and other furnishings and equipment owned by Seller located at the Leased Premises and, to the extent provided in Section 46, any and all liquor, beer or wine licenses appurtenant to or relating to the Leased Premises ("**Liquor Licenses**"), if any, (together with the Liquor Licenses, "**FF&E**");

*INITIAL* [_____]

WHEREAS, Buyer desires to purchase and accept such assignment and assume all rights, title, interests and obligations of Tenant under the Lease, and any Subleases and FF&E to the extent set forth herein, subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Seller and Buyer agree as follows:

1.    Procedures.  This Agreement is made subject to, and in accordance with, the Global Bidding Procedures Order or the Discrete Procedures Order.  Capitalized terms used but not otherwise defined herein (including on Schedule I attached hereto) shall have the meanings ascribed to them in the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable.  In the event of a contradiction between this Agreement and the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, the Global Bidding Procedures Order or the Discrete Procedures Order, as applicable, shall control.

2.    Lease Consideration.  The consideration for the assignment of the Lease, together with the Subleases and FF&E to the extent set forth herein (the foregoing, as applicable, collectively, the "**Acquired Assets**"), shall be equal to TWO MILLION NINE HUNDRED TWENTY FIVE ($2,925,000.00) DOLLARS (the "**Purchase Price**") which shall be comprised of:

a.    Two Million Nine Hundred Twenty Five Thousand Dollars ($2,925,000.00) as consideration for the Lease, plus

b.    **NONE.**[1]

Buyer's submission of an executed copy of this Agreement along with the Deposit shall be deemed an irrevocable offer subject only to the rights of termination provided herein.

3.    Payment of Purchase Price.  The Purchase Price shall be paid to Seller by Buyer as follows:

a.    Deposit.  Concurrently herewith, Buyer shall deposit with TITLEVEST SERVICES, LLC, a New York limited liability company ("**Escrowee**") by a bank wire transfer of immediately available federal funds to an account designated by Escrowee the sum of ONE HUNDRED FORTY SIX THOUSAND TWO HUNDRED FIFTY ($146,250.00) DOLLARS (together with all interest thereon, the "**Deposit**"), which Deposit shall be held by Escrowee pursuant to the escrow agreement (the "**Escrow Agreement**") attached hereto as Exhibit D and hereby made a part hereof.  Notwithstanding anything to the contrary set forth in this Agreement

---

[1] NTD: We have required that bidders separately list the consideration for the leases, FF&E and inventory to facilitate the expedient calculation and timely payment of transfer taxes and sales taxes.

or in the Escrow Agreement, (i) all charges of Escrowee, if any, attendant to holding and/or disbursing the Deposit shall be paid by Buyer and (ii) all interest accrued in connection with the Deposit hereunder shall accrue for the sole benefit of the party to whom the Deposit is paid. The Parties agree that any payments made pursuant to this Section 3(a) in respect of accrued interest shall be deemed to be an adjustment to the Purchase Price for tax purposes to the extent permitted by applicable Law.

    b. Closing Payment. On the Closing Date, as defined below, the Purchase Price, as adjusted by the application of the Deposit, shall be paid by Buyer by wire transfer of immediately available federal funds to the account designated on Exhibit E hereto or as otherwise designated in writing by Seller.

    4. Allocation. If, at least three (3) Business Days prior to Closing, either Seller or Buyer requests a further allocation of the Purchase Price (and all other relevant items) among the Acquired Assets, the Parties mutually agree to determine in good faith an appropriate allocation to be reflected in writing no later than the Closing (the "**Allocation Schedule**"). The Allocation Schedule shall be conclusive and binding on the Parties, and Seller and Buyer agree to (and agree to cause their respective subsidiaries and Affiliates to) prepare, execute, and file all Tax Returns on a basis consistent with the Allocation Schedule (including any update thereto). None of the Parties will take any position inconsistent with the Allocation Schedule (including any update thereto) on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority. The Allocation Schedule may be updated from time to time by mutual agreement of the Parties and as necessary to reflect any adjustment to the Purchase Price for applicable Tax purposes or as required by applicable Law.

    5. Payment of Cure Amount. The Purchase Price includes consideration for the proposed cure amount of the Lease (the "**Cure Amount**"), which Cure Amount shall be the total amount payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Buyer and assignment to Buyer of all contracts being assigned hereunder, and which shall be subject to approval by the Bankruptcy Court.

    6. Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York, such other location in the state where the Leased Premises are located as may be selected by Seller, or such other location as shall be mutually agreed upon by Seller and Buyer commencing at 10:00 a.m. local time on a date (the "**Closing Date**") that is the thirtieth (30th) Business Day following the date hereof, or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto. Seller shall have a one time right to adjourn the Closing for up to thirty (30) days on notice provided no later than the Closing Date. For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective at 12:01 a.m., New York City time, on the Closing Date.

    7. Assignment. As of the Closing Date, pursuant to sections 363 and 365 of the Bankruptcy Code and in accordance with the Discrete Procedures or a sale order entered pursuant to the Global Bidding Procedures Order, Tenant shall grant, transfer and assign to

Buyer, without representation or warranty of any kind, all of its right, title, and interest in and to the Lease, the Subleases, if any, and, to the extent provided herein, FF&E.

8.    <u>Assumption</u>.  On and after the Closing Date, Buyer shall assume all of the covenants, agreements, and obligations of Tenant as tenant under the Lease and as sublessor under the Subleases, if any.  In further consideration of the above assignment, Buyer hereby agrees that it shall, as of the Closing Date: (a) perform all of the covenants, conditions and agreements of (i) the Lease (including making all payments) as if Buyer were the original tenant under the Lease and (ii) the Subleases, if any, as if Buyer were the original sublessor under each of such Subleases, and (b) that the Lease and each of the Subleases, if any, shall remain in full force and effect.  As of the Closing Date, Seller shall have no further liabilities or obligations with respect to the Lease, including, but not limited to, obligations related to rents, utilities, Taxes, insurance and common area maintenance, regardless of when due and payable, nor any of the Subleases, if any, and Seller shall be released from all such obligations and Buyer shall fully indemnify and hold harmless Seller with respect thereto.  No Person, other than Buyer, shall be deemed a beneficiary of the provisions of this <u>Section 8</u>.

9.    <u>Prorations/Adjustments</u>.  As set forth above, Seller shall be solely responsible to pay the Cure Amount to the landlord.  There will be no prorations between Seller and Buyer on the Closing Date, and no post-assignment reconciliations or adjustments of any kind shall occur. Buyer shall receive the benefits and burdens for all adjustments under the Lease that occur after the Closing Date (regardless of the period in question that is subject to the adjustment), including year-end adjustments for Taxes, fees, any common area maintenance charges, and percentage rent for calendar year 2015 and thereafter and Buyer shall fully indemnify and hold harmless Seller with respect thereto.  Seller shall retain all security deposits under any Subleases and there shall be no offset or reduction in the Purchase Price in connection with the same.  Buyer shall replace all such security deposits as of the Closing Date and maintain the same in accordance with applicable Laws and each Sublease, as applicable.

