Hearing Date and Time: November 5, 2015 at 2:00 p.m. (Eastern Time)
Objection Deadline: October 30, 2015 at 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re                                                            :
                                                                 :    **Chapter 11**
**THE GREAT ATLANTIC & PACIFIC TEA**                             :
**COMPANY, INC.,** *et al.*,                                     :    **Case No. 15-23007 (RDD)**
                                                                 :
          Debtors.[1]                                            :    **(Jointly Administered)**
                                                                 :
-----------------------------------------------------------------x

**NOTICE OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C.
§§ 105, 363 AND 365 AND FED R. BANKR. P. 2002, 6004 AND 6006 FOR
AN ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT
BETWEEN SELLERS AND PSK SUPERMARKETS, INC. AND THE
TRANSACTIONS CONTEMPLATED THEREIN, (II) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES IN
CONNECTION THEREWITH, (III) AUTHORIZING THE SALE OF CERTAIN
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES, AND (IV)  GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc. (3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**") of The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to the Order [Docket No. 496] approving the Discrete Sale and Lease Rationalization Procedures attached thereto as Exhibit 1 (the "**Discrete Procedures**")[2] and 11 U.S.C. §§ 105, 363 and 365 and Fed. R. Bankr. P. 2002, 6004 and 6006 for an order (i) approving the asset purchase agreement between The Great Atlantic & Pacific Tea Company, Inc., A&P Supermarkets, Inc., Pathmark Stores, Inc., A&P Real Property, LLC and A&P Live Better, Inc. (the "**Sellers**") and PSK Supermarkets, Inc. ("**PSK**") and the transactions contemplated therein; (ii) authorizing the Sellers' assumption and assignment to PSK of certain unexpired leases; (iii) authorizing the sale of certain of the Sellers' assets free and clear of liens, claims, interests, and encumbrances; and (iv) granting related relief, will be held before the Honorable Robert D. Drain, United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York, 10601 (the "**Bankruptcy Court**"), on **November 5, 2015 at 2:00 p.m. (Eastern Time)** (the "**Hearing**").

**PLEASE TAKE FURTHER NOTICE** that any responses or objections ("**Objections**") to the Motion, including to the Adequate Assurance Information, and any other Assumption and Assignment Information *but excluding any cure objections*,[3] shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Discrete Procedures.

[3] Pursuant to the *Notice of Assumption, Assignment and Cure Costs With Respect to Additional Contracts of the Debtors*, dated September 25, 2015 (ECF No. 1090), the Debtors served a notice of cure costs on all counterparties to "Additional Contracts" with an objection deadline of October 9, 2015 at 4:00 p.m.

2

Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with General Order M-399, the Discrete Procedures, and the Order Pursuant to 11 U.S.C. § 105(a) and Fed. Bankr. P. 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated July 20, 2015 (ECF No. 62), so as to be so filed and received no later than **October 30, 2015 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if an Objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: October 23, 2015
    New York, New York

        */s/ Garrett A. Fail*_____
        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York  10153
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007
        Ray C. Schrock, P.C.
        Garrett A. Fail
        *Attorneys for Debtors*
        *and Debtors in Possession*

WEIL:\95493876\5\50482.0005

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **THE GREAT ATLANTIC & PACIFIC TEA** | : | |
| **COMPANY, INC.,** *et al.*, | : | **Case No. 15-23007 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

## MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 AND FED R. BANKR. P. 2002, 6004 AND 6006 FOR AN ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN SELLERS AND PSK SUPERMARKETS, INC. AND THE TRANSACTIONS CONTEMPLATED THEREIN, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES IN CONNECTION THEREWITH, (III) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, AND (IV) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc. (3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

The Great Atlantic & Pacific Tea Company, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases, respectfully represent:

## Preliminary Statement

1.     The Debtors seek approval of an asset purchase agreement with PSK Supermarkets, Inc. ("**PSK**") dated as of September 30, 2015, as amended by that certain letter agreement, dated October 23, 2015, a copy of which is attached hereto as **Exhibit A** (the "**PSK Agreement**").[2]  Pursuant to the PSK Agreement, the Debtors propose to sell two stores[3] as going concerns (the "**PSK Stores**") for a total cash purchase price of $22,181,000.  The purchase price was achieved after an auction for the PSK Stores that was conducted in accordance with the Discrete Sale and Lease Rationalization Procedures (the "**Discrete Procedures**") on October 8, 2015 at which PSK emerged as the successful bidder for both properties.  The PSK Agreement represents the highest and best transaction for the PSK Stores and secures significant value for the Debtors' estates, including an incremental $2,781,000 (inclusive of break-up fees that were offset by PSK as a credit in connection with its overbids) as a result of the auction.  In addition to the auction, the Debtors have extensively marketed the PSK Stores during the pre- and postpetition marketing process, and believe that the value offered by PSK is favorable to the Debtors and their estates.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PSK Agreement. Contact information for PSK may be found in the PSK Agreement.

[3] The PSK Stores include two stores operating at the following locations:  300 West 145th Street, New York, New York, 10039 and 245 Route 25A, Rocky Point, New York.

2

## Background

2.     On July 19, 2015 (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     These chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

4.     On July 24, 2015, the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors.

5.     Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Christopher W. McGarry Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to on the Commencement Date (ECF No. 4) (the "**McGarry Declaration**").

## Jurisdiction

6.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

3

**Relief Requested**

7.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Section IV.B of the Discrete Procedures, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit B** (the "**Proposed Transaction Order**"), (i) approving the asset purchase agreement between The Great Atlantic & Pacific Tea Company, Inc., APW Supermarkets, Inc., Pathmark Stores, Inc., A&P Real Property, LLC, A&P Live Better, LLC (collectively, the "**Sellers**"), and PSK, and the transactions contemplated therein; (ii) authorizing the Sellers' assumption and assignment to PSK of certain unexpired real property leases (the "**Leases**"); (iii) authorizing the sale of the PSK Stores free and clear of liens, claims, interests, and encumbrances; and (iv) granting related relief.

**The Bidding Procedures and PSK's Bid Protections**

8.      On August 11, 2015, the Court entered the *Order Approving (A) Global Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) the Form and Manner of Notice of Auctions, Sale Transactions and Sale Hearing, (D) the Assumption and Assignment Procedures, and (E) the Date for Auctions, if Necessary, and Sale Hearings* (ECF No. 495), approving the Global Bidding Procedures (the "**Global Procedures**").[4] The Global Bidding Procedures authorized the Debtors to solicit bids and approved procedures for the consideration of the highest or otherwise best offers for all of the Debtors' stores and related assets.  On that same day, the Bankruptcy Court entered the Discrete Procedures Order, approving the Discrete Procedures.  In the Global Procedures, the Debtors reserved the right to market or sell any of their Stores pursuant to the Discrete Procedures.

---

[4] Copies of the Discrete Procedures and the Global Procedures may be found at: http://cases.primeclerk.com/aptea.

4

9.      The Debtors determined that proceeding under the Discrete Procedures for the sale of the PSK Stores is in the best interests of their estates.  By offering bid protections to PSK, the Debtors induced PSK to enter into the PSK Agreement and secured significant value for the PSK Stores.  Accordingly, on September 30, 2015, the Debtors filed the Auction Notice for the PSK Stores, which sought approval of the bid protections provided to PSK, set forth the bidding procedures applicable to the PSK Stores, which are attached as Exhibit A to the Auction Notice (the "**PSK Bidding Procedures**"), and scheduled an auction for such stores.

10.      As set forth in the Auction Notice, the PSK Agreement provides for the payment of a break-up fee to PSK in an amount equal to 3% of the Cash Purchase Price (the "**Termination Payment**"), upon the Debtors' consummation of a transaction for a PSK Store with another bidder.  No objections to the Auction Notice were filed.  Accordingly, the Termination Payment and the PSK Bidding Procedures were deemed approved in accordance with the Discrete Procedures.

