**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:                                             :

                                                   :        Chapter 11

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC.,                                      :        Case No. 15-23007 (LGB)


                         Debtors.                  :

-------------------------------------------------------------x

THE OFFICIAL COMMITTEE OF UNSECURED :
CREDITORS ON BEHALF OF THE
BANKRUPTCY ESTATE OF THE GREAT
ATLANTIC & PACIFIC TEA COMPANY INC.,  :        Adv. Pro. No. 17-08264 (LGB)

*et al.,*

                         Plaintiff,                :

v.                                                 :

MCKESSON CORPORATION,                              :

                         Defendant.                :

-------------------------------------------------------------x

## <u>MEMORANDUM OPINION</u>

## <u>APPEARANCES</u>

BUCHALTER
*Attorneys for McKesson Corporation*
18400 Von Karman Avenue
Irvine, CA 92612
By:    Jeffrey Garfinkle

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Attorneys for McKesson Corporation*
200 West 21st Street, 17th Floor
New York, NY 10036
By:    Tracy Klestadt

GRIFFIN HAMERSKY LLP
*Attorneys for the Official Committee of Unsecured Creditors and Special Counsel for the Debtor*
420 Lexington Avenue
New York, NY 10170

By:    Michael Hamersky
       Richard Milin

**HON. LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

On July 13, 2017, the Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company[1] (the "Committee" or "Plaintiff"), initiated an adversary proceeding (the "Adversary Proceeding") when it filed its Complaint for Avoidance and Recovery of Preferential Transfers Pursuant to 11 U.S.C. §§ 547 & 550 (the "Complaint") against a creditor of the Debtor, McKesson Corporation d/b/a McKesson Drug Co. (the "Defendant" or "McKesson").  ECF No. 1 ("Compl.").[2]

Before the Court is McKesson's Motion for Summary Judgment asking the Court to find that McKesson holds a fixed, allowed administrative claim in the amount of $1,750,731.87.  For the reasons set forth in this decision, McKesson's Motion for Summary Judgment is denied.

## I.    PROCEDURAL HISTORY

The Complaint seeks the avoidance and recovery of thirty payments made by the Debtor to McKesson, totaling $67,752,943.44, during the ninety-day period prior to the Petition Date (the

---

[1] On July 19, 2015 (the "Petition Date"), The Great Atlantic & Pacific Tea Company, Inc. (the "Debtor") and several of its affiliated entities (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 15-23007 (Bankr. S.D.N.Y. 2015) ("Main Case") [ECF No. 1].  The Debtors' Chapter 11 cases were jointly administered under Case No. 15-23007 (RDD).  (Am. Compl. ¶ 13).  The only remaining Debtor is The Great Atlantic & Pacific Tea Company, Inc. (the "Debtor").  (Am. Compl. ¶¶ 6 and 13).  On July 24, 2015, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.  (Am. Compl. ¶ 4).  The Committee consists of (i) 1199SEIU Health Care Employees Pension Fund, (ii) Basser-Kaufman, Inc., (iii) C&S Wholesale Grocers, Inc., (iv) CBA Industries, Inc., (v) McKesson Corporation, (vi) Pension Benefit Guaranty Corporation and (vii) United Food and Commercial Workers International Union.  (Am. Compl. ¶ 4).  On June 6, 2016, the Court authorized the Committee to prosecute avoidance actions on behalf of the Debtors' estates.  (Am. Compl. ¶ 5).

[2] Unless otherwise specified, all citations are to the Adversary Proceeding. *The Official Committee of Unsecured Creditors on Behalf of the Bankruptcy Estate of The Great Atlantic & Pacific Tea Company Inc., et al. v. McKesson Corporation*, No. 17-08264 (Bankr. S.D.N.Y. 2017) ("Adv. Pro.").

"Preference Period"). Compl. ¶ 14. The first claim for relief is brought pursuant to section 547 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), and the second is brought pursuant to section 550(a) of the Bankruptcy Code. Compl. ¶¶ 14–22, 24–26.

On August 10, 2017, McKesson filed its Answer to the Complaint (the "Answer"). ECF No. 4. McKesson asserted various defenses set forth in section 547(c) of the Bankruptcy Code, including the ordinary course of business, contemporaneous exchange, and subsequent new value defenses, as well as a setoff defense on account of McKesson's administrative claim pursuant to section 503(b)(9) of the Bankruptcy Code. Answer ¶¶ 16, 18, 21, 24.

A. <u>2019 Summary Judgment Motion</u>

Following the filing of the Answer, the Committee and McKesson conducted an initial round of discovery and participated in a mediation that was ultimately unsuccessful. *See* ECF No. 23. On May 1, 2019, as permitted by this Court at a hearing held on November 16, 2018, McKesson filed a Motion for Summary Judgment (the "2019 Motion") seeking a determination that the alleged preferential transfers were shielded via the defenses McKesson asserted in its Answer, specifically, the ordinary course of business, contemporaneous exchange, subsequent new value, and section 503(b)(9) setoff defenses. ECF No. 24, at 4. The Declaration of Jenifer Towsley was filed in support of the 2019 Motion. ECF No. 25 ("2019 Towsley Decl.").

