**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re:

    THE GREAT ATLANTIC & PACIFIC
    TEA COMPANY, INC., *et al.*

               Debtors.

------------------------------------------------------------------x

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS on behalf of the bankruptcy estate of
THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., *et al.*,

               Plaintiff,

        - against -

McKESSON SPECIALTY CARE DISTRIBUTION
CORPORATION (Sued as McKesson Specialty
Distribution LLC),

               Defendant.

------------------------------------------------------------------x

**FOR PUBLICATION**
Chapter 11
Case No. 15-23007 (LGB)

Adv. Proc. No. 17-08266 (LGB)

<u>**MEMORANDUM OPINION REGARDING**</u>
<u>**SPECIALTY PREFERENCE ALLEGATIONS**</u>

<u>**APPEARANCES**</u>

BUCHALTER
*Attorneys for McKesson Corporation*
18400 Von Karman Avenue
Irvine, CA 92612
By:    Jeffrey Garfinkle

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Attorneys for McKesson Corporation*
200 West 21st Street, 17th Floor
New York, NY 10036
By:    Tracy Klestadt

MILIN LAW PLLC
*Attorneys for the Official Committee of Unsecured Creditors*
*and Special Counsel for the Debtor*
18 East 12th Street, 2nd Floor
New York, NY 10003

By:     Michael Hamersky
        Richard Milin

**HON. LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

After a long and winding procedural journey, this adversary proceeding (the "Specialty Adversary Proceeding") between the Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company (the "Committee" or "Plaintiff") and McKesson Specialty Care Distribution Corporation (the "Defendant" or "McKesson Specialty", and together with the Committee, the "Parties") comes to an end.[1]  The Court held a trial from July 12 through July 18, 2024 (the "Trial") and heard fact and expert witness testimony. On October 9, 2024, the Court heard the Parties' final legal arguments.  Now, the Court's decision on the surviving issues are set forth here and in three other related opinions.[2]  This opinion (the "Specialty Preference Opinion") shall resolve whether the various payments made from the Debtor to McKesson Specialty during the 90-day period prior to the Petition Date, April 20, 2015 through July 18, 2015 (the "Preference Period"), were preferential transfers, and whether McKesson Specialty has valid defenses to those allegations.

---

[1] On July 19, 2015 (the "Petition Date"), The Great Atlantic & Pacific Tea Company, Inc. ("A&P") and several of its affiliated entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 15-23007 (Bankr. S.D.N.Y. 2015) [Main Case ECF No. 1] (the "Main Case").  The Debtors' Chapter 11 cases were jointly administered under Case No. 15-23007 (RDD). (Am. Compl. ¶ 13).  The only remaining Debtor is The Great Atlantic & Pacific Tea Company, Inc. (Am. Compl. ¶¶ 6 and 13).  On July 24, 2015, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors pursuant to section 1102 of the Bankruptcy Code. (Am. Compl. ¶ 4).  The Committee consists of (i) 1199SEIU Health Care Employees Pension Fund, (ii) Basser-Kaufman, Inc., (iii) C&S Wholesale Grocers, Inc., (iv) CBA Industries, Inc., (v) McKesson Corporation, (vi) Pension Benefit Guaranty Corporation and (vii) United Food and Commercial Workers International Union. (Am. Compl. ¶ 4).  On June 6, 2016, the Court authorized the Committee to prosecute avoidance actions on behalf of the Debtors' estates. (Am. Compl. ¶ 5).

[2] In addition to this Specialty Preference Opinion, the Court shall issue the: (i) "Preference & Stay Violations Opinion" on the docket of Adv. Proc. No. 17-08264 (LGB) (the "Primary Proceeding"), (ii) the "Claims Opinion" on the dockets of the Primary Proceeding and the Main Case, and (iii) the "Systems Preference Opinion" on the docket of Adv. Proc. No. 17-08265 (LGB) (the "Systems Adversary Proceeding").

## I. PROCEDURAL HISTORY

On July 13, 2017, the Plaintiff initiated this Specialty Adversary Proceeding by filing its Complaint against McKesson Specialty. *See* Compl. [ECF No. 1].[3]  The Complaint sought the avoidance and recovery of nine payments made by the Debtor to McKesson Specialty, totaling $102,872.33, during the Preference Period.  *See id.* at Ex. A.  The first claim for relief is brought pursuant to section 547 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), and the second is brought pursuant to section 550(a) of the Bankruptcy Code.  *See id.* at ¶¶ 13–22, 23–26.

On August 10, 2017, McKesson Specialty filed its Answer to the Complaint.  McKesson Specialty's Answer to Compl. [ECF No. 4] (the "Answer").  McKesson Specialty asserted various defenses set forth in section 547(c) of the Bankruptcy Code, including the ordinary course of business, contemporaneous exchange, and subsequent new value defenses, as well as a setoff or recoupment defense to the extent that McKesson Specialty provided goods or services to the Debtor after the Petition Date for which payment was never received.  *See* Answer at ¶¶ 23–27.

Following the filing of the Answer, the Committee and McKesson Specialty conducted an initial round of discovery and participated in a mediation that was ultimately unsuccessful.  *See* Mem. of Mediator Allan L. Gropper [ECF No. 19].  As discussed in more detail in the Preference & Stay Violations Opinion issued concurrently with this Opinion, McKesson Corporation ("McKesson") thereafter filed several motions for summary judgment regarding the alleged preferential transfers in the Primary Proceeding, and the Debtor filed an Amended Complaint in the Primary Proceeding, to which McKesson responded with a Motion to Dismiss.  *See* Preference

---

[3] Unless otherwise specified, all citations are to the Specialty Adversary Proceeding: *The Official Committee of Unsecured Creditors on Behalf of the Bankruptcy Estate of The Great Atlantic & Pacific Tea Company Inc., et al. v. McKesson Specialty Care Distribution Corporation*, No. 17-08266 (Bankr. S.D.N.Y. 2017).

& Stay Violations Opinion at 4–6.  The issues resolved in that litigation are not directly applicable to the issues in this Opinion, but as discussed below, are related to the resolution of the issues in this Specialty Adversary Proceeding.