10.    <u>Free and Clear of All Liens.</u>  Pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, Seller shall convey its rights and interests under the Lease to Buyer free and clear of all liens, claims, interests, or encumbrances (collectively, "**Liens**"), if any, with any such Liens attaching to the proceeds paid to Seller.

11.    <u>Closing Deliverables</u>.  On the Closing Date:

a.    Seller shall deliver to Buyer a duly executed copy of: (i) an Assignment and Assumption of Lease in the form attached hereto as <u>Exhibit F</u> ("**Assignment and Assumption**"); (ii) a FIRPTA Certificate; (iii) if applicable, Transfer Tax forms or certifications provided by Buyer as more specifically described in subsection (b) below; (iv) if applicable, a Quitclaim Bill of Sale in the form attached hereto as <u>Exhibit G</u>; (v) a landlord notice and a subtenant notice (if applicable), each in the form attached hereto as <u>Exhibit H</u>; and (vi) if applicable, an assignment and assumption with respect to the Subleases, to the extent such Subleases are assignable and are in effect on the Closing Date, in the form attached hereto as <u>Exhibit I</u> ("**Assignment of Subleases**").

b.    Buyer shall deliver to Seller: (i) a fully executed counterpart of the Assignment and Assumption, (ii) an executed copy of all Transfer Tax forms or certifications as may be required by each state, county or municipality to record the Assignment and Assumption and effectuate the transactions contemplated herein; (iii) a fully executed counterpart of the Assignment of Subleases; (iv) such other documents as may be reasonably required to complete the transactions provided for in this Agreement. All documents executed and delivered by Buyer pursuant to this Section shall be in form and substance reasonably satisfactory to Seller.

12.    Transfer Tax Forms.  Buyer shall be responsible for the preparation, delivery and recordation of any and all real estate Transfer Tax forms or certifications required by any Governmental Authority (unless Seller notifies Buyer that they will do so), with Buyer being responsible for any payment required therewith as provided in Section 13.  The Party that is required by applicable law to file or record any other Transfer Tax forms or certifications shall prepare and timely file and record such forms or certifications, with Buyer being responsible for any payment required therewith with respect to the Acquired Assets as provided in Section 13.  The Parties hereto shall cooperate in making, in a timely manner, all such tax returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any such Transfer Taxes.  At Seller's request, all Transfer Tax forms and certifications, along with payment therefor, shall be delivered by Buyer to Seller for recordation and payment with the appropriate Governmental Authority.  To the extent required by applicable Law, Seller shall execute any Transfer Tax forms or certifications.

13.    Closing Costs.

a.    Seller and Buyer shall each pay their own attorneys' fees and expenses.  Buyer shall pay (i) all state, county and local Transfer Taxes required to be paid in connection with the assignment and assumption of the Lease and any and all Subleases, and the consummation of the transactions contemplated herein, all of which amounts shall be paid, if applicable, to the proper Governmental Authority on or prior to the Closing Date and (ii) all title and escrow charges.

b.    Except as otherwise provided in this Agreement, all other costs and expenses of the transaction contemplated by this Agreement shall be borne by Buyer.

c.    Buyer agrees to fully indemnify and hold Seller harmless for, from and against any loss, cost, claim, damage or expense incurred, directly or indirectly, by Seller as a result of Buyer's failure to pay any Taxes or costs pursuant to clauses (a) and (b) above.  Buyer's obligations in this Section shall survive the Closing Date.

14.    Conditions to Closing.

a.    Conditions to Buyer's Obligations.  Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

AP/D226551/FCORP399

WEIL:\95469026\4\50482.0005

(i)    the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(ii)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(iii)    each delivery contemplated by Section 11(a) to be delivered to Buyer shall have been delivered.

b.    Conditions to Seller's Obligations.  Seller's obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(i)    Buyer shall have performed and complied with all of its covenants and agreements hereunder through the Closing in all material respects;

(ii)    the transactions contemplated by this Agreement shall have been authorized or deemed authorized pursuant to the Discrete Procedures Order or a sale order entered by the Bankruptcy Court as contemplated by the Global Bidding Procedures Order, and no order staying, reversing, modifying or amending such authorization shall be in effect on the Closing Date;

(iii)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(iv)    each payment contemplated by Sections 3, 4 and 13 to be made to Seller or any landlord shall have been made, and each delivery contemplated by Section 11(b) to be delivered to Seller shall have been delivered.

c.    No Frustration of Closing Conditions.  Neither Buyer nor Seller may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Subsection 14(a) or Subsection 14(b), as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliate's failure to use its reasonable best efforts (or commercially reasonable efforts, with respect to those matters contemplated by Section 17, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach hereunder.  The Parties agree that neither the failure to obtain a court order nor any action with respect to a Competing Bid (as defined below), to the extent permitted hereunder, shall be deemed to be a failure to use the efforts required to satisfy the conditions to consummation of the transactions contemplated hereunder nor a breach hereunder.

15.    No Other Contingencies.  Buyer expressly agrees and acknowledges that Buyer's obligations hereunder are not in any way conditioned upon or qualified by Buyer's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt, financing or equity investment or otherwise) nor upon Buyer's ability to obtain title insurance.

AP/D226551/FCORP399

6

16.    <u>Termination of Agreement</u>.

a.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(i)    by the mutual written consent of the Parties;

(ii)    by any Party by giving written notice to the other Party if:

(A)    any court of competent jurisdiction shall have enacted or issued a Law permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this agreement and such Law or Decree or other action shall have become final and non-appealable; or

(B)    the Closing shall not have occurred prior to the sixtieth (60) day from the date hereof ("**Outside Date**"); <u>provided</u> that if the Closing shall not have occurred on or before the Outside Date due to a material breach of this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 16(a)(ii)(B)</u>.

(iii)    if (i)(x) Seller enters into a definitive agreement with respect to a higher or better competing bid in accordance with the bidding procedures attached hereto as <u>Exhibit J</u> (the "**Bidding Procedures**") in respect of the Lease (a "**Competing Bid**"), (y) the Bankruptcy Court enters an order approving the Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

b.    Seller may terminate this Agreement at any time prior to Closing if Buyer fails to satisfy any requirement set forth under <u>Section 14(b)(v)</u>, including delivery of the Deposit required hereunder. In such case, the Agreement shall be rendered null and void, Seller shall be entitled to retain any and all consideration already paid to Seller, including, but not limited to, the Deposit.

c.    <u>Effect of Termination</u>. If any Party terminates this Agreement pursuant to <u>Section 16(a) or (b)</u>, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that <u>Section 13</u>, this <u>Section 16</u>, <u>Sections 23 through 43</u>, and <u>Schedule I</u> shall survive any such termination) and no Party shall have any Liability (except as set forth in <u>Section 16(b) and Section 17</u>) to the other Party hereunder (except as may be provided in <u>Section 4</u> and <u>Subsection 16(b)</u>); <u>provided</u>, <u>however</u>, that nothing in this <u>Section 16</u> shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; <u>provided</u>, <u>further</u>, subject to <u>Section 16(d)</u> below, that other than in the case of fraud or willful misconduct, (a) the maximum Liability of Seller under this Agreement shall not exceed the reasonable out of pocket expenses incurred by Buyer and (b) subject to subsection (d) below, the maximum liability of Buyer under this Agreement shall not exceed the Deposit.

d.    <u>Lease Indemnity</u>.    Notwithstanding anything contained herein to the contrary, if this Agreement is terminated pursuant to <u>Section 16(a) or (b)</u>, Buyer shall indemnify Seller for all Liabilities and Damages arising out of any Lease assumed by Seller pursuant to section 365(k) of the Bankruptcy Code.  This indemnity shall survive such early termination.