11.      The PSK Bidding Procedures generally mirror the Global Procedures approved by the Court.  The Debtors set a new bid deadline of October 6, 2015 at 5:00 p.m. (Eastern Time) for the submission of competing bids.  The Debtors did, in fact, receive valid overbids by the bid deadline for each of the PSK Stores.  As a result, in accordance with the PSK Bidding Procedures, the Debtors conducted an auction for the PSK Stores on October 8, 2015. PSK participated in the auction and was the successful bidder for both properties.

## The PSK Agreement

12.      Pursuant to the terms and conditions of the PSK Agreement, the Sellers agreed to sell, transfer and assign to PSK all of their rights, title and interest in and to the Leases

5

and certain inventory, equipment, furnishings, fixtures, goodwill and pharmacy assets related to the following:

| Store | Banner | City | Address | State |
|-------|--------|------|---------|-------|
| 72603 | Pathmark | New York | 300 West 145th Street | NY |
| 70611 | Waldbaums | Rocky Point | 245 Route 25A | NY |

13.     In exchange, PSK has agreed to pay to the Sellers a purchase price in the amount of $22,181,000 (the "**Purchase Price**"), which shall be allocated as follows: (a) $13,228,000 to store number 72603, and (b) $9,535,000 to store number 70611.  PSK is entitled to a credit against the Purchase Price of its break-up fee of $582,000, which PSK used as consideration at the auction.  In each case, there shall be additional amounts paid for inventory.

14.     In addition, and as set forth more specifically in section 6.3 of the PSK Agreement, PSK has agreed to use commercially reasonable efforts to interview qualified employees of the PSK Stores who are represented by a labor union and who apply for employment.  If PSK makes an offer of employment, PSK anticipates that, to the extent it has existing collective bargaining agreements within a similar geographic area as the relevant stores, any such offers of employment will be on similar terms as are reflected in such existing collective bargaining agreements.

15.     The Debtors are responsible for paying any cure costs (the "**Cure Costs**") related to the assumption and assignment to PSK of the Leases.  The Debtors have determined the Cure Costs under each Lease as of September 25, 2015 and served the *Notice of Assumption, Assignment and Cure Costs With Respect to Additional Contracts of the Debtors*, dated September 25, 2015 (ECF No. 1090), on all counterparties to "Additional Contracts" with an objection deadline of October 9, 2015 at 4:00 p.m.  Certain portions of the Cure Costs may be

6

paid prior to assumption and assignment of the Leases.  The Cure Costs net of any amounts paid are the only amounts proposed to be paid upon the assumption and assignment of the Leases.

### Marketing Process

16.     The PSK Agreement is the result of extensive pre- and postpetition marketing efforts, including an auction with active bidding for the PSK Stores.  As set forth in greater detail in the motion to approve the Discrete Procedures (ECF No. 27), in March 2015, the Debtors retained Evercore Partners LLC ("**Evercore**") to serve as their investment banker and to market substantially all of their assets, including the PSK Stores.  In April 2015, the Debtors retained Hilco Real Estate LLC ("**Hilco**") to provide additional consulting and advisory services to the Debtors in connection with their asset sale strategy.  Prior to the Commencement Date, Evercore and Hilco contacted over fifty potential buyers, including companies already operating in the grocery industry, private equity firms and non-grocery retailers.  Immediately following the Commencement Date, Evercore and Hilco commenced a more aggressive marketing effort and contacted over 150 potential interested parties, including additional grocery and non-grocery retailers, as well as landlords, real estate investors and brokers, via direct emails and phone calls, and placed strategic advertisements in local and national media in order to reach the widest possible audience of potential acquirers.  These efforts resulted in significant interest in the Debtors' assets, including the PSK Stores.

17.     The PSK Agreement represents the highest and best offer the Debtors have received for the PSK Stores to date.

WEIL:\95493876\5\50482.0005

**Extraordinary Provisions Under Local Guidelines**

18.    Collectively, the PSK Agreement and the Proposed Transaction Order

contain the following provisions, which the Amended Guidelines for the Conduct of Assets

Sales, adopted by General Order M-383, require to be disclosed separately:

a.    <u>Deadlines that Effectively Limit Notice</u>.    Pursuant to the Discrete
Procedures Order, the Court approved a 17-day notice period and 10-day
objection deadline for the sale of the PSK Stores and the assumption and
assignment of the Leases in connection therewith.    The Debtors filed a
notice identifying PSK as the successful bidder for the PSK Stores on
October 9, 2015 (ECF No. 1315).    The Debtors served Adequate
Assurance Information on the Cure Notice Parties on October 19, 2015, 17
days before the November 5, 2015 hearing (the "**Sale Hearing**").    The
deadline for the Cure Notice Parties to object to the Adequate Assurance
Information provided – and for all parties in interest to object to the sale of
the PSK Stores to PSK – is October 30, 2015 (the "**Objection Deadline**"),
11 days after service of the Adequate Assurance Information.    Although
the Sale Hearing has been scheduled on 4 days' less notice than required
by the Discrete Procedures, in light of the notices otherwise provided, no
party in interest has been prejudiced.    Accordingly, the Debtors
respectfully submit that shortening the 17-day notice period with respect
to this motion is warranted.

In the Discrete Procedures Order, the Court also approved the Debtors'
conducting auctions within 14 days of the filing of an auction notice.    The
Debtors scheduled the auction for the PSK Stores on less than 14 days to
coincide with the second auction being conducted under the Global
Bidding Procedures and several other auctions scheduled pursuant to the
Discrete Procedures for the same day.    Adequate notice of the Debtors'
proposed sale of the PSK Stores has been provided.    In addition, as
evidenced by the increased Purchase Price and the bidding that occurred
on the PSK Stores, auctioning the PSK Stores on the same day as other
auctions generated the greatest interest in and opportunity for interest
purchasers to bid on the PSK Stores.    Accordingly, the Debtors submit that
shortening the 14-day notice period provided for in the Discrete
Procedures by six-days is warranted.

b.    <u>Use of Proceeds</u>.    Other than the credit provided to PSK for its earned
Termination Payment, the PSK Agreement does not contemplate an

8

allocation of sale proceeds.  Any proceeds received from the sale of the PSK Stores are, however, subject to the provisions of the Final DIP Order,[5] including the mandatory payment provisions contained therein.

c.   <u>Requested Findings as to Successor Liability</u>.  The Proposed Transaction Order contains findings of fact and conclusions of law limiting PSK's successor liability.

d.   <u>No Sale Free and Clear of Unexpired Leases</u>.  The PSK Agreement and the Proposed Transaction Order provide for the sale of the PSK Stores free and clear of all Liabilities and Liens (each as defined in the PSK Agreement) to the maximum extent permitted under the Bankruptcy Code. Neither the PSK Agreement nor the Proposed Transaction Order contemplate a sale of property free and clear of any possessory leasehold interest.

e.   <u>Relief from Bankruptcy Rules 6004(h) and 6006(d)</u>.  The Debtors seek relief from the 14-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d).

**The Relief Requested Is Warranted
<u>And in the Best Interests of the Debtors and Their Economic Stakeholders</u>**

A.   <u>Sale of the PSK Stores</u>

19.   Ample authority exists for approval of the PSK Agreement.  Section 363 of the Bankruptcy Code provides, in relevant part, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Committee of Equity Security Holders v. Lionel Corp. (In re*

---

[5] *See Final Order Authorizing Debtors to (A) Obtain Third Lien Postpetition Financing Pursuant to 11 U.S.C. § 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2), and (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 (ECF No. 531) (the* **Final DIP Order**").

9

*Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *Gen. Motors*, 407 B.R. at 493-94; *In re Betty Owens Sch.*, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); *accord In re Delaware and Hudson Ry. Co.,* 124 B.R. at 166; *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002).