The Committee filed an opposition to the 2019 Motion and the Declaration of Tim Carnahan in support of their opposition. ECF No. 34; ECF No. 35 (the "Carnahan Decl.").

At a hearing held on September 16, 2019 (the "September 2019 Hearing") Judge Drain granted in part and denied in part the 2019 Motion, adopting the reasoning set forth in *Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc. (In re Quantum*

3

*Foods, LLC)*, 554 B.R. 729, 733 (Bankr. D. Del. 2016), ruling that McKesson has the right to set off its section 503(b)(9) administrative claim against any judgment for avoidance and recovery of preferential transfers.  ECF No. 43, Hr'g Tr. at 54, 57–58.

Following the September 2019 Hearing, the parties conducted another round of discovery, during which the Committee filed an Amended Complaint adding two new additional causes of action, one for an alleged violation of the automatic stay and a second for defensive claims (the "Amended Complaint").  ECF No. 93 ("Am. Compl."), ¶¶ 131–69, 170–200.  In response, McKesson filed a Motion to Dismiss the Amended Complaint (the "Motion to Dismiss").  ECF No. 99.  On December 27, 2021, the Motion to Dismiss was denied by the Court, except that the claim asserting various defensive claims for alleged violations of sections 362(a) and 542 "shall only seek relief as a defense, setoff or recoupment, against [McKesson's] allowed claims, including any allowed administrative priority claims under section 503(b)(9)."  ECF No. 107, ¶ 2.

B.  2022 Summary Judgment Motions

On April 15, 2022, McKesson filed two summary judgment motions.  One motion, McKesson Corporation's Motion for Summary Judgment on Debtor's First, Fifth, and Thirteenth Omnibus Claim Objections Seeking to Disallow 11 U.S.C. § 503(b)(9) Claims (the "Claim Motion"), was filed in the main bankruptcy case.  *Main Case* [ECF No. 5059] ("Claim Mot.").  The second motion, McKesson Corporation's Motion for Summary Judgment or, in the Alternative, Summary Adjudication and Supporting Memorandum of Facts and Law[3] (the "Setoff Motion"), was filed on the Adversary Proceeding docket.  [ECF No. 115] ("Setoff Mot.").  In

---

[3] The Setoff Motion asks the Court to grant McKesson summary judgment based on various defenses including the ordinary course of business, contemporaneous exchange, and subsequent new value defenses as set forth in section 547(c) of the Bankruptcy Code, as well as a setoff defense pursuant to section 503(b)(9) of the Bankruptcy Code.  The Setoff Motion is mentioned here due to significant overlap between the Setoff Motion and the Claim Motion, however, the issues raised with respect to the Setoff Motion will be addressed in a separate summary judgment opinion.

support of both the Claim Motion and the Setoff Motion, McKesson filed McKesson Corporation's Local Rule 7056-1(b) Statement of Undisputed Facts and Conclusions of Law In Support of Motions For Summary Judgment ("McKesson's Statement of Undisputed Facts"). *Main Case* [ECF No. 5064]; *Adv. Pro.* [ECF No. 120] ("McKesson's Statement"). In further support of the Claim Motion and Setoff Motion, McKesson filed the Declaration of Jenifer Towsley. ECF No. 118, (the "2022 Towsley Decl.").

On May 6, 2022, the Committee filed its opposition to the Setoff Motion (the "Setoff Opposition") and its opposition to the Claim Motion (the "Claim Opposition"). ECF No. 125 ("Setoff Opp'n."); ECF No. 126 ("Claim Opp'n."). The Committee also filed a response to McKesson's Statement of Undisputed Facts. *Main Case* [ECF No. 5088]; *Adv. Pro.* [ECF No. 129] ("Committee's Statement").

On May 13, 2022, McKesson filed a reply to the Claim Opposition (the "Claim Reply") (*Main Case* [ECF No. 5095]), and a reply to the Setoff Opposition (*Adv. Pro.* [ECF No. 134]). In support of the Claim Reply, McKesson filed the Declarations of Dawn DeVito and Richard Milin. ECF No. 127 ("DeVito Decl."); ECF No. 128 ("Milin Decl.").

C. Additional Filings

On July 19, 2022, McKesson filed a Notice of Relevant Decision by Eleventh Circuit Court of Appeals, bringing to the Court's attention a recent Eleventh Circuit decision that addresses issues similar to those in the Adversary Proceeding. ECF No. 139.

## II.      FACTUAL BACKGROUND

### A.  Contractual Relationship Between the Debtor and McKesson

The business relationship between McKesson and the Debtor was generally governed by a Supply Agreement dated December 6, 2012 (the "Supply Agreement") and New York state law. Am. Compl. ¶¶ 19–20; Setoff Mot. at 7–8; ECF No. 25-1 ("Supply Agreement").  Under the Supply Agreement, McKesson supplied the Debtor's pharmacies with "Merchandise," defined in the Supply Agreement to include "prescription drugs ('Rx'), over the counter drugs ('OTC'), health and beauty aids, and sundries" (collectively, the "Merchandise").  2022 Towsley Decl. ¶ 4.