The parties subsequently proceeded to trial (the "Trial") on all remaining issues between the Plaintiff, McKesson, McKesson Pharmacy Systems LLC, and McKesson Specialty across the Main Case, the Primary Proceeding, the Systems Adversary Proceeding, and the Specialty Adversary Proceeding.  On July 1, 2024, McKesson filed its Opening Trial Brief [ECF No. 73].  On July 2, 2024, the Court entered its First Amended Pretrial Order [ECF No. 80].  On July 8, 2024, the Committee filed its Pre-Trial Memorandum of Law [ECF No. 81].  Admitted as exhibits at the Trial included expert reports prepared by both the Plaintiff and McKesson Specialty relating to the preference allegations in the Specialty Adversary Proceeding.[4]

The Trial was held from July 12, 2024, to July 18, 2024.  Following the Trial, the Court ordered the parties to submit post-trial briefing and scheduled closing arguments.  *See* Order Scheduling Post-Trial Briefing and Closing Arguments [ECF No. 93].  On September 16, 2024, McKesson filed its Post-Trial Brief Submitted by the McKesson Entities [ECF No. 99], and its Request for Judicial Notice Submitted by McKesson Entities in Support of Post-Trial Brief [ECF No. 101].  On the same day, the Committee filed its Post-Trial Memorandum of Law [ECF No. 100].  The Court heard the Parties' closing arguments on October 9, 2024.  *See* Oct. 9, 2024 Hr'g Tr. [ECF No. 102].

Other than in discrete sections of the Parties' Post-Trial briefing, the Parties did not submit other briefs specific to the issues in this Specialty Adversary Proceeding. The Parties submitted

---

[4] *See Expert Report of Charles M. Berk, CPA, CFF, CIRA of CBIZ Accounting, Tax & Advisory of New York, LLC*, dated May 6, 2021 [McK 44] (the "Berk Report"); *Expert Report of William J. Pederson of EisnerAmper LLP*, dated July 29, 2021 [PX 126] (the "Pederson Report").

expert reports, which set forth many of the facts and analysis relevant to the claims in this case. The Parties also submitted into evidence several declarations relevant to the issues in this Specialty Adversary Proceeding.[5]  The Parties incorporate into this case some of the arguments made in the Primary Proceeding as to the preference allegations there. This is due to some overlap between the legal issues presented.

## II.  RELEVANT FACTUAL BACKGROUND

McKesson Specialty was a subsidiary of McKesson that generally delivered specialty pharmaceutical products[6] directly to physician practices for patient care. *See* Berk Report at 12. However, occasionally those specialty products would instead be ordered by a specific A&P store to be dispensed directly to an individual patient.  *See id.*  In the instances where the specialty products were ordered by a specific A&P store, invoices were billed to that store and payment terms were determined by McKesson Specialty's underlying agreements with manufacturers and insurance parties.  *See id.*  Credit terms for specialty products provided to A&P were therefore variable and driven by the specific product in question.  *See id.*  Unlike A&P's relationship with McKesson and McKesson Pharmacy Systems LLC, A&P's relationship with McKesson Specialty was not governed by a written agreement.  *See id.*

---

[5] See Preference Decl. of T. Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 82]; Decl. of J. Towsley Direct Trial Testimony Proffered by the McKesson Entities [ECF No. 74]; Declaration of C. Berk; Direct Trial Testimony Proffered by McKesson Entities [ECF No. 78]; Preference Decl. of T. Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 82]; S&P Decl. of D. DeVito: McKesson Specialty and Pharmacy [ECF No. 174].

[6] According to McKesson Specialty's expert Berk, a pharmaceutical product is classified as "specialty" based on the following factors: high cost; diseases requiring complex treatment regimens such as cancer and rheumatoid arthritis; special handling, storage and delivery requirements; and, in some cases, exclusive distribution arrangements.  *See* "S&P" Decl. of Dawn DeVito: McKesson Specialty and Pharmacy [ECF No. 86] at 10.

In the twelve months prior to the Preference Period, credit terms were always either "Immediate"[7] or "Net 60." *See id.* During that period, McKesson Specialty sent a total of 15 invoices to A&P, 3 of which had Net 60 terms and 12 of which had Immediate terms. *See id.* at 17. The three invoices with Net 60 terms were tied to the same product, a drug called "LUCENTIS", all ordered by the same A&P pharmacy. *See id.* at 18. The remaining twelve invoices with Immediate terms were for several different products with different manufacturers.[8] *See id.* During the Preference Period, McKesson Specialty issued a total of nine invoices to A&P all of which had Immediate terms. *See id.* at 16. McKesson Specialty did not specify what products each of these invoices were for.

During the Preference Period, A&P purportedly made four payments to McKesson Specialty on account of nine different invoices in the aggregate amount of $102,872.33, as set forth below:

| Payment Date | Complaint Invoice Date | Invoice Date (Asserted by McKesson) | Payment Amount | Payment Date | Complaint Invoice Date | Invoice Date (Asserted by McKesson) | Payment Amt. |
|---|---|---|---|---|---|---|---|
| 4/30/2015 | 3/28/15 | 3/27/15 | $10,537.53 | 5/15/2015 | 5/9/15 | 5/6/15 | $19,439.37 |
| 4/30/2015 | 4/4/15 | 4/2/15 | $10,537.53 | 6/1/2015 | 2/7/15 | 2/5/15 | $10,537.53 |
| 4/30/2015 | 4/28/15 | 4/21/15 | $10,537.53 | 6/1/2015 | 5/16/15 | 5/13/15 | $9,670.25 |
| 4/30/2015 | 2/7/15 | 3/9/15 | $10,537.53 | 6/1/2015 | 5/23/15 | 5/21/15 | $10,537.53 |
| | | | | 6/22/2015 | 6/17/15 | 6/17/15 | $10,537.53 |

McKesson Specialty did not dispute the amounts set forth in the Complaint, but did dispute all but one of the invoice dates as set forth above. *See* Berk Report at Ex. 1. McKesson Specialty's

---

[7] McKesson Specialty asserts that it has assumed that "Immediate" credit terms require that a payment is made at the time of product delivery. *See id.*

[8] These product's names were: TARGRETIN, AFINITOR, TASIGNA, and Thyrogen.

proposed invoice dates were determined through a review of the respective invoices in question.

*See id.*   The Plaintiff did not offer an explanation for the discrepancy between McKesson

Specialty's proposed dates and those listed in the Complaint.   Through the course of the Parties'

expert reports and post-trial briefing, the Plaintiff also seemed to implicitly accept McKesson

Specialty's asserted invoice dates with respect to McKesson Specialty's ordinary course and new

value defenses by positing its arguments based off of them, rather than those set forth in the

Complaint.   The Court will thus credit McKesson Specialty's alleged invoice dates rather than

those set forth in the Complaint.