17.    <u>Bankruptcy Court Matters</u>.

a.    <u>Competing Transaction</u>.    This Agreement is subject to approval by the Bankruptcy Court in accordance with the Discrete Procedures Order, and the consideration by Seller of a Competing Bid in accordance with the Discrete Procedures Order and, in the event Sellers receive a Competing Bid, an auction to be conducted in accordance with the Bidding Procedures.

b.    <u>Break Up Fee</u>.    In consideration for Buyer having expended considerable time, effort and expense in connection with this Agreement, Sellers grant Buyer, subject to compliance with the Discrete Procedures Order, a break-up fee in an amount equal to 3% of the Purchase Price (the "**Break Up Fee**").  Seller further agrees that the Break Up Fee constitutes an allowed administrative expense claim against Seller's estate pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code.  In the event a Competing Bid is consummated, if no material breach by Buyer of this Agreement has occurred, Seller shall cause the (1) refund of the Deposit to Buyer in accordance with the Bidding Procedures and (2) payment to Buyer of the Break Up Fee on the first Business Day following the date of consummation of the Competing Bid.

c.    From the date hereof and until the transactions contemplated hereby are consummated, Seller is permitted to, and is  permitted to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by or from any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, and  Seller shall be permitted and shall have the authority to (and to cause its Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, including supplying information relating to the assets of Seller to prospective buyers.  Without limiting the foregoing, Seller shall be permitted to perform all of the foregoing activities with respect to all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Global Bidding Procedures Order, Discrete Procedures Order or other applicable Law.

d.    <u>Bankruptcy Court Filings</u>.

(i)    If the Buyer is the successful bidder (to the extent an auction is conducted), as soon as reasonably practicable following the execution of this Agreement, Seller shall seek approval of the Agreement in accordance with the Global Bidding Procedures Order or the Discrete Procedures Order and file any necessary notice or pleadings required in connection therewith. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the transactions contemplated by this Agreement pursuant to the Global Bidding Procedures Order or the Discrete Procedures Order, including a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for providing the Adequate Assurance Information

to the Cure Notice Parties and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder. In the event the approval of the transactions contemplated by this Agreement shall be appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

18.    <u>Intentionally Omitted</u>

19.    <u>Delivery; "AS IS" Transaction</u>.

a.    Buyer acknowledges that it has fully inspected or waived the right to inspect the Leased Premises prior to the execution of this Agreement and does hereby assume all of the risks, including, but not limited to, latent defects in the Leased Premises. Seller shall not be obligated to do any work or alter, restore, repair or develop the Leased Premises, but Seller shall deliver the Leased Premises in vacant, broom clean condition, and, if applicable, with all furnishings, fixtures, equipment, inventory, racks, aisle displays, refrigeration equipment and personal property removed from the Leased Premises. Any work (including demolition) which may be necessary to adapt the Leased Premises for Buyer's occupancy or for the operation of Buyer's business therein shall be the sole responsibility of Buyer and shall be performed by Buyer at its sole cost and expense, in accordance with the terms of the Lease.

b.    BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE LEASE OR THE LEASED PREMISES (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE LEASED PREMISES; THE PHYSICAL CONDITION OF THE LEASED PREMISES; THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE LEASED PREMISES OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE LEASED PREMISES; THE ZONING OF THE LEASED PREMISES; THE POSSIBILITY OF DEVELOPING OR USING THE LEASED PREMISES IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE LEASE OR THE LEASED PREMISES; THE FITNESS OF THE LEASED PREMISES, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE LEASED PREMISES (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE LEASE OR THE LEASED PREMISES). BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE

BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLER. BUYER ALSO ACKNOWLEDGES THAT BUYER HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE LEASED PREMISES AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE LEASED PREMISES AND/OR THE LEASE, AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IS ACQUIRING THE LEASE AND THE LEASED PREMISES, BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT, AND BUYER IS NOT RELYING UPON ANY REPRESENTATIONS OF SELLER OR SELLER'S AGENTS. ACCORDINGLY, BUYER HEREBY ACCEPTS THE LEASED PREMISES IN ITS "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS.

20.    Store Closed.  The Parties acknowledge and agree that Seller has ceased (or will cease as of the Closing Date) operations at the Leased Premises and the Leased Premises will be delivered in broom clean condition.

21.    Release; Indemnity.  Pursuant to section 365(k) of the Bankruptcy Code, on and after the Closing Date, Buyer agrees to defend and indemnify Seller against, and hold Seller harmless from, any and all claims, actions, proceedings, suits, costs, liabilities, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and disbursements), whether foreseen or unforeseen, in connection with the Lease, the Leased Premises (including, without limitation, the performance or observance or the failure or refusal to perform or observe any agreement or obligation of the tenant under the Lease or any term or provision thereof required to be performed by the tenant under the Lease), each Sublease, and this Agreement.

22.    Casualty and Condemnation.

a.    Seller agrees to give Buyer prompt written notice of any fire, flood or similar casualty affecting any portion of the Leased Premises or of any actual or threatened (to the extent that Seller has current knowledge thereof) taking or condemnation of all or any portion of any Leased Premises.

b.    If prior to Closing there shall occur:  (i) damage to any Leased Premises caused by fire or other casualty; or (ii) the taking or condemnation of all or any portion of the Leased Premises; then, in each case, the Closing Date shall occur as provided in this Agreement, and Buyer shall be assigned at the Closing Date (A) all interest of Seller in and to any insurance proceeds (including, but not limited to, any proceeds of business interruption insurance for the period after the date of the Closing Date), subject to all applicable deductible amounts or (B) condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing Date for the direct cost of the repair of any of the damage or taking that Seller may elect, in its sole discretion, to undertake or in pursuing the collection of any such insurance proceeds or participating in any condemnation proceeding.

c.    The Parties hereby waive the provisions of the Uniform Vendor and Purchaser Risk Act (to the extent the same is applicable to the Leased Premises) and of any other Law to the same or similar effect, and agree that the same shall not apply to this Agreement.

23.     Brokers' Fees.  Other than the fees and expenses payable to Evercore Group L.L.C. or Hilco Real Estate Group LLC in connection with the transactions contemplated hereby, which shall be borne by Seller, neither Party has entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.  Buyer shall indemnify and hold Seller harmless from and against any and all claims, causes of action, losses, costs, expenses, damages or liabilities, including reasonable attorneys' fees and disbursements, which Seller, or any of its affiliates may sustain, incur or be exposed to, by reason of any claim or claims against Buyer by any broker, finder or other person or entity for fees, commissions or other compensation arising out of the transactions contemplated herein if such claim or claims are based in whole or in part on dealings or agreements with the Buyer.  Any broker retained by or providing services to Buyer in connection with the transaction evidenced by this Agreement shall be compensated solely by Buyer without contribution from Seller.