20.    As described above, pursuing the PSK Agreement represents a reasonable exercise of the Debtors' business judgment and is in the best interests of all parties. The Debtors have provided notice of the sale of the PSK Stores in accordance with the requirements set forth in the Discrete Procedures, which notice is more than adequate and reasonable.[6] Such notice included actual notice of the auction for the PSK Stores, the Sale Hearing and the PSK Agreement to all interested parties. Such notice, together with the authority pursuant to section 363 and 365 of the Bankruptcy Code, will also enable the Court to make findings at the Sale Hearing and in the Sale Order that PSK shall not be liable under theories of successor liability in connection with the assets included in the PSK Stores.

21.    The Debtors believe that the Purchase Price is fair and reasonable and represents the highest and best offer for the PSK Stores that the Debtors have received to date. The Purchase Price is market tested and was subject to the extensive marketing process described above and an auction with active bidding. Accordingly, the Court and parties in interest can be

---

[6] The Debtors' creditors were also on notice that the Debtors may sell the PSK Stores because the Sale Notice (as such term is defined in the Global Procedures) listed such stores and was served upon all of the Debtors' creditors.

assured that the Debtors will have selected the highest and best offer for the PSK Stores. Finally, the Debtors' and PSK's compliance with the Discrete Procedures and the PSK Bidding Procedures establishes that the Debtors and PSK have proceeded in good faith.

**B.      Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

22.      In the interest of attracting the best offers, the sale of the PSK Stores is free and clear of any and all liens, claims, encumbrances and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and other interests attaching to the proceeds of the sale. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if applicable non-bankruptcy law permits sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f)(1) – (5). With respect to any party asserting a lien, claim, encumbrance or other interest against the Stores, the Debtors will be able to satisfy one or more of the conditions set forth in section 363(f).

**C.      Protections As a Good Faith Purchaser**

23.      Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not

11

> such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp.*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 3d Cir. 1986). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

24. The PSK Agreement is the product of arm's-length, good faith negotiations in as competitive a purchasing process as is possible under the circumstances, including a robust auction for the PSK Stores. Based upon the record to be made at the Sale Hearing, the Debtors will request a finding that PSK is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

### D.    Assumption and Assignment of the Leases

25. Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume . . . any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v.*

*Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2d Cir. 1993).

26.    In connection with the PSK Agreement, the Debtors will assume and assign the Leases to PSK effective as of the Closing Date.  The Debtors are responsible for the payment of the Cure Costs associated with such Leases pursuant to the Discrete Procedures, which the Debtors estimate to be $0 for the PSK Stores.  Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to another entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Pursuant to section 365(k), the Debtors will, therefore, be relieved from any liability for any breach of any of the Leases assigned to PSK.  As such, the assumption and assignment of the Leases to PSK constitutes a sound exercise of the Debtors' business judgment.

27.    Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Leases that will be assumed must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As stated, the Debtors served the *Notice of Assumption, Assignment and Cure Costs With Respect to Additional Contracts of the Debtors*, dated September 25, 2015 (ECF No. 1090), on all counterparties to "Additional Contracts" with an objection deadline of October 9, 2015 at 4:00 p.m.

28.    The Cure Notice Parties have had the opportunity to object to the proposed assumption and assignment to PSK.  If no timely objection is received, (i) the counterparty to the applicable Lease shall be deemed to have consented to the assumption and assignment of such Lease to PSK and forever shall be barred from asserting any objection with regard to such assumption or assignment, and (ii) the Cure Costs shall be controlling, notwithstanding anything

13

to the contrary in any Lease, or any other document, and the counterparty to a Lease shall be deemed to have consented to the Cure Costs and forever shall be barred from asserting any other claims related to such Lease against the Debtors, PSK, or the property of any of them.

29.    In accordance with Section IV.H of the Discrete Procedures, all undisputed Cure Costs will be paid on the Closing Date.  Any disputed Cure Costs will be paid by the earlier of (i) when the Debtors and the non-Debtor counterparties agree to a cure amount or (ii) within five (5) days after the date of the entry of a final order by the Court determining an amount.  *See* Discrete Procedures at ¶ IV.H.

30.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."   11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote

14

sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is whether rent will be paid).

31.     The Debtors certify that, on October 19, 2015, they caused PSK's Adequate Assurance Information to be served on the Cure Notice Parties, as required by Sections IV.C. and IV.D of the Discrete Procedures.

32.     At the Sale Hearing, to the extent necessary, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the ability of PSK to perform under the PSK Agreement and the Leases to be assumed and assigned.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of PSK to provide adequate assurance of future performance, as required by section 365(b)(1)(C) of the Bankruptcy Code.  Accordingly, it is requested that at the conclusion of the Sale Hearing, the proposed assumption and assignment of the Leases be approved.

33.     To facilitate the assumption and assignment of the Leases, the Debtors further request the Court find all anti-assignment provisions of the applicable Leases and Subleases to be unenforceable under section 365(f) of the Bankruptcy Code.[7]

## E.    Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

34.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property… is stayed until the expiration of fourteen (14) days after entry of the order,

---

[7] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease…"  11 U.S.C. § 365(f)(1).   Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

15

unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

35.    In light of the current circumstances and financial condition of the Debtors, the Debtors believe that in order to maximize value, the sale of the PSK Package should be consummated as soon as practicable.  Accordingly, the Debtors request that the Proposed Transaction Order be effective immediately upon entry of such order and that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## Notice

36.    Notice of this Motion has been provided to the Transaction Notice Parties in accordance with the Discrete Procedures, including the Debtors' pre- and postpetition lenders with asserted liens (including, without limitation, holders of leasehold mortgages of record) against the assets proposed to be sold.  Notice of this Motion has also been provided to the each of the counterparties to the Leases.  The Debtors submit that such notice is sufficient to satisfy the service requirements of Fed. R. Bankr. P. 6004(d), and that no further notice or service need be provided.

37.    No previous request for the relief sought herein has been made to this or any other Court.

16

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: October 23, 2015
New York, New York

*/s/ Garrett A. Fail*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

17

**<u>Exhibit A</u>**

**PSK Agreement**

EXECUTION VERSION

PSK Supermarkets Inc.
444 South Fulton Avenue
Mount Vernon, NY 10553


October 23, 2015

The Great Atlantic & Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, New Jersey 07645

> Re:    PSK/A&P Asset Purchase Agreement, dated September 30, 2015

Gentlemen:

Reference is made to that certain Asset Purchase Agreement, dated as of September 30, 2015 (as amended, the "APA"), by and among (a) The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation ("A&P"), Pathmark Stores, Inc., a Delaware corporation, APW Supermarkets, Inc., a New York corporation, A&P Real Property, LLC, a Delaware limited liability company, and A&P Live Better, LLC a Delaware limited liability company (each, a wholly-owned Subsidiary of A&P and, together with A&P, "Sellers"), and (b) PSK Supermarkets, Inc., a New Jersey corporation ("Buyer"). Capitalized terms used herein and not defined shall have the meanings ascribed to them in the APA.

WHEREAS, the Auction contemplated by the APA occurred on October 8, 2015; and

WHEREAS, Buyer was selected as the winning bidder at the Auction with respect to Store number 72603 and Store number 70611.

NOW, THEREFORE, the Parties wish to acknowledge and agree to certain changes to the APA in order to reflect the foregoing, as follows:

1.      The Cash Purchase Price shall be amended to be $22,181,000 (which includes $428,000 for the pharmacy scripts of Store number 72603 and $285,000 for the pharmacy scripts of Store number 70611), which amount shall be allocated as follows: (i) $13,228,000 to Store number 72603 (the "72603 Cash Amount") *less* a credit for the break-up fee payable in respect of such Store in accordance with the Bidding Procedures in the amount of $582,000 (the "Break-up Fee"), and (ii) $9,535,000 to Store number 70611 (the "70611 Cash Amount").

2.      On the Closing Date with respect to Store number 72603, Buyer shall (i) pay the Purchase Price applicable to such Store, including the 72603 Cash Amount and that portion of the Inventory Purchase Price, Prepaid Expenses and Seller Proration Amount, if any (or less the Buyer Proration Amount, if any)

October 23, 2015
Page 2

applicable to such Store (for the avoidance of doubt, *less* the Break-up Fee) and (ii) assume the Assumed Liabilities with respect to such Store.