The Debtor placed orders with McKesson through an electronic daily ordering system, and McKesson delivered Merchandise to the Debtor's pharmacies five days per week, Monday through Friday.  2022 Towsley Decl. ¶ 4.  Pursuant to the terms of the Supply Agreement, McKesson sold Merchandise to the Debtor on different credit terms based on the category of the Merchandise, which most often fell into the categories of non-generic pharmaceuticals ("Branded Pharmaceuticals") and generic pharmaceuticals ("Generic Pharmaceuticals").  *Id.*  Payment for Branded Pharmaceuticals was due on the Friday of the week following the date of an invoice, while payment for Generic Pharmaceuticals was due on the sixth following Friday.  Supply Agreement §§ 4.A and 4.B; Carnahan Decl. ¶¶ 41–42.

According to the Amended Complaint, the Supply Agreement entitled the Debtor to a rebate on certain purchases of Generic and Branded Pharmaceuticals if the Debtor was current on certain payment obligations to McKesson.  Am. Compl. ¶¶ 20–21.  The Plaintiff states that, pursuant to the Supply Agreement, "the Debtor paid [McKesson] for 'One Stop' generic merchandise by a two-step process: [f]irst, the Debtor paid [McKesson's] invoice, which [was] marked up by 20% over the manufacturer's invoice," and "[s]econd, [McKesson] paid a rebate of

16.667% on the Debtor's 120% payment, thereby eliminating the 20% mark-up entirely." Claim Opp'n. at 9. The Supply Agreement specifies the timing of the payment and rebate process, stating that "the Debtor owed [McKesson] on the sixth following Friday for its purchases, and [McKesson] owed the Debtor its rebate [fifteen] days after the [end of the] month in which its purchases were made. *Id.*

The Plaintiff contends that the Debtor often received a "prebate" for all purchases during, and many before, the second half of each month, because McKesson often paid the Debtor the rebate before the Debtor was required to pay McKesson's invoice. Claim Opp'n. at 9. The Amended Complaint asserts that Section 21(M) was the only provision of the Supply Agreement requiring payment as a condition of the Debtor's right to rebates and did not require the Debtor to have paid for the specific merchandise on which rebates were granted as a condition of paying those rebates. Am. Compl. ¶ 22. Rather, the Debtor was merely required to be current on the broader class of "payments due and owing to McKesson" as of the date the rebate was due. *Id.* Section 21(M) of the Supply Agreement states:

> Any rebate, volume incentive, or other similar payment based on A&P's purchases and prompt payment…[I]n the event that A&P on the payment date for any such Rebate ("Rebate Payment Date") is not current with respect to A&P's payments due and owing to McKesson pursuant to this agreement…McKesson shall have no obligation hereunder to pay any such rebate either on the Rebate Payment Date or at any time thereafter.

> By agreeing to Section 21(M), the Committee asserts that McKesson agreed to pay rebates to the Debtor for merchandise the Debtor had not yet paid for in exchange for the Debtor being current on its obligations to McKesson when they came due. Am. Compl. ¶ 23.

B. The Preference Period

The Debtor made thirty payments to McKesson during the Preference Period (the "Ninety-Day Payments"), the details of which are as follows:

| Delivery Date | Invoice Amount | Delivery Date (Cont.) | Invoice Amount (Cont.) |
|---|---|---|---|
| April 25-30, 2015 | $4,635,582.73 | June 19, 2015 | $ 741,785.01 |
| May 1, 2015 | $ 774,381.20 | June 20-25, 2015 | $3,926,765.57 |
| May 2-7, 2015 | $4,102,560.89 | June 26, 2015 | $ 804,111.40 |
| May 8, 2015 | $ 776,996.14 | June 27 to July 2, 2015 | $4,321,063.37 |
| May 9-14, 2015 | $3,921,757.61 | July 2, 2015 | $ 122,852.16 |
| May 15, 2015 | $ 804,896.06 | July 3, 2015 | $ 3,430.68 |
| May 16-21, 2015 | $4,097,585.05 | July 7, 2015 | $ 535.66 |
| May 22, 2015 | $ 813,698.06 | July 4-9, 2015 | $5,023,685.93 |
| May 23-28, 2015 | $3,493,423.33 | July 10, 2015 | $ 896,236.61 |
| May 29, 2015 | $ 909,118.06 | July 12-13, 2015 | $1,436,808.53 |
| May 30 to June 4, 2015 | $4,182,929.58 | July 13, 2015 | $ 4,304.64 |
| June 5, 2015 | $ 824,426.09 | July 14, 2015 | $1,088,919.73 |
| June 6-11, 2015 | $3,924,060.86 | July 15, 2015 | $ 883,260.71 |
| June 12, 2015 | $ 789,712.50 | July 16, 2015 | $ 830,735.91 |
| June 13-18, 2015 | $3,817,872.39 | July 17, 2015 | $ 883,298.31 |

McKesson's Statement at 2; Committee's Statement at 5–6.[4]

In the months leading up to the Petition Date, McKesson became aware that the Debtor was experiencing financial difficulties. 2019 Towsley Decl. ¶ 10. McKesson began sending

---

[4] The Committee disputes the payments dated July 2, 2015, July 7, 2015, and July 13, 2015, and the amount of the payment dated July 14, 2015. Committee's Statement at 5–6.

weekly emails to the Debtor attaching a report ("Pathmark Report") for the previous week's deliveries of Merchandise, identifying delivery dates and an invoice amount.[5]  McKesson's Statement at 1.  Pathmark Reports were sent to the Debtor for the duration of the Preference Period.