### III.  DISCUSSION

#### A.  The Plaintiff's *Prima Facie* § 547(b) Case

Under § 547(b), the Plaintiff may avoid any transfer of an interest of the debtor in property:

(1) to or for the benefit of the creditor; (2) for or on account of an antecedent debt; (3) made while

the debtor is insolvent; (4) made on or within 90 days prior to the filing of the petition; and (5) that

enables such creditor to receive more than they would have received if: (A) the debtor had

liquidated under Chapter 7; (B) such transfer had not been made, and (C) such creditor received

payment of such debt to the extent provided under the Bankruptcy Code.   11 U.S.C. § 547(b)(1)-

(5).   The Plaintiff bears the burden of proving each element of § 547(b) by a preponderance of the

evidence.   *See In re Roblin Indus., Inc.*, 78 F.3d 30, 34 (2d Cir. 1996).   If the Plaintiff shows that

all five of these requirements are met here, the transfers are *prima facie* preferential *See Giuliano*

*v. RPG Management, Inc. (In re NWL Holdings, Inc.)*, 2013 WL 2436667, at *2 (Bankr. D. Del.

June 4, 2013).

Here, the Plaintiff's Complaint asserts that each of the requirements above were met.  *See*

Complaint at ¶¶ 14-20.   At Trial, the Plaintiff specifically asserted § 547(b)(5)'s fifth requirement

was met here, that the transfers at issue in this case enabled McKesson Specialty to receive more than it would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfer has not been made, and McKesson Specialty received payment of the debt to the extent provided by the Bankruptcy Code. *See* First Amended Pretrial Order at 15. In its Answer, McKesson Specialty denied knowledge or information sufficient to have a belief as to the truth of the Plaintiff's allegations as to the § 547(b) requirements. *See* Answer at ¶ 1. At Trial and thereafter, McKesson Specialty did not expressly contest that any of the five requirements of § 547(b)(5) were not met here. *See* First Amended Pretrial Order at 15-17; McKesson's Post-Trial Brief [ECF No. 99] at 48. Further, the Parties only included McKesson Systems' § 547(c)(4) defenses as "issues to be tried" at Trial. *See id.* at 18.

The Court finds that all five requirements are met here. As an initial matter, it is clear that the transfers here were property of the debtor in the form of cash. As to the first § 547(b) requirement, the evidence did not suggest that the transfers here were made for the benefit of any entity or person other than McKesson Specialty, and McKesson Specialty did not offer any evidence to the contrary. Additionally, that McKesson Specialty was a creditor of the debtor[9] at the time of the transfers, is also apparent given that McKesson Specialty had a right to payment upon providing the specific goods on which account the transfers here were made.

As to the second requirement, the Parties in the course of their expert reports, briefing, and testimony at Trial also make clear that the transfers at issue here were all credit-based transactions on Immediate or Net 60 Terms, where the goods in question were delivered prior to the transfers,

---

[9] "Creditor" is defined by the Bankruptcy Code as "an entity with a claim against the Debtor that arose" at or before the Petition Date. 11 U.S.C. § 101(10)(A). A "claim" is defined as any: "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. 11 U.S.C. § 101(5).

and that therefore these transfers were made on account of antecedent debts that arose upon the delivery of the goods in question. *See Togut v. Barasky (In re Kossoff PLLC)*, 673 B.R. 253, 265 (Bankr. S.D.N.Y. 2025) (quoting *Pereira v. Lehigh Sav. Bank, SLA (In re Artha Mgmt., Inc.)*, 174 B.R. 671, 678 (Bankr. S.D.N.Y. 1994) (For purposes of a voidable preference action under Section 547(b)(2), an "antecedent debt" is "a debt which is incurred prior to the relevant transfer. . . [a]nd "a debt is incurred . . . when it arises and not when payment becomes due.").

As to the third requirement, there is a rebuttable presumption of insolvency that the debtor is insolvent during the 90 days before the petition date, which McKesson Specialty failed to rebut. *See Roblin*, 78 F.3d at 34. As to the fourth requirement, the Parties did not disagree that all of the transfers at issue here did indeed occur on or within 90 days of the Petition Date.

1. <u>Did the Transfers Enable McKesson Specialty to Receive More Than It Would Have Otherwise Recovered in a Chapter 7 Liquidation, As Required Under § 547(b)(5)?</u>

The fifth requirement for § 547(b) is met "whenever the plaintiff shows that the creditor would receive less than 100% in a hypothetical chapter 7 distribution." *See Savage & Assocs. V. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008). Additionally, each transfer's preferential status is to be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results." *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229 (1936). The party seeking avoidance has the initial burden of showing that the creditor would have recovered less in liquidation than the value of the pre-petition transfers by "construct[ing] a hypothetical [C]hapter 7 case and determin[ing] the percentage distribution [each class of claims] would have received on the petition date." *In re Wonderwork, Inc.*, 611 B.R. 169, 213 (Bankr. S.D.N.Y. 2020).

9

Thus, when the creditor-transferee is not secured and claims within the same priority class would not fully recover in the hypothetical Chapter 7 distribution, any transfers made during the preference period on account of the creditor-transferee are deemed to have allowed excessive recovery. *See Hassett v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 262 (Bankr. S.D.N.Y. 1996) (*citing Elliott v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421 (9th Cir. 1985) ("[A]s long as the distribution in bankruptcy is less than one-hundred percent, *any* payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.")). Further, any costs that would be associated with administering the Chapter 7 proceeding must be included in the priority distribution. *See In re Candor Diamond Corp.*, 68, B.R. 588, 595 (Bankr. S.D.N.Y. 1986). Critically, the Chapter 7 trustee fee of roughly 3% of the total funds disbursed must be satisfied prior to other priority or non-priority unsecured debt, including any section 503(b) administrative claims. 11 U.S.C. § 507(a)(1)(C).

This Court has allowed fact-finders to utilize many forms of evidentiary support to construct the hypothetical Chapter 7 case and determine proper distributions. *See Candor Diamond,* 68 B.R. at 595 (combining deposition testimony, filed claims and prior court orders to estimate distributions and conclude excessive recovery); *see also In re Teligent, Inc.,* 380 B.R. at 339-42 (examining Plan, Disclosure Statement, Confirmation Order, monthly operating reports, and various Riders to the Statement of Financial Affairs to determine whether information was sufficient to construct hypothetical Chapter 7 liquidation); *CIS Corp.*, 195 B.R. at 262-63 (calculating hypothetical recovery and finding insolvency when trustee testified to contents of valuation studies, accounts receivable billing, and remarketing agreements).

Where as here, the allegedly preferential transfers were on account of unsecured, non-priority claims, the Court concludes that McKesson Specialty would, more likely than not, have recovered nothing in a chapter 7 liquidation.[10]  At the time of filing, the Debtor's schedules show assets of $601,441,108.28, burdened by approximately $925 million in secured debt and $1.2 billion of general unsecured claims.  *See* Summary of Schedules, Schedules of Assets and Liabilities and Stmt. of Fin. Affairs for the Great Atl. and Pac. Tea Co. [Main Case ECF No. 720] at 37.  In a chapter 7 liquidation, the Debtor's available assets would have had to be liquidated in a fire sale, and the proceeds would have to be applied to satisfy the $925 million in secured debt. Since most of the Debtor's assets were subject to the secured lender's liens,[11] the Court finds it highly implausible that the Debtor would have been able to generate asset sale proceeds to pay 100% of not only the $925 million in secured debt, but also 100% of the approximately $1.2 billion general unsecured claims pool.