24.     Survival.  Except as specifically set forth herein, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 11(a) or Section 11(b) shall survive, and each of the same shall terminate and be of no further force or effect as of the Closing.

25.     Expenses.  Except as otherwise expressly set forth herein, including but not limited to Section 11, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

26.     Entire Agreement.  This Agreement, any documents delivered at Closing pursuant hereto, and any confidentiality agreement entered into by Seller and Buyer in connection with this transaction, constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

27.     Incorporation of Exhibits and Schedules.  The Exhibits and Schedule(s) to this Agreement are incorporated herein by reference and made a part hereof.

28.     Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach.  No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 28 except as expressly provided herein.

Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

29.    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of each other Party.

30.    <u>Notices</u>.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

> The Great Atlantic & Pacific Tea Company, Inc.
> 2 Paragon Drive
> Montvale, New Jersey 07645
> Attention: Christopher W. McGarry and Matthew Bennett
> E-mail: mcgarryc@aptea.com; bennettm@aptea.com

With a copy (which shall not constitute notice to Seller) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
> E-mail: ray.schrock@weil.com; samuel.zylberberg@weil.com

If to Buyer:

> Bogopa Service Corp.
> 650 FountainAvenue
> Brooklyn, New York 11208
> Attention:  Edward Suh, Esq.
> E-mail: edward.suh@bogopausa.com

With a copy (which shall not constitute notice to Buyer) to:

> Harfenist Kraut & Perlstein, LLP
> 3000 Marcus Avenue, Suite 2E1
> Lake Success, New York 11042
> Attention: Allen Perlstein

AP/D226551/FCORP399

12

E-mail: aperlstein@hkplaw.com

With a copy (which shall not constitute notice to Buyer) to:

Klestadt Winters Jureller Southard & Stevens, LLP
570 Seventh Avenue
17th floor
New York, NY 10018
Attention: Tracy Klestadt, Esq.
E-mail: TKlestadt@Klestadt.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 30.

31.    Governing Law.    This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

32.    Submission to Jurisdiction; Service of Process.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 30; provided, however, that nothing in this Section shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

33.    Waiver of Jury Trial.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

AP/D226551/FCORP399

13

34.    <u>Specific Performance</u>.  Buyer acknowledges and agrees that Seller and its estate would be damaged irreparably in the event Buyer does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Seller may have under law or equity, Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

35.    <u>Severability</u>.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

36.    <u>No Third Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than Buyer, Seller, and their respective successors and permitted assigns, except as expressly set forth in this Agreement.

37.    <u>Non-Recourse</u>.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.   No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this <u>Section 37</u>.

38.    <u>Mutual Drafting</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

39.    <u>Headings</u>.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

40.    <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

41.    <u>Limitations Under Applicable Law</u>.  Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to limitations under applicable Law, including, without limitation, Sections 1113 and 1114 of the Bankruptcy Code.

42.    <u>Assignment of Lease</u>.  The acceptance of the Assignment and Assumption by Seller shall be deemed to be a full performance of Seller and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement.

43.    <u>Prevailing Party</u>.  If any action is brought by either of the Parties against the other, then the prevailing Party shall be entitled to recover from the other Party court costs and reasonable attorneys' fees and costs actually incurred.

44.    <u>Assignment</u>.  Buyer shall have the right to assign this Agreement to an Affiliate simultaneously with the Closing, provided that such assignment shall not release Buyer from its obligations hereunder.

45.    <u>Covered Employees</u>.  For those store employees represented by a labor union, Buyer will negotiate with the appropriate local union representing such Covered Employees, in good faith, to (a) assume the applicable collective bargaining agreement; (b) reach a mutually acceptable collective bargaining agreement; or (c) enter into an agreement with such local union integrating such represented Covered Employees into Buyer's existing collective bargaining units.  For all purposes of this <u>Section 45</u>, Buyer acknowledges the requirements of sections 1113 and 1114 of the Bankruptcy Code and agrees to use good faith reasonable best efforts to cooperate with Seller in ensuring compliance with any applicable provisions thereof.  Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to applicable law, including, without limitation, sections 1113 and 1114 of the Bankruptcy Code and any applicable federal labor law.

46.    <u>Liquor Licenses</u>.  Seller shall assign its entire right title and interest in any liquor license issued in connection with the Premises (the "Liquor License") and shall otherwise cooperate with Buyer (either prior to Closing or post-Closing) at no cost to Seller, with respect to the transfer of any such Liquor License, if any and to the extent transferable, provided that (i)

such transfer is made without representation or warranty, (ii) the transfer of any such Liquor License shall not be a condition to Closing, and (iii) Buyer shall have no right to terminate this Agreement or to any reduction or offset in the Purchase Price or refund of any funds in the event the Liquor License is not transferable to Buyer. The provisions of this Article shall survive Closing.

**[<u>SIGNATURE PAGE FOLLOWS</u>]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


A&P REAL PROPERTY, LLC,
a Delaware limited liability company

By:_____
Name:
Title:


BOGOPA SERVICE CORP.,
a New York corporation


By:_____
Name: Edward Suh
Title: Vice President and Secretary

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

A&P REAL PROPERTY, LLC,
a Delaware limited liability company

By:_____
Name:
Title:

BOGOPA SERVICE CORP.,
a New York corporation

By:_____
Name:
Title:

*ALLEN PERLSTEIN*
*ASST. SECRETARY*

## LIST OF SCHEDULE AND EXHIBITS

| SCHEDULE | DESCRIPTION |
|---|---|
| Schedule I | Definitions |

| EXHIBIT | DESCRIPTION |
|---|---|
| Exhibit A | The Lease |
| Exhibit B | Premises |
| Exhibit C | Sublease(s) |
| Exhibit D | Escrow Agreement |
| Exhibit E | Wire Instructions |
| Exhibit F | Form of Assignment and Assumption of Lease |
| Exhibit G | Form of Quitclaim Bill of Sale |
| Exhibit H | Form of Landlord Notice and Form of Subtenant Notice |
| Exhibit I | Form of Assignment and Assumption of Subleases |
| Exhibit J | Bidding Procedures |

## Schedule I

## Definitions

(v)      "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

(vi)      "Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(vii)      "Code" means the Internal Revenue Code of 1986, as amended.

(viii)      "Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

(ix)      "Decree" means any judgment, decree, ruling, injunction or any other order of any Governmental Authority.

(x)      "FIRPTA Certificate" means a certificate from Tenant in compliance with applicable Treasury Regulations setting forth Tenant's (or, if applicable, its regarded owner's) name, address and federal tax identification number and stating that Tenant (or, if applicable, its regarded owner) is not a "foreign person" within the meaning of section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to section 1445 of the Code.

(xi)      "Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

(xii)      "Law" means any constitution applicable to, and any law, statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

(xiii)      "Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

(xiv)      "Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

(xv)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

(xvi)    "Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

(xvii)    "Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

(xviii)    "Transfer Tax" means any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or similar non-income Taxes, fees or governmental charges imposed under applicable Law in connection with the transactions contemplated by this Agreement.