3.    On the Closing Date with respect to Store number 70611, Buyer shall (i) pay the Purchase Price applicable to such Store, including the 70611 Cash Amount and that portion of the Inventory Purchase Price, Prepaid Expenses and Seller Proration Amount, if any (or less the Buyer Proration Amount, if any) applicable to such Store and (ii) assume the Assumed Liabilities with respect to such Store.

4.    <u>Definitions</u>.

(a) The definition of "Acquired Assets" is hereby amended by adding in clause (g) of such definition the words "(collectively, the "Pharmacy Assets")" after the reference to "<u>Schedule 1.1(b)</u>".

(b) The definition of "Buyer Designee" is hereby amended by adding the following language "and, in connection with the acquisition of the Pharmacy Assets in accordance with the provisions of <u>Section 2.3</u>, a Pharmacy Buyer Designee" at the end of such definition following the reference to "<u>Section 2.3</u>".

(c) The following definitions are added to Section 1.1 of the APA in alphabetical order:

(i) "<u>Pharmacy Buyer Designee</u> means a third party pharmacy operator designated by Buyer to purchase the Pharmacy Assets which is satisfactory to Sellers."

(ii) "<u>Pharmacy Records</u> means all files, prescription records, customer records, lists and profiles, documents, instruments, papers, books, in-store computer files and records and all other records of Sellers and in any media solely to the extent exclusively related to the Stores; in each case, relating to the patients, doctors, pharmaceuticals, controlled substances and prescriptions dispensed by or filled at the Stores."

5.    <u>Section 2.3</u>. Section 2.3(a) is hereby amended and restated in its entirety as follows:

(a)    Prior to the Closing, Buyer may designate one or more Buyer Designees to purchase Acquired Assets and assume the Assumed Liabilities with respect to one or more Stores and to assign to any such Buyer Designee all rights and obligations of Buyer pursuant to this Agreement and any Related Agreement with respect to the designated Stores, Acquired Assets and Assumed

October 23, 2015
Page 3

Liabilities; provided, however, that, no such designation or assignment shall relieve Buyer of its obligations under this Agreement (including as a result of the failure of a Buyer Designee to satisfy its obligations hereunder) and provided further, however, that every Buyer Designee shall be required to execute a joinder to this Agreement in a form satisfactory to Sellers.

(b) Prior to the Closing, Buyer may designate a Pharmacy Buyer Designee to purchase the Pharmacy Assets of each Store and to assign to any such Pharmacy Buyer Designee all rights and obligations of Buyer pursuant to this Agreement and any Related Agreement with respect to such Pharmacy Assets at the designated Store; provided, however, that, no such designation or assignment shall relieve Buyer of its obligations under this Agreement (including as a result of the failure of a Pharmacy Buyer Designee to satisfy its obligations hereunder) and provided further, however, that each Pharmacy Buyer Designee shall be required to execute a joinder to this Agreement in a form satisfactory to Sellers.

6.      Section 2.5. The first paragraph of Section 2.5 is hereby deleted and replaced with the following:

The closings of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m. local time on a separate date (the "Closing Date") for each Store following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, as shall be mutually agreed upon by Sellers and Buyer, each such date to be on or prior to the Outside Date.

7.      Section 2.6(b). Section 2.6(b) is hereby amended by inserting the following language at the conclusion thereof: "At the Closing, Sellers will deliver to Pharmacy Buyer Designee a Power of Attorney authorizing Pharmacy Buyer Designee to use Seller's Pharmacy Licenses for a period of ninety (90) days after Closing".

8.      Section 3.11. Section 3.11 is hereby amended by adding the following language after clause (b) of such section (as Section 3.11(c), Section 3,11(d), and Section 3.11(e), respectively):

October 23, 2015
Page 4

(c)    HIPAA.  To the extent applicable, each Seller is in, and during the past three (3) years has been in, compliance in all material respects with the applicable obligations as a "Covered Entity" with respect to its "Health Plan" and the pharmacies it operates, and as a "Business Associate" where applicable (as such capitalized terms are defined in the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act ("HIPAA")).  With respect to any applicable data privacy or security requirements under HIPAA (collectively, the "HIPAA Commitments"), or any other privacy or security requirements imposed by federal or state Law on the healthcare data held, collected, used or disclosed by Sellers, including state healthcare data breach notification Laws and related state consumer protection Laws (collectively, the "Additional Privacy Requirements"), (i) to the Knowledge of Sellers, Sellers are in material compliance with the HIPAA Commitments and the Additional Privacy Requirements and (ii) Sellers have not received (A) any written inquiry from, or notice that they are under investigation by, any Healthcare Governmental Authority regarding Sellers' compliance with the HIPAA Commitments or the Additional Privacy Requirements or (B) any written notice from any party with whom they have a Business Associate Contract (as such term is defined under HIPAA) of any allegation that they have been in material breach or violation of any of the Business Associate Contracts to which they are parties. To the Knowledge of Sellers, no Seller has, during the past three (3) years, engaged in an activity that would trigger a reporting requirement under any HIPAA Commitments or the Additional Privacy Requirements. To the Knowledge of Sellers, Sellers have not, during the past three (3) years, suffered any unauthorized acquisition, access, use or disclosure of any patient health information that, individually or in the aggregate, is a material violation of the HIPAA Commitments or the Additional Privacy Requirements.

(d)    Compliance with Healthcare Laws.  Sellers are conducting, and during the past three (3) years have conducted, the Business in compliance in all material respects with, and neither Sellers, nor to the Knowledge of Sellers any of their respective Representatives, has engaged in any activities in connection with the Business that would constitute a material breach or violation of, applicable Law of any Healthcare Governmental Authority with respect to regulatory matters relating to the sale and dispensing of pharmaceuticals and controlled substances, and the provision,

October 23, 2015
Page 5

administration, and/or payment for pharmacy products or services (collectively, "Healthcare Laws"), including, to the extent applicable, (i) any state licensure, credentialing, accreditation or certification requirement, including those limiting the scope of activities of Persons acting without such license, credential, accreditation or certification, (ii) any billing, coding, coverage or reimbursement rules and regulations applicable to the services provided by Sellers, (iii) rules and regulations governing the operation and administration of Medicare, Medicaid, Tricare, or any other federal health care programs (as defined in the Social Security Act) and any other state health care program, (iv) the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(b)), the Ethics in Patient Referral Act (42 U.S.C. §135nn), the False Claims Act (31 U.S.C. §3729 et seq.), the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b, the Exclusion Laws, 42 U.S.C. § 1320a-7, and state anti-kickback, self-referral and false claims Laws, (v) rules and regulations of the U.S. Food and Drug Administration and (vi) the Controlled Substances Act of 1970.

(e)     To the Knowledge of Sellers, during the past three (3) years, (i) no Seller has received any written notice or communication from any Healthcare Governmental Authority alleging material noncompliance with any Healthcare Laws applicable to the Business, (ii) there has not been, and there is no, Litigation, search warrant, subpoena, civil investigative demand, demand letter or request for information by or from any enforcement agency related to material noncompliance with any Healthcare Laws applicable to the Business pending, or to the Knowledge of Sellers, threatened against Sellers, (iii) submissions or reports by Sellers to any Healthcare Governmental Authority were true and accurate, in all material respects, when submitted or were subsequently amended or corrected, (iv) no Seller has been a defendant in any qui tam/False Claims Act litigation in connection with the Business, (v) no Seller has any reporting obligations pursuant to any written settlement agreement or any other written agreements entered into with any Healthcare Governmental Authority or are a party to a corporate integrity agreement a Healthcare Governmental Authority, in each case in connection with the Business and (vi) Sellers have maintained all records required to be in material compliance under any Healthcare Laws applicable to the Business.

October 23, 2015
Page 6

9.      Section 4.7. The first sentence of Section 4.7 is hereby amended and restated in its entirety as follows: "As of the Closing, Pharmacy Buyer Designee will be a "Covered Entity" as defined by HIPAA."