In July of 2015, and in light of the Debtor's financial struggles, McKesson notified the Debtor that it would modify the credit terms governing Generic and Branded Pharmaceuticals on a go-forward basis.  2019 Towsley Decl. ¶ 10; Carnahan Decl. ¶ 44.  The credit terms were modified, effective July 13, 2015, to require the Debtor to pay for both Generic and Branded Pharmaceuticals no later than one day after delivery, with payment made via wire, rather than the Debtors standard procedure of automatic clearing house payment ("Modified Credit Terms").  2019 Towsley Decl. ¶ 10; Carnahan Decl. ¶ 48.  In the week prior to the Petition Date, McKesson sent the Debtor daily Pathmark Reports as opposed to weekly.  McKesson's Statement at 1.

Four payments were made to McKesson by the Debtor under the Modified Credit Terms, totaling approximately $4.25 million, as follows: (1) Tuesday, July 14, 2015 in the amount of $1,436,808.53; (2) Wednesday, July 15, 2015 in the amount of $1,098,919.73; (3) Thursday, July 16, 2015 in the amount of $883,250.71; and (4) Friday, July 17, 2015 in the amount of $830,735.91 ("Modified Credit Term Payments").  Am. Compl., Ex. A.  The Debtor also made its regularly scheduled Friday payment on July 17, 2015.  2019 Motion at 11.  Except for the four Modified Credit Term Payments, the twenty-six other Ninety-Day Payments were made under the original terms of the Supply Agreement, with each invoice paid on its exact due date.  2019 Towsley Decl. ¶ 9; Am. Compl., Ex. 1.

---

[5] The parties dispute whether the Pathmark report identifies the "invoice amount" or the "value" of the merchandise, with the Committee asserting the former and McKesson the latter.  McKesson's Statement at 1; Committee's Statement at 2–3.

C.  The Extension Agreement

On September 8, 2015, the Debtor and McKesson entered into an agreement titled, Extension of Compliance with Terms of Supply Agreement (the "Extension Agreement"), pursuant to which the terms of the Supply Agreement were extended to January 31, 2016, and the Debtor paid McKesson an extension fee in the amount of $1 million to be applied to reduce McKesson's administrative claim.  McKesson's Statement at 6; Committee's Statement at 12.

The Amended Complaint states that the Extension Agreement removed certain impediments to the Debtor's collection of rebates, and provided that McKesson "shall pay all accrued Postpetition Rebates when due to be paid on the terms set forth in the [Supply] Agreement, including this Extension, but *without regard to section 21(M) or any other provision of the [Supply] Agreement that would prohibit, condition, or suspend the payment of such Postpetition Rebates to [the Debtor].*"  Am. Compl. ¶ 40.

Section 7 of the Extension Agreement concerns the buyback and return programs existing between McKesson and the Debtor under the Supply Agreement and states: "[a]fter A&P ceases pharmacy operations, to the extent A&P returns excess inventory to McKesson that would, under the terms of the [Supply] Agreement, entitle A&P to receive a refund, McKesson may retain any amount that would otherwise be refunded, to be applied in partial satisfaction of McKesson's § 503(b)(9) claim."  Claim Opp'n. at 11.

According to the DeVito Declaration, the buyback program, provided for in Section 7(A)(10) of the Supply Agreement, was a program through which the Debtor could return unsold Merchandise to McKesson and receive a credit, which typically would be posted in the Debtor's buyback account and then moved to offset their oldest balance. *See* DeVito Decl. ¶¶ 77–78. The

return program, the Plaintiff asserts, entitled the Debtor to a refund for return of product following the close of its pharmacies. Claim Opp'n. at 11.

### D. McKesson's Proof of Claim

On November 24, 2015, McKesson filed its initial proof of claim in the bankruptcy case against the Debtors, including an administrative claim pursuant to section 503(b)(9) for "at least $4,943,773.12" for goods received by the Debtor during the twenty days prior to the Petition Date (the "Administrative Claim Period"). Setoff Mot. at 6. On January 29, 2016, the Debtor filed its First Omnibus Objection Seeking to Disallow Administrative Claims (the "First Omnibus Objection"), objecting to McKesson's administrative claims asserted against the Debtor and its now-dismissed bankrupt affiliates as duplicative or amended and superseded by subsequent claims filed by McKesson. *Main Case* [ECF No. 2413, at 4–6].

On February 26, 2016, McKesson filed its Response to Debtors' First Omnibus Objection ("First Objection Response"), asserting that its administrative claims were not duplicative because no ruling had been entered substantively consolidating all or some of the Debtors, and as such, McKesson held separate claims against each of the Debtors against which it filed its proofs of claim. *Main Case* ECF No. 2541, ¶¶ 7–9. On March 8, 2016, McKesson filed an amended proof of claim, asserting an administrative claim pursuant to section 503(b)(9) for "at least $1,748,115.92." Setoff Mot. at 6. On March 15, 2016, the First Omnibus Objection hearing scheduled for March 25, 2016 was adjourned indefinitely. *Main Case* ECF No. 2598.