Thus, the Court finds that the Plaintiff has shown by a preponderance of the evidence that McKesson Specialty's receipt of the allegedly preferential transfers would have resulted in an outsized recovery for McKesson Specialty, and so the Plaintiff has met their burden to establish a *prima facie* preference claim with respect to these allegedly preferential transfers.

### B.  Were Any of the Transfers Made in the Ordinary Course of Business?

The ordinary course of business defense generally applies when transfers are "recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the

---

[10] McKesson Specialty did not assert that it had any § 503(b)(9) or other priority claims as McKesson had asserted in the Primary Proceeding.  Indeed, none of the invoice dates here occurred within the 20 days before the Petition Date. Thus, the Court does not analyze here the hypothetical chapter 7 recovery for any § 503(b)(9) or other priority claims.

[11] *See, e.g.*, Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) [Main Case ECF No. 18] at ¶ 5.

11

debtor and the debtor's transferee." *Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007) (citation omitted).  McKesson Specialty must establish the ordinary course of business defense by a preponderance of the evidence. *See id.* at 458.  It may do so by either showing that: (i) the payments are not avoidable under section 547(c)(2)(B)'s "subjective" test, or (ii) the payments are not avoidable under section 547(c)(2)(C)'s "objective" test.  *See* 11 U.S.C. § 547(c)(2)(B) (using conjunction "or" between subsections (B) and (C) in section 547(c)(2)).

1.   The Subjective Test

The subjective test focuses on the business relationship or financial affairs between the particular debtor and transferee in each case, and requires consideration of six factors:

(i)      the prior course of dealing between the parties,
(ii)     the amount of the payment,
(iii)    the timing of the payment,
(iv)    the circumstances of the payment,
(v)     the presence of unusual debt collection practices, and
(vi)    changes in the means of payment.

*See Pereira v. UPS (In re Waterford* Wedgwood *USA, Inc.)*, 508 B.R. 821, 827-28 (Bankr. S.D.N.Y. 2014) (citing *Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006)); *see also Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 210 (Bankr. S.D.N.Y. 2005); *Hassett*, 195 B.R. at 258 (Bankr. S.D.N.Y. 1996).

McKesson Specialty asserts that two of the nine transfers here are protected by their ordinary course defense under the subjective test.  The parties agree that the remaining seven transfers are not protected by an ordinary course defense.  However, for the foregoing reasons, the Court finds that both of the transfers in question are not protected by an ordinary course defense either under the subjective or objective tests.

12

a.   The Prior Course of Dealing Between the Parties

For this factor, McKesson Specialty must establish a "baseline of dealings," demonstrating some consistency between the Preference Period payment practices with other non-Preference Period payment practices between the debtor and the creditor." *See Pereira*, 508 B.R. at 828.  Late payments alone are presumptively nonordinary, but that presumption may be rebutted through showing that such late payments were the standard course of dealing between the parties. *See Jacobs v. Gramercy Jewelry Mfg. Corp. (In re M. Fabrikant & Sons, Inc.)*, 2010 Bankr. LEXIS 3941, at *8-9 (Bankr. S.D.N.Y. 2010).  In so rebutting, courts look to a comparison between the average lateness of payments in the pre-preference period and the average lateness of payments in the post-preference period to determine whether late payments during the preference period are ordinary or not. *See Pereira* at 828.  This generally involves comparing the average number of days between the invoice and payment dates during the pre-preference and preference periods. *Davis v. Clarklift-West, Inc. (In re Quebecor World (USA), Inc.)*, 518 B.R. 757, 762 (Bankr. S.D.N.Y. 2014); *In re M. Fabrikant*, 2010 Bankr. LEXIS 3941, at *9-10.  "Although a narrow band of difference is acceptable, payments delayed beyond a reasonable amount of time past the pre-preference period average generally do not fall within the ordinary course of business. *See Quebecor World*, 518 B.R. at 763.  Additionally, courts reject the argument that any preference period payment is ordinary if it falls anywhere within the minimum and maximum number of days from invoice to payment during the historical period. *See id.*  Courts have also found that where payments are made more than anywhere from 16 to 30 days after the pre-preference period average time, such transfers would not be in the ordinary course. *See In re M. Fabrikant*, 2010 Bankr. LEXIS 3941, at *11-12 (collecting cases); *Quebecor World*, 518 B.R. at 763-64 (collecting cases). Conversely, courts have found that payments are ordinary when made anywhere from 5 to 21 days

13

after the pre-preference period average time. *See Ryniker v. Kaufmann (In re Décor Holdings, Inc.)*, 2022 Bankr. LEXIS 303, at *10-11 (Bankr. E.D.N.Y. 2022) (collecting cases).

McKesson Specialty's primary argument on this factor is that, while all the payments made during the Preference Period in this case were made late, the presumption that such late payments are non-ordinary is rebutted after comparing the average lateness of payments in the historical period with the same during the Preference Period, and concluding that it was the Parties' baseline practice to, on average, pay late in a manner that was reasonably consistent with the lateness of payments during the Preference Period. *See* Berk Report at 19-21. McKesson Specialty's expert Berk formulated two "average lateness" ranges, one for the historical, pre-preference period and one for the Preference Period, and compares them to one another to determine whether the late payments made during the Preference Period are ordinary. *See id.*

Berk concludes that based on the pre-preference period data consisting of 5 payments on account of 15 invoices, the mean average lateness range was 12 to 29 days (average +/- one standard deviation) after the due date, with a mean average of 20.8 days. *See* Berk Report at 19. After analyzing the Preference Period data consisting of four payments on account of nine invoices, Berk concludes that the mean average lateness range was 5 to 116 days (average +/- one standard deviation), with a mean average of 31.1 days after the due date. *See id.* at 18-19. Berk then asserts that two of the nine invoices paid during the Preference Period fall within the historical period average lateness range of 12 to 29 days, and therefore those payments are shielded by the ordinary course defense. *See id.* at 20-21.