(xix)    "Treasury Regulations" mean the Treasury regulations promulgated under the Code

## EXHIBIT A

### The Lease

| 91 | 038-3512 | 1425 KENNEDY BOULEVARD | NORTH BERGEN | NJ | STORE 038-3512 – 1425 KENNEDY BOULEVARD, NORTH BERGEN, NJ<br><br>INDENTURE OF LEASE DATED MARCH 15, 1989 ORIGINALLY BETWEEN NORTH BERGEN STORES, INC., CLEMENTON HOLDING CORPORATION, AND VORNADO, INC., AS LANDLORD, AND WALDBAUM, INC., AS THE SAME MAY HAVE BEEN AMENDED.<br><br>• GUARANTY DATED MARCH 15, 1989<br>• MEMORANDUM OF LEASE DATED MARCH 15, 1989 [RECORDED]<br>• MODIFICATION OF LEASE DATED MAY 18, 1992<br>• MODIFICATION OF MEMORANDUM OF LEASE DATED MAY 26, 1992<br>• LETTER AGREEMENT DATED MAY 10, 1995<br>• RENEWAL LETTER DATED DECEMBER 21, 2011<br>• ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED DECEMBER 23, 2011<br>• ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012<br>• GUARANTY DATED MARCH 13, 2012<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.4.73 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |

## EXHIBIT B

### Leased Premises

**1425 Kennedy Boulevard, North Bergen, New Jersey**

## EXHIBIT C

### Sublease(s)

None

## EXHIBIT D

### Escrow Agreement

**Bidder ID No. 109**

**Site No(s). 072-6634, 072-6288, 038-3512, 038-3504**

### ESCROW RIDER TO LEASE SALE AGREEMENT

This Escrow Agreement dated this 10TH day of September 2015 (this "<u>Escrow Agreement</u>"), is entered into by and among THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., ("<u>Seller</u>"), BOGOPA SERVICE CORP. ("<u>Bidder</u>"), and TITLEVEST SERVICES, LLC, a New York limited liability company, as escrow agent ("<u>Escrow Agent</u>"). Seller and Bidder are known herein, individually or collectively as the context may require as a "<u>Party</u>" or the "<u>Parties</u>". Any capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Agreement (as defined below).

### W I T N E S S E T H

WHEREAS, the Bidder has executed that certain Lease Sale Agreement (the "<u>Sale Agreement</u>") as part of a bid for the acquisition of certain real property more particularly described on <u>Exhibit A</u> (the "<u>Premises</u>");

WHEREAS, as part of the bid process, Bidder is required to wire to Escrow Agent a Deposit in the amount of $587,500.00 (the "<u>Escrow Funds</u>"); and

WHEREAS, Bidder desires that Escrow Agent hold the Escrow Funds in escrow pursuant to the terms of this Escrow Agreement; and

WHEREAS, Escrow Agent is willing to hold the Escrow Funds, on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid, the receipt and sufficiency of which are hereby mutually acknowledged, the Parties and the Escrow Agent agree as follows:

I.    **ESCROW DEPOSIT**

A.    <u>Delivery of Escrow Funds; Authorization of Escrow Agent</u>. Concurrently with execution and delivery of this Escrow Agreement, Bidder shall deliver the Escrow Funds along with a nonrefundable Escrow Fee of $500 ("<u>Initial Escrow Fee</u>"; together with all other nonrefundable escrow fees set forth on <u>Exhibit C</u>, the "<u>Nonrefundable Escrow Fees</u>") to Escrow Agent via wire transfer. Upon receipt, the Escrow Funds shall be held by Escrow Agent in Escrow Agent's client escrow account at Citibank. The Parties hereby appoint Escrow Agent to serve as escrow agent with respect to the Escrow Funds, and Escrow Agent hereby accepts such appointment and

agrees to act in accordance with the terms and subject to the conditions of this Escrow Agreement. Escrow Agent shall have the right to disburse the Escrow Funds, in whole or in part, solely in accordance with the terms of this Escrow Agreement. Escrow Agent shall not, under any circumstances, pledge or hypothecate any portion of the Escrow Funds and shall act only as directed in accordance with the terms of this Escrow Agreement.

B.    UNTIL RELEASED AND DISBURSED IN ACCORDANCE WITH THE TERMS OF THIS ESCROW AGREEMENT, ALL ESCROW FUNDS SHALL (i) REMAIN THE PROPERTY OF BIDDER, (ii) NOT BE OR BECOME THE PROPERTY OR ASSETS OF SELLER OR ESCROW AGENT, AND (iii) NOT BE SUBJECT TO ANY LIEN OR ANY JUDGMENT OR CREDITORS' CLAIMS AGAINST SELLER, BIDDER OR ESCROW AGENT. IN NO EVENT SHALL ANY OF THE ESCROW FUNDS BE COMMINGLED WITH DEPOSIT ACCOUNTS OF ESCROW AGENT OR OTHERWISE TREATED AS A DEPOSIT ACCOUNT OF ESCROW AGENT OR REFLECTED ON THE FINANCIAL STATEMENTS OF ESCROW AGENT.

## II.    <u>RELEASE OF ESCROW FUNDS</u>

A.    <u>Potential Bidder</u>. If Bidder is determined by Seller not to meet the requirements for qualifying as a bidder in any auction for the Premises (the "<u>Auction</u>"), as confirmed by the Debtors, within three (3) business days after the deadline for Seller to make a determination regarding which bids have been determined to be qualified bids for such auction (the "<u>Designation Deadline</u>") ("<u>Unqualified Bidder</u>"), the Escrow Agent shall return to Bidder the Deposit.

B.    <u>Qualified Bidder</u>. The Deposit will be forfeited to Seller if Bidder is determined by Seller to meet the requirements for qualifying as a bidder at the Auction ("<u>Qualified Bidder</u>") and (A) Bidder attempts to modify, amend or withdraw its qualified bid, except as may permitted by the governing procedures or the Sale Agreement, during the time the qualified bid remains binding and irrevocable under the applicable procedures and the Sale Agreement or (B) the Bidder is selected as the Successful Bidder (defined below) and fails to enter into the required definitive documentation or to consummate the transaction according to the applicable procedures, and the terms of the applicable transaction documents with respect to the successful bid. The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by Seller two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of Seller stating that Bidder has breached or failed to satisfy its obligations or undertakings.

C.    <u>Successful Bidder</u>. If Bidder is the successful bidder for the Premises ("<u>Successful Bidder</u>"), Seller or its agent shall notify Escrow Agent, and Escrow Agent shall retain the Escrow Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement.

D.    <u>Backup Bidder</u>. If the Bidder is selected as the next highest or next best bid for purchase of the Premises ("<u>Backup Bidder</u>"), Seller or its agent shall notify the Escrow Agent, and the Escrow Funds will continue to be held by the Escrow Agent until the acquisition of the Premises by the Successful Bidder, at which time the Escrow Funds will be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as <u>Exhibit B</u>, less any applicable Nonrefundable Escrow Fees (and Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated); provided that if the Successful Bidder does not consummate the purchase of the Premises, then the Escrow Agent shall retain the Escrow

Funds through and including the Closing Date (and any permitted extensions), subject to the terms of this Escrow Agreement.