10.     Section 5.2. Section 5.2 is hereby amended as follows:

(a) by renumbering subsection (iv) of Section 5.2(a) to (v);

(b) by inserting the following as clause (iv) in Section 5.2(a) after clause (iii) and before the word "or":  "as set forth in Section 5.2(c)"; and

(c) by inserting the following as clause (c) of Section 5.2: "Each Party acknowledges and agrees that (i) prior to the Closing, Sellers shall use their commercially reasonable efforts to maintain reasonable levels of Inventory at the Stores, and (ii) Sellers shall not be under any obligation to maintain any seasonal related Inventory, including for the avoidance of doubt, Inventory relating to the Halloween or Thanksgiving seasons/holidays; provided, however, that with respect to the Thanksgiving holiday, Sellers shall use their commercially reasonable efforts to transfer turkeys and related holiday specific merchandise to the Stores, to the extent available, from other stores owned by Sellers.".

11.     Section 5.12. Section 5.12 is hereby amended by replacing each reference to the word "Buyer" with "Pharmacy Buyer Designee".

12.     Article V. Article 5 is hereby amended by inserting the following as Section 5.13:

Section 5.13.   Pharmacy Records; Pharmacy Licenses.

(a)     Promptly as practicable after the execution of this Agreement, Buyer will cause Pharmacy Buyer Designee to make application to the applicable authorities to transfer the Pharmacy Records, if and as necessary, from Sellers to Pharmacy Buyer Designee.  Such application shall be made on a timely basis and shall be pursued by Pharmacy Buyer Designee, at its sole cost and expense.  Sellers, at Pharmacy Buyer Designee's cost and expense, shall cooperate with Pharmacy Buyer Designee and provide any documents and/or information necessary to assist in effectuating such transfer and execute such consents or other papers as may be reasonably required subject to applicable patient privacy rights and to the extent not otherwise prohibited by applicable Law, assign,

transfer, and convey to Pharmacy Buyer Designee all of their right, title, and interest in and to the applicable Pharmacy Records, and Pharmacy Buyer Designee hereby agrees to purchase and accept from Sellers all of the applicable Pharmacy Records as of each applicable Closing. Notwithstanding the foregoing, in the event that the Pharmacy Buyer Designee's application by the applicable authority has been denied (or Buyer reasonably expect such application to be so denied), then Buyer may elect, at its sole option, which election shall be made by Buyer in writing no later than November 7, 2015 (and if no such election is made by such date, then Buyer shall be deemed to have made the election in the following clause (i)):

(i) for the Pharmacy Assets or Pharmacy Records to be deemed Excluded Assets, in which case the Parties shall negotiate in good faith to agree on a reduction of the Purchase Price that appropriately reflects the value of such non-transferred Pharmacy Assets or Pharmacy Records; or

(ii) to proceed with the Closing (without, for the avoidance of doubt, any reduction to the Purchase Price), in which case, if the applicable application has been approved as of the Closing Date, then the Pharmacy Assets or Pharmacy Records shall be delivered to the applicable Pharmacy Buyer Designee at such Closing.

In the event that Buyer makes the election in the foregoing clause (ii) and, following such date Sellers sell the Pharmacy Assets or Pharmacy Records to a third party (as a result of the failure of the applicable Pharmacy Buyer Designee to obtain approval of the applicable application), then Sellers shall forward the proceeds of such sale to Buyer. For the avoidance of doubt, in the event that the Pharmacy Assets or Pharmacy Records are delivered to a Pharmacy Buyer Designee at the applicable Closing (subject to the receipt of approval of the applicable application), (1) such Pharmacy Buyer Designee shall operate the applicable pharmacy in its entirety, including by using its own employees and computer systems (and not those of Sellers) and (2) Sellers shall maintain copies of the Pharmacy Records in its possession (to the extent in its possession) for a period of ninety (90) days following the applicable Closing Date.

(b)    Buyer will cause Pharmacy Buyer Designee to file all applications necessary, and use its commercially reasonably efforts, to obtain all permits, licenses or approvals (including without limitation, all applicable state permits, United States Drug Enforcement Agency numbers, National Council for Prescription

October 23, 2015
Page 8

Drug Programs numbers, National Provider Identifier numbers, CDS numbers and Medicare and Medicaid numbers (collectively, the "Pharmacy Licenses") necessary to operate a retail pharmacy within any Store within ten (10) Business Days after the entry of the Sale Order. In the event that any Pharmacy License necessary for the Buyer's operation of any pharmacy within an applicable Store is not obtained prior to the applicable Closing, Sellers acknowledge and agree that, beginning on each applicable Closing Date and subject to the immediately following sentence, Pharmacy Buyer Designee shall be entitled to utilize, only in connection with Pharmacy Buyer Designee's operation of any pharmacy located within any Store and only to the extent permitted by applicable Law, the Pharmacy Licenses of Sellers related to such pharmacy. To effect the foregoing authorization, at or prior to each applicable Closing and only to the extent that Buyer has not obtained the applicable Pharmacy License, Sellers and Pharmacy Buyer Designee shall (i) execute a Power of Attorney satisfactory to Sellers and Pharmacy Buyer Designee authorizing Pharmacy Buyer Designee to use Seller's Pharmacy Licenses (as permitted by applicable law) for a limited period of time (not to exceed ninety (90) days) and (ii) execute such documents, if any, as may be required or requested by a Governmental Authority, including any affidavits of sale. As a condition precedent to Seller's execution of such Power of Attorney or any other documents required or requested by a Governmental Authority, Pharmacy Buyer Designee shall also agree that (i) during the period of Pharmacy Buyer Designee's use of Seller's Pharmacy Licenses, Pharmacy Buyer Designee shall own and operate the applicable Pharmacy in accordance with applicable Law and (ii) Pharmacy Buyer Designee shall indemnify Seller's against all losses arising out of Pharmacy Buyer Designee's use of such Pharmacy Licenses, instruments or Power of Attorney. Pharmacy Buyer Designee's use of the Pharmacy Licenses with respect to any pharmacy shall automatically terminate upon the issuance to Pharmacy Buyer Designee of all of the Pharmacy Licenses necessary for Pharmacy Buyer Designee to lawfully operate such pharmacy.

13.    Section 7.1. Section 7.1 is hereby amended by adding in clause (e) of such definition the words "or Pharmacy Buyer Designee (as applicable)" after the words "to Buyer" and in front of the words "shall have been delivered".

14.    Section 8.1(b)(ii). The first sentence of Section 8.1(b)(ii) is hereby amended and restated as follows: "the Closing shall not have occurred prior to November 30, 2015  (the "Outside Date")". The second sentence of Section 8.1(b)(ii) is hereby deleted.

October 23, 2015
Page 9

15.    Except to the extent modified by this letter agreement, the APA remains in full force and effect.  In the event of any conflict between the terms of this letter agreement and the terms of the APA, the terms of this letter agreement shall control.  This letter agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this letter agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  The exchange of copies of this letter agreement and of signature pages by facsimile transmission or by electronic transmission in Adobe Acrobat format shall constitute effective execution and delivery of this letter agreement as to the Parties and may be used in lieu of the original letter agreement for all purposes. The provisions of Article IX of the APA are incorporated by reference herein and shall be deemed applicable to this letter agreement *mutatis mutandis*.

[Signature Page Follows]

CONSENTED AND AGREED TO
on this 23rd day of October, 2015

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.

By: _____
Name: Christopher W. McGarry
Title: Executive Vice President and Chief Administrative Officer


PATHMARK STORES, INC.

By: _____
Name: Christopher W. McGarry
Title: Vice President & Secretary


APW SUPERMARKETS, INC.

By: _____
Name: Christopher W. McGarry
Title: Vice President & Secretary


A&P REAL PROPERTY, LLC

By: _____
Name: Christopher W. McGarry
Title: Vice President & Secretary


A&P LIVE BETTER, LLC

By: _____
Name: Christopher W. McGarry
Title: Vice President & Secretary

October 23, 2015
Page 11


PSK SUPERMARKETS, INC.