On April 15, 2016, the Debtor filed its Fifth Omnibus Objection to Claims ("Fifth Omnibus Objection"), asserting again that McKesson's claims against the Debtor and several of its bankrupt affiliates should be disallowed and expunged to the extent they are duplicative. *Main Case* ECF No. 2689, ¶¶ 11, 14, 17. On May 5, 2016, McKesson filed its Response to Debtors' Fifth Omnibus

Objection ("Fifth Objection Response"), responding again that its administrative claims should not be considered duplicative unless the Debtors' bankruptcy estates are substantively consolidated, in which case McKesson would hold only a single claim against the consolidated Debtors. *Main Case* [ECF No. 2760, ¶¶ 10–11]. The Fifth Omnibus Objection was scheduled to be heard on June 10, 2016 was cancelled the day before. *Main Case* [ECF No. 2888].

On May 20, 2016, the Debtor filed its Thirteenth Omnibus Objection to Claims ("Thirteenth Omnibus Objection"), asserting that, because McKesson failed to provide sufficient documentation in support of its administrative claim, the Debtor could not determine the validity of the claims. *Main Case* [ECF No. 2828, ¶ 12]. On June 10, 2016, McKesson filed its Response to Debtor's Thirteenth Omnibus Objection ("Thirteenth Objection Response"), asserting that it provided all documentation requested by the Debtor. *Main Case* [ECF No. 2913, ¶¶ 12–14]. The Thirteenth Omnibus Objection was scheduled to be heard on June 24, 2016, and was adjourned sine die, on June 22, 2016, with the Notice of Adjournment stating that "the hearing may be rescheduled by the Debtors on Notice to the affected claimant(s)." *Main Case* [ECF No, 2957].

On June 15, 2021, McKesson filed a supplemental administrative claim, addressing the claims asserted in the Amended Complaint and McKesson's contingent section 503(b)(9) administrative claim (the "Supplemental Administrative Claim"). Setoff Mot. at 7. The Supplemental Administrative Claim asserts an administrative claim for "at least $1,750,731.87" for "Goods received by the Debtor[] during the 20 days before the Petition Date . . . and as reduced by the One Million Dollars ($1,000,000) Extension Fee per the terms of the 'Extension of Compliance with Terms of Supply Agreement.'" *Id.* The Supplemental Administrative Claim states that "to the extent any of the payments received by McKesson during the Administrative

Claim Period are determined to be avoidable as a preference or otherwise," McKesson's administrative expense claim should be increased by that amount. *Id.*

On April 12, 2022, the Committee filed a Stipulation and Order Authorizing the Committee to Prosecute the Claims Objection Against McKesson Corporation (the "Prosecution Stipulation"), asserting that the Committee should prosecute the Debtor's First, Fifth, and Thirteenth Omnibus Claim Objections (collectively, the "Claim Objections") against McKesson on behalf of the Debtor due to overlap between this Adversary Proceeding and the Claim Objections and to serve judicial economy. *Main Case* ECF No. 5055, at 2–3. Three days later, on April 15, 2022, McKesson filed its Claim Motion. *Main Case* [ECF No. 5059].

On April 26, 2022, McKesson filed its Opposition to the Prosecution Stipulation (the "Prosecution Stipulation Opposition"), asserting that the Committee does not have the power to prosecute the Claim Objections under the Case Resolution Order, and the Committee had not proffered good cause to change the governing terms of the Case Resolution Order. *Main Case* [ECF No. 5073, ¶¶ 4–5] ("Prosecution Stipulation Opp'n."). McKesson further asserted that there is no significant overlap regarding the Setoff Motion, filed in the Adversary Proceeding, and the Claim Motion, filed in the main bankruptcy case. Prosecution Stipulation Opp'n. ¶ 16.

On May 9, 2022, the Committee filed its Response to McKesson's Prosecution Stipulation Opposition ("Prosecution Stipulation Response") elaborating on the overlap between the Claim Motion and the Setoff Motion, asserting that the Committee was granted the power to prosecute the Claim Objections in the Case Resolution Order, and arguing that the interests of the Debtor and the Committee are best served by allowing the Committee to prosecute the Claim Objections. *Main Case* [ECF No. 5092, 2–6].

At a hearing on May 13, 2022, the Debtor and the Committee agreed that the Committee would withdraw the Prosecution Stipulation, and instead, the Debtor would submit another pleading directly engaging Griffin Hamersky LLP as special counsel for the Debtor.  Claim Reply ¶ 3.  On May 18, 2022, the Debtor filed on presentment an application to retain and employ Griffin Hamersky LLP as special counsel ("Retention Application").  *Main Case* [ECF No. 5104].  In an order dated June 14, 2022, the Court approved the Retention Application, effective as of March 21, 2022.  *Main Case* [ECF No. 5125].

E.  The Claim Motion

The Claim Motion focuses exclusively on McKesson's fixed administrative claim and the Debtor's Claim Objections.  Claim Mot. ¶ 8.  McKesson asserts that, since adjourning the hearing on the Thirteenth Omnibus Objection, the Debtor has not taken any steps toward resolving the Claim Objections and the Committee has not joined or intervened in the Debtor's Claim Objections beyond a letter submitted to the Court in the Adversary Proceeding on March 25, 2022 (the "March 2022 Letter").  [ECF No. 112].