The Court concludes that at first glance, McKesson Specialty's average lateness analysis seems to weigh in favor of McKesson Specialty's ordinary course defense. As courts have noted, the average lateness analysis involves comparing the average times between the two periods, and

14

measuring the discrepancy in days between those two averages. *See Quebecor World*, 518 B.R. at 762-63. Courts have also rejected the argument that any preference period payment is ordinary if it falls anywhere within the minimum and maximum number of days from invoice to payment during the historical period. *See id.* Both parties attempt to assert a variation on this method of measurement (*i.e.*, they assert that if a Preference Period payment falls within the historical mean average range (using +/- one standard deviation), then the payment is ordinary). The Court finds that this is incorrect, and that the important analysis here is to compare the averages between the historical and preference periods and to determine how many days apart these two averages are.[12]

Here, the mean average lateness increased from 20.8 to 31.1 from the historical period to the Preference Period. However, the high end of the ranged mean average increased from 29 to 116 days, though the low end of the ranged mean average decreased from 12 to 5. As courts have noted before, a narrow band of difference is acceptable between the pre-preference period and Preference Period averages. S*ee Quebecor World*, 518 B.R. at 763. In particular, courts have found that where the averages are within 5 to 21 days of one another, those transfers would be ordinary with respect to their lateness. *See In re Décor Holdings*, 2022 Bankr. LEXIS 303, at *10-11 (collecting cases). Since the mean average itself only increased by about 10 days here, the Court would initially conclude that as to average lateness, the transfers very well could be deemed ordinary.

However, the Court finds that McKesson Specialty's average lateness analysis is materially flawed in several important ways. First, as outlined in the Plaintiff's expert report, McKesson Specialty's formulation groups together invoices with widely differing due dates and payment

---

[12] McKesson Specialty asserts that because two of the nine invoices paid during the Preference Period were paid within the historical range of 12 to 29 days, the payments on account of those two invoices are therefore ordinary. *See* Berk Report at 20-21. This is not a methodology the Court will apply here.

terms (*i.e.*, both the immediate payment invoices and 60 day payment invoices are lumped together into one range, rather than broken down into two separate ranges). *See* Pederson Report at 11. The Court finds that this lack of separation between these two groups of invoices (immediate and 60 day terms) means that McKesson Specialty's average lateness analysis fails to tell the Court anything meaningful about the average lateness of either group of invoices. This is especially so where the historical period data consists of only 15 invoices over a 12-month period, 3 of which required payment in 60 days and 12 of which required immediate payment, compared to 9 invoices during the Preference Period all of which required immediate payment. *See* Berk Report at Ex. 1 & 2; Pederson Report at 11. There is a valid basis to think that the inclusion of the three invoices in the historical period on 60 day terms makes a fully fair comparison between the historical period and the Preference Period very difficult, as those payments were not technically paid late (*e.g.*, each of the Net 60 invoices in the historical period were made within a couple days to up to a month from the invoice dates). *See id.*

Second, McKesson Specialty's average lateness analysis also fails to evaluate average lateness on a drug-by-drug or manufacturer-by-manufacturer basis, either or both of which would have made McKesson Specialty's average lateness analysis more meaningful. As McKesson Specialty's own expert stated in his report, "the credit terms were variable based on the underlying agreements with manufacturers and insurance parties. . . [c]redit terms were therefore driven by the specific product." *See* "S&P" Decl. of Dawn DeVito: McKesson Specialty and Pharmacy [ECF No. 86] at 10; PX 130 at 2. The Court thinks an average lateness analysis on a drug-by-drug level would be necessary here given that the credit terms were exclusively driven by the specific product in question.

Aside from the average lateness analysis, there is other evidence here that indicates that the timing of A&P's payments to McKesson Specialty in the historical period illustrate no clear schedule or pattern such that a baseline of dealings could be established. For example, the historical period indicates that payments were actually made mostly on a "clean-up" basis (*i.e.*, 8 of the 15 historical period invoices were paid on the same day) rather than on any defined schedule. *See* Pederson Report at 12. This sporadic patterning of orders, with payments being made on a seemingly "clean-up basis," continued during the Preference Period (*i.e.*, about 75% of the Preference Period invoices, including for the two invoices McKesson Specialty asserts an ordinary course defense to here, were paid as "clean-up" payments). *See id.* at 12-13 (noting two of A&P's Preference Period payments appear to be "clean-up" payments in that one pays invoices between 9 and 52 days old, and another pays invoices between 11 and 116 days old).

Additionally, although McKesson Specialty posits that all the historical period transfers ostensibly had Net 60 or Immediate credit terms, it does not appear that the Parties' actual course of performance conformed in any sense to these apparent credit terms. As McKesson Specialty itself represents, the three invoices with 60-day terms in the historical period were paid within 2, 27, and 29 days of the invoice date, and the 12 invoices with immediate terms in the historical period were paid within a range of 11 to 36 days of the invoice date. *See* Berk Report at 19. In comparison, all nine Preference Period transfers had immediate terms that were paid within a range of 5 to 116 days of the invoice date. *See id.* at 20.

Finally, the Plaintiff also points out that the transaction data contained in excel spreadsheets (pulled from the SAP and Epicor data which form the actual basis of the Debtor's books and record) and bank statements of McKesson Specialty used by McKesson Specialty to undertake its ordinary course defense analysis, were either never produced or were not sufficiently identified in

17

produced documents. *See* Pederson Report at 9-10. The Court finds this fact weighs slightly in favor of the Plaintiff as a sufficiency of evidence issue underlying McKesson Specialty's § 547(c)(2)(A) defense.

Since the burden ultimately falls on McKesson Specialty to prove its ordinary course defense, the Court concludes that McKesson Specialty's flawed average lateness analysis, coupled with the fact that the Parties' transaction history lacked any semblance of a regular or customary pattern to it (other than the amounts of some of the payments), means that McKesson Specialty has failed to establish a baseline of dealings (*i.e.*, customary and recurring credit transactions) between the Parties, and thus failed to also prove the Parties adhered to that baseline of dealings during the Preference Period.

b.      Amount of the Payment

The second factor, amount of the preferential payment, weighs in favor of McKesson Specialty. Each of the Preference Period transfers here corresponded to specific amounts invoiced to A&P, and the Parties do not dispute that those invoiced amounts were in fact paid in full to McKesson Specialty during the Preference Period (except that McKesson Specialty contends that another $10,537.53 is still owed on account of one of the transfers, which the Court will also address in the next paragraph). A&P appeared to have generally paid McKesson Specialty's invoices in full in the amount stated on corresponding invoices both before and during the Preference Period. To the extent the payment history shows a recurring amount invoiced (*e.g.*, the amount of $10,537.53 on immediate terms is billed in that same amount and on the same terms across both periods), that amount does not change at all across the two periods.