E.      <u>Neither Successful Nor Backup Bidder</u>.  If Bidder is determined by Sellers to be neither the Successful Bidder nor the Backup Bidder, then, within three (3) business days of execution by the Successful Bidder and Seller of the documentation memorializing the successful bid, the Escrow Funds will be promptly returned to Bidder by wire transfer in accordance with Bidder's wire instructions attached hereto as <u>Exhibit B</u>, less any applicable Nonrefundable Escrow Fees. Escrow Agent will notify Bidder by electronic mail at the time the refund wire transfer has been initiated.  In the case of Subsections (C) and (D) of this <u>Section II</u>, Escrow Agent shall release the funds no later than the Outside Date except to the extent the Sale Agreement is executed by Seller with respect to a Backup Bidder prior to the Outside Date.

F.      <u>Disbursements</u>.  The Debtors and Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit. If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

G.      <u>Reliance</u>.  Escrow Agent shall rely on all information provided to it by attorneys at Weil, Gotshal & Manges LLP regarding (i) the Successful Bidder, the Backup Bidder, an Unqualified Bidder and a Qualified Bidder (ii) the closing with the Successful Bidder, and (iii) any default by the Successful Bidder or acceptance of the Backup Bidder.  Bidder acknowledges that Escrow Agent is entitled to rely on said information in disbursing the Escrow Funds.

III.    **DUTIES OF THE ESCROW AGENT**

A.      <u>Scope of Responsibility</u>. Notwithstanding any provision to the contrary, Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstances will Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement.  Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to Escrow Agent; and Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document.  References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and Escrow Agent has no duties or obligations with respect thereto.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

B.      <u>Attorneys and Agents</u>. Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by Escrow Agent.  Escrow Agent shall be reimbursed for any and all compensation (reasonable and documented fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

C.      <u>Reliance</u>.  Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives,

successors and/or assigns. Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person's or persons' authority. Concurrently herewith, the Bidder shall deliver <u>Exhibit D</u> hereto, which contains authorized party designations.

D.    <u>Right Not Duty Undertaken</u>.  The permissive rights of Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

E.    <u>No Financial Obligation</u>.  No provision of this Escrow Agreement shall require Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.  Escrow Agent shall not be liable for the insolvency of any bank in which the Escrow Funds are deposited.

## IV.    <u>PROVISIONS CONCERNING ESCROW AGENT</u>

A.    <u>Indemnification</u>.  The Parties, jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, reasonable and documented attorneys' fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating to (a) the Escrow Agent's execution and performance of this Escrow Agreement, except to the extent that such loss, liability or expense shall have been finally adjudicated to have directly resulted from the gross negligence or willful misconduct of the Escrow Agent (or any person through which its duties are performed, as provided in <u>Section 3(C)</u>) or (b) the Escrow Agent's following any instructions or other directions from the Bidder or Sellers, except to the extent that its following any such instruction or direction is expressly forbidden by the terms of this Escrow Agreement. The provisions of this <u>Section 4(A)</u> shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

B.    <u>Limitation of Liability</u>. ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

C.    <u>Resignation or Removal</u>.  Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and Seller may remove Escrow Agent by furnishing to Escrow Agent a written notice of Escrow Agent's removal along with payment of all reasonable and documented fees and expenses to which it is entitled through the date of termination or removal.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Funds and to deliver the same to a successor escrow agent as shall be appointed by the Seller, as evidenced by a written notice filed with Escrow Agent or in accordance with a court order.  If the Seller fails to appoint a successor

escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties. Any such successor escrow agent shall deliver to Seller and Bidder a written instrument accepting such appointment, and thereupon it shall succeed to all the rights and duties of the escrow agent hereunder and shall be entitled to receive possession of the Escrow Funds. Upon receipt of the identity of the successor escrow agent, the Escrow Agent shall deliver the Escrow Funds then held hereunder, less any reasonable and documented fees and expenses then due and owing to the Escrow Agent, to the successor escrow agent. In the event of the resignation or removal of the Escrow Agent, the resigning or removed Escrow Agent shall be absolved from any further duties as the Escrow Agent hereunder; provided, however, that the Escrow Agent or any successor escrow agent shall continue to act as the Escrow Agent until a successor is appointed and qualified to act as the Escrow Agent.

D.      Compensation. Escrow Agent shall be entitled to fees and expenses incurred in administering and disbursing the Escrow Funds, and compensation for its services which shall be paid by Bidder as set forth on Exhibit C. If any material controversy arises hereunder, or Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then Escrow Agent shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable and documented attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event. If any amount due to Escrow Agent hereunder is not paid within thirty (30) days of the date due, Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.

E.      Disagreements. If any conflict, disagreement or dispute arises between, among, or involving the Parties concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or Escrow Agent is in doubt as to the action to be taken hereunder, Escrow Agent is authorized to retain the Escrow Funds until Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Funds, (ii) receives a written agreement executed by the Parties directing delivery of the Escrow Funds, in which event Escrow Agent shall be authorized to disburse the Escrow Funds in accordance with such agreement, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, Escrow Agent shall be relieved of all liability as to the Escrow Funds which it delivers to such court and shall be entitled to recover reasonable and documented attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

F.      Attachment of Escrow Funds; Compliance with Legal Orders. In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting Escrow Funds, Escrow Agent is hereby expressly authorized, in its reasonable discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that Escrow Agent obeys or complies with any such writ, order or decree, it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

## V.    MISCELLANEOUS

A.    Successors and Assigns. This Escrow Agreement shall be binding on and inure to the benefit of the Parties and Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement. No assignment of the interest of the Parties shall be binding unless and until written notice of such assignment shall be delivered to other Party and Escrow Agent and shall require the prior written consent of such other Party and Escrow Agent (such consent not to be unreasonably withheld).

B.    Notices. All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (a) personally, (b) by facsimile transmission with written confirmation of receipt, (c) on the day of transmission if sent by electronic mail ("e-mail") to the e-mail address given below, (d) by overnight delivery with a reputable national overnight delivery service, or (e) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited in the United States mail. If notice is given to a party, it shall be given at the address for such party set forth below. It shall be the responsibility of each party hereto to notify the Escrow Agent and the other Party in writing of any name or address changes.

If to Sellers:

The Great Atlantic and Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645
Attention: Christopher W. McGarry; Matthew Bennett
E-mail: mcgarryc@aptea.com; bennettm@aptea.com

with a copy (which shall not constitute notice to Sellers) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C. and Samuel Zylberberg
Facsimile: (212) 310-8007
E-mail: ray.schrock@.com; samuel.zylberberg@weil.com

Notices to Bidder:

Bogopa Service Corp.
650 FountainAvenue
Brooklyn, New York 11208
Attention: Edward Suh, Esq.
E-mail: edward.suh@bogopausa.com

With a copy to:

Harfenist Kraut & Perlstein, LLP
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
Attention: Allen Perlstein
E-mail: aperlstein@hkplaw.com


And with a copy to:

Klestadt Winters Jureller Southard & Stevens, LLP
570 Seventh Avenue
17th floor
New York, NY  10018
Attention: Tracy Klestadt, Esq.
E-mail: TKlestadt@Klestadt.com

Notices to Escrow Agent:

TitleVest Services, LLC
44 Wall Street – 10th Floor
New York, NY 10005
Attn:  Sara Murray
E-Mail:  APBid@TitleVest.com