By:

Name:  Daniel Katz

Title:  V.P.

**<u>Exhibit B</u>**

**Proposed Transaction Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re                                                    :        **Chapter 11**
                                                         :
**THE GREAT ATLANTIC & PACIFIC TEA**                     :        **Case No. 15-23007 (RDD)**
**COMPANY, INC.,** *et al.,*                             :
                                                         :        **(Jointly Administered)**
            **Debtors.**[1]                              :

-----------------------------------------------------------------x

## ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG SELLERS AND PSK SUPERMARKETS, INC. (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES IN CONNECTION THEREWITH AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated [ ], 2015 (Docket No. [ ]) (the "Sale Motion")[2], filed by

the above-captioned debtors and debtors in possession (the "Debtors") seeking, among other

things, entry of an order, pursuant to sections 105, 363 and 365 of the United States Bankruptcy

Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 6004-1 and 6006-1

of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York (the "Local Bankruptcy Rules"), authorizing and approving the sale of the

Acquired Assets and the assumption and assignment of certain executory contracts and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599).  The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2] Capitalized terms used herein but not otherwise defined have the meanings given to them in the Asset Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to them in the Sale Motion.

unexpired leases of the Debtors in connection therewith (the "Leases"); and the Court having

taken into consideration this Court's prior order, dated August 11, 2015 (Docket No. 496) (the

"Discrete Procedures Order"), approving procedures for the sale or disposition of certain of the

Debtors' stores, including certain executory contracts, unexpired leases and assets related thereto

(the "Discrete Procedures"); and the Court having taken into consideration the bidding

procedures for the Acquired Assets (the "Bidding Procedures") attached as Exhibit A to the

notice of auction filed on September 30, 2015 (Docket No. 1126); and PSK Supermarkets, Inc.

(the "Buyer") having submitted a bid for the Acquired Assets, which was the successful bid for

the Acquired Assets at an auction held on October 8, 2015 (the "Auction"); and the Court having

conducted a hearing on the Sale Motion (the "Sale Hearing") on November 5, 2015, at which

time all interested parties were offered an opportunity to be heard with respect to the Sale

Motion; and the Court having reviewed and considered (i) the Sale Motion and the exhibits

thereto, (ii) the Asset Purchase Agreement, dated as of September 30, 2015, by and between

Sellers and Buyer, as amended by the Letter Agreement, dated as of October 23, 2015 by and

between Sellers and Buyer (together, the "Asset Purchase Agreement"), a copy of which is

attached hereto as Exhibit A, whereby the Debtors have agreed, among other things, to sell the

Acquired Assets to Buyer, including certain executory contracts and unexpired leases and

subleases of the Debtors that will be assumed and assigned to Buyer, on the terms and conditions

set forth in the Asset Purchase Agreement (the "Sale Transactions"), and (iii) the arguments of

counsel made, and the evidence proffered and adduced, at the Sale Hearing; and it appearing that

due notice of the Sale Motion and the form of this order (the "Proposed Sale Order") having

been provided in accordance with the Discrete Procedures Order; and all objections to the Sale

Motion having been withdrawn, resolved or overruled as provided in this Order; and it appearing

WEIL:\95494749\3\50482.0005

that the relief requested in the Sale Motion and granted herein is in the best interests of the

Debtors, their estates and creditors and all parties in interest in these chapter 11 cases; and upon

the record of the Sale Hearing and these chapter 11 cases; and after due deliberation thereon; and

good cause appearing therefor, it is hereby

<strong>FOUND AND DETERMINED THAT:</strong>

A.    **<u>Fed. R. Bankr. P. 7052</u>**.  The findings and conclusions set forth herein constitute

the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made

applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the

following findings of fact constitute conclusions of law, they are adopted as such. To the extent

any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    **<u>Jurisdiction and Venue</u>**.  This Court has jurisdiction to decide the Sale Motion

and over the Sale Transactions pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b).  This matter is a

core proceeding pursuant to 28 U. S. C. § 157(b)(2).  Venue of these chapter 11 cases and the

Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.    **<u>Statutory and Rule Predicates</u>**.  The statutory and other legal predicates for the

relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code,

Bankruptcy Rules 2002, 6004, and 6006, Local Bankruptcy Rules 6004-1 and 6006-1, and the

Amended Guidelines for the Conduct of Asset Sales, Approved by Administrative Order

Number 383 in the United States Bankruptcy Court for the Southern District of New York.

D.    **<u>Opportunity to Object</u>**.  A fair and reasonable opportunity to object to and to be

heard with respect to the Sale Motion, the Sale Transactions and the relief requested in the Sale

Motion has been given, as required by the Bankruptcy Code and the Bankruptcy Rules, to all

Persons entitled to notice pursuant to the Discrete Procedures Order, including, but not limited

3

to, the following: (i) all non-Debtor parties to the Leases, (ii) all parties who have requested

notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002, (iii) all applicable federal,

state, and local taxing and regulatory authorities, and (iv) all of the Debtors' known creditors.

      E.      **Final Order**.  This Order constitutes a final order within the meaning of 28

U.S.C. § 158(a).

      F.      **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and

sound business purposes and justifications for approval of the Sale Motion, the Asset Purchase

Agreement, and the Sale Transactions and in entering into the Asset Purchase Agreement and

related Bill of Sale and Assignment and Assumption Agreement (the "Related Agreements").

The Debtors' entry into and performance under the Asset Purchase Agreement and Related

Agreements (i) constitute a sound and reasonable exercise of the Debtors' business judgment,

(ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the

Debtors and their stakeholders, and (iii) are reasonable and appropriate under the circumstances.

Business justifications for the Sale Transactions include, but are not limited to, the following:

(i) the Asset Purchase Agreement constitutes the highest and best offer received for the Acquired

Assets; (ii) the Asset Purchase Agreement presents the best opportunity to maximize the value of

the Acquired Assets and avoid decline and devaluation of the Acquired Assets; (iii) unless the

Sale Transactions and all of the other transactions contemplated by the Asset Purchase

Agreement are concluded expeditiously, as provided for pursuant to the Asset Purchase

Agreement, recoveries to creditors may be diminished; and (iv) the value of the Debtors' estates

will be maximized through the sale of the Acquired Assets pursuant to the Asset Purchase

Agreement.

WEIL:\95494749\3\50482.0005

G.      **Compliance with Discrete Procedures**.  The Debtors and Buyer complied with

the Discrete Procedures and Bidding Procedures in all respects.  Buyer was the successful bidder

for the Acquired Assets in accordance with the Bidding Procedures.

H.      **Highest and Best Value**.  (i) The Debtors and their advisors, including Evercore

Group LLC and Hilco Real Estate LLC, engaged in a robust and extensive marketing and sale

process, both prior to the commencement of these chapter 11 cases and through the postpetition

sale process pursuant to the Discrete Procedures Order, (ii) the Debtors conducted a fair and

open sale process, (iii) the sale process, the Bidding Procedures and the Auction were non-

collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to

make an offer to purchase the Acquired Assets, and (iv) the process conducted by the Debtors

pursuant to the Discrete Procedures and the Bidding Procedures obtained the highest and best

value for the Acquired Assets for the Debtors and their estates, and any other transaction would

not have yielded as favorable an economic result.

I.      **Fair Consideration**.  The consideration to be paid by Buyer under the Asset

Purchase Agreement constitutes fair and reasonable consideration for the Acquired Assets.

J.      **No Successor or Other Derivative Liability**.  Buyer is not, and will not be, a

mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or

their respective estates and there is no continuity between Buyer and the Debtors.  The Sale

Transactions do not amount to a consolidation, merger or *de facto* merger of Buyer and any of

the Debtors.

K.      **Good Faith**.  The Asset Purchase Agreement and each of the transactions

contemplated therein were negotiated, proposed and entered into by the Debtors and Buyer in

good faith, without collusion and from arm's-length bargaining positions.  Buyer is a "good faith

WEIL:\95494749\3\50482.0005

purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. Neither the Debtors nor Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between Buyer and the Debtors.