In the March 2022 Letter, the Committee raised several arguments regarding the Claim Objections, including that: (1) the Debtor has no record of receipt of $127,692.46 in Merchandise that is included in McKesson's fixed administrative claim, and (2) the fixed administrative claim does not reflect several credits owed by McKesson to the Debtor.  Claim Mot. ¶ 25; March 2022 Letter at 1–2.  The Claim Opposition details the issues raised in the March 2022 Letter, and further disputes the amount of McKesson's administrative claim on the grounds that the invoices used by McKesson to calculate the amount of its administrative claim do not reflect the true value of the goods the Debtor received during the Administrative Claim Period.  Claim Opp'n. at 9–10.

14

The Claim Opposition argues that McKesson's fixed administrative claim should be reduced by "at least $941,000" due to: (1) overstatements of the value of the Merchandise delivered by McKesson to the Debtor, totaling approximately $404,000; (2) two credits that McKesson's records reflect it owes to the Debtor, totaling $371,600; and (3) two sums improperly seized from the Debtor by McKesson, totaling approximately $157,400.  Claim Opp'n. at 1.

## III.    SUMMARY JUDGMENT STANDARD

Bankruptcy Rule 7056 incorporates Rule 56 of the Federal Rules of Civil Procedure, which states that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "bears the burden of establishing that no genuine issue of material fact exists" and that the undisputed facts entitle the movant to judgment as a matter of law.  *See Morales v. Holder*, 351 F. App'x 554, 555 (2d Cir. 2009) (*quoting Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1060–61 (2d Cir. 1995)).

If the moving party satisfies this burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (citation and internal quotation marks omitted).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," and rather must establish the existence of a genuine issue of fact by "citing to particular parts of materials in the record."  *Ning Yen Yao v. Kao (In re Kao)*, 612 B.R. 272, 280 (Bankr. S.D.N.Y. 2020) (*quoting Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2019); Fed. R. Civ. P. 56(a)) (internal quotation marks and citation omitted).  If, however, "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

In determining whether a genuine issue of material fact exists, the court must draw all factual inferences in the light most favorable to the nonmoving party. *Rodriguez v. City of N.Y.*, 72 F.3d 1051,1061 (2d Cir. 1995) (citations and internal quotation marks omitted). If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Id.* (*citing Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir.1988)). A grant of summary judgment will only be precluded by "disputes over facts that might effect the outcome of the suit under governing law." *In re Kao*, 612 B.R. at 280 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing the available evidence, the court cannot "weigh the evidence, assess the credibility of witnesses, or resolve issues of fact." *Rodriguez*, 72 F.3d at 1061 (citations omitted).

## IV. DISCUSSION

The Claim Motion asks the Court to find that McKesson is entitled to summary judgment on the Thirteenth Omnibus Objection[6] and to determine that McKesson holds an allowed section 503(b)(9) claim in the amount of $1,750,731.87. Numerous issues remain in dispute regarding the allowed amount of McKesson's non-contingent section 503(b)(9) claim, including whether certain deliveries were made to the Debtor, whether McKesson owes the Debtor a number of credits, whether the invoices used to calculate McKesson's administrative claim reflect the true value of the Merchandise delivered, and whether McKesson may assert a section 503(b)(9) claim based on

---

[6] The First Omnibus Objection and Fifth Omnibus Objection have been rendered moot by the entry of the Court's Order Authorizing Final Resolution of the Debtors' Cases and Granting Related Relief (the "Case Resolution Order") establishing the Debtor, The Great Atlantic & Pacific Tea Company, Inc., as the "sole remaining Debtor entity in these Chapter 11 Cases." *Main Case* [ECF No. 4810], Case Resolution Order ¶ 5.

deliveries used to offset its preference liability via a subsequent new value ("SNV") defense.  The first three issues, all factual in nature, will be addressed here, while the fourth issue regarding the SNV defense and those legal in nature, will be addressed in a separate summary judgment opinion being issued in the Adversary Proceeding.

### A. Unproven Deliveries

McKesson's administrative claim against the Debtor includes $127,692.46 that McKesson believes the Debtor owes it on account of a shipment of Merchandise delivered to the Debtor during the Administrative Claim Period.  In its Claim Opposition and supporting declarations, the Plaintiff asserts that the Debtor has no record of receiving this Merchandise from McKesson and that McKesson has failed to provide proof of this delivery from its shipper.  Claim Opp'n. at 8. As such, the Plaintiff argues that McKesson's administrative claim should be reduced by $127,692.46.

In the Claim Motion, McKesson states that the Debtor has no record of receipt of $127,692.46 in Merchandise because the Debtor's records relied entirely upon the Pathmark Reports for the pharmacy inventory information, and there was no Pathmark Report provided by McKesson to the Debtor that covered the delivery of $127,692.46 in Merchandise.  Claim Mot. ¶¶ 28, 30.  McKesson explains that it had not sent a corresponding Pathmark Report to the Debtor on account of this delivery because the terms of the Supply Agreement indicated that the time to bill for the $127,692.46 delivery was post-petition, and McKesson did not send the Debtor any Pathmark Reports after the Petition Date with respect to Merchandise the Debtor had ordered prior to the Petition Date due to the imposition of the automatic stay.  Claim Mot. ¶ 30.