With regard to the $10,537.53 that McKesson Specialty contends was never paid by A&P on account of the invoice 308601764 dated February 7, 2015, the Court finds that the evidence

18

indicates that this invoice was in fact paid in full, as evidenced by McKesson Specialty's internal emails discussing this invoice.[13]  *See* "S&P" Decl. of Dawn DeVito: McKesson Specialty and Pharmacy [ECF No. 86] at 13; PX 192.

c.    Timing of the Payments

Here, the evidence indicates that the payment terms were changed at least twice during the Preference Period from the historical Immediate and Net 60 Terms.  *See* "S&P" Decl. of Dawn DeVito: McKesson Specialty and Pharmacy [ECF No. 86] at 12-13.  As noted by the Plaintiff's witness DeVito, several email records show that McKesson Specialty required A&P to prepay its invoices during almost two weeks of the Preference Period and then gave A&P three business days to pay thereafter.  *See id.*  This factor thus weighs in favor of the Plaintiff.

d.    Circumstances of the Payment and Presence of Unusual Debt Collection Practices

The Plaintiff also asserts that McKesson Specialty asserted undue pressure on A&P to pay such that the two Preference Period transfers at issue here were not paid in the ordinary course. *See* Pederson Report at 12-13.  Courts have held that "[p]ayments made as a result of unusual economic pressure and unusual debt collection practices are not in the ordinary course of business." *Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006); *Gold Force Int'l v. Cyberrebate.com*, 2004 WL 287144, *5 (E.D.N.Y. Feb. 10, 2004).  Even in the absence of the other *Pereira* factors, the Plaintiff could successfully avoid transfers resulting from coercion or pressure if McKesson Specialty engaged in collection practices during the Preference Period that substantially differed from their historical period collection practices, or if McKesson Specialty threatened A&P such that A&P had no

---

[13] On June 16, 2015, McKesson's representative Patricia Kirts stated to McKesson's manager Meg Mitchell via email that "Invoice 308601764" had been "paid. . .in full" and that "the block and prepay [requirement] have been removed from the account and the customer may place an order today." *See* PX 192.

19

choice but to pay on time or risk the shutdown of their business. *See Pameco*, 356 B.R. at 340*;*

*Cyberrebate.com*, 2004 WL 287144 at \*5; *see also In re Accessair, Inc.*, 314 B.R. 386, 394 (B.A.P.

8th Cir. 2004) (negating ordinary course defense where creditor threatened to cut off software

support, essentially rendering debtor inoperable).

Though the Plaintiff admits that the record is not conclusive on this point here, the Plaintiff

points to the timing of the transfers at issue here that indicate they might have been paid in response

to McKesson Specialty's pressure and alleged threats to discontinue shipments to A&P. *See*

Pederson Report at 13*.* As to the first payment on April 30, 2015 for $10,537.53, the Plaintiff

notes that this was the first payment made by A&P after McKesson Specialty had threatened in an

email dated March 27, 2015, with respect to a $4,731,048.02 invoice, to discontinue shipments if

invoices were not paid by wire immediately. *See* Carnahan Pref. Decl. [ECF No. 82] at 11-12.

As to the second payment on June 1, 2015 for $9,670.25, the Plaintiff asserts that a few

days prior, McKesson Specialty had threatened A&P in writing that it would discontinue

shipments if invoices were not paid on time. Specifically, on May 27, 2015, McKesson Specialty

sent A&P an "Importance High" email requesting immediate payment of another invoice

(308601764) that was months past due. *See* PX 37. Subsequently on June 1, 2015, A&P paid

three past due invoices, including 308601764 and the $9,670.25 invoice (308999029) at issue here

which was a few weeks' past due, for a total of $30,745.31. The Court notes that no such threat

to discontinue shipments appears in the referenced email (email reads "Invoice 308601764 is still

open. Please process this invoice for immediate payment.").

The Court finds that McKesson Specialty's conduct did not rise to the level of undue

pressure sufficient to take the payments out of the ordinary course. To start, neither of the asserted

"threats" here were with respect to the actual transfers at issue in this case. However, the evidence

20

here does give rise to an inference that A&P might have felt at least some circumstantial pressure to get current on all its past due invoices.  However, ultimately, the Court finds that concerned creditors should be empowered to pursue collecting on their valid debts in some ways.  Efforts to convince a customer to pay are certainly ordinary course to some degree.  The above-discussed email communications at issue here simply do not constitute undue pressure in the Court's view, especially as they were not made with respect to the two transfers specifically at issue here, but related to other discrete transfers within the course of the Parties' business relationship.

Also, the evidentiary record here does not establish that, as in *Accessair, Inc.*, the relationship between A&P as an entire operating entity and McKesson Specialty was such that A&P, or its discrete pharmacy business, would cease to operate without McKesson Specialty's uninterrupted support.  *See Accessair, Inc.*, 314 B.R. at 390.  Additionally, as discussed in this Court's Preference & Stay Violations Opinion, the fact that A&P prioritized payments to McKesson Specialty over other creditors, standing alone, does not constitute undue pressure so as to take those transfers out of the ordinary course.  *See* Preference & Stay Violations Opinion at 37-38.

### e.   Changes in the Means of Payment

A&P's historical period records indicate that A&P sometimes paid McKesson Specialty by wire and sometimes by check.  *See* "S&P" Decl. of Dawn DeVito: McKesson Specialty and Pharmacy [ECF No. 86] at 14.  During the Preference Period, all of the payments were recorded as being paid by check.  *See id.*  Thus, the Court concludes this factor does not weigh in favor of either party, as the Preference Period payments by check are not consistent, nor inconsistent with the historical period, where payments were made in a mix of wire transfers and checks.

f.    Conclusion

Thus, considering the *Pereira* factors as a whole, the Court finds that McKesson Specialty does not have an ordinary course defense pursuant to § 547(c)(2)(A).

2.    The Objective Test

In its expert report and at Trial, McKesson Specialty appeared to assert an ordinary course defense pursuant to the objective test per § 547(c)(2)(B) only as a mere footnote. *See* Berk Report at 15, fn. 34.  There is no discussion of the objective test analysis in McKesson's pre- or post-trial briefing in the particular context of this McKesson Specialty Proceeding.  Similarly, Berk's expert report merely refers the Court to Mr. Kosty's testimony to come at Trial "as to the objective test regarding industry standard in the pharmaceutical supply business." *See id.*  It appears that Mr. Berk is referring to Mr. Kosty's and Mr. Iampietro's (and others) testimony at Trial regarding industry standards in the pharmaceutical supply business generally, which testimony largely focused on whether threats of non-shipment after payment default would be ordinary or not in standard industry practice.  So, the Court will refer to that testimony in its analysis here, as it was unable to find any testimony as to industry standards within the particular context of the shipment of specialty pharmaceutical products at issue in this case.