C.      <u>Governing Law; Jurisdiction</u>.   This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the principles of conflict of laws thereof), except to the extent that the laws of such state are superseded by chapter 11 of title 11 of the United States Code ("<u>Chapter 11</u>").  Without limiting any Party's right to appeal any order of the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Escrow Agreement and to decide any claims (including with respect to <u>Section</u>) or disputes which may arise or result from, or be connected with, this Escrow Agreement, any breach or default hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated herein; <u>provided</u>, <u>however</u>, that if the contemplated Chapter 11 cases of Seller and certain of its affiliates has closed, the parties hereto agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts of the State of New York, located in New York County for the resolution of any such claim or dispute.  Each party hereto (i) expressly and irrevocably consents and submits to the jurisdiction of each such court; (ii) agrees that each such court shall be deemed to be a convenient forum; (iii) agrees that service of process in any such proceeding may be made by giving notice pursuant to <u>Section V(B)</u>; and (iv) agrees not to assert, by way of motion, as a defense or otherwise, in any such proceeding commenced in any such court, any claim that such party is not subject personally to the jurisdiction of such court, that such proceeding has been brought in an inconvenient forum,

that the venue of such proceeding is improper or that this Escrow Agreement or the subject matter of this Escrow Agreement may not be enforced by such court.

D.    Entire Agreement. This Escrow Agreement sets forth the entire agreement and understanding of the Parties and Escrow Agent related to the Escrow Funds.

E.    Amendment. This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by all of the Parties and Escrow Agent.

F.    Waivers. The failure of any Party at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any Party of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

G.    Headings.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

H.    Counterparts.  This Escrow Agreement and any notices or communications may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

I.    Conflicts.  In the event of any conflict between this Escrow Agreement and the Sale Agreement or any order of the Bankruptcy Court, the terms of the Sale Agreement and/or the order of the Bankruptcy Court shall govern, but only as between the Parties.

J.    Publication; disclosure.  By executing this Escrow Agreement, the Parties and the Escrow Agent acknowledge that this Escrow Agreement (including related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement.  The Parties further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement, or, in the alternative, publishing a conformed copy of this Escrow Agreement.  If a Party must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as any judicial, or administrative order, subpoena or discovery request, it shall notify in writing the other Party and the Escrow Agent at the time of execution of this Escrow Agreement of the legal requirement to do so.  If any Party becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that Party shall promptly notify in writing the other Parties and the Escrow Agent and shall be liable for any unauthorized release or disclosure.

[Signature Page Follows]

AP/D226557/FCORP399

WEIL:\95469026\4\50482.0005

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

**THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.**

By: _____
Name:
Title:

**PATHMARK STORES, INC.**

By: _____
Name:
Title:

**BOGOPA SERVICE CORP.**

By____ _____
Name: _ *ALLEW PORUSTAN*
Title:     ASST. SEC

**TITLEVEST SERVICES, LLC**

By:_____
Name:
Title:

**EXHIBIT A to Escrow Agreement**
The Premises

| No. | Store No. | Address |
|-----|-----------|---------|
| 153 | 072-6634 | 111-10 Flatlands Avenue, Brooklyn, New York |
| 53 | 038-3524 | 289 Bergen Boulevard, Fairview, New Jersey |
| 91 | 038-3512 | 1425 Kennedy Boulevard, North Bergen, New Jersey |
| 50 | 072-6288 | 211 Elmora Avenue, Elizabeth, New Jersey |

**EXHIBIT B to Escrow Agreement**

Wire Instructions

**EXHIBIT C to Escrow Agreement**

FEES OF ESCROW AGENT

<u>Preclosing</u>

- **Adminstration Fee**: **$500.00**
  The Administration Fee is payable with the bid submission.

- **Escrow Agreement Negotiation Fee**: **$200**
  For negotiation of this Escrow Agreement or review and negotiation of an alternative form of escrow agreement. Payable with bid submission.

<u>Closing</u>
- **Escrow Closing Fee**: $750 for attendance at Closing. Payable at Closing.
- **Preparation of Transfer Tax Forms**: $150/set per property. Payable at Closing.

<u>General</u>

**Out of Pocket Expenses**: Actual Cost. Escrow Agent will charge for out-of-pocket expenses in response to specific tasks assigned by the client or provided for in the escrow agreement. Possible expenses would be, but are not limited to, express mail, Federal Express or other over-night carrier, messenger charges, wiring fees and travel fees and expenses to attend closing or other meetings. There are no charges for indirect out-of- pocket expenses. Payable at closing.

**EXHIBIT D to Escrow Agreement**

BIDDER AUTHORIZED PARTY

<u>Telephone Numbers and Authorized Signatures for</u>
<u>Person(s) Designated to Execute the Escrow Agreement, Give Joint Instruction and Confirm</u>
<u>Funds Transfer Instructions</u>

For Buyer:

| Name | Business Telephone Numbers | Signature |
|------|---------------------------|-----------|
| 1.Edward Suh | 718-346-6500 | |
| 2. | | |
| 3. | | |

To the extent required herein, all instructions to be delivered by Bidder, including but not limited to funds transfer instructions, whether transmitted by facsimile or otherwise, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of Bidder.

AP/D226557/FCORP399

WEIL:\95469026\4\50482.0005

# EXHIBIT E

## Wire Instructions

**See attached**

## EXHIBIT F

### Form of Assignment and Assumption of Lease[2]

### ASSIGNMENT AND ASSUMPTION OF LEASE

THIS **ASSIGNMENT AND ASSUMPTION OF LEASE** (this "**Assignment**") is entered into and effective as of [ _____ ], 2015, by and between A&P REAL PROPERTY, LLC, a Delaware limited liability company, whose address is 2 Paragon Drive, Montvale, New Jersey 07645 ("**Seller**"), and BOGOPA SERVICE CORP., a New York corporation, whose address is 650 Fountain Avenue, Brooklyn, New York 11208 ("**Buyer**"). Seller and Buyer are referred to collectively herein as the "**Parties**."

WHEREAS, the Parties are parties to that certain Lease Sale Agreement, dated September 10, 2015 (the "**Purchase Agreement**") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement);

WHEREAS, the execution and delivery of this Assignment is contemplated by the Purchase Agreement; and

WHEREAS, Seller desires to assign, transfer, convey, and deliver to Buyer the Lease described in **Exhibit A** attached hereto including all amendments, modifications, and supplements thereto (collectively, the "**Lease**"), and Buyer desires to accept an assignment of the Lease together with all right, title, and interest of Seller thereunder. The Lease encumbers all or a portion of certain property (the "**Leased Premises**") which property is more specifically described on **Exhibit B** attached hereto (the "**Premises**").

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1)  <u>Assignment and Assumption of Lease</u>.  Effective as of the Closing, Seller hereby assigns, transfers, conveys, and delivers to Buyer all of Seller's estate, right, title and interest as tenant of the leasehold estate described under the Lease, and Buyer hereby accepts the assignment, transfer, conveyance, and delivery of Seller's estate, rights, title and interest in, to and under such leasehold estate, and assumes and agrees to pay, discharge, and perform when due all of Seller's obligations as tenant under the Lease.