L.    **Notice**. As evidenced by the certificates of service filed with the Court: (i) proper, timely, adequate and sufficient notice of the Sale Motion, the bidding process (including the deadline for submitting bids and the Auction), the Sale Hearing, the Sale Transactions and the Proposed Sale Order was provided by the Debtors; (ii) such notice was good, sufficient and appropriate under the particular circumstances and complied with the Discrete Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transactions, the Bidding Procedures, the Sale Hearing or the Proposed Sale Order is required.

M.    **Cure Notice**. As evidenced by the certificates of service filed with the Court, and in accordance with the provisions of the Discrete Procedures Order, the Debtors have served, prior to the Sale Hearing, notice (the "Cure Notice") of the Debtors' intent to assume and assign the Leases and of the related proposed cure amount (the "Cure Amount") upon each non-debtor counterparty to the Leases. The service of the Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Amount for the assumption and assignment of the Leases. All non-debtor parties to the Leases have had a reasonable opportunity to object both to the Cure Amounts listed on the applicable Cure Notice and to the assumption and assignment of the Leases to Buyer.

6

N.    **Satisfaction of Section 363(f) Standards**.  The Debtors may sell the Acquired

Assets free and clear of all liens, claims (including those that constitute a "claim" as defined in

section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of

any kind or nature whatsoever against the Debtors or the Acquired Assets, including, without

limitation, any debts arising under or out of, in connection with, or in any way relating to, any

acts or omissions, obligations, demands, guaranties, rights, contractual commitments,

restrictions, product liability claims, environmental liabilities, employee pension or benefit plan

claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims

for taxes of or against the Debtors, and any derivative, vicarious, transferee or successor liability

claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or

regulation of the United States, any state, territory, or possession thereof or the District of

Columbia), whether arising prior to or subsequent to the commencement of these chapter 11

cases, whether known or unknown, and whether imposed by agreement, understanding, law,

equity or otherwise arising under or out of, in connection with, or in any way related to the

Debtors, the Debtors' interests in the Acquired Assets, the operation of the Debtors' businesses

before the Closing, or the transfer of the Debtors' interests in the Acquired Assets to Buyer

(collectively, excluding any liabilities expressly assumed under the Asset Purchase Agreement,

the "Claims"), because, in each case, one or more of the standards set forth in section 363(f)(1)-

(5) of the Bankruptcy Code have been satisfied.  Without limiting the generality of the foregoing,

"Claims" shall include any and all liabilities or obligations whatsoever arising under or out of, in

connection with, or in any way relating to: (1) any of the employee benefit plans, including any

Claims related to unpaid contributions or current or potential withdrawal or termination liability;

(2) any of the Debtors' collective bargaining agreements; (3) the Worker Adjustment and

7

Retraining Notification Act of 1988; or (4) any of the Debtors' current and former employees.

The Debtors have properly served all holders of Claims with the Sale Motion in accordance with

the Federal Rules of Bankruptcy Procedure.  Those holders of Claims who did not object (or who

ultimately withdrew their objections, if any) to the Sale Transactions or the Sale Motion are

deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders

of Claims who did object that have an interest in the Acquired Assets fall within one or more of

the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately

protected by having their Claims that constitute interests in the Acquired Assets, if any, attach

solely to the proceeds of the Sale Transactions ultimately attributable to the property in which

they have an interest, in the same order of priority and with the same validity, force and effect

that such holders had prior to the Sale Transactions, subject to any defenses of the Debtors.  All

Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired

Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting

such Claims against Buyer or any of its assets, property, Affiliates, successors, assigns, or the

Acquired Assets.

O.      Buyer would not have entered into the Asset Purchase Agreement and would not

consummate the transactions contemplated thereby, thus adversely affecting the Debtors and

their estates and their creditors, if the sale of the Acquired Assets was not free and clear of all

Claims, or if Buyer would, or in the future could, be liable for any such Claims, including, as

applicable, certain liabilities related to the operation of stores by the Debtors that will not be

assumed by Buyer, as described in the Asset Purchase Agreement.

P.      The total consideration to be provided under the Asset Purchase Agreement

reflects Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the

WEIL:\95494749\3\50482.0005

Bankruptcy Code, with title to and possession of the Acquired Assets free and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

Q.    **Assumption and Assignment of Leases**.  The assumption and assignment of the Leases are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the reasonable exercise of the Debtors' sound business judgment. Specifically, the assumption and assignment of the Leases (i) is necessary to sell the Acquired Assets to Buyer, (ii) limit the losses suffered by counterparties to the Leases, and (iii) maximize the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Leases.

R.    With respect to each of the Leases, the Debtors have met all requirements of section 365(b) of the Bankruptcy Code.  Further, Buyer has provided adequate assurance of future performance under the Leases in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to such Leases.  Accordingly, the Leases may be assumed by the Debtors and assigned to Buyer as provided for in the Asset Purchase Agreement.

S.    **Validity of the Transfer**.  As of the Closing, the transfer of the Acquired Assets to Buyer will be a legal, valid and effective transfer of the Acquired Assets, and will vest Buyer with all right, title and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims.

T.    The Debtors (i) have full corporate or limited liability company (as applicable) power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transactions have been duly and validly authorized by all

9

necessary corporate action of the Debtors, (ii) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, and (iii) upon entry of this Order, other than any consents identified in the Asset Purchase Agreement (including with respect to antitrust matters), need no consent or approval from any other Person to consummate the Sale Transactions.

U.      The Acquired Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estate within the meaning of section 541(a) of the Bankruptcy Code. The Debtors are the sole and rightful owners of the Acquired Assets, and no other Person has any ownership right, title, or interests therein.

V.      The Asset Purchase Agreement is a valid and binding contract between the Debtors and Buyer and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement and the Sale Transactions, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

W.      **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transactions, and the Debtors and Buyer intend to close the Sale Transactions as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transactions as contemplated by the Asset Purchase Agreement.  Accordingly, there is sufficient

10

cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the transactions contemplated by this Order.

        X.    **Personally Identifiable Information**.  As may be contemplated in the Asset Purchase Agreement, and subject to the terms of this Order, the sale to Buyer under the Asset Purchase Agreement of personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) about individuals, if any, is either consistent with the privacy policy of the Debtors in effect on the date of commencement of these chapter 11 cases or consistent with the recommendations of the consumer privacy ombudsman appointed in these chapter 11 cases.

        Y.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

        **NOW THEREFORE, IT IS ORDERED THAT**:

        1.    **Motion is Granted**.  The Sale Motion and the relief requested therein is granted and approved, as set forth herein..

        2.    **Objections Overruled**.  All objections (except for objections to Cure Amounts, if any, that have been adjourned (the "Adjourned Cure Objections"), solely to the extent such objections relate to any asserted cure obligations pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code),  if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits.

11

3.    **Notice.**  Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

4.    **Fair Purchase Price**.  The consideration provided by Buyer under the Asset Purchase Agreement is fair and reasonable.

5.    **Approval of the Asset Purchase Agreement**.  The Asset Purchase Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved.  The failure specifically to include any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

6.    **Consummation of Sale Transactions**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to execute, deliver and perform their obligations under and comply with the terms of the Asset Purchase Agreement and to consummate the Sale Transactions, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement and this Order.

7.    The Debtors, their Affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and to take all further actions as may be (a) reasonably requested by Buyer for the purpose of assigning, transferring, granting, conveying and conferring to Buyer, or reducing to possession, the Acquired Assets or (b) necessary or

12

appropriate to the performance of the obligations contemplated by the Asset Purchase Agreement, all without further order of the Court.

8.      All Persons that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to Buyer as of the Closing.

9.      Each and every any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

10.     **Transfer of Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Asset Purchase Agreement.  The Acquired Assets shall be transferred to Buyer, and upon the Closing, such transfer shall: (a) be valid, legal, binding and effective; (b) vest Buyer with all right, title and interest of the Debtors in the Acquired Assets; and (c) be free and clear of all Claims in accordance with section 363(f) of the Bankruptcy Code, with all Claims that represent interests in property to attach to the net proceeds of the Sale Transactions, in the same amount and order of their priority, with the same validity, force and effect which they have against the Acquired Assets, and subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing.