The parties dispute whether McKesson delivered to the Debtor a shipment of $127,692.46 in Merchandise.  Under the summary judgment standard, the Court is to draw all factual inferences

in favor of the party against whom summary judgment is sought.  Accordingly, the Court finds

that McKesson is not entitled to a grant of summary judgment with respect to $127,692.46 for

unpaid deliveries that the Plaintiff asserts the Debtor never received.  Summary judgment is denied

with respect to the $127,692.46 delivery.

### B.  Alleged Credits Owed to the Debtor

The Plaintiff argues that McKesson's administrative claim must be reduced by $379,651.76

to reflect several credits McKesson owes to the Debtor, two of which relate to the returns and

buyback program provided for in Section 7 of the Extension Agreement.[7]  Claim Opp'n. at 11–13.

The three credits addressed in this Section IV.B allegedly appear as open credits on McKesson's

records.

### 1.  $44,032.76 Return Credit

The Plaintiff asserts that McKesson's administrative claim should be reduced to reflect

Merchandise totaling $44,032.76 that the Debtor returned to McKesson between November 23,

2015 and December 18, 2015, after it ceased pharmacy operations.  Claim Opp'n. at 11.  The Claim

Opposition states that the Debtor was entitled to a refund for return of product under the terms of

the Supply Agreement, and accordingly, McKesson is obligated to pay this credit to the Debtor

under Section 7 of the Extension Agreement.  *Id.*

In its Claim Opposition, the Plaintiff states that McKesson's accounting records "include

more than 100 entries designated 'RA# submission after A&P closure date,' and 'RA' is a standard

---

[7] Section 7 of the Extension Agreement states: "After A&P ceases pharmacy operations, to the extent A&P returns
excess inventory to McKesson that would, under the terms of the [Supply] Agreement, entitle A&P to receive a refund,
McKesson may retain any amount that would otherwise be refunded, to be applied in partial satisfaction of
McKesson's § 503(b)(9) claim."  (DeVito Decl., Ex. 1 § 7; Claim Opp'n. at 11).

business abbreviation for 'return authorization.'" *Id.* The Plaintiff alleges that entries with posting dates between November 23, 2015 and December 18, 2015, totaling $44,032.76, appear on McKesson's books as "open credits owed to A&P." *Id.*

McKesson argues in its Claim Motion that no evidence has been presented to indicate that the Debtor did in fact return the Merchandise at issue. Claim Mot. at 39. McKesson further states that even if a return had occurred, it would have been after the Petition Date, and the Debtor has already received credits for all post-petition returned Merchandise. *Id.*

Under the summary judgment standard, the burden is on McKesson to show that no genuine dispute of material fact exists and that it is entitled to a judgment determining the amount of its fixed administrative claim. The parties dispute whether a return of merchandise occurred, and if it did occur, whether McKesson credited the Debtor for the return. Accordingly, summary judgment is denied with respect to the $44,032.76 return credit.

### 2. $327,561.90 Buyback Credit

The Plaintiff asserts that McKesson's administrative claim should be reduced by $327,561.90 in connection with a buyback program. The DeVito Declaration points to McKesson's records, which allegedly contain an entry made on September 26, 2017, reflecting the $327,561.90 credit as a "'Rebate Credit' with the designation 'Buyback program.'" *See* DeVito Decl. ¶ 69. The Plaintiff asserts that this credit likely consists of sums McKesson owes the Debtor for post-petition returns received by McKesson from the Debtor's manufacturers and deduces that this credit has not been paid to the Debtor because McKesson's last payment to the Debtor occurred on June 16, 2016, over a year prior to the entry of the credit on McKesson's books. DeVito Decl. ¶ 71; Claim Opp'n. at 12.

McKesson states that the Plaintiff has not offered any evidence to show that Merchandise was returned to McKesson pursuant to the buyback or return programs, and even if a return of Merchandise did occur, it would have done so post-petition, and McKesson "properly provided credits for all post-petition returned Merchandise." Claim Mot. ¶¶ 38–39.

Whether a return of Merchandise occurred pursuant to the buyback program and whether the $327,561.90 credit appearing on McKesson's books was paid to the Debtor are disputed by the parties. As such, under the summary judgment standard and drawing all factual inferences in favor of the Plaintiff, summary judgment is denied with respect to the $327,561.90 credit.

### 3. Small Credits Totaling $8,051.76

In its Claim Opposition, the Plaintiff states that McKesson's records reflect a series of small credits it owes to the Debtor, totaling $8,051.76 (the "Small Credits"). The Plaintiff does not provide McKesson's recorded designation of each of the Small Credits but does state, as an example, that one of the credits is owed "because of a $30 overpayment by [the Debtor]." Claim Opp'n. at 12. McKesson does not directly address the Small Credits in the Claim Motion or Claim Reply, but broadly addresses all credits at issue by indicating that any post-petition credits owed to the Debtor had already been paid by McKesson. Claim Mot. ¶ 39.