Under section 547(c)(2)(B) of the Bankruptcy Code, creditors may retain an otherwise preferential payment if it was made on terms standard to the "general practices in the industry, in particular the industry of the creditor." *Abovenet, Inc. v. Lucent Tech., Inc (In re Metromedia Fiber Network, Inc.)*, 2005 WL 3789133, \*5 (Bankr. S.D.N.Y. 2014).  The Second Circuit has held that "ordinary business terms" should be liberally construed "and that 'only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary.'" *Roblin*, 78 F.3d at 39–40 (quoting *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).  Creditors need only

show that the terms of the transaction were within the outer limits of particular industry practices, allowing for significant behavioral latitude.[14]  *See id.*  Moderate variance from the industry's objective norms is thus insufficient to find departure from those norms.  *See id.*

McKesson Specialty bears the burden of proving by a preponderance of the evidence that the allegedly preferential transfers were made according to ordinary business terms.  *See In re Conex Holdings, LLC*, 518 B.R. 269, 279 (Bankr. D. Del. 2014).  Courts accept expert testimony as to industry standard business practices, witness testimony of events between the parties, and the business records and invoices of the parties, as evidence to prove this defense.  *See id.* at 285–86; *Pereira v. UPS (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 829-30 (Bankr. S.D.N.Y. 2014). Under this objective standard, the Parties' dealings during the Preference Period are not compared to the Parties' historical practices, but rather to a normative baseline set by a preponderance of the evidence.  *See id.*  Notably, the question is whether the conduct and terms employed during the Preference Period was comparable to the conduct and terms employed by similarly situated debtors and creditors facing the same or similar circumstances (*i.e.*, a debtor facing financial distress).  *See Roblin*, 78 F.3d at 42 ("Restricting a creditor to courses of action typical in untroubled times leaves no room for realistic debt workouts and unfairly penalizes those creditors that take conventional steps to institute a repayment plan.").

As discussed in the Preference & Stay Violations Opinion, both Parties at Trial brought forth fact and expert witnesses to testify to their respective positions, and the Court has reviewed the voluminous body of business documents and communications records submitted by each side. McKesson's industry expert, Timothy Kosty, asserted his beliefs that: (1) the overarching Supply

---

[14] Put another way, the inquiry under section 547(c)(2)(B) is "whether 'a particular arrangement is so out of line with what others do' that it cannot be said to have been made in the ordinary course." *Id.* (citing *Leidenheimer, 439 F.3d* at 239 (quoting *In re Gulf City Seafoods*, 296 F.3d 363, 369 (5th Cir. 2002))).

Agreement (at issue in the Primary Proceeding) contained no abnormal terms, (2) McKesson never deviated from those terms, and (3) threats of non-shipment after payment default were not necessarily out of the ordinary even in the absence of an explicit contractual provision. *See* July 12, 2024 Hr'g Tr. [ECF No. 94] at 76-78 ("The industry perspective, if you don't pay your bill, you don't get supply.").[15]

However, the Plaintiff's own industry expert, Steven Iampietro, found McKesson's threats objectionable, declaring that McKesson "behaved as a bully" and that threats of non-shipment would have "not ordinarily been considered as part of [a] wholesalers' arsenal for dealing with struggling strategic retailers in or after 2015." *See* Expert Decl. of Steven A. Iampietro [ECF No. 87] at 7. However, Iampietro also stated that exercising similar default terms within his own employer's credit manual would also amount to "minor bullying."[16] *See* July 12, 2024 Hr'g Tr. [ECF No. 94] at 153–54. Iampietro further criticized McKesson's behavior by proposing hypothetical courses of action that, in his view, would have achieved the same results without threatening to disrupt the pharmacies.[17] *See* Expert Decl. of Steven A. Iampietro [ECF No. 87] at 9–10.

Carnahan strongly echoed Iampietro's testimony with his characterization of McKesson as a "uniquely aggressive creditor" who "behaved as a bully," but when questioned at Trial, admitted

---

[15] The Uniform Commercial Code is applicable across supplier-retailer relationships in many industries besides pharmaceutical distribution, and so its terms may assist in discerning the most basic of expectations between sophisticated firms. In the event that a buyer repudiates their obligation to pay for shipments of goods, a supplier may rightfully withhold that shipment under § 2-703(a).

[16] Iampietro worked for AmerisourceBergen's credit department for nearly two decades. AmerisourceBergen and McKesson control the pharmaceutical distribution market, along with one other competitor.

[17] These suggestions were all roundly criticized as unworkable by McKesson's witness Jenifer Towsley. *See* Decl. of Jenifer Towsley [ECF No. 162] at 24-28. For example, Towsley noted in her trial declaration that any negotiations with A&P "to reduce its financial exposure by consensual means" would likely have taken the transfers out of the ordinary course of business. *See id.* at 27.

that other major suppliers to A&P had actually curtailed shipping when Carnahan failed to pay their outstanding bills on time." *See* July 16, 2024 Hr'g Tr. [ECF No. 95] at 240–242; July 17, 2024 Hr'g Tr. [ECF No. 96] at 73–74. On cross-examination, Carnahan also discussed his previous experience at another major retailer, which was also facing financial struggles and suppliers potentially cutting them off when bills went unpaid. Regarding those threats, however, Carnahan averred that he "think[s] that is the standard commercially," and added, "You've got to pay for it if you're going to get it." July 16, 2024 Hr'g Tr. [ECF No. 95] at 242.

The Plaintiff in this McKesson Specialty Proceeding points to much the same record of emails, calls, and other communication records as put forth in the Primary Proceeding evidencing McKesson's apparent pressure applied on A&P to pay outstanding bills. *See* Pederson Report at 5-7. This includes the threats regarding the May 22 Transfer (*i.e.*, the accelerated payment) in the Primary Proceeding, which caused A&P to change payment methods from ACH to a same-day wire payment, something it had never done before. *See id.* at 5-6.

Even assuming that these various emails and threats (which largely deal with transfers made in the Primary Proceeding) provides evidence that those threats also applied to the payments made to McKesson Specialty during the Preference Period, the Court concludes here, similar to its analysis in the Preference & Stay Violations Opinion, that those various threats did not rise to a level sufficient to take them out of the objective ordinary course of business pursuant to § 547(c)(2)(B) because such "threats" were not a deviation from the general practices in the industry. *See Roblin,* 78 F.3d at 39-40. Indeed, some of A&P's other suppliers actually cut off shipments upon non-payment, adding credence to Carnahan's opinion on the commercial standard, as does his previous experience with financially distressed retailers. *See* July 16, 2024 Hr'g Tr. [ECF No. 95] at 242; July 17, 2024 Hr'g Tr. [ECF No. 96] at 73–74. Had McKesson Specialty actually

withheld Merchandise at any point in time, the Court would be less confident in its conclusion. In the instant case, it appears that McKesson Specialty did no more than "sabre rattle." July 12, 2024 Hr'g Tr. [ECF No. 94] at 165.