2)  <u>Conflict</u>.  The assignment and assumption of the Lease (and the obligations thereunder) made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern,

---

[2] NTD: REQUIRES LEGAL DESCRIPTION. WEIL TO ATTACH AT A LATER DATE.

supersede, and prevail. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the Purchase Agreement.

3)    <u>Severability</u>. Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Assignment is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Assignment.

4)    <u>Amendments</u>. This Assignment may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Seller.

5)    <u>Counterparts; Facsimile and Electronic Signatures</u>. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

6)    <u>Governing Law</u>. This Assignment shall be governed by the Laws of the state in which the Leased Premises are located, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

7)    <u>Third Party Beneficiaries and Obligations</u>. This Assignment shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Assignment, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Assignment.

8)    <u>Recordation</u>. Seller makes no representation regarding the recordability of this Assignment, nor the Lease or related documents. Seller shall bear no liability for the failure of the Lease or related documents to be recorded.

9)    <u>Further Assurances</u>. Each of the Parties, without additional consideration, shall execute and deliver all such further documents and do such other things as the other Party may reasonably request to give full effect to this Assignment, including, without limitation, any other form of assignment agreement required in order to record this Assignment in the appropriate public records of the county in which the Leased Premises is located.

* * * * *

WEIL:\95469026\4\50482.0005

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.


**SELLER:**

A&P REAL PROPERTY, LLC,
A Delaware limited liability company


By: _____
Name: _____
Title: _____


[ACKNOWLEDGMENTS]


[Seller Signature Page to Assignment and Assumption of Lease –
North Bergen, New Jersey(Store038-3512)]

**BUYER**:

BOGOPA SERVICE CORP.
a New York corporation

By: _____
Name: Edward Suh
Title:  Vice President and Secretary

STATE OF NEW YORK        )
                                            ) ss.:
COUNTY OF _____)

On the    day of _____ in the year 2015, before me, the undersigned, personally appeared Edward Suh personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

[Buyer Signature Page to Assignment and Assumption of Lease –
North Bergen, New Jersey (Store 038-3512)]

## EXHIBIT A

### Lease

| 91 | 038-3512 | 1425 KENNEDY BOULEVARD | NORTH BERGEN | NJ | STORE 038-3512 – 1425 KENNEDY BOULEVARD, NORTH BERGEN, NJ<br><br>INDENTURE OF LEASE DATED MARCH 15, 1989 ORIGINALLY BETWEEN NORTH BERGEN STORES, INC., CLEMENTON HOLDING CORPORATION, AND VORNADO, INC., AS LANDLORD, AND WALDBAUM, INC., AS THE SAME MAY HAVE BEEN AMENDED.<br><br>• GUARANTY DATED MARCH 15, 1989<br>• MEMORANDUM OF LEASE DATED MARCH 15, 1989 [RECORDED]<br>• MODIFICATION OF LEASE DATED MAY 18, 1992<br>• MODIFICATION OF MEMORANDUM OF LEASE DATED MAY 26, 1992<br>• LETTER AGREEMENT DATED MAY 10, 1995<br>• RENEWAL LETTER DATED DECEMBER 21, 2011<br>• ORDER OF THE UNITED STATES BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK DATED DECEMBER 23, 2011<br>• ASSIGNMENT AND ASSUMPTION AGREEMENT DATED MARCH 13, 2012<br>• GUARANTY DATED MARCH 13, 2012<br><br>AND ALL OTHER DOCUMENTS LOCATED IN DATAROOM FOLDER 1.4.73 AS OF THE BUSINESS DAY IMMEDIATELY PRIOR TO THE DATE OF THE AGREEMENT THAT AFFECT OR AMEND THE AGREEMENTS IDENTIFIED ABOVE. |
|----|----------|------------------------|--------------|-----|----|

[Buyer Signature Page to Assignment and Assumption of Lease –
North Bergen, New Jersey (Store 038-3512)]

## EXHIBIT G

### Form of Quitclaim Bill of Sale

### QUITCLAIM BILL OF SALE

THIS **QUITCLAIM BILL OF SALE** (this "Bill of Sale") is entered into and effective as of _____, 2015, by and among A&P REAL PROPERTY, LLC, a Delaware limited liability company, ("Seller") and BOGOPA SERVICE CORP., a New York corporation ("Buyer"). Seller and Buyer are referred to collectively herein as the "Parties."

WHEREAS, the Parties are parties to that certain Lease Sale Agreement, dated September 10, 2015 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the Parties hereby agree as follows:

1.    Sale and Acceptance of Acquired Assets. For true and lawful consideration paid by Buyer, the sufficiency of which is hereby acknowledged, effective as of the date hereof, (a) Seller hereby sells, assigns, transfers, conveys, grants and delivers to Buyer all of its right, title and interest in and to the Acquired Assets, and (b) Buyer hereby accepts the foregoing sale and assignment.

2.    Conflict. In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.

3.    No Representation. This Bill of Sale is made without any covenant, warranty or representation by, or recourse against, Seller or any of Seller's Affiliates of any kind whatsoever.

4.    Severability. Whenever possible, each provision of this Bill of Sale shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Bill of Sale is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Bill of Sale.

5.    Amendments. This Bill of Sale may not be amended or modified except by an instrument in writing signed by, or on behalf of, Buyer and Seller.

6.    Counterparts; Facsimile and Electronic Signatures. This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by

portable document format (.pdf), each of which shall be deemed an original.

7.    <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

8.    <u>Third Party Beneficiaries and Obligations</u>. This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Bill of Sale, express or implied, is intended to or shall confer upon any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, or liabilities under or by reason of this Bill of Sale.

9.    <u>Entire Agreement</u>. This Bill of Sale, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof, which such prior agreements, understandings, representations and statements, oral or written, shall be of no further force or effect.

* * * * *

IN WITNESS WHEREOF, the Parties have executed this Bill of Sale as of the date first above written.

A&P REAL PROPERTY, LLC,
a Delaware limited liability company,

By: _____
Name:
Title:

BOGOPA SERVICE CORP.

By: _____
Name: Edward Suh
Title:   Vice President and Secretary

[Signature Page to Bill of Sale]

## EXHIBIT H

### Form of Landlord Notice
### NOTICE TO LANDLORD

[ _____ ], 2015

**<u>Via Federal Express</u>**

[Name and Address of Landlord]

Re:      Notice of assignment of lease at 1425 Kennedy Boulevard, North Bergen, New Jersey
(the "Lease")

Ladies and Gentlemen:

Please be advised that on July 19, 2015, [ _____ ], the tenant under the Lease ("Tenant"), and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.

Effective as of [ _____ ], Tenant's interest in the Lease has been assigned to [ _____ ] ("Assignee"), and Assignee has assumed all of the tenant's obligations under the Lease.

Any future inquiries regarding your Lease should be directed to the address below:

[Assignee's Name]
c/o Bogopa Service Corp.
650 Fountain Avenue
Brooklyn, New York 11208

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WEIL:\95469026\4\50482.0005

Very truly yours,

[ _____ ]


By: _____
    Name: Edward Suh
    Title:  Secretary

## Exhibit I

**Form of Assignment and Assumption of Subleases**

**Not applicable**

WEIL:\95469026\4\50482.0005

## Exhibit J

**Bidding Procedures**[1]

---

[1] NTD: TO BE ATTACHED.