11.     Except as otherwise provided in the Asset Purchase Agreement, all Persons (and their respective successors and assigns) including, without limitation, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, employees, former employees, pension plans, multiemployer pension plans, labor unions, trade creditors and any

13

other creditors holding Claims against the Debtors or the Acquired Assets, are hereby forever

barred, estopped and permanently enjoined from asserting or pursuing such Claims against

Buyer, its Affiliates, successors or assigns, its property or the Acquired Assets, including,

without limitation, taking any of the following actions with respect to a Claim (other than an

Assumed Liability): (a) commencing or continuing in any manner any action or other proceeding

against Buyer, its Affiliates, successors or assigns, assets or properties; (b) enforcing, attaching,

collecting or recovering in any manner any judgment, award, decree, or order against Buyer, its

Affiliates, successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any

Claims against Buyer, its successors or assigns, assets or properties; (d) asserting a Claim as a

setoff, right of subrogation or recoupment of any kind against any obligation due Buyer or its

successors or assigns; or (e) commencing or continuing any action in any manner or place that

does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions

contemplated or taken in respect thereof.  No such Persons shall assert or pursue against Buyer

or its Affiliates, successors or assigns any such Claim.

      12.     This Order (a) shall be effective as a determination that, as of the Closing, all

Claims, have been unconditionally released, discharged and terminated as to Buyer and the

Acquired Assets, and that the conveyances and transfers described herein have been effected,

and (b) is and shall be binding upon and govern the acts of all Persons, including all filing

agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds,

registrars of deeds, administrative agencies, governmental departments, secretaries of state,

federal and local officials and all other Persons who may be required by operation of law, the

duties of their office, or contract, to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of title in

or to any lease; and each of the foregoing Persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

13.    Following the Closing of the Sale Transactions, no holder of any Claim shall interfere with Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtors may take in these chapter 11 cases.

14.    Except as expressly set forth in the Asset Purchase Agreement, Buyer and its successors and assigns shall have no liability for any Claim, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature or character whatsoever, including Claims arising under, without limitation: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's Affiliates or predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; and (e) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the

WEIL:\95494749\3\50482.0005

Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation

Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980,(xi) state and local

discrimination laws, (xii) state and local unemployment compensation laws or any other similar

state and local laws, (xiii) state workers' compensation laws or (xiv) any other state, local or

federal employee benefit laws, regulations or rules or other state, local or federal laws,

regulations or rules relating to, wages, benefits, employment or termination of employment with

any or all Debtors or any predecessors; (xv) any antitrust laws; (xvi) any product liability or

similar laws, whether state or federal or otherwise; (xvii) any environmental laws, rules, or

regulations, including, without limitation, under the Comprehensive Environmental Response,

Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (xviii) any

bulk sales or similar laws; (xix) any federal, state or local tax statutes, regulations or ordinances,

including, without limitation, the Internal Revenue Code of 1986, as amended; and (xx) any

common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest

liability theory or any other theory of or related to successor liability.

       15.    If any Person that has filed financing statements, mortgages, mechanic's liens, *lis*

*pendens* or other documents or agreements evidencing Claims against or in the Debtors or the

Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Sale

Transactions, in proper form for filing and executed by the appropriate parties, termination

statements, instruments of satisfaction, releases of all interests which the Person has with respect

to the Debtors or the Acquired Assets or otherwise, then with regard to the Acquired Assets that

are purchased by Buyer pursuant to the Asset Purchase Agreement and this Order (a) the Debtors

are hereby authorized and directed to execute and file such statements, instruments, releases and

other documents on behalf of the Person with respect to the Acquired Assets and (b) Buyer is

16

hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

16.    **No Successor or Other Derivative Liability**.  By virtue of the Sale Transactions, Buyer shall not be deemed to: (a) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (b) have, *de facto* or otherwise, merged with or into any or all Debtors; or (c) be a mere continuation or substantial continuation of any or all Debtors or the enterprise or operations of any or all Debtors.

17.    **Assumption and Assignment of Leases**.  The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Leases to Buyer free and clear of all Claims, and to execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer the Leases to Buyer as provided in the Asset Purchase Agreement.  Upon the Closing, Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Leases and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Leases.  Buyer acknowledges and agrees that from and after the Closing, subject to and in accordance with the Asset Purchase Agreement, it shall comply with the terms of each assumed and assigned Lease in its entirety, including any indemnification obligations expressly contained in such Lease that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order.

WEIL:\95494749\3\50482.0005

18.     All Cure Amounts shall be determined and paid in accordance with the Discrete

Procedures Order.  Payment of the Cure Amounts shall be in full satisfaction and cure of any and

all defaults under the Leases, whether monetary or non-monetary.  Each non-debtor party to a

Lease is forever barred, estopped and permanently enjoined from asserting against the Debtors or

Buyer, their successors or assigns or the property of any of them, any default existing as of the

date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

19.     An Adjourned Cure Objection may be resolved after the Closing Date in

accordance with the Discrete Procedures.

20.     **Ipso Facto Clauses Ineffective**.  The Leases shall be transferred to, and remain in

full force and effect for the benefit of, Buyer in accordance with their respective terms, including

all obligations of Buyer as the assignee of the Leases, notwithstanding any provision in any such

Leases (including, without limitation, those of the type described in sections 365(e)(1) and (f) of

the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  There

shall be no rent accelerations, escalations, assignment fees, increases or any other fees charged to

Buyer or the Debtors as a result of the assumption or assignment of the Leases.

21.     Upon the Debtors' assignment of the Leases to Buyer under the provisions of this

Order, no default shall exist under any of the Leases, and no counterparty to any Leases shall be

permitted to declare a default by any Debtor or Buyer otherwise take action against Buyer as a

result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations

under the relevant Lease.  Any provision in a Lease that prohibits or conditions the assignment or

sublease of such Lease (including without limitation, the granting of a lien therein) or allows the

counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or

extension, or modify any term or condition upon such assignment or sublease, constitutes an

18

unenforceable anti-assignment provision that is void and of no force and effect. The failure of the Debtors or Buyer to enforce at any time one or more terms or conditions of any Lease shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Lease.

22. **Statutory Mootness**. The transactions contemplated by the Asset Purchase Agreement are undertaken by Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transactions shall neither affect the validity of the Sale Transactions nor the transfer of the Acquired Assets to Buyer, free and clear of Claims, unless such authorization is duly stayed before the Closing pending such appeal.

23. **No Avoidance of Asset Purchase Agreement**. Neither the Debtors nor Buyer has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.

24. **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing, or risk its appeal will be foreclosed as moot.

25. **Personally Identifiable Information**. After giving due consideration to the facts, circumstances and conditions of the Asset Purchase Agreement, as well as the applicable reports of the consumer privacy ombudsman filed with the Court, which Buyer agrees to comply

WEIL:\95494749\3\50482.0005

with, no showing was made that the sale of any personally identifiable information contemplated in the Asset Purchase Agreement, subject to the terms of this Order, would violate applicable nonbankruptcy law.

26.      **Binding Effect of this Order**.  The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates and their creditors, Buyer, and their respective Affiliates, successors and assigns, and any affected third parties, including all Persons asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

27.      **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Order and the terms of (a) the Asset Purchase Agreement, or (b) any other order of this Court, the terms of this Order shall control.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases, or any order confirming such plan, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

28.      **Modification of Asset Purchase Agreement**.  The Asset Purchase Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not materially change the terms of the Asset Purchase Agreement or any related agreements, documents or other instruments.

WEIL:\95494749\3\50482.0005

29.    **Bulk Sales**.  No bulk sales law, or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Asset Purchase Agreement, the Sale Motion or this Order.

30.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Order or the Asset Purchase Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

Dated:  [ ], 2015
      White Plains, New York

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\95494749\3\50482.0005