The parties dispute whether McKesson has paid the Small Credits to the Debtor. As such, McKesson has not shown that the undisputed facts entitle it to summary judgment regarding the Small Credits. Accordingly, summary judgment is denied as to the Small Credits.

C. <u>Improperly Seized Funds</u>

1. <u>$134,503.57 Deduction</u>

The Claim Opposition asserts that, in late 2015, McKesson deducted $134,503.57 from sums it owed to the Debtor without consent or permission from the Court. Claim Opp'n. at 13. The Plaintiff states that the Debtor returned $134,503.57 in Merchandise prior to the Petition Date, for which it expected to receive a credit. *Id.* The Plaintiff asserts that rather than provide the Debtor with a credit, McKesson deducted the value of the Merchandise from sums it owed the Debtor "with the intention of applying it against the Debtor's pre-petition debts – when the bankruptcy was over." *Id.*; DeVito Decl. ¶¶ 93–97. The DeVito Declaration points to an internal McKesson email sent by McKesson's Vice President of Credit and AR Operations, Jenifer Towsley, on December 15, 2015, which states "[t]he $134,503.57 should remain on the alternate account set up to capture credits we do not want to pay to A&P. We will apply against the balances following the close of bankruptcy." DeVito Decl. ¶¶ 93–97. The Plaintiff asserts that this is a violation of the automatic stay. Claim Opp'n. at 13.

McKesson does not directly address the allegedly improperly seized funds in the Claim Motion or Claim Reply, but broadly addresses all credits at issue by indicating that any post-petition credits owed to the Debtor had already been paid by McKesson. Claim Mot. ¶ 39.

The parties dispute whether the $134,503.57 credit should be included in McKesson's administrative claim. McKesson has not satisfied its burden of showing that the undisputed facts entitle it to include this credit in its administrative claim. Accordingly, summary judgment is denied as to the $134,503.57 credit.

2.    $22,918.39 Deduction

The Plaintiff asserts that McKesson's administrative claim should be reduced because McKesson wrongfully deducted $22,918.39 from its last payment to the Debtor in June 2016, and recorded a credit on its books in that amount. Claim Opp'n. at 13; DeVito Decl., ¶¶ 105–09.  The Committee argues that this deduction by McKesson was unjustified, as McKesson made no showing that the debts were genuinely owed or that they arose after the Debtor's bankruptcy. Claim Opp'n. at 13.    An internal McKesson email sent by Jenifer Towsley describes the $22,918.39 deduction as: "10,418.49 December SGX Rebate per 1/15 email," and "12,500 Equipment charges per 3/31 email." DeVito Decl. ¶ 106, Ex. 3.  McKesson maintains that any post-petition credits owed to the Debtor have already been paid.  Claim Mot. ¶ 39.

The parties dispute whether the $22,918.39 deduction was proper, the reason for the deduction, and whether McKesson's administrative claim should be reduced to reflect the deduction.  In drawing all factual inferences in favor of the Plaintiff, McKesson has not established that it was entitled to take the deduction.  Accordingly, summary judgment is denied with respect to the $22,918.39 deduction.

D.  Value of Merchandise Delivered by McKesson to the Debtor

The Claim Opposition seeks further reduction of McKesson's administrative claim in the amount of approximately $277,000 on the grounds that the invoices used by McKesson to calculate its administrative claim do not represent the true purchase price or actual value of the goods the Debtor received during the Administrative Claim Period.  Claim Opp'n at 9–10.  The Plaintiff suggests that the true purchase price of the goods received by the Debtor during the Administrative Claim Period is the invoice amount *less* the rebate amount the Debtor was entitled to, highlighting that the Debtor had often received its "prebate" on a shipment of Merchandise prior to paying the

invoices pertaining to that same shipment. *Id.* McKesson's Claim Motion states that there is little disagreement about the value of the Merchandise, and noted that Ms. DeVito, in her deposition, "acknowledge[d] that invoices for Merchandise of a value of $1.6 million were valid." *See* Claim Mot. at 14 n.9.

The parties dispute whether the invoices used by McKesson to calculate its administrative claim represent the true purchase price of the Merchandise. Considering the facts in the light most favorable to the Plaintiff, the Court finds that McKesson has not established that the $277,000 in question should be included in McKesson's administrative claim. Accordingly, summary judgment is denied as to whether the invoices represent the true purchase price of the Merchandise.

## V.    CONCLUSION

The Court denies summary judgment with respect to the Thirteenth Omnibus Objection and declines to determine the amount of McKesson's fixed, allowed section 503(b)(9) claim at this time.

The allowed amount of McKesson's administrative claim remains in dispute as to whether certain deliveries were made to the Debtor, whether McKesson owes the Debtor the three credits discussed in Section IV.B and two deductions discussed in Section IV.C, and whether the invoices used to calculate McKesson's administrative claim reflect the true value of the delivered Merchandise.

The Court requests that the parties to the Adversary Proceeding contact the Court to schedule a status conference to occur within the next few weeks on a mutually agreeable date.

Dated: January 18, 2024
New York, New York

*/s/ Lisa G. Beckerman*
**THE HONORABLE LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**