However, the Court ultimately concludes that McKesson Specialty's expert report (and the evidentiary record underlying that report) is ultimately too incomplete for the Court to be able to ascertain the Parties' adherence to a course of performance that was in line with a normative baseline of industry practices at large. *See In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 369 (5th Cir. 2002) ("We only say that the judge must satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue."). For one, McKesson Specialty failed to present any non-conclusory evidence indicating pharmaceutical supply industry practices dealing specifically with specialty items such as those at issue here. Similarly, the Plaintiff did not discuss or produce significant evidence of industry practices specifically with regard to the supply of specialty pharmaceuticals. However, since it is McKesson Specialty's burden to prove it has an ordinary course defense under the objective test, the Court concludes that it has failed to meet that burden here.

### C. To What Extent is McKesson Specialty's Preference Liability Reduced on Account of its Provision of Subsequent New Value?

As discussed above, the Court has determined that none of the transfers here are shielded from avoidance by other valid section 547(c) defenses. Thus, the Court will apply the subsequent new value defense under section 547(c)(4) (the "SNV Defense") to all of the transfers.[18] *See In re Dots, LLC*, 562 B.R. 286, 295 (Bankr. D. N.J. 2017) (holding that in fact, in order to determine

---

[18] *See also In re IRFM, Inc.*, 52 F.3d 228, 233 at fn. 6 (9th Cir. 1995) (". . . once a creditor has successfully asserted a defense under section 547(c)(1), (2), or (3), it may not attempt to assert a defense under section 547(c)(4) for the same preferential transfer.")

26

validity of new value defense under section 547(c)(4), court must necessarily undertake examination of whether transfers are unavoidable as protected by other section 547(c) affirmative defenses, such as an ordinary business terms defense).  Additionally, the Court incorporates by reference the section of the Preference & Stay Violations Opinion holding that the invoice amount of merchandise delivered during the Preference Period is the proper method of valuing said merchandise for purposes of calculating the SNV Defense. *See* Preference & Stay Violations Opinion at 46-49.  Based on the record, the Court calculates McKesson Specialty's preference exposure, net of its SNV Defense, as follows:

| Payment Date (*i.e.,* Check Clearing Date) | Invoice Date | Payment Amount | Invoice Number | New Value Received by Debtors | New Value Available | Preference Exposure, Net of Only New Value Defense |
|---|---|---|---|---|---|---|
| 4/30/2015 | 3/27/15 | $10,537.53 | 308805654 | | | $10,537.53 |
| 4/30/2015 | 4/2/15 | $10,537.53 | 308831687 | | | $21,075.06 |
| 4/30/2015 | 4/21/15 | $10,537.53 | 308908439 | | | $31,612.59 |
| 4/30/2015 | 3/9/15 | $10,537.53 | 308712163 | | | $42,150.12 |
| | | | 308971999 | 5/6/15 | $19,439.37 | $22,710.75 |
| | | | 308999029 | 5/13/15 | $9,670.25 | $13,040.50 |
| 5/15/15 | 5/6/15 | $19,439.37 | 308971999 | | | $32,479.87 |
| | | | 309042183 | 5/21/15 | $10,537.53 | $21,942.34 |
| 6/1/15 | 2/7/15 | $10,537.53 | 308601764 | | | $32,479.87 |
| 6/1/15 | 5/13/15 | $9,670.25 | 308999029 | | | $42,150.12 |
| 6/1/15 | 5/21/15 | $10,537.53 | 309042183 | | | $52,687.65 |
| | | | 309151911 | 6/17/15 | $10,537.53 | $42,150.12 |
| 6/22/15 | 6/17/15 | $10,537.53 | 309151911 | | | |
| | | | | | | $52,687.65[19] |

The record indicates that A&P received new value in the form of goods delivered subsequent to the payment made to McKesson Specialty on April 30, 2015 valued at $19,439.37

---

[19] This is McKesson Specialty's total, net preference exposure after application of the SNV Defense.

and $9,670.25 on May 6, 2015 and May 13, 2015 respectively.[20]  *See* Berk Report at Ex. 1.  A&P additionally received new value in the form of additional goods delivered subsequent to the payment made to McKesson Specialty on May 15, 2015 valued at $10,537.53 on May 21, 2015. *See id.*  A&P received a final provision of new value in the form of goods delivered subsequent to the payment made to McKesson Specialty on June 1, 2015 in the amount of $10,537.53 on June 17, 2015.  *See id.*  Additionally, both McKesson Specialty and the Plaintiff agreed that the $52,687.65 total net preference exposure was the correct amount if only the SNV Defense was applied to the Preference Period transfers.  *See* Pl's Post-Trial Brief at 32; *See* Expert Report of Charles M. Berk at Ex. 1 (McK 44).

The Plaintiff also asserts that the net preference exposure after applying the SNV Defense is understated by at least $9,670.25 because it includes that amount both as part of its ordinary course of business defense and as new value that reduces Pharmacy's preference liability.  *See* Pederson Report at 8-9.  The Court disagrees and finds that the net preference exposure is not understated as the Court has already found that none of the transfers were shielded from avoidance by McKesson Specialty's ordinary course of business (or any other) defense.

## IV.  <u>CONCLUSION</u>

In summary, this Court rules as follows:

1. Each of the transfers in the McKesson Specialty Proceeding enabled McKesson Specialty to receive more than it would have received if the Main Case were a case under chapter 7, the transfer had not been made, and McKesson Specialty received payment on such debt to the extent provided by the provisions of the Bankruptcy Code.

---

[20] *See In re Micro Innov. Corp.*, 185 F.3d 329, 333 (5th Cir. 1999) (holding that extension of new value need not be directly connected to the preceding preference in order to shelter it) (collecting cases).

2. None of the transfers in the McKesson Specialty Proceeding are shielded from avoidance on account of McKesson Specialty's § 547(c)(2) ordinary course of business defense.

3. After accounting for McKesson Specialty's SNV Defense pursuant to § 547(c)(4), the Plaintiff can, pursuant to §§ 547 and 550, avoid and recover $52,687.65 from McKesson Specialty.

4. The Plaintiff is directed to submit a proposed form of judgment consistent with this Opinion.

Dated: June 17, 2026
New York, New York

*/s/ Lisa G. Beckerman*
THE HONORABLE LISA G. BECKERMAN
UNITED STATES BANKRUPTCY JUDGE

29